## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SERAP LOKMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>AZURE POWER GLOBAL LIMITED, RANJIT GUPTA, MURALI SUBRAMANIAN, and PAWAN KUMAR AGRAWAL,<br><br><br>　　　Defendants. | Case No. 1:22-cv-7432<br><br><br><br>Hon. Gregory H. Woods |

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
Morgan Embleton (to be admitted *pro hac vice*)
Amanda Miller (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
amandamiller@zlk.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 4

PARTIES ............................................................................................................... 5

ADDITIONAL SUBSTANTIVE FACTUAL ALLEGATIONS .......................... 7

  I.   Company Background .......................................................................... 7

       A.   India's Strong and Growing Focus on Renewable Energy ............. 7

       B.   In Order to Benefit from India's Strong Investment in Renewable Energy,
            Azure was Dependent on Winning Bids for Renewable Energy Projects ..................... 9

       C.   Azure Uses Land Aggregators to Source Land ............................. 11

       D.   Azure is Subject to Laws Requiring it to Comply with Anti Kick-Back and
            Health and Safety Regulations .................................................... 12

  II.  Azure Tracks Project Performance in "Real-time" Using an  Advanced Tracking
       System and Key Performance Indicators ........................................... 15

  III. Defendants Manipulate Internal Data to Report More Profitable Results,
       Resulting in Whistleblowers Complaints Against Management Asserting
       Kickback Scheme and Data Manipulation ......................................... 17

  IV.  Azure Announces a Slew of Suspicious Executive Departures  and Repeated
       Delays in the Filing of its 2022 Form 20-F ....................................... 21

  V.   Azure Receives a Second Whistleblower Complaint Revealing Procedural
       Irregularities, Material Data Manipulations and Safety Issues ....................... 23

  VI.  Azure Receives a Third Whistleblower Complaint Revealing Irregularities in
       Commissioning Procedures and Failure to be Transparent with the Market .................. 23

  VII. The January 25, 2023 Press Release Revealing Azure Needed to Expand its
       Investigation into the Whistleblower Allegations ................................. 25

  VIII. Azure's Auditors Resign Mere Days Before the      Mandated 2022 Form 20-F was
       Supposed to Be Filed ...................................................................... 30

DEFENDANTS' MATERIAL CLASS PERIOD  MISREPRESENTATIONS AND
OMISSIONS ........................................................................................................ 32

  I.   The 2021 Form 20-F ......................................................................... 32

  II.  First Quarter 2022 Financial Results Press Release on August 30, 2021 .......................... 36

  III. Quarter Financial Results Earnings Call on August 31, 2021 ........................................... 38

  IV.  Press Release October 22, 2021 Announcing a 120 MW Wind Project With SECI ........ 40

  V.   Press Release on November 11, 2021 Announcing a 150 MW ISTS Connected Wind-
       Solar Project With SECI ................................................................... 41

VI.  Second Quarter 2022 Financial Results Press Release on December 10, 2021 ................. 43

VII.  Second Quarter 2022 Financial Results Earnings Call on December 13, 2021 ................. 46

VIII. Azure's January 3, 2022 Commissioning Press Release ................................................. 51

IX.  Third Quarter 2022 Financial Results Press Release on February 25, 2022 ................... 52

X.  Third Quarter 2022 Financial Results Earnings Call on February 28, 2022 ................... 55

XI.  Azure's March 14, 2022 Commissioning Press Release ................................................ 59

THE TRUTH IS REVEALED ................................................................................................ 60

I.  April 26, 2022 Form 6-K Announcing Defendants Gupta and Subramanian's
    Sudden Departures ........................................................................................................ 60

II.  August 16, 2022 Amended Form 12b-25 Notification of Late Filing and Internal
    Control Deficiencies ..................................................................................................... 61

III.  The August 29, 2022 Press Release ............................................................................. 62

IV.  The July 13, 2023 Update Revealed A Further Delay in the 2022 20-F Filing and
    All But Certain Delisting .............................................................................................. 70

POST-CLASS PERIOD EVENTS ......................................................................................... 71

I.  Additional Executive and Auditor Resignations .......................................................... 71

II.  The Long-Awaited 2022 Form 20-F Confirms Corruption, Fraud, and Internal
    Control Violations ........................................................................................................ 72

    A.  The Whistleblower Allegations and Special Committee Investigation ..................... 72

    B.  The Auditor Provides an Adverse Opinion ............................................................ 75

III.  NYSE Denies Azure's Appeal and its Equity Shares are Officially Delisted ................. 80

ADDITIONAL SCIENTER ALLEGATIONS ......................................................................... 80

I.  Defendants' Admissions Supports Scienter .................................................................. 80

II.  Defendants Receipt of Numerous Whistleblower Complaints Supports Scienter ............ 81

III.  Auditor Replacements and Resignations Support a Strong Inference of Scienter ............ 82

IV.  Class Period Executive Resignations Support a Strong Inference that Defendants
    Knew of Undisclosed Operational Problems and Corruption .......................................... 83

V.  Defendants' Data Manipulation Was Widespread and Occurred Over Multiple of
    Azure's Largest Projects Spanning Several Years .......................................................... 85

VI.  Defendants' Admitted Monitoring of Azure's Performance in "Real Time"
    Supports a Strong Inference that Defendants Acted With Scienter ................................. 86

VII. Defendants Personally Visited the Azure Plants Which Supports A Strong
    Inference of Scienter .................................................................................................... 88

VIII. Defendants Involvement in Issuing, Implementing, and Monitoring Safety
    Policies Support a Strong Inference of Scienter ............................................................ 88

IX.   Azure's Violations of its Own Internal Ethics and Internal Control Policies and
      Procedures Supports A Strong Inference of Scienter ........................................................ 90

LOSS CAUSATION .................................................................................................................... 91

CLASS ACTION ALLEGATIONS ............................................................................................. 98

APPLICABILITY OF PRESUMPTION OF RELIANCE ........................................................... 99

NO STATUTORY SAFE HARBOR ........................................................................................... 102

FIRST CLAIM ............................................................................................................................. 103

SECOND CLAIM ........................................................................................................................ 106

PRAYER FOR RELIEF .............................................................................................................. 107

JURY DEMAND ......................................................................................................................... 107

Lead Plaintiff Serap Lokman ("Plaintiff"), by and through her attorneys, brings this class action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), individually and on behalf of all persons and entities that purchased or otherwise acquired Azure Power Global Limited ("Azure" or the "Company") equity shares between June 15, 2021 and July 13, 2023, inclusive (the "Class Period"). Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Azure with the SEC; (b) review and analysis of press releases and media reports issued by and disseminated by Azure; (c) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Azure and the industry in which it operates; (d) review of other publicly available information concerning Azure; and (e) interviews with sources familiar with the Company in an advisory capacity.

Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This class action arises from Defendants' deceptive scheme of bribery and kickbacks and false reporting of financial data throughout the Class Period, resulting in a

restatement of key financial metrics and the abrupt resignations of Azure's external auditors, executives, and directors that ultimately culminated in the delisting of Azure's equity shares from the New York Stock Exchange.

2.    In recent years, the Republic of India has made production of renewable energy a major part of its stated goal to transition to clean energy. To advance that goal, the Indian government set a nationwide target of reaching 450 gigawatts ("GWs" or "Gigawatts") of solar energy capacity by 2030. In order to grab market share in this exploding industry, it was imperative that Azure, a self-described seller of renewable power in India, expand operations by obtaining new long-term fixed price contracts and the land on which to operate its plants.

3.    During the Class Period, Defendants claimed that one of Azure's competitive advantages was its ability to receive "all our data into a centralized monitoring station at [the] head office," which gives Azure the ability to "monitor and analyze plant performance at the project site" in "real time." Using Azure's centralized data monitoring system, Defendants monitored and analyzed the Company's performance according to several Key Performance Indicators ("KPIs").

4.    One of the most important KPIs to Azure's business is megawatts ("MWs" or "Megawatts") operating, which represents the total MWs of "rated capacity" of Azure's solar power plants that are commissioned and operational as of the reporting period. Rated capacity is the expected maximum output a solar power plant can produce without exceeding design limits, which Defendants state "is a measure of the growth rate of our business."

5.    Azure's central monitoring system also allowed Defendants to monitor the plants' safety compliance. This was particularly important to the market because companies like Azure

are subject to strict safety and environmental laws where lack of compliance can result in liability, fines, seizure of property, and imprisonment.

6.      Starting in early 2020, shortly after Defendants Gupta, Subramanian, and Agrawal took over the Company, Azure's financial performance began a steady decline. Thus, Defendants began manipulating data to make the Company appear more profitable to investors and win new projects. Defendants further engaged in a widespread kickback scheme in which Azure's top executives were paying third parties to win new projects, in violation of internal ethics and control policies and anti-corruption regulations for which Azure may be subject to substantial fines and penalties.

7.      Yet, throughout the Class Period, Defendants reported inflated double-digit Megawatts operating growth, touting to investors that the Company was securing "important milestone[s]" and maximizing "growth potential with the remarkable opportunities that we have in the Indian renewable energy market." Azure further claimed it achieved its successes while remaining "in compliance with applicable domestic and foreign anti-bribery and anti-corruption laws and regulations."

8.      As investors would ultimately learn, none of this was true. Several whistleblowers came forward starting in 2021, reporting that Azure was not in compliance with its ethics policies or anti-corruption laws. Rather, in violation of these policies, Defendants were engaged in an illegal kickback and data manipulation scheme to win new projects through "inaccurate record keeping," "manipulation of project data," "failures to provide accurate information both internally and externally" and "corrupt payments." In turn, Azure's lack of internal controls caused reported Megawatts operating for Fiscal 2022 to be overstated by at least 10% and necessitated a reserve

3

to reduce asset values for the improper kickback payments, and likely fines and penalties, among other things.[1]

9.      The severe corruption and lack of controls at Azure was revealed to the market through a series of partially corrective disclosures beginning in April 2022 that revealed the abrupt resignations of Defendants Gupta and Subramanian, Azure's receipt of multiple whistleblower complaints and that Azure was the subject of massive corruption involving its top executives in connection with a kickback scheme and the manipulation of project data. These issues caused a lengthy delay in the filing of Azure's 2022 Annual Report on Form 20-F ("2022 Form 20-F") of more than one year and ultimately caused Azure to breach its debt covenants and be delisted from the NYSE.

10.     As a result of these disclosures, Azure's stock price dropped from $14.66 per share on April 25, 2022 to $0.34 per share on July 14, 2023, the last day of the Class Period, or a near 100% decline.

11.     Because of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's equity shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[1] Azure utilizes an unconventional fiscal calendar, such that the first quarter ("Q1") extends from April 1 through June 30, the second quarter ("Q2") extends from July 1 to September 30, the third quarter ("Q3") extends from October 1 through December 31, and the fourth quarter ("Q4") extends from January 1 through March 31. Throughout this Complaint, Plaintiffs identify certain time periods or quarters as "fiscal" to refer to Azure's fiscal calendar. Where Plaintiffs identify other time periods or quarters as "calendar" they mean time periods or quarters as would ordinarily occur in a calendar year beginning on January 1 and ending on December 31.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Lead Plaintiff Serap Lokman, as set forth in the certification submitted in support of her motion for appointment as Lead Plaintiff in this matter, incorporated by reference herein (ECF 16), purchased Azure equity shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Azure Global Power Limited describes itself as a power producer and sustainable energy solutions provider in India. Azure is incorporated under the laws of Mauritius with its principal executive offices located in New Delhi, India. Azure's equity shares trade on the NYSE under the symbol "AZRE."

18.     Defendant Ranjit Gupta ("Gupta") served as Azure's Chief Executive Officer ("CEO") and member of the board of directors (the "Board") from July 2019 until his resignation on April 26, 2022.

19.     Defendant Murali Subramanian ("Subramanian") joined Azure in July 2019 as President, and on April 4, 2020, Subramanian was named Chief Operational Officer ("COO"). Subramanian was terminated  on April 26, 2022.

20.     Defendants Gupta and Subramanian have a long history of working closely together. They both received degrees from the Indian Institute of Technology in Mumbai and then began their careers together at Schlumberger, holding various field and management positions. Gupta and Subramanian then spent many years serving as executives together at various power companies, including Orange Renewable and IndiaBulls. Prior to joining Azure, they were co-founders of Ostro Energy, a start-up enterprise purportedly with a portfolio of over 1,000 megawatts.

21.     As disclosed in Azure's 2021 Annual Report on Form 20-F ("2021 Form 20-F"), both Defendant Gupta and Defendant Subramanian were entitled to Stock Appreciation Rights (SARs) as part of their compensation plans. Per their Executive Employment Agreements signed July 18, 2019 and amended as of July 20, 2020, Azure granted both of them a one-time nonrecurring grant of 100,000 SARs at an exercise price per SAR at US $10.48, and, if a restructuring event did not occur, then certain amounts of SARs vest each year on March 31. For the year ended March 31, 2020, Azure granted an additional 15,000 SARs each to Defendants Gupta and Subramanian.

22.     Defendant Pawan Kumar Agrawal ("Agrawal") started as Azure's Chief Investment Officer on February 1, 2019, and became Azure's Chief Financial Officer ("CFO")

on March 15, 2019. Defendant Agrawal was Azure's CFO until May 1, 2023, when he was replaced by Sugata Sircar.

23.     Defendants Gupta, Subramanian, and Agrawal (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## ADDITIONAL SUBSTANTIVE FACTUAL ALLEGATIONS

**I.     Company Background**

### A.  India's Strong and Growing Focus on Renewable Energy

24.     The global appetite for renewable energy has steadily increased over the past several years, resulting in India's renewable energy capacity growing to become the fourth largest in the world.[2] India's government  has made a strong commitment to transitioning to clean energy in its power sector by setting several nationwide targets, including reaching 100 gigawatts of solar

---

[2]     India Brand Equity Foundation (IBEF), *Indian Renewable Energy Industry Analysis* https://www.ibef.org/industry/renewable-energy-presentation (last updated December 2022).

energy capacity by 2022,[3] and 450 gigawatts of renewable energy by 2030.[4] In November 2021, at the COP-26 Summit in Glasgow,[5] Prime Minister Mr. Narendra Modi pledged to boost India's renewable energy generation capacity to 500 gigawatts, which would satisfy *half* of India's energy needs through renewable sources by the year 2030.[6]

25.     As of August 2019, India has issued US $8.6 billion-worth of bonds, 80 percent of which were used to finance renewable energy projects in the country.[7] According to a report from the Institute for Energy Economics and Financial Analysis, investment hit record level highs in India in 2021-2022 of US $14.5 billion.[8] As of November 2022, it is estimated that India's renewable energy sector will attract investment worth US $80 billion over the next four years.[9]

26.     The Solar Energy Corporation of India ("SECI") is responsible for the development of the entire renewable energy sector in India and, thus, has played a major role in the sector's development. The SECI has allocated 10 billion rupees (US $132 million) of India's 2022-2023 annual budget to renewable energy growth and expansion.[10]

27.     Azure's main competitors include companies such as ReNew Power Limited, Tata Power Solar Systems Limited, Adani Green Energy Limited, Softbank Energy, O2 Power private Limited and ACME Cleantech Solutions Private Limited, among others.

---

[3] National Renewable Energy Laboratory (NREL), *India Renewable Integration Study*, https://www.nrel.gov/analysis/india-renewable-integration-study.html (last accessed November 7, 2023)
[4] National Renewable Energy Laboratory (NREL) *Supporting India's States With Renewable Energy Integration* https://www.nrel.gov/international/india-renewable-energy-integration.html (last accessed November 7, 2023).
[5] "COP" refers to Conference of the Parties, an annual summit for parties to the United Nations Framework Convention on Climate Change.
[6] India Brand Equity Foundation, *supra*.
[7] M Ramesh, The Hindu Business Line, *Why aren't Indian companies warming to green bonds?* (last updated January 9, 2022 06:18 pm IST).
[8] Institute for Energy Economic and Financial Analysis *Record US $14.5 billion investment in Indian renewable energy sector in last financial year.* (last updated June 9, 2022).
 https://ieefa.org/articles/record-us145-billion-investment-indian-renewable-energy-sector-last-financial-year
[9] India Brand Equity Foundation, *supra*.
[10] India Brand Equity Foundation, *supra*.

28.     Azure purports to have several advantages over its peers in the renewable energy space. For example, Azure touts itself as having one of the largest operational solar portfolios in India, operating approximately forty-five utility scale projects throughout India with over 3 gigawatts of operational capacity. Another "key differentiator" is Azure's experience in land acquisition. According to the 2021 Form 20-F, because Azure has become one of India's largest renewable energy operators, it has better negotiating power with original equipment manufacturers and project finance lenders than its competitors.

29.     In addition, Azure claims in its 2021 Form 20-F that, unlike some competitors, its in-house engineering, procurement and construction expertise allow it to deliver returns above its cost of capital and that the Company's "strong track record in project development across utility scale and commercial rooftop," has allowed Azure to grow its portfolio with high credit rating off-takers and access to international capital.

30.     According to the 2021 Form 20-F, Azure's competitive advantage further allows the Company to secure more favorable financing and more government contracts:

> Our reputation, track record, shareholder base, governance framework help in securing the best financing terms and aid our relationship with government authorities while developing, constructing and operating renewable energy projects. Based on these factors, we believe that we compete favorably with our competitors in the regions we service.

31.     Azure could lose its purported competitive advantage if the Company ceases to obtain new contracts or fails to obtain favorable (or any) financing for new projects.

**B.  <u>In Order to Benefit from India's Strong Investment in Renewable Energy, Azure was Dependent on Winning Bids for Renewable Energy Projects</u>**

32.     Azure claims to be at the forefront in the solar sector as a developer, constructor, and operator of solar projects. Azure has stated that its mission is to lead India's energy transition to renewable energy by providing sustainable energy solutions and helping to achieve carbon

neutrality by being the lowest-cost renewable energy power producer and creating high-performance renewable energy assets (e.g., solar power). Under Azure's profile section of its website, the Company's stated goal is to displace 230 million tons of global emissions by 2030.

33.     According to its website, Azure began working with solar in 2008, and by 2009, developed its first 2-megawatt utility scale solar project in Punjab, India. Azure continued to add projects to the Indian states of Gujarat, Rajasthan, Uttar Pradesh, and Chhattisgarh. By 2016, Azure had reached a 1-gigawatt total capacity, which it doubled by 2018. By 2020, Azure boasted a combined total of 7-gigwatts of solar panels.

34.     Azure derives its revenue from the sale of power to central and state government utilities and independent industrial and commercial customers. The Company's customers include, primarily SECI, NTPC Limited and NTPC Vidyut Vyapar Nigam Limited, a subsidiary of NTPC Limited, as well as various commercial establishments. During the Class Period, Azure claimed to operate approximately forty-five utility scale projects throughout India and had 2.9 gigawatts of operational capacity and approximately 4.5 gigawatts of capacity under construction.

35.     Azure obtains new projects through a bidding process, which takes approximately eighteen months. The first step in the process is to submit a bid for the project. The winner of the bidding process is then issued a Letter of Award ("LOA"). Thereafter, Azure acquires the land and constructs the plant. Once the plant is constructed, Azure enters into a Purchase-Power Agreement ("PPA") with customers, typically for 25-years, who then pay a fixed rate for electricity generated from Azure renewable energy plants.

36.     Azure purports to manage the entire project development and operational process with an in-house engineering, procurement and construction team and advanced in-house operations with maintenance capability.

37.     Accordingly, as alleged herein, Azure's success is highly dependent on winning bids for utility scale projects across India, sourcing the land on which to build them, and operating them safely and profitably.

### C. Azure Uses Land Aggregators to Source Land

38.     Azure describes land as one of the most critical resources to be able to build a project successfully. Azure claims that its experience in land acquisition is a "key differentiator" that separates Azure from its competitors. Azure's projects are located either on freehold land purchased from private individuals and entities, or land leased from the state governments and third parties. Land lease arrangements range typically from 30 to 35 years, and the PPAs are generally for a term of 25 years.

39.     Azure's land acquisition process first depends on whether the land is privately owned or owned by the government. When the land is privately owned, Azure identifies the appropriate parcels of land and conducts due diligence with local legal counsel. If the land is government-owned, Azure identifies the suitable parcels of land from the responsible agency and obtains approval from the relevant authority.

