# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SERAP LOKMAN, Individually and On Behalf of All Others Similarly Situated, <br>                 Plaintiff, <br> *v.* <br> AZURE POWER GLOBAL LIMITED, RANJIT GUPTA, MURALI SUBRAMANIAN, and PAWAN KUMAR AGRAWAL, <br>                 Defendants. | Case No. 1:22-cv-7432 <br><br> Hon. Gregory H. Woods <br><br> **<u>ORAL ARGUMENT REQUESTED</u>** |

<br><br>

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND FACTS. ...................................................................................................... 5

    A.    The Parties. .................................................................................................. 5

    B.    Azure Operates Power Plants That Create Renewable Energy. ............................ 6

    C.    Azure Provides Periodic Disclosures During the Class Period Related to its Operational Capacity,  Newly Commissioned Projects, and Awards. .............. 7

    D.    Azure's SEC Filings Contained Extensive Risk Disclosures. ............................. 10

    E.    Azure Received and Extensively Investigated Whistleblower Reports................ 11

        1.    The First Whistleblower Report.................................................... 11

        2.    The Second Whistleblower Report. .............................................. 12

        3.    The Third Whistleblower Report. ................................................. 13

        4.    Azure Convenes A Special Committee to Review Projects and Contracts. .................................................................................. 15

    F.    Executive and Director Resignations. .................................................... 16

    G.    Changes in Azure's Auditors. ................................................................ 17

    H.    Azure's Statements Regarding Health & Safety Procedures. ............................. 18

ARGUMENT ..................................................................................................................... 19

I.    STANDARD OF REVIEW. ......................................................................................... 19

II.    PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION. ..................................................................................................... 20

    A.    Azure's Risk Disclosures. ..................................................................... 21

    B.    Statements About General Compliance. ............................................... 25

    C.    Statements About Azure's Commitment to Safety. .............................. 26

    D.    Statements About Azure's MW Operating and kWh Generation. ........................ 28

1.    The Company Did Not Restate Any MW Operating Data or kWh Generation Data. ........................................................................ 29

a.    MW Data. ....................................................................................... 29

b.    kWh Generation Data. ................................................................. 32

2.    Plaintiff Repeatedly Mischaracterizes the Company's Statements with Respect to Data Irregularities. ............................................. 33

3.    Failure to Meet a Contractual Milestone is Not Evidence of Fraud. ........ 34

E.    Representations About Wind Power Projects. ...................................................... 36

F.    Representations About Plant Commissioning. ..................................................... 38

G.    Representations About Payments to Land Aggregators. ..................................... 41

III.    THE SAC FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER. .................... 42

A.    The SAC Fails to Adequately Allege Motive and Opportunity to Commit Fraud. ......................................................................................................... 43

B.    The SAC Fails to Plead Strong Circumstantial Evidence of Fraud. ..................... 44

1.    Azure's Receipt of, and Subsequent Disclosures Concerning, Whistleblower Reports and Investigations Do Not Support Any Inference of Scienter. ................................................................. 45

2.    Executive and Director Resignations Do Not Support Scienter. .............. 49

3.    That Azure Replaced Its Auditors Does Not Support a Finding of Scienter. ...................................................................................... 52

4.    Azure's Centralized Monitoring System Does Not Support a Finding of Scienter. .................................................................................. 54

5.    Azure's Alleged Violation of its Own Policies Does Not Create an Inference of Scienter. ................................................................ 56

IV.    THE SAC DOES NOT PLEAD RELIANCE FOR POST-AUGUST 2022 PURCHASERS. ........................................................................................................... 58

V.    THE SAC FAILS TO STATE A SECTION 20(A) CLAIM. .......................................... 58

CONCLUSION ........................................................................................................................ 59

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes, Inc.*,
 292 F.3d 424 (5th Cir. 2002) ....................................................................................................50

*Acito v. IMCERA Grp., Inc.*,
 47 F.3d 47 (2d Cir. 1995)................................................................................................24, 27

*In re Aegean Marine Petroleum Network, Inc. Secs. Litig.*,
 529 F. Supp. 3d 111 (S.D.N.Y. 2021)......................................................................................51

*In re Allergan PLC Sec. Litig.*,
 2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019)..........................................................................24

*Arora v. HDFC Bank Ltd.*,
 671 F. Supp. 3d 305 (E.D.N.Y. 2023) .....................................................................................27

*In re AT&T/DirecTV Now Sec. Litig.*,
 480 F. Supp. 3d 507 (S.D.N.Y. 2020)......................................................................................46

*In re Banco Bradesco S.A. Sec. Litig.*,
 277 F. Supp. 3d 600 (S.D.N.Y. 2017) (Woods, J.) ..................................................................23

*In re Bausch & Lomb, Inc. Sec. Litig.*,
 592 F. Supp. 2d 323 (W.D.N.Y. 2008) ....................................................................................48

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)..................................................................................................................19

*In re Biogen Inc. Sec. Litig.*,
 857 F.3d 34 (1st Cir. 2017).......................................................................................................45

*In re Braskem S.A. Sec. Litig.*,
 246 F. Supp. 3d 731 (S.D.N.Y. 2017).......................................................................................25

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*,
 No. 12 Civ. 4924 (KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ....................19, 49, 50

*In re Carter-Wallace, Inc. Sec. Litig.*,
 220 F.3d 36 (2d Cir. 2000)........................................................................................................44

*Chapman v. Mueller Water Prods., Inc.*
 466 F. Supp. 3d 382 (S.D.N.Y. 2020).......................................................................................22

iii

*City of Brockton Retirement Sys. v. Avon Products, Inc.*
No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ................................45

*City of Brockton Retirement Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)....................................................................................53

*City of Pontiac v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)...................................................................................................22

*City of Roseville Emps. Ret. Sys, v. Horizon Lines, Inc.*
442 F. App'x 672 (3d Cir. 2011) .....................................................................................35, 36

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991).......................................................................................................6

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
No. 19-CV-6180, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...........................................24

*In re DRDGOLD Ltd., Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)....................................................................................43

*ECA Loc. 134 IBEW Joint Pension Tr. of Chi. V. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..................................................................................20, 42, 43, 44

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006).....................................................................................43

*Feasbey v. Indust. Matematik, Int'l Corp..*
No. 99 Civ.8761 LTS JCF, 2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) ...........................52

*Foley v. Transcocean Ltd.*,
861 F. Supp. 2d 197 (S.D.N.Y. 2012).....................................................................................27

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020).....................................................................................49

*Francisco v. Abengoa, S.A.*
624 F. Supp. 3d 365 (S.D.N.Y. 2022).....................................................................................50

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016).....................................................................................49

*Gissin v. Endres*,
739 F.Supp. 2d 488 (S.D.N.Y. 2010)......................................................................................44

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................19, 55, 56

*Glickman v. Alexander & Alexander Servs., Inc.*
No. 93 Civ. 7594 (LAP), 1996 WL 88570 (S.D.N.Y. Feb. 19, 1996) ...................................54

*Greco v. Qudian Inc.*,
1:20-cv-577-GHW, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022 ) (Woods J.) .....................30

*Gross v. AT&T Inc.*,
19-CV-2892 (VEC), 2021 WL 9803956 (S.D.N.Y. September 27, 2001) .............................46

*In re Hertz Glob. Holdings Inc. Sheet Metal Workers Local Union 80 Pension Tr.*
*Fund*,
905 F.3d 106 (3d Cir. 2018) ...........................................................................................47, 51

*In re Hudson Techs., Litig.*
No. 98 CIV. 1616(JGK), 1999 WL 767418 (S.D.N.Y. Sept. 28, 1999) ................................57

*Inter-Local Pension Fund v. General Electric*,
445 F. App'x 368 (2d Cir. 2011) .......................................................................................54

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ..............................................................................................43

*In re KeySpan Corp. Sec. Litig.*,
385 F. Supp. 2d 358 (E.D.N.Y. 2003) ...............................................................................42

*Kumar v. Kulicke & Soffa Indus., Inc.*,
No. CV 19-0362, 2019 WL 5081896 (E.D. Pa. Oct. 9, 2019) ..............................................50

*Lachman v. Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y 2020) .................................................................................24

*Lopez v. CTPartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016) ..................................................................................40

*Lopez v. Ctpartners Exec. Search Inc.*,
173 F. Supp. 3d 79 (S.D.NY. 2016) ...................................................................................30

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) .......................................................................45

*Lucas v. Icahn*,
616 F. App'x 448 (2d Cir. 2015) .......................................................................................42

*Luck v. Westchester Med. Ctr.*,
No. 17-cv-9110 (NSR), 2019 WL 416333 (S.D.N.Y. Feb. 1, 2019) .......................................6

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ...................19, 47

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd,* 616 Fed. Appx. 442 (2d Cir. 2015) ..............23, 47

*Marcu v. Cheetah Mobile Inc.*,
  18-CV-11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020)......................................22

*Menora Mivtachim Ins. Ltd. v. Intl. Flavors & Fragrances Inc.*
  19 Civ. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021)  ...............................37, 39

*In re Mylan N.V. Sec. Litig.*
  379 F. Supp. 3d 198 (S.D.N.Y. 2019)....................................................................................58
  No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)................................22

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
  No. 08 Civ. 9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ...............................22

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)....................................................................................30

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................................................19, 45

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015).........................................................................................................36

*Ong. v. Chipotle Mexican Grill, Inc.*
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)..............................................................................27, 30

*In re Pegasus Wireless Corp. Secs. Litig.*,
  No. 07–81113–CIV., 2009 WL 3055205 (S.D. Fla. Sep. 21, 2009)......................................57

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009)..............................................................................44, 54

*In re Regions Morgan Keegan Secs., Deriv. & ERISA Litig.*,
  No. 2:13-cv-02654-SHM-dkv, 2014 WL 12611247 (W.D. Tenn. Aug. 4.
  2014) ....................................................................................................................................57

*Rok v. Identiv, Inc.*,
  No. 15-cv-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .........................................57

*S.E.C. v. Patel*,
  07–cv–39–SM, 2009 WL 3151143 (D.N.H. Sept. 30, 2009) ................................................30

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)....................................................................................................43

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)..................................................................................45

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019).............................................................................49, 52

*In re Security Capital Assurance*,
  729 F.Supp.2d 569 (S.D.N.Y 2010).....................................................................................48

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)..................................................................................................47

*Skiadas v. Acer Therapeutics, Inc.*,
  1:19-cv-6137-GHW, 2020 WL 3268495 (S.D.N.Y., June 16, 2020) (Woods,
  J.)..........................................................................................................................................43

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)...........................................................................................23, 48

*Stevelman v. Alias Rsch., Inc.*,
  174 F.3d 79 (2d Cir. 1999)......................................................................................23, 30, 46

*In re SunEdison, Inc. Secs. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) .........................................................................................57

*In re Synchrony Fin. Litig.*,
  988 F.3d 157 (2d Cir. 2021)................................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................19, 20

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
  Master File No. 08 Civ. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013).....................48

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  No. 13 Civ. 8846(LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .................................46

*In re UBS AG Sec. Litig.*,
  Master File No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28,
  2012) .....................................................................................................................................19

*Urman v. Novelos Therapeutics, Inc.*,
  796 F. Supp. 2d 277 (D. Mass. 2011) ...................................................................................53

*In re Vale S.A. Sec. Litig.*,
  No. 1:15-cv-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017)
  (Woods, J.) .............................................................................................................................27

vii

*Wilbush v. Ambac Fin. Grp., Inc.,*
    271 F. Supp. 3d 473 (S.D.N.Y. 2017)..................................................................................49, 51

**Statutes**

15 United States Code
    § 78v-4(b)(2)(A) ...............................................................................................................42

Sarbanes Oxley Act § 404........................................................................................................22

**Rules and Regulations**

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................................................1
    Rule 10b-5.........................................................................................................................47
    Rule 12(b)(6).................................................................................................................1, 5, 6
Sarbanes Oxley Act
    § 404................................................................................................................................ 22

Defendants Azure Power Global Limited ("Azure" or the "Company"), Ranjit Gupta and Murali Subramanian (collectively with Pawan Kumar Agrawal, "Defendants")[1] respectfully submit this memorandum of law in support of their Motions to Dismiss the Second Amended Class Action Complaint ("SAC") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## PRELIMINARY STATEMENT

The SAC is a 108-page jumble of unrelated and disorganized snippets from Azure's securities filings and press releases over a two year period that advances a classic fraud-by-hindsight theory of liability. The SAC's supposed "support" for the alleged misrepresentations comes from Azure's own disclosure of its investigations into whistleblower allegations. Plaintiff mainly ignores the actual findings of those investigations, which identified certain issues relating to, at most, less than a handful of the approximately 45 projects operated by Azure. Instead, Plaintiff cherry picks and combines language from various sources to support her unwarranted conclusion that every allegation made by a whistleblower was: (1) true, (2) applied to each and every one of Azure's 45 projects, **and** (3) had been occurring for months or years before the conduct was reported. Plaintiff also speculates, without any basis, that Defendants all had contemporaneous knowledge of the conduct alleged. Plaintiff pleads no particularized facts to support any of those assumptions or conclusions; she simply relies on mischaracterizations of Company disclosures, conjecture, innuendo, and *ipse dixit*.

In June and July 2021, Azure received whistleblower complaints through its internal control system alleging improper conduct in the acquisition of land, improper conduct by the

---

[1] Mr. Agrawal has filed a separate memorandum of law and joins in and incorporates by reference this memorandum of law to the extent applicable to him. Azure, Mr. Gupta and Mr. Subramanian join and incorporate by reference the arguments in Mr. Agarwal's memorandum of law to the extent applicable to them.

Company's sales team, and payment of kickbacks. The Company's Ethics Committee conducted "a fulsome investigation" of those claims supervised by the Board's Audit and Risk Committee with the support of independent external counsel and forensic accounting professionals. That investigation found that the whistleblower allegations were not substantiated. In fact, as Azure disclosed in its filings, one of the allegations was determined to be a "hoax."

Almost a year later, in May of 2022, Azure received a separate whistleblower complaint alleging health and safety lapses, employee misconduct, procedural irregularities and improper payments at a single project belonging to a subsidiary. The Company's Ethics Committee again conducted an extensive investigation under the supervision of the Audit and Risk Committee and with the assistance of external counsel and forensic accountants. As subsequently disclosed, the Company's investigation discovered that some employees at that project site had improperly manipulated and misrepresented project data and had failed to provide accurate information internally and externally. But, the investigation found no evidence of improper payments to any government official. Nor did the findings require the Company to make any adjustments to its financial statements.

