

EXHIBIT W

___

**FORM 20-F**

**(Mark One)**

☐     **Registration statement pursuant to section 12(b) or 12(g) of the Securities Exchange Act of 1934**
**or**

☐     **Transition report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the transition period from _____ to _____**
**or**

☒     **Annual report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the fiscal year ended March 31, 2022**
**or**

☐     **Shell company report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934**
**Date of event requiring this shell company report**
**Commission file number 001-37909**

**Azure Power Global Limited**
(Exact name of Registrant as specified in its charter)

**Mauritius**
(Jurisdiction of Incorporation or Organization)

**5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi 110017, India**
**Telephone: (91-11) 49409800**
(Address and Telephone Number of Principal Executive Offices)

**Sunil Gupta, Chief Executive Officer**

**5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi 110017, India**
**Telephone: +91-11 49409800, Fax: +91- 11 49409807, e-mail: sunil.gupta@azurepower.com**

**Sugata Sircar, Group Chief Financial Officer**

**5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi 110017, India**
**Telephone: +91-11 49409800, Fax: +91- 11 49409807, e-mail: sugata.sircar@azurepower.com**
(Name, Telephone, email and/or Facsimile Number and Address of Company Contact Person)
**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Equity Shares, par value US$0.000625 per share | AZRE[1] | New York Stock Exchange |

**Securities registered or to be registered pursuant to Section 12(g) of the Act.**
**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.**
**None**
**(Title of Class)**

As of March 31, 2022, 64,161,490 equity shares, par value US$0.000625 per share, were issued and outstanding.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

If this annual report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that are required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during

the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☐ No ☒

Indicate by check mark whether the registrant is a large, accelerated filer, an accelerated filer or an emerging growth company. See the definitions of "large, accelerated filer", "accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large, accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐          Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued by the International Accounting Standards Board ☐          Other ☐

If "Other" has been checked in the previous question, indicate by check mark which financial statement item the registrant has elected to follow. Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☐ No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court: Yes ☐ No ☐

[1]   As of July 13, 2023, the NYSE suspended trading in and announced the delisting of our shares. We are appealing this decision. Refer to "*Risk Factors — The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares*" section of this document for further details.

# TABLE OF CONTENTS

|  | Page # |
|---|---|
| *Form 20-F Cross-Reference Guide* | *3* |
| *Conventions Used in this Annual Report* | *5* |
| *Forwards Looking Statement* | 7 |
| **I. Company, Business & Industry Overview** | |
| A. Business Overview | 8 |
| *Our Competitive Advantages* | |
| *Our Business Strategy* | |
| *Project Implementation* | |
| B. Company Overview | 14 |
| *Organizational Structure* | |
| *Our Sustainability Initiatives and ESG Focus* | |
| C. Industry Overview | 18 |
| *Power Consumption* | |
| *Solar Energy Potential* | |
| *Wind Energy Potential* | |
| D. Regulatory Matters | 20 |
| *Central Government – Policies & Regulations* | |
| *Environmental Laws* | |
| **II. Operating and Financial Review and Prospects** | |
| A. Overview | 31 |
| *Key Operating Metrics* | |
| *Key Financial Metrics* | |
| B. Results of Operations | 51 |
| *Fiscal Year 2022 Compared to Fiscal Year 2021* | |
| *Fiscal Year 2021 Compared to Fiscal Year 2020* | |
| C. Liquidity and Capital Resources | 57 |
| *Liquidity Position* | |
| *Cash Flow Discussion* | |
| *Fiscal Year 2022 Compared to Fiscal Year 2021* | |
| *Fiscal Year 2021 Compared to Fiscal Year 2020* | |
| D. Off-balance sheet arrangements | 62 |
| E. Contractual obligations | 63 |
| F. Critical accounting policies and estimates | 64 |
| **III. Share ownership and Trading** | |
| A. Major shareholders | 65 |
| B. Related party transactions | 66 |
| C. Distributions | 67 |
| D. Significant Changes | 68 |
| E. Trading markets | 69 |
| F. Purchases of equity securities by the issuer and affiliated purchasers | 70 |
| G. Material Modification to the Rights of Security Holders and Use of Proceeds | 71 |
| **IV. Management and Employees** | |
| A. Management | 72 |
| *Board of Directors* | |
| *Executive Officers* | |
| B. Board Practices | 77 |
| *Board of Directors* | |
| *Terms of Directors and Executive Officers* | |
| *Duties of Directors* | |
| C. Management Compensation | 79 |
| *Directors and Officers Compensation* | |
| *Equity-Based Compensation* | |
| *Indemnification Agreements* | |
| D. Board Committees | 82 |
| E. Employees | 86 |
| *Employee Benefit Plans* | |

      *Executive Leadership*  
      *Employment Agreements*  

**V. Risk Factors**    88  
**VI. Additional Information**    118  
  A. Legal Proceedings    118  
  B. Bylaws    121  
  C. Material Contract    122  
  D. Exchange Controls and Other Limitations Affecting Security Holders    123  
  E. Taxation    124  
     *Mauritius Taxation*  
     *US Federal Income Taxation*  
     *Indian Taxation*  
  G. Quantitative and Qualitative Disclosures about Market Risk    128  
  F. Controls and Procedures    130  
     *Evaluation of Disclosure Controls and Procedures*  
     *Management's Report on Internal Control Over Financial Reporting*  
  G. Corporate governance    132  
  H. Whistle-Blower Policy    133  
     *Code of Business Conduct and Ethics*  
  I.  Principal Accountant Fees and Services    134  
  K. Information filed with securities regulators    136  
  L. Disclosure on delay in filling of Form 20-F    137  
  M. Unresolved SEC Staff comments    138  
Exhibits    139  
Signatures    143  
Index to consolidated financial statements    F-1

**FORM 20-F CROSS-REFERENCE GUIDE**

| Item # | Form 20-F caption | Location in this Report | Page |
|---|---|---|---|
| | Conventions used in the Annual report | Conventions used in this Annual Report | **5** |
| | Special note regarding FORWARD-LOOKING INFORMATION | Forward-Looking Statements | 7 |
| **1** | **Identity of directors, senior management and advisers** | Not applicable | - |
| **2** | **Offer statistics and expected timetable** | Not applicable | - |
| **3** | **Key information** | | |
| | 3A. [Reserved] | | - |
| | 3B. Capitalization and Indebtedness | Not applicable | - |
| | 3C. Reasons for the Offer and Use of Proceeds | Not applicable | - |
| | 3D. Risk Factors | Risk Factors | 118 |
| **4** | **Information on the Company** | | |
| | 4A. History and Development of the Company | Business Overview, Company Overview | 8, 14 |
| | 4B. Business Overview | Business Overview, Company Overview, Industry Overview | 8, 14, 18 |
| | 4C. Organizational Structure | Company Overview | 14 |
| | 4D. Property, Plants and Equipment | Overview | 31 |
| **4A** | **Unresolved staff comments** | Unresolved SEC Staff comments | 138 |
| **5** | **Operating and financial review and prospects** | | |
| | 5A. Operating Results | Results of Operations | 51 |
| | 5B. Liquidity and Capital Resources | Liquidity and Capital Resources | 57 |
| | 5C. Research and Development, Patents and Licenses, etc. | Not applicable | - |
| | 5D. Trend Information | Trend Information | 51 |
| | 5E. Critical Accounting Estimates | Critical Accounting Policies and Estimates | 63 |
| **6** | **Directors, senior management and employees** | | |
| | 6A. Directors and Senior Management | Management | 72 |
| | 6B. Compensation | Management Compensation | 79 |
| | 6C. Board Practices | Board Practices, Board Committees | 77, 82 |
| | 6D. Employees | Employees | 86 |
| | 6E. Share Ownership | Major Shareholders | 65 |
| **7** | **Major shareholders and related party transactions** | | |
| | 7A. Major Shareholders | Major Shareholders | 65 |
| | 7B. Related Party Transactions | Related Party Transactions | 66 |
| | 7C. Interest of Experts and Counsel | Not applicable | - |
| **8** | **Financial information** | | |
| | 8A. Consolidated Statements and Other Financial Information | Financial statements, Legal Proceedings, Distribution | F-1, 118 |
| | 8B. Significant Changes | Significant Changes | 68 |
| **9** | **The offer and listing** | | |
| | 9A. Offer and Listing Details | Trading Markets | 69 |
| | 9B. Plan of Distribution | Not applicable | - |
| | 9C. Markets | Trading Markets | 69 |
| | 9D. Selling Shareholders | Not applicable | - |
| | 9E. Dilution | Not applicable | - |
| | 9F. Expenses of the Issue | Not applicable | - |
| **10** | **Additional information** | | |
| | 10A. Share Capital | Bylaws | 121 |
| | 10B. Memorandum and Articles of Association | Bylaws | 121 |

| | | | |
|---|---|---|---|
| | 10C. Material Contracts | Material Contracts | 122 |
| | 10D. Exchange Controls | Exchange Controls and Other Limitations Affecting Security Holders | 123 |
| | 10E. Taxation | Taxation | 124 |
| | 10F. Dividends and Paying Agents | Not applicable | - |
| | 10G. Statements by Experts | Not applicable | - |
| | 10H. Documents on Display | Information Filed with Securities Regulators | 136 |
| | 10I. Subsidiary Information | Not applicable | - |
| **11** | **Quantitative and qualitative disclosures about market risk** | | |
| | 11a. Quantitative information about market risk | Quantitative and Qualitative information about market risk | 128 |
| | 11b. Qualitative information about market risk | Quantitative and Qualitative information about market risk | 128 |
| | 11c. Interim Period | Not applicable | - |
| **12** | **Description of securities other than equity securities** | | |
| | 12A. Debt Securities | Not applicable | - |
| | 12B. Warrants and Rights | Not applicable | - |
| | 12C. Other Securities | Not applicable | - |
| | 12D. American Depositary Shares | Not applicable | - |
| **13** | **Defaults, dividend arrearages and delinquencies** | Liquidity and Capital Resources | 57 |
| **14** | **Material modifications to the right of security holders and use of proceeds** | Material Modifications to the Rights of Security Holders and Use of Proceeds | 71 |
| **15** | **Control and procedures** | | |
| | 15a. Disclosure Controls and Procedures | Controls and Procedures | 130 |
| | 15b. Management's Report on Internal Control over Financial Reporting | Controls and Procedures | 130 |
| | 15c. Attestation Report of the Registered Public Accounting Firm | Controls and Procedures | 130 |
| | 15d. Changes in Internal Control over Financial Reporting | Controls and Procedures | 130 |
| **16** | [Reserved] | | |
| **16A** | **Audit committee financial expert** | Board Committees | 82 |
| **16B** | **Code of ethics** | Whistle-Blower Policy | 133 |
| **16C** | **Principal accountant fees and services** | Principal accountant fees and services | 134 |
| **16D** | **Exemptions from the listing standards for audit committees** | Board Committees; Corporate Governance | 82, 132 |
| **16E** | **Purchase of equity securities by the issuer and affiliated purchasers** | Not applicable | - |
| **16F** | **Change in registrant's certifying accountant** | Principal Accountant Fees and Services | 134 |
| **16G** | **Corporate Governance** | Corporate Governance | 133 |
| **16H** | **Mine safety disclosure** | Not applicable | - |
| **16I** | **Disclosures Regarding Foreign Jurisdictions that Prevent Inspections** | Not applicable | - |
| **17** | **Financial statements** | Not applicable | - |
| **18** | **Financial statements** | Financial statements | F-1 |
| **19** | **Exhibits** | Exhibits | 139 |

# CONVENTIONS USED IN THIS ANNUAL REPORT

Except where the context requires otherwise and for purposes of this annual report only:

"Our Company", "the Company", "APGL", or "Azure Power" refers to Azure Power Global Limited on a standalone basis

"We", "us", "the Group", "Azure" or "our" refers to Azure Power Global Limited, a company organized under the laws of Mauritius, together with its subsidiaries (including Azure Power Rooftop Private Limited ("AZR"), and Azure Power India Private Limited, or APIPL, its predecessor and current subsidiaries)

"ALMM" refers to Approved List of Models & Manufacturers

"APDC" refers to Assam Power Distribution Company

"APERC" refers to Andhra Pradesh Electricity Regulatory Commission

"APTEL" refers to Appellate Tribunal for Electricity

"Awarded" refers to the capacity won and for which LOA has been received

"APIPL" a company organized under the laws of India, refers to Azure Power India Private Limited

"BM" refers to Biomass

"BOS' refers to Balance of System

"CAGR" refers to compounded annual growth rate

"CDPQ" refers to Caisse de dépôt et placement du Québec

"CDPQ Infrastructures" refers to CDPQ Infrastructures Asia Pte Ltd.

"CEA" refers to Central Electricity Authority

"CEO" refers to Chief Executive Officer

"CERC" refers to the Central Electricity Regulatory Commission of India, the state level counterparts of which are referred to as "State Electricity Regulatory Commission", or "SERC"

"Contracted" refers to capacity won and for which PPA has been signed with offtaker

"COO" refers to Chief Operating Officer

"COP-26" refers to 26th UN Climate Change Conference of the Parties in Glasgow

"COVID-19" refers to novel coronavirus disease of 2019

"CPSU" refers to Central Public Sector Undertaking

"CSR" refers to Corporate Social Responsibility

"CTU" refers to Central Transmission Utility

"CUF" refers to Capacity Utilization Factor

"Discom" refers to Distribution Company

"DSM" refers to Deviation Settlement Mechanism

"E&S" refers to Environmental & Social

"EPC" refers to Engineering, Procurement and Construction

"ERM" refers to Enterprise Risk Management

"ESG" refers to Environmental, Social, and Governance

"FDI" refers to Foreign Direct Investment

"FIFP" refers to Foreign Investment Facilitation Portal

"GBC" refers to Global Business Company

"GDP" refers to Gross Domestic Product

"GEC" refers to Green Energy Corridor

"GH/GA" refers to Green Hydrogen/ Green Ammonia

"GIB" refers to Great Indian Bustard

"GoI" refers to Government of India

"GST" refers to Goods and Service Tax

"GW" refers to Gigawatt

"INR", "rupees", or "Indian rupees" refers to the legal currency of India

"IREDA" refers to Indian Renewable Energy Development Agency Limited

"ISTS" refers to Inter State Transmission System

"KERC" refers to Karnataka Electricity Regulatory Commission

"LTI" refers to Lost Time Injury

"LOA" refers to Letter of Award

"LPSC" refers to Late Payment Surcharge
"MNRE" refers to Ministry of New and Renewable Energy, Government of India.
"MOP" refers to Ministry of Power, Government of India
"MSEDCL" refers to Maharashtra State Electricity Distribution Co. Limited
"MSPA" refers to the Restated Master Share Purchase Agreement between us and Radiance
"Mt" refers to million tonnes
"MVN" refers to Mega Volt Ampere
"MW" refers to Megawatt
"NAPCC" refers to National Action Plan on Climate Change
"NISE" refers to National Institute of Solar Energy
"NIWE" refers to National Institute of Wind Energy
"NSM" refers to the Jawaharlal Nehru National Solar Mission.
"NTP" refers to National Tariff Policy
"NTPC" refers to NTPC Limited
"NVVNL" refers to NTPC Vidyut Vyapar Nigam Limited
"NYSE" refers to New York Stock Exchange
"O&M" refers to Operation and Maintenance
"OMERS" refers to OMERS Infrastructure Asia Holdings Pte. Ltd.
"PFIC" refers to Passive Foreign Investment Company
"PIL" refers to Public Interest Litigation
"PLI" refers to Production Linked Incentive
"PPA" refers to Power Purchase Agreement
"PSA" refers to Power Sale Agreement
"PSERC" refers to Punjab State Electricity Regulatory Commission
"PSPCL" refers to Punjab State Power Corporation Limited
"PV" refers to Photovoltaic
"Radiance" refers to Radiance Renewables Private Limited
"RBI" refers to Reserve Bank of India
"RPO" refers to Renewable Purchase Obligation
"SEC" refers to the U.S. Securities and Exchange Commission
"SECI" refers to Solar Energy Corporation of India
"U.S. GAAP" refers to the Generally Accepted Accounting Principles in the United States
"US$", "$" or "U.S. dollars" refers to the legal currency of the United States
"VGF" refers to Viability Gap Funding

In this annual report, references to "U.S." or the "United States" are to the United States of America, its territories and possessions, any State of the United States and the District of Columbia. References to "India" are to the Republic of India, its territories and its possessions. References to "Mauritius" are to the Republic of Mauritius.

Unless otherwise indicated, the consolidated financial statements and related notes included in this annual report have been presented in Indian rupees and prepared in accordance with U.S. GAAP. References to a particular "Fiscal", "fiscal", "fiscal year" or "FY" are to our fiscal year ended March 31 of that year, which is typical in our industry and in the jurisdictions in which we operate.

This annual report contains translations of certain Indian rupee amounts into U.S. dollars at specified rates solely for the convenience of the reader. Unless otherwise stated, the translation of Indian rupees into U.S. dollars has been made at INR 75.87 to US$1.00, which is the noon buying rate in New York City for cable transfer in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York on March 31, 2022. We make no representation that the Indian rupee or U.S. dollar amounts referred to in this annual report could have been converted into U.S. dollars or Indian rupees, as the case may be, at any particular rate or at all.

As used in this annual report, all references to watts (e.g., megawatts, gigawatts, kilowatt hour, terawatt hour, MW, GW, kWh, etc.) refer to measurements of power generated.

**Forward-Looking Statements**

This annual report contains forward looking statements about our current expectations and views of future events. All statements, other than statements of historical facts, contained in this annual report, including statements about our strategy, future operations, future financial position, future revenues, projected costs, prospects, plans and future megawatt goals of management, are forward looking statements. These statements relate to events that involve known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. In some cases, these forward-looking statements can be identified by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "potential," "continue," "is/are likely to" or other similar expressions.

These forward-looking statements are subject to risks, uncertainties and assumptions, some of which are beyond our control. In addition, these forward-looking statements reflect our current views about future events and are not a guarantee of future performance. Actual outcomes may differ materially from the information contained in the forward-looking statements because of a number of factors, including, without limitation, the risk factors set forth in "Risk Factors" and the following:

- the pace of government sponsored auctions and changes in auction rules;
- availability of land for projects and transmission capacity installed for evacuation of power generated;
- permitting, development and construction of our project pipeline according to schedule;
- solar irradiation and wind availability in the regions in which we operate;
- adverse change in laws and regulations related to environmental, health and safety;
- developments in, or changes to, laws, regulations, governmental policies, incentives, and taxation affecting our operations;
- our ability to successfully implement any of our business strategies, including acquiring other companies and sale of our assets;
- our ability to enter into PPAs, on acceptable terms, the occurrence of any event that may expose us to certain risks under our PPAs and the willingness and ability of counterparties to our PPAs to fulfill their obligations;
- solar power curtailments by state electricity authorities;
  the impact of fraud or other misconduct (including bribery) by our employees and former employees;
- material changes in the costs and availability of solar panels, raw materials, capital equipment's and other equipment and manpower required for our operations; and
- other risks and uncertainties, including those listed under the caption "Risk Factors."

We caution you that forward-looking statements are not guarantees of future performance and involve risks and uncertainties. Actual results may differ materially from those in forward-looking statements as a result of various factors. These risks and uncertainties include factors relating to (i) economic, political and social issues in the country in which we operate, including factors relating to the coronavirus pandemic outbreak, (ii) the domestic as well as global economy, (iii) financial and capital markets, (iv) Indian government policies and regulation on renewable energy, (v) tax related laws in US, Mauritius and India, and (vi) degree of competition in the renewable energy market in India.

For additional information on risk factors that could cause our actual results to differ from expectations reflected in forward- looking statements, see "Risk Factors". Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them in light of new information or future developments. All forward-looking statements attributed to us or a person acting on our behalf are expressly qualified in their entirety by this cautionary statement, and you should not place undue reliance on any forward-looking statement. You should read this annual report, the exhibits hereto and other documents we have filed with the SEC completely and with the understanding that our actual future results or performance may be materially different from what we expect.

# I. BUSINESS, COMPANY & INDUSTRY OVERVIEW

## A. Business Overview

Azure is one of India's leading utility scale renewable energy project developers and operators. We build, own, and operate large grid-scale renewable energy projects across India that supply clean energy to India's power grid. We developed India's first utility-scale solar power project in 2009 and have since then grown to achieve substantial scale in the Indian renewable industry. Despite the challenges arising from the COVID-19 pandemic, during FY 2022 we commissioned our 600 MW Rajasthan 6 project, which is the largest single site solar project owned and operated by any developer in India.

As of the date of this Form 20-F, our total portfolio stands at 7,311 MW including 86.5 MW of rooftop capacity and excluding 200 MW wind–solar hybrid project earlier won by the Group with Maharashtra State Electricity Distribution Co. Limited[1]. We had a total operating capacity of 3,041 MW which includes rooftop capacity and Contracted and Awarded capacity of 4,270 MW. Out of total Contracted and Awarded capacity of 4,270 MW, around 700 MW is at early stages of development. A major part of our 4,270 MW project pipeline consists of 4,000 MW allocated by SECI under their manufacturing linked tender, that we won in FY 2020. In FY 2022, we executed PPAs with SECI for 2,983 MW under this manufacturing linked allocation and subsequently, in January 2023 for an additional 50 MW, taking our cumulative SECI manufacturing linked PPA capacity to 3,033 MW. PPAs for the balance capacity of 967 MW under manufacturing linked projects can be signed only after SECI has the power supply agreements for these remaining MW in place. The 3,033 MW of PPA capacity was initially required to be delivered in a phased manner from November 2023 to November 2026. Out of this capacity, 700 MW is presently required to be commissioned from July 2024 to November 2024. The scheduled commissioning timelines for most of this capacity (650 MW) is estimated from the expected CTU Grid Connectivity operationalization date, which in-turn is determined from the anticipated completion dates of the requisite elements of the CTU's grid transmission/ evacuation system. However, these 4,000 MW manufacturing linked projects are currently challenged under two Public Interest Litigations (PILs), filed in the High Court of Andhra Pradesh in FY 2022 (where we are not a party), challenging various aspects of the manufacturing linked tender. For further information, see *"Legal Proceedings" and see "Operating and Financial Review and Prospects - Projects under execution"*. In FY 2023, we also executed PPAs with SECI for our first 150 MW solar-wind hybrid project, and for our first wind project of 120 MW. The presently estimated scheduled commissioning timelines for these projects are December 2024 (for the 120 MW wind project), and May 2025 (for the 150 MW solar-wind hybrid project). These timelines are estimated on the basis of anticipated dates of regulatory approvals and anticipated completion dates of the requisite elements of the grid's transmission/evacuation system.

Our operational power plants are spread over 12 Indian states. Out of total operational capacity, some 90% of our plants are in high irradiation zones like Rajasthan, Gujarat, Maharashtra, and Andhra Pradesh. Below are outlines of our utility scale operational portfolio as of the date of this Form 20-F.



State wise Operational Capacity

---

[1] This project was cancelled on March 10, 2023, pursuant to withdrawal of the Group's appeal before the Appellate Tribunal for Electricity. Appeal was filed to challenge Maharashtra Electricity Regulatory Commission's order, that rejected the adoption of the auction discovered tariff of INR 2.62 per unit and instead gave the Group an option to reduce the tariff to INR 2.49 per unit.

We sell renewable power under long term PPAs, typically 25 years in duration,[2] at a fixed tariff. The quality of our offtake customers is fundamental to our business and more than 85% of our PPAs are signed with top rated central government owned intermediaries such as SECI and NTPC, providing predictable and consistent revenues and cash flows. Further, according to a report published by MOP in April 2023, among the state government owned Discoms that we have large capacities contracted with, Gujarat is rated A+, Punjab & Assam are A rated, while the three Discoms of Karnataka (CHESCOM, GESCOM and HESCOM) are B rated, and Maharashtra Discom is rated B-. Our counterparty exposure for the commissioned capacity is set out below:



In addition to total operating capacity of 3,041 MW, we have Contracted and Awarded capacity of approximately 4,270 MW, bringing our total portfolio size to over 7,311 MW. During FY 2022, we generated 4,551 million units of clean and green electricity for the Indian power grid. We expanded beyond solar power in FY 2022 by winning our first wind and solar-wind hybrid power projects. Our goal is to remain a leader in the renewable energy market in India. All our operating assets are currently solar, but we intend to add wind as well as storage assets over time, to complement our clean generation capacity.

Our business success is driven by:

1. **Predictability:** Our projects are developed under long-term electricity supply contracts *i.e., PPAs*, which provide predictability of revenue for our operations.

2. **Sustainability:** 100% of our electricity generated by us is clean and is generated from renewable sources. We estimate that Azure's renewable power generation helped to avoid the production of approximately 5 million tons of $CO_2e$ in FY 2023 and 19.5 million tons -equivalent since inception.

3. **Dependability:** We aim to be a reliable developer that executes its pipeline on time and within budget.

4. **Competitive Pricing:** Our in-house technical expertise in design and engineering, project execution and operation and maintenance, together with our ability to finance at better pricing from both domestic and global sources, enables us to achieve competitive tariffs and deliver our target project returns.

5. **Community Support:** Our CSR and community programs are integral to our strategy. We build long-term community relationships, hire from local communities, purchase or lease land with few alternative uses, and seek to support local economic and social development.

---

[2] Except for one 10 MW project in Uttar Pradesh with Uttar Pradesh Power Corporation Limited, which is subject to a 12 year PPA.

**Our Competitive Advantage**

We believe that Azure has developed durable competitive advantages from a range of factors, including:

(i) **Pioneer:** Being a leader in renewable energy industry is fundamental to Azure. We have been early adopters of proven technologies, such as bi-facial modules, trackers, and robotic dry cleaning. Our track record in project financing and refinancing includes the issue of Green Bonds at the lowest rates in India's renewable industry.

(ii) **Strong customer portfolio**: More than 85% of our signed PPAs are with central government owned intermediaries like SECI and NTPC. This means that our offtake profile is strong with an industry leading portfolio receivable cycle and the least possible disruptions to revenue collections.

(iii) **Superior execution capabilities:** We have developed in-house capabilities for the full cycle of our business to enhance our insight, increase our speed and lower our costs. This includes land and site development, design and engineering, and innovation in construction techniques. Because of our execution capabilities, we have been able to increase our operational capacity from 55 MW as of March 31, 2014 to 3,041 MW as of the date of this Form 20-F.

(iv) **Focus on efficiency and productivity:** We have deployed monitoring drone at our project sites for thermal inspection of plants. All our plants are connected to Centralized Monitoring System which record and monitor our plant performance on real time basis as well as maintenance data on a daily, weekly and monthly basis. Being an early mover in the Indian solar industry we have inhouse expertise to manage substations from small to large voltage of up to 400kV, which is second highest voltage level available in India.

(v) **Access to capital:** Capital is one of the most important resources in our business, and we believe that strong backing from our large shareholders is a critical advantage. This strong sponsorship and our solid track record supports us in the credit markets, demonstrated by the refinancing of our first Green Bond in FY 2022. *Refer to "Risk Factors - Any downgrade of our credit rating may result in increase in interest cost or may trigger covenant defaults under our loan agreements"* and "Certain Factors affecting our Results" for further discussion of rating updates.

(vi) **Focus on ESG standards:** At Azure, our efforts are focused on integrating sustainability with our business strategy and day to day operation of the company. A framework has been developed to link the executive compensation to its ESG performance by developing an organizational level scorecard. ESG risks have been integrated into our Enterprise Risk Management (ERM) framework and we are a signatory to the United Nations Global Compact's Ten Principles. As a pivotal partner in India's transition to clean journey, we are taking measures to monitor and improve our environmental performance rolling out initiatives like deployment of robotic cleaning to reduce our dependence on ground water, planting trees across sites to enhance our natural capital and tracking and reducing our greenhouse gas emissions. For last 5 years, Azure has been validated as "carbon neutral" for its scope 1 and 2 emissions. The Company has institutionalized an EV Policy to replace our fossil-based vehicles to EVs in an effort to reduce its dependence on fossil fuel. As part of effort to reduce our scope 1 emissions, we have rolled out a robust EV policy to move away from fossil-based vehicle and have taken a commitment to enhance natural capital by planting 50 trees per MW for all project we install in future. We are ISO 140001 (Env.), 45001 (Safety) and SA8001 (Social accountability) certified company. We are strictly governed by key policies including our anti-bribery and corruption policy, whistle blower policy, code of business conduct and ethics and corporate social responsibility. We were awarded the Apex India CSR Excellence Award 2021, Greentech effective safety culture award 2021 in recognition of our safety initiatives. In October 2022, we won the prestigious Golden Peacock Award for Sustainability for 2022.

(vii) **Innovation:** We have adopted world class technology and systems to deliver sustainable value in our business. To study new technologies and the interplay between various elements of renewable power generation, we setup a test laboratory in the state of Rajasthan in 2021. This facility is aimed at improving construction processes and testing new technologies before they are mainstreamed in our projects. We have developed design and execution technologies for module mounting structure and electrical connections to suit projects located even in challenging environments. Technologies recently deployed at scale include automated robotic cleaning in over 1,178 MW projects at different sites, use of drone for predictive and rapid maintenance identification and improving revenue by reducing electrical mismatch & import energy.

**Our Business Strategy**

India is our focus market. During Fiscal 2022, India was the third largest electricity producer and the fourth-largest

energy consumer in the world. It is a global pacesetter in terms of renewable energy capacity additions and is on track to become one of the world's largest markets for clean energy technologies. India has set ambitious climate change and energy transition targets, including Net-Zero carbon emissions by 2070, growth of non-fossil fuel energy capacity to 500 GW by 2030 and to achieve energy independence by 2047. The GOI's support for the sector, macro factors such as increased electrification and rapid urbanization are expected to result in India representing a significant share in the global renewable energy market across technologies like solar and wind. For more information, see "Industry Overview".

We believe we are well positioned to benefit from the expanding renewable energy market in India. We expect to continue to invest in the capabilities that we believe give us an edge in an increasingly competitive market. These include:

- In-house expertise in competitive bidding, design, construction, and operation of renewable energy assets to world class standards of quality and cost;
- Deep engagement in the evolving Indian renewable energy ecosystem with policy makers, regulators and customers at central and state levels;
- Leadership in raising and deploying both equity and debt capital, including project and climate financing;
- Insight into and early deployment of evolving technologies, including solar generation, construction techniques, and digital and automated optimization and grid interface; and
- Strong and effective governance including corporate responsibility and community engagement.

Our strategic priorities are:

- To execute our pipeline while managing risk and delivering targeted investment returns;
- To bid for and win renewable energy auctions in India focused on solar, wind, storage, and their hybrid solutions with a bidding strategy that conforms to our risk-return profile;
- To maintain world class standards of safety, reliability and efficiency at our plants using leading digital and automated tools;
- To build capabilities to address a more demanding utility grid environment led by higher renewable energy penetration. In addition to existing solar capabilities, we plan to increase our non-solar generation, especially wind and storage; and
- To develop business beyond the core utility business by partnering with large energy users for their requirements by providing reliable renewable energy.

### *To execute our pipeline of projects*

Delivering on our pipeline in a timely and efficient manner – within acceptable risk and return parameters – is our key strategic priority. We have signed PPAs for approximately 3,303 MW of our pipeline and have signed LOAs for another 967 MW. Whilst most of the pipeline is in solar, we have started early-stage development on wind projects and wind solar hybrid projects. We continue to identify project sites with good renewable energy resource potential, connectivity to the grid, and favorable on-ground working ecosystem.

### *Bid for and win renewable energy auctions in India in line with our risk and return profile*

The ambitious targets set by the GoI, combined with climate change commitments being announced by Indian corporates, are expected to substantially increase the demand for clean energy. India offers tremendous potential in solar and wind power, which should be the fastest growing sources of energy in the next decade and beyond. We will continue to bid in a disciplined manner to win projects at an acceptable rate of return and include Power Purchase Agreements (PPAs) with high grade offtake. The PPAs signed by the company are typically for 25 years duration and considering the long tenor of these contracts, it's important to ensure that the counterparties to such agreements are organizations with robust business model and strong operational cashflows to service their PPA obligations. Based on the above, Azure only selects bidding opportunities that it believes minimize the risks, ensure bankability of our projects, and have a high probability of generating the expected cash-flows.

### *Maintain world class standards of safety, reliability and efficiency at our plants including using digital and automated tools*

We are a fully integrated renewable energy company undertaking development, construction, ownership, operation, and maintenance of renewable energy plants. New technologies, including digital and automation, will help optimize output and reduce cost, while better serving the grid requirement for firmer and more predictable power. We have rolled out multiple initiatives aimed at enhancing safety, efficiency and process improvements which include advanced automated robotic cleaning

technologies for photovoltaic modules, drones for monitoring, centralized digital platform for asset performance monitoring, predictive analytics etc. We will continue to deploy technologies and innovations that help us deliver world class operating performance and simultaneously optimize the asset life.

***Build capabilities in non-solar generation especially in wind, and in storage, to address a more demanding utility grid environment***

As the share of renewable energy increases in the energy mix, the challenges to integrate Renewable Energy in the grid will increase due to their variable nature of generation. We expect that there will be an increasing focus to improve power system flexibility and reduce the intermittency associated with renewable power. The Indian wind energy profile complements India's solar generation profile. Thus, we expect that wind energy, solar-wind hybrids and energy storage solutions will be increasingly deployed for a predictable and flatter renewable energy generation profile and grid stability. On similar lines, we expect that utility customers will increase their share of renewable energy consumption but will increasingly demand more predictable and continuous power. This will require integration of solar, wind and storage technologies. In line with the evolving requirements of the market, we will continue to strengthen our capability to deliver firm and dispatchable renewable power to our customers by leveraging solar, wind and storage technologies.

***Develop business beyond the core utility business by partnering with large energy users for their requirements for reliable green energy***

With an increasing focus on decarbonization and sustainability, there is a significant and growing demand for renewable energy from commercial and industrial customers. We aim to partner with large energy consumers across segments to meet their requirements for reliable and affordable green energy. We will look for opportunities to displace their brown energy consumption with green power through various techno-commercial offerings tailored to specific customer needs. Such displacement would target not only the power requirements of our partners but also the grey fuel usage for various heating, cooling and other process driven energy requirements.

We will continue to evaluate new technologies such as Green Hydrogen which present an opportunity to implement large scale renewable energy projects in a sustainable manner. We intend to identify such opportunities which integrate with our business strategy, add value to our existing portfolio and would leverage our core strength of building efficient renewable energy projects.

**Project Implementation**

We have inhouse design, engineering, project execution, operations and maintenance capabilities. We remain one of the pioneers in executing and delivering renewable projects in India, demonstrated by our early adoption of proven technologies like bi-facial modules, trackers, and robotic dry cleaning. We aim to operate our plants to world-class standards of safety, reliability and efficiency using leading digital and automated tools with predictive and rapid response abilities.

Many of our projects are in zones with high irradiation and/or strong winds. We position our power plants to optimize generating efficiency, proximity to customers, and local government support. The typical timeline available under a PPA for commissioning a power project is approximately 18-24 months. The following diagram illustrates the key activities under life cycle of a typical project.



We procure major components such as solar modules and inverters directly from multiple manufacturers with industry standard warranty and guarantee terms. Our supply chain team are developing strategic relationships with a range of key suppliers of critical equipment and components both in India and globally. We select our suppliers based on quality, technology provided, expected cost, reliability, warranty coverage, ease of installation and other ancillary costs.

The price of components for our solar power plants have declined over the longer time horizon as manufacturers lower their cost of production via technological improvement and economies of scale. However, in the second half of FY 2022, we experienced challenges in receipt and pricing of material from suppliers, primarily due to price increases of raw materials and disruptions to trade flows due to COVID-19 shutdowns in source markets and the imposition of customs duties. We have responded to these supply headwinds by deepening our strategic partnerships with key suppliers like for modules we entered into an agreement with Premier Energies Group ("Premier Group") and First Solar, Inc. subsequent to the end of FY 2022. We agreed to invest INR 1,000 million (US$13.2 million) in Premier Group, one of India's leading manufacturers of solar PV cells and modules and also signed a Module Supply Agreement ("MSA") for supply of modules up to 600 MW capacity per annum over next 4 years. Under the MSA, we have a right to procure modules of up to 600 MW per annum, with a minimum commitment given to off-take 300 MW per annum, subject to agreed exemptions. With First Solar, we entered into an agreement for 600 MW (DC) of high-performance, advanced thin film photovoltaic (PV) solar modules.

We also signed a Master Supply Agreement with Siemens Gamesa Renewable Power Private Limited ("Siemens Gamesa") to supply 96 units of onshore wind turbines that will cater to an overall capacity of approximately 346 MW of wind projects. The turbine supply was expected to commence during Q2 calendar year 2023 but it is now tentatively planned to commence in Q2 calendar year 2024 as the timelines for the project are under review.

Once a project is constructed and grid-connected, it produces recurring revenue. Our project operating expenses are relatively lower than conventional power plants, with most cash flow servicing the capital costs of the project or contributing to our growth capital requirements including corporate overhead. Because plant operating margins are relatively stable, our growth and financial success depend on effective management of our expenses and the development of new projects. Also refer to the section entitled "*Operating and Financial Review and Prospects*" for further details.

## B. Company Overview

Azure Power Global Limited is a publicly traded limited liability company incorporated in Mauritius We are an Indian renewable energy developer and independent renewable power producer, and our entire operations are currently in India. Our green bonds are listed on the Singapore Exchange (SGX) with the first solar green bond from India listed in 2017. As such we are subject to regulation in four jurisdictions: the United States of America where Azure Power shares are registered with the SEC; Mauritius, where Azure Power is incorporated; Singapore, where our Bonds are traded; and India, where we operate.

Our shares are listed on the New York Stock Exchange (NYSE). On July 13, 2023, the NYSE suspended trading in our equity shares and commenced delisting proceedings. For further information, see "*Risk Factors - The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares*".

Our Company's registered office is located at c/o AAA Global Services Ltd., 4th Floor, Iconebene, Rue De L'institut, Ebene, 80817, Mauritius with principal executive offices located at: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi – 110017, India. Our telephone number at our principal executive office's location is +91 (11) 4940 9800 and our principal website address is http://www.azurepower.com. Unless expressly indicated, the information contained on our website is not incorporated by reference in this Annual Report. Reports, proxy, information statements and other information regarding Azure Power can be accessed via the SEC website at http://www.sec.gov/Edgar. Our Company's agent for service of process in the United States is CT Corporation System, located at 28 Liberty Street, New York, NY 10005.

## Organizational Structure

The following diagram illustrates our corporate structure as of the date of this 20-F:



*\* In April 2021, we entered into a sales contract with Radiance Renewables Private Limited ("Radiance") to sell certain subsidiaries having an operating capacity of 153 MW for INR 5,350 million (US$70.5 million), subject to certain purchase price adjustments. Out of the identified rooftop portfolio of 153 MW, the Company has already transferred 17.3 MW to Radiance, 33.2 MW will be transferred to Radiance after refinancing of the RG-II bonds and 16 MW will be transferred to Radiance post March 31, 2024. Hence, we have not considered these rooftop portfolios of 66.5 MW for reporting under its total portfolio as at year end. Further, the Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the remaining un-transferred 86.5 MW portfolio to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement, Hence, portfolio of 86.5 MW have been considered for reporting under total portfolio as at year end.*

**Our Sustainability Initiatives and ESG Focus**

Sustainability is at the core of our business. We are focused on integrating sustainability across business, building a culture focused on sustainability, sustainability reporting and ESG ratings. Our leadership is evident in the ratings received by

us. We have rated as a "low risk" company with a score of 15.8 by Morningstar Sustainalytics; MSCI has given us a rating of "AA" indicating Azure's resilience to long term ESG risks.

As a socially and environmentally conscious company, we are committed to protecting our environment and creating a safe and health workplace. To meet these objectives, we have implemented our Environmental and Social Management framework (ESMG). The framework acts as a guideline through which we plan and undertake activities to meet our HSE commitments and helps us to assess our environmental and social performance against established international guidelines such as the International Finance Corporation ("IFC") Performance Standards and World Bank Equator Principles and governance standards. We continue to operate our plants to the highest standards of safety. We have defined targets for monitoring the continual improvement in our safety performance. In Fiscal 2023, a contract worker had a fatal accident at one of our solar energy project sites in Rajasthan, following which we have strengthened our awareness and training programmes for employees and contractual workers.

We estimate that Azure's renewable power generation helped to avoid the production of approximately 5 million tons of CO2e in FY 2023 and 19.5 million tons -equivalent since inception. We strongly believe that commitment to high standards of corporate responsibility is both the right way to do business but also an enabler of our business.

During Fiscal 2022, we rolled out various initiatives to address United Nations Sustainable Development Goals (SDG). As one of country's pivotal clean energy partner, we at Azure are helping India's to achieve its Net Zero target, thereby contributing to achieving the goals of SDG 13 (Climate Action). As part of our community development initiatives, we are actively working towards improving the quality of infrastructure in schools around our sites, thereby contributing towards achieving the goals of SDG 4 (Quality Education), development of village infrastructure, thereby contributing towards advancement of SDG 1 (No Poverty) and SDG 6 (Clean Water and Sanitation).



**ESG Updates**

**Environmental**

As a pure play renewable energy company, we are working towards clean energy transition and contributing to India met its Net zero target.

*Climate change*: We estimate that Azure's renewable power generation helped to avoid the production of approximately 5 million tons of $CO_2e$ in FY 2023 and 19.5 million tons -equivalent since inception. We have been validated to be carbon neutral for 5th consecutive year for our scope 1 and 2 emissions. Our actions to reduce Scope 1 emissions include implementation of an Electric Vehicle policy that will phase out all fossil fuel-based vehicles by 2030.

*Water Security:* We reduced our water consumption per MWh from 122 L/ MWh in FY 2018 to 15 L/ MWh in FY 2023. We recognize that the water required for cleaning our solar modules may result in adverse environmental impact. We are installing robotic dry-cleaning systems at all our project sites to eliminate the requirement for water which has helped to save approximately 1 million kilo liters of water Additionally, we are installing ground water recharge structures across our sites to offset our water consumption.

*Natural capital enhancement:* We are committed to planting 50 tree saplings per MW installed at all our future projects. in FY 2023, we planted 30,000 trees around our sites.

**Social**

*Community engagement:* Through our community engagement initiatives, Azure is committed to improving the quality of life by making a positive economic and social contribution to the communities living in and around its sites. In Fiscal 2022, we won the prestigious Apex India CSR Excellence award 2021. In FY 2023, we commissioned an Impact Evaluation of our CSR activities carried out during FY 2022.

*Occupational Health and Safety:* Our foremost priority is the health and safety of our staff and contractors at project sites as well as our corporate office. Our target is zero harm for everyone from our operations. We continue to promote safety awareness and best practices among all employees and contractors. We obtained ISO 45001 (Occupational Health and Safety) certification, won the Greentech Effective Safety Culture Award 2021 and Grow Care India Occupational Health and Safety award 2021. We undertook a safety culture survey in September 2022 which saw voluntary participation of 50% of our employees. The survey concluded that the company is performing better than its peers in matter of safety. The internal validation corroborates external validation in form of multiple safety awards as received by the company.

*Labor and working condition:* We look to monitor the social and compliance performance of our key contractors and suppliers. We have obtained Social Accountability 8000 certification to assure appropriate labor and working conditions associated with our projects.

**Governance**

We are committed to the high standards of corporate governance and continue to improve our processes and practices.

*Board Membership:* Our Board currently consists of nine members, two of whom are women. All Board members are Non-Executive; five are Independent Non-Executives and four are Non-Executive nominees of shareholders (three of CDPQ and one of OMERS).

There have been changes in the membership of the Board in FY 2022 and thereafter. In September 2021, Mr. Barney Rush, Chairman, stepped down and was replaced by Mr. Richard Alan Rosling as Chairman. In March 2022, Ms. Christine McNamara joined the Board and became the Chair of the Audit and Risk Committee. She stepped down from her position on June 26, 2023 for personal reasons. The Company appointed Mr. Richard Payette as a new independent non-executive director

on July 1, 2023 and he was also appointed as the Chair of the Audit and Risk Committee. Mr. Payette brings four decades of experience in the management of global companies and in accounting, audit and governance areas.

In April 2022, our previous Managing Director and CEO, Mr. Ranjit Gupta, resigned.

In May 2022, Ms. Delphine Voeltzel joined the Board as a director and Nominee of OMERS. At the end of May 2022, Arno Harris left the Board after more than six years of service. In October 2022, Mr. Sugata Sircar joined the Board as an Independent Director and member of the Audit & Risk committee. Mr. Sugata is a chartered accountant with 32 years of experience in energy and automation, chemicals, textiles, tires, fast moving consumer goods and city gas distribution. Mr. Sircar stepped down from his role as independent director of the Company on April 30, 2023 to become our Group CFO.

In February 2023, Mr. Jean-François Boisvenu joined the Board as an Independent Non-executive Director. Mr. Boisvenu has more than 25 years of experience in corporate and commercial law matters, with expertise in international banking transactions, lending and debt capital markets transactions and financial institutions regulation. In March 2023, Mrs. Yung Oy Pin Lun Leung left the Board after more than three years of service. She was replaced by Mr. Gowtamsingh Dabee. Mr. Dabee has over 25 years of experience as a professional accountant in public practice and industry in Mauritius, Africa, and the Middle East.

On October 11, 2023, Mr. Alan Rosling resigned as Chairman of the Board and as a director of the Company and APIPL. On October 12, 2023, the Company announced that Mr. M.S Unnikrishnan became the Chairman of the Board of the Company.

For further information, see "Management and Employees – Management".

***Board Committees:*** In recent months, the Board has completed a review of the Terms of Reference, Charters and membership of its Committees. The Audit Committee is now the Audit and Risk Committee, taking responsibility for our new ERM system. The CSR Committee is now the Sustainability and CSR Committee and has a broader mandate to ensure our ESG and CSR performance is world class and supports our goals, ethos, and operating strategy.

For further information, see "Management and Employees – Board Committees".

***Executive Committees:*** There are two executive committees which are formed by the Board as follows:

(i) Ethics Committee – To review and investigate reported whistleblower complaints. Members of the Ethics Committee include the CEO and GCFO. The Ethics Committee is chaired by the Head of Legal and reports to the ARC.
(ii) Executive Risk Committee – To develop, implement and monitor the Enterprise Risk Management framework. CFO and CEO are the members of this committee.

For further information, see "Management and Employees – Board Committees".

***Leadership:*** On April 26, 2022, we announced that the Board had accepted the resignations of our previous CEO & Managing Director, Mr. Ranjit Gupta, and COO, Mr. Murali Subramanian. Mr. Harsh Shah joined the Company as CEO on July 1, 2022 but subsequently resigned on August 29, 2022. Thereafter, Mr. Rupesh Agarwal became Acting CEO of the Company on Mr. Shah's resignation. In November 2022, Mr. R. Narasimhan Iyer joined as Chief Operating Officer of the Company. On April 30, 2023, Mr. Sugata Sircar resigned from his position as non-executive Independent Director and member of the Company's Audit & Risk Committee and Capital Committee and on May 1, 2023, joined as Group CFO and Executive Director, Finance of the Company's subsidiary, APIPL. In July 2023, Mr. Sunil Gupta was appointed as the CEO of the group and as Managing Director of the Company's subsidiary, APIPL. For more information, see "Risk Factors – The loss of our senior management or key employees may adversely affect our ability to conduct our business".

For further information, see "Management and Employees – Management".

## C. Industry Overview

Renewable energy represents a significant and growing industry in India. At the 26th meeting of Conference of the Parties COP-26 climate summit in Glasgow, the Prime Minister of India increased the country's renewable energy target to 500 GWs by 2030, which would represent 50% of the country's energy requirements. Beyond that, the Prime Minister committed India to net carbon neutrality by 2070. India's Nationally Determined Commitments were further tightened at COP-27 in Egypt.

An efficient, resilient, and financially robust power sector is essential for the growth of the Indian economy. Renewable sources of power are cleaner, faster to build and more cost-effective than most traditional sources of power. India's rapidly growing economy requires significant investment in additional power capacity. India is already one of the largest renewable energy markets globally.

Renewable energy has strong government support and the government has designed policies, programs, and a liberal environment to attract domestic and foreign investment to the sector. Initially, the National Solar Mission (NSM) was launched in 2010 as a part of India's National Action Plan on Climate Change (NAPCC) with a view to deploy 20 GWs of solar capacity by FY 2022. In 2015, the targets were revised to 175 GWs by 2022. India has now committed to achieve about 50 percent cumulative electric power installed capacity from non-fossil fuel-based energy resources by 2030.

The Indian renewable energy sector is the fourth most attractive renewable energy market in the world, with total installed capacity of renewable power of 131 GWs as of August 2023. India has witnessed one of the fastest growth rates in renewable energy capacity among all large economies, with renewable energy capacity growing from 35.5 GWs in March 2014 to 131 GWs in August 2023, a 269% increase. India's total electricity installed capacity stood at 424 GWs as of August 31, 2023.

**Total Installed Capacity** *(As of August 31, 2023)*

| Category | Installed Generation Capacity *(in MW)* | % Share in Total |
|---|---|---|
| Coal | 206,195 | 48.60 |
| Lignite | 6,620 | 1.56 |
| Gas | 25,038 | 5.90 |
| Diesel | 589 | 0.14 |
| **Total Fossil Fuel (A)** | **238,442** | **56.20** |
| Hydro | 46,850 | 11.04 |
| Wind | 44,089 | 10.39 |
| Solar | 71,610 | 16.88 |
| BM Power/Cogen | 10,261 | 2.42 |
| Waste to Energy | 570 | 0.13 |
| Small Hydro Power | 4,982 | 1.18 |
| Nuclear | 7,480 | 1.76 |
| **Total Non-Fossil Fuel (B)** | **185,842** | **43.80** |
| **Total Installed Capacity** | **424,284** | **100** |

### Power Consumption

There is huge potential for power demand to grow in India. The country is among the fastest growing large economies, already ranked fifth globally in terms of total GDP. Over the ten year period up to June 2023, electricity consumption and peak demand in India grew at a CAGR of 3.6% and 5.7%, respectively. Annual per capita power consumption in India has also grown significantly from 0.8 MWh in FY 2011 to 1.3 MWh in 2021-22, although it is still among the lowest in the world. According to the International Energy Agency, the annual per capita electricity consumption of India is around 21.7% that of China, which had per capita electricity consumption of 5.98 MWh, and around 9.9% of the United States, which had per capita electricity consumption of 13.07 MWh.

### Solar Energy Potential

National Institute of Solar Energy (NISE), an autonomous research and development institution under the MNRE, assesses the country's solar potential at approximately 748 GWs, assuming 3% of the waste land area could be covered by Solar PV modules. Solar energy has taken a central place in India's NAPCC with the NSM as one of the key Missions. The GOI have launched various schemes under the NSM to boost generation of solar power in the country, most importantly

procurement of solar power by SECI, but also including initiatives such as Solar Park Scheme, Viability Gap Funding ("VGF") Schemes, CPSU Scheme, Defence Scheme, Canal bank & Canal top Scheme, Bundling Scheme and Grid Connected Solar Rooftop Scheme.

In addition, policies to promote and enable renewable energy have included a Renewable Purchase Obligation (RPO) on certain industries, the waiver of ISTS charges and losses for inter-state sale of solar and wind power, "must run" status, guidelines for procurement of solar power though tariff based competitive bidding process, standards for deployment of solar photovoltaic systems and devices, provision of roof top solar and guidelines for development of smart cities, amendments in building by-laws for mandatory provision of roof top solar for new construction or higher floor area ratio, infrastructure status for solar projects, tax free solar bonds, and providing long tenor loans from multi-lateral agencies.

Solar power capacity in India increased from 2.6 GWs in March 2014 to 71.61 GWs as of August 2023. Refer below for solar installed capacity as of August 2023 for states with highest irradiation:



Statewise solar installed capacity

**Wind Energy Potential**

In recent years wind power generation capacity in India has increased significantly. Through the National Institute of Wind Energy (NIWE), the GOI installed over 800 wind-monitoring stations across the country and issued wind potential maps at 50 meters, 80 meters, 100 meters and 120 meters above ground level. The recent assessment indicates a gross wind power potential of 302 GWs in the country at 100 meters and 695.50 GWs at 120 meters above ground level. Most of this potential exists in seven states: Gujarat, Telangana, Maharashtra, Tamil Nadu, Madhya Pradesh, Karnataka and Andhra Pradesh.

**D. Regulatory Matters**

*Due to the industry and geographic diversity of our projects, our operations are subject to a variety of rules and regulations. Set forth below is a brief overview of the principal laws and regulations currently governing the businesses of our Indian subsidiaries. The laws and regulations set out below are not exhaustive and are only intended to provide general information to the investors and are neither designed nor intended to be a substitute for professional legal advice.*

**(i) Central Government – Policies and Regulations:**

**Electricity Act, 2003**

The Electricity Act, 2003, as amended ("Electricity Act") is the central legislation which covers, among others, generation, transmission, distribution, trading and use of electricity. It governs the establishment, operation and maintenance of any electricity generating company and prescribes technical standards in relation to the connectivity of generating companies with the grid. As per provisions of the Electricity Act, generating companies are required to establish, operate and maintain generating stations, sub-stations and dedicated transmission lines. Further, the generating companies may supply electricity to any licensee or even directly to consumers, subject to obtaining open access to the transmission and distribution systems and payment of transmission charges, including wheeling charges and any other open access charges, as may be determined by the concerned electricity regulatory commission. In terms of the Electricity Act, open access means the non-discriminatory provision for the use of transmission lines or distribution system or associated facilities with such lines or system, by any licensee or consumer or a person engaged in generation in accordance with the regulations specified by the relevant electricity regulatory commission.

In accordance with Section 7 of the Electricity Act, a generating company may establish, operate and maintain a generating station without obtaining a license under the Electricity Act if it complies with the technical standards relating to connectivity with the grid prescribed under clause (b) of Section 73 of the Electricity Act.

Under the Electricity Act, the State Electricity Regulatory Commissions, ("SERCs") are required to promote co-generation and generation of electricity from renewable sources of energy and sale of electricity to any person from sources other than the incumbent distribution licensee under the provisions of open access. The Electricity Act further requires the SERCs to specify, for the purchase of electricity from renewable sources, as a percentage of the total consumption of electricity within the area of a distribution licensee, which has been implemented in the form of renewable purchase obligations, ("RPOs").

Additionally, the Electricity Rules, 2005, as amended ("Electricity Rules") also prescribe a regulatory framework for developing captive generating plants. Pursuant to the Electricity Rules, a power plant shall qualify as a captive power plant only if not less than 26% of ownership is held by captive users and not less than 51% of the aggregate electricity generated in such plant, determined on an annual basis, is consumed for captive use. In case of a generating station owned by a company formed as a special purpose vehicle, the electricity required to be consumed by captive users is to be determined with reference to such unit or units identified for captive use and not with reference to the generating station as a whole, and equity shares to be held by the captive users must not be less than 26% of the proportionate equity interest of the company related to the generating unit or units identified as the captive generating plant.

The Ministry of Power introduced the Electricity Act (Amendment) Bill, 2020 ("2020 Amendment Bill") to amend the Electricity Act to promote the generation of electricity from renewable sources of energy. The Ministry of Power also introduced Electricity (Rights to Consumers) Rules, 2020, as amended ("2020 Electricity Rules") to empower consumers of electricity and confer rights upon the consumers to be entitled to reliable services and quality electricity. The 2020 Electricity Rules introduced, inter alia, installation of smart or pre -payment meter. Further, the Rules intend to ensure the availability of 24x7 power to all the consumers with some exceptions for lower hours that the relevant State Electricity Regulatory Commission may specify for certain categories of consumers and introduces robust grievance redressal mechanism to be introduced by the distribution licensees.

The Ministry of Power introduced the Electricity (Amendment) Bill, 2022 ("2022 Amendment Bill") which seeks to, among others, facilitate (i) development of the hydro sector in the country; and (ii) the use of distribution networks by all licensees under provisions of non-discriminatory open access with the objective of enabling competition, enhancing efficiency of distribution licensees for improving services to consumers and ensuring sustainability of the power sector. The 2022 Amendment Bill added that RPO should not be below a minimum percentage of the total consumption of electricity in the area

of a distribution licensee, prescribed by the central government. Failure to meet RPO requirements will be punishable with a penalty ranging between Rs. 0.25 and Rs. 0.35 per kilowatt-hour for the shortfall in the first year of default and between Rs. 0.35 and Rs. 0.50 per kilowatt-hour for the shortfall continuing after the first year of default. The Ministry of Power has also issued the Electricity (Amendment) Rules, 2022 to determine that the surcharge imposed by the state commission shall not exceed 20% of average cost of supply, timely recovery of power purchase costs by distribution licensee, resource adequacy, energy storage system, and implementation of a uniform renewable energy tariff for central pool.

**Tariff Determination**

Under the Electricity Act, the appropriate commission is empowered to determine the tariff for the supply of electricity by a generating company to a distribution licensee. The appropriate electricity regulatory commission is guided by certain principles while determining the tariff applicable to power generating companies which include, among other things, principles and methodologies specified by the CERC for tariff determination, safeguarding consumer interest and other multiyear tariff principles laid down by the implementation of the National Electricity Policy ("NEP") the Tariff Policy and the National Tariff Policy of India, 2016 ("NTP 2016"); and, tariff may also be determined through the transparent process of bidding in accordance with the guidelines issued by the Government of India.

**National Tariff Policy, 2016**

The Government of India notified the Tariff Policy on January 6, 2006 ("Tariff Policy 2006") under Section 3 of the Electricity Act, to ensure availability of electricity to consumers at reasonable and competitive rates, financial viability of the sector and to attract investment, promote transparency, consistency and predictability in regulatory approaches across jurisdictions and minimize perceptions of regulatory risks and promote competition and to guide CERC and the SERCs in discharging their functions. The Tariff Policy 2006 has now been replaced with the NTP 2016.

In exercise of the powers conferred under Section 3 of the Electricity Act, 2003, the Government of India has issued the revised tariff policy to be applicable from January 28, 2016. The objectives of NTP 2016, among others, include:

1. ensuring financial viability of the power sector and attract investments;
2. ensuring availability of electricity to consumers at reasonable and competitive rates;
3. promoting generation of electricity from renewable sources; and
4. promoting hydroelectric power generation.

The NTP 2016 has removed the ambiguity on applicability of the RPOs on co-generation as it has been clarified that co- generation from sources other than renewable sources shall not be excluded from the applicability of the RPO. NTP 2016 specifies that an existing coal or lignite based generating station may choose to add additional renewable energy capacity and generation from such renewable energy capacity may be bundled with its thermal generation for the purpose of sale. In case an obligated entity procures such bundled power, then the SERCs will consider the obligated entity to have met the RPO to the extent of power bought from such renewable energy generating stations.

Further, to encourage faster capacity addition based on solar and wind energy sources, the Ministry of Power on November 23, 2021 waived the inter-state transmission charges for solar, wind, hydro pumped storage plant ("PSP") and battery energy storage system projects ("BESS") commissioned up to June 30, 2025. Such waiver shall be applicable for a period of 25 years for solar, wind and hydro PSP, or for a period of 12 years for BESS, or for a period subsequently notified for future projects by the GoI, from the date of commissioning of the power plant. The waiver shall be allowed for inter-state transmission charges only, and not losses. Such power plants shall be required to meet the following criteria, among others: (a) solar and wind energy generation consumed or sold through competitive bidding, power exchange, or through bilateral agreement; (b) electricity from solar and/or wind sources used by PSP and BESS subject to at least 51% of electricity requirement for pumping of water in PSP and charging of battery in BESS is met by use of electricity generated from wind and/or solar power plants; (c) electricity generated/supplied from such PSP and BESS power plants as mentioned above in (b); (d) for trading of electricity generated/supplied from solar, wind and sources mentioned in (a) to (c) above in green term ahead market and green day ahead market up to June 30, 2025; (e) for green hydrogen plants commissioned up to June 30, 2025 i.e. hydrogen generated using the electricity produced from solar and wind energy and sources mentioned in (a) to (c) above. This waiver shall be applicable for a period of 8 years from the date of commissioning of such hydrogen plant.

**Guidelines for Tariff Based Competitive Bidding Process for Procurement of Wind and Solar Power**

The Ministry of Power has issued guidelines on August 3, 2017 and December 8, 2017, as amended, for procurement

of solar and wind power, respectively, through tariff based competitive bidding process ("Competitive Bidding Guidelines"). The Competitive Bidding Guidelines aim to enable the distribution licensees to procure solar and wind power at competitive rates in a cost-effective manner. These Guidelines have been issued under the provisions of Section 63 of the Electricity Act for long term procurement of electricity, determined through the competitive bidding process, by the procurers, the distribution licensees, or the authorized representatives(s), or an intermediary procurer from grid-connected Solar PV Power Projects or grid-connected Wind Power Projects having capacity of 5 MW and above or 5 MW and above for intra-state projects 50 MW and above for inter-state projects, respectively. The Competitive Bidding Guidelines were further supplemented when the Ministry of Power issued guidelines on August 26, 2022 with the aim of promoting cheaper renewable energy sources replacing costlier thermal power and to promote RPO of distribution licensees.

**Guidelines for Tariff Based Competitive Bidding Process for Procurement of Power from Grid Connected Wind Solar Hybrid Projects**

The Ministry of New and Renewable Energy has issued guidelines on October 14, 2020 ("Competitive Bidding Guidelines"), as amended, for ensuring availability of renewable energy to DISCOMs at competitive rates. The objective for the Competitive Bidding Guidelines is to provide a framework for procurement of electricity from interstate transmission system grid connected wind- solar hybrid power projects through a transparent process of bidding. These Competitive Bidding Guidelines have been issued under the provisions of Section 63 of the Electricity Act, 2003. The individual minimum capacity of projects allowed is 50 MW at one site and a single bidder cannot bid for less than 50 MW. Further, the rated power capacity of one resource (wind or solar) shall be at least 33% of the total contracted capacity. The SECI will be the nodal agency for implementation of these Competitive Bidding Guidelines. The bidders may obtain fiscal and financial incentives available for such projects as per prevailing conditions and rules, and the same may be disclosed by the SECI in the request for selection document.

**Guidelines for Tariff Based Competitive Bidding Process for Procurement of Round-The Clock Power from Grid Connected Renewable Energy Power Projects, complemented with Power from any other source or storage.**

The Ministry of Power has issued guidelines on July 22, 2020 as amended on November 3, 2020, February 5, 2021, February 3, 2022 and August 26, 2022 to enable procurement of round-the-clock power by distribution companies from grid- connected renewable energy power projects, complemented with power from any source or storage, through tariff based competitive bidding process, and to facilitate addition to renewable energy capacity and fulfillment of renewable power obligation requirements of distribution companies. Pursuant to these guidelines, the renewable energy component generated under this program is eligible for renewable purchase obligation compliance. Further, the amendment dated February 5, 2021 has made it mandatory to include force majeure clauses in the PPAs as per the industry standards. The amendment dated August 26, 2022 provided, among other things, that: (i) the provisions for change in law shall be construed in accordance with the Electricity (Timely Recovery of Costs due to Change in Law) Rules, 2021 notified by the Ministry of Power on October 22, 2021; and (ii) in case of project components being located at multiple locations, if one of such components (wind or solar PV) is ready for injection of power into the grid but the remaining component is unable to be commissioned, then the generator will be allowed for commissioning of such component which is ready outside the ambit of PPA, with first right of refusal for such power vested with the end procurer. Subsequent to refusal of such power by the end procurer, the right of refusal shall vest with the intermediary procurer. In case the procurer/intermediary procurer decides to buy such discrete component(s) power outside the PPA, such power shall be purchased at 50% of the PPA Tariff/weighted average levelized tariff for the applicable contract year.

**Central Electricity Regulatory Commission (Terms and Conditions of Tariff Determination from Renewable Energy Sources) Regulations, 2020**

CERC notified the Central Electricity Regulatory Commission (Terms and Conditions of Tariff Determination from Renewable Energy Sources) Regulations, 2020, or the "Tariff Regulations 2020," on June 23, 2020. These regulations came into force from July 1, 2020 and shall remain effective until March 31, 2023, unless reviewed earlier or extended by CERC. Under the Tariff Regulations 2020, CERC has specified certain parameters for determination of tariff for new sources of renewable energy such as floating solar project, renewable hybrid energy project and renewable energy project with storage in addition to those covered in past tariff regulations. In case of renewable energy projects for which generic tariff has to be determined as per these regulations, it will be done through a tariff order at least one month before the commencement of the year for each year of the control period, which is from July 2020 to March 2023. The other tariff, which is project specific, shall be determined by the CERC on a case to case basis for, among others, solar PV power projects, floating solar projects, solar thermal power projects, wind power projects, renewable hybrid energy projects and renewable energy with storage projects.

**National Electricity Policy, 2005**

The Indian Government notified the National Electricity Policy, as amended ("NEP") on February 12, 2005, under Section 3 of the Electricity Act. The key objectives of the NEP, amongst other things are, stipulating guidelines for accelerated development of the power sector, providing supply of electricity to all areas and protecting interests of consumers and other stakeholders, keeping in view availability of energy resources, technology available to exploit these resources, economics of generation using different resources and energy security issues.

Further, NEP emphasizes the need to promote generation of electricity based on non-conventional sources of energy. The NEP provides that SERCs should specify appropriate tariffs to promote renewable energy (until renewable energy power projects relying on non-conventional technologies can compete within the competitive bidding system). SERCs are required to specify percentages of the total consumption of electricity in the area of a distribution licensee that progressively increase the share of electricity generated from renewable sources. Furthermore, the NEP provides that such purchase of electricity by distribution companies should be through competitive bidding.

The Government of India has released draft of National Electricity Policy, 2021 and sought comments from the stakeholders. Once implemented, the draft National Electricity Policy aims at achieving the following objectives, among others: (a) promotion of clean and sustainable generation of electricity; (b) development of adequate and efficient transmission systems; (c) revitalization of DISCOMs; (d) development of efficient markets for electricity; (e) supply of reliable and quality power in line with specified standards in an efficient manner; (f) move towards light- touch regulation; and (g) promotion of manufacturing goods and services in India in the generation, transmission and distribution segments of the power sector under the Make in India initiative and Atmanirbhar Bharat Abhiyan (self-reliance scheme).

**Central Electricity Regulatory Commission (Indian Electricity Grid Code) Regulations, 2010 ("Grid Code")**

The CERC in these regulations, as amended from time to time, has laid down the rules, guidelines, and standards to be followed for planning, developing, maintaining and operating the power systems, in the most secure, reliable, economic and efficient manner. These regulations have been amended to require the wind and solar power generators to forecast and schedule their power generation on a day ahead basis. Further, the Grid Code provides a "must-run" status to all solar and wind power plants and exempts such power plants from "merit order dispatch" principles. The schedule by wind and solar generators which are regional entities may be revised by giving advance notice to the relevant regional load dispatch centre.

**Guidelines for Development of Onshore Wind Power Projects, 2016 ("MNRE Guidelines")**

The Ministry of New and Renewable Energy ("MNR") initially issued guidelines for orderly growth of the wind power sector, which were subsequently revised from time to time. These guidelines aim to facilitate the development of wind power projects in an efficient and cost-effective manner.

**Revised Guidelines for Wind Power Projects ("Wind Power Guidelines")**

To ensure quality of wind farm projects and equipment, MNRE introduced the Wind Power Guidelines which were revised and addressed to the erstwhile State Electricity Boards, state nodal agencies and financial institutions such as Indian Renewable Energy Development Agency Limited ("IREDA"). The Wind Power Guidelines provide for, inter alia, proper planning, selection of quality equipment and implementation, performance and monitoring of wind power projects.

**Renewable Purchase Obligations**

The Electricity Act promotes the development of renewable sources of energy by requiring the SERCs to ensure grid connectivity and the sale of electricity generated from renewable sources. In addition, the Electricity Act and the Tariff Policy require the SERCs to specify, for the purchase of electricity from renewable sources, a percentage of the total consumption of electricity within the area of a distribution licensee, which are known as RPOs. RPOs are required to be met by obligated entities (distribution licensees, captive power plants and open access consumers) by purchasing renewable energy, either by renewable energy power producers such as the Group, or by purchasing renewable energy certificates ("RECs"). In the event of default by an obligated entity in any fiscal year, the SERC may direct the obligated entity to pay a penalty or to deposit an amount determined by the relevant SERC, into a fund to be utilized for, among others, the purchase of RECs.

**Generation Based Incentive Scheme ("GBI Scheme")**

To encourage generation from wind energy projects, MNRE notified the GBI Scheme for grid connected wind power projects on December 17, 2009 which is currently applicable to the wind power projects which were commissioned and registered under the GBI Scheme during period commencing from the date of the aforementioned notification and up to March 2017. GBIs under the GBI Scheme are available for the wind power projects selling electricity to the grid and captive wind power projects but exclude wind power projects that undertake third-party sales. Only those wind power projects which sell electricity at the tariff announced by SERCs and/or state governments are eligible for benefits under the GBI Scheme. The objective of the GBI Scheme is to (i) broaden the investor base; (ii) incentivize actual generation with the help of generation/outcome based incentives; and (iii) facilitating entry of large independent power producers and foreign direct investment in the Indian wind power sector. Under the GBI Scheme, generation-based incentives are available for a minimum period of four years and maximum period of 10 years.

**Ujwal Discom Assurance Yojana ("UDAY")**

UDAY is a scheme formulated by the Ministry of Power, Government of India, pursuant to an Office Memorandum dated November 20, 2015. It provides for the financial turnaround and revival of Power Distribution companies, ("DISCOMs"). The scheme is applicable only to state-owned DISCOMs including combined generation, transmission, and distribution undertakings.

The various state governments, their respective DISCOMs and the Government of India have entered into agreements which stipulate responsibilities of the entities towards achieving the operational and financial milestones under the scheme. One of the features of this scheme is that the States have agreed to take over 75% of the debt of the DISCOMs as of September 30, 2015 over a period of two years–50% of the DISCOM debt in 2015-16 and 25% in 2016-17 as per the mechanism provided for in the scheme.

**National Solar Mission ("NSM")**

NSM was approved by the Government of India on November 19, 2009 and launched on January 11, 2010. The target for solar deployment was enhanced to 100 GW of solar power in India by 2022. The target principally comprises 40 GW rooftop solar power projects and 60 GW large and medium scale grid connected solar power projects. In addition, the Government of India on March 22, 2017 sanctioned the implementation of a scheme to enhance the capacity of solar parks from 20,000 MW to 40,000 MW for setting up at least 50 solar parks each with a capacity of 500 MW and above by 2019-2020, which was further extended to 2021-2022.

**Central Electricity Regulatory Commission (Open Access in Inter-State Transmission) Regulations, 2008 ("CERC Open Access Regulations")**

The CERC Open Access Regulations, as amended from time to time, for inter- state transmission provide for a framework which not only facilitates traditional bilateral transactions (negotiated directly or through electricity traders), but also caters to collective transactions discovered in a power exchange through anonymous, simultaneous competitive bidding by sellers and buyers. Applicable to short term open access transactions up to one month at a time, the emphasis of the CERC Open Access Regulations is on scheduling rather than reservation to ensure that the request of an open access customer is included in the dispatch schedules released by RLDCs. Further, certain types of transmission services by payment of transmission charges (to be levied in Rupees per MWh) shall be available to open access customers based on the type of transactions, i.e., bilateral or collective. In addition to transmission charges, certain operating charges shall also be levied. The CERC Open Access Regulations enable entities connected to inter-state transmission as well as intra-state transmission and distribution systems to purchase power from a source other than the incumbent distribution licensee situated outside the relevant State. The CERC Open Access Regulations were last amended in December 2019, establishing procedures for scheduling of transactions in the real-time market.

**Central Electricity Regulatory Commission (Grant of Connectivity, Long-term Access and Medium-term Open Access in inter-State Transmission and related matters) Regulations, 2009 ("CERC Connectivity & Access Regulations")**

The CERC Connectivity & Access Regulations, as amended from time to time, provide a framework for granting connectivity, medium and long-term access to the inter-state transmission system ("ISTS") Any power generating station, including a captive generating plant or a bulk consumer, is authorized to seek connectivity, medium and long-term access to the ISTS in accordance with the provisions made under these Regulations. CERC Connectivity & Access Regulations identifies Central Transmission Utility ("CTU") as the nodal agency for grant of connectivity. With respect to medium and long-term

access to ISTS, CTU is mandated to frame procedures concurrent to the CERC Connectivity & Access Regulations covering all the aspects as envisaged in the CERC Connectivity & Access Regulations in detail. For grant of connectivity, wind and solar based projects are treated differently by CERC Connectivity & Access Regulations, as a separate set of procedures is framed for wind and solar projects safeguarding the interests of renewable energy projects and the transmission system owner.

**Central Electricity Regulatory Commission (Sharing of Inter-State Transmission Charges and Losses) Regulations, 2020 ("CERC Transmission Charges Regulations 2020")**

The CERC Transmission Charges Regulations 2020, as amended on February 7, 2023, provides a framework for sharing of charges among the entities for using the ISTS network. As per the CERC Transmission Charges Regulations 2020, transmission charges and losses for the use of ISTS are not applicable for solar power-based projects whose useful life has been commissioned during the period from July 1, 2011 to June 30, 2023 and for wind power-based projects whose useful life has been commissioned during the period from July 1, 2017 to June 30, 2023. The CERC Transmission Charges Regulations 2020 has come into force from November 1, 2020 and has superseded the CERC Transmission Charges Regulations 2010. The CERC Transmission Charges Regulations 2020 accorded ISTS transmission charges waiver to wind, solar and hydro projects as follows:

- REGS or RHGS based on wind or solar sources or hydro PSP ESS which have declared commercial operation up to June 30, 2025 shall be considered for waiver of transmission charges. for a period of 25 years from date of COD;
- Battery ESS charged with REGS or RHGS based on wind or solar sources which have declared commercial operation up to June 30, 2025 shall be considered for waiver of transmission charges for a period of 12 years from date of COD;
- Hydro generating station where: (a) PPAs are signed on or after December 1, 2022 but on or before June 30, 2025; and (b) construction work is awarded on or before June 30, 2025 shall be considered for waiver of transmission charges under the CERC Transmission Charges Regulations 2020, for a period of 18 years from the date of COD of the hydro generating station post June 30, 2025; and
- ISTS charges shall be levied in a staggered manner with annual increments of 25% post June 30, 2025.

**Central Electricity Regulatory Commission (Deviation settlement Mechanism and related matters) Regulations, 2022 ("F&S Regulations")**

The CERC in these regulations, as amended from time to time, has laid down rules guidelines and standards for maintaining grid discipline and grid security as envisaged under the Grid Code through the commercial mechanism for Deviation Settlement through withdrawal and injection of electricity by the users of the grid including wind and solar based plants connected to an interstate transmission network. The wind and solar generators connected to interstate transmission networks are required to provide a daily 15 minutes' time block wise generation schedule. The schedule may be revised by giving advance notice to the relevant Regional Load Despatch Centre. Any deviations between actual generation with respect to the schedule generation in the 15-minute time block is liable to attract commercial charges as per the formula prescribed in the F&S Regulations.

**Electricity (Timely Recovery of Costs due to Change in Law) Rules, 2021 ("Change in Law Rules")**

The Change in Law Rules, provide the mechanism for adjustment and recovery of monthly tariff or charges upon the occurrence of a change in law (such as change in any domestic tax including duty, levy, cess, or charges as specified under the Change in Law Rules), for the compensation of the affected party to restore such affected party to the same economic position as if such change in law had not occurred. Change in law, as per the Change in Law Rules, unless otherwise defined in the relevant agreement means, any enactment or amendment or repeal of any law, made after the determination of tariff under the Electricity Act, 2003, leading to corresponding changes in the cost requiring change in tariff. Where the relevant agreement does not lay down a formula for calculation of the amount of the impact of a change in law to be adjusted and recovered, such impact shall be calculated in accordance with the formula provided in the Change in Law Rules, which is based on, among other things, the estimated monthly electricity generation, contracted capacity of the power plant as per the agreement, normative plant load factor and capacity utilization factor. The generating company or transmission licensee shall, within thirty days of the coming into effect of the recovery of impact of change in law, furnish all relevant documents along with the details of calculation for adjustment of the amount of the impact in the monthly tariff or charges to the appropriate commission, which shall verify the calculation and adjust the amount of impact within 60 days from the date of receipt of the relevant documents. After such adjustment, the generating company or transmission licensee, as the case may be, shall adjust the monthly tariff or charges annually based on actual amount recovered, to ensure that the payment to the affected party is not more than the yearly annuity amount. The Ministry of Power, pursuant to its circular dated February 21, 2022, clarified that this Change in Law

Rules will be applicable on the events occurred on or after the date of notification of this Change in Law Rules.

**Electricity (Promotion of Generation of Electricity from Must-Run Power Plant) Rules, 2021 ("Must-Run Rules")**

Under the Must-Run Rules, a wind, solar, wind-solar hybrid or hydro power plant (in cases where water levels could lead to flooding risk) or a power plant from any other sources, as may be established from time to time by the relevant governmental authority, that has entered into an agreement to sell electricity to any person is a 'must-run power plant'. A must-run power plant is not subject to reduction or regulation of generation or supply of electricity on account of merit order dispatch or any other commercial consideration, except in the event of technical constraint in the electricity grid or for reasons of security of the electricity grid. In the event of reduced demand by a procurer from a must-run power plant, compensation is payable by the procurer to the must -run power plant at the rates specified in the agreement for purchase or supply of electricity. In the event of any technical constraint in the electricity grid or for reasons of security of the electricity grid, where the procurer notifies the must-run power plant in advance of a reduction, the must-run power plant will sell the electricity not utilized by the procurer on the open market. The amount realized by such must-run power plant from such sale of electricity on the open market, after deducting actual expenses paid for the sale on the open market, if any, shall reduce the compensation payable by the procurer. Amounts owed pursuant to the foregoing will be paid by the procurer on a monthly basis with any offset payment paid by the must-run power plant to the procurer within one month of the close of the fiscal year.

**Electricity (Late Payment Surcharge) Rules, 2022 ("LPS Rules 2022")**

The LPS Rules 2022 were notified by the Ministry of Power on June 3, 2022. The LPS Rules 2022 are applicable for payments to be made in pursuance of power purchase agreements, power supply agreements and transmission service agreements, where tariff is determined under the Electricity Act, 2003, including such agreements which become effective before the LPS Rules 2022 came into force. The LPS Rules 2022 provide that late payment surcharge, that is, the charges payable by a distribution company to a generating company or electricity trader for power procured from it, or by a user of a transmission system to a transmission licensee on account of delay in payment of monthly charges beyond the due date, shall be payable on the payment outstanding after the due date at the base rate of late payment surcharge applicable for the period for the first month of default. The rate of late payment surcharge for the successive months of default shall increase by 0.5% for every month of delay provided that the late payment surcharge shall not be more than 3 percent higher than the base rate at any time and shall not be higher than the rate specified in the agreement for purchase or transmission of power. All payments by a distribution licensee to a generating company or a trading licensee for power procured from it or by a user of a transmission system to a transmission licensee shall be first adjusted towards late payment surcharge and thereafter, towards monthly charges, starting from the longest overdue bill. LPS Rules 2022 also provides for regulation of access to power in case of non-payment of dues within the specified time period. The over-dues of the prior period, i.e., up to June 3, 2022, shall be liquidated through equated monthly installments as per the provision of the LPS Rules 2022.

**Electricity (Promoting Renewable Energy Through Green Energy Open Access) Rules, 2022 ("Green Energy Open Access Rules 2022")**

The Ministry of Power notified the Green Energy Open Access Rules 2022 on June 6, 2022 with the objective of ensuring access to affordable, reliable, sustainable and green energy. The reduction of the open access transaction limit from 1 MW to 100 kW and appropriate provisions for cross-subsidy surcharge, additional surcharge, and standby charge is expected to incentivize consumer access to green energy at reasonable rates.

**Central Electricity Regulatory Commission (Connectivity and General Network Access to the inter-State Transmission System) Regulations, 2022 ("GNA Regulations")**

The CERC issued the GNA Regulations on June 7, 2022, which, when fully implemented, will replace CERC regulations form 2009. The GNA Regulations provide electricity generators with general network access, allowing them to connect to and distribute power through the inter-state transmission system without designating the location of the offtaker. The GNA Regulations also contemplate grant of temporary GNA (T-GNA), which provides an open access right to an eligible buying entity for a duration of up to 11 months.

**Ministry of Environment - E-Waste (Management) Rules, 2022**

These rules apply to every manufacturer, producer refurbishes dismantler and recycler involved in manufacture, sale, transfer, purchase, refurbishing, dismantling, recycling and processing of e- waste or electrical and electronic equipment, including Solar panels/cells, solar Photovoltaic panels/cells/modules under (ii) Consumer Electrical and Electronics and

Photovoltaic.

This rule requires every manufacturer and producer of solar photo-voltaic modules or panels or cells to also:

- Store solar photo-voltaic modules or panels or cells waste generated up to the year 2034 - 2035 as per the guidelines laid down by the CPCB in this regard;
- Ensure that the processing of the waste other than solar photo-voltaic modules or panels or cells;
- Ensure that the inventory of solar photo-voltaic modules or panels or cells shall be put in place distinctly on portal; and
- Comply with standard operating procedure and guidelines laid down by CPCB.

**Ministry of Environment, Forest and Climate Change - Plastic Waste Management Rules, 2016**

These rules apply to every waste generator, local body, village body, manufacturer, importers and producer. The rules do not apply to the export oriented units or units in special economic zones, notified by the Central Government, manufacturing their products against an order for export only.

The waste generator must take steps to minimize generation of plastic waste and segregate plastic waste at source in accordance with the Solid Waste Management Rules, 2000; not litter plastic waste and ensure segregated storage of waste at source; and handover segregated waste to the relevant local body or agencies appointed by them or registered waste pickers', registered recyclers or waste collection agencies.

**Renewable energy certificates ("RECs")**

The CERC notified the Central Electricity Regulatory Commission (Terms and Conditions for Recognition and Issuance of Renewable Energy Certificate for Renewable Energy Generation) Regulations, 2010 ("REC Regulations") on January 14, 2010 and the same was amended on September 29, 2010, July 10, 2013, December 30, 2014 and March 28, 2016. The REC Regulations aim at the development of markets for power from non-conventional energy sources by issuance of transferable and saleable credit certificates. The REC Regulations facilitate fungibility and inter-state transaction of renewable energy with least cost and technicality involved. The CERC has nominated the National Load Dispatch Centre as the central agency to perform certain functions, including, inter alia, registration of eligible entities, issuance of certificates, maintaining and settling accounts in respect of certificates, acting as repository of transactions in certificates and such other functions incidental to the implementation of REC mechanism as may be assigned by the CERC. The REC mechanism provides a market-based instrument which can be traded freely and provides means for fulfillment of RPOs by the distribution utilities/consumers.

**Central Electricity Regulatory Commission (Terms and Conditions for Renewable Energy Certificates for Renewable Energy Generation) Regulations, 2022**

According to the new regulations, renewable energy generating stations, captive generating stations based on renewable energy sources, distribution licensees, and open access consumers are now eligible to issue renewable energy certificates (RECs).

The national load despatch center (NLDC) has been designated the agency to implement these regulations. REC Regulations stipulated the details of Grant of accreditation, Issuance, Exchange, Redemption, Denomination, Pricing and Validity for certificates. CERC has also introduced certificate multiplier for renewable energy generating station, Hydro, municipal solid waste, non- fossil fuel-based cogeneration and biomass and biofuel. Certificate once assigned to a renewable energy generating station, the certificate multiplier will remain valid for 15 years.

**National Wind-Solar Hybrid Policy ("Hybrid Policy")**

MNRE announced the Hybrid Policy on May 14, 2018, with an aim to encourage renewable power generation and promote new projects as well as hybridization of the existing wind and solar projects. The policy was amended on August 13, 2018. The main objective of the Hybrid Policy is to provide a framework for promotion of large grid connected wind-solar photovoltaic hybrid systems for optimal and efficient utilization of transmission infrastructure and land, reducing the variability in renewable power generation and achieving better grid stability.

The implementation of wind solar hybrid systems will be/was on the basis of different configurations and use of technology. The Hybrid Policy mandates the Central Electricity Authority and the CERC to formulate necessary standards and

regulations for wind-solar hybrid systems.

**Guidelines for Tariff Based Competitive Bidding Process for procurement of power from Grid Connected Wind Solar Hybrid Projects, 2020 ("Hybrid Projects Guidelines")**

Pursuant to the Hybrid Policy, a scheme was introduced on May 25, 2018 for setting up of 2500 MW of wind-solar hybrid power projects at a tariff discovered through competitive bidding. The Hybrid Projects Guidelines dated October 14, 2020, as amended, issued by MNRE provides a framework for procurement of electricity from ISTS grid connected wind-solar hybrid power projects and facilitates transparency and fairness in procurement processes. Further, power purchase agreements, ("PPAs") entered into pursuant to these guidelines shall not have a term lesser than 25 years from the COD. These Guidelines have been issued under the provisions of Section 63 of the Electricity Act for long term procurement of electricity, determined through the competitive bidding process, by the procurers, the distribution licensees or an intermediary procurer from Inter State Transmission State grid-connected wind-solar hybrid power projects having individual size of 50 MW and above at one site with minimum bid capacity of 50 MW. The Hybrid Projects Guidelines as amended on March 9, 2022 and November 2, 2022 provide that where the distribution licensee, authorizes any agency to carry out the tendering/bidding process on its behalf then the agency will be responsible for fulfilling all the obligations imposed on the procurer during the bidding phase, in accordance with these Guidelines.

**Approved Models and Manufacturers of Solar Photovoltics Modules (Requirements for Compulsory Registration) order 2019 ("ALMM Order")**

The GoI has introduced a list of approved module suppliers who will be eligible to supply modules to project developers selected to develop solar projects in government projects, government assisted projects, projects under government schemes and programs, open access, net-metering projects, installed in the country, including specified projects set up for sale of electricity to the government. The Ministry of New and Renewable Energy on March 10, 2023 stated that the projects commissioned by March 31, 2024 will be exempted from the requirement of procuring solar photovoltaic modules from the list of approved module suppliers.

**Integrated Day Ahead Market**

Pursuant to a notification dated March 24, 2021, the Ministry of Power, India, an integrated day-ahead market ("Integrated DAM"), is expected to be launched at the power exchanges with separate price formation for power generated from renewable energy and conventional power. According to this notification, the proposed market structure should allow the buyer to meet the RPO target by dire power from the exchange. The notification is proposed to be implemented by June 30, 2021.

**Amendments to the guidelines for tariff-based competitive bidding process for procurement of Round-The-Clock (RTC) power from grid-connected renewable energy (RE) power projects, complemented with power from any other source or storage**

The amendments were notified by the Government of India in February 2022 and provide that the bidding evaluation parameter will be the weighted average levelized tariff per unit supply of RTC power. The bidder will be selected on the basis of the lowest weighted average levelized tariff. If the allocated quantum of power to the bidder is less than the total quantum of power to be contracted, capacity allocation will be on the basis of the bidder's capacity to fill the tendered capacity until it is exhausted. This compares to the previous system wherein the remaining qualifying bidders (except the lowest cost bidder) were asked to match the tariff of the lowest cost bidder.

**Guidelines for Procurement and Utilization of Battery Energy Storage Systems as part of Generation, Transmission and Distribution Assets, along with Ancillary Services**

The guidelines were notified by the Government of India in March 2022 and aim to facilitate the procurement of battery storage systems to be utilized either in combination with renewable energy or as a standalone asset. These guidelines will also play a critical role in achieving the nation's renewable energy and decarbonization goals. Business opportunities identified by the Ministry of Power in this space include BESS coupled with RE and with transmission infrastructure and storage for distribution and ancillary services.

**Revised Scheme for Flexibility in Generation of Thermal/Hydro Power Stations through Bundling with Renewable Energy and Storage Power**

A revised scheme was notified by the Government of India in April 2022. The revisions provide flexibility in generation and scheduling of power from thermal/hydro plants through bundling with renewable energy. This reduces the cost of power and helps distribution companies to meet renewable purchase obligations for distribution licensees to meet a certain minimum quantity of their power requirement from renewable sources.

**Guidelines for Encouraging Competition in Development of Transmission Projects and Tariff based Competitive-bidding Guidelines for Transmission Service, 2021**

The MoP and the GoI issued the Guidelines for Encouraging Competition in Development of Transmission Projects ("CDTP Guidelines") and the Tariff based Competitive-bidding Guidelines for Transmission Service on August 10, 2021 ("TBCB Guidelines"), framed under the provisions of Section 63 of the Electricity Act in order to facilitate the smooth and rapid development of transmission capacity in the country as envisaged in the NEP and the NTP such that inter-state/intra-state transmission projects, other than those exempted by the GoI are implemented through tariff based competitive bidding. The CDTP Guidelines provides for the preparation of a) perspective plan for fifteen years, b) short term plan for five years, both collectively being a part of the National Electricity Plan by the Central Electricity Authority and c) a network plan prepared by the Central Transmission Utility based upon the National Electricity Plan prepared in accordance with the NEP which will be reviewed and updated as and when required but not later than once a year. Information will be made available to the stakeholders regarding new projects and the respective technical and other specifications for the purpose of project formulation and for enabling competitive bidding to take place. In addition, the selection of developers for identified projects would be through tariff based competitive bidding through e-reverse bidding for transmission services according to the TBCB Guidelines. Additionally, the nodal agency shall appoint an independent engineer during the construction phase in accordance with the framework prescribed in the CDTP Guidelines.

The TBCB Guidelines apply to the procurement of transmission services for the transmission of electricity through tariff-based competitive bidding. The TBCB Guidelines aim at facilitating competition through wider participation in providing transmission services and tariff determination through a process of tariff-based bidding.

The TBCB Guidelines provide that a Bid Process Coordinator ("BPC") would be responsible for conducting the bid process for the procurement of the required transmission services for inter-state and intra-state transmission projects to be implemented under the tariff-based competitive bidding process prescribed. For the procurement of transmission services, the BPC shall adopt a single stage two envelope tender process featuring the requirement of a request for proposal with the preparation of bid documents as per the prescribed requirements. The initial price offer submitted online with the request for proposal will be evaluated based on annual transmission charged for all components covered under the package as quoted by the bidder. The bidders will undertake in the prescribed e-reverse bidding process with the minimum of two qualified bidders.

On selection of the bidder and issue of letter of intent from the BPC, the selected bidder shall execute the share purchase agreement to acquire the special purpose vehicle created for the project to become the transmission service provider in accordance with the bid made and consequently execute the transmission service agreement in accordance with the TBCB Guidelines. The transmission service provider shall accordingly be required to make an application for the grant of a transmission license to the appropriate commission within five working days from the date of execution of the share purchase agreement for the acquisition of the special purpose vehicle.

(ii) **Environmental Laws**

The Central Pollution Control Board of India ("CPCB") a statutory organization established in 1974 under the Ministry of Environment, Forest and Climate Change ("MoEF&CC") is responsible for setting the standards for maintenance of clean air and water and providing technical services to the MoEF&CC.

CPCB has classified industrial sectors under the red, orange, green and white categories. The newly introduced white category pertains to those industrial sectors which are practically non-polluting, including solar power generation through photovoltaic cells, wind power projects of all capacities and mini hydroelectric power. In relation to the white category of industries, only intimation to the relevant State Pollution Control Board is required, and there is no requirement to obtain a consent to operate within this category. However, to the extent they are applicable to the entities prescribed under the relevant legislation, the pollution control laws in India must be adhered to.

Solar PV Cell manufacturing plant is covered under the red category and there is a requirement to obtain consent to

operate in this category.

### *National Action Plan on Climate Change*

The National Action Plan on Climate Change, or the "NAPCC," issued by the Government of India in 2008 has recommended that the national renewable energy generation standard be set at 5% of total grid purchase and that it be increased by 1% each year for ten (10) years, with the option for the SERCs to set higher minimum percentages than 5%, to ensure that by 2020, 15% of the total power capacity is generated from renewable energy sources. NAPCC also recommends imposition of penalty under the Electricity Act in case of utilities falling short to meet their RPOs.

### *National Wind Mission*

In order to boost electricity generation from on-shore and off-shore wind sources, ensure certainty for stakeholders and capacity building, the MNRE has formulated the National Wind Mission, which provides for, inter alia, single window clearance for wind energy projects, land allocation mechanisms, tariff and financing mechanisms.

### *Green Hydrogen Policy*

In January 2023, the Ministry of New and Renewable Energy Green Hydrogen Mission was notified to produce 5 MMT of Green Hydrogen per annum by 2030, with potential to reach 10 MMT per annum. The Mission will support replacement of fossil fuels and fossil fuel based feedstocks with renewable fuels and feedstocks based on Green Hydrogen. This will include replacement of hydrogen produced from fossil fuel sources with Green Hydrogen in ammonia production and petroleum refining, blending Green Hydrogen in city gas distribution systems, production of steel with Green Hydrogen, and use of Green Hydrogen-derived synthetic fuels (including Green Ammonia, and Green Methanol) to replace fossil fuels in various sectors including mobility, shipping, and aviation. The Mission also aims to make India a leader in technology and manufacturing of electrolysers and other enabling technologies for Green Hydrogen.

### *Energy Conservation (Amendment) Bill, 2022*

The Energy Conservation (Amendment) Bill, 2022 was passed in December 2022, with the intention of encouraging the use of biofuels, green hydrogen and other renewable energy sources, as well as promoting the trading of carbon credits.

The bill includes the following key provisions:

1. Mandating minimum use of non-fossil fuel sources for industries (mining, steel, cement, textile, chemicals and petrochemicals) and commercial buildings.
2. Enabling government authorities to specify a system for trading carbon credits and for carbon markets.
3. Enhancing the scope and coverage of the Energy Conservation Building Code

### *Measures to promote Hydropower:*

In March 2019, the Government of India issued measures to promote hydropower including:

1. Declaring Large Hydropower Projects (>25 MW) as renewable energy.
2. Rationalizing hydropower tariff.
3. Budgetary support for flood moderation and Storage Hydro Electric Projects (HEPs).
4. Budgetary Support for enabling infrastructure.

**II. OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

*The following discussion of our business, financial condition and results of operations should be read in conjunction with our consolidated financial statements and the related notes included elsewhere in this annual report. This discussion contains forward-looking statements and involves numerous risks and uncertainties, including, but not limited to, those described in "Risk Factors" and elsewhere in this annual report. Actual results could differ materially from those contained in any forward-looking statements.*

**A. Overview**

We are committed to remain a leader and pioneer of the renewable energy market in India. We sell renewable power to our customers in India on long term fixed price contracts, in many cases at prices at or below prevailing alternatives for our customers. Our financial strategy is to build our renewable energy assets with the most efficient cost of capital available to us. Since we have engineering, procurement and construction as well as O&M capabilities in-house, we retain the value creation at all stages of development and operation. Through value engineering, operational performance monitoring and efficient financial strategy, we are able to deliver cost-effective energy to our customers.

We recognize revenue monthly, from renewable energy sold to our customers on a per kilowatt hour basis for the electricity supplied by our renewable power plants. We sell renewable energy based on terms in Power Purchase Agreements or "PPAs".

The energy output of our plants is dependent in part on the quantum of solar irradiation at plant locations. As a result, our revenue is impacted by seasonal patterns such as shorter daylight hours in winters as well as daily and annual fluctuation in insolation. Typically, our plant load factor, or "PLF", from operational solar power plants is lowest in the third quarter and highest in the first quarter of any given fiscal year (which ends on March 31).

A significant portion of the cost of our solar power plants consists of solar photovoltaic panels (or solar modules as they are called generally), inverters and other plant equipment. Other less significant costs include the cost of land or leasehold land costs, and installation costs. Our cost of operations primarily consists of expenses pertaining to operations, maintenance and insurance of our solar power plants. These expenses include payroll and related costs for plant maintenance staff, plant maintenance, insurance and, if applicable, lease costs. The cost of financing is a significant element in the overall cost of development and operations.

Under U.S. GAAP, we depreciate the capital cost of solar power plants over the estimated useful life of 25-35 years. We typically fund our projects through a mix of project finance and sponsor equity. Our project financing agreements typically restrict the ability of our project subsidiaries to distribute funds to us unless specific financial thresholds are met on specified dates. Some of our project finance borrowings are denominated in U.S. dollars, while we seek to hedge, fluctuations in the U.S. dollar exchange rate, any unhedged foreign currency exchange exposure can adversely impact our profitability. We seek to finance longer term and at fixed rates, but some of our borrowings have variable interest rates and changes in such rates may lead to an adverse effect on our overall cost of capital.

We use certain financial and non-financial non-U.S. GAAP measures to provide a comparison of our performance. The non-financial metrics include electricity generation, PLF, MW operating, MW Contracted & Awarded and MW Operating, Contracted & Awarded. We also use certain non-U.S. GAAP financial metrices such as Cost per MW operating, portfolio revenue run-rate, Adjusted EBITDA and Cash Flow to Equity to provide a comparison of our financial results. We use non-financial metrics that are commonly used in the industry to help users compare us with our peers and better demonstrate growth in terms of our current capacity, as well as our future capacity. We understand that non-U.S. GAAP measures helps investors compare our performance period over period and assess how we have improved productivity in reducing the cost of building a plant through cost per megawatt as well as measure the output of the plants through PLFs. The non-financial metrics are used by analysts and investors in arriving at a fair valuation of the Company by projecting future revenue as well as predicting the results of the company.

We classify a financial measure as being a non-U.S. GAAP financial measure if that financial measure excludes or includes amounts, or is subject to adjustments that have the effect of excluding or including amounts, that are not included or excluded in the most directly comparable measure calculated and presented in accordance with U.S. GAAP as in effect from time to time in the United States in our statements of operations, balance sheets or statements of cash flows. The non-U.S. GAAP financial measures are supplemental measures that are not required by, or are not presented in accordance with, U.S.

31

GAAP. Non-U.S. GAAP financial measures do not include operating, other statistical measures or ratios calculated using exclusively financial measures calculated in accordance with U.S. GAAP. Moreover, the way we calculate the non-U.S. GAAP financial measures may differ from that of other companies reporting measures with similar names, which may limit these measures' usefulness as a comparative measure.

**Certain Factors affecting our Results**

*Late filing of this Form 20-F and NYSE delisting*

We did not file our annual report on Form 20-F for fiscal 2022 (the "2022 Form 20-F") and Fiscal 2023 including interim filings by the timelines required under SEC rules. In accordance with SEC rules, we are now unable to file new Form F-3 registration statements (including shelf registration statements) until such time we have timely filed all required SEC reports for 12 calendar months.

The NYSE suspended trading of our shares on July 13, 2023 due to our failure to timely file our periodic reports, including 2022 Form 20-F, in violation of their listing rules. We are appealing the NYSE's decision, but, if our appeal is unsuccessful, our shares will be delisted, and no further trading on the NYSE will be possible. Consequently, our shares are only available to trade on the over-the-counter (or OTC) "expert" market, where quotations only will be directly available to broker dealers and professional investors (not to retail investors).

See "*Risk Factors - The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares.*"

*Cashflow and Liquidity Position:*

Our expansion plans in Fiscal 2024, if consummated, will require additional financing. We expect to incur substantial capital expenditure as well as operating and financial expenses, and, if so, our cash reserves and cash flow from operations may be insufficient to meet our planned obligations. Our ability to obtain additional financing on favorable terms, if at all, will depend on several factors, including our future results of operations, financial condition and cash flows, the amount and terms of existing indebtedness, general market conditions and market conditions for financing activities and the economic, political and other conditions in the markets where we operate. Our ability to raise financing on acceptable terms also depends on our credit ratings and may also be affected by the failure to deliver audited consolidated financial statements and the financial statements of subsidiaries and restricted borrowing groups in accordance with financing documents. We can make no assurances that we will be able to raise additional financing on acceptable terms in a timely manner or at all. Failure to obtain additional financing on acceptable terms and in a timely manner could adversely affect our business, results of operations, financial condition and cash flows. See "Risk Factors – Our cash reserves and cash flows may be insufficient to meet our working capital requirements and expansion plans absent further financing. Accordingly, our failure to obtain additional financing on acceptable terms and in a timely manner could materially and adversely affect our financial condition."

*Defaults under our Loan Agreements:*

Timely submission of financial statements of the Group, our subsidiaries and/or our subsidiary restricted groups is a key covenant in most of our financing agreements. Due to our inability to meet these covenants to date in respect of Fiscal 2022 and Fiscal 2023 (and interim periods therein), we secured extensions from our lenders in respect of these covenants until June 30, 2023 and July 15, 2023 (in one case). We have requested each of the applicable lenders for a further extensions until October 31, 2023, for submission of our financial statements for Fiscal 2022, and until December 31, 2023, for submission of our financial statements for Fiscal 2023.

While we received the requested extensions from several lenders, we have not yet received the requested extensions from lenders representing INR 14,089 million (US$ 185.7 million) of our external indebtedness. In this regard, our auditors have provided in their audit report that these "events raise a substantial doubt about the Company's ability to continue as a going concern." See "Consolidated Financial Statements - Report of Independent Registered Public Accounting Firm" on page F-2.

The Company is currently under discussions with its lenders to obtain the requisite extensions and expects to receive them in due course. The lenders who have not granted such extensions have rights under the respective financing agreements to take actions including (but not limited to) acceleration of the repayment of all or some of the indebtedness owed to them and/or security enforcement under the terms of the applicable financing agreements. Any such actions by lenders also could result in cross-defaults or cross-accelerations of other indebtedness and could materially and adversely affect our business, results of operations, financial condition and cash flows.

In addition, due to our inability to meet these information covenants to date, some of our lenders have started charging us penalty interest rates. In addition, in some of our borrowing facilities, the lenders have also revised the rate of interest upward due to delay in Fiscal 2022 audited financial statements and our downgrade in credit ratings. These penal rates of interest and higher rates of interest have increased our finance costs for the projects to which these loans relate. While the penal interest

may cease to be charged upon finalization and submission of the delayed financial statements, the rate of interests which have been revised upwards may not be reverted to pervious levels, and, therefore, may result in continued higher cost of funds for our debt borrowings for these projects.

*Credit Rating Downgrades:*

Most of our external borrowings are required to be rated by accredited credit rating agencies. In Fiscal 2023 and Fiscal 2024, the rating agencies Fitch Ratings, Moody's Investor Service, CRISIL and Care Ratings have each downgraded or announced a review of credit ratings with negative implications of the credit ratings of one or more of our subsidiaries. Downgrades in our credit ratings and other factors have led to interest rate increases in respect of some of our certain of our borrowings which has increased our financing costs and other similar interest rate increases are possible.

The table below sets forth our ratings and downgrades in Fiscal 2023 and Fiscal 2024 with respect to various borrowings.

| Borrower or Borrower Group | Borrowing | Rating Agency | Downgrade Action |
|---|---|---|---|
| Azure Power India Private Limited | Long term & Short term | CRISIL | On December 23, 2022, long term downgraded to A+ (from AA-) and short term downgraded to A1 (from A1+) |
| | | | On May 29, 2023 long term downgraded to A (from A+) |
| | | | On July 11, 2023, long term downgraded to BBB+ (from A) and short term downgraded to A2 (from A1). |
| Azure Power India Private Limited | Long term & Short term | CARE | On December 27, 2022, long-term to A+ (from AA-) |
| | | | On May 15, 2023, long-term downgraded to A (from A+) and short term downgraded to A1 (from A1+) |
| | | | On July 15, 2023, long-term downgraded to BBB+ (from A) and short term downgraded to A2 (from A1). |
| Azure Power Maple Private Limited | Long Term | CRISIL | On December 23, 2022, long term downgraded to A (from A+) |
| | | | On May 29, 2023 long term downgraded to A- (from A) |
| | | | On July 11, 2023, long term downgraded to BBB+ (from A-) |
| Azure Power Forty Three Private Limited | Long Term | CRISIL | On December 23, 2022, long term downgraded to A+ (from AA-) |
| | | | On May 29, 2023 long term downgraded to A (from A+) |
| | | | On July 11, 2023, long term downgraded to BBB+ (from A) |
| Azure Power Forty Private Limited | Long Term | CRISIL | On December 23, 2022, long term downgraded to A (from A+) |
| | | | On May 29, 2023 long term downgraded to A- (from A) |
| | | | On July 11, 2023, long term downgraded to BBB+ (from A-) |
| Azure Power Forty Private Limited | Long Term | CARE | On Feb 13, 2023 long term downgraded to A- (from A) |
| | | | On July 18, 2023, long term downgraded to BBB (from A-) |
| Azure Solar Private Limited | Long Term | CARE | On July 18, 2022, long term downgraded to A (from AA-) |
| Azure Power (Rajasthan) Private Limited | Long Term | CARE | On July 18, 2022, long term downgraded to A (from AA-) |
| Azure Power Jupiter Private Limited | Long Term | CARE | On July 18, 2022, long term downgraded to A (from AA-) |
| Restricted Group - II | Long Term | Fitch | On January 16, 2023, long term downgraded to BB- (from BB) |
| | | | On June 26, 2023, long term downgraded to B (from BB-) |

33

| | | | On January 16, 2023, long term downgraded to Ba2 (from Ba1) |
|---|---|---|---|
| Restricted Group – II | Long Term | Moody's | On May 29, 2023, long term downgraded to Ba3 (from Ba2) |
| | | | On July 14, 2023, long term downgraded to B1 (from Ba3) and withdrawn |
| Restricted Group - III | Long Term | Fitch | On January 16, 2023, long term downgraded to BB (from BB+) |
| | | | On June 26, 2023, long term downgraded to B (from BB) |
| Restricted Group - III | Long Term | Moody's | On January 16, 2023, long term downgraded to Ba3 (from Ba2) |
| | | | On May 29, 2023, long term downgraded to B1 (from Ba3) |
| | | | On July 14, 2023, long term downgraded to B2 (from B1) and withdrawn |

*Our rated borrowing as set forth in the table above, remain on negative credit outlook by each of the respective credit rating agencies, and, accordingly, further ratings downgrades could be announced by such agencies at any time.*

*See "Risk Factors - Any downgrade of our credit rating may result in increase in interest cost or may trigger covenant defaults under our loan agreements."*

***Whistle-blower Allegations and Special Committee Investigation:***

***We have conducted investigations into whistle-blower claims and learned of other allegations in June, July, and October 2021 against certain directors, officers and employees and former officers and directors of the Company.***

In June and July 2021, we received whistle-blower complaints alleging corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, payment of kickbacks, and improper conduct by our sales team (this specific allegation was later determined to be a hoax). Our Ethics Committee, supervised by the Board's Audit and Risk Committee and with the support of outside counsel and forensic accounting professionals, conducted a fulsome investigation into these allegations and found none to be substantiated. We nonetheless implemented enhancements to our compliance program recommended by our advisors after the investigations had concluded.

In addition, on October 1, 2021, the Enforcement Directorate of India filed a Prosecution Complaint with a special court in New Delhi in respect of an earlier Enforcement Case Information Report. Our former Group Chief Financial Officer and current Chief Financial Officer of our subsidiary APIPL, Mr. Pawan Kumar Agrawal, is one of the individuals named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. The relevant transactions that are the subject of the complaint predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of the Company, and the criminal charges are not directed at, and do not concern, the Company or its subsidiaries. We will continue to monitor the proceedings as Mr. Agrawal defends the charges made against him.

***We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities.***

In May 2022, we received a whistle-blower complaint that alleged health and safety lapses, procedural irregularities, misconduct by certain employees, improper payments and false statements relating to one of our projects belonging to a project subsidiary. Following extensive investigation by the Ethics Committee, supervised by the Board's Audit and Risk Committee and by external counsel and forensic professionals, we identified evidence of manipulation and misrepresentation of project data by some employees at that project site. Weak controls over payments to a vendor and failures to provide accurate information both internally and externally were found, but no direct evidence that any improper payment was made to any government official was identified. Further, in Fiscal 2023, we reported to SECI that this project had (i) shortfalls in generation and (ii) that it failed to timely complete and commission the requisite contractually required capacity. On January 3, 2023 and January 4, 2023, SECI advised us, inter alia, that the project may be liable for damages and penalties for shortfalls in generation

and for not commissioning the full capacity required under its PPA in a timely manner.

In September 2022, we received an additional whistle-blower complaint containing similar allegations of misconduct as the May 2022 complaint, as well as allegations of misconduct related to joint ventures and land acquisition, allegations of our failure to be transparent with the market and advisors and other allegations. The Ethics Committee, supervised by the Board's Audit and Risk Committee, with the support of external counsel and forensic accounting professionals, investigated these September 2022 allegations. The investigation of the September 2022 complaint identified significant control issues in the process of acquiring land and land use rights in relation to one of our projects. The investigation concluded that third party land aggregators may have been involved in improper payments but no improper transfer of money by the Group was identified. We have made an adjustment (de-capitalization) in the books of accounts of INR 135 million (US$ 1.8 million) on estimate, as a prudent measure in the given project. Further, we have reviewed the entire amount paid to land aggregators in other projects to identify any similar issue and after an assessment a further adjustment (decapitalisation) aggregating to INR 118 million (US$ 1.6 million) has been made in the books of account on estimate, as a prudent measure, though no improper payments by the Group could be identified.

We also identified potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project. In addition, it appears our former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project. We were not able to identify any evidence of improper payments related to either of these transactions. Considering the observations regarding the transactions, we have reassessed the valuation of the asset purchase and related government orders and did not find any adjustment that needed to be made in the books of account.

Our investigation did not substantiate other portions of this September 2022 whistle-blower complaint.

As part of our investigations of the May 2022 and September 2022 whistle-blower complaints, we also widened our review to include a review of projects commissioned in Fiscal 2022 and Fiscal 2023 to ensure that similar weaknesses were not present. As part of our investigations, we identified inconsistencies in project data in certain of our projects, but we identified no improper payments made in connection with these projects.

We have taken a range of actions due to these findings, and the employees involved in the misconduct are no longer associated with us. In accordance with the recommendations of the Ethics Committee, the Board's Audit and Risk Committee and their legal and forensic advisors, we are implementing remedial measures in both project control and monitoring. Further, we reported the findings from its investigations of the May 2022 and September 2022 whistle-blower complaints to the SEC and the U.S. Department of Justice, and we continue to cooperate with these authorities.

In addition, a Special Committee of the Board of Directors (the "Special Committee") was convened in August 2022 to review certain material projects and contracts over a three-year period for anti-corruption and related compliance issues. Independent outside counsel and forensic advisors were engaged to support the Special Committee. The Special Committee's investigation has identified evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project but no related improper payments or transfers by the Group have been identified. The Special Committee's review and its findings could impact our decision-making in connection with such projects. We have disclosed the details of the Special Committee's investigation to the SEC and the U.S. Department of Justice, and we continue to cooperate with those agencies.

Our Group including our subsidiaries with respect to affected projects could be exposed to liabilities under the relevant contractual and tender documents (including levy of damages and liquidated damages, reduction of PPA tariffs and/or short closure of capacity), administrative actions (including the risk of PPA cancellation, risk of being debarred from SECI's future contracts, withdrawal or nullification of commissioning certificates and/or revocation of commissioning extensions) and penalties from customers and other civil liabilities, all of which could adversely impact the revenue, profitability and capitalization of the affected projects. In addition, fines and/or penalties by regulatory authorities (including by the SEC, the U.S. Department of Justice and applicable Indian regulatory authorities) could be imposed on us. Any such fines or penalties could materially and adversely affect our business, results of operations, financial condition and cash flows in future periods. In addition, we could be exposed to future litigation in connection with any findings of fraud, corruption, or other misconduct by our employees and former employees and executives.

For further information on the liabilities associated with the May 2022 and September 2022 whistle-blower complaints and the Special Committee investigation, see "Our Consolidated Financial Statements as of, and for the year ended,

March 31, 2022, Note 27 – Whistle-blower Allegations and Special Committee Investigations".

*Projects under execution:*

In Fiscal 2023, the economics of projects currently under execution by us, have deteriorated given geo-political constraints and inflation in the supply chain, particularly in module prices, higher interest rates and a strong U.S. dollar.

We are conducting an ongoing review of our projects under contract to consider their commercial and economic viability. We also have reviewed our projects including those under review by the Special Committee with respect to improper payment allegations and related compliance issues. *For more information, see below "- We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities*."

In respect of our 2,333 MW projects in the state of Andhra Pradesh as part of its awarded 4,000 MW manufacturing linked projects, two Public Interest Litigations ("PILs") were filed in the High Court of Andhra Pradesh in Fiscal 2022, challenging various aspects of the manufacturing linked tender and seeking to quash the Andhra Pradesh Regulator's approval for procurement of capacity tied up by Andhra Pradesh Discoms with SECI pursuant to the tender. The tariff adoption for the capacities by the Central Electricity Regulatory Commission is subject to the outcome of the PILs. We are not a party to the PILs, and the PILs currently are pending adjudication. As a result of these PILs and because the tariffs have been conditioned on the outcome of the PILs, we have not initiated project execution including land acquisition and procurement. Given uncertainties, we initiated discussions with SECI regarding the 2,333 MW projects and have requested that SECI work with us toward a resolution of the matter through reallocation of the capacity to another state, termination of the PPAs or other resolution. In a letter received in August 2023, SECI has requested that we comply with the provisions of our PPA with SECI. We continue to engage with SECI on this matter and look toward a fair resolution. If were unable to resolve the matter with SECI, we could face claims under our PPA with SECI, which could materially and adversely affect our business and subject us to damages or other liabilities that could adversely affect our results of operations and financial condition in future periods.

We continue to consider and manage all of our projects under execution in view of these developments.

*General and administrative expenses (excluding Stock Appreciation Right (SAR) expenses):*

The consolidated general and administrative expenses (excluding SAR expenses) in Fiscal 2022 were higher than our consolidated general and administrative expenses (excluding SAR expenses) in Fiscal 2021 primarily due to higher legal and accounting costs related to whistle-blower and other investigations and legal costs related to defending various litigation matters. See "Whistle-blower Allegations and Special Committee Investigation" above. While we expect that such higher costs will adversely affect our operating results and cashflow in Fiscal 2023, we expect our SARs expenses to be lower than Fiscal 2022.

*Operational update on Assam project:*

In May 2022, portion of our 25 MW Assam project (Region 4) was severely affected by floods and other climatic hazards and was not operation from May 2022 to February 2023. The cost of restoration work was approx. INR 210 million (US$ 2.8 million) and total admissible insurance claim was INR 392 million (US$ 5.2 million) including business interruption. We consider these events to be a force majeure under the PPA. We formally informed the force majeure event to offtaker i.e. Assam Power Distribution Company Limited ("APDCL") vide our letter dated May 17, 2022. There is no formal acceptance of force majeure from APDCL, however, there is no penalty imposed for this period due to non-availability of plant.

*Rooftop Portfolio and Radiance:*

In April 2021, the Company has entered into an agreement with Radiance to sell certain subsidiaries (the "Rooftop Subsidiaries") with an operating capacity of 153 MW (the "Rooftop Portfolio") for INR 5,350 million, subject to certain

purchase price adjustments (the "Rooftop Sale Agreement"). Pursuant to the Rooftop Sale Agreement, Radiance was to acquire 100% of the equity ownership of the Rooftop Subsidiaries owned by the Group. The Company had recognized an impairment loss in relation to the Rooftop Subsidiaries aggregating to INR 3,255 million during the year ended March 31, 2021.

As on September 30, 2023, we received aggregate sale proceeds of INR 1,412 million (excluding working capital support reimbursed by Radiance), and we had transferred 66.5 MWs out of the total portfolio of 153 MWs. Out of this 66.5 MW, 33.2 MWs were from RG-II entities, for which we transferred a 48.6% shareholding to Radiance pursuant to the terms of the Green Bond Indentures, and the remaining 51.4% will be transferred to Radiance only after refinancing of the RG-II bonds. In August 2021, post refinancing of 5.5% Senior Notes and repayment of loan relating to one of a rooftop project of 10 MW, the restriction on transfer of shareholding was released. For another 16 MWs, which is the Delhi Jal Board rooftop project, a 49% shareholding was transferred to Radiance and the remaining 51% will be transferred in 2024 after compliance with equity lock-in conditions under the applicable PPA. The transfer of ownership of these portfolios is not anticipated to occur within 12 months due to these restrictions.

Further, subsequent to year end, Company has transferred 100% shareholding in relation to 2.5 MW operating capacity.

The Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the remaining un-transferred 86.5 MW portfolio to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement.

## **COVID-19**

In Fiscal 2021 and Fiscal 2022, COVID-19 and related lockdowns, especially in China, impacted our supply of components and raw materials for our projects. Our contracts with our suppliers and contractors all contain provisions for force majeure. In Fiscal 2021 and Fiscal 2022, due to the impact of COVID -19 related lockdowns in India and other parts of the world some of our suppliers issued force majeure notices to us requesting a suitable time extension for delivery.

During Fiscal 2021, under the MNRE's direction, lockdowns due to COVID-19 were treated as force majeure events and blanket time-extension of 5 months were provided to all renewable energy projects. During the second wave of the COVID-19 pandemic in India at the start of Fiscal 2022, MNRE through its notifications dated May 12, 2021 and June 29, 2021, granted a further time-extension of 2.5 months (corresponding to the period from April 1, 2021 to June 15, 2021), for projects having their scheduled commissioning date (SCOD) on or after April 1, 2021, provided such time-extensions are not used as a ground for claiming termination of a PPA or for claiming any increase in the project cost. MNRE through its notification dated September 15, 2021, further clarified that the time-extension given for 2.5 months is an out-of-contract concession and can be claimed by renewable energy project developers and EPC contractors, provided that they do not claim any increase in project cost on account of this 2.5 months' time extension. Subsequently, MNRE through its notification dated November 3, 2021 clarified that, change-in-law event shall continue to be governed by the provisions of the governing PPA and as decided by the appropriate commission. Further, MNRE though another notification, dated November 3, 2021, empowered its Dispute Resolution Committee to consider any additional time extension requirement in exceptional circumstances on account of disruptions into supply of imported solar PV modules and make a recommendation to MNRE on a case-to-case basis.

**Key Operating Metrics**

*Megawatts Operating and Megawatts Contracted & Awarded*

We measure the rated capacity of our plants in megawatts. Rated capacity is the expected maximum output that a power plant can produce without exceeding its design limits. We believe that tracking the growth in aggregate megawatt rated capacity is a measure of the growth rate of our business.

*Megawatts Operating* represents the aggregate cumulative megawatt rated capacity of solar power plants that are commissioned and operational as of the reporting date.

*Megawatts Contracted & Awarded* represents the aggregate megawatt rated capacity of renewable power plants which include (i) PPAs signed with customers, and (ii) capacity won and allotted in auctions and where LOAs have been received but does not include the commissioned and operational capacity as of the reporting date.

The following table represents the megawatts Operating and megawatts Contracted & Awarded, which together are also called our total Portfolio, as of the end of the respective periods presented:

| | As of March 31, | | |
|---|---|---|---|
| | **2020** | **2021*** | **2022**#** |
| Megawatts Operating | 1,808 | 1,990 | 2,752 |
| Megawatts Contracted & Awarded | 5,307 | 4,965 | 4,759 |
| Megawatts Operating, Contracted & Awarded | **7,115** | **6,955** | **7,511** |

\* *In Fiscal Year 2021, we identified certain subsidiaries to sell off on a going concern basis, which currently form part of our Rooftop business. Out of this identified portfolio, during the current year in April 2021, we executed a contract with Radiance to sell certain subsidiaries having an operating capacity of 153 MW. Hence, we have not considered this rooftop portfolio capacity for reporting under total portfolio as at year end.*

\*\* *Out of the identified rooftop portfolio of 153 MW, the Company has already transferred 17.3 MW to Radiance, 33.2 MW will be transferred to Radiance after refinancing of the RG-II bonds and 16 MW will be transferred to Radiance post March 31, 2024. Hence, we have not considered these rooftop portfolios of 66.5 MW for reporting under its total portfolio as at year end. The Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the remaining un-transferred 86.5 MW portfolio to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement. Hence, portfolio of 86.5 MW have been considered for reporting under total portfolio as at year end.*

\# *Adjusted for inconsistencies in MWs reported as identified by the Group through its review of 2022 whistle-blower allegations. See "Whistle-blower Allegations and Special Committee Investigation" section for details.*

As of March 31, 2023, the Company had operating capacity of 3,041 megawatts and we do not expect commissioning of any further projects during Fiscal Year 2023-24. Therefore, we expect to have megawatts operating of 3,041 MW by March 31, 2024.

*Plant Load Factor ("PLF")*

Plant load factor, or PLF, is the ratio of the actual output of all our power plants, including rooftop portfolio, over the reporting period to their potential output if it were possible for them to operate at full rated capacity. The PLF is not the same as the availability factor. Our power plants have high availability, that is, when the sun is shining our plants are almost always able to produce electricity. The variability in our PLF is a result of seasonality, weather, air pollution, rotation of the earth, equipment efficiency losses, breakdown of our transmission system and grid unavailability. We compute PLF on the basis of PPA capacity in AC or alternate current, which is generally lower than the actual installed capacity in DC or direct current.

We track PLF as a measure of the performance of our power plants. It indicates effective utilization of resources and validates our value engineering and operations research. Higher PLF at a plant indicates increased electricity generation. Monitoring PLF on real time allows us to respond rapidly to potential generation anomalies. PLF in AC was 21.6% for Fiscal Year 2022 compared with 20.9% for FY 2021, higher primarily due to greater optimization in our new plants and by adding additional DC capacity to our existing facilities.

|  | Fiscal Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | **2020** | **2021** | **2022** |
| Plant Load Factor (AC) (%) | 19.5 | 20.9 | 21.6 |

*Electricity Generation*

Electricity generation represents the actual amount of power generated by our power plants including rooftop portfolio over the reporting period. This is a measure of the periodic performance of our power plants.

|  | Fiscal Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | **2020** | **2021** | **2022** |
| Electricity Generation (kilowatt hours in millions) | 2,870 | 3,495 | 4,551 |

*Summary of Operating Metrics*

| Key metrics | Unit of Measurement | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 |
| --- | --- | --- | --- | --- |
| Electricity generation | kWh in millions | 2,870 | 3,495 | 4,551 |
| Plant load factor | % | 19.5 | 20.9 | 21.6 |
| MW Operating | MW | 1,808 | 1,990 | 2,752 |
| MW Contracted & Awarded | MW | 5,307 | 4,965 | 4,759 |
| MW Operating, Contracted & Awarded | MW | 7,115 | 6,955 | 7,511 |

**Key Financial Metrics**

*Adjusted EBITDA*

Adjusted EBITDA is a non-U.S. GAAP financial measure. We present Adjusted EBITDA as a supplemental measure of our performance. This measurement is not recognized in accordance with U.S. GAAP and should not be viewed as an alternative to U.S. GAAP measures of performance. The presentation of Adjusted EBITDA should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

We define Adjusted EBITDA as net loss/(income) plus (a) income tax expense/(benefit), (b) interest expense, net, (c) depreciation and amortization (d) loss/(gain) on foreign currency exchange (net) I other expense/(income) and (f) Impairment loss. We believe Adjusted EBITDA is useful to investors in assessing our ongoing financial performance and provides improved comparability between periods through the exclusion of certain items that management believes are not indicative of our operational profitability and that may obscure underlying business results and trends.

Adjusted EBITDA is also used by securities analysts, lenders and others in their evaluation of different companies because it excludes certain items that can vary widely across different industries or among companies within the same industry. For example, interest expense can be highly dependent on a company's capital structure, debt levels and credit ratings. Therefore, the impact of interest expense on earnings can vary significantly among companies. In addition, the tax positions of companies can vary because of their differing abilities to take advantage of tax benefits and because of the tax policies of the various jurisdictions in which they operate. As a result, effective tax rates and tax expense can vary considerably among companies.

Adjusted EBITDA has limitations as an analytical tool, and one should not consider it in isolation or as a substitute for analysis of our results as reported under U.S. GAAP. Some of these limitations include:

- it does not reflect cash expenditures or future requirements for capital expenditures or contractual commitments or foreign exchange gain/loss;

- it does not reflect changes in, or cash requirements for, working capital;
- it does not reflect significant interest expense or the cash requirements necessary to service interest or principal payments on our outstanding debt;
- it does not reflect payments made or future requirements for income taxes; and
- although depreciation, amortization and impairment are non-cash charges, the assets being depreciated and amortized will often have to be replaced or paid in the future and Adjusted EBITDA does not reflect cash requirements for such replacements or payments.

Investors are encouraged to evaluate each adjustment and the reasons we consider it appropriate for supplemental analysis.

The following table presents a reconciliation of net (loss)/profit to Adjusted EBITDA:

| | Fiscal Year Ended March 31, | | | |
| | 2020 | 2021 | 2022 | |
| | INR | INR | INR | US$ |
| | | (in millions) | | |
| Net loss | (2,337) | (4,201) | (2,126) | (27.8) |
| Income tax expense | 489 | 296 | 1,316 | 17.3 |
| Interest expense, net | 7,962 | 8,410 | 11,930 | 157.2 |
| Other (income)/expense, net | (96) | 18 | 3 | 0.0 |
| Depreciation and amortization | 2,860 | 3,202 | 3,667 | 48.3 |
| Impairment loss/(reversal) | — | 3,255 | (80) | (1.1) |
| Loss/(gain) on foreign currency exchange (net) | 512 | 7 | (33) | (0.4) |
| **Adjusted EBITDA** | **9,390** | **10,987** | **14,677** | **193.5** |

(1) Translation of balances in the financial information table above from INR into US$, as of and for Fiscal Year 2022, are solely for the convenience of the readers and were calculated at the rate of US$1.00 = INR 75.87, the noon buying rate in New York City for cable transfers in non-U.S. currencies, as certified for customs purposes by the Federal Reserve Bank of New York on March 31, 2022. No representation is made that the INR amounts could have been, or could be, converted, realized or settled into US$ at that rate on March 31, 2022, or at any other rate.

### *Project Cost per Megawatt Operating*

Project cost per megawatt operating consists of the total project cost including solar photovoltaic panels, inverters, balance of plant equipment, freehold land or leasehold land, capitalizable financing costs, and installation costs incurred for installing one megawatt of DC capacity during the reporting period. A reduction in project cost per megawatt helps reduce the cost of power and thereby improves our ability to win new projects.

| | Fiscal Year Ended March 31, | | |
|---|---|---|---|
| | **2021** | **2022** | |
| | **INR** | **INR** | **US$** |
| | | **(in millions)** | |
| **Including Safeguard Duty:** | | | |
| Cost per MW (AC) | 42.9 | 43.1 | 0.57 |
| Cost per MW (DC) | 28.8 | 33.5 | 0.44 |
| **Excluding Safeguard Duty:** | | | |
| Cost per MW (AC) | 40.1 | 42.4 | 0.56 |
| Cost per MW (DC) | 26.1 | 32.9 | 0.43 |

Cost per MW has increased in current year as compared to previous year primarily on account of increase in module prices.

*Cash Flow to Equity ("Cfe")*

Cash Flow to Equity is a Non- U.S.GAAP financial measure. We present Cfe as a supplemental measure of our performance. This measurement is not recognized in accordance with U.S. GAAP and should not be viewed as an alternative to U.S. GAAP measures of performance. The presentation of Cfe should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

We believe U.S. GAAP metrics, such as net income (loss) and cash from operating activities, do not provide the same level of visibility into the performance and prospects of our operating business as a result of the long-term capital-intensive nature of our businesses, non-cash depreciation and amortization cash used for debt servicing as well as investments and costs related to the growth of our business.

Our business owns high-value, long-lived assets capable of generating substantial Cash Flow to Equity over time. We define Cfe as profit before tax (the most comparable U.S. GAAP metric), adjusted for net cash provided for used/in operating activities, other than changes in operating assets and liabilities, income and deferred taxes and amortization of hedging costs; less: cash paid for income taxes, debt amortization and maintenance capital expenditure.

We believe that changes in operating assets and liabilities is cyclical for cash flow generation of our assets, due to high growth environment. Furthermore, to reflect the actual cash outflows for income tax, we deduct income and deferred taxes computed under U.S. GAAP presented in our consolidated financial statements and instead include the actual cash tax outflow during the period, are considered as part of tax expense.

We believe that external consumers of our financial statements, including investors and research analysts, use Cfe both to assess Azure's performance and as an indicator of its success in generating an attractive risk-adjusted total return, assess the value of the business and the platform. This has been a widely used metric by analysts to value our business, and hence we believe this will help potential investors in analyzing the cash generation from our operating assets.

We have disclosed Cfe for our operational assets on a consolidated basis, which is not the cash from operations on a consolidated basis. We believe Cfe supplements U.S. GAAP results to provide a more complete understanding of the financial and operating performance of our businesses than would not otherwise be achieved using U.S. GAAP results alone. Cfe should be used as a supplemental measure and not in lieu of our financial results reported under U.S. GAAP.

We have categorized the Cfe into "Operational Assets" and "Others", as defined below, so that users of our financial statements are able to understand the Cash generation from our operational assets.

We define our "Operational Assets", as the projects which had commenced operations on or before March 31, 2022. –The operational assets represent the MW operating as on the date.

We define "Others" as (i) the project SPV's which are under construction, or under development – as provided in the Power Purchase Agreement table in this Form 20-F, (ii) "corporate" which includes our three Mauritius entities, (iii) other projects not covered under operational assets, and (iv) other entities under the group which are newly incorporated.

We define "debt amortization" as the current portion of long-term debt which has been repaid during the period as part of debt repayment obligations, excluding the debt which has been repaid before maturity or refinanced. It does not include the amortization of debt financing costs or interest paid during the period.

*Other items from the Statement of Cash Flows* include most of the items that reconcile "Net (loss) gain" and "Changes in operating assets and liabilities" from the Statement of Cash Flows, other than deferred taxes, non-cash employee benefit and amortization of hedging costs.

Following is the Cfe statement for the periods March 2021 and 2022:

| | For the twelve months ended March 31, 2021 | | | For the twelve months ended March 31, 2022 | | | |
| | Unaudited | | | Unaudited | | | |
| | Total | Other | Operating | Total | Other | Operating | Operating |
| | INR | INR | INR | INR | INR | INR | US$ |
|---|---|---|---|---|---|---|---|
| Revenue from customers | 15,236 | - | 15,236 | 18,341 | - | 18,341 | 241.7 |
| Cost of operations | 1,261 | - | 1,261 | 1,597 | - | 1,597 | 21.0 |
| General and administrative | 2,988 | 2,159 | 829 | 2,067 | 1,288 | 779 | 10.3 |
| Depreciation and amortization | 3,202 | 36 | 3,166 | 3,667 | 28 | 3,639 | 48.0 |
| Impairment loss/(reversal) | 3,255 | - | 3,255 | (80) | - | (80) | (1.1) |
| **Operating income/(loss)** | 4,530 | (2,195) | 6,725 | 11,090 | (1,316) | 12,406 | 163.5 |
| Interest expense, net | 8,410 | 1,024 | 7,386 | 11,930 | 6,498 | 5,432 | 71.6 |
| Other expense, net | 18 | - | 18 | 3 | 1 | 2 | (0.0) |
| Loss/(gain) on foreign currency exchange, net | 7 | 3 | 4 | (33) | 17 | (50) | (0.7) |
| **Profit/(Loss) before income tax** | (3,905) | (3,222) | (683) | (810) | (7,832) | 7,022 | 92.6 |
| Add: Depreciation and amortization | 3,202 | 36 | 3,166 | 3,667 | 28 | 3,639 | 48.0 |
| Add: Impairment loss | 3,255 | - | 3,255 | (80) | - | (80) | (1.1) |
| Add: Loss/(gain) on foreign currency exchange, net | 7 | 3 | 4 | (33) | 17 | (50) | (0.7) |
| Add: Amortization of debt financing costs | 369 | 74 | 295 | 1,107 | 140 | 967 | 12.7 |
| Add: Other items from Statement of Cash Flows[1] | 1,840 | 1,062 | 778 | 1,796 | 10 | 1,786 | 23.5 |
| Less: Cash paid for income taxes | (488) | (43) | (445) | (644) | (516) | (128) | (1.7) |
| Less: Debt amortization[2] | (698) | - | (698) | (1,591) | - | (1,591) | (21.0) |
| **Cfe** | 3,582[4] | (2,090) | 5,672 | 3,412 | (8,153) | 11,565 | 152.3 |

(1) *Other items from the Statement of Cash Flows:* For the year ended March 31, 2021 and March 31, 2022 respectively, Other items include: loss on disposal of property plant and equipment of INR 32 million and INR 167 million (US$2.2 million), share based compensation of INR 1,001 million and reversal of INR 295 million (US$3.9 million), non-cash rent expense of INR 169 million and INR 354 million (US$4.7 million), allowance for doubtful debts of INR 294 million and reversal of INR 97 million (US$1.3 million), loan repayment charges of INR 257 million and INR 1,608 million (US$21.2 million) and Assets Retirement Obligation (ARO) accretion of INR 42 million and INR 46 million (US$0.6 million).

(2) Debt Amortization: Repayments of term and other loans during the year ended March 31, 2022, was INR 90,022 million (US$1,186.5 million) *(refer to the Statement of Cash Flows)* which includes INR 88,431 million (US$1,165.5 million) related to refinancing of loans, extinguishment, repayment of debt and payments for hedge and have been excluded to determine debt amortization of INR 1,591 million (US$21.0 million). Repayments of term and other loans during the year ended March 31, 2021, was INR 10,563 million *(refer to the Statement of Cash Flows)* which includes INR 9,865 million related to refinancing of loans or early repayment of debt before maturity and have been excluded to determine debt amortization of INR 698 million.

(3) *Classification of Maintenance capital expenditures and Growth capital expenditures:* All our capital expenditures are considered Growth Capital Expenditures. In broad terms, we expense all expenditures in the current period that would primarily maintain our businesses at current levels of operations, capability, profitability or cash flow in operations and maintenance and therefore there are no Maintenance Capital Expenditures. Growth capital expenditures primarily provide new or enhanced levels of operations, capability, profitability or cash flows.

(4)    Reconciliation of total Cfe to U.S. GAAP cash from Operating Activities:

| | For the year ended March 31, 2021 | For the year ended March 31, 2022 |
|---|---|---|
| **Cfe *(Non-U.S. GAAP)*** | **3,582** | **3,412** |
| *Items included in U.S. GAAP Cash from Operating Activities but not considered in Cfe:* | | |
| Change in current assets and liabilities as per statement of cash flows | (838) | (1,455) |
| Current income taxes | (625) | (859) |
| Prepaid lease payments and employee benefits | (246) | (312) |
| Amortization of hedging costs | 1,918 | 1,576 |
| *Items included in Cfe but not considered in U.S. GAAP Cash Flow from Operating Activities:* | | |
| Debt amortization | 698 | 1,591 |
| Cash taxes paid | 488 | 644 |
| **Cash from Operating Activities *(U.S. GAAP)*** | **4,977** | **4,597** |

*Summary of key financial metrices*

The following are the key metrics used to evaluate our business performance:

| Key metrics | Unit of Measurement | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 |
|---|---|---|---|---|
| Revenue [1] | INR in millions | 12,958 | 15,236 | 18,341 |
| Revenue [2] | US$ in millions | 171.9 | 208.3 | 241.7 |
| Cost per MW Operating [3] | INR in millions | 35.5 | 28.8 | 33.5 |
| Adjusted EBITDA | INR in millions | 9,390 | 10,987 | 14,677 |
| Cfe | INR in millions | 1,860 | 3,582 | 3,412 |

(1)    Revenue consists of revenue from the sale of power, including other revenue items related to generation from renewable power.

(2)    Translation of balances from INR into US$, as of and for Fiscal Year 2022 are solely for the convenience of the readers and were calculated at the rate of US$1.00 = INR 75.87, the noon buying rate in New York City for cable transfers in non-U.S. currencies, as certified for customs purposes by the Federal Reserve Bank of New York on March 31, 2022. No representation is made that the INR amounts could have been, or could be, converted, realized or settled into US$ at that rate on March 31, 2022, or at any other rate.

(3)    Installation per MW of DC capacity and includes INR 0.6 million (US$0.01 million) per MW operating of safe-guard duties which we expect to recover.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with U.S. GAAP. We have identified certain accounting policies that we believe are the most critical to the presentation of our consolidated financial information over a period of time. These accounting policies may require our management to take decisions on subjective and/or complex matters relating to reported amounts of assets, liabilities, revenue, costs, expenses and related disclosures. These would further lead us to estimate the effect of matters that may inherently be uncertain.

The judgment on such estimates and underlying assumptions is based on our experience, historical trends, understanding of the business, industry and various other factors that we believe are reasonable under the circumstances. These form the basis of our judgment on matters that may not be apparent from other available sources of information. In many instances changes in the accounting estimates are likely to occur from period-to-period. Actual results may differ from the

estimates. The future financial statement presentation, financial condition, results of operations and cash flows may be affected to the extent that the actual results differ materially from our estimates.

Our significant accounting policies are summarized in *Note 2—Summary of Significant Accounting Policies* in our consolidated financial statements included in this annual report.

## Components of Results of Operations

### Operating Revenue

We recognize revenue on PPAs when the power plant generates power, and it is supplied to the customer in accordance with the respective PPA. Revenue is recognized in each period based on the volume of electricity supplied to the customer at the price stated in the PPA, once the energy kilowatts are supplied and collectability is reasonably assured. The energy kilowatts we supplied are validated by the customer prior to billing and recognition of revenue.

Where PPAs include scheduled price changes, revenue is recognized by applying the average rate to the energy output estimated over the term of the PPA. We estimate the total kilowatt hour units expected to be generated annually during the tenure of PPA using budgeted PLFs, rated capacity of the project and annual estimated decrease in rated capability of solar panels. The contractual rates are applied to this annual estimate to determine the total estimated revenue over the term of the PPA. We then use the total estimated revenue and the total estimated kilowatt hours to compute the average rate used to record revenue on the actual energy output supplied. We compare the actual energy supplied to the estimate of the energy expected to be generated over the remaining term of the PPA on a periodic basis, but at least annually. Based on this evaluation, we reassess the energy output estimated over the remaining term of the PPA and adjust the revenue recognized and deferred to date. Through March 31, 2022, the adjustments have not been significant, and the difference between the actual billing and revenue recognized is recorded as deferred revenue.

### Cost of Operations (Exclusive of Depreciation and Amortization)

Cost of operations primarily consists of expenses pertaining to operations and maintenance of our solar power plants. These expenses include payroll and related costs for maintenance staff, plant maintenance, insurance, and, if applicable, lease costs.

### General and Administrative Expenses

Our general and administrative expenses include payroll and related costs for corporate, finance and other support staff, including bonus and share based compensation expense, professional fees and other corporate expenses. We anticipate that we will incur additional general and administrative costs, including headcount and expansion related costs, to support the growth in our business as well as additional costs of being a public reporting company.

### Depreciation and Amortization

Depreciation and Amortization expense are recognized using the straight-line method over the estimated useful life of our solar power plants and other assets. Leasehold improvements related to solar power plants are amortized over the shorter of the lease term or the underlying period of the PPA for that particular solar power plant. Leasehold improvements related to office facilities are amortized over the shorter of the lease period or the estimated useful life. Freehold land is not depreciated. Construction in progress is not depreciated until such projects are commissioned.

### Impairment loss/(reversal)

Impairment loss/(reversal) relates to our non-core solar rooftop portfolio, for which we entered into an agreement for sale during April 2021.

### Interest Expense, Net

Interest expense, net consists of interest incurred on term loans for projects under our fixed and variable rate financing arrangements including interest expense and cost of hedging foreign currency risk on the Green Bonds, and interest expense on non-convertible debentures. Interest cost also includes the cost of swaps and option contracts entered to mitigate the foreign exchange risk for solar green bond transactions. We have designated the swaps and option contracts as a cash flow hedge and are tested for effectiveness on a quarterly basis or as determined at the time of designation of hedge. Interest expense also include bank fees and other borrowing costs, which are typically amortized over the life of the loan using the effective interest rate method. Interest expense is presented net of capitalized financing costs and interest income earned from bank deposits.

Interest incurred in connection with a project that has been commissioned is expensed while interest incurred prior to commissioning is capitalized.

**Other expense/(income)**

Other expense/(income) primarily consists of mutual fund income net of certain expense.

**Gain/Loss on Foreign Currency Exchange (Net)**

We are exposed to movements in currency exchange rates, particularly to changes in exchange rates between U.S. dollars and Indian rupees. While our functional currency is the U.S. dollar, the functional currency of APIPL is Indian rupees and a portion of APIPL's borrowings from financial institutions are denominated in U.S. dollars. Foreign exchange gain/loss includes the unrealized and realized gain/loss from foreign currency fluctuations on our non-functional currency denominated borrowings.

We also enter into foreign currency option contracts to mitigate and manage the risk of changes in foreign exchange rates on our borrowings denominated in currencies other than our functional currency. Some of these hedges do not qualify as cash flow hedges under Accounting Standards Codification, or "ASC", Topic 815, "Derivatives and Hedging." Changes in the fair value of these option contracts are recognized in the consolidated statements of operations and are included in loss on foreign currency exchange.

**Income Tax Expense/(Income)**

Our income tax expense/ (income) consists of current and deferred income tax as per applicable jurisdictions in Mauritius, India and the United States. Income tax for our current and prior periods is measured at the amount expected to be recovered from or paid to taxation authorities based on our taxable income or loss for that period.

Deferred income taxes and changes in related valuation allowance, if any, reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. We use the asset and liability method in accounting for income taxes. Under this method, deferred income tax assets and liabilities are determined based on the difference between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse.

The tax rates on reversal of temporary differences might be different from the tax rates used for creation of the respective deferred tax assets/liabilities.

As of March 31, 2021, and 2022, we had net deferred tax assets of INR 1,748 million and INR 1,920 million (US$ 25.3 million), respectively, and net deferred tax liabilities of INR 2,046 million and INR 1,936 million (US$ 25.5 million), respectively.

We apply a two-step approach to recognize and measure uncertainty in income taxes in accordance with ASC Topic 740. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount, which is more than 50% likely of being realized upon ultimate settlement. We re-evaluate these uncertain tax positions on an annual basis. This evaluation is based on factors including changes in facts or circumstances, changes in tax law and effectively settled issues under tax-audit. Such a change in recognition or measurement could result in the recognition of a tax benefit or an additional charge to the tax provision in the relevant period. As of March 31, 2021, and 2022, we did not have any material uncertain tax positions.

We establish valuation allowances against our deferred tax assets when it is more likely than not that all or a portion of a deferred tax asset will not be realized. The valuation allowance as on March 31, 2021 and 2022 were INR 1,088 million and INR 2,281 million (US$30.1 million), respectively.

A portion of our Indian operations qualifies for tax holiday related to their operating income attributable to undertakings, as defined, in operating solar power plants under section 80-IA of the Indian Income Tax Act, 1961. This holiday is available for a period of ten consecutive years out of fifteen years beginning from the year in which the undertaking first generates power (referred to as the Tax Holiday period), however, the exemption is available only to the projects completed on or before March 31, 2017. We assess the election of the Tax Holiday period on an annual basis for each of our undertakings. We believe these undertakings will generate higher taxable profits due to lower interest cost as debt balances are paid down in the later years of operations and therefore, we plan to defer the Tax Holiday election to later years in order to maximize the

benefits. As of March 31, 2022, we are claiming tax holiday benefits for twelve of our subsidiaries. Deferred tax assets are recognized to the extent probable of realization outside the anticipated Tax Holiday period. For example, if we choose years six through 15 as the tax holiday period, we recognize deferred tax assets only to the extent that they will be realized either in years one through five or from year 16 onwards. As a result, all temporary differences do not result in creation of a deferred tax asset or liability.

Under certain of our subsidiaries, which are not eligible for deduction under section 80IA of the Income Tax Act, we had opted for the reduced corporate tax rate of 22% as per the provision of the Taxation Laws (Amendment) Act, 2019.

APIPL and AZR provide EPC and related support services to other group subsidiaries and as a result incur income taxes on profits from the services provided. The services provided to the group subsidiaries are in the nature of capitalizable costs and are therefore capitalized as part of property, plant and equipment in the standalone financial statements of such subsidiaries. However, these capitalized costs are eliminated for the purposes of the consolidated financial statements. The costs capitalized in the standalone financial statements are however eligible for income tax deductions in the tax records of the respective group subsidiaries. We started recording Deferred Tax Asset on the intra-entity transfer of assets pursuant to ASU 2016-16, from April 1, 2017. We assess that the probability of realizing the benefit on an annual basis and its recognition is limited to the extent probable of realization outside of the anticipated Tax Holiday period. Our estimate is that such benefit is limited to approximately 30% to 55% of the tax expense incurred by APIPL and the subsidiary. As a result, while all the profits on inter-company transactions are eliminated during consolidation, it does not result in a complete reversal of tax expense on such inter-company transactions. Accordingly, while we may not be profitable, we report income tax expense / benefit that may fluctuate from period to period. Further, EPC services by APIPL to other group subsidiaries were provided up-till financial year ended March 31, 2020 only. Now all subsidiaries are managing these EPC services by themselves with dedicated team of field-service engineers, technicians and other employees.

### Contracts Designated as Cashflow Hedges for Solar Green Bonds

We issued U.S. dollar denominated 3.575% Solar Green Bonds in August 2021 and 5.65% Solar Green Bonds in September, 2019 (together the "Green Bonds"), listed on the Singapore Exchange Limited. We used the proceeds from the Green Bonds to repay project level debt of certain projects in India, in the form of intercompany Non-Convertible Debentures ("NCD") and External Commercial Borrowings ("ECBs") denominated in INR. We hedged the exchange rate risk on the proceeds invested from the Green Bonds through cross currency swap for payment of coupons and through call spread option contracts for repayment of principal (collectively, "option contracts"). We have designated these option contracts as a cashflow hedge. We expect that these option contracts mitigate the exchange rate risk associated with the forecasted transaction for semi-annual repayment of coupon and principal and also for repayment of the principal balance at the end of five years.

The cashflow from the underlying agreement match the terms of a hedge such as—notional amount, maturity of the option contracts, mitigation of exchange rate risk, and there are no significant changes in the counter party risk, hence they are designated as a cashflow hedge in accordance with ASC Topic 815— Derivatives and Hedging. Fair value of the hedge at the time of inception of the contract was nil and the cost of the hedge is recorded as an expense over the period of the contract on a straight-line basis. Changes in fair value of the option contracts designated as cash flow hedge are recorded in Other Comprehensive Income/(Loss), net of tax, until the hedge transactions occur. We evaluate hedge effectiveness of cash flow hedges at the time a contract is entered into as well as on a quarterly basis. We test the effectiveness of the hedge relationship on a quarterly basis and the hedge was effective as of March 31, 2022.

We used the derivatives option pricing model based on the principles of the Black-Scholes model to determine the fair value of the foreign exchange option contracts. We classify the fair value of these foreign exchange option contracts as Level 2 because the inputs used in the valuation model are observable in active markets over the term of the respective contracts. Fair value of the hypothetical derivative is computed based on the above inputs from Bloomberg or other reputed banks.

| | As of March 31, 2021 (in millions) | | | |
| --- | --- | --- | --- | --- |
| | Notional Amount (US$) | Current Liabilities (Fair value) (INR) | Other Assets (Fair value) (INR) | Other Assets (Fair value) (US$) |
| Foreign currency option contracts | 849.7 | — | 5,766 | 78.8 |

| | As of March 31, 2022 (in millions) | | | |
| --- | --- | --- | --- | --- |
| | Notional Amount (US$) | Current Liabilities (Fair value) (INR) | Other Assets (Fair value) (INR) | Other Assets (Fair value) (US$) |
| Foreign currency option contracts | 753.9 | (1,735) | 2,647 | 34.9 |

### Property, Plants and Equipment

Our Company's principal executive offices are located at 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi 110017, India and occupy approximately 20,550 square feet of space. Our power projects are located primarily on land leased from the state governments and third parties and freehold land purchased from private individuals and entities. Further, we source the land required for construction of plants under the land lease arrangement or procure at the required locations of the plant. Our land lease arrangements range typically from 25 to 35 years, but our PPAs are generally for a term of 25 years. We believe that our facilities are in good condition and generally suitable and adequate for our needs in the foreseeable future. However, we will continue to seek additional space as needed to satisfy our growth.

### Internal Control over Financial Reporting

We availed the exemptions afforded to us as an Emerging Growth Company pursuant to the Jumpstart Our Business Startups Act of 2012, or the JOBS Act untill FY 2021. The Company completed its fifth anniversary from the first sale of common equity shares during FY 2022, and as such the exemptions available to us as an Emerging Growth Company are no longer available to us. We now comply with all reporting requirements as applicable to other public companies that are foreign private issuers including the requirement to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act and accordingly included as part of the financial statements.

### Power Purchase Agreements

The material terms of the PPAs we have entered into and bids we have won as of the date of this Form 20-F for our utility scale projects are summarized in the following table.

| Project Names | Commercial Operation Date [1] | PPA Capacity (MW) | DC Capacity (MW) | Tariff (INR / kWh) | [6] | Offtaker | Duration of PPA in Years |
|---|---|---|---|---|---|---|---|
| | | | **Utility Operational** | | | | |
| Gujarat 1.1 | Q2 2011 | 5 | 5 | 15.00[2] | | Gujarat Urja Vikas Nigam Limited | 25 |
| Gujarat 1.2 | Q4 2011 | 5 | 5 | 15.00[2] | | Gujarat Urja Vikas Nigam Limited | 25 |
| Punjab 1 | Q4 2009 | 2 | 2 | 17.91 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Rajasthan 1 | Q4 2011 | 5 | 5 | 11.94 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Rajasthan 2.1 | Q1 2013 | 20 | 22 | 8.21 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Rajasthan 2.2 | Q1 2013 | 15 | 18 | 8.21 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Punjab 2.1 | Q3 2014 | 15 | 15 | 7.67 | | Punjab State Power Corporation Limited | 25 |
| Punjab 2.2 | Q4 2014 | 15 | 15 | 7.97 | | Punjab State Power Corporation Limited | 25 |
| Punjab 2.3 | Q4 2014 | 4 | 4 | 8.28 | | Punjab State Power Corporation Limited | 25 |
| Karnataka 1 | Q1 2015 | 10 | 10 | 7.47 | | Bangalore Electricity Supply Company Limited | 25 |
| Uttar Pradesh 1 | Q1 2015 | 10 | 12 | 8.99 | | Uttar Pradesh Power Corporation Limited | 12 |
| Rajasthan 3.1 | Q2 2015 | 20 | 23 | 5.45[3] | | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 3.2 | Q2 2015 | 40 | 43 | 5.45[3] | | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 3.3 | Q2 2015 | 40 | 41 | 5.45[3] | | Solar Energy Corporation of India Limited | 25 |
| Chhattisgarh 1.1 | Q2 2015 | 10 | 10 | 6.44 | | Chhattisgarh State Power Distribution Company Limited | 25 |
| Chhattisgarh 1.2 | Q2 2015 | 10 | 10 | 6.45 | | Chhattisgarh State Power Distribution Company Limited | 25 |
| Chhattisgarh 1.3 | Q3 2015 | 10 | 10 | 6.46 | | Chhattisgarh State Power Distribution Company Limited | 25 |
| Rajasthan 4 | Q4 2015 | 5 | 6 | 5.45[3] | | Solar Energy Corporation of India Limited | 25 |
| Delhi 1.1 | Q4 2015 | 2 | 2 | 5.43[3] | | Solar Energy Corporation of India Limited | 25 |
| Karnataka 2 | Q1 2016 | 10 | 12 | 6.66 | | Bangalore Electricity Supply Company Limited | 25 |
| Andhra Pradesh 1 [4] | Q1 2016 | 50 | 54 | 6.63[2] | | Southern Power Distribution Company of Andhra Pradesh Limited | 25 |
| Punjab 3.1 | Q1 2016 | 24 | 25 | 7.19 | | Punjab State Power Corporation Limited | 25 |
| Punjab 3.2 | Q1 2016 | 4 | 4 | 7.33 | | Punjab State Power Corporation Limited | 25 |
| Bihar 1 | Q3 2016 | 10 | 11 | 8.39 | | North & South Bihar Power Distribution Company Limited | 25 |
| Punjab 4.1 | Q4 2016 | 50 | 52 | 5.62 | | Punjab State Power Corporation Limited | 25 |
| Punjab 4.2 | Q4 2016 | 50 | 52 | 5.63 | | Punjab State Power Corporation Limited | 25 |
| Punjab 4.3 | Q4 2016 | 50 | 52 | 5.64 | | Punjab State Power Corporation Limited | 25 |
| Karnataka 3.1 | Q1 2017 | 50 | 54 | 6.51 | | Chamundeshwari Electricity Supply Company Limited | 25 |
| Karnataka 3.2 | Q1 2017 | 40 | 42 | 6.51 | | Hubli Electricity Supply Company Limited | 25 |
| Karnataka 3.3 | Q1 2017 | 40 | 42 | 6.51 | | Gulbarga Electricity Supply Company Limited | 25 |
| Maharashtra 1.1 | Q1 2017 | 2 | 2 | 5.50[3] | | Ordinance Factory, Bhandara | 25 |
| Maharashtra 1.2 | Q1 2017 | 5 | 6 | 5.31 | | Ordinance Factory, Ambajhari | 25 |
| Andhra Pradesh 2 [5] | Q2 2017 | 100 | 130 | 5.12 | | NTPC Limited | 25 |
| Uttar Pradesh 2 | Q2-Q3 2017 | 50 | 59 | 4.78 | | NTPC Limited | 25 |
| Telangana 1 | Q1 2018 | 100 | 128 | 4.67 | | NTPC Limited | 25 |
| Uttar Pradesh 3 | Q2 2018 | 40 | 51 | 4.43[3] | | Solar Energy Corporation of India Limited | 25 |
| Andhra Pradesh 3 | Q2 2018 | 50 | 59 | 4.43[3] | | Solar Energy Corporation of India Limited | 25 |
| Gujarat 2 | Q4 2018 – Q1 2019 | 260 | 363 | 2.67 | | Gujarat Urja Vikas Nigam Limited | 25 |
| Karnataka 4.1 | Q1 2019 | 50 | 75 | 2.93 | | Bangalore Electricity Supply Company | 25 |
| Karnataka 4.2 | Q1 2019 | 50 | 75 | 2.93 | | Hubli Electricity Supply Company Limited | 25 |
| Rajasthan 5 | Q2-Q3 2019 | 200 | 262 | 2.48 | | Solar Energy Corporation of India Limited | 25 |
| Maharashtra 3 | Q3 2019 | 130 | 195 | 2.72 | | Maharashtra State Electricity Distribution Company Limited | 25 |
| Assam 1 | Q3 2020-Q1 2022 | 90 | 135 | 3.34 | | Assam Power Distribution Company | 25 |
| Rajasthan 6 | Q4 2020- Q1 2022 | 600 | 893 | 2.53 | | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 8 | Q4 2021- Q1 2022 | 300 | 417 | 2.58 | | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 9 | Q1-Q3 2022 | 300 | 385 | 2.54 | | Solar Energy Corporation of India Limited | 25 |
| Others [8] | Q1 2018-Q4 2019 | 7 | 10 | 3.36[4] | | Various | 25 |
| Operational Capacity Rooftop | 2013- Q1 2020 | 86 | 86 | Various | | Various | 25 |
| Total Operational Capacity | | 3,041 | 3,485 | | | | |
| Under Construction / Contracted/ Awarded | | | | | | | |
| 4 GW Project 1 | | 700 (7) | | 2.54 | | Solar Energy Corporation of India Limited | 25 |
| 4 GW Project 1 | | 2,333 (7) | | 2.42 | | Solar Energy Corporation of India Limited | 25 |
| 4 GW Project 1 | | 300 (7) | | 2.54 | | Solar Energy Corporation of India Limited | 25 |
| 4 GW Project 1 | | 667 (7) | | 2.42 | | Solar Energy Corporation of India Limited | 25 |
| SECI Hybrid | | 150 (9) | | 2.35 | | Solar Energy Corporation of India Limited | 25 |
| SECI WIND | | 120 (9) | | 2.70 | | Solar Energy Corporation of India Limited | 25 |

48

| | | |
|---|---|---|
| Total Contracted & Awarded Capacity – Utility | 4,270 | |
| **Total Portfolio*** | **7,311** | |

Notes:

(1) Refers to the applicable quarter of the calendar year in which commercial operations commenced or are scheduled to commence based on AC capacity.
(2) Current tariff, subject to escalation. Please also see "—Tariff structure"
(3) Projects are supported by VGF, in addition to the tariff. Please also see "—VGF for projects"
(4) Levelized tariff; includes capital incentive.
(5) Projects under accelerated depreciation per the Indian Income tax regulation.
(6) In the case of projects with more than one PPA, tariff is calculated as the weighted average of the PPAs for such project.
(7) LOA received. PPA signed for 3,033 MW and for 967 MW yet to be signed. For more information, see "Operating And Financial Review And Prospects – Projects under execution"
(8) Others include projects with Hindustan Aeronautics Limited (HAL), Decathlon and other offtakers.
(9) PPA for 150 MW solar-wind hybrid signed on July 15, 2022 and PPA for 120 MW for wind project signed on August 31, 2022 (119 MW) and November 28, 2022 (1 MW).

\*   In FY 2021, we entered into a sales contract with Radiance Renewables Private Limited ("Radiance") to sell certain subsidiaries having an operating capacity of 153 MW for INR 5,350 million (US$70.5 million), subject to certain purchase price adjustments. Out of the identified rooftop portfolio of 153 MW, the Company has already transferred 17.3 MW to Radiance, 33.2 MW will be transferred to Radiance after refinancing of the RG-II bonds and 16 MW will be transferred to Radiance post March 31, 2024. Hence, we have not considered these rooftop portfolios of 66.5 MW for reporting under its total portfolio as at year end. Further, the Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the remaining un-transferred 86.5 MW *portfolio* to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement. Hence, portfolio of 86.5 MW have been considered for reporting under total portfolio as at year end.

Our PPAs typically require that certain conditions be met including, among others, that we have obtained all necessary consents and permits, financing arrangements have been made and an agreement has been entered into to provide for the transmission of power. Furthermore, the PPAs contain customary termination provisions and negative and affirmative covenants, including the provision of performance bank guarantees and minimum guarantees of power to be sold and restrictions on changing the controlling shareholder of the project subsidiaries.

### Megawatts Allotted or Won at Auction

During Fiscal Year 2020, we won a bid for 2,000 MW manufacturing linked project with SECI and also elected to exercise a greenshoe option for an additional 2,000 MW as per auction guidelines. During Fiscal Year 2020, we received a Letter of Award ("LOA") for the 2,000 MW project and also received a LOA for the greenshoe option for 2,000 MW, during Fiscal Year 2021.

During Fiscal Year 2022, we signed PPAs with SECI for 650 MW at a fixed tariff of INR 2.54 per kWh and for 2,333 MW at a fixed tariff of INR 2.42 per kWh respectively for supply power for 25 years, as a part of the 4,000 MW manufacturing linked projects. However, 2,333 MW out of 4,000 MW manufacturing linked projects are being challenged under a Public Interest litigation filed before the Hon'ble High Court of Andhra Pradesh.

We executed a PPA with SECI for our 150 MW solar-wind hybrid project on July 15, 2022, PPA with SECI for our 120 MW wind project on August 31, 2022 (for 119 MW) and on November 28, 2022 (for 1 MW) and PPA for additional 50 MW under manufacturing linked projects on January 5, 2023. We also received a LOA on December 14, 2021 for 200 MW solar-wind hybrid project from Maharashtra State Electricity Distribution Co. Limited (MSEDCL), however, this project was cancelled on March 10, 2023, pursuant to withdrawal of the Group's appeal before the Appellate Tribunal for Electricity. Appeal was filed to challenge Maharashtra Electricity Regulatory Commission's order, that rejected the adoption of the auction discovered tariff of INR 2.62 per unit and instead gave the Group an option to reduce the tariff to INR 2.49 per unit.

We will continue our discussions with SECI towards signing PPAs for the balance capacity of 967 MW for which LOAs have been received.

For further information, see *"Legal Proceedings"* and *"Operating And Financial Review And Prospects – Projects*

*under execution".*

**Tariff structure**

The tariff for Gujarat 1.1 and Gujarat 1.2 is INR 15.0 per kWh for the first 12 years and INR 5.0 per kWh for remainder of the contract term. The tariff for Andhra Pradesh 1 is INR 5.89 per kWh for first year, increasing by 3% each year from the second year to the tenth year and thereafter with the same tariff as that in year ten for the remainder of the 25-year term. All other projects have a fixed rate structure.

**Viability Gap Funding (VGF) for projects**

We won and implemented few projects under the erstwhile VGF scheme by MNRE. The VGF for Rajasthan 3.1 project is INR 23.0 million per MW, for Rajasthan 3.2 it is INR 22.0 million per MW, for Rajasthan 3.3 it is INR 13.0 million per MW and Rajasthan 4 it is INR 12.9 million per MW. The VGF for Andhra Pradesh 3 project is INR 7.4 million per MW. The VGF for Maharashtra 1 project is INR 0.9 million per MW. The VGF for Uttar Pradesh 3 is INR 8.0 million per MW. The VGF for Delhi 1 is INR 4.6 million per MW.

## B. Results of Operations

The following section illustrates our results of operations for the years ended March 31, 2020, 2021 and 2022 and includes a discussion and analysis of our performance, financial condition and results of operations.

| Consolidated Statement of Operations data: | 2020 (INR) | 2021 (INR) | 2022 (INR) | 2022 (US$) [a] |
|---|---|---|---|---|
| **Operating revenues:** | | | | |
| Revenue from customers [1] | 12,958 | 15,236 | 18,341 | 241.7 |
| **Operating costs and expenses:** | | | | |
| Cost of operations (exclusive of depreciation and amortization shown separately below) [2] | 1,146 | 1,261 | 1,597 | 21.0 |
| General and administrative [3] | 2,422 | 2,988 | 2,067 | 27.2 |
| Depreciation and amortization [4] | 2,860 | 3,202 | 3,667 | 48.3 |
| Impairment loss/(reversal) [5] | — | 3,255 | (80) | (1.1) |
| **Total operating costs and expenses:** | **6,428** | **10,706** | **7,251** | **95.4** |
| **Operating income** | **6,530** | **4,530** | **11,090** | **146.3** |
| **Other expense, net:** | | | | |
| Interest expense, net [6] | 7,962 | 8,410 | 11,930 | 157.2 |
| Other (income)/expenses [7] | (96) | 18 | 3 | 0.0 |
| Loss/(gain) on foreign currency exchange, net [8] | 512 | 7 | (33) | (0.4) |
| Total other expenses, net | **8,378** | **8,435** | **11,900** | **156.8** |
| **Loss before income tax** | **(1,848)** | **(3,905)** | **(810)** | **(10.5)** |
| Income tax expense [9] | (489) | (296) | (1,316) | (17.3) |
| **Net loss** | **(2,337)** | **(4,201)** | **(2,126)** | **(27.8)** |
| Less: Net profit/ (loss) attributable to non-controlling interest | (68) | 5 | (22) | (0.3) |
| **Net profit / (loss) attributable to APGL equity shareholders** | **(2,269)** | **(4,206)** | **(2,104)** | **(27.5)** |
| **Net profit / (loss) per share attributable to APGL equity stockholders** | | | | |
| Basic | (52.71) | (87.66) | (41.36) | (0.55) |
| Diluted | (52.71) | (87.66) | (41.36) | (0.55) |
| Shares used in computing basic and diluted per share amounts: | | | | |
| Weighted average shares | | | | |
| Basic | 43,048,026 | 47,979,581 | 50,876,360 | 50,876,360 |
| Diluted | 43,048,026 | 47,979,581 | 50,876,360 | 50,876,360 |

(a) Azure Power Global Limited's functional currency is the U.S. dollar and reporting currency is the Indian rupee. Solely for the convenience of the reader, we have translated the financial information for Fiscal Year 2022. The rate used for this translation is INR 75.87 to US$1.00, which is the noon buying rate in New York City for cable transfer in non-U.S. dollar currencies as certified for customs purposes by the Federal Reserve Bank of New York as of March 31, 2022, which is the last available rate in the period of reported financial statements. No representation is made that the Indian rupee amounts could have been, or could be, converted, realized or settled into U.S. dollars at that rate.

**Fiscal Year 2022 Compared to Fiscal Year 2021**

(1) *Operating Revenue*

Operating revenues during Fiscal Year 2022 increased by INR 3,105 million, or 20.4%, to INR 18,341 million (US$241.7 million) compared to Fiscal Year 2021. The principal reasons for the increase in revenue during Fiscal Year 2022 was the incremental revenue from projects that commenced operations at various dates during Fiscal Year 2021 and Fiscal Year 2022. These include Rajasthan 6 and Assam 1 solar power projects, part of which commenced operation during FY 2021 and contributed incremental operating revenue of INR 2,223 million, and INR 207 million, respectively, in Fiscal Year 2022. In addition, Rajasthan 8 and Rajasthan 9 projects commenced their operations during FY 2022 and contributed incremental operating revenue of INR 296 million and INR 53 million respectively. Further, there was an additional revenue of INR 617

million from sale of carbon credits, which is partially offset by decrease in revenue from existing projects, due to lower insolation and other matters.

(2) *Cost of Operations (Exclusive of Depreciation and Amortization)*

Cost of operations during Fiscal Year 2022 increased by INR 336 million, or 26.6%, to INR 1,597 million (US$21.0 million), compared to Fiscal Year 2021, and remained consistent at 8% - 9% of revenue recognized during the respective periods in both years.

The net increase was primarily due to an increase in plant maintenance cost related to newly operational projects and partial commissioned projects during Fiscal Year 2021.

(3) *General and Administrative Expenses*

General and administrative expenses during Fiscal Year 2022, decreased by INR 921 million, or 30.8%, to INR 2,067 million (US$27.2 million) compared to Fiscal Year 2021. The decrease was primarily due to reversal of stock appreciation rights (SARs) expense of INR 373 million (US$4.9 million) on account of management transition compared to an expense of INR 1,319 million in year ended March 31, 2021, partially offset by increase in expense due to liquidation charges of INR 548 million (US$7.2 million) on account of termination of joint venture agreement with M/s Waaree Energies Limited (also refer to Note 10 "Investment in equity investee" in our consolidated financial statements for details). Further, a adjustment (decapitalisation) aggregating INR 253 million (US$ 3.3 million) has been made in books of account as impact of Whistle blower based on certain benchmarking reports.

(4) *Depreciation and Amortization*

Depreciation and amortization expenses during Fiscal Year 2022 increased by INR 465 million, or 14.5%, to INR 3,667 million (US$48.3 million) compared to Fiscal Year 2021. The principal reason for the increase in depreciation was the full year effect of projects commissioned during Fiscal Year 2021, primarily the Rajasthan 6 project contributing an incremental depreciation expense of INR 441 million in current year. Further, there was incremental depreciation on projects commissioned during Fiscal Year 2022, which included Rajasthan 8 and Rajasthan 9, amounting to INR 87 million and INR 11 million respectively.

(5) *Impairment loss/(reversal)*

We recognized an reversal of impairment loss of INR 80 million (US$1.1 million) during the year ended March 31, 2022, primarily due to 86.5 MW rooftop portfolio re-classified from asset held for sale to respective balance sheet captions in the consolidated balance sheet as at March 31, 2022.

(6) *Interest Expense, Net*

Net interest expense during Fiscal Year 2022 increased by INR 3,520 million, or 41.9%, to INR 11,930 million (US$157.2 million) compared to Fiscal Year 2021. The increase of INR 1,192 million (US$15.7 million) is primarily due to non-recurring charges for refinancing of 5.5% Solar Green bonds and other project loans and increase of INR 1,206 million (US$15.9 million) is on borrowings related to projects commissioned after year ended March 31, 2021. Further, increase of INR 1,169 million (US$ 15.4 million) is on account of loss on cancellation of hedged instruments.

(7) *Other Expense*

Other expenses during Fiscal Year 2022 decreased by INR 15 million to INR 3 million (US$0.0 million) as compared to Fiscal Year 2021.

(8) *Gain on Foreign Currency Exchange*

The foreign exchange gain during Fiscal Year 2022 increased by INR 40 million to INR 33 million (US$0.4 million) compared to FY 2021.

## (9) *Income Tax Expense*

Income tax expense increased during Fiscal Year 2022 by INR 1,020 million to an income tax expense of INR 1,316 million (US$17.3 million) compared to Fiscal Year 2021, the details of which are summarized below.

| | Year ended March 31, (in millions) | | | |
| --- | --- | --- | --- | --- |
| | **2020** | **2021** | **2022** | **2022** |
| | **INR** | **INR** | **INR** | **US$** |
| Current tax expense | 120 | 242 | 485 | 6.4* |
| Withholding Tax on interest on restricted group debt | 258 | 383 | 367 | 4.8 |
| Deferred income tax (benefit)/expense | 111 | (330) | 464 | 6.1 |
| **Total** | **489** | **296** | **1,316** | **17.3** |

\* Current tax on profit before tax. Current tax includes INR 42 million (US$0.6 million) for tax adjustment relating to earlier years.

We pay taxes on taxable profits at the individual entity level, in accordance with the tax rates in the relevant jurisdictions. While at the consolidated level, we remain unprofitable, certain Indian and non-Indian subsidiaries at the individual entity level have previously generated taxable profits. These taxable profits result from services provided by these entities to other subsidiaries and are taxed at the applicable tax rates in the jurisdiction of the entity providing the services. These inter-company transactions and profits are eliminated during consolidation, while the related income tax expense is not eliminated. We started recording deferred tax asset on the intra-entity transfer of assets pursuant to ASU 2016-16, from April 1, 2017. Subsequent thereto, there was a decrease in tax expense, which is primarily attributable to adoption of a new accounting standard on "intra-entity transfer of assets", resulting in recognition of deferred tax asset on the income taxes paid on the intra entity transfer of assets to the extent these are expected to be realized by the subsidiary outside of the tax holiday period. Furthermore, a portion of our Indian operations qualifies for a tax holiday related to their operating income attributable to undertakings, as defined, in operating solar power plants under section 80-IA of the Indian Income Tax Act, 1961. This holiday is available for a period of ten consecutive years out of 15 years beginning from the year in which the undertaking first generates power (referred to as the tax holiday period); however, the exemption is available only to the projects completed on or before March 31, 2017. We anticipate that we will claim the aforesaid deduction in the last ten years out of 15 years beginning with the year in which we generate power and when we have taxable income. Accordingly, our current operations are taxable at the normally applicable tax rates. Due to the tax holiday period, a substantial portion of the temporary differences between the book and tax basis of our assets and liabilities do not have any tax consequences as they are expected to reverse within the tax holiday period.

The total income tax expense for Fiscal Year 2022 was INR 1,316 million, which increased by INR 1,020 million compared to Fiscal Year 2021.

The current tax expense (other than impact of tax adjustment relating to earlier years) for Fiscal Year 2022 increased by INR 201 million compared to Fiscal Year 2021 primarily on account of (i) increase in the taxable income of the entities that are outside Tax holiday period; (ii) increase in the book profits under various SPVs resulting increase in Minimum Alternate Tax; and (iii) increase in the Other Income (primarily interest income) of entities utilizing the 80-IA exemption, as the benefit of the tax holiday period is not available for such other income items.

The withholding tax on interest on restricted group debt relates to the tax on intercompany interest on Solar Green Bond entities for which the tax credit is not available under Mauritius tax laws. The withholding tax amount for FY 2022, has decreased by INR 16 million compared to Fiscal Year 2021 primarily due to refinancing of 5.5% Solar Green bonds during the previous year ended March 31, 2022.

During Fiscal Year 2022, we recorded a deferred tax expense of INR 464 million (after considering valuation allowance primarily relating to unabsorbed depreciation and business losses of entities availing 80-IA exemption), whereas for Fiscal Year 2021, we recorded a deferred tax benefit of INR 330 million.

Our tax expenses are further described in Note 13—Income Taxes to our consolidated financial statements included in this annual report.

**Fiscal Year 2021 Compared to Fiscal Year 2020**

*Operating Revenue*

Operating revenues during FY 2021 increased by INR 2,278 million, or 17.6%, to INR 15,236 million (US$208.3 million) compared to FY 2020. The principal reasons for the increase in revenue during FY 2021 was the incremental revenue from projects that commenced operations at various dates during FY 2020 and FY 2021. These include Rajasthan 5 and Maharashtra 3 solar power projects, which commenced operation during FY 2020 and contributed incremental operating revenue of INR 312 million, and INR 617 million, respectively, in FY 2021. In addition, Rajasthan 6 and Assam 1 projects commenced their operations during FY 2021 and contributed incremental operating revenue of INR 335 million and INR 63 million respectively. Further, there was an additional revenue of INR 381 million for the recovery of Safe-Guard Duties and Goods and Service Tax under the change in law provision of our PPAs for four of our projects. The remaining increase in revenue was from existing projects, including repowering.

*Cost of Operations (Exclusive of Depreciation and Amortization)*

Cost of operations during FY 2021 increased by INR 115 million, or 10.0%, to INR 1,261 million (US$17.2 million), compared to FY 2020, and remained consistent at 8% - 9% of revenue recognized during the respective periods in both years.

The net increase was primarily due to an increase in plant maintenance cost related to newly operational projects and partial commissioned projects during the previous FY 2020, partially offset by lower module cleaning and other operation and maintenance activities due to COVID-19.

*General and Administrative Expenses*

General and administrative expenses during FY 2021 increased by INR 566 million, or 23.4%, to INR 2,988 million (US$40.9 million) compared to FY 2020. The higher General and administrative expenses was primarily due to an increase in stock appreciation rights (SARs) expense of INR 1,150 million compared to the year ended March 31, 2020, partially offset by absence of management transition expense of INR 323 million, absence of interest charges on the safeguard duty on the import of modules of INR 125 million and lower other cost due to cost reductions initiatives in travel, professional and other administrative expenses.

*Depreciation and Amortization*

Depreciation and amortization expenses during FY 2021 increased by INR 342 million, or 12.0%, to INR 3,202 million (US$43.8 million) compared to FY 2020. The principal reason for the increase in depreciation was the full year effect of projects that commenced operations on various dates during FY 2020. Plants which were commissioned commercial operation during part of FY 2020, which primarily includes Rajasthan 5 and Maharashtra 3 solar power projects contributing an incremental depreciation expense of INR 41 million and INR 87 million, respectively, in FY 2021. Further, there is incremental depreciation on projects commissioned during FY 2021, which includes the Rajasthan 6 and Assam 1 amounting to INR 103 million and INR 19 million respectively.

*Impairment loss*

We have reported an impairment loss during FY 2021 of INR 3,255 million (US$44.5 million) primarily relating to the planned disposal of our rooftop projects and other identified assets.

*Interest Expense, Net*

Net interest expense during FY 2021 increased by INR 448 million, or 5.6 %, to INR 8,410 million (US$114.8 million) compared to FY 2020. The increase was primarily due to incremental interest expense (net) of INR 753 million on borrowing related to new projects, refinancing of existing loans during current year causing an increase of INR 257 million, partially offset

by prior year charges that did not repeat, comprising INR 385 million of prepayment charges to settle existing loans from the proceeds from the issuance of a solar green bond, INR 124 million related to the extinguishment of a debt facility, and INR 96 million relating to the refinancing of a loan.

### Other Expenses/(Income)

Other expenses/(income) during FY 2021 increased by INR 114 million to INR 18 million (US$0.2 million) as compared to FY 2020. The lower income is primarily on account of lower investment in mutual funds due to lower free cash available during the year ended March 31, 2021.

### Loss on Foreign Currency Exchange

The foreign exchange loss during FY 2021 decreased by INR 505 million to a loss of INR 7 million (US$0.1 million) compared to FY 2020. During the current FY, we refinanced a foreign currency loan of INR 3,099 million (US$42.4 million) into an INR denominated loan, which had reduced the impact of Gain /Loss on Foreign Currency Exchange.

### Income Tax Expense/(Benefit)

Income tax expense decreased during FY 2021 by INR 193 million to INR 296 million (US$4.0 million), compared to FY 2020, the details of which are summarized below.

| | Year ended March 31, (in millions) | | | |
|---|---|---|---|---|
| | **2019** | **2020** | **2021** | **2021** |
| | **INR** | **INR** | **INR** | **US$** |
| Current tax expense | 128 | 120 | 242 | 3.3* |
| Withholding Tax on interest on restricted group debt | 192 | 258 | 383 | 5.2 |
| Deferred income tax (benefit)/expense | (167) | 111 | (330) | (4.5) |
| Total | 153 | 489 | 296 | 4.0 |

\* Current tax on profit before tax.

The total income tax expense for FY 2021 was INR 296 million, which decreased by INR 193 million compared to FY 2020.

The current tax expense for FY 2021 increased by INR 122 million compared to FY 2020 primarily on account of (i) increase in the taxable income of the entities that are outside Tax holiday period; and (ii) increase in the Other Income (primarily interest income) of entities utilizing the 80-IA exemption, as the benefit of the tax holiday period is not available for such other income items.

The withholding tax on interest on restricted group debt relates to the tax on intercompany interest on Solar Green Bond entities for which the Tax credit is not available under Mauritius tax laws. Amount for FY 2021 has increased by INR 125 million compared to FY 2020 primarily due to the reason that during the previous year withholding tax on our 5.65% Solar Green Bond was booked for part of the year as these bonds were issued in September 2019, whereas in the current year withholding tax is recognized for the full year for these bonds.

During FY 2021, we recorded a deferred tax benefit of INR 329 million (after considering valuation allowance of INR 269 million relating to the impairment loss related to the rooftop entities we are disposing of), whereas for FY 2020, we recorded a deferred tax expense of INR 111 million. The deferred tax benefit in the current year is primarily due to an increase in deferred tax asset of INR 280 million from the inter-company margin on projects under capital work in progress (including, but not limited to Rajasthan 6, Rajasthan 8 and Rajasthan 9) and the remaining increase is due to movement in other temporary timing difference between the book and tax basis of our assets and liabilities.

Our tax expenses are further described in Note 13—Income Taxes to our consolidated financial statements included in this annual report.

**Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events since March 31, 2022, that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial conditions.

56

**C. Liquidity and Capital Resources**

We currently do not generate adequate cash from operations to fund corporate expenses and to finance our growth. Our subsidiaries provide various support services to other group subsidiaries and charge amounts in the form of management fees for the services provided. Restrictions on the ability of our subsidiaries to pay us cash dividends as a result of certain regulatory and contractual restrictions may make it impracticable to use such dividends as a means of funding the expenses of Azure Power Global Limited. For a further discussion on our ability to issue and receive dividends, see "*Financial Statements*"

Our principal liquidity requirements are to finance current operations, service our debt and support our growth in India. We plan to continue to use capital to finance the construction of renewable power plants. Historically, our operations largely relied on equity and project-level long term borrowings, proceeds from issuance of compulsorily convertible preferred shares and compulsorily convertible debentures, and internally generated cash flows to meet capital expenditure requirements. As a normal part of our business and depending on market conditions, we will from time to time consider opportunities to repay, redeem, repurchase or refinance our indebtedness. Changes in our operating plans, lower than anticipated electricity sales, increased expenses or other events may cause us to seek additional debt or financing in future periods. There can be no guarantee that financing will be available on acceptable terms or at all. Debt financing, if available, could impose additional cash payment obligations, additional covenants and operating restrictions. Future financings could result in the dilution of our existing shareholding. In addition, any of the items discussed in detail under "Risk Factors" elsewhere in this annual report may also significantly impact our liquidity.

**Liquidity Position**

As of March 31, 2022, our liquid assets totaled INR 18,796 million (US$247.7 million), which was comprised of cash and cash equivalents. In addition, we have INR 3,784 million (US$49.9 million) of short-term restricted cash as of March 31, 2022 that generally gets utilized for capital expenditures. As of March 31, 2022, we carried cash and cash equivalent of INR 17,636 million (US$ 232.5 million) held by our foreign subsidiaries, which are not readily available to Azure Power Global Limited.

We also have commitments from financial institutions that we can draw upon in the future upon the achievement of specific funding criteria. As of March 31, 2022, we have such undrawn commitments excluding rooftop projects amounting to INR 5,980 million (US$78.8 million) under project-level financing arrangements.

We are subject to business and operational risks that could adversely affect our cash flows. A material decrease in our cash flows would likely produce a corresponding adverse effect on our borrowing capacity.

*Sources of Liquidity*

Our ability to meet our debt service obligations and other capital requirements will depend on our future operating performance which, in turn, will be subject to general economic, financial, business, competitive, legislative, regulatory and other conditions, many of which are beyond our control. Our financing arrangements as of March 31, 2022 consisted of project- level financing arrangements and other borrowings.

*Project-level Financing Arrangements*

Our borrowings include project-specific financing arrangements collateralized by the underlying power plants. The table below summarizes certain terms of our project-level financing arrangements as of March 31, 2022:

| Name of project | Outstanding principal Amount (in millions) | | Type of Interest | Currency | Maturity Date [1] |
|---|---|---|---|---|---|
| | INR | US$ | | | |
| Andhra Pradesh 1 | 2414 | 31.8 | Fixed | INR | 2026 |
| Bihar 1 | 422 | 5.6 | Fixed | INR | 2026 |
| Gujarat 1 | 893 | 11.8 | Fixed | INR | 2026 |
| Karnataka 1 | 720 | 9.5 | Fixed | INR | 2026 |
| Karnataka 3.1 | 2,115 | 27.9 | Fixed | INR | 2026 |
| Karnataka 3.2 | 1,723 | 22.7 | Fixed | INR | 2026 |
| Karnataka 3.3 | 2,704 | 35.6 | Fixed | INR | 2026 |
| Punjab 1 | 312 | 4.1 | Fixed | INR | 2026 |
| Punjab 2 | 1,866 | 24.6 | Fixed | INR | 2026 |
| Punjab 4 | 5,332 | 70.3 | Fixed | INR | 2026 |
| Rajasthan 3.1 | 1,142 | 15.1 | Fixed | INR | 2026 |
| Rajasthan 3.2 | 1,263 | 16.6 | Fixed | INR | 2026 |
| Rajasthan 3.3 | 2,237 | 29.5 | Fixed | INR | 2026 |
| Rajasthan 4 | 227 | 3.0 | Fixed | INR | 2026 |
| Telangana 1 | 4,841 | 63.8 | Fixed | INR | 2026 |
| Uttar Pradesh 1 | 340 | 4.5 | Fixed | INR | 2026 |
| Gujarat 2 | 9,188 | 121.1 | Fixed | INR | 2024 |
| Maharashtra 3 | 5,238 | 69.0 | Fixed | INR | 2024 |
| Karnataka 4 | 3,934 | 51.9 | Fixed | INR | 2024 |
| Maharashtra 1.1 & 1.2 | 325 | 4.3 | Fixed | INR | 2024 |
| Uttar Pradesh 3 | 1,778 | 23.4 | Fixed | INR | 2024 |
| Andhra Pradesh 3 | 2,179 | 28.7 | Fixed | INR | 2024 |
| Punjab 3.1 and 3.2 | 1,219 | 16.1 | Fixed | INR | 2024 |
| Chhattisgarh 1.1,1.2 & 1.3 | 1,520 | 20.0 | Floating | INR | 2036 |
| Rajasthan 1 | 406 | 5.4 | Fixed | INR | 2031 |
| Rajasthan 2 | 2,424 | 31.9 | Fixed | INR | 2033 |
| Karnataka 2 | 367 | 4.8 | Floating | INR | 2034 |
| Andhra Pradesh 2 | 5,070 | 66.8 | Floating | INR | 2036 |
| Uttar Pradesh 2 | 2,103 | 27.7 | Floating | INR | 2037 |
| Rajasthan 5 | 5,655 | 74.5 | Floating | INR | 2039 |
| Rajasthan 8 | 11,932 | 157.3 | Floating | US$ | 2026 |
| Rajasthan 9 | 8,454 | 111.4 | Mixed | INR/US$ | 2022-2041 |
| Assam 1 | 3,600 | 47.4 | Floating | INR | 2042 |
| Rajasthan 6 | 21,090 | 278.0 | Floating | INR | 2042 |
| Rooftop Projects [4] | 2,959 | 39.0 | Mixed | INR/US$ | 2022-2032 |
| **Total Amount** | **117,992[2], [3]** | **1,555.1** | | | |

(1) This represents the last repayment period. These loans are repayable on a quarterly or semi-annual or on bullet payment basis. For repayment by period of the above-mentioned loans, refer to contractual obligation and commercial commitments.
(2) This amount is presented in the financials as, net of ancillary cost of borrowing of INR 1,194 million (US$15.7 million).
(3) Further, non-project level debt of INR 12,058 million (US$158.9 million) are excluded from the above table. The non-project level debt balance includes INR 4,058 million (US$53.5 million) of foreign exchange impact on project debt against which the company has taken a hedge and also include INR 1,118 million (US$14.7 million) loan taken from minority shareholder in rooftop entities which forms part of the group.
(4) Rooftop Projects includes Delhi Rooftop 4, Gujarat rooftop, Punjab Rooftop 2, Railway 1 and SECI 50.

Our outstanding project-level borrowings have been secured by certain movable and immovable properties, including property, plant and equipment, as well as a pledge of the shares of the project-level SPVs.

The financing agreements governing our project-level borrowings contain financial and other restrictive covenants that limit our project subsidiaries' ability to make distributions to us unless certain specific conditions are met, including the satisfaction of certain financial ratios. Certain rooftop project entities of the Group, which are held for the sale, were not in compliance with the financial covenants related to this borrowing and had obtained suitable waivers for the non-compliance prior to the issuance of these financial statements. See also Note 12 to the consolidated financial statements.

### Uses of Liquidity

Our principal requirements for liquidity and capital resources can be categorized into investment for developing power plants and debt service obligations. Generally, once operational, our power generation assets do not require significant capital expenditures to maintain their operating performance and our working capital is sufficient to meet the operations. For principal and interest payments on our debt outstanding as of March 31, 2022, refer to the section entitled "Contractual Obligations".

### Capital Expenditures

As of March 31, 2022, we operated 47 utility scale projects with a combined rated capacity of 2,666 MW. As of such date, we were also constructing projects with a combined rated capacity of 247 MW.

All our capital expenditures are considered Growth Capital Expenditures. In broad terms, we expense all expenditures in the current period that would primarily maintain our businesses at current levels of operations, capability, profitability or cash flow in operations and maintenance and therefore there are no Maintenance Capital Expenditures. Growth capital expenditures primarily provide new or enhanced levels of operations, capability, profitability or cash flows.

Our capital expenditure requirements consist of:

(i)   Expansion capital expenditures for new projects;
(ii)  Working capital spent for building a pipeline of projects for the coming year(s); and
(iii) Replacement capex for running plant.

Expansion capital expenditures also include interest expense associated with borrowings used to fund expansion during the construction phase of the projects.

Our capital expenditure amounted to INR 18,321 million, INR 18,909 million and INR 40,869 million (US$538.7 million) for FY 2020, FY 2021 and FY 2022 respectively. Our capital expenditure during the current year was primarily for construction of Assam 1, Rajasthan 6, Rajasthan 8 and Rajasthan 9.

## Cash Flow Discussion

We also use traditional measures of cash flow, including net cash provided by operating activities, net cash used in investing activities and net cash provided by financing activities, as well as cash available for distribution to evaluate our periodic cash flow results.

Cash and cash equivalents include cash on hand, demand deposits with banks, term deposits and all other highly liquid investments purchased with an original maturity of three months or less at the date of acquisition and that are readily convertible to cash. It does not include restricted cash which consists of cash balances restricted as to withdrawal or usage and relate to cash used to collateralize bank letters of credit supporting the purchase of equipment for solar power plants, bank guarantees issued in relation to the construction of the solar power plants within the timelines stipulated in PPAs and for certain debt service reserves required under our loan agreements.

### Fiscal Year 2022 Compared to Fiscal Year 2021

The following table reflects the changes in cash flows for the comparative periods:

|  | 2021 | 2022 | 2022 | Change |
| --- | --- | --- | --- | --- |
|  | INR | INR | US$ | INR |
|  |  | (Millions) |  |  |
| **Cash flow data** |  |  |  |  |
| Net cash provided by operating activities | 4,977 | 4,597 | 60.6 | (380) |
| Net cash used in investing activities | (18,919) | (39,427) | (519.7) | (20.508) |
| Net cash provided by financing activities | 15,092 | 41,940 | 552.8 | 26,848 |

#### Operating Activities

During Fiscal Year 2022, we generated INR 4,597 million (US$ 60.6 million) of cash from operating activities. This cash generated from operating activities primarily is a result of net loss of INR 2,126 million during FY 2022 added with non-cash items including a derivative instrument of INR 1,576 million, depreciation and amortization of INR 3,667 million, reversal of Impairment loss of INR 80 million, deferred income taxes of INR 457 million, amortization of debt financing cost of INR 1,107 million and prepayment penalty on refinancing of loans of INR 1,608 million, offset by reversal of share based

compensation of INR 295 million. In addition to this there is impact of working capital changes, including INR 1,018 million due to increase in other liabilities, increase in deferred revenue of INR 3,184 million, increase in accounts payable of INR 347 million, offset by decrease in interest payable of INR 520 million, INR 1,057 million increase in trade receivables and increase in prepaid and other assets by INR 4,427 million.

During FY 2021, we generated INR 4,977 million (US$68.3 million) of cash from operating activities. This cash generated from operating activities primarily resulted from a net loss during FY 2021 of INR 4,201 million increased by non-cash items including a derivative instrument of INR 1,918 million, depreciation and amortization of INR 3,202 million, Impairment loss of INR 3,255 million, allowance for doubtful accounts of INR 294 million and share based compensation of INR 1,001 million, offset by deferred income taxes of INR 329 million, in addition to changes in working capital including, a INR 61 million decrease in other liabilities, an INR 224 million increase in deferred revenue, a INR 20 million decrease in prepaid expenses and other current assets, a INR 112 million decrease in other assets primarily resulting from prepaid income taxes and interest receivable on term deposits and INR 83 million decrease in interest payable offset by an INR 874 million increase in accounts receivable.

### Investing Activities

During FY 2022, we utilized INR 39,427 million (US$519.7 million) in our investing activities. This cash outflow was primarily due to INR 40,869 million (US$538.7 million) incurred to purchase property, plant and equipment primarily related to the construction of our Rajasthan 6, Rajasthan 8, Rajasthan 9 and Assam 1 projects and investment in equity investee amounting to INR 94 million (US$ 1.2 million). This cash outflow has been offset by proceeds from disposal of subsidiaries for INR 1,557 million (US$ 20.5 million).

During FY 2021, we utilized INR 18,919 million (US$258.9 million) in our investing activities. This cash outflow was primarily due to INR 18,909 million (US$258.8 million) incurred to purchase property, plant and equipment primarily related to the construction of our following projects Rajasthan 6 and Assam 1.

### Financing Activities

During FY 2022, we generated INR 41,940 million (US$ 552.8 million) from financing activities. This cash inflow was primarily due to net proceeds of INR 18,622 million (US$245.4 million) from issuance of equity share under right issues, net loan proceeds of INR 31,710 million (US$ 418.0 million) for our Rajasthan 6, Rajasthan 8, Rajasthan 9 and additional loans on refinancing of existing projects, offset by lower loan draw down on account of refinancing of Green Bonds amounting to INR 6,784 million (US$89.4 million) and INR 1,608 million (US$21.2 million) on account of prepayment charges paid on refinancing of loans.

During FY 2021, we generated INR 15,092 million (US$206.2 million) from financing activities. This cash inflow was primarily due to new loan proceeds of INR 25,510 million (US$348.7 million) for our Assam 1, Rajasthan 6, Rajasthan 2, Rajasthan 5 and Karnataka 2 projects and certain rooftop solar power plants, offset by repayment of term loan amounting to INR 10,563 million (US$144.5 million), which includes INR 2,279 million (US$31.2 million) paid towards hedging costs for Green Bonds and import of goods and a INR 257 million (US$3.5 million) decrease due to loan prepayment charges.

### Fiscal Year 2021 Compared to Fiscal Year 2020

The following table reflects the changes in cash flows for the comparative periods:

|  | For fiscal year ended March 31, | | | |
|  | 2020 | 2021 | | Change |
|  | INR | INR | US$ | INR |
|  | | (In millions) | | |
| **Cash flow data** | | | | |
| Net cash provided by operating activities | 3,678 | 4,977 | 68.3 | 1,299 |
| Net cash used in investing activities | (18,256) | (18,919) | (258.9) | (663) |
| Net cash provided by financing activities | 16,146 | 15,092 | 206.2 | (1,054) |

### Operating Activities

During FY 2021, we generated INR 4,977 million (US$68.3 million) of cash from operating activities. This cash generated from operating activities primarily resulted from a net loss during FY 2021 of INR 4,201 million increased by non-cash items including a derivative instrument of INR 1,918 million, depreciation and amortization of INR 3,202 million, Impairment loss of INR 3,255 million, allowance for doubtful accounts of INR 294 million and share based compensation of INR 1,001 million, offset by deferred income taxes of INR 329 million, in addition to changes in working capital including, a INR 61 million decrease in other liabilities, an INR 224 million increase in deferred revenue, a INR 20 million decrease in prepaid expenses and other current assets, a INR 112 million decrease in other assets primarily resulting from prepaid income taxes and interest receivable on term deposits and INR 83 million decrease in interest payable offset by an INR 874 million increase in accounts receivable.

During FY 2020, we generated INR 3,678 million (US$49.2 million) of cash from operating activities. This cash generated from operating activities primarily resulted from a net loss during FY 2020 of INR 2,337 million increased by non-cash items including a derivative instrument of INR 1,428 million, depreciation and amortization of INR 2,860 million, allowance for doubtful accounts of INR 303 million and deferred income taxes of INR 149 million, offset by realized gain on investments of INR 108 million, in addition to changes in working capital including, an INR 164 million increase in other liabilities, an INR 340 million increase in deferred revenue, an INR 247 million decrease in prepaid expenses and other current assets, an INR 335 million increase in other assets primarily resulting from prepaid income taxes and interest receivable on term deposits and INR 699 million increase in interest payable offset by an INR 1,390 million increase in accounts receivable.

### Investing Activities

During FY 2021, we utilized INR 18,919 million (US$258.9 million) in our investing activities. This cash outflow was primarily due to INR 18,909 million (US$258.8 million) incurred to purchase property, plant and equipment primarily related to the construction of our following projects Rajasthan 6 and Assam 1.

During FY 2020, we utilized INR 18,256 million (US$242.7 million) in our investing activities. This cash outflow was primarily due to INR 18,321 million (US$243.0 million) incurred to purchase property, plant and equipment primarily related to the construction of our following projects Assam 1, Rajasthan 6, Rajasthan 5, Maharashtra 3, Gujarat 2 and Karnataka 4.1 and 4.2, offset by a net sale of INR 108 million (US$1.4 million) of available-for-sale current investments.

### Financing Activities

During FY 2021, we generated INR 15,092 million (US$206.2 million) from financing activities. This cash inflow was primarily due to new loan proceeds of INR 25,510 million (US$348.7 million) for our Assam 1, Rajasthan 6, Rajasthan 2, Rajasthan 5 and Karnataka 2 projects and certain rooftop solar power plants, offset by repayment of term loan amounting to INR 10,563 million (US$144.5 million), which includes INR 2,279 million (US$31.2 million) paid towards hedging costs for Green Bonds and import of goods and a INR 257 million (US$3.5 million) decrease due to loan prepayment charges.

During FY 2020, we generated INR 16,146 million (US$214.3 million) from financing activities. This cash inflow was primarily due to issuance of Green Bonds for INR 24,400 million (US$323.7 million), new loan proceeds of INR 19,538 million (US$259.2 million) for our Uttar Pradesh 3, Andhra Pradesh 3 and Karnataka 4 projects and certain rooftop solar power plants and private placement for issuance of 6,493,506 equity shares at US$11.55 per share to Caisse de depot et placement du Quebec, from which we raised INR 5,317 million (US$70.5 million) offset by repayment of term loan amounting to INR 32,827 million (US$435.4 million), which includes INR 1,058 million (US$14.0 million) paid towards hedging costs for Green Bonds and an INR 282 million (US$3.7 million) decrease due to loan prepayment charges.

## D. Off-Balance Sheet Arrangements

The terms of our PPAs provide for the annual delivery of a minimum amount of electricity at fixed prices. Under the terms of the PPAs, we have issued irrevocable performance bank guarantees. These in total amount to INR 7,730 and INR 5,179 million (US$68.3 million) as of March 31, 2021 and 2022, respectively.

As of March 31, 2021 and 2022, the Company has irrevocable performance bank guarantees aggregating to INR 5,366 million and INR 2,320 million (US$30.6 million) respectively, in relation to under construction projects. Further, bank guarantees of INR 516 million and INR 1,517 million (US$20.0 million) as of March 31, 2021 and 2022 respectively are in relation to commissioned projects as per respective PPAs and other project requirements.

Bank guarantees amounting to INR 906 million and INR 458 million (US$6.0 million) as of March 31, 2021 and 2022, respectively, have been issued to meet Debt-Service Reserve Account (DSRA) requirements for outstanding loans.

We have also obtained guarantees from financial institutions as a part of the bidding process for establishing solar projects amounting to INR 932 million and INR 873 million (US$11.5 million) as of March 31, 2021 and 2022 respectively. We have given term deposits as collateral for those guarantees which are classified as restricted cash on the consolidated balance sheet.

Further, INR 10 million and INR 11 million (US$0.1 million) bank guarantee as of March 31, 2021 and 2022 respectively, are towards other commitments. The funds released from maturity/settlement of existing bank guarantees can be used for future operational activities.

## E. Contractual Obligations

We have contractual obligations and other commercial commitments that represent prospective cash requirements. The following table summarizes our outstanding contractual obligations and commercial commitments as of March 31, 2022.

| | Payment due by Period | | | | |
| --- | --- | --- | --- | --- | --- |
| | Under 1 year | 1-3 Years | 3-5 Years | Over 5 years | Total |
| | (INR in millions) | | | | |
| **Contractual cash obligations** | | | | | |
| Long-term debt (principal) [1] | 7,480 | 41,173 | 39,766 | 34,521 | **122,940** |
| Long-term debt (interest) [2] | 7,617 | 13,628 | 7,583 | 17,586 | **46,414** |
| Operating lease obligations | 313 | 652 | 690 | 11913 | **13,567** |
| Purchase obligations [3] | 2,857 | — | — | — | **2,857** |
| Asset retirement obligations | — | — | — | 902 | **902** |
| **Total contractual obligations** | **18,267** | **55,453** | **48,039** | **64,922** | **186,680** |
| **Total contractual obligations (US$)** | **240.8** | **730.9** | **633.2** | **855.7** | **2,460.6** |

(1) The long-term debt includes project secured term loans and, other secured bank loans. The long-term debt (principal) obligations for foreign currency denominated project borrowings have been converted to Indian rupees using the closing exchange rate as of March 31, 2022 as per Reserve Bank of India.
(2) Interest on long-term debt is calculated based on the outstanding balance of the debt at the prevailing interest rate for the corresponding periods.
(3) Consists of asset purchase commitment for construction of solar power plants.

**F. Critical Accounting Policies and Estimates**

In December 2019, the FASB issued ASU 2019-12, Simplifying the Accounting for Income Taxes ("ASU 2019-12"). This ASU eliminates certain exceptions to the general principles in ASC 740, Income Taxes and adds guidance to reduce complexity in accounting for income taxes. The ASU eliminates, inter alia, the general methodology for calculating income taxes in an interim period when a year-to-date loss exceeds the anticipated loss for the year. The ASU requires that an entity reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date. ASU 2019-12 is effective for the annual periods beginning after December 15, 2020, including interim periods within those fiscal years. During FY 2022, we applied ASU 2019-12 and noted that the impact of adoption of this guidance did not have a material effect on our consolidated financial statements.

In March 2020, the Financial Accounting Standards Board issued ASU No. 2020-04, "Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting ("ASU 2020-04")." ASU 2020-04 provides temporary optional expedients and exceptions to the guidance in U.S. GAAP on contract modifications and hedge accounting to ease the financial reporting burdens related to the expected market transition from the London Interbank Offered Rate (LIBOR) and other interbank offered rates to alternative reference rates. In January 2021, the FASB issued Accounting Standard Update ("ASU") 2021-01 (Topic 848), which amends and clarifies the existing accounting standard issued in March 2020 ("ASU") 2020-04 for Reference Rate Reform. Reference rates such as LIBOR, are widely used in a broad range of financial instruments and other agreements. The ASU permits entities to elect certain optional expedients and exceptions when accounting for derivative contracts and certain hedging relationships affected by changes in the interest rates used for discounting cash flows, for computing variation margin settlements, and for calculating price alignment interest in connection with reference rate reform activities under way in global financial markets (the "discounting transition"). The ASU 2020-04 is effective for adoption at any time between March 12, 2020 and December 31, 2022, for all entities and the ASU 2021-01 is effective for all entities as of January 7, 2021 through December 31, 2022. As of March 31, 2022, we have not made any contract modifications to replace the reference rate in any of its agreements and will continue to evaluate the effects of this standard on its consolidated financial position, results of operations, and cash flows.

Other recent accounting pronouncements issued by the FASB (including its Emerging Issues Task Force) and the SEC did not or are not believed by management to have a material impact on our present or future financial statements.

# III. SHARE OWNERSHIP AND TRADING

## A. Major Shareholders

The following table sets forth certain information with respect to the beneficial ownership of our Company's equity shares as of October 10, 2023 by each of our directors and executive officers, by all of our directors and executive officers as a group and by each person known to us to own beneficially more than 5% of the equity shares.

As used in this table, beneficial ownership means the sole or shared power to vote or direct the voting or to dispose of or direct the sale of any security. A person is deemed to be the beneficial owner of securities that can be acquired within 60 days upon the exercise of any option, warrant or right as of October 10, 2023. Equity shares subject to options, warrants or rights that are currently exercisable or exercisable within 60 days are deemed outstanding for computing the ownership percentage of the person holding the options, warrants or rights, but are not deemed outstanding for computing the ownership percentage of any other person. The amounts and percentages are based on 64,161,490 equity shares outstanding as of the date of this table:

| Name | Number shares beneficially owned | % |
|---|---|---|
| **Directors and Executive Officers:** | | |
| Panicker Unnikrishnan Mangalath Sukumara | - | - |
| Cyril Sebastien Dominique Cabanes | - | - |
| Deepak Malhotra | - | - |
| Muhammad Khalid Peyrye[1] | - | - |
| Supriya Prakash Sen | 402 | *[2] |
| Jean-François Boisvenu | - | - |
| Delphine Voeltzel | - | - |
| Gowtamsingh Dabee | - | - |
| Richard Payette | - | - |
| Sugata Sircar | - | - |
| Sunil Gupta | - | - |
| Pawan Kumar Agrawal | 92,044 | 0.14% |
| R Narasimhan Iyer | - | - |
| Vijay Kumar Wadhwani | - | - |
| Shweta Srivastava | - | - |
| All Directors and Executive Officers as a Group | 92,446 | 0.14% |
| **5% or Greater Shareholders:** | | |
| CDPQ Infrastructures Asia Pte Ltd.[3] | 34,258,963 | 53.4% |
| OMERS[4] | 13,759,647 | 21.4% |

## Shareholders' Agreement

The Company did not have any changes to its shareholders agreement. The shareholders agreement is attached as exhibit no. 4.3, 4,4 and 4.5.

---

[1] Mr. Peyrye's business address is c/o AAA Global Services Ltd., 4th Floor, Iconebene, Rue De L'institut, Ebene, 80817, Mauritius.

[2] Less than 0.01%

[3] CDPQ Infrastructures Asia Pte Ltd., a company organized and existing under the laws of Singapore, is a wholly-owned subsidiary of the Caisse de dépôt et placement du Québec, a body constituted by the Act Respecting the Caisse De Dépôt Et Placement Du Québec. The principal address of the Caisse de dépôt et placement du Québec is 1000, Place Jean-Paul-Riopelle, Montréal, Québec, H2Z 2B3.

[4] During the Fiscal Year 2022, OMERS Infrastructure Asia Holdings Pte. Ltd. ("OMERS"), has acquired the entire stake of 19.4% in the Company, previously held by International Finance Corporation and IFC GIF Investment Company.

## B. Related Party Transactions

We believe that the terms of our related party transactions are comparable to the terms we could obtain from independent third parties. Our Company's related party transactions are subject to the review and approval of the audit and risk committee of our Company's Board of Directors. Our Company's audit and risk committee will consider whether the transaction is to be conducted on an arm's-length basis and whether the services can be procured from an independent third party. The charter of our audit and risk committee as adopted by our Company's Board of Directors provides that we may not enter into any related-party transaction unless and until it has been approved by the audit and risk committee. Refer "Note 20. Related Party Disclosures" of the Notes to Consolidated Financial Statements for details of transactions with related parties.

## C. Distribution

The Company has never declared or paid dividends, nor does the Company have any present plan to pay any cash dividends on our equity shares in the foreseeable future. The Company currently intends to retain its available funds and any future earnings to operate and expand its business.

**D. Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of the annual financial statements included in this annual report. See "Certain Factors affecting our Results".

**E. Trading Markets**

The Company's equity shares have been listed on the NYSE since October 12, 2016 under the symbol "AZRE." On July 13, 2023, the NYSE suspended trading in our equity shares and commenced delisting proceedings as a result of our failure to timely file with the SEC our annual report on Form 20-F for the period ended March 31, 2022 and our semi-annual report on Form 6-K for the period ended September 30, 2022. On July 26, 2023, we submitted an appeal of this decision. We await the hearing of the Company's appeal before the NYSE. Although we are appealing the NYSE's attempt to delist our equity shares, our equity shares are currently suspended from trading on the NYSE and will remain suspended during the delisting proceedings. See "Risk Factors – *The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares"*.

**F. Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

Azure did not engage in any share repurchases during Fiscal Year 2022.

**G. Material Modifications to the Rights of Security Holders and Use of Proceeds**

**Material modifications to the rights of the security holders**

There have been no material modifications to the rights of securities holders.

**Use of proceeds**

In January 2022, we completed a rights offering of 15,828,917 new equity shares to raise up to US$250 million. Each right entitles the holder to purchase 0.3275 equity shares at the subscription price of US$15.79 per whole equity share. HSBC Securities (USA) Inc. and Roth Capital Partners, LLC acted as our dealer managers in connection with the rights offering. The offering by our Company resulted in aggregate gross proceeds before expenses of US$250 million and incurred an underwriter's commission and other expenses of US$2.9 million. As on March 31, 2022, out of the net equity proceeds, US$100 million was utilized against repayment of corporate debts and US$26.4 million was utilized to pay off certain borrowings. The balance of the proceeds are being utilized for purchase of renewable assets and other operational expenses.

During November – December 2019, we completed a US$75 million private placement. An aggregate 6,493,506 shares were sold by us in the offering at a price of US$11.55 per share to CDPQ Infrastructures. The offering by our Company resulted in aggregate gross proceeds before expenses of US$75.0 million. We have used the net proceeds to fund capital expenditures for projects.

During October – November 2018, our Company completed our follow-on to our public offering of our Company's equity shares pursuant to a Registration Statement on Form F-3, as amended (File No. 333-227164), which became effective on September 10, 2018. Credit Suisse Securities (USA) LLC., Barclays Capital Inc., and HSBC Securities (USA) Inc., acted as managing underwriters for the issue. An aggregate of 14,915,542 shares (including 115,542 shares exercised by underwriters subsequent to our offering) were sold by our Company in the offering at a price of US$12.50 per share. The initial offering by our Company resulted in aggregate gross proceeds before expenses of US$186.4 million and incurred an underwriter's commission and other expenses of US$1.3 million. Our Company has used US$182.0 million of the net proceeds to purchase equity shares of our subsidiary APIPL and Azure Power Rooftop Private Limited, as outlined in the registration statement and prospectus.

## IV. MANAGEMENT AND EMPLOYEES

### A. Management

**Board of Directors**

Our Board of Directors (the "Board") sets policies for our business and monitors the implementation of those policies by our executive officers. Our Board has nine directors. Our Board has in-depth experience in the renewable energy industry and corporate finance and is globally respected in energy, finance, and public policy. All Board directors are non-executive; five are Independent Non-Executives and four are Non-Executive nominees of shareholders (three of CDPQ and one of OMERS). The following table presents certain information concerning the current board of directors as of October 10, 2023.

| Name of Directors | Age | Position |
|---|---|---|
| Panicker Unnikrishnan Mangalath Sukumara | 63 | Chairman of the Board of Directors[1] |
| Muhammad Khalid Peyrye | 45 | Director |
| Supriya Prakash Sen | 58 | Director |
| Jean-François Boisvenu | 57 | Director *(from February 8, 2023)* |
| Cyril Sebastien Dominique Cabanes | 49 | Director |
| Deepak Malhotra | 44 | Director |
| Delphine Voeltzel | 39 | Director *(from May 11, 2022)* |
| Gowtamsingh Dabee | 56 | Director *(from March 30, 2023)* |
| Richard Payette | 63 | Director *(from July 01,2023)* |
| Richard Alan Rosling | 61 | Chairman of the Board of Directors[1] *(from October 1, 2021 to October 11, 2023)* |
| Arno Lockheart Harris | 54 | Director *(until May 31, 2022)* |
| Ranjit Gupta | 53 | Chief Executive Officer/Managing Director *(until April 26, 2022)* |
| Barney S. Rush | 72 | Chairman of the Board of Directors *(until September 30, 2021)* |
| Sugata Sircar | 59 | Director *(from October 1, 2022 until April 30, 2023)* |
| Christine Ann McNamara | 64 | Director *(from March 1, 2022 until June 26, 2023)* |
| Yung Oy Pin Lun Leung | 57 | Director *(until March 16, 2023)* |

[1] On October 11, 2023, Mr. Alan Rosling resigned as Chairman of the Board and as a director of the Company and APIPL. On October 12, 2023, the Company announced that Panicker Unnikrishnan Mangalath became the Chairman of the Board of the Company.

Below is a summary of the business experience, activities and areas of expertise of our current directors.

| | Name and Designation | Experience and areas of expertise |
|---|---|---|
|  | **Panicker Unnikrishnan Mangalath Sukumara**<br><br>*Chairman and Non-Executive Director* | ■ Over 30 years of experience in the energy and environmental sector. Asia Innovator of the Year by CNBC Asia, one of the best CEOs in India by Grant Thorton, and India Innovator of the Year by CNBC India.<br><br>■ Managing Director and CEO of Thermax Ltd.<br><br>■ Actively involved with various industry bodies to help in policy making and technology development for India.<br><br>■ He holds a Bachelor of Engineering (Mechanical) from Visveswaraiya NIT, Nagpur and has completed an Advanced Management Program from Harvard Business School.<br><br>■ Nominated to the Board by CDPQ. |
| | **Muhammad Khalid Peyrye**<br><br>*Independent Director* | ■ One of our resident directors in Mauritius.<br><br>■ Heads the Corporate Secretarial and Administrative cluster of AAA Global Services Ltd.<br><br>■ Previously was a Money Laundering and Compliance officer for a leading financial services company. |
| | **Supriya Prakash Sen**<br><br>*Independent Director* | ■ Over 30 years of experience in banking, private equity, capital markets and multilateral funding and investment as well as significant involvement in sustainability initiatives globally and in India. |

| | | |
|---|---|---|
| | | ■ She was Senior Advisor at McKinsey and a strategy consultant for clients in South East Asia, South Asia and China. |
| | | ■ Worked on differentiated funding models for enabling private investment in green infrastructure. |
| | | ■ She holds MBA from IIM, Calcutta and also holds executive development programs in strategic innovation, public policy and governance. |
| | **Jean-François Boisvenu** *Independent Director* | ■ More than 25 years of extensive experience in corporate and commercial law matters, with particular expertise in international banking transactions, lending and debt capital markets transactions and financial institutions regulation. |
| | | ■ He is a partner at Eversheds Sutherland (Mauritius), prior to that, he was Group Head Legal at AfrAsia Bank Limited and worked at BLC Robert. |
| | | ■ Before moving to Mauritius in 2009, he was a partner at the Canadian law firm McCarthy Tétrault (Banking and Insolvency Department). Mr. Boisvenu is a Member of the Quebec Bar (Canada) and a Registered Foreign Lawyer in Mauritius. |
| | | ■ He holds degrees in Law from University of Montreal and Quebec Bar School (Canada) and a bachelor's degree in Applied Economics from École des Hautes Études Commerciales de Montréal. |
| | **Cyril Sebastien** **Dominique Cabanes** *Non-Executive Director* | ● Vice President, Head of Infrastructure Transactions, Asia-Pacific at CDPQ. |
| | | ● More than 20 years of experience across all facets of infrastructure transactions including acquisitions, financing and fundraising. |
| | | ● He holds a Masters from ESCP-Europe and an MBA from Drexel University. |
| | | ● Nominated to the Board by CDPQ. |
| | **Deepak Malhotra** *Non-Executive Director* | ● Managing Director, Infrastructure, India at CDPQ. |
| | | ● More than 20 years of experience. He previously worked at International Finance Corporation, World Bank, at a leading credit agency in India and in the Merchant Navy. |
| | | ● He holds a Bachelor's Degree from Delhi University and an MBA from Vanderbilt University. |
| | | ● Nominated to the Board by CDPQ. |
| | **Delphine Voeltzel** *Non-Executive Director* | ● She has 13 years of professional experience in the infrastructure sector across Europe and Asia and is leading OMERS Infrastructure's investment efforts in Asia |
| | | ● Presently, she is serving as Managing Director at OMERS Infrastructure. |
| | | ● Responsible for originating and executing new transactions in Asia and managing the existing investment portfolio for OMERS Infrastructure. |

| | | |
|---|---|---|
| | | • She holds a Master of Science in Management from HEC Paris School of Management. |
| | | • Nominated to the Board by OMERS. |
| | **Gowtamsingh Dabee**<br><br>*Independent Director* | • He has over 25 years of experience as a professional accountant in public practice and industry in Mauritius, Africa, and the Middle East.<br>• Presently he is a Partner of GD Riches Chartered Accountants and is an auditor, public accountant, and insolvency practitioner in Mauritius.<br>• Prior to that, he served as the CFO and Company Secretary of a multinational corporation in Mauritius where he was instrumental in implementing SOX internal control systems for the group subsidiaries.<br>• Also worked with the representative office of Andersen Worldwide in Mauritius and the Arthur Andersen Office in Dubai.<br>• He is an Associate Member of the Institute of Chartered Accountants in England and Wales (ICAEW) and a Fellow of Chartered Association of Certified Accountant (FCCA). He holds an MBA from Surrey Business School, University of Surrey, UK, and an Advanced Diploma in International Tax from the Chartered Institute of Taxation UK (CIOT).<br>• He is a registered insolvency practitioner in Mauritius and a member of INSOL. |
| | **Richard Payette**<br><br>*Independent Director* | • He is a business leader with over four decades of experience in management of global companies and accounting and audit matters.<br>• His area of expertise includes organisational transformation, international market development, finance, audit, governance, and risk management.<br>• He currently serves as a director of Export Development Canada (EDC), Canada's export credit agency wholly owned by the Government of Canada and the Canadian Public Accountability Board (CPAB), a regulatory body charged with overseeing audits of Canadian reporting issuers.<br>• He earlier served as Chair of the boards of the Canadian Chamber of Commerce and Fédération de Chambres de Commerce du Québec.<br>• From 2016 until 2020, he served as President and CEO Québec of Manulife and was the CEO for the Americas region at BDO International between 2010 and 2015.<br>• He worked with Raymond Chabot Grant Thornton since 1982 until 2009, lastly as the President and CEO. He is also a member of the advisory boards of Lemay and LexRockAI.<br>• He is a Fellow of the Chartered Professional Accountants of Canada and holds an ESG Certification and designation. |

## Executive Officers

The executive officers are responsible for the management of the company under the governance of the Board of Directors. All our executive offices are experienced in their domains. The following table lists our current executive officers.

| Name of Executive Officers | Age | Position |
|---|---|---|
| Sunil Gupta | 60 | Chief Executive Officer |
| Sugata Sircar | 59 | Group Chief Financial Officer |
| Pawan Kumar Agrawal | 44 | Chief Financial Officer |
| R Narasimhan Iyer | 59 | Chief Operating Officer |
| Shweta Srivastava | 47 | Chief Human Resource Officer |
| Vijay Kumar Wadhwani | 44 | Head – Management Assurance |

Below is a summary of the business experience, activities and areas of expertise of our current executive officers.

| | Name and Designation | Experience and areas of expertise |
|---|---|---|
|  | **Sunil Gupta**<br><br>*Chief Executive Officer* | <ul><li>Sunil comes with global experience in renewable energy, new energy and digital technologies. He has over two decades of experience in managing growth, operational excellence, and profitability of global renewable energy businesses.</li><li>Prior to Azure Power, Sunil was the Head – South-East Asia & South Asia Business at Vena Energy (a leading Asia Pacific renewable energy company), managing existing business and developing new projects.</li><li>Prior to that, he was Group Head – Renewable Energy Business at Sembcorp Industries, Singapore, where he built the renewables business and spearheaded market entry in India, Australia, Singapore and Vietnam.</li><li>In India, he was instrumental in managing businesses comprising of multiple utility scale wind and solar power generation plants.</li><li>As a cleantech industry professional, Sunil has also worked with Standard Chartered Bank and Morgan Stanley and has extensive experience in Investment Banking and Corporate Finance.</li><li>Sunil earned his MBA from Indian Institute of Management, Ahmedabad and B. Tech from Indian Institute of Technology, Delhi.</li></ul> |
|  | **Sugata Sircar**<br><br>*Group Chief Financial Officer & Executive Director* | <ul><li>Sugata joined the Company as Executive Director Finance & Group Chief Financial Officer after resigning from his position as Independent Director.</li><li>He has over 32 years of experience of which more than 20 years were as CFO, most recently being as CFO at Schneider Electric India. He has worked in various industries including energy and automation, tires, city gas distribution and FMCG.</li><li>He was with Gujarat Gas (subsidiary of British Gas UK) as Finance Director & CFO and then as Managing Director. He also worked with Cabot India, Madura Coats, Britannia Industries and Dunlop.</li><li>His expertise is in partnering strategy building & execution, business performance management; leading business integration & transformation projects; merger & acquisition; governance, compliances, business risk management.</li><li>He is a Chartered Accountant (FCA) 1989 and has done advanced management programs from Harvard Business School, Kellogs and ISB.</li></ul> |
|  | **Pawan Kumar Agrawal**[1]<br><br>*Chief Financial Officer of APIPL* | <ul><li>Leading capital, investor relations, secretarial, finance, and accounting functions.</li><li>Extensive experience in project finance, credit rating, policy, and business development in infrastructure sectors with special focus on renewable energy.</li><li>He was associated with YES Bank Limited, CRISIL (Standard & Poor's subsidiary in India), Indian Oil Corporation and Ernst & Young.</li></ul> |

---

[1] During Fiscal Year 2022, the Enforcement Directorate of India filed a Prosecution Complaint with a special court in New Delhi on October 1, 2021, in respect of an earlier Enforcement Case Information Report wherein Mr. Pawan Kumar Agrawal, the current Chief Financial Officer of AZI, is one of those named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. The relevant transactions that were the subject of the complaint predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of AZI, and the criminal charges are not directed at, and do not concern, the Group. We will continue to monitor the proceedings as Mr. Agrawal defends the charges made against him.

| | | |
|---|---|---|
| | | • Instrumental in issuance of India's first Green Bond as well as India's first IIFCL/ADB braced Partial Credit Enhanced Bond in the Indian Solar Sector.<br>• A rank holder Chartered Accountant and Cost Accountant in India, MBA from Faculty of Management Studies, Delhi University and has also cleared all three levels of Chartered Financial Analyst (CFA, USA). |
| | **R Narasimhan Iyer**<br><br>*Chief Operating Officer* | • R Narasimhan Iyer has over 30 years of experience in business operations, strategic execution, power transmission, distribution, metering & renewable energy generation space.<br>• He holds deep experience in energy sector technologies and robust understanding of energy policies, strategies, institutions and regulations.<br>• He served as Director Operations at SB Energy (SoftBank Group) and has also worked with companies like SunEdison, Schneider Electric, Secure Meters, IBM, and ABB in various roles like roles and capacities.<br>• He holds a degree in Electrical & Electronics Engineering from Birla Institute of Technology & Science, Pilani and a Gold Medalist in Post Graduate Diploma in International Business from Indian Institute of Foreign Trade, New Delhi. |
| | **Shweta Srivastava**<br><br>*Chief Human Resource Officer* | • Professional with more than 20 years of diverse human resources experience in Fortune 500 corporations, across industries like hi-tech, consumer, life sciences & Infrastructure.<br>• She has diverse experience of working across 14 countries in the Middle East & South East Asia, UK and other international regions. She has led large teams and worked closely with senior management.<br>• During past years, she has assumed responsibilities spanning various HR functions in Talent Acquisition, Business Partnering, Leadership & OD, Diversity & Inclusion, Employee Engagement, HR Strategy & Growth.<br>• Her prior experiences include Vedanta Ltd. As the Group Head Talent Acquisition, Sterlite Power (part of Vedanta Group) as people strategy lead and other senior leadership positions at Indus Towers Limited, United health Group, Qualcomm, Motorola and Ericsson.<br>• She holds master's in human resources from Pune University, and has bachelor's from Ambedkar University. She has also done Leadership Excellence Program from Harvard Business School. |
| | **Vijay Wadhwani**<br><br>*Head – Management Assurance* | • Leading our management assurance and internal audit function. Highly accomplished, results driven senior accounting and financial management executive with more than 18 years of progressive experience.<br>• Worked as a part of the Big 4 audit firm with diverse skills in client management and expertise in managing statutory audit, process consulting and group reporting.<br>• Experience of working in complex environment with applicability of UGAAP, IFRS and Indian GAAP (now Ind-AS).<br>• He was working with S.N. Dhawan & CO LLP (Member firm of Mazars in India). Previously worked with Minda Industries Limited and S. R. Batliboi & Co. LLP (Ernst & Young).<br>• He holds Chartered Accountant (May 2001), IBBI Registered Valuer (RV) (Oct 2021). |

**B. Board Practices**

**Board of Directors**

Our Company is managed and controlled by its Board of Directors. As October 11, 2023, our Company's Board of Directors consists of nine directors, of which five are independent non-executive directors and two of whom are women. As a foreign private issuer, we are permitted to follow home country corporate governance practices. Certain corporate practice in Mauritius, which is our home country, may differ significantly from the NYSE corporate governance listing standards. Unlike the requirements of the NYSE, the corporate governance practice and requirements in Mauritius do not require us

- to have the majority of our Board of Directors be independent;
- to have all our members of our compensation committee or our nominating and corporate governance committee to be independent directors;
- to have a nominations committee; or
- to hold regular executive sessions where only independent directors shall be present.

Please refer "Corporate Governance" section for exceptions availed by the Company.

**Terms of Directors and Executive Officers**

In accordance with our Company's Constitution, one-third of our Company's directors (or, if their number is not a multiple of three, the number nearest to but not greater than one-third) shall be up for re-election by rotation at each annual meeting of our company. The Chairman of the Board and/or the managing director during the tenure shall not be subject to retirement by rotation or be taken into account in determining the number of directors to retire in each year. Any director appointed by the Board after the last annual meeting shall be taken into account in determining which particular directors or the number of directors who are to retire by rotation. The directors up for re-election in each year shall be those who have been in office longest since their last re-election or appointment and as between persons who became or were last re-elected directors on the same day, those up for re-election shall (unless they otherwise agree among themselves) be determined by lot. Any director may be removed by either an ordinary resolution of our shareholders or by the majority vote of the Board of Directors in the following circumstances: for cause, which refers to willful misconduct, fraud, conviction of a felony, gross negligence or breach of a written policy of the company; or if the director becomes mentally unsound or bankrupt or becomes disqualified from being a director under Mauritius law.

Under Mauritius law, the office of a director of our company is required to become vacant at the conclusion of the Company's annual meeting commencing after the director attains the age of 70 years. However, a person age 70 or over, by ordinary resolution of which no shorter notice is given than that required to be given for the holding of a meeting of shareholders, be appointed or re-appointed or authorized to continue to hold office as a director until the next annual meeting at which such director's class is up for re-election.

A vacancy on the Board of Directors may be filled by a majority vote of our Board of Directors or by ordinary resolution of the shareholders.

Executive officers are selected by and serve at the discretion of the Board of Directors.

**Duties of Directors**

Under Mauritius law, the Company's directors have a duty to exercise their powers honestly in good faith and in the best interests of the Company. The directors also have a duty to exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. Where a director of a public company also holds office as an executive, the director is required under Mauritius law to exercise that degree of care, diligence and skill which a reasonably prudent and competent executive in that position would exercise. In fulfilling their duty of care to the Company, the directors must ensure compliance with the Mauritius Companies Act and the Company's Constitution, as amended from time to time. A shareholder has the right to seek damages against the Company's directors if a duty owed by the directors to the shareholder is breached.

The functions and powers of the Company's Board of Directors include, among others:

- Convening shareholders' annual meetings and reporting its work to shareholders at such meetings;
- Authorizing dividends and distributions;

- Appointing officers and determining the term of office;
- Exercising the borrowing powers of the Company and mortgaging the property of the Company, provided that shareholders' approval shall be required if any transaction is a major transaction for the Company under section 130 of the Mauritius Companies Act, which includes, among others, acquisitions and dispositions worth more than 75% of the value of the Company's assets; and
- Approving the issuance and transfer of shares of the Company, including the recording of such shares in our share register.

Subject to the Mauritius Companies Act, the Company's Board of Directors may delegate any one or more of its powers to (i) a committee of directors, (ii) a director or employee of the Company (iii) or any other person.

**C. Management Compensation**

**Directors and Officers Compensation**

For FY 2022, the aggregate compensation (excluding grants of stock options) to our Chief Executive Officer, Chief Financial Officer and Chief Operating Officer was INR 134 million (US$1.8 million), and INR 12 million (US$0.2 million) in fees paid to our Directors. Our binding agreements with each of the members of senior management are listed herein under "Employment Agreement". Except as otherwise disclosed, the above cash compensation does not include stock compensation and employee benefits to our directors and senior management.

In FY 2023, our Company's Board of Directors approved the Amended Directors Compensation Plan 2022 which is effective from October 1, 2022 for independent non-executive Directors not drawing salaries before and the policy is as follows:

A. Annual Retainer for board membership - US$50,000 per director
B. Annual Retainer for committee membership - US$5,000 per committee for Audit and Risk, Compensation and Capital Committees. US$3,000 per committee for Nomination & Governance and Sustainability & CSR Committees.
C. Annual Retainer for board and committee chairs –
    a) Chairman of the Board (non-executive): US$50,000
    b) Audit: US$25,000
    c) Compensation and Capital: US$15,000
    d) Nomination & Governance and Sustainability & CSR: US$8,000
D. Meeting Fees – None
E. Restricted Stock ("RS") will be granted to directors in accordance with the following schedule:
    a. A scale of the RS grants as follows:
        1. Year 1: from October 1 (the beginning of the first full year of the board service) to September 30 of the next year: US$20,000.
        2. Year 2 at the outset of the second full year on October 1: US$40,000.
        3. Year 3 at the outset of the third full year on October 1: US$60,000.
        4. Year 4 and beyond at the outset of the fourth full year on October 1: US$75,000.
    b. The amount of the RS granted will be valued as of October 1 of the year in question, with the RS equal to the corresponding US$ value, divided by the FMV of the stock price on October 1 (or the next business day) of that year, determined as set out in the Equity Incentive Plan 2016, as amended from time to time.
    c. RS grants will be administered as per the Equity Incentive Plan 2016, as amended.
    d. The RS grants will be subject to a Period of Restriction of 18 months from the day of grant provided the director remains on the Azure Power board; and provided further that:
        1. if the director voluntarily resigns (or leave the board for other reasons other than for Cause) from the board during a year of service, the Period of Restriction on RS granted for that year will lapse immediately on a pro-rata basis determined as a percentage of days served for that year, and further, the Period of Restriction on the prior year's award will also lapse if it has not lapsed already;
        2. if a director is removed for Cause, all RS for which the Period of Restriction has not lapsed, regardless of when granted, will be forfeit; and
    e. The RS under Period of Restriction will not have voting rights or rights to any dividends or any other distribution from the Company.
    f. It is hereby clarified that the granting of RS will be in the form of a letter of grant and RS shall only be transferable to the name of the director when they are earned by the director, which shall be deemed to occur at the end of the Period of Restriction (provided the director remains on the Azure Power Board) or upon the lapsing of the Period of Restriction as evoked in paragraph d1 above. On account of the possibility (albeit remote) that RS may have to be forfeited (as evoked in paragraph d2), the director shall be deemed not to be owed any RS or any other form of emoluments in lieu of the RS until the end of the Period of Restriction / lapsing of the Period of Restriction as stated above.

As part of the Directors Remuneration Plan set out above, we granted 4,748 shares of RS to three of our directors, during FY 2022 to be vested in 18 months from grant date but accelerated for retirement at the end of a term or involuntary retirement if not for cause. On exercise of these shares of RS, equivalent number of equity shares will be issued by our Company subject to adjustments as to Mauritius withholding tax.

Remuneration payable under the Directors Remuneration Plan are subject to following respective conditions:

a) Affiliated or nominated directors have elected not to receive any compensation from Company for the time being,

b) Unless otherwise determined, the Mauritian directors will not be covered under this Policy and will be paid as arrangement agreed with AAA Global Services Limited.

**Equity-Based Compensation**

Our Company, during FY 2017, adopted the amended Equity Incentive Plan "2016 Equity Incentive Plan (as amended in 2017)" with approval of the shareholders of the Company obtained at the Annual Meeting held on September 25, 2017. The Company increased the pool size of the existing Stock Option pool by one million shares which took the total pool size to 2,023,744 shares. On April 30, 2020, Company further adopted the amended Equity Incentive Plan "2016 by Equity Incentive Plan (as amended on March 31, 2020). The amendment will require that the fair market value of the Grants to be based on the 10-day daily volume weighted closing price average up to and including the date of determination and some minimal drafting corrections of the Plan.

Our 2016 Equity Incentive Plan (as amended on March 31, 2020) is a comprehensive incentive compensation plan under which we can grant equity-based and other incentive awards to our officers, employees and directors.

The objective of the plan is (i) to provide means to enable us to attract and retain high quality human resources in our employment; (ii) to make the compensations and rewards competitive in the market; and (iii) to achieve sustained growth and create shareholder value by aligning the interests of the employees with our long term interests.

Pursuant to the U.S. securities laws and regulations, we have filed Form S-8 for registration of equity shares issuable upon exercise of ESOP grants under our 2016 Equity Incentive Plan (as amended in 2017) with the SEC.

As of March 31, 2022, we had 558,829 equity shares issuable pursuant to the exercise of any outstanding options granted under the ESOP plans, the 2016 Equity Incentive Plan and the 2016 Equity Incentive Plan (as amended on March 31, 2020).

The following paragraphs further describe the principal terms of the 2016 Equity Incentive Plan (as amended on March 31, 2020).

*Administration*

The Compensation Committee of the Company is the sole administrator for the administration of options, including the ESOPs. Computershare Trust Company, N.A. has been appointed as plan administrator. Company has total 2,304,732 shares which are Authorized for Grant as of March 31, 2022.

Under the terms of the 2016 Equity Incentive Plan (as amended on March 31, 2020), which may be amended from time to time, the sum of all grants made under the equity incentive plan shall not exceed 10% of our total issued and subscribed equity capital.

*Eligibility*

Our compensation committee may grant options to all eligible employees on the basis of the following criteria: position, role and performance of the employee, tenure in organization and such other factors as the compensation committee may decide from time to time.

*Vesting Schedule*

The grants made to any individual shall be vested in the following manner:

- 25% on the expiry of 12 months from the date of grant;
- 25% on the expiry of 24 months from the date of grant;

- 25% on the expiry of 36 months from the date of grant; and
- 25% on the expiry of 48 months from the date of grant.

### *Option Exercise*

There shall be no lock-in period after the options have vested and the options must be exercised by the employees before the end of the tenure of the plan. In case of termination of services other than not for cause as per the Plan, employees can exercise the options vested as on the last day of employment, as per the respective Post Termination Exercise Period Policy as stated in their letter of awards.

### *Restricted Stocks*

As part of the Directors Remuneration Plan our Company also granted shadow Restricted Stock (as provided above) during FY 2022 to be vested in 18 months from grant date but accelerated for retirement at the end of a term or involuntary retirement if not for cause. On exercise of these RS, amount payable by our Company will be the number of RS awarded multiplied by the price of the common stock on the date the RS are exercised. See section above "*B. Compensation, (Directors and Officers Compensation)*".

### *Amendment or Termination*

Our Company's Board of Directors may in its absolute discretion amend, alter or terminate the 2016 Equity Incentive Plan (as amended on March 31, 2020) from time to time, provided that no amendment, alteration or termination in any grant would impair or prejudice the rights of the employee without the consent of the employee, and provided further that the Board of Directors may not, without the approval of the shareholders, amend the 2016 Equity Incentive Plan (as amended on March 31, 2020) (1) to increase the aggregate number of shares which may be issued pursuant to the provisions of the equity incentive plan on exercise, surrender of options or upon grants; (2) to change the option exercise price; or (3) to extend the maximum period during which the grants may be made under the plan.

### *Outstanding Options for Directors and Senior Management*

Outstanding options as of March 31, 2022 under our ESOP/RS plans are as follows:

| Name | Equity Shares Underlying Outstanding Options | Exercise Price per share (US$ per share) | Date of expiration[1] |
|---|---|---|---|
| Supriya Prakash Sen | 1,402 | 0 | August 30, 2027 |
| Pawan Kumar Agrawal | 51,794 | 10.73 | August 30, 2027 |
| | 99,000 | 14.19 | August 30, 2027 |
| | 10,000 | 27.98 | August 30, 2027 |
| Others | 396,633 | 10.73 to 27.98 | July 20, 2025 – August 30, 2027 |
| **Total** | **558,829** | | |

Note: 1. For all the grants issued prior to March 31, 2020, in the event that a participant of our ESOP plan terminates their service with our Company, the Post Termination Exercise Period shall be: i) 90 days if they served for less than 3 years; ii) 2 years if the service period was more than 3 years but less than 4 years; or iii) an incremental year will be added to the exercise period for each year of service beyond 4 years up to a maximum period co-terminus with the Equity Incentive Plan 2016 (as amended on March 31, 2020). However, for all the grants issued post March 31, 2020, the Post Termination Stock Option Exercise Periods ("PTEP") policy was amended to six-month expiration on all new grants awarded.

### Indemnification Agreements

We have obtained Directors' and Officers' liability Insurance to indemnify the Directors and executive officers of our Company against certain liabilities and expenses arising from their being a director or officers. In addition, the Company has executed indemnity agreements with directors and officers.

**D. Board Committees**

Our Company's Board of Directors has established the following committees: Audit & Risk Committee, Nominating & Governance Committee, Compensation Committee, and Sustainability & Corporate Social Responsibility Committee. These committees assist in the effective functioning of the Board and help them to ensure that the views of directors are effectively represented.

We have written charters for the responsibilities of committees and these are reviewed and approved by the Board of Directors on annual basis. The charters of committees are available on our company website. Special committees may be formed from time to time as required to review particular matters or transactions.

Each committee's members and functions are described below.

**i) Statutory Committees**

**Audit & Risk Committee**

Our Audit & Risk Committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. It consists of a chairperson, Mr. Richard Payette, and two members, Ms. Supriya Prakash Sen and Mr. Jean-François Boisvenu.

Mr. Richard Payette was appointed as new Chairperson of the Committee effective July 1, 2023 (replacing Ms. Christine Ann McNamara who had been in office from March 1, 2022 to June 26, 2023). Mr. Arno Lockheart Harris resigned from the membership of the Committee effective May 31, 2022. Mr. Sugata Sircar appointed as member of the Audit & Risk Committee with effect from October 1, 2022 but left the role on April 30, 2023 to become the new CFO. Mr. Jean-François Boisvenu was appointed as a new member of the Audit & Risk Committee on March 15, 2023.

All members including the chair satisfy the independence requirements set forth in the New York Stock Exchange's Listed Company Manual. They also satisfy the independence requirements of Rule 10A-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

We have determined that Mr. Payette is an "audit committee financial expert" as defined in Item 16A(b) of Form 20-F by the Securities and Exchange Commission's rules. For further information, see "Management and Employees – Management".

| | |
|---|---|
| **Mr. Richard Payette** | **Chairperson** |
| **Ms. Supriya Prakash Sen** | **Member** |
| **Mr. Jean-François Boisvenu** | **Member** |

**Responsibilities include:**
- Providing oversight of financial reporting and related internal controls;
- Appointment, compensation and over sight of the independent auditors and pre-approving all auditing and non-auditing services permitted to be performed by independent auditors;
- Reviewing significant accounting and reporting issues to understand potential impact on financial statements and management's response;
- Reviewing and approving of all related party transactions on an ongoing basis;
- Discussing the annual audited financial statements and quarterly financial statements with management and independent auditors;
- Reviewing the adequacy and effectiveness of our accounting and internal control policies and procedures and any steps taken to monitor and control major financial risk exposures;
- Monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance;
- Meeting separately and periodically with management and our internal and independent auditors;
- Reporting regularly to Board of Directors;
- Reviewing and approving the Enterprise Risk Management Policy, risk register, mitigation plans, monitoring plan, and test reports; and

- Such other matters that are specifically delegated to our audit committee by our Board of Directors from time to time.

**Compensation Committee**

Our Compensation Committee assists our Board of Directors in reviewing and approving the compensation structure of our directors and executive officers, including all forms of compensation to be provided to our directors and executive officers. Members of the Compensation Committee are not prohibited from direct involvement in determining their own compensation.

Our Compensation Committee consists of the chairperson and three members. We rely upon the home country exemption of the New York Stock Exchange Listed Company Manual and Rule10C-1(b)(1) (iii) (A) (4) under the Exchange Act in respect of the composition of the Compensation Committee, as Mauritius law does not require all members of the committee to be independent. Each of our compensation committee members qualifies as a "non-employee director" within the meaning of Rule 16b-3 of the Exchange Act.

Our Company's chief executive officer may not be present at any Compensation Committee meeting during which his compensation is deliberated.

| | |
|---|---|
| **Mr. Panicker Unnikrishnan Mangalath Sukumara** | **Chairperson** |
| **Mr. Cyril Sebastien Dominique Cabanes** | **Member** |
| **Ms. Supriya Prakash Sen** | **Member** |
| **Ms. Delphine Voeltzel** | **Member** |

**Responsibilities includes:**
- Reviewing and approving the compensation package for our executive officers;
- Reviewing the compensation of our executive officers and directors and making recommendations to the board with respect to the compensation;
- Reviewing and approving corporate goals and objectives relevant to the compensation of our chief executive officer, other executive officers and directors evaluating the performance of our chief executive officer, other executive officers and directors in light of those goals and objectives, and setting the compensation level of our chief executive officer, other executive officers and directors based on such evaluation; and
- Reviewing periodically and making recommendations to the board regarding any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, employee pension and welfare benefit plans.

**Nominating and Governance Committee**

Nominating and Governance Committee consists of the chairperson and three members. The purpose of the Nominating and Governance Committee is to assist the Board in fulfilling its responsibilities. We rely upon the home country exemption of the New York Stock Exchange Listed Company Manual in respect of the composition of the Nominating and Governance Committee, as Mauritius law does not require all members of the committee to be independent.

| | |
|---|---|
| **Mr. Panicker Unnikrishnan Mangalath Sukumara** | **Chairperson** |
| **Mr. Cyril Sebastien Dominique Cabanes** | **Member** |
| **Ms. Supriya Prakash Sen** | **Member** |
| **Ms. Delphine Voeltzel** | **Member** |

**Responsibilities includes:**
- Reviewing and making recommendations to the Board of Directors with respect to corporate governance guidelines and issues;
- Identifying qualified candidates as consistent with the criteria approved by the Board for director nominees and recommending such candidates to the Board for selection for all directorships to be filled by the Board, in conjunction with the Chairman of the Board;
- Nominating the chairs and members of the Board committees, in conjunction with the Chairman of the Board; and

- Conducting annual reviews of the Board's independence, qualifications, and experiences in light of the availability of potential Board members; and oversee the evaluation of the Board of Directors.

**Sustainability and Corporate Social Responsibility Committee**

Sustainability and Corporate Social Responsibility ("Sustainability and CSR") Committee consists of the chairperson and two members. The purpose of the Sustainability and CSR Committee is to assist the Board in fulfilling its responsibilities listed below.

| | |
|---|---|
| **Mr. Panicker Unnikrishnan Mangalath Sukumara** | **Chairperson** |
| **Ms. Supriya Prakash Sen** | **Member** |
| **Mr. Deepak Malhotra** | **Member** |

**Responsibilities includes:**
- Undertake all activities as per CSR policy of the Company;
- Review the Sustainability and CSR Vision and Strategy;
- Review the policies, practices, and ensure compliance with these set policies;
- Review the annual targets and metrics and that this is reflective of industry best practice;
- Provide input into the Company's annual sustainability report; and
- Review issues such as reputation risk, incidents impacting environment, social and governance concerns.

**ii) Non-Statutory Committees**

**Capital Committee**

Capital Committee consists of the chairperson and four members. The purpose of the Capital Committee is to assist the Board in relation to capital raising, investment, and disposition/disinvestment/sale of the projects, maintain adequate liquidity and timely decision making to achieve the Company's business plan.

| | |
|---|---|
| **Mr. Panicker Unnikrishnan Mangalath Sukumara** | **Chairperson** |
| **Mr. Richard Payette** | **Member** |
| **Mr. Deepak Malhotra** | **Member** |
| **Ms. Supriya Prakash Sen** | **Member** |
| **Ms. Delphine Voeltzel** | **Member** |

**Responsibilities includes:**
- Review and approve capital raising, investment, and disposition/disinvestment/sale of the projects in relation to Company and its Subsidiaries;
- Review and recommend for approval by the Board of any Company equity and debt issuances;
- Establish corporate philosophy and policies regarding project capital raising, allocation, investment, and disposition/disinvestment/sale of the projects;
- Establish and oversee treasury policies of the Company;
- Provide guidance to management on ordinary course project transactions of the Company; and
- Periodically review and ensure the Company has adequate options to raise the capital necessary to meet its business plan.

**Other Committees**

Special committees may be formed from time to time as required to review particular matters or transactions.

During the leadership transition following the resignation of our previous CEO and Managing Director, a Special Committee of the Board was created to support the Chairman in supervising our operations. This Special Committee was comprised of Mr. Rosling, Mr. Unnikrishnan, Mr. Malhotra, and Ms. McNamara, and it was dissolved on August 22, 2022.

In addition, a Special Committee of the Board of Directors was convened in August 2022 to review material projects and contracts over a three-year period for anti-corruption and related compliance issues. This Special Committee is comprised of Ms. Delphine Voeltzel and Mr. Jean-François Boisvenu.

The Board also established a Special Finance Committee in July 2023 in connection with capital raising activities. This Special Finance Committee comprises Mr. Richard Payette, Mr. Jean-François Boisvenu and Ms. Supriya Prakash Sen.

## E. Employees

As of March 31, 2023, we had 427 full time employees and no part time employee. We consider our relations with our employees to be amicable. The following table sets forth the number of our employees for each of the major functions as of March 31, 2020, March 31, 2021, March 31, 2022 and March 31, 2023:

| | As of March 31, 2020 | As of March 31, 2021 | As of March 31, 2022 | As of March 31, 2023 |
|---|---|---|---|---|
| Infrastructure | 263 | 121 | 156 | 128 |
| Bidding and land strategy | 25 | 13 | 19 | 22 |
| Operations and maintenance | 235 | 248 | 231 | 217 |
| F&A, Capital, Legal and HRM | 82 | 89 | 64 | 65 |
| **Total** | **605** | **471** | **470** | **427** |

## Employee Benefit Plans

For FY 2022, the aggregate compensation, including directors' fees, excluding grants of stock options to our directors and executive officers, was INR 12 million (US$0.2 million) – *See Directors and Officers Compensation*. Our agreements with each of the members of senior management are listed herein under "Employment Agreement." Except as otherwise disclosed, the above cash compensation does not include stock compensation and employee benefits to our directors and senior management.

### *Provident Fund*

In accordance with Indian law, all of our employees in India are entitled to receive benefits under the Employees' Provident Fund Scheme, 1952, as amended, a retirement benefit scheme under which an equal amount as required under the Employees' Provident Funds and Miscellaneous Provisions Act, 1952, of the base salary of an employee is contributed both by employer and employee in a fund with government/trust with company.

### *Gratuity*

In accordance with Indian law, we pay gratuity to our eligible employees in India. Under our gratuity plan, an employee is entitled to receive a gratuity payment on his superannuation or on his retirement or on the termination of his or her employment if the employee has rendered continuous service to our Company for not less than five years, or if the termination of employment is due to death or disability due to accident or disease. The amount of gratuity payable to an eligible employee is equal to 15 days' salary based on the last drawn salary for every completed year of employment (or any portion of a year exceeding six months).

### *Leave Encashment Policy*

Under our leave encashment policy, an employee is entitled to accumulate up to 45 days of leave Employees are encouraged to avail of the leave and hence, any balance over 45 days lapses of January 1 of each calendar year. In the event of resignation, termination of employment or retirement, an employee is entitled to a payment for the accrued leave of absence up to a maximum of 45 days . The amount of payment to be made for each day of such accrued leave of absence shall be calculated by dividing the last drawn monthly base salary by 26 days.

## Executive Leadership

On April 26, 2022, Mr. Ranjit Gupta and Mr. Murali Subramanian, previously our Managing Director and Chief Operating Officer respectively, resigned from the Company. Both relinquished their roles with the Company and its subsidiaries, and Mr. Gupta also resigned from the Board of Directors. Mr. Harsh Shah joined as Chief Executive Officer with effect from July 1, 2022 and subsequently resigned on August 29, 2022 with immediate effect. Thereafter, Mr. Rupesh Agarwal took charge as Acting CEO of the Company on Mr. Shah's resignation. In November 2022, Mr. R Narasimhan Iyer joined as Chief Operating Officer of the Company.

On April 30, 2023, Mr. Sugata Sircar resigned from his position as Independent Director and joined as Group Chief Financial Officer and became Executive Director Finance of the Company's subsidiary, Azure Power India Private Limited. Mr. Pawan Agrawal continues as CFO of APIPL and its group of subsidiaries, reporting to Sugata.

On July 10, 2023, Mr. Sunil Gupta joined the Company as Chief Executive Officer and Managing Director of the Company's subsidiary, Azure Power India Private Limited. With the appointment of Mr. Sunil Gupta, Mr. Rupesh Agarwal resigned from his role of Acting CEO and relinquished his roles with the Company and its subsidiaries.

On October 11, 2023, Mr. Alan Rosling resigned as Chairman of the Board and as a director of the Company and APIPL. On October 12, 2023, the Company announced that Mr. M.S Unnikrishnan became the Chairman of the Board of the Company.

**Employment Agreements**

All of our executive officers have entered into employment agreements with the Company. Aside from the employee benefit plans, our employment agreements do not provide for any special termination benefits, nor do we have any other arrangements with our directors for special termination benefits.

Each executive officer has acknowledged that ownership of any intellectual property created by him or her for the Company shall remain the property of the Company.

In addition, each executive officer has agreed to be bound by the non-competition and non-solicit restrictions set forth in his employment agreement. Specifically, each executive officer has agreed, while employed by us and for a period of one year after termination of his employment, not to:

- directly or indirectly, enter into the employment of, tender consulting or other services to, acquire any interest in, or otherwise participate in any business that competes, directly or indirectly, with any of the companies or entities in the same lines of business that the Company is engaged in at the time the employment is terminated; nor
- solicit, encourage, or induce or attempt to solicit, encourage, or induce any employee or customer, or prospective employees and customers with whom the Company has had discussions or negotiations within the last six months of the termination of his employment not to establish a relationship with the Company.

**V. Risk Factors**

*You should carefully consider the following factors in addition to the other information set forth in this annual report. If any of the following risks actually occur, our business, results of operations, financial condition and cash flows could be materially and adversely affected. In that event, the trading price of our shares could decline, and you may lose part or all of your investment. This annual report also contains forward-looking information that involves risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of many factors, including the risks described below and elsewhere in this annual report.*

**Financial Risks**

***Our cash reserves and cash flows may be insufficient to meet our working capital requirements and expansion plans absent further financing. Accordingly, our failure to obtain additional financing on acceptable terms and in a timely manner could materially and adversely affect our financial condition.***

The unavailability of our Fiscal 2022 consolidated financial statements (filed with this Form 20-F) and our Fiscal 2023 financial statements (due to be filed with our Fiscal 2023 Form 20-F) has severely limited our ability to draw down borrowings from other bank loan facilities or raise financing from other sources. In addition, we have not been able to dividend cash from project subsidiaries due to breach of covenants related to the delivery of audited financial statements to lenders. For further information, see below *"- Our failure to deliver our audited consolidated financial statements and the financial statements of our subsidiaries violates covenants in certain of our financing agreements and materially and adversely affect our business, results of operations, financial condition and cash flows."*

Our working capital requirements and cash flow have been adversely affected by higher levels of general and administrative expenses (excluding Stock Appreciation Rights (SAR) expenses) due to substantially higher legal and accounting costs related to whistle-blower and other investigations and compliance reporting to our regulators and legal costs related to defending various litigation matters, and our cash flows may be insufficient to service our working capital requirements without further financing.

In addition, we expect to incur substantial expenses as we construct our new power projects for which we have contractual obligations. If we are unable to meet our obligations for our committed projects, we could be exposed to liabilities under the relevant contractual and tender documents, administrative actions and penalties from customers and other civil liabilities, all of which could adversely impact the affected projects.

Further, our cash and cash flow may not be sufficient to refinance borrowings in the event that a default is declared and the principal is accelerated or to finance

contingent liabilities. Accordingly, our failure to obtain additional financing on acceptable terms and in a timely manner to ensure we have sufficient cash could materially and adversely affect our business, results of operations and financial condition.

Our ability to obtain external financing is subject to a number of uncertainties, including:

- our future results of operations, financial condition and cash flows;
- the availability of our consolidated financial statements and the financial statements of our subsidiaries and restricted borrowing groups for Fiscal 2023 and subsequent periods;
- our past credit history and credit ratings (see "- *Any downgrade of our credit rating may result in increase in interest cost or may trigger covenant defaults under our loan agreements*" below);
- the prevailing exchange rate of Indian rupee against major currencies, in particular, the U.S. dollar;
- the continued confidence of banks, financial institutions and debt capital investors in us and the renewable energy industry in India;
- the interest rate environment in India and internationally;
- the general condition of global equity and debt capital markets;
- economic, political and other conditions in the jurisdictions where we operate;
- regulatory and government support in the form of tax incentives, preferential tariffs, project cost

subsidies and other incentives; and

- our ability to comply with any financial covenants under our debt financing.

In addition, our ability to obtain additional financing may be dependent on the compliance review of our lenders and creditors in light of the review of corruption and related controls and compliance issues by our Special Committee and our Audit and Risk Committee and our ongoing reporting of these issues to the SEC and the Department of Justice and to Indian regulatory authorities. For more information, see below "*We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities.*"

Failure to obtain additional financing on acceptable terms and in a timely manner could adversely affect our business, results of operations, financial condition and cash flows. Moreover, any additional equity financing may be dilutive to our shareholders, and any debt financing may contain restrictive covenants that limit our flexibility going forward.

***Our failure to deliver our audited consolidated financial statements and the financial statements of our subsidiaries violates covenants in certain of our financing agreements and materially and adversely affect our business, results of operations, financial condition and cash flows.***

Timely submission of financial statements of our Group, our subsidiaries and/or our subsidiary restricted groups is a key covenant in most of our financing agreements. Due to our inability to meet these covenants to date in respect of our Fiscal 2022 and Fiscal 2023 (and interim periods therein) financial statements, we secured time various extensions from our lenders in respect of these covenants until June 30, 2023 and July 15, 2023 (in few cases). We requested each of the applicable lenders for a further time extensions until October 31, 2023, for submission of financial statements for Fiscal 2022, and until December 31, 2023, for submission of financial statements for Fiscal 2023. While we received the time extensions from several lenders, we have not yet received the requested time extensions from lenders representing INR 14,089 million (US$ 185.7 million) of our external indebtedness. In this regard, our auditors have provided in their audit report that these "events raise a substantial doubt about the Company's ability to continue as a going concern." See "Consolidated Financial Statements - Report of Independent Registered Public Accounting Firm" on page F-2.

The Company is currently under discussions with the remaining lenders to obtain the requisite time extensions and expects to receive the same in due course. The lenders which have not granted such extensions have rights under the respective financing agreements to take actions including (but not limited to) acceleration of the repayment of all or some of the indebtedness owed to them and/or security enforcement under the terms of the applicable financing agreements. Any such actions by lenders also could result in cross-defaults or cross-accelerations of other indebtedness and could materially and adversely affect our business, results of operations, financial condition and cash flows.

In addition, due to our inability to meet these information covenants to date, some of our lenders have started charging us penalty interest rates. In addition, in some of our borrowing facilities, the lenders have also upward revised the rate of interest due to delay in Fiscal 2022 audited financial statements and our downgrade in credit ratings. These penalty rates of interest and higher rates of interest have increased our finance costs for the projects to which these loans relate. While the penalty interest may cease to be charged upon finalization and submission of the delayed financial statements, the rate of interests which have been revised upwards may not be revert to pervious levels, and, therefore, may result in continued higher cost of funds for our debt borrowings for these projects.

***Any downgrade of our credit rating may result in increase in interest cost or may trigger covenant defaults under our loan agreements.***

Most of our external borrowings are required to be rated by accredited credit rating agencies. In Fiscal 2023 and Fiscal 2024, the rating agencies Fitch Ratings, Moody's Investor Service, CRISIL and Care Ratings have each downgraded or announced a review of credit ratings with negative implications of the credit ratings of one or more of our subsidiaries. Downgrades in our credit ratings and other factors have led to interest rate increases in respect of some of our certain of our borrowings which has increased our financing costs and other similar interest rate increases are possible.

In addition, in certain of our financing agreements, a downgrade of our credit ratings below BBB or BBB-, could lead to interest rate increases which would further increase financing costs. Further, in certain of our financing agreements, any downgrade of our credit ratings below BBB or BBB-, constitutes a default which could lead to acceleration of the repayment of all or some of the indebtedness owed under these financing agreements. Any such defaults and accelerations also could result in cross-defaults or cross-accelerations of other indebtedness and could materially and adversely affect our business, results of operations, financial condition and cash flows.

For further information, see "*Operating and Financial Review and Prospects – Certain Factors affecting our Results – Credit Rating Downgrades.*"

***If we fail to comply with financial and other covenants under our loan agreements, our business, results of operations, financial condition and cash flows may be materially and adversely affected.***

The agreements with respect to our existing project-level indebtedness contain financial and other covenants that require us to maintain certain financial ratios or impose certain restrictions on the disposition of our assets or the conduct of our business. We expect to continue to finance a significant portion of our project development and construction costs with project financing.

Our financing agreements also include certain restrictive covenants whereby we may be required to obtain approval from our lenders to, among other things, incur additional debt, undertake guarantee obligations, enter into any scheme of merger, amalgamation, compromise, demerger or reconstruction, change our capital structure and controlling interest, dispose of or sell assets, transfer shares held by major shareholders to third parties, invest by way of share capital, lend and advance funds, make payments, declare dividends in the event of any default in repayment of debts or failure to maintain financial ratios, place deposits and change our management structure. Most of our lenders also impose significant restrictions in relation to our solar projects, under the terms of the relevant project loans taken by our respective subsidiaries.

For information on our failure to timely deliver our audited financial statements, see "-Our failure to deliver our audited consolidated financial statements and the financial statements of our subsidiaries violates covenants in certain of our financing agreements and materially and adversely affect our business, results of operations, financial condition and cash flows."

Our failure to comply with such covenants or to obtain our lenders' consent to take restricted actions in a timely manner or with any other terms of the financing documents entered with lenders may result in the declaration of an event of default by one or more of our lenders, which may result in accelerating repayment obligation under the relevant loans and/ or trigger cross defaults under other financing agreements and/ or increase in rate of interest on such loans and/ or other suitable action in terms of the financing documents and the law. We cannot assure you that, in the event of any such acceleration, we will have sufficient resources to repay these borrowings. Failure to meet our obligations under the debt financing agreements could adversely affect our business, results of operations, financial condition and cash flows. Furthermore, a breach of those financial and other covenants or a failure to meet certain financial ratios under these financing agreements could also restrict our ability to pay dividends.

***Our substantial indebtedness and volatility in interest rates could adversely affect our business, results of operations, financial condition and cash flows.***

We have incurred substantial debt to finance our projects which is secured by project assets. Since certain of our borrowings under a project-specific financing arrangement have floating rates of interest, volatility in interest rates affects the cost of these borrowings. An increase or decrease in interest rates will increase or decrease our interest expense associated with such borrowing.

In periods of volatile interest rates, we seek to finance our projects on a long-term basis with debt matched to cash flows, and we attempt to fix the interest rate and hedge any forex exposure. Such debt could have significant consequences on our operations, including:

- reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions and other general corporate purposes as a result of our debt service obligations;
- limiting our ability to obtain additional financing;
- limiting our flexibility in planning for, or reacting to, changes in our business, the industry in which we operate and the general economy;
- potentially affecting our credit rating
- potentially increasing the cost of any additional financing; and

- limiting the ability of our project operating subsidiaries to pay dividends to us for working capital or return on our investment.

Any of these factors and other consequences that may result from our substantial indebtedness could adversely affect our business, results of operations, financial condition and cash flows impacting our ability to meet our payment obligations under our debt. Our ability to meet our payment obligations under our outstanding debt depends on our ability to generate adequate cash flow in the future. This, to some extent, is subject to general economic, financial, competitive, legislative and regulatory factors as well as other factors that are beyond our control.

In addition, certain of our borrowings under a project-specific financing arrangement have floating rates of interest. Therefore, an increase or decrease in interest rates will increase or decrease our interest expense associated with such borrowing. We are affected by volatility in interest rates in our borrowings. Interest rates are highly sensitive to many factors beyond our control, including the monetary policies of the RBI and other central banks, deregulation of the financial sector in India, domestic and international economic and political conditions and other factors. Furthermore, the rise in inflation and consequent fluctuation in interest rates, repo rates (the rates at which the RBI lends to commercial banks) may also be important factors affecting interest rates. A significant increase in interest expense could adversely affect our business, results of operations, financial condition and cash flows impacting our ability to meet our payment obligations under our debt.

### *We were not profitable in the past three fiscal years, and we may not be profitable in the future.*

We have incurred losses since our inception. During Fiscal 2021 and Fiscal 2022, we had a net loss of INR 4,201 million and INR 2,126 million (US$ 27.8 million), respectively. We do not expect to be profitable in Fiscal 2024 and may not be profitable in the future.

We expect our consolidated general and administrative expenses (excluding SAR expenses) in Fiscal 2023 and Fiscal 2024 will be higher than our consolidated general and administrative expenses (excluding SAR expenses) in Fiscal 2022 due to higher legal and accounting costs related to whistle-blower and other investigations and legal costs related to defending various litigation matters. Accordingly, we expect our consolidated general and administrative expenses (excluding SAR expenses) in Fiscal 2023 and Fiscal 2024 will adversely affect our profitability in Fiscal 2023 and Fiscal 2024 as well as our cash flows from operations in these fiscal years.

Our profitability also may be adversely impacted by liabilities associated with the review of corruption and related controls and compliance issues by our Special Committee and our Audit and Risk Committee and our ongoing reporting of these issues to the SEC and the Department of Justice. For more information, see below "*We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities.*"

### *Fluctuations in foreign currency exchange rates may negatively affect our revenue, cost of sales and gross margins and could result in exchange losses.*

As the functional currency of our Indian subsidiaries is the Indian rupee, our operating expenses are denominated primarily in Indian rupees. However, some of our capital expenditures, and particularly those for equipment imported from international suppliers, such as solar panels, are denominated in foreign currencies. In addition, our borrowings are usually incurred in foreign currencies, especially the US dollar, and we swap these foreign currencies into Indian rupees to fund our projects and working capital. To the extent that we are unable to match revenue received in our functional currency with costs paid in foreign currencies, or hedge such exposure, exchange rate fluctuations in any such currency could have an adverse effect on our profitability.

Substantially all of our cash flows are generated in Indian rupees and, therefore, significant changes in the value of the Indian rupee relative to the other foreign currencies could materially and adversely affect our reported results of operations, financial condition and cash flow and our ability to meet interest and principal payments on borrowings. In addition to currency translation risks, we incur currency transaction risks whenever we or one of our projects enter into a purchase or sales transaction using a currency other than the Indian rupee. We expect our future capital expenditures in connection with our proposed expansion plans to include significant expenditures in foreign currencies for imported solar panels, components, equipment and machinery.

A significant fluctuation in the Indian rupee to U.S. dollar or other foreign currency exchange rates could materially

and adversely affect our business, results of operations, financial condition and cash flows. The exchange rate between the Indian rupee and these currencies, primarily the U.S. dollar, has fluctuated in the past and any appreciation or depreciation of the Indian rupee against these currencies can impact our profitability and results of operations. Our results of operations have been impacted by such fluctuations in the past and may be impacted by such fluctuations in the future. For example, the Indian rupee had depreciated against the U.S. dollar in four of the last five years, which may impact our results of operations in future periods. Furthermore, we have borrowings denominated in U.S. dollars and, as such, an annual decline in the Indian rupee against the U.S. dollar effectively adds to the functional interest rate of our borrowings and the Indian rupee equivalent needed to repay the borrowings, when they fall due.

Consequently, depreciation of the Indian rupee to the U.S. dollar, could result an increase in foreign currency related transaction and translation losses and negatively impact our performance.

***Our operating results may fluctuate from period to period, which could make our future performance difficult to predict and could cause our operating results for a particular period to fall below expectations.***

Our quarterly and half-yearly operating results are difficult to predict and may fluctuate significantly in the future. We have experienced seasonal and quarterly fluctuations in the past, especially in the winter months, and we may experience similar fluctuations in the future. However, given that the renewable energy industry is growing rapidly, those fluctuations may be masked by our recent growth rates and thus may not be readily apparent from our historical operating results. As such, our past quarterly operating results may not be good indicators of future performance.

In addition to the other risks described in this section, the following factors could cause our operating results to fluctuate:

- the expiration or initiation of any central or state subsidies or incentives;
- our ability to complete installations in a timely manner due to market conditions or due to unavailable financing;
- our ability to continue to expand our operations, and the amount and timing of expenditures related to such expansions;
- announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures or capital-raising activities or commitments;
- changes in auction rules;
- changes in feed-in tariff rates for solar power, VGF, our pricing policies or terms or those of our competitors;
- actual or anticipated developments in our competitors' businesses or the competitive landscape;
- an occurrence of low global horizontal irradiation that affects our generation of solar power;
- fluctuations due to the COVID-19 pandemic and resulting operational disruptions;
- change in law or adoption of new accounting pronouncements; and
- significant volatility in market conditions (including, but not limited to foreign currency rates, interest rates and our share price).

For these or other reasons, the results of any prior quarterly or annual periods should not be relied upon as indications of our future performance. In addition, with respect to the above factors our actual revenue, key operating and financial metrics and other operating results in future quarters may fall short of the expectations of investors and financial analysts, which could have a material adverse effect on the trading price of our shares.

***We do not intend to continue to report quarterly consolidated financial information and, in the future, will only report our unaudited consolidated six months interim and annual audited consolidated financial information.***

As a "foreign private issuer" we are not required under SEC rules to report quarterly consolidated financial information. Accordingly, we intend in the future only to report our unaudited consolidated six months interim and annual audited consolidated financial information. As many of our industry competitors in India and internationally provide quarterly financial information, it will not be possible for investors and research analysts to benchmark our results against the results of our competitors on a quarterly basis. This change could impact the decision of research analysts to cover us or to publish research about us or cause them to change their recommendations regarding our shares adversely, resulting in a decline in our stock price and trading volume.

**Compliance risks**

***The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares.***

As a result of our failure to timely file our annual report on Form 20-F with the SEC, the NYSE informed us on December 7, 2022 that we were not in compliance with the NYSE's continued listing requirements under the timely filing criteria outlined in Section 802.01E of the NYSE Listed Company Manual and that we would be provided a six-month extension from the due date of the annual report, August 16, 2022, as extended from the original due date of August 1, 2022, pursuant to the Form 12b-25 filed with the SEC on August 1, 2022 to file the annual report on Form 20-F, as well as any other subsequent delayed filings.

On February 14, 2023, the NYSE granted our request for additional time to file our annual report on Form 20-F and any subsequent delayed filings, stating it would provide an additional trading period through July 15, 2023 subject to reassessment on an ongoing basis and that failure to file the annual report on Form 20-F and any subsequent delayed filings by the end of this period could result in a trading suspension. On July 6, 2023, we requested the NYSE for additional time to file our Annual Report, as well as well as our current report on Form 6-K for the six months September 30, 2022 (the "**2022 Form 6-K**" and, together with the annual report on Form 20-F, the "**Delayed Filings**"), due to continued delays in the completion of our audit and review of our internal control over financial reporting.

On July 13, 2023, the NYSE suspended trading in our Company's shares and commenced delisting proceedings (the "**Delisting Decision**"). As described more fully in our Form 6-K filed on July 13, 2023, we have taken substantial steps to remediate the issues that led to the Delayed Filings including, among others, the replacement of our independent public accounting firm for our U.S. GAAP consolidated financial statements, strengthening our management team and appointing external consultants to review our internal controls and compliance framework. On July 26, 2023, we submitted an appeal of the Delisting Decision. We await the hearing of our appeal before the NYSE.

Currently, our shares are only available to trade on the over-the-counter (or OTC) "expert" market, where quotations are only directly available to broker dealers and professional investors (not to retail investors).

Although we are filing this annual report on Form 20-F for Fiscal 2022 on this date and plan to file our Form 6-K for the half year ended September 30, 2022 as soon as practicable, we cannot assure that our shares will not be delisted, or that they will resume trading on the NYSE. If our shares were to be delisted, there can be no assurance whether or when it would again be listed for trading on the NYSE or another U.S. exchange. Further, the market price of our shares might decline and become more volatile, and the holders of our shares may find that their ability to trade in our shares would be adversely affected. The delisting of our shares could also result in other negative outcomes, including the potential loss or reduction of confidence by customers, business partners and employees, the potential loss or reduction of investor interests, and fewer business and strategic opportunities, any of which could have a material adverse impact on our results of operations, cash flows and financial conditions.

***We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities.***

In May 2022, we received a whistle-blower complaint that alleged health and safety lapses, procedural irregularities, misconduct by certain employees, improper payments and false statements relating to one of our projects belonging to a project subsidiary. Following extensive investigation by the Ethics Committee, supervised by the Board's Audit and Risk Committee and by external counsel and forensic professionals, we identified evidence of manipulation and misrepresentation of project data by some employees at that project site. Weak controls over payments to a vendor and failures to provide accurate information both internally and externally were found, but no direct evidence that any improper payment was made to any government official was identified. Further, in Fiscal 2023, we reported to SECI that this project had (i) shortfalls in generation and (ii) that it failed to timely complete and commission the requisite contractually required capacity. On January 3, 2023 and January 4, 2023, SECI advised us, inter alia, that the project may be liable for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner.

In September 2022, we received an additional whistle-blower complaint primarily making similar allegations of misconduct as raised in the May 2022 complaint, as well as allegations of misconduct related to joint ventures and land acquisition, allegations of our failure to be transparent with the market and advisors and other allegations. The Ethics

Committee, supervised by the Board's Audit and Risk Committee, with the support of external counsel and forensic accounting professionals, investigated these September 2022 allegations. The investigation of the September 2022 complaint identified significant control issues in the process of acquiring land and land use rights in relation to one of our projects. The investigation specified that third party land aggregators may have been involved in improper payments but no improper transfer of money by the Group was identified. We have made an adjustment (de-capitalization) in the books of accounts of INR 138 million (US$ 1.8 million) on estimate, as a prudent measure in the given project. Further, we have reviewed the entire amount paid to land aggregators in other projects to identify any similar issue and after an assessment a further adjustment (decapitalisation) aggregating to INR 118 million (US$ 1.6 million) has been made in the books of account on estimate, as a prudent measure, though no improper payments by the Group could be identified.

We also identified potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project. In addition, it appears our former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project. We were not able to identify any evidence of improper payments related to either of these transactions. Considering the observations regarding the transactions, we have reassessed the valuation of the asset purchase and related government orders and did not find any adjustment that needed to be made in the books of account.

Our investigation did not substantiate other portions of this September 2022 whistle-blower complaint.

As part of our investigations of the May 2022 and September 2022 whistle-blower complaints, we also widened our review to include a review of projects commissioned in Fiscal 2022 and Fiscal 2023 to ensure that similar weaknesses were not present. As part of our investigations, we identified inconsistencies in project data in certain of our projects, but we identified no improper payments made in connection with these projects.

We have taken a range of actions due to these findings, and the employees involved in the misconduct are no longer associated with us. In accordance with the recommendations of the Ethics Committee, the Board's Audit and Risk Committee and their legal and forensic advisors, we are implementing remedial measures in both project control and monitoring. Further, we reported the findings from its investigations of the May 2022 and September 2022 whistle-blower complaints to the SEC and the U.S. Department of Justice, and we continue to cooperate with these authorities.

In addition, a Special Committee of the Board of Directors (the "Special Committee") was convened in August 2022 to review certain material projects and contracts over a three-year period for anti-corruption and related compliance issues. Independent outside counsel and forensic advisors were engaged to support the Special Committee. The Special Committee's investigation has identified evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project but no related improper payments or transfers by the Group have been identified. The Special Committee's review and its findings could impact our decision-making in connection with such projects. We have disclosed the details of the Special Committee's investigation to the SEC and the U.S. Department of Justice, and we continue to cooperate with those agencies.

Our Group including our subsidiaries with respect to affected projects could be exposed to liabilities under the relevant contractual and tender documents (including levy of damages and liquidated damages, reduction of PPA tariffs and/or short closure of capacity), administrative actions (including the risk of PPA cancellation, risk of being debarred from SECI's future contracts, withdrawal or nullification of commissioning certificates and/or revocation of commissioning extensions) and penalties from customers and other civil liabilities, all of which could adversely impact the revenue, profitability and capitalization of the affected projects. In addition, fines and/or penalties by regulatory authorities (including by the SEC, the U.S. Department of Justice and applicable Indian regulatory authorities) could be imposed on us. Any such fines or penalties could materially and adversely affect our business, results of operations, financial condition and cash flows in future periods. In addition, we could be exposed to future litigation in connection with any findings of fraud, corruption, or other misconduct by our employees and former employees and executives.

For further information on the liabilities associated with the May 2022 and September 2022 whistle-blower complaints and the Special Committee investigation, see "Our Consolidated Financial Statements as of, and for the year ended, March 31, 2022, Note 27 – Whistle-blower Allegations and Special Committee Investigations".

***We have conducted investigations into whistle-blower claims and learned of other allegations in June, July, and October 2021 against certain directors, officers and employees and former officers and directors of the Company.***

In June and July 2021, we received whistle-blower complaints alleging corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, payment of kickbacks, and improper conduct by our "sales team" (this specific allegation was later determined to be a hoax). Our Ethics Committee, supervised by the Board's Audit and Risk Committee and with the support of outside counsel and forensic accounting professionals, conducted a fulsome investigation into these allegations and found none to be substantiated. We nonetheless implemented enhancements to our compliance program recommended by our advisors after the investigations had concluded.

In addition, on October 1, 2021, the Enforcement Directorate of India filed a Prosecution Complaint with a special court in New Delhi in respect of an earlier Enforcement Case Information Report. Our former Group Chief Financial Officer and current Chief Financial Officer of our subsidiary APIPL, Mr. Pawan Kumar Agrawal, is one of those named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. The relevant transactions that are the subject of the complaint predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of the Company, and the criminal charges are not directed at, and do not concern, the Company or its subsidiaries. We will continue to monitor the proceedings as Mr. Agrawal defends the charges made against him.

***Our international corporate structure and operations require us to comply with anti-corruption laws and regulations of the United States and various other jurisdictions. If we are not in compliance with applicable legal requirements, we may be subject to civil or criminal penalties and other remedial measures.***

We are subject to the U.S. Foreign Corrupt Practices Act (FCPA) which prohibits, in relevant part, U.S. nationals, companies that have securities registered in the U.S. and any officer, director, employee, or agent of such issuer or any shareholder thereof acting on behalf of such issuer from making corrupt payments to foreign officials for the purpose of obtaining or keeping business. The FCPA also imposes obligations to keep accurate books and records, to maintain appropriate internal controls, and to prevent circumvention of such controls. We are also subject to the Indian Penal Code, 1860, the Prevention of Corruption Act, 1988 and the Prevention of Money Laundering Act, 2002 which are applicable on our subsidiaries in India. In addition, we have been and will continue to be subject to anti-corruption, anti-bribery and anti-money laundering legislation in other jurisdictions, which in certain circumstances go beyond the scope of the FCPA rules and regulations.

Any violations of these laws, regulations and procedures by our employees, independent contractors, subcontractors and agents could be costly and time-consuming to investigate and could expose us to administrative, civil or criminal penalties or fines (including under U.S. and Indian laws and regulations as well as other applicable laws). If we were to be investigated for, charged with, or convicted of, violating these laws and regulations, our reputation could be harmed and it could cause some of our investors to sell their interests in our company to be consistent with their internal investment policies or to avoid reputational damage, and some investors might forego the purchase of our shares, all of which may negatively impact the trading prices of our shares. In addition, any administrative, civil or criminal penalties or fines which could materially and adversely affect our business, results of operations, cash flows and financial condition.

For information regarding current investigations of certain whistleblower and other allegations against certain directors, officers, former officers and directors and employees of the Company, see "*Risk Factors - We have conducted investigations into whistle-blower claims and learned of other allegations in June, July, and October 2021 against certain directors, officers and employees and former officers and directors of the Company*" and "*Risk Factors - We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities*."

***Any damages caused by fraud, corruption, or other misconduct by our employees and former employees could adversely affect our business, the results of operations, financial condition and cash flows.***

We are exposed to operational risks arising from any inadequacy or failure of internal processes or systems. In addition, we are exposed to risks associated with fraud, corruption, or other misconduct of our directors, officers and employees. Employee or executive misconduct could also involve the improper use or disclosure of confidential information, bribery, data breach or other illegal acts, which could result in regulatory sanctions and reputational or financial harm, including harm to our brand.

Our processes, management information systems, and internal control procedures are designed to monitor our operations and overall compliance. Our systems, however, may not be able to identify every act of non-compliance and/or

suspicious transaction in a timely manner, or at all. In addition, certain internal control processes are carried out manually, which may increase the risk that human error, tampering, or manipulation will result in losses that may be difficult to detect.

One of the tools we use to provide assurance is our whistle-blower policy and related procedures, which encourages employees and directors to report concerns related to unethical conduct and governs the investigation of such reports. Our whistle-blower policy sets forth guidelines for our employees and directors to report concerns related to unethical conduct. Under the policy, our Ethics Committee investigates the allegations under the supervision of the Board's Audit and Risk Committee. The Ethics Committee may, at its discretion, consider appointing an investigator or investigation team internally and/or external parties for the purpose of investigation.

As part of our investigations of certain whistleblower and other allegations against certain directors, officers, former officers and directors and employees, we identified certain unethical and unauthorized conduct by former officers, directors and employees. For information regarding certain whistleblower and other allegations against certain directors, officers, former officers and directors and employees of the Company, see " - *We have identified material weaknesses in our internal control over financial reporting. If we fail to develop and maintain an effective system of internal controls over financial reporting or if we experience additional material weaknesses in the future, we may not be able to accurately or timely report our financial results, which may adversely affect investor confidence.*"

***We have identified material weaknesses in our internal control over financial reporting. If we fail to develop and maintain an effective system of internal controls over financial reporting or if we experience additional material weaknesses in the future, we may not be able to accurately or timely report our financial results, which may adversely affect investor confidence.***

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement in our financial statements will not be prevented or detected on a timely basis. These deficiencies could result in additional material misstatements to its financial statements that could not be prevented or detected on a timely basis.

Management have identified material weaknesses in internal control over financial reporting as of March 31, 2022. This caused us to fail to meet our periodic reporting obligations which in turn caused our shares suspended from trading on the NYSE.

Management determined that internal controls over financial reporting were ineffective due to inadequacy of certain review controls including control failures in financial statement closing procedures, controls pertaining to capitalization, vendor selection process, land acquisition, documentation on testing of control attributes and completeness and accuracy of reports used including inadequate consideration in designing of risk and controls matrices.

Management, under the supervision of the Company's Audit and Risk Committee, has initiated remediation actions focused on improving the Group's internal control and compliance environment to address the control deficiencies that led to material weaknesses. Management is taking support from external consultants while performing this remediation exercise.

Management will monitor the effectiveness of remediation plans and will make changes as appropriate. If we fail to develop and maintain an effective system of internal controls over financial reporting or if we experience additional material weaknesses in the future, we may not be able to accurately or timely report our financial results, which may adversely affect investor confidence.

***We did not timely file our annual reports on Form 20-F for Fiscal 2022 and Fiscal 2023. In accordance with SEC rules, we are now unable to file new Form F-3 registration statements (including shelf registration statements) for 12 months which may limit our financing options.***

We did not file our annual reports on Form 20-F for Fiscal 2022 and Fiscal 2023 by the time provided by SEC rules. In accordance with SEC rules, we are now unable to file new Form F-3 registration statements (including shelf registration statements) until such time we have timely filed all required SEC reports for 12 calendar months. Our inability to use Form F-3 registration statements (including shelf registration statements) may make it more difficult to raise funds in United States and may make our fundraising activities more expensive. In addition, our failure to meet our SEC and NYSE filing obligations has led to the delisting of our shares on the NYSE, see *"Risk Factors - The NYSE has notified us of its intention to delist our shares due to our failure to timely file our periodic reports in violation of their listing rules."*

***Our auditors have resigned as our auditors and as auditors of the subsidiaries for which they acted as statutory auditor.***

On July 10, 2023, S.R. Batliboi & Co. LLP ("SRB"), member firm of Ernst and Young Global Limited, resigned as our independent registered public accounting firm and the auditor of the subsidiary companies of Azure Power India Private

Limited. SRB stated that because they did not receive information that they requested to complete their audit work inclusive of our March 31, 2022 draft financial statements, US annual filing, associated books and records, and our conclusions and representations on the impact of the whistle blower complaints, it was not possible for them to complete the audit of the financial statements within the necessary timeline. During our two most recent fiscal years, Fiscal 2022 and Fiscal 2023, and subsequent interim period prior to resignation of SRB, except for information outstanding as mentioned above, we did not have disagreements with SRB on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of SRB, would have caused SRB to make reference to the subject matter of the disagreements in connection with its reports on the consolidated financial statements for such years. On September 5, 2023, SRB and Ernst & Young Mauritius resigned as our auditors and as the auditors of Azure Power Energy Limited and Azure Power Solar Energy Private Limited. These resignations may generate negative publicity, cause investors to lose confidence in our financial reporting, and our share price may decline as a result.

*As a "foreign private issuer", we are permitted to, and it will, follow certain home country corporate governance practices which may afford less protection to holders of our shares.*

As a "foreign private issuer", we are permitted to follow certain home country corporate governance practices. As a company incorporated in Mauritius and with securities registered with the SEC, we may follow our home country practice with respect to the composition of its Board of Directors and executive sessions and composition of our compensation committee and our nominating and corporate governance committee. The corporate governance practice and requirements in Mauritius do not require us to have the majority of its Board of Directors be independent or to hold regular executive sessions where only independent directors shall be present. In addition, Mauritius law does not require our compensation committee or our nominating and corporate governance committee to be comprised of only independent directors. Such Mauritian home country practices may afford less protection to holders of our shares than would be available to the shareholders of a U.S. corporation.

**Procurement, Supply Chain and Construction Risks**

*We may incur unexpected cost overruns and expenses if the suppliers of components in our solar/wind projects delay or fail to deliver solar modules, solar cells and other components or equipment for any reason.*

We enter into contracts with our suppliers to supply solar modules, solar cells and other components or equipment for our solar and wind projects. If our suppliers do not perform their obligations, we may need to enter into new contracts with other suppliers at a higher cost or may suffer schedule disruptions. In addition, our suppliers may have difficulty fulfilling our orders and incur delivery delays, or charge us higher prices, higher up-front payments and deposits, which would result in higher-than-expected prices or less favorable payment terms to develop our projects. Delays in the delivery of ordered components and equipment for our solar and wind projects could delay the completion of our under-construction projects. In addition, our relationship with our suppliers may worsen or lead to disagreements or litigation which could materially and adversely affect our business, results of operations, financial condition and cash flows. Any such delays or disruptions could materially and adversely affect our business, results of operations, financial condition and cash flows and thus affect the value of our shares.

*Our construction activities may be subject to cost overruns or delays which may adversely affect our business, results of operations, financial condition and cash flows.*

Construction of our solar, wind and other renewable energy projects may be adversely affected by circumstances outside of our control, including inclement weather, adverse geological and environmental conditions, failure to receive regulatory approvals on schedule or third-party delays in providing supplies and other materials. Changes in project plans or designs, or defective or late execution may increase our costs from our initial estimates and cause delays. Increases in the prices of our components and equipment may increase procurement costs. There can be no assurance that the prices of components and equipment required for our power projects that are presently contracted and under construction will not change, which may cause the economic returns available from these projects to differ from our initial projections. Any fluctuations in prices of our components or raw materials materially and adversely affect our business, results of operations, financial condition and cash flows. If we experience unexpected increases in procurement costs, our forecasted revenues and cash flows could be materially adversely affected.

Labor shortages, work stoppages, labor disputes or disruptions in transportation bringing in labor for projects also can significantly delay a project, increase our costs or cause us to breach our performance guarantees under our PPAs, particularly because strikes and labor transportation disruptions are not considered a force majeure event under many of our PPAs. Moreover, local political changes and delays, for instance, caused by state and local elections, as well as demonstrations

or protests by local communities and special interest groups could result in, or contribute to, project time and cost overruns for us.

In addition, we sometimes utilize and rely on third-party sub-contractors to construct and install portions of our renewable energy projects. If our subcontractors do not satisfy their obligations or do not perform work that meets our quality standards or if there is a shortage of third-party subcontractors or if there are labor strikes that interfere with the ability of our employees or contractors to complete their work on time or within budget, we could experience significant delays or cost overruns.

We may not be able to recover any of these losses in connection with construction cost overruns or delays.

Any such contingencies that could lead us to fail to generate our expected return from our solar and other renewable energy projects and could materially and adversely affect our business, results of operations, financial condition and cash flows.

*We face risks and uncertainties when developing our projects.*

The development and construction of our projects (including wind, solar, hydro, transmission, manufacturing, etc.) involve numerous risks and uncertainties and require extensive research, planning and due diligence. Before we determine that a project is economically, technologically or otherwise feasible, we may be required to incur significant capital expenditure for land and interconnection rights, regulatory approvals, preliminary engineering, equipment procurement, legal and other matters. Success in developing a project depends on many factors, including:

- accurately assessing resources availability at levels deemed acceptable for project development and operations;
- fluctuations in foreign exchange and inflation rates impacting equipment and supplier costs;
- fluctuations in the cost and availability of raw materials and purchased components;
- receiving critical components and equipment (that meet our design specifications) on schedule and on acceptable commercial terms;
- securing necessary project approvals, licenses and permits in a timely manner;
- securing appropriate land, with satisfactory land use permits, on reasonable terms;
- availability of adequate grid infrastructure and obtaining rights to interconnect the project to the grid or to transmit energy;
- obtaining financing on competitive terms;
- completing construction on schedule without any unforeseeable delays; and
- entering into PPAs or other offtake arrangements on acceptable terms.

Generally, our PPAs require that we bring our projects to commercial operation by a certain date. There may be delays or unexpected difficulties in completing our projects as a result of these or other factors. We may also have to reduce the size of some of our projects due to occurrence of any of these factors. Further, the majority of our PPAs provide for a reduction of tariff if we fail to commission a project by the scheduled commission date. If we are unable to adhere to project timelines for reasons other than as specifically contemplated in the PPAs, it could result in the reduction in tariffs, or other penalties, including paying liquidated damages for delay in commissioning of projects or granting the off-taker the right to draw on performance bank guarantees provided by us, including in certain cases up to 100% of the bank guarantee, or the termination of the PPAs. Further, we may also be subject to penalties in respect of failure to ensure transmission of electricity from the project to the grid and the respective off-taker, as agreed under the respective PPA and/or transmission agreements. If we experience such problems, our business, results of operations, financial condition and cash flows could be materially and adversely affected.

*Our in-house procurement and construction operations expose us to certain risks.*

We undertake in-house procurement and construction operations for our solar and wind projects, which exposes us to certain risks that would ordinarily be borne by third parties. For example, entering into third-party engineering, procurement and construction ("EPC") contracts on the basis of fixed price contracts would insulate us from adverse price fluctuations for the equipment and materials we use for constructing solar and wind projects. As a result, we are exposed to construction cost risks that could be caused by various factors, including:

- increases in the price and availability of land, labor, equipment and materials;
- inaccuracies of drawings and technical information;

- delays in the delivery of equipment and materials to project sites;
- unanticipated increases in equipment, material and land costs;
- delays caused by local and seasonal weather conditions; and
- any other unforeseen design and engineering issues, or physical, site and geological conditions that may result in delays.

Additionally, we are primarily responsible for all equipment and construction defects, potentially adding to the cost of construction of our projects. Although we generally obtain warranties from our equipment suppliers, we cannot assure that we will be successful with any warranty claims against our suppliers. If our procurement and construction operations are insufficient, we may incur additional costs in engaging third party service providers to undertake our procurement and construction activities or experience significant delays or disruption of our operations. We also enter into solar and wind energy project contracts on a business-to-business basis under which we are responsible for designing, constructing and installing and maintaining these projects. Any delay, default, malfunctioning or unsatisfactory performance by our in-house teams could result in significant losses, damage our reputation and expose us to claims which we may not be able to recover from any third party, and therefore, adversely affect our business, results of operations, financial condition and cash flows. The construction projects are capital intensive, requires significant time and are subject to delays or cost overruns, which could require us to expend additional capital and adversely affect our business and operating results. Such potential events include shortages and late delivery of building materials and facility equipment, installation, commissioning and qualification of equipment, labor disputes, delays or failure in securing the necessary governmental approvals, building sites or land use rights, and other changes to plans necessitated by changes in market conditions. Such delays could adversely affect our business, results of operations, financial condition and cash flows.

***Delays in obtaining, or a failure to maintain, governmental approvals and permits required to construct and operate our projects may adversely affect such projects and our business.***

The design, construction and operation of our solar and other renewable energy projects are highly regulated, require various governmental approvals and permits, and may be subject to conditions that may be stipulated by relevant government authorities which vary from state to state. There is no certainty that all permits required for a given project will be granted on time or at all. If we fail to obtain or renew such licenses, approvals, registrations and permits in a timely manner, we may not be able to commence or continue operating our projects in accordance with our contracted schedules or at all, which could adversely affect our business, results of operations, financial condition and cash flows. There is also no certainty that relevant government authorities will not take any action in the future which may expose us to penalties or have a material adverse impact on our operations. We are also exposed to changes in the legal and regulatory environment in which we operate, including changing taxes and tariffs and data privacy and protection laws which could, increase our operating costs, or result in litigation or regulatory action.

***There are substantial delay between making significant upfront investments in our solar and other renewable energy projects and receiving revenue.***

There are generally many months or even years between our initial bid in renewable energy auctions to build solar or other renewable energy projects and the date on which we begin to recognize revenue from the sale of electricity generated by such projects. Our initial investments include, legal, accounting and other third-party fees, costs associated with project analysis and feasibility study, payments for land rights, payments for interconnection and grid connectivity arrangements, government permits, engineering and procurement of solar panels, balance of system costs or other payments, which may be non-refundable. Our projects may not be fully monetized for 25 years given the average length of our PPAs, but we bear the costs of our initial investment upfront. Furthermore, we have historically relied on our own equity contribution, international lenders and bank loans to pay for costs and expenses incurred during project development. Solar and other renewable energy projects generate revenue only after becoming commercially operational and starting to sell electricity to the power grid through off takers. Between our initial investment in the development of solar projects and their connection to the transmission grid, there may be adverse developments, such as unfavorable environmental or geological conditions, pandemics, labor strikes, panel shortages or monsoon weather. Furthermore, we may not be able to obtain all of the permits as anticipated and permits that were obtained may expire or become ineffective, any of which may delay construction or commercial operation. Further, we may not be able to obtain project level financing as anticipated, which may delay or halt construction of a particular project. Any such delays, could put materially and adversely affect our business, results of operations, financial condition and cash flows.

**Risks Related to Retention of Management and Key Employees**

***The loss of our senior management or key employees may adversely affect our ability to conduct our business.***

We depend on our management team, and the loss of any key executives could negatively impact our business. We have had successive changes in our senior management in 2022 and 2023 in the CEO, CFO and COO positions, which has created internal disruption, adversely affected our operations and strategy implementation and attracted negative publicity. In addition, on October 11, 2023, Mr. Alan Rosling resigned as Chairman of the Board and as a director of the Company and APIPL. On October 12, 2023, the Company announced that Mr. M.S Unnikrishnan became the Chairman of the Board of the Company.

There can be no assurance that our competitors will not offer better compensation packages, incentives and other perquisites to such skilled personnel. In the event that we are not able to attract and retain talented employees as required for conducting our business, or if we experience high attrition levels which are largely out of our control, or if we are unable to motivate and retain existing employees, our business, results of operations, financial condition and cash flows may be adversely affected. In addition, an inability to attract and retain sufficient technical and managerial personnel could limit our ability to manage and complete our projects on schedule and within budget, which may adversely affect our business and strategy implementation.

The loss of the services of our key personnel or our inability to recruit or train a sufficient number of experienced personnel or our inability to manage the attrition levels in different employee categories may have an adverse effect on our business, results of operations, financial condition and cash flows. Further, if we cannot hire additional qualified personnel or retain them, our ability to expand our business may be impacted. As we expand operations by constructing new renewable energy projects, we will need to continue to attract and retain experienced management, operations and project construction personnel. We may also be required to increase our levels of employee compensation more rapidly than in the past to remain competitive in attracting suitable employees.

**Offtaker risks related to compliance with the terms of PPAs, delay in payments, and LOAs cancelled**

***Counterparties to our PPAs may not fulfill their obligations which could materially and adversely affect our business, results of operations, financial condition and cash flows.***

We generate electricity income primarily pursuant to PPAs entered into with central and state government-run utilities. If the counterparties to our PPAs do not fulfill their obligations our business, results of operations, financial condition and cash flows could be materially and adversely affected. Our counterparties to our PPAs may become subject to financial stress, insolvency or liquidation proceedings during the term of the relevant contracts, and the credit support received from such customers may not be sufficient to cover our losses in the event of a failure to perform. There may also be disputes raised by the counterparties to the amounts invoiced, or delays associated with collection of receivables from government owned or controlled entities on account of the financial condition of these entities that deteriorated significantly in the past. Where we are selling power to non-governmental entities, we take into account the credit ratings assigned by rating agencies and our ability to collect when assessing the counterparties' creditworthiness. The Governmental entities to which we sell power generally may not have credit ratings for us to consider, and many of the state governments in India, if rated, would likely rate lower than the Indian government. Although the central and state governments in India have taken steps to improve the liquidity, financial condition and viability of state electricity distribution utility companies, there can be no assurance that the utility companies that are currently our customers will have the resources to pay on time or at all.

In addition, our PPA customers may, for any reason, become unable or unwilling to fulfil their related contractual obligations, refuse to accept delivery of power delivered thereunder or otherwise terminate such agreements prior to the expiration thereof. If such events occur, our business, results of operations, financial condition and cash flows could be materially and adversely affected.

***There are a limited number of strong credit purchasers of utility scale quantities of electricity which exposes us to risk of LOA cancellations, and our utility scale projects to risk.***

Typically we derive approximately 70% of our revenue from our top five customers. Since the transmission and distribution of electricity are either monopolized or highly concentrated in most jurisdictions, there are a limited number of possible purchasers for utility scale quantities of electricity in a given geographic location, including transmission grid operators and central and state-run utilities. For instance, for projects established pursuant to the NSM, solar project developers are required to enter into PPAs with specified implementation agencies (who in turn sell power to Discoms). As a result, there is a concentrated pool of potential buyers for electricity generated by our plants and projects, which may restrict our ability to (1) negotiate favorable terms under new PPAs, and (2) execute PPA for the projects for which we have won and have received LOAs.

Furthermore, if the financial condition of these utilities and/or power purchasers deteriorate or the NSM or other solar policy to which they are currently subject and that compel them to source renewable energy supplies change, demand for electricity produced by our renewable energy plants could be negatively impacted. Consequently, it is difficult to identify new customers, and our inability to retain existing customers and identify new customers can adversely affect our business.

**Power Generation Risks**

*Any constraints in the availability of the electricity grid, including our inability to obtain access to transmission lines in a timely and cost-efficient manner could adversely affect our business.*

Delivering power to our power purchasing customers is our responsibility. We generally rely on transmission lines and other transmission and distribution facilities that are owned and operated by transmission or distribution utilities. Where we do not have access to available transmission and distribution networks, we may engage contractors to build transmission lines and other related infrastructure. In such a case, we will be exposed to additional costs and risks associated with developing transmission lines and other related infrastructure, such as the ability to obtain right of way from landowners for the construction of our transmission lines, which may delay and increase the costs of our projects and, thereby, adversely affect our business, results of operations, financial condition and cash flows.

In addition, India's physical infrastructure, including its electricity grid, is less robust than that of many developed countries. As a result of grid constraints, such as grid congestion and restrictions on transmission capacity of the grid, the transmission and dispatch of the full output of our projects may be curtailed. We may have to stop producing electricity during the period when electricity cannot be transmitted. Such events could reduce the net power generation of our projects from estimated power generation. If construction of renewable energy projects outpaces transmission capacity of electricity grids, we may be dependent on the construction and upgrade of grid infrastructure by the transmission utilities. We cannot assure that the relevant transmission utilities will develop required transmission infrastructure in timely manner, or at all. The curtailment of our power projects' output levels will reduce our electricity output and limit operational efficiencies, which in turn could adversely affect our business, results of operations, financial condition and cash flows.

*Maintenance and expansion of power generation facilities involve significant risks that could result in reduced power generation and financial results.*

Our facilities may require periodic upgrading and improvement. Any unexpected operational or mechanical failure, including failure associated with breakdowns, and any decreased operational or management performance, could reduce our facilities' generating capacity below expected levels and reduce our revenues as a result of generating and selling less power. Degradation of the performance of our projects beyond levels provided for in the related PPAs may also reduce our revenues. Our plants may be adversely affected by storms, high winds or flooding, lower solar insolation resulting in damage and loss of revenue. Unanticipated capital expenditures associated with maintaining, upgrading or repairing our facilities may also reduce profitability, especially because our tariff is fixed in the PPAs, and we may not be able to pass through any unexpected costs in relation to the projects to our customers. Furthermore, we are not able to mitigate such project risks by shifting some or all of the risk to a third-party Engineering, Procurement and Construction or Operations and Maintenance contractor since we provide most of these services in-house. Due to this, our maintenance and power generation facilities may be negatively resulting in reduced power generation and adverse impact on financial results. This impact we may not be able to recover through insurance. If the situation worsens there could be a further adverse impact on our revenues. Further, changes in technology may require us to make additional capital expenditures to upgrade our facilities. The development and implementation of such technology entails technical and business risks and additional costs of implementation.

**Changes in the political, fiscal or regulatory environment in India.**

*A substantial portion of our business and operations are located in India, and we are subject to regulatory, economic, social and political uncertainties in India.*

Our business and our employees are located in India, and we intend to continue to develop and expand our business in India. Consequently, our financial performance will be affected by changes in exchange rates and controls, interest rates, changes in government policies, including taxation policies, social and civil unrest and other political, social and economic developments in or affecting India. An election or a new administration in India or in any of the states could result in uncertainty in the renewable energy market, which could harm our operations.

India has a mixed economy with a large public sector and an extensively regulated private sector. The GoI has exercised and continues to exercise significant influence over many aspects of the Indian economy. Since 1991, successive Indian governments have generally pursued policies of economic liberalization and financial sector reforms, including by significantly relaxing restrictions on the private sector. Nevertheless, the role of the Indian central and state governments in the Indian economy as producers, consumers and regulators has remained significant and there is no assurance that such liberalization policies will continue. The GoI in the past, among other things, imposed controls on the prices of a broad range of goods and services, restricted the ability of businesses to expand existing capacity and reduce the number of their employees, determined the allocation to businesses of raw materials and foreign exchange and reversed their policies of economic liberalization. The performance and growth of our business are necessarily dependent on economic conditions prevalent in India, which may be adversely affected by such developments. We may not be able to react to such changes promptly or in a cost-effective manner. Increased regulation or changes in existing regulations may require us to change our business policies and practices and may increase the cost of providing services to our customers which would have an adverse effect on our business, results of operations, financial condition and cash flows.

Notwithstanding the Reserve Bank of India's policy initiatives, the course of market interest rates continues to be uncertain due to high inflation, the increase in the fiscal deficit and the GoI's borrowing program. Any continued or future inflation because of increases in prices of commodities such as crude oil or otherwise, may result in a tightening of monetary policy and could materially and adversely affect our business, results of operations, financial condition and cash flows. Any increase in interest rates or reduction in liquidity could adversely impact our business.

Further, as per the Electricity Act, the state distribution companies in India are required to procure minimum prescribed energy from renewable energy sources in the form of renewable purchase obligation. However, in the past, most of the states have been in non-compliance with the obligation to purchase such minimum amount of energy produced from renewable energy sources, on account of low penalties currently associated with such non-compliance. Accordingly, there may be an adverse impact on our profitability due to resultant lower procurement of renewable energy.

Our long-term growth is also dependent upon the targets set by the GoI for renewable energy. Any change in the present government, a reduction in the targets set by the GoI for renewable energy or a failure to meet the GoI's targeted installed capacity may result in a slowdown in our growth opportunities and adversely affect our ability to achieve our long-term business objectives, targets and goals.

***The regulatory and policy environment affecting the renewable energy sector in India impacts our business.***

The regulatory and policy environment in which we operate is evolving and subject to periodic change, and our business, results of operations, financial condition and cash flows could be adversely affected by any unfavorable changes in or interpretations of existing laws, or implementation of new laws. Uncertainty in the applicability, interpretation or implementation of any amendment to, or change in, governing law, regulation or policy in the jurisdictions in which we operate, including by reason of an absence, or a limited body, of administrative or judicial precedent may be time consuming as well as costly for us to resolve and may impact the viability of our business currently or in the future.

Our business, results of operation and financial performance could be adversely affected by any change in laws or interpretation of existing, or the promulgation of, laws, rules and regulations applicable to us. There can be no assurance that the GoI will not implement new regulations and policies which will require us to obtain additional approvals and licenses from the government and other regulatory bodies or impose onerous requirements and conditions on our operations, which could result in increased compliance costs as well as divert significant management time and other resources.

Further, we depend in part on government policies that support renewable energy and enhance the economic feasibility of developing renewable energy projects. The GoI and several of the states in which we operate or plan to operate provide incentives that support the generation and sale of renewable energy, and additional legislation is regularly being considered that could enhance the demand for renewable energy and obligations to use renewable energy sources. In addition, regulatory policies in each state in India currently provide a favorable framework for securing attractive returns on capital invested. If any of these incentives or policies are adversely amended, eliminated or not extended beyond their current expiration dates, or if funding for these incentives is reduced, or if governmental support of renewable energy development, particularly solar and wind energy, is discontinued or reduced, it could adversely affect our ability to obtain financing, the viability of new renewable energy projects constructed based on current tariff and cost assumptions or the profitability of our existing projects.

We also benefit from a number of other government incentives, including; preferential charges on transmission,

wheeling and banking facilities; generation-based incentives schemes for certain wind power assets; tax holidays; and availability of accelerated depreciation for wind and solar power assets. There is no assurance that the GoI and state governments will continue to provide incentives and allow favorable policies to be applicable to us, and these incentives may be available for limited period.

Changes to government policies curtailing renewable energy generation may adversely affect our business. If governmental authorities stop supporting, or reduce or eliminate their support for, the development of renewable energy projects, it may become more difficult to obtain financing, our economic return on certain projects may be reduced and its financing costs may increase. A delay or failure by governmental authorities to administer incentive programs in a timely and efficient manner could also adversely affect our ability to obtain financing for its projects. These may, in turn, materially and adversely affect business, results of operations, financial condition and cash flows.

### *Duties on solar equipment imports increase our costs and adversely impact our performance.*

The Indian government imposes duties on various solar equipment and devices that are key to our business, and such duties are subject to frequent change. These duties can greatly increase our project costs. To the extent we are unable to pass on the impact of such duties to our off takers under any of our PPAs, our business, results of operations, financial condition and cash flows will be adversely affected.

### *Foreign investment laws in India include certain restrictions, which may affect our future assets sales, acquisitions or investments in India.*

India regulates ownership of Indian companies by non-residents, and although many restrictions on foreign investment have been relaxed in recent years others, such as investments from countries bordering India, have been subject to more regulation. Pursuant to the Consolidated Foreign Direct Investment Policy, 2020 (the "FDI Policy"), investments can be made by non-residents in Indian companies to the extent of the percentage of the total capital of the Indian company specified in the FDI Policy. At present, the FDI Policy permits 100% foreign direct investment in Indian companies engaged in the power sector. Under current Indian regulations, transfers of shares between non-residents and residents are permitted (subject to certain exceptions) if they comply with, among other things, the Foreign Exchange Management (Non-debt Instruments) Rules, 2019, as amended from time to time, in relation to pricing and valuation of such shares and certain reporting requirements for such transactions specified by the Reserve Bank of India. If the transfer of shares is not in compliance with such pricing guidelines or reporting requirements or falls under any of the exceptions specified by the Reserve Bank of India, the prior approval of the Reserve Bank of India will be required before any such transfer may be consummated. We may not be able to obtain any required approval from the Reserve Bank of India or any other Indian regulatory authority on any particular terms or at all.

For example, under the FDI policy, the Indian government provides additional requirements for foreign investments in India, including requirements with respect to downstream investments by Indian companies owned or controlled by non-resident entities and the transfer of ownership or control, from resident Indian persons or entities to non-residents, of Indian companies in sectors with limits on foreign investment. As substantially all of APIPL's and AZR's shares are directly held by Azure Power Global Limited, it would be considered an entity owned and controlled by non-residents under applicable Indian laws. Accordingly, any downstream investment by APIPL or AZR into another Indian company will have to be in compliance with conditions applicable to such Indian entity, in accordance with the FDI policy. In addition, there may be investors who may not be able to buy assets we wish to sell in future. There are guidelines in relation to pricing and valuation of shares and restrictions on sources of funding for such investments. To the extent these guidelines become more restrictive, they may restrict our ability to make further equity investments in India, including through Azure Power Global Limited.

Further, India's Foreign Exchange Management Act, 1999, as amended, and the rules and regulations promulgated thereunder ("FEMA") prohibit us from borrowing from our Indian subsidiaries. We are permitted to lend to our Indian subsidiaries subject to compliance with India's policy on external commercial borrowings as notified by the Reserve Bank of India from time to time, which specifies certain conditions, including in relation to eligible lenders and borrowers, permitted end use and limits on the all-in-cost.

### *Our ability to raise foreign capital may be constrained by Indian law.*

Our Indian subsidiaries are subject to exchange controls that regulate borrowing in foreign currencies. Such regulatory restrictions limit our financing sources and hence could constrain our ability to obtain financings on competitive terms and refinance existing indebtedness. In addition, we cannot assure you that the required approvals will be granted to us

without onerous conditions, or at all. Limitations on raising foreign debt may adversely affect our business, results of operations, financial condition and cash flows.

***We are subject to various labor laws, regulations and standards in India. Non-compliance with and changes in such laws may adversely affect our business, results of operations, financial condition and cash flows.***

We are required to comply with various labor and industrial laws in India. Moreover, new laws are anticipated, which, when implemented, will introduce several new changes, such as introducing a single registration and license for Indian companies, increasing threshold for applicability of certain laws for factories, increase in threshold for engaging contract workers, and government approval for retrenchment (termination) of workers. There is no assurance that our costs of complying with current and future labor laws and other regulations will not adversely affect our business, results of operations, financial condition and cash flows. There is a risk that we may fail to comply with such regulations, which could result in us being exposed to sanctions and fines and may lead us to stop operations which could have an adverse impact on our operations.

***Changes in the taxation system in India could adversely affect our business.***

Our operations, profitability and cash flows could be adversely affected by any unfavorable changes in central and state-level statutory or regulatory requirements in connection with direct and indirect taxes and duties, including income tax, goods and service tax, ("GST") in India, or by any unfavorable interpretation taken by the relevant taxation authorities and/or courts and tribunals in India. For example, the GoI levied GST on renewable energy devices as well as on service of construction for solar power plant and wind operated electricity generators. Such income tax rules are subject to change, and any current tax benefits may not be available in the future. Any amendments to Indian tax laws could adversely affect our business, results of operations, financial condition and cash flows.

**Health, Safety and Environmental Risks**

***Our operations have inherent safety risks and hazards that require continuous oversight and substantial insurances coverage.***

Construction and generation of power from solar power generation facilities and plants involves inherent safety risks and hazards which must be identified and mitigated. Power generation involves hazardous activities, including high voltages in key equipment and delivering electricity to transmission and distribution systems. Natural risks such as earthquake, flood, lightning, hurricane and wind, other hazards, such as fire, structural collapse and machinery failure also are inherent risks in our operations. These and other hazards can cause personal injury or loss of life, damage to and destruction of property, plant and equipment and contamination of, or damage to, the environment and suspension of operations. We maintain insurance protection that we consider adequate, but we cannot provide any assurance that our insurance will be sufficient or effective under all circumstances and against all hazards or liabilities to which we may be subject. Furthermore, our insurance coverage is subject to deductibles, caps, exclusions and other limitations. A loss for which we are not fully insured could materially and adversely affect our business, results of operations, financial condition and cash flows. Further, due to rising insurance costs and changes in the insurance markets, we cannot provide any assurance that our insurance coverage will continue to be available at all or at rates or on terms similar to those presently available. Any losses not covered by insurance could materially and adversely affect our business, results of operations, financial condition and cash flows.

As part of our investigation of the whistle-blower complaint in May 2022, we discovered deviations from safety and quality norms at one of our project sites. Although no loss time injury or fatality at this site occurred, we implemented mechanisms to remediate the problems identified and in so doing strengthen safety and quality protocols. We also undertook audits at other sites which were under direct supervision of similar personnel and confirmed that the deviation from safety and quality norms and was limited to only one project site. We have now formalized and implemented a "Safety consequence management policy" that establishes individual accountability for deviation from the company's safety management system.

***Our operations are subject to governmental, health, safety and environmental regulations, and we may have to incur material costs to comply with these regulations.***

The power generation business in India is subject to a broad range of environmental, social (including labor), health, safety and other laws and regulations. These laws and regulations require us to obtain and maintain a number of approvals, licenses, registrations and permits for developing and operating power projects. Additionally, we may need to apply for more approvals in the future, including renewal of approvals that may expire from time to time. Furthermore, our government approvals and licenses are subject to numerous conditions, some of which are onerous and require us to make substantial

expenditure. We may incur material costs, including clean up or remediation costs, fines and civil or criminal sanctions, and third-party property damage or personal injury claims, as a result of any violations of or liabilities under environmental or health and safety laws or noncompliance with permits and approvals, which, as a result, may have a material adverse effect on our reputation, business, results of operations, financial condition and cash flows.

Environmental laws and regulations in India have become and continue to be more stringent, and the scope and extent of new environmental regulations, including their effect on our operations, cannot be predicted with any certainty. In case of any change in environmental or pollution regulations, we may be required to invest in, among other things, environmental monitoring, pollution control equipment, and emissions management and other expenditure to comply with environmental standards. Any failure on our part to comply with future regulations applicable to us may result in legal proceedings, including public interest litigation, being commenced against us, third party claims or the levy of regulatory fines.

We currently fall under an exemption granted to solar photovoltaic projects that exempts us from complying with the Environment Impact Assessment Notification, 2006, issued under the Environment (Protection) Act, 1986. While we are not required to obtain consents under the Water (Prevention and Control of Pollution) Act, 1974, Air (Prevention and Control of Pollution) Act, 1981 and the Hazardous Waste (Management, Handling and Transboundary Movement) Rules, 2016, E-waste Management Rules 2016, and certain procedural requirements, such as informing the Pollution Control Board, exists. However, there can be no assurance that we will not be subject to any such consent requirements in the future, and that we will be able to obtain and maintain such consents or clearances in a timely manner, or at all, or that we will not become subject to any regulatory action on account of not having obtained or renewed such clearances in any past periods. Non-compliance witch such environmental and other similar laws and regulations will have a material adverse effect on our reputation, business, results of operations, financial condition and cash flows.

**Competition Risks**

*We may not be ability to acquire rights to develop and generate power from new solar projects through the competitive bidding process.*

We acquire the rights to develop and generate power from new projects through a competitive bidding process, in which we compete for project awards based primarily on pricing, technical and engineering expertise, financial conditions, including specified minimum net worth criteria, availability of land, financing capabilities and track record. The bidding processes are affected by factors which may be beyond our control, such as market conditions or government incentive programs. If we misjudge our competitiveness when submitting our bids or if we fail to lower our costs to submit competitive bids, we may not acquire the rights on new renewable energy projects. Furthermore, we make assumptions with respect to prices for system components and raw materials, and if prices for system components and raw materials are greater than our assumed prices, our project economics may be adversely affected and the project for which we bid may not remain economically viable.

In addition, rules of the auction process may change. Each state in India has its own regulatory framework and states have their own renewable energy policy. The rules governing the various regional power markets may change from time to time, in some cases, in a way that is contrary to our interests and adverse to our financial returns. For example, most national auctions currently use the reverse auction structure, in which several winners take part in the same project. There can be no assurance that the central and state governments will continue to allow us to utilize such bidding structures and any shift away from the current structures, such as to a Dutch auction, could increase the competition and adversely affect our business, results of operations, financial condition and cash flows.

For information on the risk of not executing PPAs in respect of our 4,000 MWs manufacturing linked tender, see "Risk Factors –*We may not be able to sign PPAs for balance capacity of 967 MWs in respect of the 4,000 MWs manufacturing linked tender for which letter of award has already been received*".

*We face significant competition from traditional and renewable energy companies.*

We face significant competition in the markets in which we operate. Our primary competitors are Indian and international developers and operators of solar projects and other renewable energy sources. We also compete with utilities generating power from conventional fossil fuels. Deregulation of the Indian power sector and increased private sector investment have intensified the competition we face. The Electricity Act, 2003, or the Electricity Act, removed certain licensing requirements for power generation companies, provided for open access to transmission and distribution networks and also facilitated additional capacity through captive power projects. These and other similar future reforms do and will provide

opportunities for increased private sector participation in power generation.

Furthermore, our competitors may have greater operational, financial, technical, management or other resources to achieve better economies of scale and lower cost of capital, allowing them to bid in the same auction at more competitive rates. Our competitors may also have a more effective or established localized business presence or a greater willingness or ability to operate with little or no operating margins for sustained periods of time. Our competitors may also enter into strategic alliances or form affiliates with other competitors to our detriment. As our competitors grow in scale, they may establish in-house EPC and O&M capabilities, which may offset a current advantage we may have over them. Moreover, suppliers or contractors may merge with our competitors which may limit our choices of suppliers or contractors and hence the flexibility of our overall project execution capabilities. In addition, some of our competitors have developed their own internal solar panel manufacturing capabilities. As the renewable energy industry grows and evolves, we may also face new competitors who are not currently in the market. In addition, we face competition from developers of other renewable energy facilities, including biomass, and nuclear, as well as other forms of renewable electricity generation like hydrogen. Competition from such producers may increase if the technology used to generate electricity from these other renewable energy sources becomes more sophisticated, or if the Indian government elects to further strengthen its support of such renewable energy sources. Any increase in competition during the bidding process or reduction in our competitive capabilities could materially and adversely affect our market share and the profit that we generate from our projects.

**IT and cyber security risks**

***Weaknesses, disruptions, failures or cyber security events in our IT systems could adversely impact our business.***

We rely on IT systems in connection with financial controls, risk management and transaction processing as well as to manage our power projects. We may be subject to disruptions of our IT systems, arising from events that are wholly or partially beyond our control (for example, damage or incapacitation by human error, natural disasters, electrical or telecommunication outages, sabotage, computer viruses, or loss of support services from third parties such as internet backbone providers). Although we have not experienced material incidents in the past, we may in the future experience incidents of system failures, cyber-attacks and frauds, hacking, phishing, trojans and theft of data or other types of cyber security attacks or incidents that have a material adverse effect on our business, results of operations, financial condition and cash flows. In the event we experience systems interruptions, errors, downtime, incidents of hacking, phishing, or breaches of our data security systems, this may give rise to deterioration in customer service and loss or liability to us and it may materially and adversely affect our reputation, business, results of operations, financial condition and cash flows. Such cyber security events could expose us to a risk of loss or misuse of our information, litigation, reputational damage, violations of applicable privacy and other laws, fines, penalties or losses that are either not insured against or not fully covered by insurance maintained. We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities.

**Risks related to project land and the acquisition of land**

***We may not be able to find suitable sites for the development of renewable energy projects.***

Our ability to realize our business and growth plans is dependent on our ability to develop and secure rights to sites suitable for the development of projects. Suitable sites are determined on the basis of cost, wind, solar and hydro resource levels, topography, grid connection infrastructure and other relevant factors, which may not be available in all areas. Further, wind, solar and hydro energy projects must be interconnected to the power grid in order to deliver electricity, which requires us to find suitable sites with adequate evacuation and transmission infrastructure, including right of way. Solar energy and transmission infrastructure projects also require sufficient contiguous land for development, which may be difficult to procure on suitable terms. Some locations used for evacuation and transmission facilities are not owned by us and are located on land owned by third parties. Land used for our projects is subject to other third-party rights such as rights of passage and rights to place cables and other equipment on the properties, which may interfere with our right to use the land and ultimately impair our operations.

Any failure by us to secure suitable sites may materially impact the development of a project and may also result in non-compliance with related conditions under project agreements. If this occurs across a number of our projects, our business and prospects could be materially and adversely affected.

***Land title in India can be uncertain, and it may be subject to onerous conditions which may restrict its use.***

There is no central title registry for real property in India, and the documentation of land records in India has not been fully computerized. Property records in India are generally maintained at the state and district level and in local languages and, while digitization is proceeding in many states, have historically been updated manually through physical records. Therefore, property records may not be available online for inspection or updated in a timely manner, may be illegible, untraceable, incomplete or inaccurate in certain respects, or may have been kept in poor condition, which may impede title investigations or our ability to rely on such property records. In addition, there may be a discrepancy between the duration of the principal lease under different orders issued by state governments in respect of a particular parcel of revenue land. Furthermore, title to land in India is often fragmented, and in many cases, land may have multiple owners. Title may also suffer from irregularities, such as non-execution or non-registration of conveyance deeds and inadequate stamping, pending or on-going litigation and may be subjected to encumbrances of which we are unaware. In some cases, owners and those traditionally occupying or using land may differ. Any defects in, or irregularities of, title may result in a loss of development or operating rights over the land, which may prejudice the success of our power projects and require us to write off substantial expenditures in respect of our power projects.

As part of our investigation into whistle-blower complaints, we identified significant control issues in our process of acquiring land and land use rights for one of our projects. For further information, see "- *We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities*".

In addition, improperly executed, unregistered or insufficiently stamped conveyance instruments in a property's chain of title, unregistered encumbrances in favor of third parties, rights of adverse possessors, ownership claims of family members of prior owners or third parties, or other defects that a purchaser may not be aware of can affect title to a property. As a result, potential disputes or claims over title to the land on which our power projects are or will be constructed may arise. However, an adverse decision from a court or the absence of an agreement with such third parties may result in additional costs and delays in the construction and operating phases of any solar projects situated on such land. Also, such disputes, whether resolved in our favor or not, may divert management's attention, incur extra-legal cost, harm our reputation or otherwise disrupt our business. For instance, we have filed civil suits in UP and Gujarat seeking directions from the court to the counterparty to execute sale deeds in our favor.

Further, some properties used for our solar projects are subject to other third-party rights such as right of passage and rights to place cables and other equipment on the properties, which may result in certain interferences with our use of the properties. Our rights to the properties used for our solar projects may be challenged by property owners and other third parties for various other reasons as well. Any such challenge, if successful, could impair the development or operations of our solar projects on such properties.

Additionally, the power projects that we may develop or acquire in the future may be located on land that may be subject to onerous conditions under the lease agreements through which we acquire rights to use such land and rights of way. Furthermore, the state government may exercise its rights of eminent domain, or compulsory acquisition in respect of land on which our projects are or will be located. Any of this may adversely affect our business, results of operations, financial condition and cash flows.

***We do not own all the land on which we operate.***

We lease some of the land that we utilize or intend to utilize for our projects, and we may be subject to conditions under the pertinent lease agreements. Such conditions typically include restrictions on leasehold interest or rights to use the land, continual operating requirements, and other obligations which include obtaining requisite approvals, payment of necessary statutory charges and giving preference to local workers for construction and maintenance. We are also exposed to the risk that these leases will not be extended or will be terminated by the relevant lessors. Some of our projects are located, or will be located, on revenue land that is owned by the state governments or on land acquired or to be acquired from private parties. The timeline for transfer of title in the land is dependent on the type of land on which the projects are, or will be, located, and the policies of the relevant state government in which such land is located. In the case of land acquired from private parties, which is agricultural land, the transfer of such land from agriculturalists to non -agriculturalists such as our Company and the use of such land for non-agricultural purposes may require an order from the relevant state land or revenue authority allowing such transfer or use. For revenue land, we obtain a lease from the relevant government authority. In certain cases, the land leased for the development of renewable energy projects is obtained on a sub-lease. Such land may be subject to disputes on account of right of way, encroachment and other related issues.

The timeline for transfer of title to the land depends on the type of land on which the projects are located and the policies of the relevant state government in which such land is located. In the case of land acquired from private parties, which is agricultural land, the transfer of such land may require an order from the relevant state land or revenue authority allowing such transfer or use. There is no certainty that the outstanding approvals would be received on time, or that lease or sub-lease deeds would be executed in a timely manner, such that the operation of the projects will continue unaffected. In certain cases, any delay in the construction or commissioning of a project may result in termination of the lease. Further, the terms of lease and sub-lease agreements may also not be co-terminus with the lifetime of the power projects. In the event that the relevant lessor do not wish to renew the lease or sub-lease agreements, we may be forced to remove our equipment at the end of the lease and/or sub-leases and we may not be able to find an alternative location in the short term or at all. Consequently, our business, results of operations, financial condition and cash flows could be adversely affected.

## Risks of Adverse Weather Events and Natural Calamities

### *The generation of electricity from solar and wind sources depends on suitable weather.*

The electricity produced and revenues generated by our renewable energy projects are highly dependent on weather conditions and air pollution, which are beyond our control. Furthermore, components of our systems, such as solar panels and inverters, could be damaged by severe weather. We generally will be obligated to bear the expense of repairing the damaged solar energy systems that we own, subject to insurance policies in effect, and replacement and spare parts for key components may be difficult or costly to acquire or may be unavailable. Unfavorable weather, high levels of air pollution and atmospheric conditions could impair the effectiveness of our assets or reduce their output beneath their rated capacity or require shutdown of key equipment, impeding operation of our assets and our ability to achieve certain performance guarantees pursuant to our PPAs, forecasted revenues and cash flows. Sustained unfavorable weather could also unexpectedly delay the installation of renewable energy systems, which could result in a delay in us acquiring new projects or increase the cost of such projects. We guarantee the performance of our solar power plants and could suffer monetary consequences if our plants do not produce to our contracted levels.

We base our investment decisions with respect to each solar or wind project on the findings of related solar and wind studies conducted on-site prior to construction. However, actual climatic conditions at a project site may not conform to the findings of these studies and therefore, our facilities may not meet anticipated production levels or the rated capacity of our generation assets, which could adversely affect our business, results of operations, financial condition and cash flows.

### *Natural calamities could have a negative impact on the Indian economy and adversely affect our business.*

India experienced natural calamities such as earthquakes, cyclone and floods in the past few years. We have experienced unusually heavy rainfall and consequent flooding at several of our plants in recent monsoons. The extent and

severity of these natural disasters determines their impact on the Indian economy. If climatic conditions or natural disasters occur in areas where our projects and project teams are located, project development, operations, connectivity to the power grid and the provision of O&M services may be adversely affected. In particular, timely delivery of materials and labor availability may be affected. Substantially all of our operations and employees are located in India and there can be no assurance that we will not be adversely affected by natural disasters in the future or that we will be able to obtain suitable insurance to cover such losses.

## Contractual Risks Related to Our PPAs and Fixed Tariffs

### *We initiated a strategic review of all projects contracted and awarded in Fiscal 2022 by the Special Committee with respect to improper payment allegations and related compliance issues.*

We are conducting an ongoing review of our projects under contract to consider their commercial and economic viability. We also have reviewed our projects including those under review by the Special Committee with respect to improper payment allegations and related compliance issues. *For more information, see below "- We have conducted investigations into whistle-blower claims and other allegations against certain directors, officers and employees and former officers and directors of the Company. We have reported the allegations and our findings to the SEC and the Department of Justice and continue to cooperate with these authorities.*"

In respect of our 2,333 MW projects in the state of Andhra Pradesh as part of its awarded 4,000 MW manufacturing

linked projects, two Public Interest Litigations ("PILs") were filed in the High Court of Andhra Pradesh in Fiscal 2022, challenging various aspects of the manufacturing linked tender and seeking to quash the Andhra Pradesh Regulator's approval for procurement of capacity tied up by Andhra Pradesh Discoms with SECI pursuant to the tender. The tariff adoption for the capacities by the Central Electricity Regulatory Commission is subject to the outcome of the PILs. We are not a party to the PILs, and the PILs currently are pending adjudication. As a result of these PILs and because the tariffs have been conditioned on the outcome of the PILs, we have not initiated project execution including land acquisition and procurement. Given uncertainties, we initiated discussions with SECI regarding the 2,333 MW projects and have requested that SECI work with us toward a resolution of the matter through reallocation of the capacity to another state, termination of the PPAs or other resolution. In a letter received in August 2023, SECI has requested that we comply with the provisions of our PPA with SECI. We continue to engage with SECI on this matter and look toward a fair resolution. If were unable to resolve the matter with SECI, we could face claims under our PPA with SECI, which could materially and adversely affect our business and subject us to damages or other liabilities that could adversely affect our results of operations and financial condition in future periods.

***We may not be able to sign PPAs for balance capacity of 967 MWs in respect of the 4,000 MWs manufacturing linked tender for which letter of award has already been received.***

In Fiscal 2020, we won a bid for 2,000 MWs manufacturing linked project with SECI, and we also elected to exercise a greenshoe option for an additional 2,000 MWs as per auction guidelines. During Fiscal 2022, we executed PPAs with SECI for an aggregate of 2,983 MWs out of 4,000 MWs and in January 2023 we executed a PPA for an additional 50 MWs. PPAs for the balance capacity of 967 MWs are still pending for execution with SECI. SECI has stated that they shall only be able to sign PPAs for the remaining 967 MWs, if they get Discoms to sign Power Sales Agreements for such un-mapped capacity. We will continue our discussions with SECI towards signing PPAs for the balance capacity of 967 MWs. In case we are unable to sign PPAs in respect of this capacity, it could adversely affect our prospects.

In addition, we may not be able to complete our 2,333 MWs manufacturing linked projects in Andhra Pradesh, see "*Operating And Financial Review And Prospects - Projects under execution*".

***The majority of our revenue is exposed to fixed tariffs, changes in tariff regulation and structuring.***

Under a long-term PPA, we typically sell power generated from a power plant to central government owned intermediaries or state distribution companies, at pre-determined fixed tariffs. The terms of our PPAs are generally 25 years from the scheduled commissioning dates of the projects. Our PPAs are generally not subject to downward revisions unless we elect to utilize accelerated rate of depreciation or if there is a delay in commissioning our projects, although we have entered into contracts that provide for downward adjustments in the past and may do so in the future. Accordingly, if there is an industry-wide increase in tariffs or if we are seeking an extension of the term of the PPA, we will not be able to renegotiate the terms of the PPA to take advantage of the increased market tariffs. In addition, in the event of increased operational costs, we will not have the ability to reflect a corresponding increase in our tariffs. While some of our PPAs provide for tariff increase due to "change in law," any such increase in tariff requires regulatory approvals which can be time consuming and expensive. We may face difficulties in recovering the costs (whether by tariff increases or litigation) through such corrective measures, from the respective state distribution companies/ authorities in a timely manner and may also face resistance from the regulators when we seek increases in tariffs. This may lead to disputes and impact our business, results of operations, financial condition and cash flows.

Further, any delay in commissioning the projects or supplying electricity during the term of the PPA may result in reduction in tariffs, based on the terms of the PPA. In some of our PPAs (specifically those executed with SECI), in the event of an early commissioning of the projects prior to the scheduled commissioning date, SECI has the right of first refusal, and may purchase the generated power, only with the consent of the buying utilities. In case of early part-commissioning of the project, the power if purchased, is only purchased at 75% of the tariff payable under the PPA, until the scheduled commissioning date. Similarly, any excess generation, over and above the maximum contracted energy defined in the PPA, would be subject to the consent of the buying utility and shall be purchased at 75% of the tariff otherwise payable under the PPA. Therefore, the prices at which we supply power may have little or no relationship with the costs incurred in generating power, which may lead to fluctuations in our margins. All the above factors limit our business flexibility, expose us to an increased risk of unforeseen business and industry changes and could adversely affect our business, results of operations, financial condition and cash flows.

***Our PPAs may be terminated upon the occurrence of certain events.***

Our profitability is largely a function of our ability to manage our costs during the terms of the PPAs and operate our power projects at optimal levels. If we are unable to manage our costs effectively or operate our power projects at optimal levels, our business, results of operations, financial condition and cash flows may be adversely affected. Our PPAs typically allow an offtaker to terminate the agreement or demand penalties from us upon the occurrence of certain events, including but not limited to, the failure to comply with prescribed minimum shareholding requirements; complete project construction or connection to the transmission grid by a certain date; supply the minimum amount of power specified; comply with prescribed operation and maintenance requirements; obtain regulatory approvals and licenses; comply with technical parameters set forth in grid codes and regulations; and comply with other material terms of the relevant PPAs. Furthermore, most of our PPAs allow termination on a case-by-case basis in the event force majeure event(s) continue for an extended period of time.

In instances of PPA termination where we are entitled to receive termination payments from a counterparty or distribution company due to such counterparty's or distribution company's material breach, there can be no certainty that such counterparty or distribution company will make such payments on time or at all. Further, it is unlikely that termination payments will be adequate to pay all the outstanding third-party debt that we have borrowed for the project.

Certain of our PPAs allow our offtakers to purchase the relevant project from us under certain circumstances. Some of the PPAs also entitle our lenders to appoint another party as the operator of our projects, under certain circumstances, such as the creation of security contravening the terms of the relevant PPAs, bankruptcy, insolvency or winding up proceedings against a power generator, or a change in control event without the lender's consent. If any such third party is not appointed within the stipulated time, the PPAs may be terminated by the offtakers and we may be required to acquire the project on mutually agreed terms as per the relevant PPAs. If we are unable to acquire the project, the lenders may enforce their mortgage rights under the respective credit agreements. If such buy-outs or step-ins occur and we are unable to locate and acquire suitable replacement projects on time or at all, our business, results of operations, financial condition and cash flows may be materially and adversely affected.

### *Restriction in transfer of PPAs*

Certain PPAs, particularly our PPAs executed with SECI, require us to retain the controlling shareholding (more than 50% of the voting rights and paid-up share capital) prevalent at the time of the signing of the PPA from one to three years after the commercial operation date (except with prior approval); however, transfer of controlling shareholding within the same group of companies is permitted with the permission of SECI after the commercial operation date, subject to the condition that the management control remains within the same group of companies. This effectively restricts our ability to generate revenues through sale of allotted projects, until after one to three years from the commercial operation date and can materially and adversely affect our business, results of operations, financial condition and cash flows.

### Risks Related to Our Limited Operating History and Growth Strategy

### *Our limited operating history, especially with large-scale solar projects or managing such a large portfolio, may not serve as an adequate basis to judge our future performance.*

We began our business in 2008 and have a limited operating history. We established our first utility scale solar plant in India in 2009. Accordingly, our relatively limited operating history, especially with large-scale projects, or managing such a large portfolio may not be an adequate basis for evaluating our business prospects and financial performance and makes it difficult to predict the future results of our operations. Period-to-period comparisons of our operating results, and our results of operations for any period should not be relied upon as an indication of our performance for any future period. In particular, our results of operations, financial condition, cash flows and future success depend, to a significant extent, on our ability to continue to identify suitable sites, acquire land for solar projects, obtain required regulatory approvals, arrange financing from various sources, construct solar projects in a cost-effective and timely manner, expand our project pipeline and manage and operate solar projects that we develop. If we cannot do so, we may not be able to expand our business at a profit or at all, maintain our competitive position, satisfy our contractual obligations, or sustain growth and profitability.

### *As part of our strategy, we engage in acquisitions which involve a number of risks, that could adversely affect our ability to achieve the benefits and returns expected.*

We are evaluating, and are in preliminary discussions with, sellers of renewable energy assets in India that would complement our current portfolio. Our strategy is to continue to build shareholder value, and we will evaluate acquisition opportunities that satisfy our criteria for value accretive returns acquisitions, some of which may be significant. Acquisitions, involve a number of risks, that could adversely affect our ability to achieve the benefits and returns expected and cause pour

performance to suffer. These risks include:

- lower than expected revenue from the acquired company or assets;
- problems in integration of the acquired company's accounting, human resources and other administrative systems, including management information, purchasing, accounting, finance, billing, payroll and benefits and regulatory compliance;
- use of available cash, new borrowings or borrowings under existing credit facilities to consummate the acquisition may not yield targeted or desired benefits;
- diversion of management's attention from existing operations to the integration of acquired companies;
- difficulties in the assimilation and retention of employees;
- difficulties in the maintenance of customer relationships;
- incurring significantly higher capital expenditures and operating expenses, which could substantially limit our operating or financial flexibility;
- ongoing obligations under agreements related to the acquisition;
- infringement claims, violation of laws, commercial disputes, tax liabilities and other known and unknown liabilities; and
- inheritance of claims or liabilities, as a result of strategic acquisitions, including claims from DISCOMs, customers, or other third parties and potential adverse effects on our operating results.

**Risks Related to Litigation and Legal Proceedings**

***We may become involved in costly and time-consuming litigation, arbitration and other regulatory proceedings, which require significant attention from our management.***

We may, in the ordinary course of our business, become involved in litigation, administrative or arbitral proceedings. For example, we are, and may become subject to litigation against counter-parties to project agreements, additional demands from Indian governmental or tax authorities, including, but not limited to, on account of differing interpretations of central and state tax statutes in India, which are extensive and subject to change from time to time. Additionally, claims may be brought against or by us from time to time regarding, for example, defective or incomplete work, defective products, personal injuries or deaths, damage to or destruction of property, breach of warranty, late completion of work, delayed payments, breach of module supply contracts, intellectual property rights, regulatory compliance, labor issues, environmental issues and ownership rights. Further, claims may be brought against due to employee and executive compensation related matters. These various claims may subject us to litigation, arbitration and other legal proceedings, which may be expensive, lengthy, disruptive to normal business operations and require significant attention from our management.

If we were found to be liable on any of the claims against us, we would incur a charge against earnings to the extent a reserve had not been established for coverage. If amounts ultimately realized from the claims by us were materially lower than the balances included in our financial statements, we would incur a charge against earnings to the extent profit had already been accrued. Charges and write-downs associated with such legal proceedings could materially and adversely affect our business, results of operations, financial condition and cash flows. Moreover, legal proceedings, particularly those resulting in judgments or findings against us, may harm our reputation and competitiveness in the market.

For further information on ongoing claims, see Item 8.A. - "*Consolidated Statements and Other Financial Information — Legal Proceedings*".

***An action alleging violations of U.S. securities laws has been brought against our Company in the New York.***

A class action lawsuit that was filed in the U.S. District Court for the Southern District of New York, case number 1:22-cv-07432, against our Company and certain of its current and former directors and officers alleging violations of U.S. securities laws. The lead plaintiff has filed a First Amended Complaint, and the court set a deadline for the lead plaintiff to file a Second Amended Complaint of 28 days after the date of filing this Form 20-F. The court also required that the parties provide it with a status update by October 31, 2023. The Company sees no merit in the claims asserted in the lawsuit and intends to defend the case vigorously.

**External Risks Including the Global Economy, Unrest, Terrorism War, Downgrading of India's Debt**

***Global economic conditions have been challenging and continue to affect the Indian market, which may adversely affect***

*our business, results of operations, financial condition and cash flows.*

The Indian economy and its securities markets are influenced by economic developments and volatility in securities markets in other countries. Investors' reactions to developments in one country may adversely affect the market price of securities of companies located in other countries, including India. Adverse economic developments, such as rising fiscal or trade deficits, or a default on national debt, in other emerging market countries may also affect investor confidence and cause increased volatility in Indian securities markets and indirectly affect the Indian economy in general. Furthermore, global events such as supply chain constraints, rising retail and wholesale inflation, volatility in global oil prices and other commodity prices and events such as the COVID-19 pandemic and the war in Ukraine have impacted the macro-economic conditions. Further, worldwide financial instability could have an adverse impact on the Indian economy, including the adverse foreign exchange rates and higher interest rates. Any other global economic developments or the perception that any of them could occur may adversely affect global economic conditions and the stability of global financial markets and may significantly reduce global market liquidity and restrict the ability of key market participants to operate in certain financial markets. Any of these factors could depress economic activity and restrict our access to capital, which could have an adverse effect on our business, results of operations, financial condition and cash flows.

*War, terrorist acts and other acts of violence involving India or other neighboring countries could adversely affect our operations.*

Terrorist attacks and other acts of violence or war involving India or other neighboring countries may significantly harm the Indian markets and the worldwide financial markets. The occurrence of any of these events may result in a loss of business or consumer confidence and reduced investment, which could potentially lead to economic recession and adversely affect our business, results of operations, financial condition and cash flows. In addition, any deterioration in international relations may result in investor concern regarding regional stability, which could decrease the price of our shares. Further, our insurance policies for a certain part of our business do not cover terrorist attacks or business interruptions from terrorist attacks or for other reasons.

*Any downgrading of India's sovereign debt rating by an international rating agency could adversely impact our business, results of operations, financial condition and cash flows.*

India's sovereign rating is Baa3 with a "stable" outlook (Moody's), BBB- with a "stable" outlook (S&P) and BBB- with a "stable" outlook (Fitch). Any adverse revisions to India's credit ratings by international rating agencies may adversely affect our ratings, terms on which it is able to finance capital expenditure or refinance any existing indebtedness. This could adversely affect our business, results of operations, financial condition and cash flows.

**Risks Related to Our Corporate Structure, Control of our Business and Investments in Mauritius Companies**

*Our Company will have to rely principally on dividends and other distributions on equity paid by its operating subsidiaries and limitations on their ability to pay dividends to our Company could adversely impact your ability to receive dividends on our Company's equity shares.*

Since our Company cannot borrow from our Indian subsidiaries, dividends and other distributions on equity paid by our operating subsidiaries will be our principal source for cash in order for it to fund its operations including corporate expenses and taxes. Accordingly, our Company may need to issue additional equity or borrow funds, either of which may be unavailable on attractive terms, if at all.

If our operating subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us. As our key operating subsidiary, APIPL, is established in India, it is also subject to certain limitations with respect to dividend payments. As of the date of this annual report, APIPL has not paid any cash dividends on its shares and does not intend to pay dividends to its equity shareholders, including us, in the foreseeable future. Moreover, as we do not own 100% of APIPL, any dividend payment made by APIPL to us will also involve a payment to the other shareholders of APIPL. If we do not receive distributions or payments from APIPL, the liquidity, financial condition and our cash flows could be materially and adversely affected.

*As a shareholder in our Company organized under the laws of Mauritius, you may have greater difficulties in protecting your interests than as a shareholder of a United States corporation.*

Our Company is incorporated under the laws of Mauritius. The laws generally applicable to United States

corporations and their shareholders may provide shareholders of United States corporations with rights and protection for which there may be no corresponding or similar provisions under the Companies Act 2001 of Mauritius, as amended, or the Mauritius Companies Act. As such, being a holder of our Company's shares, you may or may not be accorded the same level of shareholder rights and protection that a shareholder of a United States corporation may be accorded under the laws generally applicable to United States corporations and their shareholders. Taken together with the provisions of our Company's constitution, which our Company adopted with effect upon completion of its public offering in October 2016, some of these differences may result in you having greater difficulties in protecting your interests as our Company's shareholder than you would have as a shareholder of a United States corporation. This affects, among other things, the circumstances under which transactions involving an interested director are voidable, whether an interested director can be held accountable for any benefit realized in a transaction with us, what rights you may have as a shareholder to enforce specified provisions of the Mauritius Companies Act or our Company's Constitution, and the circumstances under which we may indemnify our Company's directors and officers.

***Anti-takeover provisions in our Company's constitutional documents could make an acquisition of us more difficult and may prevent attempts by our Company's shareholders to replace or remove our Company's current management.***

Provisions in our Company's Constitution may have the effect of delaying or preventing a change in control or changes in our management, including the following provisions which may be regarded as defensive measures:

- a staggered Board of Directors;
- the ability to issue additional shares (including "blank check" preferred stock);
- granting directors, the absolute discretion to decline to register a transfer of any shares;
- requiring that amendments to our Company's Constitution be approved by a special resolution of the shareholders of our Company; and
- limiting the liability of, and providing indemnification to, our Company's directors and officers.

These provisions may restrict or prevent any attempts by our Company's shareholders to replace or remove our Company's current management by making it more difficult for shareholders to replace members of our Company's Board of Directors, which is responsible for appointing the members of our Company's management team. The provisions could also deprive our shareholders of the opportunity to sell their shares at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of us and generally limit the market price of our Company's shares.

***Our Company's largest shareholder owns 53.4% of our Company, as of September 30, 2023 and may exercise control of our Company.***

As of March 31, 2022, our Company's largest shareholder, CDPQ Infrastructures Asia Pte Ltd. ("CDPQ Infrastructures"), owned 53.4% of our Company's shares, and as of September 30, 2023, CDPQ Infrastructures owned 53.4% of our Company's shares. CDPQ Infrastructures is a company organized and existing under the laws of Singapore and is a wholly owned subsidiary of the Caisse de dépôt et placement du Québec, a body constituted by the Act Respecting the Caisse De Dépôt Et Placement Du Québec. Consequently, CDPQ Infrastructures has the ability to exercise control over our Company and may have the power to elect and remove the Directors and may determine the outcome proposals for corporate action requiring ordinary resolution of our Company's equity shareholders. The interests of CDPQ Infrastructures may be different from our interests or the interests of other shareholders of our Company. As a result, CDPQ Infrastructures, may delay or defer or initiate a change of control of our Company or a change in our capital structure, delay or defer a merger, sale of assets, or consolidation, or delay or defer the payment of dividends, or delay or defer fresh capital raise, or seek to determine or direct the price at which new capital is raised. At present, CDPQ Infrastructures has three nominee Directors on our Company's Board of Directors including our Chairman, M.S Unnikrishnan, Cyril Carbanes and Deepak Malhotra.

***You may have difficulty enforcing judgments against our Company, our Company's directors and management. Further, investors may not be able to enforce a judgment of a foreign court against our Indian subsidiaries, certain of our Company's directors, or our key management, except by way of a suit in India on such judgment.***

Our Company is incorporated under the laws of Mauritius. Further, we conduct substantially all of our operations in India through our key operating subsidiaries in India. All of our Company's directors and officers reside outside the United

States, and all of our assets and some or all of the assets of such persons are located outside the United States. As a result, it may be difficult or impossible to effect service of process within the United States upon our Company or those persons, or to recover against our Company or them on judgments of United States courts, including judgments predicated upon the civil liability provisions of the United States federal securities laws. An award of punitive damages under a United States court judgment based upon United States federal securities laws is likely to be construed by Mauritian and Indian courts to be penal in nature and therefore unenforceable in both Mauritius and India. Further, no claim may be brought in Mauritius or India against our Company or our Company's directors and officers in the first instance for violation of United States federal securities laws because these laws have no extraterritorial application under Mauritian or Indian law and do not have force of law in Mauritius or India. However, a Mauritian or Indian court may impose civil liability, including the possibility of monetary damages, on our Company or our Company's directors and officers if the facts alleged in a complaint constitute or give rise to a cause of action under Mauritian or Indian law. Moreover, it is unlikely that a court in Mauritius or India would award damages on the same basis as a foreign court if an action were brought in Mauritius or India or that a Mauritian or Indian court would enforce foreign judgments if it viewed the amount of damages as excessive or inconsistent with Mauritius or Indian practice or public policy.

The courts of Mauritius or India would not automatically enforce judgments of United States courts obtained in actions against our Company or our Company's directors and officers, predicated upon the civil liability provisions of the United States federal securities laws, or entertain actions brought in Mauritius or India against our Company or such persons predicated solely upon United States federal securities laws. Further, there is no treaty in effect between the United States and Mauritius providing for the enforcement of judgments of United States courts in civil and commercial matters and the United States has not been declared by the Indian government to be a reciprocating territory for the purposes of enforcement of foreign judgments, and there are grounds upon which Mauritian or Indian courts may decline to enforce the judgments of United States courts. Some remedies available under the laws of United States jurisdictions, including remedies available under the United States federal securities laws, may not be allowed in Mauritian or Indian courts if contrary to public policy in Mauritius or India. Because judgments of United States courts are not automatically enforceable in Mauritius or India, it may be difficult for you to recover against us or our Company's directors and officers based upon such judgments. In India, prior approval of the Reserve Bank of India is required in order to repatriate any amount recovered pursuant to such judgments.

All of our operating subsidiaries are incorporated under the laws of India. In addition, certain of our Company's directors and substantially all of our director and officer reside in India, and all or a substantial portion of our assets and such persons are located in India. As a result, it may not be possible for investors to effect service of process upon such persons

outside India, or to enforce judgments obtained against such parties outside India. In India, recognition and enforcement of foreign judgments are provided for under Section 13 and Section 44A of the Civil Procedure Code, 1908 (the "Civil Code") on a statutory basis. Section 13 of the Civil Code provides that a foreign judgment shall be conclusive regarding any matter directly adjudicated upon, except: (i) where the judgment has not been pronounced by a court of competent jurisdiction; (ii) where the judgment has not been given on the merits of the case; (iii) where it appears on the face of the proceedings that the judgment is founded on an incorrect view of international law or a refusal to recognize the law of India in cases to which such law is applicable; (iv) where the proceedings in which the judgment was obtained were opposed to natural justice; (v) where the judgment has been obtained by fraud; and (vi) where the judgment sustains a claim founded on a breach of any law then in force in India.

Under the Civil Code, a court in India shall, upon the production of any document purporting to be a certified copy of a foreign judgment, presume that the judgment was pronounced by a court of competent jurisdiction unless the contrary appears on record.

India is not a party to any international treaty in relation to the recognition or enforcement of foreign judgments. Section 44A of the Civil Code provides that where a foreign judgment has been rendered by a superior court, within the meaning of such section, in any country or territory outside India, which the Indian government has by notification declared to be a reciprocating territory, it may be enforced in India by proceedings in execution as if the judgment had been rendered by the relevant court in India. However, Section 44A of the Civil Code is applicable only to monetary decrees not being in the nature of any amounts payable in respect of taxes, other charges of a like nature or in respect of a fine or other penalty and does not apply to arbitration awards. Further, the execution of the foreign decree under Section 44A of the Civil Code is also subject to the exceptions under Section 13 of the Civil Code.

The United Kingdom, Singapore and Hong Kong (among others) have been declared by the Indian government to be reciprocating territories for the purposes of Section 44A. However, the United States has not been declared by the Indian government to be a reciprocating territory for the purposes of Section 44A of the Civil Code. Accordingly, a judgment of a court in a country which is not a reciprocating territory may be enforced in India only by a fresh proceeding suit instituted in a

court of India and not by proceedings in execution. Such a suit has to be filed in India within three years from the date of the judgment in the same manner as any other suit filed in India to enforce a civil liability in India. It is unlikely that a court in India would award damages on the same basis as a foreign court would, if an action were brought in India. Further, it is unlikely that an Indian court would enforce foreign judgments if that court were of the view that the amount of damages awarded was excessive or inconsistent with Indian public policy. A party seeking to enforce a foreign judgment in India is required to obtain approval from the RBI to repatriate outside India any amount recovered pursuant to the execution of such judgment and such amount may be subject to income tax in accordance with applicable laws. In addition, any judgment awarding damages in a foreign currency would be converted into Indian Rupees on the date of the judgment and not the date of payment. We cannot predict whether a suit instituted in an Indian court will be disposed of in a timely manner or be subject to considerable delay.

**Risks Related to Our Shares**

***Our Company does not expect to pay any cash dividends on our Company's shares.***

Our Company has not paid dividends on any of our Company's shares to date and our Company currently intends to retain our future earnings, if any, to fund the development and growth of our Company's business. As a result, capital appreciation, if any, of our Company's shares are likely to be your sole source of gain for the foreseeable future. Consequently, you will likely only experience a gain from your investment in our Company's shares if the price of our Company's shares increases.

In addition, our Company's ability and decisions whether to pay dividends in the future will depend on our earnings, financial condition and capital requirements. Dividends to U.S. holders may be negatively affected by foreign currency fluctuations. We may not generate sufficient income to cover our operating expenses and pay dividends to our Company's shareholders, or at all. Our Company's ability to pay dividends is restricted under our current financing agreements and dividends may be further restricted by financing arrangements that our Company may enter into in the future. Our Company's future dividend policy will depend on our capital requirements, financing arrangements, results of operations, financial condition and cash flows.

***There is no assurance of an active or liquid trading market for our Company's shares.***

Our Company's shares have historically had low trading volumes and an active liquid trading market for our Company's shares may not be maintained in the long term. Trading volumes have been further impacted by the delisting of our shares from the New York Stock Exchange and the trading of our Company's shares on the over-the-counter (or OTC) "expert" market, where quotations are only directly available to broker dealers and professional investors (not to retail investors). *See " - The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares".*

We cannot be certain that any trading market for our Company's shares will be sustained or that the present price will correspond to the future price at which our Company's shares will trade. Loss of liquidity could increase the price volatility of our Company's shares. Consequently, you may not be able to sell your shares at a price that is attractive to you.

***The market price of our Company's shares has been and may continue to be volatile, and you could lose all or part of your investment.***

The trading price of our shares has been volatile and is likely to continue to be volatile. Such volatility will likely be more pronounced due to the commencement of delisting proceedings by the NYSE in respect of our shares from the New York Stock Exchange and the trading of our shares on the over-the-counter "expert" market. *See " - The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares".*

Additional factors that could cause fluctuations in the market price of our Company's shares include — trading volume, prices of other securities, market trends, growth of other comparable companies, changes in operating performance, sale of additional shares in the market by us or by other investors, coverage by security analysts, changes in financial estimates, failure to meet analyst or market expectations, press releases by us or our competitors, market speculations, changes in tax and other incentives, regulatory and policy changes, litigations, business acquisitions, changes in accounting standards and economic conditions.

Further, in recent years the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. These fluctuations often have been unrelated or disproportionate to the operating performance of those companies. In addition, the stock prices of many renewable energy companies have experienced wide fluctuations that have often been unrelated to the operating performance of those companies.

These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, government shutdowns, interest rate changes, or international currency fluctuations, may cause the market price of our Company's shares to decline.

***Sales of a substantial number of our Company's shares by our Company or our Company's existing shareholders, could cause our Company's share price to fall.***

Sales of a substantial number of our shares in the public market by our Company or shareholders, or the perception that such sales might occur, could depress the market price of our Company's shares and could impair our ability to raise capital through the issuance of additional equity securities of our Company. We are unable to predict the effect that these sales and others may have on the prevailing market price of our Company's shares.

In addition, certain of our Company's shareholders can require us to register shares owned by them for public sale in the United States. Our Company also has filed a registration statement to register our Company's shares reserved for future issuance under our Company's equity compensation plans. Subject to the satisfaction of applicable exercise periods and applicable volume and restrictions that apply to affiliates, our Company's shares issued upon exercise of outstanding options will become available for immediate resale in the public market upon issuance.

Future sales of our Company's shares by our existing shareholders may make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. These sales also could cause the market price of our Company's shares to decline and make it more difficult for you to sell our Company's shares.

***Future issuances of any equity securities may cause a dilution in your shareholding, decrease the trading price of our equity shares, and restrictions agreed to as part of debt financing arrangements may place restrictions on our operations.***

Any issuance of equity securities could dilute the interests of our shareholders and could substantially decrease the trading price of our equity shares. Our Company may issue equity or equity-linked securities in the future for a number of reasons, including to finance our working capital and operations and business strategy (including in connection with acquisitions and other transactions), to adjust our ratio of debt to equity, to satisfy our obligations upon the exercise of then-outstanding options or other equity-linked securities, if any, or for other reasons. In the case where pre-emptive rights have been waived, the issuance of such additional securities may significantly dilute the equity interests of investors, subordinate the rights of holders of equity shares if preferred shares are issued with rights senior to those afforded to our Company's equity shares, or harm prevailing market prices for our Company's equity shares.

***If securities or industry analysts do not publish or cease publishing research or reports about us, our business or our market, or if they change their recommendations regarding our shares adversely, our stock price and trading volume could decline.***

The trading market for our shares is influenced by the research and reports that industry or securities analysts publish about us, our business, our market or our competitors. Since our delay in filing this Fiscal 2022 Form 20-F when due on July 31, 2022, some industry and securities analysts have ceased publishing research on us, and we may have lost visibility to the clients of such analysts. Further, if any of the analysts who cover us or may cover us in the future change their recommendation regarding our stock adversely, or provide more favorable relative recommendations about our competitors, our stock price would likely decline. If any analyst who covers us or may cover us in the future were to cease coverage of our company or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

**Tax Risks for Shareholders and Investors**

***You may be subject to Indian taxes on income arising through the sale of our shares.***

Pursuant to recent amendments to the Indian Income Tax Act, 1961, as amended, income arising directly or indirectly through the sale of a capital asset, including any share or interest in a company or entity registered or incorporated outside of India, will be liable to tax in India, if such share or interest derives, directly or indirectly, its value substantially from assets (whether tangible or intangible) located in India and whether or not the seller of such share or interest has a residence, place of business, business connection, or any other presence in India. The share or interest of the company or entity registered or incorporated outside of India is deemed to derive its value substantially from the assets located in India if the value of such Indian assets exceeds INR 100 million and represents at least 50% of the value of all the assets owned by the company or entity registered or incorporated outside of India. Substantially all of our assets are located in India.

However, if the transferor of share or interest in a company or entity registered or incorporated outside of India (along with its associated enterprises), neither holds the right of management or control in the company or entity registered or incorporated outside of India nor holds voting power or share capital or interest exceeding 5% of the total voting power or total share capital or interest in the company or entity registered or incorporated outside of India, at any time during the twelve months preceding the date of transfer, such small shareholders are exempt from the indirect transfer provisions mentioned above. The amendments also do not deal with the interplay between the amendments to the Indian Income Tax Act, 1961, as amended, and the existing Double Taxation Avoidance Agreements that India has entered into with countries such as the United States in case of an indirect transfer. Accordingly, the implications of the recent amendments are presently unclear. If it is determined that these amendments apply to a holder of our shares, such holder could be liable to pay taxes in India on such income.

***Our Company may be classified as a passive foreign investment company, which could result in adverse U.S. federal income tax consequences to certain U.S. investors of our Company's shares.***

Our Company believes that it was not a passive foreign investment company ("PFIC") for our taxable year ending March 31, 2022 and that, based on the present composition of its income and assets and the manner in which it conducts its business, our Company will does not expect to be a PFIC in our Company's current taxable year or in the foreseeable future. Whether our Company is a PFIC is a factual determination made annually, and our Company's status could change depending, among other things, upon changes in the composition and amount of our gross income and the relative quarterly average value of its assets. If our Company was a PFIC for any taxable year in which you hold our Company's shares, you generally would be subject to additional taxes on certain distributions and any gain realized from the sale or other taxable disposition of our shares regardless of whether our Company continued to be a PFIC in any subsequent year, unless you mark your shares to market for tax purposes on an annual basis. You are encouraged to consult your own tax advisor as to our Company's status as a PFIC and the tax consequences to you of such status. A U.S. Holder will not be able to elect to treat us as a qualified electing fund ("QEF") because we do not intend to prepare the information needed to make a QEF election. See "*Taxation — U.S. Federal Income Taxation — Passive Foreign Investment Company Status.*"

***If a United States person is treated as owning at least 10% of our Company's shares, the holder may be required to include amounts in its U.S. taxable income even if our Company does not make distributions to its shareholders.***

If a United States person is treated as owning (directly, indirectly, or constructively) at least 10% of the value or voting power of our Company's shares, that person may be required to include certain amounts in its U.S. taxable income even if our Company make no distributions to our Company's shareholders. A United States person that is treated as owning (directly, indirectly, or constructively) at least 10% of the value or voting power of our Company's shares may be treated as a "United States shareholder" with respect to each "controlled foreign corporation" in our Group. As a result of tax legislation enacted in 2017, it is not certain under what circumstances our non-U.S. subsidiaries will be treated as controlled foreign corporations. However, because our Group includes a U.S. subsidiary, our non-U.S. subsidiaries could be treated as controlled foreign corporations with respect to any United States shareholders (regardless of whether or not our Company is treated as a controlled foreign corporation). A United States shareholder of a controlled foreign corporation in our Group would be required to report annually and include in its U.S. taxable income its pro rata share of "Subpart F income", "global intangible low-taxed income," and investments in United States property, if any, related to that controlled foreign corporation, regardless of whether our Company makes any distributions. Failure to comply with these reporting obligations may subject a United States shareholder to significant monetary penalties and may prevent the statute of limitations with respect to such shareholder's U.S. federal income tax return for the year for which reporting was due from starting. An individual that is a United States shareholder with respect to a controlled foreign corporation generally would not be allowed certain tax deductions or foreign tax credits that would be allowed to a United States shareholder that is a U.S. corporation. Because our Company does not maintain U.S. tax books and records, our Company does not expect to be able to furnish to any United States shareholders the information that may be necessary to comply with the shareholder's reporting and taxpaying obligations under these rules. A U.S. investor should consult its advisors regarding the potential application of these rules to an investment in our Company's shares, including the possibility that the investor may be treated as a "United States shareholder" as a result of direct, indirect or constructive ownership of our Company's shares.

# VI. ADDITIONAL INFORMATION

## A. Legal Proceedings

We are currently involved in and may from time to time, become involved in legal, arbitration or governmental proceedings or be subject to claims arising in the ordinary course of our business. We are not presently party to any legal proceedings that, in the opinion of our management, would reasonably be expected to have a material adverse effect on our business, financial condition, operating results or cash flows if determined adversely to us. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

We have been involved in two arbitration proceedings concerning matters of executive compensation and stock purchase with a former chief executive officer. Our Company and our subsidiary, Azure Power India Private Limited, were respondents in arbitration proceedings initiated by our former Chairman, CEO and Managing Director of our Company, Mr. Inderpreet Singh Wadhwa ("IW") and erstwhile COO Mr. H.S Wadhwa ("HSW"), in relation to the purchase price of the shares of IW's and HSW's in Azure Power India Private Limited before the Singapore International Arbitration Centre (SIAC). The arbitration has been concluded and the award has been issued in our favor. Subsequently, IW and HSW filed an appeal challenging the SIAC award on May 5, 2022, before the Singapore High Court. However, vide order dated June 29, 2022, the appeal filed by IW and HSW has been dismissed. Consequently, the Award in our favor has been upheld. We have filed a petition before the High Court of Delhi seeking enforcement of the Award. There is no adverse order passed by the Hon'ble High Court till date. This matter is next listed for hearing on November 20, 2023.

In addition, our Company and our subsidiary Azure Power India Private Limited were respondents to arbitration proceedings initiated by IW in relation to his transition agreement before the Mumbai Centre for International Arbitration ("MCIA"). The arbitration was decided in favor of IW, and we made payments as per the Award, without prejudice to our rights to challenge the said Award.

The Company received a favorable award in an arbitration proceeding initiated by it under the Arbitration and Conciliation Act, 1996, for its 5 MW project in Maharashtra against the off-taker, whereby the off-takers' claims against the Company regarding open access charges and grid connectivity changes have been disallowed.

We were parties to an arbitration proceeding before Singapore International Arbitration Centre ("SIAC") against one of the module suppliers whereby we claimed amongst others breach of module supply agreement. We have now amicably settled the dispute. The details of the settlement are confidential. However, if the settlement terms are not complied with, it could have an adverse impact on our cashflows.

Pursuant to the manufacturing linked tender of 4,000 MW, we have executed PPAs for a capacity of 2,333 MW with SECI, for which PSA has been executed with state of Andhra Pradesh. Two Public Interest Litigations ("PILs") have been filed before the hon'ble High Court of Andhra Pradesh against the Ministry of Power, MNRE, SECI, Government of Andhra Pradesh, etc. seeking among others (i) quashing of Request for Selection dated June 25, 2019 ("RfS") issued by SECI pursuant to which Azure was awarded the manufacturing linked project for 4,000 MW capacity, (ii) setting aside of the Letter of Award issued by SECI to Azure pursuant to the RfS, (iii) setting aside of Andhra Pradesh Electricity Regulatory Commission's order ("APERC Order") approving procurement of 7 GWs from SECI under the RfS (which includes capacity of 2,333 MW for which PPAs have been executed by us) and (iv) setting aside Central Electricity Regulatory Commission's ("CERC") order dated April 02, 2022 whereby tariff discovered under the RfS was adopted. CERC had passed an order dated April 02, 2022, adopting tariffs under the PPAs subject to the outcome of the PIL. The next date is October 18, 2023.

In the event the PILs are allowed, the same may result in cancellation of the Letter of Award and PPAs awarded to/ executed by Azure pursuant to the RfS. We cannot predict the outcome of these two PILs, however, if they are allowed this could have a material adverse impact on the Company.

The Company had bid and won 200 MW wind-solar hybrid capacity pursuant to a tender issued by Maharashtra State Electricity Distribution Company Limited ("MSEDCL") in May 2021. MSEDCL filed a petition before Maharashtra Electricity Regulatory Commission ("MERC") seeking adoption of competitively discovered tariff. MERC, however, rejected the petition and refused to adopt the tariff on the ground that the discovered tariff is not market aligned.

The Company had challenged MERC's order by way of an appeal before APTEL seeking setting aside MERC's said order on the ground that, it is not permissible to re-discover and re-determine tariff discovered under Section 63 of the

Electricity Act, 2003. Based on the decision of management we have withdrawn this appeal and the same has been allowed by APTEL by way of an order dated February 24, 2023.

In relation to our 300 MW Project (Rajasthan 9), we were granted a First time Charging ("FTC") approval which was conditional and subject to providing availability of real time data, grid conditions and validity of safety clearance and the undertaking given by us. Subsequently, a Working Group Report, 2022 was introduced by CEA, whereby new requirements have been introduced. Post the issuance of the report, NRLDC has directed us to comply with such requirements by September 30th 2023, failing which the FTC/connectivity of the Project shall be revoked and the plant shall be disconnected. In relation to this, we have filed a petition before the Ld. CERC seeking extension of time for complying with the directions of NRLDC along with interim protection from disconnection from the Grid. The matter was last listed on October 10, 2023 whereby NRLDC made a specific submission that they did not initiate any action against Azure with regard to disconnection. Further the commission has directed CEA to set up a meeting with Azure and other developers for resolving the issue. The matter now listed for hearing on October 25, 2023.

In relation to the 2,000 MW (4 PPAs x 500 MW) Projects being set up by us in the state of Rajasthan, we have filed a petition before Ld. CERC seeking declaration that the Transmission Agreement for Connectivity (read with supplementary agreement) executed for availing transmission facilities stands frustrated for the reasons not attributable to us and discharge us from performance of obligations under the said agreement. We have also sought directions for no coercive actions against Azure including non-encashment of bank guarantee. The petition is presently pending and the next date of hearing will be intimated in due course.

In relation to our 10 MW project in Gujarat, Gujarat Urja Vikas Nigam Limited ("GUVNL") had filed a petition before the Gujarat Electricity Regulatory Commission ("GERC"), seeking reduction in our PPA tariff from INR 12.51 KWh as determined by GERC under Section 62 of the Electricity Act, 2003 to INR 8.15 KWh. While GERC and the Appellate Tribunal for Electricity ("APTEL") dismissed the claims made by GUVNL, an appeal filed by GUVNL against the order of APTEL is pending before the Supreme Court of India, which came up last for hearing on August 23, 2017, and is pending since then.

In relation to our 50 MW project in the State of Andhra Pradesh, the Government of AP ("GoAP") followed by the AP distribution licensee ("Discom") sought to reduce tariffs of our project (along with that of the other developers for solar and wind projects both) from the then PPA tariff of INR 5.89 per unit to INR 2.44 per unit. Azure and other developers filed a writ petition before the High Court at AP challenging this reduction, which was allowed by the Single Judge; however, the Single Judge allowed the Discom to approach the regulatory commission for seeking a reduction in tariff and directed payment to be made to the developers at the reduced rate of INR 2.44 per unit (in case of solar) in the interim. In an appeal, the Division Bench by way of judgment, dated March 15, 2022, set aside the order of the Single Judge to the extent it allowed payment at reduced tariff and the directions to approach the regulatory commission. The Division Bench further directed payments to be made at the PPA tariff within six weeks of date of the Division Bench's judgment. As Discom failed to make the payments under the PPA, a contempt petition was filed by us. Although Discom has cleared the outstanding principal amount with some deficit, we are contesting the shortfall payment and non-payment of late payment surcharge in the contempt petition. The next date of hearing will be intimated in due course. The Discom had filed a special leave petition ("SLP") before the Supreme Court challenging the judgment dated March 15, 2022, passed by the Division Bench of the High court of Andhra Pradesh. The SLP was dismissed by the Supreme Court by way of order dated January 02, 2023. The Discom has filed another SLP before the Supreme Court whereby they have challenged the Division Bench's decision to dismiss the petition pending before the regulatory commission on reduction of tariff in case of a competitively bid project under Section 63 of the Electricity Act. If the Supreme Court allows this SLP it will have an adverse impact on us. The SLP is presently pending and the next date of hearing shall be intimated in due course. Further, other states might also violate binding contractual PPA tariffs following the unfavorable outcome.

A PIL had been initiated by certain individuals claiming to be wildlife experts/interested in conservation of wildlife, before the Supreme Court of India against various state governments such as Rajasthan, Gujarat, and MNRE, MOP among others, seeking protection of the two endangered bird species, namely the GIB and the Lesser Florican found in the states of Rajasthan and Gujarat. The Supreme Court by way of order dated April 19, 2021 issued directions to: (i) underground all low voltage transmission lines, existing and future lines falling in potential and priority habitats of GIB, (ii) to convert all existing high voltage lines in priority and potential areas of GIB where found feasible within a period of one year, if not found feasible, the matter to be referred to the committee formed by the Supreme Court which will take a decision on feasibility, and (iii) to install bird diverters on all existing overhead lines in the interim.

We and many other developers have projects in the potential area as determined by the court, hence aggrieved by the order, the Solar Power Developers Association ("SPDA") and Union of India have filed an application before the Supreme Court seeking among others, exemption from undergrounding of transmission lines in potential areas. The matter was last listed

on November 30, 2022, whereby directions have been passed to parties to ensure installation of bird diverters in the Priority Area and for them to be in compliance with quality standards issued by the Supreme Court Committee. The PIL is presently pending. The SPDA has filed an application seeking modification of Supreme Court's order dated April 19, 2021. If the modification application is dismissed, we might entail significant costs and delays. Based on evaluation of management the capital outflow for acquisition and installation of bird divertors are not material.

The Company had filed a petition before Andhra Pradesh Electricity Regulatory Commission ("APERC") challenging deductions made by off-taker from the Company's monthly invoices on the alleged ground of excess installation with respect to the Company's 50 MW project in Andhra Pradesh. APERC disallowed the relief sought by the Company. The Company has challenged the aforesaid order before the higher forum and has received a stay of the APERC order.

In relation to our 30 MW project in the state of Chhattisgarh, the Revenue Department, Government of Chhattisgarh has issued demand notices under the Madhya Pradesh Electricity Duty Act, 1949 stating that we are liable to pay electricity duty on the electricity generated and supplied to the Chhattisgarh Discom. We have filed a petition before the High Court of Chhattisgarh challenging these demand notices. In the event the petition is not allowed we may have to pay the amount as per the demand raised and become liable to pay electricity duty on each unit of electricity generated and supplied. The petition will be listed in due course.

We have received demand notices by Tax Authorities in the state of Andhra Pradesh under the Andhra Pradesh Tax on Entry of Goods Act, 2001. This demand has been challenged by us by way of writ petitions before the High Court of Andhra Pradesh. In the event the petitions are not allowed we may have to submit the demand tax amount. The petitions are presently pending and the next date of the hearing will be intimated in due course.

Commissioning of our three projects in the state of Rajasthan (Rajasthan 6, Rajasthan 8 and Rajasthan 9) was delayed due to reasons beyond our control for which we were granted extension and accordingly the scheduled commercial operation date ("SCOD") was revised. In furtherance of grant of extension, we had filed a petition before the Central Electricity Regulatory Commission ("CERC") for declaration that we are not liable to pay transmission charges for the period of mismatch between the date of long-term access ("LTA") operationalization and the revised SCOD of the projects and to pass directions for alignment of the LTA start date with revised SCODs of the projects and to not take any coercive actions in the interim. However, CERC decided the petition against us. We have filed an appeal challenging the order. The appeal is presently pending and the next date of hearing will be intimated in due course. In the event the appeal is disallowed, we may have to pay the transmission charges from the date of LTA operationalization.

In relation to our 130 MW project located in Rajasthan and supplying electricity to Maharashtra Discom a petition seeking change in law relief for increase in the effective tax rates under the GST laws from 5% to 8.9% (on gross consideration) on the Composite EPC Contracts with effect from January 1, 2019, it has been decided by the Maharashtra Electricity Regulatory Commission ("MERC") in our favor whereby most of our claimed amount has been allowed. However, MSEDCL has filed an appeal before the Supreme Court challenging such allowance of our claim. The matter is pending. However, the parties are in discussion with respect to release of payments in terms of directions passed by MERC. In an another petition on the same matter, pertaining to our 100 MWs project in Karnataka has been decided in our favor by the Karnataka Electricity Regulatory Commission.

We have filed petitions before the CERC in relation to Rajasthan 6, Rajasthan 8 and Rajasthan 9 projects and before the Assam Electricity Regulatory Commission for Assam 1 project seeking reimbursement of the additional expenses incurred due to increase in the GST rate from 5% to 12% effective from October 1, 2021 on supply of Solar Power Generator. The petition filed before Assam Electricity Regulatory Commission was decided the petition by way of order dated January 27, 2023, whereby they have directed the parties to reconcile the claim amounts. In the petitions before the CERC orders have been reserved.

We have filed two petitions before the CERC in relation to Rajasthan 8 and Rajasthan 9 projects seeking reimbursement of increase in the rate of basic customs duty from 5% to 20% on the solar inverters being imported into India from February 02, 2021. These petitions are presently pending and next listed for hearing on November 10, 2023.

We had filed two petitions before the CERC in relation to Rajasthan 8 and Rajasthan 9 projects seeking reimbursement of imposed safeguard duty on import of Solar Cells whether or not assembled in modules or panels. The petitions have been decided in the Company's favor by way of order dated January 20, 2023. However, one off-taker for the Rajasthan 8 project has filed an appeal before APTEL which is presently pending. However, no adverse order has been passed.

In connection with an extension of the date of commissioning of a 40 MWs project in Karnataka of one of our subsidiaries, the Karnataka Electricity Regulatory Commission ("KERC") withdrew the extension granted by the distribution licensee on account of delay due to force majeure and reasons not attributable to us and directed it to enforce a reduced tariff and recover liquidated damages due to delay based on "actual commercial operation date". Such directions of KERC were challenged in an appeal before the Appellate Tribunal for Electricity ("APTEL"). The appeal was decided in our favor whereby APTEL stated that we were entitled to payment at PPA Tariff. A subsequent appeal against the order dated August 12, 2021 has been filed by the distribution licensee before the Supreme Court and is presently pending. Similarly, we had a favorable order dated February 28, 2020 from APTEL in relation to another 50 MW project in Karnataka wherein it was held that the Company was entitled to full PPA tariff as against the reduced tariff which was being claimed as payable by the off-taker. Since the off-taker failed to comply with APTEL's judgment, we filed an execution petition which is currently pending before APTEL. During the pendency of the execution petition, the parties are attempting to amicably settle the matter. The matter is listed for hearing on October 19, 2023.

We had filed a similar petition before KERC, whereby the off taker has reduced our tariff on grounds of delay in commissioning. The petition was decided in the Company's favor by way of order dated January 04, 2023 whereby KERC has held that the Company is entitled to tariff as stipulated in the Power Purchase Agreement and has directed the off-taker to pay the differential outstanding amount, being the difference between contracted tariff and the reduced tariff.

A class action lawsuit that was filed in the U.S. District Court for the Southern District of New York, case number 1:22-cv-07432, against our Company and certain of its current and former directors and officers alleging violations of U.S. securities laws. The lead plaintiff has filed a First Amended Complaint, and the court set a deadline for the lead plaintiff to file a Second Amended Complaint of 28 days after the date of filing this Form 20-F. The court also required that the parties provide it with a status update by October 31, 2023. The Company sees no merit in the claims asserted in the lawsuit and intends to defend the case vigorously.

**B. Bylaws**

We incorporate by reference into this annual report on Form 20-F the description of our Amended and Restated Constitution contained in our Form F-1 registration statement on Form F-1 (Registration No. 333-208584), as amended form time to time, initially filed with the SEC on December 16, 2015.

## C. Material Contracts

We have not entered into any material contracts other than those in the ordinary course of business and other than those described in "Business Overview" or elsewhere in this annual report.

In fiscal 2023, we have entered into an agreement to invest INR 1,000 million (US$13.2 million) in Premier Energies Group ("Premier Group"), one of India's leading manufacturers of solar PV cells and modules. Further we have also signed a Module Supply Agreement with Premier Group for the off-take of 600 MW capacity per annum manufactured for four years by Premier Group and other operational solar PV cell and modules capacities of Premier. Under the MSA, we have a right to procure modules of up to 600 MW per annum, with a minimum commitment given to off-take 300 MW per annum, subject to agreed exemptions.

In fiscal 2023, we have entered into an agreement for 600 MW DC of high-performance, advanced thin film photovoltaic (PV) solar modules from First Solar, Inc. The agreement is the first for production from First Solar's new manufacturing facility in Tamil Nadu, India, which is expected to be commissioned in the second half of 2023. Under the agreement, Azure Power was expected to take delivery of First Solar's Series 7 photovoltaic (PV) solar modules from the fourth quarter of 2023 to 2025. However, the same is now likely to be start from first quarter of 2024 due to changes in project scheduling. We received a force major notice from First Solar under which they notified us of their suspension of their , Azure Power was expected to take delivery of First Solar's Rules, 2022 notified by GOI in November 2022, which restricts the use of materials like lead, mercury and cadmium in the manufacture of solar PV modules in India. Subsequently, by virtue of the E-Waste (Management) Amendment Rules, 2023 dated January 30, 2023 notified by The Ministry of Environment, Forest and Climate Change, GoI, Cadmium and Lead in solar panels/modules has been included in Schedule II of the E-Waste Rules, pursuant to which First Solar withdrew the invocation of the provisions of Force Majeure and committed to meet their obligations.

In fiscal 2023, we signed a Master Supply Agreement ("MSA") with Siemens Gamesa Renewable Power Private Limited ("Siemens Gamesa"), a global leader in wind technology. Siemens Gamesa will supply 96 units of SG 3.6-145 onshore wind turbines which will cater to an overall capacity of ~346 MW wind projects. While the turbine supply was expected to commence during Q2 calendar year 2023, it is now tentatively planned to commence in Q2 calendar year 2024 as the timelines for the project are under review.

On May 27, 2023, Radiance have sent the Company a notice to terminate the Master Share Purchase Agreement in relation to 86.5 MW Rooftop portfolio in relation to Azure Power Rooftop (Genco) Private Limited and related group SPVs. The Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the un-transferred 86.5 MW portfolio to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement.

122

D. **Exchange Controls and Other Limitations Affecting Security Holders**

**Foreign Direct Investment**

Foreign investments in Indian companies are primarily governed by the Foreign Exchange Management Act, 1999, as amended, and the rules, regulations and notifications issued thereunder, including the Foreign Exchange Management (Non-debt Instruments) Rules, 2019, as amended (the "NDI Rules"), , and the Consolidated Foreign Direct Investment Policy, 2020 dated October 15, 2020 (the "Consolidated FDI Policy") issued by the Department for Promotion of Industry and Internal Trade, Ministry of Commerce and Industry, GOI ("DPIIT") read with the press notes issued by the DPIIT to amend the FDI Policy (collectively, the "FDI Regulations").

Pursuant to the FDI Regulations, investments can be made by persons resident outside India in Indian companies either under the automatic route (those which do not require approval of the GOI or the Reserve Bank of India) or the government route, depending on the sector, amount of investment and up to the extent of the percentage of the total capital of the Indian company specified in the Consolidated FDI Policy. The Consolidated FDI Policy currently allows 100% foreign direct investment in Indian companies engaged in the solar power sector under the automatic route. The FDI Regulations also prescribe certain pricing and reporting requirements in respect of issuance of equity securities of an Indian company to a non-resident or transfer of such securities between a person resident in India and a non-resident. The FDI Regulations also regulate downstream investments i.e., indirect investment by a non-resident in an Indian company through another Indian company that is not owned or controlled by persons resident in India.

A person resident outside India (other than an entity of a country, which shares its land borders with India or the beneficial owner (direct or indirect) of an investment into India, who is situated in, or is a citizen of country which shares its land border with India) and an erstwhile Overseas Corporate Body (as defined in the FDI Regulations) has general permission to purchase shares, compulsorily convertible debentures or preference shares of an Indian company, subject to certain terms and conditions.

Currently, subject to certain exceptions, investments by Non-Resident Indians ("NRIs", as defined in the FDI Regulations), in Indian companies do not require the prior approval of the GOI or the RBI.

**E. Taxation**

**Mauritius Taxation**

Our Company is a company holding a GBC License issued by the Financial Services Commission and is a tax resident in Mauritius. The Income Tax Act 1995 of Mauritius imposes a tax in Mauritius on our chargeable income at the rate of 15%.

Pursuant to the amendments to the Financial Services Act 2007 of Mauritius under the Finance Act 2018, the Company is as from July 1, 2021 governed by the new regulatory regime applicable to Global Business Companies. Generally, income tax rate for GBCs is at 15%, but subject to meeting certain prescribed conditions, a partial exemption of 80% may be allowed against certain types of income such as foreign source dividend and interest. Where the GBC derives income which is subject to foreign tax, and where the said partial exemption has not been applied, the amount of foreign tax paid may be allowed as a credit against income tax payable in Mauritius in respect of that income.

As a GBC, subject to meeting conditions, our Company may apply for Tax Residence Certificates issued by the Mauritius Revenue Authority. These certificates are required to benefit from the extensive network of Double Taxation Avoidance Agreements signed between Mauritius and other jurisdictions, including India.

Mauritius imposes no capital gains tax and has no withholding tax on the payment of dividends.

Prospective investors are urged to consult their own tax advisers in order to fully understand the tax consequences of an investment in the equity shares.

**U.S. Federal Income Taxation**

The following is a summary of certain U.S. federal income tax considerations that may be relevant to the purchase, ownership and disposition of our equity shares by a U.S. Holder (as defined below).

This summary is based on provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and published regulations, rulings and judicial interpretations thereof, in force as of the date hereof. Those authorities may be changed at any time, perhaps retroactively, so as to result in U.S. federal income tax consequences different from those summarized below.

This summary is not a comprehensive discussion of all of the tax considerations that may be relevant to a particular investor's decision to purchase, hold, or dispose of equity shares. In particular, this summary is directed only to U.S. Holders that hold equity shares as capital assets (generally, property held for investment). This summary does not address tax consequences to U.S. Holders who may be subject to special tax rules, such as banks, brokers or dealers in securities or currencies, traders in securities electing to mark to market, financial institutions, life insurance companies, regulated investment companies, real estate investment trusts, tax exempt entities, qualified retirement plans, individual retirement accounts or other tax-deferred accounts entities that are treated as partnerships for U.S. federal income tax purposes (or partners therein), U.S. Holders that acquired equity shares through the exercise of employee stock options or otherwise as compensation for services, U.S. Holders that own or are treated as owning 10% or more of our equity shares by vote or value, persons holding equity shares as part of a hedging or conversion transaction or a straddle, or persons whose functional currency is not the U.S. dollar. Moreover, this summary does not address state, local or non-U.S. taxes, the U.S. federal estate and gift taxes, or the net investment income tax applicable to certain non-corporate U.S. Holders, or any individual or corporate alternative minimum tax consequences of acquiring, holding or disposing of equity shares. For purposes of this summary, a "U.S. Holder" is a beneficial owner of equity shares that, for U.S. federal income tax purposes, is a citizen or resident of the United States, a U.S. domestic corporation, a trust if a U.S. court is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of its substantial decisions, a trust that has a valid election is in effect to be treated as a U.S. person, or an estate the income of which is subject to U.S. federal income taxation regardless of its sources.

**U.S. Holders should consult their own tax advisors about the consequences of the acquisition, ownership, and disposition of the equity shares, including the relevance to their particular situation of the considerations discussed below and any consequences arising under foreign, state, local or other tax laws.**

**Taxation of Dividends**

Subject to the discussion below under "Passive Foreign Investment Company Status," the gross amount of any distribution of cash or property with respect to our equity shares that is paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) will generally be includible in a U.S. Holder's taxable income as ordinary dividend income on the day on which the dividend is received and will not be eligible for the dividends-received deduction allowed to corporations under section 243 of the Code.

The Company does not expect to maintain calculations of its earnings and profits in accordance with U.S. federal income tax principles. U.S. Holders therefore should expect that distributions generally will be treated as dividends for U.S. federal income tax purposes.

Subject to certain exceptions for short-term positions, the U.S. dollar amount of dividends received by non-corporate U.S. Holders with respect to the equity shares will be subject to taxation at a preferential rate if the dividends are "qualified dividends." Dividends paid on the equity shares will be treated as qualified dividends if:

- the equity shares are readily tradable on an established securities market in the United States or we are eligible for the benefits of a comprehensive tax treaty with the United States that the U.S. Treasury determines is satisfactory for purposes of this provision and that includes an exchange of information program;
- Our Company was not, in the year prior to the year in which the dividend was paid, and are not, in the year in which the dividend is paid, a passive foreign investment company (a "PFIC"); and
- Certain other requirements are met.

The Company's equity shares are listed on the NYSE and we expect them to qualify as readily tradable on an established securities market in the United States so long as they are so listed. Non-corporate U.S. Holders that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation for qualified dividends. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. As discussed below, the Company does not believe it was a PFIC for the taxable year ended March 31, 2022 and does not anticipate becoming a PFIC for its current taxable year or in the foreseeable future. U.S. Holders should consult their own tax advisers regarding the availability of the reduced dividend tax rate in light of their own particular circumstances.

Dividend distributions with respect to the Company's equity shares generally will be treated as "passive category" income from sources outside the United States for purposes of determining a U.S. Holder's U.S. foreign tax credit limitation.

Dividends paid in a currency other than U.S. dollars will be includable in income in a U.S. dollar amount based on the exchange rate in effect on the date of receipt whether or not the payment is converted into U.S. dollars at that time. A U.S. Holder's tax basis in the non-U.S. currency will equal the U.S. dollar amount included in income. Any gain or loss on a subsequent conversion of the non-U.S. currency into U.S. dollars for a different amount generally will be U.S. source ordinary income or loss.

**Taxation of Dispositions of Equity Shares**

Subject to the discussion below under "Passive Foreign Investment Company Status," if a U.S. Holder realizes gain or loss on the sale, exchange or other disposition of equity shares, that gain or loss will be capital gain or loss and generally will be long-term capital gain or loss if the equity shares have been held for more than one year. Long-term capital gain realized by a non-corporate U.S. Holder generally is subject to taxation at a preferential rate. The deductibility of capital losses is subject to limitations. The amount of gain or loss will be equal to the difference, if any, between the amount realized and the U.S. Holder's adjusted tax basis in equity shares. A U.S. Holder's initial tax basis in shares generally will equal the cost of such shares.

Gain, if any, realized by a U.S. Holder on the sale or other disposition of the equity shares generally will be treated as U.S. source income for U.S. foreign tax credit purposes. U.S. Holders should consult their own tax advisors regarding the application of the foreign tax credit rules to their investment in, and disposition of, the equity shares.

**Passive Foreign Investment Company Status**

Special U.S. tax rules apply to companies that are considered to be a PFIC. The Company will be classified as a PFIC in a particular taxable year if, taking into account our proportionate share of the income and assets of its subsidiaries under applicable "look-through" rules, either

- 75 percent or more of our Company's gross income for the taxable year is passive income; or
- the average percentage of the value of our assets that produce or are held for the production of passive income is at least 50 percent.

For this purpose, passive income generally includes dividends, interest, gains from certain commodities transactions, rents, royalties and the excess of gains over losses from the disposition of assets that produce passive income. Gains from commodities transactions, however, are generally excluded from the definition of passive income if such gains are active business gains from the sale of commodities and the corporation's commodities meet specified criteria.

The Company believes, and the other paragraphs in this disclosure generally assume, that the Company was not a PFIC for our taxable year ending March 31, 2022 and that, based on the present composition of the Company's income and assets and the manner in which the Company conducts its business, the Company does not expect to be a PFIC in its current taxable year or in the foreseeable future. Whether the Company is a PFIC is a factual determination made annually, and the Company's status could change depending, among other things, upon changes in the composition and amount of its gross income and the relative quarterly average value of its assets. If the Company was a PFIC for any taxable year in which a U.S. Holder holds the Company's equity shares, the U.S. Holder generally would be subject to additional taxes on certain distributions and any gain realized from the sale or other taxable disposition of our Company's equity shares regardless of whether the Company continued to be a PFIC in any subsequent year, unless the U.S. Holder marks its equity shares to market for tax purposes on an annual basis. A U.S. Holder will not be able to elect to treat us as a qualified electing fund ("QEF") because we do not intend to prepare the information needed to make a QEF election. U.S. Holders are encouraged to consult their own tax advisor as to the Company's status as a PFIC and the tax consequences to them of such status.

**Foreign Financial Asset Reporting**

Certain U.S. Holders that own "specified foreign financial assets" with an aggregate value in excess of the applicable reporting threshold (generally, US$50,000 for unmarried individuals) are generally required to file an information statement along with their tax returns, currently on IRS Form 8938, with respect to such assets. "Specified foreign financial assets" include any financial accounts held at a non-U.S. financial institution, as well as securities issued by a non-U.S. issuer that are not held in accounts maintained by financial institutions. The understatement of income attributable to "specified foreign financial assets" in excess of US$5,000 extends the statute of limitations with respect to the tax return to six years after the return was filed. U.S. Holders who fail to report the required information could be subject to substantial penalties. Prospective investors are encouraged to consult with their own tax advisors regarding the possible application of these rules.

**Backup Withholding and Information Reporting**

Dividends paid on, and proceeds from the sale or other disposition of, the equity shares to a U.S. Holder generally may be subject to the information reporting requirements of the Code and may be subject to backup withholding unless the U.S. Holder provides an accurate taxpayer identification number and makes any other required certification or otherwise establishes an exemption. Backup withholding is not an additional tax. The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a refund or credit against the U.S. Holder's U.S. federal income tax liability, provided the required information is furnished to the U.S. Internal Revenue Service in a timely manner.

**Indian Taxation**

The discussion contained herein is based on the applicable tax laws of India as in effect on the date hereof and is subject to possible changes in Indian law that may come into effect after such date. Prospective investors should consult their own tax advisers as to the consequences of purchasing the equity shares, including, without limitation, the consequences of the receipt of dividend and the sale, transfer or disposition of the equity shares.

Before the Amendment in Finance Act, 2020, i.e., up to March 31, 2020, dividend payments by companies to its shareholders, were subject to dividend distribution tax in India payable by companies at a rate of 17.47% (effective rate of TDS after grossing up is 21.17%) on the total amount distributed as a dividend as grossed up by the amount of such dividend distribution tax.

Pursuant to the amendment, Dividend Distribution tax ("DDT") payable by Indian companies has been abolished and dividend income is taxable in the hands of shareholders as per income tax rates applicable on them. However, Indian companies are required to deduct tax at source in respect of dividend paid. Considering the same from FY 2021 onwards, dividend payments to its shareholders by companies are taxable in the hands of shareholders. However, withholding tax shall be deducted at source by companies at the applicable rate under Indian tax law pursuant to amendments to the Indian Income Tax Act, 1961, as amended, income arising directly or indirectly through the transfer of a capital asset, including any share or interest in a company or entity registered or incorporated outside India, will be liable to tax in India, if such share or interest derives, directly or indirectly, its value substantially from assets (whether tangible or intangible) located in India and whether or not the

seller of such share or interest has a residence, place of business, business connection, or any other presence in India. The share or interest of the company or entity registered or incorporated outside of India, shall be deemed to derive its value substantially from the assets located in India, if the value of such Indian assets exceeds INR 100 million, and represents at least 50% of the value of all the assets owned by the company or entity registered or incorporated outside of India. Substantially all of our assets are located in India. However, if the transferor of share or interest in a company or entity registered or incorporated outside of India (along with its associated enterprises), neither holds the right of management or control in the company or entity registered or incorporated outside of India nor holds voting power or share capital or interest exceeding 5% of the total voting power or total share capital or interest in the company or entity registered or incorporated outside of India, at any time during the twelve months preceding the date of transfer, such small shareholders are exempt from the indirect transfer provisions mentioned above.

The amendments also do not deal with the interplay between the Indian Income Tax Act, 1961, as amended, and the double taxation avoidance agreements that India has entered into with countries such as the United States, in case of an indirect transfer. Accordingly, the implications of these amendments are presently unclear. If it is determined that these amendments apply to a holder of our equity shares, such holder could be liable to pay tax in India on such income.

The Taxation Laws (Amendment) Act, 2019 received the assent of the President on December 11, 2019 and published in the Gazette of India on December 12, 2019. The amendment provides an option for the companies to opt for reduced corporate tax rate of 22% provided they do not claim certain tax benefits under the Income Tax Act. The Company has opted for the reduced tax rate for the subsidiaries which are not eligible for deduction under section 80IA of the Income Tax Act. Further, New domestic companies incorporated on or after October 1, 2019 making fresh investment in manufacturing can opt an option to pay income-tax at the rate of 15%. This benefit is available to companies which do not avail any exemption/incentive and commences their production on or before March 31, 2024. Also, such companies shall not be required to pay Minimum Alternate Tax.

**G. Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to several market risks in our normal business activities. Market risk is the potential loss that may result from market changes associated with our business or with an existing or forecasted financial or commodity transaction. The types of market risks we are exposed to include interest rate risk and foreign currency risk.

**Interest Rate Risk**

As of March 31, 2022, our long-term debt was both fixed and variable interest rates. Exposure to interest rate fluctuations will depend on the amount of debt that bears interest at variable rates, the time at which the interest rate is adjusted and the quantum of fluctuation in the interest rate.

Our results of operations are subject to interest rate fluctuations on our variable rate borrowings. The sensitivity analysis below has been determined based on the exposure to interest rates for non-derivative financial instruments at the balance sheet date. For floating rate liabilities, the analysis is prepared assuming the amount of liability outstanding at the balance sheet date was outstanding for the whole period.

During FY 2023 and FY 2024, RBI has increased the repo rate by 2.50%. As a result of the same, Indian lenders have also affected increase in their benchmark rates. Consequently, the interest rate in one of the debts availed at the variable interest rate has seen an increase by 1.50% due to revision in the benchmark rate of the concerned lender. During FY 2023 and FY 2024 till date, some of the lenders have increased interest rates/ levied additional penal interest due to delay in submission of audited financials for FY 2022, resulting in overall increase in the effective rate of interest. Even after submission of audited financial statements for FY 2023 and FY 2024, some or all of the lenders may not agree to revision of such increased interest rates/ penal interest to original rates.

We use hedging strategies to mitigate our exposure to interest rate fluctuations in our foreign currency borrowings, but we may not hedge all of our interest rate risk and, to the extent we enter into interest rate hedges, our hedges may not necessarily have the same duration as the associated indebtedness. Our exposure to interest rate fluctuations will depend on the amount of indebtedness that bears interest at variable rates, the time at which the interest rate is adjusted, the amount of the adjustment, our ability to prepay or refinance variable rate indebtedness when fixed rate debt matures and needs to be refinanced and hedging strategies we may use to reduce the impact of any increases in rates.

**Foreign Currency Risk**

The functional currency of our Indian subsidiaries is Indian rupees, but we have long term debts denominated in U.S. dollars and Indian rupees. We are partially hedged against exchange rate risk for both of our Green Bonds and fully hedged against other foreign currency loan exposures. The fluctuations in the exchange rates between U.S. dollars and Indian rupees may result in higher fair value adjustments on our outstanding foreign currency loans or payables.

The Company and its three international subsidiaries have a functional currency which is the U.S. dollar and consequently, we are exposed to foreign exchange risk on routine transactions entered locally by these subsidiaries. The exchange rate between Indian rupees and U.S. dollars has fluctuated significantly in recent years and may continue to fluctuate in the future. Depreciation of the Indian rupee against the U.S. dollar may result in translation loss in the Consolidated Financial Statements.

We have hedged against exchange rate risk for both of our Green Bonds so as to minimize the effect of any adverse movement in the exchange rates. Further, we have hedged against debts denominated in U.S. dollars in Indian subsidiaries, in order to minimize the adverse impact of a large currency movement. We have taken foreign currency loans for our Rajasthan 8 project and are also utilizing some trade credits denominated in foreign currency for our Rajasthan 9 project.

Fair value hedges with notional amounts of US$265.1 million and US$15.7 million were outstanding as of March 31, 2021 and 2022, respectively, with the balance maturity period ranging from 0.5 months to 1 year as of March 31, 2022. Changes in the fair value of derivatives designated and qualifying as fair value hedges, together with any changes in the fair value of the hedged firm commitments attributable to the hedged risk, are recorded in the consolidated balance sheet and consolidated statements of operations. Further, cash flow hedges with notional amounts of US$1,103.0 million and US$1,097.6 million were outstanding as of March 31, 2021 and 2022, respectively, with the balance maturity period ranging from 0.5 months to 4.3 years as of March 31, 2022. The fair value of these cash flow hedges as of March 31, 2021 and 2021 were US$74.2 million and US$13.7 million of net assets, respectively, and are included in accumulated other comprehensive

loss on our consolidated balance sheets. The changes in the fair value of these option contracts are recognized in the Consolidated Statements of Operations and are included in interest expense.

We continue to monitor our risks and will consider hedging significant foreign currency exposures on an ongoing basis.

## F. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

As required by Rules 13a-15 and 15d-15 under the Exchange Act, management, including our Group's Chief Executive Officer and our Group's Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this annual report, March 31, 2022. Disclosure controls and procedures refer to controls and other procedures designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Group's principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding our required disclosure.

Based on the foregoing, our Group's Chief Executive Officer and our Group's Chief Financial Officer have concluded that, as of March 31, 2022, our disclosure controls and procedures were not effective as a result of the material weaknesses in our internal control over financial reporting as described below.

### Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Internal control over financial reporting includes maintaining records that, in reasonable detail, accurately and fairly reflect our transactions; provide reasonable assurance that transactions are recorded as necessary for preparation of our financial statements; provide reasonable assurance that receipts and expenditures of company assets are made in accordance with management authorization; and provide reasonable assurance that unauthorized acquisition, use or disposition of company assets that could have a material effect on our financial statements would be prevented or detected on a timely basis. Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected. Also, projections of any evaluation of the effectiveness of internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management used the Committee of Sponsoring Organizations of the Treadway Commission Internal Control—Integrated Framework (2013), or the COSO framework, to evaluate the effectiveness of our internal control over financial reporting.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement in our annual or interim financial statements would not be prevented or detected on a timely basis. The scope of our management's assessment of the effectiveness of internal control over financial reporting includes all of our consolidated operations. Management determined that our internal controls over financial reporting were ineffective due to

inadequacy of certain review controls including control failures in financial statement closing procedures, controls pertaining to capitalization, vendor selection process, land acquisition, documentation on testing of control attributes and completeness and accuracy of reports used including inadequate consideration in designing of risk and controls matrices.

Management, under the supervision of the Company's Audit and Risk Committee, has initiated remediation actions focused on improving the Group's internal control and compliance environment to address the control deficiencies that led to material weaknesses. Management is taking support from external consultants while performing this remediation exercise. These efforts include creation of a Management Assurance Service function, assessing and strengthening internal control framework, testing operational controls, adding accounting personnel for assistance on critical accounting matters, training of team members, implementing additional process level reviews, and periodic monitoring by the Audit and Risk Committee of the effectiveness of the remedial efforts and overall reporting framework. As it continues to implement such remediation, management may take additional measures or modify the plan elements described above.

Our management recognizes that there are inherent limitations in the effectiveness of any system of internal control over financial reporting, including the possibility of human error and the circumvention or override of internal control. Accordingly, even the most effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation and may not prevent or detect all misstatements and can only provide reasonable

assurance with respect to the preparation and presentation of our financial statements.

The effectiveness of our internal control over financial reporting as at March 31, 2022 has been audited by ASA & Associates LLP, India, our independent registered public accounting firm, as stated in their report which is reproduced in its entirety below.

**G. Corporate Governance**

Our Company is a "foreign private issuer" (as such term is defined in Rule 3b-4 under the Exchange Act) and our Company's equity shares are listed on the NYSE. Under Section 303A of the NYSE Listed Company Manual, NYSE listed companies that are foreign private issuers are permitted to follow home country practice in lieu of the corporate governance provisions specified by the NYSE, with limited exceptions. As required by the NYSE Listed Company Manual, we note the following significant differences between our Company's corporate governance practices and the corporate governance practices required to be followed by U.S. domestic companies under the NYSE Listed Company Manual:

- Under the NYSE Listed Company Manual, the Board of Directors of U.S. domestic listed companies are required to have a majority of independent directors. The Company is not subject to this requirement under Mauritius law and has decided to follow home country practice instead on this matter.
- The NYSE Listed Company Manual also requires U.S. domestic listed companies to regularly hold executive sessions for non-management directors, or an executive session that only includes independent directors at least once a year. The Company is not subject to this requirement under Mauritius law and has decided to follow our home country practice instead on this matter. However, our Board of Directors regularly holds executive sessions.
- The NYSE Listed Company Manual and Rule10C-1(b)(1) (iii) (A) (4) under the Exchange Act also require U.S. domestic listed companies to have compensation committees that only include independent directors. The Company is not subject to this requirement under Mauritius law and have decided to follow our home country practice instead on this matter.
- The NYSE Listed Company Manual also requires U.S. domestic listed companies to have nominating and corporate governance committees that only include independent directors. The Company is not subject to this requirement under Mauritius law and has decided to follow our home country practice instead on this matter.

**H. Whistle-Blower Policy**

The Company has a whistle-blower policy in place which is designed to provide a conducive environment for employees, directors, contractors, vendors, business partners or stakeholders to report any concerns related to unethical behavior or misconduct without fear of retaliation, and provides a mechanism to report concerns related to unethical behavior or misconduct. Under the policy, reported concerns are investigated by the Ethics Committee. The Company's Ethics Committee is supervised by the Board's Audit and Risk Committee.

All reported concerns under the whistle-blower policy are thoroughly investigated under the oversight of the Ethics Committee. The Ethics Committee may, at its discretion, consider appointing an investigator or investigation team internally and/or external parties for the purpose of investigation. The decision to conduct an investigation is treated as a neutral fact-finding process.

Copies of our Whistle-Blower Policy are available on the "Investor Relations" page of our corporate website www.azurepower.com

**Code of Business Conduct and Ethics**

The Company has a "Code of Business Conduct and Ethics" (the "Code") applicable to every employee, officer and director of the Company. This Code is designed to promote honest and ethical conduct; fair dealings with stakeholders; compliance with applicable laws, rules and regulations; and prompt reporting of violations of the Code. The Code provides that our directors, officers, and employees are expected to act in accordance with the highest standards of personal and professional integrity and avoid any action, position or interest that conflicts with the interests of our company or gives the appearance of a conflict. Directors, officers, and employees have an obligation under the Code to advance the Company's interests when the opportunity to do so arises.

A copy of the Code is available on the "Investor Relations" page of our corporate website www.azurepower.com.

## I. Principal Accountant Fees and Services

During the current year at meeting held on November 9, 2021, the Board of Directors of the Company approved the appointment of S.R. Batliboi & Co. LLP (member firm of Ernst and Young Global Limited) as its independent registered public accounting firm for the fiscal year ending March 31, 2022. At the same meeting, the Board of Directors of the Company approved the dismissal of Ernst & Young Associates LLP (the "Former Accounting Firm") as independent registered public accounting firm of the Company effective November 9, 2021.

On July 12, 2023, the Company's Board approved the appointment of ASA & Associates LLP ("ASA") as an independent public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), for the Company's US GAAP consolidated financial statements for Fiscal 2022 pursuant to resignation of S.R. Batliboi & Co. LLP. Considering the same, ASA & Associates LLP has served as our independent registered public accountant for the year ended March 31, 2022 for which audited statements appear in this annual report. Since, the appointment of ASA was made during Fiscal Year 2024, hence the fees for audit related services will be recognized in Fiscal year 2024.

The following table shows the aggregate fees for professional services and other services rendered by S.R. Batliboi & Co. LLP and its associates to us, including some of our subsidiaries, in FY 2022.

| Particulars | Fiscal 2021 (INR millions) | Fiscal 2022 (INR millions) | Fiscal 2022 (US$ millions) |
|---|---|---|---|
| Audit fees (audit and review of financial statements and offerings) | 49 | 71 | 0.9 |
| All other fees (tax advisory services) | 3 | 3 | 0.1 |
| **Total** | **52** | **74** | **1.0** |

The policy of our audit and risk committee is to pre-approve all audit and non-audit services provided by external auditors, including audit services, audit-related services and tax services. We have a written policy on the engagement of an external auditor. Please also see "Change in Independent Registered Public Accounting Firm" below.

134

**J. Change in Independent Registered Public Accounting Firm**

S.R. Batliboi & Co. LLP in its letter dated July 10, 2023, tendered its resignations as the independent registered public accounting firm of the Company and the Auditors of the subsidiary companies of APIPL.

In its letter, S.R. Batliboi & Co. LLP ("SRB") stated that in view of the fact that they are yet to receive the information that they have requested to complete their audit work inclusive of our March 31, 2022 draft financial statements, US annual filing, associated books and records, and our conclusions and representations on the impact of the whistle blower complaints, it is not possible for them to complete the audit of the financial statements within the timeline expected by the Company. SRB have therefore tendered their resignation.

During the Company's two most recent fiscal years, Fiscal 2022 and Fiscal 2023, and subsequent interim period prior to resignation of SRB, except for information outstanding as mentioned above, the Company did not have disagreements with SRB on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of SRB, would have caused SRB to make reference to the subject matter of the disagreements in connection with its reports on the consolidated financial statements for such years.

On July 12, 2023, the Company's Board approved the appointment of ASA & Associates LLP ("ASA") as an independent public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), for the Company's US GAAP consolidated financial statements for Fiscal 2022.

On September 5, 2023, Ernst & Young, Mauritius ("EY Mauritius") tendered its resignations as the statutory auditor of the Mauritius Entities with immediate effect. Pursuant to this resignation, the Company's Board on September 28, 2023, approved the appointment of ECOVIS (Mauritius) as the new statutory auditors for the fiscal year ending March 31, 2022 ("Fiscal 2022") and fiscal year ended March 31, 2023 ("Fiscal 2023"), to audit the financials of the Mauritius Entities for necessary filings in Mauritius.

## K. Information Filed with Securities Regulators

The SEC maintains a website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that make electronic filings through its Electronic Data Gathering, Analysis, and Retrieval, or EDGAR, system. All our Exchange Act reports and other SEC filings will be available through the EDGAR system.

**L. Disclosure on delay in filing of Form 20-F**

We did not file our annual report on Form 20-F for Fiscal 2022 by its due date in accordance with SEC Rules. On July 13, 2023, the NYSE suspended trading in our equity shares and commenced delisting proceedings as a result of our failure to timely file this annual report on Form 20-F with the SEC. On July 26, 2023, we submitted an appeal of this decision.

See "Risk Factors – *The New York Stock Exchange (NYSE) has commenced procedures to delist our Company's shares and our failure to timely file periodic reports with the SEC may result in the delisting of our Company' shares.*"

137

**M. Unresolved SEC Staff comments**

None

EXHIBITS

| Exhibit Number | Description |
|---|---|
| 1.1† | The Constitution of Azure Power Global Limited, as currently in effect (incorporated by reference to Exhibit 3.2 of our Registration Statement on Form F-1 (File No. 333-208584) filed with the Securities and Exchange Commission on March 31, 2016) |
| 2.1† | Form of Equity Share Certificate of Azure Power Global Limited (incorporated by reference to Exhibit 4.1 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on December 16, 2015) |
| 4.2* | Appointment Letter dated February 27, 2023 to Vijay Kumar Wadhwani |
| 4.3* | Indenture amongst Azure Power Energy Limited, Azure Power Global Limited and HSBC Bank USA, National Association for 3.575% senior notes due 2026 |
| 4.4* | Executive Employment Agreement, dated April 27, 2022, by and between Azure Power India Private Limited and Harsh Shah |
| 4.5* | Executive Release Agreement, dated August 29, 2022, by and between Azure Power India Private Limited, Azure Power Global Limited and Harsh Shah |
| 4.6* | Retainership Agreement, dated November 21, 2022, by and between Azure Power Fifty Two Pvt. Ltd. and R Narasimhan Iyer |
| 4.7* | Employee Employment Agreement, dated July 20, 2022, by and between Azure Power India Private Limited and Rupesh Agarwal |
| 4.8* | Employee Employment Agreement, dated August 29, 2022, by and between Azure Power India Private Limited, Azure Power Global Limited and Rupesh Agarwal |
| 4.9* | Appointment Letter dated July 28, 2022 to Shweta Srivastava |
| 4.10* | Executive Release Agreement, dated July 11, 2023, by and between Azure Power India Private Limited, Azure Power Global Limited and Rupesh Agarwal |
| 4.11* | Employee Employment Agreement, dated May 1, 2023, by and between Azure Power India Private Limited, Azure Power Global Limited and Sugata Sircar |
| 4.12* | Employee Employment Agreement, dated April 29, 2023, by and between Azure Power India Private Limited and Sunil K Gupta |
| 4.13* | Extension of Retainership Agreement, dated April 24, 2023, by and between Azure Power India Pvt. Ltd. and R Narasimhan Iyer |
| 4.14† | 2016 Equity Incentive Plan (as amended on March 31, 2020) (incorporated by reference to Exhibit 4.32 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on June 19, 2020) |

| Exhibit Number | Description |
| --- | --- |
| **4.15†** | Shareholders Agreement, dated July 22, 2015, by and among the shareholders named therein and Azure Power Global Limited (incorporated by reference to Exhibit 10.3 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on December 16, 2015) |
| **4.16†** | Shareholders Agreement, dated July 22, 2015, by and among Azure Power Global Limited, APIPL, Inderpreet Singh Wadhwa and Harkanwal Singh Wadhwa (incorporated by reference to Exhibit 10.3 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on March 1, 2016) |
| **4.17†** | Amendment to the Shareholders Agreement, dated March 30, 2016, by and among the shareholders named therein and Azure Power Global Limited (incorporated by reference to Exhibit 10.5 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on April 19, 2016) |
| **4.18†** | Second Amendment to the Shareholders Agreement, dated September 5, 2016, by and among the shareholders named therein and Azure Power Global Limited (incorporated by reference to Exhibit 10.6 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on September 22, 2016) |
| **4.19†** | Sponsor Lock-in Agreement, dated July 22, 2015, by and among the shareholders named therein and IW Green Inc. and Inderpreet Singh Wadhwa (incorporated by reference to Exhibit 10.6 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on April 19, 2016) |
| **4.20†** | Amendment to the Sponsor Lock-in Agreement, dated April 16, 2016, by and among the shareholders named therein and IW Green Inc. and Inderpreet Singh Wadhwa (incorporated by reference to Exhibit 10.7 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on April 19, 2016) |
| **4.21†** | Second Amendment to the Sponsor Lock-in Agreement, dated September 5, 2016, by and among the shareholders named therein and IW Green Inc. and Inderpreet Singh Wadhwa (incorporated by reference to Exhibit 10.9 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on September 22, 2016) |
| **4.22†** | Form of Registration Rights Agreement by and among the shareholders named therein and Azure Power Global Limited (incorporated by reference to Exhibit 10.8 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on June 30, 2016) |
| **4.23†** | Form of Indemnification Agreement by and between Azure Power Global Limited and each of the Officers and Directors of Azure Power Global Limited (incorporated by reference to Exhibit 10.16 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on June 15, 2016) |

| Exhibit Number | Description |
|---|---|
| **4.24†** | Letter Agreement, dated July 27, 2015, by and among Azure Power Global Limited, International Finance Corporation, APIPL, IW Green Inc. (which has since been converted to IW Green LLC), Inderpreet Singh Wadhwa and Harkanwal Singh Wadhwa (incorporated by reference to Exhibit 10.16 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on December 16, 2015) |
| **4.25†** | Third Amendment to the Shareholders Agreement, dated September 28, 2016, by and among the shareholders named therein and Azure Power Global Limited (incorporated by reference to Exhibit 10.23 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on October 3, 2016) |
| **4.26†** | CCPS Subscription Agreement, dated September 19, 2016, by and among Azure Power Global Limited, the Sponsors named therein and IFC GIF Investment Company I (incorporated by reference to Exhibit 10.24 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on October 3, 2016) |
| **4.27†** | Amendment to CCPS Subscription Agreement, dated September 28, 2016, by and among Azure Power Global Limited, the Sponsors named therein and IFC GIF Investment Company I (incorporated by reference to Exhibit 10.25 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on October 3, 2016) |
| **4.28†** | Share Purchase Agreement, dated September 30, 2016, by and between Azure Power Global Limited and CDPQ Infrastructures Asia Pte Ltd. (incorporated by reference to Exhibit 10.26 of our Registration Statement on Form F-1 (file No. 333-208584) filed with the Securities and Exchange Commission on October 3, 2016) |
| **4.29†** | Employment Agreement, dated November 18, 2019, by and between APIPL and Ranjit Gupta (incorporated by reference to Exhibit 4.28 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on June 19, 2020). |
| **4.30†** | Employment Agreement, dated November 18, 2019, by and between APIPL and Murali Subramanian (incorporated by reference to Exhibit 4.29 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on June 19, 2020). |
| **4.31†** | Subscription Agreement, dated November 6, 2019, by and between Azure Power Global Limited and CDPQ Infrastructures Asia Pte Ltd (incorporated by reference to Exhibit 4.30 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on June 19, 2020). |
| **4.32†** | Indenture among Azure Power Solar Energy Private Limited, Azure Power Global Limited and HSBC Bank USA, National Association dated September 24, 2019 (incorporated by reference to Exhibit 4.31 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on June 19, 2020) |
| **4.33†** | Master Share Purchase agreement dated April 1, 2021, by and between Radiance Renewables Private Limited and APIPL, AZR and entities as mentioned in Schedule 1 of the agreement (incorporated by reference to Exhibit 4.33 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on July 28, 2021) |
| **4.34†** | Amendment to Employment Agreement, dated July 20, 2020, by and between APIPL and Ranjit Gupta. (incorporated by reference to Exhibit 4.34 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on July 28, 2021) |
| **4.35†** | Amendment to Employment Agreement, dated July 20, 2020, by and between APIPL and Murali Subramanian. (incorporated by reference to Exhibit 4.35 of our annual report on Form 20-F (file No. 001-37909) filed with the Securities and Exchange Commission on July 28, 2021) |
| **11.1\*** | Code of Business Conduct and Ethics August 26, 2022 |
| **8.1\*** | List of Subsidiaries of Azure Power Global Limited |

| Exhibit Number | Description |
|---|---|
| **12.1\*** | [CEO Certification Pursuant to Section 302 of the Sarbanes Oxley Act of 2002](#) |
| **12.2\*** | [CFO Certification Pursuant to Section 302 of the Sarbanes Oxley Act of 2002](#) |
| **13.1\*\*** | [CEO Certification Pursuant to Section 906 of the Sarbanes Oxley Act of 2002](#) |
| **13.2\*\*** | [CFO Certification Pursuant to Section 906 of the Sarbanes Oxley Act of 2002](#) |
| **101.INS\*** | Inline XBRL Instance Document- this instance document does not appear in the Interactive Data File because its XBRL tags are not embedded within the inline XBRL document |
| **101.SCH\*** | Inline XBRL Taxonomy Extension Schema Document |
| **101.CAL\*** | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| **101.DEF\*** | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| **101.LAB\*** | Inline XBRL Taxonomy Extension Labels Linkbase Document |
| **101.PRE\*** | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| **104** | Cover page interactive Data File (embedded within the Inline XBRL Document) |

† Previously filed
\* Filed with this annual report on Form 20-F
\*\* Furnished with this annual report on Form 20-F

**Signatures**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on this Form 20-F on its behalf.

**Azure Power Global Limited**

By:     /s/ Sunil Gupta
Name:  Sunil Gupta
Title:    Chief Executive Officer

**Azure Power Global Limited**

By:     /s/ Sugata Sircar
Name:  Sugata Sircar
Title:    Group Chief Financial Officer

Date: October 12, 2023

# INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| **Consolidated Financial Statements** | |
| Report of Independent Registered Public Accounting Firm (PCAOB ID of ASA & Associates LLP: 3083) | F-2 |
| Consolidated Balance Sheets as of March 31, 2021 and 2022 | F-8 |
| Consolidated Statements of Operations for the years ended March 31, 2020, 2021 and 2022 | F-9 |
| Consolidated Statements of Comprehensive loss for the years ended March 31, 2020, 2021 and 2022 | F-10 |
| Consolidated Statements of Shareholders' Equity for the years ended March 31, 2020, 2021 and 2022 | F-11 |
| Consolidated Statements of Cash Flows for the years ended March 31, 2020, 2021 and 2022 | F-12 |
| Notes to Consolidated Financial Statements | F-13 |

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of
Directors of Azure Power Global Limited

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheet of Azure Power Global Limited (the "Company") and its subsidiaries (the "Group") as of March 31, 2022, the related consolidated statements of operations and other comprehensive loss, changes in equity and cash flows for the year ended March 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of the Group as of March 31, 2022, and the results of its operations and its cash flows for the year ended March 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Group's internal control over financial reporting as of March 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated October 11, 2023, expressed an adverse opinion thereon.

**Substantial Doubt related to Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Group will continue as a going concern. As discussed in Note 12 to the consolidated financial statements, the Group has breached loan covenants to certain lenders owing to delay in submission of audited financial statements in Fiscal 2022 and Fiscal 2023. These events raise a substantial doubt about the Company's ability to continue as a going concern. Management's plans in this regard are also described in Note 12. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on the Group's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Group in accordance with the U.S. federal securities laws and the applicable rules and regulations of the U.S. Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of Matters**

1.  We draw attention on the following matters related to whistle-blower complaints received by the Group during Fiscal 2022 and subsequently:

    a)  Refer to note 27 to the consolidated financial statements in respect of allegations of improper payments by land aggregators for acquisition of land in one of the projects more fully described therein. In respect of that matter, the management has made an adjustment (de-capitalisation) in the books of accounts of INR 253 million (equivalent to USD 3.4 million) on an estimated basis.

    b)  Refer note 27 to the consolidated financial statements, wherein the Company has voluntarily disclosed certain matters to the U.S. Securities and Exchange Commission and the U.S. Department of Justice. Engagement and cooperation with the aforesaid authorities is continuing on those matters. Any potential liability or penalty from authorities cannot be assessed at this stage.

Our Audit report is not modified in respect of above matters.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current-period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

**a. Whistle blower complaints**

| Critical audit matter description | As discussed in Note 27 to the consolidated financial statements, the Group received whistle-blower complaints alleged on below matters:<br><br>· In one of the projects, certain employees of the Group obtained a premature plant commissioning certificate after submitting inaccurate data.<br>· In one of the projects, a member of the Group entered into agreements with some land aggregators for adjustments to land use permissions which may have involved improper payments.<br>· Potential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project was alleged. |
|---|---|
| How we addressed the matter in our audit | Our audit procedures related to the whistle blower complaints and the impact of these on the consolidated financial statements of the Group included the following, among others:<br><br>· We obtained and reviewed the findings of investigators appointed by the Company to investigate these matters.<br>· We independently conducted the inquiries and meetings with investigators and forensic advisors and obtained written responses from them.<br>· We enquired with management and the Audit and Risk Committee of the Board of Directors of the Company about the facts and obtained the representations in writing in this respect.<br>· We reviewed the impact of above matters on Group's consolidated financial statements as of, and for the year ended, March 31, 2022, and the appropriate adjustments incorporated in the books of account by the Company in respect of these matters.<br>· We reviewed the impact of these matters on the effectiveness of the Internal Controls on Financial reporting of the Group and reported significant deficiencies in the controls to the Audit and Risk Committee and the Board of Directors of the Company, and our audit report on Internal Controls over Financial Reporting has been modified accordingly. |

**b. Contingencies for investigations, lawsuits and other legal proceedings**

| Critical audit matter description | As discussed in Note 27 to the consolidated financial statements, due to the ongoing investigations, lawsuits and other legal proceedings, management is of the view, that the Group might be exposed to various liabilities such as levy of damages, reduction of PPA tariffs, administrative actions from lenders including the risk of PPA cancellation, all of which could adversely impact the revenue, profitability, and capitalization of the affected projects. Any such fines or penalties could materially and adversely affect the Group's results of operations, financial condition, and cash flows in future periods. |
|---|---|
| How we addressed the matter in our audit | · We obtained management's assessment and representation stating that no triggering event such as demand or any potential notice from any lender or regulator has happened, except the ongoing inquiries from U.S. Securities and Exchange Commission and the U.S. Department of Justice.<br>· The discussions and disclosures to the U.S. Securities and Exchange Commission and the U.S. Department of Justice are ongoing and the Company is cooperating with all the issues raised by the regulators and based on submissions made till date, the management has confirmed that there is no financial impact on the Group as of the date of this report and there is no impact on the Group's ability to run the operations of the business of the Group.<br>· We independently conducted the inquiries including meetings with the investigators and obtained written response from them.<br>· We enquired with management and Audit and Risk Committee of the Board of Directors of the Company about the facts and obtained the representation in writing in this respect.<br>· Considering the potential liabilities which are not presently ascertainable, we have reported the matter by way of emphasis of matter paragraph in this audit report (refer Emphasis of Matters paragraph (b) above) |

## c. Impairment and other estimates of Property, Plant & Equipment (PPE)

| | |
|---|---|
| Critical audit matter description | As discussed in Note 23 to the consolidated financial statements, the Group uses various inputs to assess indicators of impairment as well as evaluate the need to recognise any impairment provision. Also, the Group relies on various third-party expert reports for the purpose of estimation (e.g. useful life, fair valuation etc). Any departure/deviation in the estimates used will have a significant bearing on the carrying value of the PPE. |
| How we addressed the matter in our audit | · We have reviewed the third-party report as applicable and the inputs used by management in determining the estimates and have performed following procedures:<br><br>- We assessed the qualifications, independence, and objectivity of the external experts engaged by management to perform the fair value assessments. We reviewed the scope and terms of their engagement to ensure it aligns with audit requirements.<br>- We reviewed the expert reports, including their methodologies, assumptions, data sources, and findings. We assessed whether the reports were consistent with relevant accounting standards and industry best practices.<br>- We compared the expert reports' conclusions and valuations to the estimates provided by management. Significant discrepancies or inconsistencies between the expert opinions and management's estimates were investigated and documented.<br><br>· We evaluated management's process for identifying indicators of impairment, including changes in market conditions, technological advancements, economic factors, or internal issues that may suggest a potential impairment of PPE.<br><br>· We assessed the appropriateness of management's methods and assumptions used to determine the fair value of PPE when impairment indicators were present. This involved evaluating the selection of valuation models, discount rates, and the use of external experts, if applicable.<br>· We reviewed the documentation and underlying data used by management in their impairment assessment and fair value determination. This included examining historical financial data, market information, and internal reports. |

## d. Substantial Doubt Related to Going Concern

| | |
|---|---|
| Critical audit matter description | As discussed in Note 12 to the consolidated financial statements, the Group has breached loan covenants to certain lenders owing to delay in submission of audited financial statements. Such breach of loan covenants may require the Group to classify the borrowings as repayable on demand and could materially and adversely affect the Group's results of operations, financial condition, and cash flows in future periods and raise a substantial doubt about the Company's ability to continue as a going concern. |
| How we addressed the matter in our audit | · We obtained the loan extension letters from certain lenders where the loan covenant breach was observed. In addition, we analysed the impact of the breach in the covenants and its impact on the Group's cash flow for the purpose of the going concern assessment wherever extensions letters from lenders were not made available.<br>· We analysed the Group's current and projected cash flow, net assets and profits.<br>· We evaluated the disclosures in the consolidated financial statements for Fiscal 2022 made by the Group related to uncertainty for Going Concern and its related compliances.<br>· Considering the existence of uncertainty, we have reported the matter by way of the paragraph on 'Substantial Doubt Related to Going Concern' in our audit report. |

/s/ **ASA & Associates LLP**

We are serving as the Group's auditor for the first year.

New Delhi, India
October 11, 2023

**Report of Independent Registered Public Accounting Firm**

**To the Shareholders and the Board of Directors of Azure Power Global Limited**

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Azure Power Global Limited (the "Company") as of March 31, 2021 and 2020, the related consolidated statements of operations, comprehensive loss, shareholders' equity, and cash flows for each of the three years in the period ended March 31, 2021, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at March 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended March 31, 2021, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young Associates LLP

We have served as the Company's auditor since 2009

Gurugram, India

July 28, 2021

**Report of Independent Registered Public Accounting Firm**
To the Shareholders and the Board of Directors of
Azure Power Global Limited

**Opinion on Internal Control Over Financial Reporting**

We have audited the internal control over financial reporting as of March 31, 2022 of Azure Power Global Limited (the "Company") and its subsidiaries (the "Group"), based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). In our opinion, because of the effect of the material weaknesses described below, on the achievement of the objectives of the control criteria, the Group has not maintained effective internal control over financial reporting as of March 31, 2022, based on the COSO criteria.

A material weakness is a deficiency, or combination of deficiencies, in the internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Management has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated statement of financial position of the Group as of March 31, 2022, the related consolidated statements of operations and other comprehensive loss, changes in equity and cash flows of the Group for the year ended March 31, 2022, and the related notes. These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the financial year ended March 31, 2022 consolidated financial statements and this report does not affect our report dated October 11, 2023, which expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Group's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company and the Group in accordance with the U.S. federal securities laws and the applicable rules and regulations of the U.S. Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect

misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ **ASA & Associates LLP**

New Delhi, India
October 11, 2023

| | As of March 31, | | |
|---|---|---|---|
| | **2021** **(INR)** | **2022** **(INR)** | **2022** **(US$)** **(Note 2d)** |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | 11,107 | 18,796 | 247.7 |
| Restricted cash | 4,881 | 3,784 | 49.9 |
| Accounts receivable, net | 4,887 | 6,041 | 79.6 |
| Investments in held to maturity securities | - | 6 | 0.1 |
| Prepaid expenses and other current assets | 2,190 | 1,925 | 25.4 |
| Assets classified as held for sale [(1)] | 3,301 | 127 | 1.7 |
| **Total current assets** | **26,366** | **30,679** | **404.4** |
| Restricted cash | 170 | 726 | 9.6 |
| Property, plant and equipment, net | 1,08,847 | 144,332 | 1,902.4 |
| Software, net | 29 | 8 | 0.1 |
| Accounts receivable,net | - | 3,203 | 42.2 |
| Deferred income taxes | 1,748 | 1,920 | 25.3 |
| Right-of-use assets | 4,214 | 4,465 | 58.9 |
| Other assets | 7,084 | 5,190 | 68.4 |
| Investments in held to maturity securities | 7 | - | - |
| Investment in equity investee | - | 96 | 1.3 |
| **Total assets** | **148,465** | **190,619** | **2,512.6** |
| **Liabilities and shareholders' equity** | | | |
| Current liabilities: | | | |
| Short-term debt | 8,943 | 7,036 | 92.7 |
| Accounts payable | 4,294 | 3,573 | 47.2 |
| Current portion of long-term debt | 4,658 | 9,209 | 121.4 |
| Income taxes payable | 46 | 181 | 2.4 |
| Interest payable | 1,530 | 1,003 | 13.2 |
| Deferred revenue | 110 | 230 | 3.0 |
| Lease liabilities | 283 | 300 | 4.0 |
| Other liabilities | 1,927 | 5,009 | 66.0 |
| Liabilities directly associated with assets classified as held for sale [(1)] | 2,272 | 73 | 1.0 |
| **Total current liabilities** | **24,063** | **26,614** | **350.9** |
| **Non-current liabilities:** | | | |
| Long-term debt | 89,922 | 1,12,542 | 1,483.4 |
| Deferred revenue | 2,353 | 5,417 | 71.4 |
| Deferred income taxes | 2,046 | 1,936 | 25.5 |
| Asset retirement obligations | 811 | 902 | 11.9 |
| Lease liabilities | 3,359 | 3,534 | 46.6 |
| Other liabilities | 1,459 | 98 | 1.3 |
| **Total liabilities** | **124,013** | **151,043** | **1,991.0** |
| **Shareholders' equity** | | | |
| Equity shares, US$0.000625 par value; 48,195,962 and 64,161,490 shares issued and outstanding as of March 31, 2021, and March 31, 2022, respectively | 2 | 3 | 0.0 |
| Additional paid-in capital | 38,004 | 56,726 | 747.7 |
| Accumulated deficit | (12,786) | (15,312) | (201.8) |
| Accumulated other comprehensive loss | (972) | (2,503) | (33.0) |
| **Total APGL shareholders' equity** | **24,248** | **38,914** | **512.9** |
| Non-controlling interest | 204 | 662 | 8.7 |
| **Total shareholders' equity** | **24,452** | **39,576** | **521.6** |
| **Total liabilities and shareholders' equity** | **148,465** | **190,619** | **2,512.6** |

[(1)] Also refer note 2(u) and note 23 relating to assets and liabilities directly associated with assets classified as held for sale.

| | March 31, | | | |
|---|---|---|---|---|
| | **2020**<br>**(INR)** | **2021**<br>**(INR)** | **2022**<br>**(INR)** | **2022**<br>**(US$)**<br>**(Note 2d)** |
| **Operating revenues:** | | | | |
| Revenue from customers | 12,958 | 15,236 | 18,341 | 241.7 |
| **Operating costs and expenses:** | | | | |
| Cost of operations (exclusive of depreciation and amortization shown separately below) | 1,146 | 1,261 | 1,597 | 21.0 |
| General and administrative | 2,422 | 2,988 | 2,067 | 27.2 |
| Depreciation and amortization | 2,860 | 3,202 | 3,667 | 48.3 |
| Impairment loss/(reversal) | - | 3,255 | (80) | (1.1) |
| **Total operating costs and expenses:** | **6,428** | **10,706** | **7,251** | **95.4** |
| **Operating income** | **6,530** | **4,530** | **11,090** | **146.3** |
| **Other expense, net:** | | | | |
| Interest expense, net | 7,962 | 8,410 | 11,930 | 157.2 |
| Other (income) / expenses | (96) | 18 | 3 | 0.0 |
| Loss/ (Gain) on foreign currency exchange, net | 512 | 7 | (33) | (0.4) |
| **Total other expenses, net** | **8,378** | **8,435** | **11,900** | **156.8** |
| **Loss before income tax** | **(1,848)** | **(3,905)** | **(810)** | **(10.5)** |
| Income tax expense | (489) | (296) | (1,316) | (17.3) |
| **Net loss** | **(2,337)** | **(4,201)** | **(2,126)** | **(27.8)** |
| Less: Net profit / (loss) attributable to non-controlling interest | (68) | 5 | (22) | (0.3) |
| **Net loss attributable to APGL equity Shareholders** | **(2,269)** | **(4,206)** | **(2,104)** | **(27.5)** |
| Net profit / (loss) per share attributable to APGL equity Shareholders | | | | |
| Basic | (52.71) | (87.66) | (41.36) | (0.55) |
| Diluted | (52.71) | (87.66) | (41.36) | (0.55) |
| Shares used in computing basic and diluted per share amounts | | | | |
| Basic | 43,048,026 | 47,979,581 | 50,876,360 | 50,876,360 |
| Diluted | 43,048,026 | 47,979,581 | 50,876,360 | 50,876,360 |

See accompanying notes.

**AZURE POWER GLOBAL LIMITED**
**Consolidated Statements of Comprehensive Loss**
(INR and US$ amounts in millions)

| | March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 (INR) | 2021 (INR) | 2022 (INR) | 2022 (US$) |
| Net loss | (2,269) | (4,206) | (2,104) | (27.5) |
| Add: Non-controlling interest | (68) | 5 | (22) | (0.3) |
| Less: Total comprehensive income attributable to non-controlling interest, included in other comprehensive loss/(gain) | — | — | — | — |
| **Other comprehensive (loss)/gain, net of tax** | | | | |
| Foreign currency translation | (4,811) | 1,600 | 2,943 | 38.8 |
| Effective portion of cash flow hedge | 4,243 | (778) | (5,227) | (68.9) |
| Income tax effect on effective portion of cash flow hedge | (621) | 143 | 753 | 9.9 |
| Unrealized loss on available-for-sale securities | — | — | — | — |
| Income tax effect on unrealized gain/(loss) on available for sale of securities | — | — | — | — |
| **Total other comprehensive (loss)/gain** | **(1,189)** | **965** | **(1,531)** | **(20.2)** |
| **Total comprehensive loss** | **(3,526)** | **(3,236)** | **(3,657)** | **(48.0)** |

See accompanying notes.

**AZURE POWER GLOBAL LIMITED**
**Consolidated Statements of Shareholders' Equity**
(INR and US$ amounts in millions)

| | Equity share capital | Additional paid-in capital | Accumulated other comprehensive loss [1] | Accumulated deficit | Total APGL shareholders' equity | Non-controlling interests | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| **Balance as of March 31, 2019** | 2 | 32,186 | (748) | (6,311) | 25,129 | 267 | 25,396 |
| Proceeds from issuance of equity shares (refer note 16) | — | 5,317 | — | — | **5,317** | — | **5,317** |
| Net loss | — | — | — | (2,269) | **(2,269)** | (68) | **(2,337)** |
| Other comprehensive loss | — | — | (1,189) | — | **(1,189)** | — | **(1,189)** |
| Share based compensation | — | 30 | — | — | **30** | — | **30** |
| **Balance as of March 31, 2020** | 2 | 37,533 | (1,937) | (8,580) | 27,018 | 199 | 27,217 |

| | Equity share capital | Additional paid-in capital | Accumulated other comprehensive loss [1] | Accumulated Deficit | Total APGL shareholders' equity | Non-controlling interests | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| **Balance as of March 31, 2020** | 2 | 37,533 | (1,937) | (8,580) | 27,018 | 199 | 27,217 |
| Proceeds from issuance of equity shares (refer note 16) [3] | — | 424 | — | — | 424 | — | **424** |
| Net loss | — | — | — | (4,206) | (4,206) | 5 | **(4,201)** |
| Other comprehensive income | — | — | 965 | — | 965 | — | **965** |
| Share based compensation | — | 47 | — | — | 47 | — | **47** |
| **Balance as of March 31, 2021** | 2 | 38,004 | (972) | (12,786) | 24,248 | 204 | 24,452 |

| | Equity share capital | Additional paid-in capital | Accumulated other comprehensive loss [1] | Accumulated Deficit | Total APGL shareholders' equity | Non-controlling interests | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| **Balance as of March 31, 2021** | 2 | 38,004 | (972) | (12,786) | 24,248 | 204 | 24,452 |
| Transaction with NCI | — | — | — | (422) | (422) | 480 | 58 |
| Proceeds from issuance of equity shares [2] | 1 | 18,621 | — | — | 18,622 | — | 18,622 |
| Net loss | — | — | — | (2,104) | (2,104) | (22) | (2,126) |
| Other comprehensive loss | — | — | (1,531) | — | (1,531) | — | (1,531) |
| Share based compensation | — | 101 | — | — | 101 | — | 101 |
| **Balance as of March 31, 2022** | 3 | 56,726 | (2,503) | (15,312) | 38,914 | 662 | 39,576 |
| **Balance as of March 31, 2022 ((US$) (Note 2(d))** | 0.0 | 747.7 | (33.0) | (201.8) | 512.9 | 8.7 | 521.6 |

[1] Refer note 16 for components of accumulated other comprehensive loss.

[2] Refer note 16 for reconciliation of number of equity shares.

[3] Includes the related immaterial impact of restricted stock units ("RSU") which had been converted into restricted stock ("RS")/ share-based settlement during the previous year.

See accompanying notes.

F-11

**AZURE POWER GLOBAL LIMITED**
**Consolidated Statements of Cash Flows**
(INR and US$ amounts in millions)

| | Year ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 (INR) | 2021 (INR) | 2022 (INR) | 2022 US$ |
| **Cash flow from operating activities** | | | | |
| Net loss | (2,337) | (4,201) | (2,126) | (27.8) |
| **Adjustments to reconcile net (loss)/profit to net cash provided by/(used in) operating activities:** | | | | |
| Income taxes and deferred tax | 149 | (329) | 457 | 6.0 |
| Depreciation and amortization | 2,860 | 3,202 | 3,667 | 48.3 |
| Impairment loss//(reversal) | - | 3,255 | (80) | (1.1) |
| Amortization of derivative instrument | 1,428 | 1,918 | 1,576 | 20.8 |
| Loss on disposal of property plant and equipment | 52 | 32 | 167 | 2.2 |
| Share based compensation | 186 | 1,001 | (295) | (3.9) |
| Amortization of debt financing costs | 709 | 369 | 1,107 | 14.6 |
| Realized gain on short term investments | (108) | - | - | - |
| Employee benefit | (11) | 45 | 13 | 0.2 |
| ARO accretion | 36 | 42 | 46 | 0.6 |
| Non-cash rent expense | 193 | 169 | 354 | 4.7 |
| Allowance for doubtful accounts/ credit losses (net) | 303 | 294 | (97) | (1.3) |
| Loan prepayment charges | 282 | 257 | 1,608 | 21.2 |
| Foreign exchange loss/(gain), net | 512 | 7 | (33) | (0.4) |
| Change in Operating lease right-of-use assets | 718 | (371) | (809) | (10.7) |
| Change in Operating lease liabilities | (1,255) | 125 | 497 | 6.6 |
| **Changes in operating assets and liabilities** | | | | |
| Accounts receivable, net | (1,390) | (874) | (1,057) | (13.9) |
| Prepaid expenses and other current assets | 247 | 20 | (862) | (11.3) |
| Other assets | (335) | 112 | (3,565) | (47.1) |
| Accounts payable | 236 | (176) | 347 | 4.6 |
| Interest payable | 699 | (83) | (520) | (6.9) |
| Deferred revenue | 340 | 224 | 3,184 | 42.0 |
| Other liabilities | 164 | (61) | 1,018 | 13.2 |
| **Net cash provided by operating activities** | **3,678** | **4,977** | **4,597** | **60.6** |
| **Cash flows from investing activities** | | | | |
| Purchase of property plant and equipment | (18,321) | (18,909) | (40,869) | (538.7) |
| Purchase of software | (43) | (10) | (21) | (0.3) |
| Purchase of available for sale securities | (32,224) | - | - | - |
| Sale of available for sale securities | 32,332 | - | - | - |
| Investment in equity investee | - | - | (94) | (1.2) |
| Proceeds from disposal of subsidiaries | - | - | 1,557 | 20.5 |
| **Net cash used in investing activities** | **(18,256)** | **(18,919)** | **(39,427)** | **(519.7)** |
| **Cash flows from financing activities** | | | | |
| Proceeds from issuance of Green Bonds | 24,400 | - | 30,285 | 399.2 |
| Proceeds from term and other debt | 19,538 | 25,510 | 84,663 | 1,115.9 |
| Repayment of Green bonds | - | - | (37,069) | (488.6) |
| Repayments of term and other debt [1] | (32,827) | (10,563) | (52,953) | (697.9) |
| Loan prepayment charges | (282) | (257) | (1,608) | (21.2) |
| Proceeds from issuance of equity shares | 5,330 | 402 | 18,622 | 245.4 |
| Cost of issuance of equity shares | (13) | - | - | - |
| **Net cash provided by financing activities** | **16,146** | **15,092** | **41,940** | **552.8** |
| Effect of exchange rate changes on cash and cash equivalents, and restricted cash | (37) | 8 | 38 | 0.5 |
| Net increase in cash and cash equivalents, and restricted cash (refer note 2 (f)) | 1,568 | 1,150 | 7,110 | 93.7 |
| Cash and cash equivalents and restricted cash at the beginning of the period | 13,986 | 15,517 | 16,158 | 213.0 |
| Less: Cash and cash equivalents and restricted cash, held for sale | - | (517) | - | - |
| **Cash and cash equivalents and restricted cash at the end of the period** | **15,517** | **16,158** | **23,306** | **307.2** |
| **Supplemental disclosure of cash flow information** | | | | |
| Cash paid during the year for interest | 7,209 | 8,918 | 10,656 | 140.5 |
| Cash paid during the year for income taxes | 697 | 488 | 1,011 | 13.3 |

[1] Includes INR 1,058 million, INR 2,117 million and INR 1,840 million (US$24.3 million) paid towards hedging costs for Solar Green Bonds for the year ended March 31, 2020, 2021, and 2022, respectively.

**Notes to consolidated financial statements**

**1. Organization**

Azure Power Global Limited ("APGL" or "Azure") organized under the laws of Mauritius was incorporated on January 30, 2015. APGL's subsidiaries are organized under the laws of India (except for one U.S. subsidiary and two subsidiaries in Mauritius) and are engaged in the development, construction, ownership, operation, maintenance and management of renewable energy assets based on long-term contracts (Power Purchase Agreements or "PPA") with Indian Government energy distribution companies as well as other Indian non-governmental energy distribution companies and Indian commercial customers. APGL and its subsidiaries are hereinafter referred to as the "Company". During the current year the Company has entered into a sale agreement for the disposal of its rooftop business. See also Note 23.

**2. Summary of significant accounting policies**

*(a) Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and are presented in Indian rupees ("INR"), unless otherwise stated. The consolidated financial statements include the accounts of APGL and companies which are directly or indirectly controlled by APGL. All intercompany accounts and transactions have been eliminated upon consolidation. Certain balances relating to prior years have been reclassified, wherever required, to conform to the current year presentation.

All share and per share amounts presented in the consolidated financial statements have been adjusted to reflect the 16-for-1 stock split of the Company's equity shares that was effective on October 6, 2016.

*(b) Use of estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, costs, expenses and comprehensive loss/ gain that are reported and disclosed in the consolidated financial statements and accompanying notes. These estimates are based on management's best knowledge of current events, historical experience, actions the Company may undertake in the future and on various other assumptions that are believed to be prudent and reasonable under the circumstances. Significant estimates and assumptions are used for, but not limited to impairment of and useful lives of property, plant and equipment, determination of asset retirement obligations, valuation of derivative instruments, hedge accounting, lease liabilities, right to use asset, allowances for doubtful accounts based on payment history, credit rating, valuation of share-based compensation, income taxes, energy kilowatts expected to be generated over the useful life of the solar power plant, estimated transaction price, including variable consideration, of the Company's revenue contracts, impairment of other assets, impairment of net assets classified as held for sale and other contingencies and commitments. Although these estimates are based upon management's best knowledge of current events and actions, actual results could differ from these estimates, and such differences may be material to the consolidated financial statements.

*Estimation uncertainty relating to COVID-19 pandemic*

In evaluating the recoverability of accounts receivable including unbilled revenue, contract assets, long-lived assets and investments, the Company has considered, at the date of approval of these consolidated financial statements, internal and external information in the preparation of the consolidated financial statements including the economic outlook. The Company has performed sensitivity analysis on the assumptions used to assess the recoverability of these assets and based on current estimates, expects the carrying amount of these assets will be recovered. Based on the current collection experience the Company has not seen a material impact on accounts receivables collections due to COVID-19. The impact of COVID-19 may be different from that estimated on preparation of these consolidated financial statements and the Company will continue to closely monitor any material changes to future economic conditions. See also Note 2 (ab) - Impact of COVID-19 Pandemic.

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of APGL, its subsidiaries, and variable interest entities ("VIE"), where the Company has determined it is the primary beneficiary and are prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Company uses the equity method to account for its investments in entities where it exercises significant influence over operating and financial policies but does not retain control under either the voting interest model (generally 20% to 50% ownership interest) or the variable interest model. In 2020, the Company entered into a joint venture agreement with a third party to establish a manufacturing facility to supply solar PV modules as a part of execution of manufacturing linked tender. Further during the current year, the Company has entered into an agreement with other party and made an initial investment in equity shares of its identified subsidiary as part of execution of contract, as further described in Note 10—Investments, and these investment are accounted for using the equity method. The Company has eliminated all intercompany accounts and transactions.

### (c) Foreign currency translation and transactions

The functional currency of APGL is the United States Dollar ("US$") and reporting currency is Indian rupees ("INR"). The Company's subsidiaries with operations in India use INR as the functional currency and the subsidiaries in the United States and Mauritius use US$ as the functional currency. The financial statements of APGL and its subsidiaries, other than subsidiaries with a functional currency of INR, are translated into INR using the exchange rate as of the balance sheet date for assets and liabilities, historical exchange rates for equity transactions and average exchange rate for the year for income and expense items. Translation gains and losses are recorded in accumulated other comprehensive income or expenses as a component of shareholders' equity.

Transactions in currencies other than the functional currency are measured and recorded in the functional currency using the exchange rate in effect at the date of the transaction. At the balance sheet date, monetary assets and liabilities that are denominated in currencies other than the functional currency are translated into the functional currency using the exchange rate at the balance sheet date. All gains and losses arising from foreign currency transactions are recorded in the determination of net income or loss/(gain) during the year in which they occur.

Revenue, expense and cash flow items are translated using the average exchange rates for the respective period. The resulting gains and losses from such translations are excluded from the determination of earnings and are recognized instead in accumulated other comprehensive loss/ (gain), which is a separate component of shareholders' equity.

Realized and unrealized foreign currency transaction gains and losses, other than those hedged by the Company, arising from exchange rate fluctuations on balances denominated in currencies other than the functional currency of an entity, such as those resulting from the Company's borrowings in other than functional currency is included in Loss/(gain) on foreign currency exchange, net in the consolidated statements of operations.

### (d) Convenience translation

Translation of balances in the consolidated balance sheets and the consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows from INR into US$, as of and for the year ended March 31, 2022 are solely for the convenience of the readers and were calculated at the rate of US$1.00 = INR 75.87 , the noon buying rate in New York City for cable transfers in non U.S. currencies, as certified for customs purposes by the Federal Reserve Bank of New York on March 31, 2022 . No representation is made that the INR amounts could have been, or could be, converted, realized or settled into US$ at that rate on March 31, 2022, or at any other rate.

### (e) Cash and cash equivalents

Cash and cash equivalents include demand deposits with banks, term deposits and all other highly liquid investments purchased with an original maturity of three months or less at the date of acquisition and that are readily convertible to cash. The Company has classified term deposits totaling INR 9,936 million and INR 10,482 million (US$138.2 million) as of March 31, 2021 and 2022, respectively, as cash and cash equivalents, because the Company has the ability to redeem these deposits at any time subject to an immaterial interest rate forfeiture. All term deposits are readily convertible into known amount of cash with no more than one day notice.

*(f) Restricted cash*

Restricted cash consists of cash balances restricted as to withdrawal or usage and relates to cash used to collateralize bank letters of credit supporting the purchase of equipment for solar power plants, bank guarantees issued in relation to the construction of the solar power plants within the timelines stipulated in PPAs and for certain debt service reserves required under the Company's loan agreements. Restricted cash is classified into current and non-current portions based on the term of the deposit and the expiration date of the underlying restriction.

The following table presents the components of cash and cash equivalents and restricted cash included in the consolidated balance sheets that sums to the total of such amounts in the Consolidated Statements of Cash Flows:

| | March 31, | | | |
|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2022** |
| | **(INR)** | **(INR)** | **(INR)** | **(US$)** |
| | (In million) | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | 9,792 | 11,107 | 18,796 | 247.7 |
| Restricted cash | 4,877 | 4,881 | 3,784 | 49.9 |
| **Non-Current Assets** | | | | |
| Restricted cash | 848 | 170 | 726 | 9.6 |
| **Cash and cash equivalents and restricted cash** | **15,517** | **16,158** | **23,306** | **307.2** |

*(g) Investments*

The Company determines the appropriate classification of investment securities at the time of purchase and re-evaluates such designation at each balance sheet date. The investment securities held by the Company during the periods presented in the accompanying consolidated financial statements are classified as available-for-sale (short-term investments), consisting of liquid mutual funds units and held-to-maturity investments (long-term investments), consisting of Notes of the Bank of Mauritius.

The Company accounts for its investments in accordance with Financial Accounting Standards Board ("FASB") ASC Topic 320, *Accounting for Certain Investments in Debt and Equity Securities*. These investments are considered as available-for-sale and held-to-maturity. Investments classified as available for sale are recorded at fair value, with the unrealized gains or losses, net of tax, reported as a component of accumulated other comprehensive income or expenses in the consolidated statement of shareholders' equity.

Securities that the Company has positive intent and ability to hold until maturity are classified as held-to-maturity securities and stated at amortized cost. As of March 31, 2021, and March 31, 2022, amortized cost of held-to-maturity investments was INR 7 million and INR 6 million (US$0.1 million), respectively. The maturity date of the investment is January 31, 2023.

Realized gains and losses and a decline in value judged to be other than temporary on these investments are included in the consolidated statements of operations. The cost of securities sold or disposed is determined on the First in First Out ("FIFO") method.

*Investment in equity investee*

The Company holds equity investments where it does not have a controlling financial interest but has the ability to exercise significant influence over the operating and financial policies of the investee. These investments are accounted for under the equity method of accounting wherein the Company records its proportionate share of the investee's income or loss in its consolidated financial statements, as further described in Note 10—Investments

*(h) Accounts receivable, net*

The Company adopted "ASC Topic 326" Financial Instruments — Credit Losses, effective April 1, 2020 using the modified retrospective transition approach. The new guidance requires the measurement and recognition of expected credit losses (ECL) for financial assets held at amortized cost and replaces the existing incurred loss

impairment model with an expected loss model using the forward-looking information to calculate credit loss estimates. The new model requires consideration of a broader range of relevant information, such as offtake ratings historical loss experience, current economic conditions, and reasonable and supportable forecasts. The impact of adoption of this guidance did not have a material effect on the Company's financial statements.

### *Credit Risk*

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument which consists principally of accounts receivables, cash and cash equivalents and restricted cash, leading to a financial loss. Customer credit risk is managed using the Company's established policy, procedures and control relating to customer credit risk management. Outstanding accounts receivables are regularly monitored.

The Company's accounts receivables are generated by selling energy to customers and are reported net of any allowance for uncollectible accounts. The allowance for credit losses is based on various factors, including the length of time receivables are past due, significant one-time events, the financial health of customers and historical experience. The allowance for credit losses at March 31, 2021 and March 31, 2022 was INR 475 million and 285 million (US\$3.8 million), respectively. Accounts receivable serve as collateral for borrowings under the Company's working capital facility, described in Note 12.

### *(i) Property, plant and equipment*

Property, plant and equipment represents the costs of completed and operational solar power plants, as well as the cost of furniture and fixtures, vehicles, office and computer equipment, leasehold improvements, freehold land and construction in progress. Construction in progress represents the accumulated cost of solar power plants that have not been placed into service at the date of the balance sheet. Construction in progress includes the cost of solar modules for which the Company has taken legal title, civil engineering, electrical and other related costs incurred during the construction of a solar power plant. Construction in progress is reclassified to property, plant and equipment when the project begins its commercial operations.

Property, plant and equipment are stated at cost, less accumulated depreciation and accumulated impairment losses. Depreciation is calculated using the straight-line method over the assets' estimated useful lives as follows:

| | |
|---|---|
| Plant and machinery (solar power plants) | 25-35 years |
| Furniture and fixtures | 5 years |
| Vehicles | 5 years |
| Office equipment | 1-5 years |
| Computers | 3 years |

Leasehold improvements related to office facilities are depreciated over the shorter of the lease period or the estimated useful life of the improvement. Lease hold improvements on the solar power plant sites are depreciated over the shorter of the lease term or the remaining period of the PPAs undertaken with the respective customer. Freehold land is not depreciated. Construction in progress is not depreciated until it is ready to be used.

Improvements to property, plant and equipment deemed to extend the useful economic life of an asset are capitalized. Maintenance and repairs that do not improve efficiency or extend the estimated economic life of an asset are expensed as incurred. Additional capacity, if any, added to property plant and equipment is depreciated over the remaining estimated useful live.

*Capitalized interest*

Interest incurred on funds borrowed to finance construction of solar power plants is capitalized until the plant is ready for its intended use. The amount of interest capitalized during the years ended March 31, 2020, 2021 and 2022 were INR 355 million, INR 333 million and INR 595 million (US\$7.8 million), respectively.

### *(j) Accounting for impairment of long-lived assets*

The Company periodically evaluates whether events have occurred that would require revision of the remaining useful life of property, plant and equipment and improvements, or render their carrying value not recoverable. If such circumstances arise, the Company uses an estimate of the undiscounted value of expected

future operating cash flows to determine whether the long-lived assets are impaired. If the aggregate undiscounted cash flows are less than the carrying amount of the assets, the resulting impairment charge to be recorded is calculated based on the excess of the carrying value of the assets over the fair value of such assets, with the fair value determined based on an estimate of discounted future cash flows, appraisals, or other valuation techniques. Other than which relates to the planned disposal of the Company's rooftop business, there were no impairment charges related to remaining long-lived assets recognized during the years ended March 31, 2021, and 2022 respectively. See also note 23.

### (k) Leases and land use rights

In February 2016, the FASB issued ASU 2016-02, Leases ("ASC Topic 842"), to increase transparency and comparability among organizations by recognizing a right-of-use asset and a lease liability on the balance sheet for all leases with terms longer than 12 months and disclosing key information about leasing transactions. In July 2018, the FASB issued ASU 2018-11, Leases (Topic 842) – Targeted Improvements, which provided an optional transition method to apply the new lease requirements through a cumulative-effect adjustment in the period of adoption.

The Company adopted the guidance effective April 1, 2019 using the modified retrospective approach and elected certain practical expedients permitted under the transition guidance.

The majority of the Company's leases relate to leasehold land on which the solar power plants are constructed on and leases related to office facilities. The leasehold land related to solar power plants has a lease term ranging between 25 to 35 year which is further extendable on mutual agreement by both lessor and lessee. Where applicable, the company has the consent from the lessors to extend the leases up to 35 years. These leases have rent escalation ranging between 5% to 10%, over the tenure of the lease. All existing leases on the date of adoption of ASC Topic 842, were classified as operating leases as they were concluded at their inception under previous guidance of ASC Topic 840, as permitted by the practical expedient package elected. As the implicit rate in the lease contract is not readily determinable, the company has used its average incremental rate of borrowing of 10% for the purposes of the determination of discount rate. The weighted average remaining lease term for operating leases is 30 years.

On Adoption of ASC 842, all the lease arrangements entered prior to adoption continued to be classified as operating leases. The Company has made an assessment for lease arrangements entered during the year and classified them as operating leases. The Company did not have any finance lease during any of the periods presented in the accompanying consolidated financial statements.

The Company is a lessee in several non-cancellable operating leases, primarily for construction of solar power plants and for office facilities.

The Company determines if an arrangement is or contains a lease at contract inception. The Company recognizes a right-of-use ("ROU") asset and a lease liability at the lease commencement date. For operating leases, the lease liability is initially and subsequently measured at the present value of the unpaid lease payments at the lease commencement date.

Key estimates and judgments include how the Company determines (1) the discount rate it uses to discount the unpaid lease payments to present value, (2) lease term and (3) lease payments.

ASC Topic 842 requires a lessee to discount its unpaid lease payments using the interest rate implicit in the lease or, if that rate cannot be readily determined, its incremental borrowing rate. Generally, the Company cannot determine the interest rate implicit in the lease because it does not have access to the lessor's estimated residual value or the amount of the lessor's deferred initial direct costs. Therefore, the Company generally uses its incremental borrowing rate as the discount rate for the lease. The Company's incremental borrowing rate for a lease is the rate of interest it would have to pay on a collateralized basis to borrow an amount equal to the lease payments under similar terms.

The lease term for all of the Company's leases includes the non-cancellable period of the lease plus any additional periods covered by either a Company option to extend (or not to terminate) the lease that the Company is reasonably certain to exercise, or an option to extend (or not to terminate) the lease controlled by the lessor.

Lease payments included in the measurement of the lease liability comprise of the following:

- Fixed payments, including in-substance fixed payments, owed over the lease term (which includes termination penalties the Company would owe if the lease term assumes Company exercise of a termination option);

- Variable lease payments, if any, that depend on an index or rate, initially measured using the index or rate at the lease commencement date;

- Amounts expected to be payable under a Company-provided residual value guarantee; and

- The exercise price of a Company option to purchase the underlying asset if the Company is reasonably certain to exercise the option.

The ROU asset is initially measured at cost, which comprises the initial amount of the lease liability adjusted for lease payments made at or before the lease commencement date, plus any initial direct costs incurred less any lease incentives received.

For operating leases, the ROU asset is subsequently measured throughout the lease term at the carrying amount of the lease liability, plus initial direct costs, plus (minus) any prepaid (accrued) lease payments, less the unamortized balance of lease incentives received. Lease expense for lease payments is recognized on a straight-line basis over the lease term.

The Company has recognized and reported the Right of Use asset, on consolidated balance sheet by INR 4,465 million (US$58.9 million) as well as Lease Liabilities by INR 3,834 million (US$50.5 million) as at March 31, 2022 and INR 4,214 million in Right of Use asset as well as Lease Liabilities by INR 3,642 million as at March 31, 2021 respectively. During the year ended March 31, 2021 and 2022, the Company recorded lease cost of INR 502 million and INR 439 million (US$5.8 million) respectively. See Note 18 to the consolidated financial statements.

ROU assets for operating leases are periodically reduced by impairment losses. The Company uses the long-lived assets impairment guidance in ASC Subtopic 360-10, Property, Plant, and Equipment – Overall, to determine whether a ROU asset is impaired, and if so, the amount of the impairment loss to be recognized. See Note 2(j).

The Company monitors for events or changes in circumstances that require a reassessment of one of its leases. When a reassessment results in the remeasurement of a lease liability, a corresponding adjustment is made to the carrying amount of the corresponding ROU asset unless doing so would reduce the carrying amount of the ROU asset to an amount less than zero. In that case, the amount of the adjustment that would result in a negative ROU asset balance is recorded in the consolidated statements of operations.

Operating lease ROU assets are presented as operating lease right -of -use assets on the consolidated balance sheet. The current portion of operating lease liabilities is included in other current liabilities and the long-term portion is presented separately as operating lease liabilities on the consolidated balance sheet.

The Company has elected not to recognize ROU assets and lease liabilities for short-term leases of warehouses, office, machinery etc. that have a lease term of 12 months or less. The Company recognizes the lease payments associated with its short-term leases as an expense on a straight-line basis over the lease term.

The Company's corporate office leases generally also include non-lease maintenance services (i.e. common area maintenance). The Company allocates the consideration in the contract to the lease and non-lease maintenance component based on each component's relative standalone price. The Company determines stand-alone prices for the lease components based on the prices for which other lessors lease similar assets on a stand-alone basis. The Company determines stand-alone prices for the non-lease components (i.e. maintenance services) based on the prices that several suppliers charge for maintenance services for similar assets on a stand-alone basis.

*(l) Asset retirement obligations (ARO)*

Upon the expiration of the land lease arrangement for solar power plants located on leasehold land, the Company is required to remove the solar power plant and restore the land. The Company records the fair value of the liability for the legal obligation to retire the asset in the period in which the obligation is incurred, which is generally when the asset is constructed. When a new liability is recognized, the Company capitalizes it by

increasing the carrying amount of the related long-lived asset, which results in an ARO asset being depreciated over the remaining useful life of the solar power plant. The liability is accreted and expensed to its present expected future value each period based on a credit adjusted risk free interest rate. Upon settlement of the obligation, the Company eliminates the liability and based on the actual cost to retire, may incur a gain or loss.

The Company's asset retirement obligations were INR 811 million and INR 902 million (US$11.9 million) as of March 31, 2021 and 2022, respectively. The accretion expense incurred during the years ended March 31, 2020, 2021 and 2022 was INR 36 million, INR 42 million and INR 59 million (US$0.8 million), respectively. The depreciation expense incurred during the years ended March 31, 2020, 2021 and 2022 was INR 21 million, INR 23 million and INR 14 million (US$0.2 million), respectively.

During the current year, the carrying amount of the ARO liability is increased by INR 91 million (US$1.2 million) primarily due to commissioning of new projects during the year partially offset by revision in the estimated cost of retirement obligation, with a corresponding adjustment to the related long-lived asset.

The movement in liability during the current year as of March 31, 2022 and comparative year is as below:

|  | 2021 (INR) | 2022 (INR) | 2022 (US$) |
| --- | --- | --- | --- |
|  | | (In million) | |
| **Beginning balance** | 741 | 811 | 10.7 |
| Addition during the year | 211 | 157 | 2.1 |
| Impact of change in estimate | (183) | (125) | (1.7) |
| Liabilities settled during the year | — | — | — |
| Accretion expense during the year | 42 | 59 | 0.8 |
| **Ending balance** | **811** | **902** | **11.9** |

### (m) Software

The Company capitalizes certain internal software development cost under the provision of ASC Topic 350-40 *Internal-Use Software*. As of March 31, 2022, the amount capitalized as software includes the cost of software licenses, as well as related implementation costs, which primarily relate to third party consulting fees. Such license and implementation costs are capitalized and amortized over their estimated useful lives of three years using the straight-line method. On an ongoing basis, the Company assesses the recoverability of its capitalized software intangible assets. Capitalized software costs determined to be unrecoverable are expensed in the period in which the determination is made. As of March 31, 2022, all capitalized software is considered fully recoverable.

### (n) Debt financing costs

Financing costs incurred in connection with obtaining construction and term financing loans are deferred and amortized over the term of the respective loan using the effective interest rate method. Amortization of debt financing costs is capitalized during construction and recorded as interest expense in the consolidated statements of operations, following commencement of commercial operations of the respective solar power plants.

Amortization of debt financing costs for the years ended March 31, 2020, 2021 and 2022 was INR 709 million, INR 369 million and INR 1,107 million (US$14.6 million), including debt financing costs written off related to the debt refinancing amounting to INR 271 million, INR 30 million and INR 739 million (US$9.7 million), respectively. See Note 12.

The carrying value of debt financing costs as on March 31, 2021 and 2022 was INR 1,107 million and INR 1,189 million (US$15.7 million), excluding the debt finance cost against borrowings which are reported as liabilities held for sale. See Note 12.

Further, the Company had debt financing costs of INR 367 million and INR 141 million (US$1.9 million) under other assets and other current assets, as on March 31, 2021 and 2022, respectively for facilities not yet drawn. See Note 6.

*(o) Income taxes*

Income taxes are recorded under the asset and liability method, as prescribed under ASC Topic 740 Income Taxes, whereby deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax base. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.

The Company establishes valuation allowances against its deferred tax assets when it is more likely than not that all or a portion of a deferred tax asset will not be realized.

The computation of tax liabilities involves dealing with uncertainties in the application of complex tax regulations. The Company applies a two-step approach to recognize and measure uncertainty in income taxes in accordance with ASC Topic 740. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement through March 31, 2022, the Company does not have any unrecognized tax benefits, nor has it recognized any interest or penalties.

During the year ended 2019-20, the Taxation Laws (Amendment) Act, 2019 brought key changes to corporate tax rates in the Income Tax Act, 1961, which reduced the tax rate for certain subsidiaries within the group to 25.17%. Azure Power India Private Limited and several of its subsidiaries which are claiming tax benefits under section 80-IA of the Income Tax Act had decided not to opt for this lower tax benefit and have continued under the old regime for the fiscal year ended March 31, 2022, the statutory income tax rate as per the Income Tax Act, 1961 ranges between 25.17% to 34.94%, depending on the tax regime chosen by the particular subsidiary.

*(p) Employee benefits*

*Defined contribution plan*

Eligible employees of the Company in India receive benefits from the Provident Fund, administered by the Government of India, which is a defined contribution plan. Both the employees and the Company make monthly contributions to the Provident Fund equal to a specified percentage of the eligible employees' salary.

The Company has no further funding obligation under the Provident Fund, beyond the contributions elected or required to be made thereunder. Contributions to the Provident Fund by the Company are charged to expense in the period in which services are rendered by the covered employees and amounted to INR 37 million, INR 27 million and INR 27 million (US$0.4 million) for the years ended March 31, 2020, 2021 and 2022, respectively.

*Defined benefit plan*

Employees in India are entitled to benefits under the Gratuity Act, a defined benefit post-employment plan covering eligible employees of the Company. This plan provides for a lump-sum payment to eligible employees at retirement, death, and incapacitation or on termination of employment, of an amount based on the respective employee's salary and tenure of employment. As of March 31, 2022, this plan is unfunded.

Current service costs for defined benefit plans are accrued in the period to which they relate. In accordance with ASC Topic 715, *Compensation Retirement Benefit*- the liability in respect of defined benefit plans is calculated annually by the Company using the projected unit credit method and amounted to INR 50 million and INR 56 million (US$0.7 million) as of March 31, 2021 and 2022, respectively. Prior service cost, if any, resulting from an amendment to a plan is recognized and amortized over the remaining period of service of the covered employees. Interest costs for the period ended March 31, 2021 and 2022 were not significant. See also, Note 22.

*Compensated absences*

The Company recognizes its liabilities for compensated absences in accordance with ASC Topic 710, *Compensation-General*. The Company accrues the liability for its employee rights to compensated absence in the year in which it is earned.

*(q) Revenue recognition*

Sale of power consists of solar energy sold to customers under long term Power Purchase Agreements (PPAs), which generally have a term of 25 years. The Company's customers are generally the Government of India, power distribution companies and, to a lesser extent, commercial and industrial enterprises. Sale of power includes solar power sold through exchange.

The Company recognizes revenue on PPAs when the solar power plant generates power and is supplied to the customer in accordance with the respective PPA. The company recognizes revenue each period based on the volume of solar energy supplied to the customer at the price stated in the PPA once the solar energy kilowatts are supplied and collectability is reasonably assured. The solar energy kilowatts supplied by the Company are validated by the customer prior to billing and recognition of revenue. Revenues from the recovery of safe-guard duties and goods and service tax under the change in law provision are recognized over the PPA period in the proportion of the actual sale of solar energy in kilowatts as per the terms agreed with customers or unless contractually agreed otherwise, once collectability is reasonably assured. Revenue from the sale of carbon credit emissions are recognized at the time of transfer of carbon credits to the customers, at consideration agreed under the sale agreements.

The Company applies "ASC Topic 606" Revenue from Contracts with Customers, to recognize revenue from sale of power to its customers. Further, under Topic 606, total consideration for PPAs with scheduled price changes (price escalation is applicable in a solar power plant with 50 MW of operating capacity and price decrease in a solar power plant with 10 MW of operating capacity over the term of PPA) and for significant financing components, is estimated and recognized over the term of the agreement. Price escalations create an unbilled receivable, and the price decreases create deferred revenue. The time value of the significant financing component is recorded as interest expense. The Company uses the discount rate that would be reflected in a separate financing transaction between the entity and its customer at contract inception and recognizes the revenue amount on a straight-line basis over the term of the PPAs, and interest expense using the effective interest rate method. The Company also recognizes incremental costs incurred to obtain a contract in Other Assets in the consolidated balance sheet. These amounts are amortized on a straight-line basis over the term of the PPAs and are included as a reduction to revenue in the consolidated statements of operations.

The Company also records the proceeds received from Viability Gap Funding ('VGF') on fulfilment of the underlying conditions as deferred revenue. Such deferred VGF revenue is recognized as sale of power in proportion to the actual sale of solar energy during the period to the total estimated sale of solar energy during the tenure of the applicable power purchase agreement or balance tenure of power purchase agreement, as applicable pursuant to the revenue recognition policy.

### Revenue from customers

Revenue from customers, net consists of the following:

| | Year ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | **2021** | **2022** | **2022** |
| | **(INR)** | **(INR)** | **(INR)** | **(US$)** |
| | | **(In million)** | | |
| **Revenue from Customers:** | | | | |
| Sale of Power [(1)] | 12,958 | 15,133 | 17,621 | 232.2 |
| Others [(2)] | — | 103 | 720 | 9.5 |
| **Total** | **12,958** | **15,236** | **18,341** | **241.7** |

(1) Sale of power includes revenue for the recovery of Safe-Guard Duties and Goods and Service Tax, which is linked to generation of Solar units, resulting from the change in law provision of our PPAs, during the year ended March 31, 2021 and 2022 amounting to INR 381 million and INR 340 million (US$4.5 million) respectively.

(2) Others includes revenue from the sale of carbon credits emissions amounting to INR 103 million and INR 720 million (US$ million 9.5 million) during the year ended March 31, 2021 and 2022 respectively.

*Contract balances*

The following table provides information about receivables, unbilled receivables, contract acquisition cost and deferred revenue from customers as at March 31, 2021 and 2022, respectively.

| | As at March 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | INR | INR | US$ |
| | | (In million) | |
| **Current assets** | | | |
| Accounts receivable, net | 4,887 | 6,041 | 79.6 |
| Contract acquisition cost | - | 16 | 0.2 |
| **Non-current assets** | | | |
| Unbilled receivable | 223 | 253 | 3.3 |
| Accounts receivable (net) | - | 3,203 | 42.2 |
| Contract acquisition cost | 141 | 322 | 4.2 |
| **Current liabilities** | | | |
| Deferred revenue | 110 | 230 | 3.0 |
| **Non-current liabilities** | | | |
| Deferred revenue | 2,353 | 5,417 | 71.4 |

Movement in deferred revenue:

| | As at March 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | INR | INR | US$ |
| | | (In million) | |
| **Beginning balance** | **2,239** | **2,463** | **32.5** |
| Increased as a result of additional cash received against VGF | 236 | 40 | 0.5 |
| Deferred revenue recognized | 93 | 3,183 | 41.9 |
| Amount recognized into revenue | (105) | (39) | (0.5) |
| **Ending balance** | **2,463** | **5,647** | **74.4** |

Accounts receivable – from sale of power consist of accrued revenues due under the PPA, based on the sale of power transferred to the customer, generally requiring payment within 30 to 60 days of sale. As per terms of PPA, payment is unconditional once performance obligations have been satisfied and does not contain any future, unsatisfied performance obligation to be included in this disclosure.

*(r) Cost of operations (exclusive of depreciation and amortization)*

The Company's cost of operations consists of expenses pertaining to operations and maintenance of its solar power plants. These expenses include payroll and related costs for maintenance staff, plant maintenance, insurance, and if applicable, lease costs etc.

Depreciation expense is not included in cost of operations but is included within "Depreciation and amortization" expense, shown separately in the consolidated statements of operations.

*(s) General and administrative expenses*

General and administrative expenses include payroll and related costs for corporate, finance and other support staff, including bonus and share based compensation expense, professional fees and other corporate expenses.

*(t) Share based compensation*

The Company follows guidance under ASC Topic 718, *Compensation — Stock Compensation*, which requires compensation costs related to share-based transactions, including employee share options, to be recognized in the financial statements based on their fair value. The Company recognizes compensation expense for equity share options including Restricted stocks (RSs) net of estimated forfeitures. Forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. Share-based compensation is included in general and

administrative expenses and recognized in the consolidated statements of operations based on awards ultimately expected to vest, except the cost of services which is initially capitalized by the Company as part of the cost of property, plant and equipment.

The Company recognizes compensation expense for SARs based on the fair value of the amount payable to employees in respect of SARs, which are settled in cash, with a corresponding increase in liabilities, over the period that the employees unconditionally become entitled to the payment. The liability is remeasured at each reporting date and at settlement date based on the fair value of the SARs. Any changes in the fair value of the liability are recognized in consolidated statements of operations.

The Company has elected to use the Black-Scholes-Merton valuation model to determine the fair value of share-based awards on the date of grant for employee share options with a fixed exercise price and fixed service-based vesting.

The Company has elected to use the Black-Scholes-Merton valuation model to determine the fair value of SARs at each reporting date.

**Employee Stock Option and Restricted Stocks**

The share-based compensation expense related to share-based compensation is recorded as a component of general and administrative expenses in the Company's consolidated statements of operations and totaled INR 17 million, INR 44 million and INR 69 million (US$0.9 million) for the years ended March 31, 2020, March 31, 2021, and 2022, respectively. The amount of share-based compensation expense capitalized during the year ended March 31, 2020, March 31, 2021, and 2022 was INR 13 million, INR 8 million and INR 23 million (US$0.3 million), respectively.

**Stock Appreciation Rights**

The share-based compensation expense related to SARs is recorded as a component of general and administrative expenses in the Company's consolidated statements of operations totaled INR 1,319 million and reversal of expense of INR 373 million (US$4.9 million) for the year ended March 31, 2021, and 2022, respectively. The amount of share-based compensation expense capitalized during the years ended March 31, 2021, and 2022 was Nil. Refer to Note 21 for details on the Share based compensation.

*(u) Assets held-for-sale*

Assets and asset disposal group are classified as held-for-sale if their carrying amount will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when management commits to a plan to sell the asset; the asset is available for immediate sale in its present condition; an active program to locate a buyer and other actions required to complete the plan have been initiated; the sale of the asset is probable within one year or within extended period on account of conditions beyond the control of the Company; the asset is being actively marketed for sale at a reasonable price in relation to its current fair value; and it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. Assets and liabilities classified as held-for-sale are measured at lower of their carrying amount and fair value less costs to sell and depreciation (amortization) ceases once the asset is classified as held for sale. See also, Note 23.

*(v) Contingencies*

Liabilities for loss contingencies arising from claims, tax assessments, litigation, fines and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount of the assessment and/or remediation can be reasonably estimated. Legal costs incurred with respect to these items are expensed as incurred.

*(w) Fair value of financial instruments*

ASC Topic 820, *Fair Value Measurements and Disclosures* -, defines fair value as the price at which an asset could be exchanged or a liability transferred in an orderly transaction between knowledgeable, willing parties in the principal or most advantageous market for the asset or liability. Where available, fair value is based on observable market prices or derived from such prices. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity.

When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs, which are categorized in one of the following levels

- *Level 1 inputs: Unadjusted quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.*

- *Level 2 inputs: Other than quoted prices included in Level 1 inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.*

- *Level 3 inputs: Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at measurement date.*

### (x) Derivatives and Hedging

In the normal course of business, the Company uses derivative instruments for the purpose of mitigating the exposure from foreign currency fluctuation risks associated with forecasted transactions denominated in certain foreign currencies and to minimize earnings and cash flow volatility associated with changes in foreign currency exchange rates, and not for speculative trading purposes. These derivative contracts are purchased within the Company's policy and are with counterparties that are highly rated financial institutions.

*Contracts designated as Cash Flow Hedge*

Cash flow hedge accounting is followed for derivative instruments to mitigate the exchange rate risk on foreign currency denominated debt instruments. Changes in fair value of derivative contracts designated as cash flow hedges are recorded in other comprehensive income/(loss), net of tax, until the hedge transaction occurs. The Company evaluates hedge effectiveness of cash flow hedges at the time a contract is entered into as well as on an ongoing basis or as required. When the relationship between the hedged items and hedging instrument is highly effective at achieving offsetting changes in cashflows attributable to the hedged risk, the Company records in other comprehensive income the entire change in fair value of the designated hedging instrument that is included in the assessment of hedge effectiveness. The cost of the hedge is recorded as an expense over the period of the contract on a straight-line basis.

*Fair value hedges: hedging of foreign exchange exposure*

Fair value hedge accounting is followed for foreign exchange risk with the objective to reduce the exposure to fluctuations in the fair value of firm commitments due to changes in foreign exchange rates.

Fair value adjustments related to non-financial instruments will be recognized in the hedged item upon recognition and will eventually affect earnings as and when the hedged item is derecognized. Changes in the fair value of derivatives designated and qualifying as fair value hedges, together with any changes in the fair value of the hedged firm commitments attributable to the hedged risk, will be recorded in in the consolidated balance sheet. The gain or loss on the hedging derivative in a hedge of a foreign-currency-denominated firm commitment and the offsetting loss or gain on the hedged firm commitment is recognized in earnings in the accounting period, post the recognition of the hedged item in the balance sheet.

*Undesignated contracts*

Changes in fair value of undesignated derivative contracts are reported directly in earnings along with the corresponding transaction gains and losses on the items being economically hedged. The Company enters into foreign exchange currency contracts to mitigate and manage the risk of changes in foreign exchange rates. These foreign exchange derivative contracts were entered into to hedge the fluctuations in foreign exchange rates for recognized balance sheet items such as the Company's U.S. dollar denominated borrowings. The Company has not designated the derivative contracts as hedges for accounting purposes. Realized gains (losses) and changes in the fair value of these foreign exchange derivative contracts are recorded in Loss (gain) on foreign currency exchange, net in the consolidated statements of operations. These derivatives are not held for speculative or trading purposes.

### (y) Segment information

Operating segments are defined as components of a company about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision-making group, in deciding how to allocate resources and in assessing performance. The Company's chief executive officer is the chief operating decision maker. Based on the financial information presented to and reviewed by the chief operating decision maker in deciding how to allocate the resources and in assessing the performance of the Company, the Company has determined that it has a single operating and reporting segment: Sale of power. The Company's principal operations, revenue and decision-making functions are located in India.

### (z) Non-controlling interest

The non-controlling interest recorded in the consolidated financial statements relates to following:

(i) 0.83% ownership interest in a subsidiary, a 10MW Gujarat power plant, not held by the Company
(ii) 49.00% ownership interest in a subsidiary, a 50MW Uttar Pradesh power plant, not held by the Company

(iii) 0.60% ownership interest in a subsidiary, a 100 MW Telangana power plant, not held by the Company

(iv) 0.01% ownership interest in Azure Power India Private Limited* not held by the Company

(v) 49% ownership interest in 16 MW rooftop project** of DJB not held by the Company

(vi) 48.6% ownership interest in a subsidiary, a 4 MW rooftop project** with GEDCOL, not held by the Company

(vii) 48.6% ownership interest in a subsidiary, a 11.4 MW** rooftop project with DMRC, not held by the Company

(viii) 48.6% ownership interest in a subsidiary, a 17.8 MW** rooftop project with railways, not held by the Company.

As of March 31, 2022, the Company recorded a non-controlling interest amounting to INR 662 million (US$8.7 million) including INR 22 million (US$0.3 million) of net loss for the year ended March 31, 2022. As of March 31, 2021, the Company recorded a non-controlling interest amounting to INR 204 million including INR 5 million of net profit for the year ended March 31, 2021.

\* This remaining ownership by the founders was under arbitration and same has been decided in the favor of the Company, subsequent to the year end. Refer to note 20.

\*\* During the current year, the Company has entered into a sale agreement for the disposal of its rooftop business and has transferred the 48.6% and 49% shareholding of identified entities in reference to agreement and has recognized proportionate minority interest of INR 453 million (US$6.0 million) on transfer of its shareholdings of rooftop entities. See also Note 23

**(*aa*) Recent accounting pronouncements**

In December 2019, the FASB issued ASU 2019-12, Simplifying the Accounting for Income Taxes ("ASU 2019-12"). This ASU eliminates certain exceptions to the general principles in ASC 740, Income Taxes and adds guidance to reduce complexity in accounting for income taxes. The ASU eliminates, inter alia, the general methodology for calculating income taxes in an interim period when a year-to-date loss exceeds the anticipated loss for the year. The ASU requires that an entity reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date. ASU 2019-12 is effective for the annual periods beginning after December 15, 2020, including interim periods within those fiscal years. During current period, the Company applied ASU 2019-12 and noted that the impact of adoption of this guidance did not have a material effect on the Company's consolidated financial statements.

In March 2020, the Financial Accounting Standards Board issued ASU No. 2020-04, "Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting ("ASU 2020-04")." ASU 2020-04 provides temporary optional expedients and exceptions to the guidance in U.S. GAAP on contract modifications and hedge accounting to ease the financial reporting burdens related to the expected market transition from the London Interbank Offered Rate (LIBOR) and other interbank offered rates to alternative reference rates. In January 2021, the FASB issued Accounting Standard Update ("ASU") 2021-01 (Topic 848), which amends and clarifies the existing accounting standard issued in March 2020 ("ASU") 2020-04 for Reference Rate Reform. Reference rates such as LIBOR, are widely used in a broad range of financial instruments and other agreements. The ASU permits entities to elect certain optional expedients and exceptions when accounting for derivative contracts and certain hedging relationships affected by changes in the interest rates used for discounting cash flows, for computing variation margin settlements, and for calculating price alignment interest in connection with reference rate reform activities under way in global financial markets (the "discounting transition"). The ASU 2020-04 is effective for adoption at any time between March 12, 2020 and December 31, 2022, for all entities and the ASU 2021-01 is effective for all entities as of January 7, 2021 through December 31, 2022. As of March 31, 2022, the Company has not made any contract modifications to replace the reference rate in any of its agreements and will continue to evaluate the effects of this standard on its consolidated financial position, results of operations, and cash flows.

Other recent accounting pronouncements issued by the FASB (including its Emerging Issues Task Force) and the United States Securities and Exchange Commission did not or are not believed by management to have a material impact on the Company's present or future financial statements.

**(*ab*) Impact of COVID-19 Pandemic**

The Company has considered internal and external information in the preparation of the financial statements including the economic outlook and believes that it has taken into account the possible impact of known events arising out of the COVID-19 pandemic. The power plants had continued to remain operational during the COVID-19 pandemic, as electricity generation was designated as an essential service in India. Based on the current collection experience the Company has not seen a material impact on accounts receivables collections due to COVID-19.

### 3. Cash and cash equivalents

Cash and cash equivalents consists of the following:

| | As of March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Balances with current accounts | 1,171 | 8,314 | 109.5 |
| Bank demand deposits* | 9,936 | 10,482 | 138.2 |
| **Total** | **11,107** | **18,796** | **247.7** |

\* Includes unrestricted term deposit having maturity more than one year.

### 4. Restricted cash

Restricted cash consists of the following:

| | As of March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Bank demand deposits | 4,881 | 3,784 | 49.9 |
| Term deposits | 170 | 726 | 9.6 |
| | 5,051 | 4,510 | 59.5 |
| Restricted cash — current | 4,881 | 3,784 | 49.9 |
| **Restricted cash — non-current** | **170** | **726** | **9.6** |

### 5. Accounts receivable

The Company's accounts receivables are generated by selling energy to customers and are reported net of any allowance for uncollectible accounts. The Company uses ageing analysis, probability of default methods, past facts, significant one-time events, guidelines issued by government authorities, credit rating of customers, current economic conditions and reasonable forecasts that are most relevant in evaluating and estimating the expected credit losses.

The Company writes-off an account receivable in the period that it is deemed uncollectible and records a reduction in the ECL and the balance of the account receivables in the balance sheet.

The Company evaluates the concentration of risk with respect to its accounts receivables as high, due to the limited number of counterparts for its services, being mainly state utilities and government entities. However, the Company does not foresee any significant credit risk attached to receivables from such state utilities/government entities (also refer note 26 below).

The Company analyzed its historical loss information for its accounts receivables and adjusted for forward looking information and determined the following credit loss percentages:

| | March 31, 2022 | March 31, 2021 |
| --- | --- | --- |
| Ageing of accounts receivables | Expected Credit Losses % | Expected Credit Losses % |
| Not Due (including unbilled receivables) | 0.57% | 0.73% |
| 0-90 days | 2.27% | 2.80% |
| 90-180 days | 3.25% | 3.82% |
| 180-365 days | 3.34% | 3.99% |
| Above 365 days | 11.19% | 11.79% |

| Ageing of accounts receivables*# | March 31, 2022 (INR) (In million) | March 31, 2021 (INR) (In million) |
|---|---|---|
| Not Due (including unbilled receivables) | 7,656 | 2,924 |
| 0-90 days | 360 | 516 |
| 90-180 days | 192 | 388 |
| 180-365 days | 405 | 421 |
| Above 365 days | 917 | 1,275 |
| Total accounts receivables | 9,530 | 5,524 |

\*    Includes INR 1 million (US$0.0 million) and INR 162 million relating to receivables of the Company's rooftop business being classified as Assets held for sale for the year ended March 31, 2022 and 2021 respectively. Total accounts receivable includes non-current portion.

\#    Includes receivables of INR 3,172 million (US$ 41.8 million) in relation to claims of Safeguard duties under change in Law provisions of Power purchase agreement.

Accounts receivable, net consists of the following:

| | As of March 31, | | |
|---|---|---|---|
| | 2021 (INR) | 2022 (INR) (In million) | 2022 (US$) |
| Accounts receivable [1] | 5,362 | 9,529 | 125.6 |
| Less: Allowance for doubtful accounts/ credit losses | (475) | (285) | (3.8) |
| Total | 4,887 | 9,244 | 121.8 |
| Non-current | - | 3,203 | 42.2 |
| Current | 4,887 | 6,041 | 79.6 |

[1]    Includes INR 1,558 million and INR 5,228 million (US$68.9 million) of unbilled receivables for the year ended March 31, 2021 and 2022, respectively.

Activity for the allowance for doubtful accounts/ credit losses is as follows:

| | As of March 31, | | |
|---|---|---|---|
| | 2021 (INR) | 2022 (INR) (In million) | 2022 (US$) |
| Balance at the beginning of the year | 246 | 475 | 6.3 |
| Provision for doubtful debts/ expected credit losses (net) | 286 | (198) | (2.6) |
| Write offs charged against the allowance | (44) | - | - |
| Reclassified to held for sale | (13) | - | - |
| Reclassified from held for sale | - | 8 | 0.1 |
| Balance at the end of the year | 475 | 285 | 3.8 |

In relation to the Company's 50 MW project in Andhra Pradesh, the Andhra Pradesh DISCOM, Southern Power Distribution Company of Andhra Pradesh Ltd ("APSPDCL"), had issued a letter to the Company requesting the reduction of quoted tariff to INR 2.44 per unit as against the PPA rate of INR 5.89 per unit for solar projects from the date of commissioning and threatened termination of the PPA in case of refusal to accede to such reduction ("Letter"). The Company had challenged the Letter before the High Court at Vijayawada, as well as the decision of the Government of Andhra Pradesh ("GoAP") to constitute a High-Level Negotiation Committee to review, negotiate, and bring down" the solar energy purchase prices vide order dated July 1, 2019 ("HLNC Order"). The High Court vide its judgment dated September 24, 2019 ("Judgment"), whilst quashing the aforesaid Letter and HLNC Order, granted its implied blessing to Andhra Pradesh DISCOM to approach the Andhra Pradesh Electricity Regulatory Commission ("APERC") for reduction of tariff by directing APSPDCL to make payment of outstanding and future invoices at the "interim" rate of Rs. 2.44/- per unit, till the dispute is resolved by APERC. Accordingly, the Company has filed a writ appeal challenging the Judgment, whereby the Company has inter alia sought: (i) setting aside of the Judgment to the limited extent of the direction to Discoms to make payment at the "interim" rate of Rs. 2.44 per unit and the implied blessing granted by the High Court to approach the APERC for reduction of tariff; and (ii) quashing of all actions undertaken by the respondents and/or restrain the respondents from taking any action seeking reduction of tariff under the concluded PPA and/or unilateral alteration of the terms of such PPA, pursuant to the directions in the Judgment, including quashing of the proceedings. Further, the appellate authority during several hearings had directed the DISCOM to remit the overdue receivables at interim rate.

During the current year on March 15, 2022, High court of Andhra Pradesh, Amaravati has passed an order in favour of the Company and has directed the discom to make the payments of arrears with within six weeks from the date of this order, at the original rate of INR 5.89 per unit mentioned in PPAs.

Subsequent to March 2022, the Company has received a letter from offtaker dated August 4, 2022, stating outstanding liability as at May 31, 2022, to be paid in 12 monthly installments. The Company has also received dues pursuant to the same.

## 6. Prepaid expenses and other current assets

Prepaid expenses and other current assets consist of the following:

| | As of March 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Derivative asset - current (Note 25) | 914 | 13 | 0.2 |
| Interest receivable on term deposits | 305 | 98 | 1.3 |
| Prepaid debt financing costs | 367 | 141 | 1.9 |
| Balance with statutory authorities | 396 | 267 | 3.5 |
| Prepaid bank guarantee charges | 68 | 62 | 0.8 |
| Prepaid insurance and other expenses | 82 | 95 | 1.3 |
| Advance to suppliers | 44 | 998 | 13.2 |
| Other | 14 | 251 | 3.2 |
| **Total** | **2,190** | **1,925** | **25.4** |

**7. Property, plant and equipment, net**

Property, plant and equipment, net consists of the following:

| | Estimated Useful Life (in years) | As of March 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 (INR) | 2022 (INR) | 2022 (US$) |
| | | (In million) | | |
| Plant and machinery (solar power plants) | 25-35 | 101,331 | 133,394 | 1,758.2 |
| Leasehold improvements — solar power plant | 25-35 | 5,970 | 6,297 | 83.0 |
| Furniture and fixtures | 5 | 13 | 13 | 0.2 |
| Vehicles | 5 | 72 | 83 | 1.1 |
| Office equipment | 1-5 | 38 | 125 | 1.6 |
| Computers | 3 | 96 | 102 | 1.3 |
| Leasehold improvements — office | 1-3 | 147 | 152 | 2.0 |
| | | 107,667 | 140,166 | 1,847.4 |
| Less: Accumulated depreciation | | 11,966 | 15,758 | 207.7 |
| Less: Accumulated impairment | | 657 | 616 | 8.1 |
| | | 95,044 | 123,792 | 1,631.6 |
| Freehold land* | | 3,193 | 3,224 | 42.5 |
| Construction in progress | | 10,610 | 17,316 | 228.3 |
| **Total** | | **108,847** | **144,332** | **1,902.4** |

Depreciation expense on property, plant and equipment was INR 2,808 million, INR 3,165 million and INR 3,639 million (US$48.0 million) for the years ended March 31, 2020, 2021 and 2022, respectively. Refer note 23 for impairment recognized and classification of assets held for sale during the current year.

The Company has received government grants for the construction of rooftop projects amounting to INR 115 million and INR Nil million (US$ Nil million) for the years ended March 31, 2021 and 2022, respectively. The proceeds from these grants have been recorded as a reduction to the carrying value of the related projects.

\* Also see note 27. "Whistle-blower Allegations and Special Committee Investigation" for adjustment towards payment made to land aggregators.

**8. Software, net**

| | Estimated Useful Life (in years) | As of March 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 (INR) | 2022 (INR) | 2022 (US$) |
| | | (In million) | | |
| Software licenses and related implementation costs | 3 Years | 164 | 169 | 2.2 |
| Less: Accumulated amortization | | 135 | 161 | 2.1 |
| **Total** | | **29** | **8** | **0.1** |

Aggregate amortization expense for software was INR 52 million, INR 37 million and INR 28 million (US$0.3 million) for the years ended March 31, 2020, 2021 and 2022, respectively.

Estimated amortization expense for the years ending March 31, 2023 and 2024 is INR 4 million and INR 3 million respectively.

## 9. Other assets

Other assets consist of the following:

| | As of March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Prepaid income taxes | 502 | 646 | 8.5 |
| Derivative asset (Note 25) | 5,786 | 3,530 | 46.6 |
| Interest receivable on term deposits | 22 | 28 | 0.4 |
| Security deposits | 381 | 373 | 4.9 |
| Contract acquisition cost | 141 | 322 | 4.2 |
| Unbilled receivables | 223 | 253 | 3.3 |
| Other | 29 | 38 | 0.5 |
| **Total** | **7,084** | **5,190** | **68.4** |

## 10. Investment in equity investee

Investment in equity investee, consists of the following:

| | As of March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Investment in associate | 0 | 96 | 1.3 |
| **Total** | **0** | **96** | **1.3** |

During the year ended March 31, 2020, Azure Power India Private Limited ("APIPL") won a tender issued by Solar Energy Corporation of India Limited (SECI). Pursuant to the terms of the tender, APIPL was required to enter into a joint venture agreement on January 6, 2020 with a third party to establish a manufacturing facility with a capacity of manufacturing 500 MW (or 1000 MW with greenshoe) solar PV modules per annum. Accordingly, the Company had invested INR 0.026 million (US$0.0004 million) to acquire 26% of the equity shares in a newly formed company incorporated as part of the joint venture agreement to establish a manufacturing facility (investee) and is committed to further invest 26% of the equity required for construction of the manufacturing facility, and additionally procure modules. Based on commercial and business grounds, the Company has terminated the aforesaid joint venture agreement subsequent to the year end, and has incurred a one-time cost of INR 548 million (US$7.2 million) as a part of the settlement.

During the current year ended March 31, 2022, the Company has entered into a non-binding obligation with M/s Premier Energies limited ("Premier/ Manufacturer"), a solar module manufacturing company, relating to execution of tender received from SECI. The Company has initially invested INR 94 million (US$1.2 million) to acquire 26% of the equity shares of an entity, where Premier have invested in 74% of equity shares. Subsequent to the year end, the Company has entered into related module supply agreements and share and debentures subscription agreements with Premier. The Company is entitled for return of 10% p.a. on investment made under the agreement.

## 11. Other liabilities

Other current liabilities, consists of the following:

| | As of March 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Derivative liability (See Note 25) | 961 | 2,499 | 32.9 |
| Provision for employee benefits | 8 | 11 | 0.1 |
| Provision for SAR to employees (See Note 21) | 95 | 844 | 11.1 |
| Payable to statutory authorities | 126 | 291 | 3.8 |
| Other payables | 737 | 1,364 | 18.1 |
| **Total** | **1,927** | **5,009** | **66.0** |

Other non-current liabilities, consists of the following:

| | As of March 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Derivative liability (See Note 25) | 251 | 7 | 0.1 |
| Provision for SAR to employees (See Note 21) | 1,122 | - | - |
| Provision for gratuity | 46 | 53 | 0.7 |
| Provision for compensated absences | 40 | 38 | 0.5 |
| **Total** | **1,459** | **98** | **1.3** |

## 12. Long term debt

Long term debt, consists of the following:

| | As of March 31, | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| **Secured term loans:** | | | |
| Foreign currency loans | 73,200 | 75,709 | 998.0 |
| Indian rupee loans | 21,380 | 44,924 | 592.1 |
| **Unsecured term loans:** | | | |
| Indian rupee loans* | - | 1,118 | 14.7 |
| **Total debt** | **94,580** | **121,751** | **1,604.8** |
| Less: current portion | **4,658** | **9,209** | **121.4** |
| Long-term debt | **89,922** | **112,542** | **1,483.4** |

\* Pertains to unsecured term loan taken by subsidiaries, forming the part of disposable group during the current year from its minority shareholders amounting to INR 1,118 million (US$14.7 million) as at March 31, 2022 and INR nil as at March 31, 2021.

**Foreign currency term loans**

*5.5% Senior Notes*

During the year ended March 31, 2018, Azure Power Energy Limited (one of the subsidiaries of APGL) issued 5.5% US$ denominated Senior Notes ("5.5% Senior Notes" or "Green Bonds") and raised INR 31,260 million net of discount of INR 9 million at 0.03% and issuance expense of INR 586 million. The discount on issuance of the Green Bonds and the issuance expenses was recorded as finance cost, using the effective interest rate method and the unamortized balance of such amounts was netted with the carrying value of the Green Bonds. The Green Bonds were listed on the Singapore Exchange Securities Trading Limited. In accordance with the terms of the issue, the proceeds were used for repayment of project level loans. The interest on the 5.5% Senior Notes were payable on a semi-annual basis and the principal amount was payable in November 2022. The Company had guaranteed the principal and interest repayments to the investors; however, the guarantee had been cancelled during the financial year 2020-21 on May 7, 2020, upon the Company satisfying certain financial covenants, on the basis of the financial statements for the year ended March 31, 2019. During the current period in August

2021, these Senior Notes have been re-paid by the Company through refinancing of 3.575% Senior Notes, as detailed below.

*3.575% Senior Notes*

During the year ended March 31, 2022, Azure Power Energy Limited (one of the subsidiaries of APGL) issued 3.575% US$ denominated Senior Notes ("3.575% Senior Notes" or "Green Bonds") and raised INR 30,285 million, net of issuance expense of INR 408 million. The issuance expenses have been recorded as finance cost, using the effective interest rate method and the unamortized balance of such amounts is netted with the carrying value of the Green Bonds. The Green Bonds are listed on the Singapore Exchange Securities Trading Limited. In accordance with the terms of the issue, the proceeds were used for repayment of 5.5% Senior Notes. The interest on the 3.575% Senior Notes is payable on a semi-annual basis and the principal amount is payable in 10 installments starting from February 2022. As of March 31, 2022, the net carrying value of the Green Bonds was INR 29,884 million (US$393.9 million). The Green Bonds are secured by a pledge of Azure Power Energy Limited's shares.

*5.65% Senior Notes*

During the year ended March 31, 2020, Azure Power Solar Energy Private Limited (one of the subsidiaries of APGL) issued 5.65% US$ denominated Senior Notes ("5.65% Senior Notes" or "Green Bonds") and raised INR 24,400 million net of discount of INR 7 million at 0.03% and issuance expense of INR 397 million. The discount on issuance of the Green Bonds and the issuance expenses have been recorded as finance cost, using the effective interest rate method and the unamortized balance of such amounts is netted with the carrying value of the Green Bonds. The Green Bonds are listed on the Singapore Exchange Securities Trading Limited.

In accordance with the terms of the issue, the proceeds were used for repayment of project level loans. The interest on the 5.65% Senior Notes are payable on a semi-annual basis and the principal amount is payable in December 2024. As of March 31, 2022, the net carrying value of the Green Bonds was INR 26,301 million (US$346.7 million). The Company continues to guarantee the principal and interest repayments to the investors and the guarantee shall become ineffective on meeting certain financial covenants. The Green Bonds are secured fixed charge by the Company over the capital stock of Azure Power Solar Energy Private Limited.

*Loan from Export Development Canada and Standard Chartered Bank (Singapore) Limited*

During the year ended March 31, 2021, the Company borrowed INR 6,931 million (US$93.0 million) from Export Development Canada and Standard Chartered Bank (Singapore) Limited. The funds were provided to project SPVs as shareholder loans or through other instrument for capital expenditure or for payment of capital expenditure in respect of various specified projects. These facilities are foreign currency loans and carry an interest rate of LIBOR+Margin of 3.95% and the loan is repayable in 8 half yearly instalments commencing November 2021. The borrowing is collateralized by the shares of project SPVs, a hypothecation/charge over receivables of the Company and corporate guarantee of Azure Power Global Limited. The net carrying value of the loan as of March 31, 2022 is INR 6,806 million (US$89.7 million).

**Indian Rupee Non-Convertible Debentures**

During the year ended March 31, 2018, the Company issued Non-Convertible Debentures in one of its subsidiaries and borrowed INR 1,865 million, net of issuance expense of INR 35 million. The debentures carry an interest rate of 12.30% per annum. The debentures are repayable in 11 equalized semi-annual instalments beginning September 2022 until September 2027 and interest payments are payable semi-annually. During the year ended as on March 31, 2022, Non-Convertible Debentures was paid and unamortized carrying value of ancillary cost of borrowing was expensed.

During the year ended March 31, 2019, the Company issued Non-Convertible Debentures in two of its subsidiaries and borrowed INR 548 million, net of issuance expense of INR 14 million. The debentures carry an interest rate of 10.32% per annum. The debentures are repayable on October 2024 and interest payments are payable every three months commencing from April 2019. During the year ended March 31, 2020, the Company issued further Non-Convertible Debentures in four of its subsidiaries and borrowed INR 439 million (US$5.8 million), net of issuance expenses of INR 19 million (US$0.3 million) under the same facility. The debentures carry an interest rate of 9.85% to 10.87% per annum. The debentures are repayable starting October 2024 and interest payments are payable every three months commencing from March 2020. The issuance expenses are amortized over the term of the contract using the effective interest rate method. The borrowing is collateralized by first ranking pari passu mortgage charge on all immovable and movable properties of related subsidiary within the group with a net carrying value of INR 3,331 million (US$43.9 million). As of March 31, 2022, the net carrying value of the Non-Convertible Debentures was INR 980 million (US$12.9 million). As of March 31, 2022, the Company was not in compliance with the financial covenants related to this borrowing and has classified the loan under current debt.

**Project level secured term loans**

*Foreign currency loans*

During the current year the Company has prepaid the foreign currency loan of INR 45 million (US$0.6 million) which was taken for financing its rooftop solar power projects (which form part of disposable group) and carried a fixed interest rate of 4.42% per annum. The loan was repayable in 54 quarterly instalments which commenced from October 15, 2017. The borrowing was collateralized by the leasehold land, movable/immovable properties and underlying solar power project assets and counter guaranteed by Azure Power India Private Limited, which got released post repayment.

During the year ended March 31, 2019, the Company borrowed INR 552 million, as project level financing for some of its rooftop projects. During the year ended March 31, 2020, the Company further borrowed INR 135 million (US$1.8 million) and INR 271 million (US$3.6 million) under the same facility. These foreign currency facilities carry an annual interest rate of LIBOR + 2.75%. The facility is repayable starting October 2024 and interest payments are payable every three months commencing from April 2019. The borrowing is collateralized by first ranking pari passu mortgage charge on all immovable and movable properties of the borrower with a net carrying value of INR 3,331 million (US$43.9 million) as on March 31, 2022. The net carrying value of the loan as of March 31, 2022 is INR 974 million (US$12.8 million). As of March 31, 2022, the Company was not in compliance with the financial covenants related to this borrowing and has classified the loan under current debt.

During the year ended March 31, 2022, the Company borrowed amount of INR 11,756 million (US$154.9 million) from MUFG Bank, Societe Generale, Export development Canada and Honkong Mortgage corporation limited for financing of its 300 MW solar project with Solar Energy Corporation of India. These facilities carries interest rate sum of margin and LIBOR. As of March 31, 2022, the loan carries interest rate of 8.25%. The loan is repayable in 18 quarterly instalments commencing April 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 13,224 million (US$174.3 million) as of March 31, 2022 and pledge of 100% share of borrower held by promoters. The net carrying value of the loan as of March 31, 2022 is INR 11,726 million (US$154.5 million).

*Indian rupee loans*

The net carrying value of the loan as of March 31, 2022, is INR 404 million (US$5.3 million), borrowed for financing of a 5 MW solar power project with NTPC Vidyut Vyapar Nigam Limited. The loan has been refinanced from Kotak Infrastructure Debt Fund Limited and unamortized carrying value of ancillary cost of borrowing was expensed. These facility carries an interest rate of 8.25% per annum with reset after every 5 years. The loan is repayable in 42 quarterly instalments commencing September 2021. The borrowing is collateralized by movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 463 million (US$6.1 million) as of March 31, 2022.

The net carrying value of the loan as of March 31, 2022, is INR 66 million (US$0.9 million), borrowed for the financing of a 2.5 MW rooftop solar power project. The interest rate as of March 31, 2022, is 12.16% per annum. The loan is repayable in 29 semi-annual instalments which commenced on January 15, 2014. The borrowing is collateralized by first charge on Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 110 million (US$1.4 million) as of March 31, 2022, and is guaranteed by Azure Power India Private Limited. This debt is related to rooftop business and hence has been classified as liabilities directly associated with assets classified as held for sale. See also note 23. As of March 31, 2022, the Company was not in compliance with the financial covenants related to this borrowing and has obtained suitable waivers for the non-compliance. Subsequent to year end, the Company has transferred its shareholding under this 2.5 MW rooftop project to Radiance.

The net carrying value of the loan as of March 31, 2022 is INR 1,509 million (US$19.9 million), borrowed for financing of a 30 MW solar power project with Chhattisgarh State Power Distribution Company Ltd. The loan first has been refinanced from Aditya Birla Finance Ltd (ABFL) and during the year ended March 31,2022 loan is again refinanced from Indian renewable Energy Development Agency Limited (IREDA) and unamortized carrying value of ancillary cost of borrowing was expensed. As on March 31, 2022, the loan carries interest rate of 7.5% per annum and interest rate is fixed for a period of 3 year from initial date of disbursement. The loan is repayable in 168 monthly instalments and commenced from April 2022. The borrowing is collateralized by a first charge on the Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 1,344 million (US$17.7 million) as of March 31, 2022.

The net carrying value of the loan as of March 31, 2022, is INR 2,093 million (US$27.6 million), borrowed for financing of a 50 MW solar power project with NTPC Limited. The loan has been refinanced from NIIF Infrastructure Finance Limited and unamortized carrying value of ancillary cost of borrowing was expensed. As of March 31, 2022, the loan carries interest rate of 7.75% per annum and ROI is subject to reset in every five years from initial disbursement. The loan is repayable in 64 quarterly instalments and commenced December 2021. The borrowing is collateralized by a first charge on the Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 2,135 million (US$28.1 million) as of March 31, 2022 and the loan had been guaranteed by the corporate guarantee and pledge of 51% shares of Azure Power India Private Limited, the holding company

The net carrying value of the loan borrowed for financing a 100 MW solar power project with NTPC Limited as of March 31, 2022 is INR 5,048 million (US$66.5 million). During the year ended March 31, 2022 loan has been refinanced from NIIF infrastructure Finance Limited and Aseem Infrastructure Finance Limited and unamortized carrying value of ancillary cost of borrowing was expensed. As of March 31, 2022, the loan carries interest rate of 7.75% per annum and fixed for first three year of initial disbursement. The loan is repayable in 62 quarterly instalments and commenced March 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 4,990 million (US$65.8 million) as of March 31, 2022.

During the year ended March 31, 2021, the Company borrowed amount of INR 1,734 million (US$23.7 million) from Aditya Birla finance Limited and Tata Cleantech Capital Limited for financing of its 200 MW solar project with Solar Energy Corporation of India. The loan was borrowed from a consortium of banks led by Yes Bank, which carries an annual floating rate of interest at a MCLR plus 0.55%. The loan is repayable in 72 quarterly instalments commencing September 2020. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 9,238 million (US$126.3 million) as of March 31, 2021. The net carrying value of the loan as of March 31, 2021 is INR 1,572 million (US$21.5 million). Loan is repaid during the year and unamortized carrying value of ancillary cost of borrowing was expensed.

During the year ended March 31, 2022, the Company borrowed amount of INR 3,264 million (US$43.0 million), net of initial installment, from Tata Cleantech Capital Limited for financing of its 200 MW solar project with Solar Energy Corporation of India. As of March 31, 2022, the loan carries interest rate of 7.50% and same is fixed for the period of three year from initial disbursement The loan is repayable in remaining 69 quarterly instalments commencing March 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 8,600 million (US$113.4 million) as of March 31, 2022. The net carrying value of the loan as of March 31, 2022 is INR 3,205 million (US$42.2 million).

During the year ended March 31, 2022, the Company borrowed amount of INR 2,467 million (US$32.5 million) , net of initial installment, from Axis Bank for financing of its 200 MW solar project with Solar Energy Corporation of India. Loan has interest rate of 3 years MCLR and as of March 31, 2022, the loan carries interest rate of 7.50% and same is fixed for the period of three year from initial disbursement The loan is repayable in remaining 69 quarterly instalments commencing March 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 8,600 million (US$113.4 million) as of March 31, 2022. The net carrying value of the loan as of March 31, 2022 is INR 2,423 million (US$31.9 million).

During the year ended March 31, 2019, the Company borrowed INR 124 million (US$1.8 million) as an External Commercial Borrowings from International Finance Corporation (IFC) for some of its rooftop projects. These facilities carry an interest rate of 10.74% and interest payments are payable every three months which commenced April 2019. The borrowing is collateralized by first ranking pari paasu mortgage charge on all immovable and movable properties of the borrower with a net carrying value of INR 2,813 million (US$37.1 million) as of March 31, 2022. The loan is repayable on October 15, 2024. The net carrying value of the loan as of March 31, 2022 is INR 122 million (US$1.6 million). As of March 31, 2022, the Company was not in compliance with the financial covenants related to this borrowing and has classified the loan under current debt.

During the year ended March 31, 2020 and March 31, 2021, the Company borrowed INR 463 million (US$6.1 million) and INR 56 million (US$0.8 million) as a project level financing for financing of a 16 MW rooftop solar power project from the State Bank of India ('SBI'). These facilities carry an annual interest rate of 6 months MCLR + 1.45%. As of March 31, 2022, the loan carries interest rate of 8.50% per annum. The loan is repayable in 52 quarterly installments commencing June 2020. The borrowing is collateralized by first charge on Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 605 million (US$8.0 million) as of March 31, 2022 and pledge of 51% shares of the Promoter company and Corporate Guarantee which shall terminate as per conditions stipulated in the Rupee Term Loan Agreement. The net carrying value of the loan as of March 31, 2022 is INR 407 million (US$5.4 million). As of March 31 2022, the Company was not in compliance with the financial covenants related to this borrowing and has obtained suitable waivers for the non-compliance.

The net carrying value of the loan borrowed for financing of its 90 MW solar project with Assam Power Distribution Company Limited as on March 31, 2022 is INR 3,575 (US$47.1 million). During the year ended March 31, 2022 loan has been refinanced from Indian renewable energy development agency limited (IREDA) and unamortized carrying value of ancillary cost of borrowing was expensed. As of March 31, 2022, the loan carries interest rate of 7.50% and same is fixed for the period of three year from initial disbursement. The loan is repayable in 234 monthly instalments commencing October 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 4,586 million (US$60.4 million) as of March 31, 2022 and pledge of 51% shares held by the Promoter company in the SPV and Further loan is guaranteed by Azure Power India Pvt Ltd.

The net carrying value of the loan as of March 31, 2022 is INR 2,414 million (US$31.8 million), borrowed for financing of a 35 MW solar project with NTPC Vidyut Vyapar Nigam Limited. The loan has been refinanced from NIIF Infrastructure Finance Ltd and Kotak Infra Debt Fund Limited and unamortized carrying value of ancillary cost of borrowing was expensed. These facilities carry an interest rate of 8% per annum. The loan is repayable in 47 quarterly instalments commencing September 2021. The borrowing is collateralized by movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 2,266 million (US$29.9 million) as of March 31, 2022 and pledge of 51% shares of the Promoter company and Corporate Guarantee which shall terminate as per conditions stipulated in the agreement.

The net carrying value of the loan borrowed for financing of its 600 MW solar project with Solar Energy Corporation of India as on March 31, 2022 is INR 20,983 million (US$276.6 million). During the year ended March 31, 2022 loan has been refinanced from L & T finance Limited and unamortized carrying value of ancillary cost of borrowing was expensed. As of March 31, 2022, the loan carries interest rate of 7.20% and same is fixed for the period of 3.5 year from initial disbursement. The loan is repayable in 243 monthly instalments commencing July 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 26,456 million (US$348.7 million) as of March 31, 2022 and corporate guarantee of Azure Power India Private Limited.

During the year ended March 31, 2021, the Company borrowed an amount of INR 413 million (US$5.6 million) from Kotak Infrastructure Debt Fund Limited for financing of a 10 MW solar power project with Bangalore Electricity Supply Company Limited. The loan is disbursed to refinance the previous lender REC Limited. These facility carries an interest rate of 8.50% per annum fixed till September 30, 2022 and shall be reset every two years thereafter. The loan is repayable in 54 quarterly instalments commencing December 2020. The borrowing is collateralized by movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 541 million (US$7.1 million) as of March 31, 2022, The net carrying value of the loan as of March 31, 2022 is INR 359 million (US$4.7 million).

During the year ended March 31, 2022, the Company borrowed amount of INR 1,418 million (US$18.7 million) from State Bank of India for financing of its 300 MW solar project with Solar Energy Corporation of India. Loan has interest rate of SBI 6-month MCLR +2.60% and as of March 31, 2022, the loan carries interest rate of 9.55%. The loan is repayable in 222 monthly instalments commencing March 2022. The borrowing is collateralized by first ranking pari passu mortgage charge on all immovable and movable properties of the borrower with a net carrying value of INR 14,693 million (US$193.7 million) as on March 31,2022. The net carrying value of the loan as of March 31, 2022, is INR 1,402 million (US$18.5 million).

During the current year, certain subsidiaries falling under the disposable group of rooftop entities has raised unsecured term loans from its minority shareholder amounting to INR 1,118 million (US$14.7 million) as at March 31, 2022 and nil as at March 31, 2021 respectively. These funds have been used for settlement of inter group loans between subsidiaries. which are also consolidated in the Company.

As of March 31, 2022, the Company has unused commitments excluding Rooftop portfolio for long-term financing arrangements amounting to INR 5,980 million (US$78.8 million) for solar power projects.

### *Trade credit*

As of March 31, 2021, the Company had multiple buyer's credit facilities amounting to INR 4,140 million (US$56.6 million) jointly from Yes Bank and State bank of India, including INR 2,641 million (US$35.0 million) availed during the year ended March 31, 2020, for financing of a 200 MW solar power project with Solar Energy Corporation of India. These facilities carry a floating interest rate of LIBOR+ 0.38%-0.50%, for its solar power projects. The trade credits are required to be repaid in 2.7 -2.8 years from the date of shipment of the products from the suppliers, with semi-annual interest payments. These buyer's credit facilities have been repaid during the current year.

As of March 31, 2021, the Company had buyer's credit facility amounting to INR 295 million (US$4.0 million), from Yes bank, for certain of its operational SPV's, entered during the year ended March 31, 2019. These facilities carry a floating interest rate of six months LIBOR plus 0.8% spread. These buyer's credit facilities have been repaid during the current period.

As of March 31, 2021, the Company had a buyer's credit facility amounting to INR 7,428 million (US$101.6 million) for one of its under construction SPVs for 600 MW solar power project with Solar Energy Corporation of India, entered during the current period. This facility carries a floating interest rate of six months LIBOR plus spread (45 basis points, 60 basis points or 11 basis points) as applicable. These buyer's credit facilities have been repaid during the current period by taking

term loan from L & T finance limited.

As of March 31, 2022, the Company has a buyer's credit facility amounting to INR 7,036 million (US$92.7 million) for one of its under construction SPVs for 300 MW solar power project with Solar Energy Corporation of India. This facility carries a floating interest rate of 12 Month SOFR and spread ranging plus 0.21 PCT.

### *Short term credit*

During the year ended March 31, 2021 and period ended March 31, 2022, the Company borrowed an amount of INR 1,529 million and INR 5,970 million respectively as a short-term facility from The Hongkong and Shanghai banking Corporation Limited (HSBC). Borrowings under this facility are repayable within 12 months of disbursement. The facility bears an interest rate of 8.75% per annum, payable monthly. The facility is repaid during the current year.

During the current year ended March 31, 2022, the Company has obtained an Overdraft facility against Fixed deposits (ODFD) of INR 2,250 million. Borrowing under this facility is repayable within one year from disbursement or till FD maturity whichever is earlier. The facility bears an interest rate of Fixed rate of 0.2% over FD rate. The facility is repaid during the current year.

### *Other long-term loans*

During the current year ended March 31, 2022, the Company has obtained car loan of INR 7 million (US$0.1 million). Borrowing under this facility is repayable in 60 monthly instalments commencing November 2021. The facility bears an interest rate of 7.2% as of March 31, 2022. The net carrying value of the loan as of March 31, 2022, is INR 7 million (US$0.1 million).

During the current year ended March 31, 2022, the Company has obtained car loan of INR 2 million (US$0.0 million). Borrowing under this facility is repayable in 60 monthly instalments commencing January 2022. The facility bears an interest rate of 7.1% as of March 31, 2022. The net carrying value of the loan as of March 31, 2022, is INR 2 million (US$0.0 million).

### Covenants and debt financing costs

These aforementioned borrowings are subject to certain financial and non-financial covenants. Financial covenants include cash flow to debt service, indebtedness to net worth ratio, debt equity ratio and maintenance of debt service balances.

As of March 31, 2021, the Company was in compliance with the financial covenants or remediated the non-compliance prior to the issuance of these financial statements.

Generally, under the terms of the loan agreements entered into by the Company's project subsidiaries, the project subsidiaries are restricted from paying dividends, if they default in payment of their principal, interest and other amounts due to the lenders under their respective loan agreements. Certain of APGL's project subsidiaries also may not pay dividends out of restricted cash.

The carrying value of debt financing costs as on March 31, 2021 and March 31, 2022 was INR 1,107 million and INR 1,194 million (US$15.7 million), respectively, for the above loans, which is amortized over the term of the contract using the effective interest rate method.

Timely submission of financial statements of the Group, our subsidiaries and/or our subsidiary restricted groups is a key covenant in most of our financing agreements. While we have received the time extensions from several lenders, we have not yet received the requested time extensions from lenders representing INR 14,089 million (US$ 185.7 million) of our external indebtedness. The Company is currently under discussions with its lenders to obtain the requisite time extensions and expects to receive the same in due course.

### Restricted cash

The Company is required to maintain principal and interest, both as defined in the respective agreements, as a reserve with banks specified by the respective lenders. Such amounts, totaling INR 906 million and INR 1,786 million (US$23.5 million) as of March 31, 2021 and March 31, 2022, respectively, are classified as restricted cash on the consolidated balance sheets.

As of March 31, 2022, the aggregate maturities of long-term debt are as follows:

| As of March 31, | Annual maturities [1] | |
| --- | --- | --- |
| | INR | US$ |
| | (In million) | |
| 2023 | 7,480 | 98.6 |
| 2024 | 6,497 | 85.6 |
| 2025 | 34,676 | 457.1 |
| 2026 | 5,755 | 75.9 |
| 2027 | 34,011 | 448.3 |
| Thereafter | 34,521 | 455.0 |
| Total: aggregate maturities of long-term debt | 122,940 | 1,620.5 |
| Less: carrying value of unamortized debt financing costs | (1,189) | (15.7) |
| Net maturities of long-term debt | 121,751 | 1,604.8 |
| Less: current portion of long-term debt | 9,209 | 121.4 |
| Long-term debt | 112,542 | 1,483.4 |

[1] Long term debt (principal) obligations for foreign currency denominated borrowings have been translated to Indian rupees using the closing exchange rate as of March 31, 2022 as per Reserve Bank of India.

## 13. Income Taxes

The individual entities within the Company file individual tax returns as per the regulations existing in their respective jurisdictions.

The fiscal year under the Indian Income Tax Act ends on March 31. A portion of the Company's Indian operations qualify for deduction from taxable income because its profits are attributable to undertakings engaged in development of solar power projects under section 80-IA of the Indian Income Tax Act, 1961. This holiday is available for a period of ten consecutive years out of fifteen years beginning from the year in which the Company generates power ("Tax Holiday Period"). However, the exemption is only available to the projects completed on or before March 31, 2017. The Company anticipates that it will claim the aforesaid deduction in the last ten years out of fifteen years beginning with the year in which the Company generates power and when it has taxable income. Accordingly, its current operations are taxable at the applicable tax rates, based on eligibility criteria.

The Company had adopted the provisions of ASC Topic 740 as they relate to uncertain income tax positions. Tax exposures can involve complex issues and may require extended periods to resolve. The Company does not have any uncertain tax positions requiring recognition. The Company reassesses its tax positions in light of changing facts and circumstances, such as the closing of a tax audit, refinement of an estimate, or changes in tax codes. To the extent that the final tax outcome of these matters differs from the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made.

The provision (benefit) for income taxes consists of the following:

| | Year ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | 2022 |
| | INR | INR | INR | US$ |
| | (In million) | | | |
| Current tax expense [1] | 120 | 242 | 485 | 6.4 |
| Withholding tax on interest on Inter-Company debt related to green bonds | 258 | 384 | 367 | 4.8 |
| Deferred income tax (benefit)/expense | 111 | (330) | 464 | 6.1 |
| Total | 489 | 296 | 1,316 | 17.3 |

(1) Current tax on profit before tax. Current tax includes INR 42 million (US$0.6 million) for tax adjustment relating to earlier years

Income/(loss) before income taxes is as follows:

| | March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (INR) | (US$) |
| | (In million) | | | |
| Domestic operations | 326 | 8 | 19 | 0.3 |
| Foreign operations | (2,174) | (3,913) | (829) | (10.8) |
| **Total** | **(1,848)** | **(3,905)** | **(810)** | **(10.5)** |

Net deferred income taxes on the consolidated balance sheet is as follows:

| | March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Deferred tax assets | 2,836 | 4,201 | 55.4 |
| Less: valuation allowance | (1,088) | (2,281) | (30.1) |
| **Net deferred tax assets** | **1,748** | **1,920** | **25.3** |
| **Deferred tax liability** | 2,046 | 1,936 | 25.5 |

At March 31, 2022, the Company performed an analysis of the recoverability of the deferred tax asset. Based on the analysis, the Company has concluded that a valuation allowance offsetting the deferred tax assets is required. Change in the valuation allowance for deferred tax assets as of March 31, 2021 and March 31, 2022 is as follows:

| | March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Opening valuation allowance | 217 | 1,088 | 14.3 |
| Movement during the Year* | 871 | 1,193 | 15.8 |
| Closing valuation allowance | **1,088** | **2,281** | **30.1** |

\* For financial year 2021 and 2022, The movement also includes INR 741 million and INR 843 million (US$ 11.1 million) respectively relating to capital loss on rooftop and other asset classified as held for sale. The movement for financial year 2021 and 2022 also includes INR 269 million and reversal of INR 125 million (US$ 1.6 million) respectively relating to other rooftop assets that are part of the sale agreement which are expected to be settled beyond 12 months.

The significant components of the net deferred income tax assets and liabilities exclusive of amounts that would not have any tax consequences because they will reverse within the Tax Holiday Period, are as follows:

| | As of March 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| **Deferred tax assets:** | | | |
| Net operating loss [(a)] | 8,620 | 12,309 | 162.2 |
| Tax on Inter — Company margin | 320 | 210 | 2.8 |
| Deferred revenue | 466 | 503 | 6.6 |
| Asset retirement obligation | 191 | 232 | 3.1 |
| Depreciation and amortization | 102 | - | - |
| Minimum alternate tax credit | 612 | 765 | 10.1 |
| Other deductible temporary difference | 280 | 226 | 3.0 |
| Capital loss on investment in rooftop and other assets | 741 | 843 | 11.1 |
| Valuation allowance | (1,088) | (2,281) | (30.1) |
| **Deferred tax liabilities:** | | | |
| Depreciation and amortization | (9,697) | (12,732) | (167.8) |
| Other comprehensive income | (845) | (91) | (1.2) |
| **Net deferred tax (liability) asset** | **(298)** | **(16)** | **(0.2)** |

(a) Includes deferred tax on unabsorbed depreciation that can be carried forward indefinitely for set off as per income tax laws.

APGL, the holding company and two of its subsidiaries incorporated in Mauritius have an applicable income tax rate of 15%. However, the group's significant operations are based in India and are taxable as per the Indian Income Tax Act, 1961. For effective tax reconciliation purposes, the applicable tax rate in India has been considered. The income tax rate differs from the amount computed by applying the statutory income tax rate to loss before income taxes and is as follows:

| | 2020 | | 2021 | | 2022 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Tax (INR) | % | Tax (INR) | % | Tax (INR) | % | US$ |
| Statutory income tax (benefit)/expense | (646) | 34.94% | (1,365) | 34.94% | (283) | 34.94% | (3.7) |
| Temporary differences reversing in the Tax Holiday Period | (386) | 20.88% | (1,070) | 27.40% | (9) | (1.11)% | (0.1) |
| Impact of changes in tax rate | 3 | (0.16%) | - | - | - | - | - |
| Permanent timing differences | 1,327 | (71.81%) | 1,423 | (36.44%) | 25 | (3.05)% | 0.3 |
| Valuation allowance created / (reversed) during the year | (111) | 6.03% | 871 | (22.30%) | 1,193 | (147.32)% | 15.7 |
| Tax adjustment relating to earlier years | - | - | - | - | 42 | (5.19)% | 0.6 |
| Withholding tax on interest on Inter-Company debt related to green bonds | 258 | (13.96%) | 384 | (9.83%) | 367 | (45.31)% | 4.8 |
| Other difference | 44 | (2.38%) | 53 | (1.36%) | (37) | 4.57% | (0.5) |
| **Total** | **489** | **(26.46%)** | **296** | **(7.58%)** | **1,316** | **(162.46)%** | **17.3** |

During the year end March 31, 2020, The Taxation Laws (Amendment) Act, 2019 has brought key changes to corporate tax rates in the Income Tax Act, 1961, which reduced the tax rate for certain subsidiaries within the group to 25.17%. Azure Power India Private Limited and several of its subsidiaries which are claiming tax benefits under section 80-IA of the Income Tax Act had decided not to opt for this lower tax benefit and have continued

under the old regime for the fiscal year ended March 31, 2021 and 2022. The statutory income tax rate as per the Income Tax Act, 1961 ranges between 25.17% to 34.94%, depending on the tax regime chosen by the particular subsidiary.

As of March 31, 2020, 2021, and 2022, deferred income taxes have not been provided for the Company's share of undistributed net earnings of foreign operations due to management's intent to reinvest such amounts indefinitely.

## 14. Interest expense, net

Interest expense, net consists of the following:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2022** |
| | **(INR)** | **(INR)** | **(INR)** | **(US$)** |
| | | **(In million)** | | |
| **Interest expense:** | | | | |
| Term loans | 7,655 | 8,399 | 10,067 | 132.7 |
| Bank charges and other [(1)] | 871 | 598 | 2,341 | 30.9 |
| Loss on account of modification of contractual cash flows | - | - | 294 | 3.9 |
| | 8,526 | 8,997 | 12,702 | 167.5 |
| **Interest income:** | | | | |
| Term and fixed deposits | 564 | 554 | 578 | 7.6 |
| Others | - | 33 | 194 | 2.7 |
| | 564 | 587 | 772 | 10.3 |
| **Total** | 7,962 | 8,410 | 11,930 | 157.2 |

[(1)] Bank charges and other includes amortization of debt financing costs of INR 709 million, INR 369 million and INR 1,107 million (US$14.6 million) for the years ended March 31, 2020, 2021 and 2022, respectively, and includes debt financing costs written off related to the debt refinancing amounting to INR 271 million, INR 30 million and INR 739 million (US$9.7 million), respectively.

## 15. Loss on foreign currency exchange

Loss on foreign currency exchange consists of the following:

| | Year ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2022** |
| | **(INR)** | **(INR)** | **(INR)** | **(US$)** |
| | | **(In million)** | | |
| Unrealized loss/ (gain) on foreign currency loans | 258 | (12) | 1 | 0.0 |
| Realized (gain) loss on foreign currency loans | 18 | 13 | - | - |
| Realized loss/ (gain) on derivative instruments | 109 | (1) | (4,886) | (64.4) |
| Other loss on foreign currency exchange | 127 | 7 | 4,852 | 64.0 |
| **Total** | 512 | 7 | (33) | (0.4) |

## 16. Equity shares

### *Equity shares*

Equity shares have a par value of US$0.000625 per share at APGL. There is no limit on the number of equity shares authorized. As of March 31, 2021, and 2022, there were 48,195,962 and 64,161,490 equity shares issued and outstanding.

| | As of March 31, | | | |
|---|---|---|---|---|
| | **2021** | **2021** | **2022** | **2022** |
| | **Number of shares** | **INR in thousands** | **Number of shares** | **INR in thousands** |
| **Issued:** | | | | |
| Outstanding and fully paid: | | | | |
| Equity shares of US$0.000625 par value each | | | | |
| Beginning balance | 47,650,750 | 2,065 | 48,195,962 | 2,090 |
| Issuance of new shares [1] | - | - | 15,828,917 | 741 |
| Exercise of ESOPs [2] | 545,212 | 25 | 136,611 | 6 |
| **Ending balance** | **48,195,962** | **2,090** | **64,161,490** | **2,837** |

[1] During the current year, the Company's has raised proceeds of INR 18,621 million (US$245.4 million) net of issuance expenses through its Rights offering and has issued 15,828,917 equity shares (par value $0.000625 per share) at US$15.79 per share. These proceeds from the rights offering have been invested in subsidiaries and are utilised for repayment of existing corporate borrowings.

[2] Refer Note 21 for details of ESOPs exercised during the year.

### *Accumulated other comprehensive loss*

The following represents the changes and balances to the components of accumulated other comprehensive loss:

| | Foreign currency translation, net of taxes | Cashflow Hedge, net of taxes | Total accumulated other comprehensive loss, net of taxes |
|---|---|---|---|
| | **(INR)** | **(INR)** | **(INR)** |
| **Balance as of March 31, 2020** | **(7,682)** | **5,745** | **(1,937)** |
| Adjustments during the year | 1,600 | (635) | 965 |
| **Balance as of March 31, 2021** | **(6,082)** | **5,110** | **(972)** |
| Adjustments during the year | 2,943 | (4,474) | (1,531) |
| **Balance as of March 31, 2022** | **(3,139)** | **636** | **(2,503)** |
| **Balance as of March 31, 2022 ((US$) (Note 2(d))** | **(41.4)** | **8.4** | **(33.0)** |

## 17. Earnings per share

The Company calculates earnings per share in accordance with FASB ASC Topic 260 Earnings Per Share and FASB ASC Topic 260-10-45 Determining Whether Instruments Granted in Share-Based Payment Transactions Are Participating Securities. Basic and diluted earnings losses per equity share give effect to the change in the number of equity shares of the Company. The calculation of basic earnings per equity share is determined by dividing net profit/loss attributable to APGL equity shareholders by the weighted average number of equity shares outstanding during the respective periods. The potentially dilutive shares, consisting of employee share options have been included in the computation of diluted net earnings per share and the weighted average shares outstanding, except where the result would be anti-dilutive.

Net (loss)/profit per share is presented below:

| | Year ended March 31 | | | |
| --- | --- | --- | --- | --- |
| | 2020 (INR) | 2021 (INR) | 2022 (INR) | 2022 (US$) |
| | (amounts in millions, except share and per share data) | | | |
| Net loss attributable to APGL equity shareholders **(A)** | (2,269) | (4,206) | (2,104) | (27.5) |
| **Shares outstanding for allocation of undistributed income:** | | | | |
| Equity shares | 47,650,750 | 48,195,962 | 64,161,490 | 64,161,490 |
| **Weighted average shares outstanding** | | | | |
| Equity shares – Basic (B) | 43,048,026 | 47,979,581 | 50,876,360 | 50,876,360 |
| Equity shares – Diluted (C) | 43,048,026 | 47,979,581 | 50,876,360 | 50,876,360 |
| **Net (loss)/profit per share — basic and diluted** | | | | |
| Equity earnings/(loss) per share – Basic (D=A/B) | (52.71) | (87.66) | (41.36) | (0.55) |
| Equity earnings/(loss) per share – Diluted (E=A/C) | (52.71) | (87.66) | (41.36) | (0.55) |

Refer to Note 16 for details of shares issued.

The number of share options outstanding but not included in the computation of diluted earnings per equity share because their effect was antidilutive is 703,708 and 184,600 for years ended March 31, 2021 and 2022, respectively.

## 18. Leases

The Company has several non-cancellable operating leases, primarily for construction of solar power plants and for office facilities, warehouses, and office space that have a lease term ranging between 3 to 35 years (after considering further extendable period on mutual agreement by both lessor and lessee). The Company has considered the renewal options in determining the lease term to the extent it was reasonably certain to exercise those renewal options and accordingly, associated potential option payments are included as part of lease payments.

The components of lease cost for the year ended March 31, 2021 and March 31, 2022 were as follows:

| | For the year ended March 31, | | |
| --- | --- | --- | --- |
| | 2021 INR | 2022 INR | 2022 US$ |
| | | (In million) | |
| Operating lease cost | 502 | 439 | 5.8 |
| Short-term lease cost | 13 | 17 | 0.2 |
| **Total lease cost** | **515** | **456** | **6.0** |

Amounts reported in the consolidated balance sheet as of March 31, 2021 and March 31, 2022 were as follows:

| | As at March 31, 2021 INR | As at March 31, 2022 INR | As at March 31, 2022 US$ |
|---|---|---|---|
| | | (In million) | |
| **Non-current assets** | | | |
| Right-of-use assets* | 4,214 | 4,465 | 58.9 |
| **Non-current liabilities** | | | |
| Lease liabilities | 3,359 | 3,534 | 46.6 |
| **Current liabilities** | | | |
| Lease liabilities | 283 | 300 | 4.0 |
| **Total operating lease liabilities** | **3,642** | **3,834** | **50.6** |

\* Also see note 27. "Whistle-blower Allegations and Special Committee Investigation" for adjustment towards payment made to land aggregators

Other information related to leases as of March 31, 2021 and March 31, 2022 was as follows:

| | As at March 31, 2021 INR | As at March 31, 2022 INR | As at March 31, 2022 US$ |
|---|---|---|---|
| | | (In million) | |
| Supplemental cash flow information: | | | |
| Cash paid for amounts included in the measurement of lease liabilities | 331 | 310 | 4.1 |
| Weighted average remaining lease term | 30 years | 30 years | |
| Incremental borrowing rate | 10% | 10% | |

Maturities of lease liabilities under non-cancellable leases as of March 31, 2022 are as follows:

| Year ended March 31, 2022 | Amount (INR) | US$ |
|---|---|---|
| | (In million) | |
| Fiscal 2023 | 313 | 4.1 |
| Fiscal 2024 | 320 | 4.2 |
| Fiscal 2025 | 331 | 4.4 |
| Fiscal 2026 | 340 | 4.5 |
| Fiscal 2027 | 350 | 4.6 |
| Thereafter | 11,913 | 157.1 |
| **Total undiscounted lease payments** | **13,567** | **178.9** |
| Less: Imputed interest | 9,733 | 128.3 |
| **Total lease liabilities** | **3,834** | **50.6** |

## 19. Commitments, guarantees and contingencies

### A) Capital commitments

The commitments for the purchase of property, plant and equipment were INR 12,931 million and INR 2,857 million (US$37.7 million) as of March 31, 2021 and 2022 respectively.

### B) Guarantees

The terms of our PPAs provide for the annual delivery of a minimum amount of electricity at fixed prices. Under the terms of the PPAs, we have issued irrevocable performance bank guarantees. These in total amount to INR 7,730 and INR 5,179 million (US$68.3 million) as of March 31, 2021 and 2022 respectively.

As of March 31, 2021 and 2022, the Company has irrevocable performance bank guarantees aggregating to INR 5,366 million and INR 2,320 million (US$30.6 million) respectively, in relation to under construction

projects. Further, bank guarantees of INR 516 million and INR 1,517 million (US$20.0 million) as of March 31, 2021 and 2022 respectively are in relation to commissioned projects as per respective PPAs and other project requirements.

Bank guarantees amounting to INR 906 million and INR 458 million (US$6.0 million) as of March 31, 2021 and 2022 respectively, have been issued to meet Debt-Service Reserve Account (DSRA) requirements for outstanding loans.

We have also obtained guarantees from financial institutions as a part of the bidding process for establishing solar projects amounting to INR 932 million and INR 873 million (US$11.5 million) as of March 31, 2021 and 2022 respectively. We have given term deposits as collateral for those guarantees which are classified as restricted cash on the consolidated balance sheet.

Further, INR 10 million and INR 11 million (US$0.1 million) bank guarantee as of March 31, 2021 and 2022 respectively, are towards other commitments. The funds released from maturity/settlement of existing bank guarantees can be used for future operational activities.

## C) Contingencies

A PIL had been initiated by certain individuals claiming to be wildlife experts/interested in conservation of wildlife, before the Supreme Court of India against various state governments such as Rajasthan, Gujarat, and MNRE, MOP among others, seeking protection of the two endangered bird species, namely the GIB and the Lesser Florican found in the states of Rajasthan and Gujarat. The Supreme Court by way of order dated April 19, 2021 issued directions to: (i) underground all low voltage transmission lines, existing and future lines falling in potential and priority habitats of GIB, (ii) to convert all existing high voltage lines in priority and potential areas of GIB where found feasible within a period of one year, if not found feasible, the matter to be referred to the committee formed by the Supreme Court which will take a decision on feasibility, and (iii) to install bird diverters on all existing overhead lines in the interim.

We and many other developers have projects in the potential area as determined by the court, hence aggrieved by the order, the Solar Power Developers Association ("SPDA") and Union of India have filed an application before the Supreme Court seeking among others, exemption from undergrounding of transmission lines in potential areas. The matter was last listed on November 30, 2022, whereby directions have been passed to parties to ensure installation of bird diverters in the Priority Area and for them to be in compliance with quality standards issued by the Supreme Court Committee. The PIL is presently pending. The SPDA has filed an application seeking modification of Supreme Court's order dated April 19, 2021. If the modification application is dismissed, we might entail significant costs and delays. Based on evaluation of management the capital outflow for acquisition and installation of bird divertors are not material.

## 20. Related Party Disclosures

The Company has certain loan facilities with International Finance Corporation ("IFC"), which was a substantial shareholder of the Company having significant influence, up-to August 6, 2021. During the current period, OMERS Infrastructure Asia Holdings Pte. Ltd. ("OMERS"), has acquired the entire stake of 19.4% in the Company, previously held by International Finance Corporation and IFC GIF Investment Company.

The Company had two outstanding disputes with its erstwhile Chief Executive Officer, Mr. Inderpreet Singh Wadhwa. During the current year, the Company has received an unfavorable Award from the Mumbai Centre for International Arbitration in relation to Mr. Wadhwa's transition from the Company, and subsequently made payments as required in the Award, without prejudice to its rights.

In respect of second matter, during the current year the Company received a favorable Award from Singapore International Arbitration Centre in relation to the purchase price of shares, held by Mr. Inderpreet Singh Wadhwa and Mr. H. S. Wadhwa (erstwhile Chief Operating Officer), in Azure Power India Private Limited. However, Mr. Inderpreet Singh Wadhwa has challenged the award and filed an appeal before the High Court of Singapore. Subsequent to year end, the appeal challenging the SIAC Award has been dismissed by the Singapore court.

## 21. Share based compensation

The Company has a 2015 Stock Option Plan and 2016 Equity Incentive Plan and as amended on March 31, 2020 (collectively "ESOP Plans") duly approved by the Board of Directors and had 2,023,744 stock options in the employee stock option pool. Under the ESOP Plans, the Compensation Committee on behalf of Board of Directors (the "Directors") may from time to time make grants to one or more employees, determined by it to be eligible for participation under the plans.

The Compensation Committee determines which employees are eligible to receive the equity awards, the number of equity awards to be granted, the exercise price, the vesting period and the exercise period. The vesting period will be decided by the Compensation Committee as and when any grant takes place. All options granted under these plans shall vest over a period of 4 years from the date of grant with 25% vesting at the end of year one, 25% vesting at the end of year two, 25% vesting at the end of year three and 25% vesting at the end of year four unless specified otherwise. Shares forfeited by the Company are transferred back to the employee stock pool and shall be available for new grants.

Options are deemed to have been issued under these plans only to the extent actually issued and delivered pursuant to a grant. To the extent that a grant lapses or the rights of its grantee terminate, any equity shares subject to such grant are again available for new grants.

The option grant price may be determined by the Compensation Committee and is specified in the option grant. The grant is in writing and specifies the number of options granted the price payable for exercising the options, the date/s on which some or all of the options shall be eligible for vesting, fulfilment of the performance and other conditions, if any, subject to when vesting shall take place and other terms and conditions thereto. The option grant can be exercised only by the employees/ Key Managerial personal (KMP) of the Company.

### Employee Stock Option Plan and Restricted Stocks (RS)

Options granted under the plan are exercisable into equity shares of the Company, have a contractual life equal to the shorter of ten years, or July 20, 2025, or July 20, 2027, as the case may be, and vest equitably over four years, unless specified otherwise in the applicable award agreement. The Company recognizes compensation cost, reduced by the estimated forfeiture rate, over the vesting period of the option. A summary of share option activity during the years ended March 31, 2021 and March 31, 2022 is set out below:

| | Number of options | Weighted average exercise price in INR |
|---|---|---|
| Options outstanding as of March 31, 2020 | 870,065 | 756 |
| Granted [(1)] | 443,772 | 1,466 |
| Converted from RSU* | 10,920 | - |
| Exercised | (545,212) | 709 |
| Forfeited | (75,837) | 861 |
| Options outstanding as of March 31, 2021 | 703,708 | 1,217 |
| Vested and exercisable as of March 31, 2021 | 231,712 | 852 |

(1) Includes 4,273 RS granted during the year to its Directors.

* The Company had converted RSU issued to its Board members into Restricted Shares (RS) at the then current share price on the date of conversion to be settled into equity shares of the Company.

| | Number of options | Weighted average exercise price in INR |
|---|---|---|
| Options outstanding as of March 31, 2021 | 703,708 | 1,217 |
| Granted [1] | 24,205 | 1583 |
| Exercised | (136,611) | 788 |
| Forfeited | (32,474) | 1,613 |
| Options outstanding as of March 31, 2022 | 558,829 | 1,314 |
| Vested and exercisable as of March 31, 2022 | 250,784 | 1,128 |

(1)  Includes 4,748 RS granted during the year to its Directors.

Total options available for grant as of March 31, 2022 was 457,114 ESOPs.

The Black-Scholes-Merton option pricing model includes assumptions regarding dividend yields, expected volatility, expected option term, and risk-free interest rates. The Company estimates expected volatility based on the historical volatility of the Company (considering sufficient history of its own data is available now for identifying the volatility). The risk-free interest rate is based on the yield of relevant time period based on US government bonds in effect at the time of grant for a period commensurate with the estimated expected life. The expected term of options granted is derived using the "simplified" method as allowed under the provisions of ASC Topic 718 to provide a reasonable basis upon which to estimate expected term.

The fair value of each share option granted to employees/ RS is estimated on the date of grant using the lack- Scholes option-pricing model with the following weighted average assumptions:

| | Year ended March 31, | |
|---|---|---|
| | 2021 | 2022 |
| Dividend yield | 0% | 0% |
| Expected term (in years) | 3.7 – 7.4 | 3.8 – 5.1 |
| Expected volatility | 34.0% - 45.6% | 46.3% - 47.8% |
| Risk free interest rate | 0.49% - 1.01% | 0.55% - 0.80% |

As of March 31, 2021, and 2022, the aggregate intrinsic value of all outstanding options was Nil.

The share-based compensation expense related to share options (including RS) is recorded as a component of general and administrative expenses in the Company's consolidated statements of operations and totaled, INR 17 million, INR 36 million and INR 69 million (US$0.9 million) for the years ended March 31, 2020, 2021 and 2022, respectively. The amount of share-based compensation expense capitalized during the year ended March 31, 2021 and 2022 was INR 8 million and INR 23 million (US$0.3 million), respectively.

Unrecognized compensation cost for unvested options as of March 31, 2022 is INR 104 million (US$1.4 million), which is expected to be expensed over a weighted average period of 3.1 years.

The intrinsic value of options exercised during the year ended March 31, 2021, and March 31, 2022 was INR 35 million and INR Nil respectively.

During November 2018, the Company repriced the exercise price for 692,507 options, which were previously awarded to certain officers, employees and directors under the ESOP plans from US$13.25 to US$11.90 per share. All terms and conditions of the eligible options, including the vesting schedule, service condition and other terms remain the same. The impact of the repricing of the options has been considered in the company's financial statements.

The intrinsic value per option at the date of grant during the years ended March 31, 2021 and 2022 is as follows:

| Date of grant | No. of options granted | Deemed fair value of equity shares (INR) | Intrinsic value per option at the time of grant (INR) | Valuation used |
|---|---|---|---|---|
| October 01, 2020* | 4,273 | 2,320 | — | Market price |
| March 31, 2021 | 182,800 | 2,057 | — | Market price |
| July 7, 2021 | 20,000 | 1,838 | — | Market price |

\*   Pertains to RSUs converted into RSs at the prevailing market price.

**Stock Appreciation Rights (SARs)**

The Company granted incentive compensation in the form of Stock Appreciation Rights ("SARs"), as defined in the Company's 2016 Equity Incentive Plan, as amended on March 31, 2020, to its CEO and COO. The SARs have been granted in 4 tranches with maturity dates up to financial year March 31, 2028.

A summary of SARs activity during the periods ending March 31, 2021 and 2022 is set out below:

| | Number of SARs | Weighted average exercise price in INR |
|---|---|---|
| SAR outstanding as of March 31, 2020 | 1,970,000 | 752 |
| Granted | 80,000 | 2,056 |
| Exercised | (175,000) | 722 |
| Options outstanding as of March 31, 2021 | 1,875,000 | 810 |
| Vested as of March 31, 2021 | 417,500 | 757 |
| Exercisable as of March 31, 2021 | 67,500 | 940 |

| | Number of SARs | Weighted average exercise price in INR |
|---|---|---|
| SAR outstanding as of March 31, 2021 | 1,875,000 | 810 |
| Granted | - | - |
| Options outstanding as of March 31, 2022 | 1,875,000 | 810 |
| Vested as of March 31, 2022 | 680,000 | 805 |
| Exercisable as of March 31, 2022 | 130,000 | 1,154 |

The fair value of each SAR granted to employees is estimated at each reporting date using the Black- Scholes option-pricing model with the following weighted average assumptions:

| | Year ended March 31, | |
|---|---|---|
| | 2021 | 2022 |
| Dividend yield | 0% | 0% |
| Expected term (in years) | 3.7 – 5.2 | 3.2 – 4.7 |
| Expected volatility | 45.20% - 45.64% | 49.32% - 52.52% |
| Risk free interest rate | 0.63% -  1.01% | 2.45% -2.49% |

The share-based compensation expense related to SARs is recorded as a component of general and administrative expenses in the Company's consolidated statements of operations totaled INR 1,319 million and reversal of expense of INR 373 million (US$4.9 million) for the year ended March 31, 2021 and 2022, respectively. The amount of share-based compensation expense capitalized during the year ended March 31, 2021 and 2022 was INR Nil million. The carrying value of the liability recorded for SARs as at March 31, 2021 and 2022 was INR 1,217 million and INR 844 million (US$11.1 million), respectively.

Unrecognized compensation cost for unvested SARs as of March 31, 2022 is INR 414 million (US$5.5 million), which is expected to be expensed over a weighted average period of 3.4 years.

On April 26, 2022, the Company through its Board of Directors has accepted the resignations of erstwhile CEO and COO of the Company. Both of the KMP's were relinquished from their roles with the Company/ Group with immediate effect. Considering the same adjustment in relation to stock appreciation rights of CEO and COO will be made in Fiscal Year 2023.

The fair value per SAR at the date of grant during the year ended March 31, 2022 is as follows:

| Date of grant | No. of SARs granted | Deemed fair value of SAR (INR) | Vesting period | Valuation used |
|---|---|---|---|---|
| July 18, 2019 | 200,000 | 722 | February 2020 | Market price |
| July 18, 2019 | 1,600,000 | 722 | March 31, 2020 to July 31, 2027 | Market price |
| March 30, 2020 | 170,000 | 1,069 | March 31, 2021 to March 31, 2024 | Market price |
| March 30, 2021 | 80,000 | 2,056 | March 31, 2022 to March 31, 2025 | Market price |

## 22. Post retirement plans

The Company has a defined benefit gratuity plan. Every employee who has completed five years or more of service is entitled to a gratuity on departure at 15 days salary (last drawn salary) for each completed year of service. The Scheme is unfunded and accrued cost is recognized through a provision in the accounts of the company.

The following table sets forth the changes in projected benefit obligations -

| | As of March 31 | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| **Benefit obligation at beginning of year** | 34 | 50 | 0.7 |
| Service cost | 13 | 14 | 0.2 |
| Interest cost | 3 | 4 | 0.1 |
| Net actuarial loss (gain) | 16 | (8) | (0.1) |
| Benefits paid | (16) | (4) | (0.1) |
| **Benefit obligation at end of year** | 50 | 56 | 0.8 |
| **Amounts recognized in statement of financial position at March 31 consist of:** | | | |
| Other non-current liabilities | 47 | 53 | 0.7 |
| Other current liabilities | 3 | 3 | 0.1 |
| **Net amount recognized** | 50 | 56 | 0.8 |

### Components of Net Periodic Benefit Cost (Income)

Net periodic benefit cost (income) for our postretirement benefit plans consisted of the following and is recorded as a component of general and administrative expenses in the Company's consolidated statement of operations:

| | Year ended March 31 | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| Service Cost | 13 | 14 | 0.2 |
| Interest Cost | 3 | 4 | 0.1 |
| Amortization of: | | | |
| Net actuarial loss (gain) | 16 | (8) | (0.1) |
| **Net periodic benefit cost (income)** | **32** | **10** | **0.2** |

**The principal assumptions used in determining gratuity for the Company's plans are shown below:**

| | Year ended March 31 | |
|---|---|---|
| | 2021 | 2022 |
| Discount rate | 7.53% | 7.92% |
| Salary escalation rate | 10.00% | 10.00% |
| Employee turnover rate | 9.00% | 9.00% |
| Retirement age | 58 years | 58 years |

**The following estimated payments to the defined benefit plan in future years:**

| | Year ended March 31 | | |
|---|---|---|---|
| | 2021 | 2022 | 2022 |
| | (INR) | (INR) | (US$) |
| | | (In million) | |
| **Within the next** | | | |
| - 1 year | 3 | 4 | 0.1 |
| - 1 and 2 years | 3 | 3 | 0.0 |
| - 2 and 3 years | 3 | 4 | 0.1 |
| - 3 and 4 years | 4 | 5 | 0.1 |
| - 4 and 5 years | 4 | 5 | 0.1 |
| - 5 and 10 years | 25 | 24 | 0.3 |

**23. Impairment of assets and Assets held for sale**

In April 2021, the Company has entered into an agreement with Radiance to sell certain subsidiaries (the "Rooftop Subsidiaries") with an operating capacity of 153 MW (the "Rooftop Portfolio") for INR 5,350 million, subject to certain purchase price adjustments (the "Rooftop Sale Agreement"). Pursuant to the Rooftop Sale Agreement, Radiance will acquire 100% of the equity ownership of the Rooftop Subsidiaries owned by the Group. The Company had recognized an impairment loss in relation to the Rooftop Subsidiaries aggregating to INR 3,255 million during the year ended March 31, 2021, pursuant thereto these assets (net) are carried at its fair values in the financial statements.

As per the terms of the Rooftop Sale Agreement in respect to 43.2 MW operating capacity that are part of the Restricted Groups (as defined in the respective Green Bond Indentures) 48.6% of the equity ownership has been transferred to Radiance on the closing date, and pursuant to the terms of the Green Bond Indentures, the remaining 51.4% may only be transferred post refinancing of the Green Bonds. During the current year in August 2021, post refinancing of 5.5% Senior Notes and repayment of loan relating to one of a rooftop project of 10 MW, the restriction on transfer of shareholding was released and related assets and liabilities of the SPV have been reclassified as assets held for sale. Further, the loan repaid by the Company relating to this 10 MW project will be recovered from Radiance.

The transfer of ownership for the remaining operating capacity of 33.2 MW for the Solar Green Bonds is not anticipated to occur within 12 months, hence, the assets and liabilities of these subsidiaries are not presented as "Assets classified as held for sale" and instead continue to be classified within the respective balance sheet captions in the consolidated financial statements at March 31, 2022 and March 31, 2021 respectively.

There is also a restriction on transfer of equity ownership relating to the 16 MW project with Delhi Jal Board (DJB), wherein 49% of the equity ownership will be transferred to Radiance on closing date, and the remaining 51% will be transferred on or after March 31, 2024. Accordingly, the related assets and liabilities of

the DJB 16 MW project are not presented as "Assets classified as held for sale" and instead continue to be classified within the respective balance sheet captions at March 31, 2022 and March 31, 2021 respectively.

In May 2021, the Company has disposed its investment in a subsidiary on a going concern basis for consideration of INR 123 million (US$1.7 million). The same was reported as asset held for sale under financials for the year ended March 31, 2021.

In February 2022, the Company has also executed a revised agreement with Radiance and transferred 100% shareholding in relation to 15.9 MW operating MW of rooftop entities (including 10 MW where restriction on account of Bonds was released post refinancing), 48.6% of the equity ownership of entities forming part of Restricted Groups having 33.2 MW operating capacity and 49% of the equity ownership relating to the 16 MW project with Delhi Jal Board (DJB). Further, subsequent to year end, Company has transferred 100% shareholding in relation to 2.5 MW operating capacity

In the event the sale of the Rooftop Subsidiaries does not occur, the Company must reimburse Radiance the equity value of the assets not transferred along with an 10.5% per annum equity return.

On May 27, 2023, Radiance have sent the Company a notice to terminate the Master Share Purchase Agreement in relation to 86.5 MW Rooftop portfolio. The Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the remaining un-transferred 86.5 MW portfolio to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement. Accordingly, the assets and related liabilities of these subsidiaries are not presented as "Assets classified as held for sale" and instead re-classified within the respective balance sheet captions in the consolidated balance sheet as at March 31, 2022.

The assets and liabilities of the Rooftop Subsidiaries classified as held for sale, together with the calculation of the related impairment loss is shown below.

|  | As of March 31, | | |
| --- | --- | --- | --- |
|  | 2022 | 2022 | 2021 |
|  | (INR) | (US$) | (INR) |
|  |  | (In million) |  |
| Current assets: |  |  |  |
| Cash and cash equivalents | 41 | 0.6 | 290 |
| Restricted cash | 9 | 0.1 | 84 |
| Accounts receivable, net | 1 | 0.0 | 149 |
| Prepaid expenses and other current assets | - | - | 44 |
| **Total current assets** | **51** | **0.7** | **567** |
| Restricted cash | - | - | 143 |
| Property, plant and equipment, net | 96 | 1.3 | 4,576 |
| Deferred income taxes | - | - | 359 |
| Right-of-use assets | - | - | 87 |
| Other assets | - | - | 23 |
| **Total assets (A)** | **147** | **2.0** | **5,755** |
| Liabilities |  |  |  |
| Current liabilities: |  |  |  |
| Accounts payable | 1 | 0.0 | 13 |
| Current portion of long-term debt | 66 | 0.9 | 12 |
| Interest payable | 2 | 0.0 | 91 |
| Other liabilities | 4 | 0.1 | 159 |
| **Total current liabilities** | **73** | **1.0** | **275** |
| Non-current liabilities: |  |  |  |
| Long-term debt | - | - | 1,939 |
| Deferred income taxes | - | - | 6 |
| Other liabilities | - | - | 59 |
| **Total liabilities (B)** | **73** | **1.0** | **2,279** |
| **Net Assets (C=A-B)** | **74** | **1.0** | **3,476** |
| **Fair value (D)** | **54** | **0.7** | **878** |
| **Impairment loss/ (reversal)* (E=C-D)** | **20** | **0.3** | **2,598** |

The Company has recognized reversal of impairment loss of INR 80 million (US$1.1 million) in this respect under in Consolidated Statement of Operations for the current year ended March 31, 2022, primarily due to 86.5 MW rooftop portfolio re-classified from asset held for sale to respective balance sheet captions in the consolidated balance sheet as at March 31, 2022.

The fair value of consideration related to the rooftop sale in previous year includes expected recovery of VGF for INR 463 million (US$6.1 million). The Company has undertaken to refund to the purchaser an amount equivalent to 85% of any shortfall in recovery of VGF. Based on the current circumstances, management has assessed that they have complied with the conditions associated with the grant of VGF and hence have determined that the recovery of the VGF is likely.

During the current year ended March 31, 2022, in respect of the 33.2 MW operating capacity that are part of the Restricted Groups, and 16 MW project with Delhi Jal Board, the Company has consolidated the entities in the consolidated financial statements and net carrying value of assets are reinstated. The Company has reported the Minority interest equivalent to shareholding transferred to Radiance.

**24. Fair Value Measurements**

ASC Topic 820 Fair Value Measurements and Disclosures defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly, hypothetical transaction between market participants at the measurement date. ASC Topic 820 establishes a three-tier value hierarchy of fair value measurement based upon the whether the inputs to that measurement are observable or unobservable. Observable inputs reflect data obtained from independent sources while unobservable inputs reflect the Company's market assumptions. ASC Topic 820 prioritizes the inputs used in the valuation methodologies in measuring fair value as follows:

Level 1 — Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 — Includes other inputs that are directly or indirectly observable in the marketplace. Observable inputs, other than Level 1 quoted prices for similar instruments in active markets; quoted prices for similar or identical instruments in markets that are not active; and valuations using models in which all significant inputs are observable in active markets.

Level 3 — Unobservable inputs which are supported by little or no market activity.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

In accordance with ASC Topic 820, assets and liabilities are to be measured based on the following valuation techniques:

Market approach — Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.

Income approach — converting the future amounts based on the market expectations to its present value using the discounting methodology.

Cost approach — Replacement cost method.

The valuation techniques used by the Company to measure and report the fair value of certain financial assets and liabilities on a recurring basis are as follows;

*Foreign exchange derivative contracts*

The Company enters into foreign exchange option contracts to hedge fluctuations in foreign exchange rates for recognized balance sheet items such as foreign exchange term loans. The Company mitigates the credit risk of these foreign exchange option contracts by transacting with highly rated counterparties which are major banks. The Company uses valuation models to determine the fair value of the foreign exchange option contracts. The inputs considered include the theoretical value of a call option, the underlying spot exchange rate as of the balance sheet date, the contracted price of the respective option contract, the term of the option contract, the implied volatility of the underlying foreign exchange rates and the risk-free interest rate as of the balance sheet date. The techniques and models incorporate various inputs including the credit worthiness of counterparties, foreign exchange spot and forward rates, interest rate yield curves, forward rate yield curves of the underlying option contracts. The Company classifies the fair value of these foreign exchange option contracts in Level 2 because the

inputs used in the valuation model are observable in active markets over the term of the respective option contracts.

| | | Fair value measurement at reporting date using | | |
|---|---|---|---|---|
| Description | As of March 31, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| | | (In million) | | |
| **Assets** | | | | |
| **Current assets** | | | | |
| Forward exchange derivative contracts (INR) | 914 | - | 914 | - |
| **Non-current assets** | | | | |
| Fair valuation of swaps and options (INR) | 5,765 | - | 5,765 | - |
| Forward exchange derivative contracts (INR) | 21 | - | 21 | - |
| **Total assets (INR)** | **6,700** | **-** | **6,700** | **-** |
| **Total assets (US$)** | **91.6** | **-** | **91.6** | **-** |

| | | Fair value measurement at reporting date using | | |
|---|---|---|---|---|
| Description | As of March 31, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| | | (In million) | | |
| **Liabilities** | | | | |
| **Current liabilities** | | | | |
| Forward exchange derivative contracts | 961 | - | 961 | - |
| **Non-current liabilities** | | | | |
| **Other Liabilities** | | | | |
| Fair valuation of swaps and forward (INR) | 251 | - | 251 | - |
| **Total Liabilities (INR)** | **1,212** | **-** | **1,212** | **-** |
| **Total Liabilities (US$)** | **16.5** | **-** | **16.5** | **-** |

| Description | | Fair value measurement at reporting date using | | | |
| --- | --- | --- | --- | --- | --- |
| | | As of March 31, 2022 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| | | | (In million) | | |
| **Assets** | | | | | |
| **Current assets** | | | | | |
| Forward exchange derivative contracts (INR) | | 13 | - | 13 | - |
| **Non-current assets** | | | | | |
| Fair valuation of swaps and options (INR) | | 2,647 | - | 2,647 | - |
| Fair valuation of swaps and forward (INR) | | 883 | - | 883 | - |
| **Total assets (INR)** | | **3,543** | **-** | **3,543** | **-** |
| **Total assets (US$)** | | **46.7** | **-** | **46.7** | **-** |

| Description | | Fair value measurement at reporting date using | | | |
| --- | --- | --- | --- | --- | --- |
| | | As of March 31, 2022 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| | | | (In million) | | |
| **Liabilities** | | | | | |
| **Current liabilities** | | | | | |
| Forward exchange derivative contracts (INR) | | 106 | - | 106 | - |
| Fair valuation of swaps and forward (INR) | | 658 | - | 658 | - |
| Fair valuation of swaps and options (INR) | | 1,735 | - | 1,735 | - |
| **Non-current liabilities** | | | | | |
| Fair valuation of swaps and forward (INR) | | 7 | - | 7 | - |
| **Total Liabilities (INR)** | | **2,506** | **-** | **2,506** | **-** |
| **Total Liabilities (US$)** | | **33.0** | **-** | **33.0** | **-** |

The carrying amount of cash and cash equivalents, including restricted cash, accounts receivable, accounts payables, and other current financial assets and liabilities approximate their fair value largely due to the short-term maturities of these instruments and are classified as level 2. There have been no transfers between categories during the current year.

The carrying value and fair value of the Company's fixed rate project financing term loans is as follows:

| | As of March 31, | | |
| | 2021 | | |
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) | |
|---|---|---|---|
| Fixed rate project financing loans: | | | |
| Foreign currency loans | 61,993 | 66,255 | 905.9 |
| Indian rupee loans | 5,910 | 5,628 | 76.9 |

| | As of March 31, | | |
| | 2022 | | |
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) | |
|---|---|---|---|
| Fixed rate project financing loans: | | | |
| Foreign currency loans | 56,785 | 57,032 | 751.7 |
| Indian rupee loans | 4,006 | 3,580 | 47.2 |

The Company uses the yield method to estimate the fair value of fixed rate loans using interest rate change as an input. The carrying amount of the Company's variable rate project financing terms loans approximate, their fair values due to their variable interest rates.

The carrying value and fair value of the Company's investment in the Bank of Mauritius notes, classified as held to maturity securities is as follows:

| | As of March 31, | | |
| | 2021 | | |
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) | |
|---|---|---|---|
| Non-current investments: | | | |
| Fixed rate Bank of Mauritius notes | 7 | 7 | 0.1 |

| | As of March 31, | | |
| | 2022 | | |
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) | |
|---|---|---|---|
| Current investments: | | | |
| Fixed rate Bank of Mauritius notes | 6 | 6 | 0.1 |

The Company uses the yield method to estimate the fair value of fixed rate Bank of Mauritius notes by using interest rate as an input. The carrying amount of the Company's investment in fixed rate Bank of Mauritius notes approximate, their fair values relative to variable interest rates.

* Fair value measurement at reporting date using significant unobservable inputs (Level 3).

## 25. Derivative instruments and hedging activities

*Option Contracts Undesignated as Hedge*

(Gains)/Losses on foreign exchange derivative contracts for the year ended March 31, 2020, 2021 and 2022 aggregated INR 109 million, INR Nil million and INR Nil, respectively.

*Contracts designated as a Cashflow Hedge*

The Company hedged the foreign currency exposure risk related to certain intercompany loans denominated in foreign currency through a call spread option with a full swap for coupon payments. The Company also availed trade credit facilities denominated in foreign currencies which were fully hedged through interest rate swaps. The foreign currency forward contracts and options were not entered into for trading or speculative purposes.

The Company documented each hedging relationship and assessed its initial effectiveness on inception date and the subsequent effectiveness was tested as determined at the time of inception of the contract. The gain or loss on the hedge contracts was recorded in accumulated other comprehensive income to the extent the hedge contracts were effective. The gain or loss on the hedge contracts shall be reclassified to interest expense when the coupon payments and principal repayments are made on the related investments. The hedge contracts were effective as of March 31, 2022.

The following table presents outstanding notional amount and balance sheet location information related to foreign exchange derivative contracts as of March 31, 2021 and 2022:

| | **As of March 31, 2021** | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Notional Amount (US$)** | **Non-Current Liabilities (Fair Value) (INR)** | **Prepaid expenses and other current assets (Fair Value) (INR)** | **Other Assets (Fair Value) (INR)** | **Other Assets (Fair Value) (US$)** | **Non- Current Liabilities (Fair Value) (US$)** | **Prepaid expenses and other current assets (Fair Value) (US$)** |
| | | | | **(In million)** | | | |
| Fair valuation of swaps and options | 849.7 | - | - | 5,765 | 78.8 | - | - |
| Forward exchange derivative contracts | 11.2 | - | - | 21 | 0.3 | - | - |
| Fair valuation of swaps and forward | 94.6 | 251 | - | - | - | 3.4 | - |
| Forward exchange derivative contracts | 46.1 | - | 38 | - | - | - | 0.5 |

| | **March 31, 2021** | | | |
|---|---|---|---|---|
| | **Notional (US$)** | **Current Liabilities (INR)** | **Other Assets (INR)** | **Current Liabilities (US$)** |
| | | **(In million)** | | |
| Forward exchange derivative contracts | 101.4 | 74 | — | 1.0 |

| | Notional Amount (US$) | Non-Current Liabilities (Fair Value) (INR) | Current Liabilities (Fair Value) (INR) | Prepaid expenses and other current assets (Fair Value) (INR) | Other Non-Current Assets (Fair Value) (INR) | Other Non-Current Assets (Fair Value) (US$) | Current Liabilities (Fair Value) (US$) | Non-Current Liabilities (Fair Value) (US$) | Prepaid expenses and other current assets (Fair Value) (US$) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **As of March 31, 2022** Audited (In million) | | | | |
| Fair valuation of swaps and options | 753.9 | - | 1,735 | - | 2,647 | 34.9 | 22.9 | - | - |
| Forward exchange derivative contracts | 93.8 | - | 106 | 13 | - | - | 1.4 | - | 0.2 |
| Fair valuation of swaps and forward | 253.7 | 7 | 658 | - | 883 | 11.6 | 8.7 | 0.1 | - |

The company recorded the net fair value of derivative liability of INR 827 million and INR 4,404 million (US$58.0 million) in the Other comprehensive income for the year ended March 31, 2021 and 2022, respectively and recorded an expense of INR 1,918 million and INR 1,302 million (US$17.2 million) related to the amortization of the cost of the hedge for the year ended March 31, 2021 and 2022, respectively.

The foreign exchange derivative contracts mature generally over a period of 0.7 – 4.3 years.

*Contracts designated as fair value hedge*

The Company hedged the exposure to fluctuations in the fair value of firm commitments denominated in foreign currency through forward exchange derivative contracts. Fair value adjustments related to non-financial instruments will be recognized in the hedged item upon recognition and will eventually affect earnings as and when the hedged item is derecognized. Changes in the fair value of derivatives designated and qualifying as fair value hedges, together with any changes in the fair value of the hedged firm commitments attributable to the hedged risk, will be recorded in in the consolidated balance sheet. The gain or loss on the hedging derivative in a hedge of a foreign-currency-denominated firm commitment and the offsetting loss or gain on the hedged firm commitment is recognized in earnings in the accounting period, post the recognition of the hedged item in the balance sheet. The forward exchange derivative contracts were not entered into for trading or speculative purposes.

The foreign exchange derivative contracts mature generally over a period of 1 months – 9 months.

The Company documented each hedging relationship and assessed its initial effectiveness on inception date and the subsequent effectiveness was tested as determined at the time of inception of the contract. The hedge

contracts were effective as of March 31, 2022.

| | As of March 31, 2021 | | | | |
|---|---|---|---|---|---|
| | Notional (US$) | Current Liabilities (Fair value) (INR) | Prepaid expenses and other current assets (Fair value) (INR) | Prepaid expenses and other current assets (Fair value) (US$) | Current Liabilities (Fair value) (US$) |
| | | | Audited (In million) | | |
| Forward exchange derivative contracts | 265.1 | 887 | 876 | 12.0 | 12.1 |

| | As of March 31, 2022 | | | | |
|---|---|---|---|---|---|
| | Notional (US$) | Current Liabilities (Fair value) (INR) | Prepaid expenses and other current assets (Fair value) (INR) | Prepaid expenses and other current assets (Fair value) (US$) | Current Liabilities (Fair value) (US$) |
| | | | Audited (In million) | | |
| Forward exchange derivative contracts | 15.7 | 12 | 1 | 0.0 | 0.2 |

The company recorded the fair value of derivative asset/liability of INR 887 million and INR 12 million (US$0.2 million) as at March 31, 2021 and 2022, respectively and incurred an amount of INR 200 million and INR 1,001 million (US$13.2 million) related to acquisition of capital assets during the year ended March 31, 2021 and 2022, respectively.

## 26. Concentrations of credit risk

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash and cash equivalents, restricted cash, accounts receivables and derivative instruments. The Company mitigates the risk of credit losses from financing instruments, other than accounts receivables, by selecting counter parties that are well known Indian or international banks.

The following customers account for more than 10% of the Company's accounts receivable and sale of power as of and for the year ended March 31, 2021 and 2022:

| | March 31, 2021 | | March 31, 2022 | |
|---|---|---|---|---|
| Customer Name | % of Sale of Power | % of Accounts Receivable* | % of Sale of Power | % of Accounts Receivable * |
| Solar Energy Corporation of India | 21.47% | 13.17% | 30.09% | 39.64% |
| Punjab State Power Corporation Limited | 13.46% | 11.60% | 10.71% | 4.53% |
| NTPC Vidyut Vyapar Nigam Limited | 20.36% | 10.54% | 15.23% | 5.42% |
| Hubli Electricity Supply Company Limited | 5.08% | 9.45% | 5.32% | 10.49% |
| Chamundeshwari Electricity Supply Company | 3.62% | 14.41% | 2.88% | 8.20% |
| Andhra Pradesh Power Coordination Committee | 3.53% | 18.32% | 2.83% | 13.12% |
| Gujarat Urja Vikas Nigam Limited | 11.17% | 3.16% | 8.89% | 1.79% |

\* Includes receivables for Rooftop entities

## 27. Whistle-blower Allegations and Special Committee Investigation

In June and July 2021, we received whistle-blower complaints alleging corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, payment of kickbacks, and improper conduct by our "sales team" (this specific allegation was later determined to be a hoax). Our Ethics Committee, supervised by the Board's Audit and Risk Committee and with the support of outside counsel and forensic accounting professionals, conducted a fulsome investigation into these allegations and found none to be substantiated. We nonetheless implemented enhancements to our compliance program recommended by our advisors after the investigations had concluded.

In addition, on October 1, 2021, the Enforcement Directorate of India filed a Prosecution Complaint with a special court in New Delhi in respect of an earlier Enforcement Case Information Report. Our former Group Chief Financial Officer and current Chief Financial Officer of our subsidiary APIPL, Mr. Pawan Kumar Agrawal, is one of those named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. The relevant transactions that are the subject of the complaint predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of the Company, and the criminal charges are not directed at, and do not concern, the Company or its subsidiaries. We will continue to monitor the proceedings as Mr. Agrawal defends the charges made against him.

In May 2022, we received a whistle-blower complaint that alleged health and safety lapses, procedural irregularities, misconduct by certain employees, improper payments and false statements relating to one of our projects belonging to a project subsidiary. Following extensive investigation by the Ethics Committee, supervised by the Board's Audit and Risk Committee and by external counsel and forensic professionals, we identified evidence of manipulation and misrepresentation of project data by some employees at that project site. Weak controls over payments to a vendor and failures to provide accurate information both internally and externally were found, but no direct evidence that any improper payment was made to any government official was identified. Further, in Fiscal 2023, we reported to SECI that this project had (i) shortfalls in generation and (ii) that it failed to timely complete and commission the requisite contractually required capacity. On January 3, 2023 and January 4, 2023, SECI advised us, inter alia, that the project may be liable for damages and penalties for shortfalls in generation and for not commissioning the full capacity required under its PPA in a timely manner.

In September 2022, we received an additional whistle-blower complaint primarily making similar allegations of misconduct as raised in the May 2022 complaint, as well as allegations of misconduct related to joint ventures and land acquisition, allegations of our failure to be transparent with the market and advisors and other allegations. The Ethics Committee, supervised by the Board's Audit and Risk Committee, with the support of external counsel and forensic accounting professionals, investigated these September 2022 allegations. The investigation of the September 2022 complaint identified significant control issues in the process of acquiring land and land use rights in relation to one of our projects. The investigation specified that third party land aggregators may have been involved in improper payments but no improper transfer of money by the Group was identified. We have made an adjustment (de-capitalization) in the books of accounts of INR 135 million (US$ 1.8 million) on estimate, as a prudent measure in the given project. Further, we have reviewed the entire amount paid to land aggregators in other projects to identify any similar issue and after an assessment a further adjustment (decapitalisation) aggregating to INR 118 million (US$ 1.6 million) has been made in the books of account on estimate, as a prudent measure, though no improper payments by the Group could be identified.

We also identified potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project. In addition, it appears our former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project. We were not able to identify any evidence of improper payments related to either of these transactions. Considering the observations regarding the transactions, we have reassessed the valuation of the asset purchase and related government orders and did not find any adjustment that needed to be made in the books of account.

Our investigation did not substantiate other portions of this September 2022 whistle-blower complaint.

As part of our investigations of the May 2022 and September 2022 whistle-blower complaints, we also widened our review to include a review of projects commissioned in Fiscal 2022 and Fiscal 2023 to ensure that similar weaknesses were not present. As part of our investigations, we identified inconsistencies in project data in certain of our projects, but we identified no improper payments made in connection with these projects.

We have taken a range of actions due to these findings, and the employees involved in the misconduct are no longer associated with us. In accordance with the recommendations of the Ethics Committee, the Board's Audit and Risk Committee and their legal and forensic advisors, we are implementing remedial measures in both project control and monitoring. Further, we reported the findings from its investigations of the May 2022 and September 2022 whistle-blower complaints to the SEC and the U.S. Department of Justice, and we continue to cooperate with these authorities.

In addition, a Special Committee of the Board of Directors (the "Special Committee") was convened in August 2022 to review certain material projects and contracts over a three-year period for anti-corruption and related compliance issues. Independent outside counsel and forensic advisors were engaged to support the Special Committee. The Special Committee's investigation has identified evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project but no related improper payments or transfers by the Group have been identified. The Special Committee's review and its findings could impact our decision-making in connection with such projects. We have disclosed the details of the Special Committee's investigation to the SEC and the U.S. Department of Justice, and we continue to cooperate with those agencies.

Our Group including our subsidiaries with respect to affected projects could be exposed to liabilities under the relevant contractual and tender documents (including levy of damages and liquidated damages, reduction of PPA tariffs and/or short closure of capacity), administrative actions (including the risk of PPA cancellation, risk of being debarred from SECI's future contracts, withdrawal or nullification of commissioning certificates and/or revocation of commissioning extensions) and penalties from customers and other civil liabilities, all of which could adversely impact the revenue, profitability and capitalization of the affected projects. In addition, fines and/or penalties by regulatory authorities (including by the SEC, the U.S. Department of Justice and applicable Indian regulatory authorities) could be imposed on us. Any such fines or penalties could materially and adversely affect our business, results of operations, financial condition and cash flows in future periods. In addition, we could be exposed to future litigation in connection with any findings of fraud, corruption, or other misconduct by our employees and former employees and executives.

## 28. Subsequent events

On April 26, 2022, the Company through its Board of Directors ("BOD") has accepted the resignations of erstwhile CEO and COO of the Company. Both of the KMP's were relinquished from their roles with the Company/ Group with immediate effect. Mr. Richard Alan Rosling, Chairman of the BOD, oversaw the operations of the Company during the interim period till the appointment of new CEO on July 1, 2022, supported by a Committee of Directors.

On July 1, 2022, Mr. Harsh Shah has joined as new Chief Executive Officer ("CEO") of the Company and subsequently resigned on August 29, 2022 with immediate effect. Thereafter, Mr. Rupesh Agarwal took charge as Acting CEO of the Company on Harsh's resignation.

On May 11, 2022, the Company has announced the appointment of Ms. Delphine Voeltzel as a nominee board member of the Company, on behalf of OMERS Infrastructure.

On May 12, 2022, The Company has entered into a share purchase agreement, Debenture subscription agreement and module supply agreement with M/s Premier Energies limited ("Premier/ Manufacturer"), a solar

module manufacturing company, relating to execution of tender received from SECI (also See Note 10 above relating to investment in equities).

On May 14, 2022, The Company has entered into a termination agreement with M/s Waaree Energies Limited, a solar module manufacturing company. The related non-recurring fee paid on account of termination, have been provided for in books of account in current year. (also See Note 10 above relating to investment in equities).

On September 30, 2022, the Company has announced the appointment of Mr. Sugata Sircar as an independent non-executive director of the Company and on May 03, 2023, the Company announced the appointment of Mr. Sugata Sircar as Group CFO and Executive Director, Finance of the Company's subsidiary, Azure Power India Private Limited, with effect from May 1, 2023. He has resigned from his position as Non-executive Independent Director and member of the Company's Audit & Risk Committee and Capital Committee.

On October 11, 2023, Mr. Alan Rosling resigned as Chairman of the Board and as a director of the Company and APIPL. Mr. M.S Unnikrishnan has become the Chairman of the Board of the Company.

On February 10, 2023, the Company has announced the appointment of Mr. Jean-François Boisvenu as an Independent Non-Executive Director based in Mauritius on the Company's Board effective February 08, 2023.

On March 31, 2023, the Company has announced the appointment of Mr. Gowtamsingh (Vikash) Dabee as an Independent Non-Executive Director effective March 30, 2023. He replaced Mrs. Yung Oy Pin Lun Leung (Jane) who resigned as an Independent Non-Executive Director on 16 March 2023.

On May 3, 2023, the Company has announced the appointment of Mr. Sunil Gupta as Chief Executive Officer (CEO) effective July 10, 2023, replacing the acting CEO, Rupesh Agarwal.

On May 27, 2023, Radiance have sent the Company a notice to terminate the Master Share Purchase Agreement in relation to 86.5 MW Rooftop portfolio in relation to Azure Power Rooftop (Genco) Private Limited and related group SPVs. The Company is in discussion with Radiance to mutually terminate the transfer in shareholding of the un-transferred 86.5 MW portfolio to Radiance, and the same shall be subject to modification of the Amended Rooftop Sale Agreement. Accordingly, the assets and related liabilities of these subsidiaries are not presented as "Assets classified as held for sale" and instead re-classified within the respective balance sheet captions in the consolidated balance sheet as at March 31, 2022.

On June 16, 2023, the Company has announced the appointment of Mr. Richard Payette as an Independent non-executive Director on the Company's Board effective July 1, 2023.

On June 23, 2023, the Company has announced the resignation of Ms. Christine Ann Mc Namara as an Independent non-executive Director on the Company's Board.

Subsequent to year end, the Company has received letters from its offtakers that they would pay the outstanding dues as on June 03, 2022, in monthly installments ranging from 12-48 months as per Electricity (Late Payment Surcharge and Related Matters) Rules 2022. The Company has already starting receiving these amounts subsequently.

We were parties to an arbitration proceeding before Singapore International Arbitration Centre ("SIAC") against one of the module suppliers whereby we claimed amongst others breach of module supply agreement. Subsequent to the year end, we have amicably settled the dispute.

Exhibit 4.2



**Letter No. - AP:HR: FY 22-23:AZ1446**

DATE-27 February 2023

**Mr. Vijay Kumar Wadhwani**
**223, Delhi Apartments, Plot 15C, Sector-22, Dwarka, New Delhi, India**
**Pin Code:-110077**

**Sub: Appointment Letter**

Dear **Vijay,**

With reference to your application and subsequent interview you had with regard to your appointment with **AZURE POWER INDIA PRIVATE LIMITED** (hereinafter referred to as "Azure" which shall mean and include the said company, its executors, assigns and successors-in-interest) we are pleased to offer you a position in our organization on the following terms and conditions.

1. **Appointment/Designation:**

   You are being appointed as **Sr Vice President**
   w. e. f. **27 February 2023**,
   WHEREAS

   - The Company is engaged with the business of generation and production of solar energy and electricity.
   - The Employee has represented to the Company that he/she has the requisite knowledge, expertise, experience and skill to render the services in relation to the requirements of such person under the terms of this Agreement.
   - The Company has, based on the aforesaid representations made by the Employee, agreed to retain the services of the Employee for the consideration and subject to the terms and conditions herein contained.

2. **Salary**

   You will be entitled to an annual remuneration of of **Rs. 10518756/** annum including salary & allowances.

   In addition to the above stated salary & allowances you will also be entitled to a Variable Performance Pay up to a maximum of Rs. **2231256**/-, payable as per the terms governing the Variable Performance Pay Programme of the company. Please note that all payments will be strictly as per the rules and regulations as defined under the Income Tax Act, 1961 and other related statutes, and any subsequent modifications. The management reserves the right to merge, bifurcate or modify the salary structure at any time at its sole discretion keeping the value of remuneration unaltered.

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800     📠 +91 11 4940 9807     ✉ info@azurepower.com     🌐 www.azurepower.com

v P a g e 1 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

3. **Performance Management/Appraisals**

Performance management/Appraisals are designed to foster mutual understanding about job responsibilities, job interest and career objectives between the employees and their supervisors, share employee concerns and problems set mutually on agreeable goals and targets for the next review period.

4. **Job Responsibilities**

You will be a part of the **Management** department in SBU **Core Team**at Azure. Your duties and responsibilities will be discussed with you in detail at the time of joining and may be re- assigned to you from time to time. You might be assigned additional responsibilities as and when required. We will continuously monitor your work performance to ensure that you remain challenged and that our work program brings out the best in you. We look forward to deliverables that fully attest to your background and qualifications. You shall abide by such rules and regulations, directions, instructions or orders of the Company, in this regard, as are issued or communicated from time to time.

5. **Medical Fitness**

Your appointment and continuance will be subject to your being medically fit for job/work and the management will have the right to get you examined from the company's Medical Practitioner, whose finding shall be final and binding upon you.

6. **Transferability**

1) Your services may be transferred from one job/position/location to another, from one department to another or from the appointing company to any other company / division of Azure, whether existing at present or to be set up in future anywhere in India or abroad.
2) In such a case, you will be governed by the rules, regulations and orders as applicable in the establishment to which you have been transferred, including conditions and rules covering Working Hours, Leaves, Holidays Salary, Allowances and Perquisites.

7. **Leaves**

All leaves shall be in accordance with the Company's policy and would require prior sanction / approval of the sanctioning authority. In case of sick leave or casual leave or any other leave taken under unforeseen circumstances, for which prior approval is not possible, immediate information by telephone will be required to be sent to the sanctioning authority. The necessary written approval is to be taken on your next working day and mailed to the HR Department. In case you fail to do so, Management will have the right to take action against you under applicable rules of the Company.



Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800    📠 +91 11 4940 9807    ✉ info@azurepower.com    🌐 www.azurepower.com

v P a g e 2 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

8. **Probation**

You will be on probation for a period of **180 days** from the date of your appointment. Please note that the following special Terms and Conditions of service are applicable to you only during the period of your Probation:

1) During the period of probation if the management perceives the services of the employee are undesirable for the organization they may be terminated on an immediate basis without assigning any reason whatsoever. In this situation the employee will not be entitled to any salary / wages / expense reimbursement whatsoever.
2) Your transition into post-probation services for the Company is fully subject to and dependent on the satisfactory performance during the period of your Probation. Lack of such satisfaction of Azure from your services, may and should cause termination of your employment as detailed herein.
3) You will be confirmed in the services of the Company after satisfactory performance during probation, and you will not be deemed to have been confirmed unless you are informed in writing to that effect.
4) Your period of Probation may be modified at the discretion of Azure.
5) During the period of your Probation your service may be terminated at the discretion of the Company, without assigning any reason, by giving **30 day** notice in writing or salary in lieu of the notice. During this period, you may resign from your appointment by giving notice in writing to the company or salary in lieu of the notice period. However, if you choose to terminate the relationship within the probation period, the company reserves the right to relieve you at its sole discretion before the expiry of the notice period without any liability towards the payment of salary/emoluments etc.
6) During the period of your Probation only the basic salary is taken into consideration for the calculation of the salary in lieu of the notice period i.e. for all full & final settlements.

9. **Termination from Service**

If you shall be found engaged in or abetting immoral, illegal or other activities against the interests of the organization or its employees or found absent for more than seven consecutive working days without prior permission in writing of the management or if you proceed on leave without prior sanction or overstay the sanctioned leave without proper intimation and/or approval, at the discretion of the Azure management, your service may automatically come to an end and a presumption will be drawn that you have abandoned the employment/service on your own accord by losing lien on the post and under such circumstances you will lose all rights to any compensation or other payables due to you after proper adjustments.

Further, notwithstanding anything contained in this Agreement, the Company shall be entitled to terminate this Agreement forthwith in the event of:



Azure Power India Private Limited
Regd. Office: 5ᵗʰ Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

v P a g e 3 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

1) Any breach of integrity, act of dishonesty, embezzlement or any misconduct by the Employee or in case of breach of the terms, conditions or stipulations contained in this Agreement, by the Employee;
2) The Employee's disobedience, willful refusal, willful or negligent failure, or unsatisfactory performance as to perform duties reasonably assigned by the Company after being provided notice by the Company and a reasonable opportunity to cure such breach in a manner satisfactory to the Company;
3) The Employee being convicted of any criminal offence or committing fraud against, or the misappropriation of material property belonging to the Company;
4) The Employee breaching in any material with respect to the terms of this Agreement, any organizational documents of the Company, or any other material agreement of the Company, and failing to cure such breach in a manner satisfactory to the Company within ten (10) days after receipt of notice by the Company;
5) Any material violation by the Employee of the Company's policies prohibiting harassment of employees, any violation by the Employee of an engagement policy of the Company which results in material liability to the Company, or any act or omission which materially damages the Company's business or assets; or
6) Any other action or inaction on the part of the Employee that would constitute adequate cause for termination pursuant to applicable law and regulations.

10. **Relinquishing Service / Relieving**

After confirmation both the parties to the contract may terminate the contract of employment by giving **90 days** notice in writing or salary in lieu of the notice period. However, if you choose to terminate this relationship, the company reserves the right to relieve you at its sole discretion before the expiry of the notice period without any liability towards the payment of salary/emoluments etc.

1) After confirmation, if the management perceives that your services are undesirable for the organization you may be terminated on an immediate basis without assigning any reason whatsoever. In this situation you will not be entitled to any salary/wages/expense reimbursement whatsoever.
2) Even after confirmation the basic salary is taken into consideration for the calculation of the salary in lieu of the notice period i.e. in all type of full and final settlements.

11. **Job Assignments**

You may, during the course of your employment, be given any assignment that may derive from the Company's business needs as defined from time to time by your reporting manager and the Azure management. Such management shall give you any assignment that they, in their subjective judgment, feel is suited to your background, qualifications or experience. You will not refuse to carry out any assignment solely on the grounds that it has not been part of your usual duties during your employment. You will also not be entitled to any additional compensation for carrying out any job, which in the opinion of the Management is equivalent to the job you have been assigned earlier.



Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

v P a g e 4 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

12. <u>**Non-Compete and Non-Solicit**</u>

1) The Employee hereby undertakes and ensures that all business opportunities known to him/her or made known to him/her at any time, with respect to and/or connected with the business of the Company are referred to the Board and shall be undertaken in any other company only if the Board does not avail of such opportunity, in which event the employee may undertake the said business opportunity through any other entity provided that in so undertaking the said business opportunity, the Employee shall, at all times, ensure that the time spent by him on such other business opportunity not taken up by the Company shall not impede the performance of his services to the Company.

2) The Employee covenants and agrees that during the subsistence of this Agreement, he/she shall not, directly or indirectly attempt in any manner to solicit from any client/customer, except on behalf of the company, business of the type carried on by the Company or to persuade any person, firm or entity which is a client/ customer of the Company to cease doing business or to reduce the amount of business which any such client/customer has customarily done or might propose doing with the Company whether or not the relationship between the Company and such client / customer was originally established in whole or in part through his or its efforts.

3) The Employee acknowledges that the services he is to render to the Company are of a special and unusual character, with a unique value to the Company, the loss of which cannot adequately be compensated by damages or an action at law. In view of the unique value to the Company of this services for which the Company has contracted hereunder, because of the confidential information to be obtained by, or disclosed to the Employee covenants and agrees that during the term of engagement and during for a period of one year thereafter but subject to clause 12.1 above, the Employee shall not directly or indirectly, enter into the engagement of, tender consulting or other services to, acquire any interest in (whether for the Employee's own account as an individual proprietor, or as a partner, associate, stockholder, officer, director, trustee or otherwise), or otherwise participate in any business that competes, directly or indirectly, with any of the companies or entitles (i) in the same lines of business that the Company is engaged in at the time the Employee's engagement is terminated.

4) During and for one year following termination of engagement (i) the Employee may not solicit, encourage, or induce or attempt to solicit, encourage, or induce any (A) current employee, marketing agent, or employee of the Company to terminate his or her engagement, agency or consultancy with the Company, or any (B) prospective employee with whom the Company has had discussions or negotiations within six months prior to the employee's termination of engagement not to establish a relationship with the Company. (ii) induce or attempt to induce any current customer to terminate its relationship with any of the Company or (iii) induce any potential customer with whom the Company has had discussions or negotiations within [six months] prior to the Employee's termination of engagement not to establish a relationship with the Company.



Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com



**Letter No. - AP:HR: FY 22-23:AZ1446**

13. **Confidentiality**

   1) The Employee recognizes that he is being hired in a position of trust and confidence with the Company and will in the course of his engagement with the Company, be exposed to various items of secret and confidential information that are proprietary to the Company. The Employee acknowledges that the Company needs to protect such secret and confidential information, covenants to hold any such information in trust for the Company and undertakes not to disclose such information to any third party.

   2) The Employee represents that his performance of the terms of this Agreement and his engagement with the Company does not and will not breach any agreement to keep in confidence information previously acquired by him in confidence from any third party, The Employee has not entered into, and agrees, subject to clause 2.1 above, not to enter into, agreement in conflict with this Agreement or which in any way prohibits his performance of or restricts his ability to perform his obligations under this Agreement. The Employee has not brought, and agrees he/she will not bring with him/her to the Company for use in his/her engagement with the Company any materials or documents of a former employer or any other person or entity for whom he/she has provided services (paid or unpaid) that are not generally available to the public unless he/she has obtained express written authorization from the former employer or other person or entity for whom he/she provided such services for their possession and use.

14. **Intellectual property**

   1) The Employee acknowledges that ownership of, and all right, title, and interest in, all the trademarks, trade names, brand names, patents, designs, domain names and other intellectual property rights created by the Employee expressly for the Company ("Intellectual Properties") shall vest in the Company.

   2) The Employee expressly agrees that all Intellectual Properties created by the Employee expressly for the Company shall be a "work for hire" under the laws of any jurisdiction. In any event, the Employee hereby transfers and shall be deemed to have assigned in favor of the Company, all rights, title and interest in and to all the Intellectual Properties, together with the rights to sub-license or transfer any and all rights assigned hereunder to third parties, in perpetuity as and when the same come into existence. The Employee shall assist and cooperate with Company in perfecting the Company's rights in the Intellectual Properties.

   3) The Employee shall not, during the continuation of this Agreement or thereafter, divulge or make use of any trade secret or confidential information concerning the business of the Company or any of its dealing, transactions and affair or any information concerning any of its suppliers, agents, distributors or customers which the Employee possesses or comes into possession while in the engagement of the Company or which he may make or discover while in the service of the Company and the Employee shall also use his best endeavor to prevent another person from doing so. All data, documents, plans, drawings, photographs, reports, statements, correspondence, etc. and technical information, know-how and instructions as well as business details or commercial policies that pass to the Employee or

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

v P a g e 6 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

which come to the Employee's knowledge shall be treated as confidential and the Employee shall be bound to keep secret all such confidential matters including papers and documents, computer floppies. CDs containing the same and shall not disclose, communicate, reproduce or distribute the same or copies thereof to anyone except in the course of the rightful discharge of his duties as the employee of the Company.

4) The Employee represents and warrants that he/she will keep all Intellectual Properties created by the Employee expressly for the Company, in strict confidence and shall use the same only for the purpose of the business and benefit of the company and for no other purpose, except with prior written consent of the Company.

5) The Employee further represents and warrants that all the Intellectual Properties created by the Employee expressly for the Company are original, and that the Employee possesses all rights necessary to effectuate the transfer of the rights as contemplated above. Nothing contained herein shall apply in the event of any innocent infringement.

6) The Employee shall forthwith communicate to the Company and transfer to it the exclusive benefits of all inventions, processes, improvements, and any other discoveries which the Employee may make or discover in the course of his/her association with the Company, relating to any trade or business of the Company and will give full information as to the exact mode of working and using the same and also all such explanations and instructions to the officers and workmen of the Company as may be necessary to enable them to work effectively and will at the expense of the Company furnish it with all necessary plans, drawing and models.

7) The Employee expressly agrees that all Intellectual Properties created by the Employee expressly for the Company shall be under a contract of service. In consideration of his/her engagement with the Company, the Employee hereby transfers and shall be deemed to have assigned in favor of the Company, all rights, title and interest in and to all the Intellectual Properties, together with the rights to sublicense or transfer any and all rights assigned hereunder to third parties, in perpetuity. The Employee agrees that such assignment shall be perpetual, worldwide and royalty free. The Employee agrees that notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, such assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Employee, even if the Company does not exercise the rights under assignment within a period of one year from the date of assignment. The Employee acknowledges and agrees that he shall waive any right to and shall not raise any objection or claims to the Copyright Board with respect to the assignment, pursuant to Section 19A of the Copyright Act, 1957. The Employee shall assist and cooperate with Company in perfecting the Company's rights in the intellectual Properties.

8) The Employee shall, whenever requested to do so by the Company whether during or after the termination of his engagement hereunder, at the cost of the Company execute and sign any and all applications, assignments and other instruments which the Company may deem necessary or advisable in order to obtain protection for aforesaid improvement, inventions and discoveries in such countries as the Company may direct and to vest in the Company the whole, right, title and interest therein.

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800     📠 +91 11 4940 9807     ✉ info@azurepower.com     🌐 www.azurepower.com

v P a g e 7 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

15. <u>**Retirement**</u>

You will superannuate from the services of the company on attaining the age of **58 years** (as per the proof of age submitted to the company at the time of your joining) or any exception in this age requires the written approval from CEO/COO.

16. <u>**Other General Terms of Employment**</u>

1) The employee shall not be associated in any capacity whatsoever with any competitor company for a period of at least 12 months after departure from Azure.
2) The assets/data given to you are exclusive rights of the organization; you are only given the mere authorization to utilize the assets/data on behalf and for the organization. All data created by you during your association with the company are also exclusive rights of the company. Upon resignation it is your primary duty to hand-over all these assets/data to your reporting manager assigned by the company and obtain the necessary clearances from your department and subsequently from the HR Department. In case of any tampering or illegal usage of these assets/data or non-submission of the assets/data upon resignation, the company reserves all rights to initiate appropriate legal actions against you and you will automatically lose all rights to any dues payable to you.
3) In case Azure imparts high cost training to the employee, the employee shall be required to enter into a written agreement with Azure prior to the training and only after the agreement has been signed will the employee be permitted to proceed for the training.
4) This appointment will cease immediately, if any of the statement made or particulars given in your application/employment form are found to be false or incorrect in material particulars.
5) This appointment letter along with the Annexure shall form the contract of employment between you and Azure ("Azure" or "The Company").
6) Failing to observe any of the conditions of service, including those specified in the rules will amount to the misconduct of "Willful" disobedience of any lawful and reasonable order of a superior.
7) The Company with the consent of the employee has the right to vary, amend and modify an item of the pay packet without adversely affecting the total pay packet.
8) This appointment is based on the information given by you to us in your application/employee data form and during your evaluation process and shall be considered null and void if any material error/suppression in the company's opinion is discovered at any point of time.
9) In case of any change in the address during the course of your employment it shall be your duty to intimate the same to the Management / HR Department in writing within three days of such change in address.
10) All communication sent to you by the management at your last given address shall be deemed to have been delivered to you at the correct address.
11) You will be responsible for the safe custody of the tools, equipment, documentation and any other items entrusted to you and in case of any damage or loss, the management shall have the right to deduct the same from your salary/wages besides taking any other disciplinary action as may be deemed fit and proper.

Azure Power India Private Limited
Regd. Office: 5ᵗʰ Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

v P a g e 8 | 11



**Letter No. - AP:HR: FY 22-23:AZ1446**

12) In case of theft, fraud, dishonesty, drunkenness, fighting, riotous or disorderly behavior or conduct, smoking and spitting on the premises, gambling, damaging or destroying records, files, papers or other information (whether in tangible or intangible form), or properties of the company, impertinence, insubordination, threatening, assaulting or intimidating any Superior Officer/ Manager/ Director, holding or organizing or taking part in any meeting, demonstration, illegal strike, unlawful and unjustified cessation of work or adopting go slow tactics or refusal of work or attempt to incite or intimidate or force other workmen to go on strike in advance, habitual negligence in discharge of duties, using insulting words or abusive languages towards the superior/manager, vulgarity, molestation of other employees, teasing and cutting indecent jokes or making indecent remarks towards other employees and any other act/omission/offence constituting misconduct is alleged against you in accordance with the provision of the standing orders/service rules of the company, you may be placed under suspension pending enquiry and shall not be entitled to any form of salary/wages during the period of such suspension.

13) If during the suspension enquiry or in accordance with the report of the Enquiry Officer, your misconduct will be proved or you will be found guilty, your services will be liable to be terminated without giving notice or compensation or wages in lieu of notice.

17. **<u>Verification</u>**

This appointment is based on the details provided by you to the Company. Your appointment is subject to satisfactory verification of the following documents which you have submitted at the time of joining:

- Completed Application Form
- Copy of pay slip of your last month of employment
- Copy of current/last employer's Appointment Letter
- Copy of all Degree and/or Professional Course certificates
- Photocopy of Passport /Driving License/PAN card
- Relieving Letter from last employer
- 4 Passport size photographs

18. **<u>Joining</u>**

You shall take up your duties on **27 February 2023** , solely at your own expenses and if applicable will be reimbursed on the scheduled date as per the company policy.

You will be reporting to **Rupesh Agarwal (CEO Office -CEO)** of the Company.

And will be posted at the **New Delhi** initially and may be relocated to other locations depending upon project requirements and Management directives.

This letter is being sent to you in duplicate. Please affix your signature on the duplicate copy in token of your acceptance of the salary, perks & benefits as well as all other terms and conditions contained in this letter and return the same to us for our records within seven days from issue of this letter.

We look forward to working with you at **AZURE POWER INDIA PRIVATE LIMITED**



Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com



**Letter No. - AP:HR: FY 22-23:AZ1446**

Wishing you all the best.

For **AZURE POWER INDIA PRIVATE LIMITED**

**Shweta Srivastava**
**Sr. Vice President - HR**

<u>**ACCEPTANCE**</u>

I, , **Vijay Kumar Wadhwani** hereby declare that I have fully read and understood the terms & conditions enumerated above to the best of my knowledge and belief.

I hereby agree & accept all the above terms and conditions.

**Signature of the Employee**

**Name : Vijay Kumar Wadhwani**

**Date :27 February 2023**

<u>**Annexure – 1**</u>

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800     📠 +91 11 4940 9807     ✉ info@azurepower.com     🌐 www.azurepower.com



**Letter No. - AP:HR: FY 22-23:AZ1446**

| Details of Salary & Allowances | | |
|---|---|---|
| **Employee Code** | **AZ1446** | |
| **Name** | **Vijay Kumar Wadhwani** | |
| **Designation** | **Sr Vice President** | |
| **Department / SBU** | **Management/Core Team** | |
| **Band** | **Sr Vice President** | |
| **Date of joining** | **27 February 2023** | |
| **Company** | **AZURE POWER INDIA PRIVATE LIMITED** | |
| **Salary Components** | **Monthly (Rs)** | **Annual (Rs)** |
| Basic Salary | 425000 | 5100000 |
| House Rent Allowance | 212500 | 2550000 |
| Choice Pay | 188063 | 2256750 |
| Company Contribution to Provident Fund | 51000 | 612000 |
| **Total** | **876563** | **10518756** |
| *Variable Performance Pay | | |
| Maximum Entitlement to Variable Performance Pay | | 2231256 |
| **Total CTC** | | **12,750,001.00** |

* Payment of Variable Performance Pay (VPP) is discretionary. Earning of VPP is linked to performance management process dependent upon your individual performance and your continued commitment towards the achievement of organisational goals as well as the performance of your department and the company. If the company announces disbursal of VPP to the eligible executives for a particular financial year after assessment of the performance of the individual employees, departments and the company during that period, then as per your eligibility determined on the aforesaid parameters, VPP shall be paid to you only if you are on the full-time active employment of the company as on the date of disbursement and have not taken steps for cessation of the employment.

Authorised Signatory                     Employee's Signature

Shweta Srivastava                        **Vijay Kumar Wadhwani**
Sr. Vice President - HR                   **Sr Vice President - Management**

**DATE OF JOINING DAY:- 27 February 2023**     **DATE OF JOINING DAY:- 27 February 2023**

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800        📠 +91 11 4940 9807        ✉ info@azurepower.com        🌐 www.azurepower.com

Exhibit 4.3

EXECUTION VERSION

**AZURE POWER ENERGY LTD**
as Company

**AZURE POWER GLOBAL LIMITED**
as Parent

**HSBC BANK USA, NATIONAL ASSOCIATION**
as Trustee and Collateral Agent

**INDENTURE**

Dated as of August 19, 2021

**3.575% SENIOR NOTES DUE 2026**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| ARTICLE 1 DEFINITIONS |  | 1 |
| Section 1.01 | Definitions | 1 |
| Section 1.02 | Other Definitions | 22 |
| Section 1.03 | Rules of Construction | 23 |
| ARTICLE 2 THE NOTES |  | 23 |
| Section 2.01 | Form and Dating | 23 |
| Section 2.02 | Execution and Authentication | 24 |
| Section 2.03 | Registrar, Transfer Agent, Paying Agent and Note Holders Representative | 24 |
| Section 2.04 | Paying Agent to Hold Money | 25 |
| Section 2.05 | Holder Lists | 25 |
| Section 2.06 | Transfer and Exchange | 25 |
| Section 2.07 | Replacement Notes | 34 |
| Section 2.08 | Outstanding Notes | 35 |
| Section 2.09 | Treasury Notes | 35 |
| Section 2.10 | Temporary Notes | 35 |
| Section 2.11 | Cancellation | 35 |
| Section 2.12 | Defaulted Interest | 36 |
| Section 2.13 | Additional Amounts | 36 |
| ARTICLE 3 REDEMPTION AND PREPAYMENT |  | 39 |
| Section 3.01 | Notices to Trustee | 39 |
| Section 3.02 | Selection of Notes to Be Redeemed or Purchased | 39 |
| Section 3.03 | Notice of Redemption | 40 |
| Section 3.04 | Effect of Notice of Redemption | 40 |
| Section 3.05 | Deposit of Redemption or Purchase Price | 40 |
| Section 3.06 | Notes Redeemed or Purchased in Part | 41 |
| Section 3.07 | Optional Redemptions | 41 |
| Section 3.08 | Mandatory Amortization Redemption | 42 |
| Section 3.09 | Offer to Purchase by Application of Excess Proceeds | 43 |
| Section 3.10 | Redemption for Taxation Reasons | 44 |
| Section 3.11 | MCS Amortization Redemption | 45 |
| ARTICLE 4 COVENANTS |  | 46 |
| Section 4.01 | Payment of Notes | 46 |
| Section 4.02 | Maintenance of Office or Agency | 47 |
| Section 4.03 | Provision of Financial Statements and Reports | 47 |
| Section 4.04 | Compliance Certificate | 49 |
| Section 4.05 | Taxes | 49 |
| Section 4.06 | Stay, Extension and Usury Laws | 49 |
| Section 4.07 | Restricted Payments | 50 |
| Section 4.08 | Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries | 52 |
| Section 4.09 | Incurrence of Indebtedness and Issuance of Preferred Stock | 53 |
| Section 4.10 | Asset Sales | 56 |
| Section 4.11 | Transactions with Shareholders and Affiliates | 57 |
| Section 4.12 | Liens | 59 |
| Section 4.13 | Restricted Group's Business Activities | 59 |
| Section 4.14 | Company's Business Activities | 59 |

| | | |
|---|---|---|
| Section 4.15 | Corporate Existence | 61 |
| Section 4.16 | Offer to Repurchase Upon Change of Control Triggering Event | 61 |
| Section 4.17 | Anti-Layering | 63 |
| Section 4.18 | Limitations on Redemptions or Dispositions of and Amendments to Onshore Debt | 63 |
| Section 4.19 | [Reserved] | 65 |
| Section 4.20 | [Reserved] | 65 |
| Section 4.21 | Issuances of Guarantees by Restricted Subsidiaries | 65 |
| Section 4.22 | No Payments for Consent | 65 |
| Section 4.23 | Additional Note Guarantees | 66 |
| Section 4.24 | Permitted Pari Passu Secured Indebtedness | 66 |
| Section 4.25 | Intercreditor Agreement and Priority | 66 |
| Section 4.26 | [Reserved] | 67 |
| Section 4.27 | [Reserved] | 67 |
| Section 4.28 | Subsidiaries | 67 |
| Section 4.29 | [Reserved | 67 |
| Section 4.30 | Repayment of Existing Notes and Amendment of Rupee ECB | 67 |
| Section 4.31 | Use of Proceeds | 67 |
| Section 4.32 | Government Approvals and Licenses; Compliance with Law | 68 |
| Section 4.33 | Currency Indemnity | 68 |
| Section 4.34 | Company Representations and Warranties | 69 |
| Section 4.35 | Suspension of Certain Covenants | 69 |
| **ARTICLE 5 SUCCESSORS** | | **70** |
| Section 5.01 | Merger, Consolidation, and Sale of Assets | 70 |
| Section 5.02 | Successor Corporation Substituted | 71 |
| **ARTICLE 6 DEFAULTS AND REMEDIES** | | **71** |
| Section 6.01 | Events of Default | 71 |
| Section 6.02 | Acceleration | 72 |
| Section 6.03 | Other Remedies | 72 |
| Section 6.04 | Waiver of Past Defaults | 73 |
| Section 6.05 | Control by Majority | 73 |
| Section 6.06 | Limitation on Suits | 73 |
| Section 6.07 | Rights of Holders to Receive Payment | 74 |
| Section 6.08 | Collection Suit by Trustee | 74 |
| Section 6.09 | Trustee May File Proofs of Claim | 74 |
| Section 6.10 | Priorities | 74 |
| Section 6.11 | Undertaking for Costs | 75 |
| **ARTICLE 7 TRUSTEE** | | **75** |
| Section 7.01 | Duties of Trustee | 75 |
| Section 7.02 | Rights of Trustee | 76 |
| Section 7.03 | Individual Rights of Trustee | 81 |
| Section 7.04 | Trustee's Disclaimer | 81 |
| Section 7.05 | Notice of Defaults | 81 |
| Section 7.06 | Limitation on Duty of Trustee and Collateral Agent in Respect of Collateral; Indemnification | 81 |
| Section 7.07 | Compensation and Indemnity | 82 |
| Section 7.08 | Replacement of Trustee | 83 |
| Section 7.09 | Successor Trustee by Merger, etc. | 84 |
| Section 7.10 | Eligibility; Disqualification | 84 |
| Section 7.11 | Rights of Trustee in other roles; Collateral Agent | 84 |

| | | |
|---|---|---|
| ARTICLE 8 LEGAL DEFEASANCE AND COVENANT DEFEASANCE | | 84 |
| | | |
| Section 8.01 | Option to Effect Legal Defeasance or Covenant Defeasance | 84 |
| Section 8.02 | Legal Defeasance and Discharge | 84 |
| Section 8.03 | Covenant Defeasance | 85 |
| Section 8.04 | Conditions to Legal or Covenant Defeasance | 85 |
| Section 8.05 | Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions | 86 |
| Section 8.06 | Repayment to Company | 87 |
| Section 8.07 | Reinstatement | 87 |
| | | |
| ARTICLE 9 AMENDMENT, SUPPLEMENT AND WAIVER | | 87 |
| | | |
| Section 9.01 | Without Consent of Holders | 87 |
| Section 9.02 | With Consent of Holders | 88 |
| Section 9.03 | Supplemental Indenture | 90 |
| Section 9.04 | Revocation and Effect of Consents | 90 |
| Section 9.05 | Notation on or Exchange of Notes | 90 |
| Section 9.06 | Trustee to Sign Amendments, etc. | 90 |
| | | |
| ARTICLE 10 COLLATERAL AND SECURITY | | 91 |
| | | |
| Section 10.01 | Security | 91 |
| Section 10.02 | [Reserved] | 92 |
| Section 10.03 | Priorities of Proceeds from Enforcement of Security | 92 |
| Section 10.04 | Release of Collateral | 93 |
| Section 10.05 | Certificate of the Parent | 93 |
| Section 10.06 | Authorization of Actions to Be Taken by the Trustee Under the Collateral Documents | 94 |
| Section 10.07 | Authorization of Receipt of Funds by the Trustee Under the Collateral Documents | 94 |
| Section 10.08 | Termination of Security Interest | 94 |
| Section 10.09 | Certain Rights of Collateral Agent | 94 |
| | | |
| ARTICLE 11 NOTE GUARANTEES | | 97 |
| | | |
| Section 11.01 | Guarantee | 97 |
| Section 11.02 | Limitation on Liability | 99 |
| Section 11.03 | Successors and Assigns | 99 |
| Section 11.04 | No Waiver | 99 |
| Section 11.05 | Subrogation | 99 |
| Section 11.06 | Modification | 99 |
| Section 11.07 | Execution of Supplemental Indenture for Future Guarantors | 99 |
| Section 11.08 | Non-Impairment | 100 |
| Section 11.09 | Releases | 100 |
| | | |
| ARTICLE 12 SATISFACTION AND DISCHARGE | | 100 |
| | | |
| Section 12.01 | Satisfaction and Discharge | 100 |
| Section 12.02 | Application of Trust Money | 101 |
| | | |
| ARTICLE 13 MISCELLANEOUS | | 101 |
| | | |
| Section 13.01 | Notices | 101 |
| Section 13.02 | [Reserved] | 102 |
| Section 13.03 | Certificate and Opinion as to Conditions Precedent | 102 |
| Section 13.04 | Statements Required in Certificate or Opinion | 103 |
| Section 13.05 | Rules by Trustee and Agents | 103 |
| Section 13.06 | No Personal Liability of Incorporators, Promoters, Directors, Officers, Employees and Stockholders | 103 |

| | | |
|---|---|---|
| Section 13.07 | Governing Law | 104 |
| Section 13.08 | Adverse Interpretation of Other Agreements | 104 |
| Section 13.09 | Successors | 104 |
| Section 13.10 | Severability | 104 |
| Section 13.11 | Counterpart Originals | 104 |
| Section 13.12 | Table of Contents, Headings, etc. | 104 |
| Section 13.13 | Patriot Act | 105 |
| Section 13.14 | Submission to Jurisdiction; Waiver of Jury Trial | 105 |

EXHIBIT A FORM OF NOTE     110

EXHIBIT B FORM OF CERTIFICATE OF TRANSFER     123

EXHIBIT C FORM OF CERTIFICATE OF EXCHANGE     127

EXHIBIT D FORM OF SUPPLEMENTAL INDENTURE     129

EXHIBIT E FORM OF AGENT APPOINTMENT LETTER     132

EXHIBIT F - 1 FORM OF COMPANY AUTHORIZATION CERTIFICATE     140

EXHIBIT F - 2 FORM OF PARENT AUTHORIZATION CERTIFICATE     142

EXHIBIT F - 3 FORM OF GUARANTOR AUTHORIZATION CERTIFICATE     144

EXHIBIT G [RESERVED]     146

EXHIBIT H NOTE HOLDERS REPRESENTATIVE APPOINTMENT LETTER     147

EXHIBIT I FORM OF OPINION AND FORM OF OFFICER'S CERTIFICATE     155

EXHIBIT J FORM OF INTERCREDITOR AGREEMENT     159

EXHIBIT K FORM OF COMPANY'S POWER OF ATTORNEY     160

INDENTURE dated as of August 19, 2021 among Azure Power Energy Ltd, a public company with limited liability incorporated under the laws of Mauritius (the "*Company*"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius (the "*Parent*") and HSBC Bank USA, National Association, as trustee (the "*Trustee*") and collateral agent (the "*Collateral Agent*").

The Company, the Parent and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined herein) of the Initial Notes and any Additional Notes (as defined herein) issued under this Indenture (collectively, the "*Notes*").

## ARTICLE 1
## DEFINITIONS

Section 1.01 *Definitions*.

"*144A Definitive Note*" means the Definitive Note issued in exchange for beneficial interests in the 144A Global Note.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.02 and 4.09, as part of the same series as the Initial Notes; *provided that* any Additional Notes that are not fungible with the Notes for U.S. federal income tax purposes shall have a separate CUSIP number than any previously issued Notes, unless the Notes and the Additional Notes are issued with no more than a *de minimus* amount of original issue discount for U.S. federal income tax purposes, but shall otherwise be treated as a single class with all other Notes issued under this Indenture.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"*Agent*" *or* "*Agents*" means any Registrar, Transfer Agent, Paying Agent and/or additional paying agent.

"*Applicable Premium*" means, with respect to a Note at any redemption date, the greater of (1) 1.00% of the principal amount of such Note and (2) the excess of (a) the present value at such redemption date of the redemption price of such Note at August 19, 2023 (such redemption price being set forth in the table appearing in Section 3.07(c)), plus all required remaining scheduled principal and interest payments due on such Note (assuming the due payment of all amortization amounts in accordance with the amortization profile set out in Section 3.08 and no other subsequent redemptions) through August 19, 2023 (but excluding accrued and unpaid interest, if any, to (but not including) the redemption date), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (b) the principal amount of such Note on such redemption date.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"*Asset Acquisition*" means an acquisition by any Restricted Subsidiary of the property and assets of any Person (other than a Restricted Subsidiary) that constitute substantially all of a division or line of business of such Person.

"*Asset Disposition*" means the sale or other disposition by any Restricted Subsidiary (other than to another Restricted Subsidiary) of all or substantially all of the assets that constitute a division or line of business of any Restricted Subsidiary.

"*Asset Sale*" means the sale, lease, conveyance or other disposition of any assets or rights (including by way of merger, consolidation or Sale and Leaseback Transaction) in one transaction or a series of related transactions by the Company or any other Restricted Subsidiary to any Person; *provided that* "Asset Sale" shall not include:

(1)     the sale, lease, transfer or other disposition of inventory, products, services, accounts receivable or other current assets in the ordinary course of business;

(2)     Restricted Payments permitted to be made under Section 4.07 or any Permitted Investment;

(3)     sales, transfers or other dispositions of assets with a Fair Market Value not in excess of US$1.0 million (or the Dollar Equivalent thereof);

(4)     any sale or other disposition of damaged, worn-out or obsolete or permanently retired assets (including the abandonment or other disposition of property that is no longer economically practicable to maintain or useful in the conduct of the business of the Restricted Group);

(5)     any sale, transfer or other disposition deemed to occur in connection with creating or granting any Permitted Lien;

(6)     a transaction covered by Section 4.16 or Section 5.01;

(7)     any sale, transfer or other disposition of any assets by the Company or any other Restricted Subsidiary to the Company or any other Restricted Subsidiary;

(8)     any sale, transfer or other disposition of any national, state or foreign production tax credit, tax grant, renewable energy credit, carbon emission reductions, certified emission reductions or similar credits based on the generation of electricity from renewable resources or investment in renewable generation and related equipment and related costs, or the sale or issuance of Capital Stock entitling the holder thereof to benefit from any such items;

(9)     any sale, transfer or other disposition of licenses and sublicenses of software or intellectual property in the ordinary course of business;

(10)    any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims in the ordinary course of business;

(11)    the sale or other disposition of cash or Temporary Cash Equivalents;

(12)    dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(13)    transfers resulting from any casualty or condemnation of property;

(14)     dispositions of investments in joint ventures to the extent required by or made pursuant to buy/sell arrangements between the joint parties;

(15)     the unwinding of any Hedging Obligation;

(16)     the sale, transfer or other disposition of Capital Stock of a Restricted Subsidiary to an offtaker or an Affiliate of an offtaker of a project owned and operated by a Restricted Subsidiary; and

(17)     the sale, transfer or other disposition of contract rights, development rights or resource data obtained in connection with the initial development of a project prior to the commencement of commercial operations of such project.

"*Attributable Indebtedness*" means, in respect of a Sale and Leaseback Transaction, the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

"*Authorized Officer*" means, with respect to the Company, the Parent or a Guarantor, as applicable, any one person, officer, a director, who, in each case, is authorized to represent the Company, the Parent or a Guarantor, as the case may be, as designated in the Authorization Certificate furnished to the Trustee.

"*Average Life*" means, at any date of determination with respect to any Indebtedness, the quotient obtained by dividing (1) the sum of the products of (a) the number of years from such date of determination to the dates of each successive scheduled principal payment of such Indebtedness and (b) the amount of such principal payment by (2) the sum of all such principal payments.

"*Bankruptcy Law*" means the United States Bankruptcy Code of 1978 or any similar U.S. federal or state law or foreign law for the relief of debtors.

"*Board of Directors*" means:

(1)     with respect to a corporation, the board of directors of the corporation;

(2)     with respect to a partnership, the board of directors of the general partner of the partnership;

(3)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function,

including, in each case, any committee thereof duly authorized to act on its behalf.

"*Board Resolution*" means any resolution of the Board of Directors taking an action which it is authorized to take and (i) adopted at a meeting duly called and held at which a quorum of members (if so required) was present and acting throughout or (ii) adopted by written resolution of a majority of the members of the Board of Directors.

"*Business Day*" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in The City of New York, London, Mauritius, Singapore or India (or in any other place in which payments on the Notes are to be made) are authorized by law or governmental regulation to close.

"*Capital Lease Obligations*" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty; *provided that* for purposes of this Indenture, GAAP will be deemed to treat operating leases in a manner consistent with the treatment thereof under GAAP as in effect prior to the adoption of Ind-AS 116 – Leases, notwithstanding any modification or interpretative changes thereto, and not as a Capital Lease Obligation.

"*Capital Stock*" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person,

but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Capital Subsidies*" means the central financial assistance for rooftop solar projects provided to certain Restricted Subsidiaries as set forth and further described in the guidelines or schemes issued by the Indian Ministry of New and Renewable Energy.

"*Change of Control*" means the occurrence of any of the following events:

(1)     the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Restricted Group, taken as a whole, to any "person" (within the meaning of Section 13(d) of the Exchange Act), other than one or more Permitted Holders (for the avoidance of doubt, any sale, transfer, conveyance or other disposition of all or substantially all of the Restricted Group required by applicable law, rule, regulation or order will constitute a Change of Control under this definition);

(2)     if either of the Parent or the Company consolidates with, or merges with or into, any Person (other than one or more Permitted Holders), or any Person (other than one or more Permitted Holders) consolidates with, or merges with or into, the Parent or the Company, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of the Parent or the Company, as the case may be, or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the Voting Stock of the Parent or the Company, as the case may be, outstanding immediately prior to such transaction is converted into or exchanged for (or continues as) Voting Stock (other than Disqualified Stock) of the surviving or transferee Person constituting a majority of the outstanding shares of Voting Stock of such surviving or transferee Person (immediately after giving effect to such issuance);

(3)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than the Permitted Holders, is or becomes the "beneficial owner"

4

(as such term is used in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Parent;

(4)     the adoption of a plan relating to the liquidation or dissolution of the Parent or the Company (other than a liquidation or dissolution of the Parent undertaken in compliance with Section 5.01); or

(5)     the Parent and the Permitted Holders collectively ceasing to be the "beneficial owner" (as such term is used in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of any Restricted Subsidiary other than pursuant to a Qualified InvIT Transfer or a Qualified Restricted Subsidiary Sale.

"*Change of Control Triggering Event*" means the occurrence of a Change of Control and, if the Notes are rated, a Rating Decline.

"*Collateral*" means a first-priority fixed charge by the Parent as chargor over the Capital Stock of the Company.

"*Clearstream*" means Clearstream Banking S.A.

"*Combined Interest Expense*" means, with respect to the Restricted Group for any period, the amount that would be included in gross interest expense (excluding any interest on Subordinated Affiliate Debt accrued during such period) on a combined income statement prepared in accordance with GAAP for such period of the Restricted Group (*provided,* for the avoidance of doubt, that such gross interest expense shall not be net of interest income), plus, to the extent not included in such gross interest expense, and to the extent accrued or payable during such period by the Restricted Group, without duplication, (1) interest expense attributable to Capital Lease Obligations, (2) amortization of debt issuance costs and original issue discount expense and non-cash interest payments in respect of any Indebtedness, (3) the interest portion of any deferred payment obligation, (4) all commissions, discounts and other fees and charges with respect to letters of credit or similar instruments issued for financing purposes or in respect of any Indebtedness, (5) the net costs associated with Hedging Obligations with respect to Indebtedness (including the amortization of fees), (6) interest accruing on Indebtedness of any other Person (other than a Restricted Subsidiary) that is Guaranteed by, or secured by a Lien on any asset of, the Restricted Group and (7) any capitalized interest. Notwithstanding any of the foregoing, Combined Interest Expenses shall not include any payments on any operating leases, including without limitation any payments on any lease, concession or license of property (or Guarantee thereof) which would be considered an operating lease under GAAP as in effect prior to the adoption of Ind-As 116 – Leases.

"*Combined Net Income*" means, for any period, the aggregate of the net income of the Restricted Group for such period, on a combined basis, determined in accordance with GAAP; *provided that:*

(1)     the net income (or loss) of any Person other than a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the Restricted Group;

(2)     the cumulative effect of a change in accounting principles will be excluded;

(3)     any translation gains or losses due solely to fluctuations in currency values and related tax effects will be excluded; and

(4)     non-cash (a) equity-based compensation expense and (b) unrealized gain or loss in respect of Hedging Obligations will be excluded.

5

"*Commodity Hedging Agreement*" means any spot, forward, commodity swap, commodity cap, commodity floor or option commodity price protection agreements or other similar agreement or arrangement.

"*Common Stock*" means, with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock or ordinary shares, whether or not outstanding on the Original Issue Date, and includes all series and classes of such common stock or ordinary shares.

"*Company*" has the meaning set forth in the preamble of this Indenture and its successors and assigns, until released in accordance with the provisions of this Indenture, and shall thereafter refer to the successor.

"*Corporate Trust Office*" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 452 Fifth Avenue, New York, New York 10018, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"*Credit Facilities*" means, one or more debt or commercial paper facilities, in each case, with banks or other institutional lenders or other lenders (including any direct or indirect shareholder of the Restricted Subsidiary Incurring Indebtedness under such Credit Facility) providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time; *provided that* any Credit Facility with a direct or indirect shareholder of the Restricted Subsidiary Incurring Indebtedness under such Credit Facility will, by its terms or by the terms of any agreement or instrument under which such Indebtedness is issued, not provide for any cash payment of interest (or premium, if any).

"*Currency Hedging Agreement*" means any currency swap agreement, currency cap agreement, currency floor agreement, currency futures agreement, currency option agreement or any other similar agreement or arrangement.

"*Custodian*" means a custodian of the Global Notes for DTC under a custody agreement or any similar successor agreement, which will initially be Cede & Co.

"*Debt Service*" means, for any period, the sum of (i) all principal and interest payments payable or accrued in such period in respect of Indebtedness of the Restricted Group (other than Indebtedness owing to a member of the Restricted Group and other than MCS Amounts); (ii) all fees, expenses and other charges payable or accrued in such period in respect of all such Indebtedness (other than Indebtedness owing to a member of the Restricted Group), calculated without duplication for Guarantees with respect to such Indebtedness; (iii) all Obligations payable or accrued in such period under Hedging Obligations Incurred by the Restricted Group; and (iv) the amortized portion of any original issue discount or any premium accrued in respect of any such Indebtedness (including upon the Stated Maturity thereof) in such period.

"*Debt Service Coverage Ratio*" means, for any period, the ratio of (x) Stated EBITDA for such period (net of all taxes as recorded in the combined statement of profit and loss of the Restricted Group) for such period to (y) Debt Service for such period. In making the foregoing calculation:

(1) pro forma effect will be given to any Indebtedness Incurred, and interest with respect to any Indebtedness repaid, repurchased, defeased or redeemed, since the beginning of

6

such period, in each case as if such Indebtedness had been Incurred, repaid, repurchased, defeased or redeemed on the first day of such period (other than Indebtedness Incurred or repaid under a revolving credit or similar arrangement or any predecessor revolving credit or similar arrangement);

(2)     interest expense attributable to interest on any Indebtedness (whether existing or being Incurred) computed on a pro forma basis and bearing a floating interest rate will be computed as if the rate in effect on the date of determination (taking into account any Interest Rate Hedging Agreement applicable to such Indebtedness if such Interest Rate Hedging Agreement has a remaining term in excess of 12 months or, if shorter, at least equal to the remaining term of such Indebtedness) had been the applicable rate for the entire period; and

(3)     pro forma effect will be given to Asset Dispositions and Asset Acquisitions (including giving pro forma effect to the application of proceeds of any Asset Disposition) that occur during such period as if they had occurred and such proceeds had been applied on the first day of such period;

*provided* that to the extent that clause (3) of this sentence requires that pro forma effect be given to an Asset Acquisition or Asset Disposition (or asset acquisition or asset disposition), such pro forma calculation will be based upon the then most recent two semi-annual periods immediately preceding the date of determination of the Person, or division or line of business of the Person, that is acquired or disposed for which financial information is available.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Defaulting Hedging Providers*" bear the meaning ascribed to it in the Intercreditor Agreement.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06, substantially in the form of Exhibit A except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Determination Agent*" means the Parent, an accounting, appraisal or investment banking firm of internationally recognized standing (or a local affiliate thereof), or a consulting firm of internationally recognized standing (or a local affiliate thereof) so long as the principals of such firm involved in the preparation of such opinion are experienced professionals in accounting, appraisal or investment banking.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

(1)     matures or is mandatorily redeemable for cash or in exchange for Indebtedness pursuant to a sinking fund obligation or otherwise;

(2)     is convertible or exchangeable at the option of the holder thereof for Indebtedness or Disqualified Stock; or

(3)        is or may become (in accordance with its terms) upon the occurrence of certain events or otherwise redeemable or repurchasable for cash or in exchange for Indebtedness at the option of the holder of the Capital Stock in whole or in part,

in each case on or prior to the earlier of (a) the Stated Maturity of the Notes or (b) the date on which there are no Notes outstanding; *provided, however, that* (i) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock and (ii) any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Parent or the Company, as applicable, to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Stock if any such redemption or repurchase obligation is not prohibited by Section 4.07.

"*Dollar Equivalent*" means, with respect to any monetary amount in a currency other than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the noon buying rate for U.S. dollars in New York City for cable transfers as certified for customs purposes by the Federal Reserve Bank of New York on the date of determination.

"*ECB Regulations*" means the Foreign Exchange Management Act, 1999, the Foreign Exchange Management (Borrowing and Lending Regulations), 2018 and the Master Direction - External Commercial Borrowings, Trade Credits and Structured Obligations issued by the Reserve Bank of India dated March 26, 2019 as amended, modified or replaced from time to time.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means a sale of Equity Interests (other than Disqualified Stock) of any Restricted Subsidiary or any direct or indirect parent entity of any Restricted Subsidiary, in each case other than to a Restricted Subsidiary, to the extent that the net cash proceeds therefrom are either contributed to the common equity capital of, or invested in the form of Subordinated Affiliate Debt into, any Restricted Subsidiary.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*Existing Notes*" means the US$500 million aggregate principal amount of the Company's 5.50% senior notes due 2022.

"*Fair Market Value*" means the value that would be paid by a willing buyer to an unaffiliated willing seller, determined in good faith by senior management of the Company or if the relevant value exceeds US$5.0 million (or the Dollar Equivalent thereof), the Board of Directors of the Parent or of the Company (unless otherwise provided in this Indenture), in each case whose determination shall be conclusive.

"*Fitch*" means Fitch Ratings, Ltd. and its successors and assigns.

"*Force Majeure Event*" means any event (including but not limited to an act of God, fire, epidemic, explosion, floods, earthquakes, typhoons; riot, civil commotion or unrest, insurrection, terrorism, war, strikes or lockouts; nationalization, expropriation or other governmental actions; any law, order or regulation of a governmental, supranational or regulatory body; regulation of the banking or securities industry including changes in market rules, currency restrictions, devaluations or fluctuations; market conditions affecting the execution or settlement of transactions or the value of assets; and breakdown, failure or malfunction of any telecommunications, computer services or

systems, or other causes) beyond the control of any party which restricts or prohibits the performance of the obligations of such party contemplated by this Indenture.

"*FX ECB*" means any foreign currency denominated external commercial borrowings extended by the Company to the other Restricted Subsidiaries on terms substantially similar to the then existing terms of the Rupee ECBs.

"*GAAP*" means (a) with respect to the Parent, the generally accepted accounting principles adopted in the United States of America published by the Financial Accounting Standards Board or any successor board or agency as in effect from time to time and (b) with respect to the Restricted Group, the Indian Accounting Standards as in effect from time to time ("Ind-AS"), in each case as modified by commonly used carve-out principles as in effect on the date of such report or financial statement (or otherwise on the basis of such GAAP as then in effect). All ratios and computations contained or referred to in this Indenture will be computed in conformity with GAAP applied in a consistent basis. Notwithstanding the foregoing, for purposes of any ratios, calculations and amounts to be determined pursuant to this Indenture (but not for purposes of the financial statements required to be delivered pursuant to Section 4.03), GAAP will be deemed to treat operating leases in a manner consistent with the treatment thereof under GAAP as in effect prior to the adoption of Ind-AS 116 - Leases, notwithstanding any modifications or interpretative changes thereto.

"*Global Note Legend*" means the legend set forth in Section 2.06(f)(2), which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the 144A Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depository or its nominee, substantially in the form of Exhibit A and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Sections 2.01, 2.06(b)(3), 2.06(b)(4), 2.06(d)(2) or 2.06(f).

"*Government Securities*" means direct obligations of, or obligations Guaranteed by, the United States of America, and the payment for which the United States of America pledges its full faith and credit.

"*Guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"*Guarantor*" means any Restricted Subsidiary that executes a Note Guarantee in accordance with the provisions of the Indenture, and its successors and assigns, in each case, until such Note Guarantee has been released in accordance with the provisions of the Indenture.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person pursuant to Commodity Hedging Agreements, Currency Hedging Agreement or Interest Rate Hedging Agreements.

"*Holder*" means the Person in whose name a Note is registered in the Note register.

"*Incur*" means, with respect to any Indebtedness, Subordinated Affiliate Debt or Disqualified Stock, to incur, create, issue, assume, Guarantee or otherwise become liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness, Subordinated Affiliate Debt or Disqualified Stock; *provided that* the accretion of original issue discount, the accrual of interest, the accrual of dividends, the payment of interest in the form of additional Indebtedness or

Subordinated Affiliate Debt and the payment of dividends on Disqualified Stock in the form of additional shares of Disqualified Stock (to the extent provided for when the Indebtedness, Subordinated Affiliate Debt or Disqualified Stock on which such interest or dividend is paid was originally issued) will not be considered an Incurrence of Indebtedness. The terms "Incurrence," "Incurred" and "Incurring" have meanings correlative with the foregoing.

"*Indebtedness*" means, with respect to any Person at any date of determination (without duplication):

(1)     all indebtedness of such Person for borrowed money;

(2)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments;

(4)     all obligations of such Person to pay the deferred and unpaid purchase price of property or services, except Trade Payables;

(5)     all Capital Lease Obligations and Attributable Indebtedness;

(6)     all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided that* the amount of such Indebtedness will be the lesser of (a) the Fair Market Value of such asset at such date of determination and (b) the amount of such Indebtedness;

(7)     all Indebtedness of other Persons Guaranteed by such Person to the extent such Indebtedness is Guaranteed by such Person; and

(8)     to the extent not otherwise included in this definition, Hedging Obligations.

*provided that*, the term "Indebtedness" shall not include (i) Subordinated Affiliate Debt or (ii) any lease obligations of any asset which would be considered an operating lease under GAAP as in effect prior to the adoption of Ind-As 116 – Leases.

The amount of Indebtedness of any Person at any date will be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation; *provided that:*

(1)     the amount outstanding at any time of any Indebtedness issued with original issue discount is the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with GAAP;

(2)     money borrowed and set aside at the time of the Incurrence of any Indebtedness in order to prefund the payment of the interest on such Indebtedness will not be deemed to be "Indebtedness" so long as such money is held to secure the payment of such interest;

(3)     the amount of Indebtedness with respect to any Hedging Obligation at any time will be equal to the net amount, if any, payable if the Commodity Hedging Agreement, Currency Hedging Agreement or Interest Rate Hedging Agreement giving rise to such Hedging Obligation terminated at that time; and

(4)      without duplication for clause (3) above, the amount of any Indebtedness for which there is a related Currency Hedging Agreement or Interest Rate Hedging Agreement at any time shall be calculated after giving effect to such Currency Hedging Agreement or Interest Rate Hedging Agreement.

"*Indian Escrow Agreements* " means the escrow agreements to be entered into by, among others, each Indian Restricted Subsidiary, a bank and the applicable Onshore Debt Trustee, in each case in accordance with "Escrow Agreement" in the INR term sheet included as Appendix B-I in the Offering Memorandum.

"*Indian Restricted Subsidiary*" means any Restricted Subsidiary other than the Company.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" means the US$414,000,000 aggregate principal amount of Notes issued under this Indenture on the date hereof.

"*INR*" means Indian Rupees.

"*Interest Payment Date*" means February 19 and August 19 of each year, commencing February 19, 2022.

"*Interest Rate Hedging Agreement*" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement.

"*Investment Grade*" means a rating of "AAA," "AA," "A" or "BBB," as modified by a "+" or "-" indication, or an equivalent rating representing one of the four highest rating categories, by Fitch, or a rating of "Aaa," "Aa," "A" or "Baa," as modified by a "1," "2" or "3" indication, or an equivalent rating representing one of the four highest rating categories, by Moody's, or the equivalent ratings of any Nationally Recognized Statistical Rating Organization or Organizations, as the case may be, which will have been designated by the Parent or the Company as having been substituted for Fitch or Moody's or both, as the case may be.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), capital contributions, purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The acquisition by the Company or any other Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in Section 4.07(c). The amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"*Moody's*" means Moody's Investors Service, Inc. and its successors and assigns.

"*Nationally Recognized Statistical Rating Organization*" has the meaning assigned to that term in Section 3(a)(62) of the Exchange Act.

"*Net Cash Proceeds*" means with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or cash equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of:

(1)     brokerage commissions and other fees and expenses (including fees and expenses of counsel and investment bankers) related to such Asset Sale;

(2)     provisions for all taxes (whether or not such taxes will actually be paid or are payable) as a result of such Asset Sale without regard to the consolidated results of operations of the Parent or any of its Subsidiaries, taken as a whole;

(3)     payments made to repay Indebtedness or any other obligation outstanding at the time of such Asset Sale that either (x) is secured by a Lien on the property or assets sold or (y) is required to be paid as a result of such sale; and

(4)     appropriate amounts to be provided by the Parent or any Restricted Subsidiary as a reserve against any liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in conformity with GAAP and reflected in an Officer's Certificate delivered to the Trustee.

"*New Onshore Debt*" means the Onshore Debt extended by the Company to the Indian Restricted Subsidiaries using the proceeds of the Notes.

"*Note*" has the meaning set forth in the preamble of this Indenture.

"*Note Guarantee*" means each guarantee from a Guarantor.

"*Note Holders Representative*" means the representative of the Holders as appointed by the Company pursuant to the Mauritius Companies Act 2001 and the Note Holders Representative Appointment Letter or any successor Person thereto and shall initially be Farzanah Nawool, attorney at law, of Appleby (JV) Ltd & Cie, 7th Floor Happy World House, 37, Sir William Newton Street, Port Louis, Republic of Mauritius.

"*Note Holders Representative Appointment Letter*" means the appointment letter appointing a note holders representative in Mauritius, substantially in the form of Exhibit H.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Offering Memorandum*" means the offering memorandum dated August 11, 2021, in connection with the offering of the Notes.

"*Officer*" means one of the directors or executive officers of the Parent or, in the case of the Company or any other Restricted Subsidiary, one of the directors or officers of the Company or such other Restricted Subsidiary, as the case may be.

"*Officer's Certificate*" means a certificate signed by an Officer.

"*Onshore Debt*" means the Rupee ECBs, the Rupee NCDs and the FX ECBs.

"*Onshore Debt Trustee(s)*" means the trustee(s) appointed in respect of the Onshore Debt.

"*Opinion of Counsel*" means a written opinion from external legal counsel selected by the Parent or the Company, provided that such counsel will be acceptable to the Trustee in its sole discretion.

"*Original Issue Date*" means the date on which the Notes are originally issued under this Indenture.

"*Original Issue Date Receivables*" means all rights which exist as of the Original Issue Date of any of the Indian Restricted Subsidiaries to receive payment arising from generation based incentives, receivables from O&M contractors, EPC contractors, insurance companies, the sale or lease of goods or the performance of services, including the sale of power, by any of the Indian Restricted Subsidiaries pursuant to an arrangement with another Person (other than another Restricted Subsidiary) pursuant to which such other Person is obligated to pay to any of the Indian Restricted Subsidiaries for goods and services under terms that permit the purchase of such goods and services on credit.

"*Original Onshore Debt*" means Onshore Debt subscribed for or loaned by the Company on or prior to the Original Issue Date.

"*Parent*" has the meaning set forth in the preamble of this Indenture and its successors and assigns until released in accordance with the provisions of this Indenture and thereafter shall refer to the successor.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Permitted Business*" means any business, service or activity engaged in by the Restricted Group on the Original Issue Date and any other businesses, services or activities that are related, complementary, incidental, ancillary or similar to any of the foregoing or any expansions, extensions or developments thereof, including the ownership, acquisition, development, financing, operation and maintenance of power generation or power transmission or distribution facilities.

"*Permitted Holders*" means any or all of the following:

(1)     Caisse de dépôt et placement du Québec and OMERS Infrastructure;

(2)     any Affiliate of any Person under (1) above; and

(3)     any group of which one or more Persons referred to in clauses (1) or (2) above is a member so long as such Person or Persons collectively are the beneficial owners (without giving effect to the existence of such group) of at least a majority of the Voting Stock collectively owned by the members of such group.

"*Permitted Investments*" *means*:

(1)     any Investment in the Company or another Restricted Subsidiary;

(2)     any Investment in Temporary Cash Equivalents;

(3)  any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.10;

(4)  any acquisition of assets or Capital Stock solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company or the Parent or contributed by the Parent to the common equity capital of a Restricted Subsidiary;

(5)  any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Restricted Group, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(6)  Investments represented by Hedging Obligations;

(7)  loans or advances to employees made in the ordinary course of business of the Parent or any Restricted Subsidiary in an aggregate principal amount not to exceed US$1.0 million (or the Dollar Equivalent thereof) at any one time outstanding;

(8)  repurchases of the Notes;

(9)  pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under Section 4.12;

(10)  (x) receivables, trade credits or other current assets owing to any Restricted Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms, including such concessionary trade terms as the Parent or such Restricted Subsidiary considers reasonable under the circumstances and (y) advances or extensions of credit for purchases and acquisitions of assets, supplies, material or equipment from suppliers or vendors in the ordinary course of business; and

(11)  Investments existing at the Original Issue Date and described in the Offering Memorandum and any Investment that amends, extends, renews, replaces or refinances such Investment; provided, however, that such new Investment is on terms and conditions no less favorable to the applicable Restricted Subsidiary than the Investment being amended, extended, renewed, replaced or refinanced.

"*Permitted Liens*" means:

(1)  Liens in favor of the Collateral Agent created pursuant to this Indenture and the Collateral Documents with respect to the Notes (including any Additional Notes) and the Note Guarantees;

(2)  Liens in favor of a Restricted Subsidiary (including in favor of any trustee or agent on behalf thereof);

(3)  Liens on property (including Capital Stock) existing at the time of acquisition of the property by any Restricted Subsidiary; *provided that* such Liens were in existence prior to such acquisition, and not incurred in contemplation of, such acquisition;

(4)  Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(5)     Liens existing on the Original Issue Date;

(6)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided that* any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(7)     Liens imposed by law, such as suppliers', carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(8)     survey exceptions, easements or reservations of, or rights of others for, licenses, rights- of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(9)     Liens created to secure the Notes or any Note Guarantee;

(10)    Liens securing Indebtedness which is Incurred to refinance secured Indebtedness which is permitted to be Incurred under clause (a)(4) of Section 4.09; *provided that* such Liens do not extend to or cover any property or assets of a Restricted Subsidiary other than the property or assets securing the Indebtedness being refinanced;

(11)    (x) Liens on property or assets securing Indebtedness used or to be used to defease or satisfy and discharge the Notes; *provided that* (a) the Incurrence of such Indebtedness was not prohibited by this Indenture and (b) such defeasance or satisfaction and discharge is not prohibited by this Indenture and (y) Liens on cash and Temporary Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness;

(12)    Liens created on Collateral and under the Collateral Documents securing Permitted Pari Passu Secured Indebtedness;

(13)    Liens on the assets and with the priority as set forth in Appendix B to the Offering Memorandum securing Indebtedness permitted to be Incurred under Section 4.09(a)(10); *provided that* such Indebtedness is not owed to any direct or indirect shareholder of the Restricted Subsidiary Incurring such Indebtedness;

(14)    Liens incurred or pledges or deposits made in the ordinary course of business (x) to a public utility or any municipality or governmental or other public authority when required by such utility or municipality or governmental or other authority in connection with the operations of the Restricted Subsidiaries or (y) in connection with workers' compensation, unemployment insurance and other types of social security and employee health and disability benefits;

(15)    Liens on Escrowed Proceeds for the benefit of the related holders of debt securities incurred in accordance with Section 4.09 or on cash set aside at the time of the incurrence of such Indebtedness or on Temporary Cash Equivalents purchased with such cash, in either case to the extent such cash or Temporary Cash Equivalents prefund the payment of interest, premium or penalties on such Indebtedness and are held in an escrow account or similar arrangement to be applied for such purpose;

(16)     Liens securing Indebtedness Incurred by a Restricted Subsidiary (other than the Company) under Section 4.09(a)(12); *provided* that the Onshore Debt of such Restricted Subsidiary is equally and ratably secured;

(17)     Liens in favor of Solar Energy Corporation of India Ltd., as the provider of Viability Gap Funding (including in favor of any trustee or agent on behalf of such provider), if required under the Viability Gap Funding securitization agreements; and

(18)     Liens securing Indebtedness Incurred by a Restricted Subsidiary under the covenant described under Section 4.09(a)(13); *provided that* the Onshore Debt of such Restricted Subsidiary is equally and ratably secured;

*provided that*, the only Liens permitted on the Collateral are (1), (5), (6), (7), (9), (11) and (12). Liens permitted under clause (12) to secure Currency Hedging Agreements related to the Notes or Permitted Pari Passu Secured Indebtedness may have super priority status as described under Section 4.25.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*Preferred Stock*" as applied to the Capital Stock of any Person means Capital Stock of any class or classes that by its term is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"*Private Placement Legend*" means the legend set forth in Section 2.06(f)(1) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified InvIT Transfer*" means the sale, transfer or other disposition, in accordance with the SEBI (Infrastructure Investment Trusts) Regulations, 2014, of 50% or more of the total voting power of the Voting Stock of one or more Indian Restricted Subsidiaries to an infrastructure investment trust registered with the Securities and Exchange Board of India (an "InvIT"); *provided* that (i) the Company remains a "foreign equity holder" (as defined in the ECB Regulations) of such Indian Restricted Subsidiaries, (ii) the Parent (and/or any of its Subsidiaries) and/or one or more Permitted Holders are the sponsor (as defined in the SEBI (Infrastructure Investment Trusts) Regulations, 2014) of the InvIT and owns a majority of the total voting power of the Voting Stock of the investment manager of the InvIT, and (iii) the Parent or the Company has obtained prior written confirmations from the Rating Agencies that such transaction will not result in a decrease in the ratings of the Notes.

"*Qualified Restricted Subsidiary Sale*" means a disposition (whether by means of a sale, transfer, merger or otherwise) of the Voting Stock of one or more Indian Restricted Subsidiaries which results in the Parent holding, directly or indirectly, less than 50% of the total voting power of the Voting Stock of any such Indian Restricted Subsidiary; *provided* that (i) the Onshore Debt of any such Indian Restricted Subsidiary is fully and irrevocably redeemed, (ii) the Company redeems the Notes in a principal amount not less than the Dollar Equivalent of such Onshore Debt (net of any hedge unwind and other costs in connection with any such redemption of Notes), (iii) prior to such Qualified Restricted Subsidiary Sale, the Parent shall deliver to the Trustee an Officer's Certificate or an opinion issued by a Determination Agent certifying that after giving effect to such Qualified Restricted Subsidiary Sale and the repayment of any Onshore Debt arising therefrom, the Company has sufficient contracted cash flows (including as a result of the Required Hedging Arrangements) to satisfy all scheduled interest payment obligations under the Notes and the Required Hedging Arrangements, and to satisfy all principal payment obligations (based on a 95% probability analysis) under the Notes and the Required Hedging Arrangements (with such Officer's Certificate or opinion being in substantially the form as

attached to the Indenture, which may include language limiting or excluding the liability of any Determination Agent in providing such opinion), and (iv) the Parent or the Company has obtained prior written confirmations from each of the Rating Agencies which are then rating the Notes that such transactions will not result in a decrease in the ratings of the Notes.

"*Rating Agencies*" means (1) Fitch and (2) Moody's; provided that if Fitch or Moody's shall not make a rating of the Notes publicly available, one or more Nationally Recognized Statistical Rating Organizations, as the case may be, selected by the Company or the Parent, which will be substituted for Fitch or Moody's or both, as the case may be.

"*Rating Category*" means (i) with respect to Fitch, any of the following categories: "BB," "B," "CCC," "CC," "C" and "D" (or equivalent successor categories); (ii) with respect to Moody's, any of the following categories: "Ba," "B," "Caa," "Ca," "C" and "D" (or equivalent successor categories); and (iii) the equivalent of any such category of Fitch or Moody's used by another Rating Agency. In determining whether the rating of the Notes has decreased by one or more gradations, gradations within Rating Categories ("+" and "—" for Fitch; "1," "2" and "3" for Moody's; or the equivalent gradations for another Rating Agency) will be taken into account (e.g., with respect to Fitch, a decline in a rating from "BB+" to "BB," as well as from "BB-" to "B+," will constitute a decrease of one gradation).

"*Rating Date*" means that date which is 60 days prior to the earlier of (x) a Change of Control and (y) a public notice of the occurrence of a Change of Control or of the intention by the Parent or any other Person or Persons to effect a Change of Control.

"*Rating Decline*" means the occurrence on or within six months after the date of a Change of Control, or of public notice of the occurrence of a Change of Control or the intention by the Parent or any other Person or Persons to effect a Change of Control (which period will be extended so long as the rating of the Notes is under publicly announced consideration for possible downgrade by any of the Rating Agencies) of any of the events listed below:

(1)     if the Notes are rated by one or more Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by any such Rating Agency shall be below Investment Grade; or

(2)     if the Notes are rated below Investment Grade by one or more Rating Agencies on the Rating Date, the rating of the Notes by any such Rating Agency shall be decreased by one or more gradations (including gradations within Rating Categories as well as between Rating Categories).

"*Record Date*" means February 4 and August 4 immediately preceding an Interest Payment Date.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Global Note substantially in the form of Exhibit A bearing the Global Note Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of Notes sold in reliance of Rule 903 of Regulation S.

"*Required Hedging Arrangements*" means Currency Hedging Agreements pursuant to customary ISDA documentation and hedging arrangements thereunder that comprise:

(i)     a coupon swap on the interest payments due under the Notes to fully protect the Company against any depreciation in the Indian Rupee to the U.S. Dollar; and

(ii)     hedging of principal amount through either of or a mix of:

17

(a) swap on the principal amount of the Notes that protects the Company against any depreciation in the Indian Rupee to the U.S. Dollar if the Indian Rupee to U.S. Dollar spot rate is above a certain agreed rate after the date of each Incurrence of New Onshore Debt in each case on the payment of principal due under the Notes on early redemption, Mandatory Amortization Redemption or MCS Amortization Redemption; and/or

(b) a call spread option on the principal amounts of the Notes that will partially protect the Company (by receiving the same fixed payment) against any depreciation in the Indian Rupee to the U.S. Dollar if the Indian Rupee to U.S. Dollar spot rate is in between the agreed buy and sell strike rate.

"*Responsible Officer*" shall mean, when used with respect to the Trustee, any managing director, vice president, trust associate, relationship manager, transaction manager, client service manager, any trust officer or any other officer located at the Corporate Trust Office of the Trustee who customarily performs functions similar to those performed by any persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and in each such case, who shall have direct responsibility for the day to day administration of this Indenture.

"*Restricted Group*" means the Company and the other Restricted Subsidiaries.

"*Restricted Subsidiary*" means each of the Company, Azure Power (Punjab) Private Limited, Azure Urja Private Limited, Azure Power Pluto Private Limited, Azure Surya Private Limited, Azure Power Eris Private Limited, Azure Sunshine Private Limited, Azure Green Tech Private Limited, Azure Clean Energy Private Limited, Azure Power Mars Private Limited, Azure Power (Karnataka) Private Limited, Azure Sunrise Private Limited, Azure Power (Raj.) Private Limited, Azure Photovoltaic Private Limited, Azure Power (Haryana) Private Limited, Azure Power Thirty Seven Private Limited and Azure Power Infrastructure Private Limited, other than any Indian Restricted Subsidiary that is sold in a Qualified Restricted Subsidiary Sale.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*Rupee ECB*" means Rupee denominated external commercial borrowings extended by the Company to certain other Restricted Subsidiaries, a summary of the current terms of which is set out in Appendix B-III, "INR ECB Term Sheet" of the Offering Memorandum.

"*Rupee NCDs*" means the (i) Rupee denominated senior secured non-convertible debentures to be issued by the Restricted Subsidiaries, other than the Company, and subscribed for by the Company as described in the Offering Memorandum under the heading "Use of Proceeds" (a summary of the terms of which is set out in Appendix B-I, "INR NCD Term Sheet" of the Offering Memorandum) and any future Rupee denominated non-convertible debentures issued by a Restricted Subsidiary and subscribed for by the Company on terms substantially similar to the then existing terms of the Rupee NCDs; and (ii) Rupee denominated senior secured non-convertible debentures issued by certain Restricted Subsidiaries, other than the Company (a summary of the current terms of which is set out in Appendix B-II, "INR NCD Term Sheet" of the Offering Memorandum).

"*S&P*" means Standard & Poor's Ratings Group and its successors or assigns.

"*Sale and Leaseback Transaction*" means any direct or indirect arrangement relating to property (whether real, personal or mixed), now owned or hereafter acquired whereby any Restricted Subsidiary transfers such property to another Person and any Restricted Subsidiary leases it from such Person.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Senior Indebtedness*" means, with respect to any Person, all obligations of such Person, whether outstanding on the Original Issue Date or thereafter created, incurred or assumed, without duplication, consisting of principal and premium, if any, accrued and unpaid interest on, and fees and other amounts relating to, all Indebtedness of such Person, including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such Person, regardless of whether post-filing interest is allowed in such proceeding.

"*Stated EBITDA*" means, for any period, Combined Net Income for such period plus, to the extent such amount was deducted in calculating such Combined Net Income:

(1)     Combined Interest Expense;

(2)     income taxes (on a combined basis) (other than income taxes attributable to extraordinary gains (or losses) or sales of assets outside the ordinary course of business) as recorded in the combined statement of profit and loss of the Restricted Group;

(3)     depreciation expense, amortization expense and all other non-cash items (including impairment charges and write-offs) reducing Combined Net Income (other than non- cash items in a period which reflect cash expenses paid or to be paid in another period), less all non-cash items increasing Combined Net Income (other than the accrual of revenues in the ordinary course of business);

(4)     any gains or losses arising from the acquisition of any securities or extinguishment, repurchase, cancellation or assignment of Indebtedness or Subordinated Affiliate Debt as permitted by this Indenture; and

(5)     any unrealized gains or losses in respect of Hedging Obligations or other derivative instruments or forward contracts or any ineffectiveness recognized in earnings related to a qualifying hedge transaction or the fair value of changes therein recognized in earnings for derivatives that do not qualify as hedge transactions, in each case, in respect of Hedging Obligations;

all as determined on a combined basis for the Restricted Group.

"*Stated Maturity*" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date it was first Incurred in compliance with this Indenture, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"*Subordinated Affiliate Debt*" means any indebtedness Incurred by any Restricted Subsidiary owed to its Affiliates which, by its terms or by the terms of any agreement or instrument pursuant to which such indebtedness is issued or remains outstanding, (i) is expressly made subordinate to the prior payment in full of the Onshore Debt or the Notes, as applicable, issued by such Restricted Subsidiary (including upon any default, bankruptcy, reorganization, liquidation, winding up or other disposition of assets of the Restricted Subsidiary), (ii) does not mature or require any amortization and is not required

to be repaid, redeemed, repurchased or otherwise retired, pursuant to a sinking fund obligation, event of default or otherwise (including any redemption, retirement or repurchase which is contingent upon events or circumstance but excluding any retirement required by virtue of acceleration of such indebtedness upon an event of default) in whole or in part, on or prior to six months after the earlier of (a) the first date no Notes are outstanding and (b) the final Stated Maturity of the Notes, (iii) does not provide for any cash payment of interest (or premium, if any) prior to six months after the earlier of (a) the first date no Notes are outstanding and (b) the final Stated Maturity of the Notes, (iv) is not secured by a Lien on any assets of the Restricted Subsidiary and is not guaranteed by any Restricted Subsidiary and (v) does not (including upon the happening of any event) restrict the payment of amounts due in respect of the Onshore Debt or the Notes or compliance by the Restricted Subsidiary with its obligations under the Onshore Debt or the Notes; *provided, however,* that upon any event or circumstance that results in such indebtedness ceasing to qualify as Subordinated Affiliate Debt, such indebtedness shall constitute an Incurrence of Indebtedness by the Restricted Subsidiary.

"*Subsidiary*" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)     any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"*Temporary Cash Equivalents*" means any of the following:

(1)     United States dollars, Indian rupees, Euros or, in the case of any Restricted Subsidiary, local currencies held by such Restricted Subsidiaries from time to time in the ordinary course of the Permitted Business;

(2)     direct obligations of the United States of America, Canada, a member of the European Union, India or any agency of any of the foregoing or obligations fully and unconditionally Guaranteed by any of the foregoing or any agency of any of the foregoing, in each case maturing within one year;

(3)     demand or time deposit accounts, certificates of deposit and money market deposits maturing within 365 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, the United Kingdom, India, Hong Kong or Mauritius and which bank or trust company (x) has capital, surplus and undivided profits aggregating in excess of US$100.0 million (or the Dollar Equivalent thereof) and (y)(A) has outstanding debt which is rated "A" or such similar equivalent rating) or higher by at least one Nationally Recognized Statistical Rating Organization or (B) is organized under the laws of India and has a long term foreign issuer credit rating or senior unsecured debt rating equal to or higher than India's sovereign credit rating by at least one Nationally Recognized Statistical Rating Organization (as defined in Section 3(a)(62) under the Exchange Act) or (C) is a bank owned or controlled by the government of India and organized under the laws of India;

(4)     repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (2) above entered into with a bank or trust company meeting the qualifications described in clause (3) above;

(5)     commercial paper, maturing not more than six months after the date of acquisition thereof, issued by a corporation (other than an Affiliate of the Parent) organized and in existence under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P or Fitch;

(6)     securities with maturities of six months or less from the date of acquisition thereof, issued or fully and unconditionally Guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P, Moody's or Fitch;

(7)     any money market fund that has at least 95.0% of its assets continuously invested in investments of the types described in clauses (1) through (6) above;

(8)     demand or time deposit accounts with any scheduled commercial bank organized under the laws of India; and

(9)     certificates of deposit and debt mutual funds, maturing not more than one year after the date of acquisition thereof, which invest solely in companies organized under the laws of India whose long-term debt has a national credit rating of AAA/A1+.

"*Total Assets*" means, as of any date, the total assets of the Restricted Group on a combined basis calculated in accordance with GAAP as of the last day of the most recent semi-annual period for which financial statements are available (which may be internal financial statements), calculated after giving pro forma effect to any acquisition or disposition of property, plant or equipment subsequent to such date and after giving pro forma effect to the application of the proceeds of any Indebtedness; *provided that* for purposes of this Indenture, GAAP will be deemed to treat operating leases in a manner consistent with the treatment thereof under GAAP as in effect prior to the adoption of Ind-AS 116 – Leases, notwithstanding any modification or interpretative changes thereto.

"*Trade Payables*" means, with respect to any Person, any accounts payable or any other indebtedness or monetary obligation to trade creditors created, assumed or Guaranteed by such Person or any of its Restricted Subsidiaries arising in the ordinary course of business in connection with the acquisition of goods or services and payable within one year.

"*Treasury Rate*" means, as of any redemption date, the yield to maturity as of the earlier of (a) such redemption date or (b) the date on which such Notes are defeased or satisfied and discharged, of the most recently issued United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to August 19, 2023; *provided, however*, that if the period from the redemption date to August 19, 2023 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used. Any such Treasury Rate shall be obtained by the Company.

"*Unrestricted Definitive Note*" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a Global Note, including a Regulation S Global Note, that does not bear and is not required to bear the Private Placement Legend.

"*Viability Gap Funding*" means the funding provided or to be provided by Solar Energy Corporation of India Ltd. to certain Restricted Subsidiaries accordance with the VGF securitization agreements executed between Solar Energy Corporation of India Ltd. and such Restricted Subsidiaries.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Wholly Owned Restricted Subsidiary*" means (i) the Company or (ii) any other Restricted Subsidiary, all of the outstanding Capital Stock of which (other than any director's qualifying shares, Investments by foreign nationals mandated by applicable law or Investments by an off taker or an affiliate of an offtaker of a project owned and operated by such Restricted Subsidiary) is owned or controlled by either (x) the Parent or the Company or (y) one or more Wholly Owned Restricted Subsidiaries of the Parent or the Company.

Section 1.02 *Other Definitions*.

| Term | Defined in Section |
|---|---|
| "*Affiliate Transaction*" | 4.11 |
| "*Amortization Date*" | 3.08 |
| "*Asset Sale Offer*" | 3.09 |
| "*Authentication Order*" | 2.02 |
| "*Change of Control Offer*" | 4.16 |
| "*Change of Control Payment*" | 4.16 |
| "*Change of Control Payment Date*" | 4.16 |
| "*Collateral*" | 10.01 |
| "*Collateral Agent*" | 4.25 |
| "*Collateral Documents*" | 10.01 |
| "*Company Power of Attorney*" | 10.01 |
| "*Contractual Currency*" | 4.33 |
| "*Covenant Defeasance*" | 8.03 |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Proceeds*" | 4.10 |
| "*Excess Proceeds Repurchase Offer*" | 4.10 |
| "*Existing Indebtedness*" | 4.09 |
| "*Guaranteed Obligations*" | 11.01 |
| "*Intercreditor Agreement*" | 4.25 |
| "*Legal Defeasance*" | 8.02 |
| "*Mandatory Amortization Redemption*" | 3.08 |
| "*MCS*" | 3.11 |
| "*MCS Amortization Redemption*" | 3.11 |
| "*MCS Amortization Redemption Date*" | 3.11 |
| "*MCS Amount*" | 3.11 |
| "*Offer Amount*" | 3.09 |
| "*Offer Period*" | 3.09 |
| "*Pari Passu Secured Parties*" | 4.25 |
| "*Paying Agent*" | 2.03 |
| "*Parent Power of Attorney*" | 10.01 |
| "*Permitted Indebtedness*" | 4.09 |
| "*Permitted Pari Passu Secured Indebtedness*" | 4.24 |
| "*Permitted Refinancing Indebtedness*" | 4.09 |

| | |
|---|---|
| *"Powers of Attorney"* | 10.01 |
| *"Purchase Date"* | 3.09 |
| *"Reinstatement Date"* | 4.35 |
| *"Relevant Taxing Jurisdiction"* | 2.13 |
| *"Replacement Assets"* | 4.10 |
| *"Registrar"* | 2.03 |
| *"Restricted Payments"* | 4.07 |
| *"Share Charge"* | 10.01 |
| *"Subordinated Indebtedness"* | 4.07 |
| *"Surviving Person"* | 5.01 |
| *"Suspension Event"* | 4.35 |
| *"Suspension Period"* | 4.32 |
| *"Trustee"* | 8.05 |

Section 1.03 *Rules of Construction*.

Unless the context otherwise requires or except as otherwise expressly provided:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)     "herein", "hereof" and other words of similar import refer to in this Indenture as a whole and not to any particular Section, Article or other subdivision;

(4)     "or" is not exclusive;

(5)     words in the singular include the plural, and in the plural include the singular;

(6)     "will" shall be interpreted to express a command;

(7)     provisions apply to successive events and transactions;

(8)     references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture;

(9)     references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time; and

(10)     references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations as amended from time to time (or to successor statutes and regulations).

**ARTICLE 2 THE NOTES**

 Section 2.01 *Form and Dating*.

(a) *General*. The Notes and the certificate of authentication from the Trustee will be substantially in the form of Exhibit A. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authentication. The Notes shall be in minimum denominations of US$200,000 or integral multiples of US$1,000 in excess thereof.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company, the Parent and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b) *Global Notes*. Notes issued in global form will be substantially in the form of Exhibit A (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form will be substantially in the form of Exhibit A (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Registrar or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06.

(c) *Euroclear and Clearstream Procedures Applicable.* The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Global Note that are held by Participants through Euroclear or Clearstream.

Section 2.02 *Execution and Authentication*.

At least one Officer must sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by one Officer (an "*Authentication Order*"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.07.

With the delivery of this Indenture, the Company and the Parent is furnishing, and from time to time thereafter the Company, the Parent and each Guarantor may each furnish, a certificate to the Trustee substantially in the form of Exhibits F-1, F-2 and F-3 (an "Authorization Certificate") identifying and certifying the incumbency and specimen (or facsimile) signatures of the Authorized Officers. Until the Trustee receives a subsequent Authorization Certificate, the Trustee shall be entitled to conclusively rely on the last Authorization Certificate delivered to it for purposes of determining the Authorized Officers. Typographical and other minor errors or defects in any signature shall not affect the validity or enforceability of any Note which has been duly authenticated and delivered by the Trustee.

Section 2.03 *Registrar, Transfer Agent, Paying Agent and Note Holders Representative*.

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange (the "*Registrar*") and an office or agency where Notes may be presented for

payment (the "*Paying Agent*"). The Registrar will keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without prior notice to any Holder and shall so notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. The Company, the Parent or any other Restricted Subsidiary may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints HSBC Bank USA, National Association to act as the Registrar, Transfer Agent and Paying Agent pursuant to the agent appointment letter as set forth in Exhibit E, and to act as Custodian with respect to the Global Notes.

The Company initially appoints Farzanah Nawool, attorney at law, of Appleby (JV) Ltd & Cie, 7th Floor Happy World House, 37, Sir William Newton Street, Port Louis, Republic of Mauritius to act as the Note Holders Representative, pursuant to the Note Holders Representative Appointment Letter as set forth in Exhibit H, and to act as such with respect to the Global Notes pursuant to the Mauritius Companies Act 2001.

Section 2.04 *Paying Agent to Hold Money*.

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or Additional Amounts, if any, or interest on the Notes. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company, the Parent or any other Restricted Subsidiary) will have no further liability for the money. If the Company, the Parent or any other Restricted Subsidiary acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent.

Section 2.05 *Holder Lists*.

The Trustee through the Registrar will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders. If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

Section 2.06 *Transfer and Exchange*.

(a) *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

(1) the Company delivers to the Trustee and the Registrar notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary;

(2) the Company, at its sole discretion, notifies the Trustee and the Registrar in writing that it elects to cause the issuance of the Definitive Notes; or

(3) if a beneficial owner of a Note requests such exchange in writing through DTC following a Default or an Event of Default which has occurred and is continuing.

Upon the occurrence of any of the preceding events in (1), (2) or (3) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Registrar. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f).

(b) *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the 144A Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1) *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any 144A Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same 144A Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2) *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar either:

(A) both:

(i)  a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above;

*provided that* in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Global Note prior to the receipt by the Registrar of any certificates required pursuant to Rule 903 or Rule 904 under the Securities Act or Rule 144 under the Securities Act (if available).

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Registrar shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g).

(3) *Transfer of Beneficial Interests to Another 144A Global Note.* A beneficial interest in any 144A Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another 144A Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives a certificate from the transferor in the form of Exhibit B, including the certifications in item (1) thereof.

(4) *Transfer and Exchange of Beneficial Interests in a 144A Global Note for Beneficial Interests in an Unrestricted Global Note.* A beneficial interest in any 144A Global Note may be exchanged by any Holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A) if the holder of such beneficial interest in a 144A Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C, including the certifications in item (1)(a) thereof; or

(B) if the holder of such beneficial interest in a 144A Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case set forth in this Section 2.06(b)(4), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to the above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to the above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a 144A Global Note.

(c) *Transfer or Exchange of Beneficial Interests for Definitive Notes*.

(1) *Beneficial Interests in 144A Global Notes to 144A Definitive Notes.* If following the occurrence of an event described in Section 2.06(a), any holder of a beneficial interest in a 144A Global Note proposes to exchange such beneficial interest for a 144A Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a 144A Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A) if the holder of such beneficial interest in a 144A Global Note proposes to exchange such beneficial interest for a 144A Definitive Note, a certificate from such Holder in the form of Exhibit C, including the certifications in item (2)(a) thereof;

(B) if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(C) if such beneficial interest is being transferred in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certification in item (2) thereof;

(D) if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E) if such beneficial interest is being transferred to the (Company or any of its Subsidiaries), a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(b) thereof; or

(F) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(c) thereof, the Registrar shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g), and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a 144A Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Registrar shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a 144A Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2) *Beneficial Interests in 144A Global Notes to Unrestricted Definitive Notes.* Following the occurrence of an event described in Section 2.06(a), a holder of a beneficial interest in a 144A Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

(A) if the holder of such beneficial interest in a 144A Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C, including the certifications in item (1)(b) thereof; or

(B) if the holder of such beneficial interest in a 144A Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in such case set forth in this paragraph, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3) *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes.* If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(2), the Registrar will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g), and the Company will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) and will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will not bear the Private Placement Legend.

(d) *Transfer and Exchange of Definitive Notes for Beneficial Interests.*

(1) *144A Definitive Notes to Beneficial Interests in 144A Global Notes.* If any Holder of a 144A Definitive Note proposes to exchange such Note for a beneficial interest in a 144A Global Note or to transfer such 144A Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a 144A Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the Holder of such 144A Definitive Note proposes to exchange such Note for a beneficial interest in a 144A Global Note, a certificate from such Holder in the form of Exhibit C, including the certifications in item (2)(b) thereof;

(B) if such 144A Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(C) if such 144A Definitive Note is being transferred in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(D) if such 144A Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(E) if such 144A Definitive Note is being transferred to the Parent or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(b) thereof; or

(F) if such 144A Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(c) thereof,

the Registrar will cancel the 144A Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate 144A Global Note.

(2) *144A Definitive Notes to Beneficial Interests in Unrestricted Global Notes.* A Holder of a 144A Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such 144A Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A) if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C, including the certifications in item (1)(c) thereof; or

(B) if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B, including the certifications in item (4) thereof; and, in such case set forth above in this paragraph, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of Section 2.06(d)(2), the Registrar will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3) *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.* A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Registrar will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to (3) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e) *Transfer and Exchange of Definitive Notes for Definitive Notes.* Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1) *144A Definitive Notes to 144A Definitive Notes.* Any 144A Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a 144A Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof; and

(B) if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications, certificates and (Opinion of Counsel) required by item (3) thereof, if applicable.

(2) *144A Definitive Notes to Unrestricted Definitive Notes.* Following the occurrence of an event described in Section 2.06(a), any 144A Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(A) if the Holder of such 144A Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C, including the certifications in item (1)(d) thereof; or

(B) if the Holder of such 144A Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in such case set forth above in this paragraph if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3) *Unrestricted Definitive Notes to Unrestricted Definitive Notes.* A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f) *Legends.* The following legends will appear on the face of all 144A Global Notes and 144A Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1) *Private Placement Legend.*

(A) Except as permitted by subparagraph (B) below, each Global Note and each 144A Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS NOTE AND THE NOTE GUARANTEE (IF ANY) HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, THIS NOTE AND THE NOTE GUARANTEE (IF ANY) MAY NOT BE OFFERED, SOLD, PLEDGED OR

31

OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB") OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT, WITHIN THE TIME PERIOD REFERRED TO UNDER RULE 144(d) UNDER THE SECURITIES ACT AS IN EFFECT ON THE DATE OF THE TRANSFER OF THIS NOTE, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO AZURE POWER ENERGY LTD (THE "COMPANY") OR ANY SUBSIDIARY THEREOF, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE), (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (E) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRANSFER AGENT. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS."

(B) Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(4), (c)(2), (c)(3), (d)(2), (d)(3), (e)(2) or (e)(3) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(2) *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT

TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE REGISTRAR MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE REGISTRAR FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(g) *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or cancelled in whole and not in part, each such Global Note will be returned to or retained and cancelled by the Registrar in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such increase.

(h) *General Provisions Relating to Transfers and Exchanges*.

(1) To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(2) No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.09, 4.10, 4.16 and 9.05).

(3) The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4) All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5) Neither the Registrar nor the Company will be required:

(A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 and ending at the close of business on the day of selection;

(B) to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C) to register the transfer of or to exchange a Note between a record date and the next succeeding Interest Payment Date.

(6) Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7) The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02.

(8) Notwithstanding anything contained herein to the contrary, neither the Trustee nor any Agent will be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the registration provisions of or any exemptions from the Securities Act or any other securities laws or the applicable laws of any jurisdiction.

(9) All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

Section 2.07 *Replacement Notes*.

If any mutilated Note is surrendered to the Trustee or the Company and the Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee, any Agent or the Company, an indemnity bond must

be supplied by the Holder that is sufficient in the judgment of the Trustee, any Agent and the Company to protect the Company, the Trustee and any Agent from any loss that any of them may suffer if a Note is replaced. The Company may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08 *Outstanding Notes*.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Registrar in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. All Notes that are purchased, acquired or otherwise redeemed by the Company or the Parent will be cancelled in accordance with Section 2.11. Except as set forth in Section 2.09, a Note does not cease to be outstanding because an Affiliate of the Company or any Guarantor holds the Note; however, Notes held by an Affiliate of the Company or any Guarantor shall not be deemed to be outstanding for purposes of Section 3.07(a).

If a Note is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Registrar receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, the Parent, any other Restricted Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09 *Treasury Notes*.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Guarantor will be considered as not outstanding, except that for the purposes of determining whether the Trustee and each Agent will be protected in relying on any such direction, waiver or consent, only Notes for which the Trustee and each Agent has received an Officer's Certificate from the Company or an Affiliate of the Company evidencing such ownership or beneficial holding will be so disregarded.

Section 2.10 *Temporary Notes*.

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes in registered form but may have variations that the Company considers appropriate for temporary Notes and as may reasonably be acceptable to the Registrar. Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11 *Cancellation*.

The Company at any time may deliver Notes, and the Company and the Parent shall promptly deliver all Notes that are purchased, acquired or otherwise redeemed by the Company or the Parent, to the Paying Agent for cancellation and the Paying Agent shall cancel such Notes. The Registrar and

Trustee will forward to the Paying Agent any Notes surrendered to them for registration of transfer, exchange or payment. The Paying Agent and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will destroy cancelled Notes (subject to the record retention requirement of the Exchange Act). Certification of the destruction of all cancelled Notes will be delivered to the Company upon prior written request of the Company. The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Paying Agent for cancellation.

Section 2.12 *Defaulted Interest*.

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01. The Company will notify the Paying Agent in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company will fix or cause to be fixed each such special record date and payment date; *provided that* no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Company (or, upon the written request, the Trustee or the Registrar in the name and at the expense of the Company) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.13 *Additional Amounts*.

All payments of principal of, and premium (if any), and interest on the Notes or under the Note Guarantees (if any) will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within India, Mauritius or any other jurisdiction in which the Company, a Surviving Person or any Guarantor is or was organized or resident for tax purposes or any political subdivision or taxing authority thereof or therein (each, as applicable, a "*Relevant Taxing Jurisdiction*") or any jurisdiction through which payment is made by or on behalf of the Company, the Guarantors (if any) or a Surviving Person, or any political subdivision or taxing authority thereof or therein (together with the Relevant Taxing Jurisdictions, the "*Relevant Jurisdictions*"), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. If any such withholding or deduction is so required, the Company, the Guarantors (if any) or a Surviving Person, as the case may be, will pay such additional amounts (the "*Additional Amounts*") as will result in receipt of such amounts as would have been received had no such withholding or deduction been required, except that no Additional Amounts will be payable:

(a) for or on account of:

(1) any tax, duty, assessment or governmental charge that would not have been imposed but for:

(A) the existence of any present or former connection between the Holder or beneficial owner of such Note and the Relevant Jurisdiction other than merely holding such Note or the receipt of payments thereunder or under the Note Guarantee (if any), or the enforcement of such Notes or the Note Guarantees (if any), including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(B) the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of, premium, if any, and interest on, such Note became due and payable

pursuant to the terms thereof or was made or duly provided for, except to the extent that the Holder thereof would have been entitled to such Additional Amounts if it had presented such Note for payment on any date within such 30-day period;

(C) the presentation of such Note (in cases in which presentation is required) for payment in the Relevant Jurisdiction, unless such Note could not have been presented for payment elsewhere; or

(D) the failure of the Holder or beneficial owner to comply with a timely request of the Company, any Guarantor or a Surviving Person, addressed to the Holder, to provide any applicable information concerning such Holder's or beneficial owner's nationality, residence, identity or connection with any Relevant Jurisdiction, if and to the extent that it is legally entitled to do so and due and timely compliance with such request is required under the statutes, regulations or official administrative guidance having a force of law of the Relevant Jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable to such Holder;

(2) any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or other governmental charge;

(3) any tax, duty, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of or interest or any premium on the Note or payments under the Note Guarantees (if any);

(4) any tax, assessment, withholding or deduction required by Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended ("*FATCA*"), any current or future Treasury Regulations or rulings promulgated thereunder, any law, regulation or other official guidance enacted in any jurisdiction implementing FATCA, any intergovernmental agreement between the United States and any other jurisdiction to implement FATCA, or any agreement with the U.S. Internal Revenue Service under FATCA; or

(5) any combination of taxes, duties, assessments or governmental charges referred to in the preceding clauses (1), (2), (3) and (4); or

(b) to a Holder that is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be required to be included in the income under the laws of a Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

(c) The Company, any applicable Guarantor or a Surviving Person, as the case may be, will (i) make such withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Company, any applicable Guarantor or a Surviving Person, as the case may be, will make reasonable efforts to obtain original tax receipts or certified copies thereof evidencing the payment of any taxes, duties, assessment or governmental charges so deducted or withheld and paid to the Relevant Jurisdiction. The Company, any applicable Guarantor or a Surviving Person, as the case may be, will furnish to the Trustee, within 60 days after the date of the payment of any taxes, duties, assessment or governmental charges so deducted or withheld is due pursuant to applicable law, either original tax receipts or certified copies thereof evidencing such payment or, if such receipts are not obtainable, other evidence of such payments.

(d) At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable, if the Company, any Guarantor or a Surviving Person, as the case may be,

will be obligated to pay Additional Amounts with respect to such payment, the Company, a Guarantor or a Surviving Person, as the case may be, will deliver to the Trustee an Officer's Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and will set forth such other information necessary to enable the Paying Agent to pay such Additional Amounts to the Holders on such payment date.

(e) The Paying Agent and the Trustee will make payments free of withholdings or deductions on account of taxes unless required by applicable law. If such a deduction or withholding is required, the Paying Agent or the Trustee will not be obligated to pay any Additional Amount to the recipient unless such an Additional Amount is received by the Paying Agent or the Trustee. The Company, any Guarantor or Surviving Person shall give notice to the Paying Agent and the Trustee of withholding or deduction as soon as it becomes aware of the requirement to make the withholding or deduction and shall give to the Paying Agent and the Trustee such information reasonably available to the Company as the Paying Agent and the Trustee may require to enable them to assess and comply with the requirement.

(f) Each of the Company, each Guarantor and any Surviving Person agrees to provide to the Paying Agent and the Trustee, and consents to the collection and processing by the Paying Agent and the Trustee of, any authorisations, waivers, forms, documentation and other information, relating to its status (or the status of its direct or indirect owners or Holders) or otherwise required to be reported, under the FATCA (the "*FATCA Information*"). Each of the Company, each Guarantor and any Surviving Person further consents to the disclosure, transfer and reporting of such FATCA Information to any relevant government or taxing authority, any affiliate of the Paying Agent or Trustee, any sub- contractors, service providers or associates of the Paying Agent, the Trustee or any of their affiliates, and any person making payments to the Paying Agent, the Trustee or any of their affiliates, including transfers to jurisdictions which do not have strict data protection or similar laws, to the extent that the Paying Agent and the Trustee reasonably determines that such disclosure, transfer or reporting is necessary or warranted to facilitate compliance with FATCA. Each of the Company, each Guarantor and any Surviving Person agrees to inform the Paying Agent and the Trustee promptly, and in any event, within 30 days, in writing if there are any changes to the FATCA Information supplied to the Paying Agent and the Trustee from time to time. Each of the Company, each Guarantor and any Surviving Person warrants that each person whose FATCA Information it provides (or has provided) to the Paying Agent and the Trustee has been notified of and agreed to, and has been given such other information as may be necessary to permit, the collection, processing, disclosure, transfer and reporting of their information as set out in this paragraph. The parties hereto agree that either of them may request the other, from time to time, to make such changes to this agreement as may be necessary or desirable to ensure that payments can be made to or to the order of a common depositary or common safekeeper without any deduction, whether under FATCA or otherwise and/or to enable the Company or the Trustee to comply with any legal obligations that may apply to it pursuant to FATCA. On such request, the parties shall negotiate such changes in good faith for 30 days. Failing agreement, at the end of such period, if the Trustee made the request, the Trustee may resign, whether or not a substitute Trustee has been appointed.

(g) In addition, the Company, the Guarantors (if any) or a Surviving Person, as the case may be, will pay any stamp, issue, registration, documentary, value added or other similar taxes and other duties (including interest and penalties) payable in any Relevant Jurisdiction in respect of the creation, issue, offering, execution or enforcement of, or the receipt of payments under, the Notes, the Note Guarantees (if any) or any documentation with respect thereto. Whenever there is mentioned in any context the payment of principal of, and any premium or interest on, any Note or under the Note Guarantees (if any), such mention will be deemed to include payment of Additional Amounts provided for in this Indenture to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

**ARTICLE 3**
**REDEMPTION AND PREPAYMENT**

Section 3.01 *Notices to Trustee*.

Unless the Company has delivered an Officer's Certificate to the Trustee pursuant to the third paragraph of Section 3.03, if the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officer's Certificate setting forth:

(a)      the clause of this Indenture pursuant to which the redemption shall occur;

(b)      the redemption date;

(c)      the principal amount of Notes to be redeemed; and

(d)      the redemption price.

Section 3.02 *Selection of Notes to Be Redeemed or Purchased*.

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee will select Notes for redemption or purchase on a *pro rata* basis to the extent practicable or pursuant to another method in accordance with the procedures of the Depositary, unless otherwise required by law or applicable stock exchange requirements.

No Notes of a principal amount of US$200,000 or less can be redeemed or purchased in part, and if Notes are redeemed or purchased in part, the remaining outstanding amount must be at least equal to US$200,000 and integral multiples of US$1,000 in excess thereof. Notices of redemption will be mailed by first class mail at least 10 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or the satisfaction and discharge of this Indenture.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount of that Note that is to be redeemed. Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of Notes called for redemption.

In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption or purchase date by the Trustee from the outstanding Notes not previously called for redemption or purchase. A new Note in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the Holder upon cancellation of the original Note.

The Trustee will as soon as reasonably practicable notify the Company in writing of the Notes selected for redemption or purchase and, in the integral of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected will be in amounts of US$200,000 or integral multiples of US$1,000 in excess thereof; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, shall be redeemed or purchased. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03 *Notice of Redemption*.

Subject to the provisions of Section 3.09, at least 30 days but not more than 60 days before a redemption date, the Company will mail or cause to be mailed, by first class mail, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Articles 8 or 12 hereof.

The notice will identify the Notes to be redeemed and will state:

(a) the redemption date;

(b) the redemption price;

(c) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note; *provided that* the unredeemed portion has a minimum denomination of US$200,000;

(d) the name and address of the Paying Agent;

(e) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f) that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g) the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h) that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee will give the notice of redemption in the Company's name and at its expense; *provided however*, that the Company has delivered to the Trustee, at least 45 days prior to the redemption date, an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

At least 10 days prior to mailing of any notice of redemption to the Holders under this Article 3, the Company shall provide notice of redemption to the Trustee.

Section 3.04 *Effect of Notice of Redemption*.

Except as provided in Section 3.07(c), once notice of redemption is mailed in accordance with Section 3.03, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price.

Section 3.05 *Deposit of Redemption or Purchase Price*.

No later than one Business Day prior to the redemption or purchase date, the Company will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued interest and Additional Amounts, if any, on all Notes to be redeemed or purchased on that date. The Trustee or the Paying Agent will as soon as reasonably practicable return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the

amounts necessary to pay the redemption or purchase price of, and accrued interest and Additional Amounts, if any on, all Notes to be redeemed or purchased.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after an interest record date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01.

Section 3.06 *Notes Redeemed or Purchased in Part*.

Upon surrender of a Note that is redeemed or purchased in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

Section 3.07 *Optional Redemptions*.

(a) At any time prior to August 19, 2023, upon not less than 30 nor more than 60 days' prior notice, the Company may, on any one or more occasions, redeem up to 40% of the aggregate principal amount of Notes issued under this Indenture at a redemption price of 103.575% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to (but not including) the applicable redemption date, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; *provided that*:

(1) at least 60% of the aggregate principal amount of Notes issued on the Original Issue Date (excluding Notes held by the Parent or its Subsidiaries) remains outstanding immediately after the occurrence of such redemption; and

(2) the redemption occurs within 90 days of the date of the closing of such Equity Offering.

(b) At any time prior to August 19, 2023, upon not less than 30 nor more than 60 days' prior notice, the Company may, on any one or more occasions, redeem all or any portion of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed, plus the Applicable Premium as of, and accrued and unpaid interest, if any, to (but not including), the applicable redemption date, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date. Neither the Trustee nor any of the Agents shall be responsible for verifying or calculating the Applicable Premium.

(c) At any time on or after August 19, 2023, upon not less than 30 nor more than 60 days' prior notice, the Company may, on any one or more occasions, redeem all or any portion of the Notes at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to (but not including) the applicable redemption date, if redeemed during the periods indicated below, subject to the rights of Holders on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Period | Redemption Price |
|---|---|
| From August 19, 2023 to August 18, 2024 | 101.7875% |
| From August 19, 2024 to August 18, 2025 | 100.89375% |
| On or after August 19, 2025 | 100.000% |

Unless the Company defaults in the payment of the applicable redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

Any redemption pursuant to this Section 3.07, and any related notice of redemption may, at the Company's discretion, be subject to one or more conditions precedent. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice may state that, in the Company's discretion, the redemption date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption may not occur and such notice may be rescinded if any or all such conditions shall not have been satisfied by the redemption date, or by the redemption date so delayed.

(d) Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

Section 3.08 *Mandatory Amortization Redemption*.

The Notes are subject to partial mandatory amortization redemptions (each, a "*Mandatory Amortization Redemption*") on each of the dates shown below (each such date, an "*Amortization Date*") and the redemption price shall be the principal amount thereof, plus accrued and unpaid interest to, but not including, the applicable Amortization Date (subject to the right of Holders on the relevant Record Date to receive interest due on such date). The amount of Notes to be redeemed on a particular Amortization Date shall be equal to the product of (x) the applicable Amortization Percentage on the applicable Amortization Date set forth in the table below times (y) the principal amount of Notes issued on the Original Issue Date. Each Mandatory Amortization Redemption will be done on a *pro rata* basis consistent with Section 3.02. No notice of Mandatory Amortization Redemptions will be required to be delivered to the Holders.

| Amortization Date | Amortization Percentage |
|---|---|
| February 19, 2022 | 1.55% |
| August 19, 2022 | 1.19% |
| February 19, 2023 | 1.19% |
| August 19, 2023 | 1.34% |
| February 19, 2024 | 1.34% |
| August 19, 2024 | 1.48% |
| February 19, 2025 | 1.48% |
| August 19, 2025 | 1.67% |
| February 19, 2026 | 1.67% |
| August 19, 2026 | All remaining outstanding principal amounts |

The Trustee and the Agents will not be responsible for monitoring, verifying or calculating the amounts payable under the Mandatory Amortization Redemptions and will not be responsible to the Holders for any loss arising from any failure by them to do so.

In the event of a Mandatory Amortization Redemption, the Company will deliver a notice of the Mandatory Amortization Redemption to Holders (copying the Trustee and the Paying Agent) no later than 15 Business Days prior to the payment under such Mandatory Amortization Redemption

together with an Officer's Certificate stating the aggregate amount payable in connection with such redemption and the relevant calculations (including the amount paid as a percentage of principal) and any under payment or amounts carried forward from a previous period. At least 10 days prior to mailing of any such notice of redemption to the Holders, the Company shall provide notice of redemption to the Trustee.

Any notice of redemption pursuant to this Section 3.08 shall be in the form set forth in Section 3.03.

Section 3.09 *Offer to Purchase by Application of Excess Proceeds*.

If, pursuant to Section 4.10, the Company is required to commence an offer to all Holders to purchase Notes (an "*Asset Sale Offer*"), it will follow the procedures specified below.

The Asset Sale Offer shall be made to all Holders and all Holders of other Indebtedness that is *pari passu* with the Notes containing provisions similar to those set forth in this Indenture with respect to offers to purchase or redeem with the proceeds of sales of assets. The Asset Sale Offer will remain open for a period of at least 30 days following its commencement and not more than 60 days, except to the extent that a longer period is required by applicable law (the "*Offer Period*"). No later than three Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Company will apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes and such other *pari passu* Indebtedness (on a *pro rata* basis, if applicable) or, if less than the Offer Amount has been tendered, all Notes and other Indebtedness tendered in response to the Asset Sale Offer. Payment for any Notes so purchased will be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related Interest Payment Date, any accrued and unpaid interest if any, will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no additional interest will be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

Upon the commencement of an Asset Sale Offer, the Company will send, by first class mail, a notice to the Trustee and each of the Holders. The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer. The notice, which will govern the terms of the Asset Sale Offer, will state:

(a) that the Asset Sale Offer is being made pursuant to this Section 3.09 and Section 4.10 and the length of time the Asset Sale Offer will remain open;

(b) the Offer Amount, the purchase price and the Purchase Date;

(c) that any Note not tendered or accepted for payment will continue to accrue interest;

(d) that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest after the Purchase Date;

(e) that Holders electing to have a Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in minimum denominations of US$200,000 and integral multiples of US$1,000 thereof only;

(f) that Holders electing to have Notes purchased pursuant to any Asset Sale Offer will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Company, a Depositary, if appointed by the Company, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(g) that Holders will be entitled to withdraw their election if the Company, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, an e-mail, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(h) that, if the aggregate principal amount of Notes and other *pari passu* Indebtedness surrendered by Holders thereof exceeds the Offer Amount, the Company will select the Notes and other *pari passu* Indebtedness to be purchased in accordance with Section 3.02 based on the principal amount of Notes and such other *pari passu* Indebtedness surrendered (with such adjustments as may be deemed appropriate by the Company so that only Notes in minimum denominations of US$200,000, and integral multiples of US$1,000 in excess thereof, will be purchased); and

(i) that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer), *provided*, that the unpurchased portion has a minimum denomination of US$200,000.

On or before the Purchase Date, the Company will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, but subject to Section 3.02, the Offer Amount of Notes or portions thereof tendered pursuant to the Asset Sale Offer, or if less than the Offer Amount has been tendered, all Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.09. The Company, the Depositary or the Paying Agent, as the case may be, will promptly (but in any case not later than five days after the Purchase Date) mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Company for purchase, and the Company will promptly issue a new Note, and the Trustee, upon written request from the Company, will authenticate and mail or deliver (or cause to be transferred by book entry) such new Note to such Holder, in a principal amount equal to any unpurchased portion of the Note surrendered, *provided*, that the unpurchased portion has a minimum denomination of US$200,000. Any Note not so accepted shall be promptly mailed or delivered by the Company to the Holder thereof. The Company will publicly announce the results of the Asset Sale Offer on the Purchase Date.

Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.9 shall be made pursuant to the provisions of Sections 3.01 through 3.06.

Section 3.10 *Redemption for Taxation Reasons*.

The Notes may be redeemed, at the option of the Company or a Surviving Person, as the case may be, as a whole but not in part, upon giving not less than 30 days' nor more than 60 days' notice to the Holders and the Trustee (which notice will be irrevocable), at a redemption price equal to 100% of the principal amount thereof, together with accrued and unpaid interest (including any Additional Amounts), if any, to the date fixed by the Company or the Surviving Person, as the case may be, for redemption if, as a result of:

(a) any change in, or amendment to, the statutes, regulations or official administrative guidance having the force of law, of a Relevant Taxing Jurisdiction affecting taxation; or

(b) any change in, or amendment to, the existing official position regarding the application or interpretation of such statutes, regulations, rulings or official administrative guidance (including a holding, judgment or order by a court of competent jurisdiction),

which change or amendment or official position is announced and becomes effective (i) with respect to the Company or any of the other Restricted Subsidiaries, on or after the Original Issue Date, or (ii) with respect to a Surviving Person organized or resident for tax purposes in a jurisdiction that is not the

Company's Relevant Taxing Jurisdiction as of the Original Issue Date, on or after the date such Surviving Person becomes a Surviving Person, with respect to any payment due or to become due under the Notes or the Onshore Debt, as applicable, the Company, a Surviving Person, or a Restricted Subsidiary that has Incurred Onshore Debt, as the case may be, is, or on the next Interest Payment Date would be, required to pay Additional Amounts (or in the case of Onshore Debt, the Restricted Subsidiary that is the issuer or borrower of the Onshore Debt would be required to withhold or deduct any taxes, duties, assessments or government charges of whatever nature), and such requirement cannot be avoided by the taking of reasonable measures by the Company, a Surviving Person or such Restricted Subsidiary, as the case may be; *provided that* no such notice of redemption will be given earlier than 90 days prior to the earliest date on which the Company, a Surviving Person, or such Restricted Subsidiary, as the case may be, would be obligated to pay such Additional Amounts (or withhold or deduct an amount with respect to any payment on Onshore Debt) if a payment in respect of the Notes (or on Onshore Debt) were then due; and *provided further that* where any such requirement to pay Additional Amounts (or withhold or deduct an amount with respect to any payment on Onshore Debt) is due to taxes imposed by India or any political subdivision or taxing authority thereof or therein, the Company or the Surviving Person will be permitted to redeem the Notes in accordance with the provisions hereof only if the rate of withholding or deduction in respect of which Additional Amounts are required (or in respect of which withholding is required on Onshore Debt) is in excess of 20% (in the case of the Notes), 5.0% (in the case of the Rupee NCDs and the FX ECBs) and 7.5% (in the case of the Rupee ECBs) (in each case, plus applicable surcharge and cess).

Prior to the mailing of any notice of redemption of the Notes pursuant to the foregoing, the Company or a Surviving Person, as the case may be, will deliver to the Trustee at least 10 days but not more than 60 days before a redemption date:

(1) an Officer's Certificate stating that such change or amendment referred to in the prior paragraph has occurred, describing the facts related thereto and stating that such requirement cannot be avoided by the Company, a Surviving Person or the applicable Restricted Subsidiary, as the case may be, taking reasonable measures; and

(2) an Opinion of Counsel or an opinion of a tax consultant of recognized standing with respect to tax matters of the Company's or a Surviving Person's Relevant Taxing Jurisdiction, or tax matters of India, with respect to the Restricted Subsidiaries, stating that the requirement to pay such Additional Amounts results from such change or amendment referred to in the prior paragraph.

The Trustee is and shall be entitled to accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent described above without further verification, in which event it will be conclusive and binding on the Holders, and the Trustee will not be responsible for any loss occasioned by acting in reliance on such certificate and opinion.

Section 3.11 *MCS Amortization Redemption*.

The Notes are subject to partial mandatory cash sweep ("*MCS*") amortization redemptions (each, an "*MCS Amortization Redemption*") on each of the dates shown below (each such date, an "*MCS Amortization Redemption Date*") and the redemption price shall be the principal amount thereof, plus accrued and unpaid interest to, but not including, the applicable MCS Amortization Redemption Date (subject to the right of Holders on the relevant Record Date to receive interest due on such date). The amount of Notes to be redeemed on a particular MCS Amortization Redemption Date (such amount, the "*MCS Amount*") shall be equal to the product of (x) the applicable MCS Amortization Percentage on the applicable MCS Amortization Redemption Date set forth in the table below times (y) the principal amount of Notes issued on the Original Issue Date. To the extent that an MCS Amortization Redemption is not made on the relevant MCS Amortization Redemption Date or is made in an amount less than the MCS Amount payable on the applicable MCS Amortization Redemption Date, such unpaid amount(s) will be carried forward to the next MCS Amortization Redemption Date and will be added

45

to the applicable MCS Amount to be paid on such next MCS Amortization Redemption Date. Any such amounts shall be carried forward into each subsequent period until paid or until the Notes have been redeemed in full. An MCS Amortization Redemption that is not made on the relevant MCS Amortization Redemption Date will not constitute a Default or an Event of Default.

Each MCS Amortization Redemption will be done on a *pro rata* basis consistent with Section 3.02. In the event of an MCS Amortization Redemption, the Company will deliver a notice of the MCS Amortization Redemption to Holders (copying the Trustee and the Paying Agent) no later than 15 Business Days prior to the payment under such MCS Amortization Redemption together with an Officer's Certificate stating the aggregate amount payable in connection with such redemption and the relevant calculations (including the amount paid as a percentage of principal) and any under payment or amounts carried forward from a previous period.

| MCS Amortization Redemption Date | MCS Amortization Percentage |
|---|---|
| February 19, 2022 | 2.08% |
| August 19, 2022 | 2.13% |
| February 19, 2023 | 2.13% |
| August 19, 2023 | 2.08% |
| February 19, 2024 | 2.08% |
| August 19, 2024 | 2.02% |
| February 19, 2025 | 2.02% |
| August 19, 2025 | 1.98% |
| February 19, 2026 | 1.98% |

Neither the Trustee nor the Agents will be responsible for monitoring, verifying or calculating the amounts payable under the MCS Amortization Redemptions and will not be responsible to the Holders for any loss arising from any failure by them to do so.

## ARTICLE 4
## COVENANTS

Section 4.01 *Payment of Notes*.

The Company will pay or cause to be paid the principal of, premium, if any, and interest and Additional Amounts, if any, on, the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest and Additional Amounts, if any, will be considered paid on the date due if the Paying Agent, if other than the Company, the Parent or any other Restricted Subsidiary thereof, holds as of 5:00 p.m. (London time) one Business Day prior to the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest and Additional Amounts, if any, then due.

Not later than 5:00 p.m. (London time) on the second Business Day immediately preceding each payment date, the Company shall confirm such payment, or procure confirmations by an e-mail or fax message from the bank making such payment to the Paying Agent. For the avoidance of doubt, the Paying Agent shall only be obliged to remit money to Holders if it has actually received such money from the Company.

The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, at the rate equal to the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Amounts, if any, (without regard to any applicable grace period) at the same rate to the extent lawful.

An installment of principal or interest will be considered paid on the date due if the Paying Agent, other than the Company or any Affiliate of the Company, holds on that date money designated for and sufficient to pay the installment. If the Company or any Affiliate of the Company acts as Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

Anything in this Section 4.01 to the contrary notwithstanding, the Company may at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture or for any other reason, pay or cause to be paid to the Trustee all sums held in trust by the Company or any Paying Agent hereunder, as required by this Section 4.01 and such sums shall be held by the Trustee. If the Paying Agent shall pay all sums held in trust to the Trustee as required under this Section 4.01, the Paying Agent shall have no further liability for the money so paid over to the Trustee. The Paying Agent shall not be bound to make any payment until it has received the full amount due to be paid to it pursuant to this Section 4.01.

Anything in this Section 4.01 to the contrary notwithstanding, the agreements to hold sums as provided in this Section 4.01 are subject to the provisions of 8.06.

Section 4.02 *Maintenance of Office or Agency*.

The Company will maintain an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands by Holders to or upon the Company in respect of the Notes and this Indenture may be made. The Company hereby initially designates the specified office of the Paying Agent as such office of the Company. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made to the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in each place where principal of, and interest on, any Notes are payable. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

For so long as the Notes are listed on the SGX-ST and the rules of the SGX-ST so require, if a Global Note is exchanged for Definitive Notes, the Company will appoint and maintain a paying agent in Singapore, where the Notes may be presented or surrendered for payment or redemption, and make an announcement of such exchange through the SGX-ST that will include all material information with respect to the delivery of the Definitive Notes, including details of the paying agent in Singapore by way of an announcement through SGXNET.

Upon written notice to the Trustee, the Company may change the Paying Agent, Registrar or Transfer Agent without prior notice to the Holders. In addition, the Company, the Parent or any of its Subsidiaries may act as Paying Agent in connection with the Notes other than for the purposes of effecting a redemption under Section 3.02 or an offer to purchase the Notes described under Section 4.10 or Section 4.16.

Section 4.03 *Provision of Financial Statements and Reports*.

(a) The Parent will provide to the Trustee, as soon as they are available, but in any event not more than ten (10) calendar days after they are filed with the SEC or, if the Parent does not file periodic reports with the SEC, the principal international recognized stock exchange on which the Parent's Common Stock is at any time listed for trading, true and correct copies (in English or with an English translation) of any quarterly or annual financial or other report filed with or furnished to the

SEC or such exchange, as the case may be; provided, however, that if at any time the Parent does not file or furnish periodic reports with or to the SEC and the Common Stock of the Parent is not listed for trading on an internationally recognized stock exchange, the Parent will provide to the Trustee, in the English language (or accompanied by an English translation thereof):

(1) within 120 days after the end of each fiscal year of the Parent beginning with the fiscal year ending March 31, 2022, annual reports containing (a) audited consolidated balance sheets of the Parent as of the end of the two most recent fiscal years and audited consolidated statements of income and cash flow of the Parent for the two most recent fiscal years, including footnotes to such financial statements and the audit report of a member firm of an internationally recognized accounting firm on the financial statements; and (b) an operating and financial review of the audited consolidated financial statements; and

(2) within 90 days after the end of the first semi-annual period in each fiscal year of the Parent beginning with the semi-annual period ending September 30, 2022, semi-annual reports containing an unaudited consolidated balance sheet of the Parent as of the end of such semi-annual period and unaudited condensed statements of income and cash flow of the Parent for the most recent semi-annual period ending on the unaudited consolidated balance sheet date, and the comparable prior year period.

(b) The Company will provide to the Trustee the following reports in the English language:

(1) no later than 30 calendar days after the date on which the Parent provides its corresponding annual reports to the Trustee pursuant to the preceding paragraphs of this Section 4.03(a), commencing with the annual report for the fiscal year ending March 31, 2022, annual reports containing: (a) audited combined balance sheets of the Restricted Group as of the end of the two most recent fiscal years and audited combined statements of income and cash flow of the Restricted Group for the two most recent fiscal years, including footnotes to such financial statements and the audit report of a member firm of an internationally recognized accounting firm on the financial statements; and (b) an operating and financial review of the audited combined financial statements; and

(2) no later than 30 calendar days after the date on which the Parent provides its corresponding semi-annual reports to the Trustee pursuant to the preceding paragraph, commencing with the semi-annual report for the semi-annual period ending September 30, 2022, semi-annual reports containing (a) an unaudited combined balance sheet of the Restricted Group as of the end of such semi-annual period and unaudited combined statements of income and cash flow of the Restricted Group for the most recent semi-annual period ending on the unaudited combined balance sheet date, and the comparable prior year period, together with footnotes, and a review report thereon by a member firm of an internationally recognized accounting firm; and (b) an operating and financial review of the unaudited combined financial statements.

(c) The Parent or the Company will provide to the Trustee (1) concurrently with each annual report provided under clause (b)(1) of this Section 4.03, an Officer's Certificate stating the Debt Service Coverage Ratio for the two consecutive semi-annual periods ending on the last date of such fiscal year (taken as one annual period) and showing in reasonable detail the calculation of such ratio with a certificate from the Parent's or the Company's external auditors verifying the accuracy and correctness of the calculations and arithmetic computations; *provided, however,* that the Parent and the Company shall not be required to provide such auditor certification if its external auditors refuse as a general policy to provide such certification; and (2) as soon as possible and in any event within 10 Business Days after the Parent or the Company becomes aware or should reasonably became aware of the occurrence of a Default or an Event of Default, an Officer's Certificate setting forth the details of the Default or Event of Default, and the action which the Parent or the Company proposes to take with respect thereto.

(d) All financial statements of (1) the Parent will be prepared in accordance with GAAP as in effect on the date of such report or financial statement (or otherwise on the basis of GAAP as then in effect) and on a consistent basis for the periods presented and (2) the Restricted Group will be prepared in accordance with Ind-AS (as defined in the definition of "GAAP" in Section 1.01) and on a consistent basis for the periods presented; provided, however, that the reports set forth in this covenant may, if applicable financial reporting standards change, present earlier periods on a basis that applied to such periods.

(e) Further, the Company has agreed that, for as long as any Notes are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, during any period in which the Company is neither subject to Section 13 or 15(d) of the Exchange Act, nor exempt from reporting pursuant to Rule 12g3-2(b) thereunder, the Company will supply to (1) any Holder or beneficial owner of a Note or (2) a prospective purchaser of a Note or a beneficial interest therein designated by such Holder or beneficial owner, the information specified in, and meeting the requirements of, Rule 144A(d)(4) under the Securities Act, upon the request of any Holder or beneficial owner of a Note.

(f) Delivery of any such information to the Trustee, the Collateral Agent or the Agents is for informational purposes only and the any of their receipt of them will not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Company or the Parent's compliance with any of its or their covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.04 *Compliance Certificate*.

(a) The Parent shall deliver to the Trustee, on or before a date not more than 120 days after the end of each fiscal year and within 14 days after a written request from the Trustee, an Officer's Certificate of the Parent or the Company stating that a review has been conducted of the activities of the Parent and the Restricted Subsidiaries and the Parent and the Restricted Subsidiaries' performance under this Indenture, the Notes and the Collateral Documents, and that the Parent and each Restricted Subsidiary have fulfilled all of their respective obligations thereunder, or, if there has been a default in the fulfillment of any such obligation, specifying each such Default or Event of Default and the nature and status thereof.

Section 4.05 *Taxes*.

The Parent will cause each of its Restricted Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders.

Section 4.06 *Stay, Extension and Usury Laws*.

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each of the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07 *Restricted Payments*.

(a) The Company will not, and the Parent will not permit any other Restricted Subsidiary to, directly or indirectly:

(1) declare or pay any dividend or make any distribution on or with respect to any Restricted Subsidiary's Capital Stock (other than dividends or distributions payable solely in shares of any Restricted Subsidiary's Capital Stock (other than Disqualified Stock or Preferred Stock) or in options, warrants or other rights to acquire shares of such Capital Stock) held by Persons other than the Company or any other Restricted Subsidiary;

(2) purchase, call for redemption or redeem, retire or otherwise acquire for value any shares of Capital Stock (including options, warrants or other rights to acquire such shares of Capital Stock) of any Restricted Subsidiary or any direct or indirect parent of a Restricted Subsidiary, in each case held by any Persons other than the Company or any other Restricted Subsidiary and other than Capital Stock of any Restricted Subsidiary that is a Subsidiary of another Restricted Subsidiary;

(3) make any voluntary or optional principal payment, or voluntary or optional redemption, repurchase, defeasance, or other acquisition or retirement for value, of Subordinated Affiliate Debt or Indebtedness that is contractually subordinated in right of payment to the Notes, any Note Guarantees or any Onshore Debt ("*Subordinated Indebtedness*"), excluding any intercompany Indebtedness between or among any Restricted Subsidiaries; or

(4) make any Investment, other than a Permitted Investment;

(the payments or any other actions described in clauses (1) through (4) above being collectively referred to as "*Restricted Payments*") unless:

(A) no Default has occurred and is continuing or would occur as a result of such Restricted Payment;

(B) all MCS Amounts payable or carried forward in respect of MCS Amortization Redemption Dates on or prior to the date of such Restricted Payment shall have been paid in full;

(C) (x) (i) in case of any Restricted Payment to be made after 90 days from the Original Issue Date, the Indian Escrow Agreements are executed; and (ii) in the case of any Restricted Payment made on or after the date falling 60 days after the execution of the Indian Escrow Agreements by all the Indian Restricted Subsidiaries, each of the accounts which are subject to the Indian Escrow Agreements has been duly established and funded as per the terms of the Indian Escrow Agreements, or (y) if the Indian Escrow Agreements cannot be executed within 90 days from the Original Issue Date or the accounts which are subject to the Indian Escrow Agreements cannot be established within 60 days of the execution of the Indian Escrow Agreements, in either case solely as a result of implementation by scheduled commercial banks and/or payments banks of circulars, notifications, rules or regulations of the RBI in respect of the opening and maintenance of current accounts by Indian companies or any requirements of the Onshore Debt Trustee or the bank with which the accounts which are subject to the Indian Escrow Agreements are being established, compliance with which is beyond the control of the Indian Restricted Subsidiaries, then any Restricted Payment shall only be permitted if the Indian Restricted Subsidiaries have created a charge by way of hypothecation over their existing accounts having the required ranking and priority as set out in Appendix B to the Offering Memorandum in favor of

the Onshore Debt Trustee and provided a notice of charge to the relevant banks where such accounts are maintained; and

(D) the Debt Service Coverage Ratio is at least 1.3 to 1.0 for the most recent two consecutive semi-annual periods for which combined financial statements of the Restricted Group are available (which, in the case of (i) any semi-annual period ending on September 30 in any year, shall be reviewed or audited, and (ii) any annual period ending on March 31 in any year, shall be audited), taken as one annual period.

(b) The foregoing provision shall not be violated by reason of:

(1) the redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Indebtedness or Subordinated Affiliate Debt of any Restricted Subsidiary (i) with the net cash proceeds of, or in exchange for, a substantially concurrent Incurrence of Indebtedness or Subordinated Affiliate Debt issued in exchange for, or the net cash proceeds of which are used to, refinance or refund, replace, exchange, renew, repay, redeem, defease, discharge or extend, such Subordinated Indebtedness or Subordinated Affiliate Debt; provided that such new Indebtedness or Subordinated Affiliate Debt, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness or Subordinated Affiliate Debt is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes, the Note Guarantees (if any), or the Onshore Debt, as applicable, at least to the extent that the Subordinated Indebtedness or Subordinated Affiliate Debt to be refinanced is subordinated to the Notes, the Note Guarantees (if any), or the Onshore Debt, as applicable, or (ii) in exchange for, or out of the net cash proceeds of, a substantially concurrent capital contribution or sale (other than to a Restricted Subsidiary) of, shares of Capital Stock (other than Disqualified Stock) of any Restricted Subsidiary (or options, warrants or other rights to acquire such Capital Stock);

(2) the redemption, repurchase or other acquisition of Capital Stock of any Restricted Subsidiary (or options, warrants or other rights to acquire such Capital Stock) (i) in exchange for, or out of the net cash proceeds of a substantially concurrent capital contribution or sale (other than to a Restricted Subsidiary) of, shares of Capital Stock (other than Disqualified Stock) of any Restricted Subsidiary (or options, warrants or other rights to acquire such Capital Stock), or (ii) in exchange for, or out of the net cash proceeds of a substantially concurrent Incurrence of, Subordinated Affiliate Debt or Subordinated Indebtedness of any Restricted Subsidiary;

(3) dividends by any Restricted Subsidiary to fund the redemption, repurchase or other acquisition of Capital Stock of the Parent from employees, former employees, directors or former directors of the Parent or any of its Subsidiaries (or permitted transferees of such persons), or their authorized representatives upon the death, disability or termination of employment of such employees or directors, in an aggregate amount not to exceed US$1.0 million (or the Dollar Equivalent thereof) in any fiscal year;

(4) payments of cash, dividends, distributions, advances or other Restricted Payments to allow the payment of cash in lieu of the issuance of fractional shares upon (i) the exercise of options or warrants, (ii) the conversion or exchange of Capital Stock of any such Person or (iii) stock dividends, splits or business combinations;

(5) Restricted Payments made with cash proceeds received from Viability Gap Funding and Capital Subsidies, in each case which were receivable after the Original Issue Date and that are not included in Stated EBITDA for such period; provided that such Restricted Payments are made within 90 days of receiving such proceeds;

(6) Restricted Payments in an aggregate amount not to exceed the amounts of Original Issue Date Receivables which have been actually received by the Indian Restricted Subsidiaries after the Original Issue Date;

(7) the making of any other Restricted Payments in an aggregate amount, together with all other Restricted Payments made under this clause (7), not exceeding US$30.0 million (or the Dollar Equivalent thereof);

*provided that*, in the case of clauses (5), (6) and (7) above, no Default shall have occurred and be continuing or would occur as a consequence of the actions or payments set forth therein.

(c) The amount of any Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or any other Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The value of any assets or securities that are required to be valued by this covenant will be the Fair Market Value. The Board of Directors' determination of the Fair Market Value of a Restricted Payment or any such assets or securities must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of recognized international standing (or a local affiliate thereof) if the Fair Market Value exceeds US$10.0 million (or the Dollar Equivalent thereof).

Section 4.08 *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.*

(a) The Parent will not permit any Restricted Subsidiary (other than the Company) to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1) pay dividends or make any other distributions on any Capital Stock of such Restricted Subsidiary owned by the Company or any other Restricted Subsidiary;

(2) pay any Indebtedness or other obligation owed to the Parent, the Company or any other Restricted Subsidiary;

(3) make loans or advances to the Parent, the Company or any other Restricted Subsidiary; or

(4) sell, lease or transfer any of its property or assets to the Parent, the Company or any other Restricted Subsidiary;

*provided that* (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on Common Stock; (ii) the subordination of loans or advances made to any Restricted Subsidiary to other Indebtedness Incurred by any Restricted Subsidiary; and (iii) provisions requiring transactions to be on fair and reasonable terms or on an arm's length basis, in each case, shall not be deemed to constitute such an encumbrance or restriction.

(b) The foregoing restrictions will not apply to encumbrances or restrictions:

(1) existing in agreements as in effect on the Original Issue Date and any extensions, refinancings, renewals, supplements, amendments or replacements of any of the foregoing agreements; *provided that* the encumbrances and restrictions in any such extension, refinancing, renewal, supplement, amendment or replacement are not materially more restrictive, taken as a whole, than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced, as determined in good faith by the Board of Directors of the Parent or of the Company;

(2) in the Notes, the Note Guarantees (if any), this Indenture, the Onshore Debt, the Collateral Documents and any agreements pursuant to which security interests or Guarantees are granted for the benefit of the holder of any Onshore Debt or the Holders;

(3) existing under or by reason of applicable law, rule, regulation or order;

(4) with respect to the property or assets that are acquired by any Restricted Subsidiary, existing at the time of such acquisition and not incurred in contemplation thereof, and any extensions, refinancings, renewals or replacements thereof; *provided that* the encumbrances and restrictions in any such extension, refinancing, renewal or replacement are not materially more restrictive, taken as a whole, than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced, as determined in good faith by the Board of Directors of the Parent or of the Company;

(5) if they arise, or are agreed to in the ordinary course of business, and that (x) restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, (y) exist by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of the Company or any other Restricted Subsidiary not otherwise prohibited by this Indenture or that limit the right of the debtor to dispose of assets subject to a Lien not otherwise prohibited by this Indenture (z) do not relate to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of any Restricted Subsidiary in any manner material to any Restricted Subsidiary;

(6) arising from provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business if the encumbrances or restrictions (i) are customary for such types of agreements and (ii) would not, at the time agreed to, be expected to materially adversely affect the ability of the Company or any Guarantor to make required payments on the Notes or any Note Guarantee, as determined in good faith by the Board of Directors of the Parent or the Company;

(7) with respect to any Indebtedness that is permitted by Section 4.09 *provided that* the encumbrances or restrictions (i) are customary for such types of agreements and (ii) would not, at the time agreed to, be expected to materially adversely affect the ability of the Company or any Guarantor to make required payments on the Notes or any Note Guarantee, as determined in good faith by the Board of Directors of the Parent or of the Company; or

(8) encumbrances or restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business

Section 4.09 *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a) The Company will not, and the Parent will not permit any other Restricted Subsidiary to, Incur any Indebtedness, and the Company will not, and the Parent will not permit any other Restricted Subsidiary to, issue any Preferred Stock; *provided that* the Company or any other Restricted Subsidiary may Incur each and all of the following ("*Permitted Indebtedness*"):

(1) Indebtedness of the Company under the Notes (excluding Additional Notes), Indebtedness under any Note Guarantee and Indebtedness of any Restricted Subsidiary under any Onshore Debt;

(2) Indebtedness outstanding on the Original Issue Date (excluding Indebtedness permitted under clause (3) below) (the "*Existing Indebtedness*");

(3) Indebtedness of any Restricted Subsidiary owed to the Company or any other Restricted Subsidiary; *provided that* (i) any event which results in any such Restricted Subsidiary to which such Indebtedness is owed ceasing to be a Restricted Subsidiary or any subsequent transfer of such Indebtedness (other than to the Company or any other Restricted Subsidiary) shall be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this clause (a)(3); and i(ii) such Indebtedness must be unsecured and be expressly subordinated in right of payment to the Notes, in the case of the Company, the Note Guarantee, in the case of a Guarantor, or the Onshore Debt, in the case of another Restricted Subsidiary to the extent such Restricted Subsidiary is the obligor under Onshore Debt;

(4) Indebtedness of any Restricted Subsidiary ("*Permitted Refinancing Indebtedness*") issued in exchange for, or the net proceeds of which are used to refinance or refund, replace, exchange, renew, repay, redeem, defease, discharge or extend (collectively, "refinance" and "refinances" and "refinanced" shall have a correlative meaning), then outstanding Indebtedness (or Indebtedness that is no longer outstanding but that is refinanced substantially concurrently with but in any case before the Incurrence of such Permitted Refinancing Indebtedness) Incurred under clause (a)(1), (2), (4), (12) or (13) of this Section *4.9* and any refinancings thereof in an amount not to exceed the amount so refinanced (plus premiums, accrued interest, fees and expenses); *provided that*

(A) the Indebtedness to be refinanced is fully and irrevocably repaid no later than 30 days after the Incurrence of the Permitted Refinancing Indebtedness;

(B) Indebtedness the proceeds of which are used to refinance the Notes, or Indebtedness that is *pari passu* with, or subordinated in right of payment to, the Notes, will only be permitted under this clause (a)(4) if (x) in case the Notes are refinanced in part or the Indebtedness to be refinanced is *pari passu* with the Notes, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is outstanding, is expressly made *pari passu* with, or subordinate in right of payment to, the remaining Notes or (y) in case the Indebtedness to be refinanced is subordinated in right of payment to the Notes, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes, at least to the extent that the Indebtedness to be refinanced is subordinated to the Notes; and

(C) such new Indebtedness, determined as of the date of Incurrence of such new Indebtedness, does not mature prior to the Stated Maturity of the Indebtedness to be refinanced, and the Average Life of such new Indebtedness is at least equal to the remaining Average Life of the Indebtedness to be refinanced;

(5) Indebtedness Incurred by the Company pursuant to Hedging Obligations under Currency Hedging Agreements entered into for the purpose of protecting the Company from fluctuations in currencies under the Notes or the Onshore Debt and not for speculation;

(6) Indebtedness Incurred by any Restricted Subsidiary constituting reimbursement obligations with respect to workers' compensation claims or self-insurance obligations or bid, performance, surety or appeal bonds or payment obligations in connection with insurance premiums or similar obligations, security deposits and bank overdrafts (and letters of credit in connection with or in lieu of each of the foregoing) in the ordinary course of business (in each case other than for an obligation for borrowed money);

(7) Indebtedness Incurred by any Restricted Subsidiary constituting letters of credit, trade guarantees or reimbursement obligations with respect to letters of credit or trade guarantees, in each case issued in the ordinary course of business to the extent that such letters of credit or trade

guarantees are not drawn upon or, if drawn upon, to the extent such drawing is reimbursed no later than the 60 days following receipt by such Restricted Subsidiary of a demand for reimbursement;

(8) Indebtedness arising from agreements providing for indemnification, adjustment of purchase price, earn-outs or similar obligations, or from guarantees or letters of credit, surety bonds or performance bonds securing any obligation of any Restricted Subsidiary, in any case, Incurred in connection with the acquisition or disposition of any business, assets or Restricted Subsidiary (other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Restricted Subsidiary for the purpose of financing such acquisition); *provided that* the maximum aggregate liability of a Restricted Subsidiary in respect of all such Indebtedness Incurred in connection with a disposition shall at no time exceed the gross proceeds actually received by such Restricted Subsidiary from the disposition of such business, assets or Restricted Subsidiary;

(9) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds; provided, however, that such Indebtedness is extinguished within ten Business Days of Incurrence;

(10) Indebtedness Incurred by any Restricted Subsidiary (other than the Company) under Credit Facilities for its working capital purposes, including refinancings thereof; *provided that* the aggregate principal amount outstanding of all such Indebtedness Incurred under this clause (10) at any time does not exceed US$30.0 million (or the Dollar Equivalent thereof);

(11) Indebtedness Incurred by any Restricted Subsidiary to the extent the net cash proceeds thereof are promptly and irrevocably deposited with the Trustee to defease or to satisfy and discharge the Notes as described in Article 8 and Article 12;

(12) Indebtedness Incurred by any Restricted Subsidiary no later than the first anniversary of the Original Issue Date in an amount not exceeding US$415 million (or the Dollar Equivalent thereof), *less* the principal amount of (x) the Notes issued on the Original Issue Date and (y) the Existing Indebtedness (other than any Existing Indebtedness that is refinanced as described under the heading "Use of Proceeds" in the Offering Memorandum and Existing Indebtedness Incurred under clause (a)(3) above); *provided, that* (i) in the case of Indebtedness other than Additional Notes, the final Stated Maturity of such Indebtedness is not prior to the final Stated Maturity of the Notes and the Average Life of such Indebtedness is at least equal to the remaining Average Life of the Notes, in each case determined as of the date of Incurrence of such Indebtedness, and such Indebtedness is not required to be repaid, redeemed, repurchased or otherwise retired, pursuant to a sinking fund obligation, event of default or otherwise (including any redemption, retirement or repurchase which is contingent upon events or circumstance), and in whole or in part, prior to the earlier of (I) the final Stated Maturity of the Notes and (II) the first date on which there are no Notes outstanding; (ii) if the obligee of any such Indebtedness is the Parent, such Indebtedness must be Subordinated Indebtedness; and (iii) within 30 days after the Incurrence of any such Indebtedness, the Parent shall deliver to the Trustee an Officer's Certificate or an opinion issued by a Determination Agent certifying that the Company has sufficient contracted cash flows (including as a result of the Required Hedging Arrangements) to satisfy all scheduled interest payment obligations under such Indebtedness, any related hedging arrangements, the Notes and the Required Hedging Arrangements, and to satisfy all principal payment obligations (based on a 95% probability analysis) under such Indebtedness, related hedging arrangements, the Required Hedging Arrangements and the Notes (with such Officer's Certificate or opinion being in substantially the form as attached to this Indenture as Exhibit I-B or Exhibit I-A, as applicable, which may include language limiting or excluding the liability of any Determination Agent in providing such opinion);

(13) Indebtedness Incurred by any Indian Restricted Subsidiary to fund capital expenditure necessary to comply with any regulation to move transmission cables underground; *provided that* the Parent or the Company shall have obtained prior written confirmations from the Rating Agencies that each such Incurrence will not result in a decrease in the ratings of the Notes; and

(14) guarantees by any of the Restricted Subsidiaries of Indebtedness of any other Restricted Subsidiary that was permitted to be Incurred by another provision of this covenant; provided that if the Indebtedness being guaranteed is subordinated to or *pari passu* with the Notes or a Note Guarantee, then the guarantee of such Indebtedness shall be subordinated or *pari passu*, as applicable, to the same extent as the Indebtedness guaranteed;

*provided, further,* that no Restricted Subsidiary may guarantee Indebtedness of any Person other than another Restricted Subsidiary.

(b) For purposes of determining compliance with this covenant, if an item of Indebtedness meets the criteria of more than one type of Permitted Indebtedness, the Parent or the Company, in its sole discretion, shall classify, and from time to time may reclassify, such item of Indebtedness.

(c) The accrual of interest, the accretion or amortization of original issue discount and the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, will not be deemed to be an incurrence of Indebtedness for purposes of this covenant; provided that, in each such case, the amount of any such accrual, accretion, amortization or payment is included in the Combined Interest Expense and Debt Service of the Restricted Group as accrued.

(d) Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that may be Incurred pursuant to this covenant will not be deemed to be exceeded solely as a result of fluctuations in the exchange rates of currencies. For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred (or first committed, in the case of revolving credit debt); *provided that* if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced (plus premiums, accrued interest, fees and expenses). The maximum amount of Indebtedness permitted to be incurred under clauses (a)(10) and (a)(12) shall not be deemed to have been exceeded in connection with refinancing of such Indebtedness pursuant to such clause so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced plus premiums, accrued interest, fees and expenses. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency than the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

Section 4.10 *Asset Sales*.

(a) The Company will not, and the Parent will not permit any other Restricted Subsidiary to, consummate any Asset Sale, unless:

(1) no Default shall have occurred and be continuing or would occur as a result of such Asset Sale;

(2) the consideration received by the Company or such other Restricted Subsidiary is at least equal to the Fair Market Value of the assets sold or disposed of; and

(3) at least 75% of the consideration received consists of cash, Temporary Cash Equivalents or Replacement Assets (as defined below) or any combination thereof.

For purposes of this provision, each of the following will be deemed to be cash:

(A) any liabilities, as shown on the most recent combined statement of financial position of the Restricted Group (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes) that are assumed by the transferee of any such assets pursuant to a customary assumption, assignment, novation or similar agreement that irrevocably and unconditionally releases the Company or such other Restricted Subsidiary from further liability; and

(B) any securities, notes or other obligations received by the Company or any other Restricted Subsidiary from such transferee that are promptly, but in any event within 30 days of closing, converted by the Company or such other Restricted Subsidiary into cash, to the extent of the cash received in that conversion.

Within 360 days after the receipt of any Net Cash Proceeds, such Net Cash Proceeds must be applied (a) to repay Senior Indebtedness (and if such Indebtedness is revolving credit Indebtedness, to permanently reduce such commitments) of a Restricted Subsidiary, (b) to make capital expenditures for a Permitted Business, (c) to acquire properties and assets (other than current assets) that are used or will be used in a Permitted Business, or to acquire all, or substantially all, of the assets of, or the Capital Stock of, a Person, or a line of business, which is a Permitted Business, or (d) any combination of the foregoing ((b) and (c) (collectively, "*Replacement Assets*"); *provided that* any such reinvestment in Replacement Assets made pursuant to a definitive binding agreement or a commitment approved by the Board of Directors of the Parent or of the Company that is executed or approved within such time will satisfy this requirement, so long as such reinvestment is consummated within 180 days after such 360th day; *provided, further, that* the Net Cash Proceeds from the sale, transfer or other disposition of vacant land (i) situated in Karnataka aggregating to 108 acres held by Azure Sunrise Private Limited, Azure Power (Raj.) Private Limited and Azure Photovoltaic Private Limited and/or (ii) situated in Telangana aggregating to 40 acres held by Azure Power Thirty Seven Private Limited, in each case to the extent no part of the projects or project-related assets of the Restricted Group is located on or affixed to such land, may be paid as a dividend on the Capital Stock of such Restricted Subsidiaries. Pending application of any Net Cash Proceeds in accordance with this covenant, Net Cash Proceeds may be invested or used for any purpose not otherwise prohibited under this Indenture.

Any Net Cash Proceeds from Asset Sales that are not applied or invested in accordance with the immediately preceding paragraph will constitute "Excess Proceeds". When the aggregate amount of Excess Proceeds exceeds US$5.0 million, within ten (10) days thereof, the Company must make an offer (an "*Excess Proceeds Repurchase Offer*") to purchase the Notes at a purchase price of 100% of the principal amount of the Notes and any *pari passu* Indebtedness similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale, plus accrued and unpaid interest, if any, to (but not including) the applicable date of purchase. If the aggregate principal amount of Notes and *pari passu* Indebtedness tendered into such Excess Proceeds Repurchase Offer exceeds the amount of Excess Proceeds, the Notes and such *pari passu* Indebtedness will be purchased on a *pro rata* basis. Any remaining proceeds after such Excess Proceeds Repurchase Offer may be used for any purpose not otherwise prohibited under this Indenture. Upon completion of each Excess Proceeds Repurchase Offer, the amount of Excess Proceeds will be reset at zero.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of an Asset Sale. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale provisions of this Indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Asset Sale provisions of this Indenture by virtue of such compliance.

Section 4.11 *Transactions with Shareholders and Affiliates*.

(a) The Parent will not permit any Restricted Subsidiary to enter into any transaction or series of related transactions involving aggregate consideration in excess of US$2.0 million (or the Dollar Equivalent thereof) with (a) any holder of 10% or more of any class of Capital Stock of the Parent or (b) any Affiliate of the Parent or any Restricted Subsidiary (each, an "*Affiliate Transaction*"), unless:

(1) the Affiliate Transaction is on terms that are no less favorable to such Restricted Subsidiary than those that would have been obtained in a comparable arm's-length transaction by such Restricted Subsidiary with a Person that is not such a holder or Affiliate of the Parent or such Restricted Subsidiary; and

(2) the Parent or the Company delivers to the Trustee:

(A) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$5.0 million (or the Dollar Equivalent thereof), a Board Resolution of the Parent or of the Company set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with this covenant and such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors of the Parent or of the Company; and

(B) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$10.0 million (or the Dollar Equivalent thereof), an opinion issued by an accounting, appraisal or investment banking firm of internationally recognized standing (or a local affiliate thereof) stating either (i) that such Affiliate Transaction is, or series of related Affiliate Transactions are, fair to the Restricted Subsidiary from a financial point of view or (ii) that the terms of such Affiliate Transaction is, or series of related Affiliate Transactions are, not materially less favorable to such Restricted Subsidiary than those that would have been obtained in a comparable arm's length transaction by such Restricted Subsidiary with a Person that is not such a holder or Affiliate of the Parent or such Restricted Subsidiary.

(b) The foregoing limitation does not limit, and will not apply to:

(1) directors' fees, indemnification, expense reimbursement and similar arrangements (including the payment of directors and officers insurance premiums), employee salaries, bonuses, employment agreements and arrangements, compensation or employee benefit arrangements, including stock options or legal fees and fees and compensation paid to consultants and agents;

(2) transactions between or among the Parent and its Restricted Subsidiaries or between or among Restricted Subsidiaries; *provided that* such transactions between the Parent, on the one hand, and one or more Restricted Subsidiaries, on the other hand, will be subject to clauses (1) and (2)(A) of Section 4.11(a); *provided, further* that for purposes of clause (2)(A), the Parent may provide either a Board Resolution of the Parent approved by a majority of the disinterested members of the Board of Directors of the Parent or, in lieu of a Board Resolution, a certification from senior management of the Parent adopted in accordance with policies adopted by the Board of Directors of the Parent;

(3) Restricted Payments not prohibited by Section 4.07 and Permitted Investments;

(4) transactions pursuant to agreements in effect on the Original Issue Date and described in the Offering Memorandum, or any amendment or modification or replacement thereof, so long as such amendment, modification or replacement is not more disadvantageous

to the Company and the other Restricted Subsidiaries than the original agreement in effect on the Original Issue Date;

(5) transactions with a Person that is an Affiliate solely because any Restricted Subsidiary, directly or indirectly, owns Capital Stock in, or controls, such Person; *provided that* no Affiliate of any Restricted Subsidiary (other than another Restricted Subsidiary) owns Capital Stock in such Person;

(6) any payments or other transactions pursuant to tax sharing arrangements between any Restricted Subsidiary and any other Person with which such Restricted Subsidiary files a consolidated or combined tax return or with which such Restricted Subsidiary is part of a consolidated or combined group for tax purposes or any tax advantageous group contribution made pursuant to applicable legislation;

(7) transactions with customers, clients, contractors, purchasers or suppliers of goods (including turbines and other equipment or property) or services (including administrative, cash management, legal and regulatory, engineering, technical, financial, accounting, procurement, marketing, insurance, labor, management, operation and maintenance, power supply and other services) or insurance or lessors or lessees or providers of employees or other labor or property, in each case in the ordinary course of business and that are fair or on terms at least as favorable as arm's length as determined in good faith by the Board of Directors or senior management of the Parent or of the Company; and

(8) loans or advances to, or guarantees of obligations of, directors, promoters, officers or employees of the Parent or any Restricted Subsidiary not to exceed US$1.0 million (or the Dollar Equivalent thereof) in the aggregate at any one time outstanding.

Section 4.12 *Liens*.

The Parent will not, directly or indirectly, incur, assume or permit to exist any Lien on the Collateral (other than certain Permitted Liens).

The Company will not, and the Parent will not, permit any other Restricted Subsidiary to incur, assume or permit to exist any Lien (other than Permitted Liens) securing Indebtedness on existing or future assets of a Restricted Subsidiary (other than Collateral), unless the Notes are equally and ratably secured.

Section 4.13 *Restricted Group's Business Activities*.

The Parent will not permit any Restricted Subsidiary (other than the Company) to engage in any business other than a Permitted Business.

Section 4.14 *Company's Business Activities*.

(a) Notwithstanding anything contained in this Indenture to the contrary, the Company will not, and the Parent will not permit the Company to, engage in any business activity, except (1) any activity relating to the offering, sale or issuance of the Notes or any Additional Notes or other Indebtedness Incurred in compliance with this Indenture, and the Incurrence of Indebtedness represented by the Notes and such Additional Notes or other Indebtedness subject to compliance with this Indenture, (2) the Incurrence of Subordinated Affiliate Debt, (3) any activity relating to using the proceeds of Subordinated Affiliate Debt or Indebtedness Incurred under clause (1) of this Section 4.14(a) to capitalize the Company, to repay the Existing Notes or subscribe for, or loan, the Onshore Debt Incurred by any Restricted Subsidiary, any activity relating to the Onshore Debt, and any activity relating to making other Investments in Restricted Subsidiaries, (4) any activity undertaken with the purpose of fulfilling any obligations, or exercising any right, under the Subordinated Affiliate Debt or

Indebtedness referred to in clause (1) of this Section 4.14(a) or the other provisions of this Indenture, the Collateral Documents, the Intercreditor Agreement, the Indian Escrow Agreements or any indenture, trust deed or Credit Facility related to such Subordinated Affiliate Debt or Indebtedness (including maintenance of interest reserve or escrow accounts required thereby) or for purposes of any consent solicitation or tender for such Subordinated Affiliate Debt or Indebtedness or refinancing of such Subordinated Affiliate Debt or Indebtedness, (5) using assets other than net proceeds of a debt issuance under clauses (1) or (2) of this Section 4.14(a) to acquire and hold Capital Stock or other Investments (including Onshore Debt) of a Restricted Subsidiary and using net proceeds of a debt issuance under clauses (1) or (2) of this Section 4.14(a) to acquire and hold Onshore Debt, (6) holding cash and Temporary Cash Equivalents, including any cash or Temporary Cash Equivalents acquired with the net proceeds of a debt issuance to be held in an interest account or an escrow account, (7) entering into Hedging Obligations for itself, *provided that* such Hedging Obligations are not entered into for speculative purposes, and (8) any activity directly related to the establishment and/or maintenance of the Company's corporate existence.

(b) The Parent shall at all times own all of the Capital Stock of the Company.

(c) The Parent will not commence or take any action to facilitate a winding-up, liquidation or other analogous proceeding in respect of the Company.

(d) Within 45 Business Days after the Original Issue Date, the Company will enter into the Required Hedging Arrangements and thereafter will maintain the Required Hedging Arrangements; *provided, however*, that if any Required Hedging Arrangements are terminated due to a breach by, or insolvency of, any hedge counterparty, the Company will enter into replacement Required Hedging Arrangements within 30 days of such termination. The Company will enter into the Required Hedging Arrangements with hedge counterparties that have a long term debt rating no lower than at least two of the following: (i) BBB- by Fitch, (ii) Baa3 by Moody's and (iii) BBB- by S&P, at the time such Required Hedging Arrangements are entered into.

Within 45 Business Days after the Original Issue Date, the Parent will deliver to the Trustee an Officer's Certificate or an opinion issued by a Determination Agent certifying that:

(1) the Company has entered into Required Hedging Arrangements; and

(2) the Company has sufficient contracted cash flows (including as a result of the Required Hedging Arrangements) to satisfy all scheduled interest payment obligations under the Notes and the Required Hedging Arrangements, and to satisfy all principal payment obligations (based on a 95% probability analysis) under the Notes and Required Hedging Arrangements,

with such Officer's Certificate or opinion being in substantially the form as attached to this Indenture as Exhibit I-B or Exhibit I-A, as applicable, which may include language limiting or excluding the liability of any Determination Agent in providing such opinion.

In connection with any redemption or repurchase by the Company of the Notes prior to their final Stated Maturity or redemption of Onshore Debt prior to its final Stated Maturity, the Company and the Parent will furnish an Officer's Certificate to the Trustee stating the amount of any additional amounts due as a redemption premium, prepayment charges, break costs or make whole amounts in connection with associated redemptions of Onshore Debt and certifying that such amounts are sufficient to enable the Company to pay (i) any costs associated with terminating or unwinding any Required Hedging Arrangements, if applicable, plus (ii) any additional amounts required by the Company to satisfy its payment obligations under the Notes, including the principal, premium, if any, and interest due in connection with such redemption of the Notes or Onshore Debt, respectively, or through the final Stated Maturity of the Notes, as applicable, together with calculations in reasonable detail confirming the same.

Section 4.15 *Corporate Existence.*

Subject to Article 5, the Parent shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(a) its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Parent or any such Subsidiary; and

(b) the rights (charter and statutory), licenses and franchises of the Parent and its Subsidiaries; *provided*, *however*, that the Parent shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors of the Parent shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Parent and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders.

Section 4.16 *Offer to Repurchase Upon Change of Control Triggering Event.*

(a) If a Change of Control Triggering Event occurs, each Holder will have the right to require the Company to repurchase all or any part (a "*Change of Control Offer*") (equal to US$200,000 or an integral multiple of US$1,000 in excess thereof) of that Holder's Notes pursuant to a Change of Control Offer on the terms set forth herein. In the Change of Control Offer, the Company will offer a purchase price in cash equal to 101% of the aggregate principal amount of the Notes (the "*Change of Control Payment*") repurchased, plus accrued and unpaid interest, if any, on the Notes repurchased to (but not including) the applicable date of purchase, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date. Within ten (10) days following any Change of Control Triggering Event, the Company will mail a notice to each Holder describing the transaction or transactions that constitute the Change of Control and offering to repurchase Notes on the date (the "*Change of Control Payment Date*") specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is mailed, and stating:

(1) that the Change of Control Offer is being made pursuant to this Section 4.16 and that all Notes tendered will be accepted for payment;

(2) the purchase price and the purchase date, which shall be no earlier than 30 days and no later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3) that any Note not tendered will continue to accrue interest;

(4) that, unless the Company defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

(5) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to a tender agent appoints for such purpose at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6) that Holders will be entitled to withdraw their election if the Paying Agent or tender agent, as applicable, receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, an e-mail, facsimile transmission or letter

setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his election to have the Notes purchased; and

(7) that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to US$200,000 in principal amount or an integral multiple of US$1,000 in excess thereof.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Triggering Event.

To the extent that the provisions of any securities laws or regulations conflict with Section 3.09 or this Section 4.16, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under Section 3.09 or this Section 4.16 by virtue of such compliance.

(b) On the Change of Control Payment Date, the Company will, to the extent lawful:

(1) accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(2) deposit with the Paying Agent or tender agent, as applicable, for such Change of Control Offer an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3) deliver or cause to be delivered to the Paying Agent or tender agent, as applicable, for such Change of Control Offer the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

The Paying Agent or tender agent, as applicable, for such Change of Control Offer will as soon as reasonably practicable at the expense of the Company, mail to each Holder that properly tendered the Notes the Change of Control Payment for such Notes, and the Trustee will as soon as reasonably practicable authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any. The Company will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(c) The provisions described above that require the Company to make a Change of Control Offer following a Change of Control Triggering Event will be applicable whether or not any other provisions of this Indenture are applicable.

(d) Notwithstanding anything to the contrary in this Section 4.16, the Company will not be required to make a Change of Control Offer upon a Change of Control Triggering Event if (1) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.16 and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer, or (2) notice of redemption has been given pursuant to Section 3.07 or Section 3.10, unless and until there is a default in payment of the applicable redemption price.

(e) Notwithstanding anything to the contrary in this Section 4.16, a Change of Control Offer may be made in advance of a Change of Control Triggering Event, conditioned upon the

62

consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Change of Control Offer is made.

(f) The Trustee shall not be required to take any steps to ascertain whether a Change of Control Triggering Event has occurred or may occur, and shall be entitled to assume that no such event has occurred until it has received written notice to the contrary from the Company. The Trustee shall not be required to take any steps to ascertain whether the condition for the exercise of the rights herein has occurred. The Trustee shall not be responsible for determining or verifying whether a Note is to be accepted for redemption and will not be responsible to the Holders for any loss arising from any failure by it to do so. The Trustee shall not be under any duty to determine, calculate or verify the redemption amount payable hereunder and will not be responsible to the Holders for any loss arising from any failure by it to do so.

Section 4.17 *Anti-Layering*.

The Company will not and the Parent will not permit any Guarantor to Incur any Indebtedness if such Indebtedness is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor, unless such Indebtedness is also contractually subordinated in right of payment to the Notes or the applicable Note Guarantee, on substantially identical terms. This does not apply to distinctions between categories of Indebtedness that exist by reason of any Liens or Guarantee securing or in favor of some but not all of such Indebtedness or by virtue of some Indebtedness being secured on a junior priority basis.

Section 4.18 *Limitations on Redemptions or Dispositions of and Amendments to Onshore Debt*.

(a) Other than as provided under the "Use of Proceeds" section of the Offering Memorandum and to replace the Rupee ECBs with FX ECBs, the Parent will not permit any Indian Restricted Subsidiary to voluntarily prepay or redeem, in whole or in part, any Onshore Debt and the Company will not voluntarily exercise its put right in connection with any Onshore Debt, in whole or in part, unless the proceeds of such prepayment or redemption (net of any hedge unwinding and other costs) will be applied by the Company to redeem, repurchase, defease, acquire or otherwise reduce the principal amount of the Notes outstanding.

(b) The Parent will not permit any Restricted Subsidiary to amend, waive or modify the terms and conditions of any Onshore Debt other than:

(i) to conform to any provision of this Indenture, the Notes, any Note Guarantee or the Collateral Documents, or any amendment, waiver or modification thereof;

(ii) to reflect a consolidation, merger or sale of assets permitted by Section 5.01;

(iii) in any manner not adverse to the holders of the Onshore Debt, including any increase in the redemption premium as may be agreed with the Company as per the terms of the Onshore Debt from time to time and any amendments to the Original Onshore Debt in connection with or to take into account the issuance of the Notes (including, but not limited to, resetting of interest rates from time to time and amendments to interest payment dates, tenure, redemption or other commercial terms of the Original Onshore Debt);

(iv) to remove the any-time right to redemption or prepayment exercisable by the Company in relation to the Original Onshore Debt;

(v) for the purposes of the release of the Lien over: (I) the shares and other securities and assets securing the Original Onshore Debt for the creation of any other Lien over such shares and other securities to secure the New Onshore Debt, provided that a first ranking security

interest over such shares or other securities, as the case may be, is immediately re-created for the benefit of the holder of the Onshore Debt; (b) the shares or other securities securing the Onshore Debt in connection with a Qualified Restricted Subsidiary Sale, to the extent required to effect such Qualified Restricted Subsidiary Sale; and (c) the assets securing the Onshore Debt:

(1) (1) in order to give effect to and/or ensure compliance with the ranking and priority as set out in Appendix B to the Offering Memorandum; or

(2) (2) to the extent of land aggregating to approximately (A) 108 acres in Karnataka owned by Azure Photovoltaic Private Limited, Azure Power (Raj.) Private Limited and Azure Sunrise Private Limited and (B) 40 acres in Telangana owned by Azure Power Thirty Seven Private Limited, which in each case is not being utilized for the purpose of the projects being operated by these entities, for the purpose of sale or disposition of such assets, the Net Cash Proceeds of which may be paid as a dividend on the Capital Stock of such Restricted Subsidiaries;

(vi) in connection with a Qualified Restricted Subsidiary Sale: (a) any amendment to the interest rate payable in respect of any Onshore Debt, where such amendment is made and for the purposes of meeting the requirement set forth in clause (iii) of the definition of "Qualified Restricted Subsidiary Sale"; or (b) the release of any guarantees provided in relation to the Onshore Debt, on account of a Qualified Restricted Subsidiary Sale;

(vii) in relation to release of any guarantees or security provided by Azure Renewable Energy Private Limited with respect to the Original Onshore Debt;

(viii) as required under applicable law, rule, regulation or order;

(ix) in any manner to ensure that the restrictions in any Onshore Debt applicable to the Restricted Subsidiary issuing such Onshore Debt are not inconsistent with or more restrictive than the provisions of this Indenture applicable to such Restricted Subsidiary;

(x) to enter into any amendment or supplement to or grant any waiver under any Indian Escrow Agreement in order to account for the Incurrence of any Permitted Indebtedness or for any other action which is permitted under or not restricted by this Indenture;

(xi) solely in connection with the refinancing in full of the Notes, any amendment of a technical nature to facilitate such refinancing that would not, at the time agreed to, be expected to materially adversely affect the ability of the Company to make required payments on the Notes, as determined in good faith by the Board of Directors of the Company, provided that (A) the Company has issued an irrevocable notice of redemption in relation to the Notes or (B) any such amendment is made no earlier than 30 days prior to the date on which the Notes are to be refinanced; and

(xii) solely in connection with the refinancing in full of the Existing Notes, any amendment of a technical nature to facilitate such refinancing that would not, at the time agreed to, be expected to materially adversely affect the ability of the Company to make required payments on the Existing Notes, as determined in good faith by the Board of Directors of the Company, *provided* that (A) the Company has issued an irrevocable notice of redemption in relation to the Existing Notes or (B) any such amendment is made no earlier than 30 days prior to the date on which Existing Notes are to be refinanced.

(c) The Company will not sell or dispose of, including but not limited to by way of transfer, assignment or sub-participation, any Onshore Debt to any Person, except in the case of Rupee NCDs, to the extent that the Company's agreement to such covenant conflicts with any laws and regulations (including guidance issued by the Securities and Exchange Board of India) applicable at such time.

(d) Any prepayment or redemption of the Onshore Debt will be on a *pro rata* basis based on the respective principal amounts of Onshore Debt by all Indian Restricted Subsidiaries other than where the redemption or prepayment is: (a) in accordance with the "Use of Proceeds" section of the Offering Memorandum; (b) to replace Rupee ECBs with FCY ECBs; and (c) effected by an Indian Restricted Subsidiary that is subject to a Qualified Restricted Subsidiary Sale; *provided*, in each case, that the proceeds of such prepayment or redemption (net of any hedge unwinding and other costs) will be applied by the Company to redeem, repurchase, defease, acquire or otherwise reduce the principal amount of the Notes outstanding; and *provided, further,* that there will be no Rating Decline pursuant to the redemption or prepayment of the relevant Onshore Debt.

Section 4.19 *[Reserved]*.

Section 4.20 *[Reserved]*.

Section 4.21 *Issuances of Guarantees by Restricted Subsidiaries*.

The Parent will not permit any Restricted Subsidiary (other than the Company), directly or indirectly, to Guarantee any Indebtedness of the Company, unless (a) such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for an unsubordinated Guarantee of payment of the Notes by such Restricted Subsidiary and (b) such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation as a result of any payment by such Restricted Subsidiary under its Guarantee until the Notes have been paid in full.

Any Note Guarantee will be released upon legal defeasance, covenant defeasance or satisfaction and discharge of this Indenture as provided under Article 8 and Article 12, upon repayment in full of the Notes and upon the release or discharge of the Guarantee that resulted in the creation of such Note Guarantee pursuant to this covenant except a discharge or release by or as a result of payment under such Guarantee.

Section 4.22 *No Payments for Consent*.

(a) The Company will not, and the Parent will not permit any other Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

(b) Notwithstanding the foregoing, in any offer or payment of consideration for, or as an inducement to, any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes in connection with an exchange offer, the Parent and any Restricted Subsidiary may exclude (1) in connection with an exchange offer, holders or beneficial owners of the Notes that are not "qualified institutional buyers" as defined in Rule 144A under the Securities Act, and (2) in connection with any consent, waiver or amendment, holders or beneficial owners of the Notes in any jurisdiction where the inclusion of such holders or beneficial owners could, in the reasonable judgment of the Parent or the Company, require the Parent or any Restricted Subsidiary to (A) file a registration statement, prospectus or similar document or subject the Parent or any Restricted Subsidiary to ongoing periodic reporting or similar requirements under any securities laws (including but not limited to, the United States federal securities laws and the laws of the European Union or its member states), (B) qualify as a foreign corporation or other entity as a dealer in securities in such jurisdiction if it is not otherwise required to so qualify, (C) generally consent to service of process in any such jurisdiction or (D) subject the Parent or any Restricted Subsidiary to taxation in any such jurisdiction if it is not otherwise so subject, or the solicitation of such consent, waiver or amendment from, or the granting of such consent

or waiver, or the approval of such amendment by, holders or beneficial owners in such jurisdiction would be unlawful, in each case as determined by the Parent or the Company in its sole discretion.

Section 4.23 *Additional Note Guarantees*.

The Parent may cause a Subsidiary to provide a Note Guarantee pursuant to a supplemental indenture in form and substance satisfactory to the Trustee and deliver an Opinion of Counsel to the Trustee to the effect that such supplemental indenture has been duly authorized, executed and delivered by that Subsidiary and constitutes a valid and binding agreement of that Subsidiary, enforceable in accordance with its terms (subject to customary exceptions).

Section 4.24 *Permitted Pari Passu Secured Indebtedness*.

On or after the Original Issue Date, the Parent will not create Liens on the Collateral other than (a) Liens for the benefit of the Holders to secure the Notes; (b) Liens *pari passu* with the Lien for the benefit of the Holders to secure Indebtedness of the Company, including any Additional Notes (such Indebtedness of the Company, "*Permitted Pari Passu Secured Indebtedness*"), *provided that* (1) the Company was permitted to Incur such Indebtedness under clause (a)(5) or (a)(12) of Section 4.09 and Section 4.14 and any Permitted Refinancing Indebtedness in relation to such Indebtedness and in relation to Indebtedness Incurred under clause (1)(a) of such covenant, (2) the holders of such Indebtedness (or their representative), other than any Additional Notes or other Indebtedness in respect of which the relevant holders or representative is already a party to the Intercreditor Agreement (as defined below), become party to the Intercreditor Agreement; (3) the agreement in respect of such Indebtedness contains provisions with respect to releases of the Lien over the Collateral no more restrictive on the Company than the provisions of this Indenture and the Collateral Documents; and (4) the Company delivers to the Trustee and the Collateral Agent an Opinion of Counsel and an Officer's Certificate each stating that all conditions precedent with respect to such incurrence of Indebtedness and creation of Liens and the execution of documents related thereto have been satisfied and such incurrence of Indebtedness and creation of Liens and execution of documents related thereto are authorized and permitted under this Indenture, any Collateral Documents, the Intercreditor Agreement and any other documents related to the transactions contemplated in this Indenture and (c) certain Permitted Liens. The Trustee and the Collateral Agent (each in conclusive reliance upon the Officer's Certificate and Opinion of Counsel delivered to them) will be permitted and authorized (and shall incur no liability for doing so), without the consent of any Holder, to enter into any amendments to the Collateral Documents, this Indenture and/or the Intercreditor Agreement and take any other action reasonably requested by the Company and necessary to permit the creation and registration of Liens on the Collateral to secure Permitted Pari Passu Secured Indebtedness in accordance with this paragraph and the terms of this Indenture (including, without limitation, the appointment of a collateral agent under the Intercreditor Agreement referred to below to hold the Collateral on behalf of the Holders and the holders of Permitted Pari Passu Secured Indebtedness).

Except for certain Indebtedness for which there is a corresponding Permitted Lien and any Permitted Pari Passu Secured Indebtedness, the Company and the other Restricted Subsidiaries will not be permitted to Incur any other Indebtedness secured by all or any portion of the Collateral.

Section 4.25 *Intercreditor Agreement and Priority*.

(a) On or prior to the first Incurrence of any Permitted Pari Passu Secured Indebtedness (other than Additional Notes), the Trustee and the Collateral Agent will enter into an intercreditor agreement substantially in the form set out in Exhibit J, or with such changes as the Trustee and the Collateral Agent may agree (the "*Intercreditor Agreement*"), without requiring any instruction or consent from or notice to the Holders, with the Company, the Parent, the Collateral Agent and the holders of such Permitted Pari Passu Secured Indebtedness (or their representative). The Intercreditor Agreement will provide for, among other things:

(1) That the parties thereto shall share equal priority and *pro rata* entitlement in and to the Collateral, but in the event of an acceleration of certain Hedging Obligations permitted to be incurred by the Company under Section 4.09(a)(5), amounts recovered in respect of the Collateral are required to be turned over to the Collateral Agent and, subject to the payment of certain fees and expenses, paid by the Collateral Agent to the counterparties to such Hedging Obligations in priority to the Holders and to holders or lenders of other Permitted Pari Passu Secured Indebtedness;

(2) the conditions that are applicable to the release of or granting of any Lien on the Collateral; and

(3) the conditions under which the parties thereto will enforce their rights with respect to the Collateral and the Indebtedness secured thereby.

(b) Under the Intercreditor Agreement, the holders of any Permitted Pari Passu Secured Indebtedness (or their representative) (collectively with the Trustee, the "*Pari Passu Secured Parties*") will appoint HSBC Bank USA, National Association (the "*Collateral Agent*") (or the successor Collateral Agent appointed under the Collateral Documents if such a successor has been appointed) to act as the Collateral Agent with respect to the Collateral, to exercise remedies (subject to the terms of this Indenture and any document governing Permitted Pari Passu Secured Indebtedness) in respect thereof upon the occurrence of an event of default under this Indenture and any document governing Permitted Pari Passu Secured Indebtedness, and to act as provided in the Intercreditor Agreement.

(c) In connection with the Incurrence of any subsequent Permitted Pari Passu Secured Indebtedness (other than Additional Notes or Indebtedness in respect of which the holders or their representative is already a party to the Intercreditor Agreement), the holders of such Permitted Pari Passu Secured Indebtedness (or their representative) will (a) accede to the Intercreditor Agreement and become a party to it or (b) enter into another intercreditor agreement on substantially similar terms.

(d) By accepting the Notes, each Holder shall be deemed to have consented to the execution of the Intercreditor Agreement, any supplements, amendments or modifications thereto, and any future Intercreditor Agreement required under this Indenture.

Section 4.26 *[Reserved]*.

Section 4.27 *[Reserved]*.

Section 4.28 *Subsidiaries*.

None of the Restricted Subsidiaries shall have any Subsidiaries.

Section 4.29 *[Reserved]*.

Section 4.30 *Repayment of Existing Notes and Amendment of Rupee ECB*s.

The Company will repay in full all amounts due under the Existing Notes within 20 Business Days of the Original Issue Date and will amend the Original Onshore Debt (to the extent not repaid or redeemed) within 60 days of the Original Issue Date to conform the terms thereof, in all material respects, and to the extent permitted by applicable law, to the terms set forth in Appendix B-I of the Offering Memorandum.

Section 4.31 *Use of Proceeds*.

The Parent will ensure that the Company will not, and the Company will not, use the net proceeds from the sale of the Notes issued on the Original Issue Date, and the Parent will not permit

any other Restricted Subsidiary to use the proceeds from the Onshore Debt acquired with such net proceeds, for any purpose other than (1) in the approximate amounts, in the order and for the purposes specified under the heading "Use of Proceeds" in the Offering Memorandum and (2) pending the application of all of such net proceeds in such manner, to invest the portion of such net proceeds not yet so applied in Temporary Cash Equivalents.

Section 4.32 *Government Approvals and Licenses; Compliance with Law*.

The Parent will, and will cause each Restricted Subsidiary to (a) obtain and maintain in full force and effect all governmental approvals, authorizations, consents, permits, concessions and licenses as are necessary to engage in the Permitted Businesses; (b) preserve and maintain good and valid title to its properties and assets (including land-use rights); and (c) comply with all laws, regulations, orders, judgments and decrees of any governmental body, except to the extent that failure so to obtain, maintain, preserve and comply would not reasonably be expected to have a material adverse effect on (1) the business or results of operations of the Restricted Group, taken as a whole, or (2) the ability of the Company, the Parent and any Guarantor to perform its obligations under the Notes, any Note Guarantee or this Indenture. The Company hereby represents and warrants that neither it nor any of its affiliates or subsidiaries: (a) is an individual or entity ("Person") that is, or is owned or controlled by Persons that are the subject of sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions" and each such Person a "Sanctioned Person"); (b) is located, incorporated, organized, or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, without limitation, the Crimea Region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria) (each a "Sanctioned Country"); or (c) has any business affiliation or commercial dealings with or investments in any Sanctioned Country or Sanctioned Person. The Company covenants that it will not take any action, omit to take any action, or engage in any activity which would render any of the foregoing representations or warranties untrue at any time and will promptly notify each party if any of the foregoing representations and warranties are no longer true. The Company covenants that it will not, directly or indirectly, use the proceeds hereof, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the target or subject of sanctions or (ii) in any other manner that would result in a violation of sanctions by any Person.

Section 4.33 *Currency Indemnity*.

(a) The U.S. Dollar is the sole currency of account and payment for all sums payable by the Company and the Guarantors under the Notes and the Note Guarantees (the "*Contractual Currency*"). Any amount received or recovered in a currency other than the Contractual Currency in respect of the Notes or the Note Guarantees (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up, liquidation or dissolution of any Guarantor, any Subsidiary or otherwise) by a Holder in respect of any sum expressed to be due to it from the Company or any Guarantor will constitute a discharge of the Company or the Guarantor, as the case may be, only to the extent of the Contractual Currency amount which the Holder is able to purchase with the amount so received or recovered in such other currency on the date of that receipt or recovery (or, if it is not possible to make that purchase on that date, on the first date on which it is possible to do so). If that purchased amount is less than the Contractual Currency amount expressed to be due to the Holder under any Note, the Company and the Guarantors will indemnify the Holder against any loss sustained by it as a result. For the purposes of this indemnity, it will be sufficient for the Holder to certify (indicating the sources of information used) that it would have suffered a loss had the actual purchase of Contractual Currency been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of Contractual Currency on such date had not been possible, on the first date on which it would have been possible).

(b) Each of the above indemnities will, to the extent permitted by law:

(1) constitute a separate and independent obligation from the other obligations of the Company or the Guarantors;

(2) give rise to a separate and independent cause of action;

(3) apply irrespective of any waiver granted by any Holder; and

(4) continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment or order.

Section 4.34 *Company Representations and Warranties*.

The Company represents and warrants that:

(i) it has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of organization and has obtained all necessary approvals, permits, authorizations and licenses from the authorities required by it under the laws and regulations of its jurisdiction of organization to carry on its business as now conducted;

(ii) it has the requisite power and authority to execute, deliver and perform its obligations under this Indenture and has taken all necessary action to authorize the execution, delivery and performance of its obligations under this Indenture; and

(iii) this Indenture has been duly executed and delivered by it and constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with the terms hereof.

Section 4.35 *Suspension of Certain Covenants*.

(a) If on any date following the Original Issue Date, the Notes have a rating of Investment Grade from both of the Rating Agencies and no Default or Event of Default has occurred and is continuing (a "*Suspension Event*"), then, beginning on that day and continuing until such time, if any, at which the Notes cease to have a rating of Investment Grade from either of the Rating Agencies, the provisions of this Indenture in the following Sections will be suspended:

(1) Section 4.10

(2) Section 4.07;

(3) Section 4.09;

(4) Section 4.21;

(5) Section 4.11

(6) Section 4.08;

(7) Section 4.20;

(8) Section 4.13;

(9) Section 4.17;

(b) Such covenants will be reinstated and apply according to their terms as of and from the first day on which a Suspension Event ceases to be in effect (the "*Reinstatement Date*" and the period of time between the Suspension Event and the Reinstatement Date, the "*Suspension Period*"). Such covenants will not, however, be of any effect with regard to actions of the Company or any other Restricted Subsidiary properly taken in compliance with the provisions of this Indenture during the continuance of the Suspension Event, and following reinstatement, all Indebtedness Incurred during the continuance of the Suspension Event will be classified to have been incurred pursuant to clause (a)(2) of Section 4.09.

## ARTICLE 5
## SUCCESSORS

Section 5.01 *Merger, Consolidation, and Sale of Assets*.

(a) The Parent will not permit any Restricted Subsidiary to (x) merge or consolidate with or into another Person (other than (1) pursuant to a Qualified Restricted Subsidiary Sale or (2) in relation to any Restricted Subsidiary (other than the Company), a merger or consolidation with or into another Restricted Subsidiary *provided that* in the case of (2), (i) such merger or consolidation does not adversely affect the enforceability, validity or priority of any Lien securing any Onshore Debt other than the release of the Liens over the shares and securities securing the Onshore Debt of a Restricted Subsidiary in connection with any such merger, provided further that immediately following any such merger or consolidation, replacement Liens having the same priority and ranking are re-created by the surviving entity following such merger or consolidation for the benefit of the holders of the relevant Onshore Debt; and (ii) the Parent or the Company shall have obtained prior written confirmations from the Rating Agencies that such merger or consolidation will not result in a decrease in the ratings of the Notes), or (y) sell all or substantially all of its assets taken as a whole, in one or more related transactions (other than, in relation to any Restricted Subsidiary (other than the Company), to another Restricted Subsidiary *provided that* (i) such sale does not adversely affect the enforceability, validity or priority of any Lien securing any Onshore Debt, other than the release of the Liens securing the Onshore Debt of a Restricted Subsidiary in connection with the sale of all or substantially all of the properties or assets of such Restricted Subsidiary to another Restricted Subsidiary (the "Acquirer Restricted Subsidiary"), if a security interest over such properties and assets having the same priority and ranking is immediately re-created for the benefit of the holders of the Onshore Debt of such Acquirer Restricted Subsidiary, immediately after the acquisition; and (ii) the Parent or the Company shall have obtained prior written confirmations from the Rating Agencies that such sale will not result in a decrease in the ratings of the Notes).

(b) The Parent will not merge or consolidate with or into another Person; or sell substantially all of its and the Restricted Subsidiaries' assets, taken as a whole, in one or more related transactions, unless:

(1) either:

(A) it is the surviving entity; or

(B) the surviving entity (the "*Surviving Person*") is organized under the laws of India, Mauritius, the Netherlands, the Cayman Islands, the British Virgin Islands, Hong Kong, China, Singapore, Canada, the United Kingdom, any member state of the European Union, Switzerland, the United States, any state of the United States or the District of Columbia and such Surviving Person expressly assumes the obligations of the Parent under this Indenture and the Collateral Documents, as the case may be;

(2) immediately after giving effect to such transaction, no Default shall have occurred and be continuing; and

(3) the Parent delivers an Officer's Certificate and an Opinion of Counsel as to compliance with this Section 5.01.

Section 5.02 *Successor Corporation Substituted*.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Parent in a transaction that is subject to, and that complies with the provisions of, this Section 5.01, the successor Person formed by such consolidation or into or with which the Parent is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Parent" shall refer instead to the successor Person and not to the Parent), and may exercise every right and power of the Parent under this Indenture with the same effect as if such successor Person had been named as the Parent herein and the Parent shall be released from all obligations under this Indenture.

## ARTICLE 6
## DEFAULTS AND REMEDIES

Section 6.01 *Events of Default*.

Each of the following is an "*Event of Default*":

(a) default in the payment of principal of (or premium, if any, on) the Notes when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b) default in the payment of interest on any Note when it becomes due and the continuance of any such failure for 30 days;

(c) default in compliance with Section 5.01, or in respect of the Company's obligations to consummate an offer to purchase upon a Change of Control Triggering Event or an Asset Sale;

(d) defaults under this Indenture (other than a default specified in clause (a), (b) or (c) above) and continuance for 60 consecutive days after written notice is given by Holders of 25% or more in aggregate principal amount of the Notes;

(e) any event of default occurs and is continuing with respect to any Onshore Debt (other than any default in the payment of interest);

(f) with respect to any Indebtedness of the Company or any other Restricted Subsidiary having an outstanding principal amount of US$15.0 million (or the Dollar Equivalent thereof) or more, (1) an event of default causing the holder thereof to declare such Indebtedness to be due prior to its Stated Maturity and/or (2) the failure to make a principal payment when due;

(g) passage of 60 consecutive days following entry of the final judgment or order against the Company or any other Restricted Subsidiary that causes the aggregate amount for all such final judgments or orders outstanding and not paid, discharged or stayed to exceed US$15.0 million (or the Dollar Equivalent thereof) (exclusive of any amounts for which a solvent (to the Company's best knowledge) insurance company has acknowledged liability for);

(h) an involuntary case or other proceeding is commenced against the Parent, the Company or one or more Restricted Subsidiaries (representing individually or in the aggregate at least 5% of the Total Assets or Stated EBITDA of the Restricted Group as of or for the most recently completed fiscal year of the Restricted Group for which financial statements are available) seeking the appointment of a receiver, official liquidator, administrator, trustee or corporate insolvency resolution professional and

which remains undismissed and unstayed for 90 consecutive days, or a final non-appealable judgment or order for relief is entered under any bankruptcy or other similar law;

(i) the Company, the Parent or one or more Restricted Subsidiaries (representing individually or in the aggregate at least 5% of the Total Assets or Stated EBITDA of the Restricted Group as of or for the most recently completed fiscal year of the Restricted Group for which financial statements are available):

(1) commences a voluntary case, or consents to the entry of an order for relief in an involuntary case under any bankruptcy or other similar law,

(2) consents to the appointment of a receiver, liquidator, administrator, trustee or corporate insolvency professional, or

(3) effects any general assignment for the benefit of creditors;

(j) any Guarantor denies its obligations under its Note Guarantee or such Note Guarantee is determined to be unenforceable or invalid or shall for any reason cease to be in full force and effect (other than due to a release of such Note Guarantee pursuant to the terms of this Indenture);

(k) any default by the Company or the Parent in the performance of any of their respective obligations under the Collateral Documents, which adversely affects the enforceability, validity, perfection or priority of the Lien on the Collateral or which adversely affects the condition or value of the Collateral, taken as a whole, in any material respect; or

(l) the repudiation by the Company or the Parent of any of their respective obligations under the Collateral Documents or a Collateral Document ceases to be or is not in full force or effect or the failure to create a first priority lien on the Collateral or the Trustee or the Collateral Agent ceases to have a first priority security interest in the Collateral (subject to any Permitted Liens and any Intercreditor Agreement).

Section 6.02 *Acceleration*.

If an Event of Default (other than an Event of Default specified in clause (h) or (i) of Section 6.1 above) occurs and is continuing under this Indenture, the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by written notice to the Company, may, and the Trustee at the written direction of such Holders (subject to it being indemnified and/or secured and/or pre- funded to its satisfaction) will, declare the principal of, premium, if any, and accrued and unpaid interest on the Notes to be immediately due and payable. Upon a declaration of acceleration, such principal of, premium, if any, and accrued and unpaid interest will be immediately due and payable. If an Event of Default specified in clause (h) or (i) of Section 6.01 above occurs, the principal of, premium, if any, and accrued and unpaid interest on the Notes then outstanding will automatically become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

Section 6.03 *Other Remedies*.

If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as Trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture, including, but not limited to, directing a foreclosure on the Collateral in accordance with the terms of the Collateral Documents and take such further action on behalf of the Holders with respect to the Collateral in accordance with such Holders' instruction and the relevant Collateral Documents, subject to any Intercreditor Agreement. The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the

proceeding. The Trustee shall have no liability for any decline in value or loss realized as a result of the sale of any Collateral in accordance with the terms of this Indenture.

Section 6.04 *Waiver of Past Defaults*.

The Holders of at least a majority in principal amount of the outstanding Notes by written notice to the Company and to the Trustee may on behalf of all the Holders waive all past defaults and rescind and annul a declaration of acceleration and its consequences if:

(a) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived; and

(b) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05 *Control by Majority*.

(a) The Holders of at least a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee, subject to any Intercreditor Agreement in the case of the Collateral, provided that in all cases the Trustee is indemnified and/or secured and/or prefunded to its satisfaction in advance of any such proceedings. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability and may take any other action it deems proper that is not inconsistent with any such direction received from Holders.

(b) The Trustee will not be required to expend its own funds in following such direction if it does not believe that reimbursement or satisfactory indemnification and/or security and/or pre- funding is assured to it.

Section 6.06 *Limitation on Suits*.

A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(a) the Holder has previously given the Trustee written notice of a continuing Event of Default;

(b) the Holders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c) such Holder or Holders offer the Trustee and the Collateral Agent indemnity and/or security and/or pre-funding reasonably satisfactory to the Trustee and the Collateral Agent against any fees, costs, liability or expenses to be incurred in compliance with such request;

(d) the Trustee does not comply with the request within (x) 60 days after receipt of the written request pursuant to clause (b) above or (y) 60 days after the receipt of the offer of indemnity and/or security and/or pre-funding pursuant to clause (c) above, whichever occurs later; and

(e) during such 60-day period, the Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a direction that is inconsistent with such request.

However, such limitations do not apply to the contractual right of any Holder to bring suit for the enforcement of any such contractual right to payment, on or after the due date expressed in the Notes, which right will not be impaired or affected without the consent of the Holder.

Section 6.07 *Rights of Holders to Receive Payment*.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal of, premium and Additional Amounts, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided that* a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.08 *Collection Suit by Trustee*.

If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, premium and Additional Amounts if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09 *Trustee May File Proofs of Claim*.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and if the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10 *Priorities*.

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

*First*: to the Trustee and the Collateral Agent, the Agents, and their respective agents and attorneys for amounts due under Section 7.07 and Section 10.10, including payment of all compensation, expenses, costs and liabilities properly incurred, and all advances properly made, by the Trustee and the Collateral Agent, the Agents and their respective agents and attorneys, and the costs and expenses of collection and all amounts for which the Trustee, the Collateral Agent, and the Agents are entitled to indemnification under the Collateral Documents, the Intercreditor Agreement and this Indenture, for which the Trustee, the Collateral Agent or the Agents have made a claim pursuant to the terms of the Collateral Documents, the Intercreditor Agreement and this Indenture;

*Second:* to the Note Holders Representative and its respective agents and attorneys for amounts due under paragraphs (a) and (b) of the Note Holders Representative Appointment Letter, including payment of all compensation, expenses and liabilities incurred, and all advances made by it and the costs and expenses of collection;

*Third:* to Holders for amounts due and unpaid on the Notes for principal, premium and Additional Amount if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any and interest, respectively; and

*Fourth*: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11 *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess properly incurred costs, including properly incurred attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

## ARTICLE 7
## TRUSTEE

Section 7.01 *Duties of Trustee*.

(a) If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(1) the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely on the truth of the statements contained in and the correctness of any certificates or opinions furnished to the Trustee, and the Trustee shall not be responsible for any loss occasioned by acting in

reliance on such certificates and opinions and shall not be obligated to verify any information in such certificates or opinions.

The Trustee shall not be charged with knowledge of any Default or Event of Default unless the Company has delivered written notice of such Default or Event of Default to a Responsible Officer at the Corporate Trust Office of the Trustee referencing the applicable provision of this Indenture. During the continuance of an Event of Default, the Trustee shall not be under any obligation to exercise any rights or powers conferred under this Indenture for the benefit of the Holders unless it receives the written direction of the Holders of at least 25% of the aggregate principal amount then outstanding and indemnity and/or security and/or prefunding to its satisfaction.

(c) The Trustee may not be relieved from liabilities for its own gross negligence, or its own willful misconduct, except that:

(1) this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2) the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is conclusively determined by the final judgment of a court of competent jurisdiction, no longer subject to appeal or review, that the Trustee was grossly negligent in ascertaining the pertinent facts; and

(3) the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it from the Note Holders Representative or Holders of at least 25% in aggregate principal amount of the then outstanding Notes or otherwise pursuant to the terms of this Indenture, the Notes, the Note Guarantee, the Intercreditor Agreement or any Collateral Document.

(d) Whether or not herein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to Article 7.

(e) No provision of this Indenture or any other documents related to the transactions contemplated herein will require the Trustee to expend or risk its own funds or incur any liability (financial or otherwise). The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture or any other document, unless the Trustee has been offered security and/or indemnity and/or pre-funding satisfactory to it against any loss, liability or expense.

(f) The Trustee will not be liable for interest on any money received by it. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g) The Trustee is hereby authorized and directed by the Holders to execute the Intercreditor Agreement pursuant to Section 4.25.

Section 7.02 *Rights of Trustee*.

(a) In the absence of bad faith on its part, the Trustee may conclusively rely upon all instructions, notices, declarations and certificates, opinions and any other documents, including any such document sent by facsimile, e-mail or other form of electronic communication, received by it and believed by it to be genuine and to have been signed or presented by the proper Person. In conclusively relying upon any of such documents, the Trustee need not investigate any fact or matter stated therein and shall not be responsible for the accuracy, authenticity and validity thereof and may conclusively rely as to the truth of the statements and the correctness of the opinions expressed therein.

(b) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in reliance on such Officer's Certificate or Opinion of Counsel. The Trustee may, at the Company's

expense, consult with counsel and other professional advisors and an Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder and in reliance thereon.

(c) The Trustee may act through its attorneys, delegates and agents and will not be responsible for the misconduct or negligence of any attorneys, delegates and agents appointed with due care hereunder. The Trustee shall not be obligated to monitor or supervise such attorneys, delegates and agents.

(d) The Trustee will not be liable for any action it takes or omits to take that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e) Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company.

(f) The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders or the Note Holders Representative unless such Holders or the Note Holders Representative, as applicable, have offered to the Trustee indemnity and/or security and/or pre-funding satisfactory to it against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction. The Trustee will not be responsible for any loss, liability, cost, claim, actions, demand, expense or inconvenience which may result from its exercise or non-exercise of any of the rights or powers vested in it by this Indenture or any related document other than as caused by its own gross negligence or its own willful misconduct.

(g) In no event shall the Trustee, the Collateral Agent or Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond their control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; or failure of any money transmission or SWIFT system, any laws, ordinances, regulations or the like which restrict or prohibit the performance of the obligations contemplated by this Indenture.

(h) The recitals contained herein and in the Notes are made by the Company and not by the Trustee, and the Trustee assumes no responsibility for the correctness and completeness thereof. The Trustee makes no representation as to the validity or sufficiency of this Indenture or the Notes.

(i) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its sole and absolute discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records, and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation. The Trustee shall not be bound to make any investigation into (i) the occurrence of any default, or the validity, enforceability, effectiveness or genuineness of this Indenture, the Notes, any Note Guarantee, the Intercreditor Agreement, any Collateral Documents, any related document or any other agreement, instrument or document, (iii) the creation, perfection or priority of any Lien purported to be created by this Indenture, the Notes, any Note Guarantee, the Intercreditor Agreement, any Collateral Documents, or any related document, (iv) the value or the sufficiency of any Collateral or (v) the satisfaction of any condition set forth in this Indenture, the Notes, any Note Guarantee, the Intercreditor Agreement, any Collateral Documents, or any related document.

(j) Under no circumstances shall the Trustee, the Collateral Agent or Agents be responsible or liable to the Company or any other party to this Indenture for any punitive, special, indirect or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit, business, goodwill or opportunity) whether or not foreseeable and irrespective of whether the Trustee, the Collateral Agent and Agents have known about or have been advised of the likelihood of such loss or damage and regardless of the form of legal actions.

(k) The rights, privileges, indemnity, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, (i) the Trustee in each of its capacities hereunder, and, in addition to any other rights, privileges, indemnity, protections, immunities and benefits afforded to them, the Collateral Agent and the Agents, custodian and any other Person employed to act hereunder, provided, however any such agent or custodian shall not be deemed to be a fiduciary and (ii) the entity serving as the Trustee, the Collateral Agent and the Agents in each of its capacities under any related document (including the Intercreditor Agreement and any Collateral Document) whether or not specifically set forth therein and each agent, custodian and other Person employed to act hereunder and under any related document, as the case may be;

(l) The Trustee, the Collateral Agent and Agents may request that the Company deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture; and

(m) So long as any of the Notes remains outstanding, the Company shall provide the Agents with a sufficient number of copies of this Indenture and each of the documents sent to the Trustee or which are required to be made available by stock exchange regulations or stated in the Offering Memorandum, to be available and, subject to being provided with such copies, each of the Agents will procure that such copies shall be available at its specified office during normal office hours for examination by the Holders and that copies thereof will be furnished to the Holders upon written request at their own expense.

(n) If an Event of Default occurs and is continuing, the Trustee shall be entitled to require all Agents and the Note Holders Representative to act solely in accordance with its directions. For the avoidance of doubt, the Trustee shall not be required to provide any such directions and such right shall not be construed as a duty.

(o) The Trustee shall treat all information relating to the Company as confidential, but (unless consent is prohibited by law) the Company and the Guarantors consent to the transfer and disclosure by the Trustee of any information relating to the Company and the Guarantors to and between branches, subsidiaries, representative offices, agents and affiliates of the Trustee and third parties (including service providers) selected by any of them, wherever situated, for confidential use (including without limitation in connection with the provision of any service and for data processing, statistical and risk analysis purposes and for compliance with applicable law). The Trustee and any of its branch, subsidiary, representative office, agent, affiliate or third party may transfer and disclose any such information as required or requested by any law, court, regulator, legal process, applicable law, or authority including any auditor of the Company or the Guarantors and including any payor or payee as required by applicable law; *provided that* the Trustee shall give the Company prompt written notice of such request so that the Company may seek a protective order or other remedy protecting such confidential information from disclosure so long as the provision of such notice is not contrary to applicable law. Notwithstanding anything herein to the contrary, the foregoing shall not be construed to prohibit (i) disclosure of any and all information that is or becomes publicly known, or information obtained by the Trustee from sources other than the Company or the Guarantors, (ii) disclosure as required pursuant to this Indenture, the Intercreditor Agreement, the Notes, the Note Guarantee or the Collateral Documents, or (iii) any other disclosure authorized by the Company.

(p) The Trustee will not be responsible for the acts, omissions, misconduct default or negligence of the Note Holders Representative and shall not be obliged to monitor or supervise the Note Holders Representative for any action it takes or omits to take that the Note Holders Representative believes to be authorized or within the rights or powers conferred upon it by the Note Holders Representative Appointment Letter.

(q) If an Event of Default occurs and is continuing and the Trustee instructs the Note Holders Representative to act solely in accordance with its directions, the Trustee shall not be obliged to indemnify the Note Holders Representative or pay remuneration to the Note Holders Representative before it acts in accordance with the directions of the Trustee.

(r) Notwithstanding anything to the contrary provided for in this Indenture, the Notes and the Note Holders Representative Appointment Letter, the Note Holders Representative shall not, by any provision hereof or in the Note Holders Representative Appointment Letter, have any claim or recourse to the Trustee in connection with the Note Holders Representative's indemnification, remuneration or liabilities and acknowledges and agrees that the expenses of the Note Holders Representative shall be limited to the amounts for the time being held by the Trustee in respect of the Notes under this Indenture and after application of such sums in accordance with Section 6.10 in satisfaction of payment of relevant sums.

(s) Notwithstanding anything to the contrary in this Indenture, the Notes or in any other document the Company, Parent and the Holders, by accepting the Notes, acknowledge and understand that:

(1) The Trustee has not conducted any due diligence or investigation with respect to the Note Holders Representative or its ability to perform its required duties and accepts no responsibility or liability for any acts, omissions or defaults of the Note Holders Representative; and

(2) The Note Holders Representative is executing the Note Holders Representative Appointment Letter as an agent of the Company and not as an agent of the Trustee and there is no trustee-beneficiary or fiduciary relationship between the Note Holders Representative and the Trustee of any nature whatsoever and no principal-agent relationship between the Note Holders Representative and the Trustee of any nature whatsoever until such time an Event of Default occurs and is continuing and the Trustee requires the Note Holders Representative to act as agent of the Trustee and to act solely in accordance with its directions.

(t) The Company and the Parent hereby irrevocably waive, in favor of the Trustee, the Agents and the Collateral Agent, any conflict of interest which may arise by virtue of the Trustee and/or the Agents and/or the Collateral Agent acting in various capacities under this Indenture, the Notes, the Note Guarantees and the Collateral Documents or for other customers of the Trustee and/or the Agents and/or the Collateral Agent. The Company and the Parent acknowledge that the Trustee, the Agents and the Collateral Agent and their respective affiliates (together, the "*Agent Parties*") may have interests in, or may be providing or may in the future provide, financial or other services to other parties with interests which the Company or the Parent may regard as conflicting with their respective interests under this Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and the Collateral Documents and may possess information (whether or not material to the Company or the Parent) other than as a result of acting as Trustee and/or the Agents and/or the Collateral Agent hereunder, that the Trustee and/or the Agents and/or the Collateral Agent may not be entitled to share with the Company or the Parent. The Trustee, the Agents and the Collateral Agent will not disclose confidential information obtained from the Company and the Parent (without their respective consent) to any of the Trustee's and/or the Agent's and/or the Collateral Agent's other customers nor will any of them use on the Company's or the Parent's behalf any confidential information obtained from any other customer. Without prejudice to the foregoing, the Company and the Parent agree that the Agent Parties may deal (whether for their own respective or their respective customers' accounts) in, or advise on, securities of

any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of this Indenture, the Notes, the Note Guarantees and the Collateral Documents.

(u) The Trustee shall have no obligation or duty to monitor, supervise, determine or inquire as to the Company's or the Parent's or any other Person's compliance with any provision of this Indenture, the Notes, any Note Guarantee, the Intercreditor Agreement or any Collateral Document.

(v) The Trustee shall not be deemed to have knowledge of any event unless it has been actually notified in writing of such event. In the exercise of its duties, the Trustee shall not be responsible for the verification of the accuracy or completeness of any certification or legal opinion submitted to it pursuant to this Indenture and is entitled to rely exclusively on, and take action based on the information contained in, such certification or legal opinion.

(w) The Trustee shall not be responsible for the performance by any other Person appointed by the Company in relation to the Notes, this Indenture, any Note Guarantee, the Intercreditor Agreement or any Collateral Document and, unless notified in writing to the contrary, shall assume that the same is duly performed. The Trustee shall not be liable to any Holders or any other person for any action taken by the Holders or the Trustee in accordance with the instructions of the Holders.

(x) In all instances in which the Trustee is called upon to exercise its discretion, such discretion shall be absolute and unfettered and the right of the Trustee to perform any discretionary act enumerated shall not be construed as a duty.

(y) Notwithstanding anything else herein contained, the Trustee may refrain without liability from doing anything that would or might in its opinion be contrary to any law of any state or jurisdiction (including but not limited to Hong Kong, the United States of America or any jurisdiction forming a part of it and England & Wales) or any directive or regulation of any agency of any such state or jurisdiction, in each case, applicable to it, and may without liability do anything which is, in its reasonable opinion, necessary to comply with any such law, directive or regulation or is not provided for in this Indenture. The Trustee shall as soon as reasonably practicable, to the extent permitted by applicable laws, notify the Company of such action or inaction related to a request or demand made by the Company to the Trustee. The Trustee shall not be required to take any action under this Indenture, the Notes, the Note Guarantee, the Intercreditor Agreement, any Collateral Document or any related document if taking such action (A) would subject the Trustee to a tax in any jurisdiction where it is not then subject to a tax, or (B) would require the Trustee to qualify to do business in any jurisdiction where it is not then so qualified.

(z) The Trustee shall not have any duty or responsibility in respect of (i) the acquisition or maintenance of any insurance or (ii) the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Collateral.

(aa) If the Trustee requests instructions from the Company or the Holders with respect to any action or omission by it, the Trustee shall be entitled (without incurring any liability therefor) to refrain from taking such action and continue to refrain from acting unless and until the Trustee shall have received such written instructions with respect to such request.

(bb) The Trustee, the Collateral Agent and the Agents shall not be responsible for any loss or damage, or failure to comply or delay in complying with any duty or obligation, under or pursuant to this Indenture arising as a direct or indirect result of any Force Majeure Event or any event where, in the reasonable opinion of the Trustee, the Collateral Agent or the Agents (as the case may be), performance of any duty or obligation under or pursuant to this Indenture would or may be illegal or would result in the Trustee, the Collateral Agent or the Agents (as the case may be) being in breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant

government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Trustee, the Collateral Agent or the Agents (as the case may be) are subject.

Section 7.03 *Individual Rights of Trustee*.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. The Trustee is permitted to engage in other transactions, including normal banking and trustee relationships, with the Company, the Parent and their respective Affiliates and to benefit from them without being obliged to account for profits, if any; *provided*, however, that if it acquires any conflicting interest that may have a prejudicial effect upon the Holders, the Trustee must eliminate such conflict within 90 days or resign. The Trustee and the Agents may have an interest in, may be providing, or may in the future provide financial or other services to other parties. Any Agent and the Collateral Agent may do the same with like rights and duties contained in this Section 7.03. The Trustee is also subject to Section 7.10.

Section 7.04 *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes; it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture; it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication. The Trustee shall not be deemed to be required to calculate any Treasury Rates, Additional Amounts or make-whole amount.

Section 7.05 *Notice of Defaults*.

If a Default or an Event of Default occurs and is continuing and if the Holders of 25% or more in aggregate principal amount of the Notes notified the Trustee in writing of such occurrence, the Trustee will mail to Holders, at the expense of the Company, a notice of the Default or Event of Default within 90 days after it occurs. The Trustee shall not be deemed to have notice or knowledge of a Default or an Event of Default unless and until it has received written notification of such Default or Event of Default describing the circumstances of such, and identifying the circumstances constituting such Default or Event of Default pursuant to Section 4.03(c)(2). None of the Trustee or any Agent is obligated to do anything to ascertain whether any Event of Default or Default has occurred or is continuing and will not be responsible to Holders or any other person for any loss arising from any failure by it to do so, and each of the Trustee and the Agents may assume that no such event has occurred and that the Company and the Parent are performing all of their respective obligations under this Indenture, the Notes and the Note Guarantees unless the Trustee or the Agents, as the case may be, has received written notice of the occurrence of such event or facts establishing that a Default or an Event of Default has occurred or that the Company and the Parent are not performing all of their respective obligations under this Indenture, the Notes and the Note Guarantees. The Trustee or the Agents are entitled to rely on any Opinion of Counsel or Officers' Certificate regarding whether a Default or an Event of Default has occurred.

Section 7.06 *Limitation on Duty of Trustee and Collateral Agent in Respect of Collateral; Indemnification*.

(a) The Trustee and Collateral Agent shall have no duty as to any Collateral in their possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee and Collateral Agent shall not be responsible for filing any financing or continuation statements or recording

any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.

(b) The Trustee and Collateral Agent shall not be responsible for the existence, title, genuineness, protection or value (or the protection of the diminution in value) of any of the Collateral or for the legality, genuineness, validity, perfection, priority of enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, and shall not be responsible for taking any action to protect against any diminution in the value of any Collateral; it being understood that all such obligations shall be the obligations of the Company or the Parent, as the case may be. The Collateral Agent may decline to foreclose on the Collateral or exercise remedies available if they do not receive indemnification and/or security and/or pre-funding to its satisfaction. The Collateral Agent's ability to foreclose on the Collateral may be subject to lack of perfection, the consent of third parties, prior Liens and practical problems associated with the realization of the Collateral Agent's Liens on the Collateral. Neither the Trustee, the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents, will be responsible or liable for the existence, genuineness, value, adequacy or protection of the Collateral, for the legality, genuineness, validity, perfection, priority of enforceability of the Liens, effectiveness or sufficiency of the Collateral Document, for the creation, perfection, priority, sufficiency or protection of any of the Liens, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Liens or the Collateral Documents, or any delay in doing so. The Collateral Agent will not be required to expend their own funds under any circumstances. The Trustee and Collateral Agent shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture or the Collateral Documents by the Company or any Guarantor.

Section 7.07 *Compensation and Indemnity*.

(a) The Company agrees to pay to the Trustee and each Agent from time to time compensation for their acceptance of this Indenture and services hereunder pursuant to a written fee agreement. The Trustee's and each Agent's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company will reimburse the Trustee and each Agent promptly upon request for all properly incurred disbursements, advances and expenses incurred or made by them in addition to the compensation for their services. Such expenses will include the properly incurred compensation, disbursements and expenses of the Trustee's and each Agent's respective agents and counsel and other Persons not regularly within their employ.

(b) The Company agrees to be responsible for and indemnify the Trustee and each Agent and their respective agents, employees, delegates, employees, officers and directors against any and all losses, liabilities or expenses (including legal fees and expenses) incurred by them arising out of or in connection with the acceptance or administration of their duties under this Indenture or any related document, including the properly incurred fees, costs and expenses of enforcing this Indenture against the Company and the Parent (including this Section 7.07) and defending themselves against any claim (whether asserted by the Company, the Parent, any Holder or any other Person) or liability in connection with the exercise or performance of any of their powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to their gross negligence or willful misconduct.

(c) The obligations of the Company under this Section 7.07 and Section 7.02(j) will survive the satisfaction and discharge of this Indenture, the redemption or maturity of the Notes, and the resignation or termination of appointment of the Trustee or each Agent.

(d) To secure the Company's payment obligations in this Section 7.07, the Trustee and each Agent will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal of, premium on, if any, and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture.

(e) For purposes of this Section 7.07, "hereunder" shall be deemed to include this Indenture, the Notes, the Note Guarantees and the Collateral Documents.

(f) If a Default or an Event of Default has occurred or if the Trustee finds it expedient or necessary after attempting to consult with the Company or is requested by the Company to undertake duties which are of an exceptional nature or otherwise outside the scope of the Trustee's normal duties under this Indenture, the Company and the Parent will pay such additional remuneration as they may agree (and which may be calculated by reference to the Trustee's normal hourly rate or such other rate or fees in place from time to time) or, failing such agreement, as determined by an independent financial institution (acting as an expert and not as an arbitrator) selected by the Trustee and, prior to the occurrence of an Event of Default that is continuing, also approved by the Company. The properly incurred expenses involved in such nomination and such financial institution's properly incurred fees will be paid by the Company and the Parent. The determination of such financial institution will be conclusive and binding on the Company, the Parent, the Trustee and the Holders.

Section 7.08 *Replacement of Trustee*.

(a) A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b) The Trustee may resign without giving any reason in writing at any time by giving 45 days' notice and be discharged from the trust hereby created by so notifying the Company. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so providing a 60-day notice to the Trustee and the Company in writing. The Company may remove the Trustee if:

(1) the Trustee fails to comply with Section 7.10;

(2) the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3) a custodian or public officer takes charge of the Trustee or its property; or

(4) the Trustee becomes incapable of acting.

(c) If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d) If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee may, on behalf of and at the expense of, the Company appoint a successor trustee or the retiring trustee, the Company, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e) If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Holders. The retiring Trustee

will as soon as reasonably practicable transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 will continue for the benefit of the retiring Trustee.

Section 7.09 *Successor Trustee by Merger, etc.*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee without the execution or filing of any paper with any Person or any further act on the part of any Person.

Section 7.10 *Eligibility; Disqualification.*

There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of Hong Kong, the United States of America or of any state thereof, the United Kingdom, Mauritius or India) that is authorized under such laws to exercise corporate trustee power.

Section 7.11 *Rights of Trustee in other roles; Collateral Agent.*

All rights, powers and indemnities contained in this Article 7 shall apply to the Trustee in its other roles hereunder and to the Collateral Agent and the Agents, *provided*, *however*, that the Collateral Agent are an agent.

## ARTICLE 8
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01 *Option to Effect Legal Defeasance or Covenant Defeasance.*

The Company may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an Officer's Certificate, elect to have either Section 8.02 or 8.03 be applied to all outstanding Notes upon compliance with the conditions set forth below in the relevant Sections, as the case may be.

Section 8.02 *Legal Defeasance and Discharge.*

Upon the Company's exercise under Section 8.01 of the option applicable to this Section 8.02, the Company and the Guarantors (if any) will, subject to the satisfaction of the conditions set forth in Section 8.04, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Note Guarantees if any) on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Company and the Guarantors (if any) will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Note Guarantees, if any), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 and the other Sections of this Indenture referred to in clauses (a) and (b) below, and to have satisfied all their other obligations under such Notes, the Note Guarantees (if any) and this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(a) the rights of Holders to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to below;

(b) the Company's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(c) the rights (including its rights to payment and indemnification), powers, trusts, duties and immunities of the Trustee, and the Company's and the Guarantors' obligations (if any) in connection therewith; and

(d) the Legal Defeasance and Covenant Defeasance provisions of this Indenture.

Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03.

Section 8.03 *Covenant Defeasance*.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company and the Guarantors (if any) will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from their obligations under the covenants contained in Article 4 (other than Sections 4.01, 4.02, 4.05, 4.06, 4.15 (solely with respect to the Parent and the Company), 4.32 and 4.33), hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Note Guarantees (if any), the Company and the Guarantors (if any) may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01, but, except as specified above, the remainder of this Indenture and such Notes and Note Guarantees (if any) will be unaffected thereby. In addition, upon the Company's exercise under Section 8.01 of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04, Sections 6.01 (c), (d) and (f) will not constitute Events of Default.

Section 8.04 *Conditions to Legal or Covenant Defeasance*.

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03:

(a) the Company must irrevocably deposit with the Trustee (or such other entity designated or appointed (as agent) by it for such purpose), in trust, for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized investment bank, appraisal firm, or firm of independent public accountants, to pay the principal of, premium, if any, and interest on, the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and any amounts payable by the Company under this Indenture and the Collateral Documents, and the Company must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(b) in the case of an election under Section 8.02, the Company must deliver to the Trustee an Opinion of Counsel confirming that:

(1) the Company has received from, or there has been published by, the U.S. Internal Revenue Service a ruling; or

(2) since the Original Issue Date, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c) in the case of an election under Section 8.03, the Company must deliver to the Trustee an Opinion of Counsel confirming that the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d) no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or an Event of Default resulting from the borrowing of funds to be applied to such deposit (and any similar concurrent deposit relating to other Indebtedness) and the granting of Liens securing such borrowing);

(e) such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture and any agreements or instruments governing any other Indebtedness being defeased, discharged or replaced) to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(f) the Company must deliver to the Trustee an Officer's Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or others; and

(g) the Company must deliver to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05 *Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions*.

Subject to Section 8.06, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent), to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company will pay and indemnify the Trustee against any tax, fee, cost or other charge imposed on or assessed against the cash or non-callable Government Securities deposited pursuant to Section 8.04 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Company from time to time upon the request of the Company any money or non-callable Government Securities held by it as provided in Section 8.04 which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be included in the opinion delivered under Section 8.04(1)), are in excess of the amount

thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06 *Repayment to Company*.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium and Additional Amounts if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease.

Section 8.07 *Reinstatement*.

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's and any Guarantors' obligations under this Indenture and the Notes and the Note Guarantees (if any) will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03, as the case may be; *provided, however*, that, if the Company makes any payment of principal of, premium and Additional Amounts if any, or interest on, any Note following the reinstatement of its obligations, the Company will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01 *Without Consent of Holders*.

Notwithstanding Section 9.02, the Company, any Guarantor, the Collateral Agent and the Trustee may amend or supplement this Indenture, the Notes, any Note Guarantee, the Collateral Documents or the Intercreditor Agreement (if any) without the consent of any Holder:

(a) to cure any ambiguity, defect, omission or inconsistency;

(b) to provide for certificated Notes in addition to or in place of uncertificated Notes (provided, that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the U.S. Internal Revenue Code of 1986, as amended);

(c) to provide for the assumption of the Company's or a Guarantor's obligations to the Holders of the Notes or the Note Guarantees by a successor to the Company in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Guarantor's assets, as applicable;

(d) to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights hereunder of any Holder;

(e) to conform the text of this Indenture, the Notes, the Note Guarantees or the Collateral Documents to any provision of the "Description of the Notes" section of the Offering Memorandum to the extent that such provision in that "Description of the Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Note Guarantees, the Collateral Documents or the Intercreditor Agreement (if any);

(f) to provide for the issuance of Additional Notes in accordance with the covenants set forth in this Indenture;

(g) to effect any changes to this Indenture in a manner necessary to comply with the procedures of the relevant clearing system;

(h) to allow a Guarantor to execute a supplemental indenture and/or a Note Guarantee with respect to the Notes or to release a Guarantor from its Note Guarantee in accordance with the terms of this Indenture;

(i) to enter into additional or supplemental collateral documents or to release Collateral from the Lien of this Indenture or the Collateral Documents in accordance with the terms of this Indenture;

(j) to evidence and provide for the acceptance of appointment by a successor Trustee or Collateral Agent;

(k) to enter into any amendment or supplement to or grant any waiver under any Indian Escrow Agreement in order to account for the Incurrence of Subordinated Affiliate Debt and/or Permitted Indebtedness or for any other action which is permitted under or not restricted by this Indenture; or

(l) to enter into an Intercreditor Agreement.

In connection with the matters indicated above, the Trustee and the Collateral Agent shall be entitled to rely absolutely on an Opinion of Counsel and an Officer's Certificate to the effect that the entry into such amendment, supplement or waiver is authorized or permitted by this Indenture, the Notes, any Note Guarantee, the Collateral Documents and the Intercreditor Agreement.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee and the Collateral Agent of the documents described in this Section 9.01, the Trustee and the Collateral Agent will join with the Company and the Guarantors (if any) in the execution of any amendment or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and the Collateral Agent will not be obligated to enter into such amended or supplemental indenture that affects their own rights, duties or immunities under this Indenture or otherwise.

Section 9.02 *With Consent of Holders*.

Except as provided in this Section 9.02, this Indenture, the Notes, any Note Guarantee, the Collateral Documents or the Intercreditor Agreement (if any) may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding (including Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), and any existing Default or Event of Default or compliance with any provision of this Indenture, the Notes, any Note Guarantees, the Collateral Documents or the Intercreditor Agreement (if any) may be waived with the consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding (including Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).

In connection with the matters indicated above, the Trustee and the Collateral Agent shall be entitled to rely absolutely on an Opinion of Counsel and an Officer's Certificate to the effect that the entry into such amendment, supplement or waiver is authorized or permitted by this Indenture, the Notes, any Note Guarantee, the Collateral Documents and the Intercreditor Agreement.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee and the Collateral Agent of the documents described in this Section 9.02, the Trustee will join with the Company and the Guarantors (if any) in the execution of such amendment or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's or the Collateral Agent's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee and the Collateral Agent may in its sole discretion, but will not be obligated to, enter into such amendment or supplemental indenture.

It is not necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company will mail to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver; provided that the foregoing shall not be required if such amendment, supplement or waiver, or such notice, is filed with the SEC. Any failure of the Company to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Sections 6.04 and 6.07, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Company with any provision of this Indenture or the Notes or the Note Guarantees. However, without the consent of Holders holding at least 90% in principal amount of the Notes, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes (including Additional Notes) held by a non-consenting Holder):

(a) reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(b) reduce the principal of or change the fixed maturity of any Note;

(c) change the redemption date or the redemption price of the Notes from that stated under Section 3.07 or Section 3.10;

(d) reduce the rate of or change the currency or change the time for payment of interest, including default interest, on any Note;

(e) waive a Default or an Event of Default in the payment of principal of, or interest or premium, if any, on, the Notes (except a rescission of acceleration of the Notes by the Holders of a majority in aggregate principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(f) reduce the amount payable upon a Change of Control Offer or an Excess Proceeds Repurchase Offer or change the time or manner a Change of Control Offer or an Excess Proceeds Repurchase Offer may be made or by which the Notes must be repurchased pursuant to a Change of Control Offer or an Excess Proceeds Repurchase Offer, in each case after the obligation to make such Change of Control Offer or Excess Proceeds Repurchase Offer has arisen;

(g) permit any Indebtedness to be secured by all or any portion of the Collateral, other than Permitted Pari Passu Secured Indebtedness or otherwise pursuant to a Permitted Lien;

(h) make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders to bring suit for the enforcement of any contractual right to payment, on or after the due date expressed in the Notes;

(i) waive a redemption payment with respect to any Note (other than a payment required by Section 4.10 and Section 4.16);

(j) release any Guarantor from any of its obligations under its Note Guarantee or this Indenture, except as set forth under Section 11.09 and Section 5.01;

(k) release any Collateral from the Lien of this Indenture and the Collateral Documents, except as set forth under Section 10.04;

(l) amend, supplement or grant any waiver under any Indian Escrow Agreement (i) that would adversely impact the priority of payments with respect to the Onshore Debt or the right to receive payments with respect to the Onshore Debt; or (ii) relating to any action or change not permitted under the terms of this Indenture; or

(m) make any change in the preceding amendment and waiver provisions.

Section 9.03 *Supplemental Indenture.*

Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture.

Section 9.04 *Revocation and Effect of Consents.*

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

Section 9.05 *Notation on or Exchange of Notes.*

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06 *Trustee to Sign Amendments, etc.*

The Trustee will sign any amendment or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee; *provided that* the Trustee has received an Officer's Certificate and an Opinion of Counsel pursuant to this Article 9. The Company and any Guarantor may not sign an amended or supplemental indenture until the Board of Directors of the Company and such Guarantor approves it. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.01) will be fully protected in relying upon, in addition to the documents required by Section 13.03, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amendment or supplemental indenture is authorized or permitted by this Indenture, the Notes, any Note Guarantee, the Collateral Documents and the Intercreditor Agreement.

## ARTICLE 10
## COLLATERAL AND SECURITY

Section 10.01 *Security*.

The Company initially appoints HSBC Bank USA, National Association to act as the Collateral Agent pursuant to the Collateral Documents.

The Parent shall, for the benefit of the Holders, the Trustee, the Agents and the Collateral Agent, charge on a first priority basis (subject to the Permitted Liens) the Capital Stock of the Company (the "*Collateral*" and such fixed share charge, the "*Share Charge*"). The Share Charge shall be entered into, and the security interest over the Collateral will be created and perfected, by no later than October 18, 2021.

The Parent shall issue a Mauritian law governed power of attorney, to be dated as of the date of the Share Charge, in favor of the Collateral Agent under which the Collateral Agent will have the right, upon the occurrence and during the continuance of an Event of Default, to replace the Board of Directors of the Company, if necessary, and/or to direct the Board of Directors of the Company to take steps in relation to the Onshore Debt and enforce the Liens and guarantees issued in respect of the Onshore Debt, as may be permitted under the terms of the Onshore Debt, by issuing instructions to the Onshore Debt Trustee (the "*Parent Power of Attorney*"). The Company shall issue a Mauritian law governed power of attorney, to be dated as of the Original Issue Date and effective from (and including) the date on which the Existing Notes are to be refinanced, substantially in the form set out in Exhibit K, in favor of the Collateral Agent under which the Collateral Agent will have the right, upon the occurrence and during the continuance of an Event of Default, to take steps as may be permitted under the terms of the Onshore Debt, to accelerate and enforce the Onshore Debt and enforce the Liens and guarantees issued in respect of the Onshore Debt by issuing instructions to the Onshore Debt Trustee (the "*Company Power of Attorney*" and, together with the Parent Power of Attorney, the "*Powers of Attorney*"; the Share Charge and the Powers of Attorney collectively, the "*Collateral Documents*").

The due and punctual payment of the principal of and premium and Additional Amounts, if any, on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and interest and Additional Amounts (to the extent permitted by law), if any, on the Notes and performance of all other obligations of the Company to the Holders or the Trustee, the Agents and the Collateral Agent under this Indenture and the Notes, according to the terms hereunder or thereunder, are secured as provided in the Collateral Documents which the Company and the Parent, the Trustee and the Collateral Agent have entered into simultaneously with the execution of this Indenture. Each Holder, by its acceptance of a Note, consents and agrees to the terms of the Collateral Documents (including, without limitation, the provisions providing for foreclosure and release of the Collateral) as the same may be in effect or may be amended from time to time in accordance with its terms and authorizes and directs the Collateral Agent to enter into the Collateral Documents and to perform its obligations and exercise its rights thereunder in accordance therewith. The Company and the Parent will deliver to the Trustee copies of all documents delivered to the Collateral Agent pursuant to the Collateral Documents, and will do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Collateral Documents, to assure and confirm to the Trustee and the Collateral Agent the security interest in the Collateral contemplated hereby, by the Collateral Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. The Parent will take any and all actions reasonably required to cause the Collateral Documents to create and maintain, as security for the obligations of the Company hereunder, a valid and enforceable perfected first priority Lien in and on all the Collateral, in favor of the Collateral Agent for the benefit of the Holders, superior to and prior to the rights of all third Persons and subject to no other Liens than Permitted Liens.

For the avoidance of doubt, except for the safe custody and preservation of the Collateral in its possession and the accounting for monies actually received by it, the Collateral Agent shall have no other duty as to the Collateral applicable to it, except as provided in the applicable Collateral Documents. The Collateral Agent shall be deemed to have provided safe custody and preservation of the applicable Collateral in its possession if such Collateral is accorded treatment substantially equal to that which such Collateral Agent holds similar property as a third party agent, unless otherwise provided in the Collateral Documents.

Section 10.02 *[Reserved]*.

Section 10.03 *Priorities of Proceeds from Enforcement of Security*.

The first-priority Liens over the Collateral will be granted to the Collateral Agent. The Collateral Agent will hold such Liens and security interests in the Collateral granted pursuant to the Collateral Documents with sole authority as directed by the written instruction of any Pari Passu Secured Party to, subject to the terms of the Intercreditor Agreement, to exercise remedies under the Collateral Documents upon the occurrence and during the continuance of an Event of Default, provided that, in the case of the counterparties under Hedging Obligations Incurred by the Issuer, such written instructions shall be given by or on behalf of such counterparties collectively representing more than 50% of the Hedging Obligations Incurred by the Issuer outstanding at such time. The Collateral Agent has agreed to act as secured party on behalf of the Pari Passu Secured Parties under the Collateral Documents, to follow the instructions provided to it under the Intercreditor Agreement and the Collateral Documents and to carry out certain other duties.

The Collateral Agent may decline to foreclose on the Collateral, or exercise remedies available if it does not receive indemnification and/or security and/or pre-funding to its satisfaction. In addition, the Collateral Agent's ability to foreclose on the Collateral may be subject to lack of perfection, the consent of third parties, prior Liens and practical problems associated with the realization of the Collateral Agent's Liens on the Collateral. None of the Collateral Agent nor the Trustee, nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value, adequacy or protection of the Collateral, for the legality, enforceability, effectiveness or sufficiency of the Collateral Documents, for the creation, perfection, priority, sufficiency or protection of any of the Liens, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Liens or the Collateral Documents, or any delay in doing so.

Each of this Indenture and the Collateral Documents provides that the Company and the Parent will be jointly and severally responsible for and indemnify the Collateral Agent and the Trustee for all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind imposed against the Collateral Agent arising out of the Collateral Documents except to the extent that any of the foregoing are finally judicially determined to have resulted from the gross negligence or willful misconduct of the Collateral Agent.

(a) [*Reserved*].

(b) All payments received and all amounts held by the Collateral Agent in respect of the Collateral under the Collateral Documents will, in accordance with the terms of the Intercreditor Agreement (if in effect), be applied as follows:

*first,* to the Trustee, the Collateral Agent, the Agents and to the extent applicable, any representative of holders of any Permitted Pari Passu Secured Indebtedness, to the extent necessary to reimburse the Trustee, the Collateral Agent, the Agents and any such representative for any unpaid fees, costs and expenses (including any fees and expenses of legal counsel) incurred in connection with the collection or distribution of such amounts held or realized or in connection with expenses (including any fees and expenses of legal counsel) incurred in enforcing its remedies under the Collateral

Documents and preserving the Collateral and all amounts for which the Trustee, the Collateral Agent, the Agents and any such representative are entitled to indemnification under the Collateral Documents and the Intercreditor Agreement;

*second,* on a *pro rata* and *pari passu* basis to the counterparties under Hedging Obligations Incurred by the Company (other than any Defaulting Hedging Providers) under Section 4.09(a)(5) of the definition of Permitted Indebtedness;

*third,* to the Trustee for the benefit of Holders and, to the extent applicable, holders of any other Permitted Pari Passu Secured Indebtedness (or their representative) (other than the counterparties under Hedging Obligations Incurred by the Issuer and any Defaulting Hedging Providers) on a *pro rata* and *pari passu* basis;

*fourth,* to any Defaulting Hedging Providers on a *pro rata* and *pari passu* basis; and*fifth,* any surplus remaining after such payments will be paid to the Company or whomever may be lawfully entitled thereto.

Section 10.04 *Release of Collateral.*

(a) The Liens created by this Indenture and the Collateral Documents will be released upon (1) the full and final payment and performance of the Obligations of the Company under this Indenture and the Notes or (2) legal or covenant defeasance pursuant to Article 8 or discharge of this Indenture in accordance with Article 12.

(b) The Trustee shall, if so directed by the Parent, authorize the Collateral Agent to execute, deliver or acknowledge any necessary or proper instruments of termination, satisfy or release to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Documents, as may be reasonably requested by the Parent.

(c) At any time when a Default or an Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent:

(1) all rights of the Parent and the Company to receive all or claim payment of cash dividends and other payments made upon or with respect to the Collateral will cease and such cash dividends and other payments will be paid to the Collateral Agent;

(2) all voting or other consensual rights pertaining to the Collateral will become vested solely in the Collateral Agent, and the right of the Parent to exercise any such voting and consensual rights will cease; and

(3) the Collateral Agent may distribute or sell the Collateral or any part of the Collateral in accordance with the terms of the Collateral Documents and the Intercreditor Agreement, subject to the provisions of applicable law. The Collateral Agent, in accordance with the Intercreditor Agreement, will distribute all funds distributed under the Collateral Documents in connection with the Collateral and received by the Collateral Agent for the benefit of the Permitted Pari Passu Secured Indebtedness creditors and the Holders.

(d) The release of the Collateral from the terms of this Indenture and the Collateral Documents will not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to the terms of the Collateral Documents.

Section 10.05 *Certificate of the Parent.*

The Parent or the Company shall furnish to the Collateral Agent and the Trustee on or prior to any proposed releases of Collateral an Officer's Certificate certifying and an Opinion of Counsel stating that such release shall comply with the terms of this Indenture, the Intercreditor Agreement, if any, the Notes, any Note Guarantee and the relevant Collateral Documents. Certificates of the Trustee.

If the Company wishes to release the Collateral in accordance with the Collateral Documents and has delivered the certificates and documents required by the Collateral Documents and Sections 10.04, 10.05 and 10.06 to the Trustee, the Trustee will, based on such certification and, if applicable, the Opinion of Counsel delivered pursuant to Section 10.05, instruct the Collateral Agent to release the Collateral.

Section 10.06 *Authorization of Actions to Be Taken by the Trustee Under the Collateral Documents*.

The Trustee may (without obligation), in its sole discretion and without the consent of the Holders, direct, on behalf of the Holders, the Collateral Agent to, take all actions it deems necessary or appropriate in order to:

(a) enforce any of the terms of the Collateral Documents; and

(b) collect and receive any and all amounts payable in respect of the obligations of the Company hereunder.

The Trustee will have power (without obligation) to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or of the Trustee).

Section 10.07 *Authorization of Receipt of Funds by the Trustee Under the Collateral Documents*.

The Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Collateral Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

Section 10.08 *Termination of Security Interest*.

(a) Upon the payment in full of all Obligations of the Company under this Indenture and the Notes, or upon Legal Defeasance, Covenant Defeasance or a satisfaction and discharge pursuant to Article 12, the Company will deliver a certificate to the Collateral Agent and the Trustee stating that such Obligations have been paid in full, and direct the Trustee to instruct the Collateral Agent to release the Liens pursuant to this Indenture and the Collateral Documents.

(b) [Reserved].

Section 10.09 *Certain Rights of Collateral Agent*.

(a) The Collateral Agent's duties under the respective Collateral Documents are solely mechanical and administrative in nature. The Collateral Agent shall have no other duties save as expressly provided for in the respective Collateral Documents and this Indenture.

(b) The Collateral Agent may act in relation to the Collateral Documents, respectively, through their Affiliates, officers, employees and agents and the Collateral Agent shall not be liable for any error of judgment made by any such person.

(c) The Collateral Agent is not obliged to do or omit to do anything if it would or might in their opinion constitute a breach of any law or duty of confidentiality.

(d) The Collateral Agent is not responsible for the adequacy, accuracy and/or completeness of any information supplied by the Parent, the Company or any other person, as applicable, given in or in connection with the Collateral Documents.

(e) The Collateral Agent shall not be bound to enquire:

(1) whether or not any Default or Event of Default has occurred;

(2) as to the performance, default or any breach by any party of its obligations under any of the Collateral Documents; or

(3) whether any other event specified in any of the Collateral Documents has occurred.

(f) The Collateral Agent shall be obligated to perform such duties and only such duties as are specifically set forth in this Indenture, the Intercreditor Agreement and the other Collateral Documents to which it is a party, and no implied duties or obligation shall be read against the Collateral Agent. The Collateral Agent shall not be liable for any cost, loss or liability incurred by any person as a consequence of the Collateral Agent having taken or having omitted to take any action under or in connection with the respective Collateral Documents to which they are a party to, unless directly caused by the Collateral Agent's fraud, gross negligence or willful misconduct;

(g) The Collateral Agent shall not be liable for any failure to:

(1) require the deposit with it of any deed or document certifying, representing or constituting the title of the Parent in respect of the Collateral;

(2) obtain any license, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any of the Collateral Documents;

(3) register, file or record or otherwise protect any of the Collateral created under any of the Collateral Documents under any applicable laws in any jurisdiction or to give notice to any person of the execution of any of the Collateral Documents;

(4) take any steps to perfect its title to any of the Collateral, or to render the security effective or to secure the creation of any ancillary security under the laws of any jurisdiction; or

(5) require any further assurances in relation to any of the Collateral Documents.

(h) The Collateral Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that the Parent or the Company may have to the Collateral, and shall not be liable for or bound to require the Parent or the Company, as the case may be, to remedy any defect in its right or title.

(i) The Collateral Agent may delegate by power of attorney or otherwise to any person all or any of the rights, powers and discretions vested in them by the Collateral Documents. The Collateral

Agent shall not be bound to monitor or supervise, or be in any way responsible for any loss incurred by reason of any acts, omissions, misconduct or default on the part of any such delegate or sub-delegate selected with due care.

(j) The Collateral Agent is not responsible for and will make no investigation as to the title, ownership, value, sufficiency or existence of the Collateral.

(k) The Collateral Agent is not responsible for and will make no investigation as to the existence, accuracy or sufficiency of any legal or other opinions, searches, reports, certificates, valuations or investigations given or required in connection with the Collateral.

(l) The Collateral Agent is not responsible for the creditworthiness or solvency of the Parent or the Company.

(m) The Collateral Agent shall have no obligation or duty to monitor, supervise, determine or inquire as to the performance (financial or otherwise) of the Parent or the Company, or the Parent's or the Company's performance of, or failure to perform, the obligations, duties and covenants set forth in any of the Collateral Documents.

(n) The Collateral Agent is entitled to seek directions as to the exercise of any of their powers from the Trustee and to seek clarification of any instruction previously given and shall incur no liability for any action they take or refrains from taking in accordance with the directions of the Trustee. The Collateral Agent is entitled to refrain from acting if they receive unclear, inconsistent or conflicting instructions.

(o) Nothing in the Collateral Documents shall be construed to relieve the Collateral Agent from liability for its own fraud, gross negligence or willful misconduct.

(p) The Company and the Parent agree to jointly and severally pay to the Collateral Agent from time to time compensation for their acceptance of this Indenture and of the Collateral Documents and services under this Indenture and the Collateral Documents pursuant to a written fee agreement. The Collateral Agent's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company and the Parent will jointly and severally reimburse the Collateral Agent promptly upon request for all properly incurred disbursements, advances and expenses incurred or made by them in addition to the compensation for their services. Such expenses will include the properly incurred compensation, disbursements and expenses of the Collateral Agent's agents, counsel and other Persons not regularly within their employ.

(q) The Company and the Parent agree to be jointly and severally responsible for and indemnify the Collateral Agent and its agents, employees, delegates, employees, officers and directors against any and all losses, liabilities or expenses (including legal fees and expenses) incurred by them arising out of or in connection with the acceptance or administration of their duties under this Indenture, the Notes, the Intercreditor Agreement and the Collateral Documents, including the properly incurred fees, costs and expenses of enforcing the Collateral Documents against the Company and the Parent and defending themselves against any claim (whether asserted by the Company, the Parent, any Holder or any other Person) or liability in connection with the exercise or performance of any of their powers or duties thereunder, except to the extent any such loss, liability or expense may be attributable to their gross negligence, fraud or willful misconduct.

(r) The obligations of the Company and the Parent under Sections 10.10(p) to (s) and Section 7.02(j) will survive the satisfaction and discharge of this Indenture, the redemption or maturity of the Notes, and the resignation or termination of appointment of the Collateral Agent.

(s) To secure the Company's and the Parent's payment obligations in Sections 10.10(p) to (s), the Collateral Agent will have a Lien prior to the Notes on all money or property held or collected

by the Collateral Agent, except that held in trust to pay principal of, premium on, if any, and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture.

The Collateral Agent may at any time resign by giving written notice of its resignation but without giving any reason to the Company and the Trustee and specifying the date on which its resignation shall become effective; *provided that* such date shall be at least 45 days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, if required by this Indenture, the Company shall promptly appoint a successor collateral agent by written instrument substantially in the form hereof in triplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Collateral Agent, one copy to the successor collateral agent and one copy to the Trustee. Upon the effectiveness of the appointment of a successor collateral agent, the retired Collateral Agent shall have no further obligations under this Indenture.

If no successor is appointed by the Company within 30 days of the resignation of the Collateral Agent, (i) the retiring Collateral Agent may, on behalf of and at the expenses of the Company, appoint its successor or (ii) the retiring Collateral Agent or the Company may petition any court of competent jurisdiction for the appointment of a successor collateral agent.

If the Collateral Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor collateral agent without the execution or filing of any paper with any Person or any further act on the part of any Person.

## ARTICLE 11
## NOTE GUARANTEES

Section 11.01 *Guarantee*.

(a) Each Guarantor (whether originally a signatory hereto or that is added pursuant to a supplemental indenture hereafter) fully and unconditionally and jointly and severally guarantees to each Holder and to the Trustee (1) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all payment obligations of the Company under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest, premium or Additional Amounts, if any, on the Notes and all other monetary obligations of the Company under this Indenture and the Notes within applicable grace periods and (2) the full and punctual performance within applicable grace periods of all other obligations of the Company whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "*Guaranteed Obligations*"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from such Guarantor, and that such Guarantor shall remain bound under this Article 11 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b) Each Guarantor waives presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of each Guarantor hereunder shall not be affected by (1) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (2) any extension or renewal of any thereof; (3) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (4) the failure of any Holder or the Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (5) any change in the ownership of any Guarantor.

(c) Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Company first be used and depleted as payment of the Company's or their obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Company be sued prior to an action being initiated against such Guarantor.

(d) Each Guarantor further agrees that its Note Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e) Except as expressly set forth in Sections 8.02 and 11.02, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Guarantor or would otherwise operate as a discharge of such Guarantor as a matter of law or equity.

(f) Except as expressly set forth in Sections 8.02 and 11.09, each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Company or otherwise.

(g) In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Company to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Holders or the Trustee an amount equal to the sum of (1) the unpaid principal amount of such Guaranteed Obligations, (2) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by law) and (3) all other monetary obligations of the Company to the Holders and the Trustee.

(h) Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 11.01.

(i) Each Guarantor also agrees to pay any and all costs and expenses (including attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 11.01.

Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

Section 11.02 *Limitation on Liability*.

Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by each Guarantor shall not exceed the maximum amount that can be hereby guaranteed by such Guarantor without rendering the Note Guarantee voidable under applicable law relating to fraudulent conveyance.

Section 11.03 *Successors and Assigns*.

This Article 11 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 11.04 *No Waiver*.

Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 11 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 11 at law, in equity, by statute or otherwise.

Section 11.05 *Subrogation*.

Upon making any payment with respect to any obligation of the Company under this Article, the Guarantor will be subrogated to the rights of the payee against the Company with respect to such obligation.

Section 11.06 *Modification*.

No modification, amendment or waiver of any provision of this Article 11, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless made in accordance with Article 9 hereof and unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 11.07 *Execution of Supplemental Indenture for Future Guarantors*.

The Parent and the Company shall cause each Restricted Subsidiary which is required to become a Guarantor pursuant to Section 4.21 to promptly execute and deliver to the Trustee a supplemental indenture in the form attached as Exhibit D pursuant to which such Restricted Subsidiary shall become a Guarantor under this Article 11 and shall guarantee the Guaranteed Obligations. Concurrently with the execution and delivery of such supplemental indenture, in addition to the opinions and certifications to be delivered pursuant to Article 9 hereof, the Company shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Restricted Subsidiary and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a

proceeding at law or in equity, the Note Guarantee of such Guarantor is a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms and or to such other matters as the Trustee may reasonably request.

Section 11.08 *Non-Impairment*.

The failure to endorse a Note Guarantee on any Note shall not affect or impair the validity thereof.

Section 11.09 *Releases*.

(a) The Note Guarantees will be released and discharged upon any of the following events:

(1) repayment in full of the Notes;

(2) Legal Defeasance or Covenant Defeasance in accordance with Article 8 or satisfaction and discharge of this Indenture in accordance with Article 12; and

(3) in the case of a Note Guarantee from a Restricted Subsidiary that is sold in a Qualified Restricted Subsidiary Sale, such Qualified Restricted Subsidiary Sale and (iv) in the case of a Note Guarantee created pursuant to Section 4.21, the release or discharge of the Guarantee that resulted in the creation of such Note Guarantee pursuant to this Article 11 except a discharge or release by or as a result of payment under such Guarantee; and

(b) No release and discharge of a Guarantor from its Note Guarantee shall be effective against the Trustee, any Agent or the Holders until the Company shall have delivered to the Trustee and the Collateral Agent an Officer's Certificate stating that all conditions precedent provided for in this Indenture, the Notes, any Note Guarantee, the Intercreditor Agreement and the Collateral Documents relating to such release and discharge have been complied with and that such release and discharge is authorized and permitted under this Indenture and the Collateral Documents. At the request and expense of the Company, the Trustee shall execute and deliver an instrument evidencing such release and discharge and do all such other acts and things necessary to release the Guarantor from its obligations hereunder.

## ARTICLE 12
## SATISFACTION AND DISCHARGE

Section 12.01 *Satisfaction and Discharge*.

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(a) either:

(1) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company, have been delivered to the Paying Agent for cancellation; or

(2) all Notes that have not been delivered to the Paying Agent for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee (or such other entity designated or appointed (as agent) by it for such purpose) as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government

Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Paying Agent for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption, as the case may be;

(b) the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound (other than with respect to the borrowing of funds to be applied concurrently to make the deposit required to effect such satisfaction and discharge or any similar concurrent deposit relating to other Indebtedness, and in each case the granting of Liens to secure such borrowings);

(c) the Company or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture, the Notes, any Note Guarantee, the Collateral Documents and the Intercreditor Agreement; and

(d) the Company has delivered written irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be.

In addition, the Company must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to sub clause (2) of clause (a) of this Section 12.01, the provisions of Sections 12.02 and 8.06 will survive. In addition, nothing in this Section 12.01 will be deemed to discharge those provisions of Section 7.07, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 12.02 *Application of Trust Money*.

Subject to the provisions of Section 8.06, all money deposited with the Trustee pursuant to Section 12.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent), to the Persons entitled thereto, of the principal and premium and Additional Amounts, if any, and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with this Section 12.02 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01; *provided that* if the Company has made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## ARTICLE 13
## MISCELLANEOUS

Section 13.01 *Notices*.

Any notice or communication by the Company, the Parent, any Guarantor or the Trustee to the others is duly given if in writing and delivered in person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company, the Parent or any Guarantor:

Azure Power Energy Ltd
AAA Global Services Ltd
1st Floor, The Exchange
18 Cybercity, Ebene
Mauritius

Fax: +230 454 3202
Attention: Yung Oy Pin Lun Leung, Director

If to the Trustee:

HSBC Bank USA, National Association
Issuer Services
452 Fifth Avenue
New York, NY 10018
Attention: Client Services Delivery
Fax: 212-525-1300
Email: ctlanydealmanagement@us.hsbc.com

The Company, the Parent, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it will mail a copy to the Trustee and each Agent at the same time.

When the Trustee or any Agent acts on any information, instructions, communications,(including, but not limited to, communications with respect to the delivery of securities or the wire transfer of funds) sent by facsimile, email or other form of electronic or data transmission, the Trustee or Agent, as applicable, absent gross negligence, shall not be responsible or liable in the event such communication is not an authorized or authentic communication of the Company or is not in the form the Company sent or intended to send (whether due to fraud, distortion or otherwise). The Company shall indemnify the Trustee and each Agent against any loss, liability, claim or expense (including legal fees and expenses) it may incur with its acting in accordance with any such communication.

Section 13.02 *[Reserved]*.

Section 13.03 *Certificate and Opinion as to Conditions Precedent*.

Upon any request or application by the Company to the Trustee or any Collateral Agent to take any action under this Indenture, the Company shall furnish to the Trustee or any Collateral Agent, as applicable:

(a) an Officer's Certificate in form and substance reasonably satisfactory to the Trustee or any Collateral Agent, as applicable (which must include the statements set forth in Section 13.04) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture, the Notes, any Note Guarantee, any Collateral Documents and the Intercreditor Agreement relating to the proposed action have been satisfied and such action is authorized and permitted by this Indenture, the Notes, any Note Guarantee, any Collateral Documents and the Intercreditor Agreement; and

(b) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee or any Collateral Agent, as applicable (which must include the statements set forth in Section 13.04) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied and such action is authorized and permitted by this Indenture, the Notes, any Note Guarantee, any Collateral Documents and the Intercreditor Agreement.

Section 13.04 *Statements Required in Certificate or Opinion*.

Each certificate or opinion furnished pursuant to Section 13.03 must include:

(a) a statement that the Person making such certificate or opinion has read such covenant or condition and documents related to such action;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied and such action is authorized and permitted; and

(d) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied and such action is authorized and permitted.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person (including in any Officer's Certificate or Opinion of Counsel), it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Section 13.05 *Rules by Trustee and Agents*.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.06 *No Personal Liability of Incorporators, Promoters, Directors, Officers, Employees and Stockholders*.

No incorporator, promoter, director, officer, employee or stockholder of the Company or the Parent, as such, will have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, any Note Guarantee, the Collateral Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives

and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under U.S. federal securities laws.

Section 13.07 *Governing Law*.

The laws of the State of New York will govern and be used to construe this Indenture, the Notes and the Note Guarantees.

Section 13.08 *Adverse Interpretation of Other Agreements*.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company, the Parent or any other Restricted Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.09 *Successors*.

All agreements of the Company in this Indenture and the Notes will bind its respective successors. All agreements of the Trustee in this Indenture will bind its successors. All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 11.05.

Section 13.10 *Severability*.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 13.11 *Counterpart Originals*.

The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement. The exchange of signature pages of this Indenture by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original executed Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes. Facsimile, documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Indenture and any related document, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. The parties agree that this Indenture, any addendum or amendment hereto or any related document necessary may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act and any applicable state law. Electronic signature shall mean any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record. Any document accepted, executed or agreed to in conformity with such laws will be binding on all parties hereto to the same extent as if it were physically executed and each party hereby consents to the use of any third party electronic signature capture service providers as may be reasonably chosen by a signatory hereto.

Section 13.12 *Table of Contents, Headings, etc.*

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 13.13 *Patriot Act*.

The parties hereto acknowledge that in order to help the United States government fight the funding of terrorism and money laundering activities, Section 326 of the USA PATRIOT Act which became effective on October 1, 2003 requires all financial institutions to obtain, verify, record and update information that identifies each person establishing a relationship or opening an account with such financial institution. The parties hereto agree that they will provide to the Trustee, the Collateral Agent and the Agents such information as they may request, from time to time, in order for them to satisfy the requirements of the USA PATRIOT Act or any other laws of the United States related to the fighting the funding of terrorism and money laundering activities, including but not limited to the name, address, tax identification number, if any, and other information that will allow it to identify the individual or entity who is establishing the relationship or opening the account and may also ask for formation documents such as articles of incorporation or other identifying documents to be provided.

Section 13.14 *Submission to Jurisdiction; Waiver of Jury Trial*.

The Company, the Parent and each Guarantor hereby submit to the non-exclusive jurisdiction of the U.S. federal and New York state courts in the borough of Manhattan in the city of New York in any suit or proceeding arising out of or relating to this Indenture or the transactions contemplated hereby. The Company, the Parent and each Guarantor irrevocably and unconditionally waive any objection to the laying of venue of any suit or proceeding arising out of or relating to this Indenture, the Note Guarantees, the Notes and any of the transactions contemplated hereby or thereby in federal and state courts in the borough of Manhattan in the city of New York and irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such suit or proceeding in any such court has been brought in an inconvenient forum. The Company, the Parent and each Guarantor irrevocably appoint Cogency Global Inc., located at 122 East 42nd Street, 18th floor, New York, NY 10168, as its authorized agent in the borough of Manhattan in the city of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such agent, and written notice of said service to the company by the person serving the same to the address provided in Section 13.01, shall be deemed in every respect effective service of process upon the company or any guarantor, as the case may be, in any such suit or proceeding. The Company, the Parent and each Guarantor further agree to take any and all action as may be necessary to maintain such designation and appointment of such agent in full force and effect so long as the Notes are outstanding. Nothing herein shall affect the right of the Trustee or any Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company, the Parent or the Guarantors in any other jurisdiction.

Each party hereto hereby waives its rights to a jury trial of any claim or cause of action based upon or arising out of this Indenture, the Notes, the Note Guarantees, or the transactions contemplated hereby or thereby. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. This Section 13.14 has been fully discussed by each of the parties hereto and these provisions shall not be subject to any exceptions. Each party hereto hereby further warrants and represents that such party has reviewed this waiver with its legal counsel, and that such party knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. This waiver is irrevocable, meaning that it may not be modified either orally or in writing, and this waiver shall apply to any subsequent amendments, supplements or modifications to (or assignments of) this Indenture. In the event of litigation, this Indenture may be filed as a written consent to a trial (without a jury) by the court.

To the extent that either the Company, the Parent or any Guarantor has or hereafter may acquire any sovereign or other immunity from jurisdiction of any court or from any legal process with respect to itself or its property, each of the Company, the Parent and the Guarantors irrevocably waives such immunity in respect of its obligations hereunder or under any Note, any Note Guarantee or any Collateral Document, as applicable.

[*Signatures on following page*]

Dated as of August 19, 2021

**AZURE POWER ENERGY LTD**
as the Company

By: _____
Name:
Title:

**AZURE POWER GLOBAL LIMITED**
as the Parent

By: _____
Name:
Title:

**HSBC BANK USA,**
**NATIONAL ASSOCIATION**
as Trustee and Collateral Agent

By: _____
Name:
Title:

# EXHIBIT A

## FORM OF NOTE

## [FACE OF NOTE]

CUSIP: [05502V AA1 / V0002U AA5]

ISIN: [US05502VAA17 / USV0002UAA52]

Common Code: [237768736 / 237768752]

3.575% Senior Notes due 2026

No. ___US$_____

Azure Power Energy Ltd promises to pay to Cede & Co or its registered assigns the principal sum of _____U.S. DOLLARS on August 19, 2026.

Interest Payment Dates: February 19 and August 19

Record Dates: February 4 and August 4

Dated: [●]

109

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by the duly authorized officer referred to below.

Dated: _____

AZURE POWER ENERGY LTD, as Company

By: _____
Name:
Title:

**Certificate of Authentication**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated: _____

HSBC Bank USA, National Association,

as Trustee

By : _____
Name :
Title :

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) *INTEREST*. Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius (the "*Company*"), promises to pay interest on the principal amount of this Note at 3.575% per annum from February 19, 2022 until maturity. The Company will pay interest semiannually in arrears on February 19 and August 19 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided that* if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; *provided further* that the first Interest Payment Date shall be February 19, 2022. The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% per annum in excess of the rate then in effect to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

(2) *METHOD OF PAYMENT*. The Company will pay interest on the Notes (except defaulted interest) to the Holders of record at the close of business on February 4 or August 4 immediately preceding the Interest Payment Date, even if such Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium and Additional Amounts if any, and interest at the office or agency of the Company maintained for such purpose within or without the City and State of New York, or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders or by wire transfer; *provided that* payment by wire transfer of immediately available funds will be required with respect to principal of and interest, premium on, all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Company or the Paying Agent and provided further that interest payable on the Notes held through DTC will be available to DTC participants on the Business Day following the payment thereof. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3) *PAYING AGENT AND REGISTRAR*. HSBC Bank USA, National Association will act as initial Paying Agent, Transfer Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company, the Parent or any other Restricted Subsidiaries may act in any such capacity.

(4) *INDENTURE AND COLLATERAL DOCUMENTS*. The Company issued the Notes under an Indenture dated as of August 19, 2021 (the "*Indenture*") among the Company, the Parent, the Trustee and the Collateral Agent. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture.

To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are secured obligations of the Company. The Notes are secured by the Collateral pursuant to the Collateral Documents referred to in the Indenture. The Indenture does not limit the aggregate principal amount of Notes that may be issued thereunder.

(5) *OPTIONAL REDEMPTIONS.*

(a) At any time prior to August 19, 2023 upon not less than 30 nor more than 60 days' prior notice, the Company may, on any one or more occasions, redeem up to 40% of the aggregate principal amount of Notes issued under the Indenture at a redemption price of 103.575% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to (but not including) the applicable redemption date, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; *provided that*:

(1) at least 60% of the aggregate principal amount of Notes issued on the Original Issue Date (excluding Notes held by the Parent or its Subsidiaries) remains outstanding immediately after the occurrence of such redemption; and

(2) the redemption occurs within 90 days of the date of the closing of such Equity Offering.

(b) At any time prior to August 19, 2023, upon not less than 30 nor more than 60 days' prior notice, the Company may, on any one or more occasions, redeem all or any portion of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed, plus the Applicable Premium as of, and accrued and unpaid interest, if any, to (but not including), the applicable redemption date, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Interest Payment Date. Neither the Trustee nor any of the Agents shall be responsible for verifying or calculating the Applicable Premium.

(c) At any time on or after August 19, 2023, upon not less than 30 nor more than 60 days' prior notice, the Company may, on any one or more occasions, redeem all or any portion of the Notes at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed to (but not including) the applicable redemption date, if redeemed during the periods indicated below, subject to the rights of Holders on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Period | Redemption Price |
|---|---|
| From August 19, 2023 to August 18, 2024 | 101.7875% |
| From August 19, 2024 to August 18, 2025 | 100.89375% |
| On or after August 19, 2025 | 100.000% |

Unless the Company defaults in the payment of the applicable redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

Any redemption conducted pursuant to Section 3.07 of the Indenture and any related notice of redemption may, at the Company's discretion, be subject to one or more conditions precedent. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice may state that, in the Company's discretion, the redemption date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption may not occur and

such notice may be rescinded if any or all such conditions shall not have been satisfied by the redemption date, or by the redemption date so delayed.

(6) *MANDATORY AMORTIZATION REDEMPTION.*

The Notes are subject to partial mandatory amortization redemptions (each, a "*Mandatory Amortization Redemption*") on each of the dates shown below (each such date, an "*Amortization Date*") and the redemption price shall be the principal amount thereof, plus accrued and unpaid interest to, but not including, the applicable Amortization Date (subject to the right of Holders on the relevant Record Date to receive interest due on such date). The amount of Notes to be redeemed on a particular Amortization Date shall be equal to the product of (x) the applicable Amortization Percentage on the applicable Amortization Date set forth in the table below times (y) the principal amount of Notes issued on the Original Issue Date. Each Mandatory Amortization Redemption will be done on a *pro rata* basis consistent with Section 3.02 of the Indenture. No notice of Mandatory Amortization Redemptions will be required to be delivered to the Holders.

| Amortization Date | Amortization Percentage |
| --- | --- |
| February 19, 2022 | 1.55% |
| August 19, 2022 | 1.19% |
| February 19, 2023 | 1.19% |
| August 19, 2023 | 1.34% |
| February 19, 2024 | 1.34% |
| August 19, 2024 | 1.48% |
| February 19, 2025 | 1.48% |
| August 19, 2025 | 1.67% |
| February 19, 2026 | 1.67% |
| August 19, 2026 | All remaining outstanding principal amounts |

Any notice of redemption pursuant to this Section 6 shall be in the form set forth in Section 3.03 of the Indenture.

(7) *MCS AMORTIZATION REDEMPTION.*

The Notes are subject to partial mandatory cash sweep ("*MCS*") amortization redemptions (each, an "*MCS Amortization Redemption*") on each of the dates shown below (each such date, an "*MCS Amortization Redemption Date*") and the redemption price shall be the principal amount thereof, plus accrued and unpaid interest to, but not including, the applicable MCS Amortization Redemption Date (subject to the right of Holders on the relevant Record Date to receive interest due on such date). The amount of Notes to be redeemed on a particular MCS Amortization Redemption Date (such amount, the "*MCS Amount*") shall be equal to the product of (x) the applicable MCS Amortization Percentage on the applicable MCS Amortization Redemption Date set forth in the table below times (y) the principal amount of Notes issued on the Original Issue Date. To the extent that an MCS Amortization Redemption is not made on the relevant MCS Amortization Redemption Date or is made in an amount less than the MCS Amount payable on the applicable MCS Amortization Redemption Date, such unpaid amount(s) will be carried forward to the next MCS Amortization Redemption Date and will be added to the applicable MCS Amount to be paid on such next MCS Amortization Redemption Date. Any such amounts shall be carried forward into each subsequent period until paid or until the Notes have been redeemed in full. An MCS Amortization Redemption that is not made on the relevant MCS Amortization Redemption Date will not constitute a Default or an Event of Default.

Each MCS Amortization Redemption will be done on a *pro rata* basis consistent with Section 3.02 of the Indenture. In the event of an MCS Amortization Redemption, the Company will deliver a notice of the MCS Amortization Redemption to Holders (copying the Trustee and the Paying Agent) no later than 15 Business Days prior to the payment under such MCS Amortization Redemption together with an Officer's Certificate stating the aggregate amount payable in connection with such redemption and the relevant calculations (including the amount paid as a percentage of principal) and any under payment or amounts carried forward from a previous period.

| MCS Amortization Redemption Date | MCS Amortization Percentage |
|---|---|
| February 19, 2022 | 2.08% |
| August 19, 2022 | 2.13% |
| February 19, 2023 | 2.13% |
| August 19, 2023 | 2.08% |
| February 19, 2024 | 2.08% |
| August 19, 2024 | 2.02% |
| February 19, 2025 | 2.02% |
| August 19, 2025 | 1.98% |
| February 19, 2026 | 1.98% |

Neither the Trustee nor the Agents will be responsible for monitoring, verifying or calculating the amounts payable under the MCS Amortization Redemptions and will not be responsible to the Holders for any loss arising from any failure by them to do so.

(8) REPURCHASE AT THE OPTION OF HOLDER.

(1) If a Change of Control Triggering Event occurs, each Holder will have the right to require the Company to repurchase all or any part (equal to US$200,000 or an integral multiple of US$1,000 in excess thereof) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of the Notes repurchased plus accrued and unpaid interest, if any, on the Notes repurchased, to (but not including) the applicable date of purchase, subject to the rights of Holders on the relevant record date to receive interest due on the relevant Interest Payment Date (the "*Change of Control Payment*"), except to the extent that the Company has previously or concurrently elected to redeem the Notes pursuant to Section 5 hereof. Within ten days following any Change of Control Triggering Event, the Company will mail a notice to each Holder, with a copy to the Trustee and Registrar describing the transaction or transactions that constitute the Change of Control and setting forth the procedures governing the Change of Control Offer as required by the Indenture.

(2) If the Company or any other Restricted Subsidiary consummates any Asset Sales, within ten days of each date on which the aggregate amount of Excess Proceeds exceeds $5.0 million, the Company will commence an offer to all Holders and all Holders of other Indebtedness that is *pari passu* with the Notes containing provisions similar to those set forth in the Indenture with respect to offers to purchase or redeem with the proceeds of sales of assets (an "*Asset Sale Offer*") pursuant to Section 3.09 of the Indenture to purchase the maximum principal amount of Notes and any *pari passu* Indebtedness that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof plus accrued and unpaid interest thereon to (but not including) the date of purchase in accordance with the procedures set forth in the Indenture. If the aggregate principal amount of Notes and such *pari passu* Indebtedness tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the Notes and such other *pari passu* Indebtedness will be purchased on a *pro rata* basis. Any remaining proceeds after such Excess Proceeds Repurchase Offer may be used for any purpose not otherwise prohibited under the Indenture. Holders that

are the subject of an offer to purchase will receive an Asset Sale Offer from the Company prior to any related purchase date and may elect to have such Notes purchased by completing the form entitled "Option of Holder to Elect Purchase" attached to the Notes.

(9) *NOTICE OF REDEMPTION*. Notice of redemption will be mailed at least 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than US$200,000 may be redeemed in part but only in integral multiples of US$1,000 in excess thereof, unless all of the Notes held by a Holder are to be redeemed.

(10) *DENOMINATIONS, TRANSFER, EXCHANGE*. The Notes are in registered form without coupons in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. Holders shall furnish appropriate endorsements and transfer documents in connection with a transfer of Notes to the Trustee and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company will not be required to exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company will not be required to exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(11) *PERSONS DEEMED OWNERS*. The registered Holder of a Note may be treated as its owner for all purposes.

(12) *AMENDMENT, SUPPLEMENT AND WAIVER*. Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes. Without notice to or the consent of any Holder, the Company and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make other changes that do not adversely affect the rights of any Holder.

(13) *DEFAULTS AND REMEDIES*. If an Event of Default, as defined in the Indenture, occurs and is continuing, the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may by written notice to the Company and to the Trustee, or the Trustee at the written request of such Holders shall (subject to being indemnified and/or secured and/or prefunded to its satisfaction), declare the principal of, premium, if any, and accrued and unpaid interest on all the Notes to be immediately due and payable. If a bankruptcy or insolvency default with respect to the Company, the Parent or any other Restricted Subsidiaries occurs and is continuing, the Notes automatically become immediately due and payable. Holders may not enforce any Indenture or the Notes except as provided in the Indenture. The Trustee may require security and/or indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

(14) *TRUSTEE DEALINGS WITH COMPANY*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(15) *NO RECOURSE AGAINST OTHERS*. No incorporator, promoter, director, officer, employee or stockholder of the Company or the Parent, as such, will have any liability for any obligations of the Company, the Parent or the Guarantors under the Notes, the Indenture, any

Note Guarantee, the Collateral Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under U.S. federal securities laws.

(16) *AUTHENTICATION*. This Note will not be valid until authenticated by the manual signature of the Trustee.

(17) *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(18) *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19) *GOVERNING LAW.* THE LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THIS NOTE AND THE NOTE GUARANTEES.

The Company will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

Azure Power Energy Ltd
AAA Global Services Ltd
1st Floor, The Exchange
18 Cybercity, Ebene
Mauritius
Attention: Yung Oy Pin Lun Leung

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:

_____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

119

Option of Holder to Elect Purchase

If you want to elect to have this Note purchased by the Company pursuant to Section 4.10 or 4.16 of the Indenture, check the appropriate box below:

☐ Section 4.10                    ☐ Section 4.16

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.10 or Section 4.16 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

(Sign exactly as your name appears on the face of this Note)

Your Signature: _____

Tax Identification No.:_____

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

120

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount [at maturity] ** of this Global Note | Amount of increase in Principal Amount [at maturity] of this Global Note | Principal Amount [at maturity] of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |

*This schedule should be included only if the Note is issued in global form.*
** [Footnote to be added for discount notes]

**EXHIBIT B**

**FORM OF CERTIFICATE OF TRANSFER**

[*Company address block*]

[*Registrar address block*]

Re: 3.575% Senior Notes due 2026 of Azure Power Energy Ltd

Reference is hereby made to the Indenture, dated as of August 19, 2021 (the "*Indenture*"), among Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius, Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius (the "*Parent*") and HSBC Bank USA, National Association, as trustee (the "*Trustee*") and collateral agent.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $ in such Note[s] or interests (the "*Transfer*"), to (the "*Transferee*"), as further specified in

Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1. ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a 144A Definitive Note pursuant to Rule 144A.** The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the 144A Definitive Note and in the Indenture and the Securities Act.

2. ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note, or a 144A Definitive Note pursuant to Regulation S.** The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act and, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

3. ☐ **Check and complete if Transferee will take delivery of a beneficial interest in a 144A Definitive Note pursuant to any provision of the Securities Act other than Rule 144A** The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in 144A Global Notes and 144A Definitive Notes and pursuant to and in accordance with the Securities

Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a) ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b) ☐ such Transfer is being effected to the Company or a subsidiary thereof; or

(c) ☐ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act;

**4. ☐ Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a) ☐ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required on order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Notes, on 144A Definitive Notes and in the Indenture.

(b) ☐ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required on order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Notes, on 144A Definitive Notes and in the Indenture.

(c) ☐ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Notes or 144A Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

[Insert Name of Transferor]

By: _____
Name:
Title:

Dated: _____

ANNEX A TO CERTIFICATE OF TRANSFER

1. The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)  ☐ a beneficial interest in the 144A Global Note (CUSIP_____); or

(b)  ☐ a 144A Definitive Note.

2. After the Transfer the Transferee will hold:

[CHECK ONE]

(a)  ☐ a beneficial interest in the:

(i)  ☐ 144A Global Note (CUSIP_____); or

(ii) ☐ Unrestricted Global Note (CUSIP_____); or

(b) ☐ a 144A Definitive Note; or

(c) ☐ an Unrestricted Definitive Note, in accordance with the terms of the Indenture.

**EXHIBIT C**

**FORM OF CERTIFICATE OF EXCHANGE**

[*Company address block*]

[*Registrar address block*]

Re: 3.575% Senior Note due 2026 of Azure Power Energy Ltd

Reference is hereby made to the Indenture, dated as of August 19, 2021 (the "*Indenture*"), among Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius, Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius (the "*Parent*") and HSBC Bank USA, National Association, as trustee (the "*Trustee*") and collateral agent.

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or

interest in such Note[s] specified herein, in the principal amount of $    in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

**1. Exchange of 144A Definitive Notes or Beneficial Interests in a 144A Global Note for**

**Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

**(a) ☐ Check if Exchange is from beneficial interest in a 144A Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a 144A Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

**(b) ☐ Check if Exchange is from beneficial interest in a 144A Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a 144A Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the 144A Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

**(c) ☐ Check if Exchange is from 144A Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a 144A Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities

Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d) ☐ **Check if Exchange is from 144A Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a 144A Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to 144A Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

**2. Exchange of 144A Notes or Beneficial Interests in 144A Global Notes for 144A Definitive Notes or Beneficial Interests in 144A Global Notes**

(a) ☐ **Check if Exchange is from beneficial interest in a 144A Global Note to 144A Definitive Note.** In connection with the Exchange of the Owner's beneficial interest in a 144A Global Note for a 144A Definitive Note with an equal principal amount, the Owner hereby certifies that the 144A Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the 144A Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Definitive Note and in the Indenture and the Securities Act.

(b) ☐ **Check if Exchange is from 144A Definitive Note to beneficial interest in a 144A Global Note**. In connection with the Exchange of the Owner's 144A Definitive Note for a beneficial interest in the 144A Global Note, with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the 144A Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant 144A Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

[Insert Name of Transferor]

By: _____

Name: _____

Title: _____

Dated:_____

**FORM OF SUPPLEMENTAL INDENTURE**

SUPPLEMENTAL INDENTURE (this "*Supplemental Indenture*"), dated as of     ,     20     , among Azure Power Energy Ltd, a public company with limited liability incorporated under the laws of Mauritius (the "*Company*"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius (the "*Parent*"),_____ (the "*New Guarantor*") and HSBC Bank USA, National Association, as trustee (the *"Trustee"*) and collateral agent (the *"Collateral Agent"*).

W I T N E S E T H:

WHEREAS the Company, the Trustee and each of the parties described above are parties to an Indenture, dated as of August 19, 2021, as amended (as amended, supplemented, waived or otherwise modified, the "*Indenture*"), providing for the issuance of the Company's 3.575% Senior Notes due 2026;

WHEREAS, pursuant to Section 9.01 and Section 11.07 of the Indenture, each New Guarantor is required to execute a supplemental indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Trustee and the other parties hereto mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1. Definitions. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Indenture.

2. Agreement to Guarantee. Pursuant to, and subject to the provisions of, Article 11 of the Indenture, [each][the] New Guarantor (which term includes each other New Guarantor that hereinafter guarantees the Notes pursuant to the terms of the Indenture) hereby fully and unconditionally guarantees, jointly and severally with the Parent and each other New Guarantor, to each Holder and to the Trustee to the extent set forth in the Indenture and subject to the provisions thereof (a) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all payment obligations of the Company under the Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, or interest, premium or Additional Amounts, if any, on, the Notes and all other monetary obligations of the Company under the Indenture and the Notes within applicable grace period and (b) the full and punctual performance within applicable grace periods of all other obligations of the Company whether for fees, expenses, indemnification or otherwise under the Indenture and the Notes (all the foregoing being hereinafter collectively called the "*Guaranteed Obligations*"). [Each][The] New Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from such New Guarantor and that such New Guarantor[s] will remain bound under Article 11 of the Indenture, notwithstanding any extension or renewal of any Guaranteed Obligation.

The Guaranteed Obligations of [each][the] New Guarantor to the Holders and to the Trustee, Paying Agent, Transfer Agent and Registrar pursuant to the Indenture as supplemented hereby, are expressly set forth in Article 11 of the Indenture and reference is hereby made to the Indenture for the precise terms of the Note Guarantee.

[*Relevant limitations imposed by local law analogous to Section 11.02 of the Indenture to be inserted, if and as applicable*].

3. <u>Ratification of Indenture: Supplemental Indentures Part of Indenture</u>. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and each Holder, by accepting the Notes whether heretofore or hereafter authenticated and delivered (a) agrees to and shall be bound by such provisions, (b) authorizes and directs the Trustee, Paying Agent, Transfer Agent and Registrar, on behalf of such Holder, to take such action as may be necessary or appropriate to effectuate the subordination as provided in the Indenture and (c) appoints the Trustee attorney-in-fact of such Holder for such purpose; *provided, however*, that [the][each] New Guarantor shall be released from all its obligations with respect to this Guarantee in accordance with the terms of the Indenture, including Section 11.09 of the Indenture and upon any defeasance of the Notes in accordance with Article 8 of the Indenture.

4. <u>Governing Law</u>. This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

5. <u>Trustee Makes No Representation</u>. Each of the Trustee, Paying Agent, Transfer Agent, Registrar and the Collateral Agent makes no representation as to the validity or sufficiency of this Supplemental Indenture. The recitals of fact contained herein shall be treated as statements of the other parties hereto and not the Trustee, Paying Agent, Transfer Agent and Registrar and the Collateral Agent.

6. <u>Counterparts</u>. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

7. <u>Effect of Headings</u>. The Section headings herein are for convenience only and shall not affect the construction thereof.

Dated: _____, 20\_\_\_\_\_

[_]
as New Guarantor

By:
_____
Name:
Title:

**Azure Power Energy Ltd**
as Company

By:
_____
Name:
Title:

**Azure Power Global Limited**
as Parent

By:
_____
Name:
Title:

**HSBC Bank USA, National Association**,
as Trustee and Collateral Agent

By:
_____
Name:
Title:

130

**FORM OF AGENT APPOINTMENT LETTER**

Dated: August 19, 2021

HSBC Bank USA, National Association
Issuer Services
452 Fifth Avenue New York, NY 10018
Attention: Client Services Delivery

Re: 3.575% Senior Notes due 2026 of Azure Power Energy Ltd

Reference is hereby made to the Indenture dated as of August 19, 2021 (as amended, modified or supplemented from time to time, the "*Indenture*") among Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius (the "*Company*"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius (the "*Parent*") and HSBC Bank USA, National Association as trustee and collateral agent. Unless otherwise defined herein, terms used herein are used as defined in the Indenture.

The Company hereby appoints HSBC Bank USA, National Association as the paying agent, transfer agent and registrar (the "*Agent*") with respect to the Notes and the Agent hereby accepts such appointment. By accepting such appointment, the Agent agrees to be bound by and to perform the services with respect to itself set forth in, and subject to the rights, privileges, protections, immunities and benefits (including any rights of indemnification) set forth in, the Indenture and the Notes, as well as the following terms and conditions to all of which the Company agrees and to all of which the rights of the Holders from time to time shall be subject:

(a) The Company, no later than 5:00 p.m. (London time) one Business Day immediately preceding each date on which a payment in respect of the Notes becomes due, shall (i) transfer (or cause to be transferred) to the Agent in the currency of United States of America immediately available funds such amount as may be required for the purposes of such payment and (ii) notify the Agent of such transfer. The Company, no later than 5:00 p.m. (London time) on the second Business Day immediately preceding each date on which any payment in respect of the Notes becomes due, shall confirm such payment, or procure confirmation, by an e-mail or facsimile message from the bank making such payment to the Agent. The Agent shall not be bound to make payment until funds in such amount as may be required for the purpose of such payment have been received from the Company.

(b) The Agent shall be entitled to the compensation to be agreed in writing upon with the Company, for all services rendered by it under the Indenture, and the Company agrees promptly to pay such compensation and to reimburse the Agent for its out-of-pocket expenses (including fees and expenses of counsel) properly incurred by it in connection with the services rendered by it hereunder and under the Indenture. The Company hereby agrees to indemnify the Agent and its officers, directors, agents, employees and representatives for, and to hold it harmless against, any loss, liability or expense (including properly incurred fees and expenses of counsel) incurred without gross negligence or willful misconduct on its part arising out of or in connection with its acting as the Agent hereunder and under the Indenture. The obligations of the Company under this paragraph (b) shall survive the payment of the Notes, the termination or expiry of the Indenture or this letter and the resignation or removal of the Agent. Under no circumstances will the Agent be liable to the Company or any other party to this letter or the Indenture for any special, indirect, punitive, consequential loss or damage of any kind (inter alia, being loss of business, goodwill, opportunity or profit), whether or not foreseeable, even if actually aware of or advised of the possibility of such loss or damage and regardless of the form of action.

(c) In acting under the Indenture and in connection with the Notes, the Agent is acting solely as agent of the Company and does not assume fiduciary duty or any other obligation towards or relationship of agency or trust for or with any of the owners or holders of the Notes, except that all funds held by the Agent for the payment of principal, interest or other amounts (including Additional Amounts) on the Notes shall, subject to the provisions of the Indenture, be held by the Agent and applied as set forth in the Indenture and in the Notes, but need not be segregated from other funds held by the Agent, except as required by law. The Agent shall not be liable to account for interest on money paid to it pursuant to any of the provisions of the Indenture or the Notes. Any funds held by the Agent are not subject to the UK Financial Conduct Authority Client Money Rules.

(d) The Agent may consult with counsel or other professional advisors satisfactory to it and any advice or written opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it under the Indenture in good faith and in accordance with such advice or opinion.

(e) The Agent shall give the Trustee written notice of any failure by the Company (or by any other obligor on the Notes or the Guarantors) to make any payment of the principal, or premium or interest on, the Notes and any other payments to be made on behalf of the Company under the Indenture, when the same shall be due and payable and at any time during the continuance of any such failure the Agent will pay any such sums so held in trust by it to the Trustee.

(f) The Agent shall be fully protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties. If the Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from the Company or any other person which, in its opinion, conflict with its rights or obligations under this Agreement, it shall be entitled to refrain from taking any action until it is directed in writing by a final order or judgment of a court of competent jurisdiction. The Agents shall be entitled to refrain from taking any actions, without liability, if conflicting, unclear or equivocal instruction or direction are received or in order to comply with the Applicable Law. The Agents shall not be liable for errors in judgment made in good faith.

(g) The Agent and any of its Affiliates, in its individual capacity or any other capacity, may become the owner of, or acquire any interest in, any Notes or other obligations of the Company with the same rights that it would have if it were not the Agent and may engage or be interested in any financial or other transaction with the Company, and may act on, or as depository, Trustee or agent for, any committee or body of Holders or other obligations of the Company, as freely as if it were not the Agent and that the Agent and its Affiliates shall not be under any obligation to monitor any conflicts of interest, if any, which may arise between each of themselves and such other parties.

(h) The Agent shall not be under any liability for interest on any monies received by it pursuant to any of the provisions of the Indenture or the Notes.

(i) The Agent shall be obligated to perform such duties and only such duties as are specifically set forth in the Indenture and hereunder, and no implied duties or obligation shall be read against the Agent. The Agent shall not be under any obligation to take any action under the Indenture or hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its opinion, assured to it. The Agent shall have no obligation to expend its own funds or otherwise incur any financial liability in the performance of its obligations hereunder or under the Indenture. The Agent will not be responsible for any loss, liability, cost, claim, actions, demand, expense or inconvenience which may result from its exercise or non-exercise of any of the rights or powers vested in it other than as caused by its own gross negligence or its own willful misconduct. In addition to its rights, privileges, protections, immunities and benefits, the rights, privileges, protections, immunities and benefits (including any rights of indemnification) given to the

Trustee under the Indenture are extended to, and shall be enforceable by the Agent and each agent, custodian and other Person employed to act hereunder and under any related document, as the case may be, as if specifically set forth therein.

(j) The Agent may at any time resign by giving written notice of its resignation but without giving any reason to the Company and the Trustee and specifying the date on which its resignation shall become effective; *provided that* such date shall be at least 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, if required by the Indenture, the Company shall promptly appoint a successor agent by written instrument substantially in the form hereof in triplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Agent, one copy to the successor agent and one copy to the Trustee. Upon the effectiveness of the appointment of a successor Agent, the resigning Agent shall have no further obligations under this letter or the Indenture.

Such resignation shall become effective upon the earlier of (i) the effective date of such resignation and (ii) the acceptance of appointment by the successor agent, as provided below. The Company may, at any time and for any reason, remove the Agent and appoint a successor agent, by written instrument in triplicate signed on behalf of the Company, one copy of which shall be delivered to the Agent being removed, one copy to the successor agent and one copy to the Trustee. Any removal of the Agent and any appointment of a successor agent shall become effective upon acceptance of appointment by the successor agent. Upon its resignation or removal, the Agent shall be entitled to the payment by the Company of its compensation for the services rendered hereunder and to the reimbursement of all out-of-pocket expenses properly incurred in connection with the services rendered by it hereunder.

(k) The Company shall remove the Agent and appoint a successor paying agent if the Agent shall (i) become incapable of acting, (ii) be adjudged bankrupt or insolvent, (iii) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) make a general assignment for the benefit of creditors or (vi) fail generally to pay its debts as they become due.

(l) Any successor agent appointed as provided herein shall execute and deliver to its predecessor and to the Company and the Trustee an instrument accepting such appointment (which may be in the form of an acceptance signature to the letter of the Company appointing such agent) and thereupon such successor agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Agent and such predecessor shall pay over to such successor agent all monies or other property at the time held by it hereunder.

Notwithstanding the above, the Company agrees with the Agent that if no successor to such Agent has been appointed by the Company after 30 days from the notice of resignation or removal, such retiring Agent may, on behalf of and at the expense of the Company, itself appoint a successor Agent or the retiring Agent or the Company, or petition any court of competent jurisdiction for appointment of, as its successor Agent.

(m) The Agent shall at all times be a responsible financial institution which is authorized by law to exercise its respective powers and duties hereunder and under the Indenture.

(n) Notwithstanding any other provision of this letter, in acting under the Indenture and this letter and in connection with the Notes, the Agent shall be entitled to make a deduction or withholding from any payment which it makes under the Indenture and the Notes for or on account of

any Tax if and only to the extent so required by Applicable Law, in which event such Agent shall make such payment after such withholding or deduction has been made and shall account to the relevant Authority for the amount so withheld or deducted. The Agent will use reasonable efforts to cooperate with the Company and the Guarantors to enable them to provide the Tax receipts or other evidence of payments referred to in Section 2.13 of the Indenture. The Agent shall be entitled to make payments net of any Taxes or other sums required by any Applicable Law to be withheld or deducted. If such a withholding or deduction is so required, the Agent will not pay an additional amount in respect of that withholding or deduction.

(o) The Agent shall treat all information relating to the Company as confidential, but (unless consent is prohibited by law) the Company consents to the transfer and disclosure by the Agent of any information relating to the Company and the Guarantors to and between branches, subsidiaries, representative offices and affiliates of the Trustee, for confidential use in connection with the provision of any service under this letter and the Indenture. The Agent and any of its branch, subsidiary, representative office or affiliate may transfer and disclose any such information as required by any law, court regulator or legal process; *provided that* the Agent shall give the Company prompt written notice of such request so that the Company may seek a protective order or other remedy protecting such confidential information from disclosure so long as the provision of such notice is not contrary to applicable law. Notwithstanding anything herein to the contrary, the foregoing shall not be construed to prohibit (i) disclosure of any and all information that is or becomes publicly known, or information obtained by the Trustee from sources other than the Company or the Guarantors, (ii) disclosure as required pursuant to this Indenture, the Intercreditor Agreement, the Notes, the Note Guarantee or the Collateral Documents, or (iii) any other disclosure authorized by the Company.

(p) The Company hereby irrevocably waives, in favor of the Agent, any conflict of interest which may arise by virtue of the Agent acting in various capacities under the Indenture and this letter or for other customers of the Agent. The Company acknowledges that the Agent and its Affiliates (together, the "*Agent Parties*") may have interests in, or may be providing or may in the future provide financial or other services to other parties with interests which the Company may regard as conflicting with its interests and may possess information (whether or not material to the Company) other than as a result of the Agent acting as Agent hereunder, that the Agent may not be entitled to share with the Company. The Agent will not disclose confidential information obtained from the Company (without its consent) to any of the Agent's other customers nor will it use on the Company's behalf any confidential information obtained from any other customer. Without prejudice to the foregoing, the Company agrees that the Agent Parties may deal (whether for its own or its customers' account) in, or advise on, securities of any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of the Indenture and this letter.

(q) The Agent may act through its attorneys, delegates and agents and will not be responsible for the misconduct or negligence of any attorney, delegate or agent appointed with due care by it hereunder or for supervising or monitoring the act or proceedings of such attorney, delegate or agent.

(r) In no event shall the Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; or failure of any money transmission or SWIFT system, any laws, ordinances, regulations or the like which restrict or prohibit the performance of the obligations contemplated by this letter.

(s) The Agent is not obliged to do or omit to do anything which in its reasonable opinion, would or may be illegal or would constitute a breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action

(whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Agent is subject.

(t) The Agent shall, on demand by the Trustee by notice in writing given to the Agent and the Company at any time after an Event of Default has occurred, until notified by the Trustee to contrary, to the extent permitted by applicable law, deliver all monies, documents and records held by the Agent in respect of the Notes to the Trustee or as the Trustee shall direct in such notice or subsequently, *provided that* this paragraph shall not apply to any documents or records which the Agent is obliged not to release by any law or regulation to which it is subject. The Agent shall not be deemed to have notice of any Event of Default, unless notified in writing of the same.

(u) The Agent shall, on demand by the Trustee by notice in writing given to them and the Company at any time after the Event of Default or Default has occurred, until notified by the Trustee to the contrary, as far as permitted by applicable law to act thereafter as agents of the Trustee under the Indenture and the Notes and to act solely in accordance with the Trustee's directions, deliver up all Certificates and all monies, documents and records held by the Agent in respect of the Notes to the Trustee or as the Trustee shall direct in such notice or subsequently, *provided that* this paragraph (i) shall not apply to any documents or records which the Agent or the relevant agent is obliged not to release by any law or regulation to which it is subject.

(v) The obligations hereunder of the Agent with respect to its duties as paying agent, transfer agent and registrar shall be several, not joint.

(w) Any notice or communication to the Agent shall be in the English language and will be deemed given when sent by facsimile transmission, with transmission confirmed. Any notice to the Agent will be effective only upon receipt. The notice or communication should be addressed to the Agent at:

HSBC Bank USA, National Association
Issuer Services
452 Fifth Avenue
New York, NY 10018
Attention: Client Services Delivery
Fax: 212-525-1300
Email: ctlanydealmanagement@us.hsbc.com

Any notice to the Company or the Trustee shall be given as set forth in the Indenture.

(x) Any entity into which the Agent may be merged or converted or any entity with which the Agent may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Agent shall be a party or any corporation succeeding to the business of the Agent shall be the successor to the Agent hereunder (provided that such corporation shall be qualified as aforesaid) without the execution or filing of any document or any further act on the part of any of the parties hereto.

(y) Any amendment, supplement or waiver under Sections 9.01 and 9.02 of the Indenture that adversely affects the Agent shall not affect the rights, powers, obligations, duties or immunities of the Agent unless the Agent has consented thereto.

(z) The Indenture, the Notes and this letter, together with the fee proposal agreed between HSBC Bank USA, National Association and the Company, contain the whole agreement between the parties relating to the subject matter of the Indenture and this letter and supersede any previous written or oral agreement between the parties in relation to the matters dealt with in the Indenture and this letter.

(aa) The Company and the Guarantors agree that the provisions of Sections 13.07 and 13.14 of the Indenture shall apply hereto, *mutatis mutandis*.

(bb) This letter may be executed in counterparts, each of which shall be an original which together shall constitute one and same instrument.

(cc) Mutual Undertaking Regarding Information Reporting and Collection Obligations. Each party herein shall, within ten business days of a written request by another party, supply to that other party such forms, documentation and other information relating to it, its operations, or the Notes as that other party reasonably requests for the purposes of that other party's compliance with Applicable Law and shall notify the relevant other party reasonably promptly if it becomes aware that any of the forms, documentation or other information provided by such party is (or becomes) inaccurate in any material respect; provided, however, that no party shall be required to provide any forms, documentation or other information pursuant to this paragraph to the extent that: (i) any such form, documentation or other information (or the information required to be provided on such form or documentation) is not reasonably available to such party and cannot be obtained by such party using reasonable efforts; or (ii) doing so would or might in the reasonable opinion of such party constitute a breach of any: (a) Applicable Law; (b) fiduciary duty; or (c) duty of confidentiality.

(dd) Notice of Possible Withholding Under FATCA. The Company and the Guarantors shall notify the Agent if the Company or the Guarantors determine that any payment to be made by the Agent under any Notes is a payment which could be subject to FATCA Withholding if such payment were made to a recipient that is generally unable to receive payments free from FATCA Withholding, and the extent to which the relevant payment is so treated; provided, however, that the Company and the Guarantors' obligation under this paragraph shall apply only to the extent that such payments are so treated by virtue of characteristics of the Company and the Guarantors, the Notes, or both.

(ee) Company and the Guarantors' Right to Redirect. If the Company or the Guarantors determine in its sole discretion that withholding for or on account of any Tax will be required by Applicable Law in connection with any payment due to any of the Agent on any Notes, then the Company and the Guarantors will be entitled to redirect or reorganize any such payment in any way that it sees fit in order that the payment may be made without such deductions or withholding provided that, any such redirected or reorganized payment is made through a recognized institution of international standing and otherwise made in accordance with this letter. The Company and the Guarantors will promptly notify the Agent and the Trustee of any such redirection or reorganization.

(ff) Notwithstanding anything else herein contained, the Agent may refrain without liability from doing anything that would or might in its opinion be contrary to any law of any state or jurisdiction (including but not limited to Hong Kong, the United States of America or any jurisdiction forming a part of it and England & Wales) or any directive or regulation of any agency of any such state or jurisdiction and may without liability do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

(gg) Definitions. For the purposes of paragraphs (n), (cc), (dd), (ee) and (gg) the defined terms used herein shall have the following meaning:

"Applicable Law" means any law or regulation including, but not limited to: (i) any statute or regulation; (ii) any rule or practice of any Authority by which any party is bound or with which it is accustomed to comply; (iii) any agreement between any Authorities; and (iv) any customary agreement between any Authority and any party.

"Authority" means any competent regulatory, prosecuting, Tax or governmental authority in any jurisdiction.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"FATCA Withholding" means any withholding or deduction required pursuant to an agreement described in section 1471(b) of the Code, or otherwise imposed pursuant to sections 1471 through 1474

of the Code, any regulations or agreements thereunder, any official interpretations thereof, or any law implementing an intergovernmental approach thereto.

"Tax" means any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of any Authority having power to tax.

**Azure Power Energy Ltd**

By: _____
Name:
Title:   Director

**Agreed and accepted:**

**HSBC BANK USA, NATIONAL ASSOCIATION**
As Paying Agent and Transfer Agent

By: _____
Name:
Title:

**HSBC BANK USA, NATIONAL ASSOCIATION**
As Registrar

By: _____
Name:
Title:

**Acknowledged by:**

**HSBC BANK USA, NATIONAL ASSOCIATION**
As Trustee

By: _____
Name:
Title:

**EXHIBIT F-1**

**FORM OF COMPANY AUTHORIZATION CERTIFICATE**

I, [Name], [Title] of Azure Power Energy Ltd acting on behalf of Azure Power Energy Ltd, hereby certify that:

(A)      the persons listed below are (i) Authorized Officers of the Company for purposes of the Indenture dated as of August 19, 2021 (as amended, modified or supplemented from time to time, the "Indenture") among Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius (the "Company"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius, and HSBC Bank USA, National Association as trustee and collateral agent, (ii) duly elected or appointed, qualified and acting as the holder of the respective office or offices set forth opposite his name and (iii) the duly authorized person who executed or will execute the Indenture, the Collateral Documents and the Notes (as defined in the Indenture) by his manual signature or signature in scanned format delivered through email and was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name;

(B)      each signature appearing below is the person's genuine signature; and

(C)      attached hereto as Schedule I is a true, correct and complete specimen of the certificates representing the Notes; and

(D)      such individuals have the authority to provide written direction/confirmation and receive callbacks at the phone number(s) noted below in connection with the 3.575% Senior Notes due 2026 of the Company.

SCHEDULE I

Authorized Officers:

| Name | Title | Specimen Signature | Telephone Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____

**Azure Power Energy Ltd**

By: _____
Name:
Title:

By: _____
Name:
Title:

**EXHIBIT F - 2**

**FORM OF PARENT AUTHORIZATION CERTIFICATE**

I, [Name], [Title] of Azure Power Global Limited, acting on behalf of Azure Power Global Limited (the "Parent"), hereby certify that:

(A) the persons listed below are (i) Authorized Officers of the Parent for purposes of the Indenture dated as of August 19, 2021 (as amended, modified or supplemented from time to time, the "Indenture") among Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius (the "Company"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius, and HSBC Bank USA, National Association as trustee and collateral agent, (ii) duly elected or appointed, qualified and acting as the holder of the respective office or offices set forth opposite his name and (iii) the duly authorized person who executed or will execute the Indenture by his manual signature or signature in scanned format delivered through email and was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name; and

(B) each signature appearing below is the person's genuine signature.

Authorized Officers:

| Name | Title | Specimen Signature |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

141

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____

**Azure Power Global Limited**

By: _____
Name:
Title:

By: _____
Name:
Title:

**EXHIBIT F - 3**

**FORM OF GUARANTOR AUTHORIZATION CERTIFICATE**

I, [Name], [Title] of [Name of Guarantor], acting on behalf of [Name of Guarantor] (the "Guarantor"), hereby certify that:

(A)    the persons listed below are (i) Authorized Officers of the Guarantor for purposes of the Indenture dated as of August 19, 2021 (as amended, modified or supplemented from time to time, the "Indenture") among Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius (the "Company"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius, and HSBC Bank USA, National Association as trustee and collateral agent, (ii) duly elected or appointed, qualified and acting as the holder of the respective office or offices set forth opposite his name and (iii) the duly authorized person who executed or will execute the Indenture by his manual signature or signature in scanned format delivered through email and was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name; and

(B)    each signature appearing below is the person's genuine signature.

Authorized Officers:

| Name | Title | Specimen Signature |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

143

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated:_____

**[Name of Guarantor]**

By: _____
Name:
Title:

**EXHIBIT G**

**[RESERVED].**

# EXHIBIT H

## NOTE HOLDERS REPRESENTATIVE APPOINTMENT LETTER

Dated: August 19, 2021

**Appleby (JV) Ltd & Cie**
7th Floor Happy World House
37, Sir William Newton Street
Port Louis
Republic of Mauritius

**Attention: Farzanah Nawool**

Re: US$414,000,000 of 3.575% Senior Notes due 2026 of Azure Power Energy Ltd

Reference is hereby made to the Indenture dated as of August 19, 2021 (as amended, modified or supplemented from time to time, the "*Indenture*") among Azure Power Energy Ltd, a public company with limited liability incorporated under the laws of Mauritius (the "*Company*"), Azure Power Global Limited, a public company with limited liability incorporated under the laws of Mauritius and HSBC Bank USA, National Association as trustee (the "*Trustee*"). Terms used herein are used as defined in the Indenture.

The Company hereby appoints Farzanah Nawool, attorney at law, of Appleby (JV) Ltd & Cie, 7th Floor Happy World House, 37, Sir William Newton Street, Port Louis, Republic of Mauritius to act as the Note Holders Representative, pursuant to the present Note Holders Representative Appointment Letter and to act as such with respect to the Notes pursuant to the Mauritius Companies Act 2001 (the "*Representative*") and the Representative hereby accepts such appointment. By accepting such appointment, the Representative agrees to be bound by and to perform the duties with respect to itself set forth in the Mauritius Companies Act and the Notes, as well as the following terms and conditions to all of which the Company agrees and to all of which the rights of the holders from time to time of the Notes shall be subject:

(a) The Representative shall be entitled to the compensation to be agreed in writing upon with the Company, for all services rendered by it under the Indenture, and the Company agrees promptly to pay such compensation and to reimburse the Representative for its properly incurred out-of-pocket expenses (including fees and expenses of counsel) incurred by it in connection with the services rendered by it hereunder and under the Indenture.

(b) The Company hereby agrees to indemnify the Representative and its officers, directors, agents, employees and representatives for, and to hold it harmless against, any loss, liability or expense (including properly incurred fees and expenses of counsel) incurred without gross negligence or willful misconduct on its part arising out of or in connection with its acting as the Representative hereunder and under the Indenture. The obligations of the Company under this paragraph (b) shall survive the payment of the Notes, the termination or expiry of the Indenture or this letter and the resignation or removal of the Representative. Under no circumstances will the Representative be liable to the Company or any other party to this letter or the Indenture for any special, indirect, punitive, consequential loss or damage of any kind (*inter alia*, being loss of business, goodwill, opportunity or profit), whether or not foreseeable, subject to the Representative having taken due care and reasonable steps for mitigating or minimizing the special, indirect, punitive, consequential loss or damage arising out of a foreseeable event.

(c) In acting under the Indenture and in connection with the Notes, the Representative is acting solely as Representative and does not assume any obligation towards or relationship of

agency or trust for or with any of the owners or holders of the Notes other than provided in the Indenture.

(d) The Representative may consult with counsel or other professional advisors satisfactory to it and any advice or written opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it under the Indenture in good faith and in accordance with such advice or opinion. The Representative shall be under an obligation to inform the Company of such advice or written opinion of such counsel and must mutually agree with the Company on the course of action to be taken.

(e) The Representative shall be fully protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties. If the Representative shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from the Company or any other person which, in its opinion, conflict with its rights or obligations under this Agreement, it shall be entitled to refrain from taking any action until it is directed in writing by a final order or judgment of a court of competent jurisdiction.

(f) The Representative shall be obligated to perform such duties and only such duties as are specifically set forth in the Mauritius Companies Act and hereunder, and no implied duties or obligation shall be read against the Representative. The Representative shall not be under any obligation to take any action under the Indenture or hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its opinion, assured to it. The Representative shall have no obligation to expend its own funds or otherwise incur any financial liability in the performance of its obligations hereunder or under the Indenture.

(g) The Representative may at any time resign by giving written notice of its resignation to the Company and the Trustee and specifying the date on which its resignation shall become effective; *provided that* such date shall be at least 60 days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, the Company shall promptly appoint a successor Representative by written instrument substantially in the form hereof in triplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Representative, one copy to the successor Representative and one copy to the Trustee.

Such resignation shall become effective upon the earlier of (i) the effective date of such resignation and (ii) the acceptance of appointment by the successor Representative, as provided below. The Company may, at any time and for any reason, remove the Representative and appoint a successor Representative, by written instrument in triplicate signed on behalf of the Company, one copy of which shall be delivered to the Representative being removed, one copy to the successor Representative and one copy to the Trustee. Any removal of the Representative and any appointment of a successor Representative shall become effective upon acceptance of appointment by the successor Representative. Upon its resignation or removal, the Representative shall be entitled to the payment by the Company of its compensation for the services rendered hereunder and to the reimbursement of all properly incurred out-of-pocket expenses incurred in connection with the services rendered by it hereunder.

(h) The Company shall remove the Representative and appoint a successor paying Representative if the Representative (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a

trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.

(i) Any successor Representative appointed as provided herein shall execute and deliver to its predecessor and to the Company and the Trustee an instrument accepting such appointment (which may be in the form of an acceptance signature to the letter of the Company appointing such Representative) and thereupon such successor Representative , without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Representative and such predecessor shall pay over to such successor Representative all monies or other property at the time held by it hereunder.

Notwithstanding the above, the Company agrees with the Representative that if, no successor to such Representative has been appointed by the Company after 30 days from the notice of resignation or removal, such retiring Representative may, on behalf of and at the expense of the Company, itself appoint a successor Representative or the retiring Representative or the Company, or petition any court of competent jurisdiction for appointment of, as its successor Representative.

(j) The Representative shall treat all information relating to the Company as confidential, but (unless consent is prohibited by law) the Company consents to the transfer and disclosure by the Representative of any information relating to the Company to and between branches, subsidiaries, representative offices, affiliates of the Trustee, for confidential use in connection with the provision of any service under this letter and the Indenture. The Representative and any of its branch, subsidiary, representative office or affiliate may transfer and disclose any such information as required by any law, court regulator or legal process; *provided that* the Representative shall give the Company prompt written notice of such request so that the Company may seek a protective order or other remedy protecting such confidential information from disclosure so long as the provision of such notice is not contrary to applicable law.

(k) The Company hereby irrevocably waives, in favor of the Representative, any conflict of interest which may arise by virtue of the Representative acting in various capacities under the Indenture and this letter or for other clients of the Representative. The Company acknowledges that the Representative and its Affiliates (together, the "***Representative Parties***") may have interests in, or may be providing or may in the future provide other services to other parties with interests which the Company may regard as conflicting with its interests and may possess information (whether or not material to the Company) other than as a result of the Representative acting as Representative hereunder, that the Representative may not be entitled to share with the Company. The Representative will not disclose confidential information obtained from the Company (without its consent) to any of the Representative's other customers nor will it use on the Company's behalf any confidential information obtained from any other customer. Without prejudice to the foregoing, the Company agrees that the Representative Parties may deal (whether for its own or its customers' account) in, or advise on, securities of any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of the Indenture and this letter.

(l) The Representative may act through its attorneys, delegates and representatives and will not be responsible for the misconduct or negligence of any attorney, delegate or representative appointed with due care by it hereunder or for supervising the act or proceedings of such attorney, delegate or representative.

(m) In no event shall the Representative be responsible or liable for any failure or delay in the performance of its obligations hereunder because of circumstances beyond its control,

including, without limitation, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, rebellion, embargo, civil commotion or the like which restrict or prohibit the performance of the obligations hereunder, and other causes beyond its control whether or not of the same class or kind as specifically named above subject to the Representative having exercised due care and reasonable measures to minimize or mitigate the effects of such circumstances.

(n) The Representative is not obliged to do or omit to do anything which in its reasonable opinion, would or may be illegal or would constitute a breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Representative is subject.

(o) The Representative shall, on demand by the Trustee by notice in writing given to them and the Company at any time after an Event of Default has occurred, until notified by the Trustee to the contrary, as far as permitted by applicable law:

(i) act thereafter as Representative of the Trustee under the Indenture and the Notes mutatis mutandis on the terms provided in this letter (save for necessary consequential amendments and the Trustee's liability under any provision hereof for the indemnification, remuneration and all other expenses of the Representative shall be limited to the amounts for the time being held by the Trustee in respect of the Notes on the trusts of the Indenture and after application of such sums in accordance with the Indenture in satisfaction of payment of sums) and thereafter hold all Certificates and moneys, documents and records held by them in respect of the Notes to the order of the Trustee.

(p) Any notice or communication to the Representative will be deemed given when sent by facsimile transmission, with transmission confirmed. Any notice to the Representative will be effective only upon receipt. The notice or communication should be addressed to the Representative at:

**Representative**

Farzanah Nawool, attorney at law, of Appleby (JV) Ltd & Cie, 7th Floor Happy World House, 37, Sir William Newton Street, Port Louis, Republic of Mauritius.

Attention: Farzanah Nawool

With a copy to:

The Trustee

**HSBC Bank USA, National Association**
Issuer Services
452 Fifth Avenue
New York, NY 10018
Attention: Client Services Delivery
Fax: 212-525-1300
Email: ctlanydealmanagement@us.hsbc.com

Any notice to the Company or the Trustee shall be given as set forth in the Indenture.

(q) Any amendment, supplement or waiver under the Indenture that adversely affects the Representative shall not affect the rights, powers, obligations, duties or immunities of the Representative unless the Representative has consented thereto.

(r) The Indenture, the Notes and this letter, together with fee proposal dated as at the date hereof between the Representative and the Company, contain the whole agreement between the parties relating to the subject matter of the Indenture and this letter and supersede any previous written or oral agreement between the parties in relation to the matters dealt with in the Indenture and this letter.

(s) This letter may be executed in counterparts, each of which shall be an original which together shall constitute one and same instrument.

The agreement set forth in this letter shall be construed in accordance with and governed by the laws of the law of Mauritius.

**AZURE POWER ENERGY LTD**

Name:
Title:   Director

Agreed and accepted:

**REPRESENTATIVE**

Name:  **Farzanah Nawool**
Title:   Attorney at Law

*SIGNATURE PAGE TO NOTE HOLDERS REPRESENTATIVE APPOINTMENT LETTER*

Acknowledged by:

**HSBC Bank USA, National Association**

Trustee

Name:
Title:

EXHIBIT I

**FORM OF OPINION AND FORM OF OFFICER'S CERTIFICATE**

<u>A – FORM OF OPINION</u>

[●], 20[●]

HSBC Bank USA, National Association, as Trustee and Collateral Agent
Issuer Services
452 Fifth Avenue
New York, NY 10018
Attention: Client Services Delivery

Azure Power Energy Ltd, as Issuer
AAA Global Services Ltd
1st Floor, The Exchange
18 Cybercity, Ebene
Mauritius

Ladies and Gentlemen:

We have been engaged by Azure Power Energy Ltd, a company with limited liability incorporated under the laws of Mauritius (the "<u>Issuer</u>"), to provide certain opinions in connection with the Issuer's offering of US$414,000,000 in aggregate principal amount of its 3.575% senior notes due 2026 (the "<u>Notes</u>"). The Notes are governed by the Indenture (the "<u>Indenture</u>"), dated as of August 19, 2021, among the Issuer, Azure Power Global Limited and HSBC Bank USA, National Association, as trustee. This opinion letter is furnished pursuant to Section 4.14 of the Indenture. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

In arriving at the opinions expressed below we:

1. have reviewed the following documents:

    (a)   an executed copy of the Indenture;

    (b)   the definitive documentation for the Onshore Debt;

    (c)   the Currency Hedging Agreements included in the Required Hedging Arrangements (the "<u>Currency Hedges</u>");

    (d)   the schedules and confirmations for the Currency Hedges;

    (e)   the term sheets for the Currency Hedges;

    (f)   the U.S. Dollar cash flows with respect to the Notes; and

    (g)   the cash flows with respect to the Onshore Debt;

2. have conducted a review of The Currency Hedging Agreements and the Issuer's contracted cash flows and its scheduled payment obligations under the Indebtedness, the Notes and the Required Hedging Arrangements; and

3. have, in our opinion, made such examination and investigation as is necessary to enable us to express the informed opinions set out in paragraphs 1 and 2 below.

In rendering the opinions expressed below, we have assumed the authenticity of all documents submitted to us as originals and the conformity to the originals of all documents submitted to us as copies. In addition, we have assumed and have not verified the accuracy as to factual matters of each document we have reviewed.

Based on the foregoing, it is our opinion that:

1. The Currency Hedging Agreements included in the Required Hedging Arrangements comprise (i) a coupon swap on the interest payments due under the Notes to fully protect the Issuer against any depreciation in the Indian Rupee to the U.S. Dollar; and (ii) hedging of principal amount through either of or a mix of: (a) swap on the principal amount of the Notes that protects the Issuer against any depreciation in the Indian Rupee to the U.S. Dollar if the Indian Rupee to U.S. Dollar spot rate is above a certain agreed rate after the date of each Incurrence of New Onshore Debt in each case on the payment of principal due under the Notes on early redemption, Mandatory Amortization Redemption or MCS Amortization Redemption, and/or (b) a call spread option on the principal amounts of the Notes that will partially protect the Issuer (by receiving the same fixed payment) against any depreciation in the Indian Rupee to the U.S. Dollar if the Indian Rupee to U.S. Dollar spot rate is in between the agreed buy and sell strike rate.

2. The Issuer has sufficient contracted cash flows to satisfy all scheduled payment obligations under the Notes and the Required Hedging Arrangements. [The Issuer has sufficient contracted cash flows to satisfy all scheduled payment obligations under the Indebtedness incurred under Section 4.09(12) and any related hedging arrangements thereto, the Notes and the Required Hedging Arrangements*].

We are furnishing this letter to you in connection with the issuance of the Notes. This letter is not to be relied on by or furnished to any other person or used, circulated, quoted or otherwise referred to for any other purpose. We assume no obligation to advise you, or to make any investigations, as to any factual matters arising subsequent to the date hereof that might affect the opinions expressed herein.

None of [●] or any of its officers, employees or agents shall be liable to the Holders, any beneficial owners of the Notes, the Trustee, the Collateral Agent or any other person, including for any loss (whether a loss of profit, loss of opportunity or consequential loss), cost, expense or any other damage suffered by any such person, for any errors in calculations or determinations made by it hereunder, or any failure to make, or delay in making, any calculations or determinations (irrespective of whether such error, failure or delay affects any other calculations or determinations made hereunder) or otherwise in acting as Determination Agent. The foregoing does not affect the obligations of the Issuer and [●] pursuant to their separate engagement letter related to the services [●] is providing as Determination Agent.

Very truly yours,

[●]

By: _____

---

\* Please use the language in square brackets where the opinion is being furnished pursuant to Section 4.09(12) of the Indenture.

B – FORM OF OFFICER'S CERTIFICATE

[●], 20[●]

HSBC Bank USA, National Association, as Trustee and Collateral Agent
Issuer Services
452 Fifth Avenue
New York, NY 10018
Attention: Client Services Delivery

In connection with Azure Power Energy Ltd's, a company with limited liability incorporated under the laws of Mauritius, (the "Issuer") offering of US$414,000,000 in aggregate principal amount of its 3.575% senior notes due 2026 (the "Notes"), which are governed by the Indenture (the "Indenture"), dated as of August 19, 2021, among the Issuer, Azure Power Global Limited and HSBC Bank USA, National Association, as trustee, I [●] in my capacity as [Director] of the Issuer furnish this certificate pursuant to Section 4.14 of the Indenture. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture.

I hereby certify, in my capacity as a [Director] of the Issuer and not in my personal capacity, that:

1. I have reviewed the following documents:

    (a)   an executed copy of the Indenture;

    (b)   the definitive documentation for the Onshore Debt;

    (c)   the Currency Hedging Agreements included in the Required Hedging Arrangements (the "Currency Hedges");

    (d)   the schedules and confirmations for the Currency Hedges;

    (e)   the term sheets for the Currency Hedges;

    (f)   the U.S. Dollar cash flows with respect to the Notes; and

    (g)   the cash flows with respect to the Onshore Debt.

2. I, together with appropriate officers of the Issuer, have conducted a review of The Currency Hedging Agreements and the Issuer's contracted cash flows and its scheduled payment obligations under the Indebtedness, the Notes and the Required Hedging Arrangements.

3. In my opinion, I have made such examination and investigation as is necessary to enable me to make an informed opinion and deliver the certifications set out in paragraphs 4 and 5 below.

4. The Currency Hedging Agreements included in the Required Hedging Arrangements comprise (i) a coupon swap on the interest payments due under the Notes to fully protect the Issuer against any depreciation in the Indian Rupee to the U.S. Dollar; and (ii) hedging of principal amount through either of or a mix of: (a) swap on the principal amount of the Notes that protects the Issuer against any depreciation in the Indian Rupee to the U.S. Dollar if the Indian Rupee to U.S. Dollar spot rate is above a certain agreed rate after the date of each Incurrence of New Onshore Debt in each case on the payment of principal due under the Notes on early redemption, Mandatory Amortization Redemption or MCS Amortization Redemption.

5. The Issuer has sufficient contracted cash flows to satisfy all scheduled payment obligations under the Notes and the Required Hedging Arrangements. [The Issuer has sufficient contracted cash flows to satisfy all scheduled payment obligations under the Indebtedness incurred under Section 4.09(12) and any related hedging arrangements thereto, the Notes and the Required Hedging Arrangements *].

I am furnishing this certificate to you in connection with the issuance of the Notes. This certificate is not to be relied on by or furnished to any other person or used, circulated, quoted or otherwise referred to for any other purpose. I assume no obligation to advise you, or to make any investigations, as to any factual matters arising subsequent to the date hereof that might affect the confirmations expressed herein.

Very truly yours,

[●]

By: _____

* Please use the language in square brackets where the certificate is being furnished pursuant to Section 4.09(12) of the Indenture.

**EXHIBIT J**

**FORM OF INTERCREDITOR AGREEMENT**

**FORM OF INTERCREDITOR AGREEMENT**

**EXECUTION VERSION**

**Intercreditor Agreement**

by and among

**HSBC Bank USA, National Association**
Indenture Trustee

**The Super Senior Hedging Providers Listed in Part A of Schedule 1 Hereto**

**HSBC Bank USA, National Association**
Collateral Agent

**Azure Power Energy Ltd**
Issuer

and

**Azure Power Global Limited**
Chargor

**Dated August 19, 2021**

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Pari Passu Security | 5 |
| 3. | Appointment of the Collateral Agent | 6 |
| 4. | Enforcement; Written Instructions | 7 |
| 5. | Distribution of Proceeds and Release | 9 |
| 6. | Resignation and Replacement of Collateral Agent | 10 |
| 7. | Super Senior Hedging Obligations | 11 |
| 8. | Accession of Holders of Permitted Pari Passu Secured Indebtedness | 12 |
| 9. | Dispute | 12 |
| 10. | Representations and Warranties | 13 |
| 11. | Successor Agent by Consolidation, Merger, Conversion or Transfer | 13 |
| 12. | Change of Indenture Trustee or Other Secured Parties | 13 |
| 13. | Indemnification | 14 |
| 14. | Limitation on Liability | 14 |
| 15. | Notices; Electronic Communication | 15 |
| 16. | Miscellaneous | 15 |
| 17. | Corporate Actions | 20 |
| 18. | Termination | 21 |
| 19. | Amendment | 21 |
| 20. | Governing Law; Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial | 21 |
| 21. | Counterparts; Signatures | 22 |
| 22. | Severability | 22 |
| 23. | Conflict | 22 |
| 24. | Exclusive Benefit | 23 |
| 25. | Same Rights | 23 |
| 26. | Language | 23 |
| Schedule 1 | Holders of Permitted Pari Passu Secured Indebtedness | 35 |
| Schedule 2 | Security Enforcement Principles | 37 |
| Exhibit A | Form of Supplement to Intercreditor Agreement | 38 |

**This Intercreditor Agreement** (as supplemented and amended from time to time, this "**Agreement**"), dated as of August 19, 2021, by and among:

**(1)**      **HSBC Bank USA, National Association** not in its individual capacity but solely as trustee for the Noteholders under the Indenture (the "**Indenture Trustee**");

**(2)**      The Super Senior Hedging Providers listed in Part A of Schedule 1 hereto;

**(3)**      **HSBC Bank USA, National Association** as collateral Agent for the benefit of the Indenture Trustee (for itself and the benefit of the Noteholders) and the other Secured Parties (the "**Collateral Agent**");

**(4)**      **Azure Power Energy Ltd** (the "**Issuer**"); and

**(5)**      **Azure Power Global Limited** as the chargor (the "**Chargor**") under the Fixed Charge Agreement or other Shared Secured Documents.

**Whereas:**

(A)      The Issuer, the Chargor and the Indenture Trustee have entered into the Indenture and the Issuer has entered into the Super Senior Hedging Agreements.

(B)      The Issuer may from time to time incur additional Permitted Pari Passu Secured Indebtedness in accordance with the terms of the Indenture.

(C)      The Chargor has charged the Collateral to the Collateral Agent to provide a Security Interest for the Note Obligations, the Super Senior Hedging Obligations and any other Permitted Pari Passu Secured Obligations.

(D)      The execution of this Agreement is authorized under the Indenture.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants contained herein and for other good and valuable consideration, the parties hereto agree as follows:

**1.**      **Definitions**

1.1      In this Agreement (including the recitals):

"**1992 ISDA Master Agreement**" means the Master Agreement (Multicurrency – Cross Border) as published by the International Swaps and Derivatives Association, Inc.

"**2002 ISDA Master Agreement**" means the 2002 Master Agreement as published by the International Swaps and Derivatives Association, Inc.

"**Additional Notes**" has the meaning given to such term in the Indenture.

"**Agent**" has the meaning given to such term in the Indenture and any similar agents for Permitted Pari Passu Secured Indebtedness.

"**Close-Out Netting**" means:

(a)      in respect of a Super Senior Hedging Agreement based on a 1992 ISDA Master Agreement, any step involved in determining the amount payable in respect of an Early Termination Date (as defined in the 1992 ISDA Master Agreement) under section 6(e) of the 1992 ISDA Master Agreement before the application of any subsequent set-off (as defined in the 1992 ISDA Master Agreement);

(b)      in respect of a Super Senior Hedging Agreement based on a 2002 ISDA Master Agreement, any step involved in determining an Early Termination Amount (as defined

in the 2002 ISDA Master Agreement) under section 6(e) of the 2002 ISDA Master Agreement; and

(c)    in respect of a Super Senior Hedging Agreement not based on an ISDA Master Agreement, any step involved on a termination of the transactions under that Super Senior Hedging Agreement pursuant to any provision of that Super Senior Hedging Agreement which has a similar effect to either provision referenced in paragraph (a) and paragraph (b) above.

"**Business Day**" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in The City of New York, London, Mauritius or India are authorized by law or governmental regulation to close.

"**Collateral**" means all assets charged, or purported to be charged, by the Issuer and the Chargor to the Collateral Agent under the Shared Security Documents, including proceeds thereof.

"**Defaulting Hedging Provider**" means any Hedging Provider in respect of which an Event of Default (as defined in the relevant Hedging Agreement) in relation to which such Hedging Provider is the Defaulting Party (as defined in the relevant Hedging Agreement) occurs.

"**Enforcement Notice**" means any enforcement notice to be delivered by the Collateral Agent to the Issuer and the Chargor to the effect that the Collateral has become enforceable as a result of the occurrence of an Event of Default that is continuing.

"**Event of Default**" has the meaning given to such term in any applicable Secured Party Document, *provided* that in respect of any Hedging Agreement based on a 1992 ISDA Master Agreement or 2002 ISDA Master Agreement, such term shall also include the occurrence or designation of an Early Termination Date with respect to all transactions thereunder resulting from any Termination Event as such term is defined in such Hedging Agreement. For the avoidance of doubt, the foregoing reference to a Termination Event under this definition shall not imply or be construed that a default or event of default has occurred under any agreement.

"**Fixed Charge Agreement**" means the Fixed Charge Agreement to be entered into on or before October 18, 2021 between the Chargor and the Collateral Agent in respect of the share capital of the Issuer.

"**Hedging Agreements**" means the hedging agreements entered into by the Issuer and the Hedging Providers (including any Hedging Providers acceding thereto) (as may be amended, supplemented or superseded from time to time) for the purpose of protecting the Issuer from fluctuations in currency exchange rates, interest rates or commodity prices and not for speculation.

"**Hedging Obligation**" means, as of any date of determination, the aggregate for each Hedging Agreement of:

(a)    the net amount payable to any or all of the Hedging Providers in connection with Hedging Agreements where the transactions under such Hedging Agreements have been closed out on or before such date of determination and the net amount calculated in accordance with the relevant Hedging Agreements; and

(b)    the net amounts that would be payable to any or all of the Hedging Providers in connection with Hedging Agreements if the transactions under such Hedging Agreements were closed out or terminated at or about 11:00 a.m. (London time) on such date of determination and such net amount calculated in accordance with the relevant Hedging Agreements; provided that if such aggregate net amount is a negative number the Hedging Obligation of the Hedging Providers will be zero,

in each case, to be certified by the relevant Hedging Provider and as calculated in accordance with the relevant Hedging Agreement.

"**Hedging Providers**" means the persons identified in Schedule 1 hereto as having entered into Hedging Agreements (including, for the avoidance of doubt, the Super Senior Hedging Providers).

"**Indenture**" means the indenture dated as of August 19, 2021 relating to the Notes, as amended, restated, supplemented or otherwise modified from time to time.

"**ISDA Master Agreement**" means a 1992 ISDA Master Agreement or a 2002 ISDA Master Agreement, as applicable.

"**Issuer Power of Attorney**" means the Mauritian law governed power of attorney dated August 19, 2021 and effective from (and including) the date on which the Existing Notes are refinanced, in favor of the Collateral Agent under which the Collateral Agent will have the right, upon the occurrence and during the continuance of an Event of Default, to take steps as may be permitted under the terms of the Onshore Debt, to accelerate and enforce the Onshore Debt and enforce the Liens and guarantees issued in respect of the Onshore Debt by issuing instructions to the Onshore Debt Trustee.

"**Liabilities**" means all present and future moneys, debts, liabilities and obligations due at any time by the Issuer to any Secured Party under the Secured Party Documents, both actual and contingent.

"**Majority Secured Parties**" means the Secured Parties which have provided a written instruction or instructions to the Collateral Agent hereunder and collectively represent more than 50% of the aggregate of the Note Obligations, the Hedging Obligations and any other Permitted Pari Passu Secured Obligations outstanding at such time, calculated based on the Collateral Agent's spot rate of exchange for the purchase of the applicable currencies in U.S. Dollars in the London foreign exchange market at or about 11:00 a.m. (London time) on the date of determination.

"**Majority Super Senior Hedging Providers**" means the Super Senior Hedging Providers which have provided a written instruction or instructions to the Collateral Agent hereunder and collectively represent more than 50% of the aggregate Super Senior Hedging Obligations outstanding at such time, calculated in accordance with the Super Senior Hedging Agreements on the date of determination.

"**Note Documents**" means the Indenture and the Notes and such other agreements, instruments and certificates executed and delivered (or issued) by the Issuer or any Note Guarantor pursuant to the foregoing documents.

"**Note Obligations**" means all present and future obligations, contingent or otherwise, of the Issuer to the Indenture Trustee and the holders of the Notes arising under or pursuant to the Note Documents, including any interest, fees and expenses accruing after the initiation of any insolvency proceeding (irrespective of whether such interest, fees and expenses are allowed as a claim in such proceeding).

"**Notes**" means the Issuer's US$414,000,000 3.575% Senior Secured Notes due 2026 and any Additional Notes.

"**Note Guarantee**" has the meaning given to it in the Indenture.

"**Noteholders**" means the Holders (as such term is defined in the Indenture).

"**Payment Netting**" means:

(a)      in respect of a Super Senior Hedging Agreement based on an ISDA Master Agreement, netting under section 2(c) of the relevant ISDA Master Agreement; and

(b)      in respect of a Super Senior Hedging Agreement not based on an ISDA Master Agreement, netting pursuant to any provision of that Super Senior Hedging Agreement which has a similar effect to the provision referenced in paragraph (a) above

"**Parent Power of Attorney**" means the Mauritian law governed power of attorney in favor of the Collateral Agent under which the Collateral Agent will have the right, upon the occurrence and during the continuance of an Event of Default, to replace the Board of Directors of the Issuer, if necessary, and/or to direct the Board of Directors of the Issuer to take steps in relation to the Onshore Debt and enforce the Liens and guarantees issued in respect of the Onshore Debt, as may be permitted under the terms of the Onshore Debt, by issuing instructions to the Onshore Debt Trustee.

"**Payment**" means any payment, repayment, prepayment, redemption, defeasance or discharge of any principal, interest or other amount on or in respect of any of the Liabilities (or other liabilities or obligations).

"**Permitted Pari Passu Secured Indebtedness**" means any "**Permitted Pari Passu Secured Indebtedness**" as defined under and incurred in compliance with the terms of the Indenture.

"**Permitted Pari Passu Secured Indebtedness Documents**" means all agreements governing or evidencing Permitted Pari Passu Secured Indebtedness.

"**Permitted Pari Passu Secured Obligations**" means all present and future obligations, contingent or otherwise, of the Issuer to any holder of the Permitted Pari Passu Secured Indebtedness, that has (or the agent or representative thereof has) become a party hereto in its capacity as a Secured Party, arising under or pursuant to the Secured Party Documents to which such Permitted Pari Passu Secured Indebtedness relates, including any interest, fees and expenses accruing after the initiation of any insolvency proceeding (irrespective of whether such interest, fees and expenses are allowed as a claim in such proceeding).

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"**proceeds**" has the meaning given to such term set forth in Article 9 of the New York Uniform Commercial Code.

"**Secured Parties**" means, collectively, the Indenture Trustee for the benefit of the Noteholders, the Super Senior Hedging Providers and any holder (or any representative or agent thereof) of any other Permitted Pari Passu Secured Indebtedness that has been identified in Schedule 1 hereto and become a party to this Agreement pursuant to Section 8 hereof on behalf of itself or, as the case may be, holder(s) of Permitted Pari Passu Secured Indebtedness.

"**Secured Party Documents**" means the Note Documents, the Super Senior Hedging Agreements and the other Permitted Pari Passu Secured Indebtedness Documents.

"**Security Enforcement Objective**" means maximizing, so far as is consistent with prompt and expeditious realization of value from enforcement of the Shared Security Interest, and in a manner consistent with the provisions of this Agreement, including, in particular, the order of application of proceeds set forth in Section 5 hereof, the recovery by the Super Senior Hedging Providers, the Noteholders and the holders of other Permitted Pari Passu Secured Indebtedness.

"**Security Enforcement Principles**" means the principles set forth in Schedule 2 hereto.

"**Security Interest**" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"**Shared Security Documents**" means the Fixed Charge Agreement, the Issuer Power of Attorney, the Parent Power of Attorney and any other document executed from time to time evidencing the Shared Security Interest, in each case as such may be amended, supplemented or modified from time to time.

"**Shared Security Interest**" means the Security Interest in favor of the Collateral Agent as agent for the Secured Parties created, or purported to be created, pursuant to the Shared Security Documents.

"**Super Senior Hedging Agreements**" means the Hedging Agreements entered into by the Issuer for the purpose of protecting it from fluctuations in currency exchange rates or interest rates related to the Notes or Permitted Pari Passu Secured Indebtedness.

"**Super Senior Hedging Providers**" means the Hedging Providers that have entered into Super Senior Hedging Agreements.

"**Super Senior Hedging Obligations**" means the Hedging Obligations of the Super Senior Hedging Providers under the Super Senior Hedging Agreements.

1.2     A reference in this Agreement to any party or person shall be construed so as to include its successors in title, permitted assigns and permitted transferees, including in the case of the Issuer, any successor to the Issuer under the Indenture.

1.3     Section, clause and schedule headings are for ease of reference only.

1.4     Capitalized terms used herein but not defined herein have the meanings assigned to them in the Indenture, unless the context otherwise requires.

2.      **Pari Passu Security**

2.1     Notwithstanding (a) the time, order or method of attachment or perfection of any Security Interests, the time or order of filing of financing statements (or similar filings in any applicable jurisdiction), or the giving of or failure to give notice of the acquisition or expected acquisition of purchase money or other Security Interest, (b) the manner in which the Shared Security Interest is acquired, whether by grant, statute or operation of law, subrogation or otherwise, (c) the fact that the Collateral or Shared Security Interest (or any portion thereof) is otherwise subordinated, voided, avoided, invalidated or lapsed and (d) any applicable law or any provision to the contrary in any Secured Party Document and the Shared Security Documents with respect to the Collateral and all proceeds of the Collateral, each Secured Party agrees that (i) the Security Interest of each Secured Party in the Collateral ranks and shall rank equally in priority with the Security Interest of the other Secured Parties in the Collateral and (ii) the Note Obligations, the Hedging Obligations and any other Permitted Pari Passu Secured Obligations rank and shall rank *pari passu* among themselves.

2.2     The agreements as to the priority of the Security Interest of each Secured Party in and to the Collateral provided for herein shall not be deemed to subordinate or otherwise affect in any respect the Security Interest securing any other indebtedness (which, for the avoidance of doubt, does not include any Note Obligations, Super Senior Hedging Obligations or other Permitted Pari Passu Secured Obligations) of the Issuer or the Chargor.

2.3     Each Secured Party agrees that it will not attack, contest or bring (or voluntarily join in) any action for the purpose of contesting the validity, perfection, priority or enforceability of the Security Interest of any other Secured Party or finance or urge any other Person to do so;

*provided* that any Secured Party may enforce its rights and privileges hereunder without being deemed to have violated this provision. Any provision contained in this Agreement to the contrary notwithstanding, the terms and conditions of this Agreement shall not apply to any property or asset (including properties or assets (or proceeds thereof) that do not constitute Collateral) as to which one Secured Party has a Security Interest and as to which the other Secured Parties do not have a Security Interest.

3. **Appointment of the Collateral Agent**

3.1     Each Secured Party hereby irrevocably appoints and authorizes the Collateral Agent to act as its collateral agent under and in connection with the Shared Security Documents and this Agreement in accordance with laws of the State of New York or the law of another applicable jurisdiction, as the case may be, and authorizes the Collateral Agent to enter on its behalf and on behalf of the Noteholders (in the case of the Indenture Trustee), the Super Senior Hedging Providers and, if applicable, the holders of any other Permitted Pari Passu Secured Indebtedness to which such Secured Party relates, into the Shared Security Documents.

3.2     The Collateral Agent agrees and acknowledges that it shall hold the Collateral and any Security Interest thereon for the equal and ratable benefit of all Secured Parties in accordance with the terms of the Shared Security Documents and subject to the terms and conditions of this Agreement, including, in particular, the order of application of proceeds set forth in Section 5 hereof. Each of the Secured Parties agrees and acknowledges that the Shared Security Documents shall be subject to the terms and conditions of this Agreement in all circumstances, and further agrees that it shall pay all proceeds received or realized by it in relation to the Collateral granted in favor of it under the Shared Security Documents and any Security Interest thereon to the Collateral Agent for application and distribution in accordance with Section 5 hereof.

3.3     In addition to its rights, powers, privileges, limitations and exculpation set forth herein, the Collateral Agent shall be entitled, in acting as collateral Agent for the Secured Parties, to all of the rights, powers and privileges, and the benefit of the limitations and exculpations, as set out in the Shared Security Documents and the Secured Party Documents or in accordance with applicable laws and regulations.

3.4     As of the date hereof, this Agreement is entered into by the Indenture Trustee, the Super Senior Hedging Providers, the Collateral Agent, the Issuer and the Chargor pursuant to section 4.25 (*Intercreditor Agreement and Priority*) of the Indenture.

3.5     The Chargor shall deliver all original share certificates, transfer forms and all other perfection documents to the Collateral Agent on or prior to the date hereof under the Shared Security Documents and the Collateral Agent shall hold such documents subject to the terms of this Agreement.

3.6     Any Secured Party who is holding any perfection document shall deliver such perfection document to the Collateral Agent to hold such perfection documents for the benefit of all Secured Parties.

3.7     For the limited purpose of perfecting the Security Interests of the Secured Parties in those types or items of the Collateral, if any, in which a Security Interest may only be perfected by possession or control, any Secured Party that is in possession or control of such Collateral agrees that if it elects to relinquish possession or control of such Collateral, it shall deliver possession or control thereof to the Collateral Agent; *provided* that, no Secured Party shall be required to deliver any such Collateral or take any other action referred to in this Section to the extent that such action would contravene any law, order or other legal requirements, and in the event of a controversy or dispute, such Secured Party may interplead any item of Collateral in any court of competent jurisdiction.

4. **Enforcement; Written Instructions**

4.1 Only the Collateral Agent (or any delegate, receiver or other Person appointed by the Collateral Agent in accordance with the Shared Security Documents or this Agreement) shall be entitled to act, or otherwise refrain from acting, in connection with, or enforce (including, without obligation, to perfect or continue the perfection of), the Shared Security Interest on behalf of the Secured Parties pursuant to the terms of the applicable Shared Security Document and this Agreement.

4.2 Each Secured Party agrees that, in relation to any instruction given by it to the Collateral Agent to take action in relation to depositing or maintaining any Collateral subject to a Shared Security Interest or any other action in respect of such Collateral, any Secured Party may provide to the Collateral Agent written instructions signed by an authorized person of such Secured Party; *provided, however, that* upon receipt of any such written instruction from any Secured Party, the Collateral Agent shall as soon as reasonably practicable provide the Issuer and the Chargor and the other Secured Parties with a copy of such instruction.

4.3 Upon the occurrence and during the continuance of an Event of Default, any Secured Party may, to the extent permitted or not restricted under the applicable Secured Party Document, notify in writing the Collateral Agent (with a copy to the other Secured Parties) of the occurrence of such Event of Default and may instruct in writing the Collateral Agent (with a copy to the other Secured Parties) to (i) enforce the Collateral and/or take any actions which the Collateral Agent is entitled to do under the terms of the Shared Security Documents and (ii) deliver an Enforcement Notice to the Issuer and the Chargor (such instructions, the "**Enforcement Instructions**"); *provided, however*, that in the case of the Super Senior Hedging Providers, the Enforcement Instructions shall be given by or on behalf of the Majority Super Senior Hedging Providers. Upon receipt of an Enforcement Instruction, the Collateral Agent shall act, in accordance with written instructions received by it from the applicable Secured Party, to enforce on or against the Shared Security Interest subject to Sections 4.4, 4.5, 4.7 and 9 hereof *provided, however, that* upon receipt of an Enforcement Instruction, the Collateral Agent shall as soon as reasonably practicable provide the Issuer, the Chargor and the other Secured Parties accordingly with a copy of such Enforcement Instruction and such Enforcement Notice. Any Enforcement Instruction delivered pursuant to this Agreement shall expressly include instructions as to the actions to be taken by the Collateral Agent and shall include a certification (upon which the Collateral Agent may conclusively rely) that the actions contemplated by such Enforcement Instruction complies with and is in accordance with the Security Enforcement Principles.

4.4 Notwithstanding any provision herein to the contrary but subject to Section 9 hereof, if the Collateral Agent identifies a conflict:

(a) between Secured Parties' interests in connection with any Enforcement Instructions; or

(b) in the event that more than one of the Secured Parties issues Enforcement Instructions, between those Enforcement Instructions,

and the Collateral Agent believes in its sole and absolute discretion that the interests of the Secured Parties would be in conflict upon the exercise of those Enforcement Instructions, or that compliance with an Enforcement Instruction would cause the Collateral Agent to contravene another Enforcement Instruction, the Collateral Agent shall notify each Secured Party in writing not more than ten (10) Business Days after it becomes aware of such conflict that the Collateral Agent considers such a conflict exists and the Collateral Agent is not obligated to take any action if it identifies such conflict; *provided that*, the Collateral Agent shall act in accordance with such Enforcement Instructions to the extent that such Enforcement Instructions do not conflict with each other and further *provided that* the Collateral Agent shall act in accordance with Section 9 hereof.

4.5 Notwithstanding anything to the contrary contained in this Agreement, if the Collateral Agent shall receive any instruction from any Secured Party with respect to any act or action (including failure to act) in connection with this Agreement or the Shared Security Documents, the Collateral Agent shall be entitled to refrain from such act or taking such action unless and until it shall have received written instruction from any Secured Party and to the extent requested, indemnification and/or security and/or pre-funding to its satisfaction in respect of actions to be taken, and the Collateral Agent shall not incur liability to any Secured Party, any Noteholder or any holder of Permitted Pari Passu Secured Indebtedness or any other Person by reason of so refraining. Without limiting the foregoing, no party hereto shall have any right of action whatsoever against the Collateral Agent and the Collateral Agent shall incur no liability to any party hereto as a result of the Collateral Agent acting or refraining from acting hereunder in accordance with the instructions of the Secured Parties or under any Shared Security Document as provided for therein.

4.6 The Collateral Agent shall be entitled to seek directions as to the exercise or non-exercise of any of its rights, powers, or discretions from the instructing Secured Party and to seek clarification of any instruction previously given, and the Collateral Agent shall be entitled to refrain from acting in the absence of any, or any clear, written instructions.

4.7 The Collateral Agent may refrain from acting unless and until (a) clearly instructed in writing by a Secured Party as to whether or not any right, power or discretion is to be exercised and, if it is to be exercised, as to the manner in which it should be exercised and (b) it has received security and/or indemnity and/or pre-funding satisfactory to it.

4.8 The Collateral Agent shall be fully protected and not liable if it complies with any instructions of any Secured Party as the case may be with respect to any Enforcement Instruction in accordance with the provisions of this Section or any other instruction of a Secured Party provided pursuant to any Shared Security Document or this Agreement.

4.9 The Collateral Agent shall not be responsible to any Secured Party for any failure to enforce or to maximize the proceeds of any enforcement in respect of any Enforcement Instruction.

4.10 Each Secured Party agrees to certify to the Collateral Agent, (x) upon reasonable request of the Collateral Agent and (y) at any time when an instruction is provided by a Secured Party to the Collateral Agent hereunder, the outstanding principal amount of, as the case may be, the Notes or the Permitted Pari Passu Secured Indebtedness to which such Secured Party relates.

4.11 The Collateral Agent shall not be responsible for acting or refraining from acting unless instructed by any written instruction or Enforcement Instruction received by it pursuant to the terms of this Agreement or any Shared Security Document and shall not have any responsibility or liability to any interests arising from circumstances particular to any holder (whatever their number) as regards the exercise and performance of all powers, authorities, duties, discretions and obligations of the Collateral Agent in respect of the Collateral or the rights or benefits which are comprised in the Collateral. Prior to receiving any Enforcement Instruction from any Secured Party, the Collateral Agent shall be under no obligation to take any steps to call in or to enforce the Collateral and shall not be liable for any liability, damages, cost, loss or expense (including legal fees) and any value added tax thereon arising from any omissions on its part to take any such steps.

4.12 The Collateral Agent shall not be responsible and/or liable for the priority of the Collateral on enforcement.

4.13 The Issuer and the Chargor will promptly and diligently notify the Collateral Agent and each Secured Party of:

(a) any occurrence of which they become aware which might:

8

(i) adversely affect their ability to perform any of their obligations under, or otherwise to comply with any of the terms of, this Agreement; or

(ii) jeopardize any assets comprising the Collateral; and

(b) any steps or action which they are taking, or are considering taking, to remedy or mitigate the effect of such occurrence.

5. **Distribution of Proceeds and Release**

Following the delivery of an Enforcement Instruction, the Issuer may not make any Payment in respect of any Liabilities except from the proceeds from any sale, collection, liquidation or enforcement of the Collateral, which shall be distributed by the Collateral Agent in accordance with the terms hereof and subject to the conditions of the relevant Shared Security Document, *provided* that the Payments prohibited by this Section 5 shall remain owing by the Issuer to the extent not paid. Notwithstanding any provision of this Agreement to the contrary, such proceeds shall be applied as follows:

(a) *first*, to the Indenture Trustee, the Collateral Agent, the Agents and, to the extent applicable, any representative of holders of any Permitted Pari Passu Secured Indebtedness, to the extent necessary to reimburse the Indenture Trustee, the Collateral Agent, the Agents and any such representative for any unpaid fees, costs and expenses (including fees and expenses of legal counsel) incurred in connection with the collection or distribution of such amounts held or realized or in connection with expenses (including fees and expenses of legal counsel) incurred in enforcing its remedies under the Shared Security Documents and preserving the Collateral and all amounts for which the Indenture Trustee, the Collateral Agent, the Agents and any such representative are entitled to indemnification under the Shared Security Documents and this Agreement;

(b) *second*, on a *pro rata* and *pari passu* basis to the Super Senior Hedging Providers (other than any Defaulting Hedging Providers) under Super Senior Hedging Obligations;

(c) *third*, to the Indenture Trustee for the benefit of Noteholders and, to the extent applicable, holders of any Permitted Pari Passu Secured Indebtedness (or their representative) (other than the Super Senior Hedging Providers and any Defaulting Hedging Providers) on a *pro rata* and *pari passu* basis;

(d) *fourth*, to any Defaulting Hedging Providers on a *pro rata* and *pari passu* basis; and

(e) *fifth*, any surplus remaining after such payments will be paid to the Issuer or whomever may be lawfully entitled thereto.

Each party hereto agrees that any proceeds of the Collateral received or recovered by it in violation of the priorities set forth above and the other provisions of this Agreement shall be segregated and held in trust and promptly paid over to the Collateral Agent, in the same form as received, with any necessary endorsements, for application in accordance with the priorities set forth above.

Each Secured Party expressly authorizes and instructs the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of each of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the Shared Security Documents.

6. **Resignation and Replacement of Collateral Agent**

6.1    Resignation

The Collateral Agent may resign without giving any reason at any time by thirty (30) calendar days' prior written notice of resignation to each Secured Party, the Issuer and the Chargor.

6.2    Removal

(a)    The Collateral Agent may be removed by sixty (60) days' prior written notice of removal to the Collateral Agent from the Majority Secured Parties, with a copy thereof to the Issuer and the Chargor.

(b)    If the Collateral Agent has resigned or has been removed by or on behalf of the Secured Parties, the Secured Parties (in consultation with the Issuer and Chargor (so long as no Event of Default has occurred and is continuing)) shall appoint a successor Collateral Agent and give notice of such successor Collateral Agent to the retiring Collateral Agent, the Issuer and the Chargor within thirty (30) calendar days of giving the foregoing notice of removal to the Collateral Agent or of receiving the foregoing notice of resignation from the retiring Collateral Agent.

(c)    If a successor Collateral Agent has not been appointed, or has not accepted such appointment, within thirty (30) calendar days after the retiring Collateral Agent has given notice of resignation or has received notice of removal, the retiring Collateral Agent may, at the expense of the Issuer, and with notice to the Issuer and the Chargor, appoint a successor Collateral Agent or any one of the Secured Parties or the retiring Collateral Agent may apply to a court of competent jurisdiction for the appointment of a successor Collateral Agent or for other appropriate relief.

6.3    Effectiveness

A resignation or removal of the Collateral Agent and appointment of a successor Collateral Agent will become effective only upon:

(a)    the successor Collateral Agent's acceptance of appointment as provided in this Section 6; and

(b)    the execution of all documents that are necessary to substitute the successor Collateral Agent hereunder pursuant to Section 6.4 hereof and under each of the Shared Security Documents.

6.4    Transfer of rights and interests

Upon delivery by the successor Collateral Agent of a written acceptance of its appointment to the retiring Collateral Agent and each Secured Party, and upon the execution of all documents that are necessary to substitute the successor Collateral Agent hereunder and under each of the Shared Security Documents:

(a)    the retiring Collateral Agent will at the expense of the Issuer and the Chargor transfer and assign all property and documents held by it as Collateral Agent to the successor Collateral Agent, subject to the Shared Security Interest;

(b)    the resignation or removal of the retiring Collateral Agent will become effective; and

(c)    the successor Collateral Agent will have all the rights, powers and duties of the retired Collateral Agent under this Agreement and the Shared Security Documents and the retiring Collateral Agent shall have no further duties, responsibilities or obligations hereunder.

6.5     Failure to appoint successor Collateral Agent

Without prejudice to the Collateral Agent's rights under Section 9 hereof in the event that:

(a)     the Collateral Agent has given notice of its resignation pursuant to Section 6.1 hereof, or any Secured Party has given notice to the Collateral Agent of its removal pursuant to Section 6.2 hereof; and

(b)     a successor Collateral Agent has not been appointed or has not accepted its appointment, or the requirements of Sections 6.3 and 6.4 hereof relating to the transfer of the rights and interests of the Collateral Agent to the successor Collateral Agent have not been satisfied, in each case within thirty (30) calendar days of the date of delivery of such notice,

the Collateral Agent may, at its option, refuse to comply with any claims or demands, including without limitation, any Enforcement Instruction, and refuse to take any other action hereunder; *provided, however, that* the Collateral Agent shall inform each Secured Party, the Issuer and the Chargor in writing of its decision, and in any such event, the Collateral Agent shall not be liable in any way or to any person for its failure or refusal to act if the circumstances set out in this Section 6.5 occur, and the Collateral Agent shall be entitled to continue to so refuse to act and refrain from acting until the matters referred to in paragraph (b) above have been satisfied.

7.      **Super Senior Hedging Obligations**

7.1     No payment may be made to a Super Senior Hedging Provider by (or on behalf of) the Issuer or the Collateral Agent if any scheduled payment due from that Super Senior Hedging Provider to the Issuer under a Super Senior Hedging Agreement is due and unpaid unless the scheduled payment due from that Super Senior Hedging Provider to the Issuer under a Super Senior Hedging Agreement based on a 1992 ISDA Master Agreement or 2002 ISDA Master Agreement is being withheld pursuant to the provisions of section 2(a)(iii) of such Super Senior Hedging Agreement.

7.2     Failure by the Issuer to make a payment to a Super Senior Hedging Provider which results solely from the operation of Section 7.1 hereof shall, without prejudice to Section 7.3 hereof, not result in a default, potential event of default, event of default or termination event (however described) by or in respect of the Issuer under that Super Senior Hedging Agreement.

7.3     The Issuer shall not be released from liability for failing to make any payment under the terms of any Super Senior Hedging Agreement by the operation of Section 7.1 hereof even if its obligation to make that payment is restricted at any time by Section 7.1 hereof.

7.4     If, on termination of any transaction under any Super Senior Hedging Agreement occurring after the acceleration of the Notes or any Permitted Pari Passu Secured Indebtedness or the delivery of any Enforcement Instruction, a settlement amount or other amount (following the application of any Close-Out Netting or Payment Netting in respect of that Super Senior Hedging Agreement) falls due from a Super Senior Hedging Provider to the Issuer, then that amount shall be paid by that Super Senior Hedging Provider to the Collateral Agent, treated as the proceeds of enforcement of the Shared Security Interest and applied in accordance with the terms of this Agreement. The payment of such amount by the Super Senior Hedging Provider to the Collateral Agent in accordance with this Section 7.4 shall discharge the Super Senior Hedging Provider's obligation to pay such amount to the Issuer.

7.5     For the avoidance of doubt, in the event of any inconsistency between the provisions of the Super Senior Hedging Agreement and this Section 7, this Section 7 will prevail.

8. **Accession of Holders of Permitted Pari Passu Secured Indebtedness**

Without prejudice to any provision of the Secured Party Documents, the Issuer may not incur Permitted Pari Passu Secured Indebtedness (other than Additional Notes or other indebtedness in respect of which the holders or their representative is already a party to this Agreement) and the Chargor may not create Security Interests on the Collateral unless the holder(s) (or a representative on its or their behalf) of such Permitted Pari Passu Secured Indebtedness agree(s) to become a party hereto pursuant to a supplement hereto substantially in the form of Exhibit A and the Collateral Agent is satisfied with its internal compliance procedures (including but not limited to Know Your Client checks) in respect of such additional party acceding to this Agreement. Upon (a) the due execution and delivery of such supplement by each such holder (or its representative) and (b) the satisfaction of any and all conditions under the Secured Party Documents to the incurrence of such Permitted Pari Passu Secured Indebtedness by the Issuer or the Chargor, such holder (or its representative) shall become a Secured Party (and a Super Senior Hedging Provider, if applicable) bound by the provisions hereof and Schedule 1 hereto shall be deemed to be amended to incorporate the particulars of such holder (or its representative) set forth in Annex A to such supplement. Without prejudice to any other provisions of this Agreement, this Section 8 shall not oblige any successor, assign or transferee under the Indenture to execute a supplement hereto. The Issuer shall promptly deliver to the Collateral Agent an updated Schedule 1 hereto reflecting such particulars.

9. **Dispute**

9.1 In the event of any disagreement between any Secured Parties or between a Secured Party and the Majority Secured Parties, or if the Collateral Agent believes at its sole and absolute discretion that any conflict has arisen:

(a) between such Secured Parties' interests in connection with any instructions given by any Secured Party; or

(b) in the event that each of the Secured Parties issues any instructions with respect to the same or a similar subject, between those instructions,

any Secured Party or the Collateral Agent may deliver a notice to the other Secured Parties and the Collateral Agent, as applicable, and the delivery of such notice shall commence a 30 calendar day consultation period during which time the Secured Parties shall consult with each other in good faith with a view to coordinating the proposed instructions and keep the Collateral Agent informed of such consultation and coordination efforts. If consultation has taken place for at least 30 calendar days, there shall be no further obligation to consult and, the Collateral Agent may act in accordance with the instructions of the Majority Secured Parties, which shall be binding on all Secured Parties; *provided that* the Majority Secured Parties shall provide such instructions that comply with the Security Enforcement Principles; *provided further that* if no such instructions from the Majority Secured Parties are available, the Collateral Agent may, at its option, refuse to comply with any claims or demands, and refuse to take any other action hereunder, so long as such disagreement or conflict continues; *provided further that* if the Collateral Agent receives conflicting instructions as to whether or not to enforce the Shared Security Interest, the instructions that direct the Collateral Agent to enforce the Shared Security Interest shall prevail subject, in the case of Super Senior Hedging Providers, that any such instruction have come from the Majority Super Senior Hedging Providers, and in any such event, the Collateral Agent shall not be liable in any way or to any person for its failure or refusal to act if the circumstances set out in this Section 9.1 occur, and the Collateral Agent shall be entitled to continue to so refuse to act and refrain from acting until (i) the rights of all parties having or claiming an interest in the Shared Security Interest shall have been fully and finally adjudicated by a court of competent jurisdiction or the disagreement or, as the case may be, the conflict shall have been resolved by agreement between the Secured Parties (and the Secured Parties shall consult with one another in good faith for at least 30 calendar days with a

view to resolving the disagreement or, as the case may be, the conflict), and (ii) the Collateral Agent shall, in the case of adjudication by a court of competent jurisdiction, have received a final order, judgment or decree by such court of competent jurisdiction, which order, judgment or decree is not subject to appeal, and in the case of resolution of differences by agreement, have received a notice in writing signed by an authorized person of each of the Secured Parties setting forth in detail the agreement. The Collateral Agent shall have the option, after 30 calendar days' notice to the other parties of its intention to do so, to file an action in interpleader requiring the parties hereto to answer and litigate any claims and rights among themselves. The costs and expenses (including attorneys' fees and expenses) properly incurred by the Collateral Agent in connection with such proceeding shall be paid by, and be the obligation of, the Issuer, and the Collateral Agent shall have the right to pay or reimburse itself for the prior payment of such fees and expenses from the Shared Security Interest.

9.2 The Collateral Agent may consult with legal counsel and/or professional advisors of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder, and shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of such counsel. The Issuer agrees to reimburse the Collateral Agent on demand for all legal fees, disbursements and expenses properly incurred by the Collateral Agent in so consulting with legal counsel and the Collateral Agent shall have the right to pay or reimburse itself for the prior payment of such fees, disbursements and expenses from the Shared Security Interest.

Each Secured Party agrees or is deemed to agree that it shall provide or cause to be provided an Enforcement Instruction that is in accordance with the Security Enforcement Principles and, upon delivery of any Enforcement Instruction, shall be deemed to certify that such Enforcement Instruction is in accordance with the Security Enforcement Principles.

9.3 The parties hereto agree that any instructions given by any Secured Party to the Collateral Agent hereunder or any document executed in connection therewith shall in all circumstances be subject to this Section 9.

9.4 The rights of the Collateral Agent under this Section 9 are cumulative of all other rights which it may have by law or otherwise.

10. **Representations and Warranties**

Each Secured Party, the Issuer and the Chargor, each individually, hereby represents and warrants that (i) this Agreement has been duly authorized, executed and delivered on its behalf by a person thereunto duly and validly authorized and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms and (ii) the execution and delivery of, and the performance of its obligations under, this Agreement do not violate any law or regulation applicable to it.

11. **Successor Agent by Consolidation, Merger, Conversion or Transfer**

If the Collateral Agent consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business or assets to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Collateral Agent with the same effect as if the successor Collateral Agent had been named the Collateral Agent.

12. **Change of Indenture Trustee or Other Secured Parties**

12.1 The Indenture Trustee may assign and transfer all of its rights and obligations hereunder to a replacement Indenture Trustee, or may resign or be removed, in accordance with the Indenture; *provided that* the Indenture Trustee shall give prompt notice to the other parties to this

Agreement of such assignment, transfer, resignation or removal. Upon such assignment transfer, resignation or removal taking effect in accordance with the terms of the Indenture the replacement Indenture Trustee shall be, and be deemed to be, acting as trustee for each of the Noteholders (as well as for itself) for the purposes of this Agreement in place of the old Indenture Trustee.

12.2 Each of the other Secured Parties may assign and transfer all of its respective rights and obligations hereunder to a replacement Secured Party, or may resign or be removed, in accordance with the relevant Permitted Pari Passu Secured Indebtedness Document; *provided that* such Secured Party shall give prompt notice to the other parties to this Agreement of such assignment, transfer, resignation or removal. Upon such assignment, transfer, resignation or removal taking effect in accordance with the terms of the relevant Permitted Pari Passu Secured Indebtedness Document, the replacement Secured Party shall be, and be deemed to be, acting as the Secured Party for the purposes of this Agreement in place of the old Secured Party.

13. **Indemnification**

13.1 The Issuer agrees to be responsible for and will indemnify the Collateral Agent or any predecessor Collateral Agent and their agents, employees, officers and directors for, and hold it harmless against any loss or liability or properly incurred expense incurred by it without gross negligence or wilful misconduct on its part arising out of or in connection with the acceptance or administration of this Agreement and its duties under this Agreement, including (i) the properly incurred costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Agreement and (ii) the reasonable compensation and properly incurred expenses and disbursements of the Collateral Agent's agents and counsel and other persons not regularly within the Collateral Agent's employ. This Section 13 shall survive the resignation or removal of the Collateral Agent and the termination of this Agreement.

13.2 References to the Collateral Agent in Sections 13, 14, 15 and 16 shall include any person selected by the Collateral Agent with due care to whom the Collateral Agent properly delegates any power, authority, duty or obligation under and in accordance with this Agreement.

14. **Limitation on Liability**

14.1 The Collateral Agent shall not be liable to any person (including without limitation the Issuer, the Chargor and the Secured Parties) for any action taken or omitted or for any loss or injury resulting from its actions or its performance or lack of performance of its duties hereunder in the absence of gross negligence or wilful misconduct on its part. The Collateral Agent is authorized to act, and shall not be liable for acting, in reliance upon any judgment, order, instruction, notice, certification, demand, consent, authorization, receipt, power of attorney or other writing delivered to it by any other party without being required to determine the authenticity or validity thereof, the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgement or order. The Collateral Agent may act in reliance upon any signature believed by it to be genuine and may assume that such person has been properly authorized to do so. The Collateral Agent shall not be liable (i) for any indirect, consequential, punitive or special damages (including loss of business, goodwill, opportunity or profit), regardless of the form of action and whether or not (a) any such damages arise directly or indirectly, (b) any such damages were foreseeable or contemplated or the possibility of which was advised or known to the Collateral Agent or (c) the claim for such damages is made in negligence, breach of contract or otherwise or (ii) for the acts or omissions of any nominees, correspondents, designees, agents, delegates, subagents or subcustodians selected by the Collateral Agent with due care.

14.2 The Collateral Agent shall not be liable to account for interest on money paid to it by the Issuer.

14.3    The Collateral Agent is not responsible for and will make no investigation as to the title, ownership, value, sufficiency or existence of any of the assets which are the subject of the Collateral or as to the value or sufficiency of any Shared Security Document or this Agreement.

14.4    The Collateral Agent is not required to be the registered holder of title to any assets comprising the Collateral prior to enforcement.

14.5    The Collateral Agent is not responsible for and will make no investigation as to the existence, accuracy or sufficiency of any legal or other opinions, searches, reports, certificates, valuations or investigations given or required in connection with any of the Collateral.

14.6    The Collateral Agent shall be entitled to call for and rely on any certificate of any party hereto as to any matter on which the Collateral Agent requires to be satisfied. The Collateral Agent shall not be liable for acting or not acting (or relying) on such information in good faith.

14.7    In no event shall the Collateral Agent be required to expend or risk any of its own funds or otherwise incur any liability, financial or otherwise, in the performance of its duties or in the exercise of any of its rights or powers under the Agreement. The Collateral Agent will be under no obligation to exercise any of its rights and powers under this Agreement unless it is offered security and/or indemnity and/or pre-funding satisfactory to it against any loss, liability or expense.

14.8    This Section 14 shall survive the resignation or removal of the Collateral Agent and the termination of this Agreement

15.    **Notices; Electronic Communication**

15.1    Any communication to be made under or in connection with this Agreement shall be made in English, in writing and, unless otherwise stated, may be made by fax, electronic transmission or letter. The address, email address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party for any communication or document to be made or delivered under or in connection with this Agreement is identified with its name below (or any substitute address, email address or fax number or department or officer as the party may notify to the other parties by not less than five Business Days' notice).

15.2    Any electronic communication made between the parties hereto will be effective only when actually received in readable form.

16.    **Miscellaneous**

16.1    The Collateral Agent may use legal counsel, independent accountants and other professional advisers in connection with this Agreement, the Shared Security Documents or any other related documents and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisers. Before the Collateral Agent acts or refrains from acting, it may require an officer's certificate and/or an opinion of counsel from any other party hereto. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance thereon.

16.2    The Collateral Agent shall only be obligated to perform duties expressly set out in this Agreement and the Shared Security Documents and no implied covenants or obligations shall be read into this Agreement, the Shared Security Documents or any other related documents. For the avoidance of doubt, except for the safe custody and preservation of the Collateral in its possession and the accounting for monies actually received by it, the Collateral Agent shall have no other duty with respect to the holding of the Collateral. The Collateral Agent shall be deemed to have provided safe custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent holds similar property as a third party agent.

16.3  The Collateral Agent may acquire an interest in the Notes or any Permitted Pari Passu Secured Indebtedness or be involved in any other transaction with the Issuer and/or the Chargor.

16.4  The Issuer will, including to the extent not otherwise reimbursed under Section 16.5 hereof, within 30 calendar days of demand by the Collateral Agent, pay or discharge all out-of-pocket costs, charges, taxes, liabilities and expenses properly incurred by the Collateral Agent in the preparation and execution of this Agreement and the performance of its functions under, and in any manner in relation to, this Agreement and the Shared Security Documents, including but not limited to, out-of-pocket expenses properly incurred seeking appropriate legal or financial advice to discharge its duties, legal and travelling expenses and any stamp, documentary or other taxes or duties paid or payable by the Collateral Agent in connection with any action or legal proceedings brought or contemplated by the Collateral Agent against the Issuer to enforce any provision of this Agreement or the Shared Security Documents. Such costs, charges, liabilities and expenses will (i) in the case of payments made by the Collateral Agent before such demand, carry interest from the date of demand at the rate of two per cent, per annum above the Collateral Agent's cost of funds determined by the Collateral Agent on the date on which the Collateral Agent made such payments; and (ii) in other cases, carry interest at such rate from 30 calendar days after the date of the demand or (where the demand specifies that payment is to be made on an earlier date) from such earlier date. This Section 16.4 shall survive the resignation or removal of the Collateral Agent and the termination of this Agreement.

16.5  The Issuer shall pay the Collateral Agent such fees, costs and expenses as separately agreed upon in writing between the Issuer and the Collateral Agent. If the Collateral Agent receives any Enforcement Instructions and is required to perform duties that are not expressly contemplated under this Agreement, or if the Collateral Agent is requested to undertake duties which are of an exceptional nature or otherwise outside the scope of the Collateral Agent's normal duties under this Agreement, the Issuer will pay such additional remuneration as they may agree (and which may be calculated by reference to the Collateral Agent's normal hourly rate in place from time to time) or, failing such agreement as to any of the matters in this Section 16.5, as determined by an independent financial institution (acting as an expert and not as an arbitrator) selected by the Collateral Agent and, prior to the occurrence of an Event of Default that is continuing, also approved by the Issuer. The properly incurred expenses involved in such nomination and the financial institution's reasonable fees will be paid by the Issuer. The determination of such financial institution will be conclusive and binding on the Issuer, the Collateral Agent and the Secured Parties. This Section 16.5 shall survive the resignation or removal of the Collateral Agent and the termination of this Agreement.

16.6  In case any term or provision of this Agreement conflicts with the terms or provisions of any Shared Security Documents, the terms and provisions of this Agreement shall govern.

16.7  The Collateral Agent is not required to monitor the performance (financial or otherwise) of the Issuer or any other Person, or the Issuer's or any other Person's performance of, or failure to perform, the obligations, duties and covenants set forth in the Secured Party Documents or the Shared Security Documents or any other document, and shall bear no responsibility for, or liability in connection with, the failure of any Person to perfect a security interest in the Collateral.

16.8  The Collateral Agent is not responsible for payment of any taxes or stamp duty as a result of (a) it holding any assets subject to a Security Interest or (b) it enforcing any Security Interest held by it. The Issuer and the Chargor shall be solely responsible for the payment of all such taxes and stamp duties.

16.9  The Collateral Agent is not responsible for making any deductions or withholdings in respect of taxes or other governmental charges in respect of any amounts paid by the Collateral Agent from the proceeds of any enforcement of the Shared Security Interest. If any applicable law requires the deduction or withholding of any tax from any such payment by the Collateral

Agent, then the Collateral Agent shall be entitled to make such deduction or withholding and pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law.

16.10 The Collateral Agent is not responsible for the creditworthiness, financial and business condition or solvency of the Issuer, the Chargor or any other party providing any Collateral.

16.11 The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless the Collateral Agent has received written notice from a Secured Party which has specified the same.

16.12 Notwithstanding anything to the contrary in this Agreement, the Secured Party Documents and the Shared Security Documents, the Collateral Agent shall not in any event be liable for any loss or damage, or any failure or delay in the performance of its obligations hereunder if it is prevented from so performing its obligations by any reason which is beyond the control of the Collateral Agent, including, but not limited to, by any existing or future law or regulation, any existing or future act of governmental authority, act of God, flood, war whether declared or undeclared, terrorism, riot, rebellion, civil commotion, strike, lockout, other industrial action, general failure of electricity or other energy or utility supply, aircraft collision, technical failure, accidental or mechanical or electrical breakdown, computer failure or failure of any money transmission system or any event where, in the reasonable opinion of the Collateral Agent, performance of any duty or obligation under or pursuant to this Agreement would or may be illegal or would result in the Collateral Agent being in breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Collateral Agent is subject.

16.13 The Collateral Agent shall be regarded as acting through its agency division which shall be treated as a separate division from any other of its departments or divisions. If any information is received by another department or division of the Collateral Agent, unless the Collateral Agent has written notice of such information, it shall be treated as confidential to that other department or division and the Collateral Agent shall not be deemed to have notice of it.

16.14 The Collateral Agent will treat information provided hereunder as confidential, but (unless consent is prohibited by law) each of the Issuer and the Chargor hereby consents to the transfer and disclosure by the Collateral Agent of any information relating to it provided hereunder to and between branches, subsidiaries, representative offices, affiliates and agents of the Collateral Agent and third parties, in each case selected by the Collateral Agent with due care, wherever situated, for confidential use (including in connection with the provision of any service and for data processing, statistical and risk analysis purposes). The Collateral Agent and any branch, subsidiary, representative office, affiliate, agent or third party may transfer and disclose any such information as required by any applicable law, regulatory authority or legal process.

16.15 The Collateral Agent is entitled to delegate instead of acting personally and is entitled to appoint attorneys and agents selected by it with due care and the Collateral Agent shall not be responsible for the acts or omissions of delegates, attorneys or agents appointed with due care by it hereunder or for monitoring or supervising such delegates', attorneys' or agents' actions. The Collateral Agent shall not be responsible for the negligence or misconduct of any attorneys and agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Collateral Agent acted with gross negligence or wilful misconduct in the selection of such attorney or agent.

16.16 The Collateral Agent is not obliged to do or omit to do anything which in its opinion would or may be illegal, or would constitute a breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency,

regulatory authority, stock exchange or self-regulatory organization to which the Collateral Agent is subject.

16.17  The Collateral Agent shall not be responsible for the registration, filing, protection or perfection of any Security Interest granted by or pursuant to this Agreement or any Shared Security Document, and shall not be responsible for ensuring that necessary registration, filing, protection or perfection are carried out to ensure that Security Interests capable of being registered, filed against, protected or perfected are so registered, filed against, protected or perfected.

16.18  The Collateral Agent and its officers, directors, employees, attorneys and agents shall have no responsibility to make any investigation in relation to:

(a)     the execution, genuineness, legality, validity, effectiveness, enforceability, adequacy, accuracy, sufficiency or completeness of any Shared Security Documents or any other document;

(b)     the collectability of amounts payable under any Shared Security Documents or the observance by the Issuer or the Chargor or any other relevant party of its obligations under any Shared Security Document or any other document;

(c)     any determination or calculation made (or deemed made) by or on behalf of any person pursuant to any Shared Security Document or any Secured Party Document;

(d)     any accounts, books, records or files maintained by the Issuer, the Chargor, any Secured Party or any other party or in relation to any of the Collateral;

(e)     the scope or accuracy of any recitals, representations, warranties or statements made by or on behalf of the Issuer, the Chargor, any Secured Party or any relevant party (other than itself) in, or incorporated by reference into the Shared Security Documents, any Secured Party Document or any other documents entered into in connection with or pursuant to this Agreement or the Shared Security Documents;

(f)     the satisfaction of any conditions set forth in this Agreement or the Shared Security Documents or any related documents; and

(g)     the existence of any other Security Interest affecting any asset secured under the Shared Security Documents.

16.19  In addition to the trusts, powers, authorities and discretions conferred on the Collateral Agent by applicable law, the Collateral Agent shall have the following powers, authorities and discretions:

(a)     the Collateral Agent shall have sole and absolute discretion as to the exercise or performance or non-exercise or non-performance of each of the powers, authorities, duties, discretions and obligations under the Shared Security Documents and each of the other documents to which it a party or conferred on it by operation of law and the exercise or performance or non-exercise or non-performance of those powers, authorities, duties, discretions and obligations shall, as between itself and the other Secured Parties, be conclusive and binding on the other Secured Parties, in each case except as expressly provided otherwise in the Shared Security Documents or the other documents to which it is a party or unless otherwise instructed by a Secured Party;

(b)     the Collateral Agent, as between itself and the other Secured Parties, shall have full power to determine all questions arising in relation to any of the provisions of the Shared Security Documents, this Agreement and the Collateral and every such determination shall, as between itself and the other Secured Parties, be conclusive, in each case except as expressly provided otherwise in the Shared Security Documents or

the other documents to which it is a party or unless otherwise instructed by a Secured Party in accordance with the Shared Security Documents and this Agreement;

(c)    any consent given by the Collateral Agent for the purposes of the Shared Security Documents, or any of the other documents may be given on such terms and subject to such conditions (if any) as the Collateral Agent in its discretion considers appropriate and the Collateral Agent may subsequently ratify anything for which its prior consent was required but not obtained, in each case except as expressly provided otherwise in the Shared Security Documents or the other documents to which it is a party or unless otherwise instructed by a Secured Party. Without prejudice to the generality of the foregoing, if a document specifies that the Collateral Agent is required to give its consent to any event, matter or thing or take such action if certain specified conditions are met, the Collateral Agent shall give its consent to that event, matter or thing or take such action upon it being satisfied, in its discretion, that those specified conditions have been met, in each case except as expressly provided otherwise in the Shared Security Documents or the other documents to which it is a party or unless otherwise instructed by a Secured Party;

(d)    where it is necessary or desirable for any purpose in connection with the Shared Security Documents or this Agreement for the Collateral Agent to convert any sum held by it (or whether stipulated in any document presented to it) or for any other reason from one currency to another, the sum shall (unless otherwise provided in the Shared Security Documents or the Secured Party Documents or required by law) be converted at such spot rate or spot rates, in accordance with such method and as at such date for the determination of such spot rate of exchange, as may be specified by the Collateral Agent in its absolute discretion but acting in good faith and having regard to current spot rates of exchange, if available. Any spot rate, method and date so specified shall be binding on the Secured Parties, the Issuer and the Chargor; and

(e)    the Collateral Agent may at the expense of the Issuer and the Chargor (without double charging), make arrangements which it considers appropriate with any affiliate of the Collateral Agent for the safe custody of the Secured Party Documents.

16.20    Nothing will oblige the Collateral Agent to satisfy any know your customer requirement in relation to the identity of any person on behalf of any Secured Party or any Agent (as defined under any Secured Party Document).

16.21    The Collateral Agent is not obliged to review or check the accuracy or completeness of any document it forwards to another party and it may assume that such documents are correct and genuine.

16.22    The Collateral Agent is not liable for any delay (or any related consequences) in crediting an account with an amount required under the Secured Party Documents to be paid by the Collateral Agent if the Collateral Agent has without gross negligence or willful misconduct taken all reasonable steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognized clearing or settlement system used by the Collateral Agent for that purpose.

16.23    Subject to Sections 4.4 and 9 hereof, in performing its duties and obligations as Collateral Agent and in exercising any rights, powers or discretions granted to it under this Agreement, the Collateral Agent shall act solely on the written instructions of the Secured Parties, and the Collateral Agent shall incur no liability to any party (including but not limited to the Issuer, the Chargor and the Secured Parties) for any action it takes, or refrains from taking, on the instructions of the Secured Parties. The right of the Collateral Agent to perform any discretionary act enumerated in this Agreement, any Shared Security Document or any related document shall not be construed as a duty.

16.24   Notwithstanding anything else herein contained, the Collateral Agent may refrain, without liability, from doing anything that would or might in its opinion be contrary to this Agreement, any Shared Security Document or any other document related to transactions contemplated herein, any law of any state or jurisdiction (including but not limited to Hong Kong, Mauritius, the United States of America or any jurisdiction forming a part of it and England & Wales) or any directive or regulation of any agency of any such state or jurisdiction and may without liability do anything which is, in its opinion, necessary to comply with this Agreement, any Shared Security Document, any other document related to transactions contemplated herein or any such law, directive or regulation.

16.25   The Collateral Agent shall not be under any obligation to insure any assets comprising the Collateral, and shall not be responsible for any loss that may be suffered by any person (including but not limited to the Issuer, the Chargor and the Secured Parties) as a result of, or the inadequacy of, any such insurance.

16.26   The Collateral Agent shall have no responsibility or obligation to ensure any Enforcement Instruction or any other instruction received by it complies with the Security Enforcement Principles.

16.27   The rights, privileges, protections, immunities and benefits given to the Collateral Agent, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by (i) the Collateral Agent in each document related hereto to which it is a party and (ii) the entity serving as the Collateral Agent in each of its capacities hereunder and in each of its capacities as under any related document whether or not specifically set forth therein and each agent, custodian and other Person employed to act hereunder and under any related document, as the case may be.

16.28   The Collateral Agent shall not be liable for failing to comply with its obligations in so far as the performance of such obligations is dependent upon the timely receipt of instructions and/or other information from any other Person which are not received or not received by the time required.

16.29   The Collateral Agent shall not be required to take any action if taking such action (A) would subject the Collateral Agent to a tax in any jurisdiction where it is not then subject to a tax, or (B) would require the Collateral Agent to qualify to do business in any jurisdiction where it is not then so qualified.

16.30   The Collateral Agent is not responsible for the creditworthiness or solvency of the Issuer or the Chargor.

17.   **Corporate Actions**

The Collateral Agent does not, and shall not be deemed to, assume any responsibility to monitor any corporate actions affecting the Shared Security Interest. The Collateral Agent shall have no responsibility and shall not be liable for ascertaining or acting upon any calls, conversions, exchange offers, tenders, interest rate changes, or similar matters relating to the Shared Security Interest unless the Collateral Agent shall have received written and timely notice of the same. The Collateral Agent does not, and shall not be deemed to, assume any responsibility or incur any liability for any act or omission to act with respect to any discretionary corporate action affecting the Shared Security Interest. In the event the Collateral Agent receives notice of any discretionary corporate action in respect of the Shared Security Interest, the Collateral Agent shall promptly notify each Secured Party and request written instructions from the Secured Parties in respect of discretionary corporate actions and shall use commercially reasonable efforts to act upon such instructions. In the absence of such instructions, the Collateral Agent shall not be obligated to take any action in respect of the discretionary corporate action affecting the Shared Security Interest.

18. **Termination**

This Agreement shall terminate upon the earlier to occur of (i) the distribution of all assets subject to a Shared Security Interest, and (ii) the Collateral Agent's receipt of (A) a joint written instruction signed by each Secured Party advising the Collateral Agent that this Agreement has terminated and instructing the Collateral Agent either to discharge the Shared Security Interest or to distribute the Collateral to the Indenture Trustee or another Secured Party as provided for therein, or (B) a written confirmation from each Secured Party confirming that no amounts remain outstanding under the relevant Secured Party Document.

19. **Amendment**

Any amendment of this Agreement (other than the accession of any Secured Party on behalf of holders of Permitted Pari Passu Secured Indebtedness pursuant to Section 8 hereof) shall be binding only if evidenced by a document in writing signed by each of the parties hereto. Notwithstanding the foregoing, any amendment of this Agreement to remove any Secured Party upon the satisfaction and discharge, defeasance or other satisfaction in full of all obligations of the Issuer or the Chargor secured by the Collateral under the Secured Party Documents to which such Secured Party is party shall be binding if evidenced by a document in writing signed by such Secured Party and acknowledged by the Collateral Agent.

20. **Governing Law; Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial**

20.1    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

20.2    Each of the parties hereto hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or United States Federal court sitting in the Borough of Manhattan, the City of New York over any suit, action or proceeding arising out of or relating to this Agreement or any transactions contemplated hereby. Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an convenient forum. To the extent that any party hereto, has or hereafter may acquire any sovereign or other immunity from jurisdiction of any court or from any legal process with respect of itself or its property, such a party hereto irrevocably waives such immunity in respect of its obligations hereunder. The parties hereto agree that any judgment in any such suit, action or proceeding, brought in such a court shall be conclusive and binding upon the parties hereto, and, to the extent permitted by applicable law, may be enforced in any court to the jurisdiction of which any of the parties hereto, is subject by a suit upon such judgment or in any manner provided by law, provided that service of process is effected upon the parties hereto, in the manner specified in the following subclause or as otherwise permitted by applicable law.

20.3    During the term of this Agreement, each of the Issuer, the Chargor and the Secured Parties will at all times maintain an authorized agent in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Agreement (each, a "**Process Agent**"). Service of process upon such agent and written notice of such service mailed or delivered to the Issuer, the Chargor or the applicable Secured Party, as the case may be, shall to the fullest extent permitted by applicable law be deemed in every respect effective service of process upon the Issuer, the Chargor or the applicable Secured Party, as the case may be, in any such legal action or proceeding. Each of the Issuer, the Chargor and the Secured Parties hereby agree to take any and all action as may be necessary to maintain the designation and appointment of an agent in full force and effect until the termination of this Agreement. The name and address of the Process Agent of each of the Issuer and the Chargor are set forth with

its name below (or the name and address of any substitute Process Agent of any such party may be notified by such party to the other parties by not less than five Business Days' notice).

20.4    The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any requirement or other provision of law, rule, regulation or practice which requires or otherwise establishes as a condition to the institution, prosecution or completion of any suit, action or proceeding (including appeals) arising out of or relating to this Agreement.

20.5    EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

21.     **Counterparts; Signatures**

This Agreement may be executed in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Facsimile, or electronic transmission of, signatures on counterparts of this Agreement and electronic signatures shall be deemed original signatures with all rights accruing thereto. The parties agree that this Agreement, any addendum or amendment hereto or any related document necessary may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act and any applicable state law. Electronic signature shall mean any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record. Any document accepted, executed or agreed to in conformity with such laws will be binding on all parties hereto to the same extent as if it were physically executed and each party hereby consents to the use of any third party electronic signature capture service providers as may be reasonably chosen by a signatory hereto.

22.     **Severability**

The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

23.     **Conflict**

Each of the parties hereto irrevocably waives in favor of HSBC Bank USA, National Association. any conflict of interest which may arise by virtue of HSBC Bank USA, National Association or any of its affiliates acting in various capacities under this Agreement, the Note Documents and the Shared Security Documents or any other documents. Each of the parties hereto recognizes that the Collateral Agent (acting individually and not in the capacity as the Collateral Agent) and its affiliates may engage in transactions and/or business adverse to the parties hereto or in which parties adverse to the parties hereto may have interests. Nothing in this Agreement shall (i) preclude the Collateral Agent (acting individually and not in the capacity as the Collateral Agent) and any of its affiliates from engaging in such transactions or business, or (ii) obligate the Collateral Agent or any of its affiliates to (A) disclose such transactions and/or business to the parties hereto, or (B) account for any profit made or payment received in, or as a part of, such transactions and/or business. Nothing herein shall be deemed to (i) give rise to a partnership or joint venture, or (ii) establish a fiduciary or similar relationship, among the parties hereto and the Collateral Agent. HSBC Bank USA, National Association hereby confirms that in its capacity as the Collateral Agent it is acting under this Agreement as security agent for the Indenture Trustee for the benefit of the Noteholders, the

Super Senior Hedging Providers and any holder of any other Permitted Pari Passu Secured Indebtedness who becomes a party to this Agreement pursuant to Section 8 hereof, in respect of the assets subject to the Shared Security Interest and solely in accordance with the terms and conditions set forth in this Agreement.

24. **Exclusive Benefit**

Except as specifically set forth in this Agreement, this Agreement is for the exclusive benefit of the parties hereto and their respective successors and permitted assigns hereunder, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.

25. **Same Rights**

In entering into or in taking (or forbearing from) any action under or pursuant to this Agreement, the Indenture Trustee shall have and be protected by all of the rights, powers, immunities, indemnities and other protections granted to the Indenture Trustee under the Indenture. Notwithstanding anything herein to the contrary, for purposes of any Enforcement Instruction or any other instruction provided to the Indenture Trustee or any action taken by the Indenture Trustee, the parties acknowledge and agree that such instruction or action shall have been provided by or taken by the Indenture Trustee at the direction of the requisite Noteholders pursuant to the terms of the Indenture and related documents and the Indenture Trustee, individually or in such capacity, will not be liable for any actions taken as a result of such instruction or action. Any deemed certification with respect to an Enforcement Instruction given by the Indenture Trustee shall be deemed to be a certification of the Noteholders directing the Indenture Trustee to have given such Enforcement Instruction and shall not be deemed to be a certification of the Indenture Trustee.

26. **Language**

Any notice given under or in connection with this Agreement must be in English. All other documents provided under or in connection with this Agreement must be:

(a) in English; or

(b) if not in English, and if so required by the Collateral Agent, accompanied by a certified English translation at the Chargor's cost and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

[*THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK*]

**HSBC Bank USA, National Association**
as Indenture Trustee

By: _____
Name:
Title:

Address:
Fax:
Attention:

[Signature Page to the Intercreditor Agreement]

**HSBC Bank USA, National Association**
as Collateral Agent

By: _____
Name:
Title:

Address:
Fax:
Attention:

[Signature Page to the Intercreditor Agreement]

**Barclays Bank PLC**
as Super Senior Hedging Provider

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

[Signature Page to the Intercreditor Agreement]

**Credit Suisse AG**
as Super Senior Hedging Provider

By: _____
Name:
Title:

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:     Credit Suisse AG, New York Branch
Eleven Madison Avenue, New York, NY10010
United States of America

Attention:     General Counsel, General Counsel Division

[Signature Page to the Intercreditor Agreement]

**The Hongkong and Shanghai Banking Corporation Limited**
as Super Senior Hedging Provider

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

[Signature Page to the Intercreditor Agreement]

**JPMorgan Chase Bank, N.A.**
as Super Senior Hedging Provider

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

**Morgan Stanley & Co International plc**
as Super Senior Hedging Provider

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

[Signature Page to the Intercreditor Agreement]

Signed for
**Societe Generale**
as Super Senior Hedging Provider

by its authorized signatory

_____
Authorised signatory

_____

[Signature Page to the Intercreditor Agreement]

**Standard Chartered Bank (Singapore) Limited**
as Super Senior Hedging Provider

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

[Signature Page to the Intercreditor Agreement]

**Azure Power Energy Ltd**
as Issuer

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

[Signature Page to the Intercreditor Agreement]

**Azure Power Global Limited**
as Chargor

By: _____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Attention:

[Signature Page to the Intercreditor Agreement]

**Schedule 1**

**Holders of Permitted Pari Passu Secured Indebtedness**

**Part A: Super Senior Hedging Provider**

| Holder | Description of Permitted Pari Passu Secured Indebtedness |
|---|---|
| Barclays Bank PLC | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about August 17, 2021 with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through a mix of: (a) swap on the principal amount of the Notes; (b) a call spread option on the principal amounts of the Notes |
| Credit Suisse AG | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about August 17, 2021 with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through: (a) swap on the principal amount of the Notes and/or (b) a call spread option on the principal amounts of the Notes |
| The Hongkong and Shanghai Banking Corporation Limited | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about August 17, 2021 with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through a mix of: (a) swap on the principal amount of the Notes; (b) a call spread option on the principal amounts of the Notes |
| JPMorgan Chase Bank, N.A. | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about August 17, 2021 with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through a mix of: (a) swap on the principal amount of the Notes; (b) a call spread option on the principal amounts of the Notes |
| Morgan Stanley & Co International plc | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about August 17, 2021 with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through a mix of: (a) swap on the principal amount of the Notes; (b) a call spread option on the principal amounts of the Notes |
| Societe Generale | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about the date of this Agreement with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through a mix of: (a) swap on the principal amount of the Notes; (b) a call spread option on the principal amounts of the Notes |

35

| Holder | Description of Permitted Pari Passu Secured Indebtedness |
|---|---|
| Standard Chartered Bank (Singapore) Limited | Hedging Obligations under a 2002 ISDA Master Agreement dated on or about August 18, 2021 with respect to (i) a coupon swap on the interest payments due under the Onshore Debt and/or (ii) hedging of principal amount through: (a) swap on the principal amount of the Notes and/or (b) a call spread option on the principal amounts of the Notes |

**Part B: Holders of other Permitted Pari Passu Secured Indebtedness**

| Holder | Description of Permitted Pari Passu Secured Indebtedness |
|---|---|
| | |

**Schedule 2**

**Security Enforcement Principles**

1. The primary and overriding aim of any enforcement of the Shared Security Interest shall be to achieve the Security Enforcement Objective.

2. Without prejudice to the Security Enforcement Objective, all or substantially all of the proceeds of any enforcement of the Shared Security Interest received by the Collateral Agent shall be in cash or cash equivalent investments.

3. Any enforcement of the Shared Security Interest must be prompt and expeditious, it being acknowledged that, subject to the other provisions of this Agreement, the time frame for the realization of value from any such enforcement will be determined by the Majority Secured Parties, provided that it is consistent with the Security Enforcement Objective.

4. On any proposed enforcement of the Shared Security Interest other than by way of public auction, the applicable Secured Parties shall have delivered to the Collateral Agent an opinion from a Financial Adviser (and the applicable Secured Parties shall provide Enforcement Instructions that are consistent with such opinion and the methods described therein):

    (i) on the optimal method of enforcing the Shared Security Interest so as to achieve the Security Enforcement Principles and maximize the recovery of such enforcement;

    (ii) that the proceeds received from such enforcement are fair from a financial point of view after taking into account all relevant circumstances; and

    (iii) that such enforcement is otherwise in accordance with the Security Enforcement Objective.

    For these purposes, "**Financial Adviser**" means an independent, reputable and internationally recognized investment bank, firm of accountants or other professional firm which is regularly engaged in providing valuations of companies similar or comparable to the Issuer.

5. Such opinion will, except in the case of manifest error, be conclusive evidence that the Security Enforcement Objective has been met.

37

**Exhibit A**

**Form of Supplement to Intercreditor Agreement**

SUPPLEMENT TO INTERCREDITOR AGREEMENT, dated as of August 19, 2021, made by [●], as [agent/trustee/hedging provider] (the "**New Secured Party**") [for and on behalf of the finance parties under the facility agreement dated [●]]/[for and on behalf of itself and the noteholders under an indenture dated [●]]/[under the hedging agreement dated [●]] (the "**New Finance Document**") pursuant to the Intercreditor Agreement dated as of [●], 2021 (as may be amended, restated or supplemented from time to time, the "**Intercreditor Agreement**"), among Azure Power Energy Ltd (the "**Issuer**"), Azure Power Global Limited (the "**Chargor**"), HSBC Bank USA, National Association, as Indenture Trustee, [●] [and [●]], as Super Senior Hedging Provider[s], and HSBC Bank USA, National Association, as Collateral Agent. Unless otherwise defined herein, capitalized terms used and not defined herein shall have the meanings given to them in the Intercreditor Agreement.

For purposes of this Supplement, "**New Secured Obligations**" means all present and future obligations, contingent or otherwise, of the Issuer [and [●]] arising under or pursuant to the New Finance Document, including any interest, fees and expenses accruing after the initiation of any insolvency proceeding (irrespective of whether such interest, fees and expenses are allowed as a claim in such proceeding).

For good and valid consideration, the sufficiency of which hereby is acknowledged, the New Secured Party hereby agrees as follows:

(a) It shall be a Secured Party [and a Super Senior Hedging Provider] for all purposes under the Intercreditor Agreement and the documents executed in connection therewith, and, as such, shall be deemed to be a Secured Party [and a Super Senior Hedging Provider] for such purposes;

(b) It shall (i) be bound by all covenants, agreements, acknowledgments and other terms and provisions applicable to it as a Secured Party [and a Super Senior Hedging Provider] pursuant to the Intercreditor Agreement and the documents executed in connection therewith to the same extent, and in the same manner, as if it (in its capacity as a Secured Party [and a Super Senior Hedging Provider]) were a direct party thereto, (ii) perform all obligations required of it pursuant to the Intercreditor Agreement and such other documents executed in connection therewith and (iii) be entitled to the benefits of a Secured Party [and a Super Senior Hedging Provider] under the Intercreditor Agreement and the documents executed in connection therewith;

(c) The New Secured Obligations shall constitute Permitted Pari Passu Secured Indebtedness [and Super Senior Hedging Obligations] for purposes of the Intercreditor Agreement;

(d) Notwithstanding (i) the time, order or method of attachment or perfection of any Security Interest, the time or order of filing of financing statements (or similar filings in any applicable jurisdiction), or the giving of or failure to give notice of the acquisition or expected acquisition of purchase money or other Security Interest, (ii) the manner in which the Shared Security Interest is acquired, whether by grant, statute or operation of law, subrogation or otherwise, (iii) the fact that the Collateral or Shared Security Interest (or any portion thereof) is otherwise subordinated, voided, avoided, invalidated or lapsed and (iv) any applicable law or any provision to the contrary in any Secured Party Document and the Shared Security Documents with respect to the Collateral and all proceeds of the Collateral, the New Secured Party agrees that (x) the Security Interest of the New Secured Party in the Collateral ranks and shall rank equally in priority with the Shared Security Interest of the other Secured Parties in the Collateral and (y) the Note Obligations, the Hedging Obligations, the

New Secured Obligations and any other Permitted Pari Passu Secured Obligations, the holder (or representative or agent thereof) of which is a party to the Intercreditor Agreement pursuant to Section 8 thereof from time to time, rank and shall *pari passu* among themselves.

The New Secured Party hereby represents that it is a holder of Permitted Pari Passu Secured Indebtedness or a trustee or agent for or on behalf of the holders of any Permitted Pari Passu Secured Indebtedness and has the authority to execute and deliver this Supplement on behalf of itself or the holders of such Permitted Pari Passu Secured Indebtedness.

The New Secured Party hereby acknowledges that it has received and reviewed an executed copy of the Intercreditor Agreement (including, without limitation, all amendments, restatement, supplements and other modifications thereto) and each of the documents referred to therein (including, without limitation, all amendments, supplements and other modifications thereto).

Upon the effectiveness of this Supplement, Schedule 1 to the Intercreditor Agreement shall be deemed to be amended to incorporate the particulars of the New Secured Party set forth in Annex A hereto.

This Supplement shall become effective upon the delivery by the New Secured Party to the Collateral Agent, each other Secured Party, the Issuer and the Chargor of a counterpart hereof duly executed by the New Secured Party. This Supplement may be executed in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Facsimile, or electronic transmission of, signatures on counterparts of this Supplement shall be deemed original signatures with all rights accruing thereto.

The address for notices to the New Secured Party, and the name and address of its Process Agent, is set forth on the signature pages hereof.

THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. THE NEW SECURED PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NON EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR UNITED STATES FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN. THE CITY OF NEW YORK OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SUPPLEMENT OR THE INTERCREDITOR AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. THE NEW SECURED PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN CONVENIENT FORUM.

**[Name of New Secured Party]**
[as [agent/trustee/hedging provider]]

_____
Name:
Title:

Address:
Fax:
Attention:

Name and address of Process Agent:

Accepted and Agreed:

**HSBC Bank USA, National Association**
as Collateral Agent

_____
Name:
Title:

**Azure Power Energy Ltd**
as Issuer

_____
Name:
Title:

**Azure Power Global Limited**
as Chargor

_____
Name:
Title:

**Annex A**

**Particulars of New Secured Party**

| Holder | Description of Permitted Pari Passu Secured Indebtedness |
|---|---|
|  |  |

**EXHIBIT K**

**FORM OF COMPANY'S POWER OF ATTORNEY**

(Azure Power Energy Ltd)

**KNOW ALL MEN BY THESE**, that Azure Power Energy Ltd, a public company incorporated under the laws of Mauritius having its registered office at c/o AAA Global Services Ltd., 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius (the "**Grantor**"), hereby irrevocably appoints **HSBC Bank USA, National Association**, as the Collateral Agent, a national banking association, having its registered office at 1800 Tyson's Boulevard, McLean Virginia (the "**Attorney**") to be true and lawful proxy in the name and on behalf of the Grantor, to appear and otherwise act, in the name, place and stead in the same way that the Grantor might do, and the Grantor grants the powers set out herein to the Attorney.

**WHEREAS**:

(A) Pursuant to an Indenture dated as of August 19, 2021 made among Azure Power Energy Ltd, Azure Power Global Limited and HSBC Bank USA, National Association, Azure Power Energy Ltd will be offering US$414,000,000 3.575% Senior Notes due 2026 on the terms and conditions set out therein (the "**Indenture**").

(B) Pursuant to the Indenture, an intercreditor agreement will be entered into between, among others, Azure Power Energy Ltd, Azure Power Global Limited and HSBC Bank USA, National Association (the "**Intercreditor Agreement**").

**NOW THEREFORE, THE GRANTOR HEREBY AGREES AND DECLARES AS FOLLOWS:**

1. Words and expressions defined in the Indenture or the Intercreditor Agreement (as applicable) shall, unless the context otherwise requires or otherwise defined herein, have the same meanings when used in this Power of Attorney (including the recitals).

2. Pursuant to the terms of the Indenture, the Grantor **HEREBY NOMINATES, CONSTITUTES, APPOINTS AND EMPOWERS** the Attorney, to represent and act for and on behalf of the Grantor as its true and lawful attorney-in-fact to do the following upon the Attorney being made aware that an Event of Default (as defined in the Indenture) has occurred and is continuing under the Indenture or an Event of Default (as defined in the Intercreditor Agreement) has occurred and is continuing under the Intercreditor Agreement to take steps: (i) as may be permitted under the terms of the Onshore Debt; (ii) to accelerate and enforce the Onshore Debt (in accordance with its terms); and (iii) to enforce any Lien created to secure such Onshore Debt (in accordance with its terms) and/or guarantees issued in respect of such Onshore Debt (in accordance with its terms), in each case by issuing instructions to the security trustee appointed in respect of such Onshore Debt.

3. The Grantor **HEREBY DECLARES** that the powers conferred hereunder are granted with full rights of substitution so that all references herein to the "Attorney" shall include any such substitute or substitutes and the Attorney shall have power to revoke any substitution granted.

4. This Power of Attorney shall be effective and valid until revoked by the Grantor or until all of the Grantor's obligations under the Indenture have been irrevocably discharged in full. Upon the discharge of the Grantor's obligations under the Indenture, this Power of Attorney shall be revoked automatically.

5. Each person who signs this Power of Attorney on behalf of the Grantor confirms to be individually, or (if applicable) jointly with one or more of the other signatories of this Power of Attorney, authorised to represent the Grantor.

6. The Grantor hereby ratifies and confirms any actions taken by the Attorney hereunder and proxy or his substitutes duly appointed shall do in the name, place of the undersigned pursuant hereto.

7. This Power of Attorney shall be effective from (and including) the date on which the Existing Notes are to be refinanced.

8. This Power of Attorney shall be governed by and construed in accordance with laws of Mauritius.

**IN WITNESS WHEREOF** Azure Power Energy Ltd has duly executed this Power of Attorney on the 19th day of August 2021.

| | |
|---|---|
| For and on behalf of | ) |
| Azure Power Energy Ltd | |
| | ) |
| | ) |

Name: 
Title:   Director

**Exhibit 4.4**

## EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (the **"Agreement"**) is entered into as of April 27, 2022 (the **"Execution Date"**) by and between:

1.  **Azure Power India Private Limited**, a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017(hereinafter referred to as the **"Indian Company"**, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

2.  **Mr. Harsh Shah**, a citizen of India having PAN ARAPS4885L, and residing at 2003, Vista 3, The Address opposite R-city mall, LBS road, Ghatkopar West, Mumbai 400086 (hereinafter referred to as the **"Executive"** which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the Executive are hereinafter collectively referred to as **"Parties"** and each individually as a "**Party**".

   **WHEREAS**, the Indian Company is desirous of appointing the Executive as its Chief Executive Officer (**"CEO"**), in accordance with, as well as recommending the Executive for appointment as the Chief Executive Officer of the Mauritius Company (*as defined in this Agreement*), on the terms and conditions, contained herein, and the Executive desires to be appointed as the CEO of each of the Companies (*as defined in this Agreement*), in accordance with, and on the terms and conditions, contained herein.

   **NOW, THEREFORE,** in consideration of the foregoing and the mutual provisions contained herein and for other good and valuable consideration, the adequacy and sufficiency of which is acknowledged by all Parties, the Parties agree as follows:

1.  **Duties and Scope of Employment, etc.**

   (a) <u>Positions and Duties</u>.

   (i)   The Indian Company hereby agrees to employ the Executive, and the Executive agrees to be employed by the Indian Company, in accordance with the terms and conditions of this Agreement from the **"Effective Date"** of September 1, 2022 (or such earlier date as agreed between the Indian Company and the Executive in writing), subject to completion of satisfactory background checks, to the sole satisfaction of each of the India Company Board and Mauritius Company Board. Based on the recommendation of the India Company Board, commencing from the Effective Date, the Mauritius Company shall employ the Executive, and the Executive agrees to be employed by the Mauritius Company, in accordance with the terms and conditions of this Agreement.

(ii)    The Executive will serve as the CEO of the Indian Company and Mauritius Company, and in such additional positions as the Indian Company and/ or Mauritius Company may designate from time to time. The employment of the Executive with the Indian Company and the Mauritius Company shall be co-terminus.

(iii)   In his capacity as the Indian Company's and Mauritius Company's CEO, the Executive will: (a) report to the Indian Company's Board of Directors (**"India Company Board"**) and the Mauritius Company's Board of Directors (**"Mauritius Company Board"**); (b) perform such duties and responsibilities normally attendant to such positions and such other additional and different duties as the relevant Company may from time to time assign which are consistent with the Executive's position; and (c) act in compliance with the Indian Company's and Mauritius Company's constituent documents, applicable law and regulations, and any directives or policies established by the India Company Board and Mauritius Company Board.

(iv)    The Executive's principal place of employment shall be at the Indian Company's corporate office in Delhi, India.

(b) <u>Employment Term</u>.

(i)     The term of employment (the **"Term"**) of the Executive shall commence on and from the Effective Date and end upon the effective date (the **"Termination Date"**) of his termination or resignation from employment with the Company for any reason.

(ii)    For the avoidance of doubt:

(1)     the effective date of termination (other than for **"Cause"** (*as defined in this Agreement*)) shall not be earlier than the last day of the applicable required notice period provided for in this Agreement, subject to the provisions of Section 1(c) below; and

(2)     the effective date of termination for Cause (*as defined in this Agreement*) shall be as determined by the Indian Company, in its sole and exclusive discretion.

(iii)   The employment of the Executive by Indian Company and Mauritius Company is co-terminus, and his termination by one Company will automatically be deemed to be his termination by the other Company.

(c) <u>Notice</u>. Each Party agrees to provide the other with ninety (90) days' notice, or such other notice period as mutually agreed between the Parties in writing (**"Notice Period"**), prior to terminating this Agreement for reasons other than "Cause" (*as defined below*) (**"Termination Notice"**). The Indian Company may, in its sole and exclusive discretion: (i)

place the Executive on "Garden Leave" (as defined in this Agreement) for up to the duration of the Notice Period; or (ii) in lieu of providing notice within the prescribed period, satisfy its Notice Period obligation under this Section, by providing the Executive with the equivalent of ninety (90) days' of the Executive's Fixed Pay (as defined in this Agreement). The Executive shall have no right to satisfy the Notice Period obligations by providing the Indian Company with any consideration, unless agreed in writing by the Indian Company, in which case the Indian Company shall also have the right to seek payments in lieu of the Notice Period, equivalent to ninety (90) days' of the Executive's Fixed Pay (as defined in this Agreement). It is clarified that the Indian Company or Mauritius Company shall be entitled to terminate the Executive's employment for Cause, immediately, without any notice requirements.

(d) <u>Executive Position</u>. During the Term, the Executive's position will be CEO of the Indian Company and Mauritius Company or in such other additional position or positions as the Indian Company and/ or Mauritius Company may designate from time to time. The Executive will have such duties, authorities and responsibilities as are commensurate with his position. All of the Executive's duties, responsibilities and powers with respect to the Indian Company and Mauritius Company, will, at all times, be subject to the order, direction and supervision of the Chairperson of the India Company Board or Mauritius Company Board (as the case may be) and or any other designee, who is a non-executive member of the India Company Board or Mauritius Company Board (as the case may be), as the India Company Board or Mauritius Company Board (as the case may be) may determine. During the Executive's employment with the Company, the Executive (without prejudice to Section 6): (i) will devote his full vocational time and best efforts to the furtherance of the business of the "Group" (*as defined in this Agreement*) on a full-time basis; (ii) will exercise the highest degree of loyalty and the highest standards of conduct in the performance of his duties; (iii) will comply with all applicable laws and regulations; (iv) will not, except as noted herein or as required for furtherance of the Executive's duties with the Group, engage in any other business activity (other than Passive Investments), whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the express written consent of the India Company Board and Mauritius Company Board, which consent shall be at the sole discretion of each of the India Company Board and Mauritius Company Board; (v) will not engage, directly or indirectly, in any activity, employment or business venture (other than Passive Investments), whether or not for remuneration, that is competitive, same or similar with the Group's business in any respect or make any preparations to engage in any competitive activities; (vi) will not take any action or make any omission that deprives the Group of any business opportunities or otherwise act in a manner that conflicts with the best interest of the Group or is detrimental to the business of the Group; and (vii) will not accept any appointment / nomination, or be appointed / nominated, on the board of directors or other governing body of any body corporate (other than in respect of the Group, as specifically required by the Indian Company or the Mauritius Company in connection with the Executive's employment), without the express written consent of the India Company Board and Mauritius Company Board, which consent shall be at the sole discretion of each of the India Company Board and Mauritius Company Board.. If the Executive wishes to

3

engage in an outside activity not expressly permitted under the terms of this Section, the Executive shall first propose such activity to each of the India Company Board and Mauritius Company Board for its determination as to whether such activities are permissible. Even if the India Company Board and Mauritius Company Board consent to the Executive's engagement in an outside activity, the India Company Board and/or Mauritius Company Board shall have the right to revoke its consent at any time, and upon notice to the Executive of such revocation of consent, the Executive shall terminate such outside activity at the earliest practicable opportunity.

It is clarified that for the purposes of the above, the term "Passive Investment" shall mean: (i) ownership of up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market; or (ii) ownership of unlisted securities of a company of less than 50% (on a fully diluted basis), subject to: (A)the Executive not having the right or ability to control or influence the management or decisions (directly or indirectly) of such company, (B) the Executive not having any rights to appoint a nominee, or any right to being appointed, on the board of such company, and (C) the Executive not having any other role in such company, except that of a shareholder holding minority shares in such company.

(e) <u>Representations and Warranties by the Executive</u>. The Executive's employment with the Companies is conditioned on the Executive's representations and warranties to the Indian Company and Mauritius Company that:

    (i)      he is not disqualified or prevented from acting as the CEO of the Indian Company and the Mauritius Company under applicable law or regulation;

    (ii)      his execution, delivery and performance of his duties under this Agreement will not violate, conflict with, result in a breach of the terms, conditions or provisions of, result in the creation of any encumbrances or constitute a default (or an event that, with the giving of notice or lapse of time or both, would constitute a default) or an event creating rights of acceleration, modification, termination, cancellation or a loss of rights under any contract to which the Executive is a party, including any non- compete or non-solicitation agreement or obligation, any approval, order, judgment, decree or award to which the Executive is a party or by which he is bound or any law applicable to the Executive; and

    (iii)      this Agreement has been duly and validly executed by the Executive and upon execution and delivery, this Agreement will constitute, legal, valid and binding obligations of the Executive, enforceable against him in accordance with its terms.

**2.**    **<u>Compensation</u>.**

(a) <u>Fixed Pay</u>. During the Term, the Indian Company will pay the Executive the salary set forth in the table below as compensation for his services (the **"Fixed Pay"**). The Fixed Pay will

be paid monthly in accordance with the Indian Company's normal payroll practices and be subject to the usual applicable withholdings.

| Period | Salary |
|---|---|
| From the Effective Date till (including) March 31, 2023 | Annual salary of INR 3,75,00,000 (the **"Initial Fixed Pay"**) |
| For the period after March 31, 2023 | To be determined by the India Company Board based on the outcome of the annual performance review process |

(b) <u>Variable Pay</u>.

(i) In addition to the Fixed Pay, with respect to each completed fiscal year of the Indian Company during the Term (excluding the Notice Period), the Executive shall be eligible to earn a variable pay which may range from NIL to 125% of the Fixed Pay for such fiscal year (the **"Variable Pay"**), with a target Variable Pay of 75% of Fixed Pay of such fiscal year (the **"Target Variable Pay"**). The actual amount of Variable Pay will be determined by the India Company Board, and based on the achievement of annual individual and Company level performance objectives established by the India Company Board, subject to: (x) the Executive's continuing employment with the Companies through the applicable payment date for any such Variable Pay (in the manner contemplated herein), and (y) the Executive's employment not having been terminated for Cause, the Executive not being placed on Garden Leave, or the Notice Period not commencing.

(ii) In accordance with the above, the Variable Pay for each fiscal year as determined as being payable as of March 31 of the fiscal year (**"Relevant FY for Variable Pay"**), shall be paid as follows:

(I) 67% of the Variable Pay for Relevant FY for Variable Pay will be paid by June 15 of the fiscal year immediately succeeding the Relevant FY for Variable Pay;

(II) The balance Variable Pay for the Relevant FY for Variable Pay (**"Deferred Variable Pay"**) shall be paid in three equal installments with the salary payout for the month of April of the three calendar years immediately succeeding the calendar year referred in (I) above.

**By way of illustration:**

***Payment of the Variable Pay for the fiscal year ending March 31, 2023 ("FY 22-23", being the Relevant FY for Variable Pay in this illustration) will be as follows***:

- 67% of the Variable Pay for FY 22-23 shall be payable by June 15, 2023;

- 11% of the Variable Pay for FY 22-23 shall be payable along with the payment of the Executive's salary for the month of April 2024;
- 11% of the Variable Pay for FY 22-23 shall be payable along with the payment of the Executive's salary for the month of April 2025 ;
- 11% of the Variable Pay for FY 22-23 shall be payable along with the payment of the Executive's salary for the month of April 2026 .

The individual performance objectives used in determining Variable Pay for a fiscal year will be established by the Indian Company prior to the commencement of the fiscal year to which the Variable Pay relates.

For the fiscal year ended March 31, 2023, the Executive's Variable Pay and Target Variable Pay shall be an amount equal to his Variable Pay and Target Variable Pay respectively *prorated* for the period from the Effective Date through March 31, 2023.

(iii)    In the event the Executive's employment is terminated for (A) reasons other than for Cause, or (B) if the Executive resigns from employment, *then* only the portion of the Deferred Variable Pay for the fiscal year(s) prior to the date of such termination/ resignation which has not yet been paid to the Executive, shall be paid to the Executive.

(c)   <u>Long Term Incentive Compensation</u>.

(i)    The Executive shall, in each completed fiscal year, be entitled to long term incentive compensation (the **"Long Term Incentive Compensation"** or **"LTIC"**) of an amount of up to 167% of the Initial Fixed Pay for the period of 6 years on and from the fiscal year in which the Effective Date falls, payable as below (less any applicable withholdings). The payment of LTIC shall at all times be subject to (x) the Executive's continuing employment with the Companies through the applicable payment date for any such LTIC (in the manner contemplated herein), and (y) the Executive's employment not having been terminated, the Executive not being placed on Garden Leave or the Notice Period not commencing. The LTIC for the subsequent 6 year period on and from the fiscal year in which the Effective Date falls shall be determined by the India Company Board in its sole discretion, subject to the Executive's employment not being terminated, the Executive not being placed on Garden Leave or the Notice Period not commencing.

The LTIC which is determined as receivable by the Executive (per this Section 2(c)) for a fiscal year (**"Relevant FY for LTIC"**) shall be payable in tranches as below:

(a)   20% of the LTIC for the Relevant FY for LTIC, shall be paid by along with the payment of the Executive's salary for the month of April of the fiscal year immediately succeeding Relevant FY for LTIC (such payment date being the

**"Initial LTIC Payment Date"**);

(b) 30% of the LTIC for the Relevant FY for LTIC shall be paid 12 months after Initial LTIC Payment Date;

(c) 50% of the LTIC for the Relevant FY for LTIC shall be paid 24 months after Initial LTIC Payment Date. The amounts mentioned in (b) and (c) above are referred to as **"Deferred LTIC"**.

(ii) The amount of LTIC payable to the Executive for the fiscal year ending on March 31, 2023 shall depend upon the Executive meeting the Key Performance Parameters set by India Company Board (as determined by the India Company Board). As per the discussions with the Executive, below are some of the important Key Performance Parameters which shall be the focus for the Financial Year ending March 31, 2023:

- Establishing and stabilizing the organization structure
- Setting a long-term vision, mission and strategy
- Setting up the plan for completion of the contracted PPAs
- Delivery of budget targets and Key Performance Indicators; and
- Ensuring adherence to the schedule for the 4GW project.

(iii) Immediately after the Effective Date, the Executive and the India Company Board shall develop a five year plan effective on and from the fiscal year starting April 1, 2023 (**"LTIC Plan"**), highlighting the Key Performance Parameters for grant of LTIC. The LTIC Plan shall be reviewed and revised annually by the India Company Board based on prevalent market conditions. The amount of LTIC payable to the Executive for the fiscal years commencing from April 1, 2023 shall depend upon the Executive meeting the Key Performance Parameters set out in the prevalent LTIC Plan (as determined by the India Company Board).

(iv) The LTIC may be paid (at the sole discretion of the Companies):

(A) In case the Mauritius Company is not listed on any stock exchange, through cash payment of LTIC amount (less any applicable withholdings) by the Indian Company as per the timelines specified in Section 2(c)(i) above;

(B) In case the Mauritius Company is listed on any stock exchange, through issuance or transfer of common shares of the Mauritius Company (**"Common Stock"**) for the value of LTIC. In this regard, the value of Common Stock shall be calculated based on the '6 month VWAP' (**"Issuance Price"**). Herein, '6 month VWAP' means:

The number mathematically computed by:

(X) Multiplying: (i) the closing price of the Common Stock, as reported in Bloomberg or such other source as the India Company Board (on

recommendation from Mauritius Company Board) deems reliable, for each of the Trading Days in the 6 month period immediately prior to date of grant of the relevant LTIC, (ii) the trading volume of the Common Stock, as reported in Bloomberg or such other source as the India Company Board (on recommendation from Mauritius Company Board) deems reliable, for each such Trading Day;

(Y) determining the sum of the product of (X) above for such 6 month period; and

(Z) dividing such sum by the cumulative trading volume, which is the sum of the trading volume of the Common Stock for each Trading day in such 6 month period.

***LTIC in case of delisting subsequent to award of LTIC:***

(C) In case any Common Stock is awarded to the Executive in accordance with this Section 2(c) while the Mauritius Company is listed but, prior to issuance/ transfer of Common Stock, the Mauritius Company delists, then the value of the Common Stock acquired by the Executive will be determined basis the relevant Issuance Price (calculated in accordance with the formula for '6 month VWAP' specified in Section 2(c)(iv)(B) above) for the Common Stock, determined from the date of grant of the relevant Common Stock as part of the LTIC (**"VWAP Delisted Value"**). In this regard, the VWAP Delisted Value will be paid to the Executive (in lieu of the Executive surrendering / consenting to extinguishment of his entitlement to Common Stock) *less* any applicable withholdings, by the Indian Company. It is clarified however that (i) such payment shall only be in made accordance with the timelines specified in Section 2(c)(i) above; and (ii) there will be no acceleration of the LTIC / issuance or transfer of Common Stock to the Executive on account of the delisting of the Mauritius Company.

(D) In case any Common Stock is already issued or transferred to the Executive in accordance with Section 2(c)(iv)(B) above, and subsequently the Mauritius Company ceases to be listed on any stock exchange, then the Executive shall transfer such Common Stock to the Mauritius Company as part of its delisting process, and the price paid to the Executive for such Common Stock shall be a function of: the delisting price paid by the Mauritius Company to its shareholders at the time of delisting multiplied by the number of Common Stock then held by the Executive, *less* any applicable withholdings, by the Indian Company. It is clarified that at the time of such delisting, the Executive shall mandatorily sell/ transfer, and the Executive hereby undertakes to sell/ transfer such Common Stock to the Mauritius Company.

(d) <u>Sign on bonus</u>: The Executive shall be entitled to receive INR 1,50,00,000 as a sign-on bonus (**"Sign On Bonus"**) paid by the Indian Company as additional incentive to the Executive for agreeing to taking up employment and undertake the responsibilities and obligations set out herein. The Sign On Bonus shall be paid to the Executive, after deduction of applicable withholding taxes, along with the payment of the first salary of the Executive. The Executive acknowledges that the Sign On Bonus is being paid in reliance of the Executive's representation that he will continue in employment beyond 2 years from Effective Date. In the event, the employment of the Executive terminates, for any reason whatsoever: (i) within 12 months of Effective Date, then 100% of the Sign On Bonus shall be clawed back by the Indian Company, and shall be payable by the Executive, and the Indian Company shall be entitled to set-off the Sign On Bonus, against any amounts payable to the Executive in terms of this Agreement; and (ii) after 12 months but before 24 months of Effective Date, then 50% of the Sign On Bonus shall be clawed back by the Indian Company, and shall be payable by the Executive, and the Indian Company shall be entitled to set-off 50% of the Sign On Bonus, against any amounts payable to the Executive in terms of this Agreement. It is clarified that for the purposes of determination of 'employment' in the above, the Notice Period or any period of Garden Leave, shall be excluded.

Parties acknowledge that the payment of the Sign On Bonus is purely as an incentive payment and shall not be construed as compensation for any services provided by the Executive to Indian Company or Mauritius Company or payment for any goods exchanged.

(e) <u>Compensatory bonus</u>: The Executive shall additionally be entitled to receive an additional bonus (**"Compensatory Bonus"**), calculated in accordance with this Agreement, and paid by the Indian Company as compensation for relinquishment of other entitlements in the Executive's previous employment. The Executive acknowledges that the Compensatory Bonus shall be paid in accordance with this Agreement in reliance of the Executive's representation that he will continue in employment beyond 2 years from Effective Date.

In this regard, the Executive shall, no later than 15 days from the Effective Date, provide a written declaration/ representation to the Indian Company of the exact amount of compensation and other entitlements received with respect to lapsed long term incentive plan and annual bonus (if any) from the Executive's previous employment (**"Declaration of Receipt"**) excluding leave encashment, gratuity, reimbursements and already paid compensation prior to resignation from the previous company. Upon receiving such Declaration of Receipt, the Indian Company shall set-off the amounts specified in the Declaration of Receipt against the amount of INR 2,50,00,000, and such resultant amount shall be paid by the Indian Company as the Compensatory Bonus to the Executive along with the payment of the first salary to the Executive after the date of receiving the Declaration of Receipt. The Executive hereby represents and warrants to the India Company that the details set out in the Declaration of Receipt shall be true, correct and accurate, and not misleading in any manner, and no relevant information shall be excluded from such Declaration of Receipt.

In the event, the employment of the Executive terminates, for any reason whatsoever: (i) within 12 months of Effective Date, then 100% of the Compensatory Bonus shall be clawed back by the Indian Company, and shall be payable by the Executive, and the Indian Company shall be entitled to set-off the Compensatory Bonus, against any amounts payable to the Executive in terms of this Agreement; and (ii) after 12 months but before 24 months of Effective Date, then 50% of the Compensatory Bonus shall be clawed back by the Indian Company, and shall be payable by the Executive, and the Indian Company shall be entitled to set-off 50% of the Compensatory Bonus, against any amounts payable to the Executive in terms of this Agreement. It is clarified that for the purposes of determination of 'employment' in the above, the Notice Period, or any period of Garden Leave, shall be excluded.

Parties acknowledge that the payment of the Compensatory Bonus is purely as an additional incentive payment and shall not be construed as payment for any services provided by the Executive to Indian Company or Mauritius Company or payment for any goods exchanged.

(f) Other. During the Term , for so long as the Executive meets the eligibility requirements of the applicable plan, practice, policy or program of Indian Company and/ or Mauritius Company: (i) except as specifically provided herein, the Executive shall be entitled to participate in all savings and retirement plans, practices, policies and programs of Indian Company and/ or Mauritius Company that are made available generally to other executive officers of Indian Company and/ or Mauritius Company, and (ii) except as specifically provided herein, the Executive and/or the Executive's family, as the case may be, shall be entitled to participate in, and shall receive all benefits under, all welfare benefit plans, practices, policies and programs (including Indian Company and/ or Mauritius Company's health insurance and disability plans) provided by Indian Company and/ or Mauritius Company that are made available to other executive officers of Indian Company and/ or Mauritius Company (for the avoidance of doubt, such plans, practices, policies or programs shall not include any plan, practice, policy or program which provides benefits in the nature of severance or continuation pay). Each of the Indian Company and Mauritius Company may change, amend or discontinue any of its employee benefit plans, practices, policies and programs at any time during the Executive's employment with the Indian Company or Mauritius Company, and nothing contained herein will obligate the Indian Company and/ or Mauritius Company to institute, maintain or refrain from changing, amending or discontinuing any employee benefit plan, practice, policy or program.

(g) Clawback. The Executive agrees that the compensation and benefits provided under this Agreement will be subject to forfeiture, cancellation, recoupment or clawback as required by applicable laws, government regulations and stock exchange requirements. The Executive further agrees that any incentive compensation paid or payable under this Agreement (including any Variable Pay and Long Term Incentive Compensation) will be subject to forfeiture, cancellation, recoupment or clawback in accordance with the terms of applicable law or the U.S. Dodd Frank Wall Street Reform and Consumer Protection Act (the **"Dodd-Frank Act"**) and rules and regulations thereunder in the event the Indian Company or

Mauritius Company is required to restate its financial statements, regardless of whether the Indian Company or Mauritius Company is then subject to the Dodd-Frank Act. For the avoidance of doubt, the Executive's agreement to clawback under this Section 2(g) will not apply to restatements of the Indian Company or Mauritius Company's financial statements due to acts, omissions or events that occurred prior to the Effective Date.

(h) <u>Vacation</u>. The Executive will be entitled to paid vacation in accordance with the policy as applicable to other executive officers of the Indian Company and/or Mauritius Company (as may be determined by the India Company Board), with the timing and duration of specific days off mutually and reasonably agreed to by the Parties.

(i) <u>Expenses.</u> The Indian Company will reimburse the Executive for reasonable business related travel, entertainment or other expenses incurred by the Executive in the furtherance of or in connection with the performance of the Executive's duties hereunder, in accordance with Indian Company's expense reimbursement policy for executive officers of Indian Company and/or Mauritius Company in effect from time to time (as may be determined by the India Company Board). The Executive will be reimbursed as per the actual amounts incurred (duly substantiated), not exceeding an amount of INR 5,00,000 for relocation related expenses, as a one-time reimbursement.

3. **<u>Severance</u>**.

(a) <u>Termination other than for Cause</u>. The Indian Company or the Mauritius Company is, subject to the terms of this Agreement, entitled to terminate the employment of the Executive for any reasons whatsoever, by providing the Termination Notice. If during the Term (excluding the Notice Period) the Indian Company or Mauritius Company terminates the Executive's employment other than for Cause, subject to the provisions of Section 4 and applicable law and regulation, the Executive will be entitled to: (i) Fixed Pay due but unpaid (including any specific entitlement during the Notice Period in accordance with Section 1(c) above); (ii) subject to the other provisions of this Agreement, the vested Deferred Variable Pay as set out in Section 2(b)(iii) of this Agreement (iii) benefits to which the Executive is entitled under applicable laws and pursuant to any employee benefit plans of the Companies as of the Termination Date (except any severance plan), subject to the Executive serving the Notice Period; and (iv) reimbursement of business expenses for which the Executive is entitled to reimbursement under Section 2(i) but for which Executive has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(a). Other than the foregoing, the Indian Company and the Mauritius Company shall not have any further obligation to the Executive. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Executive shall be obligated to provide the Indian Company invoices of all business expenses incurred within 10 days of Termination Date. It is further clarified that upon such termination the Executive will not be entitled to, and shall automatically (without any further actions) relinquish all claims to, LTIC such that no further amounts are payable to the Executive in respect of LTIC.

(b) <u>Termination for Cause</u>: The Indian Company or the Mauritius Company is at all times entitled to terminate the employment of the Executive for Cause, immediately, and without complying with the notice requirements set out in this Agreement. If during the Term (including any Notice Period), the Indian Company or Mauritius Company terminates the Executive's employment for Cause, the Executive shall not be entitled to receive any payments, except to the extent mandated by law. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, LTIC and Variable Pay), will not be payable. Any amount so payable shall be paid (less applicable withholdings) within 45 days from the Termination Date.

(c) <u>Cessation of employment due to resignation by the Executive</u>. The Executive is, subject to the terms of this Agreement, entitled to resign from the employment for any reasons whatsoever, by providing the Termination Notice. If during the Term, the Executive resigns from employment for any reason whatsoever, subject to the provisions of applicable law and regulation, the Executive will be entitled to: (i) the Fixed Pay due but unpaid to him (including any specific entitlement during the Notice Period in accordance with Section 1(c) above); (ii) vested benefits to which the Executive is entitled under applicable laws and pursuant to any employee benefit plans as of the Termination Date (except any severance plan), subject to the Executive serving the Notice Period; (iii) reimbursement of business expenses for which the Executive is entitled to reimbursement under Section 2(i) but for which Executive has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(c); and (iv) subject to the other provisions of this Agreement, the vested Deferred Variable Pay as set out in Section 2(b)(iii) of this Agreement. Other than the foregoing, the Indian Company and the Mauritius Company shall not have any further obligation to the Executive. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Executive shall be obligated to provide the Indian Company invoices of all business expenses incurred within 10 days of Termination Date. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, LTIC), will not be payable.

(d) <u>Exclusive Remedy</u>. In the event of a termination of the Executive's employment with the Indian Company or Mauritius Company, the provisions of this Section 3 are intended to be and are exclusive and in lieu of any other rights or remedies to which the Executive or the Indian Company or Mauritius Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement.

**4.** **Conditions to Receipt of Severance: No Duty to Mitigate.**

(a) <u>Separation Agreement and Release of Claims</u>. The Executive acknowledges and agrees that (i) the Company's payment of the severance compensation detailed in Section 3, will be

deemed to constitute a full settlement and discharge of any and all obligations of the Companies and their Affiliates to the Executive arising out of this Agreement, the Executive's employment with the Companies and their Affiliates and/or the termination of the Executive's employment with the Companies and their Affiliates; and (ii) upon payment of the severance compensation detailed in Section 3, the Company will stand discharged of all obligations towards the Executive, and the Executive shall, automatically and without any further action, be deemed to have fully and unqualifiedly released Indian Company and Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities. The Executive further acknowledges and agrees that as a condition precedent to receiving any of the severance compensation detailed in Section 3, the Executive will execute, deliver to the Companies, and not revoke a release agreement, in a form prepared by, and satisfactory to, the Indian Company (the **"Executive Release Agreement"**, key parameters of which have been set out in Schedule 1) pursuant to which the Executive will release and waive, to the fullest extent permitted by law, all claims against the Indian Company and Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities, including, without limitation, all claims arising out of this Agreement, the Executive's employment with Companies and/or their Affiliates, and/or the termination of Executive's employment with the Companies and/or their Affiliates. The severance compensation described in Section 3 is in lieu of any severance benefits under any severance policy or plan the Indian Company or Mauritius Company may have now or in the future, and the Executive acknowledges that the Executive is not entitled to any other severance benefits and the Executive further undertakes to timely execute the Executive Release Agreement.

(b) Confidential Information, Non-solicitation. and Non-Competition. The receipt of any severance compensation pursuant to Section 3 will be subject to the Executive not violating the provisions of Sections 5 and 6. In the event the Executive breaches the provisions of Sections 5 and 6, all payments and benefits to which the Executive may otherwise be entitled pursuant to Section 3 will immediately cease, to the extent permissible under law.

(c) No Duty to Mitigate. Except as expressly provided herein, the Executive shall not be required to seek other employment or otherwise mitigate the amount of any payments to be made by the Companies pursuant to this Agreement. Except as otherwise provided herein, the payments provided pursuant to this Agreement shall not be reduced by any compensation earned by the Executive as the result of employment by another employer after the termination of the Executive's employment or otherwise.

5. **Non-Disclosure of Confidential Information.**

(a) Confidential Information. For purposes of this Agreement, the term **"Confidential Information"** means any and all of the Group's trade secrets, confidential and proprietary

information and all other nonpublic information and data of or about the Group and its business, including, without limitation, lists of customers, information pertaining to customers, marketing plans and strategies, information pertaining to suppliers, pricing information, engineering and technical information, software codes, cost information, data compilations, research and development information, business plans, financial information, personnel information, information received from third parties that the Group has agreed to keep confidential, and information about prospective customers or prospective products and services, whether or not reduced to writing or other tangible medium of expression, including, without limitation, work product created by the Executive in rendering services for the Group; provided, however, that **"Confidential Information"** shall not include information that: (i) is or becomes generally available to the public by use, publication or the like, through no fault of the Executive; (ii) is obtained without restriction by the Executive after termination of the Executive's employment with the Companies from a third party who had the legal right to disclose such information to the Executive; (iii) the Executive possessed prior to the Executive's employment with the Companies; or (iv) is independently developed by the Executive without the use of any of the Group's Confidential Information after the termination of his employment with the Companies.

(b) <u>Non-Disclosure Obligations</u>. During the Executive's employment with the Companies and thereafter, the Executive will not use or disclose to others any of the Confidential Information, except: (i) in the course of the Executive's work for and on behalf of the Group, (ii) with the prior written consent of the Companies, (iii) as required by law or judicial process, provided the Executive promptly notifies the Companies in writing of any subpoena or other judicial request for disclosure involving Confidential Information or trade secrets, and cooperates with any effort by the Group to obtain a protective order preserving the confidentiality of the Confidential Information or trade secrets, or (iv) in connection with reporting possible violations of law or regulations to any governmental agency or from making other disclosures protected under any applicable whistleblower laws. The Executive agrees that the Group owns the Confidential Information and the Executive has no rights, title or interest in any of the Confidential Information. Additionally, the Executive will abide by Indian Company and Mauritius Company's policies protecting the Confidential Information, as such policies may exist from time to time. At the Indian Company or Mauritius Company's request or upon termination of the Executive's employment with the Companies for any reason, the Executive will immediately deliver to the Companies any and all materials (including all copies and electronically stored data) containing any Confidential Information in the Executive's possession, custody or control. Upon termination of the Executive's employment with the Companies for any reason, the Executive will, if requested by the Companies, provide the Companies with a signed written statement disclosing whether the Executive has returned to the Companies all materials (including all copies and electronically stored data) containing any Confidential Information previously in the Executive's possession, custody or control.

(c) <u>Whistleblower Laws</u>. Notwithstanding anything herein or in any other agreement with or policy (including without limitation, any code of conduct or the employee manual) of Indian

Company or Mauritius Company, nothing herein or therein is intended to or shall: (i) prohibit the Executive from making reports of possible violations of: (A) U.S. federal law or regulation (even if the Executive participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes- Oxley Act of 2002 or of any other whistleblower protection provisions of U.S. state or federal law or regulation; and (B) Indian law or regulation (even if the Executive participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of the Whistle Blowers Protection Act, 2014 or of any other whistleblower protection provisions of any applicable Indian law or regulation; (ii) require notification to or prior approval by the Indian Company or Mauritius Company of any such reporting or cooperation; or (iii) result in a waiver or other limitation of the Executive's rights and remedies as a whistleblower, including to a monetary award. Notwithstanding the foregoing, the Executive is not authorized (and the above should not be read as permitting the Executive) to disclose communications with counsel that were made for the purpose of receiving legal advice or that contain legal advice or that are protected by the attorney work product or similar privilege. Furthermore, the Executive will not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made (X) in confidence to a U.S. federal, state or local government official, either directly or indirectly, or to an attorney, in each case, solely for the purpose of reporting or investigating a suspected violation of U.S. law or (Y) in a complaint or other document filed in a lawsuit or proceeding, if such filings are made under seal.

(d) <u>Survival of Non-Disclosure Obligations</u>. The Executive's confidentiality/non-disclosure obligations under this Agreement continue after the termination of Executive's employment with the Companies. With respect to any particular trade secret information, Executive's confidentiality/non-disclosure obligations will continue as long as such information constitutes a trade secret under applicable law. With respect to any particular Confidential Information that does not constitute a trade secret, the Executive's confidentiality/non- disclosure obligations will continue as long as such information remains confidential, and will not apply to information that becomes generally known to the public through no fault or action of the Executive or others who were under confidentiality obligations with respect to such information.

6. **<u>Non-Solicitation and Non-Competition.</u>**

(a) <u>Non-Competition</u>. During the Term and the "Non-Compete Time Period" (*as defined in this Agreement*), the Executive will not within the "Restricted Geographic Area" (*as defined in this Agreement*) engage in (including, without limitation, being employed by, working for, or rendering services to) any "Competitive Business" (*as defined in this Agreement*) in any "Prohibited Capacity" (*as defined in this Agreement*). Notwithstanding the foregoing, if the Competitive Business has multiple divisions, business units, lines or segments, some of which are not competitive with the business of the Group, nothing herein will prohibit the Executive from being employed by, working for or assisting any division, business unit, line

or segment of such Competitive Business that is not competitive with the business of the Group.

(b) <u>Customer Restrictions</u>. During the Term and the "Restricted Time Period", the Executive will not sell, market or provide, attempt to sell, market or provide, or assist any Person in the sales, marketing or provision of, any "Competing Service/Product" (*as defined in this Agreement*) to any of the Group's Customers (excluding any governmental agencies / authorities which are the Group's Customers or existing customer of the new organization) with respect to whom, at any time during the Executive's employment with the Companies, the Executive had any business contact on behalf of the Group, the Executive had any relationship, business development, sales, service or account responsibility (including, without limitation, any supervisory or managerial responsibility) on behalf of the Group, or the Executive had access to, or gained knowledge of, any Confidential Information concerning the Group's business with such customer, or otherwise solicit or communicate with any such customers for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting in any Person in the sales, marketing or provision of, any Competing Service/Product.

(c) <u>Non-Interference with Contractors, Vendors, or Other Relationships</u>. During the Restricted Time Period, the Executive will not urge, induce or seek to induce any of the Group's independent contractors, subcontractors, business partners, distributors, brokers, consultants, sales representatives, customers, referral sources, vendors, suppliers or any other Person with whom the Group has a business relationship to terminate their relationship with, or representation of, the Group or to cancel, withdraw, reduce, limit or in any manner modify any such Person's business with, or representation of, the Group.

(d) <u>Employee Restrictions</u>. During the "Restricted Time Period", the Executive will not: (i) solicit for employment, hire, employ, engage the services of, or attempt to hire, employ, or engage the services of, any individual who is an employee of the Group; (ii) assist any Person in the recruitment, hiring or engagement of any individual who is an employee of the Group; (iii) urge, induce or seek to induce any individual to terminate his/her employment with the Group; or (iv) advise, suggest to or recommend to any Competitive Business that it employ, engage the services of, or seek to employ or engage or engage the services of any individual who is an employee of the Group.

(e) <u>Non-Competition Compensation</u>. During the Non-Compete Time Period, the Company will pay the Executive an amount equivalent to 6 months of the annualized Fixed Pay in effect as of the Termination Date as consideration for the Executive's undertakings in Section 6(a) to (d) above (the **"Non-Competition Compensation"**). The Non-competition Compensation will be paid by the Indian Company in one single bullet payment at the end of the Non- Compete Time Period subject to the applicable withholdings. In the event of a breach or threatened breach of the Executive's obligations under Section 5 or this Section 6, the Company shall be entitled to: (i) not make any Non-Competition Compensation as of the date of such breach or threatened breach, and following the date of such breach or threatened

breach, the Executive shall have no further rights to any Non-Competition Compensation, and (ii) in addition to other available remedies, seek equitable relief (by injunction, restraining order, or other similar remedy) against such breach or threatened breach from a court of competent jurisdiction without the necessity of showing actual damages and without the necessity of posting a bond or other security. In the event a court of competent jurisdiction determines that the Executive's obligations under Section 5 or this Section 6 are more restrictive than necessary to protect the Group's legitimate business interests, such court may reduce the scope of the restriction(s), or sever and remove the unenforceable provision(s), to the extent necessary to make the restriction(s) enforceable.

(f) For purposes of this Agreement: (i) "Non-Compete Time Period" means 6 months after the Termination Date; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties; and (ii) "Restricted Time Period means 3 years after the Termination Date"; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties.

7.  **Assignment**. This Agreement will be binding upon and inure to the benefit of: (a) any Successor of the Indian Company; and (b) to the heirs, executors and legal representatives of the Executive upon the Executive's death as it relates to the severance compensation specified in Section 3. Any such successor of the Indian Company will be deemed substituted for the Indian Company under the terms of this Agreement for all purposes. For this purpose, **"Successor"** means any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Indian Company. None of the rights of the Executive to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance or other disposition of the Executive's right to compensation or other benefits will be null and void.

8.  **Notices**. Except as may be otherwise provided herein, all notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and signed by or on behalf of the Party giving it. Such notice shall be served by sending it or by delivering by hand, mail or courier to the address set forth below. In each case it shall be marked for the attention of the relevant Party set forth below. Any notice so served shall be deemed to have been duly given (i) in case of delivery by hand, when hand delivered to the other Party; or (ii) when sent by mail, where 7 (seven) business days have elapsed after deposit in the mail with certified mail receipt requested postage prepaid; or (iii) when delivered by courier on the second business day after deposit with an overnight delivery service, postage prepaid, with next business day delivery guaranteed, provided that the sending Party receives a confirmation of delivery from the delivery service provider; or (iv) for electronic mail notification with return receipt requested, upon the obtaining of a valid return receipt from the recipient.

To the **Indian Company**:

Azure Power India Private Limited

Address: 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
Attn: Chairman, Board of Directors

To the **Executive**:

Mr. Harsh Shah
Address: 2003, Vista 3, The Address, opposite R-city mall, LBS road, Ghatkopar
West, Mumbai 400086

9.  **<u>Severability</u>**. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement will continue in full force and effect without said provision.

10. **<u>Governing Law and Arbitration</u>**. The provisions of this Agreement shall, in all respects, be governed by, and construed in accordance with the laws of India. Any dispute arising out of or in connection with this Agreement, including any question regarding the existence, validity or termination of this Agreement shall be referred to and finally resolved by arbitration in accordance with the Arbitration Rules of the Singapore International Arbitration Centre (SIAC Rules), which rules are deemed to be incorporated by reference in this Section. The seat of arbitration shall be Singapore, and venue of arbitration shall be New Delhi. The arbitral tribunal shall consist one 1 (One) arbitrator, jointly appointed by the Parties. In the event that the Parties are unable to appoint such sole arbitrator, then, the Executive on one hand and the Indian Company on the other hand, will appoint 1 (One) arbitrator each, and the 2 (Two) arbitrators so appointed shall appoint the third arbitrator. The law governing this Agreement shall be Indian law. The language of arbitration shall be English. Subject to the foregoing, the Parties agree to be subject to the exclusive jurisdiction of the courts in New Delhi. Nothing herein contained shall be construed as prohibiting any of the Companies from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the Executive.

11. **<u>Works</u>**. All work performed by the Executive and all inventions, discoveries, developments, work product, processes, improvements, creations, deliverables and all written, graphic or recorded material and works of authorship fixed in any tangible medium of expression made, created or prepared by the Executive, alone or jointly with others, during the Executive's employment with the Companies and relating to the Group's business (collectively, the **"Works"**) shall be the Companies' exclusive property, shall be deemed a work made for hire, and all rights, title and interest in the Works shall vest in the Companies. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably assigned to the Companies. All Works shall belong exclusively to the Companies, and the Companies shall have the right to obtain and hold in their own name, any patents, copyrights, registrations or such other intellectual properly protections as may be appropriate to the subject matter. The Executive will sign documents of assignment, declarations and other documents and take all other actions reasonably required by the Companies, at the Companies' s expense, to perfect and enforce any of its proprietary rights and to vest all right, title and interest to the Works in the Companies. This Section does not apply to an invention for which no equipment, supplies, facility, or Confidential Information of the

Group was used and which was developed entirely on the Executive's own time, unless: (a) the invention relates (1) directly to the business of the Group, or (2) to the Group's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Executive for the Group. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably, absolutely and perpetually assigned to the Companies for worldwide territory. Notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, any assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Executive, even if the Companies do not exercise the rights under the assignment within a period of one year from the date of assignment. The Executive hereby agrees to waive any right to and agrees to refrain from raising any objection or claims to the Copyright Board with respect to any assignment, pursuant to Section 19A of the Copyright Act, 1957. The Executive also waives all moral rights in relation to the Work developed or conceived by the Executive. The Executive acknowledges that the Fixed Pay payable under this Agreement is good and valuable consideration for the assignment of the Works, the sufficiency of which is hereby acknowledged.

12. **<u>Definitions</u>**. For purposes of this Agreement, the following terms have the following meanings, unless the context requires otherwise or unless otherwise stated.

**"Affiliate"** means any entity that directly, or indirectly through one or more intermediaries, is owned or controlled by, owns or controls, or is under common ownership or control with, the Indian Company or Mauritius Company; for this purpose, "control" of an entity means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the entity, whether through the ownership of voting securities, by contract or otherwise.

**"Company"** means, individually, each of the Indian Company and Mauritius Company, and **"Companies"** means, collectively, the Indian Company and Mauritius Company.

**"Cause"** means the occurrence of one or more of the following: (i) an act of fraud or dishonesty made by the Executive against the Group in connection with the Executive's responsibilities which the Indian Company or Mauritius Company reasonably believes will damage its business; (ii) the Executive's conviction of, or plea of no contest to, a felony (excluding traffic offenses) which the India Company Board or Mauritius Company reasonably believes had or will have a detrimental effect on the reputation or business of the Indian Company or Mauritius Company or its affiliates; (iii) the Executive's intentional or gross misconduct; (iv) the Executive's intentional improper disclosure of confidential information; (v) the Executive's continued violations of material Indian Company or Mauritius Company policies or provisions of the Executive's agreements with the Indian Company or Mauritius Company, including any violation of or failure to perform the Executive's reasonably assigned duties; or (vi) the Executive's failure to cooperate with the Indian Company or Mauritius Company in any investigation or formal proceeding.

**"Competing Service/Product"** means any service or product that is similar to and competitive with any of the services/products and/or related services/products offered or provided by the Group as of the Termination Date.

**"Competitive Business"** means any company engaged in the renewable power business, wind, solar or hydro, energy storage or any other business of the Group as of the Termination Date in the Restricted Geographic Area.

**"Garden Leave"** means a Company's right to place the Executive on "garden leave" during the Notice Period. Such Company may, in its sole discretion, during the Garden Leave to: (a) suspend or terminate, in whole or in part, any powers, duties or work exercised by or provided to the Executive; (b) change the Executive's designation or duties as such Company decides appropriate; (c) prevent the Executive from contacting or communicating with any current, former or proposed clients, customers, employees, or vendors of the Group; (d) exclude the Executive from the premises of the Group; (e) announce to employees, clients, customers, vendors and other relevant persons of the Group that Executive has been given notice of termination or that the Executive has resigned; and/or (f) ask the Executive to resign so such Company can appoint a new Chief Executive Officer prior to the end of the Notice Period, provided that in such event the last date of the Notice Period shall be deemed the Termination Date.

**"Group"** means any of the Companies, their subsidiaries and their Affiliates, unless the context otherwise requires.

**"Group's Customer"** or **"Group Customer"** means: (i) any Person to whom the Group is selling or providing any service or product as of the Termination Date; (ii) any Person to whom the Group provided or sold any service or product at any time during the one (1) year preceding the Termination Date; and/or (ii) any Person with whom the Group has contracted or otherwise entered into an arrangement to provide any service or product as of the time of the Termination Date.

**"Mauritius Company"** means Azure Power Global Limited, a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene,, Mauritius, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns.

**"Person"** means any individual or entity (including without limitation a corporation, partnership, Limited Lability company, trust, joint venture, or governmental entity or agency).

**"Prohibited Capacity"** means: (i) the same or similar capacity or function to that in which the Executive worked for the Group at any time during his employment; (ii) any executive or officer capacity or function; (iii) any business development capacity or function; (iv) any ownership capacity (except the Executive may own as a passive investment up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market);

(v) any business consulting or advising capacity of function; (vi) any director or similar capacity or function; (vii) any capacity or function in which the Executive likely would inevitably use or disclose any of the Group's trade secrets and/or Confidential Information; (viii) any capacity or function in which the customer goodwill the Executive helped to develop on behalf of the Group would facilitate or support the Executive's work for a Competitive Business; and/or (ix) any other capacity or function in which the Executive's knowledge of the Confidential Information would facilitate or assist the Executive's work for the Competitive Business.

**"Restricted Geographic Area"** means India, and each country the Group is doing business in as of the Termination Date.

13. **Integration**. This Agreement represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. This Agreement may be modified only by agreement of the Parties by a written instrument executed by the Parties that is designated as an amendment to this Agreement.

14. **Waiver of Breach**. The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

15. **Headings**. All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

16. **Tax Withholding**. All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

17. **Acknowledgment**. The Executive acknowledges that he has had the opportunity to discuss this matter with and obtain advice from his private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

18. **Counterparts**. This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

[*Schedule and signature pages follow*]

21

**SCHEDULE 1 | KEY PARAMETERS OF EXECUTIVE RELEASE AGREEMENT**

The Executive acknowledges and agrees that as a condition precedent to receiving any portion of the severance compensation detailed in Section 3 of the Agreement, the Executive will execute, deliver to the Companies, and not revoke, the Executive Release Agreement, which will: (a) substantially contain the following terms which are acknowledged and agreed to by the Executive (upfront) at the time of signing this Agreement, and (b) be executed and delivered to the Companies (and not subsequently revoked) in a form prepared by, and satisfactory to, the Indian Company:

(1)     The Executive confirms that all positions (including, but not limited to, all board / committee and executive positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company.

(2)     The Executive, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims (other than in respect of payment of amounts specifically set out in the Executive Release Agreement), and hereby acknowledges and declares that on payment by the Indian Company of the dues to the Executive in accordance with the terms of the Agreement and the Executive Release Agreement, the Executive will have no Claims against the Companies and if required execute such further documents as may be reasonably required by Companies in confirmation on payment of the amounts due. The Executive waives any future Claims whatsoever that the Executive or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities, other than those in respect of payment of amounts due.

For this purpose, **'Claims'** means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, liquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers'

compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu), leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other employee benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies, or to any event, act or omission that has occurred at any time up to and including the date of termination of the Executive, whether or not the Claim arises or may arise under contract, tort, equity or statute.

(3) The Executive shall not, up to and after the date of termination, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, their officers, directors, employees, business practices, plans or procedures, products, or pertaining to the Executive's tenure with the Companies or the terms of this Agreement.

(4) The Executive agrees to take all steps, execute all documents and do all acts and things as may be reasonably required by the Companies to give effect to the transactions and matters contemplated by the Agreement and the Executive Release Agreement, and implement the provisions of the same.

(5) In the event, at any time after the termination of employment of the Executive, it is discovered (pursuant to any internal or external / regulatory investigation(s)) that the Executive was engaged or involved in any of the following: (a) misconduct / fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws or the Agreement or the Executive Release Agreement, or (d) misappropriation of funds / property, then the Companies shall have all rights and entitlements against the Executive, as may be available under applicable laws, and/or in equity, including the right to claim damages for breach/ actions of the Executive.

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power India Private Limited**

_____

Authorized Signatory

**Name**:

**Designation**:

*Signature Page – Executive Employment Agreement*

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

**Name**:  Harsh Shah

Exhibit 4.5

# EXECUTIVE RELEASE AGREEMENT

This Executive Release Agreement **("Agreement")** is entered into on August 29, 2022 **("Execution Date")**, and is deemed to be effective from August 29, 2022 **("Effective Date")**, at New Delhi by and between:

1.  **AZURE POWER INDIA PRIVATE LIMITED,** a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017 (hereinafter referred to as the **"Indian Company",** which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns);

2.  **AZURE POWER GLOBAL LIMITED,** a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius (hereinafter referred to as the **"Mauritius Company",** which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

3.  **MR. HARSH SHAH,** a citizen of India bearing PAN ARAPS4885L and resident of 802, Tower 7, Parsvnath Srishti 2, Sector 93A, Noida 201304 (hereinafter referred to as the **"Executive"** which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the Mauritius Company are individually referred to as **"Company"** and collectively referred to as **"Companies"**

The Companies and the Executive shall, hereinafter, be collectively and commonly referred to as "**Parties**" and individually as a **"Party"**.

Any term not defined under this Agreement shall have the meaning assigned in the Employment Agreement *(as defined below),* notwithstanding the cessation of employment of the CEO under the employment agreement dated July 01, 2022 between the Indian Company and the Executive **("Employment Agreement").**

**WHEREAS** The Executive held the position of Chief Executive Officer **("CEO")** in the Indian Company and Mauritius Company (collectively, **"Companies")** from July 01, 2022. The Executive has tendered his resignation *vide* letter dated 21st August 2022 from all employment with the Companies and the Group *(as defined hereinafter)*. The Parties are therefore desirous of recording the final terms and conditions of such cessation, as set out hereinafter.

**NOW, THEREFORE,** in consideration of the mutual covenants, and agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties intending to be legally bound, hereby agree as follows:

(1)  The Executive confirms that all positions (including, but not limited to, all board / committee and executive positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company and the Mauritius Company. The Executive hereby agrees and affirms that he will assist the Companies and such other representatives of the Group and will sign the necessary letters and documents to record his resignation from any position that he may have been appointed to or be in the process of being appointed to and hereby authorizes the Group and such other representatives of the Group to do what is necessary in this regard to record resignation of the Executive.

1

(2) The Parties have hereby agreed the waiver of the provisions of Clause 6 (a) (*Non-Competition*), of the Employment Agreement with effect from the Effective Date. Accordingly, the Executive agrees that the Companies shall have no obligation to pay the Non-Competition Compensation as provided under Clause 6 (e) (*Non-Competition Compensation*) of the Employment Agreement. Subject to Clause 5 below, there shall be no claim on the Executive with respect to Clause 1 (c) Notice Period, 2 (d) Sign on Bonus, 2 (e) Compensatory Bonus 2(i) Expenses and the Executive shall not be asked to repay any such amounts.

(3) The Executive, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims. The Executive waives any future Claims whatsoever that the Executive or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities, other than those in respect of payment of amounts due.

For this purpose, **'Claims'** means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, liquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers' compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu), leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other employee benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies, or to any event, act or omission that has occurred at any time up to and including the date of termination of the Executive, whether or not the Claim arises or may arise under contract, tort, equity or statute.

(4) The Executive shall not, up to and after the date of termination, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, employees, business practices, plans or

procedures, products, or pertaining to the Executive's tenure with the Companies or the terms of this Agreement. The same shall be applicable to the Company, with regards to making statements on the Executive.

(5)     In the event, at any time after the termination of employment of the Executive, it is discovered (pursuant to any internal or external / regulatory investigation(s)) that during the limited period of Term of his employment, the Executive was engaged or involved in any of the following: (a) misconduct / fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws or the Agreement or (d) misappropriation of funds / property, then the Companies shall have all rights and entitlements against the Executive, as may be available under applicable laws, and/or in equity, including the right to claim damages for breach/ actions of the Executive and clawback of Sign On Bonus and Compensatory Bonus.

It is further clarified that the  Term of the Executive's employment commenced from the effective date of the CEO Agreement up to the Effective Date of this Agreement.

(6)     The Companies agree that there shall be no liability of the employee towards the Companies or his role at the company after the release. The Company shall not raise any Claims against the Executive except as any claims that the Companies may have pursuant to Clause 5 above.

(7)     The Executive agrees that his obligations under the Employment Agreement shall survive post his Terminate Date including the obligations under Clause 5 (*Non-Disclosure of Confidential Information*).

(8)     The Executive agrees to undertake best efforts to co-operate with members of the Group and their legal counsel, in connection with any current or future investigation or litigation relating to any matter with which he was involved or of which he has knowledge, or which occurred during the term of his employment with the Companies. The Company agrees to pay for the fees for independent legal counsel for such matters who will advise the employee.

(9)     Clauses 8 (*Notices*), 9 (*Severability*), 10 (*Governing Law and Arbitration*) and 12 (*Definitions*) of the Employment Agreement shall *mutatis mutandi* apply to this Agreement.

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the day and year first above written.

/s/ Mr. Harsh Shah
**MR. HARSH SHAH**

*Signature Page – Executive Release Agreement*

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power India Power Limited**

Authorized Signatory

**Name:**

**Designation:**

*Signature Page – Executive Release Agreement*

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power Global Limited**

Authorized Signatory

**Name:**

**Designation:**

*Signature Page – Employee Employment Agreement*

**Exhibit 4.6**



## RETAINERSHIP AGREEMENT

This Retainership Agreement ("Agreement") is made and executed at **New Delhi** on **November 21, 2022**

### BY AND BETWEEN

**Azure Power Fifty Two Pvt. Ltd.**, a company registered and incorporated under the Companies Act, 1956 and having its registered office at **5th Floor, Southern Park, D-II, Saket, New Delhi – 17 (hereinafter referred to as "Azure/ Company")**, which expression shall unless repugnant to the context or meaning thereof, be deemed to include its group companies, sister concerns successors and permitted assigns)

### AND

**Mr. R Narasimhan Iyer**, an individual, residing at **D 103, Rail Vihar, Sector 15, Part 2, Gurugram - 122001** presently **(hereinafter referred to as the "Retainer")**

*AZURE* and the *Retainer* *shall be individually referred to herein as "Party" and collectively as "Parties".*

**WHEREAS**, AZURE is engaged in the business of solar power production and related services ("Business") and is one of the leading solar power developers of the country and having a very good repute and goodwill in the market, built in over a period of time.

**AND WHEREAS** Azure is in requirement of a Chief Operating Officer (COO) of requisite experience, caliber and qualification who can lead and take care of the following job responsibilities at Azure in accordance with Azure's requirement:

- Managing business and project construction at Azure through stakeholder and vendor engagement
- Driving business excellence cycle from Award to CoD . Cost, Timelines, Safety & Compliance
- Handover of under construction projects SECI-4, SECI-3 and Assam as per plan to O&M team
- Project development of new projects M1 & M2 , Wind 120 and Wind Hybrid 150 – (key ordering/ land / kick -off)
- Leading business functions - Construction, Design & Engineering, Quality, SCM, Security, Administration, SHES, etc
- Maintain SHES score at 90%
- Handle team dynamics and help the assigned teams to function well together
- Reviewing and strengthening the internal controls and processes, bringing in external expertise as needed
- Building a robust team

**AND WHEREAS**, the Retainer has met the officials of Azure and Parties agree that Retainer has the requisite experience, and qualifications required by Azure for the services (as defined below) and his services can be provided on a retainership basis in capacity of **Chief Operating Officer (COO)** to Azure in accordance with the terms thereof for its Business requirements. This position will report into the Chief Executive Officer (CEO) of Azure Power.

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

1



**NOW THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS AND OBLIGATIONS CONTAINED HEREIN AND SUBJECT TO THE TERMS AND CONDITIONS SET FORTH HEREIN, THE PARTIES HEREBY AGREE AS FOLLOWS:**

**ARTICLE 1:**

### 1.1 DEFINITIONS:

a) **Business:** shall mean and include the business undertaken by Azure whether at present or in future.

b) **Compensation/Retainership Fee**: shall mean and include the amount paid by Azure to the Retainer for the services rendered by the Retainer in the manner and quantum as stated in Article 4 (i) a.

c) **Services**: shall mean the services related to **managing & leading Construction, Project delivery, Land acquisition, operational SCM, Safety, Security & Administration, Quality, D&E** and other such services required by the Retainer to Azure in accordance with Azure's requirement.

### 1.2 INTERPRETATION

(i) Words importing the singular number include the plural number and vice versa.

(ii) The headings in this Agreement are inserted for convenience only and shall be ignored in construing the meaning of this Agreement.

(iii) Any reference to any statutory enactment shall be deemed to include a reference to such enactment as re-enacted, modified or amended.

### ARTICLE 2: TERMS OF REFERENCE/PROVISION OF SERVICE

i) The Parties hereby agree that the Retainer shall during the term of this Agreement render the Services to Azure in accordance with this Agreement.

ii) The Retainer shall be responsible for **managing & leading Construction, Project delivery, Land acquisition, operational SCM, Safety, Security & Administration, Quality, D&E** domain of Azure and provide his expertise and services as per the requirement of Azure.

(iii) The Retainership/engagement under this Agreement shall be on exclusive basis and the Retainer shall not provide his services to any third party during the term of this Agreement.

(iv) The Executive shall not during the Appointment and warrants to the Company that as at the date of this agreement he is not (save as a representative of the Company or with the prior written approval of the Chairman of the Board) in respect of the companies/entities listed in Azure whether directly or indirectly, paid or unpaid, engaged or concerned in the conduct of, or become an employee, agent, partner, Retainer or director of or assist or have any financial interest in any other actual or prospective business, organisation, entity, company, occupation or profession whatsoever without prior permission from the Board, such permission not to be

**Azure Power Fifty Two One Private Limited**
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

2



unreasonably withheld or delayed. The Executive may not hold any office as a director or chairman of another company without the prior written consent of the Chairman of the Board.

## ARTICLE 3: TERM OF THIS AGREEMENT

a) This Agreement shall be effective from **November 21, 2022** to **November 20, 2024** and shall be effective for a minimum period of **Two years** therefrom ("Lock in Period"), extendable by mutual consent for a mutually agreed further period, "Term".

b) The Term of the Agreement, if extended, shall be on terms and conditions as agreed between the Parties.

c) The Parties agree that this an Exclusive Contract and therefore during the Term of this Agreement, the Retainer shall work exclusively for Azure.

d) On the successful completion of the Term, Parties will determine next steps vis-à-vis continuation of services and capacity of the same, wherein, Azure may its sole discretion make the offer of employment to the Retainer.

## ARTICLE 4: COMPENSATION AND OTHER CONDITIONS OF RETAINERSHIP

(i) Azure hereby agrees to pay to the Retainer a compensation for the Services rendered by the Retainer on a monthly basis, as stated herein below:

a) The Retainer will be paid retainership fees of **Rs. 1,60,00,000/- per annum, (Rs. One Crore Sixty Lacs Only)** termed as "Retainership Fee" during the Term. Income Tax on the said fee shall be borne by the Retainer. GST and any other leviable taxes shall be extra and applicable at actuals from time to time, which shall be paid by Azure.

The Retainer shall raise invoice for Retainership Fee on a monthly basis and submit to CHRO by 25th of every month and the same shall be paid to the Retainer by 1st of the immediately succeeding month.

The Retainership Fee will be reviewed annually and revision in Retainership Fee will be discussed based on performance of the Retainer. Any revision in Retainer Fee shall be mutually agreed between the parties thereafter.

b) In addition to the above stated retainership fees, you will be entitled to a Variable Performance Pay of **20%** of the fixed retainership fees up to a maximum of **Rs. 32,00,000/- per annum, (Rs. Thirty Two Lacs Only** on achievement of mutually agreed KRAs. This is payable as per the terms governing the Variable Performance Pay Program of the company. GST and any other leviable taxes shall be extra and applicable at actuals from time to time, which shall be paid by Azure. Payment of Variable Performance Pay (VPP) is discretionary. Earning of VPP is linked to performance management process dependent upon your individual performance and your continued commitment towards the achievement of organisational goals as well as the performance of your department and the company. If the company announces disbursal of VPP to the eligible executives for a particular financial year after assessment of the performance of the individual employees, departments and the company during that period, then as per your eligibility determined on the aforesaid

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800    📠 +91 11 4940 9807    ✉ info@azurepower.com    🌐 www.azurepower.com

3



parameters, VPP shall be paid to you only if you are on the full-time active employment of the company as on the date of disbursement and have not taken steps for cessation of the employment.

c) In addition to the above stated remuneration, you will be entitled to an additional Variable Performance Pay of **10%** of the fixed retainership fees up to a maximum of **Rs. 16,00,000/- per annum, (Rs. Sixteen Lacs Only) in case 80% of KRAs are over-achieved.** This is payable as per the terms governing the Variable Performance Pay Program of the company. GST and any other leviable taxes shall be extra and applicable at actuals from time to time, which shall be paid by Azure.

d) In addition, you will be entitled for mobile phone expenses coverage as per company policy. You will be entitled for the assets as per company policy.

e) In addition, you will be covered under the Family Mediclaim and Personal Accident Insurance Policies. Premium of these policies will be paid by the Company.

| Policy | Coverage Limit |
|---|---|
| Family Mediclaim (For Employee, Spouse and up two dependent Children) | Composite Coverage up to Rs. 10 lacs per annum. |
| Personal Accident Insurance (For Employee only) | Up to Rs. 2 Cr. |

e) All valid **travel or stay expense**s will be in addition to the Retainership Fees and shall be reimbursed on presentation of actual receipts in accordance with the Company's Policies other than agreed monthly retainership fees. Reimbursement for travel/mobile / shall be paid to the Retainer on production of valid bills and on actual expenses incurred in relation to the business of the company.

DA/TA for domestic is as below:

| Band | Level | Outstation Travel (max. entitlement*) |
|---|---|---|
| SM1 | CEO/ COO / CFO / EVP | Business Class Air / 1st AC Train |

| Band | Level | Hotel (A grade city) | Hotel (B grade city) | Hotel (C grade city) | Food allowance* | Incidental allowance** |
|---|---|---|---|---|---|---|
| SM1 | CEO/ COO/ CFO, EVP  Sr. VP /VP | At actuals | At actuals | At actuals | At actuals | At actuals |

All the rates mentioned above are excluding GST & other applicable taxes as per law

(Business Travel / stay etc. shall be facilitated by Azure).
f) The Retainership Fee shall be subject to deduction of TDS.

g) The Retainer will raise his monthly invoice during term of this agreement TDS certificate will be issued by the end of relevant financial year.

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800        📠 +91 11 4940 9807        ✉ info@azurepower.com        🌐 www.azurepower.com

4



h) Retainer shall be entitled for any out of pocket expenses once duly authorized by the **CEO / CHRO, Azure Power**. All valid out of pocket expenses will be in addition to the Retainership Fees and shall be reimbursed on presentation of actual receipts in accordance with the Company's policies. Any Taxes if applicable on such expenses shall be borne by Azure.

i) Retainer will be expected to be available for company's working on all working days of the company. Availability for company assigned work shall include attending to company work whether inside the office or outside the office.

j) Retainer will be entitled for the following annual leaves:
   a. Casual Leaves – 12
   b. Sick Leaves – 10
   c. Holidays – 11
   d. > Earned Leave: 15 days

k) The rules and regulations of time and attendance management will be applicable to the Retainer as per discretion of HR Operations.

l) There shall be no overtime compensation and this Retainership Fee is full and final for the Services to be rendered by the Retainer.

f) The Retainer shall strictly adhere to Azure's travel expense policy, which demands cost-conscious behavior. Also, for all authorised travel and lodging/boarding, Azure shall make all arrangements on prior written intimation. In case of emergency, a prior authorization must be taken before incurring cost on any out of pocket expenses.

(ii) The Retainer will coordinate and liaison with the **Azure Power team** during the term.

(iii) The Retainer shall not make any commitment /representation/agreement to any third party on behalf of Azure unless he is duly authorized in writing the representation of by Azure to do the same. DOA ( Delegation of Authority shall be defined as per Azure )

(iv) The Retainer shall employ all his skill and expertise always to the best interest of Azure. The Retainer shall always be bound to act with reasonable diligence and shall not cause any harm to Azure or its personnel due to his negligence, mis-behavior, want of skill, defaults, mistakes or misconduct.

(v) The Retainer shall be responsible for any act, error, omission or misconduct done by his during the course of acting as a Retainer for Azure.

(vi) This agreement is subject to verification of all documents, successful reference checks and background verification. The agreement will be terminated in case there is a reported discrepancy or error. Please note that terms and details of this agreement are strictly confidential and are not to be discussed with other members of the company.

## ARTICLE 5: CONFIDENTIALITY

**Azure Power Fifty Two One Private Limited**
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

5



a) The Retainer agrees for himself that he shall not disclose any kind of information received/known by the Retainer in connection with Azure or concerning Azure, to any third party or any personnel of Azure, without the express written consent of Azure or without due authorization of Azure. ("Confidential Information"). Azure shall mark/ qualify such information as Confidential in its correspondence to Retainer.

b) The Retainer agrees that he shall not make, has made, replicate, reproduce, use, sell, incorporate or otherwise exploit; for his own or third party's benefit or for any other purpose, any of the Confidential Information in any manner.

c) Notwithstanding the foregoing, the Retainer shall not be prevented from disclosing the Confidential Information: (a) as required by law; (b) that is already in the public domain; or (c), which has prior and express written consent of Azure.

d) The Retainer acknowledges that any and all the Confidential Information that may be disclosed to or discovered by or known to him by Azure is the valuable property of Azure and is of a highly proprietary and confidential nature. The Retainer further acknowledges that any unauthorized disclosure, distribution, dissemination and/or release, other than to persons who are necessarily required to know such information as per Business requirements of the Company, or any misuse of the Confidential Information by the Retainer, will cause severe, immediate and irreparable damage to Azure. In the event Azure has reasons to believe misuse or unauthorized disclosure of Confidential Information, then Azure shall be entitled to seek immediate injunctive relief along with other appropriate legal action along with immediate termination of this Agreement. Retainer shall indemnify Azure for all the losses and damages it suffers due to such breach by the Retainer as may be determined by the competent authority/court.

e) The confidentiality obligations of the Parties hereunder shall survive the termination of this Agreement and shall continue for a period of three years from the date of termination of the Agreement.

## ARTICLE 6: NON- COMPETITION

The Retainer agrees as follows:

a) During the Term of this Agreement, the Retainer shall provide services exclusively to Azure and shall not enter into any agreement, understanding or otherwise to render his services to any third party.

b) The Retainer shall not undertake any activity, whether pursuant to an agreement or otherwise, which shall compete or adversely affect the interest of Azure directly or indirectly, during the Term of this Agreement.

## ARTICLE 7: INDEMNIFICATION

Each Party agrees to indemnify the other from and against any claims, litigation, losses, damages, liabilities or expenses (including attorney's fees) arising due to any action taken or failure to act on its part or any error of a Party, which is either outside the scope of its authority under this Agreement or in violation of the terms of this Agreement or applicable law or regulation.

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

6



**ARTICLE 8: REPRESENTATION AND WARRANTIES**

a) Each Party represents and warrants as of the date hereof that:

   (i) This Agreement is a legal and binding obligation of each Party enforceable against the other party in accordance with its terms;

   (ii) The execution, delivery and performance of this Agreement by him; (i) have been authorized by all necessary corporate action, and (ii) do not have and will not (A) violate any applicable law, (B) violate its organizational documents, (C) contravene any provision of, or constitute a default under, any other Agreement or instrument to which it/he is a Party or by which it/his property or assets may be bound.

b) The Retainer represents that during the Term he will not work for any other company or organization. In the event Retainer does so this Agreement will be terminated and Azure will not be required to pay Fee for balance Term.

**ARTICLE 9: ENTIRE AGREEMENT**

a) This Agreement supersedes all previous representations and understanding, oral or written, between the Parties with respect to the subject matter thereof and the Agreements and documents contemplated hereby and contain the entire understanding of the Parties as to the terms and conditions of their relationship.

b) Terms included herein may not be contradicted by evidence of any prior oral or written agreement or evidence of contemporaneous oral or written agreement.

c) No changes, alterations or modifications hereto shall be effective unless in writing and signed by authorised representative of both Parties.

d) Headings of Articles in this are for convenience only and do not substantively affect the terms of this Agreement.

**ARTICLE 10: IMPLEMENTATION AND OBSERVATION OF THIS AGREEMENT**

a) Each Party undertakes to carry out this Agreement in good faith and to respect the spirit as well as the letter of its provision.

b) The Parties agree to enter into and execute any and all such further Agreement/Agreements, documents and the like as may be necessary to carry out the object of this Agreement.

c) The Retainer shall be bound by and comply with the terms and conditions/policies/by-laws/employments rules/ and all or any rules/regulation of Azure which is applicable to its employees or third parties and are communicated in writing to the Retainer. Any breach of the same shall be a serious misconduct on Retainer's part which may lead to termination of the retainer's services.

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800    📠 +91 11 4940 9807    ✉ info@azurepower.com    🌐 www.azurepower.com

7



d) The Retainer shall not take out of the premises of the Company, without due authorization, any property of the Company.

e) The Retainer shall attend and take part in all its policy meetings/trainings as required by Azure.

f) The Retainer shall cooperate with and give all possible assistance to each employee or officer/personnel of Azure or any third party dealing with Azure during the Term of the Agreement.

g) Towards discharging the Services, the Retainer shall be available as and when required by the Company.

h) In case the Retainer is required to undertake travel, whether locally or out of his location, in connection with this engagement the Retainer will be governed by the travel policy and other policies of the Company.

i) He shall not act contrary to any matter entrusted to him for any other party concerned or connected with such matter.

j) The Retainer shall be bound by the holidays or off- working days in accordance with Company's policies.

k) Disclosure-Retainer is required to disclose any outside activities or interests that conflict or may conflict with the best interests of Azure. Prompt disclosure is required under this paragraph if the activity or interest is related, directly or indirectly, to other consulting relationships that may conflict with this Agreement.

l) Assignment-Retainer's obligations under this Agreement will not be assigned or transferred to any other person, firm, or corporation without the prior written consent of Azure.

m) All works done by or invented by or created by or performed by the Retainer during the term of the Agreement shall be the sole property of Azure including any or all intellectual properties thereunder and there shall be no claim by the Retainer on the same. In the event any intellectual property is required to be registered with authorities, the Retainer shall provide all required assistance in the same.

## ARTICLE 11: COMPLIANCE WITH LAWS

a) Retainer agrees that the Retainer shall comply with all applicable laws while performing its obligations under this agreement. In particular, Retainer agree to comply with all the requirements of (i) the Foreign Corrupt Practices Act of the United States ("FCPA"), (ii) any law implementing the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"), and (iii) any local laws prohibiting bribery, kickbacks or other unlawful or improper means of obtaining business or commercial advantages, including the Republic of India Prevention of Corruption Act, 1988 ("Local Anti-Bribery Laws"). Retainer agrees to comply with such laws regardless of their jurisdictional limitations, in so far as

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800    📠 +91 11 4940 9807    ✉ info@azurepower.com    🌐 www.azurepower.com

8



its dealings with or on Azure's behalf or its affiliates (hereinafter referred to as the 'Company') are concerned, or while performing Retainer's obligations under this Agreement.

b) In this regard, Retainer further agrees and warrants that the Retainer will not directly or indirectly offer, give, or authorize the giving of money or anything else of value to any person (whether a government official, private party, or political entity) (i) to obtain an improper advantage for the Company or for Retainer (ii) to secure the improper performance of that person's function or misuse of that person's position.

c) Retainer acknowledges that in entering into this Agreement, the Company has relied upon Retainer's representation and warranty to strictly comply with the laws referenced above, and further agree that if Retainer violates any such law in the course of performing the activities enumerated in this agreement or in so far as its dealings with or on behalf of the Company or its affiliates are concerned, the Company may immediately, upon notice to Retainer, terminate this Agreement.

d) Retainer will promptly notify the Company if Retainer becomes aware of information that suggests that Retainer have failed to comply with the terms set out in this section.

e) Retainer will, if requested, provide reasonable assistance to the Company in performing any activity related to the Agreement that is required by any intergovernmental organization, any government, or any agency thereof in any relevant jurisdiction for the purpose of compliance with the laws referenced in this section or to satisfy the Company's contractual obligations related to anti-corruption. This shall include providing reasonable access to financial records for the purpose of auditing, examining and making copies or extracts of those records. Costs of any audits conducted under the authority of this right to audit and not addressed elsewhere will be borne by the Company.

f) Retainer appreciates that the Azure group is listed in United States of America and as per applicable laws, Azure expects you not to share the financial projections with third parties except as required for the performance of the Proposed Transaction as enumerated in the Agreement excluding the other Governmental Departments/ Government Regulatory Bodies, who may seek such financial projections for their official use. Azure requests the retainer to strictly ensure the above while processing the above financial projection or any other related information.

g) Moreover, Azure would like to sensitize the retainer that the Confidential Information may include material non-public information and that the India and United States securities laws prohibit any person who has material non-public information about a company from purchasing or selling securities of such company, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person may purchase or sell such securities.

## ARTICLE 12: GOVERNING LAW AND JURISDICTION

(i) This Agreement shall be interpreted in accordance with and governed by the laws of India.

(ii) The Courts of New Delhi shall have exclusive jurisdiction on any matter arising out of this Agreement.

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

9



**ARTICLE 13: SEVERABILITY**

In the event that any of the provisions or portions of this Agreement are held to be unenforceable or invalid by any duly constituted Arbitral panel or Court of competent jurisdiction, the Parties shall negotiate an equitable adjustment in the provisions of this Agreement with a view towards effecting the purpose of this Agreement, and the validity and enforceability of the remaining provision or portions shall not be affected thereby.

**ARTICLE 14: NOTICE**

a) Any notice required or permitted to be given hereunder shall be in writing and may be given by personal service, or by registered mail, e-mail or by courier or by facsimile if confirmed on the same day in writing by registered airmail, with postage fully prepaid to the following addresses:

**To AZURE**
Address: 5th Floor, Southern Park, D-II, Saket, New
Delhi – 17
Attention: **Shweta Srivastava**
Title: **CHRO, HR**
Telephone: 011-49409800

**To Retainer**
Address: **D 103, Rail Vihar, Sector 15, Part 2, Gurugram - 122001**
Attention: **Mr. R Narasimhan Iyer**
Phone no.: **+91-9958531163**

**ARTICLE 15: NON-WAIVER OR OTHER REMEDIES**

a) Subject to the following sub-paragraph, no waiver by either Party of any right, power or remedy under this Agreement shall operate as a waiver of any subsequent or further exercise thereof,

b) Any waiver of a Party's right, powers or remedies under this Agreement, must be in writing, dated and signed by an authorised representative of the Party, granting such waiver, and must specify these rights and to the extent these rights are being waived.

**ARTICLE 16: SURVIVAL**

No person, other than a Party, shall have any legal or equitable right, remedy or claim under or in respect of this Agreement. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**ARTICLE 17: TERMINATION**

a) Azure will have a right to terminate this Agreement for any reason whatsoever, on **180 days** or retainership fee for 180 days on a pro rata basis in lieu of it with a written notice issued to the retainer.

Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800    📠 +91 11 4940 9807    ✉ info@azurepower.com    🌐 www.azurepower.com

10



b) The Retainer will have a right to terminate this Agreement for any reason whatsoever, on **180 days days** or upon payment of retainership fee for 180 days on a pro rata basis in lieu of it to Azure with a written notice issued to the Azure

c) Both the parties can seek a reasonable waiver from the other which if granted in whatever reasonable terms shall be applicable.

## ARTICLE 18: EXECUTION IN COUNTERPARTS

This Agreement may be executed in any nos. of counterparts, each of which shall be deemed to be an original as against any part whose signature appears thereon, and all of such shall together constitute one and the same Agreement.

**IN WITNESS WHEREOF, THE PARTIES HAVE CAUSED THIS AGREEMENT TO BE EXECUTED THE DAY AND YEAR FIRST WRITTEN ABOVE**

**For and on behalf of**                                                         **By and on behalf of the Retainer**
**Azure Power Fifty Two Pvt. Ltd.**

**Name: Shweta Srivastava**                                                **Name: R Narasimhan Iyer**
**Designation: CHRO, Human Resources**



Azure Power Fifty Two One Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket, New Delhi – 110017
CIN: U40300DL2016PTC301090
☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

**Exhibit 4.7**

**EMPLOYEE EMPLOYMENT AGREEMENT**

This Employment Agreement (the "**Agreement**") is entered into as of July 20, 2022 (the "**Execution Date**") by and between:

1. **Azure Power India Private Limited**, a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017(hereinafter referred to as the "**Indian Company**", which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

2. **Mr. Rupesh Agarwal**, a citizen of India having PAN XXX, and residing at Address (hereinafter referred to as the "**Employee**" which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the are hereinafter collectively referred to as "**Parties**" and each individually as a "**Party**".

**WHEREAS**, the Indian Company is desirous of appointing the Employee as its Chief Strategy & Commercial Officer ("**CSCO**"), in accordance with, and on the terms and conditions, contained herein

**NOW, THEREFORE,** in consideration of the foregoing and the mutual provisions contained herein and for other good and valuable consideration, the adequacy and sufficiency of which is acknowledged by all Parties, the Parties agree as follows:

1. **Duties and Scope of Employment, etc.**

    (a) <u>Positions and Duties</u>.

    (i)     The Indian Company hereby agrees to employ the Employee, and the Employee agrees to be employed by the Indian Company, in accordance with the terms and conditions of this Agreement from the "**Effective Date**" of July 20, 2022 (or such earlier date as agreed between the Indian Company and the Employee in writing), subject to completion of satisfactory background checks, to the sole satisfaction of each of the Company Board.

1

(ii)    In his capacity as the Indian Company's CSCO, the Employee will report to Mr Harsh Dinesh Shah, CEO and perform such duties and responsibilities normally attendant to such positions and such other additional and different duties as the relevant Company may from time to time assign which are consistent with the Employee's position; and (c) act in compliance with the Indian Company's constituent documents, applicable law and regulations, and any directives or policies established by the India Company Board.

(iii)    The Employee's principal place of employment shall be at the Indian Company's corporate office in Delhi, India.

(b) <u>Employment Term</u>.

(i)    The term of employment (the "**Term**") of the Employee shall commence on and from the Effective Date and end upon the effective date (the "**Termination Date**") of his termination or resignation from employment with the Company for any reason.

(ii)    For the avoidance of doubt:

(1)    the effective date of termination (other than for "Cause" (*as defined in this Agreement*)) shall not be earlier than the last day of the applicable required notice period provided for in this Agreement, subject to the provisions of Section 1(c) below; and

(2)    the effective date of termination for Cause (*as defined in this Agreement*) shall be as determined by the Indian Company, in its sole and exclusive discretion.

(c) <u>Notice</u>. Each Party agrees to provide the other with ninety (90) days' notice, or such other notice period as mutually agreed between the Parties in writing ("**Notice Period**"), prior to terminating this Agreement for reasons other than "Cause" (*as defined below*) ("**Termination Notice**"). The Indian Company may, in its sole and exclusive discretion: (i)

place the Employee on "Garden Leave" (as defined in this Agreement) for up to the duration of the Notice Period; or (ii) in lieu of providing notice within the prescribed period, satisfy its Notice Period obligation under this Section, by providing the Employee with the equivalent of ninety (90) days' of the Employee's Fixed Pay (as defined in this Agreement). The Employee shall have no right to satisfy the Notice Period obligations by providing the Indian Company with any consideration, unless agreed in writing by the Indian Company, in which case the Indian Company shall also have the right to seek payments in lieu of the Notice Period, equivalent to ninety (90) days' of the Employee's Fixed Pay (as defined in this Agreement). It is clarified that the Indian Company shall be entitled to terminate the Employee's employment for Cause, immediately, without any notice requirements.

(d) <u>Employee Position</u>. During the Term, the Employee's position will be CSCO of the Indian Company or in such other additional position or positions as the Indian Company may designate from time to time. The Employee will have such duties, authorities and responsibilities as are commensurate with his position. All of the Employee's duties, responsibilities and powers with respect to the Indian Company , will, at all times, be subject to the order, direction and supervision of the CEO. During the Employee's employment with the Company, the Employee (without prejudice to Section 6): (i) will devote his full vocational time and best efforts to the furtherance of the business of the "Group" (*as defined in this Agreement*) on a full-time basis; (ii) will exercise the highest degree of loyalty and the highest standards of conduct in the performance of his duties; (iii) will comply with all applicable laws and regulations; (iv) will not, except as noted herein or as required for furtherance of the Employee's duties with the Group, engage in any other business activity (other than Passive Investments), whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the express written consent of the India Company Board , which consent shall be at the sole discretion of each of the India Company Board;

(v) will not engage, directly or indirectly, in any activity, employment or business venture (other than Passive Investments), whether or not for remuneration, that is competitive, same or similar with the Group's business in any respect or make any preparations to engage in any competitive activities; (vi) will not take any action or make any omission that deprives the Group of any business opportunities or otherwise act in a manner that conflicts with the best interest of the Group or is detrimental to the business of the Group; and (vii) will not accept any appointment / nomination, or be appointed / nominated, on the board of directors or other governing body of anybody corporate (other than in respect of the Group, as specifically required by the Indian Company or the Mauritius Company in connection with the Employee's employment), without the express written consent of the CEO. If the Employee wishes to engage in an outside activity not expressly permitted under the terms of this Section, the Employee shall first propose such activity to CEO for its determination as to whether such activities are permissible. Even if the CEO consents to the Employee's engagement in an outside activity, they shall have the right to revoke its consent at any time, and upon notice to the Employee of such revocation of consent, the Employee shall terminate such outside activity at the earliest practicable opportunity.

It is clarified that for the purposes of the above, the term "Passive Investment" shall mean:

(i) ownership of up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market; or (ii) ownership of unlisted securities of a company of less than 50% (on a fully diluted basis), subject to: (A)the Employee not having the right or ability to control or influence the management or decisions (directly or indirectly) of such company, (B) the Employee not having any rights to appoint a nominee, or any right to being appointed, on the board of such company, and (C) the Employee not having any other role in such company, except that of a shareholder holding minority shares in such company.

(e) <u>Representations and Warranties by the Employee</u>. The Employee's employment with the Companies is conditioned on the Employee's representations and warranties to the Indian Company that:

    (i)        he is not disqualified or prevented from acting as the CSCO of the Indian Company under applicable law or regulation;

    (ii)       his execution, delivery and performance of his duties under this Agreement will not violate, conflict with, result in a breach of the terms, conditions or provisions of, result in the creation of any encumbrances or constitute a default (or an event that, with the giving of notice or lapse of time or both, would constitute a default) or an event creating rights of acceleration, modification, termination, cancellation or a loss of rights under any contract to which the Employee is a party, including any non- compete or non-solicitation agreement or obligation, any approval, order, judgment, decree or award to which the Employee is a party or by which he is bound or any law applicable to the Employee; and

    (iii)      this Agreement has been duly and validly executed by the Employee and upon execution and delivery, this Agreement will constitute, legal, valid and binding obligations of the Employee, enforceable against him in accordance with its terms.

**2. <u>Compensation</u>.**

(a) <u>Fixed Pay</u>. During the Term, the Indian Company will pay the Employee the salary set forth in the table below as compensation for his services (the "**Fixed Pay**"). The Fixed Pay will be paid monthly in accordance with the Indian Company's normal payroll practices and be subject to the usual applicable withholdings.

| Period | Salary |
|---|---|
| From the Effective Date till (including) March 31, 2023 | Annual salary of INR 2,00,00,000 (the "**Initial Fixed Pay**") |
| For the period after March 31, 2023 | To be determined by the India Company Board based on the outcome of the annual performance review process |

(b) <u>Variable Pay</u>.

    (i)       In addition to the Fixed Pay, with respect to each completed fiscal year of the Indian

4

Company during the Term (excluding the Notice Period), the Employee shall be eligible to earn a variable pay which may range from NIL to 125% of the Target Variable Pay for such fiscal year (the "**Variable Pay**"), with a target Variable Pay of INR 1,00,00,000 (the "**Target Variable Pay**"). The actual amount of Variable Pay will be determined by the Company and based on the achievement of annual individual and Company level performance objectives established by the India Company Board, subject to: (x) the Employee's continuing employment with the Companies through the applicable payment date for any such Variable Pay (in the manner contemplated herein), and (y) the Employee's employment not having been terminated for Cause, the Employee not being placed on Garden Leave, or the Notice Period not commencing.

(ii)     In accordance with the above, the Variable Pay for each fiscal year as determined as being payable as of March 31 of the fiscal year ("**Relevant FY for Variable Pay**"), shall be paid as follows:

   (I)     67% of the Variable Pay for Relevant FY for Variable Pay will be paid by June 15 of the fiscal year immediately succeeding the Relevant FY for Variable Pay;

   (II)     The balance Variable Pay for the Relevant FY for Variable Pay ("**Deferred Variable Pay**") shall be paid in three equal installments with the salary payout for the month of April of the three calendar years immediately succeeding the calendar year referred in (I) above.

**By way of illustration:**

***Payment of the Variable Pay for the fiscal year ending March 31, 2023 ("FY 22-23", being the Relevant FY for Variable Pay in this illustration) will be as follows***:

- 67% of the Variable Pay for FY 22-23 shall be payable by June 15, 2023;

5

- 11% of the Variable Pay for FY 22-23 shall be payable along with the payment of the Employee's salary for the month of April 2024;
- 11% of the Variable Pay for FY 22-23 shall be payable along with the payment of the Employee's salary for the month of April 2025 ;
- 11% of the Variable Pay for FY 22-23 shall be payable along with the payment of the Employee's salary for the month of April 2026 .

The individual performance objectives used in determining Variable Pay for a fiscal year will be established by the CEO prior to the commencement of the fiscal year to which the Variable Pay relates.

For the fiscal year ended March 31, 2023, the Employee's Variable Pay and Target Variable Pay shall be an amount equal to his Variable Pay and Target Variable Pay respectively *prorated* for the period from the Effective Date through March 31, 2023.

(iii)    In the event the Employee's employment is terminated for (A) reasons other than for Cause, or (B) if the Employee resigns from employment, *then* only the portion of the Deferred Variable Pay for the fiscal year(s) prior to the date of such termination/ resignation which has not yet been paid to the Employee, shall be paid to the Employee.

(c)    <u>Long Term Incentive Compensation</u>.

(i)    The Employee shall, in each completed fiscal year, be entitled to long term incentive compensation (the "**Long Term Incentive Compensation**" or "**LTIC**"). The payment of LTIC shall at all times be subject to (x) the Employee's continuing employment with the Companies through the applicable payment date for any such LTIC (in the manner contemplated herein), and (y) the Employee's employment not having been terminated, the Employee not being placed on Garden Leave or the Notice Period not commencing.

The LTIC which is determined as receivable by the Employee (per this Section 2(c)) for a fiscal year ("**Relevant FY for LTIC**") shall be payable in tranches as below:

(a)    20% of the LTIC for the Relevant FY for LTIC, shall be paid by along with the payment of the Employee's salary for the month of April of the fiscal year immediately succeeding Relevant FY for LTIC (such payment date being the

6

"**Initial LTIC Payment Date**");

(b) 30% of the LTIC for the Relevant FY for LTIC shall be paid 12 months after Initial LTIC Payment Date;

(c) 50% of the LTIC for the Relevant FY for LTIC shall be paid 24 months after Initial LTIC Payment Date. The amounts mentioned in (b) and (c) above are referred to as "**Deferred LTIC**".

(ii) The amount of LTIC payable to the Employee for the fiscal year ending on March 31, 2023 shall depend upon the Employee meeting the Key Performance Parameters set by the CEO. These will be finalized as per the discussions with the Employee, for the Financial Year ending March 31, 2023.

(iii) The LTIC may be paid (at the sole discretion of the Companies):

(A) In case the Mauritius Company is not listed on any stock exchange, through cash payment of LTIC amount (less any applicable withholdings) by the Indian Company as per the timelines specified in Section 2(c)(i) above;

(B) In case the Mauritius Company is listed on any stock exchange, through issuance or transfer of common shares of the Mauritius Company ("**Common Stock**") for the value of LTIC. In this regard, the value of Common Stock shall be calculated based on the '6 month VWAP' ("**Issuance Price**"). Herein, '6 month VWAP' means:

The number mathematically computed by:

(X) Multiplying: (i) the closing price of the Common Stock, as reported in Bloomberg or such other source as the India Company Board (on recommendation from Mauritius Company Board) deems reliable, for each of the Trading Days in the 6 month period immediately prior to date of grant of the relevant LTIC, (ii) the trading volume of the Common Stock, as reported in Bloomberg or such other source as the India Company Board (on recommendation from Mauritius Company Board) deems reliable, for each such Trading Day;

(Y) determining the sum of the product of (X) above for such 6 month period; and

(Z) dividing such sum by the cumulative trading volume, which is the sum of the trading volume of the Common Stock for each Trading day in such 6 month period.

*LTIC in case of delisting subsequent to award of LTIC:*

(C) In case any Common Stock is awarded to the Employee in accordance with this

Section 2(c) while the Mauritius Company is listed but, prior to issuance/ transfer of Common Stock, the Mauritius Company delists, then the value of the Common Stock acquired by the Employee will be determined basis the relevant Issuance Price (calculated in accordance with the formula for '6 month VWAP' specified in Section 2(c)(iv)(B) above) for the Common Stock, determined from the date of grant of the relevant Common Stock as part of the LTIC ("**VWAP Delisted Value**"). In this regard, the VWAP Delisted Value will be paid to the Employee (in lieu of the Employee surrendering / consenting to extinguishment of his entitlement to Common Stock) *less* any applicable withholdings, by the Indian Company. It is clarified however that (i) such payment shall only be in made accordance with the timelines specified in Section 2(c)(i) above; and (ii) there will be no acceleration of the LTIC / issuance or transfer of Common Stock to the Employee on account of the delisting of the Mauritius Company.

(D) In case any Common Stock is already issued or transferred to the Employee in accordance with Section 2(c)(iv)(B) above, and subsequently the Mauritius Company ceases to be listed on any stock exchange, then the Employee shall transfer such Common Stock to the Mauritius Company as part of its delisting process, and the price paid to the Employee for such Common Stock shall be a function of: the delisting price paid by the Mauritius Company to its shareholders at the time of delisting multiplied by the number of Common Stock then held by the Employee, *less* any applicable withholdings, by the Indian Company. It is clarified that at the time of such delisting, the Employee shall mandatorily sell/ transfer, and the Employee hereby undertakes to sell/ transfer such Common Stock to the Mauritius Company.

(d) <u>Other</u>. During the Term , for so long as the Employee meets the eligibility requirements of the applicable plan, practice, policy or program of Indian Company : (i) except as specifically provided herein, the Employee shall be entitled to participate in all savings and retirement plans, practices, policies and programs of Indian Company that are made available generally to other Employee officers of Indian Company, and (ii) except as specifically provided herein, the Employee and/or the Employee's family, as the case may be, shall be entitled to participate in, and shall receive all benefits under, all welfare benefit plans, practices, policies and programs (including Indian Company's health insurance and disability plans) provided by Indian Company that are made available to other Employee officers of Indian Company (for the avoidance of doubt, such plans, practices, policies or programs shall not include any plan, practice, policy or program which provides benefits in the nature of severance or continuation pay). Each of the Indian Company may change, amend or discontinue any of its benefit plans, practices, policies and programs at any time during the Employee's employment with the Indian Company , and nothing contained herein will obligate the Indian Company to institute, maintain or refrain from changing, amending or discontinuing any benefit plan, practice, policy or program.

(e) <u>Clawback</u>. The Employee agrees that the compensation and benefits provided under this Agreement will be subject to forfeiture, cancellation, recoupment or clawback as required by

applicable laws, government regulations and stock exchange requirements. The Employee further agrees that any incentive compensation paid or payable under this Agreement (including any Variable Pay and Long Term Incentive Compensation) will be subject to forfeiture, cancellation, recoupment or clawback in accordance with the terms of applicable law or the U.S. Dodd Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") and rules and regulations thereunder in the event the Indian Company or Mauritius Company is required to restate its financial statements, regardless of whether the Indian Company is then subject to the Dodd-Frank Act. For the avoidance of doubt, the Employee's agreement to claw back under this Section 2(e) will not apply to restatements of the Indian Company's financial statements due to acts, omissions or events that occurred prior to the Effective Date.

(f) <u>Vacation</u>. The Employee will be entitled to paid vacation in accordance with the policy as applicable to other Employee officers of the Indian Company, with the timing and duration of specific days off mutually and reasonably agreed to by the Parties.

(g) <u>Expenses</u>. The Indian Company will reimburse the Employee for reasonable business related travel, entertainment or other expenses incurred by the Employee in the furtherance of or in connection with the performance of the Employee's duties hereunder, in accordance with Indian Company's expense reimbursement policy for Employee officers of Indian Company in effect from time to time.

3. **<u>Severance</u>**.

(a) <u>Termination other than for Cause</u>. The Indian Company is, subject to the terms of this Agreement, entitled to terminate the employment of the Employee for any reasons whatsoever, by providing the Termination Notice. If during the Term (excluding the Notice Period) the Indian Company terminates the Employee's employment other than for Cause, subject to the provisions of Section 4 and applicable law and regulation, the Employee will be entitled to: (i) Fixed Pay due but unpaid (including any specific entitlement during the Notice Period in accordance with Section 1(c) above); (ii) subject to the other provisions of this Agreement, the vested Deferred Variable Pay as set out in Section 2(b)(ii) of this Agreement (iii) benefits to which the Employee is entitled under applicable laws and pursuant to any benefit plans of the Companies as of the Termination Date (except any severance plan), subject to the Employee serving the Notice Period; and (iv) reimbursement of business expenses for which the Employee is entitled to reimbursement under Section 2(i) but for which Employee has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(a). Other than the foregoing, the Indian Company shall not have any further obligation to the Employee. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Employee shall be obligated to provide the Indian Company invoices of all business expenses incurred within 10 days of Termination Date. It is further clarified that upon such termination the Employee will not be entitled to, and shall automatically (without any further actions) relinquish all claims to, LTIC such that no further amounts are payable to the Employee in respect of LTIC.

9

(b) <u>Termination for Cause</u>: The Company is at all times entitled to terminate the employment of the Employee for Cause, immediately, and without complying with the notice requirements set out in this Agreement. If during the Term (including any Notice Period), the Indian Company terminates the Employee's employment for Cause, the Employee shall not be entitled to receive any payments, except to the extent mandated by law. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, LTIC and Variable Pay), will not be payable. Any amount so payable shall be paid (less applicable withholdings) within 45 days from the Termination Date.

(c) <u>Cessation of employment due to resignation by the Employee</u>. The Employee is, subject to the terms of this Agreement, entitled to resign from the employment for any reasons whatsoever, by providing the Termination Notice. If during the Term, the Employee resigns from employment for any reason whatsoever, subject to the provisions of applicable law and regulation, the Employee will be entitled to: (i) the Fixed Pay due but unpaid to him (including any specific entitlement during the Notice Period in accordance with Section 1(c) above); (ii) vested benefits to which the Employee is entitled under applicable laws and pursuant to any benefit plans as of the Termination Date (except any severance plan), subject to the Employee serving the Notice Period; (iii) reimbursement of business expenses for which the Employee is entitled to reimbursement under Section 2(i) but for which Employee has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(c); and (iv) subject to the other provisions of this Agreement, the vested Deferred Variable Pay as set out in Section 2(b)(ii) of this Agreement. Other than the foregoing, the Indian Company shall not have any further obligation to the Employee. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Employee shall be obligated to provide the Indian Company invoices of all business expenses incurred within 10 days of Termination Date. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, LTIC), will not be payable.

(d) <u>Exclusive Remedy</u>. In the event of a termination of the Employee's employment with the Indian Company, the provisions of this Section 3 are intended to be and are exclusive and in lieu of any other rights or remedies to which the Employee or the Indian Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement.

**4. Conditions to Receipt of Severance: No Duty to Mitigate.**

(a) <u>Separation Agreement and Release of Claims</u>. The Employee acknowledges and agrees that (i) the Company's payment of the severance compensation detailed in Section 3, will be

deemed to constitute a full settlement and discharge of any and all obligations of the Companies and their Affiliates to the Employee arising out of this Agreement, the Employee's employment with the Companies and their Affiliates and/or the termination of the Employee's employment with the Companies and their Affiliates; and (ii) upon payment of the severance compensation detailed in Section 3, the Company will stand discharged of all obligations towards the Employee, and the Employee shall, automatically and without any further action, be deemed to have fully and unqualifiedly released Indian Company , their Affiliates, and all of their present and/ or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities. The Employee further acknowledges and agrees that as a condition precedent to receiving any of the severance compensation detailed in Section 3, the Employee will execute, deliver to the Companies, and not revoke a release agreement, in a form prepared by, and satisfactory to, the Indian Company (the "**Employee Release Agreement**", key parameters of which have been set out in Schedule 1) pursuant to which the Employee will release and waive, to the fullest extent permitted by law, all claims against the Indian Company , their Affiliates, and all of their present and/ or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities, including, without limitation, all claims arising out of this Agreement, the Employee's employment with Companies and/or their Affiliates, and/or the termination of Employee's employment with the Companies and/or their Affiliates. The severance compensation described in Section 3 is in lieu of any severance benefits under any severance policy or plan the Indian Company may have now or in the future, and the Employee acknowledges that the Employee is not entitled to any other severance benefits and the Employee further undertakes to timely execute the Employee Release Agreement.

(b) <u>Confidential Information, Non-solicitation. and Non-Competition</u>. The receipt of any severance compensation pursuant to Section 3 will be subject to the Employee not violating the provisions of Sections 5 and 6. In the event the Employee breaches the provisions of Sections 5 and 6, all payments and benefits to which the Employee may otherwise be entitled pursuant to Section 3 will immediately cease, to the extent permissible under law.

(c) <u>No Duty to Mitigate</u>. Except as expressly provided herein, the Employee shall not be required to seek other employment or otherwise mitigate the amount of any payments to be made by the Companies pursuant to this Agreement. Except as otherwise provided herein, the payments provided pursuant to this Agreement shall not be reduced by any compensation earned by the Employee as the result of employment by another employer after the termination of the Employee's employment or otherwise.

5. **<u>Non-Disclosure of Confidential Information.</u>**

(a) <u>Confidential Information</u>. For purposes of this Agreement, the term "**Confidential Information**" means any and all of the Group's trade secrets, confidential and proprietary

information and all other nonpublic information and data of or about the Group and its business, including, without limitation, lists of customers, information pertaining to customers, marketing plans and strategies, information pertaining to suppliers, pricing information, engineering and technical information, software codes, cost information, data compilations, research and development information, business plans, financial information, personnel information, information received from third parties that the Group has agreed to keep confidential, and information about prospective customers or prospective products and services, whether or not reduced to writing or other tangible medium of expression, including, without limitation, work product created by the Employee in rendering services for the Group; provided, however, that "**Confidential Information**" shall not include information that: (i) is or becomes generally available to the public by use, publication or the like, through no fault of the Employee; (ii) is obtained without restriction by the Employee after termination of the Employee's employment with the Companies from a third party who had the legal right to disclose such information to the Employee; (iii) the Employee possessed prior to the Employee's employment with the Companies; or (iv) is independently developed by the Employee without the use of any of the Group's Confidential Information after the termination of his employment with the Companies.

(b) <u>Non-Disclosure Obligations</u>. During the Employee's employment with the Companies and thereafter, the Employee will not use or disclose to others any of the Confidential Information, except: (i) in the course of the Employee's work for and on behalf of the Group, (ii) with the prior written consent of the Companies, (iii) as required by law or judicial process, provided the Employee promptly notifies the Companies in writing of any subpoena or other judicial request for disclosure involving Confidential Information or trade secrets, and cooperates with any effort by the Group to obtain a protective order preserving the confidentiality of the Confidential Information or trade secrets, or (iv) in connection with reporting possible violations of law or regulations to any governmental agency or from making other disclosures protected under any applicable whistleblower laws. The Employee agrees that the Group owns the Confidential Information and the Employee has no rights, title or interest in any of the Confidential Information. Additionally, the Employee will abide by Indian Company 's policies protecting the Confidential Information, as such policies may exist from time to time. At the Indian Company's request or upon termination of the Employee's employment with the Companies for any reason, the Employee will immediately deliver to the Companies any and all materials (including all copies and electronically stored data) containing any Confidential Information in the Employee's possession, custody or control. Upon termination of the Employee's employment with the Companies for any reason, the Employee will, if requested by the Companies, provide the Companies with a signed written statement disclosing whether the Employee has returned to the Companies all materials (including all copies and electronically stored data) containing any Confidential Information previously in the Employee's possession, custody or control.

(c) <u>Whistleblower Laws</u>. Notwithstanding anything herein or in any other agreement with or policy (including without limitation, any code of conduct or the manual) of Indian

Company, nothing herein or therein is intended to or shall: (i) prohibit the Employee from making reports of possible violations of: (A) U.S. federal law or regulation (even if the Employee participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes- Oxley Act of 2002 or of any other whistleblower protection provisions of U.S. state or federal law or regulation; and (B) Indian law or regulation (even if the Employee participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of the Whistle Blowers Protection Act, 2014 or of any other whistleblower protection provisions of any applicable Indian law or regulation; (ii) require notification to or prior approval by the Indian Company of any such reporting or cooperation; or (iii) result in a waiver or other limitation of the Employee's rights and remedies as a whistleblower, including to a monetary award. Notwithstanding the foregoing, the Employee is not authorized (and the above should not be read as permitting the Employee) to disclose communications with counsel that were made for the purpose of receiving legal advice or that contain legal advice or that are protected by the attorney work product or similar privilege. Furthermore, the Employee will not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made (X) in confidence to a U.S. federal, state or local government official, either directly or indirectly, or to an attorney, in each case, solely for the purpose of reporting or investigating a suspected violation of U.S. law or (Y) in a complaint or other document filed in a lawsuit or proceeding, if such filings are made under seal.

(d) <u>Survival of Non-Disclosure Obligations</u>. The Employee's confidentiality/non-disclosure obligations under this Agreement continue after the termination of Employee's employment with the Companies. With respect to any particular trade secret information, Employee's confidentiality/non-disclosure obligations will continue as long as such information constitutes a trade secret under applicable law. With respect to any particular Confidential Information that does not constitute a trade secret, the Employee's confidentiality/non-disclosure obligations will continue as long as such information remains confidential, and will not apply to information that becomes generally known to the public through no fault or action of the Employee or others who were under confidentiality obligations with respect to such information.

6. **<u>Non-Solicitation and Non-Competition.</u>**

(a) <u>Non-Competition</u>. During the Term and the "Non-Compete Time Period" (*as defined in this Agreement*), the Employee will not within the "Restricted Geographic Area" (*as defined in this Agreement*) engage in (including, without limitation, being employed by, working for, or rendering services to) any "Competitive Business" (*as defined in this Agreement*) in any "Prohibited Capacity" (*as defined in this Agreement*). Notwithstanding the foregoing, if the Competitive Business has multiple divisions, business units, lines or segments, some of which are not competitive with the business of the Group, nothing herein will prohibit the Employee from being employed by, working for or assisting any division, business unit, line

or segment of such Competitive Business that is not competitive with the business of the Group. This can be waived off by mutual consent of both parties.

(b) <u>Customer Restrictions</u>. During the Term and the "Restricted Time Period", the Employee will not sell, market or provide, attempt to sell, market or provide, or assist any Person in the sales, marketing or provision of, any "Competing Service/Product" (*as defined in this Agreement*) to any of the Group's Customers (excluding any governmental agencies / authorities which are the Group's Customers or existing customer of the new organization) with respect to whom, at any time during the Employee's employment with the Companies, the Employee had any business contact on behalf of the Group, the Employee had any relationship, business development, sales, service or account responsibility (including, without limitation, any supervisory or managerial responsibility) on behalf of the Group, or the Employee had access to, or gained knowledge of, any Confidential Information concerning the Group's business with such customer, or otherwise solicit or communicate with any such customers for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting in any Person in the sales, marketing or provision of, any Competing Service/Product.

(c) <u>Non-Interference with Contractors, Vendors, or Other Relationships</u>. During the Restricted Time Period, the Employee will not urge, induce or seek to induce any of the Group's independent contractors, subcontractors, business partners, distributors, brokers, consultants, sales representatives, customers, referral sources, vendors, suppliers or any other Person with whom the Group has a business relationship to terminate their relationship with, or representation of, the Group or to cancel, withdraw, reduce, limit or in any manner modify any such Person's business with, or representation of, the Group.

(d) <u>Restrictions</u>. During the "Restricted Time Period", the Employee will not: (i) solicit for employment, hire, employ, engage the services of, or attempt to hire, employ, or engage the services of, any individual who is an employee of the Group; (ii) assist any Person in the recruitment, hiring or engagement of any individual who is an employee of the Group; (iii) urge, induce or seek to induce any individual to terminate his/her employment with the Group; or (iv) advise, suggest to or recommend to any Competitive Business that it employ, engage the services of, or seek to employ or engage or engage the services of any individual who is an employee of the Group.

(e) <u>Non-Competition Compensation</u>. During the Non-Compete Time Period, the Company will pay the Employee an amount equivalent to 6 months of the annualized Fixed Pay in effect as of the Termination Date as consideration for the Employee's undertakings in Section 6(a) to (d) above (the "**Non-Competition Compensation**"). The Non-competition Compensation will be paid by the Indian Company in one single bullet payment at the end of the Non- Compete Time Period subject to the applicable withholdings. In the event of a breach or threatened breach of the Employee's obligations under Section 5 or this Section 6, the Company shall be entitled to: (i) not make any Non-Competition Compensation as of the date of such breach or threatened breach, and following the date of such breach or threatened

breach, the Employee shall have no further rights to any Non-Competition Compensation, and (ii) in addition to other available remedies, seek equitable relief (by injunction, restraining order, or other similar remedy) against such breach or threatened breach from a court of competent jurisdiction without the necessity of showing actual damages and without the necessity of posting a bond or other security. In the event a court of competent jurisdiction determines that the Employee's obligations under Section 5 or this Section 6 are more restrictive than necessary to protect the Group's legitimate business interests, such court may reduce the scope of the restriction(s), or sever and remove the unenforceable provision(s), to the extent necessary to make the restriction(s) enforceable.

(f) For purposes of this Agreement: (i) "Non-Compete Time Period" means 6 months after the Termination Date; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties; and (ii) "Restricted Time Period means 3 years after the Termination Date"; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties.

7. **Assignment**. This Agreement will be binding upon and inure to the benefit of: (a) any Successor of the Indian Company; and (b) to the heirs, executors and legal representatives of the Employee upon the Employee's death as it relates to the severance compensation specified in Section 3. Any such successor of the Indian Company will be deemed substituted for the Indian Company under the terms of this Agreement for all purposes. For this purpose, "**Successor**" means any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Indian Company. None of the rights of the Employee to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance or other disposition of the Employee's right to compensation or other benefits will be null and void.

8. **Notices**. Except as may be otherwise provided herein, all notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and signed by or on behalf of the Party giving it. Such notice shall be served by sending it or by delivering by hand, mail or courier to the address set forth below. In each case it shall be marked for the attention of the relevant Party set forth below. Any notice so served shall be deemed to have been duly given (i) in case of delivery by hand, when hand delivered to the other Party; or (ii) when sent by mail, where 7 (seven) business days have elapsed after deposit in the mail with certified mail receipt requested postage prepaid; or (iii) when delivered by courier on the second business day after deposit with an overnight delivery service, postage prepaid, with next business day delivery guaranteed, provided that the sending Party receives a confirmation of delivery from the delivery service provider; or (iv) for electronic mail notification with return receipt requested, upon the obtaining of a valid return receipt from the recipient.

To the **Indian Company**:

Azure Power India Private Limited

Address: 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
Attn: Chairman, Board of Directors

To the employee:

Mr Rupesh Agarwal
Address

9. **<u>Severability</u>**. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement will continue in full force and effect without said provision.

10. **<u>Governing Law and Arbitration</u>**. The provisions of this Agreement shall, in all respects, be governed by, and construed in accordance with the laws of India. Any dispute arising out of or in connection with this Agreement, including any question regarding the existence, validity or termination of this Agreement shall be referred to and finally resolved by arbitration in accordance with the Arbitration Rules of the Singapore International Arbitration Centre (SIAC Rules), which rules are deemed to be incorporated by reference in this Section. The seat of arbitration shall be Singapore, and venue of arbitration shall be New Delhi. The arbitral tribunal shall consist one 1 (One) arbitrator, jointly appointed by the Parties. In the event that the Parties are unable to appoint such sole arbitrator, then, the Employee on one hand and the Indian Company on the other hand, will appoint 1 (One) arbitrator each, and the 2 (Two) arbitrators so appointed shall appoint the third arbitrator. The law governing this Agreement shall be Indian law. The language of arbitration shall be English. Subject to the foregoing, the Parties agree to be subject to the exclusive jurisdiction of the courts in New Delhi. Nothing herein contained shall be construed as prohibiting any of the Companies from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the Employee.

11. **<u>Works</u>**. All work performed by the Employee and all inventions, discoveries, developments, work product, processes, improvements, creations, deliverables and all written, graphic or recorded material and works of authorship fixed in any tangible medium of expression made, created or prepared by the Employee, alone or jointly with others, during the Employee's employment with the Companies and relating to the Group's business (collectively, the "**Works**") shall be the Companies' exclusive property, shall be deemed a work made for hire, and all rights, title and interest in the Works shall vest in the Companies. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably assigned to the Companies. All Works shall belong exclusively to the Companies, and the Companies shall have the right to obtain and hold in their own name, any patents, copyrights, registrations or such other intellectual properly protections as may be appropriate to the subject matter. The Employee will sign documents of assignment, declarations and other documents and take all other actions reasonably required by the Companies, at the Companies' s expense, to perfect and enforce any of its proprietary rights and to vest all right, title and interest to the Works in the Companies. This Section does not apply to an invention for which no equipment, supplies, facility, or Confidential Information of the

16

Group was used and which was developed entirely on the Employee's own time, unless: (a) the invention relates (1) directly to the business of the Group, or (2) to the Group's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Employee for the Group. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably, absolutely and perpetually assigned to the Companies for worldwide territory. Notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, any assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Employee, even if the Companies do not exercise the rights under the assignment within a period of one year from the date of assignment. The Employee hereby agrees to waive any right to and agrees to refrain from raising any objection or claims to the Copyright Board with respect to any assignment, pursuant to Section 19A of the Copyright Act, 1957. The Employee also waives all moral rights in relation to the Work developed or conceived by the Employee. The Employee acknowledges that the Fixed Pay payable under this Agreement is good and valuable consideration for the assignment of the Works, the sufficiency of which is hereby acknowledged.

12. **Definitions**. For purposes of this Agreement, the following terms have the following meanings, unless the context requires otherwise or unless otherwise stated.

"**Affiliate**" means any entity that directly, or indirectly through one or more intermediaries, is owned or controlled by, owns or controls, or is under common ownership or control with, the Indian Company ; for this purpose, "control" of an entity means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the entity, whether through the ownership of voting securities, by contract or otherwise.

"**Company**" means, individually, each of the Indian Company, and "**Companies**" means, collectively, the Indian Company .

"**Cause**" means the occurrence of one or more of the following: (i) an act of fraud or dishonesty made by the Employee against the Group in connection with the Employee's responsibilities which the Company reasonably believes will damage its business; (ii) the Employee's conviction of, or plea of no contest to, a felony (excluding traffic offenses) which the India Company Board reasonably believes had or will have a detrimental effect on the reputation or business of the Indian Company or its affiliates; (iii) the Employee's intentional or gross misconduct; (iv) the Employee's intentional improper disclosure of confidential information; (v) the Employee's continued violations of material Indian Company policies or provisions of the Employee's agreements with the Indian Company , including any violation of or failure to perform the Employee's reasonably assigned duties; or (vi) the Employee's failure to cooperate with the Indian Company in any investigation or formal proceeding.

"**Competing Service/Product**" means any service or product that is similar to and competitive with any of the services/products and/or related services/products offered or provided by the Group as of the Termination Date.

"**Competitive Business**" means any company engaged in the renewable power business, wind, solar or hydro, energy storage or any other business of the Group as of the Termination Date in the Restricted Geographic Area.

"**Garden Leave**" means a Company's right to place the Employee on "garden leave" during the Notice Period. Such Company may, in its sole discretion, during the Garden Leave to: (a) suspend or terminate, in whole or in part, any powers, duties or work exercised by or provided to the Employee; (b) change the Employee's designation or duties as such Company decides appropriate; (c) prevent the Employee from contacting or communicating with any current, former or proposed clients, customers, s, or vendors of the Group; (d) exclude the Employee from the premises of the Group; (e) announce to s, clients, customers, vendors and other relevant persons of the Group that Employee has been given notice of termination or that the Employee has resigned; and/or (f) ask the Employee to resign so such Company can appoint a new Chief Employee Officer prior to the end of the Notice Period, provided that in such event the last date of the Notice Period shall be deemed the Termination Date.

"**Group**" means any of the Companies, their subsidiaries and their Affiliates, unless the context otherwise requires.

"**Group's Customer**" or "**Group Customer**" means: (i) any Person to whom the Group is selling or providing any service or product as of the Termination Date; (ii) any Person to whom the Group provided or sold any service or product at any time during the one (1) year preceding the Termination Date; and/or (ii) any Person with whom the Group has contracted or otherwise entered into an arrangement to provide any service or product as of the time of the Termination Date.

"**Mauritius Company**" means Azure Power Global Limited, a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene,, Mauritius, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns.

"**Person**" means any individual or entity (including without limitation a corporation, partnership, Limited Lability company, trust, joint venture, or governmental entity or agency).

"**Prohibited Capacity**" means: (i) the same or similar capacity or function to that in which the Employee worked for the Group at any time during his employment; (ii) any Employee or officer capacity or function; (iii) any business development capacity or function; (iv) any ownership capacity (except the Employee may own as a passive investment up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market);

(v) any business consulting or advising capacity of function; (vi) any director or similar capacity or function; (vii) any capacity or function in which the Employee likely would inevitably use or disclose any of the Group's trade secrets and/or Confidential Information; (viii) any capacity or function in which the customer goodwill the Employee helped to develop on behalf of the Group would facilitate or support the Employee's work for a Competitive Business; and/or (ix) any other capacity or function in which the Employee's knowledge of the Confidential Information would facilitate or assist the Employee's work for the Competitive Business.

"**Restricted Geographic Area**" means India, and each country the Group is doing business in as of the Termination Date.

13. **Integration**. This Agreement represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. This Agreement may be modified only by agreement of the Parties by a written instrument executed by the Parties that is designated as an amendment to this Agreement.

14. **Waiver of Breach**. The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

15. **Headings**. All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

16. **Tax Withholding**. All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

17. **Acknowledgment**. The Employee acknowledges that he has had the opportunity to discuss this matter with and obtain advice from his private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

18. **Counterparts**. This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

[*Schedule and signature pages follow*]

**SCHEDULE 1 | KEY PARAMETERS OF EMPLOYEE RELEASE AGREEMENT**

The Employee acknowledges and agrees that as a condition precedent to receiving any portion of the severance compensation detailed in Section 3 of the Agreement, the Employee will execute, deliver to the Companies, and not revoke, the Employee Release Agreement, which will: (a) substantially contain the following terms which are acknowledged and agreed to by the Employee (upfront) at the time of signing this Agreement, and (b) be executed and delivered to the Companies (and not subsequently revoked) in a form prepared by, and satisfactory to, the Indian Company:

(1)     The Employee confirms that all positions (including, but not limited to, all board / committee and Employee positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company.

(2)     The Employee, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims (other than in respect of payment of amounts specifically set out in the Employee Release Agreement), and hereby acknowledges and declares that on payment by the Indian Company of the dues to the Employee in accordance with the terms of the Agreement and the Employee Release Agreement, the Employee will have no Claims against the Companies and if required execute such further documents as may be reasonably required by Companies in confirmation on payment of the amounts due. The Employee waives any future Claims whatsoever that the Employee or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities, other than those in respect of payment of amounts due.

For this purpose, '**Claims**' means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, liquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers'

20

compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu), leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies, or to any event, act or omission that has occurred at any time up to and including the date of termination of the Employee, whether or not the Claim arises or may arise under contract, tort, equity or statute.

(3) The Employee shall not, up to and after the date of termination, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, their officers, directors, s, business practices, plans or procedures, products, or pertaining to the Employee's tenure with the Companies or the terms of this Agreement.

(4) The Employee agrees to take all steps, execute all documents and do all acts and things as may be reasonably required by the Companies to give effect to the transactions and matters contemplated by the Agreement and the Employee Release Agreement, and implement the provisions of the same.

(5) In the event, at any time after the termination of employment of the Employee, it is discovered (pursuant to any internal or external / regulatory investigation(s)) that the Employee was engaged or involved in any of the following: (a) misconduct / fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws or the Agreement or the Employee Release Agreement, or (d) misappropriation of funds / property, then the Companies shall have all rights and entitlements against the Employee, as may be available under applicable laws, and/or in equity, including the right to claim damages for breach/ actions of the Employee.

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power India Private Limited**

_____

Authorized Signatory

**Name**:
**Designation**:

*Signature Page – Employee Employment Agreement*

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

**Name**:  Rupesh Agarwal

*Signature Page – Employee Employment Agreement*

**Exhibit 4.8**

## EMPLOYEE EMPLOYMENT AGREEMENT

This Employment Agreement (the **"Agreement"**) is entered into as of August 29, 2022 (the **"Execution Date"**) by and between:

1. **Azure Power India Private Limited,** a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017(hereinafter referred to as the **"Indian Company"**, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns);

2. **Azure Power Global Limited,** a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius (hereinafter referred to as the **"Mauritius Company"**, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

3. **Mr. Rupesh Agarwal,** a citizen of India having PAN ACMP2420N and residing at Unit 203 Tower 21 Lotus Boulevard Sector 100 Noida UP 210304 (hereinafter referred to as the "Employee" which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the are hereinafter collectively referred to as **"Parties"** and each individually as a **"Party".**

**WHEREAS,** the Employee is currently engaged as a Chief Strategy & Commercial Officer by the Indian Company and the Indian Company is now desirous of appointing the Employee as its Interim Chief Executive Officer, as well as recommending the Employee for appointment as the Interim Chief Executive Officer of the Mauritius Company *(as defined in this Agreement)* **("Interim CEO"),** in accordance with, and on the terms and conditions, contained herein.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual provisions contained herein and for other good and valuable consideration, the adequacy and sufficiency of which is acknowledged by all Parties, the Parties agree as follows:

**1.** **Duties and Scope of Employment, etc.**

    a) <u>Positions and Duties</u>

        (i) The Indian Company hereby agrees to employ the Employee, and the Employee agrees to be employed by the Indian Company, in accordance with the terms and conditions of this Agreement from the **"Effective Date"** of August 29, 2022 and shall, subject to the terms of this Agreement, hold be employed in his present capacity for a period twelve (12) months from Effective Date.

        (ii) In his capacity as the Indian Company's Interim CEO, the Employee will (a) report to the Indian Company's Board of Directors (the **"India Company Board")** and the

Mauritius Company's Board of Directors **("Mauritius Company Board"),** (b) perform such duties and responsibilities normally attendant to such positions and such other additional and different duties as the relevant Company may from time to time assign which are consistent with the Employee's position; and (c) act in compliance with the Indian Company's and Mauritius Company's constituent documents, applicable law and regulations, and any directives or policies established by the India Company Board and Mauritius Company Board.

    (iii)    The Employee's principal place of employment shall be at the Indian Company's corporate office in Delhi, India.

b)    <u>Employment Term</u>.

    (i)    The term of employment (the **"Term")** of the Employee shall commence on and from the Effective Date up to a period of twelve (12) months from the Effective Date or such earlier date upon his termination or resignation from employment with the Company for any reason (the **"Termination Date").**

    (ii)    For the avoidance of doubt:

        (1)    the effective date of termination (other than for "Cause" *(as defined in this Agreement))* shall not be earlier than the last day of the applicable required notice period, if any, provided for in this Agreement, subject to the provisions of Section 1(c) below; and

        (2)    the effective date of termination for Cause *(as defined in this Agreement)* shall be as determined by the Indian Company, in its sole and exclusive discretion.

c)    <u>Notice</u>.

    (i)    The Employee agrees to provide ninety (90) days' notice, or such other notice period as mutually agreed between the Parties in writing **("Notice Period"),** prior to terminating this Agreement **("Termination Notice").** The Indian Company, or the Mauritius Company may, in its sole and exclusive discretion: place the Employee on "Garden Leave" (as defined in this Agreement) for up to the duration of Notice Period; The Employee shall have no right to satisfy the Notice Period obligations by providing the Indian Company with any consideration, unless agreed in writing by the Indian Company and the Mauritius Company, in which case the Indian Company shall also have the right to seek payments in lieu of the Notice Period, equivalent to ninety (90) days' of the Employee's Fixed Pay (as defined in this Agreement).

    (ii)    The Indian Company and the Mauritius Company shall be entitled to terminate the Employee's employment immediately, without any notice requirements.

d)    <u>Employee Position</u>. During the Term, the Employee's position will be Interim CEO of the Indian Company or in such other additional position or positions as the Indian Company may designate from time to time. The Employee will have such duties, authorities and

responsibilities as are commensurate with his position. All of the Employee's duties, responsibilities and powers with respect to the Indian Company and the Mauritius Company, will, at all times, be subject to the order, direction and supervision of the India Company Board and the Mauritius Company Board, respectively. During the Employee's employment with the Company, the Employee (without prejudice to Section 6):

(i)  will devote his full vocational time and best efforts to the furtherance of the business of the "Group" *(as defined in this Agreement)* on a full-time basis;

(ii)  will exercise the highest degree of loyalty and the highest standards of conduct in the performance of his duties;

(iii)  will comply with all applicable laws and regulations;

(iv)  will not, except as noted herein or as required for furtherance of the Employee's duties with the Group, engage in any other business activity (other than Passive Investments), whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the express written consent of the India Company Board and Mauritius Company Board, which consent shall be at the sole discretion of each of the India Company Board and Mauritius Company Board;

(v)  will not engage, directly or indirectly, in any activity, employment or business venture (other than Passive Investments), whether or not for remuneration, that is competitive, same or similar with the Groups business in any respect or make any Preparations to engage in any competitive activities; (vi) will not take any action or make any omission that deprives the Group of any business opportunities or otherwise act in a manner that conflicts with the best interest of the Group or is detrimental to the business of the Group; and (vii) will not accept any appointment / nomination, or be appointed / nominated, on the board of directors or other governing body of anybody corporate (other than in respect of the Group, as specifically required by the Indian Company or the Mauritius Company in connection with the Employee's employment), without the express written consent of the India Company Board and Mauritius Company Board. If the Employee wishes to engage in an outside activity not expressly permitted under the terms of this Section, the Employee shall first propose such activity to the India Company Board and Mauritius Company Board for its determination as to whether such activities are permissible. Even if the India Company Board and Mauritius Company Board consents to the Employee's engagement in an outside activity, they shall have the right to revoke its consent at any time, and upon notice to the Employee of such revocation of consent, the Employee shall terminate such outside activity at the earliest practicable opportunity.

It is clarified that for the purposes of the above, the term "Passive Investment" shall mean: ownership of up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market; or (ii) ownership of unlisted securities of a company of less than 50% (on a fully diluted basis), subject to: (A) the Employee not having the right or ability to control or influence the management or decisions (directly or indirectly) of such company, (B) the Employee not having any rights to appoint a nominee, or any right to being appointed, on the board of such company, and (C) the Employee not having any other role in such company, except that of a shareholder holding minority shares in such company.

3

e) <u>Representations and Warranties by the Employee</u>. The Employee's employment with the Companies is conditioned on the Employee's representations and warranties to the Indian Company that:

    (i)    he is not disqualified or prevented from acting as the Interim CEO of the Indian Company or the Mauritius Company under applicable law or regulation;

    (ii)    his execution, delivery and performance of his duties under this Agreement will not violate, conflict with, result in a breach of the terms, conditions or provisions of, result in the creation of any encumbrances or constitute a default (or an event that, with the giving of notice or lapse of time or both, would constitute a default) or an event creating rights of acceleration, modification, termination, cancellation or a loss of rights under any contract to which the Employee is a party, including any noncompete or non-solicitation agreement or obligation, any approval, order, judgment, decree or award to which the Employee is a party or by which he is bound or any law applicable to the Employee; and

    (iii)    this Agreement has been duly and validly executed by the Employee and upon execution and delivery, this Agreement will constitute, legal, valid and binding obligations of the Employee, enforceable against him in accordance with its terms.

f) <u>Employee Position after the Term</u>. Parties agree that after completion of the Term or early termination of the Employee's employment in accordance with the terms of this Agreement, the Employee will resume his roles and responsibilities with the Indian Company as the 'Chief Strategy & Commercial Officer' in accordance with the terms of the employee employment agreement entered into between the Employee and the Indian Company dated July 18, 2022 (the **"CSCO Agreement"**). For the avoidance of doubt, it is hereby clarified that the CSCO Agreement shall be in abeyance during the Term of this Agreement, and upon the expiry of the Term, or such early determination of the Employee's employment in accordance with the terms of this Agreement, the CSCO Agreement will be the agreement governing the terms of employment of the Employee.

## 2.     <u>Compensation.</u>

a) <u>Fixed Pay</u>. During the Term, the Indian Company will pay the Employee the salary set forth in the table below as compensation for his services (the **"Fixed Pay"**). The Fixed Pay will be paid monthly in accordance with the Indian Company's normal payroll practices and be subject to the usual applicable withholdings.

| Period | Salary |
| --- | --- |
| From the Effective Date till (including) August 28, 2023 | Annual salary of INR 4,00,00,000 |

b) <u>Variable Pay</u>. Upon achievement of performance parameters as listed below, the Employee shall be eligible to earn a bonus variable pay of up to INR 4,00,00,000 **("Variable Pay")** at the discretion of the Board:

(i)        Completion of the audit being conducted by the E&Y, [the statutory auditors of the Indian Company] for Financial Year 2021-22;

(ii)      Completion of Quarterly audits and relevant filings with the relevant regulatory authorities in the United States of America;

(iii)     The India Company Board and the Mauritius Company Board being satisfied that the Company has achieved stability in its operating projects and overall operations;

(iv)     Power Purchase Agreements (PPAs) that are as on the Effective Date in the process of execution by the Indian Company have been executed and project's construction progress is as per the timelines under the PPAs; and

(v)      Creation of growth pipeline aas approved by the Board.

The Variable Pay shall be payable to the Employee only upon completion of the Term.

c)      <u>Other</u>. During the Term, for so long as the Employee meets the eligibility requirements of the applicable plan, practice, policy or program of Indian Company and/or the Mauritius Company: (i) except as specifically provided herein, the Employee shall be entitled to participate in all savings and retirement plans, practices, policies and programs of Indian Company and/or the Mauritius Company that are made available generally to other Employee officers of Indian Company and/or the Mauritius Company, and (ii) except as specifically provided herein, the Employee and/or the Employee's family, as the case may be, shall be entitled to participate in, and shall receive all benefits under, all welfare benefit plans, practices, policies and programs (including Indian Company's and/or the Mauritius Company's health insurance and disability plans) provided by Indian Company and/or the Mauritius Company that are made available to other Employee officers of Indian Company and/or the Mauritius Company (for the avoidance of doubt, such plans, practices, policies or programs shall not include any plan, practice, policy or program which provides benefits in the nature of severance or continuation pay). Each of the Indian Company and the Mauritius Company may change, amend or discontinue any of its benefit plans, practices, policies and programs at any time during the Employee's employment with the Indian Company, and nothing contained herein will obligate the Indian Company and/or the Mauritius Company to institute, maintain or refrain from changing, amending or discontinuing any benefit plan, practice, policy or program.

d)      <u>Clawback</u>. The Employee agrees that the compensation and benefits provided under this Agreement will be subject to forfeiture, cancellation, recoupment or clawback as required by applicable laws, government regulations and stock exchange requirements. The Employee further agrees that any incentive compensation paid or payable under this Agreement (including any Variable Pay) will be subject to forfeiture, cancellation, recoupment or clawback in accordance with the terms of applicable law or the U.S. Dodd Frank Wall Street Reform and Consumer Protection Act (the **"Dodd-Frank Act"**) and rules and regulations thereunder in the event the Indian Company or Mauritius Company is required to restate its financial statements, regardless of whether the Indian Company is then subject to the Dodd-Frank Act. For the avoidance of doubt, the Employee's agreement to claw back under this Section 2(e) will not apply to restatements of the Indian Company's financial statements due to acts, omissions or events that occurred prior to the Effective Date.

e) <u>Vacation.</u> The Employee will be entitled to paid vacation in accordance with the policy as applicable to other Employee officers of the Indian Company and/or the Mauritius Company, with the timing and duration of specific days off mutually and reasonably agreed to by the Parties.

f) <u>Expenses</u>. The Indian Company will reimburse the Employee for reasonable business related travel, entertainment or other expenses incurred by the Employee in the furtherance of or in connection with the performance of the Employee's duties hereunder, in accordance with Indian Company's expense reimbursement policy for Employee officers of Indian Company in effect from time to time.

**3.** **<u>Severance</u>.**

a) <u>Termination other than for Cause</u>. The Indian Company or the Mauritius Company is, subject to the terms of this Agreement, entitled to terminate the employment of the Employee for any reasons whatsoever, by providing the Termination Notice. If during the Term, the Indian Company or the Mauritius Company terminates the Employee's employment other than for Cause, subject to the provisions of Section 4 and applicable law and regulation, the Employee will be entitled to i) the Fixed Pay due but unpaid to him and (ii) Variable Pay approved by the Board based on evaluation of the performance of the Employee; and (iii) benefits to which the Employee is entitled under applicable laws and pursuant to any benefit plans of the Companies as of the Termination Date (except any severance plan); and (iv) reimbursement of business expenses for which the Employee is entitled to reimbursement under Section 2(f) but for which Employee has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(a). Other than the foregoing, the Indian Company or the Mauritius Company shall not have any further obligation to the Employee. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Employee shall be obligated to provide the Indian Company or the Mauritius Company invoices of all business expenses incurred within 10 days of Termination Date.

b) <u>Termination for Cause</u>: The Company is at all times entitled to terminate the employment of the Employee for Cause, immediately, and without complying with the notice requirements set out in this Agreement. If during the Term (including any Notice Period), the Indian Company or the Mauritius Company terminates the Employee's employment for Cause, the Employee shall not be entitled to receive any payments, except to the extent mandated by law. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to Variable Pay), will not be payable. Any amount so payable shall be paid (less applicable withholdings) within 45 days from the Termination Date.

c) <u>Cessation of employment due to resignation by the Employee</u>. The Employee is, subject to the terms of this Agreement, entitled to resign from the employment for any reasons whatsoever, by providing the Termination Notice. If during the Term, the Employee resigns from employment for any reason whatsoever, subject to the provisions of applicable law and regulation, the Employee will be entitled to: (i) the Fixed Pay due but unpaid to him; (ii) vested benefits to which the Employee is entitled under applicable laws and pursuant to any benefit plans as of the Termination Date (except any severance plan), subject to the Employee serving the Notice Period; and (iii) reimbursement of business

expenses for which the Employee is entitled to reimbursement under Section 2(i) but for which Employee has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(c). Other than the foregoing, the Indian Company or the Mauritius Company shall not have any further obligation to the Employee. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Employee shall be obligated to provide the Indian Company or the Mauritius Company invoices of all business expenses incurred within 10 days of Termination Date. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, Variable Pay), will not be payable.

d) <u>Exclusive Remedy</u>. In the event of a termination of the Employee's employment with the Indian Company or the Mauritius Company, the provisions of this Section 3 are intended to be and are exclusive and in lieu of any other rights or remedies to which the Employee or the Indian Company or the Mauritius Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement.

**4.** **<u>Conditions to Receipt of Severance: No Duty to Mitigate.</u>**

a) <u>Separation Agreement and Release of Claims</u>. The Employee acknowledges and agrees that (i) the Company's payment of the severance compensation detailed in Section 3, will be deemed to constitute a full settlement and discharge of any and all obligations of the Companies and their Affiliates to the Employee arising out of this Agreement, the Employee's employment with the Companies and their Affiliates and/or the termination of the Employee's employment with the Companies and their Affiliates; and (ii) upon payment of the severance compensation detailed in Section 3, the Company will stand discharged of all obligations towards the Employee, and the Employee shall, automatically and without any further action, be deemed to have fully and unqualifiedly released Indian Company and the Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities. The Employee further acknowledges and agrees that as a condition precedent to receiving any of the severance compensation detailed in Section 3, the Employee will execute, deliver to the Companies, and not revoke a release agreement, in a form prepared by, and satisfactory to, the Indian Company and the Mauritius Company (the **"Employee Release Agreement",** key parameters of which have been set out in Schedule 1) pursuant to which the Employee will release and waive, to the fullest extent permitted by law, all claims against the Indian Company and the Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities, including, without limitation, all claims arising out of this Agreement, the Employee's employment with Companies and/or their Affiliates, and/or the termination of Employee's employment with the Companies and/or their Affiliates. The severance compensation described in Section 3 is in lieu of any severance benefits under any severance policy or plan the Indian Company and the Mauritius Company may have now or in the future, and the Employee acknowledges that the Employee is not entitled to any other severance benefits and the Employee further undertakes to timely execute the Employee Release Agreement.

b) <u>Confidential Information, Non-solicitation, and Non-Competition</u>. The receipt of any

severance compensation pursuant to Section 3 will be subject to the Employee not violating the provisions of Sections 5 and 6. In the event the Employee breaches the provisions of Sections 5 and 6, all payments and benefits to which the Employee may otherwise be entitled pursuant to Section 3 will immediately cease, to the extent permissible under law.

c) <u>No Duty to Mitigate</u>. Except as expressly provided herein, the Employee shall not be required to seek other employment or otherwise mitigate the amount of any payments to be made by the Companies pursuant to this Agreement. Except as otherwise provided herein, the payments provided pursuant to this Agreement shall not be reduced by any compensation earned by the Employee as the result of employment by another employer after the termination of the Employee's employment or otherwise.

**5.** **<u>Non-Disclosure of Confidential Information.</u>**

a) <u>Confidential Information</u>. For purposes of this Agreement, the term **"Confidential Information"** means any and all of the Group's trade secrets, confidential and proprietary information and all other nonpublic information and data of or about the Group and its business, including, without limitation, lists of customers, information pertaining to customers, marketing plans and strategies, information pertaining to suppliers, pricing information, engineering and technical information, software codes, cost information, data compilations, research and development information, business plans, financial information, personnel information, information received from third parties that the Group has agreed to keep confidential, and information about prospective customers or prospective products and services, whether or not reduced to writing or other tangible medium of expression, including, without limitation, work product created by the Employee in rendering services for the Group; provided, however, that "Confidential Information" shall not include information that: (i) is or becomes generally available to the public by use, publication or the like, through no fault of the Employee; (ii) is obtained without restriction by the Employee after termination of the Employee's employment with the Companies from a third party who had the legal right to disclose such information to the Employee; (iii) the Employee possessed prior to the Employee's employment with the Companies; or (iv) is independently developed by the Employee without the use of any of the Group's Confidential Information after the termination of his employment with the Companies.

b) <u>Non-Disclosure Obligations</u>. During the Employee's employment with the Companies and thereafter, the Employee will not use or disclose to others any of the Confidential Information, except: (i) in the course of the Employee's work for and on behalf of the Group, (n) with the prior written consent of the Companies, (iii) as required by law or judicial process, provided the Employee promptly notifies the Companies in writing of any subpoena or other judicial request for disclosure involving Confidential Information or trade secrets, and cooperates with any effort by the Group to obtain a protective order preserving the confidentiality of the Confidential Information or trade secrets, or (iv) in connection with reporting possible violations of law or regulations to any governmental agency or from making other disclosures protected under any applicable whistleblower laws. The Employee agrees that the Group owns the Confidential Information and the Employee has no rights, title or interest in any of the Confidential Information. Additionally, the Employee will abide by Indian Company's and the Mauritius Company's policies protecting the Confidential Information, as such policies may exist from time to time. At the Indian Company's or the Mauritius Company's request or upon termination

of the Employee's employment with the Companies for any reason, the Employee will immediately deliver to the Companies any and all materials (including all copies and electronically stored data) containing any Confidential Information in the Employee's possession, custody or control. Upon termination of the Employee's employment with the Companies for any reason, the Employee will, if requested by the Companies, provide the Companies with a signed written statement disclosing whether the Employee has returned to the Companies all materials (including all copies and electronically stored data) containing any Confidential Information previously in the Employee's possession, custody or control.

c) <u>Whistleblower Laws</u>. Notwithstanding anything herein or in any other agreement with or policy (including without limitation, any code of conduct or the manual) of Indian Company or the Mauritius Company, nothing herein or therein is intended to or shall: (i) prohibit the Employee from making reports of possible violations of: (A) U.S. federal law or regulation (even if the Employee participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes- Oxley Act of 2002 or of any other whistleblower protection provisions of U.S. state or federal law or regulation; and (B) Indian law or regulation (even if the Employee participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of the Whistle Blowers Protection Act, 2014 or of any other whistleblower protection provisions of any applicable Indian law or regulation; (ii) require notification to or prior approval by the Indian Company and the Mauritius Company of any such reporting or cooperation; or (iii) result in a waiver or other limitation of the Employee's rights and remedies as a whistleblower, including to a monetary award. Notwithstanding the foregoing, the Employee is not authorized (and the above should not be read as permitting the Employee) to disclose communications with counsel that were made for the purpose of receiving legal advice or that contain legal advice or that are protected by the attorney work product or similar privilege. Furthermore, the Employee will not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made (X) in confidence to a U.S. federal, state or local government official, either directly or indirectly, or to an attorney, in each case, solely for the purpose of reporting or investigating a suspected violation of U.S. law or (Y) in a complaint or other document filed in a lawsuit or proceeding, if such filings are made under seal.

d) <u>Survival of Non-Disclosure Obligations</u>. The Employee's confidentiality/non-disclosure obligations under this Agreement continue after the termination of Employee's employment with the Companies. With respect to any particular trade secret information, Employee's confidentiality/non- disclosure obligations will continue as long as such information constitutes a trade secret under applicable law. With respect to any particular Confidential Information that does not constitute a trade secret, the Employee's confidentiality/non- disclosure obligations will continue as long as such information remains confidential, and will not apply to information that becomes generally known to the public through no fault or action of the Employee or others who were under confidentiality obligations with respect to such information.

**6. <u>Non-Solicitation and Non-Competition</u>.**

a) <u>Non-Competition</u>. During the Term and the "Non-Compete Time Period" *(as defined in this Agreement),* the Employee will not within the "Restricted Geographic Area" *(as*

*defined in this Agreement)* engage in (including, without limitation, being employed by, working for, or rendering services to) any "Competitive Business" *(as defined in this Agreement)* in any "Prohibited Capacity" *(as defined in this Agreement).* Notwithstanding the foregoing, if the Competitive Business has multiple divisions, business units, lines or segments, some of which are not competitive with the business of the Group, nothing herein will prohibit the Employee from being employed by, working for or assisting any division, business unit, line or segment of such Competitive Business that is not competitive with the business of the Group. This can be waived off by mutual consent of both parties.

b)  <u>Customer Restrictions</u>. During the Term and the "Restricted Time Period", the Employee will not sell, market or provide, attempt to sell, market or provide, or assist any Person in the sales, marketing or provision of, any "Competing Service/Product" *(as defined in this Agreement)* to any of the Group's Customers (excluding any governmental agencies / authorities which are the Group's Customers or existing customer of the new organization) with respect to whom, at any time during the Employee's employment with the Companies, the Employee had any business contact on behalf of the Group, the Employee had any relationship, business development, sales, service or account responsibility (including, without limitation, any supervisory or managerial responsibility) on behalf of the Group, or the Employee had access to, or gained knowledge of, any Confidential Information concerning the Group's business with such customer, or otherwise solicit or communicate with any such customers for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting in any Person in the sales, marketing or provision of, any Competing Service/Product.

c)  <u>Non-Interference with Contractors, Vendors, or Other Relationships</u>. During the Restricted Time Period, the Employee will not urge, induce or seek to induce any of the Group's independent contractors, subcontractors, business partners, distributors, brokers, consultants, sales representatives, customers, referral sources, vendors, suppliers or any other Person with whom the Group has a business relationship to terminate their relationship with, or representation of, the Group or to cancel, withdraw, reduce, limit or in any manner modify any such Person's business with, or representation of, the Group.

d)  <u>Restrictions</u>. During the "Restricted Time Period", the Employee will not: (i) solicit for employment, hire, employ, engage the services of, or attempt to hire, employ, or engage the services of, any individual who is an employee of the Group; (ii) assist any Person in the recruitment, hiring or engagement of any individual who is an employee of the Group; (iii) urge, induce or seek to induce any individual to terminate his/her employment with the Group; or (iv) advise, suggest to or recommend to any Competitive Business that it employ, engage the services of, or seek to employ or engage or engage the services of any individual who is an employee of the Group.

e)  For purposes of this Agreement: (i) "Non-Compete Time Period" means 6 months after the Termination Date; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties; and (ii) "Restricted Time Period means 3 years after the Termination Date"; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties.

**7.  <u>Indemnification</u>:**

The Indian Company and the Mauritius Company, jointly and severally, agree to indemnify, defend and hold harmless the Employee against all costs, suits, liabilities, damages and losses incurred arising out of: any claims, legal actions, proceedings (including investigations and show cause proceedings) initiated by any governmental authorities, in any jurisdiction, against the Employee, in respect of any event or set of events, that occurred prior to the Effective Date, including in relation to the Employee executing/confirming the interim financial accounts of the Companies for a period prior to the Effective Date. The Companies' obligation to indemnify the Employee under this Section 7 shall continue for a period of five (5) years from Effective Date (**"Indemnity Period"**). It is clarified that the indemnification obligation under this Section 7(a) shall continue during the Indemnity Period even if the Employee has resigned or his employment terminated prior to the expiry of the Indemnity Period.

8.  **Assignment:** This Agreement will be binding upon and inure to the benefit of: (a) any Successor of the Indian Company or the Mauritius Company; and (b) to the heirs, executors and legal representatives of the Employee upon the Employee's death as it relates to the severance compensation specified in Section 3. Any such successor of the Indian Company or the Mauritius Company will be deemed substituted for the Indian Company or the Mauritius Company under the terms of this Agreement for all purposes. For this purpose, "Successor" means any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Indian Company or the Mauritius Company. None of the rights of the Employee to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance or other disposition of the Employee's right to compensation or other benefits will be null and void.

9.  **Notices.** Except as may be otherwise provided herein, all notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and signed by or on behalf of the Party giving it. Such notice shall be served by sending it or by delivering by hand, mail or courier to the address set forth below. In each case it shall be marked for the attention of the relevant Party set forth below. Any notice so served shall be deemed to have been duly given (i) in case of delivery by hand, when hand delivered to the other Party; or (ii) when sent by mail, where 7 (seven) business days have elapsed after deposit in the mail with certified mail receipt requested postage prepaid; or (iii) when delivered by courier on the second business day after deposit with an overnight delivery service, postage prepaid, with next business day delivery guaranteed, provided that the sending Party receives a confirmation of delivery from the delivery service provider; or (iv) for electronic mail notification with return receipt requested, upon the obtaining of a valid return receipt from the recipient.

To the **Indian Company:**

Azure Power India Private Limited
Address: 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi – 110017
Attn: Chairman, Board of Directors

To the **Mauritius Company:**

Azure Power Global Limited
Address: AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius
Attn: Chairman, Board of Directors

To the **Employee:**

To: Mr Rupesh Agarwal
Address: Unit 203 Tower 21, Lotus Boulevard Sector 100, Noida UP 210304

10.     **Severability.** In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement will continue in full force and effect without said provision.

11.     **Governing Law and Arbitration.** The provisions of this Agreement shall, in all respects, be governed by, and construed in accordance with the laws of India. Any dispute arising out of or in connection with this Agreement, including any question regarding the existence, validity or termination of this Agreement shall be referred to and finally resolved by arbitration in accordance with the Arbitration Rules of the Singapore International Arbitration Centre (SIAC Rules), which rules are deemed to be incorporated by reference in this Section. The seat of arbitration shall be Singapore, and venue of arbitration shall be New Delhi. The arbitral tribunal shall consist one 1 (One) arbitrator, jointly appointed by the Parties. In the event that the Parties are unable to appoint such sole arbitrator, then, the Employee on one hand and the Indian Company on the other hand, will appoint 1 (One) arbitrator each, and the 2 (Two) arbitrators so appointed shall appoint the third arbitrator. The law governing this Agreement shall be Indian law. The language of arbitration shall be English. Subject to the foregoing, the Parties agree to be subject to the exclusive jurisdiction of the courts in New Delhi. Nothing herein contained shall be construed as prohibiting any of the Companies from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the Employee.

12.     **Works.** All work performed by the Employee and all inventions, discoveries, developments, work product, processes, improvements, creations, deliverables and all written, graphic or recorded material and works of authorship fixed in any tangible medium of expression made, created or prepared by the Employee, alone or jointly with others, during the Employee's employment with the Companies and relating to the Group's business (collectively, the **"Works"**) shall be the Companies' exclusive property, shall be deemed a work made for hire, and all rights, title and interest in the Works shall vest in the Companies. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and Interest to such Works are hereby irrevocably assigned to the Companies. All Works shall belong exclusively to the Companies, and the Companies shall have the right to obtain and hold **in** their own name, any patents, copyrights, registrations or such other intellectual properly protections as may be appropriate to the subject matter. The Employee will sign documents of assignment, declarations and other documents and take all other actions reasonably required **by** the Companies, at the Companies's expense, to perfect and enforce any of its proprietary rights and to vest all right, title and interest to the Works in the Companies. This Section does not apply to an invention for which no equipment, supplies, facility, or Confidential Information of the Group was used and which was developed entirely on the Employee's own time, unless: (a) the invention relates (1) directly to the business of the Group, or (2) to the Group's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Employee for the Group. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably, absolutely and perpetually assigned to the Companies for worldwide territory. Notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, any

assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Employee, even if the Companies do not exercise the rights under the assignment within a period of one year from the date of assignment. The Employee hereby agrees to waive any right to and agrees to refrain from raising any objection or claims to the Copyright Board with respect to any assignment, pursuant to Section 19A of the Copyright Act, 1957. The Employee also waives all moral rights in relation to the Work developed or conceived by the Employee. The Employee acknowledges that the Fixed Pay payable under this Agreement is good and valuable consideration for the assignment of the Works, the sufficiency of which is hereby acknowledged.

13. **<u>Definitions.</u>** For purposes of this Agreement, the following terms have the following meanings, unless the context requires otherwise or unless otherwise stated.

**"Affiliate"** means any entity that directly, or indirectly through one or more intermediaries, is owned or controlled by, owns or controls, or is under common ownership or control with, the Indian Company or the Mauritius Company; for this purpose, "control" of an entity means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the entity, whether through the ownership of voting securities, by contract or otherwise.

**"Company"** means, individually, each of the Indian Company and the Mauritius Company, and **"Companies"** means, collectively, the Indian Company and the Mauritius Company.

**"Cause"** means the occurrence of one or more of the following: (i) an act of fraud or dishonesty made by the Employee against the Group in connection with the Employee's responsibilities which the Company reasonably believes will damage its business; (ii) the Employee's conviction of, or plea of no contest to, a felony (excluding traffic offenses) which the India Company Board or the Mauritius Company Board reasonably believes had or will have a detrimental effect on the reputation or business of the Indian Company or the Mauritius Company or its affiliates; (iii) the Employee's intentional or gross misconduct; (iv) the Employee's intentional improper disclosure of confidential information; (v) the Employee's continued violations of material Indian Company or the Mauritius Company policies or provisions of the Employee's agreements with the Indian Company or the Mauritius Company, including any violation of or failure to perform the Employee's reasonably assigned duties; or (vi) the Employee's failure to cooperate with the Indian Company or the Mauritius Company in any investigation or formal proceeding.

**"Competing Service/Product"** means any service or product that is similar to and competitive with any of the services/products and/or related services/products offered or provided by the Group as of the Termination Date.

**"Competitive Business"** means any company engaged in the renewable power business, wind, solar or hydro, energy storage or any other business of the Group as of the Termination Date in the Restricted Geographic Area.

**"Garden Leave"** means a Company's right to place the Employee on "garden leave" during the Notice Period. Such Company may, in its sole discretion, during the Garden Leave to: (a) suspend or terminate, in whole or in part, any powers, duties or work exercised by or provided to the Employee; (b) change the Employee's designation or duties as such Company decides appropriate; (c) prevent the Employee from contacting or communicating with any current,

former or proposed clients, customers, s, or vendors of the Group; (d) exclude the Employee from the premises of the Group; (e) announce to s, clients, customers, vendors and other relevant persons of the Group that Employee has been given notice of termination or that the Employee has resigned; and/or (f) ask the Employee to resign so such Company can appoint a new Chief Employee Officer prior to the end of the Notice Period, provided that in such event the last date of the Notice Period shall be deemed the Termination Date.

**"Group"** means any of the Companies, their subsidiaries and their Affiliates, unless the context otherwise requires.

**"Group's Customer"** or **"Group Customer"** means: (i) any Person to whom the Group is selling or providing any service or product as of the Termination Date; (ii) any Person to whom the Group provided or sold any service or product at any time during the one (1) year preceding the Termination Date; and/or (ii) any Person with whom the Group has contracted or otherwise entered into an arrangement to provide any service or product as of the time of the Termination Date.

**"Mauritius Company"** means Azure Power Global Limited, a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns.

**"Person"** means any individual or entity (including without limitation a corporation, partnership, Limited Lability company, trust, joint venture, or governmental entity or agency).

**"Prohibited Capacity"** means: (i) the same or similar capacity or function to that in which the Employee worked for the Group at any time during his employment; (ii) any Employee or officer capacity or function; (iii) any business development capacity or function; (iv) any ownership capacity (except the Employee may own as a passive investment up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market); (v) any business consulting or advising capacity of function; (vi) any director or similar capacity or function; (vii) any capacity or function in which the Employee likely would inevitably use or disclose any of the Group's trade secrets and/or Confidential Information; (viii) any capacity or function in which the customer goodwill the Employee helped to develop on behalf of the Group would facilitate or support the Employee's work for a Competitive Business; and/or (ix) any other capacity or function in which the Employee's knowledge of the Confidential Information would facilitate or assist the Employee's work for the Competitive Business.

**"Restricted Geographic Area"** means India, and each country the Group is doing business in as of the Termination Date.

14. <u>**Integration.**</u> This Agreement represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. This Agreement may be modified only by agreement of the Parties by a written instrument executed by the Parties that is designated as an amendment to this Agreement.

15. <u>**Waiver of Breach.**</u> The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

16. **Headings.** All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

17. **Tax Withholding.** All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

18. **Acknowledgment.** The Employee acknowledges that he has had the opportunity to discuss this matter with and obtain advice from his private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

19. **Counterparts.** This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*[Schedule and signature pages follow]*

15

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

/s/ Rupesh Agarwal
**Name:** Rupesh Agarwal

*Signature Page – Employee Employment Agreement*

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power India Private Limited**

Authorized Signatory

**Name:**

**Designation:**

*Signature Page – Employee Employment Agreement*

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power Global Limited**

_____
Authorized Signatory

**Name:**

**Designation:**

<em>Signature Page – Executive Release Agreement</em>

**SCHEDULE 1 | KEY PARAMETERS OF EMPLOYEE RELEASE AGREEMENT**

The Employee acknowledges and agrees that as a condition precedent to receiving any portion of the severance compensation detailed in Section 3 of the Agreement, the Employee will execute, deliver to the Companies, and not revoke, the Employee Release Agreement, which will: (a) substantially contain the following terms which are acknowledged and agreed to by the Employee (upfront) at the time of signing this Agreement, and (b) be executed and delivered to the Companies (and not subsequently revoked) in a form prepared by, and satisfactory to, the Indian Company and the Mauritius Company:

(1)     The Employee confirms that all positions (including, but not limited to, all board / committee and Employee positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company and the Mauritius Company.

(2)     The Employee, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims (other than in respect of payment of amounts specifically set out in the Employee Release Agreement), and hereby acknowledges and declares that on payment by the Indian Company of the dues to the Employee in accordance with the terms of the Agreement and the Employee Release Agreement, the Employee will have no Claims against the Companies and if required execute such further documents as may be reasonably required by Companies in confirmation on payment of the amounts due. The Employee waives any future Claims whatsoever that the Employee or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities, other than those in respect of payment of amounts due.

For this purpose, **'Claims'** means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, liquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers' compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu), leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies,

or to any event, act or omission that has occurred at any time up to and including the date of termination of the Employee, whether or not the Claim arises or may arise under contract, tort, equity or statute.

(3) The Employee shall not, up to and after the date of termination, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, their officers, directors, s, business practices, plans or procedures, products, or pertaining to the Employee's tenure with the Companies or the terms of this Agreement.

(4) The Employee agrees to take all steps, execute all documents and do all acts and things as may be reasonably required by the Companies to give effect to the transactions and matters contemplated by the Agreement and the Employee Release Agreement, and implement the provisions of the same.

(5) In the event, at any time after the termination of employment of the Employee, it is discovered (pursuant to any internal or external / regulatory investigations) that the Employee was engaged or involved in any of the following: (a) misconduct / fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws or the Agreement or the Employee Release Agreement, or (d) misappropriation of funds / property, then the Companies shall have all rights and entitlements against the Employee, as may be available under applicable laws, and/or in equity, including the right to claim damages for breach/ actions of the Employee.

**Exhibit 4.9**



**Letter No. - AP:HR: FY 22-23:AZ1402**

DATE-28 July 2022

**Ms. Shweta Srivastava**
**071, Royalton Tower at Princeton Estate,**
**DLF 5.**
**Pin Code:-122009**

<u>**Sub: Appointment Letter**</u>

Dear **Shweta,**

With reference to your application and subsequent interview you had with regard to your appointment with **AZURE POWER INDIA PRIVATE LIMITED** (hereinafter referred to as "Azure" which shall mean and include the said company, its executors, assigns and successors-in-interest) we are pleased to offer you a position in our organization on the following terms and conditions.

1.   <u>**Appointment/Designation:**</u>

     You are being appointed as **Sr Vice President** w. e. f. **28 July 2022**,

     WHEREAS

     ● The Company is engaged with the business of generation and production of solar energy and electricity.
     ● The Employee has represented to the Company that he/she has the requisite knowledge, expertise, experience and skill to render the services in relation to the requirements of such person under the terms of this Agreement.
     ● The Company has, based on the aforesaid representations made by the Employee, agreed to retain the services of the Employee for the consideration and subject to the terms and conditions herein contained.

2.   <u>**Salary**</u>

     You will be entitled to an annual remuneration of **Rs.12000000/** annum including salary & allowances.

     In addition to the above stated salary & allowances you will also be entitled to a Variable Performance Pay up to a maximum of **Rs. 2000004**/-, payable as per the terms governing the Variable Performance Pay Programme of the company. Please note that all payments will be strictly as per the rules and regulations as defined under the Income Tax Act, 1961 and other related statutes, and any subsequent modifications. The management reserves the right to merge, bifurcate or modify the salary structure at any time at its sole discretion keeping the value of remuneration unaltered.

3.   <u>**Performance Management/Appraisals**</u>

     Performance management/Appraisals are designed to foster mutual understanding about job responsibilities, job interest and career objectives between the employees and their supervisors, share employee concerns and problems set mutually on agreeable goals and targets for the next review period.

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 1 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

4.     **Job Responsibilities**

You will be a part of the **HR** department in SBU **HRM** at Azure. Your duties and responsibilities will be discussed with you in detail at the time of joining and may be re-assigned to you from time to time. You might be assigned additional responsibilities as and when required. We will continuously monitor your work performance to ensure that you remain challenged and that our work program brings out the best in you. We look forward to deliverables that fully attest to your background and qualifications. You shall abide by such rules and regulations, directions, instructions or orders of the Company, in this regard, as are issued or communicated from time to time.

5.     **Medical Fitness**

Your appointment and continuance will be subject to your being medically fit for job/work and the management will have the right to get you examined from the company's Medical Practitioner, whose finding shall be final and binding upon you.

6.     **Transferability**

1)     Your services may be transferred from one job/position/location to another, from one department to another or from the appointing company to any other company / division of Azure, whether existing at present or to be set up in future anywhere in India or abroad.

2)     In such a case, you will be governed by the rules, regulations and orders as applicable in the establishment to which you have been transferred, including conditions and rules covering Working Hours, Leaves, Holidays Salary, Allowances and Perquisites.

7.     **Leaves**

All leaves shall be in accordance with the Company's policy and would require prior sanction / approval of the sanctioning authority. In case of sick leave or casual leave or any other leave taken under unforeseen circumstances, for which prior approval is not possible, immediate information by telephone will be required to be sent to the sanctioning authority. The necessary written approval is to be taken on your next working day and mailed to the HR Department. In case you fail to do so, Management will have the right to take action against you under applicable rules of the Company.

8.     **Probation**

You will be on probation for a period of **180 days** from the date of your appointment. Please note that the following special Terms and Conditions of service are applicable to you only during the period of your probation:

1)     During the period of probation if the management perceives the services of the employee are undesirable for the organization they may be terminated on an immediate basis without assigning any reason whatsoever. In this situation the employee will not be entitled to any salary / wages / expense reimbursement whatsoever.

2)     Your transition into post-probation services for the Company is fully subject to and dependent on the satisfactory performance during the period of your Probation. Lack of such satisfaction of Azure from your services, may and should cause termination of your employment as detailed herein.

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 2 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

3)   You will be confirmed in the services of the Company after satisfactory performance during probation, and you will not be deemed to have been confirmed unless you are informed in writing to that effect.

4)   Your period of Probation may be modified at the discretion of Azure.

5)   During the period of your Probation your service may be terminated at the discretion of the Company, without assigning any reason, by giving **30 day** notice in writing or salary in lieu of the notice. During this period, you may resign from your appointment by giving notice in writing to the company or salary in lieu of the notice period. However, if you choose to terminate the relationship within the probation period, the company reserves the right to relieve you at its sole discretion before the expiry of the notice period without any liability towards the payment of salary/emoluments etc.

6)   During the period of your probation only the basic salary is taken into consideration for the calculation of the salary in lieu of the notice period i.e. for all full & final settlements.

9.   **Termination from Service**

If you shall be found engaged in or abetting immoral, illegal or other activities against the interests of the organization or its employees or found absent for more than seven consecutive working days without prior permission in writing of the management or if you proceed on leave without prior sanction or overstay the sanctioned leave without proper intimation and/or approval, at the discretion of the Azure management, your service may automatically come to an end and a presumption will be drawn that you have abandoned the employment/service on your own accord by losing lien on the post and under such circumstances you will lose all rights to any compensation or other payables due to you after proper adjustments.

Further, notwithstanding anything contained in this Agreement, the Company shall be entitled to terminate this Agreement forthwith in the event of:

1)   Any breach of integrity, act of dishonesty, embezzlement or any misconduct by the Employee or in case of breach of the terms, conditions or stipulations contained in this Agreement, by the Employee;

2)   The Employee's disobedience, willful refusal, willful or negligent failure, or unsatisfactory performance as to perform duties reasonably assigned by the Company after being provided notice by the Company and a reasonable opportunity to cure such breach in a manner satisfactory to the Company;

3)   The Employee being convicted of any criminal offence or committing fraud against, or the misappropriation of material property belonging to the Company;

4)   The Employee breaching in any material with respect to the terms of this Agreement, any organizational documents of the Company, or any other material agreement of the Company, and failing to cure such breach in a manner satisfactory to the Company within ten (10) days after receipt of notice by the Company;

5)   Any material violation by the Employee of the Company's policies prohibiting harassment of employees, any violation by the Employee of an engagement policy of the Company which results in material liability to the Company, or any act or omission which materially damages the Company's business or assets; or

6)   Any other action or inaction on the part of the Employee that would constitute adequate cause for termination pursuant to applicable law and regulations.

10.   **Relinquishing Service / Relieving**

After confirmation both the parties to the contract may terminate the contract of employment by giving **90 days'** notice in writing or salary in lieu of the notice period. However, if you choose to terminate this relationship, the company reserves the right to relieve you at its sole discretion



Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 3 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

before the expiry of the notice period without any liability towards the payment of salary/emoluments etc.

1) After confirmation, if the management perceives that your services are undesirable for the organization you may be terminated on an immediate basis without assigning any reason whatsoever. In this situation you will not be entitled to any salary/wages/expense reimbursement whatsoever.

2) Even after confirmation the basic salary is taken into consideration for the calculation of the salary in lieu of the notice period i.e. in all type of full and final settlements.

11. **Job Assignments**

You may, during the course of your employment, be given any assignment that may derive from the Company's business needs as defined from time to time by your reporting manager and the Azure management. Such management shall give you any assignment that they, in their subjective judgment, feel is suited to your background, qualifications or experience. You will not refuse to carry out any assignment solely on the grounds that it has not been part of your usual duties during your employment. You will also not be entitled to any additional compensation for carrying out any job, which in the opinion of the Management is equivalent to the job you have been assigned earlier.

12. **Non-Compete and Non-Solicit**

1) The Employee hereby undertakes and ensures that all business opportunities known to him/her or made known to him/her at any time, with respect to and/or connected with the business of the Company are referred to the Board and shall be undertaken in any other company only if the Board does not avail of such opportunity, in which event the employee may undertake the said business opportunity through any other entity provided that in so undertaking the said business opportunity, the Employee shall, at all times, ensure that the time spent by him on such other business opportunity not taken up by the Company shall not impede the performance of his services to the Company.

2) The Employee covenants and agrees that during the subsistence of this Agreement, he/she shall not, directly or indirectly attempt in any manner to solicit from any client/customer, except on behalf of the company, business of the type carried on by the Company or to persuade any person, firm or entity which is a client/ customer of the Company to cease doing business or to reduce the amount of business which any such client/customer has customarily done or might propose doing with the Company whether or not the relationship between the Company and such client / customer was originally established in whole or in part through his or its efforts.

3) The Employee acknowledges that the services he is to render to the Company are of a special and unusual character, with a unique value to the Company, the loss of which cannot adequately be compensated by damages or an action at law. In view of the unique value to the Company of this services for which the Company has contracted hereunder, because of the confidential information to be obtained by, or disclosed to the Employee covenants and agrees that during the term of engagement and during for a period of one year thereafter but subject to clause 12.1 above, the Employee shall not directly or indirectly, enter into the engagement of, tender consulting or other services to, acquire any interest in (whether for the Employee's own account as an individual proprietor, or as a partner, associate, stockholder, officer, director, trustee or otherwise), or otherwise participate in any business that competes, directly or indirectly, with any of the companies or entitles (i) in the same lines of business that the Company is engaged in at the time the Employee's engagement is terminated.

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 4 | 10



4) During and for one year following termination of engagement (i) the Employee may not solicit, encourage, or induce or attempt to solicit, encourage, or induce any (A) current employee, marketing agent, or employee of the Company to terminate his or her engagement, agency or consultancy with the Company, or any (B) prospective employee with whom the Company has had discussions or negotiations within six months prior to the employee's termination of engagement not to establish a relationship with the Company. (ii) induce or attempt to induce any current customer to terminate its relationship with any of the Company or (iii) induce any potential customer with whom the Company has had discussions or negotiations within [six months] prior to the Employee's termination of engagement not to establish a relationship with the Company.

13. **Confidentiality**

1) The Employee recognizes that he is being hired in a position of trust and confidence with the Company and will in the course of his engagement with the Company, be exposed to various items of secret and confidential information that are proprietary to the Company. The Employee acknowledges that the Company needs to protect such secret and confidential information, covenants to hold any such information in trust for the Company and undertakes not to disclose such information to any third party.

2) The Employee represents that his performance of the terms of this Agreement and his engagement with the Company does not and will not breach any agreement to keep in confidence information previously acquired by him in confidence from any third party, The Employee has not entered into, and agrees, subject to clause 2.1 above, not to enter into, agreement in conflict with this Agreement or which in any way prohibits his performance of or restricts his ability to perform his obligations under this Agreement. The Employee has not brought, and agrees he/she will not bring with him/her to the Company for use in his/her engagement with the Company any materials or documents of a former employer or any other person or entity for whom he/she has provided services (paid or unpaid) that are not generally available to the public unless he/she has obtained express written authorization from the former employer or other person or entity for whom he/she provided such services for their possession and use.

14. **Intellectual property**

1) The Employee acknowledges that ownership of, and all right, title, and interest in, all the trademarks, trade names, brand names, patents, designs, domain names and other intellectual property rights created by the Employee expressly for the Company ("Intellectual Properties") shall vest in the Company.

2) The Employee expressly agrees that all Intellectual Properties created by the Employee expressly for the Company shall be a "work for hire" under the laws of any jurisdiction. In any event, the Employee hereby transfers and shall be deemed to have assigned in favor of the Company, all rights, title and interest in and to all the Intellectual Properties, together with the rights to sub-license or transfer any and all rights assigned hereunder to third parties, in perpetuity as and when the same come into existence. The Employee shall assist and cooperate with Company in perfecting the Company's rights in the Intellectual Properties.

3) The Employee shall not, during the continuation of this Agreement or thereafter, divulge or make use of any trade secret or confidential information concerning the business of the Company or any of its dealing, transactions and affair or any information concerning any of its suppliers, agents, distributors or customers which the Employee possesses or comes into possession while in the engagement of the Company or which he may make or discover while in the service of the Company and the Employee shall also use his best

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

P a g e 5 | 10



endeavor to prevent another person from doing so. All data, documents, plans, drawings, photographs, reports, statements, correspondence, etc. and technical information, know-how and instructions as well as business details or commercial policies that pass to the Employee or which come to the Employee's knowledge shall be treated as confidential and the Employee shall be bound to keep secret all such confidential matters including papers and documents, computer floppies. CDs containing the same and shall not disclose, communicate, reproduce or distribute the same or copies thereof to anyone except in the course of the rightful discharge of his duties as the employee of the Company.

4) The Employee represents and warrants that he/she will keep all Intellectual Properties created by the Employee expressly for the Company, in strict confidence and shall use the same only for the purpose of the business and benefit of the company and for no other purpose, except with prior written consent of the Company.

5) The Employee further represents and warrants that all the Intellectual Properties created by the Employee expressly for the Company are original, and that the Employee possesses all rights necessary to effectuate the transfer of the rights as contemplated above. Nothing contained herein shall apply in the event of any innocent infringement.

6) The Employee shall forthwith communicate to the Company and transfer to it the exclusive benefits of all inventions, processes, improvements, and any other discoveries which the Employee may make or discover in the course of his/her association with the Company, relating to any trade or business of the Company and will give full information as to the exact mode of working and using the same and also all such explanations and instructions to the officers and workmen of the Company as may be necessary to enable them to work effectively and will at the expense of the Company furnish it with all necessary plans, drawing and models.

7) The Employee expressly agrees that all Intellectual Properties created by the Employee expressly for the Company shall be under a contract of service. In consideration of his/her engagement with the Company, the Employee hereby transfers and shall be deemed to have assigned in favor of the Company, all rights, title and interest in and to all the Intellectual Properties, together with the rights to sublicense or transfer any and all rights assigned hereunder to third parties, in perpetuity. The Employee agrees that such assignment shall be perpetual, worldwide and royalty free. The Employee agrees that notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, such assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Employee, even if the Company does not exercise the rights under assignment within a period of one year from the date of assignment. The Employee acknowledges and agrees that he shall waive any right to and shall not raise any objection or claims to the Copyright Board with respect to the assignment, pursuant to Section 19A of the Copyright Act, 1957. The Employee shall assist and cooperate with Company in perfecting the Company's rights in the intellectual Properties.

8) The Employee shall, whenever requested to do so by the Company whether during or after the termination of his engagement hereunder, at the cost of the Company execute and sign any and all applications, assignments and other instruments which the Company may deem necessary or advisable in order to obtain protection for aforesaid improvement, inventions and discoveries in such countries as the Company may direct and to vest in the Company the whole, right, title and interest therein.

15. **<u>Retirement</u>**

You will superannuate from the services of the company on attaining the age of **58 years** (as per the proof of age submitted to the company at the time of your joining) or any exception in this age requires the written approval from CEO/COO.



Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 6 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

16.      **Other General Terms of Employment**

1)      The employee shall not be associated in any capacity whatsoever with any competitor company for a period of at least 12 months after departure from Azure.

2)      The assets/data given to you are exclusive rights of the organization; you are only given the mere authorization to utilize the assets/data on behalf and for the organization. All data created by you during your association with the company are also exclusive rights of the company. Upon resignation it is your primary duty to hand-over all these assets/data to your reporting manager assigned by the company and obtain the necessary clearances from your department and subsequently from the HR Department. In case of any tampering or illegal usage of these assets/data or non-submission of the assets/data upon resignation, the company reserves all rights to initiate appropriate legal actions against you and you will automatically lose all rights to any dues payable to you.

3)      In case Azure imparts high cost training to the employee, the employee shall be required to enter into a written agreement with Azure prior to the training and only after the agreement has been signed will the employee be permitted to proceed for the training.

4)      This appointment will cease immediately, if any of the statement made or particulars given in your application/employment form are found to be false or incorrect in material particulars.

5)      This appointment letter along with the Annexure shall form the contract of employment between you and Azure ("Azure" or "The Company").

6)      Failing to observe any of the conditions of service, including those specified in the rules will amount to the misconduct of "Willful" disobedience of any lawful and reasonable order of a superior.

7)      The Company with the consent of the employee has the right to vary, amend and modify an item of the pay packet without adversely affecting the total pay packet.

8)      This appointment is based on the information given by you to us in your application/employee data form and during your evaluation process and shall be considered null and void if any material error/suppression in the company's opinion is discovered at any point of time.

9)      In case of any change in the address during the course of your employment it shall be your duty to intimate the same to the Management / HR Department in writing within three days of such change in address.

10)     All communication sent to you by the management at your last given address shall be deemed to have been delivered to you at the correct address.

11)     You will be responsible for the safe custody of the tools, equipment, documentation and any other items entrusted to you and in case of any damage or loss, the management shall have the right to deduct the same from your salary/wages besides taking any other disciplinary action as may be deemed fit and proper.

12)     In case of theft, fraud, dishonesty, drunkenness, fighting, riotous or disorderly behavior or conduct, smoking and spitting on the premises, gambling, damaging or destroying records, files, papers or other information (whether in tangible or intangible form), or properties of the company, impertinence, insubordination, threatening, assaulting or intimidating any Superior Officer/ Manager/ Director, holding or organizing or taking part in any meeting, demonstration, illegal strike, unlawful and unjustified cessation of work or adopting go slow tactics or refusal of work or attempt to incite or intimidate or force other workmen to go on strike in advance, habitual negligence in discharge of duties, using insulting words or abusive languages towards the superior/manager, vulgarity, molestation of other employees, teasing and cutting indecent jokes or making indecent remarks towards other employees and any other act/omission/offence constituting misconduct is alleged against you in accordance with the provision of the standing orders/service rules of the company, you may be placed under suspension

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 7 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

        pending enquiry and shall not be entitled to any form of salary/wages during the period of such suspension.

13)     If during the suspension enquiry or in accordance with the report of the Enquiry Officer, your misconduct will be proved or you will be found guilty, your services will be liable to be terminated without giving notice or compensation or wages in lieu of notice.

17.     **<u>Verification</u>**

This appointment is based on the details provided by you to the Company. Your appointment is subject to satisfactory verification of the following documents which you have submitted at the time of joining:

- Completed Application Form
- Copy of pay slip of your last month of employment
- Copy of current/last employer's Appointment Letter
- Copy of all Degree and/or Professional Course certificates
- Photocopy of Passport /Driving License/PAN card
- Relieving Letter from last employer
- 4 Passport size photographs

18.     **<u>Joining</u>**

You shall take up your duties on **28 July 2022,** solely at your own expenses and if applicable will be reimbursed on the scheduled date as per the company policy.

You will be reporting to **Harsh Shah (Management -CEO)** of the Company.

And will be posted at the **New Delhi** initially and may be relocated to other locations depending upon project requirements and Management directives.

This letter is being sent to you in duplicate. Please affix your signature on the duplicate copy in token of your acceptance of the salary, perks & benefits as well as all other terms and conditions contained in this letter and return the same to us for our records within seven days from issue of this letter.

We look forward to working with you at **AZURE POWER INDIA PRIVATE LIMITED**

Wishing you all the best.

For **AZURE POWER INDIA PRIVATE LIMITED**

**Priya Chakrabarti**
**Head -Human Resource**

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800　　📠 +91 11 4940 9807　　✉ info@azurepower.com　　🌐 www.azurepower.com

P a g e 8 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

<u>**ACCEPTANCE**</u>

I, **Shweta Srivastava** hereby declare that I have fully read and understood the terms & conditions enumerated above to the best of my knowledge and belief.

I hereby agree & accept all the above terms and conditions.

**Signature of the Employee**

**Name: Shweta Srivastava**
**Date: 28 July 2022**

**Azure Power India Private Limited**
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800          📠 +91 11 4940 9807          ✉ info@azurepower.com          🌐 www.azurepower.com

P a g e 9 | 10



**Letter No. - AP:HR: FY 22-23:AZ1402**

<u>Annexure – 1</u>

| Details of Salary & Allowances | | |
|---|---|---|
| **Employee Code** | **AZ1402** | |
| **Name** | **Shweta  Srivastava** | |
| **Designation** | **Sr Vice President** | |
| **Department / SBU** | **HR/H R M** | |
| **Band** | **Sr Vice President** | |
| **Date of joining** | **28 July 2022** | |
| **Company** | **AZURE POWER INDIA PRIVATE LIMITED** | |
| **Salary Components** | **Monthly (Rs)** | **Annual (Rs)** |
| Basic Salary | 466667 | 5600004 |
| House Rent Allowance | 233334 | 2800008 |
| Choice Pay | 243999 | 2927988 |
| Company Contribution to Provident Fund | 56000 | 672000 |
| **Total** | **1000000** | **12000000** |
| *Variable Performance Pay | | |
| Maximum Entitlement to Variable Performance Pay | | 2000000 |
| **Total CTC** | | **14,000,000.00** |

\* Payment of Variable Performance Pay (VPP) is discretionary. Earning of VPP is linked to performance management process dependent upon your individual performance and your continued commitment towards the achievement of organisational goals as well as the performance of your department and the company. If the company announces disbursal of VPP to the eligible executives for a particular financial year after assessment of the performance of the individual employees, departments and the company during that period, then as per your eligibility determined on the aforesaid parameters, VPP shall be paid to you only if you are on the full-time active employment of the company as on the date of disbursement and have not taken steps for cessation of the employment.

Authorised Signatory

Employee's Signature

**Priya Chakrabarti**
**Head Human Resources**

**Shweta  Srivastava**
**Sr Vice President - HR**

**DATE OF JOINING DAY: - 28 July 2022**

**DATE OF JOINING DAY: - 28 July 2022**

Azure Power India Private Limited
Regd. Office: 5th Floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017
CIN: U40106DL2008PTC174774

☎ +91 11 4940 9800      📠 +91 11 4940 9807      ✉ info@azurepower.com      🌐 www.azurepower.com

P a g e 10 | 10

**Exhibit 4.10**

# EXECUTIVE RELEASE AGREEMENT

This Executive Release Agreement **("Agreement")** is entered into on July 11, 2023 **("Execution Date"),** and is deemed to be effective from July 10, 2023 **("Effective Date"),** at New Delhi by and between:

A.      **AZURE POWER INDIA PRIVATE LIMITED**, a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017 (hereinafter referred to as the "**Indian Company**", which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns);

B.      **AZURE POWER GLOBAL LIMITED**, a company incorporated under the laws of Mauritius and leaving its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius (hereinafter referred to as the "**Mauritius Company**", which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

C.      **MR. RUPESH AGARWAL**, a citizen of India bearing PAN ACMP2420N and resident of Unit 203, Tower 21, Lotus Boulevard, Sector 100, Noida 201304 (hereinafter referred to as the **"Executive"** which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the Mauritius Company are individually referred to as **"Company"** and collectively referred to as **"Companies"**.

The Companies and the Executive shall, hereinafter, be collectively and commonly referred to as **"Parties"** and individually as a **"Party"**.

Any term not defined under this Agreement shall have the meaning assigned in the Employment Agreement *(as defined below),* notwithstanding the cessation of employment of the Interim CEO under the employment agreement dated August 29, 2022 between the Indian Company, Mauritius Company and the Executive **("Employment Agreement")**.

WHEREAS The Executive held the position of Interim Chief Executive Officer **("CEO")** in the Indian Company and Mauritius Company (collectively, "Companies") from August 29, 2022. The Executive had tendered his resignation, which is effective July 10, 2023, from all employment (including the Chief Commercial and Strategy Officer) with the Companies and the Group *(as defined hereinafter).* The Parties are therefore desirous of recording the final terms and conditions of such cessation, as set out hereinafter.

WHEREAS the Executive has also entered into an Employment Agreement dated July 18, 2022 with the Indian Company for appointment as a Chief Commercial and Strategy Officer **("CSCO Agreement")** which CSCO Agreement is currently in abeyance as per the terms of the Employment Agreement and from which the Executive has also tendered his resignation with the same effective date. July 10, 2023.

NOW, THEREFORE, in consideration of the mutual covenants, and agreements hereinafter contained and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, the Parties intending to be legally bound, hereby agree as follows:

(1) The Executive confirms that all positions (including, but not limited to, all board / committees and executive positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company and the Mauritius Company. The Executive hereby agrees and affirms that he will assist the Companies and such other representatives of the Group and will sign the necessary letters and documents to record his resignation from any position that he may have been appointed to or be in the process of being appointed to and hereby authorizes the Group and such other representatives of the Group to do what is necessary in this regard to record resignation of the Executive.

(2) The Executive further agrees to fully cooperate with (i) the ongoing investigation by the United States Department of Justice and the Securities and Exchange Commission (collectively the United States government or USG) and any investigative steps the Companies or its counsel undertake to support the Companies' ongoing cooperation with the USG; (ii) any investigation or inquiry against the Companies initiated by any authorities in India, except that nothing in this agreement limits the rights the Executive has under the Fifth Amendment to the United States Constitution or other laws or rights recognized by the courts in India or the United States in relation to rights against self-incrimination nor will the exercise of those rights be deemed to relieve the company of the agreement to pay for the Executive's counsel.((i) and (ii) are collectively referred to as "**Investigations**"). As part of his cooperation the Executive agrees to be fully truthful and responsive to any inquiry, interview request, or related correspondence from the Companies, their counsel, the USG or the authorities in India into any matter that may involve the Executive's former employment with the Companies. The Executive further agrees to keep the information about such investigations confidential, and only share information about such investigations with the Companies, their counsel and their respective advisors, the USG, the authorities in India and his counsel and advisors (such counsels and advisors being similarly bound by confidentiality restrictions). Further, the Executive may disclose to prospective employers his ongoing cooperation with investigating agencies in the USG and in India (if any), with the understanding that such disclosure shall be limited to the fact of his cooperation.

(3) To compensate the Executive for his time in truthfully responding to questions or other requests made by the USG, any authorities in India, or the Companies—including any request to participate in an interview—the Indian Company (either by itself or by the Mauritius Company) agrees to pay the Executive a per day fee of INR 1,00,000 (one lakh) for such day that the Executive is required to visit any governmental authorities whether locally, nationally or internationally in connection with any Investigations, and reasonable costs as applicable to a CEO for any required travel. The Companies further agree to pay reasonable fees and costs for independent legal counsel for such professionals who will advise the Executive during the course of his cooperation in relation to any such

Investigations, including the independent legal counsel engaged by the Executive to advise in relation to any Investigations as of the date of this agreement.

(4) The Executive, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims. The Executive waives any future Claims whatsoever that the Executive or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities, other than those arising under paragraph 3 of this Agreement or in respect of payment of amounts specified under **Annexure A** to this Agreement.

For this purpose, 'Claims' means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, 1iquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers' compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu). leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other employee benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies, or to any event, act or omission that has occurred at any time up to and including the date of cessation of the Executive, whether or not the Claim arises or may arise under contract, tort, equity or statute.

3

(5)    The receipt of any severance compensation pursuant to Section 3 will be subject to the Executive not violating the provisions of Section 5 and Section 6 (b),(c),(d),(e) of the Employment Agreement. In the event the Executive breaches the provisions of Section 5 or Section 6 (b),(c),(d),(e) of the Employment Agreement all payments and benefits to which the Executive may otherwise be entitled pursuant to under Section 3 of the Employment Agreement will immediately cease, to the extent permissible under law. With effect from the execution of this Agreement, the Parties agree to waive applicability of Clause 6(a) of the Employment Agreement.

(6)    The Executive shall not, up to and after the date of cessation, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, employees, business practices, plans or procedures, products, or pertaining to the Executive's tenure with the Companies or the terms of this Agreement. The same shall be applicable to the Companies, with regards to making statements on the Executive. Provided, however, that this provision shall not create any limitation nor does it modify the promise to truthfully respond to inquiries from the Companies, its counsel, and the USG as outlined in paragraph 2 above nor does it limit the Companies' obligation to cooperate with the USG.

(7)    In the event, at any time after the cessation of employment of the Executive, if it is proven by a final court of competent jurisdiction that during the limited period of Term of his employment, the Executive was engaged or involved in any of the following:

       (a) misconduct or fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws (d) breach of this Agreement or (d) misappropriation of funds or property of the Companies,

       then the Companies shall have all rights and entitlements against the Executive for the proven damages, as may be available and within such time periods as available under applicable laws.

(8)    It is further clarified that the Term of the Executive's employment as a CSCO commenced from the effective date of the CSCO Agreement up to the effective date of the Employment Agreement, and the Executive's employment as an Interim CEO commenced from the effective date of the Employment Agreement up to the effective date of the Executive's resignation i.e., July 10, 2023.

(9)    The Company shall not raise any Claims against the Executive except as any claims that the Companies may have pursuant to the confidentiality obligations under Clause 2, or claims under Clause 6 or 7 above.

(10)   The Company and the Executive acknowledge the provisions of the Indemnification Agreement dated September 19, 2022 entered into between the Company and the Executive and the same shall continue to apply in accordance with the terms contained therein.

(11)    The Executive agrees that his obligations under the Employment Agreement shall survive post his Resignation Date including the obligations under Clause 5 *(Non-Disclosure of Confidential Information)* and Clause 6 (b),(c),(d),(e).

(12)    Clauses 9 *(Notices),* 10 *(Severability),* 11 *(Governing Law and Arbitration)* and 13 *(Definitions)* of the Employment Agreement shall *mutatis mutandis* apply to this Agreement.

5

## AZURE POWER INDIA PRIVATE LIMITED

## FULL AND FINAL SETTLEMENT - July 2023

| | | | |
|---|---|---|---|
| Employee Code | AZ1399 | Employee Name | Rupesh Agarwal |
| PF Account Number | DSNHP09396280000011481 | Date Of Joining | 20 July 2022 |
| Last working day | 10 July 2023 | Days Worked | 10 |
| Arrears Days | 0 | Notice Days | 0 |
| ESIC Account Number | | Leave Encashment Days | 15.5 |
| Bank Name | ICICI Bank | Bank Account Number | 039901545634 |
| Permanent Account Number | ACMPA2420N | | |

The following items have been return to the company by the above employee.

☐ Handover Doc ☐ ID CARD ☐ KT Doc ☐ LAPTOP
☐ Mobile ☐ Other ☐ SIM

| Earnings Particulars | Amount | Deductions Particulars | Amount |
|---|---|---|---|
| Basic Salary | 4,30,107 | IT Deduction | 105,89,297 |
| House Rent Allowance | 2,15,054 | PF Deduction | 51,613 |
| Choice Pay | 3,33,978 | | |
| Leave Encashment | 7,94,872 | | |
| Other Earning | 0 | | |
| Taxable Car Maintenance | 1,78,060 | | |
| Taxable Driver Reimbursement | 9,677 | | |
| Taxable LTA Reimbursement | 1,09,645 | | |
| Variable Pay | 2,60,00,000 | | |
| Total Earnings | 2,80,71,393 | Total Deductions | 1,06,40,910 |

Net full and final settlement amount payable,: 1,74,30,483 (In words: One Crore Seventy Four Lacs Thirty Thousand Four Hundred Eighty Three Only)

| Prepared By | Authorized By | Approved By |
|---|---|---|

I, Rupesh Agarwal Employee Code No: AZ1399 hereby accept a sum of Rs. 1,74,30,483 as per above full and final settlement and also declare that there are no pending dues from AZURE POWER INDIA PRIVATE LIMITED

| Signature Of Employee | Signature Of Cashier / Accountant |
|---|---|

This is a computer generated statement and hence no signature is required.

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

/s/ Rupesh Agarwal
_____
MR. RUPESH AGARWAL

*Signature Page — Executive Release Agreement*

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

For Azure Power India Power Limited

/s/ Shweta Srivastava
Authorized Signatory
Name:        SHWETA SRIVASTAVA.
Designation: CHIEF HUMAN RESOURCES OFFICER.

*Signature Page — Executive Release Agreement*

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

For Azure Power Global Limited

/s/ Sugata Sircar

Authorized Signatory
Name:        SUGATA SIRCAR
Designation: EXECUTIVE DIRECTOR

*Signature Page — Executive Release Agreement*

**Exhibit 4.11**

## EMPLOYEE EMPLOYMENT AGREEMENT

This Employment Agreement (the **"Agreement"**) is entered into as of 1ˢᵗ May 2023 (the **"Execution Date"**) by and between:

l.    **Azure Power India Private Limited,** a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017(hereinafter referred to as the **"Indian Company",** which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns);

2.    **Azure Power Global Limited,** a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1ˢᵗ Floor, The Exchange 18 Cybercity, Ebene, Mauritius (hereinafter referred to as the **"Mauritius Company",** which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

3.    **Mr. Sugata Sircar,** a citizen of India having PAN [*AITPS5665G*] and residing at D 1403, Palm Springs, Golf Course Rod, Sector 54, Gurugram 122011, Haryana, India (hereinafter referred to as the "Employee" which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the are hereinafter collectively referred to as **"Parties"** and each individually as a **"Party".**

**WHEREAS,** the Indian Company is desirous of appointing the Employee as its Executive Director, Finance, as well as recommending the Employee for appointment as the Chief Financial Officer of the Mauritius Company (*as defined in this Agreement*) (*"ED, Finance/ CFO"), in accordance with, and on the terms and conditions, contained herein.*

**NOW, THEREFORE,** in consideration of the foregoing and the mutual provisions contained herein and for other good and valuable consideration, the adequacy and sufficiency of which is acknowledged by all Parties, the Parties agree as follows:

**1.**    **Duties and Scope of Employment, etc.**

    a)    <u>Positions and Duties</u>

        (i)    The Indian Company hereby agrees to employ the Employee, and the Employee agrees to be employed by the Indian Company, in accordance with the terms and conditions of this Agreement from the **"Effective Date"** of May 01, 2023 or any other date mutually agreed between the Indian Company and Employee for a period thirty six (36) months from Effective Date.

        (ii)    In his capacity as the Indian Company's Executive Director, Finance, and the Mauritius Company's Chief Financial Officer, the Employee will (a) report to the full-time Chief Executive Officer (CEO) and in the absence of a full-time CEO, the



Employee will report to the Indian Company's Board of Directors (the **"India Company Board"**) and the Mauritius Company's Board of Directors (**"Mauritius Company Board"**), (b) perform such duties and responsibilities normally attendant to such positions and such other additional and different duties as the relevant Company may from time to time assign which are consistent with the Employee's position; and (c) act in compliance with the Indian Company's and Mauritius Company's constituent documents, applicable law and regulations, and any directives or policies established by the India Company Board and Mauritius Company Board.

(iii)    The Employee's principal place of employment shall be at the Indian Company's corporate office in Delhi, India.

(iv)    The Companies may in their sole discretion modify the designation of the Employee or decide for the Employee to be engaged solely by the Indian Company or solely by the Mauritius Company as the Companies may deem fit without requiring any amendment, termination or modification of this Agreement

b)    <u>Employment Term.</u>

(i)    The term of employment (the **"Term"**) of the Employee shall commence on and from the Effective Date up to a period of thirty-six (36) months from the Effective Date or such earlier date upon his termination or resignation from employment with the Company for any reason (the **"Termination Date"**).

(ii)    For the avoidance of doubt:

(1)  the effective date of termination (other than for "Cause" *(as defined in this Agreement))* shall not be earlier than the last day of the applicable required notice period, if any, provided for in this Agreement, subject to the provisions of Section l(c) below; and

(2)  the effective date of termination for Cause *(as defined in this Agreement)* shall be as determined by the Indian Company, in its sole and exclusive discretion.

c)    <u>Notice.</u>

(i)    The Employee agrees to provide ninety (90) days' notice, or such other notice period as mutually agreed between the Parties in writing (**"Notice Period"**), prior to terminating this Agreement (**"Termination Notice"**). The Indian Company, or the Mauritius Company may, in its sole and exclusive discretion: place the Employee on "Garden Leave" (as defined in this Agreement) for up to the duration of Notice Period; The Employee shall have no right to satisfy the Notice Period obligations by providing the Indian Company with any consideration, unless agreed in writing by the Indian Company and the Mauritius Company, in which case the Indian Company shall also have the right to seek payments in lieu of the Notice Period, equivalent to ninety (90) days' of the Employee's Fixed Pay (as defined in this Agreement).



(ii) The Indian Company and the Mauritius Company shall be entitled to terminate the Employee's employment by giving ninety (90) days' notice to the Employee. The Company shall have right to satisfy the Notice Period obligations by providing the Employee, in lieu of the Notice Period, equivalent to ninety (90) days' of the Employee's Fixed Pay (as defined in this Agreement).

d) <u>Employee Position.</u> During the Term, the Employee's position will be Executive Director, Finance of the Indian Company and Chief Financial Officer of the Mauritius Company or in such other additional position or positions as the Indian Company may designate from time to time. The Employee will have such duties, authorities and responsibilities as are commensurate with his position. All of the Employee's duties, responsibilities and powers with respect to the Indian Company and the Mauritius Company, will, at all times, be subject to the order, direction and supervision of the India Company Board and the Mauritius Company Board, respectively and the full-time CEO. During the Employee's employment with the Company, the Employee (without prejudice to Section 6):

(i) will devote his full vocational time and best efforts to the furtherance of the business of the "Group" *(as defined in this Agreement)* on a full-time basis;

(ii) will exercise the highest degree of loyalty and the highest standards of conduct in the performance of his duties;

(iii) will comply with all applicable laws and regulations;

(iv) will not, except as noted herein or as required for furtherance of the Employee's duties with the Group, engage in any other business activity (other than Passive Investments), whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the express written consent of the India Company Board and Mauritius Company Board, which consent shall be at the sole discretion of each of the India Company Board and Mauritius Company Board;

(v) will not engage, directly or indirectly, in any activity, employment or business venture (other than Passive Investments), whether or not for remuneration, that is competitive, same or similar with the Group's business in any respect or make any preparations to engage in any competitive activities; (vi) will not take any action or make any omission that deprives the Group of any business opportunities or otherwise act in a manner that conflicts with the best interest of the Group or is detrimental to the business of the Group; and (vii) will not accept any appointment / nomination, or be appointed / nominated, on the board of directors or other governing body of anybody corporate (other than in respect of the Group, as specifically required by the Indian Company or the Mauritius Company in connection with the Employee's employment), without the express written consent of the India Company Board and Mauritius Company Board. If the Employee wishes to engage in an outside activity not expressly permitted under the terms of this Section, the Employee shall first propose such activity to the India Company Board and Mauritius Company Board for its determination as to whether such activities are permissible. Even if the India Company Board and Mauritius Company Board consents to the Employee's engagement in an outside activity, they shall have the right to revoke its consent at any time, and upon notice to the Employee of such revocation of consent, the Employee shall terminate such outside activity at the earliest practicable opportunity.



It is clarified that for the purposes of the above, the term "Passive Investment" shall mean: ownership of up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market; or (ii) ownership of unlisted securities of a company of less than 50% (on a fully diluted basis), subject to: (A)the Employee not having the right or ability to control or influence the management or decisions (directly or indirectly) of such company, (B) the Employee not having any rights to appoint a nominee, or any right to being appointed, on the board of such company, and (C) the Employee not having any other role in such company, except that of a shareholder holding minority shares in such company.

e)    <u>Representations and Warranties by the Employee.</u> The Employee's employment with the Companies is conditioned on the Employee's representations and warranties to the Indian Company that:

(i)    he is not disqualified or prevented from acting as the Executive Director, Finance of the Indian Company or the Chief Financial Officer of the Mauritius Company under applicable law or regulation;

(ii)    his execution, delivery and performance of his duties under this Agreement will not violate, conflict with, result in a breach of the terms, conditions or provisions of, result in the creation of any encumbrances or constitute a default (or an event that, with the giving of notice or lapse of time or both, would constitute a default) or an event creating rights of acceleration, modification, termination, cancellation or a loss of rights under any contract to which the Employee is a party, including any non-compete or non-solicitation agreement or obligation, any approval, order, judgment, decree or award to which the Employee is a party or by which he is bound or any law applicable to the Employee; and

(iii)    this Agreement has been duly and validly executed by the Employee and upon execution and delivery, this Agreement will constitute, legal, valid and binding obligations of the Employee, enforceable against him in accordance with its terms.

## 2. <u>Compensation.</u>

a)    <u>Fixed Pay</u>. During the Term, the Indian Company will pay the Employee the salary set forth in the table below as compensation for his services (the **"Fixed Pay"**). The Fixed Pay will be paid monthly in accordance with the Indian Company's normal payroll practices and be subject to the usual applicable withholdings. The Fixed Pay will be further subject to annual review by the Mauritius Company Board.

| Period | Salary |
| --- | --- |
| From the Effective Date for 1 year | Annual salary of INR 3,00,00,000 (Indian Rupees Three Crore) |
| Between 1st and 2nd year | Annual salary of INR 2,50,00,000 (Indian Rupees Two Crore and Fifty Lakh) |

b)    <u>Variable Pay</u>. Upon achievement of key performance parameters (to be decided by the



Mauritius Company Board), the Employee shall be eligible to earn a bonus variable pay of up to INR 1,00,00,000 (Indian Rupees One Crore) for the 1st year and up to INR 1,50,00,000 (Indian Rupees One Crore Fifty lakh) for the 2nd and 3rd year **("Variable Pay")** at the discretion of and further subject to annual review by the Mauritius Company Board. The Variable Pay shall be payable to the Employee only upon end of any year. In addition, the Employee will be eligible for a Long Term Incentive Plan of up to INR 1,00,00,000 (Indian Rupees One Crore) for each year of employment with the Company in cash **("Incentive Pay")**; terms and conditions of the same shall be determined by the Mauritius Company Board. The Incentive Pay shall be a one-time payment payable (a) on the Employee completing three years of employment with the Company from the Effective Date or (b) upon the early termination of the Employee's employment with the Company, on a pro-rata basis; and in each case subject to the discretion of the Mauritius Company Board and the Employee's performance in relation to the key responsibility areas as determined by the Mauritius Company Board.

c) <u>Other</u>.

The Mauritius Company Board may in its sole discretion also award a one-time joining bonus to the Employee for such amount and on such terms that the Mauritius Board may deem fit. The Board has proposed a signing bonus of 1.25 months of the starting annual salary, or Rs 30 lakhs.

During the Term, for so long as the Employee meets the eligibility requirements of the applicable plan, practice, policy or program of Indian Company and/or the Mauritius Company: (i) except as specifically provided herein, the Employee shall be entitled to participate in all savings and retirement plans, practices, policies and programs of Indian Company and/or the Mauritius Company that are made available generally to other Employee officers of Indian Company and/or the Mauritius Company, and (ii) except as specifically provided herein, the Employee and/or the Employee's family, as the case may be, shall be entitled to participate in, and shall receive all benefits under, all welfare benefit plans, practices, policies and programs (including Indian Company's and/or the Mauritius Company's health insurance and disability plans) provided by Indian Company and/or the Mauritius Company that are made available to other Employee officers of lndian Company and/or the Mauritius Company (for the avoidance of doubt, such plans, practices, policies or programs shall not include any plan, practice, policy or program which provides benefits in the nature of severance or continuation pay). Each of the Indian Company and the Mauritius Company may change, amend or discontinue any of its benefit plans, practices, policies and programs at any time during the Employee's employment with the Indian Company, and nothing contained herein will obligate the Indian Company and/or the Mauritius Company to institute, maintain or refrain from changing, amending or discontinuing any benefit plan, practice, policy or program.

d) <u>Clawback</u>. The Employee agrees that the compensation and benefits provided under this Agreement will be subject to forfeiture, cancellation, recoupment or clawback as required by applicable laws, government regulations and stock exchange requirements. The Employee further agrees that any incentive compensation paid or payable under this Agreement (including any Variable Pay) will be subject to forfeiture, cancellation, recoupment or clawback in accordance with the terms of applicable law or the U.S. Dodd Frank Wall Street Reform and Consumer Protection Act (the **"Dodd- Frank Act")** and rules and regulations thereunder in the event the Indian Company or Mauritius Company is required to restate its financial statements, regardless of whether the Indian Company is then subject to the Dodd-Frank Act. For the avoidance of doubt, the Employee's agreement to claw back under this Section 2(e) will not apply to restatements of the Indian Company's



financial statements due to acts, omissions or events that occurred prior to the Effective Date.

e) <u>Vacation</u>. The Employee will be entitled to paid vacation in accordance with the policy as applicable to other Employee officers of the Indian Company and/or the Mauritius Company, with the timing and duration of specific days off mutually and reasonably agreed to by the Parties.

f) <u>Expenses</u>. The Indian Company will reimburse the Employee for reasonable business related travel, entertainment or other expenses incurred by the Employee in the furtherance of or in connection with the performance of the Employee's duties hereunder, in accordance with Indian Company's expense reimbursement policy for Employee officers of Indian Company in effect from time to time.

**3. <u>Severance.</u>**

a) <u>Termination other than for Cause</u>. The Indian Company or the Mauritius Company is, subject to the terms of this Agreement, entitled to terminate the employment of the Employee for any reasons whatsoever, by providing the Termination Notice. If after completion of 1 year of employment, the Indian Company or the Mauritius Company terminates the Employee's employment other than for Cause, subject to the provisions of Section 4 and applicable law and regulation, the Employee will be entitled to i) the Fixed Pay due but unpaid to him and (ii) pro rata Variable Pay approved by the Mauritius Company Board based on evaluation of the performance of the Employee; and (iii) benefits to which the Employee is entitled under applicable laws and pursuant to any benefit plans of the Companies as of the Termination Date (except any severance plan); and (iv) reimbursement of business expenses for which the Employee is entitled to reimbursement under Section 2(f) but for which Employee has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(a). If Employee's employment is terminated prior to expiry of 12 months from the Effective Date by the Indian Company or the Mauritius Company due to the Indian Company being declared insolvent or due to a change of control (defined as CDPQ & Omers collective, direct and indirect shareholding going below 50.1% in the Indian and Mauritius Company), subject to the provisions of Section 4 and applicable law and regulation, the Employee will be entitled to Fixed Salary which remains unpaid during the period of 12 months from the Effective Date.

Other than the foregoing, the Indian Company or the Mauritius Company shall not have any further obligation to the Employee. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Employee shall be obligated to provide the Indian Company or the Mauritius Company invoices of all business expenses incurred within 10 days of Termination Date.

b) <u>Termination for Cause:</u> The Company is at all times entitled to terminate the employment of the Employee for Cause, immediately, and without complying with the notice requirements set out in this Agreement. If during the Term (including any Notice Period), the Indian Company or the Mauritius Company terminates the Employee's employment for Cause, the Employee shall not be entitled to receive any payments, except to the extent mandated by law. It is clarified that any amounts/benefits that are provided for only under

 

the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to Variable Pay), will not be payable. Any amount so payable shall be paid (less applicable withholdings) within 45 days from the Termination Date.

c) <u>Cessation of employment due to resignation by the Employee</u>. The Employee is, subject to the terms of this Agreement, entitled to resign from the employment for any reasons whatsoever, by providing the Termination Notice. If during the Term, the Employee resigns from employment for any reason whatsoever, subject to the provisions of applicable law and regulation, the Employee will be entitled to: (i) the Fixed Pay due but unpaid to him; (ii) vested benefits to which the Employee is entitled under applicable laws and pursuant to any benefit plans as of the Termination Date (except any severance plan), subject to the Employee serving the Notice Period; and (iii) reimbursement of business expenses for which the Employee is entitled to reimbursement under Section 2(i) but for which Employee has not been reimbursed as of the Termination Date and for which invoices have been provided in accordance with this Section 3(c). Other than the foregoing, the Indian Company or the Mauritius Company shall not have any further obligation to the Employee. It is clarified that these aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date, provided that the Employee shall be obligated to provide the Indian Company or the Mauritius Company invoices of all business expenses incurred within 10 days of Termination Date. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, Variable Pay), will not be payable.

d) <u>Exclusive Remedy</u>. In the event of a termination of the Employee's employment with the Indian Company or the Mauritius Company, the provisions of this Section 3 are intended to be and are exclusive and in lieu of any other rights or remedies to which the Employee or the Indian Company or the Mauritius Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement.

**4.** **<u>Conditions to Receipt of Severance: No Duty to Mitigate.</u>**

a) <u>Separation Agreement and Release of Claims</u>. The Employee acknowledges and agrees that (i) the Company's payment of the severance compensation detailed in Section 3, will be deemed to constitute a full settlement and discharge of any and all obligations of the Companies and their Affiliates to the Employee arising out of this Agreement, the Employee's employment with the Companies and their Affiliates and/or the termination of the Employee's employment with the Companies and their Affiliates; and (ii) upon payment of the severance compensation detailed in Section 3, the Company will stand discharged of all obligations towards the Employee, and the Employee shall, automatically and without any further action, be deemed to have fully and unqualifiedly released Indian Company and the Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities. The Employee further acknowledges and agrees that as a condition precedent to receiving any of the severance compensation detailed in Section 3, the Employee will execute, deliver to the Companies, and not revoke a release agreement, in a form prepared by, and satisfactory to, the Indian Company and the Mauritius Company (the "**Employee Release Agreement**", key parameters of which have been set out in Schedule l) pursuant to which the Employee will release and waive, to the fullest extent permitted by law, all claims against the Indian Company and the Mauritius Company, their Affiliates, and all of their



present and/ or former owners, officers, directors, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities, including, without limitation, all claims arising out of this Agreement, the Employee's employment with Companies and/or their Affiliates, and/or the termination of Employee's employment with the Companies and/or their Affiliates. The severance compensation described in Section 3 is in lieu of any severance benefits under any severance policy or plan the Indian Company and the Mauritius Company may have now or in the future, and the Employee acknowledges that the Employee is not entitled to any other severance benefits and the Employee further undertakes to timely execute the Employee Release Agreement.

b) <u>Confidential Information. Non-solicitation. and Non-Competition.</u> The receipt of any severance compensation pursuant to Section 3 will be subject to the Employee not violating the provisions of Sections 5 and 6. In the event the Employee breaches the provisions of Sections 5 and 6, all payments and benefits to which the Employee may otherwise be entitled pursuant to Section 3 will immediately cease, to the extent permissible under law.

c) <u>No Duty to Mitigate</u>. Except as expressly provided herein, the Employee shall not be required to seek other employment or otherwise mitigate the amount of any payments to be made by the Companies pursuant to this Agreement. Except as otherwise provided herein, the payments provided pursuant to this Agreement shall not be reduced by any compensation earned by the Employee as the result of employment by another employer after the termination of the Employee's employment or otherwise.

**5.** **<u>Non-Disclosure of Confidential Information.</u>**

a) <u>Confidential Information</u>. For purposes of this Agreement, the term **"Confidential Information"** means any and all of the Group's trade secrets, confidential and proprietary information and all other nonpublic information and data of or about the Group and its business, including, without limitation, lists of customers, information pertaining to customers, marketing plans and strategies, information pertaining to suppliers, pricing information, engineering and technical information, software codes, cost information, data compilations, research and development information, business plans, financial information, personnel information, information received from third parties that the Group has agreed to keep confidential, and information about prospective customers or prospective products and services, whether or not reduced to writing or other tangible medium of expression, including, without limitation, work product created by the Employee in rendering services for the Group; provided, however, that "Confidential Information" shall not include information that: (i) is or becomes generally available to the public by use, publication or the like, through no fault of the Employee; (ii) is obtained without restriction by the Employee after termination of the Employee's employment with the Companies from a third party who had the legal right to disclose such information to the Employee; (iii) the Employee possessed prior to the Employee's employment with the Companies; or (iv) is independently developed by the Employee without the use of any of the Group's Confidential Information after the termination of his employment with the Companies.

b) <u>Non-Disclosure Obligations.</u> During the Employee's employment with the Companies and thereafter, the Employee will not use or disclose to others any of the Confidential



Information, except: (i) in the course of the Employee's work for and on behalf of the Group, (n) with the prior written consent of the Companies, (iii) as required by law or judicial process, provided the Employee promptly notifies the Companies in writing of any subpoena or other judicial request for disclosure involving Confidential Information or trade secrets, and cooperates with any effort by the Group to obtain a protective order preserving the confidentiality of the Confidential Information or trade secrets, or (iv) in connection with reporting possible violations of law or regulations to any governmental agency or from making other disclosures protected under any applicable whistleblower laws. The Employee agrees that the Group owns the Confidential Information and the Employee has no rights, title or interest in any of the Confidential Information. Additionally, the Employee will abide by Indian Company's and the Mauritius Company's policies protecting the Confidential Information, as such policies may exist from time to time. At the Indian Company's or the Mauritius Company's request or upon termination of the Employee's employment with the Companies for any reason, the Employee will immediately deliver to the Companies any and all materials (including all copies and electronically stored data) containing any Confidential Information in the Employee's possession, custody or control. Upon termination of the Employee's employment with the Companies for any reason, the Employee will, if requested by the Companies, provide the Companies with a signed written statement disclosing whether the Employee has returned to the Companies all materials (including all copies and electronically stored data) containing any Confidential Information previously in the Employee's possession, custody or control.

c) <u>Whistleblower Laws</u>. Notwithstanding anything herein or in any other agreement with or policy (including without limitation, any code of conduct or the manual) of Indian Company or the Mauritius Company, nothing herein or therein is intended to or shall: (i) prohibit the Employee from making reports of possible violations of: (A) U.S. federal law or regulation (even if the Employee participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes- Oxley Act of 2002 or of any other whistleblower protection provisions of U.S. state or federal law or regulation; and (B) Indian law or regulation (even if the Employee participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of the Whistle Blowers Protection Act, 2014 or of any other whistleblower protection provisions of any applicable Indian law or regulation; (ii) require notification to or prior approval by the Indian Company and the Mauritius Company of any such reporting or cooperation; or (iii) result in a waiver or other limitation of the Employee's rights and remedies as a whistleblower, including to a monetary award. Notwithstanding the foregoing, the Employee is not authorized (and the above should not be read as permitting the Employee) to disclose communications with counsel that were made for the purpose of receiving legal advice or that contain legal advice or that are protected by the attorney work product or similar privilege. Furthermore, the Employee will not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made (X) in confidence to a U.S. federal, state or local government official, either directly or indirectly, or to an attorney, in each case, solely for the purpose of reporting or investigating a suspected violation of U.S. law or (Y) in a complaint or other document filed in a lawsuit or proceeding, if such filings are made under seal.

d) <u>Survival of Non-Disclosure Obligations.</u> The Employee's confidentiality/non-disclosure obligations under this Agreement continue after the termination of Employee's employment with the Companies. With respect to any particular trade secret information,



Employee's confidentiality/non-disclosure obligations will continue as long as such information constitutes a trade secret under applicable law. With respect to any particular Confidential Information that does not constitute a trade secret, the Employee's confidentiality/non-disclosure obligations will continue as long as such information remains confidential, and will not apply to information that becomes generally known to the public through no fault or action of the Employee or others who were under confidentiality obligations with respect to such information.

6.  **<u>Non-Solicitation and Non-Competition.</u>**

   a)   <u>Non-Competition</u>. During the Term and the "Non-Compete Time Period" *(as defined in this Agreement),* the Employee will not within the "Restricted Geographic Area" *(as defined in this Agreement)* engage in (including, without limitation, being employed by, working for, or rendering services to) any "Competitive Business" *(as defined in this Agreement)* in any "Prohibited Capacity" *(as defined in this Agreement).* Notwithstanding the foregoing, if the Competitive Business has multiple divisions, business units, lines or segments, some of which are not competitive with the business of the Group, nothing herein will prohibit the Employee from being employed by, working for or assisting any division, business unit, line or segment of such Competitive Business that is not competitive with the business of the Group. This can be waived off by mutual consent of both parties.

   b)   <u>Customer Restrictions.</u> During the Term and the "Restricted Time Period", the Employee will not sell, market or provide, attempt to sell, market or provide, or assist any Person in the sales, marketing or provision of, any "Competing Service/Product" *(as defined in this Agreement)* to any of the Group's Customers (excluding any governmental agencies / authorities which are the Group's Customers or existing customer of the new organization) with respect to whom, at any time during the Employee's employment with the Companies, the Employee had any business contact on behalf of the Group, the Employee had any relationship, business development, sales, service or account responsibility (including, without limitation, any supervisory or managerial responsibility) on behalf of the Group, or the Employee had access to, or gained knowledge of, any Confidential Information concerning the Group's business with such customer, or otherwise solicit or communicate with any such customers for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting in any Person in the sales, marketing or provision of, any Competing Service/Product.

   c)   <u>Non-Interference with Contractors, Vendors, or Other Relationships</u>. During the Restricted Time Period, the Employee will not urge, induce or seek to induce any of the Group's independent contractors, subcontractors, business partners, distributors, brokers, consultants, sales representatives, customers, referral sources, vendors, suppliers or any other Person with whom the Group has a business relationship to terminate their relationship with, or representation of, the Group or to cancel, withdraw, reduce, Limit or in any manner modify any such Person's business with, or representation of, the Group.

   d)   <u>Restrictions</u>. During the "Restricted Time Period", the Employee will not: (i) solicit for employment, hire, employ, engage the services of, or attempt to hire, employ, or engage the services of, any individual who is an employee of the Group; (ii) assist any Person in the recruitment, hiring or engagement of any individual who is an employee of the Group; (iii) urge, induce or seek to induce any individual to terminate his/her employment with



the Group; or (iv) advise, suggest to or recommend to any Competitive Business that it employ, engage the services of, or seek to employ or engage or engage the services of any individual who is an employee of the Group.

e) For purposes of this Agreement: (i) "Non-Compete Time Period" means 6 months after the Termination Date; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties; and (ii) "Restricted Time Period means 3 years after the Termination Date"; provided that this period may be extended by such additional period as mutually agreed in writing between the Parties.

7. **Assignment:** This Agreement will be binding upon and inure to the benefit of: (a) any Successor of the Indian Company or the Mauritius Company; and (b) to the heirs, executors and legal representatives of the Employee upon the Employee's death as it relates to the severance compensation specified in Section 3. Any such successor of the Indian Company or the Mauritius Company will be deemed substituted for the Indian Company or the Mauritius Company under the terms of this Agreement for all purposes. For this purpose, "Successor" means any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Indian Company or the Mauritius Company. None of the rights of the Employee to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance or other disposition of the Employee's right to compensation or other benefits will be null and void.

8. **Notices.** Except as may be otherwise provided herein, all notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and signed by or on behalf of the Party giving it. Such notice shall be served by sending it or by delivering by hand, mail or courier to the address set forth below. In each case it shall be marked for the attention of the relevant Party set forth below. Any notice so served shall be deemed to have been duly given (i) in case of delivery by hand, when hand delivered to the other Party; or (ii) when sent by mail, where 7 (seven) business days have elapsed after deposit in the mail with certified mail receipt requested postage prepaid; or (iii) when delivered by courier on the second business day after deposit with an overnight delivery service, postage prepaid, with next business day delivery guaranteed, provided that the sending Party receives a confirmation of delivery from the delivery service provider; or (iv) for electronic mail notification with return receipt requested, upon the obtaining of a valid return receipt from the recipient.

To the **Indian Company:**

Azure Power India Private Limited

Address: 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi – 110017
Attn: Chairman, Board of Directors

To the **Mauritius Company:**

Azure Power Global Limited

Address: AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius
Attn: Chairman, Board of Directors



To the **Employee:**

To: Sugata Sircar
Address: D 1403, Palm Springs, Golf Course Rod, Sector 54, Gurugram 122011, Haryana, India

<u>**Severability.**</u> In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement will continue <u>in</u> full force and effect without said provision.

9.   <u>**Governing Law and Arbitration.**</u> The provisions of this Agreement shall, in all respects, be governed by, and construed in accordance with the laws of India. Any dispute arising out of or in connection with this Agreement, including any question regarding the existence, validity or termination of this Agreement shall be referred to and finally resolved by arbitration in accordance with the Arbitration Rules of the Singapore International Arbitration Centre (SIAC Rules), which rules are deemed to be incorporated by reference in this Section. The seat of arbitration shall be Singapore, and venue of arbitration shall be New Delhi. The arbitral tribunal shall consist one 1 (One) arbitrator, jointly appointed by the Parties. In the event that the Parties are unable to appoint such sole arbitrator, then, the Employee on one hand and the Indian Company on the other hand, will appoint 1 (One) arbitrator each, and the 2 (Two) arbitrators so appointed shall appoint the third arbitrator. The law governing this Agreement shall be Indian law. The language of arbitration shall be English. Subject to the foregoing, the Parties agree to be subject to the exclusive jurisdiction of the courts in New Delhi. Nothing herein contained shall be construed as prohibiting any of the Companies from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the Employee.

10.  <u>**Works.**</u> All work performed by the Employee and all inventions, discoveries, developments, work product, processes, improvements, creations, deliverables and all written, graphic or recorded material and works of authorship fixed in any tangible medium of expression made, created or prepared by the Employee, alone or jointly with others, during the Employee's employment with the Companies and relating to the Group's business (collectively, the **"Works")** shall be the Companies' exclusive property, shall be deemed a work made for hire, and all rights, title and interest in the Works shall vest in the Companies. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and Interest to such Works are hereby irrevocably assigned to the Companies. All Works shall belong exclusively to the Companies, and the Companies shall have the right to obtain and hold **in** their own name, any patents, copyrights, registrations or such other intellectual properly protections as may be appropriate to the subject matter. The Employee will sign documents of assignment, declarations and other documents and take all other actions reasonably required **by** the Companies, at the Companies's expense, to perfect and enforce any of its proprietary rights and to vest all right, title and interest to the Works in the Companies. This Section does not apply to an invention for which no equipment, supplies, facility, or Confidential Information of the Group was used and which was developed entirely on the Employee's own time, unless: (a) the invention relates (1) directly to the business of the Group, or (2) to the Group's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Employee for the Group. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably, absolutely and perpetually assigned to the Companies for worldwide territory. Notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, any



assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Employee, even if the Companies do not exercise the rights under the assignment within a period of one year from the date of assignment. The Employee hereby agrees to waive any right to and agrees to refrain from raising any objection or claims to the Copyright Board with respect to any assignment, pursuant to Section 19A of the Copyright Act, 1957. The Employee also waives all moral rights in relation to the Work developed or conceived by the Employee. The Employee acknowledges that the Fixed Pay payable under this Agreement is good and valuable consideration for the assignment of the Works, the sufficiency of which is hereby acknowledged.

11. **Definitions.** For purposes of this Agreement, the following terms have the following meanings, unless the context requires otherwise or unless otherwise stated.

**"Affiliate"** means any entity that directly, or indirectly through one or more intermediaries, is owned or controlled by, owns or controls, or is under common ownership or control with, the Indian Company or the Mauritius Company; for this purpose, "control" of an entity means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the entity, whether through the ownership of voting securities, by contract or otherwise.

**"Company"** means, individually, each of the Indian Company and the Mauritius Company, and **"Companies"** means, collectively, the Indian Company and the Mauritius Company.

**"Cause"** means the occurrence of one or more of the following: (i) an act of fraud or dishonesty made by the Employee against the Group in connection with the Employee's responsibilities which the Company reasonably believes will damage its business; (ii) the Employee's conviction of, or plea of no contest to, a felony (excluding traffic offenses) which the India Company Board or the Mauritius Company Board reasonably believes had or will have a detrimental effect on the reputation or business of the Indian Company or the Mauritius Company or its affiliates; (iii) the Employee's intentional or gross misconduct; (iv) the Employee's intentional improper disclosure of confidential information; (v) the Employee's continued violations of material Indian Company or the Mauritius Company policies or provisions of the Employee's agreements with the Indian Company or the Mauritius Company, including any violation of or failure to perform the Employee's reasonably assigned duties; or (vi) the Employee's failure to cooperate with the Indian Company or the Mauritius Company in any investigation or formal proceeding.

**"Competing Service/Product"** means any service or product that is similar to and competitive with any of the services/products and/or related services/products offered or provided by the Group as of the Termination Date.

**"Competitive Business"** means any company engaged in the renewable power business, wind, solar or hydro, energy storage or any other business of the Group as of the Termination Date in the Restricted Geographic Area.

**"Garden Leave"** means a Company's right to place the Employee on "garden leave" during the Notice Period. Such Company may, in its sole discretion, during the Garden Leave to: (a) suspend or terminate, in whole or in part, any powers, duties or work exercised by or provided to the Employee; (b) change the Employee's designation or duties as such Company decides appropriate; (c) prevent the Employee from contacting or communicating with any current,



former or proposed clients, customers, s, or vendors of the Group; (d) exclude the Employee from the premises of the Group; (e) announce to s, clients, customers, vendors and other relevant persons of the Group that Employee has been given notice of termination or that the Employee has resigned; and/or (f) ask the Employee to resign so such Company can appoint a new Chief Employee Officer prior to the end of the Notice Period, provided that in such event the last date of the Notice Period shall be deemed the Termination Date.

**"Group"** means any of the Companies, their subsidiaries and their Affiliates, unless the context otherwise requires.

**"Group's Customer"** or **"Group Customer"** means: (i) any Person to whom the Group is selling or providing any service or product as of the Termination Date; (ii) any Person to whom the Group provided or sold any service or product at any time during the one (1) year preceding the Termination Date; and/or (ii) any Person with whom the Group has contracted or otherwise entered into an arrangement to provide any service or product as of the time of the Termination Date.

**"Mauritius Company"** means Azure Power Global Limited, a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns.

**"Person"** means any individual or entity (including without limitation a corporation, partnership, Limited Lability company, trust, joint venture, or governmental entity or agency).

**"Prohibited Capacity"** means: (i) the same or similar capacity or function to that in which the Employee worked for the Group at any time during his employment; (ii) any Employee or officer capacity or function; (iii) any business development capacity or function; (iv) any ownership capacity (except the Employee may own as a passive investment up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market); (v) any business consulting or advising capacity of function; (vi) any director or similar capacity or function; (vii) any capacity or function in which the Employee likely would inevitably use or disclose any of the Group's trade secrets and/or Confidential Information; (viii) any capacity or function in which the customer goodwill the Employee helped to develop on behalf of the Group would facilitate or support the Employee's work for a Competitive Business; and/or (ix) any other capacity or function in which the Employee's knowledge of the Confidential Information would facilitate or assist the Employee's work for the Competitive Business.

**"Restricted Geographic Area"** means India, and each country the Group is doing business in as of the Termination Date.

12. **Integration.** This Agreement represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. This Agreement may be modified only by agreement of the Parties by a written instrument executed by the Parties that is designated as an amendment to this Agreement.



13. **Waiver of Breach.** The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

14. **Headings.** All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

15. **Tax Withholding.** All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

16. **Acknowledgment.** The Employee acknowledges that he has had the opportunity to discuss this matter with and obtain advice from his private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

17. **Counterparts.** This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*[Schedule and signature pages follow]*

**SCHEDULE 1 | KEY PARAMETERS OF EMPLOYEE RELEASE AGREEMENT**

The Employee acknowledges and agrees that as a condition precedent to receiving any portion of the severance compensation detailed in Section 3 of the Agreement, the Employee will execute, deliver to the Companies, and not revoke, the Employee Release Agreement, which will: (a) substantially contain the following terms which are acknowledged and agreed to by the Employee (upfront) at the time of signing this Agreement, and (b) be executed and delivered to the Companies (and not subsequently revoked) in a form prepared by, and satisfactory to, the Indian Company and the Mauritius Company:

(1)      The Employee confirms that all positions (including, but not limited to, all board / committee and Employee positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company and the Mauritius Company.

(2)      The Employee, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims (other than in respect of payment of amounts specifically set out in the Employee Release Agreement), and hereby acknowledges and declares that on payment by the Indian Company of the dues to the Employee in accordance with the terms of the Agreement and the Employee Release Agreement, the Employee will have no Claims against the Companies and if required execute such further documents as may be reasonably required by Companies in confirmation on payment of the amounts due. The Employee waives any future Claims whatsoever that the Employee or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, s, agents, attorneys, insurers, representatives, benefit plans and their fiduciaries, both individually and in their representative capacities, other than those in respect of payment of amounts due.

For this purpose, **'Claims'** means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, liquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers' compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu), leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies,



or to any event, act or omission that has occurred at any time up to and including the date of termination of the Employee, whether or not the Claim arises or may arise under contract, tort, equity or statute.

(3)    The Employee shall not, up to and after the date of termination, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, their officers, directors, s, business practices, plans or procedures, products, or pertaining to the Employee's tenure with the Companies or the terms of this Agreement.

(4)    The Employee agrees to take all steps, execute all documents and do all acts and things as may be reasonably required by the Companies to give effect to the transactions and matters contemplated by the Agreement and the Employee Release Agreement, and implement the provisions of the same.

(5)    In the event, at any time after the termination of employment of the Employee, it is discovered (pursuant to any internal or external / regulatory investigations) that the Employee was engaged or involved in any of the following: (a) misconduct / fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws or the Agreement or the Employee Release Agreement, or (d) misappropriation of funds / property, then the Companies shall have all rights and entitlements against the Employee, as may be available under applicable laws, and /or in equity, including the right to claim damages for breach / actions of the Employee.

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power India Private Limited**

/s/ Richard Alan Rosling
Authorized Signatory

**Name:** Richard Alan Rosling
**Designation:** Chairman

**For Azure Power Global Limited**

/s/ Richard Alan Rosling
Authorized Signatory

**Name:** Richard Alan Rosling
**Designation:** Chairman

**Signed by the Employee**

*Signature Page - Employee Employment Agreement*

**Exhibit 4.12**

### EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (the **"Agreement"**) is entered into as of April 29, 2023 (the **"Execution Date"**) by and between:

1.     **Azure Power India Private Limited,** a private limited company incorporated under the laws of India and having its office at 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017 (hereinafter referred to as the **"Indian Company",** which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns); and

2.     **Sunil K Gupta,** a citizen of Singapore having PAN **ALSPG4151H**, and residing at **11 Tanjong Rhu Road, #05-01, The Waterside, Singapore 436896** (hereinafter referred to as the **"Executive"** which expression shall unless repugnant to the meaning or context thereof, be deemed to include his legal heirs).

The Indian Company and the Executive are hereinafter collectively referred to as **"Parties"** and each individually as a **"Party".**

**WHEREAS,** the Indian Company is desirous of appointing the Executive as its Chief Executive Officer (**"CEO"**)**,** in accordance with, as well as recommending the Executive for appointment as the Chief Executive Officer of the Mauritius Company (*as defined in this Agreement),* on the terms and conditions, contained herein, and the Executive desires to be appointed as the CEO of each of the Companies (*as defined in this Agreement),* in accordance with, and on the terms and conditions, contained herein.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual provisions contained herein and for other good and valuable consideration, the adequacy and sufficiency of which is acknowledged by all Parties, the Parties agree as follows:

1. **Duties and Scope of Employment, etc.**

    (a) <u>Positions and Duties</u>.

    (i)     The Indian Company hereby agrees to employ the Executive, and the Executive agrees to be employed by the Indian Company, in accordance with the terms and conditions of this Agreement from the **"Effective Date"** of 10th July, 2023 (or such earlier date as agreed between the Indian Company and the Executive in writing), subject to completion of satisfactory background checks, to the sole satisfaction of each of the India Company Board and Mauritius Company Board. Based on the recommendation of the India Company Board, commencing from the Effective Date, the Mauritius Company shall employ the Executive, and the Executive agrees to be employed by the Mauritius Company, in accordance with the terms and conditions of this Agreement. The Executive will serve as the CEO of the Indian Company and Mauritius Company, and in such additional positions, including as a member of the board of directors of a Group entity, as the Indian Company and/ or Mauritius Company may designate from time to time. The employment of the Executive with the Indian Company and the Mauritius Company shall be co-terminus.

    (ii)     In his capacity as the Indian Company's and Mauritius Company's CEO, the Executive will: (a) report to the Indian Company's Board of Directors ("**India Company Board**") and the Mauritius Company's Board of Directors ("**Mauritius Company Board**"); (b) perform such duties and responsibilities normally attendant to such positions and such other additional and different duties as the relevant Company may from time to time assign which are consistent with the Executive's position, as are lawfully directed by the

Board of the Indian Company and / or the Mauritius Company, as the case may be; and (c) act in compliance with the Indian Company's and Mauritius Company's constituent documents, applicable law and regulations, and any directives or policies established by the India Company Board and Mauritius Company Board.

(iii) The Executive's principal place of employment shall be at the Indian Company's corporate office in Delhi, India.

(b) <u>Employment Term</u>.

(i) The term of employment (the "**Term**") of the Executive shall commence on and from the Effective Date and end upon the effective date of his termination or resignation from employment with the Company (the **"Termination Date"**)

(ii) For the avoidance of doubt:

(1) the effective date of termination or resignation (other than for "Cause" *(as defined in this Agreement))* shall be the last day of the applicable required notice period provided for in this Agreement or such other period which may be mutually agreed between the Executive and the Indian Company, subject to the provisions of Section 1(c) below; and

(2) the effective date of termination for Cause *(as defined in this Agreement)* shall be as determined by the Indian Company, in its sole and exclusive discretion.

(iii) The employment of the Executive by Indian Company and Mauritius Company and directorship with any Group, entity is co-terminus, and his termination as an employee of one Company or as a director of any Group entity, will automatically be deemed to be his termination of employment by the other Company and termination of his directorship with any Group entity unless the Parties otherwise agree in writing.

(c) <u>Notice</u>. Each Party agrees to provide the other with ninety (90) days' notice, or such other notice period as mutually agreed between the Parties in writing **("Notice Period"),** prior to terminating this Agreement for reasons other than "Cause" *(as defined below)* **("Termination Notice").** The Indian Company may, in its sole and exclusive discretion: (i) place the Executive on "Garden Leave" (as defined in this Agreement) for up to the duration of the Notice Period; or (ii) in lieu of providing notice within the prescribed period, satisfy its Notice Period obligation under this Section, by providing the Executive with the equivalent of ninety (90) days' of the Executive's Fixed Pay (as defined in this Agreement). The Executive shall have no right to satisfy the Notice Period obligations by providing the Indian Company with any consideration, unless agreed in writing by the Indian Company, in which case the Indian Company shall also have the right to seek payments in lieu of the Notice Period, equivalent to ninety (90) days' of the Executive's Fixed Pay (as defined in this Agreement). It is clarified that the Indian Company or Mauritius Company shall be entitled to terminate the Executive's employment for Cause, immediately, without any notice requirements.

(d) <u>Executive Position</u>. During the Term, the Executive's position will be CEO of the Indian Company and Mauritius Company or in such other additional position or positions as the Indian Company and/ or Mauritius Company may designate from time to time. The Executive will have such duties, authorities and responsibilities as are commensurate with his position. All of the Executive's duties, responsibilities and powers with respect to the Indian Company and Mauritius Company, will, at all times, be subject to the order, direction and supervision of the Chairperson of the India Company Board or Mauritius Company Board (as

the case may be) and or any other designee, who is a non-executive member of the India Company Board or Mauritius Company Board (as the case may be), as the India Company Board or Mauritius Company Board (as the case may be) may determine.

During the Executive's employment with the Company, the Executive (without prejudice to Section 6):

(i)     will devote his full vocational time and best efforts to the furtherance of the business of the "Group" *(as defined in this Agreement)* on a full-time basis;

(ii)    will exercise the highest standards of conduct in the performance of his duties;

(iii)   will comply with all applicable laws and regulations;

(iv)    will not, except as noted herein or as required for furtherance of the Executive's duties with the Group, engage in any other business activity (other than Passive Investments), whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the express written consent of the India Company Board and Mauritius Company Board, which consent shall be at the sole discretion of each of the India Company Board and Mauritius Company Board;

(v)     will not engage, directly or indirectly, in any activity, employment or business venture (other than Passive Investments), whether or not for remuneration, that is competitive, same or similar with the Indian Company or the Mauritius Company's business in any respect or make any preparations to engage in any competitive activities;

(vi)    will not take any action or make any omission that deprives the Group of any business opportunities or otherwise act in a manner that conflicts with the best interest of the Group or is detrimental to the business of the Group; and

(vii)   will not accept any appointment / nomination, or be appointed / nominated, on the board of directors or other governing body of any body corporate (other than in respect of the Group, as specifically required by the Indian Company or the Mauritius Company in connection with the Executive's employment), without the express written consent of the India Company Board and Mauritius Company Board, which consent shall be at the sole discretion of each of the India Company Board and Mauritius Company Board.

If the Executive wishes to engage in an outside activity not expressly permitted under the terms of this Section, the Executive shall first propose such activity to each of the India Company Board and Mauritius Company Board for its determination as to whether such activities are permissible. Even if the India Company Board and Mauritius Company Board consent to the Executive's engagement in an outside activity, the India Company Board and / or Mauritius Company Board shall have the right to revoke its consent at any time, and upon notice to the Executive of such revocation of consent, the Executive shall terminate such outside activity at the earliest practicable opportunity.

It is clarified that for the purposes of the above, the term "Passive Investment" shall mean:

(i)     ownership of up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market; or

(ii)    ownership of unlisted securities of a company of less than 50% (on a fully diluted basis), subject to: (A) the Executive not having the right or ability to control or influence the management or decisions (directly or indirectly) of such company, (B) the Executive not having any rights to appoint a nominee, or any right to being appointed, on the board of

such company, and (C) the Executive not having any other role in such company, except that of a shareholder holding minority shares in such company.

(e) <u>Representations and Warranties by the Executive</u>. The Executive's employment with the Companies is conditioned on the Executive's representations and warranties to the Indian Company and Mauritius Company that:

(i) he is not disqualified or prevented from acting as the CEO of the Indian Company and the Mauritius Company under applicable law or regulation;

(ii) he is not disqualified or prevented from acting as a director of the Indian Company or the Mauritius Company under applicable law or regulation;

(iii) his execution, delivery and performance of his duties under this Agreement will not violate, conflict with, result in a breach of the terms, conditions or provisions of, result in the creation of any encumbrances or constitute a default (or an event that, with the giving of notice or lapse of time or both, would constitute a default) or an event creating rights of acceleration, modification, termination, cancellation or a loss of rights under any contract to which the Executive is a party, including any noncompete or non-solicitation agreement or obligation, any approval, order, judgment, decree or award to which the Executive is a party or by which he is bound or any law applicable to the Executive; and

(iv) this Agreement has been duly and validly executed by the Executive and upon execution and delivery, this Agreement will constitute, legal, valid and binding obligations of the Executive, enforceable against him in accordance with its terms.

(f) <u>Indemnification of the Executive.</u> The Executive shall be indemnified, defended and kept harmless against any legal, criminal or regulatory proceedings due to events and actions by Companies' officers and directors that occurred prior to the Effective Date. The Company shall provide the Executive with all assistance if a claim is brought against the Executive due to any such prior events, including reimbursing the Executive for legal costs which are reasonably necessary to defend the Executive against such claims.

2. **Compensation.**

(a) <u>Fixed Pay</u>. During the Term, the Indian Company will pay the Executive the salary set forth in the table below as compensation for his services (the **"Fixed Pay"**). The Fixed Pay will be paid monthly in accordance with the Indian Company's normal payroll practices and be subject to the usual applicable withholdings.

| Period | Salary |
|---|---|
| From the Effective Date till (including) March 31, 2024 | Annual salary of INR 4,50,00,000 (the **"Initial Fixed Pay"**) |
| For the period after March 31, 2024 | To be determined by the India Company Board based on the outcome of the annual performance review process |

(b) Variable Pay.

(i) In addition to the Fixed Pay, with respect to each completed fiscal year of the Indian Company during the Term, the Executive shall be eligible to earn a variable pay which may range from NIL to 50% of the Fixed Pay for such fiscal year (the "**Variable Pay**").

The actual amount of Variable Pay will be determined by the India Company Board, and based on the achievement of annual individual and Company level performance objectives established by the India Company Board, subject to: (x) the Executive's continuing employment with the Companies through the applicable declaration date for any such Variable Pay, and (y) the Executive's employment not having been terminated for Cause.

(ii)     In accordance with the above, the Variable Pay for each fiscal year as determined as being payable as of March 31 of the fiscal year ("**Relevant FY for Variable Pay**"), shall be paid as follows:

(A)     67% of the Variable Pay for Relevant FY for Variable Pay will be paid by June 15 of the fiscal year immediately succeeding the Relevant FY for Variable Pay;

(B)     The balance Variable Pay for the Relevant FY for Variable Pay (**"Deferred Variable Pay"**) shall be paid in three equal installments with the salary payout for the month of April of the three calendar years immediately succeeding the calendar year referred in (I) above.

**By way of illustration:**

*Payment of the Variable Pay for the fiscal year ending March 31, 2024 ("FY 23-24", being the Relevant FY for Variable Pay in this illustration) will be as follows.*

•     67% of the Variable Pay for FY 23-24 shall be payable by June 15, 2024;

•     11% of the Variable Pay for FY 23-24 shall be payable along with the payment of the Executive's salary for the month of April 2025;

•     11% of the Variable Pay for FY 23-24 shall be payable along with the payment of the Executive's salary for the month of April 2026;

•     11% of the Variable Pay for FY 23-24 shall be payable along with the payment of the Executive's salary for the month of April 2027.

The individual performance objectives used in determining Variable Pay for a fiscal year will be established by the Indian Company prior to the commencement of the fiscal year to which the Variable Pay relates.

For the fiscal year ending on March 31, 2024 only, the Executive's minimum Variable Pay shall be 35% of the of Fixed Pay. It being clarified that, Variable Pay (including the aforementioned minimum Variable Pay) for the fiscal year ending on March 31, 2024 shall be *prorated* for the period from the Effective Date through March 31, 2024.

(iii)     In the event the Executive's employment is terminated for (A) reasons other than for Cause, or (B) if the Executive resigns from employment, *then* only the portion of the Deferred Variable Pay for the fiscal year(s) prior to the date of such termination which has not yet been paid to the Executive, shall be paid to the Executive.

(c)     Long Term Incentive Compensation.

(i)     The Executive shall, be entitled to long term incentive compensation (the "**Long Term Incentive Compensation**" or "**LTIC**") of an amount of up to INR 20,00,00,000 payable as below (less any applicable withholdings). The payment of LTIC shall at all times be subject to (x.) the Executive's continuing employment with the Companies through the

applicable payment date for any such LTIC (in the manner contemplated herein), and (y) the Executive's employment not having been terminated nor the Executive being placed on Garden Leave or the Notice Period on or prior to April 1, 2028.

The LTIC which is determined as receivable by the Executive (per this Section 2(c)) shall be payable in tranches as below:

(A)   INR 1,33,00,000 of the LTIC shall be paid along with the payment of the Executive's salary for the month of April 2026

(B)   INR 2,67,00,000 of the LTIC shall be paid along with the payment of the Executive's salary for the month of April 2027;

(C)   up to INR 16,00,00,000, determined as per 2(c)(ii) shall be paid along with the payment of the Executive's salary for the month of April 2028.

(ii)   The amount of LTIC payable to the Executive shall be determined solely by the India Company Board and depend upon (a) the target annual EBITDA and the target Adjusted Return on Capital Employed, which targets shall be determined by the India Company Board and (b) the Executive meeting the Key Performance Parameters set by India Company Board. For the purpose of this Section, 'Adjusted Return on Capital Employed' shall be calculated as the Annualized EBITDA divided by the total sum of invested equity and gross debt and, for purposes of this Agreement, shall be computed on the basis of the Adjusted Return on Capital Employed in the immediately three preceding financial years.

(iii)   The LTIC may be paid (at the sole discretion of the Companies) in cash or stock. In the event LTIC is paid in stock, then the following would be applicable:

(A)   In case the Mauritius Company is not listed on any stock exchange, through cash payment of LTIC amount (less any applicable withholdings) by the Indian Company as per the timelines specified in Section 2(c)(i) above;

(B)   In case the Mauritius Company is listed on any stock exchange, through issuance or transfer of common shares of the Mauritius Company (**"Common Stock"**) for the value of LTIC. In this regard, the value of Common Stock shall be calculated based on the '90 trading day's VWAP' (**"Issuance Price"**). Herein, '90 trading day's VWAP' means:

The number mathematically computed by:

(X)   Multiplying: (i) the closing price of the Common Stock, as reported in Bloomberg or such other source as the India Company Board (on recommendation from Mauritius Company Board) deems reliable, for each of the 90 trading days immediately prior to date of grant of the relevant LTIC, (ii) the trading volume of the Common Stock, as reported in Bloomberg or such other source as the India Company Board (on recommendation from Mauritius Company Board) deems reliable, for each such trading day;

(Y)   determining the sum of the product of (X) above for such 90 trading day period; and

(Z)   dividing such sum by the cumulative trading volume, which is the sum of the trading volume of the Common Stock for each trading day in such 90 trading day period.

***LTIC in case of delisting subsequent to award of LTIC:***

(C) In case any Common Stock is awarded to the Executive in accordance with this Section 2(c) while the Mauritius Company is listed but, prior to issuance/ transfer of Common Stock, the Mauritius Company delists, then the award shall be paid in cash.

(D) In case any Common Stock is already issued or transferred to the Executive in accordance with Section 2(c)(iii)(B) above, and subsequently the Mauritius Company ceases to be listed on any stock exchange, then the Executive shall transfer such Common Stock to the Mauritius Company as part of its delisting process, and the price paid to the Executive for such Common Stock shall be a function of: the delisting price paid by the Mauritius Company to its shareholders at the time of delisting multiplied by the number of Common Stock then held by the Executive, *less* any applicable withholdings, by the Indian Company. It is clarified that at the time of such delisting, the Executive shall mandatorily sell/ transfer, and the Executive hereby undertakes to sell/ transfer such Common Stock to the Mauritius Company.

(iv) Solely, in case of a Cessation For Valid Reason on or prior to April 1, 2028, the Executive shall be entitled to receive accelerated LTIC which shall be computed as below and payable in accordance with the provisions of Section 3 and Section 4 of this Agreement. The amount of LTIC payable to the Executive shall be determined solely by the India Company Board in accordance with Section 2(c)(ii) above.

LTIC Entitlement = (A * B * C) / 57

where,

A = a percentage, arrived at by calculating the average of the percentages of maximum Variable Pay entitlement that the Executive actually received every year until the Cessation For Valid Reason.

B = INR 20,00,00,000 less any amount already received by the Executive pursuant to Section 2(c)(i)(A) or Section 2(c)(i)(B).

C = Lower of (i) Number of months completed by the Executive in employment with the Company until the date of Cessation For Valid Reason *plus twelve*; or (ii) 57 months.

(d) <u>Sign on bonus/ Compensatory Bonus:</u>

(i) The Executive shall additionally be entitled to receive an additional bonus of INR 50,00,000 ("**Compensatory Bonus**"), calculated in accordance with this Agreement, and payable by the Indian Company simultaneously with the payment of the first Variable Pay component payable to the Executive in furtherance of Section 2 (b) (ii) (A) as compensation for relinquishment of annual bonus entitlement by the Executive's as part of his previous employment.

(ii) Parties acknowledge that the payment of the Compensatory Bonus is purely as an additional incentive payment and shall not be construed as payment for any services provided by the Executive to Indian Company or Mauritius Company or payment for any goods exchanged.

(e) <u>Other</u>. During the Term, for so long as the Executive meets the eligibility requirements of the applicable plan, practice, policy or program of Indian Company and/ or Mauritius Company:

(i)     except as specifically provided herein, the Executive shall be entitled to participate in all savings and retirement plans, practices, policies and programs of Indian Company and/ or Mauritius Company that are made available generally to other executive officers of Indian Company and/ or Mauritius Company, and

(ii)    except as specifically provided herein, the Executive and/or the Executive's family, as the case may be, shall be entitled to participate in, and shall receive all benefits under, all welfare benefit plans, practices, policies and programs (including Indian Company and/ or Mauritius Company's health insurance and disability plans) provided by Indian Company and/ or Mauritius Company that are made available to other executive officers of Indian Company and/ or Mauritius Company (for the avoidance of doubt, such plans, practices, policies or programs shall not include any plan, practice, policy or program which provides benefits in the nature of severance or continuation pay).

Each of the Indian Company and Mauritius Company may change, amend or discontinue any of its employee benefit plans, practices, policies and programs at any time during the Executive's employment with the Indian Company or Mauritius Company, and nothing contained herein will obligate the Indian Company and/ or Mauritius Company to institute, maintain or refrain from changing, amending or discontinuing any employee benefit plan, practice, policy or program.

(f)    <u>Clawback</u>. The Executive agrees that the compensation and benefits provided under this Agreement will be subject to forfeiture, cancellation, recoupment or clawback as required under this Agreement, by applicable laws, government regulations or stock exchange requirements. The Executive further agrees that any incentive compensation paid or payable under this Agreement (including any Variable Pay and Long Term Incentive Compensation) will be subject to forfeiture, cancellation, recoupment or clawback in accordance with the terms of applicable law or the U.S. Dodd Frank Wall Street Reform and Consumer Protection Act (the **"Dodd- Frank Act"**) and rules and regulations thereunder in the event the Indian Company or Mauritius Company is required to restate its financial statements, regardless of whether the Indian Company or Mauritius Company is then subject to the Dodd-Frank Act.

(g)    <u>Vacation</u>. The Executive will be entitled to paid vacation in accordance with the policy as applicable to other executive officers of the Indian Company and/or Mauritius Company (as may be determined by the India Company Board), with the timing and duration of specific days off mutually and reasonably agreed to by the Parties.

(h)    <u>Expenses</u>. The Indian Company will reimburse the Executive for reasonable business related travel, entertainment or other expenses incurred by the Executive in the furtherance of or in connection with the performance of the Executive's duties hereunder, in accordance with Indian Company's expense reimbursement policy for executive officers of Indian Company and/or Mauritius Company in effect from time to time (as may be determined by the India Company Board).

3.    **<u>Severance</u>**.

(a)    <u>Termination other than for Cause</u>. The Indian Company or the Mauritius Company is, subject to the terms of this Agreement, entitled to terminate the employment of the Executive for any reasons whatsoever, by providing the Termination Notice. If during: the Term (excluding the Notice Period) the Indian Company or Mauritius Company terminates the Executive's employment other than for Cause, subject to the provisions of Section 4 and applicable law and regulation, the Executive will be entitled to:

(i)    Fixed Pay due but unpaid (including any specific entitlement during the Notice Period in

accordance with Section 1(c) above);

(ii)    subject to the other provisions of this Agreement, the Deferred Variable Pay as set out in Section 2(b)(iii) of this Agreement;

(iii)    vested benefits to which the Executive is entitled under applicable laws and pursuant to any employee benefit plans of the Companies as of the Termination Date, subject to the Executive serving the Notice Period; and

(iv)    reimbursement of business expenses for which the Executive is entitled to reimbursement under Section 2(h) but for which Executive has not been reimbursed as of the Termination Date and for which invoices have been provided within 10 days of Termination Date.

Other than the foregoing, the Indian Company and the Mauritius Company shall not have any further obligation to the Executive. Subject to Section 4 below, the aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date. It is further clarified that upon such termination the Executive will not be entitled to, and shall automatically (without any further actions) relinquish all claims to, LTIC such that no further amounts are payable to the Executive in respect of LTIC, except solely in the case of a Cessation for Valid Reasons, where the Executive would be entitled to the LTIC as provided under Section 2(c)(iv).

(b)    <u>Termination for Cause</u>: The Indian Company or the Mauritius Company is at all times entitled to terminate the employment of the Executive for Cause, immediately, and without complying with the notice requirements set out in this Agreement. If during the Term (including any Notice Period), the Indian Company or Mauritius Company terminates the Executive's employment for Cause, the Executive shall not be entitled to receive any payments, except to the extent mandated by law. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, LTIC and Variable Pay), will not be payable. Subject to Section 4 below, any amount so payable shall be paid (less applicable withholdings) within 45 days from the Termination Date.

(c)    <u>Cessation of employment due to resignation by the Executive</u>. The Executive is, subject to the terms of this Agreement, entitled to resign from the employment for any reasons whatsoever, by providing the Termination Notice. If during the Term, the Executive resigns from employment for any reason whatsoever, subject to the provisions of applicable law and regulation, the Executive will be entitled to:

(i)    the Fixed Pay due but unpaid to him (including any specific entitlement during the Notice Period in accordance with Section 1(c) above);

(ii)    vested benefits to which the Executive is entitled under applicable laws and pursuant to any employee benefit plans as of the Termination Date (except any severance plan), subject to the Executive serving the Notice Period;

(iii)    reimbursement of business expenses for which the Executive is entitled to reimbursement under Section 2(i) but for which Executive has not been reimbursed as of the Termination Date and for which invoices have been provided within 10 days of the Termination Date; and

(iv)    subject to the other provisions of this Agreement, the vested Deferred Variable Pay as set out in Section 2(b)(iii) of this Agreement.

Other than the foregoing, the Indian Company and the Mauritius Company shall not have any further obligation to the Executive. Subject to Section 4 below, the aforementioned amounts shall be paid (less applicable withholdings) within 45 days from the Termination Date. It is clarified that any amounts/benefits that are provided for only under the terms of employment or the policies of the Companies and are not mandated by law (such as, but not limited to, LTIC), will not be payable except solely in the case of a Cessation for Valid Reasons, where the Executive would be entitled to the LTIC as provided under Section 2(c)(iv).

(d) <u>Exclusive Remedy</u>. In the event of a termination of the Executive's employment with the Indian Company or Mauritius Company, the provisions of this Section 3 are intended to be and are exclusive and in lieu of any other rights or remedies to which the Executive or the Indian Company or Mauritius Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement.

**4.** **<u>Conditions to Receipt of Severance: No Duty to Mitigate</u>**.

(a) <u>Separation Agreement and Release of Claims</u>. The Executive acknowledges and agrees that:

(i) the Company's payment of the severance compensation detailed in Section 3, will be deemed to constitute a full settlement and discharge of any and all obligations of the Companies and their Affiliates to the Executive arising out of this Agreement, the Executive's employment with the Companies and their Affiliates and/or the termination of the Executive's employment with the Companies and their Affiliates;

(ii) the Company's payment of the severance compensation detailed in Section 3, constitutes adequate consideration for the Executive's obligations which survive the termination of his employment including the undertakings provided by the Executive under Section 5 and Section 6; and

(iii) upon payment of the severance compensation detailed in Section 3, the Company will stand discharged of all obligations towards the Executive, and the Executive shall, automatically and without any further action, be deemed to have fully and unqualifiedly released Indian Company and Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities.

The Executive further acknowledges and agrees that as a condition precedent to receiving any of the severance compensation detailed in Section 3, the Executive will execute, deliver to the Companies, and not revoke a release agreement, in a form prepared by, and satisfactory to, the Indian Company (the "**Executive Release Agreement**", key parameters of which have been set out in Schedule 1) pursuant to which the Executive will release and waive, to the fullest extent permitted by law, all claims against the Indian Company and Mauritius Company, their Affiliates, and all of their present and/ or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities, including, without limitation, all claims arising out of this Agreement, the Executive's employment with Companies and/or their Affiliates, and/or the termination of Executive's employment with the Companies and/or their Affiliates. The severance compensation described in Section 3 is in lieu of any severance benefits under any severance policy or plan the Indian Company or Mauritius Company may have now or in the future, and the Executive acknowledges that the Executive is not entitled to any other severance benefits and the Executive further undertakes to timely execute the Executive Release Agreement.

(b) <u>Confidential Information. Non-solicitation. and Non-Competition</u>. The receipt of any severance compensation pursuant to Section 3 will be subject to the Executive not violating the provisions of Sections 5 and 6. In the event the Executive breaches the provisions of Sections 5 and 6, all payments and benefits to which the Executive may otherwise be entitled pursuant to Section 3 will immediately cease, to the extent permissible under law.

(c) <u>No Duty to Mitigate</u>. Except as expressly provided herein, the Executive shall not be required to seek other employment or otherwise mitigate the amount of any payments to be made by the Companies pursuant to this Agreement. Except as otherwise provided herein, the payments provided pursuant to this Agreement shall not be reduced by any compensation earned by the Executive as the result of employment by another employer after the termination of the Executive's employment or otherwise.

5. **<u>Non-Disclosure of Confidential Information</u>**.

(a) <u>Confidential Information</u>.

For purposes of this Agreement, the term "**Confidential Information**" means any and all of the Group's trade secrets, confidential and proprietary information and all other nonpublic information and data of or about the Group and its business, including, without limitation, lists of customers, information pertaining to customers, marketing plans and strategies, information pertaining to suppliers, pricing information, engineering and technical information, software codes, cost information, data compilations, research and development information, business plans, financial information, personnel information, information received from third parties that the Group has agreed to keep confidential, and information about prospective customers or prospective products and services, reduced to writing or other tangible medium of expression, including, without limitation, work product created by the Executive in rendering services for the Group.

Provided, however, that **"Confidential Information"** shall not include information that:

(i)     is or becomes generally available to the public by use, publication or the like, through no fault of the Executive;

(ii)    is obtained without restriction by the Executive after termination of the Executive's employment with the Companies from a third party who had the legal right to disclose such information to the Executive;

(iii)   the Executive possessed prior to the Executive's employment with the Companies; or

(iv)    is independently developed by the Executive without the use of any of the Group's Confidential Information after the termination of his employment with the Companies;

(b) <u>Non-Disclosure Obligations</u>.

(i)     During the Executive's employment with the Companies and thereafter, the Executive will not use or disclose to others any of the Confidential Information, except:

(A)    in the course of the Executive's work for and on behalf of the Group,

(B)    with the prior written consent of the Companies,

(C)    as required by law or judicial process, provided the Executive promptly notifies the Companies in writing of any subpoena or other judicial request for disclosure involving Confidential Information or trade secrets, and cooperates with any effort by the Group to

obtain a protective order preserving the confidentiality of the Confidential Information or trade secrets, or

(D)    in connection with reporting possible violations of law or regulations to any governmental agency or from making other disclosures protected under any applicable whistleblower laws.

(ii)    The Executive agrees that the Group owns the Confidential Information and the Executive has no rights, title or interest in any of the Confidential Information.

(iii)    Additionally, the Executive will abide by Indian Company and Mauritius Company's policies protecting the Confidential Information, as such policies may exist from time to time.

(iv)    At the Indian Company or Mauritius Company's request or upon termination of the Executive's employment with the Companies for any reason, the Executive will immediately deliver to the Companies any and all materials (including all copies and electronically stored data) containing any Confidential Information in the Executive's possession, custody or control.

(v)    Upon termination of the Executive's employment with the Companies for any reason, the Executive will, if requested by the Companies, provide the Companies with a signed written statement disclosing whether the Executive has returned to the Companies all materials (including all copies and electronically stored data) containing any Confidential Information previously in the Executive's possession, custody or control.

(c)    <u>Whistleblower Laws</u>.

Notwithstanding anything herein or in any other agreement with or policy (including without limitation, any code of conduct or the employee manual) of Indian Company or Mauritius Company, nothing herein or therein is intended to or shall:

(i)    prohibit the Executive from making reports of possible violations of: (A) U.S. federal law or regulation (even if the Executive participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002 or of any other whistleblower protection provisions of U.S. state or federal law or regulation; and (B) Indian law or regulation (even if the Executive participated in such violations) to, and cooperating with, any governmental agency or entity in accordance with the provisions of the Whistle Blowers Protection Act, 2014 or of any other whistleblower protection provisions of any applicable Indian law or regulation;

(ii)    require notification to or prior approval by the Indian Company or Mauritius Company of any such reporting or cooperation; or

(iii)    result in a waiver or other limitation of the Executive's rights and remedies as a whistleblower, including to a monetary award.

Notwithstanding the foregoing, the Executive is not authorized (and the above should not be read as permitting the Executive) to disclose communications with counsel that were made for the purpose of receiving legal advice or that contain legal advice or that are protected by the attorney work product or similar privilege. Furthermore, the Executive will not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made (X) in confidence to a U.S. federal, state or local government

official, either directly or indirectly, or to an attorney, in each case, solely for the purpose of reporting or investigating a suspected violation of U.S. law or (Y) in a complaint or other document filed in a lawsuit or proceeding, if such filings are made under seal.

(d) <u>Survival of Non-Disclosure Obligations</u>. The Executive's confidentiality/non-disclosure obligations under this Agreement continue after the termination of Executive's employment with the Companies. With respect to any particular trade secret information, Executive's confidentiality/non-disclosure obligations will continue as long as such information constitutes a trade secret under applicable law. With respect to any particular Confidential Information that does not constitute a trade secret, the Executive's confidentiality/non-disclosure obligations will continue as long as such information remains confidential, and will not apply to information that becomes generally known to the public through no fault or action of the Executive or others who were under confidentiality obligations with respect to such information.

**6.** <u>**Non-Solicitation and Non-Competition**</u>.

(a) <u>Non-Competition</u>. During the Term and the "Non-Compete Time Period" *(as defined in this Agreement),* the Executive will not within the "Restricted Geographic Area" *(as defined in this Agreement)* engage in (including, without limitation, being employed by, working for, or rendering services to) any "Competitive Business" *(as defined in this Agreement)* in any "Prohibited Capacity" *(as defined in this Agreement).* Notwithstanding the foregoing, if the Competitive Business has multiple divisions, business units, lines or segments, some of which are not competitive with the business of the Group, nothing herein will prohibit the Executive from being employed by, working for or assisting any division, business unit, line or segment of such Competitive Business that is not competitive with the business of the Group.

(b) <u>Customer Restrictions</u>. During the Term and the "Restricted Time Period", the Executive will not sell, market or provide, attempt to sell, market or provide, or assist any Person in the sales, marketing or provision of, any "Competing Service/Product" *(as defined in this Agreement)* to any of the Group's Customers (excluding any governmental agencies / authorities which are the Group's Customers or existing customer of the new organization) with respect to whom, at any time during the Executive's employment with the Companies, the Executive had any business contact on behalf of the Group, the Executive had any relationship, business development, sales, service or account responsibility (including, without limitation, any supervisory or managerial responsibility) on behalf of the Group, or the Executive had access to, or gained knowledge of, any Confidential Information concerning the Group's business with such customer, or otherwise solicit or communicate with any such customers for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting in any Person in the sales, marketing or provision of, any Competing Service/Product.

(c) <u>Non-Interference with Contractors. Vendors, or Other Relationships</u>. During the Restricted Time Period, the Executive will not urge, induce or seek to induce any of the Group's independent contractors, subcontractors, business partners, distributors, brokers, consultants, sales representatives, customers, referral sources, vendors, suppliers or any other Person with whom the Group has a business relationship to terminate their relationship with, or representation of, the Group or to cancel, withdraw, reduce, limit or in any manner modify any such Person's business with, or representation of, the Group.

(d) <u>Employee Restrictions</u>. During the "Restricted Time Period", the Executive will not: (i) solicit for employment, hire, employ, engage the services of, or attempt to hire, employ, or engage the services of, any individual who is an employee of the Group; (ii) assist any Person in the recruitment, hiring or engagement of any individual who is an employee of the Group; (iii) urge, induce or seek to induce any individual to terminate his/her employment with the

Group; or (iv) advise, suggest to or recommend to any Competitive Business that it employ, engage the services of, or seek to employ or engage or engage the services of any individual who is an employee of the Group.

(e) <u>Non-Competition Compensation</u>. During the Non-Compete Time Period, the Company will pay the Executive Fixed Pay on a monthly basis as consideration for the Executive's undertakings in Section 5 and Sections 6(a) to (d) above (the **"Non-Competition Compensation"**). In the event of a breach or threatened breach of the Executive's obligations under Section 5 or this Section 6, the Company shall be entitled to: (i) not make any Non-Competition Compensation as of the date of such breach or threatened breach, and following the date of such breach or threatened breach, the Executive shall have no further rights to any Non-Competition Compensation, and (ii) in addition to other available remedies, seek equitable relief (by injunction, restraining order, or other similar remedy) against such breach or threatened breach from a court of competent jurisdiction without the necessity of showing actual damages and without the necessity of posting a bond or other security. In the event a court of competent jurisdiction determines that the Executive's obligations under Section 5 or this Section 6 are more restrictive than necessary to protect the Group's legitimate business interests, such court may reduce the scope of the restriction(s), or sever and remove the unenforceable provision(s), to the extent necessary to make the restriction(s) enforceable.

For purposes of this Agreement: (i) "Non-Compete Time Period" means 6 months after the Termination Date; provided that this period may be amended as mutually agreed in writing between the Parties; and (ii) "Restricted Time Period means 6 months after the Termination Date"; provided that this period may be amended as mutually agreed in writing between the Parties.

7. <u>**Assignment**</u>. This Agreement will be binding upon and inure to the benefit of: (a) any Successor of the Indian Company; and (b) to the heirs, executors and legal representatives of the Executive upon the Executive's death as it relates to the severance compensation specified in Section 3. Any such successor of the Indian Company will be deemed substituted for the Indian Company under the terms of this Agreement for all purposes. For this purpose, **"Successor"** means any person, firm, corporation or other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Indian Company. None of the rights of the Executive to receive any form of compensation payable pursuant to this Agreement may be assigned or transferred except by will or the laws of descent and distribution. Any other attempted assignment, transfer, conveyance or other disposition of the Executive's right to compensation or other benefits will be null and void.

8. <u>**Notices**</u>. Except as may be otherwise provided herein, all notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and signed by or on behalf of the Party giving it. Such notice shall be served by sending it or by delivering by hand, mail or courier to the address set forth below. In each case it shall be marked for the attention of the relevant Party set forth below. Any notice so served shall be deemed to have been duly given (i) in case of delivery by hand, when hand delivered to the other Party; or (ii) when sent by mail, where 7 (seven) business days have elapsed after deposit in the mail with certified mail receipt requested postage prepaid; or (iii) when delivered by courier on the second business day after deposit with an overnight delivery service, postage prepaid, with next business day delivery guaranteed, provided that the sending Party receives a confirmation of delivery from the delivery service provider; or (iv) for electronic mail notification with return receipt requested, upon the obtaining of a valid return receipt from the recipient.

To the **Indian Company:**

Azure Power India Private Limited

Address: 5th floor, Southern Park, D-II, Saket Place, Saket, New Delhi - 110017

Attn: Chairman, Board of Directors

To the **Executive:**

Sunil K Gupta

Address: 11 Tanjong Rhu Road, #05-01, The Waterside, Singapore 436896

9. **<u>Severability</u>**. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement will continue in full force and effect without said provision.

10. **<u>Governing Law and Arbitration</u>**. The provisions of this Agreement shall, in all respects, be governed by, and construed in accordance with the laws of India. Any dispute arising out of or in connection with this Agreement, including any question regarding the existence, validity or termination of this Agreement shall be referred to and finally resolved by arbitration in accordance with the Arbitration Rules of the Singapore International Arbitration Centre (SIAC Rules), which rules are deemed to be incorporated by reference in this Section. The seat of arbitration shall be Singapore, and venue of arbitration shall be New Delhi. The arbitral tribunal shall consist one 1 (One) arbitrator, jointly appointed by the Parties. In the event that the Parties are unable to appoint such sole arbitrator, then, the Executive on one hand and the Indian Company on the other hand, will appoint 1 (One) arbitrator each, and the 2 (Two) arbitrators so appointed shall appoint the third arbitrator. The law governing this Agreement shall be Indian law. The language of arbitration shall be English. Nothing herein contained shall be construed as prohibiting any of the Parties from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the other Party.

11. **<u>Works</u>**. All work performed by the Executive and all inventions, discoveries, developments, work product, processes, improvements, creations, deliverables and all written, graphic or recorded material and works of authorship fixed in any tangible medium of expression made, created or prepared by the Executive, alone or jointly with others, during the Executive's employment with the Companies and relating to the Group's business (collectively, the **"Works"**) shall be the Companies' exclusive property, shall be deemed a work made for hire, and all rights, title and interest in the Works shall vest in the Companies. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably assigned to the Companies. All Works shall belong exclusively to the Companies, and the Companies shall have the right to obtain and hold in their own name, any patents, copyrights, registrations or such other intellectual properly protections as may be appropriate to the subject matter. The Executive will sign documents of assignment, declarations and other documents and take all other actions reasonably required by the Companies, at the Companies' s expense, to perfect and enforce any of its proprietary rights and to vest all right, title and interest to the Works in the Companies. This Section does not apply to an invention for which no equipment, supplies, facility, or Confidential Information of the Group was used and which was developed entirely on the Executive's own time, unless: (a) the invention relates (1) directly to the business of the Group, or (2) to the Group's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Executive for the Group. To the extent that the title or rights to any such Works may not, by operation of law, vest in the Companies, all rights, title and interest to such Works are hereby irrevocably, absolutely and perpetually assigned to the Companies for worldwide territory. Notwithstanding the provisions of Section 19(4) of the Copyright Act, 1957, any assignment in so far as it relates to copyrightable material shall not lapse nor the rights transferred therein revert to the Executive, even if the Companies do not exercise the rights under the assignment within a

period of one year from the date of assignment. The Executive hereby agrees to waive any right to and agrees to refrain from raising any objection or claims to the Copyright Board with respect to any assignment, pursuant to Section 19A of the Copyright Act, 1957. The Executive also waives all moral rights in relation to the Work developed or conceived by the Executive. The Executive acknowledges that the Fixed Pay payable under this Agreement is good and valuable consideration for the assignment of the Works, the sufficiency of which is hereby acknowledged.

12. **Definitions**. For purposes of this Agreement, the following terms have the following meanings, unless the context requires otherwise or unless otherwise stated.

**"Affiliate"** means any entity that directly, or indirectly through one or more intermediaries, is owned or controlled by, owns or controls, or is under common ownership or control with, the Indian Company or Mauritius Company; for this purpose, "control" of an entity means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the entity, whether through the ownership of voting securities, by contract or otherwise.

**"Company"** means, individually, each of the Indian Company and the Mauritius Company, and **"Companies"** means, collectively, the Indian Company and the Mauritius Company.

**"Cause"** means the occurrence of one or more of the following: (i) an act of fraud or dishonesty made by the Executive against the Group in connection with the Executive's responsibilities which the Indian Company or Mauritius Company reasonably believes will damage its business; (ii) the Executive's conviction of, or plea of no contest to, a felony (excluding traffic offenses) which the India Company Board or Mauritius Company reasonably believes had or will have a detrimental effect on the reputation or business of the Indian Company or Mauritius Company or its affiliates; (iii) the Executive's intentional or gross misconduct; (iv) the Executive's intentional improper disclosure of confidential information; (v) the Executive's continued violations of material Indian Company or Mauritius Company policies or provisions of the Executive's agreements with the Indian Company or Mauritius Company, including any violation of or failure to perform the Executive's reasonably assigned duties; (vi) the Executive's failure to cooperate with the Indian Company or Mauritius Company in any investigation or formal proceeding; or (vii) the Executive being disqualified from being a director under applicable law.

"**Cessation For Valid Reason**" means cessation of employment of the Executive due to (i) termination of employment of the Executive pursuant to and within 3 months from the occurrence of a Change in Control Event or (ii) the Executive being offered a lower designation pursuant to a Change in Control Event which is unacceptable to the Executive causing the Executive to cease employment with the Group within 3 months from the occurrence of a Change in Control Event.

"**Change in Control Event**" means a (a) third party (i.e., someone other than shareholders of Mauritius Company and Indian Company on Effective Date) acquiring 50% or more of the Indian Company or Mauritius Company; (b) third party (i.e., someone other than shareholders of Mauritius Company and Indian Company on Effective Date) acquiring the ability to reconstitute the board; or (c) a Group level restructuring of the Mauritius Company and Indian Company resulting in merger/ amalgamation of Group corporate entities.

**"Competing Service/Product"** means any service or product that is similar to and competitive with any of the services/products and/or related services/products offered or provided by the Group as of the Termination Date.

**"Competitive Business"** means any company engaged in the renewable power business, wind, solar or hydro, energy storage or any other business of the Group as of the Termination Date in the Restricted Geographic Area.

**"Garden Leave"** means a Company's right to place the Executive on "garden leave" during the Notice Period. Company may, in its sole discretion, during the Garden Leave: (i) suspend or terminate, in whole or in part, any powers, duties or work exercised by or provided to the Executive; (ii) change the Executive's designation or duties as such Company decides appropriate (iii) prevent the Executive from contacting or communicating with any current, former or proposed clients, customers, employees, or vendors of the Group; (iv) exclude the Executive from the premises of the Group; (v) announce to employees, clients, customers, vendors and other relevant persons of the Group that Executive has been given notice of termination or that the Executive has resigned; and/or (vi) ask the Executive to resign so such Company can appoint a new Chief Executive Officer prior to the end of the Notice Period, provided that in such event the last date of the Notice Period shall be deemed the Termination Date**;**

**"Group"** means any of the Companies, their subsidiaries and their Affiliates, unless the context otherwise requires.

**"Group's Customer"** or **"Group Customer"** means: (i) any Person to whom the Group is selling or providing any service or product as of the Termination Date; (ii) any Person to whom the Group provided or sold any service or product at any time during the one (1) year preceding the Termination Date; and/or (ii) any Person with whom the Group has contracted or otherwise entered into an arrangement to provide any service or product as of the time of the Termination Date.

**"Mauritius Company"** means Azure Power Global Limited, a company incorporated under the laws of Mauritius and having its office at C/o AAA Global Services Ltd, 1st Floor, The Exchange 18 Cybercity, Ebene, Mauritius, which expression shall unless repugnant to the meaning or context thereof, be deemed to include its successors and permitted assigns.

**"Person"** means any individual or entity (including without limitation a corporation, partnership, Limited Lability company, trust, joint venture, or governmental entity or agency).

**"Prohibited Capacity"** means: (i) the same or similar capacity or function to that in which the Executive worked for the Group at any time during his employment; (ii) any executive or officer capacity or function; (iii) any business development capacity or function; (iv) any ownership capacity (except the Executive may own as a passive investment up to two percent of any class of securities of a company regularly traded on a national stock exchange or other public market); (v) any business consulting or advising capacity of function; (vi) any director or similar capacity or function; (vii) any capacity or function in which the Executive likely would inevitably use or disclose any of the Group's trade secrets and/or Confidential Information; (viii) any capacity or function in which the customer goodwill the Executive helped to develop on behalf of the Group would facilitate or support the Executive's work for a Competitive Business; and/or (ix) any other capacity or function in which the Executive's knowledge of the Confidential Information would facilitate or assist the Executive's work for the Competitive Business.

**"Restricted Geographic Area"** means India, and each country the Group is doing business in as of the Termination Date.

13. **Integration**. This Agreement represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. This Agreement may be modified only by agreement of the Parties by a written instrument executed by the Parties that is designated as an amendment to this Agreement.

14. **Waiver of Breach**. The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

15. **Headings**. All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

16. **Tax Withholding**. All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

17. **Acknowledgment**. The Executive acknowledges that he has had the opportunity to discuss this matter with and obtain advice from his private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.

18. **Further Assurances**: The Executive agrees to take all steps, execute all documents and do all acts and things as may be reasonably required by the Companies to give effect to the transactions and matters contemplated by this Agreement and implement the provisions of the same, including appointment of the Executive as a director of a Group entity or cessation as a director of a Group entity, if required.

19. **Counterparts**. This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

*[Schedule and signature pages follow]*

**SCHEDULE 1 | KEY PARAMETERS OF EXECUTIVE RELEASE AGREEMENT**

The Executive acknowledges and agrees that as a condition precedent to receiving any portion of the severance compensation detailed in Section 3 of the Agreement, the Executive will execute, deliver to the Companies, and not revoke, the Executive Release Agreement, which will: (a) substantially contain the following terms which are acknowledged and agreed to by the Executive (upfront) at the time of signing this Agreement, and (b) be executed and delivered to the Companies (and not subsequently revoked) in a form prepared by, and satisfactory to, the Indian Company:

(1) The Executive confirms that all positions (including, but not limited to, all board / committee and executive positions) held by him in the Companies and / or in the Group, shall stand vacated as of the close of business of the Indian Company.

(2) The Executive, both on his behalf and on behalf of his successors and heirs, releases and forever discharges the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities from all Claims (other than in respect of payment of amounts specifically set out in the Executive Release Agreement) and hereby acknowledges and declares that on payment by the Indian Company of the dues to the Executive in accordance with the terms of the Agreement and the Executive Release Agreement, the Executive will have no Claims against the Companies and if required execute such further documents as may be reasonably required by Companies in confirmation on payment of the amounts due. The Executive waives any future Claims whatsoever that the Executive or his successors or heirs have or may have against any of the Companies, their affiliates and their present and/or former owners, officers, directors, employees, agents, attorneys, insurers, representatives, employee benefit plans and their fiduciaries, both individually and in their representative capacities, other than those in respect of payment of amounts due.

For this purpose, **'Claims'** means any and all past and present claims, charges, complaints, lawsuits, liabilities, obligations, promises, agreements, damages, actions, causes of action, rights, demands, costs (including all legal costs), losses, debts and expenses, injuries and grievances of any and every kind. Claims also includes, but is not limited to, a full release of any and all claims for punitive damages, attorneys' fees, injunctive relief, declaratory relief, equitable relief, loss of wages, loss of other employment, back pay, front pay, liquidated damages, compensatory damages, breach of express or implied contract, wages or benefits owed, covenants of fair dealing and good faith, interference with contract, option grants, wrongful discharge or termination, fraud, personal injury, infliction of emotional distress, mental anguish, libel, slander, defamation, negligence, assault, battery, invasion of privacy, false imprisonment, civil conspiracy, duress, promissory or equitable estoppel, violation of public policy, retaliation, breach of fiduciary duty, bad faith, employment discrimination or harassment of any type or retaliation based on any protected status (including, without limitation, national origin, race, age, sex, sexual orientation, disability, workers' compensation status, or other protected category) or other discrimination, retaliation or harassment in accordance with the subsisting laws in India or any other applicable state or local law, regulations or other similar provisions, vacation pay, sick pay, any retirement or pension contributions or benefits, medical or health benefits, short or long term disability benefits, long service payment, severance or redundancy payments, notice (or payment in lieu), leave encashment, allowances, bonus (statutory or otherwise), incentive share or share option scheme, retention scheme, and any other employee benefits; and any and all claims and demands of any other kind and nature whatsoever, foreseen, unforeseen, or unforeseeable, now known or which may hereafter be discovered relating to his employment with and/or separation from the Companies, or to any event, act or omission that has occurred at any time up to and including the date of termination of the Executive, whether or not the Claim arises

or may arise under contract, tort, equity or statute.

(3)      The Executive shall not, up to and after the date of termination, directly or indirectly, make disparaging or negative statements of whatever kind and in whatever context, through any medium, about any of the Companies, their affiliates, their officers, directors, employees, business practices, plans or procedures, products, or pertaining to the Executive's tenure with the Companies or the terms of this Agreement.

(4)      The Executive agrees to take all steps, execute all documents and do all acts and things as may be reasonably required by the Companies to give effect to the transactions and matters contemplated by the Agreement and the Executive Release Agreement, and implement the provisions of the same.

(5)      In the event, at any time after the termination of employment of the Executive, it is discovered (pursuant to any internal or external / regulatory investigation(s)) that the Executive was engaged or involved in any of the following: (a) misconduct / fraud, (b) gross negligence, (c) breach of any terms of employment or applicable laws or the Agreement or the Executive Release Agreement, or (d) misappropriation of funds / property, then the Companies shall have all rights and entitlements against the Executive, as may be available under applicable laws, and/or in equity, including the right to claim damages for breach/ actions of the Executive.

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the day and year first above written.

**For Azure Power India Private Limited**

_____

**Authorized Signatory**

**Name:**

**Designation:**

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the day and year first above written.

/s/ Richard Alan Rosling

**Name:** Richard Alan Rosling

/s/ Sunil K Gupta

SUNIL K GUPTA

**Exhibit 4.13**



**Date: 24-April-2023**

**EXTENSION OF RETAINERSHIP AGREEMENT**

This is in reference to the Retainership Agreement ("Agreement") made and executed at **New Delhi** on **November 21, 2022** by and between **Azure Power India Pvt. Ltd.,** a company registered and incorporated under the Companies Act, 1956 and having its registered office at **5th Floor, Southern Park, D-11, Saket, New Delhi-17 (hereinafter referred to as "Azure/ Company"),** and **Mr. R Narasimhan Iyer,** an individual, residing at **D 103, Rail Vihar, Sector 15, Part 2, Gurugram - 122001** presently **(hereinafter referred to as the "Retainer").**

**We are pleased to extend the term of agreement from November 20, 2024 till November 30, 2025 with revised compensation with effect from April 01, 2023 as mentioned below:**

The retainership fees of **Rs. 2,00,00,000/- per annum, (Rs. Two Crore Only)** t   ed as "Retainership Fee" during the Terin. Income Tax on the said fee shall be borne by the Retainer. OST and any other leviable taxes shall be extra and applicable at actuals from time to time, which shall be paid by Azure.

In addition to the above stated retainership fees, you will be entitled to a Variable Performance Pay of **Rs. 50,00,000/- per annum (Rs. Fifty Lacs Only)** on achievement of mutually agreed KRAs. This is payable as per the terms governing the Variable Performance Pay Program of the company. OST and any other leviable taxes shall be extra and applicable at actuals from time to time, which shall be paid by Azure.

Payment of Variable Performance Pay (VPP) is discretionary. Earning of VPP is linked to performance management process dependent upon your individual performance and your continued commitment towards the achievement of organisational goals as well as the performance of your department and the company. If the company announces disbursal of VPP to the eligible executives for a particular financial year after assessment of the performance of the individual employees, departments and the company during that period, then as per your eligibility determined on the aforesaid parameters, VPP shall be paid to you only if you are on the full-time active employment of the company as on the date of disbursement and have not taken steps for cessation of the employment.

Kindly note you are responsible to manage and lead the services related to **managing & leading Construction, Project delivery, operational SCM, Operations and Maintenance, Safety, Security & Administration, Quality, D&E.** Following are the job responsibilities:

- Managing business and project construction at Azure through stakeholder and vendor engagement
- Driving business excellence cycle from Award to CoD . Cost, Timelines, Safety & Compliance
- Handover of under construction projects SECI-4, SECI-3 and Assam as per plan to O&M team

Azure Power India One Private   Limited
Regd. Office : 5th Floor, Southe rn Park, D-11, Saket, New Delhi - 110017
CIN:   U40300DL2016PTC301090
- 91 11 J(1 _ 1) 0f:ii)(          - 11 ,1   49"-0 91:l(r'          Q 1hO  . ct:Wl iipo wer.,:.o•r •          www.azurepower.com



- Project development of new projects Ml & M2, Wind 120 and Wind Hybrid 150-(key ordering/ land / kick -off)
- Leading business functions - Construction, Design & Engineering, Quality, SCM, Security, Administration, SHES, etc
- Leading Operations & Maintenance division including Asset Management and Analytics
- Responsible for delivery of existing projects and any other new projects / winning bids
- Maintain SHES score at 90%
- Handle team dynamics and help the assigned teams to function well together
- Reviewing and strengthening the internal controls and processes, bringing in **external** expertise as needed
- Building a robust team

Rest all the other terms and conditions will remain same as per the Engagement Letter **sign.e a**

**IN WITNESS WHEREOF, THE PARTIES HAVE CAUSED THIS AGREEMENT TO BE EXECUTED THE DAY AND YEAR FIRST WRITTEN ABOVE**

| | |
|---|---|
| **For and on behalf of** | By and on behalf of the Retainer |
| **Azure Power India Pvt. Ltd.** | |

| | |
|---|---|
| Name: Shweta Srivastava | Name: R Narasimhan Iyer |
| Designation: CHRO, Human Resources | Designation: COO |
| Date: 24-April-2023 | Date: 24-April-2023 |

**Exhibit 8.1**



**Azure Power Global Limited's group structure as on March 31, 2022**

| Azure Power Energy Limited# (Mauritius) | AZURE POWER GLOBAL LIMITED# (Ultimate Holding Company in Mauritius) | Azure Power Solar Energy Private# Limited (Mauritius) |
|---|---|---|

| AZURE POWER INDIA PVT LTD (Holding Company in India) (98.50%) | AZURE POWER ROOFTOP PVT LTD (Holding Company in India) (100%) |
|---|---|

| | |
|---|---|
| 1. | Azure Power (Punjab) Pvt Ltd. (100%) |
| 2. | Azure Power (Rajasthan) Pvt Ltd. (100%) |
| 3. | Azure Power (Haryana) Pvt Ltd. (99.17%) |
| 4. | Azure Solar Pvt Ltd. (100%) *along with subsidiary* |
| 5. | Azure Sun Energy Pvt Ltd. (100%) |
| 6. | Azure Urja Pvt Ltd. (100%) *along with subsidiary* |
| 7. | Azure Surya Pvt Ltd. (100%) *along with subsidiary* |
| 8. | Azure Power (Karnataka) Pvt Ltd. (100%) *along with subsidiary* |
| 9. | Azure Power Infrastructure Pvt Ltd. (100%) *along with subsidiary* |
| 10. | Azure Sunrise Pvt Ltd. (100%) |
| 11. | Azure Sunshine Pvt Ltd. (100%) |
| 12. | Azure Power (Raj.) Pvt Ltd. (100%) |
| 13. | Azure Photovoltaic Pvt Ltd. (100%) |
| 14. | Azure Clean Energy Pvt Ltd. (100%) |
| 15. | Azure Green Tech Pvt Ltd. (100%) |
| 16. | Azure Power Earth Pvt Ltd. (100%) |
| 17. | Azure Power Eris Pvt Ltd. (100%) |
| 18. | Azure Power Mars Pvt Ltd. (100%) |
| 19. | Azure Power Mercury Pvt Ltd. (51.40%) |
| 20. | Azure Power Pluto Pvt Ltd. (100%) |
| 21. | Azure Power Saturn Pvt Ltd (51.40%) |
| 22. | Azure Power Jupiter Pvt Ltd. (51.01%) |
| 23. | Azure Power Makemake Pvt Ltd. (100%) |
| 24. | Azure Power Uranus Pvt Ltd. (100%) |
| 25. | Azure Power Venus Pvt Ltd. (100%) |
| 26. | Azure Power Thirty Three Pvt Ltd. (100%) |
| 27. | Azure Power Thirty Four Pvt Ltd. (100%) |

**Azure Power Rooftop (GenCo.) Pvt Ltd.** (100%)

| | |
|---|---|
| 1 | Azure Power Rooftop One Pvt Ltd. (100%) |
| 2 | Azure Power Rooftop Two Pvt Ltd. (100%) |
| 3 | Azure Power Rooftop Three Pvt Ltd. (100%) |
| 4 | Azure Power Rooftop Four Pvt Ltd. (100%) |
| 5 | Azure Power Rooftop Five Pvt Ltd. (100%) |
| 6 | Azure Power Rooftop Six Pvt Ltd# (100%) |
| 7 | Azure Power Rooftop Seven Pvt Ltd# (100%) |
| 8 | Azure Power Rooftop Eight Pvt Ltd. (100%) |



| 28. | Azure Power Thirty Five Pvt Ltd# (100%) |
|---|---|
| 29. | Azure Power Thirty Six Pvt Ltd. (100%) |
| 30. | Azure Power Thirty Seven Pvt Ltd. (99.84%) |
| 31. | Azure Power Thirty Eight Pvt Ltd. (51% ) |
| 32. | Azure Power Thirty Nine Pvt Ltd# (100%) |
| 33. | Azure Power Forty Pvt Ltd. (100%) |
| 34. | Azure Power Forty One Pvt Ltd. (100%) |
| 35. | Azure Power Forty Two Pvt Ltd# (100%) |
| 36. | Azure Power Forty Three Pvt Ltd. (100%) |
| 37. | Azure Power Forty Four Pvt Ltd. (51.40%) |
| 38. | Azure Power Fifty One Pvt Ltd. (100%) |
| 39. | Azure Power Fifty Two Pvt Ltd. (100%) |
| 40. | Azure Power Fifty Three Pvt Ltd. (100%) |
| 41. | Azure Power Fifty Four Pvt Ltd. (100%) |
| 42. | Azure Power Fifty Five Pvt Ltd. (26%)** |
| 43. | Azure Power Fifty Six Pvt Ltd. (100%) |
| 44. | Azure Power Fifty Seven Pvt Ltd. (100%) |
| 45. | Azure Power Fifty Eight Pvt Ltd# (100%) |
| 46. | Azure Power Fifty Nine Pvt Ltd (100%) |
| 47. | Azure Power Sixty Pvt Ltd (100%) |
| 48. | Azure Power Sixty One Pvt Ltd (100%) |
| 49. | Azure Power Sixty Two Pvt Ltd (100%) |
| 50. | Azure Power Sixty Three Private Limited (100%) |
| 51. | Azure Power Sixty Four Private Limited (100%) |
| 52. | Kotuma Winds Parks Pvt Ltd (100%) |
| 53. | Azure Power US Inc. (USA) (100%) |
| 54. | Waaree Power Pvt Ltd. (26%)** |
| 55. | Azure Power Maple Pvt Ltd. (100%) |
| 56. | Two Wind Energy Pvt. Ltd. (100%) |
| 57. | Azure Green Hydrogen Private Limited (100%) |
| 58. | Azure Energy Transition Private Limited (100%) |

**	*Associate Companies of Azure Power India Private Limited as on 31 March 2022*
#	*No projects are assigned in these companies*

**Exhibit 11.1**

# CODE OF BUSINESS CONDUCT AND ETHICS

**Azure Power Global Limited**

 

**Message from the Acting CEO**

Azure Power is an organization built up on a dream to provide Energy which is clean, affordable and effectively infinite.

At Azure Power, we strive to conduct our business with the highest degree of honesty, integrity and ethical behavior.

We do business in a direct, clear, and ethical manner. We speak with honesty and courage. We are accountable for our words and actions and strive to build a challenging and fulfilling work environment that rewards teamwork. We respect and recognize diverse work styles, lifestyles and cultural differences.

This **Code of Business Conduct and Ethics** provides an overview of the fundamental business values. These are based on our business ethics and our commitment to integrity, which apply to all employees, officers and directors of Azure Power and its global subsidiaries around the world. It summarizes some of our most important principles and policies. This Code is to be applied in conjunction with the laws and regulations of the land from where ever we operate.

The stewardship of Existence and Growth at Azure Power are marked through compelling need for Innovation, Perfection, Truthfulness and by being Good Corporate Citizens. Our values etch the fundamental beliefs and guiding principles that lay the foundation on which we perform work and conduct ourselves.

We all have a responsibility to uphold the principles of the **Code of Business Conduct and Ethics** and promptly communicate any violations or potential violations that may occur. Raising awareness about these topics, clarifying questions and resolving issues, are an essential part of making Azure Power a healthy workplace and an outstanding place to work.

Best Wishes
Acting CEO

 

**Table of contents**

| Section | Title | Page No. |
|---|---|---|
| 1 | Introduction | 4 |
| 2 | Applicability of the Code | 4 |
| 3 | Honest and ethical conduct | 4 |
| 4 | Conflict of interest | 4 |
| 5 | Corporate opportunities | 5 |
| 6 | Harassment | 5 |
| 7 | Social, health, environment and safety at the workplace | 6 |
| 8 | Alcohol/Drug-free workplace | 6 |
| 9 | Public disclosures | 6 |
| 10 | Confidentiality | 6 |
| 11 | Fair dealing | 7 |
| 12 | Protection and proper use of Company assets | 7 |
| 13 | Company funds | 8 |
| 14 | Disclosure | 8 |
| 15 | Compliance with governmental laws, rules and regulations/internal Company policies | 8 |
| 16 | Anti- Money Laundering | 9 |
| 17 | Sanctions | 9 |
| 18 | Compliance with Foreign Corrupt Practices Act | 9 |
| 19 | Business Expenditure | 10 |
| 20 | Political contributions | 11 |
| 21 | Charitable contributions | 11 |
| 22 | Insider trading | 11 |
| 23 | Interpretation of the code | 12 |
| 24 | Amendments of the code | 12 |
| 25 | Administration of code | 12 |
| 26 | Code of conduct training | 13 |
| 27 | Acknowledgement | 15 |



## 1. Introduction

The Azure Power Global Limited's (referred to as "Azure Power" or "Company") 'Code of Business Conduct and Ethics', hereafter, referred as Code is intended to define and clarify the standards for conducting business and behavior at Azure Power. The Code is designed to be in-line with the requirements of the section 406 of Sarbanes Oxley Act of 2002 and Companies Act, 2013.

This Code is designed to promote:

- Honest and ethical conduct
- Fair dealings with the stakeholders
- Compliance with applicable laws, rules and regulations
- Prompt reporting of the violations of the Code

## 2. Applicability of the Code

Every employee, officer and director of the Company is expected to read this document and promptly report to the management any actual or possible violation of the Code.

## 3. Honest and ethical conduct

All directors, officers and employees are expected to act in accordance with the highest standards of personal and professional integrity.

If directors, officers or employees have any questions regarding the best course of action in a particular situation or an ethical dilemma or if a person suspects a possible violation of law(s), regulation(s) or Azure Power's ethical standard (as listed in the Code), he/she should notify or seek clarity from:

- His/her immediate superior;
- Head of function/ department; or
- Company designated Compliance Officer

## 4. Conflicts of interest

A conflict of interest occurs when an individual's private interest interferes in any way – or even appears to interfere – with the interests of the corporation as a whole. A conflict on the part of an employee, officer or director may involve any action, inaction, or decision taken by him/her in the discharge of his or her duties, which would materially affect his or her financial interest or those of his or her family members or any business with which the person is associated. All employees, officers and directors shall also avoid any situation in which there is, or may appear to be, a potential conflict which could appear to interfere with the employee's judgment in making decisions in the best interest of the Company. All employees, officers and directors are also expected to exercise care in the management of their private affairs so as not to be perceived to benefit from:

a) the use of information acquired solely by reason of their employment; or



b) any transactions over which they can influence decisions (e.g.: investment, borrowing, purchases, sales, contracts etc.).

A conflict of interest may arise when:

● There is an outside business activity that detracts an individual's ability to devote appropriate time and attention to his/her responsibilities within the Company;
● There is a significant ownership interest in any supplier, customer, development partner or competitor of the Company;
● There is a consulting or employment relationship with any supplier, customer, business associate or competitor of the Company;
● Any employee, officer or director receives any payment, gift, inducements or incentives that may influence or appear to influence a key decision; or
● An employee, officer or director serves on a board of directors or trustees or on a committee of any entity (whether profit or not-for profit) whose interests reasonably would be expected to conflict with those of the Company.

The directors, officers and employees should be conscientious in avoiding any actual, potential or perceived conflict of interest with the Company. In case there is perceived conflict of interest, he/she should fully disclose all the facts and circumstances thereof to the Company designated Compliance officer.

5. **Corporate opportunities**

Directors, officers and employees are expressly prohibited from:
● Taking opportunities that are discovered through the use of Company's property, information, or position for personal gain;
● Competing directly with the business of the Company or with any business that the Company is considering; and
● If the Company finally decides to discontinue pursuing an opportunity that relates to the Company's business activity, an employee, officer or director may pursue such an activity only after disclosing it to the Company designated Compliance officer.

6. **Harassment**

The Company is committed to provide a professional and dignified workplace, free from any discrimination or harassment.

The Company firmly believes in providing equal opportunity in all aspects of employment and will not tolerate any illegal discrimination or harassment of any kind. Examples include derogatory comments based on race, gender, colour, sexual harassment etc.

An employee, officer or director who feels threatened and harassed must communicate his/her concerns to his immediate superior, head of the department or to Company designated Compliance Officer through the whistle blower mechanism set forth in the Company's Whistle-Blower Policy.

7. **Social, health, environment and safety at the workplace**



The safety of people at the workplace is a primary concern of the Company and each employee, officer and director must comply with all applicable safety policies. All employees, officers and directors are subject to compliance with all local laws to help maintain a safe and healthy workplace. The Company shall prevent the wasteful use of natural resources and be committed to improving the environment, particularly with regard to the emission of greenhouse gases, and shall endeavour to offset the effect of climate change in all spheres of its activities. This should be in line with Social, Health, Environment and Safety (the "SHES") policy of the Company.

8. **Alcohol/drug-free workplace**

Employees, officers and directors are prohibited from using, selling, distributing, possessing or being under the influence of alcohol or illegal drugs at the workplace.

9. **Public disclosures**

The person designated by the Board is appointed as the Company's 'spokesperson' and he/she would interact with the press/ media. No other employee, officer or director, except with the permission of the designated person, will make any statement in press/media.

Any inquiry from the media relating to Azure Power should be referred to the designated person. Only officially designated spokesperson may provide comments for the media.

Employees are strictly prohibited from making any public disclosure or any communication or any statement unless specifically authorized by the designated person.

10. **Confidentiality**

The directors, officers and employees shall maintain the confidentiality of classified information of the Company or customer or supplier or business associate of the Company to which the Company has a duty to maintain confidentiality, except when disclosure is authorized or legally mandated. The confidential information includes all non-public information (including private or proprietary information) that might be of use to competitors or harmful to the Company or its associates. The use of confidential information for his/her own advantage or profit is also prohibited.

Examples of proprietary and confidential information include:
● Any system, information or process that gives Azure Power an opportunity to obtain an advantage over its competitors;
● Non-public information about Azure Power's operations;
● Results, strategies and projections, including those on the acquisition and divestiture of businesses or business units;
● Non-public information about Azure Power's business plans, business processes and client relationships;
● Non-public employee information;
● Non-public information received in the course of employment about customers, suppliers and distributors;
● Information about Azure Power's technology, systems and proprietary products;
● Financial information of Azure Power, such as profits, earnings and dividends;



- Announcement of new product introductions or developments;
- Asset revaluations;
- Investment decisions/plans;
- Restructuring plans;
- Major supply and delivery agreements; and
- Plans to raise funds.

Any information attained by any employee, officer or director during the individual's tenure with Azure Power would be deemed to be proprietary to the Company and should not be used by the individual at any point of time.

All employees, officers and directors must ensure proprietary and confidential information is treated with utmost cautiousness. All employees, officers and directors should also take steps to ensure that business-related paperwork and documents are produced, copied, faxed, filed, stored and discarded by means designed to minimize the risk of an unauthorized person accessing them. All employees, officers and directors must also ensure that access to work areas and computers is well controlled.

## 11. Fair dealing

Each director, officer and employee must deal fairly with customers, suppliers, and competitors of the Company. Each director, officer and employee may not take unfair advantage of anyone through manipulation, concealment, abuse of confidential, proprietary or trade secret information, misrepresentation of material facts, or any other unfair dealing practices.

The Company also seeks to compete with its competitors fairly and honestly. The Company seeks competitive advantages through superior performance, and not through unethical or illegal business practices. In essence, the core of its fair dealing with respect to competition is that it does not share any form of confidential information with its competitors. The Company prices its work independently of any competitor and does not communicate its methods or intentions to bid to its competitors or enter into any agreements with its competitors or disclose information directly or indirectly which would distort competition.

## 12. Protection and proper use of Company's assets

All directors, officers and employees should protect the Company's assets and property and ensure their efficient use. Theft, carelessness, and waste of the Company's assets and property have a direct impact on the Company's profitability.

Company's assets should only be used for legitimate business purposes and by authorized employees, officers, directors or their designees. Assets include cash, securities, business plans, consumer information, customer information, proprietary processes, quality standards, supplier information, intellectual property trademarks and copyrights, physical property and services.

Company assets must not be used for personal benefit. The misappropriation of corporate assets would be considered breach of duty and may constitute an act of fraud against the company.


Azure Power reserves the right to monitor and inspect, without notice, all electronic communications data and information transmitted on the network and electronic files located on Company servers and computer devices owned by the Company.

All employees, officers and directors must have permission from respective head of department or the Board before using or authorizing the use of any Company asset, including information, work product or trademark-outside the designated Company responsibilities.

## 13. Company funds

All employees, officers and directors are responsible for safeguarding, and making proper and efficient use of Company funds, over which he/she exercises control, by following procedures to prevent their loss, theft and unauthorized use. Every employee, officer and director must take reasonable steps to ensure that the Company receives good value for its funds spent and must maintain records in accordance with the Company's internal controls at all times, fully and accurately reflecting all transactions. All reports, vouchers, bills, payroll and service, measurement and performance records and other essential data must be prepared carefully and honestly. Some of the activities to be specifically adhered to are:

- No employee, officer or director shall use Company funds that arise in the course of his or her employment, to pursue personal opportunities or gain;
- No secret funds or undisclosed or unrecorded fund shall be established for any purpose;
- No false or artificial entries shall be made in the books and records of the Company for any reason, and no employee, officer or director shall engage in any arrangement that results in such prohibited act, even if directed to do so by a supervisor;
- No payment shall be approved or made with the agreement or understanding that any part of such payment is to be used for any purpose other than that described by documents supporting the payment;
- There will be no disbursements or receipts of corporate funds outside of Azure Power's established system of accountability; and
- No employee, officer or director shall incur unreasonable expenses on behalf of the Company.

## 14. Disclosure

The Company's policy is to provide full, fair, accurate, timely, and reasonable disclosure in reports and documents that are filed with or submitted to any outside agency and/or for other public communications.

## 15. Compliance with governmental laws, rules and regulations/internal Company policies

Employees, officers and directors of the Company must comply with all applicable governmental laws, rules and regulations. Employees, officers and directors must acquire appropriate knowledge of the legal requirements relating to their duties sufficient to enable them to recognize potential dangers, and to know when to seek advice from the Company designated Compliance officer.

## 16. Anti- money laundering


All employees, officers and directors of the Company must ensure that the operations of the Company and its subsidiaries are conducted at all times in compliance with all applicable financial record keeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable anti-money laundering statutes of all applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental or regulatory agency (collectively, the "Anti-Money Laundering Laws").

17. **Sanctions**

The Company and its directors, officers and employees shall carry out business in strict observance with all applicable national and international laws and regulations relating to sanctions. The Company will not condone actual or even the appearance of breach of these rules. US sanctions legislation prohibits certain dealings with designated entities and nationals. Iran Sanctions Act, including subsequent sanctions acts against Iran (including but not limited to CISADA, National Defense Authorization Act, Iran Threat Reduction and Syria Human Rights Act, Iran Freedom and Counter-Proliferation Act ("Iran Sanctions"), Ukraine related sanctions, U.S. Executive Orders and other US sanctions legislations apply to US persons and non-US persons in some circumstances. Other sanctions legislations which may apply to the Company include the UN Security Council Resolutions and EU Council Regulations. As a matter of policy, the Company will not engage in sanctionable transactions with entities or persons on the list of Specially Designated Nationals ("SDNs") published by the Office of Foreign Assets Control ("OFAC") of the United States, any designated entities under the EU Regulations or with any other entities or persons which would be at risk of violating any applicable sanctions regulations.

Although the Company is not involved in the export or re-export business, transactions with the companies or individuals listed on the Department of Commerce's List of Denied Persons or on the "Entity List" is prohibited.

All employees, officers and directors of the Company must always stay vigilant and never violate any of the above rules. If an individual discovers any risk of breach in the above rules, such individual must report immediately to his or her immediate superior, the head of function/ department or Company designated Compliance Officer. Failure to report a concern related to these rules will be treated seriously. If you are in any doubt, you are required to seek advice.

18. **Compliance with the U.S. Foreign Corrupt Practices Act**

The U.S. Foreign Corrupt Practices Act ("FCPA") and similar laws in other countries that apply to the Company prohibit promising, authorizing or giving anything of value, directly or indirectly, to a non-U.S. government official to influence the misuse of the official's position or secure an improper advantage in an effort to win or retain business. A non-U.S. government official is defined broadly and can be any official or employee of any non-U.S. government department, agency or state-owned company; officers or employees of public international organizations (such as the United Nations); any non-U.S. party officials or political candidates. Also, international anti-corruption laws, such as the UK Bribery Act, make it a crime to offer or pay bribes or kickbacks to private parties as well as government officials.


The prohibition under the FCPA is very broad, and covers:
- cash payments;
- non-cash "payments", benefits, and favours; and
- in certain circumstances, even gifts, entertainment, and hosted travel or training which would otherwise be deemed legitimate business expenditures

The FCPA prohibits these payments whether they are made directly or indirectly through third parties, such as agents, consultants, channel partners, resellers, or other representatives and affiliates of the Company where the Company has majority ownership, including joint ventures and special purpose vehicles ("SPVs") and other entities over which the Company possesses corporate control, regardless of whether such payments or benefits are actually paid or given.

In other words, a "willful blindness" to a suspected improper payment or a mere promise of something improper can be the basis for a violation of the FCPA.

The FCPA also requires the Company to maintain internal accounting controls and keep books and records that accurately reflect all transactions and the disposition of assets, which includes but is not limited to an obligation to keep accurate records regarding gifts, entertainment and/or travel provided to foreign officials.

**Bribes**

All employees, officers and directors of the Company must not engage in any form of bribery, to any government official, private party or any third party (such as an agent or third party intermediary) either directly or indirectly.

**Facilitation payments and kickbacks**

The Company prohibits all its employees, officers and directors from making any facilitation payments directly or indirectly on behalf of the Company.

Facilitation payments are a form of bribery made for the purpose of expediting or facilitating the performance of a public official for a routine governmental action, and not to obtain or retain business or any improper business advantage.

19. **Business expenditure**

Offering or receiving any gift, gratuity or entertainment that might be perceived to unfairly influence a business relationship should be avoided.

Business gifts and entertainment are customary courtesies designed to build goodwill among business partners. These courtesies include such things as meals and beverages, tickets to sporting or cultural events, discounts not available to the general public, travel, accommodation and other



merchandise or services. In some cultures they play an important role in business relationships. However, a problem may arise when such courtesies compromise – or appear to compromise – the recipient's ability to make objective and fair business decisions.

This policy applies to all employees, officers, and directors offering gifts and entertainment to the Company's business associates.

## 20. Political contributions

The Company will not make donations or contributions, whether in cash or kind, in support of any political parties or candidates.

## 21. Charitable contributions

All contributions will be made by the Company and not by employees, officers, and directors in his/ her individual capacity after obtaining prior written approval from the Chief Executive Officer or the Chief Financial Officer of the Company.

## 22. Insider trading

It is the trading that takes place when the employees, officers or directors possessing privileged and confidential information about important events use the special advantage of that knowledge to reap profits or avoid losses on the stock market, to the detriment of the source of the information and to the typical investors who buy or sell their stock without the advantage of 'inside information.'

All employees, officers and directors are prohibited to trade in the securities (including equity securities, convertible securities, options, bonds and any stock index containing the security) of the Company during employment with the Company while in the possession of material, non-public information (also known as 'inside information') regarding the Company.

If any employee, officer or director believes that the individual has come into possession of an inside information, such individual may not execute any trade in the securities of the Company without first consulting with the Company designated Compliance Officer and Chief Financial Officer, who will then determine whether such trade would violate Azure Power's policy/applicable laws. The definition of 'material, non-public information' is broad. As a rule of thumb, any information that would affect the value of stock or other securities should be considered material. Examples of information that is generally considered "material" may include:

- Financial results or forecasts, or any information that indicates the Company's financial results may exceed or fall short of forecasts or expectations;
- Important new products or services;
- Pending or contemplated acquisitions or dispositions, including mergers, tender offers or joint venture proposals;
- Possible management changes or changes of control;
- Pending or contemplated public or private sales of debt or equity securities;
- Acquisition or loss of a significant customer or contract;
- Significant write-offs; and



- Initiation or settlement of significant litigation.

Information is "non-public" if it has not been made generally available to the public by means of a press release or other means of widespread distribution

### 23. Interpretation of the Code

Any question or interpretation under this Code shall be addressed to the Board or any person/committee authorized by the Board. Any waiver of the Code for executive officers or directors may be made only by the Board or a designated person/committee. An individual seeking a waiver of this Code shall make full disclosure of the particular circumstances to the Board or the designated person/committee.

### 24. Amendments of the Code

We are committed to continuously reviewing and updating our policies and procedures. Therefore, this Code is subject to modification. Amendment of any provision of this Code must be approved by the Company's Board and in applicable regulatory filings pursuant to applicable laws and regulations, together with details about the nature of the amendment.

### 25. Administration of the Code

#### *Distribution*

All employees, officers and directors of the Company shall receive a copy of this Code and are required to acknowledge reading and understanding the document. Further, all new employees, officers and directors are mandatorily required to read, understand and acknowledge their understanding at the time of joining the Company.

#### *Approvals*

Any waiver of or approval of non-compliance with any provision of this Code requires the prior written approval of the Company's Board or a committee of the Board with authority to grant such waivers and approvals. Copies of these approvals should be maintained by the Company and made available to auditors or investigating authorities.

#### *Reporting of violations*

All employees, officers, and directors who are or become aware of or suspect a violation of this Code are under an obligation to report to the designated person or committee of the Company. Violations or suspected violations should be reported by contacting the Company designated Compliance Officer or reporting as per the procedures set out in the Company's Whistle-Blower Policy. Reports may also be made anonymously.

The Company will not take any adverse action against anyone for providing truthful information relating to a violation of law or Company policy, and the Company will not tolerate any retaliation against persons asking questions or making good faith reports of possible violations of this Policy. Anyone who retaliates or attempts to retaliate will be disciplined. Any person who believes he or



she has been retaliated against should immediately follow the instructions in the Company's Whistle-Blower Policy.

*Investigations*

Investigations of an alleged violation of the Code shall not be commenced in any form by any Business unit/ Department/ Project Site without the written approval of the Company designated Compliance officer. Investigation process has been defined in the Company's Whistle-Blower Policy.

All employees, officers and directors are expected to cooperate with investigations undertaken or approved by the Company designated Compliance officer.

*Disciplinary action on non-compliance*

Violations of this Code will not be tolerated. Any employee, officer, or director who violates this Code will be subject to disciplinary action up to and including termination of employment or relationship with the Company.

26. **Code of conduct training**

The code requires all employees and directors to undergo the Company's code of conduct training course/s, which will be rolled out by the Company from time to time. The course/s may be conducted on-line or in-person and will be administered by the Company designated Compliance officer.

Notification for these trainings will be sent via email that they are required to take the training. Those required to take such course/s must do so within the notified timeframe and repeat the course/s as and when required.

Failure to do so without justification will be viewed very seriously by the Company and could be considered as violation of the code of conduct.

*A. ANNUAL TRAINING*

Annual training is required for all Company personnel and directors. All relevant Company personnel will receive on-line or in-person trainings.

*B. ON-BOARD TRAINING*

All New employees in the Company shall be provided with code of conduct training by the Human Resource Department as part of their on-boarding process.

*C. TRAINING COMPLETION ACKNOWLEDGEMENT*

 

Each attendee should be provided with and sign a certification that states that the employee understood the training and understands his or her obligation to abide by the Company's code of conduct.

### D.  TRAINING RECORDS

For each training session conducted, the Company designated Compliance Officer will create and retain a record of the training that includes the following:
-   the name of the person conducting the training,
-   a list of attendees, and
-   a copy of the materials used.

These training records shall be retained for a period of five (5) years from the date of the training.

 

**ACKNOWLEDGEMENT**

**Acknowledgment of receipt of the Company's Code of Business Conduct and Ethics**

**For the employees —**

I have received, read and understood the Company's Code of Business Conduct and Ethics (Code) for employees. I understand the standards and policies contained in the Code and understand that there may be additional policies or laws specific to my job. I agree to comply with the Code, any Company policies, and the legal and regulatory requirements applicable to my job.

If I have questions concerning the meaning or application of the Code, any Company policies, or the legal and regulatory requirements applicable to my job, I understand that I can consult my immediate superior or head of department / function or Company designated Compliance officer and that my questions or reports to these sources will be maintained in confidence.

**Name:** _____

**Signature:** _____

**Date:** _____


*Please sign and return this form to the HR department, for records.*

Annual confirmation

**Exhibit 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Sunil Gupta, certify that:

1.  I have reviewed this annual report on Form 20-F of Azure Power Global Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit and risk committee of the company's Board of Directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: October 11, 2023

By:      /s/ Sunil Gupta
Name:  Sunil Gupta
Title:    Chief Executive Officer

**Exhibit 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Sugata Sircar, certify that:

1. I have reviewed this annual report on Form 20-F of Azure Power Global Limited:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit and risk committee of the company's Board of Directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: October 11, 2023

By:     /s/ Sugata Sircar
Name:  Sugata Sircar
Title:    Group Chief Financial Officer

**Exhibit 13.1**

**CERTIFICATION BY THE CHIEF EXECUTIVE OFFICER PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Azure Power Global Limited (the "Company") on Form 20-F for the fiscal year ended March 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Sunil Gupta, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C.§ 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: October 11, 2023

By:      /s/ Sunil Gupta
Name:  Sunil Gupta
Title:    Chief Executive Officer

**Exhibit 13.2**

**CERTIFICATION BY THE GROUP CHIEF FINANCIAL OFFICER PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002**

      In connection with the Annual Report of Azure Power Global Limited (the "Company") on Form 20-F for the fiscal year ended March 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Sugata Sircar, Group Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C.§ 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

      1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: October 11, 2023

By:    /s/ Sugata Sircar
Name : Sugata Sircar
Title:   Group Chief Financial Officer