40.     Azure typically uses land aggregators to assist it in identifying opportunities to purchase land. Land aggregators, who are persons or entities that identify and buy land with the intent to sell or lease it back to large solar and wind farm developers, have been known to participate in kickback schemes.  For example, in some instances, land aggregators buy the land and lease it to solar farm companies with an upcharge, and kickback the profits to project managers who agree to the ruse. Or, in another common scheme, project managers collude with land aggregators and pretend to follow competitive bidding when, in fact, the preferred partner has already been selected, and the project manager receives a kickback. As a result, project funds

are misappropriated, and costs increase. Land aggregators also interact with local government and municipal authorities on a company's behalf by routing payments to government officials in order to secure permits.

41.     As revealed in the 2022 Form 20-F filed on October 12, 2023, certain "former executives" of Azure were involved with such schemes with third-party land aggregators in order to ensure Azure was the winning bidder.

### D. Azure is Subject to Laws Requiring it to Comply with Anti Kick-Back and Health and Safety Regulations

42.     Renewable energy companies like Azure are subject to safety and environmental laws. Failure to comply with such laws can result in liability, fines, seizure of property, and imprisonment. For example, according to Azure's 2021 Form 20-F, the failure to comply with the Hazardous and Other Waste (Management and Transboundary Movement) Rules, 2016 may result in monetary penalties. Also, the Environment (Protection) Act, 1986 ("EPA") vests the Indian government with the power to take any measure it deems necessary or expedient for protecting and improving the quality of the environment and preventing and controlling environmental pollution. Penalties for violation of the EPA includes fines up to Rs. 0.10 million or imprisonment of up to five years or both.

43.     According Azure's 2021 Form 20-F, Azure is also subject to the laws and regulations  that govern the businesses of the Indian subsidiaries, including but not limited to, the Electricity Act, 2003; the National Electricity Policy, 2005; the National Tariff Policy 2016; Guidelines for Tariff Based Competitive Bidding Process for Procurement of Solar Power issued by The Ministry of Power; Central Electricity Regulatory Commission Regulations; the Ministry of New and Renewable Energy, and various state administrative policies and regulations in relation to solar power projects and related matters.

44. Given Azure's safety and environmental responsibilities, the Company has made health and safety a top priority. As Defendants stated in a Facebook post on August 3, 2022, during the 3rd National Electrical Safety Week conference:

> **Safety is of paramount importance at Azure Power**. Workers in our sector are exposed to a range of potential hazards at different stages of development and it is **imperative to ensure that safety is not just about rules and preventative measures—it's also a foundational value that is deeply embedded in our organization**.

45. Defendants also frequently reported on safety. For example, on February 11, 2021, during Azure's earnings conference call for the third quarter of fiscal 2021, Defendant Gupta, then Chief Executive Officer, emphasized health and safety measures purportedly employed at Azure:

> We are very proud to announce that we obtained the ISO-45001 certification, **which demonstrates Azure's focus on occupational health and safety**. Given the remote locations of our projects, the extreme heat and difficult conditions for construction and operations as well as the inherent safety risks that come with the large-scale construction project, we believe **this validates the additional efforts we make to our workplace safe for our team members and contractors**.

46. Also, during the February 11, 2021 third quarter earnings call for fiscal 2021, Defendant Subramanian, touted Azure's ISO-45001 certification, "**which verifies that Azure Power provides a safe and healthy workplace**." Defendant Subramanian stated:

> On the governance side, **we have adopted many policies, including an enhanced health and safety policy** and have increased gender diversity on our Board. We're not stopping here, and we'll continue to implement best practices to enhance our sustainability.

47. To facilitate a safe work environment, the Company claims to "undertake regular/periodic inspections and audits to assess compliance to the SHES [i.e., Social, Health, Environment and Safety] guidelines at all sites."

48. Azure continuously emphasized the Company's purportedly safe work environment and safety culture throughout the Class Period. For example, on the June 16, 2021

Earnings Call, Defendant Gupta touted Azure's ISO certification, claiming that it "demonstrates Azure's focus on occupational health and safety and validates additional efforts we put in to make our workplaces safe for our team members and contractors…." Defendant Subramanian echoed Gupta's emphasis on the ISO certification, claiming "Azure Power provides a safe and healthy workplace." Likewise, on August 31, 2021, Defendant Subramanian represented on the Earnings Call that Azure ensured a culture of safety and compliance by hyping that Azure "recently won the Greentech Effective Safety Culture Award for 2021 from Greentech Foundation, which signifies the efforts we have put in to ensure safety culture is embedded across our project locations and sites."

49.    Thus, safety is of paramount importance to Azure's business.

50.    Azure also has an Anti-Bribery and Corruption policy, which prohibits "any form of bribery, to any government official, private party or any third party (such as an agent or third-party intermediary) either directly or indirectly."[11] The policy "also establishes processes to ensure compliance with the Anti-bribery and corruption policy and applicable laws and regulations, particularly, without limitation, the United States of America's Foreign Corrupt Practices Act ("FCPA")." The FCPA makes it unlawful for persons and entities to make payments to foreign government officials to assist in obtaining or retaining business. The FCPA also requires companies whose securities are listed in the United States, such as Azure, to meet specific accounting provisions. For example, 15 U.S.C. § 78m require corporations to "(A) make and keep books, records and accounts, which, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;" and to (B) devise and maintain an

---

[11]    *See*    Azure's    Anti-Bribery    and    Corruption    Policy    and    Procedures, https://investors.azurepower.com/~/media/Files/A/Azure-Power-IR/governance-documents/ABC%20Policy%20updated%2010%20June%202021.pdf (last accessed November 9, 2023).

adequate system of internal accounting controls. 15 U.S.C. § 78m(b)(2)(A)-(B). Azure's Environmental, Social and Governance Policy, further commits Azure to "applying the highest standards of ethics, integrity and honestly to our business and assure compliance to U.S. 'FCPA' along with local 'Anti Bribery' laws."[12]

51.     As discussed below, in violation of these anti-corruption policies, Defendants engaged in an illegal kickback and data manipulation scheme to obtain new projects.

## II.     Azure Tracks Project Performance in "Real-time" Using an Advanced Tracking System and Key Performance Indicators

52.     Azure touts its ability to monitor and analyze project data and respond quickly to problems at its plants as they arise using a "centralized monitoring station." According to Defendant COO Subramanian during Azure's February 11, 2021 third quarter 2021 earnings call, Defendants get "all our data into a centralized monitoring station at [the] head office," which gives Azure the ability to "monitor and analyze plant performance at the project site." This, says Subramanian, provides Azure with "greater visibility of even minor plant failures, and various preset alarms allow them to spot, not only failures but even parts of the plant where performance is lower than expected."

53.     Defendants also touted their real-time data access in Azure's 2021 Form 20-F wherein they praised Azure's analytics platform, stating that the advanced tracking system allows Defendants to *remotely monitor* project performance in *real-time* and respond rapidly to potential generation anomalies:

> Our operations team *monitors performance of all the projects in real time through our analytics platform*, which allow us to respond rapidly to potential generation anomalies and to repair any failures that might happen. They also perform scheduled preventive maintenance tasks on daily, weekly, monthly, and

---

[12] *See* Azure Power, Environment Safety and Governance Policy (effective as of February 2020 and signed by Defendant Gupta), https://www.azurepower.com/sites/default/files/inline-files/ESG%20Policy_0.pdf (last accessed November 8, 2023).

annual intervals to ensure our plants run smoothly and at high efficiency levels. Currently, we are able to monitor the performance of our solar power generation plants spread over 90 cities remotely.

54.     Likewise, in an Economist Impact article entitled, "Digitalisation's promise for India's utilities sector: An interview with Harsh Shah, Chief Executive Officer, Azure Power," posted to Azure's Facebook account on August 10, 2022, Shah touted as one of Azure's strengths, that it "digitally manages its power plants by using *real-time monitoring platforms* for *day-to-day analysis* and testing":

> Azure Power sees technology as a key enabler to become the number one provider of sustainable energy solutions for a carbon neutral world. Currently, the company digitally manages its power plants by *using real-time monitoring platforms for day-to-day analysis and testing* various tools to augment in-house predictive analytical capabilities *to accurately analyse energy generation data and forecast weather events*. We have digitalised most of the internal processes such as supply chain, design and engineering, and project management to improve efficiency and output while reducing turnaround time.

55.     According to the 2021 Form 20-F, Azure's monitoring platform allows management to "regularly review a number of specific metrics, *including [] key operating and financial metrics*, to evaluate our business performance, identify trends affecting our business and make strategic decisions." Azure's key metrics include revenue, electricity generation, plant load factor, cost per megawatt operating, megawatts operating, megawatt contracted and awarded, and total megawatt operating, contracted and awarded. In the 2021 Form 20-F, Azure reported those metrics for 2019 through 2021:[13]

---

[13] The plant load factor is the ratio of the actual output of all Azure's solar power plants over the reporting period to their potential output if it were possible for them to operate at full rated capacity. Electricity generation represents the actual amount of power generated by Azure's solar power plants over the reporting period and is the product of reporting period plant load factor and the average megawatts operating. It is a measure of the periodic performance of Azure's solar power plants. Megawatts Operating represents the aggregate cumulative megawatt rated capacity of solar power plants that are commissioned and Megawatts Contracted & Awarded represents the aggregate megawatt rated capacity of solar power plants pursuant to customer PPAs signed, allotted or won in an auction but not commissioned and operational as of the reporting date.  Azures claims the tracking the growth in aggregate megawatt rated capacity measures the growth rate of its business.

| Key metrics | Unit of Measurement | Fiscal Year 2019 | Fiscal Year 2020 | Fiscal Year 2021 |
|---|---|---|---|---|
| Revenue | INR in millions | 9,926 | 12,958 | 15,236 |
| Revenue | US$ in millions | 143.5 | 171.9 | 208.3 |
| Electricity generation | kWh in millions | 1,733 | 2,870 | 3,495 |
| Plant load factor | % | 18.6 | 19.5 | 20.9 |
| Cost per MW Operating | INR in millions | 40.7 | 35.5 | 28.8 |
| MW Operating | MW | 1,441 | 1,808 | 1990 |
| MW Contracted & Awarded | MW | 1,915 | 5,307 | 4,965 |
| MW Operating, Contracted & Awarded | MW | 3,356 | 7,115 | 6,955 |

56.     Azure purports to rely on these metrics when comparing its current operational and financial performance to historical performance, and to that of competitors. Such metrics are also used in the industry to evaluate growth in terms of current and future capacity.

57.     Analysts regularly relied on such metrics in arriving at price targets for Azure. For example, analyst Elvira Scotto of RBC Capital Markets gave Azure a positive rating on August 30, 2021, stating, "AZRE noted that SECI signed PSAs for ~800 MW of power, of which AZRE expects to sign PPAs for ~266 MW, at lower tariffs than the 2.92 INR (~$0.04/KWh) indicated in the auction in December 2019. For FY22, AZRE expects revenue of $241-254MM, from $245-258MM (vs our $245MM), and MW operational to be 2,750-2,955 MW, unchanged (vs our 2,968 MW)."

III.    **Defendants Manipulate Internal Data to Report More Profitable Results, Resulting in Whistleblowers Complaints Against Management Asserting Kickback Scheme and Data Manipulation**

58.     After Azure's founder, Inderpreet Wadhwa, stepped down on May 3, 2019 and Defendants Gupta, Subramanian and Agrawal took the reins, the Company's financial

performance began a steady decline.[14] Net losses steadily increased from a profit of INR 138 million in Fiscal 2019, to losses of INR 2.3 million in Fiscal 2020, and INR 4.2 million in Fiscal 2021.

59.     Short on cash, Defendants incurred additional debt to fund operations and finance new projects. Indeed, according to the Company's 2021 Form 20-F and 2022 Form 20-F, filed with the SEC, Azure's total debt balance increased **79%** over the course of only three years under the management of Gupta and Subramanian (in INR):[15]

| 2019 | 2020 | Y-O-Y % Change | 2021 | Y-O-Y % Change | 2022 | Y-O-Y Change | % Change 2019 to 2022 |
|---|---|---|---|---|---|---|---|
| 71,772 | 89,864 | 25% | 103,523 | 15% | 128,787 | 23% | *79%* |

60.     To make Azure's financial position appear more favorable, Defendants began manipulating Azure's Megawatts and other data and paying kickbacks to win new projects. As a result, concerned employees complained.

61.     On July 28, 2021, Defendants filed Azure's 2021 Form 20-F with the SEC, signed by Defendants Gupta and Agrawal, disclosing that Azure had received a number of whistleblower complaints alleging claims against "Key Managerial Personnel," concerning their actions in relation to the acquisition and use of land in Rajasthan (the "First Whistleblower Complaints"):

> [Azure] recently received complaints and several anonymous whistleblower reports, which made various claims against certain of the Company's Key Managerial Personnel, related to their and the Company's actions in relation to the acquisition of and use of land in Rajasthan, Assam, and Uttar Pradesh, as well as certain other corporate actions. These whistleblower complaints did not include the minimum required information required under the policy; however, the reports were investigated.

---

[14] Defendant Subramanian took over the role of Chief Operating Officer on April 04, 2020.
[15] In USD, Azure's long-term debt increased by approximately 30% in 2020.

62.     Azure further divulged that the reports rose to the attention of the Audit Committee who hired external counsel and forensic auditors to assist in the investigation, which purportedly "did not substantiate the allegations made in the complaints," yet Defendants stated Azure would review compliance with its internal policies and procedures:

> The Company, through its Audit Committee, and with the assistance of external counsel and forensic auditors, has undertaken an investigation to determine whether the allegations made in the complaints or contained in the whistleblower reports are substantive. The investigation did not substantiate the allegations made in the complaints or contained in the whistleblower reports. ***Nevertheless, the Company has determined that a review of certain of its processes is required to ensure continued compliance with its internal policies and procedures***.

63.     However, as Defendants would eventually admit in the 2022 Form 20-F, filed on October 12, 2023, the First Whistleblower Complaints occurred in June and July 2021 and also alleged "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, [and] payment of kickbacks[.]"

64.     On November 26, 2021, shortly after Defendants informed investors about the First Whistleblower Complaint, Azure dismissed its independent public accounting firm, Ernst & Young Associates LLP, and replaced it with S.R. Batliboi & Co. LLP ("S.R. Batliboi"). As disclosed in the November 26, 2021 press release, which was filed that day with the SEC and signed by Defendant Gupta as an exhibit to a Form 6-K:

> At a meeting held on November 9, 2021, the Board of Directors of the Company approved the appointment of S.R. Batliboi & Co. LLP (member firm of Ernst and Young Global Limited) as its independent registered public accounting firm for the fiscal year ending March 31, 2022. At the same meeting, the Board of Directors of the Company approved the dismissal of Ernst & Young Associates LLP (the "Former Accounting Firm") as independent registered public accounting firm of the Company effective November 9, 2021. The audit committee of the Board of Directors approved the change in independent registered public accounting firms on September 30, 2021.

65.     Among the adopted proposals at the 2021 Annual Meeting of Shareholders on December 22, 2021, was the appointment of Ernst & Young Mauritius as the Company's new independent auditor for the fiscal year ending March 31, 2022.[16]

66.     According to confidential local sources, following the investigation of the whistleblower complaints, Azure's external auditor, Ernst & Young, raised concerns regarding corrupt payments to vendors and project cost allocation, which would require additional qualifications be included in its audit report. Azure terminated the relationship after learning of the qualified opinion.

67.     On December 27, 2021, Azure issued a press release, attached to a Form 6-K filed with the SEC and signed by Defendant Gupta, announcing certain operational and financial updates which, again, discussed the First Whistleblower Complaint.

68.     Defendants also revealed that, despite claiming in the 2021 Form 20-F that the whistleblower allegations lacked merit, in fact, Azure's Ethics polices were deficient:

> During the current year, the Company received complaints and anonymous whistle-blower reports which made various claims against certain of the Company's Key Managerial Personnel, related to their and the Company's actions in relation to the acquisition of and use of land in Rajasthan, Assam and Uttar Pradesh, as well as certain other corporate actions. The Company, through its Audit Committee, and with the assistance of external counsel and forensic auditors, has completed its investigation to determine whether the allegations made in the complaints or contained in the whistle-blower reports are substantive. ***The issues raised, including those raised against Key Management Personnel, have been closed and allegations were not substantiated; however, the Company determined that its ethics policies regarding external consultants should be***

---

[16] According to its 2021 Form 20-F, Azure was considered an "emerging growth company," for up to five years from the end of fiscal year 2017. Emerging growth companies are exempt from certain filing requirements including: (1) not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, (2) not being required to comply with any new requirements adopted by the Public Company Accounting Oversight Board, (PCAOB), requiring mandatory audit firm rotation or a supplement to the auditor's report in which the auditor would be required to provide additional information about the audit and the financial statements of the issuer, (3) not being required to comply with any new audit rules adopted by the PCAOB after April 5, 2012 unless the SEC determines otherwise, and (4) not being required to provide certain disclosure regarding executive compensation required of larger public companies. The exemptions available to Azure ended during the fiscal year ending March 31, 2022.

*enhanced*. The Company, through its Audit Committee and with the assistance of external counsel, will be taking remedial steps (including training and policy review).

69.     Azure further disclosed that Defendant Agrawal, Azure's then Chief Financial Officer, was named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. Azure stated that it would "continue to monitor the proceedings as Mr. Agrawal defends the charges made against him."

70.     Thus, contrary to Defendants' prior statements that the allegations in the First Whistleblower Complaints were not substantial, Azure, in fact, did lack sufficient internal controls, requiring the Audit Committee to make enhancements to Azure's ethics policies.

IV.     **Azure Announces a Slew of Suspicious Executive Departures and Repeated Delays in the Filing of its 2022 Form 20-F**

71.     On April 26, 2022, Azure issued a press release announcing the sudden and abrupt departures of Defendants Gupta and Subramanian, stating that "[b]oth will relinquish their roles with the Company and its subsidiaries, and Mr. Gupta will resign from the Board of Directors…with immediate effect in order to pursue other opportunities." The Chairman of the Board, Alan Rosling became the interim CEO until a new CEO replacement was found. No other explanation was given about these departures, nor was there any succession plan in place.

72.     On May 6, 2022, Azure issued a press release announcing that it named Harsh Shah as the new CEO effective, July 1, 2022. However, Harsh Shah would not even last two months at Azure before retreating back to his prior position at IndiGrid.

73.     On June 1, 2022, Defendants officially announced that Independent Director and Audit Committee Chairman, Mr. Arno Harris, resigned from his position as a member of Azure's

Board, effective May 31, 2022. Mr. Harris was replaced by Ms. Christine McNamara, who also took over as Chair of the Audit Committee.

74.     On August 16, 2022, Azure filed an amended notice of inability to timely file its Annual Report 2022 Form 20-F within the initial prescribed time period, informing the market for the first time that the Company's internal control problems were so bad that Defendants could not even provide a date for when Azure would be able to file its 2022 Form 20-F, stating:

> The Registrant was not able to file its Annual Report on Form 20-F for the year ended March 31, 2022 (the "Form 20-F") within the initial prescribed time period. The Registrant previously filed a Form 12b-25 on August 1, 2022 (the "Original Notice"). As indicated in the Original Notice, the Registrant intended to file the Form 20-F on or before the fifteenth calendar day following the due date of the Form 20-F (the "Extended Due Date"). However, the Registrant no longer expects to file the Form 20-F by the Extended Due Date. ***The delay in filing the Form 20-F is due to Registrant's ongoing review of its internal control and compliance framework. These matters are being progressed with the assistance of the Registrant's advisers. The Registrant is making all efforts to file its Form 20-F as soon as practicable***.

75.     On August 23, 2022, Moody's placed Azure Power Energy and Azure Power Solar Energy ratings under review for downgrade and changed outlooks ratings to under review from stable. Moody's stated that the "company has [] experienced senior management turnover recently" and "[t]he internal review and the delay in filing Form 20-F are additional governance considerations material to the rating action."

76.     On August 29, 2022, Defendants announced another CEO departure, effectively immediately. CEO Harsh Shah's departure was described as an "unexpected decision," and provided no other additional information. Thereafter, Mr. Rupesh Agarwal took charge as Acting CEO of the Company on Harsh's resignation, but he too would not last, resigning less than a year later on July 10, 2023, "to pursue other opportunities." [17]

---

[17] After Rupesh Agarwal's departure in July 2023, Mr. Sunil Gupta was appointed, and is Azure's current CEO.