Several months later, in September 2022, the Company received an additional whistleblower complaint containing allegations of misconduct similar to the May 2022 complaint and also alleging misconduct with respect to land acquisitions. The Company's Ethics Committee again conducted an extensive investigation with external counsel and forensic accountants and under the supervision of the Audit and Risk Committee. The Company identified control issues in the process of acquiring land in relation to one of its projects, but no improper payment of money by the Company was identified. The Company also identified potential misrepresentations that may have been made to the Board in 2021 and possible circumvention of internal policies relating

to the development of two wind projects, but the investigation did not identify any evidence of improper payments related to either transaction or that any adjustments were needed in the Company's books of account.  All other allegations in this whistleblower complaint were not substantiated.

To further address the issues raised in the May and September 2022 whistleblower complaints, the Company disclosed that it had widened its investigation to projects commissioned by Azure in fiscal years 2022 and 2023.  As part of that review, the Company identified inconsistencies in project data at three other projects but found no improper payments in connection with any of those three projects, nor did it restate any financials.  The Company also formed a special committee of the board of directors in August 2022 to review, with the assistance of external counsel and forensic accountants, material projects over a three year period for anti-corruption and related compliance issues.  That investigation found evidence of an apparent scheme to make improper payments in relation to a project, but the special committee did not find evidence that any improper payment or transfer was actually made.

All of this was disclosed in press releases between August 2022 and July 2023 and in the Company's Fiscal Year 2022 Form 20-F filed in October 2023 (the "Fiscal 2022 Form 20-F"). Plaintiff filed this lawsuit claiming that certain statements made by Defendants – ***before*** the Company received the May and September 2022 whistleblower complaints – were false and that Defendants knew they were false when they were made.  But the SAC is devoid of any factual basis for this broad claim and there are no factual allegations (particularized or otherwise) that demonstrate that any Defendant had knowledge of the issues or allegations raised by the whistleblowers before the complaints were received and investigated by the Company.

3

In true "puzzle pleading" fashion, Plaintiff has asserted a confusing set of 50 alleged misrepresentations that are followed by a cut and paste list of supposed reasons supporting Plaintiff's claims of falsity.  Further, the alleged misstatements are all based on the assumptions that:   (1) the June and July 2021 whistleblower complaints (which were found to be unsubstantiated) were in fact true and known to be true when the complaints were received; or (2) everything alleged in the May and September 2022 whistleblower complaints was true and already known to Defendants months, if not years, before the complaints were received by the Company. With respect to the Company's investigations, Plaintiff grossly mischaracterizes the findings relating to specific instances of misconduct identified at a few projects to support her claims and, more often, ignores the majority of the finding that undercut her claims.  Moreover, Plaintiff does not link the whistleblower allegations or even her characterizations of the Company's findings to any specific alleged misrepresentations.  Many of the alleged misrepresentations cited by Plaintiff are simply references to data about Megawatt ("MW") operating or kilowatt hours ("kWh") generated, none of which has been shown to be incorrect, much less alleged to have resulted in any restatement during the proposed class period ("Class Period").  Other allegations relate to general risk disclosures, opinion statements about the Company's legal compliance, commitment to health and safety, and the adequacy of internal controls.  But these are not the types of statements that support securities fraud claims, and courts have repeatedly rejected similar attempts to allege with hindsight that such statements were knowingly false when made, simply because the company later discovered instances of misconduct or non-compliance.

Finally, the SAC completely fails to plead facts with particularity establishing scienter on the part of any Defendant.  Plaintiff does not allege Class Period stock sales by any Individual Defendant or any other indicia of motive beyond generic motives held by every corporate

4

executive.   Further, not only is there no evidence of contemporaneous knowledge of any information that would contradict any of Azure's challenged statements, Plaintiff identifies no circumstantial evidence of scienter, relying instead on conclusory allegations that, by virtue of their job titles, the Individual Defendants must have received unspecified data from which they could have discovered information contrary to Azure's public filings.

Recognizing that the SAC does not plead misrepresentations for purposes of Section 10(b), Plaintiff has also littered the SAC with irrelevant allegations regarding supposed mismanagement, executive turnover, and issues with delays in Azure's securities filings.  Plaintiff does not even attempt to link these allegations to any alleged misrepresentation but simply tries to infer that every issue, misstep, or mistake made by the Company amounts to a securities violation.  That is not the law.

Despite Plaintiff's effort to recast Azure's candid disclosures about difficulties and challenges it has faced over the last few years as securities claim, Plaintiff's allegations fail to demonstrate any actionable misconduct by the Company or any of its executives.  Accordingly, the SAC should be dismissed.

## BACKGROUND FACTS[2]

### A.      The Parties.

Plaintiff Serap Lokman is an individual who alleges that she purchased Azure equity shares during the proposed Class Period.  Plaintiff has not identified the date(s) of her purchase(s).  (SAC ¶ 16.)

Defendant Azure is a limited liability company incorporated under the laws of Mauritius, with its principal offices located in New Delhi, India.  (*Id*. ¶ 17.)  Azure is a power producer and

---

[2] Defendants assume the truth of the SAC's allegations only for purposes of this motion.

sustainable energy solutions provider.  (*Id.*)  It has one of the largest operational solar portfolios in India, operating approximately 45 utility scale projects throughout India.  (*Id.* ¶ 28.)  Azure is a key contributor to India's goal to transition to clean energy.  (*Id.* ¶ 2.)

Defendant Ranjit Gupta served as Azure's Chief Executive Officer and was a member of Azure's board of directors from July 2019 until his resignation in April of 2022.  (*Id.* ¶¶ 9, 18, 157.)  Defendant Murali Subramanian joined Azure in July of 2019 as President, and on April 4, 2020 he was named Chief Operating Officer.  He resigned from the Company in April of 2022.[3] (*Id.* ¶¶ 9, 19, 157.)  Defendant Pawan Agrawal was Azure's Chief Financial Officer from March 2019 until May 1, 2023, when a new CFO was hired and Mr. Agrawal became CFO of a subsidiary, Azure Power India Private Limited and other related companies.  (*Id.* ¶¶¶ 22, 188.)

**B.    Azure Operates Power Plants That Create Renewable Energy.**

Azure is one of India's largest renewable energy operators.  (*Id.* ¶ 28.)  As an operator, Azure typically acquires the rights to develop and generate power for new projects through a competitive bidding process, which takes approximately eighteen months.  (*Id* ¶ 35.)  The first step in that process is to submit a bid for a project.  (*Id.*)  If the bid is successful, Azure is then issued a Letter of Award ("LOA").  (*Id.*)  Thereafter, Azure acquires land for the project and proceeds to manage the project development and operational process with an in-house engineering, procurement, and construction team and advanced in-house operations with maintenance capability.  (*Id.* ¶¶ 35-36.)  For each project, Azure enters into a Purchase-Power Agreement ("PPA") with customers, typically for 25 years, who then pay a fixed rate for electricity generated

---

[3] In one paragraph, Plaintiff incorrectly claims that Mr. Subramanian was *terminated* by the Company.  (SAC ¶ 19.) But in other paragraphs, Plaintiff correctly notes that Mr. Subramanian *resigned* from his position (*id.* ¶ 9), which is consistent with Azure's press release from April 26, 2022 that Plaintiff also relies on.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991) (a court can consider documents that are either attached to the complaint or incorporated into it by reference).  "If the allegations in the complaint are contradicted by attached documents, the court need not accept the truth of the allegations."  *Luck v. Westchester Med. Ctr.*, No. 17-cv-9110 (NSR), 2019 WL 416333, at *5 (S.D.N.Y. Feb. 1, 2019).

from Azure's renewable energy plants.  (*Id.* ¶ 35.)  Azure derives its revenue from the sale of power generated by its plants to central and state government utilities and independent industrial and commercial customers.  (*Id.* ¶ 34.)

### C. Azure Provides Periodic Disclosures During the Class Period Related to its Operational Capacity,  Newly Commissioned Projects, and Awards.

In 2021 and 2022, Azure made periodic disclosures related to its MW Operating, which represents the expected maximum output of Azure's power plants that are commissioned and operational at specific times (i.e., its current operational capacity), its newly commissioned projects, and awards it received.  It also made disclosures regarding kWh generated, which represents the amount of energy actually generated by the Company's plants and provided to customers (Ex. W at 39) and upon which the Company's revenue for energy sold is based.  (SAC ¶¶ 4, 113-14, 118-19, 126-27, 129, 134-35, 143-44, 146, 148-49).

Among other things, these disclosures show that Azure was candid with its investors about its operational capacity, including by timely disclosing its actual generation of energy as well as when new projects became fully commissioned or suffered delays.  Because these disclosures are discussed in more detail in Section II,  they are only briefly summarized here in chart form to avoid unnecessary duplication.[4]

| Source: | Disclosure Related to Operational Results & Commissioning[5] | SAC |
|---|---|---|
| 1Q FY 2022 Press Release (Aug. 30, 2021) (Ex. B at 1) | • *"[MW] Operating\* were 2,052 MWs*, as of June 30, 2021, an increase of 23% over June 30, 2020."<br>• *"Electricity generation during the quarter ended June 30, 2021 was 1,112 million kWh, an increase of 228 million kWh or 25.8%, over the quarter ended June 30, 2020."* | ¶¶ 113-14 |

---

[4] For the Court's convenience, attached as Exhibit 1 to this Memorandum is the Declaration of Brian E. Cohen in Support of Defendant's Motion to Dismiss.  Citations herein to "Ex. _" refer to exhibits to the Declaration.  A chart listing and categorizing the statements challenged by Plaintiff is attached as Exhibit Z to the Declaration.

[5] The italicized language reflects the parts of statements that Plaintiff alleges are false.

| | | |
|---|---|---|
| 1Q FY 2022 Earnings Call (Aug. 31, 2021) (Ex. X at 2-4) | • "We highlighted our ISO-45001 certification earlier this year, *which demonstrates Azure's focus on occupational health and safety.*" <br> • "*Today, we have 23% more megawatts operating than we did at the same time last year[.]*" <br> • "As of 30 June 2021, *we were operating 2,052 megawatts on a PP or AC basis, which is 23% higher than what we were operating a year before. Our portfolio of 6,955 megawatts remained stable from the previous quarter.*" | ¶¶ 116, 118-19 |
| Press Release (Oct. 22, 2021) (Ex. C at 1) | • Azure announced "that it has received the *letter of award (LOA) for its first wind project, 120 MW ISTS project with Solar Energy Corporation of India (SECI) to supply power for 25 years at a tariff of INR 2.70 (~US 3.6 cents) per kWh.*" <br> • "*We have secured our first step in diversifying our presence in the renewable spectrum in India and it positions us well to add to our addressable market while we build scale in this segment on the back of strong management experience and Azure's long history of execution.*" | ¶ 121 |
| Press Release (Nov. 11, 2021) (Ex. D at 1) | • Azure "*received the letter of award (LOA) for its first 150 MW ISTS connected wind–solar hybrid power project with Solar Energy Corporation of India (SECI) to supply power for 25 years at a fixed tariff of INR 2.35 (~US 3.2 cents) per kWh.*" <br> • The SECI project "*will entail setting up of 100 MW of solar and 50 MW of wind capacity.*" <br> • "*[W]e have secured yet another important milestone with our first solar-wind hybrid project with SECI. We have taken steps to develop large wind sites and this project, along with the wind project we announced earlier, will be built as part of that development. With this win, we are confident of maximising our growth potential.*" | ¶¶ 123-24 |
| 2Q FY 2022 Press Release (Dec. 10, 2021) (Ex. F at 1) | • "*[MW] Operating\* were 2,210 MWs, as of September 30, 2021, an increase of 31% over September 30, 2020. Operating, Contracted & Awarded MWs\* were 6,955 MWs, as of September 30, 2021.*" <br> • "*Electricity generation during the quarter and six-months ended September 30, 2021 was 1,001 million kWh and 2,113 million kWh, respectively, an increase of 231 million kWh or 30%, over the quarter ended September 30, 2020, and an increase of 460 million kWH or 28%, over the six months ended September 30, 2020.*" <br> • "*We commissioned 158 MWs AC (188 MWs DC) during the three months ended September 30, 2021 and 220 MWs AC (252 MWs DC) during the six months ended September 30, 2021 against 25 MWs AC (25 MWs DC) during the*" | ¶¶ 126-27, 129 |

| | | |
|---|---|---|
| | *comparative three months and 26 MWs AC (28 MWs DC) during the six months ended September 30, 2020.”* | |
| 2Q FY 2022 Earnings Call (Dec. 13, 2021) (Ex. G at 2-5) | • Azure “received Letter of Awards for *120-megawatt wind project and 150-megawatt wind-solar hybrid project with SECI.*” <br><br> • *“We have already developed significant organizational capabilities for these in-house and are looking forward to implementation on the ground with our teams already working on developing large wind sites across the country.”* <br><br> • *“Our recent wins in this regard, the 120-megawatt Wind Project and the 150-MW Hybrid project, both with SECI.”* <br><br> • Azure *“had 31% more MWs operating in Q2 this year than we did at the same time last year.”* <br><br> • “As of September 30, 2021, *we were operating 2,210 Megawatts on a PPA or AC basis, which is 31% higher than what we were operating a year before. Our portfolio was stable at 6,955 MWs at the quarter end, which further increased to 7,225 MW subsequent to the quarter end with our recent wins.”* <br><br> • “We commissioned 158MW AC capacity and 188MW DC capacities during the quarter. As of today, we have completed and commissioned 500 MW out of 600 MW in our Rajasthan 6 project and balance 100 megawatts to be commissioned in this month.” <br><br> • Azure “won the Greentech Effective Safety Culture Award for 2021 from Greentech Foundation and the OHS Award from Grow Care India in these areas, *which signifies the efforts we have put in to ensure safety culture, which is now embedded across our project locations and sites.*” | ¶¶ 131-32, 134-35, 137,139 |
| Press Release (Jan. 3, 2022) (Ex. H at 1) | • Announced “*the successful commissioning of its largest project – 600 MWs Interstate Transmission System (ISTS) connected solar project,*”… “*with the last 100 MWs commissioned this month.*” <br><br> • Afterwards, “*Azure Power has 2510 MWs of high- performing operational solar assets.*” <br><br> • *“[W]e have managed to deliver high performing assets.”* | ¶ 141 |
| 3Q FY 2022 Press Release (Feb. 25, 2022) (Ex. I at 1) | • *“[MW] Operating\* were 2,523 MWs, as of December 31, 2021, an increase of 37% over December 31, 2020. Operating, Contracted & Awarded MWs\* were 7,425 MWs, as of December 31, 2021.”* <br><br> • *“Electricity generation during the quarter and nine-months ended December 31, 2021, was 1,068 million kWh and 3,181 million kWh, respectively, an increase of 284 million kWh or 36%, over the quarter ended December 31, 2020, and an increase of 744 million kWh or 31%, over the nine months ended December 31, 2020.”* | ¶¶ 143-44, 146 |