**V.** **Azure Receives a Second Whistleblower Complaint Revealing Procedural Irregularities, Material Data Manipulations and Safety Issues**

77.     Also on August 29, 2022, along with its executive resignations and delayed filing of the 2022 Form 20-F, Defendants issued a press release ("August 29, 2022 Press Release") announcing that Azure had received another whistleblower complaint alleging "procedural irregularities and misconduct by certain employees, at a plant belonging to one of its subsidiaries" (the "Second Whistleblower Complaint").

78.     Defendants further revealed in the August 29, 2022 Press Release that during a subsequent investigation of the Second Whistleblower Complaint, they had "discovered deviations from safety and quality norms," "identified evidence of manipulation of project data and information by certain employees," and that Azure was "initiating disclosure of the findings to the appropriate authorities." The Second Whistleblower Complaint prompted *a purported renewed* investigation of Azure's internal controls over financial reporting and immediate "action to influence mechanisms to remediate these health and safety issues" and the "rollout of "multiple initiatives aimed at enhancing safety[.]"

79.     Azure's share price plunged 44% on August 29, 2022, following all the news about Azure's executive resignations, delayed filing of its 2022 Form 20-F, and another suspicious whistleblower complaint.

80.     Defendants held a special call with investors on August 31, 2022 ("August 31, 2022 Special Call") however, Defendants failed to provide any satisfactory answers, stating that they could not comment until the investigation is complete.

**VI.** **Azure Receives a Third Whistleblower Complaint Revealing Irregularities in Commissioning Procedures and Failure to be Transparent with the Market**

81.     On December 30, 2022, Defendants filed unaudited combined financial statements on Form 6-K with the SEC ("December 30, 2022 Form 6-K"), signed by Rupesh Agarwal,

Azure's then Principal Executive Officer. The unaudited combined financial statements contained the financials for Azure's private subsidiaries, collectively referred to as Restricted Group II and Restricted Group III, for the year ending March 31, 2022.

82.     Buried on the last page of the Restricted Group-II financial statement was a disclosure about the whistleblower complaints in which Defendants claimed that none of the whistleblower allegations affected the financial statements.

83.     However, Defendants dropped another bomb in the December 30, 2022 Form 6-K, disclosing that Azure had received ***a third*** whistleblower complaint back in September 2022 (the "Third Whistleblower Complaint"), months earlier, that Azure had not disclosed to investors. The Third Whistleblower Complaint, like the First Whistleblower Complaint, concerned irregularities around the ***commissioning procedures***, ***the land acquisition process***, and the purposely vague issue of "other matters:"

> **Azure Power Thirty-Three Private Limited**
>
> The Parent entity received a whistle blower complaint in September 2022, alleging (1) ***irregularities in commissioning procedures,*** and (**2***) in land acquisition process*** among other matters*. Consistent with the group's policy the matter was referred to the group's ethics committee and an investigation was initiated by the group's management with the support of outside advisors and the supervision of the Parent entity's Audit Committee. ***An investigation was carried out and the findings concluded that the complaint was unsubstantiated***. ***These complaints do not have any material financial impact on the financial statements***.

84.     The Third Whistleblower Complaint revealed "irregularities in commissioning procedures," which expanded what Defendants previously identified as only "procedural irregularities."

85.     The December 30, 2022 Form 6-K also included information about a whistle blower complaint received by the "Parent Company," "subsequent to fiscal year which ended March 31, 2022."   The 6-K disclosed that the whistleblower complaint asserted "improper

conduct including mismanagement of funds" and "inaccurate record keeping" that resulted in the

termination of certain employees and blacklisting of vendors, stating in pertinent part:

> **Azure Power Uranus Private Limited**
>
> The Parent Company received whistle blower complaint subsequent to the fiscal year which ended March 31, 2022, ***alleging that the project manager engaged in improper conduct including mismanagement of funds for the project and inaccurate record keeping***. Consistent with the group's policy the matter was referred to the group's ethics committee and an investigation was carried and ***appropriate action has been taken including termination of the employee, and blacklisting of the manpower vendor***. Company's management concluded that there ***are no material financial impact as a result of the related conduct on the financial statements***.

86.     As Defendants would later reveal in January and October 2023, the whistleblower

complaints were, in fact, substantiated, and revealed significant issues as a result of the

investigations, including improper payments, misrepresentation by former executives, and

violation of internal Company policies, all of which Defendants concealed from investors.

**VII.**   **The January 25, 2023 Press Release Revealing Azure Needed to Expand its Investigation into the Whistleblower Allegations**

87.     On January 25, 2023, Defendants issued a Form 6-K entitled, "Update on Recent

Developments," signed by Rupesh Agarwal, Azure's then Principal Executive Officer, ("January

23, 2023 Press Release"), which revealed further details about the whistleblower complaints and

other recent negative events plaguing the Company.

88.     *First*, according to the January 25, 2023 Press Release, Azure's failure to file the

2022 Form 20-F with the SEC could subject Azure to substantial risks, including delisting of the

Company's shares from the NYSE, debt covenant defaults, and acceleration under its green

bonds, all of which would materially affect Azure's business:

> The Company has not yet filed the Form 20-F. In accordance with SEC rules, the Company is now unable to file new short-form Form F-3 registration statements (including shelf registration statements) for 12 months which may limit the

Group's financing options and could also result in the delisting of the Company's shares from the NYSE.

***

In addition, the Company's delay in filing the Form 20-F violates NYSE listing rules. On December 7, 2022, the Company received notice from the NYSE regarding its delayed filing and that the NYSE will closely monitor the status of its late filing for a six-month period ending on February 16, 2023. If the Company fails to file the Form 20-F by the end of such six-month period, the NYSE may, in its sole discretion, allow the Company's securities to trade for up to an additional six months. The Company may have to submit an official request for an extension for the NYSE's consideration at the appropriate time. If the NYSE determines that an additional six-month trading period is not appropriate, the NYSE will notify the Company that suspension and delisting procedures would commence. If the NYSE determines that an additional trading period of up to six months is appropriate, trading on the NYSE would continue, however if the Company fails to file the Form 20-F and any subsequent delayed filings by the end of that period, suspension and delisting procedures likely would commence at the end of that period.

Although the Company intends to file the Form 20-F as soon as practicable and make filings of its annual reports on Form 20-F in future years on or before the due date set by the SEC, any further delay in filing the Form 20-F or further late filings of future reports could erode investor and creditor confidence and lead to consequences such as covenant defaults under its financing documents (as described above) and delisting of the Company's shares from the NYSE (which may also trigger additional covenant defaults under its borrowing documents and defaults and acceleration under its green bonds) any or all of which would materially and adversely affect the Group's business, results of operations, financial condition and cash flows.

89.     *Second*, Defendants revealed that Azure had received the Second Whistleblower Complaint in May of 2022, months before Defendants disclosed it to investors at the end of August, and that the Second Whistleblower Complaint alleged: (1) health and safety lapses; (2) procedural irregularities; (3) misconduct by employees; (4) corrupt payments and false statements relating to a (still undisclosed) project; (5) data manipulation and misrepresentation of project data; and (6) internal control weaknesses, stating:

Whistle-blower Allegations and Special Committee Investigation:

The Group received a whistle-blower complaint in May 2022 that alleged health and safety lapses, procedural irregularities, misconduct by certain employees,

26

corrupt payments and false statements relating to one of the projects belonging to one of its project subsidiaries. Following extensive investigations by both internal and external counsel and forensic professionals, the Group identified *evidence of manipulation and misrepresentation of project data* by some employees at that project site. *Weak controls over payments to a vendor o*f *the subsidiary and failures to provide accurate information both internally and externally were found*, but no direct evidence that a corrupt payment was made to any government official was identified. *The Company has reported the findings from its investigations to the SEC and the U.S. Department of Justice, and it continues to cooperate with these authorities*.

90.     Azure was required to disclose these events to both the U.S. SEC and Department of Justice.

91.     Defendants further revealed that one of Azure's large projects with SECI had shortfalls in generation and Azure had not commissioned the project to its contractually required capacity:

> Further, in Fiscal 2023, the project subsidiary reported to the customer that the project had (i) shortfalls in generation and (ii) that it failed to timely complete and commission the requisite contractually required capacity. Subsequently, the customer has advised the subsidiary that damages and penalties may be assessed for shortfalls in generation and timely commissioning of the full capacity required under the PPA. The Group continues to have dialogue with its customer on this issue.

92.     *Third,* Defendants revealed that *data manipulation had occurred in at least three more of Azure's projects*, prompting Defendants to expand their investigation into all projects and subjecting Azure to further liabilities. Accordingly, Azure was widening its investigation to Fiscal 2022 and 2023:

> As part of its investigations, *the Group also widened its review to include a review of all projects commissioned in Fiscal 2022 and Fiscal 2023* to ensure that similar weaknesses were not present as found in the above-mentioned project related to the May 2022 whistle-blower allegations. As part of this review, the Group identified *inconsistencies in project data in three other projects*. These inconsistencies present risks including the potential for liabilities under the relevant contractual and tender documents.
>
> The Group has taken a range of actions as a result of these findings. The Group initially suspended the employees involved in the misconduct. Such employees are

27

no longer associated with the Group. In accordance with the recommendations of the Company's Ethics Committee, the Board's Audit and Risk Committee and their advisors, the Group is implementing remedial measures in both project control and monitoring. Further, *the Company has reported the findings from the investigations to the SEC and the U.S. Department of Justice, and it continues to cooperate with these authorities.*

93.     Defendants had to form a special committee supported by outside counsel and forensic advisors to take on this project and review a corruption allegation:

> In addition, a Special Committee of the Board of Directors was convened in August 2022 *to review material projects and contracts over a three-year period for anti-corruption and related compliance issues*. Independent outside counsel and forensic advisors were engaged to support the Special Committee. The review by the Special Committee *also includes an investigation into a corruption allegation against certain former executives*. As of the date of this press release, the Special Committee's investigation remains ongoing, but is substantially progressed. The Company has disclosed the details of the Special Committee's investigation to the SEC and the U.S. Department of Justice and continues to cooperate with those agencies.

94.     Thus, Defendants finally admitted that Azure's data manipulation and internal control problems date back at least three years and expand far beyond the purported one project previously disclosed on August 29, 2022, necessitating disclosure to the SEC and DOJ. Azure further stated it is unable to quantify the financial impact or breadth of the corruption at the Company exposing Azure to contractual, civil, administrative, and regulatory liabilities, including potential findings of corruption and fraud:

> Any fines, penalties, contractual damages, administrative or regulatory actions or other liabilities arising from findings of the Group's Whistle-blower and Special Committee investigations or otherwise, could adversely affect the Group's business, results of operations, financial condition and cash flows.

> As described above under "Whistle-blower Allegations and Special Committee Investigation", the Group has been investigating certain whistle-blower allegations and *reviewing material projects and contracts over a three-year period for anti-corruption and related compliance issues*. As of the date of this press release, the Group is *unable to quantify the financial impact of its findings so far (including, but not limited to employee misconduct related to manipulation of project data and information and data inconsistencies)*;

28

however, the Group could be exposed to liabilities including contractual damages (such as liquidated damages) and penalties from customers and other civil liabilities and administrative and regulatory actions, all of which could adversely impact the revenue, profitability, cash flows and capitalization of the affected projects. In addition, fines and/or penalties by regulatory authorities (including by the SEC or the U.S. Department of Justice) could be imposed on the Group. Although no such fines, penalties or civil liabilities have been demanded or levied or administrative or regulatory actions taken as of the date of this press release, any such fines, penalties, civil liabilities or administrative or regulatory action could materially and adversely affect the Group's business, results of operations, financial condition and cash flows in future periods. In addition, the Group could be exposed to future litigation in connection with any findings of fraud, corruption, or other misconduct by the Group's employees and former employees.

95.     *Fourth,* Defendants reported Megawatts Operating of 2,666 "[a]s of March 31, 2022" that had been "[a]djusted for inconsistencies in MWs ***reported*** as identified by the Group through its review of 2022-whistle-blower allegations." Thus, Azure's actual Megawatts Operating was 189 to 289 Megawatts, or approximately 6% to 10%, ***less*** than what Azure guided for Fiscal 2022 of 2,855 to 2,955 MWs Operating, just one month before Fiscal 2022 year-end.

96.     Azure also reported that its Megawatts Operating for the six months-ended September 30, 2022 of 2,907 was "[a]djusted for inconsistencies in MWs ***reported*** as identified by the Group through its review of 2022 whistleblower allegations."

97.     Defendants further quantified Azure's exposure for the previously disclosed failure to commission projects by their required deadlines:

> Update on Projects under Execution:
> In Fiscal 2022, the Group experienced delays in execution of its projects beyond the extended commissioning timelines provided by the customers and could be subject to liquidated damages as per the respective PPAs. ***The Group estimates a contingent liability on account of delayed commissioning aggregating to INR 390 million (US$ 5.2 million), including INR 16 million (US$ 0.2 million) as an aggregate impact of inconsistencies in project data that were identified during the whistle-blower investigations***. The Group is in regular discussions with its customers to seek further extensions of construction and commissioning timelines as appropriate. The inability to obtain these time extensions could have additional implications under the requisite PPAs and project agreements, including, but not limited to, reductions in project capacities and reductions in tariffs.

98.     *Fifth,* Defendants admitted in the January 25, 2023 Press Release, that while the
Company's investigation is ongoing, Azure's internal controls for at least Fiscal 2022 were not
effective:

> Internal Controls
> The Group is in the process of completing its internal controls and compliance
> framework review exercise for Fiscal 2022, and, while that review continues, it
> has **identified several material weaknesses in its internal control over financial
> reporting as of March 31, 2022**. Consequently, when the Company files the Form
> 20-F, it will report that the Group's internal controls over financial reporting were
> **not effective as of March 31, 2022**.

99.     Finally, Defendants disclosed in the January 25, 2023 update that most of the
Azure's external borrowings are required to be rated by accredited credit rating agencies and
"[a]ny downgrade of the Group's credit ratings may result in increase in interest cost or may
trigger default." Fitch Ratings, Moody's Investor Service, CRISIL and Care Ratings have each
announced a review of the Group's credit ratings with negative implications.

100.    A few weeks later, on February 15, 2023, Defendants filed a press release on Form
6-K announcing that NYSE's Listings Operations Committee agreed to provide Azure with an
additional trading period through July 15, 2023, subject to reassessment on an ongoing basis, to
complete and file the annual report on Form 20-F for the fiscal year ended March 31, 2022. Thus,
investors had to wait another six months for Azure's 2022 Form 20-F.

**VIII.    Azure's Auditors Resign Mere Days Before the
         Mandated 2022 Form 20-F was Supposed to Be Filed**

101.    Azure's mandated 2022 Form 20-F was supposed to be filed on July 15, 2023.
However, two days before, on July 13, 2023, Defendants shook the market when they revealed
that even after another six months, Azure would be unable to meet the NYSE's deadline of July
15, 2023 for the Company to fulfil its reporting obligations for Fiscal 2022 and would need

another 14 weeks to do so due to the resignation of Azure's auditors, S.R. Batliboi. According to

the release, Azure's auditors had resigned on July 10, 2023 because the Company still had not

provided them with the information needed to complete the audit, including information relating

to the whistleblower complaints:

> In its letter, SRB [S.R. Batliboi] stated that in view of the fact that they are yet to
> receive the information that they have requested to complete their audit work
> inclusive of our March 31, 2022 draft financial statements, US annual filing,
> associated books and records, and our conclusions and representations on the
> impact of the whistle blower complaints, it is not possible for them to complete
> the audit of the financial statements within the timeline expected by the company.
> They have therefore tendered their resignation.

102.    On July 12, 2023 Defendants appointed ASA & Associates LLP ("ASA") as an

independent public accounting firm "for the Company's US GAAP consolidated financial

statements for Fiscal 2022." Azure further announced on July 12, 2023 that it appointed MSKA

& Associates, a member firm of BDO International, as its statutory auditors for its subsidiary

companies of Azure Power India Private Limited, to replace S.R. Batliboi.[18]

103.    An Economic Times article, dated July 22, 2023, cited an analyst research report

by Nomura, who was not convinced about why Azure had separate auditors for its public and

private subsidiaries:

> Azure management claimed segregation of auditing US listco APGL by ASA
> while auditing Indian intermediate holdco by BDO is to reduce BDO's imminent
> auditing workload in response to a query on why Azure was not using BDO as the
> auditor for US listco. In its report, Nomura said it was not fully convinced with
> this explanation.

104.    In reality, Defendants struggled to find an auditor willing to sign off on Azure's

2022 Form 20-F, and even once they finally found one willing to sign their name to Azure's

financial documents, the auditors were obligated to provide an adverse opinion.

---

[18] MSKA & Associates are Azure's current statutory auditor for some of Azure's subsidiaries, including Azure Power
Rooftop Private Limited.

105.     Upon this news, the price of Azure's shares declined from a closing price of $1.69 on July 13, 2023 to close at $0.34 on July 14, 2023, a decline of $1.35 per share, or 79.8% on unusually heavy trading volume.

106.     The NYSE suspended trading on Azure's shares on July 13, 2023.

**DEFENDANTS' MATERIAL CLASS PERIOD
MISREPRESENTATIONS AND OMISSIONS**[19]

107.     In order to conceal the Company's true financial condition from investors throughout the Class Period, Defendants issued a series of materially false and misleading statements and omitted material facts from the Company's public filings, press releases, and other documents concerning Azure's: (1) reported Megawatts operating; (2) timely and full commissioning of customer PPAs; (3) compliance with safety, ethics and compliance policies, processes, standards and regulations; (4) corruption in the land acquisition procedures, and (5) internal controls over financial reporting. Defendants' statements were false when made because Azure's Megawatts operating were materially inflated, Azure's internal controls over financial reporting were inadequate and Azure was not in compliance with internal and regulatory safety policies and regulations, as a result of corruption, data manipulation and admitted safety and regulatory violations at multiple projects over a three-year period, as reported by multiple whistleblowers in 2021 and 2022.

**I.    The 2021 Form 20-F**

108.     On July 28, 2021, Defendants filed Azure's 2021 Annual Report on Form 20-F with the SEC for the period ended March 31, 2021, signed by Defendants Gupta and Agrawal (the "2021 Form 20-F"). The 2021 Form 20-F contained false and misleading risk disclosures

---

[19] The alleged false statements are bolded and underlined. Bolded and italicized statements are for emphasis. Italics only statements are retained from the original. The remaining statements are provided for context.

purporting to warn that employees may engage in "fraud or other misconduct," which could

adversely affect Azure's business when, in fact, the risk of employee misconduct that materially

impacted Azure's business and operations had already occurred:

> **Any damages caused by fraud or other misconduct by our employees could adversely affect our business, results of operations and financial condition.**
>
> We are exposed to operational risk arising from inadequacy or failure of internal processes or systems. In addition, we are exposed from risk associated with fraud or misconduct of our employees. In the past five fiscal years we have not experienced any fraud or misconduct by employees which has materially affected our business, results of operations or financial condition. However, **we may not be safeguarded against all fraud or misconduct by employees or outsiders, unauthorized transactions by employees and operational errors**. **Employee or executive misconduct could also involve the improper use or disclosure of confidential information, data breach or other illegal acts, which could result in regulatory sanctions and reputational or financial harm**, including harm to our brand. Our management information systems and internal control procedures are designed to monitor our operations and overall compliance. However, they may not be able to identify non-compliance and/or suspicious transactions in a timely manner or at all. In addition, **certain internal control processes are carried out manually, which may increase the risk that human error, tampering or manipulation will result in losses that may be difficult to detect.**

109.     The above statements were materially false, misleading, and/or lacked a

reasonable basis when made because:

(a)     As disclosed in the 2022 Form 20-F, Azure had received several whistleblower complaints in June and July 2021 against "Key Managerial Personnel," concerning "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, [and] payment of kickbacks" in relation to the acquisition and use of land in Rajasthan. Defendants later disclosed in the 2022 Form 20-F that certain executives at Azure (Plaintiff believes to be Gupta and Subramanian), were engaged in a scheme to provide illegal payments to win new projects; and

(b)     Thus, as of the 2021 Form 20-F, the above risk had materialized and Defendants had a duty to disclose that Azure's employees had engaged in fraud and misconduct that materially impacted Azure's business.

110.     Defendants also included in the 2021 Form 20-F, certain purported risk disclosures

claiming Azure had sufficient control over its projects and operations:

***Renewable energy project development is challenging, and our growth strategy may ultimately not be successful, which can have a material adverse effect on our business, financial condition, results of operations and cash flows***.