9

| | | |
|---|---|---|
| | • *"We commissioned 313 MWs AC during the three months ended December 31, 2021, and 533 MWs AC during the nine months ended December 31, 2021, against 153 MWs AC (236 MWs DC) during the comparative three months and 179 MWs AC (264 MWs DC) during the nine months ended December 31, 2020."* | |
| 3Q FY 2022 Earnings Call (Feb. 28, 2022) (Ex. L at 2-4) | • *"We had 37% more megawatts operating in quarter 2 – quarter 3 this year than we did at the same time last year."*<br>• "As of December 31, 2021, *we were operating 2,523 megawatts on a PPA or AC basis, which is 37% higher than what we were operating a year before. Our portfolio was at 7,425 megawatts at the end of quarter."*<br>• *"Our largest project, [600] megawatt Rajasthan 6, is now fully commissioned."*<br>• *"The second 300 megawatt Rajasthan 8 is also in line to be fully commissioned shortly*, and even though Rajasthan 9 was impacted due *to supply related challenges, we will persevere."*<br>• *"Similarly, safety is one aspect that is paramount to us. The awards that we won for our safety culture, as I reported last time, demonstrate our efforts in this area."* | ¶¶ 148-49, 151-53 |
| Press Release (Mar. 14, 2022) (Ex. M at 1) | • "Azure Power . . . announced *full commissioning of its 300 MWs Interstate Transmission System (ISTS) connected solar project.*"<br>• *"Azure Power has now operationalized 2,683 MWs of high-performing renewable energy assets in India."* | ¶ 155 |

## D.    Azure's SEC Filings Contained Extensive Risk Disclosures.

Azure's filings during the Class Period included detailed descriptions of risks inherent to Azure's activities.  For example, on July 28, 2021, Azure filed its Fiscal Year 2021 Form 20-F with the SEC (the "Fiscal 2021 Form 20-F").  (SAC ¶¶ 61, 108.)  As part of its risk disclosures in that document, Azure pointed out that its international corporate structure requires it to comply with anti-corruption laws and regulations of the United States and various other jurisdictions.  (*Id.* ¶ 111.)  Azure also noted that it developed and implemented formal controls and procedures to comply with the FCPA as well as anti-corruption, anti-bribery and anti-facilitation payment laws.  (*Id.*)  But Azure also cautioned that there was a persistent risk of fraud or misconduct by its employees, including unauthorized transactions, improper use or disclosure of confidential

10

information, data breaches, or other illegal acts. (*Id.* ¶ 108.) Further, Azure indicated that although its internal control procedures were designed to monitor its operations and overall compliance, it might not be able to identify non-compliance and/or suspicious transactions. (*Id.*) In addition, Azure disclosed that certain internal control processes were carried out manually, which could increase the risk that human error, tampering, or manipulation would result in losses that might be difficult to detect. (*Id.*)

> ### E.     Azure Received and Extensively Investigated Whistleblower Reports.

During the proposed Class Period, Azure received and disclosed a series of whistleblower complaints. As discussed below, each whistleblower complaint was investigated by or under the supervision of its Audit and Risk Committee, with the assistance of outside independent legal counsel and forensic accounting professionals.

> #### 1.     The First Whistleblower Report.

In its Fiscal 2021 Form 20-F (filed on July 28, 2021), Azure disclosed that it "recently received . . . several anonymous whistleblower reports" (the "First Whistleblower Report"). (SAC ¶ 61; Ex. A at 34.) Azure stated that the First Whistleblower Report involved various claims against certain "Key Managerial Personnel," which were related to "the acquisition of and use of land in Rajasthan, Assam, and Uttar Pradesh, as well as certain other corporate actions." (*Id.*) Azure further stated that although the First Whistleblower Report "did not include the minimum required information required under the policy," it still chose to investigate the allegations. (*Id.*) Azure's Audit Committee, with the assistance of external counsel and forensic auditors, conducted the investigation and concluded that the claims in the First Whistleblower Report were not substantiated. (*Id.* ¶ 62; Ex. A at 34.) Nevertheless, Azure stated that it would "review certain of its processes" to "ensure continued compliance with its internal policies and procedures." (*Id.*)

11

Azure made further disclosures relating to the First Whistleblower Report in a December 10, 2021 press release and a December 27, 2021 Form 6-K.  (*See* Exs. F and Y.)

In its Fiscal 2022 Form 20-F (filed on October 12, 2023), Azure disclosed additional details regarding the First Whistleblower Report, including that the complaints were received in June and July 2021 and alleged "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, payment of kickbacks, and improper conduct *by our sales team*."[6]  (Ex. W at 34 (emphasis added).)  Again, Azure made clear that a "fulsome investigation into these allegations" was conducted and none were substantiated, and that the allegation relating to the "sales team" was "later determined to be a hoax."  (*Id.*)  Nevertheless, Azure chose to voluntarily "implement[] enhancements to [its] compliance program."  (*Id.*)

### 2.    The Second Whistleblower Report.

On August 29, 2022, Azure disclosed in a press release (the "August 29, 2022 Press Release") the receipt of a whistleblower report in May 2022 (the "Second Whistleblower Report"). (SAC ¶ 77; Ex. O at 1.)   The Second Whistleblower Report alleged "potential procedural irregularities and misconduct by certain employees at a plant belonging to one of [Azure's] subsidiaries."  (*See Id.*)  The allegations relating to that single plant were investigated by Azure's Audit Committee, with the assistance of legal counsel and forensic accounting support.  (Ex. O at 1.)  The investigation "identified evidence of manipulation of project data and information by certain employees," which Azure planned to disclose to the appropriate authorities in addition to taking immediate remedial measures.  (SAC ¶ 78; Ex. O at 1.)

On August 31, 2022, Azure held an investor conference call (the "August 31, 2022 Call"), in which it further addressed, among other things, the Second Whistleblower Report.  (SAC ¶ 117;

---

[6] The SAC omits the emphasized text, which is critical to the context of the complaint.  (SAC ¶ 63.)

Ex. P at 2.)   During that call, Azure noted that the investigation had identified evidence of manipulation of project level data and information by certain employees at the project site, but that, based on the investigation to date, the manipulation did not cause any overstating of past income.  (SAC ¶¶ 170-72 (emphasis added).)

In a December 30, 2022 Form 6-K, which attached unaudited financial statements for certain subsidiaries, Azure disclosed that following the investigation of the allegations raised in the Second Whistleblower Report, "appropriate action has been taken including termination of the employee, and blacklisting of the manpower vendor" at the affected project.  (SAC ¶ 85.)  Azure also disclosed that "Company's management concluded that *there are no material financial impact [sic] as a result of the related conduct on the financial statements.*"  (*Id.*) (emphasis added).[7]

On January 25, 2023, Azure issued a Form 6-K ("January 25, 2023 Form 6-K"), which provided an update on a number of recent developments given the Company's delay in filing its Fiscal 2022 Form 20-F. (SAC ¶ 87; Ex. T at 4.)  Azure again provided a description of the Second Whistleblower Report and noted that following the investigation, **"*no direct evidence that a corrupt payment was made to any government official was identified.*"**  (SAC ¶ 89; Ex. T at 12 (emphasis added).)   A similar disclosure was also included in Azure's Fiscal 2022 Form 20-F. (Ex. W at 34.)

### 3.    The Third Whistleblower Report.

On December 30, 2022, Azure disclosed in its Form 6-K the receipt of a whistleblower report in September 2022 (the "Third Whistleblower Report").  (SAC ¶¶ 81-83; Ex. Q at 73.)  The Third Whistleblower Report alleged "(1) irregularities in commissioning procedures, and (2) in

---

[7] The SAC mistakenly describes these statements as relating to the Third Whistleblower Report, rather than the Second Whistleblower Report.

land acquisition process among other matters." (SAC ¶ 83; Ex. Q at 73.) An investigation into the allegations was conducted and found that *the complaint was unsubstantiated* and *had no material financial impact*. (SAC ¶ 83; Ex. Q at 73.)

In Azure's January 25, 2023 Form 6-K, Azure provided additional details about the Third Whistleblower Report. (SAC ¶ 87; Ex. T at 4.) Specifically, Azure noted that the Third Whistleblower Report made allegations of misconduct similar to those raised in the Second Whistleblower Report, but it also included allegations of "misconduct related to joint ventures and land acquisition," "failure to be transparent with the market and advisors," other "other allegations." (SAC ¶ 194; Ex. T at 12.) The Ethics Committee's investigation into the additional allegations "did not identify evidence concerning alleged misconduct related to joint ventures, land acquisition or any failure to be transparent with the market or its advisors." (*Id*.)

Azure further disclosed that its investigation was "widened ... to include a review of all projects commissioned in Fiscal 2022 and Fiscal 2023." (SAC ¶ 92; Ex. T at 12.) This widened review found "inconsistencies in project data for three other projects." (*Id*.) In response to those findings, Azure suspended the employees involved in the misconduct (and later reported that they were no longer with the Company), implemented remedial measures in both project control and monitoring, and reported the findings from the investigations to the SEC and the U.S. Department of Justice. (*Id*.)

When Azure issued its Fiscal 2022 Form 20-F in October 2023, it again disclosed the Third Whistleblower Report, noting that the investigation "identified significant control issues in the process of acquiring land and land use rights in relation to one of our projects." (SAC ¶ 194; Ex. W at 35.) The investigation ultimately concluded that "third party land aggregators may have been involved in improper payments but *no improper transfer of money by the[Azure] was identified*."

14

(*Id.*)  Azure also disclosed that the Company "identified potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project."  (SAC ¶ 195; Ex. W at 35.)  Azure further stated that "it appears our former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project."  (*Id.*)  However, Azure found ***no evidence of improper payments related to either of these wind project transactions and no adjustments needed to be made in the books of account.***  (*Id.*)  Azure's Fiscal 2022 Form 20-F also disclosed that the "widened" review of all projects commissioned in fiscal years 2022 and 2023 "identified inconsistencies in project data in certain of our projects, ***but we identified no improper payments made in connection with these projects.***"  (SAC ¶ 196; Ex. W at 35 (emphasis added).)

### 4.    Azure Convenes A Special Committee to Review Projects and Contracts.

In its January 25, 2023 Form 6-K,[8] Azure announced that a Special Committee of the Board of Directors was convened in August 2022 "to review material projects and contracts over a three-year period for anti-corruption and related compliance issues."  (Ex. T at 12.)  Azure also stated that "[i]ndependent outside counsel and forensic advisors were engaged to support the Special Committee," which would also investigate "a corruption allegation against certain former executives."  (*Id.*)  At the time of the January 25, 2023 Form 6-K, the Special Committee's investigation was "ongoing, but [had] substantially progressed." (*Id.*)  Moreover, Azure stated that it "disclosed the details of the Special Committee's investigation to the SEC and the U.S. Department of Justice and continues to cooperate with those agencies."  (*Id.*)

---

[8] Plaintiff mistakenly defines this Form 6-K as the "January 23, 2023 Press Release."  (SAC ¶ 87.)

In its Fiscal 2022 Form 20-F, Azure again discussed the Special Committee's investigation, this time stating that it "identified evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project ***but no related improper payments or transfers by the [Azure] have been identified.***"  (SAC ¶ 197; Ex. W at 35 (emphasis added).)

### F.    Executive and Director Resignations.

On February 28, 2022, Azure issued a press release ("February 28, 2022 Press Release") announcing that Arno Harris, the Chair of Azure's Capital and Audit Committees, "indicated his desire to step down from the Board after nearly 6 years due to his other commitments."  (Ex. K at 1.)  Mr. Harris was quoted as saying that he was "proud to have played a part in the company's accomplishments."  Azure also announced that Christine McNamara would be joining Azure's board on March 1, 2022 and taking over as the Chair of the Audit Committee. (*Id.*)  Mr. Harris and Ms. McNamara were on the board together until Mr. Harris formally resigned effective May 31, 2022.  (SAC ¶ 73; Ex. L at 2.)

On April 26, 2022, Azure issued a Form 6-K ("April 26, 2022 Form 6-K") announcing that the "Board of Directors have accepted the resignations of Ranjit Gupta, Chief Executive Officer (CEO), and Murali Subramanian, Chief Operating Officer (COO).  Both will relinquish their roles with the Company and its subsidiaries, and Mr. Gupta will resign from the Board of Directors with immediate effect in order to pursue other opportunities.  Alan Rosling, Chairman of the Board of Azure, will oversee the Company in the interim."  (Ex. N at 4; SAC ¶¶ 18-19, 71.)  In the April 26, 2022 Form 6-K, Mr. Rosling "thank[ed] both Ranjit and Murali for their service and their efforts to navigate a challenging market environment" and "wish[ed] them well for the next stage in their careers."  (Ex. N at 4.)

16

In the years that followed, a few more executives resigned.  On August 29, 2022, Harsh Shah resigned as CEO.  (SAC ¶¶ 72, 161, 222; Ex. O at 1.)  On May 3, 2023, Azure announced that Rupesh Agarwal, who took over as Acting CEO following Mr. Shah's resignation, would be resigning on July 10, 2023 "to pursue other opportunities."  (SAC ¶¶ 76, 223; Ex. U at 1.)  On October 11, 2023, after the end of the Class Period, Mr. Rosling resigned as Chairman of the Board and as a director of the Company.  (SAC ¶ 225.)

### G.    Changes in Azure's Auditors.

On November 26, 2021, Azure issued a press release attached to a Form 6-K ("November 26, 2021 Form 6-K") announcing that it had changed its independent public accounting firm. (SAC ¶ 64; Ex. E at 4.)  Specifically, the Company's then auditor, Ernst & Young Associates LLP ("E&Y"), was replaced by one of its affiliates, "S.R. Batliboi & Co. LLP (member firm of Ernst and Young Global Limited)" ("SRB").  (*Id.*)   In the November 26, 2021 From 6-K, Azure stated that "[t]he reports of [E&Y] on the Company's financial statements for the past two fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles."  (Ex. E at 4.)  Azure further stated that, "[i]n connection with the audits of the Company's financial statements for each of the two fiscal years ended March 31, 2021, and in the subsequent interim period through November 9, 2021, there were no disagreements with [E&Y] on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedures which, if not resolved to the satisfaction of [E&Y]would have caused [E&Y] to make reference to the matter in their report." (*Id*.)

In December 2021, another E&Y affiliate, Ernst & Young Mauritius, was appointed as statutory auditor for Azure and related affiliates in Mauritius.  (SAC ¶ 65.)