\* \* \*

We may expand our business significantly with several new projects in both new and existing jurisdictions in the future. As we adopt new projects, we expect to encounter additional challenges to our internal processes, external construction management, capital commitment process, project funding infrastructure, financing capabilities and regulatory approvals and compliance. **<u>Our existing operations, personnel, systems, and internal controls may not be adequate to support our growth and expansion and may require us to make additional unanticipated investments in our infrastructure</u>**. To manage the future growth of our operations, we will be required to improve our administrative, operational, and financial systems, procedures, and controls, and maintain, expand, train, and manage our growing employee base. We will need to hire and train project development personnel to expand and manage our project development efforts. If we are unable to manage our growth effectively, we may not be able to take advantage of market opportunities, execute our business strategies successfully or respond to competitive pressures. As a result, our business, prospects, financial condition, results of operations and cash flows could be materially and adversely affected.

111.    Defendants also falsely claimed in the 2021 Form 20-F that Azure was in compliance with anti-corruption regulations:

***Our international corporate structure and operations require us to comply with anti-corruption laws and regulations of the United States government and various non-U.S. jurisdictions. If we are not in compliance with applicable legal requirements, we may be subject to civil or criminal penalties and other remedial measures***.

We are subject to the U.S. Foreign Corrupt Practices Act, or the FCPA, which prohibits, in relevant part, U.S. nationals, companies that have securities registered in the U.S. and any officer, director, employee, or agent of such issuer or any shareholder thereof acting on behalf of such issuer from bribing foreign officials for the purpose of obtaining or keeping business or otherwise obtaining favorable treatment and imposes obligations to keep accurate books and records and maintain appropriate internal controls. We have been and will continue to be subject to anti-corruption, anti-bribery and anti-facilitation payment legislation in other jurisdictions, which in certain circumstances go beyond the scope of the FCPA rules and regulations, including in India.

The current and future jurisdictions in which we operate our business may have experienced governmental corruption to some degree, and in certain circumstances, strict compliance with anti-bribery and anti-facilitation payment

laws may conflict with local customs and practices, which is likely to negatively impact our results of operations. **We have developed and implemented formal controls and procedures to ensure that we are in compliance with the FCPA as well as anti-corruption, anti-bribery and anti-facilitation payment laws**. However, compliance with these new controls and procedures could make it more difficult for us to obtain timely permits or otherwise complete our projects on schedule in jurisdictions where strict compliance with anti-corruption and anti-bribery laws may conflict with local customs and practices.

**Any historic or future violations of these laws, regulations and procedures by our employees, independent contractors, subcontractors and agents could be costly and time-consuming to investigate and expose us to administrative, civil or criminal penalties or fines (including under U.S. and Indian laws and regulations as well as foreign laws). If we were to be investigated for, charged with, or convicted of, violating these laws and regulations, our reputation could be harmed and it could cause some of our investors to sell their interests in our company to be consistent with their internal investment policies or to avoid reputational damage, and some investors might forego the purchase of our equity shares, all of which may negatively impact the trading prices of our equity shares. In addition, any administrative, civil or criminal penalties or fines could have a material adverse effect on our business results of operations and cash flows.**

112.  The above statements were materially false and misleading when made because the purported risk being warned of had already materialized, as evidenced by the following:

(a)  As disclosed in the 2022 Form 20-F, Azure had received several whistleblower complaints in June and July 2021 against "Key Managerial Personnel," concerning "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, and payment of kickbacks" in relation to the acquisition and use of land in Rajasthan. Defendants later disclosed in the 2022 Form 20-F that certain executives at Azure (Plaintiff believes to be Gupta and Subramanian), were engaged in a scheme to provide illegal payments to win new projects, in direct violation of the above regulations;

(b)  As a result of Defendants' admitted participation in a kickback scheme, Azure did not have internal controls over its projects;

(c)  Defendants further revealed that Azure identified "***potential misrepresentations made by former executives***" to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project where these former executives, (upon information and belief, Gupta and Subramanian) "***may have circumvented internal policies in***

35

> *connection with the approval of another transaction related to another wind project*;"

(d)     Defendants admit their internal controls were inadequate; and

(e)     Thus, as of the 2021 Form 20-F, the above risk had materialized, and Defendants had a duty to disclose that Azure's employees had engaged in fraud and misconduct that materially impacted Azure's business.

## II.     First Quarter 2022 Financial Results Press Release on August 30, 2021

113.     On August 30, 2021, Defendants issued a press release, attached to a Form 6-K filed with the SEC, and signed by Defendant Gupta ("August 30, 2021 Press Release") announcing the Company's financial results for its fiscal first quarter 2022 for the period-ending June 30, 2021. The August 30, 2021 Press Release falsely reported inflated megawatts operating as follows:

**Fiscal First Quarter 2022 ended June 30, 2021 Operating Highlights:**

• **Megawatts ("MW") Operating\* were 2,052 MWs,** as of June 30, 2021, an increase of 23% over June 30, 2020....

114.     In the August 30, 2021 Press Release, Defendants further reported as Key Operating Metrics, electricity generation for the quarter representing a 25.8% increase over the same quarter of 2020:

Key Operating Metrics

**Electricity generation during the quarter ended June 30, 2021 was 1,112 million kWh, an increase of 228 million kWh or 25.8%, over the quarter ended June 30, 2020**. The increase in electricity generation was principally a result of an additional 396 MWs of AC (569 MWs DC) operating capacity, including our Rooftop Portfolio commissioned since June 30, 2020. Our Plant Load Factor ("PLF") for the quarter ended June 30, 2021, was 23.7%, compared to 23.1%, for the same comparable periods in 2020, which increased principally due to the addition of AC and DC capacity in high insolation locations and improved performance by our plants.

36

115.     The above statements were materially false, misleading, and/or lacked a

reasonable basis when made because:

(a)     Defendants admittedly had to restate for Fiscal 2022, "reported" MWs
Operating downward to 2,666 for Fiscal 2022 as result of data
manipulations and improper payments reported in the Second and Third
Whistleblower Complaints discussed above;

(b)     Defendants disclosed in the 2022 Form 20-F, that Azure identified
inconsistencies in project data for a number of projects in Fiscal 2022 and
2023 and that certain of Azure's executives, which Plaintiffs believe to be
Defendants Gupta and Subramanian who were terminated in April 2022,
"were involved in an apparent scheme with persons outside the Company
to make improper payments in relation to a project," which required Azure
to record a de-capitalization adjustment of US$ 3.4 million;

(c)     The auditor's report in the 2022 Form 20-F provided that "in one of the
projects, certain employees of the Group obtained a premature plant
commissioning certificate after submitting inaccurate data;"

(d)     As Defendants admitted on August 29, 2022, August 31, 2022, January 25,
2023 and in the 2022 Form 20-F, for the last three years, there was
affirmative "evidence of manipulation and misrepresentation of project
data by some employees," including "corrupt payments" and "failures to
provide accurate information both internally and externally," related to at
least four large projects, which Defendants viewed as "serious issues," and
were forced to report to the SEC and DOJ;

(e)     Defendants admitted in the January 25, 2023 Press Release and 2002 Form
20-F that, with respect to at least one customer, Azure incurred "shortfalls
in generation" from not "timely commissioning [] the full capacity required
under the PPA," resulting in "shortfalls in generation," subjecting the
Company to overstating reported megawatts and liquidated damages under
the customer PPA estimated at US $5.2 million;

(f)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F
that Azure's internal controls over financial reporting were inadequate and
that "[m]anagement has identified material weaknesses in the design and
operating effectiveness of internal control over financial reporting in
relation to land acquisition process, assets capitalisation, vendor selection
criteria and monitoring of management review controls inter-alia including
those related to significant estimates and financial statement closing
process;" and

(g)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

### III.   Quarter Financial Results Earnings Call on August 31, 2021

116.    On August 31, 2021, Defendants held their fiscal first quarter 2022 earnings call (the "August 31, 2021 Earnings Call"). During this call Defendant Subramanian represented that Azure ensured a culture of safety and compliance:

> We highlighted our ISO-45001 certification earlier this year, **which demonstrates Azure's focus on occupational health and safety**.

> I'm happy to report we have also recently won the Greentech Effective Safety Culture Award for 2021 from Greentech Foundation, **which signifies the efforts we have put in to ensure safety culture is embedded across our project locations and sites**.

117.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made when made because, as Defendants confirmed in the August 29, 2022 Press Release and during the August 31, 2022 Special Call, Azure "discovered deviations from safety and quality norms" requiring Azure to "strengthen our safety and quality protocols at this plant, but also across our other operations." Further, by touting Azure's ISO 45001 certification and Greentech Effective Safety Culture Award,[20] Defendants communicated Azure was in compliance with the international standards and had systems in place that were closely monitored by management to minimize risk and injuries in 2021 and those processes were still in place and functioning at the highest levels in Fiscal 2022.

118.    During the August 31, 2021 Earnings Call, Defendant Gupta falsely stated "**[t]oday, we have 23% more megawatts operating than we did at the same time last year**[.]"

---

[20] The Greentech Foundation "recognize[s] outstanding and exemplary initiatives and practices in the areas of developing effective safety culture to reduce incidents and accidents to save precious human lives at work places." *See* Greentech Foundation, Greentech Effective Safety Culture Award 2021, https://www.greentechevents.com/event-details/greentech-effective-safety-culture-award-2021 (last accessed November 7, 2023).

119.    Defendant Agrawal similarly falsely stated that Azure increased its operating megawatts by 23% as compared to the prior year:

> Thank you, Murali. Turning to Page 9. As of 30 June 2021, **we were operating 2,052 megawatts on a PP or AC basis, which is 23% higher than what we were operating a year before. Our portfolio of 6,955 megawatts remained stable from the previous quarter**. While these portfolio megawatt numbers exclude Rooftop portfolio, which is in the process of getting transferred to Radiance, our financials number continue to consolidate Rooftop till the transfer process is completed.

120.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made, because:

(a)    Defendants admittedly had to restate for Fiscal 2022, "reported" MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaints discussed above;

(b)    Defendants disclosed in the 2022 Form 20-F, that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's executives, which Plaintiffs believe to be Defendants Gupta and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project," which required Azure to record a de-capitalization adjustment of US$ 3.4 million;

(c)    The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(d)    As Defendants admitted on August 29, 2022, August 31, 2022, January 25, 2023 and in the 2022 Form 20-F, for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and "failures to provide accurate information both internally and externally," related to at least four large projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(e)    Defendants admitted in the January 25, 2023 Press Release and 2022 Form 20-F that, with respect to at least one customer, Azure incurred "shortfalls in generation" from not "timely commissioning [] the full capacity required under the PPA," resulting in "shortfalls in generation," subjecting the

Company to overstating reported megawatts and liquidated damages under the customer PPA estimated at US $5.2 million;

(f)    Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(g)    As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

**IV.    Press Release October 22, 2021 Announcing a 120 MW Wind Project With SECI**

121.    On October 22, 2021, Defendants issued a press release, attached to a Form 6-K filed with the SEC, signed by Defendant Gupta, ("October 22, 2021 Press Release") announcing it received a **letter of award (LOA) for its first wind project, 120 MW ISTS project with Solar Energy Corporation of India (SECI) to supply power for 25 years at a tariff of INR 2.70 (~US 3.6 cents) per kWh**. The October 22, 2021 Press Release further stated that "[t]he project is part of the 1,200 MW ISTS Tranche – XI tender from SECI and shall be constructed in Karnataka, within a period of 18 months from the signing of Power Purchase Agreement (PPA)". Defendant Gupta falsely stated that, "[t]his is a significant milestone in Azure's journey as the leading renewable energy player in India. **We have secured our first step in diversifying our presence in the renewable spectrum in India and it positions us well to add to our addressable market while we build scale in this segment on the back of strong management experience and Azure's long history of execution**."

122.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made, because:

(a)     Defendants admitted in the 2022 Form 20-F that misrepresentations were made "by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project," and that former executives "circumvented internal policies in connection with the approval of another transaction related to another wind project;"

(b)     As Defendants admitted on August 29, 2022, August 31, 2022, January 25, 2023 and in the 2022 Form 20-F, for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and "failures to provide accurate information both internally and externally," related to at least four large projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(c)     The auditor's report in the 2022 Form 20-F provided that "in one of the projects, a member of the Group entered into agreements with some land aggregators for adjustments to land use permissions which may have involved improper payments;

(d)     The auditor's report in the 2022 Form 20-F concluded that there were "potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project;"

(e)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(f)     As a result of the foregoing, Defendants statements surrounding the October 22, 2021 120 MW wind project with SECI were false and misleading because it was obtained and operated by corrupt means.

## V.   <u>Press Release on November 11, 2021 Announcing a 150 MW ISTS Connected Wind-Solar Project With SECI</u>

123.    On November, 11, 2021, Defendants issued a press release, attached to a Form 6-K filed with the SEC, signed by Defendant Gupta ("November 11, 2021 Press Release"), announcing that Azure "**received the letter of award (LOA) for its first 150 MW ISTS**

**connected wind–solar hybrid power project with Solar Energy Corporation of India (SECI)
to supply power for 25 years at a fixed tariff of INR 2.35 (~US 3.2 cents) per kWh**."

124.    The November 11, 2021 Press Release further stated that the project is "part of the
1,200 MW ISTS Hybrid Tranche – IV tender from SECI **and will entail setting up of 100 MW
of solar and 50 MW of wind capacity** within a period of 18 months from the signing of Power
Purchase Agreement (PPA)." Defendant Gupta falsely stated that, "[f]ollowing up on our first
wind project win, **we have secured yet another important milestone with our first solar-wind
hybrid project with SECI. We have taken steps to develop large wind sites and this project,
along with the wind project we announced earlier, will be built as part of that development.
With this win, we are confident of maximising our growth potential** with the remarkable
opportunities that we have in the Indian renewable energy market."

125.    The above statements were materially false, misleading, and/or lacked a
reasonable basis when made, because:

(a)    Defendants admitted in the 2022 Form 20-F that misrepresentations were
made "by former executives to the Board in July 2021 regarding an asset
purchase transaction for the development of a wind project," and that
former executives "circumvented internal policies in connection with the
approval of another transaction related to another wind project;"

(b)    As Defendants admitted on August 29, 2022, August 31, 2022, January 25,
2023 and in the 2022 Form 20-F, for the last three years, there was
affirmative "evidence of manipulation and misrepresentation of project
data by some employees," including "corrupt payments" and "failures to
provide accurate information both internally and externally," related to at
least four large projects, which Defendants viewed as "serious issues," and
were forced to report to the SEC and DOJ;

(c)    The auditor's report in the 2022 Form 20-F provided that "in one of the
projects, a member of the Group entered into agreements with some land
aggregators for adjustments to land use permissions which may have
involved improper payments;

(d)     The auditor's report in the 2022 Form 20-F concluded that there were "potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project;"

(e)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(f)     As a result of the foregoing, Defendants statements were false and misleading because it was obtained and operated by corrupt means.

## VI.    Second Quarter 2022 Financial Results Press Release on December 10, 2021

126.    On December 10, 2021, Defendants issued a press release, attached to a Form 6-K filed with the SEC, signed by Defendant Gupta, ("December 10, 2021 Press Release") announcing the Company's financial results for its fiscal second quarter 2022 for the period-ending September 30, 2021. The December 10, 2021 Press Release falsely reported a 31% increase in megawatts operating:

**Fiscal Second Quarter 2022 Period ended September 30, 2021 Operating Highlights:**

• **Megawatts ("MW") Operating\* were 2,210 MWs, as of September 30, 2021, an increase of 31% over September 30, 2020. Operating, Contracted & Awarded MWs\* were 6,955 MWs, as of September 30, 2021**…

127.    Defendants also reported in the December 10, 2021 Press Release as "Key Operating Metrics," a 30% and 28% increase in electricity generation for the quarter and six months ended September 30, 2021, respectively:

**Key Operating Metrics**

**Electricity generation during the quarter and six-months ended September 30, 2021 was 1,001 million kWh and 2,113 million kWH, respectively, an**

**increase of 231 million kWh or 30%, over the quarter ended September 30, 2020, and an increase of 460 million kWH or 28%, over the six months ended September 30, 2020**. The increase in electricity generation was principally a result of an additional 529 MWs of AC (728 MWs DC) operating capacity, including our Rooftop portfolio commissioned since September 30, 2020.

128. The above statements were materially false, misleading, and/or lacked a

reasonable basis when made because:

(a) Defendants admittedly had to restate for Fiscal 2022, "reported" MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaints discussed above;

(b) Defendants disclosed in the 2022 Form 20-F, that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's executives, which Plaintiffs believe to be Defendants Gupta and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments to obtain such projects," which required Azure to record a de-capitalization adjustment of US\$ 3.4 million;

(c) The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(d) As Defendants admitted on August 29, 2022, August 31, 2022, January 25, 2023 and in the 2022 Form 20-F, that, for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and "failures to provide accurate information both internally and externally," related to at least four large projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(e) Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that, with respect to at least one customer, Azure incurred "shortfalls in generation" from not "timely commissioning [] the full capacity required under the PPA," resulting in "shortfalls in generation," subjecting the Company to overstating reported megawatts and liquidated damages under the customer PPA estimated at US \$5.2 million;

(f) Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in

relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(g)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

129.    Furthermore, the December 10, 2021 Press Release contained false statements regarding Megawatts commissioned:

**We commissioned 158 MWs AC (188 MWs DC) during the three months ended September 30, 2021 and 220 MWs AC (252 MWs DC) during the six months ended September 30, 2021 against 25 MWs AC (25 MWs DC) during the comparative three months and 26 MWs AC (28 MWs DC) during the six months ended September 30, 2020.**

130.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

(a)     Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that a project with SECI had shortfalls in generation and that it failed to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner; and estimated that contingent liabilities on account of delayed commissioning aggregated to INR 390 million (US\$ 5.2 million);

(b)     The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(c)     The auditor's report in the 2022 Form 20-F provided that "potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project;"

(d)     A March 30, 2023, Economic Times article entitled "Before Azure Power's Results a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged that the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "the new management is waiting for the project to reach COD before announcing the audited result;"

(e)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process; and

(f)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

## VII.   Second Quarter 2022 Financial Results Earnings Call on December 13, 2021

131.    On December 13, 2021, Defendants held their fiscal second quarter 2022 earnings call (the "December 13, 2021 Earnings Call"). During the December 13, 2021 Earnings Call, Defendant Gupta announced the corruptly obtained wind and hybrid projects, and falsely stated that the Company had started working on their development:

> Apart from the SECI manufacturing PPA, we received Letter of Awards **for 120-megawatt wind project and 150-megawatt wind-solar hybrid project with SECI** subsequent to quarter end. These are first steps beyond solar for Azure, and we firmly believe that as the industry moves towards providing dispatchable renewable energy to the grid, wind and storage will be 2 important technology additions in our portfolio. **We have already developed significant organizational capabilities for these in-house, and are looking forward to implementation on the ground with our teams already working on developing large wind sites across the country**.

132.    Defendant Subramanian echoed these same corruptly obtained wind and hybrid projects, promising to only bid for commercially viable tariffs which provides returns above the costs of capital:

> As we discussed during our previous call, we have recently developed organizational capabilities to implement our plans in wind and the hybrid space. **Our recent wins in this regard, the 120-megawatt wind project and the 150-megawatt hybrid project, both with SECI**, provides us an opportunity to kickstart this process of diversifying the portfolio and move in line with the industry, which is increasingly looking at dispatchable power as the sustainable way forward in Indian RE. We want to assure you again that we shall only bid for projects at commercially viable tariffs, one which provides returns above our cost of capital.

46

133.   The above statements were materially false, misleading, and/or lacked a reasonable basis when made, because:

(a)   Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that a project with SECI had shortfalls in generation and that it failed to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner; and estimated that contingent liabilities on account of delayed commissioning aggregated to INR 390 million (US$ 5.2 million);

(b)   The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(c)   The auditor's report in the 2022 Form 20-F provided that "potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project;"

(d)   A March 30, 2023, Economic Times article entitled "Before Azure Power's Results a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "the new management is waiting for the project to reach COD before announcing the audited result;"

(e)   Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(f)   As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

134.   Also during the December 13, 2021 Earnings Call, Defendant Gupta stated that Azure "**had 31% more megawatts operating in quarter 2 this year than we did at the same time last year**."