On July 13, 2023, Azure issued a press release ("July 13, 2023 Press Release") announcing that SRB "tendered its resignations as the independent registered public accounting firm of the Company" and some of its subsidiaries in a letter dated July 10, 2023." (SAC ¶ 101; Ex. V at 2.) Azure further disclosed that SRB's resignation was based on a timing issue—specifically, that SRB would not be able to complete its audit of Azure's financial statements within the required timeline because it had not yet received certain requested information, including draft financial statements, Azure's annual U.S. filing, associated books and records, and Azure's "conclusions and representations on the impact of the whistle blower complaints." (SAC ¶ 101; Ex. V at 2.) Azure stated that aside from information being outstanding, "the Company did not have disagreements with SRB on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of SRB, would have caused [it] to make reference to the subject matter of the disagreements in connection with its reports on the consolidated financial statements for such years." (SAC ¶ 101; Ex. V at 2.) In the same press release, Azure announced that ASA & Associates LLP would be the independent public accounting firm for the Company's US GAAP consolidated financial statements for Fiscal Year 2022 while MSKA & Associates (a member firm of BDO International) would be its statutory auditors for its subsidiaries. (*Id.*)

### H.    Azure's Statements Regarding Health & Safety Procedures.

As an operator of power plants, Azure is subject to safety and environmental laws. (SAC ¶ 5). Given Azure's safety and environmental responsibilities, it has made health and safety a priority and has been awarded various certifications related to its health and safety measures. (*Id.* ¶¶ 44-45). Despite its efforts, safety issues were uncovered during the investigation into the Second Whistleblower Report, which Azure disclosed in its August 29, 2022 Press Release. Specifically, Azure disclosed that it discovered "deviations from safety and quality norms" at the

18

same facility belonging to one of its subsidiaries that was the subject of the Second Whistleblower Report. The Company further disclosed that it had implemented mechanisms to remediate them and strengthen safety and quality protocols. (*Id*. ¶ 162.) On the August 31, 2022 Call, Azure again addressed the safety issues detected at that facility and stated its plan to "strengthen our safety and quality protocols at this plant, but also across our other operations." (*Id*. ¶ 170.)

## ARGUMENT

### I.    Standard of Review.

This Court must dismiss a complaint if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] pleading that only offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *In re UBS AG Sec. Litig.,* Master File No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *7 (S.D.N.Y. Sept. 28, 2012). To state a claim under Section 10(b), Plaintiff must plead with particularity facts showing (i) a material misrepresentation or omission, (ii) scienter, (iii) connection between the misrepresentation or omission and the purchase or sale of a security, (iv) reliance upon the misrepresentation or omission, (v) economic loss, and (vi) loss causation. *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000); *Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 585 (S.D.N.Y. 2011). A failure on any one element requires dismissal. The SAC fails to plead actionable misrepresentations or scienter and therefore must be dismissed.

In addition, the PSLRA provides a more rigorous and demanding pleading standard for securities fraud, requiring plaintiffs to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention 'to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (citations omitted). "Without contemporaneous falsity there simply is no fraud." *C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG,* No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at

19

*3 (S.D.N.Y. Dec. 13, 2013) (citation omitted), and a statement believed to be true when made, but later shown to be false, is not actionable, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

To allege scienter Plaintiff must plead "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs* 551 U.S. at 324. Further, the court must take into account plausible opposing inferences. (*Id.* at 323.) Where a "plausible, nonculpable explanation[]" is more likely than fraud, a plaintiff has not pleaded scienter. (*Id.* at 324.)

## II.    Plaintiff Fails To Plead An Actionable Misstatement Or Omission.

Plaintiff's allegations that Defendants made misrepresentations rely on a number of false premises. *First,* Plaintiff erroneously assumes that the First Whistleblower Report (received in June and July of 2021) actually revealed some misconduct or violations of law. That is directly contradicted by the Company's securities filings, which state that, after a thorough board committee investigation with the assistance of external counsel and forensic accountants, the allegations were not found to be substantiated. (*See* Ex. A at  34; Ex. W at 34.) Plaintiff pleads no facts that contradict those statements.

*Second*, Plaintiff mischaracterizes the separate allegations raised in the Second and Third Whistleblower Reports (received in May and September 2022, respectively) as establishing widespread manipulation of operational data that was reported to the investing public and improper payments made by the Company in connection with the commissioning of projects or acquisitions of land. Neither of those conclusory allegations is supported by the Company's disclosures.

20

With respect to MW Operating and kWh data reported to the public, Plaintiff cannot point to any specific reported number that was false or even inconsistent with the Company's demonstrated growth between the end of Fiscal 2021 and the end of Fiscal 2022 as reported in the Company's Fiscal 2022 Form 20-F.  With respect to alleged improper payments or violations of bribery and kickback laws, Plaintiff simply ignores the Company's findings (which did not identify evidence of improper payments by the Company in connection with any project) and asserts the opposite without pleading any facts to the contrary.

### A.    Azure's Risk Disclosures.

Plaintiff asserts that risk disclosures in Azure's Fiscal 2021 Form 20-F (filed on July 28, 2021) (Ex. A at 34.) broadly warning of the potential for fraud to negatively impact the Company are misrepresentations.   Plaintiff bases her claim on the Company's receipt of the First Whistleblower Report in June/July of 2021.  (SAC ¶ 109.)

Plaintiff's theory is that the following risk disclosures were false because the Company knew the risk had already materialized.

- *"Any damages caused by fraud or other misconduct by our employees could adversely affect our business, results of operation and financial condition"* (SAC ¶ 108)*;*

- *"[W]e may not be safeguarded against all fraud or misconduct by employees or outsiders, unauthorized transactions by employees and operational errors"* (*id.*)*;*

- *"Employee or executive misconduct could also involve the improper use or disclosure of confidential information, data breach or other illegal acts, which could result in regulatory sanctions and reputational or financial harm."* (*id.*);

- *"[C]ertain internal control processes are carried out manually, which may increase the risk that human error, tampering or manipulation will result in losses that may be difficult to detect"* (*id.*);

- *"Our existing operations, personnel, systems, and internal controls may not be adequate to support our growth and expansion and may require us to make*

21

*additional unanticipated investments in our infrastructure"* (*id.* ¶ 110; Ex. A at 14); and

- "*Any historic or future violations of these laws, regulations and procedures by our employees, independent contractors, subcontractors and agents could be costly and time-consuming to investigate and expose us to administrative, civil or criminal penalties or fines (including under U.S. and Indian laws and regulations as well as foreign laws). If we were to be investigated for, charged with, or convicted of, violating these laws and regulations, our reputation could be harmed and it could cause some of our investors to sell their interests in our company to be consistent with their internal investment policies or to avoid reputational damage, and some investors might forego the purchase of our equity shares, all of which may negatively impact the trading prices of our equity shares. In addition, any administrative, civil or criminal penalties or fines could have a material adverse effect on our business results of operations and cash flows.*" (SAC ¶ 111.)

Risk disclosures "have only rarely been found to be actionable by themselves," *Marcu v. Cheetah Mobile Inc.*, 18-CV-11184 (JMF), 2020 WL 4016645, at *6 (S.D.N.Y. July 16, 2020), and only when they present as risk an event that the issuer knows has already transpired. *Chapman v. Mueller Water Prods., Inc.* 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020) (collecting cases). And even in those cases, the test is whether a reasonable investor could have been misled about the nature of the risk when he invested. *In re Mylan N.V. Sec. Litig.,* No. 16-CV-7926 (JPO), 2018 WL 1595985 at *9 (S.D.N.Y. Mar. 28, 2018). Courts recognize that general, non-specific disclosures of potential future risks do not cause a reasonable investor to believe that the company faced no current risk. *Id; In re Noah Educ. Holdings, Ltd. Sec. Litig.,* No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *7–8 (S.D.N.Y. Mar. 31, 2010) ("lengthy, forward-looking recitation of risks facing [Defendant] did not imply that none of these risks . . . would affect [Defendant's] most recent fiscal quarter").

Here, there are no particularized facts pled that the Company was aware of any existing fraud or misconduct of its employees at the time the Fiscal 2021 Form 20-F was filed or that it

22

believed its internal controls were inadequate.[9]  In particular, the mere fact that the Company had received the First Whistleblower Report is not sufficient.  *First*, a company is not required to disclose "uncharged, unadjudicated wrongdoing." *City of Pontiac v. UBS AG,* 752 F.3d 173, 184 (2d Cir. 2014) (citation omitted).  "That well-established principle would be entirely meaningless if every reporting company were required to disclose uncharged, unadjudicated conduct in the risk-factors sections of its filings." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 651 (S.D.N.Y. 2017) (Woods, J.).  *Second,* Plaintiff ignores that the Company did disclose the allegations in its securities filings and in press releases, including specifically the Fiscal 2021 Form 20-F that Plaintiff challenges.  (Ex. A at 34.)  Further, the Company's filings also disclosed that it had thoroughly investigated the claims, and that its investigation did not substantiate the allegations.  Specifically, in its December 10, 2021 press release announcing results for the Second Quarter of Fiscal 2022, Azure disclosed that, following the Audit Committee's investigation the "issues raised, including those raised against Key Management Personnel, have been resolved or found to be groundless."  (Ex. F at 5.)  Similar disclosures were made in the Company's December 27, 2021 Form 6-K and its Fiscal 2022 Form 20-F.  (Ex. Y at 52; Ex. W at 34.)

Plaintiff contends that the Company's decision, *after* its investigation of the First Whistleblower Report, to "implement[] enhancements to our compliance program recommended by our advisors" (Ex. W at 34; SAC ¶ 70.) somehow made its risk disclosures about its internal controls false.  But efforts to enhance or improve internal controls are not evidence that existing controls were inadequate, nor does it make disclosures about risks relating to prior control systems false or misleading.  The law is clear that subsequent remedial efforts are "a prudent course of

---

[9] As an emerging growth company, Azure was exempt from compliance with the auditor attestation requirements of Section 404 of the Sarbanes Oxley Act.  Accordingly, Fiscal 2022 was the first year that the Company was subject to these more extensive requirement regarding its internal controls.

action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Exp. Co*., 604 F.3d 758, 777 (2d Cir. 2010) (citations and quotations omitted); *see also Stevelman v. Alias Rsch., Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (rejecting argument that a company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings should be probative of conscious misbehavior or recklessness"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made."), *aff'd,* 616 Fed. Appx. 442 (2d Cir. 2015).

Plaintiff claims that the Company's subsequent discovery (following its investigations in 2022 of the Second and Third Whistleblower Reports) of internal control deficiencies and allegedly "illegal payments" (SAC ¶ 112(a)-(e)) somehow supports the contention that Azure believed in July 2021 that its internal controls and compliance systems were deficient. Courts regularly reject such hindsight arguments. *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-CV-6180, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021); *see Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 134 (E.D.N.Y 2020) ("Plaintiffs fail to allege that Revlon's SOX certifications were materially false or misleading simply because a weakness in Revlon's ICFR was later discovered."). The fact that risks "eventually happened" does not make risk disclosures actionable; it "means that they were true." *In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *21 (S.D.N.Y. Sept. 20, 2019); *see also Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

24

B.      **Statements About General Compliance.**

Plaintiff mistakenly claims that general statements in the Fiscal 2021 Form 20-F regarding the sufficiency of Azure's efforts to comply with applicable laws and regulations are actionable misrepresentations.  Specifically, Plaintiff claims the following general statement in the 2021 Form 20-F is a misrepresentation.

- *"We have developed and implemented formal controls and procedures to ensure that we are in compliance with the FCPA as well as anti-corruption, anti-bribery and anti-facilitation payment laws."* (SAC ¶ 111.)

Courts regularly find that similarly broad aspirational statements by an issuer concerning its compliance goals and objectives to be non-actionable puffery.  Unlike "specific, factual" statements, "vague descriptions [that] offer only generally optimistic opinions" are not actionable under Section 10(b).  *In re Synchrony Fin. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021).  A speaker engages in puffery when he claims to be "pretty confident" and "pretty positive" about the future, or makes "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices. . . ."  (*Id.*)  Such statements "are 'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be unactionable.'"  (*Id.*) (citation omitted); *see also In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d 731, 755-56 (S.D.N.Y. 2017) (despite long-running criminal bribery scheme, investigations, prosecutions, and imposition of a prison sentence for a significant stakeholder, and a 20% stock drop, statements regarding the code of ethics and standards of conduct, including commitment to "integrity," "compliance with the laws," and "fundamental values such as transparency [and] ethics" were "inherently aspirational," "inactionable," "immaterial puffery," and insufficiently specific for an investor to rely upon).  Indeed, the next paragraph of the Fiscal 2021 Form 20-F specifically recognized the possibility that, notwithstanding the implementation of compliance controls, there could be "historic or future

25

violations of these laws, regulations and procedures," which may result in damage to the Company and a negative impact on the trading price of its equity shares.  (SAC ¶ 111.)

Plaintiff also does not point to any violation of the FCPA, anti-corruption statutes, anti-bribery statutes or anti-facilitation statutes that renders the challenged statement false.  In thoroughly investigating such allegations regarding improper payments, the Company found no evidence that any such violations had occurred, and Plaintiff alleges no facts to contradict that.  Plaintiff cites the discovery by the Company *after* its investigation in 2022 that there may have been "potential misrepresentations made by former executives" to the Board in July 2021 relating to a wind project and former executives "may have circumvented internal policies" with respect to another wind project as support that the Company's earlier statements about compliance with the law were false.  (SAC ¶112(c).)  But putting to the side the fact that both findings were made after the challenged statements were made, neither finding by the Company suggests any law was broken, and indeed the Company's investigation specifically found that "***no evidence of improper payments related to either of these transactions.***"  Nor did it find ***"any adjustment that needed to be made in Azure's books of account."***  (*See* SAC ¶ 195.)  The same is true for Plaintiff's reliance on allegations in the First Whistleblower Report of "corrupt conduct" or a "kickback scheme" (*id.* ¶¶ 112(a)-(b)) – the Company's investigation found those allegations were not substantiated.  (*id.* ¶ 62.)

###  C.    Statements About Azure's Commitment to Safety.

Similarly, Plaintiff alleges that statements concerning the Company's safety culture, including statements about awards achieved by the Company (which Plaintiff does not dispute the Company actually won), were false because the Company *later* discovered "deviations from safety and quality norms" (SAC ¶¶ 117, 140, 154) at one of its projects.  Specifically, Plaintiff highlights the following statements in 2021 and early 2022:

- "We highlighted our ISO-45001 certification earlier this year, *which demonstrates Azure's focus on occupational health and safety*" (SAC ¶ 116);

- "[W]e have also recently won the Greentech Effective Safety Culture Award for 2021 . . . *which signifies the efforts we have put in to ensure safety culture is embedded across our project locations and sites*" (*id.* ¶¶ 116, 139); and

- *"Similarly, safety is one aspect that is paramount to us. The awards that we won for our safety culture, as I reported last time, demonstrate our efforts in this area"* (*id.* ¶ 153).