135.    Defendant Agrawal further echoed Defendant Gupta on the December 13, 2021

Earnings Call, and also repeated the same false financial results as reported in the December 10,

2021 Press Release:

> As of September 30, 2021, **we were operating 2,210 megawatts on a PPA or AC basis, which is 31% higher than what we were operating a year before. Our portfolio was stable at 6,955 megawatts at the end of quarter, which further increased to 7,255 megawatts subsequent to the quarter end with our recent wins**.

136.    The above statements were materially false, misleading, and/or lacked a

reasonable basis when made because:

(a)    Defendants admittedly had to restate for Fiscal 2022, "reported" MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaints discussed above;

(b)    Defendants disclosed in the 2022 Form 20-F, that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's executives, which Plaintiffs believe to be Defendants Gupta and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project," which required Azure to record a de-capitalization adjustment of US$ 3.4 million;

(c)    The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(d)    Defendants admitted on August 29, 2022, August 31, 2022, December 30, 2022, January 25, 2023 and in the 2022 Form 20-F, that for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and "failures to provide accurate information both internally and externally," related to at least four large projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(e)    Defendants admitted in the January 25, 2023 Press Release that, with respect to at least one customer, Azure incurred "shortfalls in generation" from not "timely commissioning [] the full capacity required under the PPA," resulting in "shortfalls in generation," subjecting the Company to

overstating reported megawatts and liquidated damages under the customer PPA estimated at US $5.2 million;

(f)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(g)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

137.     Also on the December 13, 2021 Earnings Call, Defendant Subramanian falsely stated that Azure had successfully commissioned megawatts for its Rajasthan 6 and 8 projects:

**We commissioned 158-megawatt AC capacity and 188-megawatt DC capacity during the quarter**. **As of today, we have completed and commissioned 500 megawatts out of 600 megawatts in our Rajasthan 6 project and balance 100 megawatts is to be commissioned in this month**. We also commissioned 150 megawatts in our Rajasthan 8 project subsequent to quarter end and are now in advanced stages to commission the balanced capacities in the project in the current quarter. Even though construction work on the 300-megawatt Rajasthan 9 was impacted due to supply-related challenges, the team has rallied and we are confident that we will meet the promised time lines.

138.     The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

(a)     Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that a project with SECI had shortfalls in generation and that it failed to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner; and estimated that contingent liabilities on account of delayed commissioning aggregated to INR 390 million (US$ 5.2 million);

(b)     The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(c)  The auditor's report in the 2022 Form 20-F provided that "potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project;"

(d)  A March 30, 2023, Economic Times article entitled "Before Azure Power's Results a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "the new management is waiting for the project to reach COD before announcing the audited result;"

(e)  Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(f)  As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

139.  Also on the December 13, 2021 Earnings Call, Defendant Subramanian further claimed Azure ensured compliance with safety policies and regulations:

I'm happy to report we have also recently won the Greentech Effective Safety Culture Award for 2021 from the Greentech Foundation and the OHS Award from Grow Care India in these areas, **which signifies the efforts we have put in to ensure safety culture, which is now embedded across the project locations and sites**.

Further, we have also successfully completed the surveillance audits for our ISO 9001 and ISO 14001 certification, signifying our continuous focus and improvement on our quality and environment management systems.

140.  The above statements were materially false, misleading, and/or lacked a reasonable basis when made because, as Defendants confirmed in the Company's August 29, 2022 Press Release, and on the August 31, 2022 Special Call, Azure "discovered deviations from safety and quality norms" requiring Azure to "strengthen [our] safety and quality protocols at this

plant, but also across our other operations." Further, by touting Azure's ISO 45001 certification, Greentech Effective Safety Culture Award, and Grow Care India OHS Award,[21] Defendants communicated Azure was following the international standards and had systems in place that were closely monitored by management to minimize risk and injuries in 2021 and those processes were still in place and functioning at the highest levels in Fiscal 2022.

## VIII.   Azure's January 3, 2022 Commissioning Press Release

141.   On January 3, 2022, Defendants issued a press release ("January 3, 2022 Press Release") announcing that the Company had "fully commission[ed] its 600 MWs SECI project[,]" stating in relevant part:[22]

> Azure Power . . .today announced **the successful commissioning of its largest project – 600 MWs Interstate Transmission System (ISTS) connected solar project**, allocated by Solar Energy Corporation of India (SECI). The project is in Bikaner, Rajasthan and the power generated from the project will be supplied to SEC at a tariff of INR 2.53 (  ~US 3.5 cents) per kWh for 25 years. This is the largest solar power project in India, owned and operated at a single location by any developer.
>
> Azure Power has commissioned this project in phases, **with the last 100 MWs commissioned this month**. Following this, **Azure Power has 2510 MWs of high-performing operational solar assets** spread across the country.
>
> "Despite the challenges and while prioritising the health and safety of all our employees and communities, **we have managed to deliver high performing assets** and are extremely proud of achieving yet another milestone in our journey towards a more resilient and sustainable future," says Ranjit Gupta, MD and CEO, Azure Power.

142.   The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

---

[21] The Grow Care India Occupational Health and Safety ("OHS") Award recognizes companies that demonstrate the "highest level of commitment & concern in Safety Management[.]" *See* Grow Care India, Safety Award, https://growcareindia.org/safety-award/ (last accessed November 7, 2023).

[22] Unlike most of Azure's press releases, this press release was not filed concurrently with the SEC but appears on the investor relations section of Azure's website.

(a)     Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that a project with SECI had shortfalls in generation and that it failed to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner; and estimated that contingent liabilities on account of delayed commissioning aggregated to INR 390 million (US$ 5.2 million);

(b)     The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(c)     The auditor's report in the 2022 Form 20-F provided that "potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project;"

(d)     A March 30, 2023, Economic Times article entitled "Before Azure Power's Results a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "the new management is waiting for the project to reach COD before announcing the audited result;"

(e)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(f)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

## IX.     Third Quarter 2022 Financial Results Press Release on February 25, 2022

143.    On February 25, 2022, Defendants issued a press release, attached to a Form 6-K filed with the SEC, and signed by Defendant Gupta ("February 25, 2022 Press Release") announcing the Company's financial results for its fiscal third quarter 2022 for the period-ending

December 31, 2021. Defendants reported a purported 37% increase in megawatts operating as compared to the same quarter in the prior year:

**Operating Highlights:**

• <u>**Megawatts ("MWs") Operating\* were 2,523 MWs, as of December 31, 2021, an increase of 37% over December 31, 2020. Operating, Contracted & Awarded MWs\* were 7,425 MWs, as of December 31, 2021**</u>.

144.     Defendants also reported in the February 25, 2022 Press Release as Key Operating Metrics a 36% and 31% increase in electricity generation for the quarter and nine months ended December 31, 2021, respectively:

Key Operating Metrics

<u>**Electricity generation during the quarter and nine-months ended December 31, 2021, was 1,068 million kWh and 3,181 million kWh, respectively, an increase of 284 million kWh or 36%, over the quarter ended December 31, 2020, and an increase of 744 million kWh or 31%, over the nine months ended December 31, 2020.**</u> The increase in electricity generation was principally a result of an additional 689 MWs of AC (805 MWs DC) operating capacity, including our Rooftop portfolio commissioned since December 31, 2020.

Our Plant Load Factor ("PLF") for the quarter and nine months ended December 31, 2021, was 19.6% and 21.1%, compared to 19.3% and 20.1%, respectively, for the same comparable periods in 2020, which increased principally due to the addition of AC and DC capacity and improved performance by our plants, including Rooftop portfolio. Our Plant Load Factor ("PLF"), excluding rooftop portfolio, for the quarter and nine months ended December 31, 2021, was 20.5% and 22.0% respectively.

145.     The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

(a)     Defendants admittedly had to restate for Fiscal 2022, "reported" MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaints discussed above;

(b)     Defendants disclosed in the 2022 Form 20-F, that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's executives, which Plaintiffs believe to be

Defendants Gupta and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project," which required Azure to record a de-capitalization adjustment of US$ 3.4 million;

(c)     The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(d)     As Defendants admitted on August 29, 2022, August 31, 2022, and January 25, 2023, for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and "failures to provide accurate information both internally and externally," related to at least four large projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(e)     Defendants admitted in the January 25, 2023 Press Release that, with respect to at least one customer, Azure incurred "shortfalls in generation" from not "timely commissioning [] the full capacity required under the PPA," resulting in "shortfalls in generation," subjecting the Company to overstating reported megawatts and liquidated damages under the customer PPA estimated at US $5.2 million;

(f)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(g)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

146.    Furthermore, the February 25, 2022 Press Release contained false statements regarding Megawatts commissioned:

**We commissioned 313 MWs AC during the three months ended December 31, 2021, and 533 MWs AC during the nine months ended December 31, 2021, against 153 MWs AC (236 MWs DC) during the comparative three months and 179 MWs AC (264 MWs DC) during the nine months ended December 31, 2020.**

54

147.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

(a)    Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that a project with SECI had shortfalls in generation and that it failed to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner; and estimated that contingent liabilities on account of delayed commissioning aggregated to INR 390 million (US$ 5.2 million);

(b)    The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(c)    A March 30, 2023, Economic Times article entitled "Before Azure Power's Results a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "the new management is waiting for the project to reach COD before announcing the audited result;"

(d)    Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(e)    As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

## X.    Third Quarter 2022 Financial Results Earnings Call on February 28, 2022

148.    On February 28, 2022, Defendants held their fiscal third quarter 2022 earnings call (the "February 28, 2022 Earnings Call"). During this call, Defendant Gupta confirmed the false and misleading financial information provided in the February 25, 2022 press release:

We continue to see steady improvements on key operational parameters we report. **We had 37% more megawatts operating in quarter 2 – quarter 3 this year than we did at the same time last year.** There has been a 27% year-on-year increase in EBITDA from our operating assets and a 58% increase in cash flow to equity from operating assets during the quarter.

149.   Defendant Agrawal echoed Gupta's remarks and touted Azure's performance:

As of December 31, 2021, **we were operating 2,523 megawatts on a PPA or AC basis, which is 37% higher than what we were operating a year before. Our portfolio was at 7,425 megawatts at the end of the quarter**, which includes signed PPAs for 2,933 megawatts and another 1,537 megawatts for which PPAs are awaited.

150.   The above statements were materially false, misleading, and/or lacked a

reasonable basis when made because:

(a)   Defendants admittedly had to restate for Fiscal 2022, "reported" MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaitns discussed above;

(b)   Defendants disclosed in the 2022 Form 20-F that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's executives, which Plaintiffs believe to be Defendants Gupta and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project," which required Azure to record a de-capitalization adjustment of US$ 3.4 million;

(c)   The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

(d)   As Defendants admitted on August 29, 2022, August 31, 2022, and January 25, 2023, for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and a "failures to provide accurate information both internally and externally" related to at least four large projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(e)   Defendants admitted in the January 25, 2023 Press Release that, with respect to at least one customer, Azure incurred "shortfalls in generation" from not "timely commissioning [] the full capacity required under the

PPA," resulting in "shortfalls in generation," subjecting the Company to overstating reported megawatts and liquidated damages under the customer PPA estimated at US $5.2 million;

(f)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(g)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

151.    Also on the February 28, 2022 Earnings Call, Defendant Subramanian falsely stated that the 7,600-megawatt Rajasthan 6, was fully commissioned:

**<u>Our largest project, 7,600-megawatt Rajasthan 6, is now fully commissioned</u>**, and we expect it to deliver superior performance to our portfolio from the next fiscal onwards. **<u>The second 300-megawatt Rajasthan 8 is also in line to be fully commissioned shortly</u>**. And even though Rajasthan 9 was impacted due to **supply-related challenges, we will persevere**. While this is about our under construction projects, we are very excited about our 4-gigawatt projects where we now have signed PPAs for almost 3 gigawatts, and we look forward to bringing these up to shovel-ready stage very quickly.

152.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

(a)     Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that a project with SECI had shortfalls in generation and that it failed to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner; and estimated that contingent liabilities on account of delayed commissioning aggregated to INR 390 million (US$ 5.2 million);

(b)     The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

57

(c)     A March 30, 2023, Economic Times article entitled "Before Azure Power's Results, a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "[t]he new management is waiting for the project to reach COD before announcing the audited result;"

(d)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;" and

(e)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

153.     During the February 28, 2022 Earnings Call, Defendant Subramanian also touted Azure's "safety culture" and purported significant "efforts in this area:"

> We are extremely proud of where we play in ensuring a better world for our communities, which are so important for our business. **Similarly, safety is one aspect that is paramount to us. The awards that we won for our safety culture, as I reported last time, demonstrate our efforts in this area.** We continue to be rated highly on ESG, with AA rating by MSCI and low-risk categorization by Sustainalytics.

154.     The above statements were materially false, misleading, and/or lacked a reasonable basis when made because, as Defendants confirmed in the Company's August 29, 2022 Press Release, and in the August 31, 2022 Special Call, Azure "discovered deviations from safety and quality norms" requiring Azure to "strengthen [our] safety and quality protocols at this plant, but also across our other operations." Further, by touting Azure's awards, Defendants communicated Azure was in compliance and had systems in place that were closely monitored by management to minimize risk and injuries in 2021 and that those processes were still in place and functioning at the highest levels in Fiscal 2022.

XI.    **Azure's March 14, 2022 Commissioning Press Release**

155.    On March 14, 2022, Defendants issued a press release ("March 14, 2022 Press Release") announcing that the Company had "fully commission[ed] its 300 MWs SECI project[,]" stating in relevant part: [23]

> Azure Power . . . announced **full commissioning of its 300 MWs Interstate Transmission System (ISTS) connected solar project**, Rajastjan 8, allocated by Solar Energy Corporation of India (SECI). The project is in Bhadla, Rajasthan and the power generated from the project is being supplied to SECI at tariff of INR 2.58 (~ US $3.7 cents) per kWh for 25 years.
>
> Following this, **Azure Power has now operationalized 2,683 MWs of high-performing renewable energy assets** in India.

156.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because:

    (a)    Defendants admittedly had to restate for Fiscal 2022, "reported" MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaitns discussed above;

    (b)    Defendants disclosed in the 2022 Form 20-F, that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's executives, which Plaintiffs believe to be Defendants Gupta and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project," which required Azure to record a de-capitalization adjustment of US$ 3.4 million;

    (c)    The auditor's report in the 2022 Form 20-F provided that "in one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data;"

    (d)    As Defendants admitted on August 29, 2022, August 31, 2022, and January 25, 2023, for the last three years, there was affirmative "evidence of manipulation and misrepresentation of project data by some employees," including "corrupt payments" and a "failures to provide accurate information both internally and externally" related to at least four large

---

[23] Unlike most of Azure's press releases, this press release was not filed concurrently with the SEC but appears on the investor relations section of Azure's website.

projects, which Defendants viewed as "serious issues," and were forced to report to the SEC and DOJ;

(e)     Defendants admitted in the January 25, 2023 Press Release that, with respect to at least one customer, Azure incurred "shortfalls in generation" from not "timely commissioning [] the full capacity required under the PPA," resulting in "shortfalls in generation," subjecting the Company to overstating reported megawatts and liquidated damages under the customer PPA estimated at US $5.2 million;

(f)     Azure disclosed in January 2023 Press Release and in the 2022 Form 20-F that Azure's internal controls over financial reporting were inadequate and that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process;"

(g)     A March 30, 2023, Economic Times article entitled "Before Azure Power's Results, a Project Awaits Rollout," revealed a "source in the know of the development" who was quoted stating, "[t]he whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational," and "[t]he new management is waiting for the project to reach COD before announcing the audited result;" and

(h)     As a result of the foregoing, Azure's business and financial conditions were materially worse than represented.

## THE TRUTH IS REVEALED

I.     **April 26, 2022 Form 6-K Announcing Defendants Gupta and Subramanian's Sudden Departures**

157.     On April 26, 2022, days before Azure claims it received the Second Whistleblower Complaint, Azure issued a Form 6-K, signed by Mr. Rosling. The April 26, 2022 Form 6-K attached a press release titled *Azure Power Announces Resignation of Ranjit Gupta as Chief Executive Officer and Murali Subramanian as Chief Operating Officer*, announcing that Defendant Gupta would be resigning as CEO and a Board member, and Defendant Subramanian would be resigning as COO purportedly "to pursue other opportunities." The April 26, 2022 press

release stated that Alan Rosling, Chairman of the Board, would "oversee the Company in the interim" while the Board searches for a new CEO.

158.    Upon the news, the price of Azure's equity shares dropped $1.73 per share from a closing price of $14.66 per share on April 25, 2022 to $12.93 per share on April 26, 2022.

## II.    **August 16, 2022 Amended Form 12b-25 Notification of Late Filing and Internal Control Deficiencies**

159.    On August 16, 2022, Azure filed an Amended Form 12b-25 Notification of Late Filing with the SEC, signed by Defendant Agrawal, stating for the first time not only that Azure was unable to file its 2022 Form 20-F by the Extended Due Date, but also that the Company's internal controls were so bad that Defendants could not provide a date for when they could file Azure's 2022 Form 20-F, stating, in pertinent part:

> Azure Power Global Limited (the "Registrant") was not able to file its Annual Report on Form 20-F for the year ended March 31, 2022 (the "Form 20-F") within the initial prescribed time period. The Registrant previously filed a Form 12b-25 on August 1, 2022 (the "Original Notice"). As indicated in the Original Notice, the Registrant intended to file the Form 20-F on or before the fifteenth calendar day following the due date of the Form 20-F (the "Extended Due Date"). However, the Registrant no longer expects to file the Form 20-F by the Extended Due Date.

> The delay in filing the Form 20-F is due to Registrant's ongoing review of its internal control and compliance framework. These matters are being progressed with the assistance of the Registrant's advisers. The Registrant is making all efforts to file its Form 20-F as soon as practicable.

> * * *

> The Registrant anticipates a significant change in its results of operations for the twelve-month period ended March 31, 2022, as compared to the twelve-month period ended March 31, 2021. The Registrant is a growing company with significant increase in operating capacity during the current year. Also, this is the first year of no emerging growth exemption as the Registrant completed its fifth anniversary during the fiscal 2022 from the first sale of common equity shares. A reasonable estimate of the results of operations could not be made as of the current date as the Registrant's accountants are still preparing the registrant's results of operations and consolidated accounts for the group.

160.     Upon the news, the price of Azure's equity shares declined from a closing price of $12.25 per share on August 15, 2022 to close at $11.25 per share on August 16, 2022.

**III.     The August 29, 2022 Press Release**

161.     On August 29, 2022, before the market opened, Azure shocked the market when it announced yet another CEO resignation, disclosing that CEO Harsh Shah, who started at Azure not even two months prior in July 2022, resigned, effective immediately. Defendants provided no explanation for Shah's sudden departure and characterized it as an "unexpected decision." The same day, in a second press release, Azure announced the appointment of Rupesh Agarwal as Acting CEO as a replacement for Harsh Shah. Azure also stated its Board will consider new appointments for a permanent CEO "in due course."

162.     Defendants also revealed in the second August 29, 2022 Press Release, that Azure had received the Second Whistleblower Complaint ***in May 2022***—months earlier—but failed to disclose it until the end of August. Defendants revealed that the Second Whistleblower Complaint alleged, among other things, "potential procedural irregularities and misconduct by certain employees at a plant belonging to one of its subsidiaries:"

WHISTLEBLOWER ALLEGATIONS

The Company received a whistleblower complaint in May 2022 alleging potential procedural irregularities and misconduct by certain employees at a plant belonging to one of its subsidiaries. ***As part of the Company's review of these allegations, it discovered deviations from safety and quality norms***, and it has implemented mechanisms to remediate them and in so doing strengthen safety and quality protocols. Azure's Audit Committee, with the assistance of legal counsel and forensic accounting support, also identified evidence of manipulation of project data and information by certain employees. The Company is implementing immediate remedial measures, and Azure is initiating disclosure of the findings to the appropriate authorities.

163.    In the same press release, Azure announced further delays in the filing of its 2022

Form 20-F annual report:

> Following its August 12, 2022, announcement of a delay in the filing of the
> Company's annual report on Form 20-F for the financial year ended March 31,
> 2022 ("FY 2021-22"), the Company reiterates that it is working in close
> consultation with its advisers to close its annual accounts. At this point, the
> Company is unable to give a firm timeline for submission of its Form 20-F for FY
> 2021-22.

164.    On this news, the price of the Company's equity shares fell $4.61 per share, or

44%, to close at $5.85 per share on August 29, 2022, on unusually heavy trading volume.