Plaintiff alleges these statements were false because Azure later disclosed —in its August 29, 2022 Press Release and during the August 31, 2022 Earnings Call — that it "discovered deviations from the safety and quality norms" and that it planned to "strengthen safety and quality protocols at this plant, but also across our other operations." (SAC ¶¶ 117, 140, 154.) Plaintiff further alleges that by touting Azure's certifications and awards, it communicated that "Azure was in compliance and had systems in place that were closely monitored by management to minimize risk and injuries in 2021 and that those processes were still in place and functioning at the highest levels in Fiscal 2022." (*Id.*) Azure's statements on health and safety are not materially misleading.

*First,* the challenged statements were at worst clearly aspirational puffery that courts have widely recognized are not actionable because no investor would rely on them. *In re Vale S.A. Sec. Litig.,* No. 1:15-cv-9539-GHW, 2017 WL 1102666, at \*22 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) (statements concerning company's commitment to safety not actionable because they are "too general to cause a reasonable investor to rely upon them") (citations and quotations omitted); *see also Ong. v. Chipotle Mexican Grill, Inc.* 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (finding statements regarding the Company's "commitment to safety and training" and "quality and food safety are integrated throughout the [company's] supply chain and everything [company] does" to be inactionable puffery); *Foley v. Transcocean Ltd.,* 861 F. Supp. 2d 197, 204 n.7 (S.D.N.Y. 2012)

27

(noting company's statement concerning "commitment to safety and training" was inactionable puffery).

*Second*, the fact that the Company later disclosed "deviations" from "safety and quality norms" at *one* out of 45 projects does not reasonably support a claim that its earlier general statements about its commitment to safety are false. *See Acito*, 47 F.3d at 53. Further, statements about the Company's commitment to health and safety are not a guarantee that such issues will not later arise. *See Arora v. HDFC Bank Ltd.*, 671 F. Supp. 3d 305, 315 (E.D.N.Y. 2023) (statement that internal controls were "effective" were not false and misleading because such statements "do not purport to guarantee that the controls will perform perfectly in every instance, but instead speak to reasonable assurance or reasonable certainty.") (citations and quotations omitted).

### D.    Statements About Azure's MW Operating and kWh Generation.

Plaintiff broadly asserts that the operational metrics reported by Azure in its SEC filings, press releases, and earnings calls from August of 2021 to March of 2022, in particular "reported Megawatts operating" (SAC ¶ 107), were false and misleading.  (*Id*. ¶¶ 113-56.)[10]    But as demonstrated below, that erroneous contention is based on: (i) an inapt comparison between Azure's reported actual Fiscal 2022 MW Operating figure to previously disclosed forward-looking MW Operating guidance that Azure came close to, but ultimately missed achieving; and (ii) a mischaracterization of the Company's findings in response to its investigations of the Second and Third Whistleblower Reports.

---

[10] For a list of the allegedly false and misleading statements regarding MW Operating and kWh Generation, Defendants respectfully refer the Court to chart above in Section C of the Background Facts.

1.      **The Company Did Not Restate Any MW Operating Data or kWh Generation Data.**

a.  **MW Operating Data.**

The sole basis for Plaintiff's claim that the Company's filings falsely reported MW Operating data is the conclusory assertion, which is cut and pasted numerous times across the SAC, that: "Defendants admittedly had to restate for Fiscal 2022, 'reported' MWs Operating downward to 2,666 for Fiscal 2022 as result of data manipulations and improper payments reported in the Second and Third Whistleblower Complaints discussed above." (SAC ¶¶ 115(a); 120(a); 128(a); 136(a); 145(a); 150(a); 156(a).) But nowhere in the SAC does Plaintiff actually identify *any* previously reported historical MW Operating number that she contends was "restated." Rather, Plaintiff relies exclusively on a footnote in Azure's January 25, 2023 Press Release stating that the 2,666 MW Operating number for Fiscal 2022 was "[a]djusted for inconsistencies in MWs reported as identified by the Group through its review of 2022 whistle-blower allegations" to assert that (i) the 2,666 MW number was restated by Azure as a result of the whistleblower allegations; and (ii) the "restated" number was "approximately 6% to 10% less than" Azure's prior MW Operating guidance for Fiscal 2022. (SAC ¶ 95; Ex. T.) That argument, which relies on mischaracterizations layered onto faulty comparisons, is flawed for a number of reasons.

*First*, the 2,666 MW Operating number reported in the January 25, 2023 Press Release was not "restated." Because the Company delayed the filing of its Fiscal 2022 financials, the SAC does not allege that Azure ever previously reported to investors a MW Operating number for full year Fiscal 2022 and, therefore, there was nothing to "restate."

*Second*, Plaintiff's apples to oranges comparison of the actual 2,666 MW Operating number with Azure's prior *guidance* for Fiscal 2022 of 2,855-2,955 MW to create the impression of a material deviation of "approximately 6% to 10%" misses the mark. (SAC ¶ 95.) For one

thing, that forward-looking guidance, which was set forth in Azure's February 25, 2022 Press Release, appeared immediately after the following cautionary language:

> The following statements are based on our current ***expectations***. These statements are ***forward-looking*** and ***actual results may differ materially***. (emphasis added).[11]

(Ex. J at 6.)  Thus, Azure's guidance is protected under the "bespeaks caution" doctrine and the PSLRA's safe harbor for forward-looking statements and Plaintiff cannot base her misstatement claim on any supposed variance between Azure's actual reported MW Operating for Fiscal 2022 and its prior guidance.  *Ong*, 294 F. Supp. 3d at 237 ("financial projections . . . fall within the purview of the PSLRA's safe harbor"); *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016) (applying "bespeaks caution" doctrine to company's "projections as to corporate earnings").

Moreover, underperforming forward-looking guidance is not securities fraud.  As this Court recently stated with respect to a claim that financial guidance constituted a misrepresentation, "'[i]t is not sufficient…to allege that an opinion was unreasonable, irrational, overly optimistic [or] not borne out by subsequent events.'  The Second Circuit has firmly rejected this fraud by hindsight approach."  *Greco v. Qudian Inc.*, 1:20-cv-577-GHW, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022 ) (Woods, J.) (*quoting Lopez,* 173 F. Supp. 3d at 85); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 402 (S.D.N.Y. 2006); *Stevelman*, 174 F.3d at 85.

Plaintiff's attempt to suggest that the market was somehow misled by the variance between the 2,666 MW Operating number and the prior guidance of 2,855-2,955 MW is further undermined

---

[11] The February 25, 2022 Press Release also contained extensive additional cautionary language warning investors of numerous "risks and uncertainties that could cause our results to differ materially from those expressed or implied by [the] forward-looking statements" contained therein.  (Ex. J at 8.)

by the SAC's own allegations concerning what the Company ***did*** in fact disclose to investors about MW Operating during Fiscal 2022.  Specifically, in a press release dated March 14, 2022, the Company disclosed actual MW Operating of 2,683 MW. (Ex. M at 1; SAC ¶ 155.)  Thus, investors were aware of the Company's actual MW Operating data as of March 14, 2022 (*i.e.*, merely two weeks before to the close of Fiscal 2022 on March 31, 2022).  The fact that the Company later reported an "adjusted" number for full year Fiscal 2022 of 2,666 MW—***a variation of only 0.63%***—cannot support a material misrepresentation claim under Section 10(b).[12]  *S.E.C. v. Patel*, 07–cv–39–SM, 2009 WL 3151143, at *52 (D.N.H. Sept. 30, 2009) (alleged variance in reported revenue of 0.68% "is not material as a matter of law").[13]

*Finally*, Plaintiff alleges no facts to support her insinuation that the investigation findings concerning data manipulation at one project and "inconsistencies" in data at three other projects (SAC ¶¶ 92, 115(b), 120 (b), 128(b), 136(b), 145(b), 150 (b), 156(b)) resulted in Azure having to "restate" any prior MW Operating data, let alone a material restatement.  Similarly, Plaintiff's rote repetition of Azure's subsequent disclosure that management identified certain "material weaknesses" in internal controls (*see id*. ¶¶ 115(f), 120(f), 122(e), 125(e), 128(e), 130(e), 133(e), 136(f), 138(e), 142(e), 145(f), 147(d), 150 (f), 152(d), 156(f)) is not supported by any facts connecting those disclosures to any previously reported MW Operating data.

---

[12] In fact, as disclosed in Azure's 2022 Fiscal Form 20-F filed in October 2023, (Ex. W at 40) the MW Operating number for Fiscal 2022 was subsequently revised ***upwards*** to 2,752 MW to account for approximately 86 MW of capacity that was supposed to be transferred to a counterparty pursuant to a sale transaction that was later mutually terminated.  (*See* Ex. W at 38; *id.* at 48-49 (disclosing that Azure was in discussions with Radiance Renewables Private Limited to terminate a 2021 sale contract and "[h]ence, portfolio of 86.5 MW have been considered for reporting under [Azure's] total portfolio as at year end [for Fiscal 2022]").)

[13] As demonstrated in Mr. Agarwal's memorandum, which Defendants incorporate herein, Plaintiff's allegations relating to the MW Operating data fail for the additional reason that the Company's January 25, 2023 Press Release did not correct or change, but reiterated, the previously-reported MW Operating amounts for the first three quarters of Fiscal 2022 that Plaintiff claims were false.  (*See* Agarwal Mem. at Part II.)

### b.  kWh Generation Data.

The SAC is devoid of any particularized factual allegations in the SAC calling into question the kWh generation data disclosed by the Company.  Electricity generation in kWh is one of the Company's "key metrics" (SAC ¶ 55) and it reflects the amount of energy actually received by Azure's customers and is verified by the customers and monitored by government regulators.  No facts are alleged showing that any such information was inaccurately reported or that any customer or regulator identified any discrepancy in the kWh provided to the electricity market versus those reported internally.

Instead, Plaintiff simply bolds and underlines Azure's reports on electricity generation in kWh in each of its quarterly updates for the First, Second and Third Quarters of Fiscal 2022 and labels them as "materially false" and "misleading" without any explanation.  (SAC ¶¶ 115, 128, 145.)  But Plaintiff alleges no facts suggesting anything suspicious or inconsistent about any of those numbers.

- *"Electricity generation during the [first] quarter ended June 30, 2021 was 1,112 million kWh, an increase of 228 million kWh or 25.8% over the quarter ended June 30, 2020."* (SAC ¶ 114).

This reflects that at the end of the First Quarter of Fiscal 2022 the Company's kWh was 1,112 million.

- *"Electricity generation during the [second] quarter . . . ended September 30, 2021 was 1,001 million kWh  . . ., an increase of 231 million kWh or 30%, over the quarter ended September 30, 2020."*  (*Id.* ¶ 127.)

Thus, at the end of the Second Quarter of Fiscal Year 2022,  the Company's total for the year was 2,113 million kWh (1,112 + 1,001).

- *"Electricity generation during the [third] quarter . . . ended December 31, 2021, was 1,068 million kWh . . ., an increase of 248 million kWh or 36% over the quarter ended December 31, 2020."*  (*Id.* ¶ 144.)

32

Thus, at the end of the Third Quarter of Fiscal 2022, the Company's total for the year was 3,181 kWh (2,113 + 1,068).

- *The Fiscal 2022 Form 20-F indicates that the Company's total electricity generation for Fiscal Year 2022 was 4,551 million kWh.* (Ex. W at 39.)

This reflects kWh generation during the Fourth Quarter of Fiscal Year 2022 of 1,370 million kWh, leading to a cumulative generation for full year Fiscal 2022 of 4,551 million kWh (3,181 + 1,370).

Plaintiff fails to explain how any of these reported numbers were false or point to any particularized factual allegation suggesting they were false.

### 2.    Plaintiff Repeatedly Mischaracterizes the Company's Statements with Respect to Data Irregularities.

Plaintiff cherry picks and misleadingly combines out of context snippets from the Company's Press Releases and Fiscal 2022 Form 20-F to try to create a false narrative regarding the Company's actual findings in its investigations of the Second and Third Whistleblower Reports relating to project data. The SAC repeatedly alleges: "[a]s Defendants admitted on August 29, 2022, August 31, 2022, January 25, 2023 and in the Fiscal 2022 Form 20-F, that, for the last three years, there was affirmative 'evidence of manipulation and misrepresentation of project data by some employees,' including 'corrupt payments' and 'failures to provide accurate information both internally and externally,' related to at least four large projects which Defendants viewed as 'serious issues,' and were forced to report to the SEC and DOJ." (SAC ¶¶ 115(d), 120(d), 122(b), 125(b), 128(d), 136(d), 145(d), 150(d), 156(d).) That supposed "admission" is Plaintiff's construct.

*First*, there was no finding or admission by the Company that there was affirmative evidence of data manipulation and misrepresentation for three years at four large projects. What the Company found was data manipulation and misrepresentation at *one project* as a result of its investigation of the Second Whistleblower Report. (SAC ¶¶ 89, 193.) But Azure said nothing to suggest that data manipulation occurred over three years or that it affected any MW Operating or

kWh metric reported to the public, nor does Plaintiff point to any such statement.  In fact, Azure disclosed that the data issues related to communicating milestone data to one customer (SECI) and not to any numbers previously reported to the markets. (*Id.*)  Although the Company found inconsistencies in project data (not "manipulation" as Plaintiff suggests) in three other projects that were commissioned in 2022 and 2023, (*id.*) that does not support Plaintiff's assertion that Company-wide inconsistencies existed for three years nor that they affected any MW Operating or kWh numbers reported to the markets.

*Second*, there is no support in the Company's filings (or anywhere else) for Plaintiff's contention that "corrupt payments" existed at four large projects or that those payments had anything to do with data inconsistencies.  Plaintiff simply ignores the Company's reports that its investigations found no evidence of improper or "corrupt" payments by the Company.  To state a Section 10(b) claim.  Plaintiff must plead facts supporting her allegations of improper payments, which she has not done.

*Third*, although the Company found failures to provide accurate information internally or externally at the one project that was the subject of the Second Whistleblower Report, there were ***no findings*** that such failures extended beyond that project, went on for three years, or were related to any MW Operating or kWh metrics reported by the Company to the markets, nor does Plaintiff plead any such facts (just conclusions).  (SAC ¶¶ 89, 193.)