165.    On August 29, 2022 RBC Capital Markets analyst Elvira Scotto, stated, "AZRE

issued a press release with a number of updates, most of which were negative, including a CEO

departure and the Audit Committee's identification of data manipulation at an AZRE subsidiary.

AZRE shares are down ~44% on the news." Scotto further explained:

> In May 2022 a whistleblower came forth with allegations of misconduct at a plant
> that is part of an AZRE subsidiary. An investigation revealed safety and quality
> issues at the plant. In addition, AZRE's Audit Committee found instances of data
> manipulation at the AZRE subsidiary. Management provided no further insight to
> what data certain employees had manipulated. In addition, AZRE has yet to file
> financials for FY22 or 1Q23 and has no firm timeline available for filing.

166.    In his August 30, 2022 report, analyst Maheep Mandloi of Credit Suisse found the

whistleblower allegations "concerning," explaining, "[a]fter a whistleblower complaint at one

power plant, the company identified deviations in safety norms and evidence of project data

manipulation by some employees. Management hasn't shared any other detail at this time on the

potential impact and the prevalence of said issue across other plants."

167.    Sadif Investment Analytics also issued a report on August 29, 2022 stating, "Azure

Power Global Ltd has a dark prospect...Overall the company is rated as high risk." Sadif found

that Azure was "significantly below the sector average and below its top 3 ranked competitors in terms of business similarity[.]"

168.    On August 30, 2022, Analysts Justin Clare and Philip Shen from Roth Capital Partners placed Azure shares under review, explaining that "[w]e are moving AZRE to Under Review from Buy as AZRE continues to be delayed in filing its 20F for financial year ended March 31, 2022 and is unable to provide a timeline for submission."

169.    On August 31, 2022, Azure held a "Special Call" with investors. Throughout the call, Mr. Rosling made it clear to frustrated analysts and investors that he would not provide any further details relating to the whistleblower complaint.

170.    Instead, Mr. Rosling demurred about the whistleblower complaint and the sudden departure of Harsh Shah:

> Let me now turn to the whistleblower issue that you referred to in the press note, which was received in May this year, and anonymous was whistleblower allegation. The complaints, and ***there were 3 strands to the original complaint, had led to certain potential procedural irregularities and misconduct by 2 employees at a single plant belonging to one of our subsidiaries***. As part of the company's review of these allegations, ***we discovered deviations from safety and quality norms at the facility, and the company's executive management immediately took action to influence mechanisms to remediate these health and safety issues***, and in so doing, to strengthen our safety and quality protocols at this plant, but also across our other operations.
>
> Safety is genuinely paramount for us. We've got every Board meeting since I joined with health and safety. We do not tolerate lapses from our health standards and safety so that we can be confident that all of our employees return safely to their families each day after work.
>
> And then secondly, Azure's Audit Committee with the assistance of legal counsel and forensic accounting support, carried out an investigation into another of the strands of the whistleblower allegations ***and indeed identified evidence of manipulation of project level data and information by certain employees***. This is just unacceptable, and the company has implemented immediate remedial measures and has initiated the disclosure of such findings to the appropriate authorities.

***

On the matter of our loss of our CEO, Harsh, I would like to reemphasize what we said in the press note *that Harsh's resignation was unexpected and regrettable*. I have to say, I wish him well going forward *in the place that he has now landed*. However, I would like to introduce all of you to Rupesh Agarwal, our Acting CEO.

171.    In response to Defendants' commentary, Analyst Justin Lars Clare of ROTH

Capital Partners, inquired about whether the data manipulation affected costs:

So first off here, I was just wondering, could you share what kind of project data and information was manipulated? *Was this energy generation data or revenue or costs*? And then just wanted to understand the scope of the issue. *How many projects may have had data manipulated*? Was this one project or was this more widespread across multiple projects? And then *are there implications here for your financial reporting*? Could you have *overstated revenues or earnings*? And is there a risk that you may have to restate financials here?

172.    Mr. Rosling claimed that the Second Whistleblower Complaint purportedly

affected a single project, and that the data manipulation did not cause any overstating of past

income:

First of all, *this relates to a single project only*. I am, as you'll understand -- look, I'm sorry to keep falling back on this, but you'll understand the position we're in. I can't go into the details of the allegations and what we found in the inquiry because you can imagine the process we're going through and the next steps that we may have to do. But what I can say is it relates to -- the whistleblower complaint related *to a single project, a very small number of employees*. I can't go into the details of exactly what we discovered. I'm afraid, I regret that.

*There is, as far as we know, not a question of overstating [past] income*. And I think I better stop there because you understand that this process has still got some legs to it.

173.    A request for more detail about the whistleblower complaint from Maheep

Mandloi of Credit Suisse was met with a firm answer that Azure's processes were violated and

there were serious issues:

__Credit Suisse__: First, just on the whistleblower allegation and understand the limited clarity can give at this stage. But could you just talk about which -- what are the potential implications? Is it something where you could see fines from the

Indian government counter parties? Or is it just the restatement, which is the risk here?

And secondly, for Rupesh, my question on strategy as, Rupesh, you've been around for few months here. So any clarity or any thoughts on the strategy for the business going forward here?

**<u>Alan Rosling</u>**: Maheep, look, at this point, ***we have found that our processes and our standards have been violated.*** And that's what we focus. So we refuse to have standards of compliance and behavior, which falls below our processes and our ethics and our beliefs.

The questions you go on to ask about the consequences of the robust way in which we are handling this and the way *we are coming forward to talk to appropriate authorities*, that I can't answer at this point. The only thing we're focused on is doing the right thing, addressing what we've discovered, ensuring that no such thing can reoccur. And I apologize again that getting dragged into the details of these particular cases just beyond what we can do at this stage.

***

So we have got a road map in place, which Rupesh has been working on since he joined us. The Board has been -- have been engaged in. And the sort of the sort of blip that we're facing now, *the challenges we're facing* average, *I do not underestimate*, ***I do not want to underscore how there are serious issues, which we are taking seriously***. But we need to look through them. We need to drive through them. We need to solve them so that we can get to that strategic opportunity that Rupesh is referring to."

174.    Analyst Puneet J. Gulati from HSBC, Research Division asked whether the safety issues and the data issues occurred at the same project:

So my first question is -- you've talked about 2 aspects*: one was misrepresentation of data; and second was deviation in quality and safety norms. Do they relate to the same project? Or are there separate projects under question here*? And if you can also comment on the materiality of these deviations and with the presentation.

175.    Mr. Rosling again responded that he could not speak to the materiality, but confirmed that both the complaint about safety and the complaint about data manipulation, occurred at a single project:

The materiality, I don't think I can at this stage for the same reasons I keep referring back to, and I apologize again for not being able to be as open and

transparent as we would like to be. It is just too difficult, as you can imagine, with the position we're in.

***

Last year, we had a couple of whistleblower allegations, which you -- we disclosed to the market. Almost-- several of them, most of which we turned out not to have substance that led us to review the processes and systems we have, the handling of whistleblowers. *So in this case, we have a single whistleblower, about a single project who made a number of separate allegations. The one was around health and safety at the site and one was about the incorrect reporting upwards of information.*

The first one, as I said earlier on, about *health and safety.* When -- the process is when we get one of these whistleblower allegations the Audit Committee Chairman is immediately notified. Internal audit take a first look to see whether there might be substance. And if it is, we can deal with the matter either by dismissing it because it doesn't have any truth or we'd handle it internally, we do so. Otherwise, its protocol is we need to have an independent third-party investigation.

So in this case, on the health and safety, we determined ourselves immediately that *there was substance of some of the things that whistleblower* the same about the site, and *we took immediate remedial action at that site.* And indeed, as I said, cascade it the learning across because health and safety is never, as you understand, a single thing. You keep going, you keep going because people [are] people and standards people forget and don't do things, and we [all do it in] our own [daily] lives.

The second set of *allegations around the data,* because it was in the nature of an allegation of that nature, *we immediately commissioned an independent party.* Some of you have asked us on the e-mails *why it's taken time since when the whistleblower submitted his complaints to us concluding this part of the investigation and disclosed to the market.*

Frankly, these things take time *to commission an independent law firm,* for them to do their process to go through all of the electronic information they need to do, it takes some time. So they are *a single whistleblower with a number of strands, one of which we had to bring an independent party and some forensics to get to the bottom of.*

176.     Puneet J. Gulati, followed up, confirming, "So single whistleblower and single project is what I should take it away from." To which Alan Rosling stated, "That's right. That's correct."

177.     Puneet J. Gulati, then asked about the CEO departures:

Is the CEO departure in any way linked to this? And number two, why is there a notice period prior to CEO departures? Management transition offers still a bit of time, and both your previous CEOs left without notice or the stake was informed on the last year -- so if you can comment on that.

178.     Alan Rosling responded that confidentiality prevents him from disclosing the

entire situation, but claimed that Harsh Shah's departure was for personal reasons:

*The 2 CEOs that have left us in the last 2 months are entirely different cases.* In the case of Harsh Shah, he came to me with a very personal request to be released. I'm afraid, again, I'm going to have to say for reasons of confidentiality and contract and my understanding within, I don't -- I cannot be drawn on these personal reasons. But I -- as I say**,** *you've probably seen what -- where Harsh has landed.* And as I said, I wish him well.

179.     Analyst Varun Ahuja of J.P. Morgan, was concerned about how the sudden

outpouring of negative information looks to the market and noted the timeline of events, and

inquired why the whistleblower complaint was not disclosed earlier:

The sequence of events available happened. *It clearly is giving a [signal] to the market that the issue is significantly bigger than what hopefully it actually is.* So, my question for you is more on the [governance] part that Harsh coming in after CEO and COO left, clearly, he would have at least been in the know-how or should have been in the know-how as to what are the implications because he joined in July and the whistleblower allegation was in May. So, despite that -- so we would naturally I presume would have been aware of this issue. So my question on that [governance] front is when Harsh left, it seems like it was -- is the actual issue much bigger than what we thought at the time of his joining?

And then just on that, why was this whistleblower issue not highlighted just a week back when he did the call, and it was always said that the results delayed because of the 5-year change, then actually the [PIL]and the whistleblower issue should have been mentioned then and there itself. So, the sequence of events from a governance perspective is creating a lot of panic in the market. Alan, if you could comment on that. So those will be my questions.

180.     Mr. Rosling reveled there was wrongful treatment of information, but again stated

that they cannot comment on the investigation:

Look, Varun, we cannot comment until an investigation is complete. I think you'll understand. So the part of the whistleblower complaint, ***which related to wrongful treatment of information***, was subject to a[n] independent third-party legal process commissioned from the major law firm. Until that exercise reports back, obviously, we can't disclose anything about it, and we can't take action.

So we are taking the first opportunity since the delivery of that work by the independent investigation to update you as our shareholders. Had, of course, we've been in a normal course, we've been disclosing it in a 20-F. But sadly, that is not the case. That is not what we had hoped to be the case. But we're taking the first opportunity to disclose that this has happened.

181.    Analyst Varun Ahuja of J.P. Morgan found the special call uninformative, stating, in his September 1, 2022 report, "Azure's investor call yesterday didn't bring out many details on aspects including the scale of the 'safety and control'; investigation, data manipulation and PIL, etc." Ahuja further wrote, "[g]iven the way the series of events is unfolding with piecemeal information coming out, *we think there would remain medium-term risk-premium* associated with Azure's bonds[.]"

182.    Analyst Elvira Scotto of RBC Capital Markets downgraded Azure Power Global on September 1, 2022, to Sector Platform and added a speculative risk qualifier, because of "the uncertainty resulting from the significant delay in AZRE filing its Form 20F and the identification of data manipulation at one of its facilities." Ms. Scotto found the whistleblower allegations "concerning," because "AZRE did not provide any details on the type of data the employees manipulated, the affected plant, the potential ramifications nor any remediation efforts" explaining, "[d]ata manipulation is more concerning to us as we believe it implies lack of proper oversight controls at the plants. In addition, while the whistleblower allegations relate to a single plant, the veracity of data at other plants comes into question."

183.    Likewise, Ms. Scotto found Azure's failure to file the 20-F concerning, as she noted in her September 1, 2022 report, "[d]elay in Form 20F filing adds to uncertainty and raises

going concern questions," and pointed out that "AZRE has not published financial data since 12/31/21, which limits visibility into AZRE's liquidity."

**IV.    The July 13, 2023 Update Revealed A Further Delay in the 2022 20-F Filing and All But Certain Delisting**

184.    In a press release, filed on July 13, 2023, Azure announced that its auditors S.R. Batliboi, tendered its resignations as the Company's independent registered public accounting firm and the auditors of the subsidiary companies of Azure Power India Private Limited and, therefore, Azure would not meet its deadline to file the 2022 Form 20-F. As a result, Azure would be delisted from the NYSE.

185.    Defendants revealed that "in light of the change of the Group's auditors," Azure would need another 14 weeks to file its 2022 Form 20-F. The delay in filing the 2022 20-F, however, was due to more than a mere change in auditors. Rather, Azure's auditors resigned because Defendants had not provided them with accurate information needed for the U.S. listing, including the full impact of the whistleblower complaints:

> In its letter, SRB [S.R. Batliboi] stated that in view of the fact that they are yet to receive the information that they have requested to complete their audit work inclusive of our March 31, 2022 draft financial statements, US annual filing, associated books and records, and our conclusions and representations on the impact of the whistle blower complaints, it is not possible for them to complete the audit of the financial statements within the timeline expected by the company. They have therefore tendered their resignation.

186.    Defendants also informed the market that the NYSE had set a deadline of July 15, 2023, and delisting may occur on or around July 15, 2023.

> As previously reported, the NYSE had set a deadline of July 15, 2023 for the Company to fulfil its reporting obligations for Fiscal 2022 (including filing its Form 20-F for Fiscal 2022 with the SEC). In light of the change of the Group's auditors as disclosed today, the Company expects that the audits of the financial statements for Fiscal 2022 of the Company, the Group and its subsidiaries will require an additional 14 weeks to complete. The NYSE, however, has indicated that suspension of trading and delisting may occur on or around the July 15, 2023

deadline. However, the Company may appeal any such delisting decision by the NYSE. The Company's SEC reporting obligations under the US Securities Exchange Act of 1934 (the "Exchange Act") will continue even if delisted, however, and the Company will continue to be required to provide periodic reports to the SEC.

187.     Upon the news, the price of Azure's equity shares declined from a closing price of $1.69 per share on July 13, 2023 to close at $0.34 per share on July 14, 2023, a decline of $1.35 per share, or 79.9% on unusually heavy trading volume.

## **POST-CLASS PERIOD EVENTS**

## I.     **Additional Executive and Auditor Resignations**

188.     On May 1, 2023, Defendant Pawan Agrawal was quietly replaced by Sugata Sircar as Azure's CFO.  As Defendants stated in Azure's May 3, 2023 press release, "[a]s a further step to strengthen the Company's overall governance and control, Sugata Sircar has joined the Company as Group CFO." Defendant Pawan Agrawal was relegated to "CFO of Azure Power India Private Limited and its group of subsidiaries, reporting to Sugata."

189.     On September 5, 2023, S.R. Batliboi and Ernst & Young Mauritius further resigned as Azure's auditors and as the auditors of Azure's subsidiaries.  Defendants stated they expect that "these resignations may generate negative publicity," and "cause investors to lose confidence in our financial reporting."

190.     Finally, on October 11, 2023, Mr. Rosling resigned as Chairman of the Board and as a director of the Company, with absolutely no explanation, and was replaced immediately by Mr. M.S. Unnikrishnan.

191.     Defendants admitted in the 2022 Form 20-F that the loss of executives over the years "has created internal disruption, adversely affected our operations and strategy implementation and attracted negative publicity."

II.     **The Long-Awaited 2022 Form 20-F Confirms
        Corruption, Fraud, and Internal Control Violations**

192.    On October 12, 2023, Azure filed its 2022 Form 20-F, signed by Azure's current

CEO, Sunil Gupta, and the current CFO, Sugata Sircar. Azure's belated 2022 Form 20-F

confirmed the widespread corruption at Azure and expanded on previously disclosed details

concerning the whistleblower complaints.

A.     **The Whistleblower Allegations and Special Committee Investigation**

193.    In the 2022 Form 20-F, Defendants disclosed that Azure's investigation into the

allegations asserted in the Second Whistleblower Complaint found misrepresentation of project

data resulting in shortfalls in generations, which Azure reported to SECI, who warned that it could

impose damages and penalties:

> In May 2022, we received a whistle-blower complaint that alleged health and
> safety lapses, procedural irregularities, misconduct by certain employees,
> improper payments and false statements relating to one of our projects belonging
> to a project subsidiary. Following extensive investigation by the Ethics
> Committee, supervised by the Board's Audit and Risk Committee and by external
> counsel and forensic professionals, *we identified evidence of manipulation and
> misrepresentation of project data by some employees at that project site. Weak
> controls over payments to a vendor and failures to provide accurate information
> both internally and externally were found*, but no direct evidence that any
> improper payment was made to any government official was identified*. Further,
> in Fiscal 2023, we reported to SECI that this project had (i) shortfalls in
> generation and (ii) that it failed to timely complete and commission the requisite
> contractually required capacity*. On January 3, 2023 and January 4, 2023, SECI
> advised us, inter alia, that the project may be liable for damages and penalties for
> shortfalls in generation and for not commissioning the full capacity required under
> its PPA in a timely manner.

194.    With respect to the First and Third Whistleblower Complaints, Defendants

disclosed that, contrary to their prior statements that the allegations in those complaints "*[were]*

*unsubstantiated*" and did "*not have any material financial impact* on the financial statements,"

there were, in fact, *significant issues* requiring "adjustments" to Azure's books:

In September 2022, we received an additional whistle-blower complaint primarily making similar allegations of misconduct as raised in the May 2022 complaint, as well as allegations of misconduct related to joint ventures and land acquisition, allegations of our failure to be transparent with the market and advisors and other allegations. The Ethics Committee, supervised by the Board's Audit and Risk Committee, with the support of external counsel and forensic accounting professionals, investigated these September 2022 allegations.

The investigation of the September 2022 complaint *identified significant control issues in the process of acquiring land and land use rights in relation to one of our projects*. The investigation specified that third party land aggregators may have been involved in improper payments but no improper transfer of money by the Group was identified. *We have made an adjustment (de-capitalization) in the books of accounts of INR 135 million (US$ 1.8 million) on estimate, as a prudent measure in the given project. Further, we have reviewed the entire amount paid to land aggregators in other projects to identify any similar issue and after an assessment a further adjustment (decapitalisation) aggregating to INR 118 million (US$ 1.6 million) has been made in the books of account on estimate, as a prudent measure*, though no improper payments by the Group could be identified.

195.   Defendants further revealed that the investigation into the Third Whistleblower Complaint led to findings that former executives made misrepresentations about wind projects and violated internal policies:

We also identified *potential misrepresentations made by former executives* to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project. In addition, it appears *our former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project*. We were not able to identify any evidence of improper payments related to either of these transactions. Considering the observations regarding the transactions, we have reassessed the valuation of the asset purchase and related government orders and did not find any adjustment that needed to be made in the books of account.

196.   Moreover, Defendants further revealed that while investigating the Second and Third Whistleblower Complaints, they found more inconsistencies with project data:

As part of our investigations of the May 2022 and September 2022 whistle-blower complaints, we also widened our review to include a review of projects commissioned in Fiscal 2022 and Fiscal 2023 to ensure that similar weaknesses were not present. As part of our investigations, *we identified inconsistencies in project data* in certain of our projects, but we identified no improper payments made in connection with these projects.

197.    A special anti-corruption committee of the Board of Directors had to be assembled to conduct a three-year review of projects and contracts, supported by outside experts, which ultimately turned up evidence that former executives which, upon information and belief, are Defendants Gupta and Subramanian, were involved in a scheme to make improper payments:

> In addition, a Special Committee of the Board of Directors (the "Special Committee") was convened in August 2022 to review certain material projects and contracts over a three-year **period for anti-corruption and related compliance issues**. Independent outside counsel and forensic advisors were engaged to support the Special Committee. The Special Committee's investigation has identified evidence that **former executives were involved in an apparent scheme with persons outside the Company to make improper payments** in relation to a project but no related improper payments or transfers by the Group have been identified. The Special Committee's review and its findings could impact our decision-making in connection with such projects. **We have disclosed the details of the Special Committee's investigation to the SEC and the U.S. Department of Justice, and we continue to cooperate with those agencies**.