### 3. Failure to Meet a Contractual Milestone is Not Evidence of Fraud.

Plaintiff misrepresents a contractual issue between Azure and one of its customers, SECI, as to one project as somehow demonstrating that Azure's MW Operating and kWh reporting was false.  Plaintiff supports this claim by cutting and pasting the following allegation in numerous paragraphs: "Defendants admitted in the January 25, 2023 Press Release and in the 2022 Form 20-F that, with respect to at least one customer, Azure incurred 'shortfalls in generation' from not

'timely commissioning [] the full capacity required under the PPA,' resulting in 'shortfalls in generation,' subjecting the Company to overstating reported megawatts and liquidated damages under the customer PPA estimated at US \$5.2 million**."**  (SAC ¶¶ 115(e), 128(e), 136(e), 145(e), 150(e), 156(e).)[14]   But this is another example of Plaintiff incorrectly summarizing Azure's actual statements from the January 25, 2023 Press Release:

> In Fiscal 2022, the Group experienced delays in execution of its projects beyond the extended commissioning timelines provided by the customers and ***could be*** subject to liquidated damages as per the respective PPAs. The Group ***estimates*** a contingent liability on account of delayed commissioning aggregating to INR 390 million (US\$ 5.2 million), including INR 16 million (US\$ 0.2 million) as an aggregate impact of inconsistencies in project data that were identified during the whistle-blower investigations. ***The Group is in regular discussions with its customers to seek further extensions of construction and commissioning timelines as appropriate. The inability to obtain these time extensions could have additional implications under the requisite PPAs and project agreements, including, but not limited to, reductions in project capacities and reductions in tariffs.***  (Ex. T at 13-14) (emphasis added.)

The Fiscal 2022 Form 20-F stated that:

> [I]n fiscal 2023 we reported to SECI that this project had (i) shortfalls in generation and (ii) that it failed to timely complete and commission the requisite contractually required capacity.   On January 3, 2023 and January 4, 2023, SECI advised us, inter alia, that the project ***may be*** liable for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under PPA in a timely manner.  (Ex. W at 93) (emphasis added.)

As these full quotes demonstrate, the Company was in communications with SECI regarding the shortfalls in generation and contractual delays, which it then communicated to the market.  Nothing in these statements suggest that any prior historical operating metrics  reported by the Company were false or misleading.  And in any event, failure to meet contractual obligations

---

[14] Plaintiff makes the same assertion elsewhere in the SAC in slightly re-worded fashion.  (*See* SAC ¶¶130(a), 133(a), 138(a), 142(a), 147(a), 152(a).)

that "could" result in penalties does not support a Section 10(b) claim.  *See City of Roseville Emps.*

*Ret. Sys, v. Horizon Lines, Inc.* 442 F. App'x 672, 675 (3d Cir. 2011) (allegations "akin to corporate

mismanagement" not sufficient to state securities fraud claim).  Moreover, Plaintiff has not alleged

that the Company was actually in breach of its contract with SECI or that it had to pay any

liquidated damages related to these issues (and in fact it did not).

E.    **Representations About Wind Power Projects.**

Plaintiff contends that the following statements regarding the award and future

development of certain wind and hybrid wind/solar projects are false:

- Azure *"received a letter of award (LOA) for its first wind project, 120 MW ISTS project with Solar Energy Corporation of India (SECI) to supply power for 25 years at a tariff of INR 2.70 (~ US 3.6 cents) per kwh"* (SAC ¶ 121);

- *"We have secured our first step in diversifying our presence in the renewable spectrum in India and it positions us well to add to our addressable market while we build scale in this segment on the back of strong management experience and Azure's long history of execution"* (*id.*):

- Azure *"received the letter of award (LOA) for its first 150 MW ISTS connected to wind-solar hybrid power project with Solar Energy Corporation of India (SECI) to supply power for 25 years at a fixed tariff of INR 2.35 (~ US 3.2 cents) per kwh"* (*id.* ¶ 123);

- The SECI project *"will entail setting up of 100 MW of solar and 50 MW of wind capacity"* (*id.* ¶ 124);

- *"We have secured yet another important milestone with our first solar-wind hybrid project with SECI. We have taken steps to develop  large wind sites and this project, along with wind project we announced earlier, will be built as part of that development. With this win, we are confident of maximizing our growth potential" id.*);

- *"*[W]e received Letter of Awards *for 120-megawatt wind project and 150-megawatt wind-solar hybrid project with SECI* subsequent to quarter end*. . . .We have already developed significant organizational capabilities for these inhouse, and are looking forward to implementation on the ground with our teams already working on developing large wind sites across the country"* (*id.* ¶ 131); and

36

- **"*Our recent wins in this regard, the 120-megawatt wind project and the 150-megawatt hybrid project, both with SECI*, provides us an opportunity to kickstart this process of diversifying the portfolio and move in line with the industry[.]"** (*Id.* ¶ 132.)

These disclosures note the terms of two project awards and provide the Company's opinion as to why the awards were significant.[15] The supposed support for Plaintiff's claims (SAC ¶¶ 122, 125, 133) does not demonstrate that anything stated by Defendants was false. Instead, Plaintiff insinuates that the statements were somehow false because the projects were purportedly obtained by "corrupt means." (*Id.* ¶¶ 122(d), 122(f), 125(d), 125(f).)

Merely alleging underlying misconduct is not sufficient to state a claim under Section 10(b). *See Menora Mivtachim Ins. Ltd. v. Intl. Flavors & Fragrances Inc,* 19 Civ. 7536 (NRB), 2021 WL 1199035 at *15 (S.D.N.Y. Mar. 30, 2021) ("Even assuming the Amended Complaint adequately pleads that Frutarom carried out illegal transactions during the Class Period, which it does not, plaintiffs still fail to state a Rule 10b-5(b) claim because the Amended Complaint does not plead any actionable false statements or omissions of material fact."). That is all Plaintiff has done — allege misconduct without pleading facts to support that allegation.

In any event, Plaintiff's contention that these projects were procured through fraud, improper payments, or overpayments is undercut by the very source Plaintiff cites for her allegations. Notably, the auditor did not "conclude" that there were "potential overpayments," it noted only that allegations of overpayment had been made. After extensively investigating specific allegations of misconduct about the development of two wind farm projects, the Company

---

[15] Defendants' statements about the importance of the projects to the Company's future and its ability to manage such projects going forward are clearly statements of opinion that are not actionable given the absence of any allegations showing they did not hold those opinions or omitted any underlying information. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 135 S. Ct. 1318, 1327-28 (2015) (statements of opinion are only actionable as (1) a false statement if "the speaker did not hold the belief she professed"; or (2) a misleading statement if she omits information "about [her] basis for holding that view").

was "not able to identify any evidence of improper payments related to either of these [wind] transactions" and the Company also "reassessed the valuation of the asset purchase and related government orders" for these projects and "did not find any adjustment that needed to be made in the books of account." (SAC ¶ 195.)  Further, with respect to the vague "scheme" reference by Plaintiff, the Company investigated this issue and determined that "no related improper payments or transfers by the [Company] have been identified" with respect to the impacted project. (*Id.* ¶ 197.)  Plaintiff ignores this, and thus has pleaded no facts to call it into question.

Additionally, as the Fiscal 2022 Form 20-F notes, both the 120 MW wind project and the 150 MW hybrid plant (100MW solar and 50 MW wind) were awarded and are under construction with 25 year PPAs. (Ex. W at 48.)  Plaintiff does not dispute those statements, which fully support the Company's opinion regarding their importance.  Finally, Plaintiff's repetition of Azure's subsequent disclosure that management identified certain "material weaknesses" in internal controls (*see* SAC ¶¶ 122(e), 125(e),133(e)) is not supported by any facts connecting those disclosures to these projects.

## F.    Representations About Plant Commissioning.

Plaintiff also alleges several misstatements associated with the commissioning of projects by Azure during Fiscal 2022.  Specifically, Plaintiff alleges that the following statements made by the Company are false:

- *"We commissioned 158 MWs AC (188 MWs DC) during the three months ended September 30, 2021 and 220 MWs AC (252 MWs DC) during the six months ended September 30, 2021 against 25 MWs AC (25 MWs DC) during the comparative three months and 26 MWs AC (28 MWs DC) during the six months ended September 30, 2020"* (SAC ¶ 129);

- *"We commissioned 158-megawatt AC capacity and 188-megawatt DC capacity during the quarter.  As of today, we have completed and commissioned 500 megawatts out of 600 megawatts in our Rajasthan 6 project and balance 100 megawatts is to be commissioned in this month"* (*id.* ¶ 137);

- *"Azure Power . . . today announced the successful commissioning of its largest project – 600 MWs Interstate Transmission System (ISTS) connected solar project allocated by Solar Energy Corporation of India (SECI)"* (*id.* ¶ 141)

- *"Azure Power has commissioned this project in phases, with the last 100 MWs commissioned this month.  Following this, Azure Power has 2510 MWs of high-performing operational solar assets" (id.*);

- *"[W]e have managed to deliver high performing assets"* (*id.*);

- *"We commissioned 313 MWs AC during the three months ended December 31, 2021, and 533 MWs AC during the nine months ended December 31, 2021, against 153 MWs AC (264 MWs DC) during the comparative three months and 179 MWs AC (264 MWs DC) during nine months ended December 31, 2020"* (*id.* ¶ 146);

- *"Our largest project, the [600]-megawatt Rajasthan 6, is now fully commissioned, and we expect it to deliver superior performance to our portfolio from the next fiscal onwards.  The second 300-megawatt Rajasthan 8 is also in line to be fully commissioned shortly. And even though Rajasthan 9 was impacted due to supply-related challenges, we will persevere"* (*id.* ¶ 151); and

- *"Azure Power . . . announced full commissioning of its 300 MWs Interstate Transmission System (ISTS) connected solar project.  Following this*, *Azure Power has now operationalized 2,683 MWs of high-performing renewable energy assets in India"* (*id.* ¶ 155.)

Plaintiff provides no well-pleaded factual basis for the contention that any of these statements are false.  The Fiscal 2022 Form 20-F disclosed (and Plaintiff has not challenged) that the following projects became operational (meaning commercial operations commenced based on AC capacity) during Fiscal 2022:

- Assam-1 Q3 2020 to Q1 2022 (AC Capacity 90; DC Capacity 135);

- Rajasthan 6 Q4 2020 to Q1 2022 (AC Capacity 600; DC Capacity 893);

- Rajasthan 8 Q4 2021 to Q1 2022 (AC Capacity 300, DC Capacity 417); and

- Rajasthan 9 Q to Q3 2022 (AC Capacity 300; DC Capacity 385).  (Ex. W at 48)

Plaintiff appears to argue that the challenged statements were false because the Company's January 25, 2023 Press Release and/or the Fiscal 2022 Form 20-F made references to (1) shortfalls in generation and failures to "timely complete and commission" a project with SECI (SAC ¶¶ 130(a), 137(a), 142(a), 147(a), 152(a), 156(e)); (2) certain employees obtaining "a premature plant commissioning certificate" (*id.* ¶¶ 130(b), 138(b), 142(b), 147(b), 152(b), 156(c)); (3) potential misconduct or fraud associated with the plants' commissioning (*id.* ¶¶ 130(c), 138(c), 142(c), 147(c), 156(a)-(b), (d)); and (4) weaknesses in internal controls (*id.* ¶ 156(f)). But even if misconduct is alleged or even identified with well-pled facts (neither of which is the case here), that does not support a securities fraud claim without a connection to a specific misrepresentation in the Company's public disclosures. *See Menora Mivtachim Ins. Ltd.,* 2021 WL 1199035, at *15. Here, there is no allegation that the plant commissioning certificate or Azure's communications with SECI were ever made public.

All Plaintiff does is quote an unnamed source from a magazine article to support her the claim. Specifically, the SAC alleges that "[a] March 30, 2023 *Economic Times* article entitled 'Before Azure Power's Results a Project Awaits Rollout,' revealed a 'source in the know of the development' who said '[t]he whistle blower has alleged the company got a commercial operation data certificate (COD) without the project being fully commercially operational' and 'the new management is waiting for the project to reach COD before announcing the audited results.'" (SAC ¶¶ 130(d), 133(d), 138(d), 142(d), 147(c), 152(c), 156(g).) Plaintiff's reliance on a magazine article citing an unnamed person "in the know" cannot satisfy her pleading burden under the PSLRA. Conclusory allegations based on newspaper articles or vaguely described confidential sources need not be credited. *See Lopez*, 173 F. Supp. 3d at 31 ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's

40

counsel."); *id.* (plaintiff must describe confidential source "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

Finally, Plaintiff's repetition of Azure's subsequent disclosure that management identified certain "material weaknesses" in internal controls (*see* SAC 130(e), 138(e), 142(e), 147(d), 152(d), 156(f)) is not supported by any facts connecting those disclosures to any plant commissioning.

### G.    Representations About Payments to Land Aggregators.

Finally, Plaintiff relies once again on disclosures concerning the whistleblower investigations to manufacture an alleged misstatement.  This time, Plaintiff cites Azure's disclosure that the investigation of the Third Whistleblower Report found evidence that "third party land aggregators may have been involved in improper payments" (SAC ¶ 194) and the auditor's report in Azure's Fiscal 2022 Form 20-F noted that "in one of the projects, a member of the Group entered into agreements with some land aggregators for adjustments to land use permissions which may have involved improper payments" (*Id.* ¶¶ 122(c), 125(c).)

Based on these disclosures, Plaintiff alleges that numerous statements in Azure's filings were false and misleading because "certain of Azure's executives, which Plaintiffs believe to be Defendants Gupta and Subramanian who were terminated in April 2022, 'were involved in an apparent scheme with persons outside the Company to make improper payments in relation to  a project,' which required Azure to record a de-capitalization adjustment of US $3.4 million." (SAC ¶¶ 115(b), 120(b), 128(b), 136 (b), 145(b), 150(b), 156(b).)  This allegation fares no better than the allegations discussed above.

*First*, Mr. Gupta and Mr. Subramanian were not "terminated" as Plaintiff incorrectly states, and the SAC contains no factual allegations to support Plaintiff's rank speculation that they are the "executives" referenced in the disclosure.

41

*Second*, the SAC does not explain how the investigation findings relating to potential "improper payments" by land aggregators at one facility rendered any of Azure's prior statements misleading.  Nor does the SAC allege that the balance sheet adjustments totaling $3.4 million, which Azure made "as a prudent measure" (SAC ¶ 194) had any impact on Azure's previously disclosed financials.  Further, a $3.4 million adjustment, or 1.6% of Azure's Fiscal 2021 revenues of $208.3 million (SAC ¶ 55), is presumptively immaterial. *See Menora Mivtachim Ins. Ltd.*,  2021 WL 1199035, at \*22 (alleged misstatement "represented at most between 1.6% to 2.7%" of company's revenues and therefore "f[e]ll comfortably below the 5% threshold to be presumptively immaterial").

*Finally*, as demonstrated above, the Company investigated all of these allegations relating to potential misconduct involving land aggregators and found no evidence of any improper payments.  (SAC ¶¶ 194, 197.)

*       *       *

Plaintiff's pattern of relying on allegations that were fully disclosed while ignoring and failing to dispute the equally fully disclosed investigative findings that the allegations lacked merit is dispositive of whether Plaintiff has pleaded any misstatements or omissions.  She has not.