198.    Defendants explained that the repercussions could include a variety of liabilities such as PPA cancellations, becoming barred from SECI's future contracts, penalties, as well as fines imposed by the SEC and the U.S. Department of Justice:

> Our Group including our subsidiaries with respect to affected projects could be exposed to liabilities under the relevant contractual and tender documents (including levy of damages and liquidated damages, reduction of PPA tariffs and/or short closure of capacity), administrative actions (including the risk of PPA cancellation, risk of being debarred from SECI's future contracts, withdrawal or nullification of commissioning certificates and/or revocation of commissioning extensions) and penalties from customers and other civil liabilities, all of which could adversely impact the revenue, profitability and capitalization of the affected projects.

> In addition, fines and/or penalties by regulatory authorities (including by the SEC, the U.S. Department of Justice and applicable Indian regulatory authorities) could be imposed on us. Any such fines or penalties could materially and adversely affect our business, results of operations, financial condition and cash flows in future periods. In addition, we could be exposed to future litigation in connection with any findings of fraud, corruption, or other misconduct by our employees and former employees and executives.

B. **The Auditor Provides an Adverse Opinion**

199.    Along with Azure's 2022 Form 20-F, Azure's auditors, ASA & Associates, LLP,

("ASA") appointed July 12, 2023, provided an adverse opinion.

200.    *First*, ASA concluded that there is substantial doubt related to Azure's ability to

continue as a going concern:

Substantial Doubt related to Going Concern

The accompanying consolidated financial statements have been prepared
assuming that the Group will continue as a going concern. As discussed in Note
12 to the consolidated financial statements, the Group has breached loan covenants
to certain lenders owing to delay in submission of audited financial statements in
Fiscal 2022 and Fiscal 2023. These events raise a substantial doubt about the
Company's ability to continue as a going concern. Management's plans in this
regard are also described in Note 12. The consolidated financial statements do not
include any adjustments that might result from the outcome of this uncertainty.[24]

201.    *Second*, ASA emphasized certain portions of the whistleblower complaints,

drawing attention to their opinion on the most important matters:

We draw attention on the following matters related to whistle-blower complaints
received by the Group during Fiscal 2022 and subsequently:

a) Refer to note 27 to the consolidated financial statements in respect of allegations
of improper payments by ***land aggregators for acquisition of land in one of the
projects more fully described therein***. In respect of that matter, the management
has made an adjustment (de-capitalisation) in the books of accounts of INR 253
million (equivalent to USD 3.4 million) on an estimated basis.

b) Refer note 27 to the consolidated financial statements, wherein the Company
has voluntarily disclosed certain matters to the U.S. Securities and Exchange
Commission and the U.S. Department of Justice. Engagement and cooperation
with the aforesaid authorities is continuing on those matters. Any potential liability
or penalty from authorities cannot be assessed at this stage.[25]

---

[24] Note 12 of the consolidated financial statements, which details several of Azure's loans classified as long-term
debt, explains that Azure is no longer in compliance with the financial covenants for several its loans. As a result,
for some of the loans, they have been reclassified as current debt. For example, Azure borrowed INR 552 million, as
project level financing for some of its rooftop projects, but as of March 31, 2022, the Company was not in compliance
with the financial covenants related to this borrowing and has classified the loan under current debt. The net carrying
value of the loan as of March 31, 2022 is INR 974 million (US$12.8 million).
[25] Note 27 of the 2022 Form 20-F is entitled "Whistle-blower Allegations and Special Committee Investigation," and
is largely summarized in the prior section, Post-Class Period Events, II.A.

202.    *Third*, ASA identified a list of critical audit matters that are material to the financial statements and involved challenging judgments. Critical audit matters are defined as "matters arising from the current-period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments."

| a. Whistleblower Complaints | |
|---|---|
| Critical audit matter description | As discussed in Note 27 to the consolidated financial statements, the Group received whistle-blower complaints alleged on below matters:<br><br>-In one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data.<br><br>-In one of the projects, a member of the Group entered into agreements with some land aggregators for adjustments to land use permissions which may have involved improper payments.<br><br>-Potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project was alleged. |
| How we addressed the matter in our audit | Our audit procedures related to the whistle blower complaints and the impact of these on the consolidated financial statements of the Group included the following, among others:<br><br>-We obtained and reviewed the findings of investigators appointed by the Company to investigate these matters.<br><br>-We independently conducted the inquiries and meetings with investigators and forensic advisors and obtained written responses from them.<br><br>-We enquired with management and the Audit and Risk Committee of the Board of Directors of the Company about the facts and obtained the representations in writing in this respect.<br><br>-We reviewed the impact of above matters on Group's consolidated financial statements as of, and for the year ended, March 31, 2022, and the appropriate adjustments incorporated in the books of account by the Company in respect of these matters. |

| | - We reviewed the impact of these matters on the effectiveness of the Internal Controls on Financial reporting of the Group and reported significant deficiencies in the controls to the Audit and Risk Committee and the Board of Directors of the Company, and our audit report on Internal Controls over Financial Reporting has been modified accordingly. |
|---|---|

| b. Contingencies for investigations, lawsuits and other legal proceedings | |
|---|---|
| Critical audit matter description | As discussed in Note 27 to the consolidated financial statements, due to the ongoing investigations, lawsuits and other legal proceedings, management is of the view, that the Group might be exposed to various liabilities such as levy of damages, reduction of PPA tariffs, administrative actions from lenders including the risk of PPA cancellation, all of which could adversely impact the revenue, profitability, and capitalization of the affected projects. Any such fines or penalties could materially and adversely affect the Group's results of operations, financial condition, and cash flows in future periods. |
| How we addressed the matter in our audit | -We obtained management's assessment and representation stating that no triggering event such as demand or any potential notice from any lender or regulator has happened, except the ongoing inquiries from U.S. Securities and Exchange Commission and the U.S. Department of Justice.

-The discussions and disclosures to the U.S. Securities and Exchange Commission and the U.S. Department of Justice are ongoing and the Company is cooperating with all the issues raised by the regulators and based on submissions made till date, the management has confirmed that there is no financial impact on the Group as of the date of this report and there is no impact on the Group's ability to run the operations of the business of the Group.

-We independently conducted the inquiries including meetings with the investigators and obtained written response from them.

-We enquired with management and Audit and Risk Committee of the Board of Directors of the Company about the facts and obtained the representation in writing in this respect.

- Considering the potential liabilities which are not presently ascertainable, we have reported the matter by way of emphasis of matter paragraph in this audit report (refer Emphasis of Matters paragraph (b) above) |

| c. Impairment and other estimates of Property, Plant & Equipment (PPE) | |
|---|---|
| Critical audit matter description | As discussed in Note 23 to the consolidated financial statements, the Group uses various inputs to assess indicators of impairment as well as evaluate the need to recognise any impairment provision. Also, the Group relies on various third-party expert reports for the purpose of estimation (e.g. useful life, fair valuation etc). Any departure/deviation in the estimates used will have a significant bearing on the carrying value of the PPE. |
| How we addressed the matter in our audit | We have reviewed the third-party report as applicable and the inputs used by management in determining the estimates and have performed following procedures: |
| | -We assessed the qualifications, independence, and objectivity of the external experts engaged by management to perform the fair value assessments. We reviewed the scope and terms of their engagement to ensure it aligns with audit requirements. |
| | - We reviewed the expert reports, including their methodologies, assumptions, data sources, and findings. We assessed whether the reports were consistent with relevant accounting standards and industry best practices. |
| | - We compared the expert reports' conclusions and valuations to the estimates provided by management. ***Significant discrepancies or inconsistencies between the expert opinions and management's estimates were investigated and documented***. |
| | -We evaluated management's process for identifying indicators of impairment, including changes in market conditions, technological advancements, economic factors, or internal issues that may suggest a potential impairment of PPE. |
| | -We assessed the appropriateness of management's methods and assumptions used to determine the fair value of PPE when impairment indicators were present. This involved evaluating the selection of valuation models, discount rates, and the use of external experts, if applicable. |
| | -We reviewed the documentation and underlying data used by management in their impairment assessment and fair value determination. This included examining historical financial data, market information, and internal reports. |

| d. Substantial Doubt Related to Going Concern | |
|---|---|
| Critical audit matter description | As discussed in Note 12 to the consolidated financial statements, the Group has breached loan covenants to certain lenders owing to delay in submission of audited financial statements. Such breach of loan covenants may require the |

| | |
|---|---|
| | Group to classify the borrowings as repayable on demand and could materially and adversely affect the Group's results of operations, financial condition, and cash flows in future periods and raise a substantial doubt about the Company's ability to continue as a going concern. |
| How we addressed the matter in our audit | -We obtained the loan extension letters from certain lenders where the loan covenant breach was observed. In addition, we analysed the impact of the breach in the covenants and its impact on the Group's cash flow for the purpose of the going concern assessment wherever extensions letters from lenders were not made available.<br><br>-We analysed the Group's current and projected cash flow, net assets and profits.<br><br>-We evaluated the disclosures in the consolidated financial statements for Fiscal 2022 made by the Group related to uncertainty for Going Concern and its related compliances.<br><br>-Considering the existence of uncertainty, we have reported the matter by way of the paragraph on 'Substantial Doubt Related to Going Concern' in our audit report. |

203.    *Fourth,* ASA concluded that Azure did not have adequate internal controls over financial reporting, opining that "because of the effect of the material weaknesses described below, on the achievement of the objectives of the control criteria, the Group has not maintained effective internal control over financial reporting as of March 31, 2022, based on the COSO criteria." [26] ASA further explained that "[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process."

---

[26] COSO Framework is the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

III.        **NYSE Denies Azure's Appeal and its Equity Shares are Officially Delisted**

204.    On October 31, 2023, the NYSE announced its official delisting decision to remove the entire class of Equity Shares of Azure Power Global Limited from listing and registration on the Exchange because, in the opinion of the Exchange, the Equity Shares are no longer suitable for continued listing and trading on the NYSE.

205.    Azure's equity shares will be officially delisted on November 13, 2023, and available for trade only on the over-the-counter expert market.

## ADDITIONAL SCIENTER ALLEGATIONS

206.    As alleged herein, Defendants acted with scienter since Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

207.    As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Azure, their control over, and/or receipt and/or modification of Azure's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Azure, participated in the fraudulent scheme alleged herein.

I.    **Defendants' Admissions Supports Scienter**

208.    Defendants have already conceded scienter. In the 2022 Form 20-F, Defendants admit that Azure identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023 and that certain of Azure's  executives, which Plaintiffs believe to be Defendants Gupta

and Subramanian who were terminated in April 2022, "were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project." Defendants' scheme necessitated the recording of a USD $3.5 million reserve.

209.    Defendants further revealed that Azure identified "***potential misrepresentations made by former executives*** to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project where these former executives, (upon information and belief, Gupta and Subramanian) "***may have circumvented internal policies in connection with the approval of another transaction related to another wind project***."

210.    Defendants' manipulative actions caused Azure to: (i) restate Megawatts Operating; (ii) record an adjustment to "decapitalize" certain assets; (iii) conduct numerous expensive investigations that required the assistance of outside consultants; (iv) replace its auditors multiple times; (v) lose its listing on the NYSE; (vi) violate its debt covenants; and (vii) receive a going concern auditor option—among other negative material impact on the Company's financial and operational results.

## II.   <u>Defendants Receipt of Numerous Whistleblower Complaints Supports Scienter</u>

211.    As described above, Azure received several anonymous whistleblower reports in June and July 2021, May 2022, and September 2022, asserting that Azure's "Key Managerial Personnel" and "executives" engaged "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, and payment of kickbacks" in relation to the acquisition and use of land in Rajasthan.

212.    Defendants further revealed months later, on December 22 and 27, 2021, that Azure's external auditor, Ernst & Young, raised concerns regarding corrupt payments to vendors and project cost allocation, which would require additional qualifications be included in its audit

report and that Azure's ethics policies regarding external consultants were grossly deficient and needed to be enhanced. Azure shortly thereafter terminated the relationship with its auditor after learning of the qualified opinion.

213.   The allegations in the Whistleblower complaints, that Defendants admit were executed by high-level executives, create a strong inference of scienter.

### III.   <u>Auditor Replacements and Resignations Support a Strong Inference of Scienter</u>

214.   On November 26, 2021, shortly after Defendants informed investors about the First Whistleblower Complaint, Azure's independent auditors, Ernst & Young, were abruptly dismissed by the Company amid the Ernst & Young's concerns regarding corruption at Azure for which it threatened to issue a qualified opinion. This suspiciously timed departure occurred shortly after receipt of the First Whistleblower Complaint and shortly before Azure was to lose its emerging growth status.

215.   Ernst & Young's dismissal started the first of many auditor resignations. Indeed, on July 10, 2023, just days before the mandated 2022 Form 20-F was supposed to filed, S.R. Batliboi resigned as its independent registered public accounting firm, stating that Azure failed to provide any information that they requested to complete its audit work. Azure further failed to provide S.R. Batliboi with Azure's "conclusions and representations on the impact of the whistle blower complaints."

216.   Defendants appointed ASA & Associates LLP ("ASA") on July 12, 2023 as an independent public accounting firm "for the Company's US GAAP consolidated financial statements for Fiscal 2022." ASA Associates eventually signed off on Azure's financial statements, but not without providing a harsh adverse opinion.

217.    On September 5, 2023, S.R. Batliboi and Ernst & Young Mauritius further resigned as Azure's auditors and as the auditors of Azure's subsidiaries.  Azure expected that "these resignations may generate negative publicity," and "cause investors to lose confidence in our financial reporting."

218.    The numerous auditor replacements support a strong inference of Defendants' knowledge, recklessness and/or scienter with respect to the operational issues facing Azure as well as the fraud and corruption later revealed.

## IV.    Class Period Executive Resignations Support a Strong Inference that Defendants Knew of Undisclosed Operational Problems and Corruption

219.    As previously set forth above, Azure experienced droves of suspiciously-timed executive departures throughout the Class Period. The sheer number of executive departures in such a short period and that they occurred at suspicious times and/or under suspicious circumstances, without explanation, and without succession plans, supports a strong inference of Defendants' knowledge, recklessness and/or scienter with respect to the corruption and operational issues facing Azure.

220.    *First,* on April 26, 2022, Azure issued a press release announcing the resignations of Defendants Gupta and Subramanian, CEO and COO, a few months after Azure received the First Whistleblower Complaints and purportedly just days before Azure received the Second Whistleblower Complaint. Given the timing of Gupta and Subramanian's sudden departures, they were likely the "former executives" involved in the corruption referred to in the January 25, 2023 Press Release and 2022 Form 20-F. Defendants further admitted in the 2022 Form 20-F, that the "CEO and COO of the Company" were "relinquished from their roles with the Company/ Group with immediate effect" on April 26, 2022, even prior to the receipt of the Second and Third Whistleblower Complaints, indicating that Defendants knew the extent of Defendants Gupta and

Subramanian's fraudulent and corrupt conduct prior to the receipt of the Second and Third Whistleblower Complaints.

221. *Second*, on June 1, 2022, shortly after receipt of the Second Whistleblower Complaint and right before Azure disclosed it could not timely file its Fiscal 2022 Form 20-F, Azure officially announced that Independent Director and the Audit Committee Chairman, Mr. Arno Harris resigned from his position as a member of the Board of Directors of Azure Power and all its subsidiaries effective May 31, 2022.

222. *Third*, on August 29, 2022 Azure issued a press release announcing CEO Harsh Shah's resignation, effective immediately, not even two months after Shah began employment at Azure. Harsh Shah's resignation was described as an "unexpected decision." Shah quickly retreated back to his former employer at IndiGrid, presumably after he got wind of the extensive corruption and internal control problems at Azure. Thereafter, Mr. Rupesh Agarwal took charge as Acting CEO of the Company on Harsh's resignation.

223. But not even one year later, Mr. Rupesh Agarwal left the Company on July 10, 2023, right before Azur announced another auditor departure and the further delay in filing its 2022 Form 20-F, purportedly "to pursue other opportunities." Subsequently, Mr. Sunil Gupta replaced Rupesh Agarwal as Azure's CEO.

224. *Fourth,* on May 1, 2023, Defendant Pawan Agrawal was quietly replaced by Sugata Sircar as Azure's CFO.  Defendant Pawan Agrawal was demoted to "CFO of Azure Power India Private Limited and its group of subsidiaries, reporting to Sugata."

225. Finally, on October 11, 2023, Mr. Rosling resigned as Chairman of the Board and as a director of the Company, with absolutely no explanation, and was replaced immediately by Mr. M.S. Unnikrishnan. Azure announced that two more directors resigned on November 1, 2023,

Mr. Deepak Malhotra and Mr. Cyril Cabanes, nominees of CDPQ Infrastructures Asia Pte Ltd, each have resigned, without explanation.

226.    Azure admitted in the 2022 20-F that the loss of executives over the years "has created internal disruption, adversely affected our operations and strategy implementation and attracted negative publicity."

227.    Azure's revolving door of executives supports a strong inference of Defendants' knowledge, recklessness, and/or scienter with respect to the operational problems and corruption facing Azure.

## V.   Defendants' Data Manipulation Was Widespread and Occurred Over Multiple of Azure's Largest Projects Spanning Several Years

228.    Defendants' admission that data manipulation at Azure was so extensive that it impacted multiple projects and required further investigation into all of the Company's material projects for three years prior to August 2022 supports a strong inference of scienter.

229.    Throughout the Class Period, Defendants touted Azure's operating and financial results while simultaneously highlighting its robust internal controls and real time monitoring of key operational and financial metrics. In reality, as Defendants admitted, Azure's projects were riddled with "inaccurate record keeping," "failures to provide accurate information both internally and externally" "corrupt payments" to vendors, and mismanagement of funds, Defendants subsequently disclosed that the Company restated Azure's MWs operating downward to "adjust[] for inconsistencies in MWs reported" due to data manipulation and financial inaccuracies.

230.    Defendants also admitted that the Company experienced "shortfalls in generation" of electricity due to Azure's failure to "timely commission[] [to] the full capacity required under a PPA." Indeed, Defendants admitted in the 2022 Form 20-F, that had to report to SECI that a project had shortfalls in generation and that it failed to timely complete and commission the

requisite contractually required capacity. SECI in turn told Azure on January 3, 2023 and January 4, 2023, as a result the project may be liable for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner.

231.    Given Defendants affirmative representations that they were monitoring key metrics related to, *inter alia*, revenue, electricity generation, and MW operating, and their subsequent admissions that those results were in fact false, they either knew that their statements regarding operating, financial, and commissioning results were inaccurate and overstated at the time they were made or recklessly disregarded Azure's widespread data manipulation and corruption in making such statements.

## VI.    Defendants' Admitted Monitoring of Azure's Performance in "Real Time" Supports a Strong Inference that Defendants Acted With Scienter

232.    Defendants regularly touted their "centralized monitoring station" and ability to "monitor and analyze plant performance at the project site," in "real-time." Thus, Defendants knew or should have known about manipulation and inaccurate reporting of data, safety issues and corrupt payments at the time they occurred. For example, according to its 2021 Form 20-F, Azure stated that it could remotely monitor performance of all the projects in "real time:"

> Our operations team monitors performance of all the projects in real time through our analytics platform, which allow us to respond rapidly to potential generation anomalies and to repair any failures that might happen. They also perform scheduled preventive maintenance tasks on daily, weekly, monthly, and annual intervals to ensure our plants run smoothly and at high efficiency levels. Currently, we are able to monitor the performance of our solar power generation plants spread over 90 cities remotely.

233.    Likewise, on February 11, 2021, on Azure's third quarter 2021 earnings conference call, Defendant Subramanian, Chief Operating Officer, reiterated that they get "all our data into a centralized monitoring station at head office," which gives them the ability to "monitor and analyze plant performance at the project site." This system provided "greater visibility of

even minor plant failures, and various preset alarms allow them to spot, not only failures but even parts of the plant where performance is lower than expected." In other words, the executive level management had access to project data at the head office, and could detect even minor problems at individual project sites.

234.   Defendants again boasted about the insight they gained from Azure's central monitoring system in the December 13, 2021 Earnings Call, where Defendant Subramanian claimed that every project was now connected though mobile phone applications which even had "predictive monitoring" capabilities:

> "Further, on the operations side, all our projects are now fully connected with our central monitoring system, which has accessibility through the mobile application as well. We are gradually phasing out laptops at our sites and have provided tablets to our site engineers who are now always connected with the Head Office staff and monitor at a granular level, the performance of each of our plants on a real-time basis. This also helps us in predictive monitoring of our plants to tackle any challenge in its infancy.