### III.    The SAC Fails to Plead A Strong Inference of Scienter.

The SAC's failure to plead specific facts giving rise to the required strong inference of scienter is an independent basis for dismissal.  To survive a motion to dismiss, a securities fraud plaintiff must plead "with particularity" and, "with respect to each act or omission alleged to violate" the securities laws, "facts giving rise to a strong inference of scienter" as to each defendant.  15 U.S.C. § 78v-4(b)(2)(A); *Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015).  In the Second Circuit, a plaintiff may plead scienter either by (1) alleging that a defendant had the motive and opportunity to commit fraud or (2) providing "strong circumstantial evidence of

conscious misbehavior or recklessness." *ECA Loc.* 134 *IBEW Joint Pension Tr. of Chi.,* 553 F.3d at 196.

Plaintiff has not satisfied either aspect of this test. Plaintiff points to no documents or confidential witnesses showing that any of the Defendants were aware that any alleged misrepresentation was false when it was made. In fact, Plaintiff has not even attempted to identify any motive or plead any circumstantial facts that would show any of the Defendants were aware of specific information that was contrary to one of the challenged statements at the time it was made. Plaintiff instead relies almost exclusively on the assumption that "Defendants knew" about each statement's falsity by virtue of their positions and access to unspecified information. Such allegations are insufficient to allege scienter. *In re KeySpan Corp. Sec. Litig.,* 385 F. Supp. 2d 358, 387 (E.D.N.Y. 2003) ("[M]ere allegations defendants were senior executives and [thus had] access to inside information [is] insufficient" to establish scienter.).

## A.    The SAC Fails to Adequately Allege Motive and Opportunity to Commit Fraud.

To plead motive and opportunity, a Plaintiff must sufficiently allege particularized facts showing that defendants "benefitted in some concrete and personal way from the purported fraud[.]" *ECA and Local 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198, 201 n.6 (there must be a "unique connection between the fraud and the [alleged benefit]").

Plaintiff does not even attempt to allege that Defendants benefitted in any concrete or personal way from the alleged misrepresentations, nor could she. Indeed, the SAC does not allege that any Individual Defendant sold stock during the proposed Class Period, which affirmatively undercuts any potential inference of scienter. *See Skiadas v. Acer Therapeutics, Inc.*, 1:19-cv-6137-GHW, 2020 WL 3268495 at *11 (S.D.N.Y., June 16, 2020) (Woods, J.) ( "absence of stock sales by insiders" is "inconsistent with intent to defraud shareholders"); *In re DRDGOLD Ltd.,*

43

*Sec. Litig.,* 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (dismissing for lack of scienter because complaint "makes no specific allegations of other insiders . . . selling stock during the class period."); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) (lack of stock sales tends to negate inference of scienter).

The only alleged motive identified by Plaintiff is a generic desire "[t]o make Azure's financial position appear more favorable" to investors and lenders. (SAC ¶ 60.)  But it is settled law that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable" do not suffice to establish scienter.  *ECA Local 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198; *see also Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead  plaintiffs must assert a concrete personal benefit to the individual defendants resulting from the fraud."); *Skiadas* 2020 WL 3268495 at *11 (same); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801 (2d Cir. 1996) (holding that a company's desire to maintain a high bond or credit rating is insufficient to establish scienter, "because [i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences downturn in stock price could be forced to defend securities fraud actions").

### B.    The SAC Fails to Plead Strong Circumstantial Evidence of Fraud.

If, as here, a complaint fails to allege motive, the "strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater."  *ECA & Local 134 IBEW Joint Pension Tr. of Chi.,* 553 F.3d at 198-99.  Thus, Plaintiff must allege particularized facts showing "reckless conduct by the defendants, which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000);

*Gissin v. Endres*, 739 F.Supp.2d 488, 503 (S.D.N.Y. 2010).  Moreover, Plaintiff must set forth detailed "allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd., Sec. Litig.,* 600 F. Supp.2d 510, 536 (S.D.N.Y. 2009).  As demonstrated below, whether viewed individually or collectively, the SAC's scienter allegations fall well short of this stringent standard.

<b>1.    Azure's Receipt of, and Subsequent Disclosures Concerning, Whistleblower Reports and Investigations Do Not Support Any Inference of Scienter.</b>

The crux of Plaintiff's scienter theory is that because Azure received certain whistleblower reports in 2021 and 2022, conducted investigations into those allegations and subsequently disclosed its findings, which included certain weaknesses in internal controls and instances of misconduct by employees, Defendants have essentially "conceded scienter" because they must have known the full extent of those issues much earlier.  (SAC ¶¶ 208; 211-13.)  Courts have routinely rejected this precise "fraud by hindsight" theory of scienter.  *See City of Brockton Retirement Sys. v. Avon Products, Inc.*, No. 11 Civ. 4665(PGG), 2014 WL 4832321 at *24 (S.D.N.Y. Sept. 29, 2014) (mere fact that defendant received whistleblower complaint does not demonstrate that defendants knew that the allegations in complaint were true); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (plaintiff's reliance on defendants' alleged post-class period "evidentiary admissions" was "fraud by hindsight," which failed to support an inference of scienter because they "do not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements").

Beyond generic allegations of "access" to information, the SAC is devoid of facts, particularized or otherwise, showing that any Defendant was aware of specific information concerning the misconduct alleged in any of the whistleblower reports prior to the Company's actual investigations, let alone information that contradicted Defendants' public statements.  That

45

omission cuts against a finding of scienter.  *See Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 406 (S.D.N.Y. 2016) (rejecting inference that defendant "had knowledge of an illegal marketing scheme" based on his supposed "access to any allegations concerning, or investigation of such a scheme" because plaintiff failed to "specifically identify the reports or statements containing [allegedly contrary] information"); *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) ("Because the plaintiffs have not alleged with sufficient particularity the nature, the content, the reliability, or the availability of the allegedly contradictory internal reports, the allegations concerning this information do not provide sufficient circumstantial evidence to raise a strong inference of the defendants' fraudulent intent.").

Nor is there any support for Plaintiff's suggestion that Azure's discovery of internal control issues or material weaknesses *during the investigations* supports an inference of Defendants' scienter at the time of the challenged statements.  (SAC ¶¶ 208-09.)  *See Stevelman* 174 F.3d at 85 (rejecting as "fraud by hindsight" scienter arguments based on discovery of "accounting practices irregularities"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846(LGS), 2014 WL 7176187, at *8 (S.D.N.Y. Dec. 16, 2014) ("weak accounting controls" that were brought to defendants' attention "after the allegedly false and misleading financial statements were issued" did not support scienter).

Plaintiff also attempts to argue from Azure's later disclosure that its investigation of the Second Whistleblower Report "identified evidence of manipulation and misrepresentation of project data by some employees" (SAC ¶ 193) that such data manipulation was "widespread" and that Defendants either "knew" that their prior statements about Azure's operations were false or

"recklessly disregarded Azure's widespread data manipulation" (*id.* ¶ 231) when making those statements.  This argument suffers from numerous flaws.

*First*, as conceded in the SAC, Azure discovered data manipulation by employees at one project that was under construction and not fully commissioned.  (SAC ¶ 193 (investigation "identified evidence of manipulation and misrepresentation of project data by some employees at *that project site*") (emphasis added).)  The Company then identified data "inconsistencies" (not manipulation) at "three other projects" out of more than 45 total projects.  (*Id.* ¶ 92.)  These allegations do not support the suggestion that data manipulation was "extensive" or "widespread" or that it occurred over any extended time period.  *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 532 (S.D.N.Y. 2020) (no inference of scienter where "Plaintiffs have failed to allege the existence of widespread fraudulent sales practices"); *Gross v. AT&T Inc.*, 19-CV-2892 (VEC), 2021 WL 9803956, at *8 (S.D.N.Y. September 27, 2001) (rejecting claim of widespread activity based on "ipse dixit").  *Second*, as with many of Plaintiff's allegations, no facts are pled showing that any Defendant had specific information that contradicted their statements about the reliability of its record keeping or monitoring of data.  *See In Re Lululemon SEC. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) (rejecting inference of scienter based on supposedly "obvious and widespread" product defect because plaintiff did not allege "what specific contradictory information the defendants had and the connection (temporal or otherwise) between that information and the statements at issue").  *Third*, Plaintiff does not allege that the alleged data "manipulation" at a single facility required Azure to restate or otherwise revise any of its financial statements.

At most, these allegations convey Plaintiff's criticism of, or disagreement with, Azure's management, neither of which is sufficient to support a fraud claim under Rule 10b-5. *See In re*

47

*Magnum Hunter,* 26 F. Supp. 3d at 297-98 (facts showing a "pattern" of defendants "acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more ... supports an inference of potentially poor accounting management, it does not support fraud"); *In re Hertz Glob. Holdings Inc. Sheet Metal Workers Local Union 80 Pension Tr. Fund*, 905 F.3d 106, 117 (3d Cir. 2018) (rejecting inference of scienter where, "[a]t most, [the complaint] has pleaded that the Individual Defendants presided over a poorly managed corporation and that the mismanagement created an environment in which improper accounting practices flourished").

Other similar instances cited in the SAC—such as "shortfalls in generation" caused by a delay in commissioning a project with SECI that could, but ultimately did not, expose the Company to contractual penalties (SAC ¶ 230) or Azure obtaining "a commercial operation date certificate (COD) without the project being fully commercially operational" (*id.* ¶ 130(d)) are likewise insufficient to demonstrate fraudulent intent. *See Singh v. Cigna Corp.,* 918 F.3d 57, 59-60 (2d Cir. 2019) (affirming dismissal of complaint that "attempt[ed] to recast corporate mismanagement as securities fraud").[16]

In all events, Plaintiff's theory of fraud is undermined by a more plausible inference of non-fraudulent intent given that the Company undertook timely and good faith investigations and disclosed to regulators and investors their continued efforts to resolve them. *Slayton*, 604 F.3d at 777 (ordering an investigation and implementing remedial efforts following the discovery of a problem is "a prudent course of action that weakens rather than strengthens an inference of scienter"); *In re Tremont Sec. Law, State Law & Ins. Litig.*, Master File No. 08 Civ. 11117, 2013

---

[16] As noted above, Plaintiff does not link the partial COD certificate to any alleged misstatement. (*See supra* at 46). Nor does the SAC provide any basis to credit allegations based entirely on an unnamed "source in the know of the development" quoted in a newspaper article. (SAC ¶130(d).)

WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (complaint failed to allege recklessness where it showed that the defendant "did investigate the risks"); *In re Security Capital Assurance*, 729 F.Supp.2d 569, 596 (S.D.N.Y 2010) (allegations failed for lack of scienter where they showed that defendants were unaware of potential misstatements in the company's filings and immediately conducted an investigation when the issue was raised by analysts during an earnings call); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 329, 343 (W.D.N.Y. 2008) (no inference of scienter where defendants launched an "independent investigation into alleged misconduct ... which had been reported to [the company's] senior management by [an] employee [and] ... [in addition] voluntarily reported the . . . matter to the SEC").

### 2.    Executive and Director Resignations Do Not Support Scienter.

Plaintiff's attempt to infer scienter from executive and director resignations, including from long after the end of the proposed Class Period, is unavailing.

Courts in this circuit have consistently held that an employee's resignation does not, standing alone, raise a strong inference of scienter. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605–06 (S.D.N.Y. 2016); C.D.T.S., 2013 WL 6576031, at *7. Rather, "[f]or executive resignations to raise a strong inference of scienter, they must be ***highly unusual and suspicious***." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017) (emphasis added). Stated differently, Plaintiff must "allege a factual basis to conclude that the resignation was tied to participation in or knowledge of the fraud." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 214 (S.D.N.Y. 2020); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind.").

Here, Plaintiff labels the resignations of Mr. Gupta and Mr. Subramanian in April 2022 as "sudden" and "suspiciously-timed" without providing any factual support for those

49

characterizations.  (SAC ¶¶ 219-20.)  The only facts alleged are that the resignations occurred "a few months after" Azure received the First Whistleblower Report and "just days before" it allegedly received the Second Whistleblower Report.  (*Id.* ¶ 220.)  As to the First Whistleblower Report, the SAC elsewhere acknowledges that those complaints were actually received by Azure in "June and July 2021" (*id.* ¶ 63) and that the Company disclosed in December 2021 that its investigation "did not substantiate" any of the allegations in the complaints (*id.* ¶ 62).  Thus, the fact that Mr. Gupta and Mr. Subramanian resigned *10 months after* Azure's receipt of the First Whistleblower Report and *four months after* the Company's investigation found those complaints to be unsubstantiated is neither "highly unusual" nor "suspicious."

Likewise, Plaintiff's attempt to infer scienter from Azure's receipt of the Second Whistleblower Report *after* Mr. Gupta and Mr. Subramanian had already "relinquished their roles with the Company/Group with immediate effect on April 26, 2022" (*id.* ¶ 220) fails because the SAC provides no factual allegations showing that either executive (or anyone else at the Company) knew about the whistleblower or the substance of the allegations prior to May 2022.  Such conjecture, without any factual support, cannot give rise to an inference of scienter. *Schiro*, 396 F. Supp. 3d at 305 ("Generic and conclusory allegations based upon rumor and conjecture are undisputedly insufficient to satisfy the heightened pleading standard of the PSLRA.") (citations and quotations omitted).[17]

Further, any inference that the resignations of Mr. Gupta or Mr. Subramanian were linked to their alleged participation in misconduct or fraud is undermined by Azure's April 26, 2022 Form

---

[17] For these reasons, the Court should also disregard Plaintiff's speculation that "[g]iven the timing of Gupta and Subramanian's sudden departure, they were likely the former executives involved in the corruption" referred to in Azure's January 25, 2023 press release and the Fiscal 2022 Form 20-F.  (SAC ¶ 220.)  In any event, as explained above, the Company's disclosures made clear that its investigations did not "identify any evidence of improper payments" in connection with any of those transactions. *See supra* at 2.

6-K explaining that they were leaving the Company "to pursue other opportunities" (SAC ¶ 71). *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 n.28 (5th Cir. 2002) ("Scienter may not be inferred from resignation of company officials 'for personal reasons.'"); *Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 402 (S.D.N.Y. 2022) ("[R]esignation by itself is insufficient to support an allegation of scienter because there are any number of reasons that an executive might resign."). Indeed, Azure's then-Chairman, Alan Rosling, is quoted in the press release thanking "both Ranjit and Murali for their service and their efforts to navigate a challenging market environment. We wish them well for the next stage in their careers." (Ex. N at 4.) The SAC does not mention Mr. Rosling's comments, much less challenge them as false, no doubt because they contradict Plaintiff's speculation that Mr. Gupta and Mr. Subramanian were forced out because the Company learned of their supposed "fraudulent and corrupt conduct" (SAC ¶ 220). *C.D.T.S.*, 2013 WL 6576031, at *7 (rejecting inference of scienter where "there are a number of other, more plausible reasons why personnel may have been demoted and resigned ... [which] are not suggestive of intentional fraud."); *Kumar v. Kulicke & Soffa Indus., Inc.*, No. CV 19-0362, 2019 WL 5081896, at *9 (E.D. Pa. Oct. 9, 2019) (rejecting plaintiff's characterizations of executive's resignation because "these assertions by Plaintiffs are speculative at best, and therefore do not adequately establish or enhance an inference of scienter").