235.   In an August 10, 2022 post to Azure's Facebook page, Harsh Shah emphasized that using technology for real-time monitoring electricity usage and day-to-day analysis was crucial for Defendants. In an Economist Impact article entitled, *Digitalisation's promise for India's utilities sector: An interview with Harsh Shah, Chief Executive Officer, Azure Power*, posted to Azure's Facebook account, Azure's former CEO is quoted:

> Mr Shah: Azure Power sees technology as a key enabler to become the number one provider of sustainable energy solutions for a carbon neutral world. Currently, the company digitally manages its power plants by ***using real-time monitoring platforms for day-to-day analysis*** and testing various tools to augment in-house predictive analytical capabilities to accurately analyse energy generation data and forecast weather events. We have digitalized most of the internal processes such as supply chain, design and engineering, and project management to improve efficiency and output while reducing turnaround time.

236.   Given that ***all*** projects were monitored "day-to-day" in "real-time" by the central monitoring system, Defendants were immediately aware of the data manipulation, shortfalls in

generation data, or irregularities in energy generation disclosed in the January 25, 2023 update at the time they occurred.

**VII.  Defendants Personally Visited the Azure Plants Which Supports A Strong Inference of Scienter**

237.   Defendants showcased plant site visits on the Company's Facebook page, which further supports their knowledge or reckless disregard for the data manipulation, false reporting of data, safety issues and corrupt payments occurring at multiple Azure plants during the Class Period. For example, in an August 17, 2022 Facebook post, Azure stated that "Senior Management" took a "keen interest" in "connect[ing] directly with the site employees and workers" so they could "understand the workings on ground."

238.   Furthermore, on the August 31, 2022 Special Call, Defendants asserted that management and the board of directors visit the plants: "We are assuring that senior management, the Board, myself visit plants, unexpectedly or expectedly. We walk around, the first thing we do on every site. The first thing we do at our Board meeting is talk about health and safety. We are using all the controls you can imagine, including advisers of various sorts, to give us assurance that the systems and the rest of the operations don't suffer similar issues."

239.   Accordingly, Defendants' admitted access to site-level data and plant employees physically at the plant further supports their scienter.

**VIII.  Defendants Involvement in Issuing, Implementing, and Monitoring Safety Policies Support a Strong Inference of Scienter**

240.   Throughout the Class Period, Defendants Gupta and Subramanian emphasized its ISO 45001 certification, Greentech Effective Safety Culture Award, and Grow Care India OHS Award as evidence of the "efforts" Defendants had "put in to make [the Company's] workplaces

safe for [its] team members and contractors[,]" to "provide[] a safe and healthy workplace[,]" and "ensure safety culture" was "embedded across the project locations and sites."

241.    Such efforts included creating and implementing Azure's Occupational Health and Safety Policy, which was signed by Defendant Gupta and effective as of November 2020. Defendants committed to and represented in this policy that they were "[c]ontinuously assess[ing] risks & opportunities throughout [its] operations" and "[m]aintain[ing] risk and incident management system[s]" that "incorporat[e] effective reporting, investigation, analysis and sharing this information across all levels[.]"[27] In line with this, Azure "undertake[s] regular/periodic inspections and audits to assess compliance to the SHES [i.e., Social, Health, Environment and Safety] guidelines at all sites" to ensure it maintains a safe work environment. Moreover, during the February 11, 2021 Earnings Call, Defendant Gupta represented that Azure was "continually working with consultants and with advisers to improve [its] safety performance" and "continually keep[ing] . . . eyes" on safety performance.

242.    Because "safeguarding Health & Safety" was "of utmost importance[,]" the Company and Defendant Gupta assured in the Occupational Health and Safety Policy that Azure's management was "commit[ting] . . . adequate time and resource[s] to fully implement [the] policy." Particularly since, Azure had "zero tolerance to non-compliance of any… Health & Safety requirements / regulations."

243.    Furthermore, Defendants' admission that Azure had "deviat[ed] from safety and quality norms" and those "health and safety lapses" existed across all of the Company's operations supports a strong inference of scienter. Throughout the Class Period, Defendants Gupta and Subramanian pointed to an international safety certification and safety awards to

---

[27] Azure Power, Occupational Health and Safety Policy, http://investors.azurepower.com/~/media/Files/A/Azure-Power-IR/governance-documents/Health%20and%20Safety%20Policy.pdf (last accessed November 7, 2023).

affirmatively represent that Azure provided a safe and healthy workplace, and to validate the efforts that the Company put into creating a robust safety culture. Defendants explained that those efforts included continuous monitoring of and improvements to safety, frequent evaluations of the safety procedures in place, consultations with safety advisors, and training.

244.    In light of Azure's company-wide safety issues and given Defendant Gupta's direct involvement in issuing Azure's Occupational Health and Safety Policy and representations that management was monitoring safety compliance and "continually" working with advisors to improve safety, Defendants either knew that their statements regarding safety were false at the time they were made or recklessly disregarded those safety violations in making such statements.

IX.   **Azure's Violations of its Own Internal Ethics and Internal Control Policies and Procedures Supports A Strong Inference of Scienter**

245.    Defendants regularly violated Azure's own internal policies by engaging in corrupt practices, failing to remain in compliance with applicable laws, rules and regulations, and failing to maintain effective internal controls. Not only did Azure violate these policies, but it also admitted that its policies were violated, which supports a strong inference of scienter.

246.    For example, under Azure's Anti-Bribery and Corruption policy, Azure prohibits "bribery and other improper payments in the conduct of the Company's business operations and establishes processes to ensure compliance with the Anti-bribery and corruption policy and applicable laws and regulations, particularly, without limitation, the United States of America's Foreign Corrupt Practices Act." Yet the Special Committee's investigation identified evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to Azure's major projects.

247.    According to the Audit Committee Charter, management of the Company is responsible for the preparation, presentation, and integrity of the Company's financial statements

as well as the Company's financial reporting process, accounting policies, internal audit function, internal accounting controls and disclosure controls. Azure admitted that it was in violation of these important company policies relating to internal accounting and disclosure controls by stating in the 2022 Form 20-F that management has "determined that internal controls over financial reporting were ***ineffective*** due to inadequacy of certain review controls including control failures in financial statement closing procedures, controls pertaining to capitalization, vendor selection process, land acquisition, documentation on testing of control attributes and completeness and accuracy of reports used including inadequate consideration in designing of risk and controls matrices."

248.   Finally, Azure's Code of Business Conduct, requires the Company comply with Section 406 of the Sarbanes Oxley Act of 2002 and promotes "[h]onest and ethical conduct, [f]air dealings with stakeholders, [c]ompliance with applicable laws, rules and regulations, and [p]rompt reporting of violations of the code."

249.   Azure admitted that its own former executive officers circumvented internal policies in connection with the approval of wind projects and by engaging in improper payments, in direct contravention of this policy. Furthermore, Azure repeatedly failed to file its financial statements on time, in direct contravention of the SEC's reporting requirements. Azure's violations of these policies, and its own admissions to these violations, supports a strong inference of scienter.

**LOSS CAUSATION**

250.   During the Class Period, Defendants engaged in a scheme and a course of conduct that artificially inflated the price of Azure's equity shares by misrepresenting and/or failing to disclose the adverse facts detailed herein. Specifically, Defendants failed to disclose,

misrepresented, and concealed: (i) Azure's MWs operating and commissioned MWs; (ii) that Azure acquired the land its projects operated on through kickbacks and corruption; (iii) Azure's failure to timely complete and commission the requisite contractually required capacity resulting in liability for damages and penalties under PPAs; (iv) the unsafe working conditions that could subject the Company to, *inter alia*, fines or liability, and severely hamper Azure's ability to secure new projects necessary to continue the aforementioned growth in MW operating, revenue, electricity generation; and (v) Azure's deficient internal controls.

251.   When the truth was revealed, and/or the risk materialized, Azure's equity share price materially declined. The decline in the price of Azure equity shares was the direct result of the nature and extent of the adverse facts misrepresented or omitted by Defendants finally being revealed to investors and the market. Plaintiff and the Class purchased Azure equity shares at artificially inflated prices, causing them to suffer damages in the form of economic loss as complained of herein.

252.   On April 26, 2022, Azure issued a Form 6-K, signed by Mr. Rosling. The April 26, 2022 Form 6-K attached a press release titled *Azure Power Announces Resignation of Ranjit Gupta as Chief Executive Officer and Murali Subramanian as Chief Operating Officer*, announcing that Defendant Gupta would be resigning as CEO and a Board member, and Defendant Subramanian would be resigning as COO.

253.   The April 26, 2022 disclosure was a materialization of the risk that Gupta and Subramanian would be terminated as a result of their participation in the undisclosed kickback payments and false reporting of Azure's financial results and concealment of Defendants' departure from internal safety, compliance and ethics policies and internal control procedures.

254.    Upon the news, the price of Azure's equity shares dropped $1.73 per share or 12%, from a closing price of $14.66 per share on April 25, 2022 to $12.93 per share on April 26, 2022.

255.    Analysts found the termination of executives important and constituting a revelation of corporate governance issues at Azure.

256.    On April 27, 2022, J.P. Morgan published a report by analyst Varun Ahuja directly linking the price decline of Azure's equity shares to the executive departures. Specifically, Mr. Ahuja's report stated that "Azure Power's equity prices reacted quite negatively to th[e] news (-13%)" regarding the departures of Defendants Gupta and Subramanian, and that prices for Azure bonds had also fallen.

257.    JP Morgan, again reported on August 24, 2022 that, it was concerned that executive departures related to "***corporate governance on project execution***" issues. An HSBC analyst similarly expressed concerns during the August 30, 2022 special call about both CEOs leaving without notice.

258.    On August 16, 2022, Azure filed an Amended Form 12b-25 Notification of Late Filing, signed by Defendant Agrawal, disclosing for the first time, that Azure would not only miss the filing deadline for its annual report on 2022 Form 20-F, but it would also not be able to file the 20-F by the extended due date as a result of an ongoing internal controls review. Defendants were unable to provide a time for when Azure would be able to file the 20-F and stated they would file it "as soon as practicable."

259.    Upon the news, the price of Azure's equity shares declined $1.00 per share, or 8% from a closing price of $12.25 per share on August 15, 2022 to close at $11.25 per share on August 16, 2022.

260.     Analysts understood the indefinite delay in filing Azure's Form 20-F as indicative of Azure's internal control problems being much worse than previously represented. For example, Justin Clare and Philip Shen of Roth Capital Partners placed Azure's equity shares under review on August 30, 2022, explaining that "[w]e are moving AZRE to Under Review from Buy as AZRE continues to be delayed in filing its 20F for financial year ended March 31, 2022 and is unable to provide a timeline for submission." Likewise, Elvira Scotto of RBC Capital Markets found Azure's failure to file the 20-F concerning, as she noted in her September 1, 2022 report, "[d]elay in Form 20F filing adds to uncertainty and raises going concern questions."

261.     The August 16, 2022 partial disclosure was also a materialization of the risk that inadequate internal controls would result in delayed filings and financial reporting.

262.     Analysts expressed concerns about Azure's filing delays and the extent of its internal control problems and corruption. For example, on August 24, 2022, Analyst Varun Ahuja of J.P. Morgan, published a report stating "issues" relating to "corporate governance on project execution" were a potential cause of the Company's delay in filing the 2022 Form 20-F. In fact, the analysts requested for "management to provide unaudited operational / financial numbers at least while they continue their due processes on controls and audited results, as we think investor concerns will linger until then."

263.     On August 29, 2022, before the market opened, Azure shocked the market when it announced yet another CEO resignation, disclosing that CEO Harsh Shah, who started at Azure not even two months prior in July 2022, resigned, effective immediately. Defendants provided no explanation for Shah's sudden departure and characterized it as an "unexpected decision."

264.     Also on August 29, 2022, Azure issued a second press release disclosing it had "received a whistleblower complaint in May 2022 alleging potential procedural irregularities and

94

misconduct by certain employees at a plant belonging to one of its subsidiaries." In particular, the August 29, 2022 Press Release disclosed that Azure's Audit Committee "identified evidence of manipulation of project data and information by certain employees." In the same press release, Azure unsurprisingly again announced further delays in the filing of its 2022 Form 20-F.

265.    The August 29, 2022 partial disclosures were also a materialization of the risk of deficiencies in Azure's internal controls over financial reporting and compliance with internal policies and procedures. It was further a materialization of the risk that Azure's executives were misrepresenting asset purchases, manipulating project data, and engaging in schemes involving corrupt conduct and improper kickback payments, which ultimately had to be disclosed to U.S. Securities and Exchange Commission and Department of Justice.

266.    Upon this news, the price of the Company's equity shares fell $4.61 per share, or 44%, to close at $5.85 per share on August 29, 2022, on unusually heavy trading volume.

267.    On August 29, 2022, RBC Capital Markets analyst Elvira Scotto stated, "AZRE issued a press release with a number of updates, most of which were negative, including a CEO departure and the Audit Committee's identification of data manipulation at an AZRE subsidiary. AZRE shares are down ~44% on the news."

268.    Likewise, in an August 30, 2022 report, Maheep Mandloi of Credit Suisse downgraded Azure to "underperform" and reduced the target price from $22.00 per share to $5.00 per share. Credit Suisse cited the delay in Azure's Form 20-F filing and the whistleblower allegations "concerning," explaining, "[a]fter a whistleblower complaint at one power plant, the company identified deviations in safety norms and evidence of project data manipulation by some employees. Management hasn't shared any other detail at this time on the potential impact and the prevalence of said issue across other plants."

269.     Also on August 30, 2022, Roth Capital Partners downgraded Azure from "buy" to "under review," citing concerns about the delayed 2022 Form 20-F filing and whistleblower allegations:

> We are moving AZRE to Under Review from Buy as AZRE continues to be delayed in filing its 20F for financial year ended March 31, 2022 and is unable to provide a timeline for submission. Additionally, in a business update on 8/29 (see here), AZRE indicated its audit committee found evidence of manipulation of project data and information by certain employees. As a result, we are moving to Under Review and will re-evaluate the business as we learn more.

270.     During the August 31, 2022 Special Call, a JP Morgan analyst commented that Azure's disclosures indicated the problem may be much larger than Defendants were letting on and expressed concerns about the executive departures and Azure's corporate governance, to which Defendants refused to provide any substantive response:

> **It clearly is giving a [signal] to the market that the issue is significantly bigger than what hopefully it actually is.** So, my question for you is more on the [governance] part that Harsh coming in after CEO and COO left, **clearly, he would have at least been in the know-how** or should have been in the know-how **as to what are the implications** because he joined in July and the whistleblower allegation was in May. So, despite that -- so we would naturally I presume would have been aware of this issue. So my question on that [governance] front is when Harsh left, it seems like it was **-- _is the actual issue much bigger than what we thought at the time of his joining_**?

271.     Analyst Elvira Scotto of RBC Capital Markets downgraded Azure Power Global on September 1, 2022, and stated, among other things, "**_the veracity of data at other plants comes into question_**" and pointing out that "AZRE has not published financial data since 12/31/21, which limits visibility into AZRE's liquidity."

272.     On July 13, 2023, after stringing investors along for more than a year, Azure announced that its auditors resigned, and Azure would not meet its July 15, 2023 deadline to file the 2022 Form 20-F.  Azure revealed that "in light of change [in]… auditors," Azure would need

another 14 weeks to complete its 2022 20-F. As a result, the NYSE suspended trading of Azure's shares.

273.     The July 13, 2023 partial disclosure that announced auditor resignations, and that Azure therefore again would not meet its July 15, 2023 deadline to file the 2022 Form 20-F was also a materialization of the risk relating to Azure's lack of internal controls and lack of compliance with safety, ethics and regulatory policies and laws that prevented the Company from filing its 2022 Form 20-F.

274.     On July 14, 2023, an article in the Economic Times discussing Azure's delisting highlighted the risk that the delisting of shares would place Azure in default of its loans and bonds:

> The delisting of shares implies a breach of covenant and triggers a technical default on Azure Power Global's two off shore bonds-worth $350 million due in 2024, and $414 million due in 2026. The bonds were issued by two separate special purpose vehicles of NYSE-listed Azure. NYSE said it reached to a decision "that the company's equity shares are not suitable for listing because the company is a late filer and has not filed with the Securities and Exchange Commission its annual report on Form 20-F for the fiscal year ended March 31, 2022, and current report on Form 6-K for the half year ended September 30, 2022." On July 13, the company had informed the stock exchange that it would not be able to complete its filings by August 16, the maximum time allowed by the bourse.

> The company also informed the exchange that it has appointed ASA Associates LLP to audit its US consolidated financial statement for March2022. MSKA & Associate, an affiliate of BDO International, has been appointed as statutory auditors for Azure's subsidiary company, Azure Power India Pvt Ltd., replacing SR Batliboi & Co. Azure Power Global said it is replacing SR Batliboi & Co, an affiliate of Ernst & Young Global, which "resigned" as statutory auditors on July 10, very close to the deadline to file the audited results."

275.     Upon the news, the price of Azure's equity shares declined from a closing price of $1.69 per share on July 13, 2023 to close at $0.34 per share on July 14, 2023, a decline of $1.35 per share, or 79.8% on unusually heavy trading volume.

276.     As a result of their purchases of Azure equity shares during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered economic loss, i.e.,

damages, under the federal securities laws. The timing and magnitude of the price decline in Azure equity shares negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

277.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Azure equity shares between June 15, 2021 and August 29, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

278.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Azure's equity shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Azure equity shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Azure or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

279.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

280.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

281.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Azure; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

282.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD ON THE MARKET DOCTRINE)**

283.    The market for Azure's equity shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures

to disclose, Azure's equity shares traded at artificially inflated prices during the Class Period. On July 2, 2021, the Company's equity share price closed at a Class Period high of $27.41 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's equity shares relying upon the integrity of the market price of Azure's equity shares and market information relating to Azure, and have been damaged thereby.

284.    During the Class Period, the artificial inflation of Azure's equity shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Azure's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Azure and its business, operations, and prospects, thus causing the price of the Company's equity shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company equity shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's equity shares at such artificially inflated prices, and each of them has been damaged as a result.

285.    At all relevant times, the market for Azure's equity shares was an efficient market for the following reasons, among others:

(a) Azure equity shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Azure filed periodic public reports with the SEC and/or the NYSE;

(c) Azure regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Azure was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

286. As a result of the foregoing, the market for Azure's equity shares promptly digested current information regarding Azure from all publicly available sources and reflected such information in Azure's equity share price. Under these circumstances, all purchasers of Azure's equity shares during the Class Period suffered similar injury through their purchase of Azure's equity shares at artificially inflated prices and a presumption of reliance applies.

287. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO STATUTORY SAFE HARBOR

288.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Azure who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

289.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

290.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Azure's equity shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

291.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's equity shares in an effort to maintain artificially high market prices for Azure's equity shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

292.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Azure's financial well-being and prospects, as specified herein.

293.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Azure's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Azure and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's equity shares during the Class Period.

294.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

295.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Azure's financial well-being and prospects from the investing public and supporting the artificially inflated price of its equity shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

296.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Azure's equity shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's equity shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the equity shares trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Azure's equity shares during the Class Period at artificially high prices and were damaged thereby.

297.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Azure was experiencing, which were not disclosed by Defendants, Plaintiff and other

members of the Class would not have purchased or otherwise acquired their Azure equity shares, or, if they had acquired such equity shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

298.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

299.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's equity shares during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

300.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

301.    Individual Defendants acted as controlling persons of Azure within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

302.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

303.    As set forth above, Azure and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's equity shares during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: November 9, 2023                    Respectfully submitted,

                                           **LEVI & KORSINSKY, LLP**

                                           By: */s/Shannon L. Hopkins*
                                           Shannon L. Hopkins (SH-1887)
                                           Gregory M. Potrepka (GP-1275)
                                           Morgan Embleton (to be admitted *pro hac vice*)
                                           Amanda Miller (admitted *pro hac vice*)
                                           1111 Summer Street, Suite 403
                                           Stamford, CT 06905
                                           Telephone: (203) 992-4523
                                           Facsimile: (212) 363-7171
                                           shopkins@zlk.com
                                           gpotrepka@zlk.com
                                           membleton@zlk.com
                                           amandamiller@zlk.com

                                           *Lead Counsel for Plaintiff and the Class*