Plaintiff's allegations regarding the departures of other Azure officers and directors in 2022 and 2023 (including some occurring months after the end of the proposed Class Period) (SAC ¶¶ 221-25) are equally unavailing because the SAC fails to allege that any of those individuals participated in (or was even aware) of any allegedly fraudulent disclosures, much less that any of

51

their resignations was linked in any way to the alleged fraud.[18]  *Wilbush*, 271 F. Supp. 3d at 499

(resignation of three officers "insufficient to raise a strong inference of scienter" without

"allegations linking the departures to the fraud"); *In re Aegean Marine Petroleum Network, Inc.*

*Secs. Litig.*, 529 F. Supp. 3d 111, 170 (S.D.N.Y. 2021) (director resignations insufficient to support

an inference of scienter because "it is not clear that any of the resignations arose from the fraud

alleged"); *In re Hertz Glob. Holdings Inc.*, 905 F.3d at 119 ("Corporate resignations do not

strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the

resignations resulted from the relevant executives' knowing or reckless involvement in a

fraud.").[19]

### 3. That Azure Replaced Its Auditors Does Not Support a Finding of Scienter.

Plaintiff alleges that the change in Azure's auditors in late 2021 was "suspiciously timed"

and therefore supports a strong inference of scienter because, "[a]ccording to confidential local

sources," E&Y raised "concerns regarding corrupt payments" at Azure and allegedly threatened

to issue a "qualified opinion." (SAC ¶¶ 64-68, 214.)  These allegations fail for a number of reasons.

*First*, the allegations are supported only by a vague reference to "confidential local

sources."  (*Id.* ¶ 66.)  "In order for a court to credit the allegations of confidential witnesses, the

witnesses must be 'described in the complaint with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information

---

[18] Plaintiff attempts to create the impression that Azure director Arno Harris's resignation, announced on June 1, 2022, was somehow related to wrongdoing because it occurred "shortly after receipt of the Second Whistleblower Complaint and right before Azure disclosed it could not timely file its Fiscal 2022 Form 20-F." (SAC ¶ 221.)  But Plaintiff omits to mention that Azure issued a press release on February 28, 2022 (*months* before any complaint was received) disclosing that Mr. Harris had "indicated his desire to step down from the Board after nearly 6 years due to his other commitments." (Ex. K at 1)

[19] Plaintiff's allegation concerning Mr. Agarwal's replacement as CFO of Azure and "demotion" to CFO of a subsidiary fails for similar reasons as demonstrated in Mr. Agarwal's separate memorandum of law in support of his motion to dismiss. (*See* Agarwal Mem. at Part I.B.2.)

alleged.'" *Schiro*, 396 F. Supp. 3d at 305. Here, the SAC pleads no facts about the positions any of these sources occupied, the time period during which they held those positions, or how any of them supposedly gained access to E&Y's audits and became aware of Azure's alleged reasons for terminating the relationship. Thus, Plaintiff's "confidential witnesses' allegations are too vague, speculative, and conclusory to contribute to an inference of scienter." *Id.*; *see also Feasbey v. Indust. Matematik, Int'l Corp.*, No. 99 Civ.8761 LTS JCF, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (disregarding information from confidential sources where complaint omitted any "information that would support an inference that the sources would possess the information attributed to them"). In fact, because these "confidential local sources" merely parrot the conclusory allegations contained in the SAC, the Court should disregard them entirely.

In any event, Plaintiff's speculation that E&Y resigned in protest because of its alleged "concerns" about corruption at Azure is undermined by the SAC's allegations, which show that E&Y was replaced by its own affiliate. Specifically, Azure's November 26, 2021 Form 6-K stated that the board of directors of Azure "approved the change" in auditors from E&Y to SRB, "a member firm of Ernst & Young Global Limited." (SAC ¶ 64.) Shortly thereafter, Azure engaged another E&Y affiliate, Ernst & Young Mauritius, to serve as statutory auditor in Mauritius. (SAC ¶¶ 64; 66; Ex. E at 4.)

Plaintiff's desired inference is further contradicted by the disclosure in Azure's Form 6-K that "[t]he reports of [E&Y] on the Company's financial statements for the past two fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles" and that "there were no disagreements with [E&Y] on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedure[.]" (Ex. E at 4.) A disclaimer of disagreements between the

company and the departing auditor undermines an inference of scienter. *See City of Brockton Retirement Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("Given E & Y's disclaimer, no inference of fraud or scienter can be drawn from E & Y's resignation in this case.").

Likewise, Plaintiff's attempt to draw an inference of scienter from the later resignation of SRB in July 2023 (SAC ¶ 215) fails because, as the Fiscal 2022 Form 20-F makes clear, the reason for SRB's resignation was not because of any disagreements with Azure over accounting matters, but rather that the Company's failure to provide information requested by SRB, relating to, among other things, the ongoing investigations of the Whistleblower Reports, prevented SRB from completing its audit work. (Ex. W at 96-97.) In fact, the Fiscal 2022 Form 20-F expressly stated that Azure "did not have disagreements with SRB on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure" relating to its fiscal years 2022 and 2023. (*Id.* at 97.)[20]

### 4. Azure's Centralized Monitoring System Does Not Support a Finding of Scienter.

Plaintiff seeks to infer scienter based on Defendants' alleged access to unspecified "real-time" data from Azure's "centralized monitoring system." (SAC ¶¶ 232-36.) However, mere access to "real-time" information is not a basis to infer scienter absent particularized allegations detailing Defendants' contemporaneous receipt of specific data contradicting Azure's public statements. *See Inter-Local Pension Fund v. General Electric*, 445 F. App'x 368, 370 (2d Cir.

---

[20] The resignation of E&Y Mauritius as statutory auditor of Azure's Mauritius subsidiaries (SAC ¶ 217) is of no relevance to the scienter inquiry because it occurred in September 2023, two months after the proposed Class Period ended. *See Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 284 (D. Mass. 2011) ("[P]ost-class period events and statements are irrelevant to the scienter determination and consideration thereof would be 'equivalent to the classic fraud by hindsight case'"). Moreover, Plaintiff does not allege any disagreements between Azure and E&Y Mauritius preceding its resignation that would support an inference of scienter as to any Defendant, including because Mr. Gupta and Mr. Subramanian had left Azure more than a year earlier and Mr. Agarwal had stepped aside as CFO of Azure several months earlier.

2011) ("[V]ague and general averments that [defendants] had access to internal corporate documents and data during the class period, including real-time customer and sales information" did not support an inference of scienter because plaintiffs "have not alleged any facts indicating that the content of the reports or data to which [defendants] were privy was inconsistent with their statements in the class period.").

Plaintiff alleges no facts suggesting that the monitoring system either provided or was utilized by any Defendant to review any financial or operating data, much less linking such data to the challenged representations. Instead, she relies on the generic allegation that "executive level management had access to project data at the head office, and could detect even minor problems at individual project sites." (SAC ¶ 233.) That type of allegation has been universally rejected by courts in this Circuit. *See In re PXRE Group*, 600 F.Supp.2d at 538 (rejecting allegation "that the individual Defendants must have known of [] concerns, due to their positions in [the company], and due to [the company's] "'intimate corporate culture'"); *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594 (LAP), 1996 WL 88570 at *14 (S.D.N.Y. Feb. 19, 1996) (allegation of management's unfettered access to corporate information "is an inadequate basis for scienter," one which would expose  virtually any  [senior corporate official], by virtue of his or her position alone to liability").

Further, as the SAC acknowledges, Azure's monitoring system was designed to provide information so that the Company could "respond rapidly to potential generation anomalies and to repair any failures that might happen." (SAC ¶ 53.) Azure never represented, nor does Plaintiff contend that it did, that the system entirely eliminated the risk of undetected anomalies or other issues. In fact, as Azure disclosed to investors in its Fiscal 2021 Form 20-F, "[o]ur processes, management information systems and internal control procedures are designed to monitor our

operations and overall compliance. Our system, however, may not be able to identify every non-compliance and/or suspicious transaction(s) in a timely manner or at all." (SAC ¶ 108; Ex. W at 95-96.)

Plaintiff's related, and similarly generic, allegation that Defendants "personally visited" solar plants and therefore must have known about "data manipulation, false reporting of data, safety issues and corrupt payments" (SAC ¶¶ 237-39) also fails to support an inference of scienter. *City of Brockton Retirement Sys.*, 2014 WL 4832321 at *20 (rejecting allegation that CEO was aware of misconduct because she "traveled to China several times for meetings with [company] executives"). Plaintiff must, but fails to, "specifically identify the reports or statements that are contradictory to the statements made.'" *Glaser*, 772 F. Supp. 2d at 588.

Finally, Plaintiff alleges that "involvement" by Mr. Gupta and Mr. Subramanian in implementing and monitoring Azure's health and safety policies demonstrates their scienter. (SAC ¶¶ 240-44.) But beyond citing to statements by those executives about certain certifications and awards achieved by Azure for workplace safety (which Plaintiff does ***not*** claim were false) and the Company's efforts to "provide a safe and healthy workplace" (*id.*) (which Plaintiff also does not dispute), the SAC contains no particularized facts showing that either of them knew, or should have known, of the "deviations from safety and quality norms" that Azure subsequently disclosed.[21]

### 5.    Azure's Alleged Violation of its Own Policies Does Not Create an Inference of Scienter.

Plaintiff asserts that scienter can also be inferred from Azure's alleged violations of its policies relating to (i) anti-bribery and corruption, (ii) financial reporting and accounting, and (iii)

---

[21] Plaintiff's reliance on statements by Azure about health and safety that post-date Mr. Gupta and Mr. Subramanian's resignations (*see e.g.*, SAC ¶¶ 44, 170, 175, 238) cannot support an inference scienter against either of them.

its Code of Business Conduct.  (SAC ¶¶ 245-49.)  No allegations in the SAC support any such inference.

*First*, as to Azure's anti-bribery and corruption policy, Plaintiff cites to a statement in the Fiscal 2022 Form 20-F disclosing that Azure's investigations "identified evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to Azure's major projects."  (SAC ¶ 246.)  But the same sentence Plaintiff quotes goes to say "***but no related improper payments or transfers by the Group have been identified***."  (*Id.* ¶ 197 (emphasis added).)  The absence of any evidence that improper payments were made, following Azure's investigation with "[i]ndependent outside counsel and forensic advisors" of Azure's "material projects and contracts over a three-year period for anti-corruption and related compliance issues" (*id.*), weakens, rather than strengthens, any potential inference of scienter.

*Second*, as to financial reporting and accounting, it is settled law that discovery and disclosure of material weaknesses in internal controls and accounting violations, as happened here, do not suffice to show scienter.  *In re Pegasus Wireless Corp. Secs. Litig.*, No. 07–81113–CIV., 2009 WL 3055205, at \*7 (S.D. Fla. Sep. 21, 2009) ("[A]lleged violations of SEC regulations or generally accepted accounting principles, without more, do not support a strong inference of scienter."); *In re Hudson Techs., Litig.*, No. 98 CIV. 1616(JGK), 1999 WL 767418, at \*5 (S.D.N.Y. Sept. 28, 1999) (GAAP violations coupled with restatement insufficient to allege scienter).

*Third*, Plaintiff's passing citation to Azure's Code of Business Conduct (SAC ¶ 248) is of no moment because the SAC does not allege any specific violations of that policy, much less violations that were known to Defendants at the time of the challenged statements.  Further,

allegations that Defendants violated the Company's ethics code are not sufficient to establish scienter. As one court has noted, "if alleging the violation of a broadly worded ethics code was sufficient to allege scienter, it would eviscerate the pleading requirements for scienter set forth in the PSLRA." *Rok v. Identiv, Inc.*, No. 15-cv-5775-CRB, 2017 WL 35496, at \*15 (N.D. Cal. Jan. 4, 2017).

## IV.     The SAC Does Not Plead Reliance for Post-August 2022 Purchasers.

Section 10(b) class periods cannot extend past the date a lead plaintiff alleges that the alleged misstatements or omissions were cured. *See In re SunEdison, Inc. Secs. Litig.*, 329 F.R.D. 124, 134 (S.D.N.Y. 2019) (Castel, J.) ("[T]he Complaint itself alleges that the 10-Q 'disclosed,' 'corrected' and 'admitted' the truth about the alleged omissions"); *In re Regions Morgan Keegan Secs., Deriv. & ERISA Litig.*, No. 2:13-cv-02654-SHM-dkv, 2014 WL 12611247, at \*6 (W.D. Tenn. Aug. 4. 2014).

The SAC seeks to expand the proposed Class Period to May 2023. (SAC ¶¶ 188-205). But this proposed expansion is inconsistent with the SAC's core allegation that everything Azure supposedly failed to disclose was disclosed no later than August 2022. (SAC ¶¶ 161-83.) Therefore, this Court should not consider any allegations concerning statements issued later than August 2022 and should hold that claims cannot be asserted by post-August 2022 purchasers of Azure stock.

## V.     The SAC Fails to State a Section 20(a) Claim.

Because Plaintiff has failed to allege a primary violation under Section 10(b), her control person liability claim under Section 20(a) necessarily fails. *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019). Plaintiff also does not plead that any Individual Defendant was a "culpable participant" in the alleged fraud, which requires a showing similar to scienter. *Id.*

## CONCLUSION

For all the foregoing reasons, the SAC should be dismissed in its entirety with prejudice.

Dated: March 22, 2024                      DENTONS US LLP


By:  */s/ Douglas W. Henkin*
     Douglas W. Henkin
     Brian E. Cohen
     Fernanda Pires Merouco
     1221 Avenue of the Americas
     New York, NY 10020
     Tel:  212-768-6700
     douglas.henkin@dentons.com
     brian.cohen@dentons.com
     fernanda.piresmerouco@dentons.com

     *Attorneys for Defendant Azure Power Global Ltd.*
WILLKIE FARR & GALLAGHER LLP

By: */s/ Sameer Advani*

Sameer Advani
Amanda M. Payne
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
sadvani@willkie.com
apayne@willkie.com

*Attorneys for Defendants*
*Ranjit Gupta and Murali Subramanian*