# EXHIBIT Y

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, DC 20549**

---

# FORM 6-K

---

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**As at December 27, 2021**

**Commission File Number 001-37909**

---

# AZURE POWER GLOBAL LIMITED

---

**5th Floor, Southern Park, D-II,**
**Saket Place, Saket, New Delhi 110017, India**
**(Address of principal executive offices)**

---

Indicate by check mark whether the registrant files or will file annual reports under cover Form 20-F or Form 40-F. Form 20-F ☒ Form 40 F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1). ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7). ☐

**<u>Exhibit Index</u>**

Exhibit
Number      Description

99.1        Press Release dated December 27, 2021
99.2        Backstop Commitment Agreement, dated December 27, 2021
99.3        Press Announcement of Rights Offering, dated December 27, 2021
99.4        Notice of Record Date, dated December 27, 2021
99.5        Dealer Manager Agreement, dated December 27, 2021

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

AZURE POWER GLOBAL LIMITED

Date: December 27, 2021

By: /s/ Ranjit Gupta

    Name:  Ranjit Gupta
    Title:    Principal Executive Officer

**Exhibit 99.1**



**Operational and financial Update**

**Ebene, December 27, 2021**: Azure Power Global Limited (NYSE: AZRE) (the "Company"), a leading independent renewable power producer in India, today announced certain operational and financial updates in connection with the Rights Offering that was also announced today.

This is not an offer to sell or purchase nor the solicitation of an offer to sell or purchase securities and shall not constitute an offer, solicitation or sale in any state or jurisdiction in which, or to any person to whom such an offer, solicitation or sale would be unlawful.

**RECENT DEVELOPMENTS**

In November 2021, the Company signed PPAs with Solar Energy Corporation of India ("SECI") for 600 MWs at a fixed tariff of INR 2.54 per kWh and, in December 2021, signed PPAs with SECI for a further 2,333 MWs at a fixed tariff of INR 2.42 per kWh for supply power for 25 years, as a part of the 4,000 MW manufacturing linked projects.

The Company has also received letter of awards (LOA), for its first 120 MWs wind project and first 150 MWs solar – wind hybrid project, from SECI. The Company further received LOA for 200 MWs solar – wind hybrid project from Maharashtra State Electricity Distribution Co. Limited (MSEDCL).

The Company is evaluating, and is in preliminary discussions, with sellers of renewable energy assets in India that would complement its current portfolio. Some of these assets may be sizeable and may result in significant acquisitions. The Company's strategy is to continue to build shareholder value and to evaluate acquisition opportunities that satisfy criteria of value accretive returns.

During the second fiscal quarter ended September 30, 2021, the Company issued Solar Green bonds (the "Bonds") of US$414 Million through its wholly owned subsidiary, Azure Power Energy Ltd at coupon of 3.575% maturing in 2026. The proceeds from the Bonds were used to repay the 5.50% US$ 500 Million solar green bond issued in 2017 with a maturity in 2022. The Bonds have a tenor of 5 years with amortisation and waterfall structures and their issuance is a leverage-positive transaction for the Company.

During the quarter ended September 30, 2021, the Company received a favorable order from the Appellate Tribunal for Electricity ("APTEL") relating to ongoing litigation in relation to the 40 MW Karnataka project having a power purchase agreement with Gulbarga Electricity Supply Company Limited (GESCOM). APTEL set aside the order of Karnataka Regulatory Commission ("KERC"), wherein the KERC had reduced the extension of time, reduced the PPA tariff and imposed liquidated damages. Subsequent to the period ended September 30, 2021, the GESCOM has further filed an appeal with Supreme Court against the order.

The Company also received a favourable order from Karnataka High Court (Order dated December 02, 2021 in WP 5368 of 2020) for its 50 MW Solar Power Project in Karnataka, against Hubli Electricity Supply Company Limited ("HESCOM"), i.e. procurer DISCOM under its PPA, whereby HESCOM has been, inter alia, directed to pay and clear all the outstanding dues payable by it in relation to all the bills and invoices raised as on the date of order and make prompt, regular and timely payments without any delay in relation to future invoices. HESCOM has also been directed to forthwith open or renew monthly irrevocable letters of credit in terms of the PPA between the Company and HESCOM. Additionally, general directions to all the DISCOMs in the State of Karnataka, have been, inter alia, to issue, honour, discharge and fulfil their duties, obligations and liabilities under the respective PPAs including opening of letters of credit as per PPA and to make prompt, regular and timely payments without any delay in relation to future invoices raised by power generators in the State of Karnataka.

During the current year, the Company received complaints and anonymous whistle-blower reports which made various claims against certain of the Company's Key Managerial Personnel, related to their and the Company's actions in relation to the acquisition of and use of land in Rajasthan, Assam and Uttar Pradesh, as well as certain other corporate actions. The Company, through its Audit Committee, and with the assistance of external counsel and forensic auditors, has completed its investigation to determine whether the allegations made in the complaints or contained in the whistle-blower reports are substantive. The issues raised, including those raised against Key Management Personnel, have been closed and allegations were not substantiated; however, the Company determined that its ethics policies regarding external consultants should be enhanced. The Company, through its Audit Committee and with the assistance of external counsel, will be taking remedial steps (including training and policy review).

During the third quarter ending December 31, 2021, the Company received an unfavorable order from appellate authority from the Mumbai Centre for International Arbitration ("MCIA"), relating to arbitration proceedings initiated by the Company's former chief executive officer in relation to his transition agreement. The Company is in process of evaluating the order received and will take necessary action in due course.

The Enforcement Directorate of India filed a Prosecution Complaint with a special court in New Delhi on October 1, 2021, in respect of an earlier Enforcement Case Information Report wherein Mr. Pawan Kumar Agrawal, the current Chief Financial Officer of the Company, is one of those named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. The relevant transactions that are the subject of the complaint predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of the Company, and the criminal charges are not directed at, and do not concern, the Company or its subsidiaries. The Company will continue to monitor the proceedings as Mr. Agrawal defends the charges made against him.

Certain PPAs, particularly the PPAs executed with SECI require the project developer to maintain its controlling shareholding (more than 50% of the voting rights and paid-up share capital) prevalent at the time of the signing of the PPA up to one year after the commercial operation date; however, transfer of controlling shareholding within the same group companies is permitted with the permission of SECI after the commercial operation date, subject to the condition that the management control remains with same group companies.

In April 2021, the Supreme Court of India while passing an order for a petition filed under public interest litigation (PIL) aimed at the conservation of two species of birds, the Great Indian Bustard and the Lesser Florican, directed the states of Rajasthan and Gujarat including developers having overhead transmission lines in identified priority and potential area to take necessary steps for conversion of overhead power lines to underground lines and in the interim install bird diverters on the overhead lines. However, in the non-feasibility of converting high voltage lines to underground lines, the matter can be referred for technical evaluation by a committee set up by Supreme Court. The conversion of overhead cables into underground power lines, wherever considered feasible by such committee, is to take place within a period of one year. The order of the Supreme Court mentioned the pass through of such expenses incurred by the power developers to the ultimate consumer, subject to approval of the Competent Regulatory Authority. The Company and other players in the industry through Solar Power Developer Association. as well as, Union of India (Ministry of New and Renewable (MNRE) have submitted a modification application to Supreme Court of India, seeking allowance for laying of over-head transmission lines outside priority areas as well as inside priority areas if the lines are of high/extra high voltage of 33 kV or above and to examine on case-to-case basis study for requirement of undergrounding even for 33kV and lower in priority area. The Management has preliminarily assessed that any costs incurred to comply with the said order are likely to be substantially or wholly recoverable by the Company under provisions of change in law and/or force majeure of their respective PPAs in due course following the prescribed procedure under the respective PPAs and law.

## MANAGEMENT DISCUSSION AND ANALYSIS ON OPERATING AND FINANCIAL REVIEW

### Unaudited Condensed Financial Information

The following is a summary of our unaudited condensed consolidated statement of operations data for the six months ended September 30, 2020 and 2021, a summary of our audited condensed consolidated balance sheet data as of March 31, 2021 and unaudited condensed consolidated balance sheet data as of September 30, 2021 and a summary of our unaudited condensed consolidated cash flow data for the six months ended September 30, 2020 and 2021. We have prepared this unaudited condensed consolidated financial information on the same basis as our audited consolidated financial statements and in accordance with United States generally accepted accounting principles. Results for the first six months of our fiscal year ending March 31, 2022 may not be indicative of our full-year results for our full fiscal year or for future six month periods.

# UNAUDITED CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS

| | Six Months ended September 30, | | |
|---|---|---|---|
| | 2020 | 2021 | 2021 |
| | INR | INR | US$ (1) |
| | | (Unaudited) | |
| | (in millions, except per share data) | | |
| **Operating revenues:** | | | |
| Revenue from customers | 7,444 | 8,826 | 119.0 |
| **Operating costs and expenses:** | | | |
| Cost of operations (exclusive of depreciation and amortization shown separately below) | 572 | 700 | 9.4 |
| General and administrative | 1,256 | 773 | 10.4 |
| Depreciation and amortization | 1,528 | 1,679 | 22.6 |
| Impairment loss *(Refer note A)* | - | 40 | 0.5 |
| Total operating costs and expenses | 3,356 | 3,192 | 42.9 |
| **Operating income** | **4,088** | **5,634** | **76.1** |
| **Other expenses, net:** | | | |
| Interest expense, net | 4,186 | 4,666 | 62.8 |
| Other expenses net | - | 2 | 0.0 |
| Loss (gain) on foreign currency exchange, net | 4 | (108) | (1.4) |
| Total other expenses, net | 4,190 | 4,560 | 61.4 |
| **Profit (loss) before income tax** | **(102)** | **1,074** | **14.7** |
| Income tax expense | (220) | (677) | (9.1) |
| **Net (loss) profit** | **(322)** | **397** | **5.6** |
| Less: Net loss attributable to non-controlling interest | (5) | (19) | (0.3) |
| **Net (loss) / profit attributable to APGL equity Shareholders** | **(327)** | **378** | **5.3** |
| **Net (loss) / profit per share attributable to APGL equity Shareholders:** | | | |
| Basic | (6.84) | 7.84 | 0.11 |
| Diluted | (6.84) | 7.76 | 0.10 |
| Shares used in computing basic and diluted per share amounts | | | |
| Equity shares: Basic | 47,817,323 | 48,203,336 | |
| Equity shares: Diluted | 47,817,323 | 48,708,973 | |
| **Supplement information:** | | | |
| Adjusted EBITDA (2) | **5,616** | **7,353** | **99.2** |

(1) Translation of balances from INR to US$ in the condensed consolidated statement of operations is for the convenience of the reader and was calculated using a rate of US$1.00 = INR 74.16, which is the noon buying rate in New York City for cable transfer in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York on September 30, 2021.

(2) Adjusted EBITDA is a non-GAAP financial measure. We present Adjusted EBITDA as a supplemental measure of our performance. This measurement is not recognized in accordance with U.S. GAAP and should not be viewed as an alternative to U.S. GAAP measures of performance. The presentation of Adjusted EBITDA should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

**Adjusted EBITDA**

We define Adjusted EBITDA as net loss (profit) plus (a) income tax expense, (b) interest expense, net, (c) depreciation and amortization and (d) loss (gain) on foreign currency exchange, net, (e) Other expenses/ (income) and (f) Impairment loss. We believe Adjusted EBITDA is useful to investors in assessing our ongoing financial performance and provides improved comparability between periods through the exclusion of certain items that management believes are not indicative of our operational profitability and that may obscure underlying business results and trends. However, this measure should not be considered in isolation or viewed as a substitute for net income or other measures of performance determined in accordance with U.S. GAAP. Moreover, Adjusted EBITDA as used herein is not necessarily comparable to other similarly titled measures of other companies due to potential inconsistencies in the methods of calculation.

Our management believes this measure is useful to compare general operating performance from period to period and to make certain related management decisions. Adjusted EBITDA is also used by securities analysts, lenders and others in their evaluation of different companies because it excludes certain items that can vary widely across different industries or among companies within the same industry. For example, interest expense can be highly dependent on a company's capital structure, debt levels and credit ratings. Therefore, the impact of interest expense on earnings can vary significantly among companies. In addition, the tax positions of companies can vary because of their differing abilities to take advantage of tax benefits and because of the tax policies of the various jurisdictions in which they operate. As a result, effective tax rates and tax expense can vary considerably among companies.

Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under U.S. GAAP. Some of these limitations include:

- it does not reflect cash expenditures or future requirements for capital expenditures or contractual commitments or foreign exchange gain/loss;

- it does not reflect changes in, or cash requirements for, working capital;

- it does not reflect significant interest expense or the cash requirements necessary to service interest or principal payments on outstanding debt;

- it does not reflect payments made or future requirements for income taxes; and

- although depreciation, amortization and impairment are non-cash charges, the assets being depreciated and amortized will often have to be replaced or paid in the future and Adjusted EBITDA does not reflect cash requirements for such replacements or payments.

Investors are encouraged to evaluate each adjustment and the reasons we consider it appropriate for supplemental analysis.

The table below sets forth a reconciliation of our Net (Loss)/Profit to Adjusted EBITDA for the periods indicated:

| | Unaudited Six Months ended September 30, | | |
|---|---|---|---|
| | **2020** | **2021** | **2021** |
| | **INR** | **INR** | **US$ (a)** |
| | | **(in millions)** | |
| Net (Loss) /Profit | **(322)** | **397** | **5.6** |
| Income tax expense | 220 | 677 | 9.1 |
| Interest expense, net | 4,186 | 4,666 | 62.9 |
| Depreciation and amortization | 1,528 | 1,679 | 22.6 |
| Loss/(gain) on foreign currency exchange, net | 4 | (108) | (1.5) |
| Other expenses/ (income) | - | 2 | 0.0 |
| Impairment loss | - | 40 | 0.5 |
| **Adjusted EBITDA** | **5,616** | **7,353** | **99.2** |

(a)     Refer to note (1) above.

<h1 style="text-align:center">Condensed Consolidated Balance Sheets</h1>
(INR and US$ amounts in millions, except share and par value data)

| | As of March 31, | As of September 30, | |
| --- | --- | --- | --- |
| | 2021 (INR) | 2021 (INR) | 2021 (US$) (1) |
| | Audited | Unaudited | Unaudited |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | 11,107 | 9,513 | 128.3 |
| Restricted cash | 4,881 | 9,780 | 131.9 |
| Accounts receivable, net | 4,887 | 5,680 | 76.6 |
| Prepaid expenses and other current assets | 2,190 | 2,317 | 31.1 |
| Assets classified as held for sale (Refer Note A) | 3,301 | 3,683 | 49.7 |
| **Total current assets** | **26,366** | **30,973** | **417.6** |
| Restricted cash | 170 | 95 | 1.3 |
| Property, plant and equipment, net | 108,847 | 120,808 | 1,628.7 |
| Software, net | 29 | 21 | 0.3 |
| Deferred income taxes | 1,748 | 1,999 | 27.0 |
| Right-of-use assets | 4,214 | 4,023 | 54.2 |
| Other assets | 7,084 | 2,431 | 32.8 |
| Investments in held to maturity securities | 7 | 6 | 0.1 |
| **Total assets** | **148,465** | **160,356** | **2,162.0** |
| **Liabilities and shareholders' equity** | | | |
| Current liabilities: | | | |
| Short-term debt | 8,943 | 21,273 | 286.9 |
| Accounts payable | 4,294 | 5,578 | 75.2 |
| Current portion of long-term debt | 4,658 | 7,107 | 95.8 |
| Income taxes payable | 46 | 47 | 0.6 |
| Interest payable | 1,530 | 854 | 11.5 |
| Deferred revenue | 110 | 110 | 1.5 |
| Lease liabilities | 283 | 274 | 3.7 |
| Other liabilities | 1,927 | 1,920 | 26.0 |
| Liabilities directly associated with assets classified as held for sale (Refer Note A) | 2,272 | 2,279 | 30.7 |
| **Total current liabilities** | **24,063** | **39,442** | **531.9** |
| **Non-current liabilities:** | | | |
| Long-term debt | 89,922 | 86,929 | 1,172.2 |
| Deferred revenue | 2,353 | 2,334 | 31.5 |
| Deferred income taxes | 2,046 | 1,644 | 22.2 |
| Asset retirement obligations | 811 | 927 | 12.5 |
| Lease liabilities | 3,359 | 3,212 | 43.3 |
| Other liabilities | 1,459 | 1,547 | 20.4 |
| **Total liabilities** | **124,013** | **136,035** | **1,834.0** |
| **Shareholders' equity** | | | |
| Equity shares, US$ 0.000625 par value; 48,195,962 and 48,206,937 shares issued and outstanding as of March 31, 2021, and September 30, 2021, respectively | 2 | 2 | 0.0 |
| Additional paid-in capital | 38,004 | 38,063 | 513.3 |
| Accumulated deficit | (12,786) | (12,408) | (167.3) |
| Accumulated other comprehensive loss | (972) | (1,559) | (21.0) |
| **Total APGL shareholders' equity** | **24,248** | **24,098** | **325.0** |
| Non-controlling interest | 204 | 223 | 3.0 |
| **Total shareholders' equity** | **24,452** | **24,321** | **328.0** |
| **Total liabilities and shareholders' equity** | **148,465** | **160,356** | **2,162.0** |

(1) Translation of balances from INR to US$ in the condensed consolidated balance sheets is for the convenience of the reader and was calculated using a rate of US$1.00 = INR 74.16, which is the noon buying rate in New York City for cable transfer in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York on September 30, 2021.

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Six Months ended September 30, | | |
| --- | --- | --- | --- |
| | **2020** | **2021** | **2021** |
| | **INR** | **INR** **(Unaudited)** **(in millions)** | **US$ (1)** |
| Net cash provided by operating activities | 2,431 | 1853 | 25.1 |
| Net cash used in investing activities | (7,174) | (11,961) | (161.6) |
| Net cash provided by financing activities | 3,356 | 13,336 | 179.8 |

(1) Translation of balances from INR to US$ in the condensed consolidated statement of cash flow is for the convenience of the reader and was calculated using a rate of US$1.00 = INR 74.16, which is the noon buying rate in New York City for cable transfer in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York on September 30, 2021.

**Note A : Impairment of assets and Asset held for Sale**

In April 2021, the Company has entered into an agreement with Radiance Renewables Pvt. Ltd. ("Radiance") to sell certain subsidiaries (the "Rooftop Subsidiaries") with an operating capacity of 153 MWs (the "Rooftop Portfolio") for INR 5,350 million, subject to certain purchase price adjustments (the "Rooftop Sale Agreement"). Pursuant to the Rooftop Sale Agreement, Radiance will acquire 100% of the equity ownership of the Rooftop Subsidiaries owned by the Group. The Company had recognized an impairment loss in relation to the Rooftop Subsidiaries aggregating to INR 3,255 million during the year ended March 31, 2021, pursuant thereto these assets (net) are carried at its fair values in the financial statements.

As per the terms of the Rooftop Sale Agreement in respect to 43.2 MWs operating capacity that are part of the Restricted Groups (as defined in the respective Green Bond Indentures) 48.6% of the equity ownership will be transferred to Radiance on the closing date, and pursuant to the terms of the Green Bond Indentures, the remaining 51.4% may only be transferred post refinancing of the Green Bonds. During the six months ended September 30, 2021, post refinancing of 5.5% Senior Notes and repayment of loan relating to one of a rooftop project of 10 MWs, the restriction on transfer of shareholding was released and related assets and liabilities of the SPV have been reclassified and reported as assets held for sale as of September 30, 2021. The loan repaid by the Company relating to this 10 MW project will be recovered from Radiance.

The transfer of ownership for the remaining operating capacity of 33.2 MWs for the Solar Green Bonds is not anticipated to occur within 12 months, hence, the assets and liabilities of these subsidiaries are not presented as "Assets classified as held for sale" and instead continue to be classified within the respective balance sheet captions in the condensed consolidated financial statements at September 30, 2021.

There is also a restriction on transfer of equity ownership relating to the 16 MW project with Delhi Jal Board (DJB), wherein 49% of the equity ownership will be transferred to Radiance on closing date, and the remaining 51% will be transferred on or after March 31, 2024. Accordingly, the related assets and liabilities of the DJB 16 MW project are not presented as "Assets classified as held for sale" and instead continue to be classified within the respective balance sheet captions at September 30, 2021 and March 31, 2021 respectively.

The sale of Rooftop Subsidiaries having remaining 103.8 MWs (including 10 MWs mentioned above) operating capacity is expected to be consummated within the next 12 months and accordingly the assets and related liabilities of these subsidiaries are shown as "Assets classified as held for sale" in the condensed consolidated balance sheet as at September 30,2021. The Company has recognized impairment loss of INR 40 million (US$ 0.5 million) in this respect under condensed consolidated Statement of Operations for the six months ended 30 September 2021.

The Company is in process of obtaining requisite approvals/ condition precedents, as defined in the contract, for transfer of its shareholding in the Rooftop subsidiaries and proceeds are expected to be received by end of current financial year.

In the event the sale of the Rooftop Subsidiaries does not occur, the Company must reimburse Radiance the equity value of the assets not transferred along with an 10.5% per annum equity return.

In May 2021, the Company has disposed its investment in a subsidiary on a going concern basis for consideration of INR 123 million (US$ 1.7 million). The same was reported as asset held for sale under financials for the year ended March 31, 2021.

The assets and liabilities of the Rooftop Subsidiaries classified as held for sale, together with the calculation of the related impairment loss is shown below.

| | As of September 30, | |
|---|---|---|
| | 2021 | 2021 |
| | (INR) | (US$) |
| | (In million) | |
| | (Unaudited) | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | 164 | 2.2 |
| Restricted cash | 267 | 3.6 |
| Accounts receivable, net | 313 | 4.2 |
| Prepaid expenses and other current assets | 9 | 0.1 |
| **Total current assets** | 753 | 10.1 |
| Property, plant and equipment, net | 2,946 | 39.7 |
| Other assets | 25 | 0.3 |
| **Total assets (A)** | 3,724 | 50.1 |
| **Liabilities** | | |
| Current liabilities: | | |
| Accounts payable | 6 | 0.1 |
| Current portion of long-term debt | 12 | 0.2 |
| Interest payable | 91 | 1.2 |
| Other liabilities | 172 | 2.3 |
| **Total current liabilities** | 281 | 3.8 |
| **Non-current liabilities:** | | |
| Long-term debt | 1,948 | 26.3 |
| Other liabilities | 51 | 0.7 |
| **Total liabilities (B)** | 2,280 | 30.8 |
| **Net Assets (C=A-B)** | 1,444 | 19.3 |
| **Fair value (D)** | 1,404 | 18.8 |
| **Impairment loss (E=C-D)** | 40[1] | 0.5 |

During the six months ended September 30, 2021 the Company has recorded an Impairment loss of INR 40 million (US$ 0.5 million) on account of changes in fair value of carrying value of net assets.

The fair value of consideration related to the rooftop sale includes expected recovery of VGF for INR 463 million (US$ 6.3 million). The Company has undertaken to refund to the purchaser an amount equivalent to 85% of any shortfall in recovery of VGF. Based on the current circumstances, management has assessed that they have complied with the conditions associated with the grant of VGF and hence have determined that the recovery of the VGF is likely.

During the six months ended September 30, 2021, in respect of the 33.2 MWs operating capacity that are part of the Restricted Groups, and 16 MW project with Delhi Jal Board, the Company has consolidated the entities in the consolidated financial statements and net carrying value of assets are reinstated.

<strong>Results of Operations for the Six Months ended September 30, 2021<br>Compared to the Six Months ended September 30, 2020</strong>

**Operating Revenues**

Operating revenues during the six months ended September 30, 2021, increased by INR 1,382 million, or 19%, to INR 8,826 million (US$119.0 million), compared to the same six months period in 2020. This increase was mainly driven by revenue generated from projects which were commissioned after the period ended September 30, 2020, and additional revenue of INR 408 million (US$ 5.5 million) from sale of carbon credits. Further the operating revenue for six months ended September 30, 2021, includes INR 343 million (US$ 4.6 million) relating to Rooftop Portfolio of 153 MWs (AC), which the Company has entered into an agreement to sell during April 2021.

**Cost of Operations (Exclusive of Depreciation and Amortization)**

Cost of operations during the six months ended September 30, 2021, increased by INR 128 million, or 22%, to INR 700 million (US$9.4 million), compared to the six months ended September 30, 2020. The increase in the cost of operations was primarily due to increase in operational expenses from project commissioned after the period ended September 30, 2020, and lower cost of operations by INR 50 million during six months ended September 30, 2020, primarily due to country wide lockdowns imposed after outbreak of first wave of COVID-19 which resulted in slowdown of maintenance activity in that six months.

The cost of operations per megawatt during the six months ended September 30, 2021, increased marginally to INR 0.31 million (~US$ 4,200), from INR 0.27 million (~US$ 3,700) in the six months ended September 30, 2020.

**General and Administrative Expenses**

General and administrative expenses for the six months ended September 30, 2021, were INR 773 million (US$ 10.4 million), a decline of INR 483 million (US$ 6.5 million) compared to the six months ended September 30, 2020. The decrease in general and administrative expense during six months ended September 30, 2021 was primarily due to reversal of stock appreciation rights (SARs) expense by INR 143 million (US$ 1.9 million) as compared to expense of INR 561 million in the six months ended September 30, 2020, partly offset by increase in legal and professional expenses by INR 183 million (US$ 2.5 million). As of September 30, 2021, 1,875,000 SARs were outstanding of which 1,682,500 SARs are not exercisable until 2024 on which we will not incur any cash payments until that time.

**Depreciation and Amortization**

Depreciation and amortization during the six months ended September 30, 2021, increased by INR 151 million (US$ 2.0 million), or 10%, to INR 1,679 million (US$ 22.6 million) compared to the six months ended September 30, 2020. The increase primarily relates to the projects commissioned since period ended September 30, 2020.

*Impairment loss*

The Company entered into an agreement with Radiance Renewables Pvt. Ltd. to sell certain subsidiaries with an operating capacity of 153 MWs. The Company is in the process of obtaining requisite approvals from off takers and lenders for the completion of the transaction. Pending transfer of shareholding, these Rooftop entities are currently being consolidated in the Company. The Company has further recognized an impairment loss of INR 40 million (US$ 0.5 million) during the six months ended September 30, 2021 in relation to change in fair valuations. The impairment loss offsets the amount which has been recognized in other line items of the profit and loss account and will not impact the overall profitability of the Company.

**Interest Expense, Net**

Net interest expense during the six months ended September 30, 2021, increased by INR 480 million (US$ 6.5 million), or 11% compared to the six months ended September 30, 2020, to INR 4,666 million (US$ 62.8 million). The increase is primarily due to an increase in interest expense of INR 683 million (US$ 9.2 million) on borrowings related to projects commissioned after September 30, 2020 after considering refinancing, interest reset, non-recurring charges relating to refinancing of the 5.5% Solar Green bonds, INR 109 million (US$ 1.5 million) and INR 115 million (US$ 1.6 million) relating to one time charge related to refinancing of existing loans, partially offset by INR 264 million (US$ 3.6 million) for charges related to refinancing of a loan incurred during the six months ended September 30, 2020 and INR 162 million (US$ 2.2 million) for higher interest income on account of higher cash available during the six months ended September 30, 2021.

**Loss/(Gain) on Foreign Currency Exchange (net)**

Foreign exchange gain during the six months ended September 30, 2021, amounted to INR 108 million (US$1.4 million) compared to a foreign exchange loss of INR 4 million during six months ended September 30, 2020. Foreign exchange gain during the six months ended September 30, 2021 was primarily related to net gain on exchange difference on settlement of Solar Green Bonds.

**Income Tax Expense**

Income tax expense during the six months ended September 30, 2021, was INR 677 million (US$ 9.1 million), compared to an income tax expense of INR 220 million during six months ended September 30, 2020. During the current period the Company has recognized a deferred tax expense (net) on account of movement in the carrying amount of certain assets and liabilities and their tax base and commissioning of new projects and sale of carbon credit emission.

## Liquidity and Capital Resources

The Company does not generate cash from operations in order to fund our expenses. Restrictions on the ability of our subsidiaries to pay us cash dividends as a result of certain regulatory and contractual restrictions may make it impracticable to use such dividends as a means of funding the expenses of Azure Power Global Limited.

Our principal liquidity requirements are to finance current operations, service our debt and support our growth in India. Including by means of asset acquisitions. We will continue to use capital in the future to finance the construction of renewable power plants and potentially to purchase renewable assets. Our operations largely rely on project-level long-term borrowings, proceeds from issuance of Green Bonds, proceeds from issuance of common stock, compulsorily convertible preferred shares and compulsorily convertible debentures, non-convertible debentures, non-convertible debentures, and internally generated cash flows to meet capital expenditure requirements. As a normal part of our business and depending on market conditions, we will from time to time consider opportunities to repay, redeem, repurchase, or refinance our indebtedness. Changes in our operating plans, lower than anticipated electricity sales, increased expenses or other events may cause us to seek additional debt or financing in future periods. There can be no guarantee that financing will be available on acceptable terms or at all. Debt financing, if available, could impose additional cash payment obligations, additional covenants and operating restrictions. Future financings could result in the dilution of our existing shareholding.

### Liquidity Position

As of September 30, 2021, our liquid assets totaled INR 9,513 million (US\$ 128.3 million), which was comprised of cash and cash equivalents. In addition, we had INR 9,780 million (US\$ 131.9 million) of short-term restricted cash as at September 30, 2021 that we expect to be utilized primarily for capital expenditures over the next twelve months. We also have commitments from financial institutions that we can draw upon in the future once specific funding criteria have been achieved. We had undrawn project debt commitments excluding Rooftop portfolio of INR 17,803 million (US\$ 240.1 million) as of September 30, 2021.

We are subject to business and operational risks that could adversely affect our cash flows. A material decrease in our cash flows would likely produce a corresponding adverse effect on our borrowing capacity.

Our financing arrangements as of September 30, 2021, consisted of project-level financing arrangements and other borrowings.

The table below summarizes certain terms of our project-level financing arrangements as of September 30, 2021:

| Name of project | Outstanding Principal Amount | | Type of Interest | Currency | Maturity date (2) | Commissioned/ Under-construction |
|---|---|---|---|---|---|---|
| | INR | US$ (1) | | | | |
| | (in millions) | | | | | |
| Rajasthan 6 | 16,486 | 222.3 | Floating | INR/USD | 2021-2040 | Partially Commissioned |
| Andhra Pradesh 1 | 2,508 | 33.8 | Fixed | INR | 2022 | Commissioned |
| Bihar 1 | 439 | 5.9 | Fixed | INR | 2022 | Commissioned |
| Gujarat 1 | 928 | 12.5 | Fixed | INR | 2022 | Commissioned |
| Karnataka 1 | 748 | 10.1 | Fixed | INR | 2022 | Commissioned |
| Karnataka 3.1 | 2,180 | 29.4 | Fixed | INR | 2022 | Commissioned |
| Karnataka 3.2 | 1,774 | 23.9 | Fixed | INR | 2022 | Commissioned |
| Karnataka 3.3 | 2,810 | 37.9 | Fixed | INR | 2022 | Commissioned |
| Punjab 1 | 324 | 4.4 | Fixed | INR | 2022 | Commissioned |
| Punjab 2 | 1,939 | 26.1 | Fixed | INR | 2022 | Commissioned |
| Punjab 4 | 5,540 | 74.7 | Fixed | INR | 2022 | Commissioned |
| Rajasthan 3.1 | 1,187 | 16.0 | Fixed | INR | 2022 | Commissioned |
| Rajasthan 3.2 | 1,350 | 18.2 | Fixed | INR | 2022 | Commissioned |
| Rajasthan 3.3 | 2,325 | 31.4 | Fixed | INR | 2022 | Commissioned |
| Rajasthan 4 | 236 | 3.2 | Fixed | INR | 2022 | Commissioned |
| Telangana 1 | 5,030 | 67.8 | Fixed | INR | 2022 | Commissioned |
| Uttar Pradesh 1 | 353 | 4.8 | Fixed | INR | 2022 | Commissioned |
| Gujarat 2 | 9,188 | 123.9 | Fixed | INR | 2024 | Commissioned |
| Maharashtra 3 | 5,238 | 70.6 | Fixed | INR | 2024 | Commissioned |
| Karnataka 4 | 3,934 | 53.0 | Fixed | INR | 2024 | Commissioned |
| Maharashtra 1.1 & 1.2 | 325 | 4.4 | Fixed | INR | 2024 | Commissioned |
| Uttar Pradesh 3 | 1,778 | 24.0 | Fixed | INR | 2024 | Commissioned |
| Andhra Pradesh 3 | 2,179 | 29.4 | Fixed | INR | 2024 | Commissioned |
| Punjab 3.1 and 3.2 | 1,219 | 16.4 | Fixed | INR | 2024 | Commissioned |
| Rajasthan 8 | 4,931 | 66.5 | Floating | US$ | 2026 | Under Construction |
| Rajasthan 1 | 425 | 5.7 | Fixed | INR | 2031 | Commissioned |
| Rajasthan 2 | 2,505 | 33.8 | Fixed | INR | 2033 | Commissioned |
| Karnataka 2 | 382 | 5.2 | Floating | INR | 2034 | Commissioned |
| Chhattisgarh 1.1,1.2 & 1.3 | 1,321 | 17.8 | Floating | INR | 2036 | Commissioned |
| Andhra Pradesh 2 | 5,017 | 67.7 | Floating | INR | 2036 | Commissioned |
| Uttar Pradesh 2 | 2,070 | 27.9 | Floating | INR | 2037 | Commissioned |
| Rajasthan 5 | 5,618 | 75.8 | Mixed | INR | 2038 | Commissioned |
| Assam 1 | 1,999 | 27.0 | Floating | INR | 2039 | Partially Commissioned |
| Rooftop Projects (5), (6) | 3,004 | 40.5 | Mixed | INR/US$ | 2022-32 | Multiple Projects |
| Total | 97,290 (3),(4) | 1,312.0 | | | | |

(1) Translation of INR to US$ is for the convenience of the reader and was calculated using a rate of US$ 1.00 = INR 74.16, which is the noon buying rate in New York City for cable transfer in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York on September 30, 2021.
(2) This represents the last repayment period. These loans are repayable on a quarterly or semi-annual basis. For repayment by period of the above-mentioned loans, refer to contractual obligation and commercial commitments
(3) This amount is presented in the financials as net of ancillary cost of borrowing of INR 1,377 million (US$ 18.6 million).
(4) Non-project level debt of INR 18,466 million (US$ 249.0 million) is excluded from the above table. Further foreign exchange fluctuation of INR 2,893 million (US$ 39.0 million) is in respect of project debt against which the company has taken hedge.
(5) Project level debt of INR 1,960 million (US$ 26.4 million) pertaining to rooftop entities under sale have been classified under Liabilities directly associated with assets classified as held for sale.
(6) Rooftop Projects primarily includes, Delhi Rooftop 4, Gujarat rooftop, Punjab Rooftop 2, Railway 1, DJB, DMRC and SECI.

Our outstanding project-level borrowings have been secured by certain movable and immovable properties, including property, plant and equipment, as well as a pledge of the shares of the project-level SPVs.

The financing agreements governing our project-level borrowings contain financial and other restrictive covenants that limit our project subsidiaries' ability to make distributions to us unless certain specific conditions are met, including the satisfaction of certain financial ratios. As of September 30, 2021, certain subsidiaries of the Company were not in compliance with the financial covenants related to this borrowing and had obtained waivers for the non-compliance prior to the issuance of these financial statements.

**Sources of Liquidity**

Our ability to meet our debt service obligations and other capital requirements will depend on our future operating performance which, in turn, will be subject to general economic, financial, business, competitive, legislative, regulatory and other conditions, many of which are beyond our control.

**Uses of Liquidity**

Our principal requirements for liquidity and capital resources can be categorized into investment for developing solar power plants and debt service obligations. Generally, once operational, our solar power generation assets do not require significant capital expenditures to maintain their operating performance and the working capital is sufficient to meet the operations.

**Capital Expenditures**

As of September 30, 2021, we operated 45 utility-scale projects with a combined rated capacity of 2,210 MWs (excluding the rooftop portfolio, for which we have entered into an agreement to sell during current period). As of such date, we were also constructing several projects with a combined rated capacity of 745 MWs.

All our capital expenditures are considered growth capital expenditures. In broad terms, we expense all expenditures in the current period that would primarily maintain our businesses at current levels of operations, capability, profitability or cash flow in operations and maintenance and therefore there are no Maintenance Capital Expenditures. Growth capital expenditures primarily provide new or enhanced levels of operations, capability, profitability or cash flows.

Our capital expenditure requirements consist of:

(i)    Expansion capital expenditures for new projects; and

(ii)    Working capital expenditures for building the pipeline of projects for coming year(s).

Expansion capital expenditures also include interest expense associated with borrowings used to fund expansion during the construction phase of our projects. We intend to build or acquire new projects after the completion of this offering.

Our capital expenditures amounted to INR 12,094 million (US$163.4 million) during the six months ended September 30, 2021, primarily for construction of Rajasthan 6, Assam 1, SECI 3 and SECI 4.

**Cash Flow Discussion**

We also use traditional measures of cash flow, including net cash provided by operating activities, net cash used in investing activities and net cash provided by financing activities, as well as cash available for distribution to evaluate our periodic cash flow results.

Cash and cash equivalents include cash on hand, demand deposits with banks, term deposits and all other highly liquid investments purchased with an original maturity of three months or less at the date of acquisition and that are readily convertible to cash. It does not include restricted cash, which consists of cash balances restricted as to withdrawal or usage and cash used to collateralize bank letters of credit supporting the purchase of equipment for solar power plants, bank guarantees issued in relation to the construction of the solar power plants within the timelines stipulated in PPAs and for certain debt service reserves required under our loan agreements.

**Operating Activities**

Cash flow from operating activities for the six months ended September 30, 2021 was INR 1,853 million (US$ 25.1 million), compared to cash flow used in operating activities of INR 2,431 million for the six months ended September 30, 2020. The cash flow from operating activities for six month was higher on account of increase in net operating profits and collections. During the six months ended September 30, 2021, the working capital outflow was INR 1,489 million (US$ 20.1 million), compared to an outflow of INR 866 million, for the six months ended September 30, 2020, primarily on account of an increase in accounts receivables and additional interest payment on refinance of 5.5% Solar Green bonds. Subsequent to the period end of September 30, 2021, the Company has received proceeds of INR 467 million (US$ 6.3 million) from sale of carbon credits.

Our days receivables (excluding Rooftop portfolio), including receivable from sale of carbon credit were 125 days as of September 30, 2021, as compared to 116 days as of March 31, 2021. Subsequent to the period end of September 30, 2021, the Company has received proceeds of INR 467 million (US$ 6.3 million) from sale of carbon credits. Excluding income and related receivables from sale of carbon credit, our days receivables would be 116 days.

**Investing Activities**

Cash used in investing activities for the six months ended September 30, 2021 was INR 11,961 million (US$ 161.6 million), compared to outflow of INR 7,174 million for the six months ended September 30, 2020, primarily due to higher capital expenditures for new solar projects by INR 4,927 million (US$ 66.4 million).

**Financing Activities**

Cash flow from financing activities for the six months ended September 30, 2021 was INR 13,336 million (US$ 179.8 million), compared to INR 3,356 million for the six months ended September 30, 2020, primarily due to higher net proceeds of debt, net of refinancing of Solar Green Bonds taken during current period.

## Power Purchase Agreements

The material terms of the PPAs we have entered into and bids we have won as of September 30, 2021 for our utility scale projects are summarized in the following table.

| Project Names | Commercial Operation Date [1] | PPA Capacity (MW) | DC Capacity (MW) | Tariff (INR / kWh) | [6] | Offtaker | Duration of PPA in Years |
|---|---|---|---|---|---|---|---|
| | | | | **Utility Operational** | | | |
| Gujarat 1.1 | Q2 2011 | 5 | 5 | 15.00 | [2] | Gujarat Urja Vikas Nigam Limited | 25 |
| Gujarat 1.2 | Q4 2011 | 5 | 5 | 15.00 | [2] | Gujarat Urja Vikas Nigam Limited | 25 |
| Punjab 1 | Q4 2009 | 2 | 2 | 17.91 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Rajasthan 1 | Q4 2011 | 5 | 5 | 11.94 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Rajasthan 2.1 | Q1 2013 | 20 | 23 | 8.21 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Rajasthan 2.2 | Q1 2013 | 15 | 18 | 8.21 | | NTPC Vidyut Vyapar Nigam Limited | 25 |
| Punjab 2.1 | Q3 2014 | 15 | 15 | 7.67 | | Punjab State Power Corporation Limited | 25 |
| Punjab 2.2 | Q4 2014 | 15 | 15 | 7.97 | | Punjab State Power Corporation Limited | 25 |
| Punjab 2.3 | Q4 2014 | 4 | 4 | 8.28 | | Punjab State Power Corporation Limited | 25 |
| Karnataka 1 | Q1 2015 | 10 | 10 | 7.47 | | Bangalore Electricity Supply Company Limited | 25 |
| Uttar Pradesh 1 | Q1 2015 | 10 | 12 | 8.99 | | Uttar Pradesh Power Corporation Limited | 12 |
| Rajasthan 3.1 | Q2 2015 | 20 | 22 | 5.45 | [3] | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 3.2 | Q2 2015 | 40 | 43 | 5.45 | [3] | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 3.3 | Q2 2015 | 40 | 41 | 5.45 | [3] | Solar Energy Corporation of India Limited | 25 |
| Chhattisgarh 1.1 | Q2 2015 | 10 | 10 | 6.44 | | Chhattisgarh State Power Distribution Company Limited | 25 |
| Chhattisgarh 1.2 | Q2 2015 | 10 | 10 | 6.45 | | Chhattisgarh State Power Distribution Company Limited | 25 |
| Chhattisgarh 1.3 | Q3 2015 | 10 | 10 | 6.46 | | Chhattisgarh State Power Distribution Company Limited | 25 |
| Rajasthan 4 | Q4 2015 | 5 | 6 | 5.45 | [3] | Solar Energy Corporation of India Limited | 25 |
| Delhi 1.1 | Q4 2015 | 2 | 2 | 5.43 | [3] | Solar Energy Corporation of India Limited | 25 |
| Karnataka 2 | Q1 2016 | 10 | 12 | 6.66 | | Bangalore Electricity Supply Company Limited | 25 |
| Andhra Pradesh 1 [4] | Q1 2016 | 50 | 54 | 6.63 | [2] | Southern Power Distribution Company of Andhra Pradesh Limited | 25 |
| Punjab 3.1 | Q1 2016 | 24 | 25 | 7.19 | | Punjab State Power Corporation Limited | 25 |
| Punjab 3.2 | Q1 2016 | 4 | 4 | 7.33 | | Punjab State Power Corporation Limited | 25 |
| Bihar 1 | Q3 2016 | 10 | 11 | 8.39 | | North & South Bihar Power Distribution Company Limited | 25 |
| Punjab 4.1 | Q4 2016 | 50 | 52 | 5.62 | | Punjab State Power Corporation Limited | 25 |
| Punjab 4.2 | Q4 2016 | 50 | 52 | 5.63 | | Punjab State Power Corporation Limited | 25 |
| Punjab 4.3 | Q4 2016 | 50 | 52 | 5.64 | | Punjab State Power Corporation Limited | 25 |
| Karnataka 3.1 | Q1 2017 | 50 | 54 | 6.51 | | Chamundeshwari Electricity Supply Company Limited | 25 |
| Karnataka 3.2 | Q1 2017 | 40 | 42 | 6.51 | | Hubli Electricity Supply Company Limited | 25 |
| Karnataka 3.3 | Q1 2017 | 40 | 42 | 6.51 | | Gulbarga Electricity Supply Company Limited | 25 |
| Maharashtra 1.1 | Q1 2017 | 2 | 2 | 5.50 | [3] | Ordinance Factory, Bhandara | 25 |
| Maharashtra 1.2 | Q1 2017 | 5 | 6 | 5.31 | | Ordinance Factory, Ambajhari | 25 |
| Andhra Pradesh 2 [5] | Q2 2017 | 100 | 130 | 5.12 | | NTPC Limited | 25 |
| Uttar Pradesh 2 | Q2-Q3 2017 | 50 | 59 | 4.78 | | NTPC Limited | 25 |
| Telangana 1 | Q1 2018 | 100 | 128 | 4.67 | | NTPC Limited | 25 |
| Uttar Pradesh 3 | Q2 2018 | 40 | 51 | 4.43 | [3] | Solar Energy Corporation of India Limited | 25 |
| Andhra Pradesh 3 | Q2 2018 | 50 | 59 | 4.43 | [3] | Solar Energy Corporation of India Limited | 25 |
| Gujarat 2 | Q4 2018 – Q1 2019 | 260 | 363 | 2.67 | | Gujarat Urja Vikas Nigam Limited | 25 |
| Karnataka 4.1 | Q1 2019 | 50 | 75 | 2.93 | | Bangalore Electricity Supply Company | 25 |
| Karnataka 4.2 | Q1 2019 | 50 | 75 | 2.93 | | Hubli Electricity Supply Company Limited | 25 |
| Rajasthan 5 | Q2-Q3 2019 | 200 | 262 | 2.48 | | Solar Energy Corporation of India Limited | 25 |
| Maharashtra 3 | Q3 2019 | 130 | 195 | 2.72 | | Maharashtra State Electricity Distribution Company Limited | 25 |
| Assam 1 | Q3 2020-Q2 2021 | 45 | 57 | 3.34 | | Assam Power Distribution Company | 25 |
| Rajasthan 6 | Q4 2020- Q2 2021 | 500 | 680 | 2.53 | | Solar Energy Corporation of India Limited | 25 |
| Others [8] | Q1 2018-Q4 2019 | 7 | 10 | 3.36 | [4] | Various | 25 |
| Total Operational Capacity | | 2,210 | 2,810 | | | | |
| **Under Construction** | | | | | | | |
| Assam 1# | Q1 2022 | 45 | | 3.34 | | Assam Power Distribution Company | 25 |
| Rajasthan 6# | Q4 2021 | 100 | | 2.53 | | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 8# | Q4 2021 | 300 | | 2.58 | | Solar Energy Corporation of India Limited | 25 |
| Rajasthan 9# | Q1 2022 | 300 | | 2.54 | | Solar Energy Corporation of India Limited | 25 |
| Total Under Construction- Utility | | 745 | | | | | |
| | | | | | | | |
| 2 GW Project 1 | | 2,000 | [7] | | | Solar Energy Corporation of India Limited | 25 |
| 2 GW Project 2 | | 2,000 | [7] | | | Solar Energy Corporation of India Limited | 25 |
| Total Contracted & Awarded Capacity – Utility | | **4,000** | | | | | |
| **Total Portfolio\*** | | **6,955** | | | | | |

Notes:

(1) Refers to the applicable quarter of the calendar year in which commercial operations commenced or are scheduled to commence based on AC capacity. There can be no assurance that our projects under construction and our Contracted projects will be completed on time or at all.
(2) Current tariff, subject to escalation. Please also see "—Tariff structure"
(3) Projects are supported by VGF, in addition to the tariff. Please also see "—VGF for projects"
(4) Levelized tariff; includes capital incentive.
(5) Projects under accelerated depreciation per the Indian Income tax regulation.
(6) In the case of projects with more than one PPA, tariff is calculated as the weighted average of the PPAs for such project.
(7) LOA received. PPA yet to be signed.
(8) Others include projects with Hindustan Aeronautics Limited (HAL), Decathlon and other offtakers.

\# Due to the COVID-19 pandemic, there is uncertainty around the timing of construction of projects and this is our best estimate of completion. Out of total capacity of 600 MWs under Rajasthan 6 project, Company have commissioned 500 MWs and remaining 100 MWs were under construction as of September 30, 2021. Further out of total capacity of 90 MWs under Assam 1 project, Company have commissioned 45 MWs and remaining 45 MWs are under construction as of September 30, 2021.

\* In Fiscal 2021, we identified certain subsidiaries to sell off on a going concern basis, which currently form part of our Rooftop business. Out of this identified portfolio, during the current period, we entered a sales contract with Radiance to sell certain subsidiaries having an operating capacity of 153 MW for INR 5,350 million (US$ 73.1 million), subject to certain purchase price adjustments. Hence, the Company has not considered these rooftop portfolios for reporting under its total portfolio as at period end.

## Key Metrics

We regularly review a number of specific metrics, including the following key operating and financial metrics, to evaluate our business performance, identify trends affecting our business and make strategic decisions.

| Key metrics | Unit of Measurement | Six months ended September 30, 2020 | Six months ended September 30, 2021 |
|---|---|---|---|
| Revenue (1) | INR in millions | 7,444 | 8,826 |
| Revenue (2) | US$ in millions | 100.4 | 119.0 |
| Electricity generation (3) | kWh in millions | 1,653 | 2,113 |
| Cost per MW operating (4) | INR in millions | 34.7 | 34.7 |
| Plant load factor | % | 20.8 | 21.9 |
| MW Operating | MW | 1,834 | 2,210 (5) |
| MW Contracted & Awarded * | MW | 5,281 | 4,745 |
| MW Operating, Contracted & Awarded | MW | 7,115 | 6,955 (5) |

(1) Revenue consists of revenue from the sale of power, including other revenue items related to generation from renewable power.

(2) Translation of balances in the key operating and financial matrices from INR into US$, as of and for the six months ended September 30, 2021 are solely for the convenience of the readers and were calculated at the rate of US$1.00 = INR 74.16, the noon buying rate in New York City for cable transfers in non U.S. currencies, as certified for customs purposes by the Federal Reserve Bank of New York on September 30, 2021. No representation is made that the INR amounts could have been, or could be, converted, realized or settled into US$ at that rate on September 30, 2021, or at any other rate.

(3) Electricity generation represents the actual amount of power generated by our solar power plants over the reporting period and is the product of plant load factor during the reporting period and the average megawatts operating.

(4) Installation per MW of DC capacity and includes INR 2.9 million (US$0.04 million) per MW operating of safe-guard duties which we expect to recover.

(5) In Fiscal 2021, we identified certain subsidiaries to sell off on a going concern basis, which currently form part of our Rooftop business. Out of this identified portfolio, during current year, we entered a sales contract with Radiance to sell certain subsidiaries having an operating capacity of 153 MW for INR 5,350 million, subject to certain purchase price adjustments. Hence, we have not considered these rooftop portfolios for reporting under its total portfolio as at period end.

Contracted & Awarded megawatts included 4,000 MWs for which we had received LOAs but the PPAs had not been signed as of September 30, 2021.

* Subsequent to the period end, we have signed PPAs with SECI for 600 MWs at a fixed tariff of INR 2.54 per kWh and 2,333 MWs at a fixed tariff of INR 2.42 per kWh for supply power for 25 years, as a part of 4,000 MW manufacturing linked projects.

**Operating Metrics**

**Megawatts Operating and Megawatts Contracted & Awarded**

We measure the rated capacity of our plants in megawatts. Rated capacity is the expected maximum output that a solar power plant can produce without exceeding its design limits. We believe that tracking the growth in aggregate megawatt rated capacity is a measure of the growth rate of our business.

*"Megawatts Operating"* represents the aggregate cumulative megawatt rated capacity of solar power plants that are commissioned and operational as of the reporting date.

*"Megawatts Contracted & Awarded"* represents the aggregate megawatt rated capacity of solar power plants pursuant to customer PPAs signed, allotted or won in an auction but not commissioned and operational as of the reporting date.

The following table represents the megawatts operating and megawatts Contracted & Awarded as of the end of the respective periods presented:

| | As of September 30, | |
| --- | --- | --- |
| | **2020** | **2021** |
| Megawatts Operating * | 1,834 | 2,210 |
| Megawatts Contracted & Awarded * | 5,281 | 4,745 |
| | | |
| Megawatts Operating, Contracted & Awarded * | 7,115 | 6,955 |

\* The decrease in Megawatts Operating, Contracted & Awarded from September 30, 2020 to September 30, 2021 reflects the agreement to sell our non-core rooftop portfolio of assets.

We target having 2,750 MWs to 2,955 MWs (excluding the rooftop portfolio, for which we have entered into an agreement to sell during the current period) operating by March 31, 2022, but this is subject to risks related to the current COVID-19 situation. Our ability to commission plants and make them operational will depend on, among other things, our ability to acquire the required land for the new capacity (on lease or direct purchase), procurement of permits and clearances, raising adequate project financing and working capital, the growth of the Indian power market in line with current government targets, our ability to maintain our market share of India's installed capacity as competition increases, the need to further strengthen our operations team to execute the increased capacity, and the need to further strengthen our systems and processes to manage the ensuing growth opportunities, as well as the other risks and challenges discussed under the caption "Risk Factors" in our Annual Report on Form 20-F for the year ended March 31, 2021.

*Plant Load Factor*

The plant load factor is the ratio of the actual output of all our solar power plants over the reporting period to their potential output if it were possible for them to operate at full rated capacity. The plant load factor is not the same as the availability factor. Our solar power plants have high availability, that is, when the sun is shining our plants are almost always able to produce electricity. The variability in our plant load factor is a result of seasonality, cloud covers, air pollution, the daily rotation of the earth, equipment efficiency losses, breakdown of our transmission system and grid availability. We compute PLF on the basis of PPA capacity (or AC), which may be lower than the actual installed (DC) capacity.

We track plant load factor as a measure of the performance of our power plants. It indicates effective utilization of resources and also validates our value engineering and operation research. Higher plant load factor at a plant indicates increased electricity generation. Monitoring plant load factor on real time allows us to respond rapidly to potential generation anomalies. Plant load factor (AC) was 21.9% for the six months ended September 30, 2021, compared with 20.8% for the six months ended September 30, 2020, primarily due to greater optimization of new facilities by adding additional DC capacity to our existing facilities.

| | Six months ended September 30 | |
| --- | --- | --- |
| | **2020** | **2021** |
| Plant Load Factor (AC) (%) | 20.8 | 21.9 |

**Electricity Generation**

Electricity generation represents the actual amount of power generated by our solar power plants over the reporting period and is the product of reporting period plant load factor and the average megawatts operating. This is a measure of the periodic performance of our solar power plants.

| | Six months ended September 30, | |
| --- | --- | --- |
| | **2020** | **2021** |
| Electricity Generation (kilowatt hours in millions) | 1,653 | 2,113 |

**Financial Metrics**

**Project Cost per Megawatt Operating**

Project cost per megawatt operating consists of solar photovoltaic panels, inverters, balance of plant equipment, freehold land or leasehold land, capitalizable financing costs, and installation costs incurred for operating one megawatt of new solar power plant capacity during the reporting period. It is an indicator of our strong engineering, procurement and construction capabilities, market cost of material and our ability to procure such material at competitive prices. A reduction in project cost per megawatt helps reduce the cost of power and thereby improves our ability to win new projects. Project cost per megawatt operating (megawatt capacity per the PPA or AC) consists of costs incurred for one megawatt of newly commissioned solar power plant capacity during the reporting period. The project cost per megawatt (DC) operating for the six months ended September 30, 2021 remains the same as that for the six months ended September 30, 2020 at INR 34.7 million (US$ 0.47 million). The project cost per megawatt (AC) operating for the six months ended September 30, 2021 was INR 39.6 million (US$ 0.53 million), compared to INR 40.4 million, for the six months ended September 30, 2020. Excluding the impact of safeguard duties, the DC and the AC costs per megawatt for the six months ended September 30, 2021 would have been lower by approximately INR 2.9 million (US$ 0.04 million) and INR 3.3 million (US$ 0.04 million), respectively, and for the six months ended September 30, 2020, the DC and the AC costs per megawatt would have been lower by approximately INR 1.3 million and INR 1.3 million, respectively.

**Nominal Contracted Payments**

Our PPAs create long-term recurring customer payments. Nominal contracted payments equal the sum of the estimated payments that the customer is likely to make, subject to discounts or rebates, over the remaining term of the PPAs. When calculating nominal contracted payments, we include those PPAs for projects that are operating or contracted or awarded. To calculate the nominal contracted payments, we multiply the contract price per kilowatt hour as per the respective PPA by the estimated annual energy output for the remaining life of the PPA period. In estimating the nominal contracted payments, we multiply the PPA contract price per kilowatt hour by the estimated annual energy output for all solar projects Operating, Contracted & Awarded and operating as of the reporting date. The estimated annual energy output of our solar projects is calculated using power generation simulation software and validated by independent engineering firms. The main assumption used in the calculation is the project location, which enables the software to derive the estimated annual energy output from certain metrological data, including the temperature, solar radiation based on the project location. Our power generation simulation software calculates the estimated annual energy output by using the following formula:

**E = A \* r \* H \* PR**
**E** = Energy (kWh)
**A** = Total solar panel Area (m²)
**r** = Solar panel efficiency (%)
**H** = Annual global radiation at collector plane
**PR** = Performance ratio, coefficient for losses (range between 0.5 and 0.95)

Performance ratio is a quantity which represents the ratio of the effectively produced (used) energy to the energy which would be produced by a "perfect" system continuously operating at standard test condition under the same radiation, taking into account losses such as array losses (shadings, incident angle modifier, photovoltaic conversion, module quality, mismatch and wiring) and system losses (inverter efficiency, transformer efficiency and transmission losses).

The calculation of the estimated annual energy output also takes into account the total rated capacity of all the solar panels to be installed for the remaining life of the PPA, net of the annual estimated decrease in rated capacity based on technology installed. The decrease in rated capacity includes various losses caused by soiling, temperature changes, inverter and transformer inefficiency, incidence angle, wire, shading and mismatch losses. The technology used for each project is assessed based on geographical conditions of the project, cost economics and the availability of such technology for construction. We assume an annual decrease in rated capacity ranging from 0.5% to 0.7% depending on the technology used, which is based on the specifications given by the manufacturer of the solar panels.

To calculate nominal contracted payments for operating, contracted & awarded projects, we assume a 50% probability of achieving the generation numbers projected by the power generation software, which is net of the annual estimated decrease in rated capacity based on the technology installed. For operating projects, instead of the formula described above, we use the actual full-year energy generated net of the annual estimated decrease in rated capacity based on the technology installed. We have used this method of calculation since the inception of all projects, including scheduled price changes where applicable.

If we were to receive government grants under any PPA, such grants would be included as nominal contracted payments in the period when received. We account for Viability Gap Funding, or VGF, as an income-type government grant. The proceeds received from VGF grants upon fulfilment of certain conditions are initially recorded as deferred revenue. This deferred VGF revenue is recognized as sale of power in proportion to (x) the actual sale of solar energy kilowatts during the period to (y) the total estimated sale of solar energy kilowatts during the tenure of the applicable PPA pursuant to our revenue recognition policy.

Nominal contracted payments are a forward-looking number, and we use judgment in developing the assumptions used to calculate it. Those assumptions may not prove to be accurate over time. Underperformance of the solar power plants, payment defaults by our customers or other factors described under "Risk Factors" in our Annual Report on Form 20-F for the year ended March 31, 2021, could cause our actual results to differ materially from our calculation of nominal contracted payments.

The following table sets forth, with respect to our PPAs, the aggregate nominal contracted payments and total estimated energy output as of the reporting dates. These nominal contracted payments have not been discounted to arrive at the present value.

| | As of September 30, | | |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| | **INR** | **INR** | **US$** |
| Nominal contracted payments for projects with PPAs (in millions) * | 515,751 | 575,993 | 7,766.9 |
| Total estimated energy output (kilowatt hours in millions) * | 151,127 | 179,749 | |

* Nominal contracted payments include projects for 600 MWs which amounts to INR 98,937 million (US$1.3 billion), for which PPAs are signed subsequent to quarter end in relation to 4,000 MWs project with SECI.

Post announced of consolidated results for the fiscal second quarter 2022, on December 10, 2021, the Company has further signed PPAs for 2,333 MW with SECI at a fixed tariff of INR 2.42 per kWh for supply power for 25 years, as a part of the 4,000 MW manufacturing linked projects. Due to the same, nominal contracted payments will increase by INR 366,525 million (US$ 4.9 billion).

The increase in Nominal Contracted Payments and total estimated energy output as of September 30, 2021, as compared to September 30, 2020, is due to inclusion of 600 MWs for which PPAs are signed subsequent to period end, partially offset by exclusion of our rooftop portfolio, which we have agreed to sell during the current period and the impact of current period revenue realised. Over time, we have seen a trend towards a decline in the Central Electricity Regulatory Commission benchmark tariff for solar power procurement. For fiscal year 2011, the Central Electricity Regulatory Commission benchmark tariff for solar power procurement was INR 17.91 per kilowatt hour. It was reduced to INR 10.39 per kilowatt hour for fiscal year 2013, which was further reduced to INR 7.72 per kilowatt hour for fiscal year 2015 and to INR 3.53 per kilowatt hour for fiscal year 2019. The overall trend of solar power tariffs is that the tariffs are declining in line with solar module prices.

Our nominal contracted payments are not impacted for the delays in construction due to COVID-19, as revenues from our PPAs start on the date of commissioning of the project.

**Portfolio Revenue Run-Rate**

Portfolio revenue run-rate equals our annualized payments from customers extrapolated based on the operating, contracted & awarded capacity as of the reporting date. In estimating the portfolio revenue run-rate, we multiply the PPA contract price per kilowatt hour by the estimated annual energy output for all operating, contracted & awarded solar projects as of the reporting date. The estimated annual energy output of our solar projects is calculated using power generation simulation software and validated by independent engineering firms. The main assumption used in the calculation is the project location, which enables the software to derive the estimated annual energy output from certain metrological data, including the temperature, wind speed and solar radiation based on the project location. Our power generation simulation software calculates the estimated annual energy output by using the formula described above.

The calculation of the estimated annual energy output also takes into account the total rated capacity of all the solar panels to be installed for the remaining life of the PPA, net of the annual estimated decrease in rated capacity based on technology installed. The decrease in rated capacity includes various losses caused by soiling, temperature changes, inverter and transformer inefficiency, incidence angle, wire, shading and mismatch losses.

To calculate portfolio revenue run-rate for operating, contracted & awarded projects, we assume a 50% probability of achieving the generation numbers projected by the power generation software, which is net of the annual estimated decrease in rated capacity based on the technology installed. For operating projects, instead of the formula described above, we use the actual full year energy generated net of the annual estimated decrease in rated capacity based on the technology installed. We have used this method of calculation since the inception of all projects, including scheduled price changes where applicable.

Portfolio revenue run-rate is a forward-looking number, and we use judgment in developing the assumptions used to calculate it. Those assumptions may not prove to be accurate over time. Underperformance of the solar power plants or other factors described under the heading "Risk Factors" in our Annual Report on Form 20-F for the year ended March 31, 2021 could cause our actual results to differ materially from our calculation of portfolio revenue run-rate.

The following table sets forth, with respect to our PPAs, the aggregate portfolio revenue run-rate and estimated annual energy output as of the reporting dates. The portfolio revenue run-rate has not been discounted to arrive at the present value.

|  | As of September 30, | | |
|---|---|---|---|
|  | **2020** | **2021** | |
|  | **INR** | **INR** | **US$** |
| Portfolio revenue run-rate for projects with PPAs (in millions) * | 23,817 | 26,854 | 362.1 |
| Estimated annual energy output (kilowatt hours in millions) * | 6,772 | 8,181 | |

\* Portfolio revenue run-rate include projects for 600 MWs which amounts to INR 4,198 million (US$56.6 million), for which PPAs are signed subsequent to period end in relation to 4,000 MWs project with SECI.

Post announced of consolidated results for the fiscal second quarter 2022, on December 10, 2021, the Company has further signed PPAs for 2,333 MW with SECI at a fixed tariff of INR 2.42 per kWh for supply power for 25 years, as a part of the 4,000 MW manufacturing linked projects. Due to the same, Portfolio revenue run-rate will increase by INR 15,550 million (US$ 209.7 million).

The increase in portfolio revenue run-rate as of September 30, 2021, as compared to September 30, 2020, is primarily due to inclusion of 600 MWs for which PPAs are signed subsequent to period end, partially offset by the exclusion of our rooftop portfolio, which we have agreed to sell during the current period.

**CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE SIX MONTHS ENDED SEPTEMBER 30, 2021**

**AZURE POWER GLOBAL LIMITED**
**Condensed Consolidated Balance Sheets**
(INR and US$ amounts in millions, except share and par value data)

| | As of March 31, | As of September 30, | |
| --- | --- | --- | --- |
| | 2021 (INR) | 2021 (INR) | 2021 (US$) |
| | Audited | Unaudited | Unaudited (Note 2c) |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | 11,107 | 9,513 | 128.3 |
| Restricted cash | 4,881 | 9,780 | 131.9 |
| Accounts receivable, net | 4,887 | 5,680 | 76.6 |
| Prepaid expenses and other current assets | 2,190 | 2,317 | 31.1 |
| Assets classified as held for sale[1] | 3,301 | 3,683 | 49.7 |
| **Total current assets** | **26,366** | **30,973** | **417.6** |
| Restricted cash | 170 | 95 | 1.3 |
| Property, plant and equipment, net | 108,847 | 120,808 | 1,628.7 |
| Software, net | 29 | 21 | 0.3 |
| Deferred income taxes | 1,748 | 1,999 | 27.0 |
| Right-of-use assets | 4,214 | 4,023 | 54.2 |
| Other assets | 7,084 | 2,431 | 32.8 |
| Investments in held to maturity securities | 7 | 6 | 0.1 |
| **Total assets** | **148,465** | **160,356** | **2,162.0** |
| **Liabilities and shareholders' equity** | | | |
| Current liabilities: | | | |
| Short-term debt | 8,943 | 21,273 | 286.9 |
| Accounts payable | 4,294 | 5,578 | 75.2 |
| Current portion of long-term debt | 4,658 | 7,107 | 95.8 |
| Income taxes payable | 46 | 47 | 0.6 |
| Interest payable | 1,530 | 854 | 11.5 |
| Deferred revenue | 110 | 110 | 1.5 |
| Lease liabilities | 283 | 274 | 3.7 |
| Other liabilities | 1,927 | 1,920 | 26.0 |
| Liabilities directly associated with assets classified as held for sale[1] | 2,272 | 2,279 | 30.7 |
| **Total current liabilities** | **24,063** | **39,442** | **531.9** |
| **Non-current liabilities:** | | | |
| Long-term debt | 89,922 | 86,929 | 1,172.2 |
| Deferred revenue | 2,353 | 2,334 | 31.5 |
| Deferred income taxes | 2,046 | 1,644 | 22.2 |
| Asset retirement obligations | 811 | 927 | 12.5 |
| Lease liabilities | 3,359 | 3,212 | 43.3 |
| Other liabilities | 1,459 | 1,547 | 20.4 |
| **Total liabilities** | **124,013** | **136,035** | **1,834.0** |
| **Shareholders' equity** | | | |
| Equity shares, US$ 0.000625 par value; 48,195,962 and 48,206,937 shares issued and outstanding as of March 31, 2021, and September 30, 2021, respectively | 2 | 2 | 0.0 |
| Additional paid-in capital | 38,004 | 38,063 | 513.3 |
| Accumulated deficit | (12,786) | (12,408) | (167.3) |
| Accumulated other comprehensive loss | (972) | (1,559) | (21.0) |
| **Total APGL shareholders' equity** | **24,248** | **24,098** | **325.0** |
| Non-controlling interest | 204 | 223 | 3.0 |
| **Total shareholders' equity** | **24,452** | **24,321** | **328.0** |
| **Total liabilities and shareholders' equity** | **148,465** | **160,356** | **2,162.0** |

[1] Refer to note 2(d) and note 24 relating to assets and liabilities directly associated with assets classified as held for sale.

See accompanying notes.

| | Six months ended September 30, | | |
| --- | --- | --- | --- |
| | Unaudited | Unaudited | Unaudited |
| | 2020 | 2021 | 2021 |
| | INR | INR | US$ (Note 2c) |
| **Operating revenues:** | | | |
| Revenue from customers | 7,444 | 8,826 | 119.0 |
| **Operating costs and expenses:** | | | |
| Cost of operations (exclusive of depreciation and amortization shown separately below) | 572 | 700 | 9.4 |
| General and administrative | 1,256 | 773 | 10.4 |
| Depreciation and amortization | 1,528 | 1,679 | 22.6 |
| Impairment loss[1] | - | 40 | 0.5 |
| Total operating costs and expenses: | 3,356 | 3,192 | 42.9 |
| **Operating income** | **4,088** | **5,634** | **76.1** |
| **Other expense, net:** | | | |
| Interest expense, net | 4,186 | 4,666 | 62.8 |
| Other expenses, net | - | 2 | 0.0 |
| Loss (gain) on foreign currency exchange, net | 4 | (108) | (1.4) |
| Total other expenses, net | 4,190 | 4,560 | 61.4 |
| **Profit (loss) before income tax** | **(102)** | **1,074** | **14.7** |
| Income tax expense | (220) | (677) | (9.1) |
| **Net profit (loss)** | **(322)** | **397** | **5.6** |
| Less: Net loss attributable to non-controlling interest | (5) | (19) | (0.3) |
| **Net (loss) / profit attributable to APGL equity Shareholders** | **(327)** | **378** | **5.3** |
| **Net (loss) / profit per share attributable to APGL equity Shareholders:** | | | |
| Basic | (6.84) | 7.84 | 0.11 |
| Diluted | (6.84) | 7.76 | 0.10 |
| Shares used in computing basic and diluted per share amounts | | | |
| Equity shares: Basic | 47,817,323 | 48,203,336 | 48,203,336 |
| Equity shares: Diluted | 47,817,323 | 48,708,973 | 48,708,973 |

[1] Refer to note 24 relating to assets and liabilities directly associated with assets classified as held for sale.

See accompanying notes.

| | Six months ended September 30, | | |
| --- | --- | --- | --- |
| | Unaudited | | |
| | 2020 | 2021 | 2021 (US$) |
| | (INR) | (INR) | (Note 2c) |
| Net (loss)/profit attributable to APGL equity shareholders | (327) | 378 | 5.3 |
| Add: Non-controlling interest | 5 | 19 | 0.3 |
| **Other comprehensive income/ (loss), net of tax** | | | |
| Foreign currency translation- OCI | 1,332 | 4,088 | 55.1 |
| Effective portion of cashflow hedge | (892) | (5,518) | (74.4) |
| Income tax effect on effective portion of cash flow hedge | 156 | 843 | 11.4 |
| **Total other comprehensive income/(loss)** | **596** | **(587)** | **(7.9)** |
| **Total comprehensive income/(loss)** | **274** | **(190)** | **(2.3)** |

See accompanying notes.

# AZURE POWER GLOBAL LIMITED
## Condensed Consolidated Statements of Shareholders' Equity
(INR and US$ amounts in millions)

| | Equity Shares | Additional paid-in capital | Accumulated other comprehensive loss [1] | Accumulated Deficit | Total APGL shareholders' equity | Non-controlling interests | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| Balance as of March 31, 2020 | 2 | 37,533 | (1,937) | (8,580) | 27,018 | 199 | 27,217 |
| Proceeds from issuance of equity shares [2],[3] | 0 | 424 | — | — | 424 | — | 424 |
| Net loss | — | — | — | (4,206) | (4,206) | 5 | (4,201) |
| Other comprehensive income | — | — | 965 | — | 965 | — | 965 |
| Share based compensation | — | 47 | — | — | 47 | — | 47 |
| Balance as of March 31, 2021 | 2 | 38,004 | (972) | (12,786) | 24,248 | 204 | 24,452 |

| | Equity Shares | Additional paid-in capital | Accumulated other comprehensive loss [1] | Accumulated Deficit | Total APGL shareholders' equity | Non-controlling interests | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| Balance as of March 31, 2021 | 2 | 38,004 | (972) | (12,786) | 24,248 | 204 | 24,452 |
| Proceeds from issuance of equity shares [2] | - | 23 | — | — | 23 | — | 23 |
| Net Profit | — | — | — | 378 | 378 | 19 | 397 |
| Other comprehensive loss | — | — | (587) | — | (587) | — | (587) |
| Share based compensation | — | 36 | — | — | 36 | — | 36 |
| Balance as of September 30, 2021 | 2 | 38,063 | (1,559) | (12,408) | 24,098 | 223 | 24,321 |
| Balance as of September 30, 2021 ((US$) (Note 2c) | 0.0 | 513.3 | (21.0) | (167.3) | 325.0 | 3.0 | 328.0 |

[1] Refer note 18 for components of accumulated other comprehensive loss.

[2] Refer note 18 for reconciliation of number of equity shares.

[3] Includes the related immaterial impact of restricted stock units ("RSU") which have been converted into restricted stock ("RS")/ share-based settlement in previous year.

See accompanying notes.

**AZURE POWER GLOBAL LIMITED**
**Condensed Consolidated Statements of Cash Flows**
(INR and US$ amounts in millions)

| | Six months ended September 30, | | |
| --- | --- | --- | --- |
| | Unaudited | Unaudited | Unaudited |
| | 2020 | 2021 | 2021 |
| | INR | INR | US$ (Note 2c) |
| **Cash flow from operating activities:** | | | |
| Net profit/(loss) | (322) | 397 | 5.6 |
| Adjustments to reconcile profit/(loss) to net cash from operating activities: | | | |
| Deferred income taxes | 102 | 176 | 2.4 |
| Depreciation and amortization | 1,528 | 1,679 | 22.6 |
| Impairment loss[1] | - | 40 | 0.5 |
| Adjustments to derivative instruments | 973 | 768 | 10.4 |
| Loss on disposal of property plant and equipment | 8 | 10 | 0.1 |
| Share based compensation | 594 | (119) | (1.6) |
| Amortization of debt financing costs | 186 | 428 | 5.8 |
| Employee benefits | 33 | (12) | (0.2) |
| ARO accretion | 20 | 26 | 0.4 |
| Non- cash rent expense | 26 | 52 | 0.7 |
| Allowance for doubtful accounts | 37 | 24 | 0.3 |
| Loan Prepayment charges | 234 | - | - |
| Foreign exchange gain/(loss), net | 4 | (108) | (1.5) |
| Change in operating lease right-of-use assets | 72 | (44) | (0.6) |
| Change in operating lease liabilities | (198) | 25 | 0.3 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | (10) | (883) | (11.9) |
| Prepaid expenses and other current assets | (214) | 265 | 3.6 |
| Other assets | (138) | 140 | 1.9 |
| Accounts payable | (121) | (828) | (11.2) |
| Interest payable | (286) | (663) | (8.9) |
| Deferred revenue | (13) | (19) | (0.3) |
| Other liabilities | (84) | 499 | 6.7 |
| **Net cash flows from operating activities** | **2,431** | **1,853** | **25.1** |
| **Cash flow from investing activities:** | | | |
| Purchase of property plant and equipment | (7,167) | (12,094) | (163.4) |
| Purchase of software | (7) | 8 | 0.1 |
| Sale of available for sale investments | - | 1 | 0.0 |
| Disposal of subsidiary[1] | - | 124 | 1.7 |
| **Net cash flows used in investing activities** | **(7,174)** | **(11,961)** | **(161.6)** |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of Solar Green bonds | - | 30,514 | 411.5 |
| Repayment of Solar Green bonds | - | (37,069) | (499.9) |
| Proceeds from equity shares | 271 | 23 | 0.3 |
| Proceeds from term and other debt | 9,023 | 24,717 | 333.3 |
| Repayments of term and other debt | (5,704) | (4,849) | (65.4) |
| Loan prepayment charges | (234) | - | - |
| **Net cash provided by financing activities** | **3,356** | **13,336** | **179.8** |
| Effect of exchange rate changes on cash and cash equivalents and restricted cash | (83) | 7 | 0.4 |
| Net increase/ (decrease) in cash and cash equivalents and restricted cash | (1,387) | 3,229 | 43.3 |
| Cash and cash equivalents and restricted cash at the beginning of the period | 15,517 | 16,149 | 217.8 |
| Add: Cash and cash equivalents and restricted cash, held for sale at the beginning of the year | - | 9 | 0.1 |
| Less: Cash and cash equivalents and restricted cash, held for sale at the end of the period | - | (6) | (0.1) |
| **Cash and cash equivalents and restricted cash at the end of the period (refer note 3)** | **14,047** | **19,388** | **261.5** |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the period for interest | 4,906 | 5,280 | 71.2 |
| Cash paid during the period for income taxes | 274 | 552 | 7.4 |

[1] Refer to note 24 relating to assets and liabilities directly associated with assets classified as held for sale.

**Notes to condensed consolidated financial statements**

**1. Organization**

Azure Power Global Limited ("APGL" or "Azure") organized under the laws of Mauritius was incorporated on January 30, 2015. APGL's subsidiaries are organized under the laws of India (except for one U.S. subsidiary and two subsidiaries in Mauritius) and are engaged in the development, construction, ownership, operation, maintenance and management of renewable energy assets based on long-term contracts (Power Purchase Agreements or "PPA") with Indian Government energy distribution companies as well as other Indian non-governmental energy distribution companies and Indian commercial customers. APGL and its subsidiaries are hereinafter referred to as the "Company". During the current period the Company has entered into a sale agreement for the disposal of its rooftop business. See Note 24.

**2. Summary of significant accounting policies**

*(a) Basis of presentation*

The accompanying condensed consolidated financial statements have been prepared for proposed equity raise by the company and are in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and are presented in Indian rupees ("INR"), unless otherwise stated. The condensed consolidated financial statements include the accounts of APGL and companies which are directly or indirectly controlled by APGL. All intercompany accounts and transactions have been eliminated upon consolidation.

Certain information and disclosures normally included in consolidated financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. Accordingly, these condensed consolidated financial statements should be read in conjunction with the Company's historical consolidated financial statements and accompanying notes included in the Company's latest Annual Report on Form 20-F for the year ended March 31, 2021. In the opinion of management, all adjustments, consisting of a normal recurring nature, considered for a fair presentation have been included in the condensed consolidated financial statements. The operating results for the six months ended September 30, 2021 are not necessarily indicative of the results expected for the full year ending March 31, 2022.

*(b) Use of estimates*

The preparation of condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, costs, expenses and comprehensive gain/loss that are reported and disclosed in the condensed consolidated financial statements and accompanying notes. These estimates are based on management's best knowledge of current events, historical experience, actions the Company may undertake in the future and on various other assumptions that are believed to be prudent and reasonable under the circumstances. Significant estimates and assumptions are used for, but not limited to impairment of and useful lives of property, plant and equipment, determination of asset retirement obligations, valuation of derivative instruments, hedge accounting, lease liabilities, right to use asset, allowances for doubtful accounts based on payment history, credit rating, valuation of share-based compensation, income taxes, energy kilowatts expected to be generated over the useful life of the solar power plant, estimated transaction price, including variable consideration, of the Company's revenue contracts, impairment of other assets and other contingencies and commitments. Although these estimates are based upon management's best knowledge of current events and actions, actual results could differ from these estimates, and such differences may be material to the condensed consolidated financial statements.

*Estimation uncertainty relating to COVID-19 pandemic*

In evaluating the recoverability of accounts receivable including unbilled revenue, contract assets, long-lived assets and investments, the Company has considered, at the date of approval of these condensed consolidated financial statements, internal and external information in the preparation of the condensed consolidated financial statements including the economic outlook. The Company has performed sensitivity analysis on the assumptions used to assess the recoverability of these assets and based on current estimates, expects the carrying amount of these assets will be recovered. The impact of COVID-19 may be different from that estimated on preparation of these condensed consolidated financial statements and the Company will continue to closely monitor any material changes to future economic conditions. See Note 2(h) - Impact of COVID-19 Pandemic.

*Principles of Consolidation*

The accompanying condensed consolidated financial statements include the accounts of APGL, its subsidiaries, and variable interest entities ("VIE") where the Company has determined it is the primary beneficiary and are prepared in conformity with U.S. GAAP. The Company uses the equity method to account for its investments in entities where it exercises significant influence over operating and financial policies but does not retain control under either the voting interest model (generally 20% to 50% ownership interest) or the variable interest model. The Company has eliminated all significant intercompany accounts and transactions.

*(c) Convenience translation*

Translation of balances in the condensed consolidated balance sheets, the condensed consolidated statements of operations, comprehensive loss, shareholders' equity, cash flows and related notes from INR into US$, as of and for the six months period ended September 30, 2021 are solely for the convenience of the readers and were calculated at the rate of US$ 1.00 = INR 74.16, the noon buying rate in New York City for cable transfers in non U.S. currencies, as certified for customs purposes by the Federal Reserve Bank of New York on September 30, 2021. No representation is made that the INR amounts could have been, or could be, converted, realized or settled into US$ at that rate on September 30, 2021, or at any other rate.

*(d) Assets held-for-sale*

Assets and asset disposal group are classified as held-for-sale if their carrying amount will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when management commits to a plan to sell the asset; the asset is available for immediate sale in its present condition; an active program to locate a buyer and other actions required to complete the plan have been initiated; the sale of the asset is probable within one year; the asset is being actively marketed for sale at a reasonable price in relation to its current fair value; and it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. Assets and liabilities classified as held-for-sale are measured at lower of their carrying amount and fair value less costs to sell and depreciation/ amortization ceases once the asset is classified as held for sale. See Note 24.

*(e) Non-controlling interest*

The non-controlling interest recorded in the condensed consolidated financial statements relates to (i) a 0.83% ownership interest in a subsidiary, a 10MW Gujarat power plant, not held by the Company, (ii) a 49.00% ownership interest in a subsidiary, a 50MW Uttar Pradesh power plant, not held by the Company, (iii) a 0.60% ownership interest in a subsidiary, a 100 MW Telangana power plant, not held by the Company and (iv) 0.01% ownership interest in Azure Power India Private Limited* not held by the Company. As of September 30, 2021, the Company recorded a non-controlling interest amounting to INR 223 million (US$ 3.0 million) including INR 19 million (US$ 0.3 million) of net profit for the six months ended September 30, 2021. As of March 31, 2021, the Company recorded a non-controlling interest amounting to INR 204 million including INR 5 million of net profit for the year.

* This remaining ownership by the founders is subject to an arbitration proceeding, see Note 22.

*(f) Revenue recognition*

Sale of power consists of solar energy sold to customers under long term Power Purchase Agreements (PPAs), which generally have a term of 25 years. The Company's customers are generally the Government of India, power distribution companies and, to a lesser extent, commercial and industrial enterprises.

The Company recognizes revenue on PPAs when the solar power plant generates power and is supplied to the customer in accordance with the respective PPA. The Company recognizes revenue each period based on the volume of solar energy supplied to the customer at the price stated in the PPA once the solar energy kilowatts are supplied and collectability is reasonably assured. The solar energy kilowatts supplied by the Company are validated by the customer prior to billing and recognition of revenue. Revenue from the recovery of Safe-guard duties and Goods and Service Tax under the change in law provision are recognized over the PPA period based on terms agreed with customers or unless agreed otherwise. Revenue from the sale of carbon credit emission is recognized at the time of transfer of credits to customers.

In accordance with ASC 606 Revenue from Contracts with Customers, total consideration for PPAs with scheduled price changes (price escalation in a solar power plant with 50 MWs of operating capacity and price decrease in a solar power plant with 10 MWs of operating capacity) and for significant financing components is estimated and recognized over the term of the agreement. Price escalations create an unbilled receivable, and the price decreases create deferred revenue. The time value of the significant financing component is recorded as interest expense. The Company uses the discount rate that would be reflected in a separate financing transaction between the entity and its customer at contract inception and recognizes the revenue amount on a straight-line basis over the term of the PPAs, and interest expense using the effective interest rate method. The Company also recognizes incremental costs incurred to obtain a contract in Other Assets in the consolidated balance sheet. These amounts are amortized on a straight-line basis over the term of the PPAs and are included as a reduction to revenue in the consolidated statements of operations.

The Company also records the proceeds received from Viability Gap Funding ('VGF') on fulfilment of the underlying conditions as deferred revenue. Such deferred VGF revenue is recognized as sale of power in proportion to the actual sale of solar energy kilowatts during the period to the total estimated sale of solar energy kilowatts during the tenure of the applicable power purchase agreement pursuant to the revenue recognition policy.

*Revenue from customers*

Revenue from customers, net consists of the following:

| | Six months period ended September 30, | | |
|---|---|---|---|
| | 2020 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | | Unaudited (In million) | |
| **Revenue from Customers:** | | | |
| Sale of Power [1] | 7,444 | 8,418 | 113.5 |
| Others [2] | — | 408 | 5.5 |
| **Total** | **7,444** | **8,826** | **119.0** |

(1) Sale of power includes revenue for the recovery of Safe-Guard Duties and Goods and Service Tax. The Company recognised income for the same amounting to INR 235 million and INR 125 million (US$ 1.7 million) for the six months ended September 30, 2020 and 2021, respectively.

(2) Others includes revenue from the sale of carbon credits recognized at the time of transfer of credits to customers.

## (g) Recent accounting pronouncements

In December 2019, the FASB issued ASU 2019-12, Simplifying the Accounting for Income Taxes ("ASU 2019-12"). This ASU eliminates certain exceptions to the general principles in ASC 740, Income Taxes and adds guidance to reduce complexity in accounting for income taxes. The ASU eliminates, inter alia, the general methodology for calculating income taxes in an interim period when a year-to-date loss exceeds the anticipated loss for the year. The ASU requires that an entity reflect the effect of an enacted change in tax laws or rates in the annual effective tax rate computation in the interim period that includes the enactment date. ASU 2019-12 is effective for annual periods beginning after December 15, 2020, including interim periods within those fiscal years. During current period, the Company applied ASU 2019-12 and noted that the impact of adoption of this guidance did not have a material effect on the Company's condensed consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, "Reference Rate Reform (Topic 848) - Facilitation of the Effects of Reference Rate Reform on Financial Reporting" which provides companies with optional financial reporting alternatives to reduce the cost and complexity associated with the accounting for contracts and hedging relationships affected by reference rate reform. The guidance applies to contracts that:

–    reference LIBOR or another rate that is expected to be discontinued as a result of rate reform; and

–    have modified terms that affect, or have the potential to affect, the amount and timing of contractual cash flows resulting from the discontinuance of the reference rate.

The amendments in this ASU are effective for all entities as of March 12, 2020 through December 31, 2022.

In January 2021, the FASB issued ASU 2021-01, "Reference Rate Reform – Scope," which clarified the scope of Topic 848 relating to contract modifications.

The Company is currently evaluating the impact of the guidance on the Company's future financial statements. The change in underlying rate is not expected to have a material financial impact on the Company.

Other recent accounting pronouncements issued by the FASB (including its Emerging Issues Task Force) and the United States Securities and Exchange Commission did not or are not believed by management to have a material impact on the Company's present or future financial statements.

## (h) Update on COVID-19 Pandemic

The Company is continuously monitoring the COVID-19 situation and taking the requisite steps to address the situation. Certain of the Company's construction activities related to projects construction were negatively impacted by the second wave of COVID-19. As a result, the Company has received extensions in scheduled commissioning date for certain projects, in reference to relaxation granted by Ministry of New & Renewable Energy (MNRE) in the current period. The Company continues to engage with the Distribution Companies ("DISCOMs") for further extensions relating to scheduled commissioning on certain other projects. The uncertainties associated with its nature and duration and the Company continues to monitor any material changes to future economic conditions.

## 3. Cash and cash equivalents

Cash and cash equivalents consist of the following:

| | As of March 31, | As of September 30, | |
| --- | --- | --- | --- |
| | 2021 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | Audited | Unaudited | |
| | | (In million) | |
| Bank deposits | 1,171 | 2,486 | 33.5 |
| Term deposits | 9,936 | 7,027 | 94.8 |
| **Total** | **11,107** | **9,513** | **128.3** |

## 4. Restricted cash

Restricted cash consists of the following:

| | As of March 31, | As of September 30, | |
| --- | --- | --- | --- |
| | 2021 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | Audited | Unaudited | |
| | | (In million) | |
| Bank deposits | 4,881 | 9,780 | 131.9 |
| Term deposits | 170 | 95 | 1.3 |
| | 5,051 | 9,875 | 133.2 |
| Restricted cash — current | 4,881 | 9,780 | 131.9 |
| **Restricted cash — non-current** | **170** | **95** | **1.3** |

## 5. Accounts receivable

The Company's accounts receivables are generated by selling energy to customers and are reported net of any allowance for uncollectible accounts. The Company uses ageing analysis, probability of default methods, past facts, significant one-time events, guidelines issued by government authorities, credit rating of customers, current economic conditions and reasonable forecasts that are most relevant in evaluating and estimating the expected credit losses. In addition, the Company has taken into consideration the impact on credit risk, if any, due to COVID-19.

The Company writes-off an account receivable in the period that it is deemed uncollectible and records a reduction in the ECL and the balance of the account receivables in the balance sheet.

The Company evaluates the concentration of risk with respect to its accounts receivables as high, due to the limited number of counterparts for its services, being mainly state utilities and government entities. However, the Company does not foresee any significant credit risk attached to receivables from such state utilities/government entities (See Note 27).

The Company analyzed its historical loss information for its accounts receivables and adjusted for forward looking information and determined the following credit loss percentages:

| | March 31, 2021 | September 30, 2021 |
| --- | --- | --- |
| **Ageing of accounts receivables** | **Expected Credit Losses %** | |
| Not Due (including unbilled receivables) | 0.73% | 0.65% |
| 0-90 days | 2.80% | 2.49% |
| 90-180 days | 3.82% | 3.56% |
| 180-365 days | 3.99% | 3.67% |
| Above 365 days | 11.79% | 11.79% |

| | March 31, 2021* | September 30, 2021* |
|---|---|---|
| | (INR) | (INR) |
| | Audited | Unaudited |
| **Ageing of accounts receivables** | (In million) | (In million) |
| Not Due (including unbilled receivables) | 2,857 | 2,930 |
| 0-90 days | 491 | 527 |
| 90-180 days | 369 | 509 |
| 180-365 days | 390 | 661 |
| Above 365 days | 1,255 | 1,499 |
| **Total accounts receivables** | **5,362** | **6,126** |

*Does not include INR 162 million and INR 379 million (US$ 5.1 million) relating to receivables of the Company's rooftop business classified as Assets held for sale as of March 31, 2021, and September 30, 2021, respectively.

Accounts receivable, net consists of the following:

| | March 31 | September 30 | |
|---|---|---|---|
| | 2021 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | Audited | Unaudited | |
| | (In million) | | |
| Accounts receivable [1] | 5,362 | 6,126 | 82.6 |
| Less: Allowance for doubtful accounts/ credit losses | (475) | (446) | (6.0) |
| **Total** | **4,887** | **5,680** | **76.6** |

[1] Includes INR 1,558 million and INR 1,267 million (US$ 17.1 million) of unbilled receivables as of March 31, 2021 and September 30, 2021, respectively.

Activity for the allowance for doubtful accounts/ credit losses is as follows:

| | March 31, | September 30, | |
|---|---|---|---|
| | 2021 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | Audited | Unaudited | |
| | (In million) | | |
| Balance at the beginning of the period | 246 | 475 | 6.4 |
| Provision for doubtful debts/ expected credit losses, net | 286 | 24 | 0.3 |
| Less: Reclassified to Assets held for sale (See Note 24) | (13) | (54) | (0.7) |
| Write offs charged against the allowance | (44) | 1 | 0.0 |
| **Balance at the end of the period** | **475** | **446** | **6.0** |

In relation to the Company's 50 MWs project in Andhra Pradesh, the Andhra Pradesh DISCOM, Southern Power Distribution Company of Andhra Pradesh Ltd ("APSPDCL"), had issued a letter to the Company requesting the reduction of quoted tariff to INR 2.44 per unit as against the PPA rate of INR 5.89 per unit for solar projects from the date of commissioning and threatened termination of the PPA in case of refusal to accede to such reduction ("Letter"). The Company had challenged the Letter before the High Court at Vijayawada, as well as the decision of the Government of Andhra Pradesh ("GoAP") to constitute a High-Level Negotiation Committee to review, negotiate, and bring down" the solar energy purchase prices vide order dated July 1, 2019 ("HLNC Order"). The High Court vide its judgment dated September 24, 2019 ("Judgment"), whilst quashing the aforesaid Letter and HLNC Order, granted its implied blessing to Andhra Pradesh DISCOM to approach the Andhra Pradesh Electricity Regulatory Commission ("APERC") for reduction of tariff by directing APSPDCL to make payment of outstanding and future invoices at the "interim" rate of Rs. 2.44/- per unit, till the dispute is resolved by APERC. Accordingly, the Company has filed a writ appeal challenging the Judgment, whereby the Company has inter alia sought: (i) setting aside of the Judgment to the limited extent of the direction to DISCOMs to make payment at the "interim" rate of Rs. 2.44 per unit and the implied blessing granted by the High Court to approach the APERC for reduction of tariff; and (ii) quashing of all actions undertaken by the respondents and/or restrain the respondents from taking any action seeking reduction of tariff under the concluded PPA and/or unilateral alteration of the terms of such PPA, pursuant to the directions in the Judgment, including quashing of the proceedings. Further, the appellate authority during several hearings has directed the DISCOM to remit the overdue receivables at interim rate. Based on a legal opinion obtained by management, the Company is invoicing and recognizing revenue as per the PPA rate since management has assessed that matter is likely to be decided in favor of the Company. Further, the Company has recognized allowance for doubtful debts on this receivable as per the expected credit loss model.

## 6. Prepaid expenses and other current assets

Prepaid expenses and other current assets consist of the following:

| | March 31 | September 30 | |
| --- | --- | --- | --- |
| | 2021 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | Audited | Unaudited | |
| | (In million) | | |
| Derivative asset (See Note 26) | 914 | 913 | 12.3 |
| Interest receivable on term deposits | 305 | 65 | 0.9 |
| Prepaid debt financing costs | 367 | 352 | 4.7 |
| Balance with statutory authorities | 396 | 483 | 6.5 |
| Prepaid bank guarantee charges | 68 | 92 | 1.2 |
| Prepaid insurance and other expenses | 82 | 277 | 3.7 |
| Advance to suppliers | 44 | 122 | 1.6 |
| Other | 14 | 13 | 0.2 |
| **Total** | **2,190** | **2,317** | **31.1** |

## 7. Property, plant and equipment, net

Property, plant and equipment, net, consists of the following:

| | Estimated Useful Life (in years) | March 31, | September 30, | |
| --- | --- | --- | --- | --- |
| | | 2021 | 2021 | 2021 |
| | | (INR) | (INR) | (US$) |
| | | Audited | Unaudited | |
| | | (In million) | | |
| Plant and machinery (primarily solar power plants) | 25-35 | 101,331 | 109,361 | 1,474.8 |
| Leasehold improvements —related to solar power plants | 25-35 | 5,970 | 6,208 | 83.7 |
| Furniture and fixtures | 5 | 13 | 16 | 0.2 |
| Vehicles | 5 | 72 | 73 | 1.0 |
| Office equipment | 1-5 | 38 | 45 | 0.6 |
| Computers | 3 | 96 | 94 | 1.3 |
| Leasehold improvements — office | 1-3 | 147 | 152 | 2.0 |
| | | 107,667 | 115,949 | 1,563.6 |
| Less: Accumulated depreciation | | 11,966 | 13,516 | 182.3 |
| Less: Accumulated impairment (See Note 24) | | 657 | 618 | 8.3 |
| | | 95,044 | 101,815 | 1,373.0 |
| Freehold land | | 3,193 | 3,284 | 44.3 |
| Construction in progress | | 10,610 | 15,709 | 211.4 |
| **Total** | | **108,847** | **120,808** | **1,628.7** |

Depreciation expense on property, plant and equipment was INR 1,509 million and INR 1,665 million (US$ 22.5 million) for the six months ended September 30, 2020 and 2021, respectively.

During the current period, 10 MW of our rooftop project has been reclassified as asset held for sale, See Note 24.

**8. Software, net**

| | Estimated Useful Life (in years) | March 31, 2021 (INR) Audited | September 30, 2021 (INR) Unaudited | September 30, 2021 (US$) Unaudited |
|---|---|---|---|---|
| | | **(In million)** | | |
| Software licenses and related implementation costs | 3 Years | 164 | 170 | 2.3 |
| Less: Accumulated amortization | | 135 | 149 | 2.0 |
| **Total** | | **29** | **21** | **0.3** |

Amortization expense for software was INR 19 million and INR 14 million (US$ 0.2 million) for the six months ended September 30, 2020 and 2021, respectively.

**9. Other assets**

Other assets consist of the following:

| | March 31, 2021 (INR) Audited | September 30, 2021 (INR) Unaudited | September 30, 2021 (US$) Unaudited |
|---|---|---|---|
| | **(In million)** | | |
| Prepaid income taxes | 502 | 358 | 4.8 |
| Derivative asset (See Note 26) | 5,786 | 1,277 | 17.2 |
| Interest receivable on term deposits | 22 | 1 | 0.0 |
| Security deposits | 381 | 376 | 5.1 |
| Contract acquisition cost | 141 | 138 | 1.9 |
| Unbilled receivables | 223 | 252 | 3.4 |
| Other | 29 | 29 | 0.4 |
| **Total** | **7,084** | **2,431** | **32.8** |

**10. Investment in equity investee**

Investment in equity investee consists of the following:

| | March 31, 2021 (INR) Audited | September 30, 2021 (INR) Unaudited | September 30, 2021 (US$) Unaudited |
|---|---|---|---|
| | **(In thousand)** | | |
| Investment in associate | 26 | 26 | 0.4 |
| **Total** | **26** | **26** | **0.4** |

During the year ended March 31, 2020, the Company had invested INR 0.026 million (US$ 0.0003 million) to acquire 26% of equity shares in a newly formed Company incorporated to establish a manufacturing facility (investee) and the Company is committed to further invest 26% of the equity required for construction of the manufacturing facility.

## 11. Asset retirement obligations (ARO)

The depreciation expense incurred during the year ended March 31, 2021, and six months ended September 30, 2021, was INR 23 million and INR 12 million (US$ 0.2 million), respectively, in relation to the asset retirement recognized. Further, the movement in liability is as below:

| | March 31, 2021 (INR) | September 30, 2021 (INR)* | September 30, 2021 (US$)* |
|---|---|---|---|
| | Audited | Unaudited | |
| | | (In million) | |
| Beginning balance | 741 | 811 | 10.9 |
| Addition during the period | 211 | 90 | 1.2 |
| Impact of change in estimate | (183) | — | — |
| Accretion expense during the period | 42 | 26 | 0.4 |
| Ending balance | 811 | 927 | 12.5 |

* Movement during six months has been reported.

## 12. Deferred revenue

The following table provides information about movement in deferred revenue.

| | March 31, 2021 | September 30, 2021 | September 30, 2021 |
|---|---|---|---|
| | INR | INR | US$ |
| | Audited | Unaudited | |
| | | (In million) | |
| Beginning balance (including current portion) | 2,239 | 2,463 | 33.2 |
| Increased as a result of additional cash received against VGF | 236 | — | — |
| Deferred revenue recognized | 93 | 39 | 0.6 |
| Amount recognized into revenue | (105) | (58) | (0.8) |
| Ending balance (including current portion) | 2,463 | 2,444 | 33.0 |

## 13. Other liabilities

Other current liabilities, consists of the following:

| | March 31, 2021 (INR) | September 30, 2021 (INR) | September 30, 2021 (US$) |
|---|---|---|---|
| | Audited | Unaudited | |
| | | (In million) | |
| Derivative liabilities (See Note 26) | 961 | 468 | 6.3 |
| Provision for employee benefits | 8 | 10 | 0.1 |
| Provision for SAR to employees (See Note 23) | 95 | 77 | 1.0 |
| Payable to statutory authorities | 126 | 123 | 1.7 |
| Other payables (primarily related to payable for material/services) | 737 | 1,242 | 16.9 |
| Total | 1,927 | 1,920 | 26.0 |

Other non-current liabilities, consists of the following:

| | March 31, 2021 (INR) | September 30, 2021 (INR) | September 30, 2021 (US$) |
|---|---|---|---|
| | Audited | Unaudited | |
| | | (In million) | |
| Derivative liabilities (See Note 26) | 251 | 448 | 6.0 |
| Provision for SAR to employees (See Note 23) | 1,122 | 997 | 13.1 |
| Provision for gratuity | 46 | 54 | 0.7 |
| Provision for compensated absences | 40 | 48 | 0.6 |
| Total | 1,459 | 1,547 | 20.4 |

## 14. Long term debt

Long term debt consists of the following:

| | March 31, 2021 (INR) Audited | September 30, 2021 (INR) Unaudited | September 30, 2021 (US$) Unaudited |
|---|---|---|---|
| | | (In million) | |
| **Secured term loans:** | | | |
| Foreign currency loans | 73,200 | 71,130 | 959.1 |
| Indian rupee loans | 21,380 | 22,906 | 308.9 |
| **Total debt** | **94,580** | **94,036** | **1,268.0** |
| Less current portion | 4,658 | 7,107 | 95.8 |
| **Long-term debt** | **89,922** | **86,929** | **1,172.2** |

**Foreign currency term loans**

*5.5% Senior Notes*

During the year ended March 31, 2018, Azure Power Energy Limited (one of the subsidiaries of APGL) issued 5.5% US$ denominated Senior Notes ("5.5% Senior Notes" or "Green Bonds") and raised INR 31,260 million net of discount of INR 9 million at 0.03% and issuance expense of INR 586 million. The discount on issuance of the Green Bonds and the issuance expenses was recorded as finance cost, using the effective interest rate method and the unamortized balance of such amounts was netted with the carrying value of the Green Bonds. The Green Bonds were listed on the Singapore Exchange Securities Trading Limited (SGX-ST). In accordance with the terms of the issue, the proceeds were used for repayment of project level loans. The interest on the 5.5% Senior Notes were payable on a semi-annual basis and the principal amount was payable in November 2022. The Company had guaranteed the principal and interest repayments to the investors; however, the guarantee was cancelled on May 7, 2020 upon the Company satisfying certain financial covenants, on the basis of the financial statements for the year ended March 31, 2019. In August 2021, these Senior Notes have been re-paid by the Company through refinancing of the 3.575% Senior Notes, as detailed in the note below. Further, the Company recorded the unamortized issuance costs and premium on redemption in interest expense totaling INR 706 million (US$ 9.6 million), in respect of refinancing of these 5.5% Senior Notes.

*3.575% Senior Notes*

In August 2021, Azure Power Energy Limited (one of the subsidiaries of APGL) issued 3.575% US$ denominated Senior Notes ("3.575% Senior Notes" or "Green Bonds") and raised INR 30,333 million (US$ 408.5 million), net of issuance expense of INR 408 million (US$ 5.5 million). The issuance expenses have been recorded as finance cost, using the effective interest rate method and the unamortized balance of such amounts are netted with the carrying value of the Green Bonds. The Green Bonds are listed on the Singapore Exchange Securities Trading Limited (SGX-ST). In accordance with the terms of the issue, the proceeds were used for repayment of the 5.5% Senior Notes. The interest on the 3.575% Senior Notes is payable on a semi-annual basis and the principal amount is payable in 10 installments, as defined in Indenture, starting from February 2022. As of September 30, 2021, the net carrying value of the Green Bonds was INR 30,343 million (US$ 409.2 million) net of issuance expense of INR 398 million (US$ 5.4 million). The Green Bonds are secured by a pledge of Azure Power Energy Limited's shares.

*5.65% Senior Notes*

During the year ended March 31, 2020, Azure Power Solar Energy Private Limited (one of the subsidiaries of APGL) issued 5.65% US$ denominated Senior Notes ("5.65% Senior Notes" or "Green Bonds") and raised INR 24,400 million net of discount of INR 7 million at 0.03% and issuance expense of INR 397 million. The discount on issuance of the Green Bonds and the issuance expenses have been recorded as finance cost, using the effective interest rate method and the unamortized balance of such amounts is netted with the carrying value of the Green Bonds. The Green Bonds are listed on the Singapore Exchange Securities Trading Limited (SGX-ST).

In accordance with the terms of the issue, the proceeds were used for repayment of project level loans. The interest on the 5.65% Senior Notes are payable on a semi-annual basis and the principal amount is payable in December 2024. As of September 30, 2021, the net carrying value of the Green Bonds was INR 25,712 million (US$ 346.7 million). The Company continues to guarantee the principal and interest repayments to the investors and the guarantee shall become ineffective on meeting certain financial covenants. The Green Bonds are secured fixed charge by the Company over the capital stock of Azure Power Solar Energy Private Limited·

*Loan from Export Development Canada and Standard Chartered Bank (Singapore) Limited*

During the year ended March 31, 2021, the Company borrowed INR 6,931 million (US$ 93.0 million) from Export Development Canada and Standard Chartered Bank (Singapore) Limited. The funds were provided to project SPVs as shareholder loans or through other instrument for capital expenditure or for payment of capital expenditure in respect of various specified projects. These borrowings are foreign currency loans and carry an interest rate of 6 month LIBOR+Margin of 3.95%, which is equivalent to 9.10% - 10.19% based on disbursements as of September 30, 2021 and the loan is repayable in 8 half yearly installments commencing November 2021. The borrowing is collateralized by the shares of project SPVs and a hypothecation/charge over the Debt Service Reserve Account ("DSRA"), the Collection Accounts and all amounts on deposit in or standing to the credit of the Collection Accounts (including, the SGD Receivables and the Surplus Cashflows credited to the Collection Accounts) of project SPVs. The net carrying value of the loan as of September 30, 2021 is INR 6,814 million (US$ 91.9 million).

*Loan from Export Development Canada, Societe Generale and MUFG Bank Ltd.*

In July 2021, the Company borrowed INR 4,926 million (US$ 66.4 million) consortium loan from Export Development Canada, Societe Generale and MUFG Bank Ltd. These funds are provided for financing of its 300 MW solar power project with Solar Energy Corporation of India. Borrowings under the consortium loan are foreign currency loans and carry an interest rate of 6 month LIBOR+Margin of 2.10% which is equivalent to 8.18% - 8.40% based on disbursements as of September 30, 2021 and the loan is repayable in 18 quarterly installments commencing April 2022. The borrowing is collateralized by first charge on the Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 9,118 million (US$ 123.0 million) as of September 30, 2021, pledge of 100% shares of the project SPV and guarantee of Azure Power India Private Limited. The net carrying value of the loan as of September 30, 2021 is INR 4,743 million (US$ 64.0 million).

**Indian Rupee Non-Convertible Debentures**

During the year ended March 31, 2018, the Company issued unsecured Non-Convertible Debentures in one of its subsidiaries and borrowed INR 1,865 million, net of issuance expense of INR 35 million. The debentures carry an interest rate of 12.30% per annum. These debentures are repayable in 11 equalized semi-annual installments beginning September 2022 until September 2027 and interest payments are payable semi-annually. The issuance expenses are amortized over the term of the contract using the effective interest rate method. As of September 30, 2021, the net carrying value of the Non-Convertible Debentures was INR 1,876 million (US$ 25.3 million).

During the year ended March 31, 2019, the Company issued Non-Convertible Debentures in two of its subsidiaries and borrowed INR 548 million, net of issuance expense of INR 14 million. The debentures carry an interest rate of 10.32% per annum. These debentures are repayable on October 2024 and interest payments are payable every three months commencing from April 2019. During the year ended March 31, 2020, the Company issued additional Non-Convertible Debentures in four of its subsidiaries and borrowed INR 439 million (US$ 5.8 million), net of issuance expenses of INR 19 million (US$ 0.3 million). These debentures carry an interest rate of 9.85% to 10.87% per annum. These debentures are repayable starting October 2024 and interest payments are payable every three months commencing from March 2020. The issuance expenses are amortized over the term of the contract using the effective interest rate method. The borrowing is collateralized by first ranking pari passu mortgage charge on all immovable and movable properties of related subsidiary within the group with a net carrying value of INR 3,413 million (US$ 46.0 million) as of September 30, 2021. The net carrying value of the Non-Convertible Debentures as of September 30, 2021 was INR 996 million (US$ 13.4 million). As of September 30, 2021, the Company was not in compliance with the financial covenants related to this borrowing and has obtained waivers for the non-compliance till September 30, 2022. Out of this total debt, INR 867 million (US$ 11.7 million) relates to rooftop business and hence has been classified as liabilities directly associated with assets classified as held for sale. See Note 24.

**Project level secured term loans**

*Foreign currency loans*

The net carrying value of the loan of INR 43 million (US$ 0.58 million) as of September 30, 2021 was borrowed in foreign currency for financing the Company's future rooftop solar power projects and carries a fixed interest rate of 4.42% per annum. The loan is repayable in 54 quarterly installments which commenced from October 15, 2017. The borrowing is collateralized by the leasehold land, movable/immovable properties and underlying solar power project assets with a net carrying value of INR 58 million (US$ 0.8 million) as of September 30, 2021 and is guaranteed by Azure Power India Private Limited. As of September 30, 2021, the Company was not in compliance with the financial covenants related to this borrowing and had obtained waivers up to September 30, 2021. This debt is related to rooftop business and hence has been classified as liabilities directly associated with assets classified as held for sale. See Note 24.

During the year ended March 31, 2019, the Company borrowed INR 552 million as project level financing for some of its rooftop projects. During the year ended March 31, 2020, the Company further borrowed INR 135 million (US$ 1.8 million) and INR 271 million (US$ 3.6 million) under the same. These foreign currency borrowings carry an annual interest rate of LIBOR + 2.75%. These borrowings are repayable starting October 2024 and interest payments are payable every three months commencing from April 2019. The borrowing is collateralized by first ranking pari passu mortgage charge on all immovable and movable properties of the borrower with a net carrying value of INR 3,413 million (US$ 46.0 million). The net carrying value of the borrowings as of September 30, 2021 is INR 970 million (US$ 13.1 million). As of September 30, 2021, the Company was not in compliance with the financial covenants related to this borrowing and has obtained waivers for the non-compliance till September 30, 2022. Out of this total debt, INR 857 million (US$ 11.6 million) relates to rooftop business and hence has been classified as liabilities directly associated with assets classified as held for sale. See Note 24.

*Indian rupee loans*

The net carrying value of the loan as of September 30, 2021 is INR 422 million (US$ 5.7 million), borrowed for financing of a 5 MW solar power project with NTPC Vidyut Vyapar Nigam Limited. The loan has been refinanced from Kotak Infrastructure Debt Fund Limited in July 2021 and unamortized carrying value of ancillary cost of borrowing was expensed. This borrowing carries an interest rate of 8.25% per annum. The loan is repayable in 42 quarterly installments commencing September 2021. The borrowing is collateralized by movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 481 million (US$ 6.5 million) as of September 30, 2021.

The net carrying value of the loan as of September 30, 2021 is INR 70 million (US$ 0.9 million), borrowed for the financing of a 2.5 MW rooftop solar power project. The interest rate as of September 30, 2021 is 12.16% per annum. The loan is repayable in 29 semi-annual installments which commenced on January 15, 2014. The borrowing is collateralized by first charge on Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 113 million (US$ 1.5 million) as of September 30, 2021 and is guaranteed by Azure Power India Private Limited. This debt is related to rooftop business and hence has been classified as liabilities directly associated with assets classified as held for sale. See Note 24.

The net carrying value of the loan as of September 30, 2021, is INR 1,309 million (US$ 17.6 million), borrowed for financing of a 30 MW solar power project with Chhattisgarh State Power Distribution Company Ltd. The loan has been refinanced from Aditya Birla Finance Ltd ("ABFL") in August 2021 and unamortized carrying value of ancillary cost of borrowing was expensed. The annual floating interest rate is at the aggregate of ABFL Long term reference rate and spread. As of September 30, 2021, the loan carries interest rate of 8.9% per annum. The loan is repayable in 60 quarterly installments and commenced August 2021. The borrowing is collateralized by a first charge on the Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 1,544 million (US$ 20.8 million) as of September 30, 2021, and the loan had been guaranteed by the corporate guarantee and pledge of 51% shares of Azure Power India Private Limited, the holding company.

During the period ended September 30, 2021, the Company borrowed INR 80 million (US$ 1.1 million) from Tata Capital Financial Services Limited. The net carrying value of the loan as of September 30, 2021, is INR 2,048 million (US$ 27.6 million), borrowed for financing of a 50 MW solar power project with NTPC Limited. The annual floating interest rate is at the TCCL Prime Lending Rate less 8.15%. As of September 30, 2021, the loan carries interest rate of 8.75% per annum. The loan is repayable in 72 quarterly installments and commenced March 31, 2020. The borrowing is collateralized by a first charge on the Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 2,610 million (US$ 35.2 million) as of September 30, 2021, and the loan had been guaranteed by the corporate guarantee and pledge of 51% shares of Azure Power India Private Limited, the holding company.

The net carrying value of the loan borrowed from Indian Renewable Energy Development Agency Limited ("IREDA") for financing a 100 MW solar power project with NTPC Limited as of September 30, 2021, is INR 5,005 million (US$ 67.5 million). The floating interest rate is at Grade-II as per IREDA. As of September 30, 2021, the loan carries interest rate of 9.00% per annum. The loan is repayable in 73 quarterly installments and commenced June 30, 2018. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 5,318 million (US$ 71.7 million) as of September 30, 2021.

During the year ended March 31, 2021, the Company borrowed INR 1,734 million (US$ 23.7 million) from Aditya Birla finance Limited and Tata Cleantech Capital Limited for financing of its 200 MW solar project with Solar Energy Corporation of India. The loan carries an annual floating rate of interest at a Marginal Cost of Funds based Lending Rate ("MCLR") plus 0.55%. During June 2021, loan taken from Aditya Birla finance Limited has been refinanced from Tata Cleantech Capital Limited. As of September 30, 2021, the loan carries interest rate of 8.55% per annum. The loan is repayable in 72 quarterly installments commencing September 2020. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 9,349 million (US$ 126.1 million) as of September 30, 2021. The net carrying value of the loan as of September 30, 2021, is INR 1,545 million (US$ 20.8 million).

During the year ended March 31, 2019, the Company borrowed INR 124 million (US$ 1.8 million) as an External Commercial Borrowings from International Finance Corporation (IFC) for some of its rooftop projects. This borrowing carry an interest rate of 10.74% and interest payments are payable every three months which commenced April 2019. The borrowing is collateralized by first ranking pari passu mortgage charge on all immovable and movable properties of the Company with a net carrying value of INR 2,887 million (US$ 38.9 million) as of September 30, 2021. The loan is repayable on October 15, 2024. The net carrying value of the loan as of September 30, 2021, is INR 122 million (US$ 1.6 million). As of September 30, 2021, the Company was not in compliance with the financial covenants related to this borrowing and has obtained suitable waivers for the non-compliance till September 30, 2022. This debt is related to rooftop business and hence has been classified as liabilities directly associated with assets classified as held for sale. See Note 24.

During the years ended March 31, 2020 and March 31, 2021, the Company borrowed INR 463 million (US$ 6.1 million) and INR 56 million (US$ 0.8 million), respectively, as a project level financing for financing of a 16 MW rooftop solar power project from the State Bank of India ('SBI'). This borrowing carry an annual interest rate of 6 months MCLR + 1.45%. As of September 30, 2021, the loan carries interest rate of 8.40% per annum. The loan is repayable in 52 quarterly installments commencing June 2020. The borrowing is collateralized by first charge on Company's movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 624 million (US$ 8.4 million) as of September 30, 2021, and pledge of 51% shares and Corporate Guarantee of Azure Power India Private Limited ("APIPL") which shall terminate as per conditions stipulated in the Rupee Term Loan Agreement. The net carrying value of the loan as of September 30, 2021, is INR 424 million (US$ 5.72 million).

During the year ended March 31, 2020, March 31, 2021, and six months ended September 30, 2021, the Company borrowed INR 1,000 million, INR 786 million, and INR 213 million, respectively, from REC Limited (formerly known as Rural Electrification Corporation Limited) ('REC') for financing of its 90 MW solar project with Assam Power Distribution Company Limited. The rate of interest shall be applicable for a Grade-III borrower with reset after 1 year. The floating interest rate is at the REC lending rate. As of September 30, 2021, the loan carries interest rate of 10.00% per annum. The loan is repayable in 204 monthly installments commencing April 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 3,105 million (US$ 41.9 million) as of September 30, 2021, and pledge of 100% shares held by the APIPL in the SPV and Corporate Guarantee of APIPL which shall terminate as per conditions stipulated in the Facility Agreement. The net carrying value of the loan as of September 30, 2021, is INR 1,986 million (US$ 26.8 million).

The net carrying value of the loan as of September 30, 2021, is INR 2,495 million (US$ 33.6 million), borrowed for financing of a 35 MW solar project with NTPC Vidyut Vyapar Nigam Limited. The loan has been refinanced from NIIF Infrastructure Finance Ltd in the month of September 2021 and unamortized carrying value of ancillary cost of borrowing was expensed. These borrowings carry an interest rate of 8.2% per annum. The loan is repayable in 47 quarterly installments commencing September 2021. The borrowing is collateralized by movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 2,340 million (US$ 31.6 million) as of September 30, 2021, and pledge of 51% shares and Corporate Guarantee of APIPL which shall terminate as per conditions stipulated in the agreement.

During the year ended March 31, 2021, and six months ended September 30, 2021, the Company borrowed INR 4,095 million and INR 745 million, respectively, from Power Finance Corporation Limited (PFC) for financing of its 600 MW solar project with Solar Energy Corporation of India. The applicable interest rate is 10.30% per annum payable monthly. This interest rate is applicable for Renewable Energy Projects with an Integrated Rating of IR-2, with 3 year reset as per PFC policy. The loan is repayable in 228 monthly installments commencing June 2022. The borrowing is collateralized by the underlying solar power project assets with a net carrying value of INR 23,445 million (US$ 316.1 million) as of September 30, 2021. The net carrying value of the loan as of September 30, 2021, is INR 4,781 million (US$ 64.5 million).

During the year ended March 31, 2021, the Company borrowed INR 413 million (US$ 5.6 million) from Kotak Infrastructure Debt Fund Limited for financing of a 10 MW solar power project with Bangalore Electricity Supply Company Limited. These borrowings carry an interest rate of 8.50% per annum fixed till September 30, 2022, and shall be reset every two years thereafter. The loan is repayable in 54 quarterly installments commencing December 2020. The borrowing is collateralized by movable and immovable properties of the underlying solar power project assets with a net carrying value of INR 615 million (US$ 8.3 million) as of September 30, 2021, operating working capital and pledge of at least 51% issued equity shares and CCDs of the borrower company. The net carrying value of the loan as of September 30, 2021, is INR 374 million (US$ 5.0 million).

During the six months ended September 30, 2021, the Company borrowed INR 544 million (US$ 7.3 million) from SBI for financing of a 200 MW solar power project with Solar Energy Corporation of India. These borrowings carry an interest rate of 10.25% linked to SBI 6M MCLR till next MCLR reset date, the applicable rate of interest on all outstanding borrowing shall be reset to the applicable rate of interest prevailing on such MCLR reset date. The loan is repayable in 68 quarterly installments commencing September 2021. The borrowing is collateralized by first ranking pari paasu mortgage charge on all immovable and movable properties of the Company with a net carrying value of INR 9,349 million (US$ 126.1 million) as of September 30, 2021. The net carrying value of the loan as of September 30, 2021, is INR 514 million (US$ 6.9 million).

*Trade credit*

As of September 30, 2021, the Company has multiple borrowings as buyer's credit amounting to INR 3,403 million (US$ 45.9 million) jointly from Yes Bank and State bank of India, including INR 2,641 million (US$ 35.0 million) availed during the year ended March 31, 2020 for financing of a 200 MW solar power project with Solar Energy Corporation of India. These borrowings carry a floating interest rate of LIBOR+ 0.38%-0.50%, for its solar power projects. The trade credits are required to be repaid in 2.7 -2.8 years from the date of shipment of the products from the suppliers, with semi-annual interest payments. The Company has repaid INR 782 million (US$ 10.5 million) in the current period.

As of March 31, 2021, the Company had borrowing as buyer's credit amounting to INR 295 million (US$ 4.0 million), from Yes bank, for certain of its operational SPV's, entered during the year ended March 31, 2019. These borrowings carried a floating interest rate of six months LIBOR plus 0.8% spread. These buyer's credit have been repaid during the current period.

*Short term debt*

During the year ended March 31, 2021, and six months ended September 30, 2021, the Company borrowed INR 1,529 million and INR 5,900 million, respectively, as a short-term borrowing from The Hongkong and Shanghai banking Corporation Limited (HSBC). This Borrowing is repayable within 12 months of disbursement. The unsecured borrowing bears an interest rate of 8.75% per annum, payable monthly. The net carrying value of the loan as of September 30, 2021, is INR 7,395 million (US$ 99.7 million).

During the six months ended September 30, 2021, the Company has obtained an Overdraft borrowing against Fixed deposits (ODFD) of INR 2,250 million. This Borrowing is repayable within one year from disbursement or till FD maturity whichever is earlier. The borrowing bears an interest rate of Fixed rate of 0.2% over FD rate. The net carrying value of the loan as of September 30, 2021, is INR 2,231 million (US$ 30.1 million).

As of September 30, 2021, the Company has an outstanding loan as buyer's credit amounting to INR 11,647 million (US$ 157.1 million) for one of its under construction SPVs for 600 MW solar power project with Solar Energy Corporation of India. These borrowings carries a floating interest rate of six months LIBOR plus spread (45 basis points, 60 basis points or 11 basis points) which is equivalent to 0.29% - 0.38% based on individual buyers credit as of September 30, 2021, as applicable.

As of September 30, 2021, the Company has unused commitments, excluding Rooftop portfolio, for financing arrangements, including short term borrowings amounting to INR 17,803 million (US$ 240.1 million) for power projects.

**Covenants and debt financing costs**

These aforementioned borrowings are subject to certain financial and non-financial covenants. Financial covenants include cash flow to debt service, indebtedness to net worth ratio, debt equity ratio and maintenance of debt service balances.

As of September 30, 2021, the Company was in compliance with the financial covenants or obtained waivers for the non-compliance prior to the issuance of these financial statements.

Generally, under the terms of the loan agreements entered into by the Company's project subsidiaries, the project subsidiaries are restricted from paying dividends if they default in payment of their principal, interest and other amounts due to the lenders under their respective loan agreements. Certain of APGL's project subsidiaries also may not pay dividends out of restricted cash.

The carrying value of debt financing costs as on March 31, 2021, and September 30, 2021 was INR 1,107 million and INR 1,377 million (US$ 18.57 million), respectively, for the above loans, which is amortized over the term of the contract using the effective interest rate method.

**Restricted cash**

The Company is required to maintain principal and interest, both as defined in the respective agreements, as a reserve with banks specified by the respective lenders. Such amounts, totaling INR 906 and INR 1,155 million (US$ 15.6 million) as of March 31, 2021 and September 30, 2021, respectively, are classified as restricted cash on the consolidated balance sheets.

As of September 30, 2021, the aggregate maturities of long-term debt are as follows:

| For 12 months period ended September 30, | Annual maturities [1] | |
|---|---|---|
| | INR | US$ |
| | (In million) | |
| 2022 | 7,385 | 99.6 |
| 2023 | 7,280 | 98.2 |
| 2024 | 4,828 | 65.1 |
| 2025 | 31,639 | 426.6 |
| 2026 | 28,468 | 383.9 |
| Thereafter | 15,731 | 212.1 |
| **Total: aggregate maturities of long-term debt** | **95,331** | **1,285.5** |
| Less: carrying value of unamortized debt financing costs | (1,295) | (17.5) |
| **Net maturities of long-term debt** | **94,036** | **1,268.0** |
| Less: current portion of long-term debt | (7,107) | (95.8) |
| **Long-term debt** | **86,929** | **1,172.2** |

[1] Long term debt (principal) obligations for foreign currency denominated borrowings have been translated to Indian rupees using the closing exchange rate as of September 30, 2021 as per Reserve Bank of India.

## 15. Income Taxes

The individual entities within the Company file individual tax returns as per the regulations existing in their respective jurisdictions.

The fiscal year under the Indian Income Tax Act ends on March 31. A portion of the Company's Indian operations qualify for deduction from taxable income because its profits are attributable to undertakings engaged in development of solar power projects under section 80-IA of the Indian Income Tax Act, 1961. This holiday is available for a period of ten consecutive years out of fifteen years beginning from the year in which the project generates power ("Tax Holiday Period"). However, the exemption is only available to the projects completed on or before March 31, 2017. The Company anticipates that it will claim the aforesaid deduction in the last ten years out of fifteen years beginning with the year in which the project generates power and when it has taxable income. Accordingly, its current operations are taxable at the applicable tax rates, based on eligibility criteria.

The Company had adopted the provisions of ASC Topic 740 as they relate to uncertain income tax positions. Tax exposures can involve complex issues and may require extended periods to resolve. The Company does not have any uncertain tax positions requiring recognition. The Company reassesses its tax positions in light of changing facts and circumstances, such as the closing of a tax audit, refinement of an estimate, or changes in tax codes. To the extent that the final tax outcome of these matters differs from the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made.

The provision (benefit) for income taxes consists of the following:

| | Six months period ended September 30, | | |
|---|---|---|---|
| | 2020 | 2021 | 2021 |
| | INR | INR | US$ |
| | (In million) | | |
| Current tax (benefit)/ expense [1] | (92) | 305 | 4.1 |
| Withholding tax on interest on Inter-Company debt related to green bonds | 210 | 181 | 2.4 |
| Deferred income tax expense | 102 | 191 | 2.6 |
| **Total** | **220** | **677** | **9.1** |

[1] Current tax on profit before tax.

Net deferred income taxes on the consolidated balance sheet are as follows:

|  | March 31, | September 30, | |
| --- | --- | --- | --- |
|  | 2021 (INR) | 2021 (INR) | 2021 (US$) |
|  | Audited | Unaudited | |
|  | | (In million) | |
| Deferred tax assets | 2,836 | 3,047 | 41.6 |
| Less: valuation allowance* | (1,088) | (1,088) | (14.7) |
| **Net deferred tax assets** | **1,748** | **1,999** | **26.9** |
| **Deferred tax liability** | **2,046** | **1,644** | **22.2** |

\* For March 31, 2021, and September 30, 2021, the valuation allowance includes INR 741 million and INR 741 million (USD 10.0 million) respectively, relating to the capital loss on rooftop and other assets classified as held for sale. It also includes INR 269 million and INR 269 million (USD 3.6 million) respectively, relating to other rooftop assets that are part of the sale agreement which are expected to be settled beyond 12 months.

At September 30, 2021, the Company performed an analysis of the recoverability of the deferred tax asset. Based on the analysis, the Company has concluded that a valuation allowance offsetting the deferred tax assets is required. Change in the valuation allowance for deferred tax assets as of March 31, 2021, and September 30, 2021 is as follows:

|  | March 31 | September 30, | |
| --- | --- | --- | --- |
|  | 2021 (INR) | 2021 (INR) | 2021 (US$) |
|  | Audited | Unaudited | |
|  | | (In million) | |
| Opening valuation allowance | 217 | 1,088 | 14.7 |
| Movement during the period | 871 | - | - |
| Closing valuation allowance | **1,088** | **1,088** | **14.7** |

During the year end March 31, 2020, The Taxation Laws (Amendment) Act, 2019 has brought key changes to corporate tax rates in the Income Tax Act, 1961, which reduced the tax rate for certain subsidiaries within the group to 25.17%. Azure Power India Private Limited and several of its subsidiaries which are claiming tax benefits under section 80-IA of the Income Tax Act had decided not to opt for this lower tax benefit and have continued under the old regime during the period ended March 31, 2021, and September 30, 2021. The statutory income tax rate as per the Income Tax Act, 1961 ranges between 25.17% to 34.94%, depending on the tax regime chosen by the particular subsidiary. Based on the future projections of Azure Power India Private Limited, management has decided to claim the lower tax rate under the new regime from FY 2033-34 onwards. The effective tax rate was 215.7% and 63.0% during the period ended September 30, 2020 and 2021, respectively, majorly on account of withholding tax related to interest on intercompany debt related to solar green bonds, impact of tax holiday, thin capitalization under section 94B of the Income-tax Act, 1961 and special tax rate on income from sale of carbon credits.

As of March 31, 2021, and September 30, 2021, deferred income taxes have not been provided for the Company's share of undistributed net earnings of foreign operations due to management's intent to reinvest such amounts indefinitely.

## 16. Interest expense, net

Interest expense, net consists of the following:

|  | Six months ended September 30, | | |
| --- | --- | --- | --- |
|  | 2020 (INR) | 2021 (INR) | 2021 (US$) |
|  | | Unaudited | |
|  | | (In million) | |
| **Interest expense:** | | | |
| Term loans | 4,249 | 4,542 | 61.2 |
| Bank charges and other [1] | 256 | 617 | 8.3 |
|  | **4,505** | **5,159** | **69.5** |
| **Interest income:** | | | |
| Term and fixed deposits | 319 | 478 | 6.5 |
| Others | - | 15 | 0.2 |
|  | **319** | **493** | **6.7** |
| **Total** | **4,186** | **4,666** | **62.8** |

[1]Bank charges and other includes amortization of debt financing costs of INR 186 million and INR 428 million (US$ 5.8 million) for the six months ended September 30, 2020 and 2021, respectively, and includes debt financing costs written off related to the debt refinancing amounting to INR 27 million and INR 248 million (US$ 3.3 million), respectively.

### 17. Loss/(gain) on foreign currency exchange

Loss/(gain) on foreign currency exchange consists of the following:

| | Six month period ended September 30 | | |
|---|---|---|---|
| | 2020 | 2021 | 2021 |
| | (INR) | (INR) | (US$) |
| | | Unaudited | |
| | | (In million) | |
| Unrealized (gain)/loss on foreign currency loans | (6) | 12 | 0.2 |
| Realized (gain) loss on foreign currency loans | 13 | — | — |
| Realized (gain) on derivative instruments | — | (4,846) | (65.3) |
| Other loss on foreign currency exchange | (3) | 4,726 | 63.7 |
| **Total** | **4** | **(108)** | **(1.4)** |

### 18. Equity shares

#### *Equity shares*

Equity shares have a par value of US$0.000625 per share at APGL. There is no limit on the number of equity shares authorized. As of March 31, 2021 and September 30, 2021, there were 48,195,962 and 48,206,937 equity shares issued and outstanding, respectively.

| | As of March 31 | | As of September 30, | |
|---|---|---|---|---|
| | 2021 | 2021 | 2021 | 2021 |
| | Number of shares | INR in thousands | Number of shares | INR in thousands |
| **Issued:** | Audited | | Unaudited | |
| Outstanding and fully paid: | | | | |
| Equity shares of US$ 0.000625 par value each | | | | |
| Beginning balance | 47,650,750 | 2,065 | 48,195,962 | 2,090 |
| Exercise of ESOPs [1] | 545,212 | 25 | 10,975 | 1 |
| **Ending balance** | **48,195,962** | **2,090** | **48,206,937** | **2,091** |

[1] See Note 23 for details of ESOPs exercised during the period.

#### *Accumulated other comprehensive loss*

The following represents the changes and balances to the components of accumulated other comprehensive loss:

| | Foreign currency translation | Cashflow Hedge, net of taxes | Total accumulated other comprehensive loss, net of taxes |
|---|---|---|---|
| | (INR) | (INR) | (INR) |
| | | (In million) | |
| **Balance as of March 31, 2020** | **(7,682)** | **5,745** | **(1,937)** |
| Adjustments during the year | 1,600 | (635) | 965 |
| **Balance as of March 31, 2021** | **(6,082)** | **5,110** | **(972)** |
| Adjustments during the period | 4,088 | (4,675) | (587) |
| **Balance as of September 30, 2021** | **(1,994)** | **435** | **(1,559)** |
| **Balance as of September 30, 2021 ((US$) (Note 2(c))** | **(26.9)** | **5.9** | **(21.0)** |

## 19. Earnings per share

The Company calculates earnings per share in accordance with FASB ASC Topic 260 Earnings Per Share and FASB ASC Topic 260-10-45 Determining Whether Instruments Granted in Share-Based Payment Transactions Are Participating Securities. Basic and diluted earnings/losses per equity share give effect to the change in the number of equity shares of the Company. The calculation of basic earnings per equity share is determined by dividing net profit/loss attributable to APGL equity shareholders by the weighted average number of equity shares outstanding during the respective periods. The potentially dilutive shares, consisting of employee share options have been included in the computation of diluted net earnings per share and the weighted average shares outstanding, except where the result would be anti-dilutive.

Net (loss)/profit per share is presented below:

| | Six months ended September 30 | | |
|---|---|---|---|
| | 2020 (INR) | 2021 (INR) | 2021 (US$) |
| | (amounts in millions, except share and per share data) | | |
| | Unaudited | | |
| Net profit / (loss) attributable to APGL equity shareholders **(A)** | (327) | 378 | 5.3 |
| **Shares outstanding for allocation of undistributed income:** | | | |
| Equity shares | 48,195,962 | 48,206,937 | 48,206,937 |
| **Weighted average shares outstanding** | | | |
| Equity shares – Basic (B) | 47,817,323 | 48,203,336 | 48,203,336 |
| Equity shares – Diluted (C) | 47,817,323 | 48,708,973 | 48,708,973 |
| **Net (loss)/profit per share — basic and diluted** | | | |
| Equity earnings/(loss) per share – Basic (D=A/B) | (6.84) | 7.84 | 0.11 |
| Equity earnings/(loss) per share – Diluted (E=A/C) | (6.84) | 7.76 | 0.10 |

See Note 18 for details of shares issued.

The number of share options outstanding but not included in the computation of diluted earnings per equity share because their effect was antidilutive is Nil and 182,800 for six months ended September 30, 2020, and September 30, 2021, respectively.

## 20. Leases

The Company has several non-cancellable operating leases, primarily for construction of solar power plants and for office facilities, warehouses, and office space that have a lease term ranging between 3 to 35 years which is further extendable on mutual agreement by both lessor and lessee. The Company has considered the renewal options in determining the lease term to the extent it was reasonably certain to exercise those renewal options and accordingly, associated potential option payments are included as part of lease payments.

The components of lease cost for the six months ended September 30, 2020 and 2021, were as follows:

| | For the six months period ended September 30, | | |
|---|---|---|---|
| | 2020 INR | 2021 INR | 2021 US$ |
| | | Unaudited | |
| | | (In million) | |
| Operating lease cost | 255 | 216 | 2.9 |
| Short-term lease cost | 4 | 9 | 0.1 |
| **Total lease cost** | **259** | **225** | **3.0** |

Amounts reported in the consolidated balance sheet as of March 31, 2021 and September 30, 2021 were as follows:

| | As at March 31, 2021 INR | As at September 30, 2021 INR | As at September 30, 2021 US$ |
|---|---|---|---|
| | | (In million) | |
| **Non-current assets** | | | |
| Right-of-use assets | 4,214 | 4,023 | 54.2 |
| **Non-current liabilities** | | | |
| Lease liabilities | 3,359 | 3,212 | 43.3 |
| **Current liabilities** | | | |
| Lease liabilities | 283 | 274 | 3.7 |
| **Total operating lease liabilities** | **3,642** | **3,486** | **47.0** |

Other information related to leases as of March 31, 2021 and September 30, 2021 was as follows:

| | As at March 31, 2021 INR | As at September 30, 2021 INR | As at September 30, 2021 US$ |
|---|---|---|---|
| | | (In million) | |
| Supplemental cash flow information: | | | |
| Cash paid for amounts included in the measurement of lease liabilities | 331 | 178 | 2.4 |
| Weighted average remaining lease term | 30 years | 30 years | |
| Incremental borrowing rate | 10% | 10% | |

Maturities of lease liabilities under non-cancellable leases as of September 30, 2021 are as follows:

| Year ended September 30, 2021 | Amount (INR) | US$ |
|---|---|---|
| | (In million) | |
| Fiscal 2022 | 287 | 3.9 |
| Fiscal 2023 | 294 | 4.0 |
| Fiscal 2024 | 305 | 4.1 |
| Fiscal 2025 | 313 | 4.2 |
| Fiscal 2026 | 321 | 4.3 |
| Thereafter | 11,171 | 150.6 |
| **Total undiscounted lease payments** | **12,691** | **171.1** |
| Less: Imputed interest | 9,205 | 124.1 |
| **Total lease liabilities** | **3,486** | **47.0** |

## 21. Commitments, guarantees, contingencies and others

### A) Capital commitments

As of September 30, 2021, the commitments for the purchase of property, plant and equipment were INR 4,881 million (US$ 65.8 million).

### B) Guarantees

The Company issues irrevocable performance bank guarantees in relation to its obligation towards construction and transmission infrastructure of solar power plants as required by the PPA and such outstanding guarantees are INR 6,886 million (US$ 92.9 million) as of September 30, 2021.

Further, INR 515 million (US$ 6.9 million) is in relation to commissioned plants and INR 17 million (US$ 0.2 million) is bank guarantee towards other commitments. The funds released from maturity/settlement of existing bank guarantees can be used for future operational activities.

The Company issued bank guarantees amounting to INR 906 million (US$ 12.2 million) as of September 30, 2021 to meet its Debt-Service Reserve Account (DSRA) requirements for its outstanding loans.

The Company has obtained guarantees from financial institutions as a part of the bidding process for establishing solar projects amounting to INR 1,303 million (US$ 17.6 million) as of September 30, 2021. The Company has given term deposits as collateral for those guarantees which are classified as restricted cash on the consolidated balance sheet.

The terms of the PPAs provide for the delivery of a minimum quantum of electricity at fixed prices.

## C) Contingencies

As of September 30, 2021, the Company had received claims from its customers totaling INR 415 million (US$ 5.7 million) for certain of its Karnataka projects which were completed beyond the contractually agreed dates. The Company had filed an appeal against such demands and had received stay orders from the appellant authorities. In respect of the matters:

- During the year ended March 31, 2020, the Company has received a favorable order from the appellate authorities in respect of its 50 MW Karnataka project. Management believes the reason for delay was not attributable to the Company.

- In August 2021, Company has received a favorable order from the Appellate Tribunal for Electricity ("APTEL") of our ongoing litigation in relation to the 40 MW Karnataka project, where APTEL had set aside the order of Karnataka Regulatory Commission ("KERC"), wherein the KERC had reduced extension of time, reduced the PPA tariff and imposed liquidated damages. Subsequent to September 30, 2021, the customer has further filed an appeal with Supreme Court against the order.

Based on the internal evaluation of the facts underlying the Company's position and advice from its legal advisors on the above matters, the management is confident that it will ultimately not be found liable for these assessments resulting in any outflow of funds related to these claims and therefore has not accrued any amount with respect to these matters in its condensed consolidated financial statements.

During the year ended March 31, 2020, the Company received a demand of INR 120 million (US$ 1.6 million), related to services tax assessment through July 31, 2017. The Company is contesting the demand and is confident that there should not be a tax outflow related to this claim.

See Note 22 for details of arbitration proceedings with the former CEO and Managing Director of the Company and former COO of the Company.

In April 2021, the Supreme Court of India while passing an order for a petition filed under public interest litigation (PIL) aimed at the conservation of two species of birds, the Great Indian Bustard and the Lesser Florican, directed the states of Rajasthan and Gujarat including developers having overhead transmission lines in identified priority and potential area to take necessary steps for conversion of overhead power lines to underground lines and in the interim install bird diverters on the overhead lines. However, in the non-feasibility of converting high voltage lines to underground lines, the matter can be referred for technical evaluation by a committee set up by Supreme Court. The conversion of overhead cables into underground power lines, wherever considered feasible by such committee, is to take place within a period of one year. The order mentioned the pass through of such expenses incurred by the power developers to the ultimate consumer, subject to approval of the Competent Regulatory Authority. The Company and other players in the industry through Solar Power Developer Association. as well as, Union of India (Ministry of New and Renewable (MNRE) have submitted a modification application to Supreme Court of India, seeking allowance for laying of over-head transmission lines outside priority areas as well as inside priority areas if the lines are of high/extra high voltage of 33 kV or above and to examine on case-to-case basis study for requirement of undergrounding even for 33kV and lower in priority area. The Management has preliminarily assessed that any costs incurred to comply with the said order are likely to be substantially or wholly recoverable by the Company under provisions of change in law and/or force majeure of their respective PPAs in due course following the prescribed procedure under the respective PPAs and law.

## D) Others

During the current period, the Company received complaints and anonymous whistle-blower reports which made various claims against certain of the Company's Key Managerial Personnel, related to their and the Company's actions in relation to the acquisition of and use of land in Rajasthan, Assam and Uttar Pradesh, as well as certain other corporate actions. The Company, through its Audit Committee, and with the assistance of external counsel and forensic auditors, has completed its investigation to determine whether the allegations made in the complaints or contained in the whistle-blower reports are substantive. The issues raised, including those raised against Key Management Personnel, have been closed and allegations were not substantiated; however, the Company determined that its ethics policies regarding external consultants should be enhanced. The Company, through its Audit Committee, and with the assistance of external counsel will be taking remedial steps (including training and policy review).

The Enforcement Directorate of India filed a Prosecution Complaint with a special court in New Delhi on October 1, 2021, in respect of an earlier Enforcement Case Information Report wherein Mr. Pawan Kumar Agrawal, the current Chief Financial Officer of the Company, is one of those named and charged with the commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India in relation to Mr. Agrawal's prior employment. The relevant transactions that are the subject of the complaint predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of the Company, and the criminal charges are not directed at, and do not concern, the Company or its subsidiaries. The Company will continue to monitor the proceedings as Mr. Agrawal defends the charges made against him.

## 22. Related Party Disclosures

The Company has certain loan facilities with International Finance Corporation ("IFC"), which was a substantial shareholder of the Company having significant influence, up till August 6, 2021. The Company has an outstanding loan totaling INR 752 million (US\$ 10.1 million) as of September 30, 2021, which includes a current portion of the loan totaling INR 10 million (US\$ 0.1 million). The Company incurred interest expense of INR 21 million, and INR 40 million (US\$ 0.5 million) for six months ended September 30, 2020 and September 30, 2021, respectively against these loan facilities.

In August 2021, OMERS Infrastructure Asia Holdings Pte. Ltd. ("OMERS"), has acquired the entire stake of 19.4% in the Company, previously held by International Finance Corporation and IFC GIF Investment Company.

The Company and its subsidiary, Azure Power India Private Limited, are respondents in arbitration proceedings initiated by the former Chairman, CEO and Managing Director of the Company, Mr. Inderpreet Singh Wadhwa ("IW") and former COO Mr. H.S Wadhwa ("HSW"), in relation to the purchase price of the shares of IW's and HSW's in Azure Power India Private Limited at Singapore International Arbitration Centre (SIAC) with the seat of arbitration in Singapore. The matter is concluded and the award is awaited. Management strongly believes in the merits of the case; however, an unfavorable outcome in these proceedings could potentially have a material adverse effect on the results of operations, cash flows and financial condition. As management believes it will be successful in the arbitration, the Company has not accrued any amount with respect to this arbitration in its condensed consolidated financial statements.

Further, subsequent to the period end, the appellate authority from the Mumbai Centre for International Arbitration ("MCIA"), has passed an order against the Company, relating to arbitration proceedings initiated by Ex- CEO in relation to his transition agreement. Company is in process of evaluating the order received and will take necessary action in due course. The claim amount is not expected to have material impact on the financial position of the Company.

## 23. Share based compensation

The Company has a 2015 Stock Option Plan and 2016 Equity Incentive Plan and as amended on March 31, 2020 (collectively "ESOP Plans") duly approved by the Board of Directors and had 2,023,744 stock options in the employee stock option pool as of September 30, 2021. Under the ESOP Plans, the Compensation Committee on behalf of Board of Directors (the "Directors") may from time to time make grants to one or more employees, determined by it to be eligible for participation under the plans.

The Compensation Committee determines which employees are eligible to receive the equity awards, the number of equity awards to be granted, the exercise price, the vesting period and the exercise period. The vesting period is decided by the Compensation Committee as and when any grant takes place. All options granted under these plans vest over a period of 4 years from the date of grant with 25% vesting at the end of year one, 25% vesting at the end of year two, 25% vesting at the end of year three and 25% vesting at the end of year four unless specified otherwise. Shares forfeited by the Company are transferred back to the employee stock pool and are available for new grants. During the year ended March 31, 2020, as a result of CDPQ acquiring the majority stake in the Company the vesting schedule of ESOPs/SARs for certain senior employees changed from yearly vesting to monthly vesting for the grants made till the date of the event. In addition, for the CEO and COO of the Company, one of the tranches vested immediately as per their employment agreements.

Options are deemed to have been issued under these plans only to the extent actually issued and delivered pursuant to a grant. To the extent that a grant lapses or the rights of its grantee terminate, any equity shares subject to such grant are again available for new grants.

The option grant price is determined by the Compensation Committee and is specified in the option grant. The grant is in writing and specifies the number of options granted, the price payable for exercising the options, the date/s on which some or all of the options shall be eligible for vesting, fulfillment of the performance and other conditions, if any, subject to when vesting shall take place and other terms and conditions thereto. The option grant can be exercised only by the employees/ Key Managerial personal (KMP) of the Company.

**Employee Stock Option Plan and Restricted Stocks (RS)**

Options granted under the plan are exercisable into equity shares of the Company, have a contractual life equal to the shorter of ten years, or July 20, 2025, or July 20, 2027, as the case may be, and vest equitably over four years, unless specified otherwise in the applicable award agreement. The Company recognizes compensation cost, reduced by the estimated forfeiture rate, over the vesting period of the option. A summary of share option activity during the periods ending March 31, 2021 and September 30, 2021 is set out below:

| | Number of options | Weighted average exercise price in INR |
|---|---|---|
| Options outstanding as of March 31, 2020 | 870,065 | 756 |
| Granted [1] | 443,772 | 1,466 |
| Converted from RSU* | 10,920 | - |
| Exercised | (545,212) | 709 |
| Forfeited | (75,837) | 861 |
| Options outstanding as of March 31, 2021 | 703,708 | 1,217 |
| Vested and exercisable as of March 31, 2021 | 231,712 | 852 |

(1) Includes 4,273 RS granted during the year to its Directors.

*The Company had converted RSU issued to its Board members into Restricted Shares (RS) at the then current share price on the date of conversion to be settled into equity shares of the Company.

| | Number of options | Weighted average exercise price in INR |
|---|---|---|
| Options outstanding as of March 31, 2021 | 703,708 | 1,217 |
| Granted | 20,000 | 1,838 |
| Exercised | (10,975) | 878 |
| Forfeited | (26,375) | 1,342 |
| Options outstanding as of September 30, 2021 | 686,359 | 1,245 |
| Vested and exercisable as of September 30, 2021 | 233,325 | 844 |

Total options available for grant as of September 30, 2021 was 455,218 ESOPs.

The Black-Scholes-Merton option pricing model includes assumptions regarding dividend yields, expected volatility, expected option term, and risk-free interest rates. The Company estimates expected volatility based on the historical volatility of the Company (considering sufficient history of its own data is available now for identifying the volatility). The risk-free interest rate is based on the yield of relevant time period based on US government bonds in effect at the time of grant for a period commensurate with the estimated expected life. The expected term of options granted is derived using the "simplified" method as allowed under the provisions of ASC Topic 718 to provide a reasonable basis upon which to estimate expected term.

The fair value of each share option granted to employees/ RS is estimated on the date of grant using the Black- Scholes option-pricing model with the following weighted average assumptions:

| | March 31, 2021 | September 30, 2021 |
|---|---|---|
| Dividend yield | 0% | 0% |
| Expected term (in years) | 3.7 – 7.4 | 3.6 – 5.1 |
| Expected volatility | 34.0% - 45.6% | 46.3% - 47.8% |
| Risk free interest rate | 0.5% - 1.0% | 0.6% - 0.8% |

As of March 31, 2021, and September 30, 2021, the aggregate intrinsic value of all outstanding options was INR Nil.

The share-based compensation expense related to share options (including RS) is recorded as a component of general and administrative expenses in the Company's consolidated statements of operations and totaled INR 32 million and INR 36 million (US$ 0.5 million) for the six months ended September 30, 2020 and 2021 respectively. The amount of share-based compensation expense capitalized during the six months ended September 30, 2020 was INR 8 million and INR 12 million (US$ 0.2 million) for six months ended September 30, 2021.

Unrecognized compensation cost for unvested options as of September 30, 2021 is INR 160 million (US$ 2.2 million), which is expected to be expensed over a weighted average period of 3.3 years.

The intrinsic value of options exercised during the year ended March 31, 2021, and period September 30, 2021 was INR 35 million and INR Nil (US$ Nil), respectively.

The intrinsic value per option at the date of grant during the years ended March 31, 2021 and six months ended September 30, 2021 is as follows:

| Date of grant | No. of options granted* | Deemed fair value of equity shares (INR) | Intrinsic value per option at the time of grant (INR) | Valuation used |
|---|---|---|---|---|
| October 01, 2020* | 4,273 | 2,320 | — | Market price |
| March 31, 2021 | 182,800 | 2,057 | — | Market price |
| July 7, 2021 | 20,000 | 1,838 | — | Market price |

*Pertains to RSUs converted into RSs at the prevailing market price.

## Stock Appreciation Rights (SARs)

The Company granted incentive compensation in the form of Stock Appreciation Rights ("SARs"), as defined, in the Company's 2016 Equity Incentive Plan, as amended on March 31, 2020, to its CEO and COO. The SARs have been granted in 3 tranches with maturity dates up to financial year March 31, 2028.

A summary of SARs activity during the year ended March 31, 2021 and six months ending September 30, 2021 is set out below:

| | Number of SARs | Weighted average exercise price in INR |
|---|---|---|
| SAR outstanding as of March 31, 2020 | 1,970,000 | 752 |
| Granted | 80,000 | 2,056 |
| Exercised | (175,000) | 722 |
| Options outstanding as of March 31, 2021 | 1,875,000 | 810 |
| Vested as of March 31, 2021 | 417,500 | 757 |
| Exercisable as of March 31, 2021 | 67,500 | 940 |

| | Number of SARs | Weighted average exercise price in INR |
|---|---|---|
| SAR outstanding as of March 31, 2021 | 1,875,000 | 810 |
| Options outstanding as of September 30, 2021 | 1,875,000 | 810 |
| Vested as of September 30, 2021 | 417,500 | 757 |
| Exercisable as of September 30, 2021 | 67,500 | 940 |

The fair value of each SAR granted to employees is estimated at each reporting date using the Black- Scholes option-pricing model with the following weighted average assumptions:

| | March, 31 2021 Audited | September 30, 2021 Unaudited |
|---|---|---|
| Dividend yield | 0% | 0% |
| Expected term (in years) | 3.7 – 5.2 | 2.7 - 5.9 |
| Expected volatility | 45.20% - 45.64% | 48.15% -52.55% |
| Risk free interest rate | 0.63% - 1.01% | 0.45% - 1.14% |

The share-based compensation expense related to SARs is recorded as a component of general and administrative expenses in the Company's condensed consolidated statements of operations totaled INR 561 million and reversal of expense INR 143 million (US$ 1.9 million) for the six months ended September 30, 2020 and September 30, 2021, respectively. The amount of share-based compensation expense capitalized during the period ended September 30, 2020 and September 30, 2021 was INR 390 million and INR Nil, respectively. The carrying value of the liability recorded for SARs as at September 30, 2021 is INR 1,075 million (US$ 14.5 million).

Unrecognized compensation cost for unvested SARs as of September 30, 2021 is INR 766 million (US$ 10.3 million), which is expected to be expensed over a weighted average period of 3.5 years.

The fair value per SAR at the date of grant during the period ended September 30, 2021 is as follows:

| Date of grant | No. of SARs granted | Deemed fair value of SAR (INR) | Vesting Period | Valuation used |
|---|---|---|---|---|
| July 18, 2019 | 200,000 | 722 | February 2020 | Market price |
| July 18, 2019 | 1,600,000 | 722 | March 31, 2020 to July 31, 2027 | Market price |
| March 30, 2020 | 170,000 | 1,069 | March 31, 2021 to March 31, 2024 | Market price |
| March 31, 2021 | 80,000 | 2,056 | March 31, 2022 to March 31, 2025 | Market price |

## 24. Impairment of assets and Assets held for sale

In April 2021, the Company has entered into an agreement with Radiance Renewables Pvt. Ltd. ("Radiance") to sell certain subsidiaries (the "Rooftop Subsidiaries") with an operating capacity of 153 MWs (the "Rooftop Portfolio") for INR 5,350 million, subject to certain purchase price adjustments (the "Rooftop Sale Agreement"). Pursuant to the Rooftop Sale Agreement, Radiance will acquire 100% of the equity ownership of the Rooftop Subsidiaries owned by the Group. The Company had recognized an impairment loss in relation to the Rooftop Subsidiaries aggregating to INR 3,255 million during the year ended March 31, 2021, pursuant thereto these assets (net) are carried at its fair values in the financial statements.

As per the terms of the Rooftop Sale Agreement in respect to 43.2 MWs operating capacity that are part of the Restricted Groups (as defined in the respective Green Bond Indentures) 48.6% of the equity ownership will be transferred to Radiance on the closing date, and pursuant to the terms of the Green Bond Indentures, the remaining 51.4% may only be transferred post refinancing of the Green Bonds. In August 2021, post refinancing of 5.5% Senior Notes and repayment of loan relating to one of a rooftop project of 10 MWs, the restriction on transfer of shareholding was released and related assets and liabilities of the SPV have been reclassified and reported as assets held for sale as of September 30, 2021.

The transfer of ownership for remaining operating capacity of 33.2 MWs for the Solar Green Bonds is not anticipated to occur within 12 months, hence, the assets and liabilities of these subsidiaries are not presented as "Assets classified as held for sale" and instead continue to be classified within the respective balance sheet captions in the condensed consolidated financial statements at September 30, 2021.

There is also a restriction on transfer of equity ownership relating to the 16 MW project with Delhi Jal Board (DJB), wherein 49% of the equity ownership will be transferred to Radiance on closing date, and the remaining 51% will be transferred on or after March 31, 2024. Accordingly, the related assets and liabilities of the DJB 16 MW project are not presented as "Assets classified as held for sale" and instead continue to be classified within the respective balance sheet captions at September 30, 2021 and March 31, 2021 respectively.

The sale of Rooftop Subsidiaries having remaining 103.8 MWs (including 10 MWs mentioned above) operating capacity is expected to be consummated within the next 12 months and accordingly the assets and related liabilities of these subsidiaries are shown as "Assets classified as held for sale" in the condensed consolidated balance sheet as at September 30,2021. The Company has recognized impairment loss of INR 40 million (US$ 0.5 million) in this respect under condensed consolidated Statement of Operations for the six months ended 30 September 2021.

The Company is in process of obtaining requisite approvals/ condition precedents, as defined in the contract, for transfer of its shareholding in the Rooftop subsidiaries and proceeds are expected to be received by end of current financial year.

In the event the sale of the Rooftop Subsidiaries does not occur, the Company must reimburse Radiance the equity value of the assets not transferred along with an 10.5% per annum equity return.

In May 2021, the Company has disposed its investment in a subsidiary on a going concern basis for consideration of INR 123 million (US$ 1.7 million). The same was reported as Asset held for sale under financials for the year ended March 31, 2021.

The assets and liabilities of the Rooftop Subsidiaries classified as held for sale, together with the calculation of the related impairment loss is shown below.

| | As of September 30, | |
| --- | --- | --- |
| | 2021 | 2021 |
| | (INR) | (US$) |
| | (In million) | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | 164 | 2.2 |
| Restricted cash | 267 | 3.6 |
| Accounts receivable, net | 313 | 4.2 |
| Prepaid expenses and other current assets | 9 | 0.1 |
| **Total current assets** | **753** | **10.1** |
| Property, plant and equipment, net | 2,946 | 39.7 |
| Other assets | 25 | 0.3 |
| **Total assets (A)** | **3,724** | **50.1** |
| **Liabilities** | | |
| Current liabilities: | | |
| Accounts payable | 6 | 0.1 |
| Current portion of long-term debt | 12 | 0.2 |
| Interest payable | 91 | 1.2 |
| Other liabilities | 172 | 2.3 |
| **Total current liabilities** | **281** | **3.8** |
| **Non-current liabilities:** | | |
| Long-term debt | 1,948 | 26.3 |
| Other liabilities | 51 | 0.7 |
| **Total liabilities (B)** | **2,280** | **30.8** |
| **Net Assets (C=A-B)** | **1,444** | **19.3** |
| **Fair value (D)** | **1,404** | **18.8** |
| **Impairment loss (E=C-D)** | **40**(1) | **0.5** |

(1) During the six months ended September 30, 2021 the Company has recorded an Impairment loss of INR 40 million (US$ 0.5 million) on account of changes in fair value of carrying value of net assets.

The fair value of consideration related to the rooftop sale includes expected recovery of VGF for INR 463 million (US$ 6.3 million). The Company has undertaken to refund to the purchaser an amount equivalent to 85% of any shortfall in recovery of VGF. Based on the current circumstances, management has assessed that they have complied with the conditions associated with the grant of VGF and hence have determined that the recovery of the VGF is likely.

During the six months ended September 30, 2021, in respect of the 33.2 MWs operating capacity that are part of the Restricted Groups and 16 MW project with Delhi Jal Board, the Company has consolidated the entities in the condensed consolidated financial statements and net carrying value of these assets are reinstated.

## 25. Fair Value Measurements

ASC Topic 820 Fair Value Measurements and Disclosures defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly, hypothetical transaction between market participants at the measurement date. ASC Topic 820 establishes a three-tier value hierarchy of fair value measurement based upon the whether the inputs to that measurement are observable or unobservable. Observable inputs reflect data obtained from independent sources while unobservable inputs reflect the Company's market assumptions. ASC Topic 820 prioritizes the inputs used in the valuation methodologies in measuring fair value as follows:

Level 1 — Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 — Includes other inputs that are directly or indirectly observable in the marketplace. Observable inputs, other than Level 1 quoted prices for similar instruments in active markets; quoted prices for similar or identical instruments in markets that are not active; and valuations using models in which all significant inputs are observable in active markets.

Level 3 — Unobservable inputs which are supported by little or no market activity.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

In accordance with ASC Topic 820, assets and liabilities are to be measured based on the following valuation techniques:

Market approach — Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.

Income approach — converting the future amounts based on the market expectations to its present value using the discounting methodology.

Cost approach — Replacement cost method.

The valuation techniques used by the Company to measure and report the fair value of certain financial assets and liabilities on a recurring basis are as follows;

*Foreign exchange derivative contracts*

The Company enters into foreign exchange option contracts to hedge fluctuations in foreign exchange rates for recognized balance sheet items such as foreign exchange term loans. The Company mitigates the credit risk of these foreign exchange option contracts by transacting with highly rated counterparties which are major banks. The Company uses valuation models to determine the fair value of the foreign exchange option contracts. The inputs considered include the theoretical value of a call option, the underlying spot exchange rate as of the balance sheet date, the contracted price of the respective option contract, the term of the option contract, the implied volatility of the underlying foreign exchange rates and the risk-free interest rate as of the balance sheet date. The techniques and models incorporate various inputs including the credit worthiness of counterparties, foreign exchange spot and forward rates, interest rate yield curves, forward rate yield curves of the underlying option contracts. The Company classifies the fair value of these foreign exchange option contracts in Level 2 because the inputs used in the valuation model are observable in active markets over the term of the respective option contracts.

| | | Fair value measurement at reporting date using | | |
| | As of September 30, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Description | | (In million) | | |
| **Assets** | | | | |
| **Current assets** | | | | |
| Forward exchange derivative contracts (INR) | 131 | - | 131 | - |
| Fair valuation of swaps and options | 14 | - | 14 | - |
| Forward exchange derivative contracts | 768 | - | 768 | - |
| **Non-current assets** | | | | |
| Fair valuation of swaps and options (INR) | 1,277 | - | 1,277 | - |
| **Total assets (INR)** | **2,190** | **-** | **2,190** | **-** |
| **Total assets (US$)** | **29.5** | **-** | **29.5** | **-** |

| | | Fair value measurement at reporting date using | | |
| | As of September 30, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Description | | (In million) | | |
| **Liabilities** | | | | |
| **Current liabilities** | | | | |
| Forward exchange derivative contracts | 256 | - | 256 | - |
| Fair valuation of swaps and forward (INR) | 212 | - | 212 | - |
| **Non-current liabilities** | | | | |
| **Other Liabilities** | | | | |
| Fair valuation of swaps and forward (INR) | 133 | - | 133 | - |
| Forward exchange derivative contracts | 315 | - | 315 | - |
| **Total Liabilities (INR)** | **916** | **-** | **916** | **-** |
| **Total Liabilities (US$)** | **12.4** | **-** | **12.4** | **-** |

| | Fair value measurement at reporting date using | | | |
|---|---|---|---|---|
| Description | As of March 31, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| | | (In million) | | |
| **Assets** | | | | |
| **Current assets** | | | | |
| Forward exchange derivative contracts (INR) | 914 | - | 914 | - |
| **Non-current assets** | | | | |
| Fair valuation of swaps and options (INR) | 5,765 | - | 5,765 | - |
| Forward exchange derivative contracts (INR) | 21 | - | 21 | - |
| **Total assets (INR)** | **6,700** | **-** | **6,700** | **-** |

| | Fair value measurement at reporting date using | | | |
|---|---|---|---|---|
| Description | As of March 31, 2021 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| | | (In million) | | |
| **Liabilities** | | | | |
| **Current liabilities** | | | | |
| Forward exchange derivative contracts | 961 | - | 961 | - |
| **Non-current liabilities** | | | | |
| **Other Liabilities** | | | | |
| Fair valuation of swaps and forward (INR) | 251 | - | 251 | - |
| **Total Liabilities (INR)** | **1,212** | **-** | **1,212** | **-** |

The carrying amount of cash and cash equivalents, including restricted cash, accounts receivable, accounts payables, and other current financial assets and liabilities approximate their fair value largely due to the short-term maturities of these instruments and are classified as level 2. There have been no transfers between categories during the current period.

The carrying value and fair value of the Company's fixed rate project financing term loans is as follows:

| | As of March 31, 2021 | | |
|---|---|---|---|
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) | |
| Fixed rate project financing loans: | | | |
| Foreign currency loans | 61,993 | 66,255 | 905.9 |
| Indian rupee loans | 5,910 | 5,628 | 76.9 |

| | As of September 30, 2021 | | |
|---|---|---|---|
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) | |
| Fixed rate project financing loans: | | | |
| Foreign currency loans | 56,111 | 59,212 | 798.4 |
| Indian rupee loans | 5,981 | 5,525 | 74.5 |

The Company uses the yield method to estimate the fair value of fixed rate loans using interest rate change as an input. The carrying amount of the Company's variable rate project financing terms loans approximate, their fair values due to their variable interest rates.

The carrying value and fair value of the Company's investment in the Bank of Mauritius notes, classified as held to maturity securities is as follows:

| | As of March 31, 2021 | | |
| --- | --- | --- | --- |
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) Audited | |
| Non-current investments: | | | |
| Fixed rate Bank of Mauritius notes | 7 | 7 | 0.1 |

| | As of September 30, 2021 | | |
| --- | --- | --- | --- |
| | Carrying Value (INR) | Fair Value * (INR) | US$ |
| | | (In million) Unaudited | |
| Non-current investments: | | | |
| Fixed rate Bank of Mauritius notes | 7 | 7 | 0.1 |

The Company uses the yield method to estimate the fair value of fixed rate Bank of Mauritius notes by using interest rate as an input. The carrying amount of the Company's investment in fixed rate Bank of Mauritius notes approximate, their fair values relative to variable interest rates.

* Fair value measurement at reporting date using significant unobservable inputs (Level 3).

## 26. Derivative instruments and hedging activities

*Contracts designated as a Cashflow Hedge*

The Company hedged the foreign currency exposure risk related to certain intercompany loans denominated in foreign currency through a call spread option with a full swap for coupon payments. The Company also availed trade credit facilities denominated in foreign currencies which were fully hedged through interest rate swaps. The foreign currency forward contracts and options were not entered into for trading or speculative purposes.

The Company documented each hedging relationship and assessed its initial effectiveness on inception date and the subsequent effectiveness was tested as determined at the time of inception of the contract. The gain or loss on the hedge contracts was recorded in accumulated other comprehensive income to the extent the hedge contracts were effective. The gain or loss on the hedge contracts shall be reclassified to interest expense when the coupon payments and principal repayments are made on the related investments. The hedge contracts were effective as of September 30, 2021.

The following table presents outstanding notional amount and balance sheet location information related to foreign exchange derivative contracts as of March 31, 2021 and September 30, 2021:

| | As of March 31, 2021 | | | |
| --- | --- | --- | --- | --- |
| | Notional | Non-Current Liabilities | Prepaid expenses and other current assets | Other Assets |

| | Amount (US$) | (Fair Value) (INR) | (Fair Value) (INR) | (Fair Value) (INR) |
|---|---|---|---|---|
| | | | **Audited (In million)** | |
| Fair valuation of swaps and options | 849.7 | - | - | 5,765 |
| Forward exchange derivative contracts | 11.2 | - | - | 21 |
| Fair valuation of swaps and forward | 94.6 | 251 | - | - |
| Forward exchange derivative contracts | 46.1 | - | 38 | - |

| | **March 31, 2021** | | |
|---|---|---|---|
| | Notional (US$) | Current Liabilities (INR) | Other Assets (INR) |
| | | **(In million)** | |
| Forward exchange derivative contracts | 101.4 | 74 | — |

| | **September 30, 2021** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Notional Amount (US$) | Current Liabilities (Fair value) (INR) | Non-Current Liabilities (Fair value) (INR) | Prepaid expenses and other current assets (Fair value) (INR) | Other Asset (Fair value) (INR) | Current Liabilities (Fair value) (US$) | Non-Current Liabilities (Fair value) (US$) | Prepaid expenses and other current assets (Fair value) (US$) | Other Assets (Fair value) (US$) |
| | | | | | **Unaudited (In million)** | | | | |
| Fair valuation of swaps and options | 855.0 | 220 | 179 | 14 | 1,277 | 3.0 | 2.4 | 0.2 | 17.2 |
| Fair valuation of swaps and forward | 107.8 | - | 269* | - | - | - | 3.6* | - | - |
| Forward exchange derivative contracts | 208.8 | 190 | - | 131 | - | 2.6 | - | 1.8 | - |

*It includes INR 50 million (USD 0.7 million) for liabilities related to assets held for sale.

The Company recorded the net fair value of derivative liability of INR 827 million and derivative liability of INR 4,876 million (US$ 65.7 million) in the Other comprehensive income for the year ended March 31, 2021 and six months ended September 30, 2021, respectively and recorded an expense of INR 765 million and INR 768 million (US$ 10.4 million) related to the amortization of the cost of the hedge for six months ended September 30, 2020 and 2021, respectively.

The foreign exchange derivative contracts mature generally over a period of 0.1 – 4.7 years.

*Contracts designated as fair value hedge*

The Company hedged the exposure to fluctuations in the fair value of firm commitments denominated in foreign currency through forward exchange derivative contracts. Fair value adjustments related to non-financial instruments will be recognized in the hedged item upon recognition and will eventually affect earnings as and when the hedged item is derecognized. Changes in the fair value of derivatives designated and qualifying as fair value hedges, together with any changes in the fair value of the hedged firm commitments attributable to the hedged risk, will be recorded in in the consolidated balance sheet. The gain or loss on the hedging derivative in a hedge of a foreign-currency-denominated firm commitment and the offsetting loss or gain on the hedged firm commitment is recognized in earnings in the accounting period, post the recognition of the hedged item in the balance sheet. The forward exchange derivative contracts were not entered into for trading or speculative purposes.

The foreign exchange derivative contracts mature generally over a period of 1 months – 1 year.

The Company documented each hedging relationship and assessed its initial effectiveness on inception date and the subsequent effectiveness was tested as determined at the time of inception of the contract. The hedge contracts were effective as of September 30, 2021.

| | **As of March 31, 2021** | | |
|---|---|---|---|
| | Notional (US$) | Current Liabilities (Fair value) (INR) | Prepaid expenses and other current assets (Fair value) (INR) |
| | | **Audited (In million)** | |
| Forward exchange derivative contracts | 265.1 | 887 | 876 |

| | September 30, 2021 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Notional Amount | Current Liabilities (Fair value) | Non-Current Liabilities (Fair value) | Prepaid expenses and other current assets (Fair value) | Current Liabilities (Fair value) | Non-Current Liabilities (Fair value) | Prepaid expenses and other current assets (Fair value) |
| | (US$) | (INR) | (INR) | (INR) | (US$) | (US$) | (US$) |
| | | | | **Unaudited** | | | |
| | | | | **(In million)** | | | |
| Forward exchange derivative contracts (FVH) | 173.2 | 29 | 51 | 31 | 0.4 | 0.7 | 0.4 |

The Company recorded the fair value of derivative asset/liability of INR 887 million and INR 49 million (US$ 0.7 million) at March 31, 2021 and September 30, 2021, respectively and incurred an amount of INR 200 and INR 1,020 million (US$ 13.8 million) related to acquisition of capital assets during the year ended March 31, 2021 and six months ended September 30, 2021, respectively.

## 27. Concentrations of credit risk

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash and cash equivalents, restricted cash, accounts receivables and derivative instruments. The Company mitigates the risk of credit losses from financing instruments, other than accounts receivables, by selecting counter parties that are well known Indian or international banks.

The following customers account for more than 10% of the Company's accounts receivable and sale of power as of and for the period ended March 31, 2021 and September 30, 2021:

| | March 31, 2021 | | September 30, 2021 | |
|---|---|---|---|---|
| **Customer Name** | **% of Sale of Power** | **% of Accounts Receivable** | **% of Sale of Power** | **% of Accounts Receivable *** |
| Solar Energy Corporation of India | 21.47% | 13.17% | 28.31% | 11.21% |
| Punjab State Power Corporation Limited | 13.46% | 11.60% | 12.41% | 9.64% |
| NTPC Limited | 16.07% | 8.47% | 11.89% | 5.56% |
| Hubli Electricity Supply Company Limited | 5.08% | 9.45% | 4.16% | 13.57% |
| Chamundeshwari Electricity Supply Company | 3.62% | 14.41% | 3.02% | 15.05% |
| Andhra Pradesh Power Coordination Committee | 3.53% | 18.32% | 3.05% | 19.29% |
| Gujarat Urja Vikas Nigam Limited | 11.17% | 3.16% | 8.85% | 1.62% |

* Includes receivables for Rooftop entities

## 28. Subsequent event

Subsequent to the September 30, 2021, the Company has signed PPAs with SECI for 600 MWs at a fixed tariff of INR 2.54 per kWh and 2,333 MWs at a fixed tariff of INR 2.42 per kWh for supply power for 25 years, as a part of the 4,000 MW manufacturing linked projects.

The Company has also received letter of awards (LOA), for its first 120 MWs wind project and first 150 MWs solar – wind hybrid project, from SECI. Since, Company is yet to sign the PPA for these projects and has not yet carried out any material activities under the project, the wind business has not been considered as a separate business segment, as of now there are non-business activities, revenue or investment in this segment.

The Enforcement Directorate of India (the "ED") registered an Enforcement Case Information Report on 15 June 2021, wherein Mr. Pawan Agrawal, the current Chief Financial Officer of the Company, is one of those named and charged with commission of offences under Sections 3 and 4 of the Prevention of Money Laundering Act, 2002 of India ("PMLA") in relation to Mr. Agrawal's prior employment with Yes Bank Limited. The ED filed a Prosecution Complaint on October 1, 2021 before a special PMLA court in New Delhi, and Mr. Agrawal received summons from such court, requiring his appearance. The relevant transactions predated Mr. Agrawal's tenure as an employee and as Chief Financial Officer of the Company, and the criminal charges are not directed at, and do not concern, the Company or its subsidiaries. Mr. Agrawal intends to continue his duties as the Company's Chief Financial Officer as he defends the charges against him.

Exhibit 99.2

## BACKSTOP COMMITMENT AGREEMENT

**THIS BACKSTOP COMMITMENT AGREEMENT** (this "Agreement"), dated as of December 27, 2021, is by and among Azure Power Global Limited, a company organized under the law of Mauritius (the "Company"), CDPQ Infrastructures Asia Pte Ltd., a company organized under the laws of Singapore ("CDPQ"), and OMERS Infrastructure Asia Holdings Pte. Ltd., a company organized under the laws of Singapore ("OMERS"). As used herein, CDPQ and OMERS are referred to as the "Backstop Investors" and each a "Backstop Investor."

## RECITALS

**WHEREAS,** the Company contemplates a rights offering (the "Rights Offering") in accordance with a prospectus supplement, to be dated December 27, 2021 in the form attached as Exhibit A hereto (the "Prospectus Supplement") and to be filed on the date herewith following entry into this Agreement, and a prospectus, dated October 23, 2020, filed with the SEC (the "Base Prospectus," together with the Prospectus Supplement (and any amendments or supplements thereto), the "Prospectus"), in respect of the Company's Form F-3 registration statement File No. 333-249479, declared effective by the SEC on October 23, 2020, as amended by Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3 as filed with the SEC on November 10, 2021, December 10, 2021 and December 15, 2021, respectively, which were declared effective by the SEC on December 17, 2021 (as amended, the "Registration Statement");

**WHEREAS,** the Company will distribute as part of the Rights Offering at no charge to the record holders of the Company's Equity Shares on the Record Date non-transferable subscription rights to purchase Equity Shares at the Subscription Price (the "Basic Subscription Right") as described in the Prospectus Supplement;

**WHEREAS,** each Backstop Investor desires to fully exercise its Basic Subscription Right to facilitate the Rights Offering;

**WHEREAS,** the Company has requested that each Backstop Investor agree, and each Backstop Investor desires, to backstop the Rights Offering in respect of Equity Shares not subscribed under the Basic Subscription Right to facilitate the Rights Offering subject to the terms and conditions set forth in this Agreement; and

**WHEREAS,** subject to the terms and conditions set forth in this Agreement, the Company desires to sell, and each Backstop Investor desires to purchase, Equity Shares of the Company as more fully described in this Agreement.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants contained in this Agreement, and for good and valuable consideration the receipt and adequacy of which are hereby acknowledged, each Backstop Investor, severally and not jointly, and the Company agree as follows:

**ARTICLE I**
**DEFINITIONS**

**1.1**     **Definitions**. The following terms shall be defined as set forth herein:

"Backstop Closing" means the closing of the Backstop Commitment.

"Backstop Closing Date" means the date on which the Backstop Closing shall occur and as set forth by the Company to the Backstop Investors in the Backstop Notice.

"Backstop Commitment" has the meaning given in Section 2.2(a).

"Backstop Entitlement" has the meaning given in Section 2.2(c).

"Backstop Investors" has the meaning given in the Preamble.

"Backstop Notice" has the meaning given in Section 2.2(f).

"Backstop Purchase Price" has the meaning given in Section 2.2(e).

"Backstop Shares" has the meaning given in Section 2.2(b).

"Base Prospectus" has the meaning given in the Recitals.

"Basic Subscription Right" has the meaning given in the Recitals.

"Basic Subscription Right Closing" has the meaning given in Section 2.1(c).

"Business Day" means a day other than a Saturday, Sunday, U.S. or New York State holiday or any other day on which commercial banks in New York City are authorized or required by law to be closed for business; *provided* that such banks shall be deemed to be open for business in the event of a "shelter in place" order or similar closure of physical branch locations is required at the direction of any Governmental Authority if such banks' electronic funds transfer systems (including wire transfers) are open for use by customers on such day; *provided further* that, in respect of actions required to be undertaken by the Backstop Investors, Business Day shall mean a day other than a Saturday, Sunday, U.S., Singapore, or Canadian federal, Ontario Province or Quebec Province, or New York State holiday or any other day on which commercial banks in New York City, Singapore, Toronto or Montreal, Canada are authorized or required by law to be closed for business.

"CDPQ" has the meaning given in the Preamble.

"Company" has the meaning given in the Preamble.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Equity Shares" means the Company's equity shares, par value $0.000625 per share.

"Expiration Date" has the meaning given in the Prospectus Supplement.

2

"Governmental Authority" means any federal, state, tribal, local or foreign governmental or quasi-governmental entity or municipality or subdivision thereof or any authority, administrative body, department, commission, board, bureau, agency, court, tribunal or instrumentality, arbitration panel, commission or similar dispute resolving panel or body, or any applicable self-regulatory organization.

"Law" means each applicable federal, state, local, municipal, foreign or other law, order, judgment, rule, code, statute, legislation, regulation, principle of common law, treaty, convention, requirement, variance, proclamation, edict, decree, writ, injunction, award, ruling or ordinance that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"OMERS" has the meaning given in the Preamble.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or other form of business organization, whether or not regarded as a legal entity under applicable Law, or any Governmental Authority or any department, agency or political subdivision thereof.

"Prospectus" has the meaning given in the Recitals.

"Prospectus Supplement" has the meaning given in the Recitals.

"Record Date" has the meaning given in the Prospectus Supplement.

"Registration Statement" has the meaning given to in the Recitals.

"Rights Offering" has the meaning given in the Recitals.

"SEC" means the U.S. Securities Exchange Commission.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Subscription Agent" means Computershare Trust Company N.A.

"Subscription Price" means $15.79 per share.

Terms not otherwise defined in this Agreement, shall have the meanings given to such terms in the Base Prospectus or Prospectus Supplement, as applicable.

**2.1**     **Rights Offering; <u>Basic Subscription Right</u>**.

(a)     The Company shall file the Prospectus Supplement with the SEC on the date hereof and use its reasonable best efforts to commence and complete the Rights Offering as soon as reasonably practicable and in accordance with the Prospectus Supplement.

(b)     Prior to the termination of this Agreement, the Company shall not amend any of the terms of the Rights Offering in a manner adverse to a Backstop Investor, including any changes in respect of the Subscription Price (or make changes to the references to the Backstop Investors in the Prospectus Supplement), extend or terminate the Rights Offering or waive any material conditions to the closing of the Rights Offering, in each case, without the prior written consent of each Backstop Investor.

(c)     Subject to <u>Section 2.3</u>, each of the Backstop Investors (severally not jointly) agrees with the Company to exercise their respective Basic Subscription Rights in full at the Subscription Price; *provided* that the Rights Offering is conducted and consummated on the terms and conditions set forth in the Prospectus Supplement. The Backstop Investors payment and settlement of their Basic Subscription Rights will be either (i) in accordance with terms and conditions set forth in the Prospectus Supplement or (ii) by wire transfer directly to the Company no later than the Expiration Date (the "<u>Basic Subscription Right Closing</u>") in accordance with <u>Section 2.1(d)</u>.

(d)     Prior to the Record Date, the Company will provide to each Backstop Investor written wire instructions as to which bank account of the Company to pay the aggregate Subscription Price payable in respect of such Backstop Investor's exercise of its Basic Subscription Rights in full in accordance with <u>Section 2.1(c)</u>. Upon receipt of the payment in full by the Company of such aggregate Subscription Price, the Company shall, on the day of receipt of such Subscription Price, cause its transfer agent to credit the number of Equity Shares to which each of the Backstop Investors is entitled in respect of its exercise of the Basic Subscription Right. The Company will instruct the Subscription Agent to facilitate the Basic Subscription Right Closing in accordance with this <u>Section 2.1</u>.

**2.2**     **<u>Backstop Commitment</u>**.

(a)     On the terms and subject to the conditions contained herein, and in reliance on the representations and warranties set forth in this Agreement, each of the Backstop Investors (severally not jointly) hereby agrees to purchase, and the Company hereby agrees to sell and issue to each of the Backstop Investors on the Backstop Closing, at the Backstop Purchase Price, the Backstop Shares representing such Backstop Investor's Backstop Entitlement (the "<u>Backstop Commitment</u>").

(b)     The "<u>Backstop Shares</u>" shall be the aggregate number of Equity Shares, if any, equal to (i) the aggregate number of Equity Shares offered by the Company in the Rights Offering pursuant to all Basic Subscription Rights (including any Basic Subscription Rights not issued and/or allocated due to the provisions of applicable state or foreign securities Laws), *less* (ii) the aggregate number of Equity Shares that are subscribed and purchased pursuant to the exercise of the Basic Subscription Rights by all holders of such Basic Subscription Rights.

(c)	The "<u>Backstop Entitlement</u>" shall be each Backstop Investor's portion of the Backstop Shares which shall be equal to: (i) with respect to CDPQ, 60% of the Backstop Shares and (ii) with respect to OMERS, 40% of the Backstop Shares (with any rounding of Backstop Shares to achieve such percentages to be mutually agreed by the Backstop Investors).

(d)	<u>No Fractional Shares</u>. No fractional Equity Shares or cash in lieu of fractional Equity Shares will be issued by the Company in connection with the Rights Offering. Any fractional Equity Shares created by the exercise of the rights will be rounded down to the nearest whole share, with such adjustments as may be necessary to ensure that the Company offer the aggregate number of Equity Shares in the Rights Offering as set forth in the Prospectus Supplement.

(e)	The "<u>Backstop Purchase Price</u>" is the aggregate amount to be paid by wire transfer of U.S. dollars in immediately available funds by each Backstop Investor equal to the number of Backstop Shares representing such Backstop Investor's Backstop Entitlement *multiplied by* the Subscription Price.

(f)	The Company (or the Subscription Agent on its behalf) shall give, or cause to be given, to each Backstop Investor, by e-mail in accordance with <u>Section 5.4</u>, not later than two Business Days after the Expiration Date, a written notification (each a "<u>Backstop Notice</u>") setting forth:

i.	the total number of Equity Shares subscribed for in the Rights Offering under the Basic Subscription Right;

ii.	the aggregate number of Backstop Shares;

iii.	each Backstop Investor's Backstop Entitlement;

iv.	the Backstop Purchase Price to be paid by such Backstop Investor and the time and date of the Backstop Closing Date, which shall be after the Expiration Date and no earlier than seven Business Days after the receipt by such Backstop Investor of the Backstop Notice; and

v.	wire instructions as to which bank account of the Company the Backstop Purchase Price should be paid.

(g)	On the Backstop Closing Date and upon the satisfaction or waiver of the conditions set forth in <u>Section 2.3</u> (other than those conditions that by their nature are to be satisfied at the Backstop Closing, but without affecting the requirement that such conditions be satisfied or waived at the Backstop Closing), the Backstop Investor shall remit, via wire transfer of immediately available funds, the Backstop Purchase Price as per the wire instructions set forth in the Backstop Notice.

(h)     At the Backstop Closing, the Company shall cause its transfer agent to credit the number of Backstop Shares to which the Backstop Investor is entitled for its Backstop Entitlement or its designee's account in book entry form and deliver to the Backstop Investor such certificates, documents or instruments required to be delivered by it to the Backstop Investor pursuant to this Agreement.

(i)     This Agreement will be filed as an exhibit to a Current Report on Form 6-K by the Company and incorporated by reference into the Registration Statement and will be disclosed in the Prospectus Supplement and the press release related to the Rights Offering.

**2.3     Conditions to Backstop Investors' Obligations**. The obligations of each of the Backstop Investors under Section 2.1 and Section 2.2 are subject to the following conditions being met:

(a)     the Rights Offering shall have been consummated in accordance with this Agreement, the Prospectus Supplement, and applicable Law, and all consents by third parties required for the consummation of the transactions contemplated hereby (including the consummation of the Rights Offering) shall have been obtained;

(b)     no judgment, injunction, decree or other legal restraint issued by a Governmental Authority shall prohibit, or have the effect of rendering unachievable or impracticable, the consummation of the Rights Offering or the transactions contemplated by this Agreement; and

(c)     no stop order suspending the effectiveness of the Registration Statement or any part thereof shall have been issued and no proceeding for that purpose shall have been initiated or threatened by the SEC; and any request of the SEC for inclusion of additional information in the Registration Statement or otherwise shall have been satisfied.

**2.4     Conditions to the Backstop Commitment**. The obligations of each of the Backstop Investors under Section 2.2 are subject to the following conditions being met:

(a)     the Backstop Shares have been authorized for listing on the NYSE;

(b)     the Expiration Date of the Rights Offering shall have occurred on or prior to January 24, 2022;

(c)     there shall not have occurred any event, development or circumstance upon or prior to the Expiration Date of the Rights Offering, which has had, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the condition (financial or otherwise), earnings, business or properties of the Company and its subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, or a material adverse effect on the performance of this Agreement or the transactions contemplated by this Agreement;

(d)     the representations and warranties of the Company set forth in Article III of this Agreement shall have been true and correct when made, shall remain true and correct as of the Backstop Closing Date except to the extent made as of a specific date; and

(e)     all obligations, covenants and agreements of the Company required to be performed at or prior to the Expiration Date of the Rights Offering and the Backstop Closing shall have been performed.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

**3.1**    **Representations and Warranties of the Company**. The Company hereby makes the representations and warranties set forth below to each of the Backstop Investors that:

(a)    **Binding Obligation**. The Company has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other Laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. The execution and delivery of this Agreement and the performance by the Company of its obligations under this Agreement and the Rights Offering will not materially conflict with or result in any material breach of, or constitute a material default, or give right to any right to termination, acceleration or cancellation under any agreement to which the Company or any of its subsidiaries is a party.

(b)    **Authorized Shares**. All shares of Equity Shares that are issuable as contemplated herein shall, upon issue, be duly authorized, validly issued, fully paid and nonassessable.

(c)    **No Litigation**. There are no actions, causes of action, claims, suits, proceedings or orders pending or, to the knowledge of the executive officers of the Company, threatened against the Company at law, in equity, or before or by any governmental agency, which seeks to restrain or enjoin, or could adversely affect the ability of the Company to effect, the consummation of the transactions contemplated hereby.

(d)    **Registration Statement and Prospectus**. At the time of effectiveness of the Registration Statement (or at the time of the effectiveness of any post-effective amendment to the Registration Statement) and at all times subsequent thereto up to the Backstop Closing Date, the Registration Statement and the Prospectus did, do and will, comply, in all material respects, with the requirements of the Securities Act and the rules and regulations promulgated thereunder. The Registration Statement, as of its most-recent effective date, did not, and as of the date of this Agreement, does not, and, as of the dates of any amendments or supplements thereto, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein, or necessary to make the statements therein, not misleading. The Prospectus, as of its date, did not and, as of the Backstop Closing Date, will not, and as of the dates of any amendments or supplements thereto, will not, include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

7

**3.2** <u>**Representations and Warranties of the Backstop Investors**</u>. Each of the Backstop Investors (severally not jointly) hereby makes the representations and warranties set forth below to the Company:

(a) <u>**Binding Obligation**</u>. The Backstop Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes a legal, valid and binding obligation of the Backstop Investor, enforceable against the Backstop Investor in accordance with its terms, except as limited by bankruptcy, insolvency or other Laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) <u>**Access to Information**</u>. The Backstop Investor acknowledges that the Company has furnished the Backstop Investor with all documents and other information required for the Backstop Investor to make an informed decision with respect to the purchase of Backstop Shares as contemplated by this Agreement.

(c) <u>**Tax Advisors**</u>. The Backstop Investor has reviewed with its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by this Agreement. With respect to such matters, the Backstop Investor relies solely on any such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Backstop Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment and the transactions contemplated by this Agreement.

**ARTICLE IV**
**<u>TERMINATION</u>**

**4.1** <u>**Termination**</u>.

(a) <u>**Mutual Termination**</u>. This Agreement may be terminated by the mutual written agreement of the Company and the Backstop Investors.

(b) <u>**Termination by the Backstop Investors**</u>. The Agreement may be terminated at any time by each Backstop Investor in respect of itself upon the failure of any of the conditions set forth in <u>Section 2.3</u> and <u>Section 2.4</u>.

(c) <u>**Automatic Termination**</u>. This Agreement will automatically terminate upon the date on which the Rights Offering is withdrawn or terminated by the Company in accordance with its terms and conditions as set forth in the Prospectus Supplement.

**4.2** <u>**Effects of Termination**</u>. If this Agreement is terminated pursuant to <u>Section 4.1</u>, this Agreement (other than <u>Section 5.3</u> which shall remain in full force and effect) shall forthwith become wholly void and of no further force and effect. Nothing herein shall relieve any party from liability for fraud or willful breach of this Agreement.

8

**ARTICLE V**
**MISCELLANEOUS**

**5.1**      **Regulation M**. In connection with the Rights Offering, the Company and the Backstop Investors will not take any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Equity Shares in violation of Regulation M under the Exchange Act.

**5.2**      **Listing**. Promptly following the date hereof (and in any event, prior to the Expiration Date and the Backstop Closing Date, as applicable), the Company shall obtain the approval by the NYSE of the listing of all of the Equity Shares to be issued in the Rights Offering (including the Backstop Shares) (subject to official notice of issuance). The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section.

**5.3**      **Indemnification of the Backstop Investors**. Subject to the provisions of this Section 5.3, the Company will indemnify and hold Backstop Investor and its directors, officers, shareholders, members, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls the Backstop Investor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling Persons (each, a "Backstop Investor Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Backstop Investor Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or (b) any action instituted against the Backstop Investor Parties in any capacity, or any of them or their respective affiliates, by any shareholder of the Company who is not an affiliate of such Backstop Investor Party, with respect to any of the transactions contemplated hereunder. If any action shall be brought against any Backstop Investor Party in respect of which indemnity may be sought pursuant to this Agreement, such Backstop Investor Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Backstop Investor Party. Any Backstop Investor Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Backstop Investor Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the Company and the position of such Backstop Investor Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The Company shall not be liable or required to indemnify a Backstop Investor Party hereunder for any settlement of any proceeding effected without the Company's written consent (unless the Company has failed after a reasonable period of time to assume defense and to employ counsel), which shall not be unreasonably withheld, conditioned or delayed, but if settled with such consent or if there be a final judgment for the plaintiff, the Company agrees to indemnify each Backstop Investor Party from and against any loss or liability by reason of such settlement or judgment. The indemnity agreements contained herein shall be in addition to any cause of action or similar right of any Backstop Investor Party against the Company or others and any liabilities the Company may be subject to pursuant to applicable Law.

**5.4**      **Notices**. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of: (a) the date of transmission, if such notice or communication is delivered via e-mail at the e-mail address set forth on the signature pages attached hereto at or prior to 5:30 p.m. (New York City time) on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via facsimile or e-mail at the facsimile number or e-mail address set forth on the signature pages attached hereto on a day that is not a Business Day or later than 5:30 p.m. (New York City time) on any Business Day, (c) the second Business Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

**5.5** **Assignment; Successors and Assigns**. All warranties and representations (as of the date such warranties and representations were made) made herein shall be considered to have been relied upon by the parties hereto and shall survive the issuance of the Backstop Shares. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties; *provided*, *however*, that none of the parties hereto may assign this Agreement or their obligations and rights hereunder without the prior written consent of the other party.

**5.6** **Execution; Counterparts**. This Agreement may be executed in one or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by email, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such emailed signature page were an original thereof.

**5.7** **Severability**. If any provision of this Agreement is held to be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision that is a reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

**5.8** **Governing Law**. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York. Each of the Company and the Backstop Investor hereto hereby irrevocably consents, to the maximum extent permitted by Law, that any action or proceeding relating to this Agreement or the transactions contemplated hereby shall be brought, at the option of the party instituting the action or proceeding, in any court of general jurisdiction in New York County, New York, in the U.S. District Court for the Southern District of New York or in any state or federal court sitting in the area currently comprising the Southern District of New York. Each of the parties hereto waives any objection that it may have to the conduct of any action or proceeding in any such court based on improper venue or forum non conveniens, waives personal service of any and all process upon it, and consents that all service of process may be made by mail or courier service directed to it at the address set forth herein and that service so made shall be deemed to be completed upon the earlier of actual receipt or ten days after the same shall have been posted or delivered to a nationally recognized courier service. Nothing contained in this shall affect the right of any party hereto to serve legal process in any other manner permitted by Law.

**5.9** **Amendment; Waiver**. This Agreement may not be amended, modified or terminated except by an instrument in writing, signed by each of the parties hereto. This Agreement may not be waived except by an instrument in writing, signed by the party against whom enforcement of such waiver is sought. No failure or delay by the Company or any Backstop Investor in exercising any right, power or remedy under this Agreement, and no course of dealing between the Company or any Backstop Investor, shall operate as a waiver of any such right, power or remedy of such party. No single or partial exercise of any right, power or remedy under this Agreement by the Company or any Backstop Investor, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by the Company or any Backstop Investor shall not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on the Company or any Backstop Investor not expressly required under this Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

**5.10** **Entire Agreement**. This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.

**5.11** **Construction**. The headings herein are for reference purposes and convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement or be deemed to limit or affect any of the provisions hereof. The parties hereto have participated jointly in the negotiation and drafting of this Agreement with the assistance of counsel and other advisors and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement or interim drafts of this Agreement. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rules of strict construction will be applied against any party hereto.

**5.12** **Interpretation**. In this Agreement, except to the extent otherwise provided or that the context otherwise requires: (i) when a reference is made in this Agreement to an Article, Section or Exhibit, such reference shall be to an Article or Section of, or an Exhibit to, this Agreement, unless otherwise indicated; (ii) whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation"; (iii) the words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iv) any references in this Agreement to "the date hereof" refers to the date of execution of this Agreement; (v) the term "or" is not exclusive; (vi) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (vii) all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined, or except as otherwise expressly provided therein; (viii) words in this Agreement describing the singular number shall be deemed to include the plural and vice versa, and words in this Agreement denoting any gender shall be deemed to include all genders; (ix) the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (x) any statute defined or referred to herein or in any agreement or instrument that is referred to herein shall mean such statute as from time to time amended, unless otherwise specifically indicated; (xi) references to a Person are also to its permitted successors and assigns; (xii) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day; (xiii) all references to "day" or "days" are to calendar days; and (xiv) all references in this Agreement to "$" or dollars shall mean U.S. denominated dollars.

**5.13** **Fees and Expenses**. Regardless of whether the Rights Offering is consummated or the Backstop Closing occurs, the Company shall reimburse the Backstop Investors for all reasonable out-of-pocket fees and expenses (including attorneys' fees and expenses) incurred by the Backstop Investors in connection with this Agreement and the Rights Offering and the transactions contemplated hereby and thereby not to exceed $150,000 for each Backstop Investor. Payment of the Backstop Investors' fees and expenses by the Company pursuant to this Section 5.13 shall be made at the Backstop Closing or, if this Agreement is terminated, no later than three Business Days after delivery by the Backstop Investors to the Company of written notice of (a) demand for payment after the termination of this Agreement, and (b) documentation of such fees and expenses. For the avoidance of doubt, the Company shall pay all of its expenses associated with the Prospectus and the Rights Offering, and the Backstop Investors shall have no obligation with respect to any fees, or with respect to any claims made by or on behalf of other Persons for fees, that may be due in connection with the Rights Offering or transactions contemplated by this Agreement due to an arrangement or agreement made by the Company (including any fees payable by the Company to HSBC Securities (USA) Inc. and Roth Capital Partners).

**5.14** **Arm's Length**. The Company acknowledges and agrees that each Backstop Investor is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity. Additionally, neither Backstop Investor is advising the Company or any other person or entity as to any legal, tax, investment, accounting, or regulatory matters in any jurisdiction. The Company has consulted with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and neither Backstop Investor shall have any responsibility or liability to the Company or its stockholders, directors, officers, employees, advisors or other representatives with respect thereto. Any review by a Backstop Investor of the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of such Backstop Investor and shall not be on behalf of the Company or its stockholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies with respect thereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**AZURE POWER GLOBAL LIMITED**

**By**   /s/ Sandeep Arora

**Name: Mr. Sandeep Arora**
**Title: Sr. Vice President, Capital**

**Address:** c/o AAA Global Services Ltd, 1st Floor,
The Exchange, 18 Cybercity, Ebene, Mauritius

**Email Address:** sandeep.arora@azurepower.com

[Signature Page to Backstop Commitment Agreement]

**CDPQ INFRASTRUCTURES ASIA PTE LTD.**

**By**   /s/ Leong Wai Leng

**Name: Leong Wai Leng**
**Title: Director**

**Address:** One Raffles Quay, #39-01 North Sydney, Singapore 048583

**Email Addresses:** dmalhotra@cdpq.com and affairesjuridiques@cdpq.com

[Signature Page to Backstop Commitment Agreement]

**OMERS INFRASTRUCTURE ASIA PTE. LTD.**

**By**   /s/Kao Pei Chui

**Name: Kao Pei Chui**
**Title: Authorised Signatory**

**By**   /s/ Prateek Maheshwari

**Name: Prateek Maheshwari**
**Title: Authorised Signatory**

**Address:** One Marina Boulevard #28-00 Singapore 018989

**Email Addresses:**

WKao@Omers.com, PMaheshwari@Omers.com and JGratiaen@Omers.com

[Signature Page to Backstop Commitment Agreement]

Exhibit A

Propectus Supplement
Dated December 27, 2021

Exhibit 99.3



**NOT FOR DISTRIBUTION OR RELEASE IN OR INTO ANY JURISDICTION IN WHICH OFFERS OR SALES WOULD BE PROHIBITED BY APPLICABLE LAW**

**Azure Power Announces Rights Offering for Equity Shares**

**Ebene, December 27, 2021:** Azure Power Global Limited (NYSE: AZRE), an independent renewable power producer in India, announced today that its Board of Directors has approved a rights offering to raise proceeds of up to $249,938,599 . Pursuant to the rights offering, each shareholder of the Company will receive one non-transferable subscription right (a "Right") for each equity share, par value $0.000625 per share (an "Equity Share") held as of 5:00 p.m., Eastern Time, on January 6, 2022 (the "Record Date"). The rights offering will be made only by means of a prospectus, and this announcement does not constitute an offer to sell, or a solicitation of an offer to buy, any of the Company's securities.

*SUMMARY OF THE TERMS OF THE OFFERING*

- Each shareholder of the Company will receive one Right for each Equity Share held as of 5:00 p.m., Eastern Time, on the Record Date which shall be January 6, 2022.

- Each Right will entitle the holder to purchase 0.3275 Equity Shares, at the subscription price of $15.79 per whole Equity Share.

- No fractional Equity Shares will be issued in the rights offering. Any fractional Equity Shares created by the exercise of the Rights will be rounded down to the nearest whole share.

- The Rights are non-transferable and will not be listed on the New York Stock Exchange ("NYSE") or any other stock exchange or market.

- CDPQ Infrastructures Asia Pte Ltd. ("CDPQ"), which held as of December 23, 2021, 24,259,272 Equity Shares that represented 50.2% of the Company's outstanding Equity Shares, and OMERS Infrastructure Asia Holdings Pte. Ltd. ("OMERS"), which held as of December 23, 2021, 9,333,178 Equity Shares that represented 19.3% of the Company's outstanding Equity Shares, have each entered into a Backstop Agreement with the Company. Under the Backstop Agreements, CDPQ and OMERS have agreed with the Company to exercise fully all their Basic Subscription Rights in this rights offering. In addition, under the Backstop Agreements, CDPQ and OMERS have agreed with the Company to purchase any Equity Shares that remain unsubscribed as a result of any unexercised Rights in the rights offering.

- The distribution of the Rights is expected to commence on January 7, 2022, to holders of Equity Shares of record as of the Record Date.

- The rights offering expires at 5:00 p.m., Eastern Time, on January 24, 2022 (the "Expiration Date"), unless extended by the Company.

The subscription agent for the rights offering will send a Rights certificate to each registered holder of the Company's Equity Shares as of the close of business (Eastern time) on the Record Date, based on the Company's registry maintained at the transfer agent for its Equity Shares. Holders of Equity Shares in "street name" through a brokerage account, bank, or other nominee will not receive a physical Rights certificate, and instead, such holders must instruct their broker, bank, or nominee whether or not to exercise subscription Rights on their behalf. For any questions or further information about the rights offering, please call Georgeson LLC, the information agent for the rights offering, at (888) 607-9107 (U.S. toll-free) or + 1 781-575-2137 (for international calls).

The rights offering will be made pursuant to the Company's effective shelf registration statement on Form F-3 (File No. 333-249479), as amended, on file with the Securities and Exchange Commission (the "SEC"), and a prospectus supplement filed with the SEC today.

The information herein is not complete and is subject to change. This press release does not constitute an offer to sell or the solicitation of an offer to buy any of the Rights, Equity Shares or any other securities, nor will there be any sale of the Rights, Equity Shares or any other securities in any state or other jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or other jurisdiction. This document is not an offering, which can only be made by a prospectus. The base prospectus contains additional information about the Company, and the prospectus supplement contains additional information about the rights offering and should be read carefully before investing. For any questions or further information about the rights offering, or to obtain a prospectus supplement and the accompanying prospectus, when available, please contact Georgeson LLC, the information agent for the rights offering, at (888) 607-9107 (U.S. toll-free) or + 1 781-575-2137 (for international calls).

Exhibit 99.4

## NOTICE OF RECORD DATE

NOTICE IS HEREBY GIVEN that Azure Power Global Limited (the "**Company**") has set the record date of 5:00 p.m., Eastern Time on January 6, 2022 (the "**Record Date**"), for a proposed offering of non-transferable subscription rights. The Company will distribute, at no charge, to the holders of our equity shares, par value $0.000625 per share (the "Equity Shares"), on the record date non-transferable subscription rights to purchase up to an aggregate of 15,828,917 new Equity Shares in accordance with a prospectus supplement, dated December 27, 2021, and a prospectus, dated December 10, 2021, to be sent to shareholders on January 7, 2022 along with the subscription rights certificate and other documents. The rights offering will be made only by means of such prospectus and prospectus supplement. This notice does not constitute an offer to sell, or a solicitation of an offer to buy, any of the Company's securities.

**DATED: December 27, 2021**

**BY ORDER OF THE BOARD OF DIRECTORS OF AZURE POWER GLOBAL LIMITED**

**AAA GLOBAL SERVICES LTD**
**COMPANY SECRETARY**

**FOR AND ON BEHALF OF THE BOARD OF DIRECTORS OF AZURE POWER GLOBAL**

**Exhibit 99.5**

December 27, 2021

HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018
USA

Roth Capital Partners, LLC
888 San Clemente Drive
Newport Beach, CA 92660
USA

Ladies and Gentlemen:

**Issue by Azure Power Global Limited of an aggregate 15,828,917 shares issuable upon exercise of rights to subscribe for such shares.**

Azure Power Global Limited, a Mauritius Category 1 Global Business Company (the "**Company**"), proposes to distribute at no charge to the holders of record (the "**Holders**") as of 5:00 p.m., Eastern Time, on January 6, 2022 (the "**Record Date**"), of its outstanding equity shares, par value $0.000625 per share (the "**Equity Shares**"), rights (each, a "**Right**" and, collectively, the "**Rights**") entitling such Holders, to collectively subscribe for up to an aggregate of 15,828,917 new Equity Shares, as described in the Prospectus (as defined below) (each, a "**Share**" and, collectively, the "**Shares**") (the "**Rights Offering**"). Pursuant to the terms of the Rights Offering, the Company is issuing to each Holder (i) one non-transferable Right for every share of Equity Shares they own on the Record Date, provided that any fractional Equity Shares created by the exercise of the Rights will be rounded down to the nearest whole share, as described in the Prospectus. The Rights entitle the Holders to acquire during the subscription period (the "**Subscription Period**") set forth in the Prospectus at the subscription price of $15.79 per Share (the "**Subscription Price**"), 0.3275 Shares for one Right exercised, on the terms and subject to the conditions set forth in the Prospectus. Pursuant to the over subscription privilege in connection with the Rights Offering, Holders who fully exercise all Rights issued to them may subscribe for additional Shares not subscribed for by other Holders.

The Company has prepared and filed with the Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended, and the rules and regulations of the Commission thereunder (collectively, the "**Securities Act**"), an automatic shelf registration statement on Form F-3 (File No. 333-249479), as amended by Post-Effective Amendment No. 1 on November 10, 2021, as further amended by Post-Effective Amendment No. 2 on December 10, 2021 and as further amended by Post-Effective Amendment No. 3 on December 15, 2021, including a prospectus, relating to the Rights and the Shares. Such registration statement, as amended, at the time it became effective, including the information, if any, deemed pursuant to Rule 430A, 430B or 430C under the Securities Act to be part of the registration statement, at the time of its effectiveness, is referred to herein as the "**Registration Statement**"; and as used herein, the term "**Prospectus**" means the prospectus, as may be amended or supplemented from time to time, including the prospectus supplement, filed pursuant to Rule 424(b)(5) on December 27, 2021 (the "**Prospectus Supplement**"), in the form furnished by the Company to the Dealer Managers for use by the Dealer Managers from time to time in connection with the Rights Offering. Any reference in this dealer managers agreement (this "**Agreement**") to the Registration Statement or the Prospectus shall be deemed to refer to and include the documents incorporated by reference therein pursuant to Item 6 of Form F-3 under the Securities Act, as of the effective date of the Registration Statement or the Prospectus, as the case may be, and any reference to "**amend**", "**amendment**" or "**supplement**" with respect to the Registration Statement or the Prospectus shall be deemed to refer to and include any documents filed after such date under the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder (collectively, the "**Exchange Act**") that are deemed to be incorporated by reference therein. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Registration Statement and the Prospectus. The term "**Offering Materials**" shall refer to (i) any Issuer Free Writing Prospectus (as defined below) and (ii) the letters to beneficial owners of the shares of the Equity Shares and the forms used to exercise rights, any letters from the Company to securities dealers, commercial banks and other nominees, in each case in the form filed as exhibits to the Registration Statement (the "**Exercise Materials**").

On December 27, 2021, the Company entered into that certain Backstop Agreement (the "**Backstop Agreement**") by and among CDPQ Infrastructures Asia Pte Ltd. and OMERS Infrastructure Asia Holdings Pte. Ltd. (collectively, the "**Supporting Shareholders**", pursuant to which the Supporting Shareholders have each agreed to exercise fully all their Rights.

As used in this Agreement, "**Issuer Free Writing Prospectus**" means any "**issuer free writing prospectus,**" as defined in Rule 433 of the Securities Act ("**Rule 433**"), including without limitation any "**free writing prospectus**" (as defined in Rule 405 of the Securities Act ("**Rule 405**")) relating to the Rights or Shares that is (i) required to be filed with the Commission by the Company, (ii) a "road show that is a written communication" within the meaning of Rule 433(d)(8)(i), whether or not required to be filed with the Commission, or (iii) exempt from filing with the Commission pursuant to Rule 433(d)(5)(i) because it contains a description of the Rights Offering that does not reflect the final terms, in each case in the form filed or required to be filed with the Commission or, if not required to be filed, in the form retained in the Company's records pursuant to Rule 433(g).

The (i) execution and delivery of this Agreement by the Company, (ii) the Rights Offering, including the issuance of Shares upon exercise of the Rights, (iii) the Backstop Agreement, (iv) performance by the Company of its obligations under this Agreement and (v) transactions contemplated hereby and thereby are referred to herein collectively as the "**Transactions**." This Agreement, the Registration Statement, the Prospectus, the Backstop Agreement and any ancillary documents required to effectuate this Agreement or the Offering are referred to herein collectively as the "**Transaction Documents**."

The date on which the Rights Offering will be consummated and the Shares will be issued is referred to as the "**Settlement Date**."

**1**      **Engagement**

   (a)      The Company hereby engages you to act as its exclusive dealer managers (the "**Dealer Managers**") in connection with the Rights Offering, and, on the basis of the representations, warranties and agreements contained herein, you hereby accept such engagement upon the terms and subject to the conditions set forth in this Agreement.

   (b)      As Dealer Managers, you agree, in accordance with your firm's customary practice, to perform those services in connection with the Rights Offering as are customarily performed by investment banks in connection with rights offerings of like nature, including, without limitation, using reasonable best efforts to solicit the exercise of the Rights and subscriptions for the Shares pursuant to the Rights Offering. The Company acknowledges and agrees that the Dealer Managers reserve the right not to participate in the Rights Offering and that the foregoing is not a commitment, express or implied, on the part of the Dealer Managers to underwrite, place or purchase any securities of the Company or to otherwise provide any financing to the Company.

(c) The Company further authorizes you to communicate with Georgeson LLC, in its capacity as information agent (the "**Information Agent**") and Computershare Trust Company, N.A., in its capacity as subscription agent (the "**Subscription Agent**" and along with the Information Agent, the "**Agents**"), with respect to matters relating to the Transactions. The Company has instructed the Agents to advise you upon your request as to the number of Shares to be issued pursuant to the exercise of Rights that Holders have subscribed for pursuant to the Rights Offering and as to such other matters in connection with the Rights Offering as you may reasonably request, subject to Section 3(e).

(d) The Company acknowledges and agrees that neither you nor any of your affiliates, directors, officers or employees shall have any liability (in tort, contract or otherwise) to the Company, its affiliates or any other person for any losses, claims, damages, liabilities and expenses (each a "**Loss**" and, collectively, the "**Losses**") arising from any act or omission on the part of any broker or dealer in securities (a "**Dealer**"), bank or trust company, or any other person in connection with the Rights Offering, and no Dealer Manager nor any of its affiliates, directors, officers or employees shall be liable for any Losses arising from its own acts or omissions in performing its obligations as a dealer manager or as a Dealer in connection with the Rights Offering, except for any such Losses that are finally judicially determined to have resulted primarily from its bad faith, gross negligence or willful misconduct in performing such obligations. In connection with the Rights Offering, no Dealer, bank or trust company shall be deemed to be acting as your agent or the agent of the Company or any of its affiliates, and you shall not be deemed the agent of any Dealer, bank or trust company or an agent of, or a fiduciary or a financial advisor to, the Company or any of its affiliates, equity holders, creditors or any other person. In acting as Dealer Managers in connection with the Rights Offering, you shall not be, nor shall you be deemed for any purpose, to act as a partner or joint venturer of, or a member of a syndicate or group with, the Company or its affiliates in connection with the acting as Dealer Managers in connection with the Rights Offering, and neither the Company nor any of its affiliates shall be deemed to act as your agents.

(e) The Company acknowledges and agrees that (i) you have been retained solely to provide the services set forth herein, and in rendering such services you shall act as an independent contractor and any duties arising out of your engagement hereunder shall be owed solely to the Company; (ii) you may perform the services contemplated hereby through or in conjunction with your affiliates, and any of your affiliates performing services hereunder shall be entitled to the benefits and be subject to the terms and conditions of this Agreement; and (iii) you are a securities firm engaged in securities trading and brokerage activities and providing investment banking and financial advisory services, and in the ordinary course of business, you and your affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for your own account or the accounts of customers, in debt or equity securities of the Company or their respective affiliates or other entities that may be involved in the Transactions. Additionally, the Company acknowledges and agrees that you are not advising the Company as to any legal, regulatory, tax, investment or accounting matters in any jurisdiction. The Company must consult with its own advisors concerning such matters and will be responsible for making its own independent investigation and appraisal of the terms of the Rights Offering and you shall have no responsibility or liability to the Company with respect thereto. Any review by the Dealer Managers of the Company or its affiliates, and the Transactions or other matters relating to such Transactions will be performed solely for the benefit of the Dealer Managers, and shall not be on behalf of the Company or its affiliates or any other person.

**2**      **Representations and Warranties by the Company.** The Company and each of its subsidiaries (collectively, the "**Group**") represents and warrants to the Dealer Managers as of the time and date of the commencement of the Rights Offering (such date and time hereinafter referred to as the "**Representation Date**"), as of the date hereof (if such date is not the Representation Date), as of the date of expiration of the Rights Offering, as set forth in the Prospectus (as it may be extended as provided in the Prospectus, the "**Expiration Date**") and as of the Settlement Date, that:

(a)      *Registration Statement and Prospectuses.* The Company is eligible to use of Form F-3 under the Securities Act. The Registration Statement has become effective under the Securities Act. No stop order suspending the effectiveness of the Registration Statement has been issued under the Securities Act, no order preventing or suspending the use of the Prospectus has been issued, and no proceedings for any of those purposes have been instituted or are pending or, to the Company's knowledge, contemplated. The Company has complied with each request (if any) from the Commission for additional information about the Registration Statement. Each of the Registration Statement and any post-effective amendment thereto, at the time of its effectiveness, complied in all material respects with the requirements of the Securities Act. The Prospectus and any amendment or supplement thereto, at the time each was filed with the Commission complied in all material respects with the requirements of the Securities Act and the Prospectus delivered to the Dealer Managers for use in connection with the Rights Offering was identical to the electronically transmitted copies thereof filed with the Commission pursuant to its Electronic Data Gathering, Analysis and Retrieval system (or any successor system) ("**EDGAR**"), except to the extent permitted by Regulation S-T. The documents incorporated or deemed to be incorporated by reference in the Registration Statement and the Prospectus, when they became effective or at the time they were or hereafter are filed with the Commission, complied and will comply in all material respects with the requirements of the Exchange Act.

(b)      Accurate Disclosure. Neither the Registration Statement nor any amendment thereto, at its effective time, at the Representation Date or at the Expiration Date, contained, contains or will contain an untrue statement of a material fact or omitted, omits or will omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. The Offering Materials (as amended or supplemented), when taken together with the Prospectus, as of their dates, at the Representation Date and the Expiration Date do not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The Prospectus, as of its date, the Representation Date or at the Expiration Date, did not, does not and will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The documents incorporated or deemed to be incorporated by reference in the Registration Statement, the Offering Materials and the Prospectus, at the time the Registration Statement became effective or when such documents incorporated by reference were filed or hereafter are filed with the Commission, when read together with the other information in the Registration Statement, the Offering Materials and the Prospectus, as the case may be, did not, do not and will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The representations and warranties in this subsection shall not apply to statements in or omissions from the Registration Statement, the Offering Materials or the Prospectus (or any amendment or supplement to the Registration Statement, the Offering Materials or the Prospectus) made in reliance upon and in conformity with written information furnished to the Company by the Dealer Managers expressly for use therein. For purposes of this Agreement, the only information so furnished shall consist of (i) the name of the Dealer Managers and (ii) the fourth paragraph under the caption "Plan of Distribution" in the Prospectus Supplement (the "Dealer Managers Information").

(c) *Issuer Free Writing Prospectuses.* No Issuer Free Writing Prospectus conflicts or will conflict with the information contained in the Registration Statement or the Prospectus, including any document incorporated by reference therein, and any preliminary or other prospectus deemed to be a part thereof that has not been superseded or modified.

(d) *Company Not Ineligible Issuer.* At the time of filing the Registration Statement and any post-effective amendment thereto, at each of the Representation Date, Expiration Date and at the date hereof, the Company was not, is not and will not be an "ineligible issuer," as defined in Rule 405, without taking account of any determination by the Commission pursuant to Rule 405 that it is not necessary that the Company be considered an ineligible issuer.

(e) *Independent Accountants.* The accountants who certified the financial statements and supporting schedules incorporated by reference in the Registration Statement, the Offering Materials and the Prospectus are independent public accountants with respect to the Company as required by the Securities Act, the Exchange Act and the Public Company Accounting Oversight Board.

(f) *Financial Statements; Non-GAAP Financial Measures.* The financial statements included or incorporated by reference in the Registration Statement, the Offering Materials and the Prospectus, together with the related schedules and notes, present fairly in all material respects the financial position of the Company and its consolidated subsidiaries at the dates indicated and the statement of operations, stockholders' equity and cash flows of the Company and its consolidated subsidiaries for the periods specified; said financial statements have been prepared in conformity with U.S. generally accepted accounting principles ("**GAAP**") applied on a consistent basis throughout the periods involved. The supporting schedules, if any, present fairly in all material respects in accordance with GAAP the information required to be stated therein. The selected financial data and the summary financial information included in the Registration Statement, the Offering Materials and the Prospectus present fairly in all material respects the information shown therein and have been compiled on a basis consistent with that of the audited financial statements included therein. All disclosures contained in the Registration Statement, the Offering Materials or the Prospectus, or incorporated by reference therein, regarding "non-GAAP financial measures" (as such term is defined by the rules and regulations of the Commission) comply with Regulation G of the Exchange Act and Item 10 of Regulation S-K of the Securities Act, to the extent applicable. The interactive data in eXtensible Business Reporting Language included in the documents incorporated by reference in the Registration Statement, the Offering Materials and the Prospectus fairly presents the information called for in all material respects and has been prepared in accordance with the Commission's rules and guidelines applicable thereto.

(g) *No Material Adverse Change.* Since the respective dates as of which information is given in the Registration Statement, the Offering Materials or the Prospectus, neither the Company nor any of its subsidiaries has (i) sustained any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, (ii) incurred any material liability or obligation, direct or contingent, other than liabilities and obligations that were incurred in the ordinary course of business or otherwise set forth or contemplated in the Registration Statement, the Offering Materials or the Prospectus, (iii) entered into any material transaction not in the ordinary course of business, except as set forth or contemplated in the Registration Statement, the Offering Materials or the Prospectus, or (iv) declared or paid any dividend on its capital stock, and since such date, there has not been any change in the capital stock (other than the issuance of equity shares, if any, pursuant to employee incentive plans described in the Registration Statement, the Offering Materials or the Prospectus) or long-term debt of the Company or any of its subsidiaries or any adverse change, or any development involving a prospective adverse change, in or affecting the condition (financial or otherwise), results of operations, stockholders' equity, properties, business or prospects of the Group, each taken as a whole, in each case in this Section 2(g) except as would not, individually or in the aggregate, have a Material Adverse Effect (as defined below).

(h) *Organization and Good Standing.* The Company and each of its subsidiaries have been duly organized and are validly existing and in good standing (where such concept is applicable) as a corporation or other business entity under the laws of their respective jurisdictions of organization, are duly qualified to do business and are in good standing as a foreign corporation or other business entity in each jurisdiction in which their respective ownership or lease of property or the conduct of their respective businesses requires such qualification, except where the failure to be so qualified or in good standing would not have, or reasonably be expected to have, a material adverse effect on the condition (financial or otherwise), results of operations, stockholders' equity, properties, business or prospects of the Company and the Group, taken as a whole (a "**Material Adverse Effect**"). Each of the Company and its subsidiaries has all power and authority necessary to own or hold its properties and to conduct the businesses in which it is engaged.

(i) *Capitalization.* The Company has authorized capitalization as set forth in each of the Registration Statement, the Offering Materials and the Prospectus under the heading "Capitalization"; and all of the issued shares of capital stock of the Company has been duly authorized and validly issued, and are fully paid, free of any liens or encumbrances (except for permitted liens as set forth in the Indenture and except as disclosed in the Registration Statement, the Offering Materials and the Prospectus) and non-assessable and were not issued in violation of any pre-emptive, right of first refusal or similar rights of any security holder of such entity.

(j) *Authorization of Agreement.* This Agreement has been duly authorized, executed and delivered by the Company.

(k) *Authorization of the Rights. The* Rights have been duly authorized for issuance and distribution to the Holders in the Rights Offering.

(l) *Authorization of the Shares.* The Shares have been duly authorized for issuance and sale to the Holders upon exercise of the Rights and, when issued and delivered by the Company upon exercise of the Rights against payment of the Subscription Price, will be validly issued, fully paid and nonassessable.

(m) *Description of the Rights and the Shares.* The Rights and the Shares will conform in all material respects to the respective statements relating thereto contained in the Registration Statement, the Offering Materials and the Prospectus.

(n) *Registration Rights.* There are no persons with registration rights or other similar rights to have any securities registered for sale or sold by the Company under the Securities Act, other than those rights that have been disclosed in the Registration Statement, the Offering Materials and the Prospectus.

(o) *No Violation or Default.* None of the Group companies are (i) in violation of its certificate of incorporation, constitution, memorandum and articles of association (or similar organizational documents), (ii) in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant, condition or other obligation contained in any indenture, mortgage, deed of trust, loan agreement, license or other agreement or instrument to which it is a party or by which it is bound or to which any of its properties or assets is subject, or (iii) in violation of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property or assets (each a "**Governmental Entity**" and collectively the "**Governmental Entities**") or has failed to obtain any license, permit, certificate, franchise or other governmental authorization or permit necessary to the ownership of its property or to the conduct of its business, except in the case of (ii) and (iii) above, where such default, violation or failure would not, individually or in the aggregate, have a Material Adverse Effect.

(p) *No Conflicts*. The issue and sale of, as the case may be, of the Rights and the Shares (together, "the **Securities**"), the execution, delivery and performance of this Agreement by the Company, the compliance by the Company with the terms thereof and the consummation of the transactions contemplated hereby, and the application of the proceeds from the Rights Offering as described under "Use of Proceeds" in the Registration Statement, the Offering Materials and the Prospectus will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement, license, lease or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company or any of its subsidiaries is subject; (ii) result in any violation of the provisions of the certificate of incorporation, constitution, memorandum and articles of association (or similar organizational documents) of the Company or any of its subsidiaries; or (iii) result in any violation of any statute or any judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries or any of their properties or assets.

(q) *No Labor Disputes.* No labor disturbance by or dispute with employees of the Group exists or, to the knowledge of the Group, is imminent that could have a Material Adverse Effect.

(r) *Legal Proceedings.* Except as disclosed in the Registration Statement, the Offering Materials and the Prospectus, there are no legal, governmental or regulatory investigations, actions, demands, claims, suits, arbitrations, inquiries or proceedings ("**Actions**") pending to which the Group is or may be a party or to which any property of the Group is or may be the subject that, individually or in the aggregate, if determined adversely to the Group could have a Material Adverse Effect; and no such Actions are, to the knowledge of the Company, threatened or contemplated by any governmental or regulatory authority or threatened by others.

(s) *Certain Environmental Matters.* The Company and its subsidiaries (i) are, and at all times prior hereto were, in compliance with all laws, regulations, ordinances, rules, orders, judgments, decrees, permits or other legal requirements of any governmental authority, including without limitation any international, foreign, national, state, provincial, regional, or local authority, relating to pollution, the protection of human health or safety, the environment, or natural resources, or to use, handling, storage, manufacturing, transportation, treatment, discharge, disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants ("**Environmental Laws**") applicable to such entity, which compliance includes, without limitation, obtaining, maintaining and complying with all permits, authorizations and approvals required by Environmental Laws to conduct their respective businesses, and (ii) have not received notice or otherwise have knowledge of any actual or alleged violation of Environmental Laws, or of any actual or potential liability for or other obligation concerning the presence, disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, except in the case of clause (i) or (ii) where such non-compliance, violation, liability, or other obligation would not, individually or in the aggregate, have a Material Adverse Effect. Except as described in the Registration Statement, the Offering Materials and the Prospectus, (x) there are no proceedings that are pending, or known to be contemplated, against the Company or its subsidiaries under Environmental Laws in which a governmental authority is also a party, and (y) the Company and its subsidiaries are not aware of any issues regarding compliance with Environmental Laws, including any pending or proposed Environmental Laws, or liabilities or other obligations under Environmental Laws or concerning hazardous or toxic substances or wastes, pollutants or contaminants, that have a Material Adverse Effect.

(t) *Accuracy of Exhibits.* There are no documents which are required to be described in the Registration Statement, the Offering Materials or the Prospectus or to be filed as exhibits to the Registration Statement which have not been so described or filed as required.

(u) *Absence of Further Requirements.* No filing (other than routine tax filings) with, or authorization, approval, consent, license, order, registration, qualification or decree of, any Governmental Entity is necessary or required for the performance by the Company of its obligations hereunder, in connection with the offering, issuance or sale of the Rights or the Shares issued upon *exercise* of the Rights hereunder or the consummation of the Transactions, except such as have been already obtained or as may be required under the Securities Act, the rules of the New York Stock Exchange (the "**NYSE**"), state securities laws or the rules of Financial Industry Regulatory Authority, Inc. ("**FINRA**").

(v) *Licenses and Permits.* The Company and its subsidiaries have such permits, licenses, patents, franchises, certificates of need and other approvals or authorizations of governmental or regulatory authorities (collectively, "**Permits**") as are necessary under applicable law to own their properties and conduct their businesses in the manner described in the Registration Statement, the Offering Materials and the Prospectus, except as disclosed in the Registration Statement, the Offering Materials and the Prospectus, or except for any of the foregoing, such that would not, individually or in the aggregate, have a Material Adverse Effect. Neither the Company nor any of its subsidiaries is in violation of, or in default under, any of the Permits, except as would not, individually or in the aggregate, have a Material Adverse Effect. Neither the Company nor any of its subsidiaries has received notice of any revocation or modification of any Permits, which, individually or in the aggregate, if revoked or modified, would have a Material Adverse Effect.

(w) *Title to Real and Personal Property.* The Company and its subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them, that are material to the business of the Company, free and clear of all liens, encumbrances and defects, except such liens, encumbrances and defects as are described in the Registration Statement, the Offering Materials and the Prospectus or such as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company. All assets held under lease by the Company, that are material to the business of the Company, are held by it under valid, subsisting and enforceable leases, with such exceptions as are described in the Registration Statement, the Offering Materials and the Prospectus or such as do not materially interfere with the use made and proposed to be made of such assets by the Company.

(x) *Intellectual Property*. The Company and its subsidiaries own or possess adequate rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses, know-how, software, systems and technology (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) necessary for the conduct of their respective businesses and have no reason to believe that the conduct of their respective businesses will conflict with, and have not received any notice of any claim of conflict with, any such rights of others.

(y) *Disclosure Controls*. The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) under the Exchange Act, (ii) such disclosure controls and procedures are designed to ensure that the information is accumulated and communicated to management of the Company, including its respective principal executive officers and principal financial officers, as appropriate and (iii) such disclosure controls and procedures are effective in all material respects to perform the functions for which they were established.

(z) *Accounting Controls*. The Company and each of its subsidiaries maintain internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP (with respect to the Company) and Indian Accounting Standards (with respect to the Company's subsidiaries), including, but not limited to, internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to permit preparation of the Company's financial statements in conformity with GAAP and to permit preparation of the Company's subsidiaries financial statements in conformity with Indian Accounting Standards and the guidance note on combined and carve-out financial statements issued by the Institute of Chartered Accountants of India, and to maintain accountability for its assets, (iii) access to the Company's assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for the Company's assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Since the date of the most recent consolidated balance sheet of the Company, (i) the Company has not been advised of or become aware of (A) any significant deficiencies in the design or operation of internal controls that could adversely affect the ability of the Company or any of its subsidiaries to record, process, summarize and report financial data, or any material weaknesses in internal controls, and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the internal controls of the Company and each of its subsidiaries; and (ii) there have been no significant changes in internal controls or in other factors that could significantly adversely affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

(aa) *No Undisclosed Relationships*. No material relationship, direct or indirect, exists between or among the Company or its subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or its subsidiaries, on the other hand, that is required to be described in the Registration Statement, the Offering Materials and the Prospectus which is not so described.

(bb)   *Compliance with the Sarbanes-Oxley Act.* There is and has been no failure on the part of the Company or any of the Company's directors or officers, in their capacities as such, to comply in all material respects with any provision of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith, including Section 402 related to loans and Sections 302 and 906 related to certifications.

(cc)   *Taxes.* The Company and its subsidiaries have filed all federal, state, local and foreign tax returns required to be filed through the date hereof, subject to permitted extensions, and have paid all taxes due, except for such taxes, if any, as are being contested in good faith and as to which adequate reserves have been provided, and no tax deficiency has been determined adversely to the Company or its subsidiaries, nor does the Company have any knowledge of any tax deficiencies that have been, or would reasonably be expected to be asserted against the Company or its subsidiaries, that would, individually or in the aggregate, have a Material Adverse Effect.

(dd)   *Insurance.* Except as would not have a Material Adverse Effect, the Company and its subsidiaries carry, or are covered by, insurance from insurers of recognized financial responsibility in such amounts and covering such risks as is adequate for the conduct of their respective businesses and the value of their respective properties and as is customary for companies engaged in similar businesses in similar industries. All policies of insurance of the Company and its subsidiaries are in full force and effect; the Company and each of its subsidiaries are in compliance with the terms of such policies in all material respects; and neither the Company nor any of its subsidiaries has received notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made in order to continue such insurance; there are no material claims by the Company or any of its subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause; and neither the Company nor any such subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

(ee)   *Investment Company Act.* The Company is not, and as of the Settlement Date and, after giving effect to the settlement of the Rights Offering and the application of the proceeds therefrom as described under "Use of Proceeds" in the Registration Statement, the Offering Materials and the Prospectus, will not be, an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the United States Securities and Exchange Commission (the "**Commission**").

(ff)   *No Stabilization.* None of the Company or any of its affiliates have taken, directly or indirectly, any action designed to or that has constituted or that could reasonably be expected to cause or result in the stabilization or manipulation of the price of any security of the Company.

11

(gg)   *No Unlawful Payments.* Neither the Company nor any of its subsidiaries nor, to the best knowledge of the Company, any director, officer, or employee of the Company or any of its subsidiaries nor any agent, affiliate or other person associated with or acting on behalf of the Company or any of its subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government or regulatory official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or any applicable law or regulation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, or committed an offence under the UK Bribery Act 2010, or any other applicable anti-bribery or anti-corruption laws; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company and its subsidiaries have instituted, and maintain and enforce, policies and procedures designed to promote and ensure compliance with all applicable anti-bribery and anti-corruption laws.

(hh)   *Compliance with Anti-Money Laundering Laws.* The operations of the Company and its subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable anti-money laundering statutes of all jurisdictions where the Company and any of its subsidiaries conducts business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental or regulatory agency (collectively, the "**Anti-Money Laundering Laws**") and no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ii)   *No Conflicts with Sanctions Laws.* Neither the Company nor any of its subsidiaries, directors, officers, employees, agents, affiliates or other person associated with or acting on behalf of the Company or any of its subsidiaries is currently the subject or the target of any sanctions administered or enforced by the U.S. Government, (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the United Nations Security Council ("**UNSC**"), the European Union, Her Majesty's Treasury ("**HMT**"), the Hong Kong Monetary Authority or other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company or any of its subsidiaries located, organized or resident in a country, region or territory that is the subject or the target of Sanctions, including, without limitation, Crimea, Cuba, Iran, North Korea and Syria (each, a "**Sanctioned Country**"); and the Company will not directly or indirectly use the proceeds of the Rights Offering hereunder, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or the target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or (iii) in any other manner that will result in a violation by any person (including any person participating in the transaction, whether as dealer manager, initial purchaser, advisor, investor or otherwise) of Sanctions. For the past five years, the Company and its subsidiaries have not knowingly engaged in and are not now knowingly engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country. No provision of this Section 2(ii) shall apply to the Dealer Managers to the extent that it is or would be unenforceable by or in respect of that person by reason of breach of (i) any provision of Council Regulation (EC) No 2271/96 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom) or (ii) any similar blocking or anti-boycott law, and Sections 2(a), 4(a), 6(a) and 8 shall be construed accordingly.

(jj) *Solvency.* On and immediately after the Settlement Date, the Company (after giving effect to the settlement of the Rights Offering and the other transactions related thereto as described in each of the Registration Statement, the Offering Materials and the Prospectus) will be Solvent. As used in this paragraph, the term "Solvent" means, with respect to a particular date and entity, that on such date (i) the fair value (and present fair saleable value) of the assets of such entity is not less than the total amount required to pay the probable liability of such entity on its total existing debts and liabilities (including contingent liabilities) as they become absolute and matured; (ii) such entity is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business; (iii) assuming consummation of the Rights Offering as contemplated by this Agreement, the Registration Statement, the Offering Materials and the Prospectus, such entity does not have, intend to incur or believe that it will incur debts or liabilities beyond its ability to pay as such debts and liabilities mature; (iv) such entity is not engaged in any business or transaction, and does not propose to engage in any business or transaction, for which its property would constitute unreasonably small capital; and (v) such entity is not a defendant in any civil action that would result in a judgment that such entity is or would become unable to satisfy.

(kk) *U.S. Jurisdiction.* The Company has the power to submit, and pursuant to this Agreement and each other Transaction Document governed by New York law has submitted, or at the Closing Date will have submitted, legally, validly, effectively and irrevocably, to the personal jurisdiction of courts of the State of New York and of U.S. federal courts sitting in the Borough of Manhattan in The City of New York; and the Parent has the power to designate, appoint and empower, and pursuant to this Agreement and each other Transaction Document governed by New York law has, or at the Closing Date will have, designated, appointed and empowered, validly, effectively and irrevocably, an agent for service of process in any suit or proceeding based on or arising under this Agreement and each such Transaction Document in any U.S. Federal or New York State court in the Borough of Manhattan in the City of New York, as provided herein and in such Transaction Documents.

13

(ll)   *Certificates*. Each certificate signed by an officer or director of the Company and delivered to the Dealer Managers or counsel for the Dealer Managers pursuant to this Agreement shall be deemed to be a representation and warranty by the Company to the Dealer Managers as to the matters covered thereby.

(mm)   *Stamp Taxes*. There are no stamp, registration, documentary, capital or other issuance or transfer taxes or duties or other similar fees or charges ("**Stamp Taxes**") required to be paid by or on behalf of the Dealer Managers in India, the United States of America, Mauritius, any jurisdiction in which the Company is organized, or otherwise resident or has a permanent establishment for tax purposes, or any jurisdiction from or through which any payment is made or, in each case, any political subdivision thereof or any other applicable taxing jurisdiction in connection with the execution and delivery of the Transaction Documents or the offer, sale or resale of the Securities.

(nn)   *No Withholding Tax*. Except, in each case, as otherwise disclosed under the Registration Statement, any of the Offering Materials, the Prospectus, all payments to be made by the Company on or by virtue of the execution, delivery, performance or enforcement of the Transaction Documents and all interest, principal, premium, if any, additional amounts, if any, and other payments under the Transaction Documents, under the current laws and regulations of India, Mauritius, any jurisdiction in which the Company is organized, or otherwise resident or has a permanent establishment for tax purposes, or any jurisdiction from or through which any payment is made or, in each case, any political subdivision thereof or any other applicable taxing jurisdiction (each, a "**Taxing Jurisdiction**"), will not be subject to withholding, duties, levies, deductions, charges or other taxes under the current laws and regulations of the Taxing Jurisdiction and are otherwise payable free and clear of any other withholding, duty, levy, deduction, charge or other tax in the Taxing Jurisdiction and without the necessity of obtaining any governmental authorization in the Taxing Jurisdiction.

(oo)   *No Immunity*. None of the Company or any of its subsidiaries is subject to civil and commercial law in respect of their respective obligations under the Transaction Documents, and none of the Company or any of its respective properties, assets or revenues is subject to any right or immunity under Mauritius, India, U.S. federal or New York state law from any legal action, suit or proceeding, from the giving of any relief in any such legal action, suit or proceeding, from set-off or counterclaim, from the jurisdiction of any Mauritius, India, U.S. federal or New York state court, from service of process, attachment upon or prior to judgment, or attachment in aid of execution of judgment, or from execution of a judgment, or other legal process or proceeding for the giving of any relief or for the enforcement of a judgment, in any such court with respect to their respective obligations, liabilities or any other matter under or arising out of or in connection herewith; and, to the extent that the Company or any of its subsidiaries or any of their respective properties, assets or revenues may have or may hereafter become entitled to any such right of immunity in any such court in which proceedings arising out of, or relating to, the transactions contemplated by the Transaction Documents, may at any time be commenced, the Company has, pursuant to this Agreement, waived, and the Company will waive, or the Company will cause its subsidiaries to waive, such right to the extent permitted by law.

(pp)  *Enforcement of Foreign Judgments*. Any final judgment for a fixed or determined sum of money rendered by any U.S. federal or New York state court located in the State of New York having jurisdiction under its own laws in respect of any suit, action or proceeding against the Company based upon any of the Transaction Documents would be declared enforceable against the Company by the courts of Mauritius, by following the relevant procedures under the Laws of Mauritius without reconsideration or reexamination of the merits.

(qq)  *Valid Choice of Law*. The choice of laws of the State of New York as the governing law of the Transaction Documents that are expressed to be governed by such laws is a valid choice of law under the laws of Mauritius and will be honored by the courts of Mauritius.

(rr)  *Exchange Controls*. No exchange control authorization or any other authorization, approval, consent or license of any governmental or regulatory authority or court in Mauritius is required for the payment of any amounts payable under the Transaction Documents, and all interest, principal, premium, if any, additional amounts, if any, and other payments on or under the Transaction Documents; and all such payments will otherwise be free and clear of any other tax, duty, withholding or deduction in Mauritius or any political subdivision or taxing authority thereof or therein and may be paid in Mauritian Rupee that may be converted into another currency and freely transferred out of Mauritius, without the necessity of obtaining any governmental authorization in Mauritius or any political subdivision or taxing authority thereof or therein.

(ss)  *Indemnification and Contribution*. The indemnification and contribution provisions set forth in Section 6 hereof do not contravene Mauritius law or public policy.

(tt)  *No Requirement to Qualify to do Business*. It is not necessary under the laws of Mauritius that any holder of the Equity Shares or the Dealer Managers should be licensed, qualified or entitled to carry on business in Mauritius (i) to enable any of them to enforce their respective rights under the Transaction Document or the consummation of the transactions contemplated hereby or thereby or any other document to be delivered in connection herewith or therewith or (ii) solely by reason of the execution, delivery or performance of any such document.

(uu)  *No Mauritius Domicile*. None of the holders of the Securities, the Dealer Managers or the Trustee will be deemed resident, domiciled, carrying on business or subject to taxation in Mauritius on an overall income basis solely by the execution, delivery, performance or enforcement of the Transaction Documents or the issuance or sale of the Shares or by virtue of the ownership or transfer of Shares or the receipt of payments on any of the Transaction Documents.

(vv)  *Tax Benefits*. All tax waivers, if any, and other tax relief, concession and preferential treatment, if any, of the Company and each of its subsidiaries in each Taxing Jurisdiction are valid, binding and enforceable and do not violate any provision of any applicable law or statute or any order, rule or regulation of any local or national governmental agency other than those which would not be reasonably expected to have a Material Adverse Effect.

(ww)    *Mauritius Legal or Administrative Proceeding*. To ensure the legality, validity, enforceability or admissibility into evidence in a legal or administrative proceeding in Mauritius of this Agreement, it is not necessary that this Agreement be filed or recorded with any court or other government authority or regulatory body in Mauritius or that any registration tax, stamp duty or similar tax be paid in Mauritius on or in respect of any of this Agreement or any other document to be furnished hereunder, other than court costs, including (without limitation) filing fees and deposits to guarantee judgment required by a court of law in Mauritius.

**3      Covenants of the Company. The Company covenants and agrees with you that:**

(a)     The Company will advise the Dealer Managers promptly (i) when any amendment to the Registration Statement has been filed or becomes effective; (ii) when any supplement to the Prospectus or any Offering Materials or any amendment to the Prospectus has been filed or distributed, or when amendments to the Offering Materials have been distributed; (iii) of any request by the Commission for any amendment to the Registration Statement or any amendment or supplement to the Prospectus or the receipt of any comments from the Commission relating to the Registration Statement or any other request by the Commission for any additional information; (iv) of the issuance by the Commission of any order suspending the effectiveness of the Registration Statement or preventing or suspending the use of the Prospectus or the initiation or threatening of any proceeding for that purpose or pursuant to Section 8A of the Securities Act; (v) of the occurrence of any event or development within the Subscription Period as a result of which the Registration Statement, any of the Offering Materials, the Prospectus or any Issuer Free Writing Prospectus as then amended or supplemented would include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing when the Offering Materials, the Prospectus or any such Issuer Free Writing Prospectus is delivered to a Holder, not misleading; and (vi) of the receipt by the Company of any notice with respect to any suspension of the qualification of the Rights or Shares for offer and sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and the Company will use its commercially reasonable efforts to prevent the issuance of any such order suspending the effectiveness of the Registration Statement, preventing or suspending the use of the Prospectus or suspending any such qualification of the Rights or Shares and, if any such order is issued, will use its commercially reasonable efforts to obtain as soon as possible the withdrawal thereof. In the case of clause (y) above, the Company will promptly prepare an amendment or supplement which will correct such statement or omission or effect compliance with such requirements and, after having provided the Dealer Managers and its counsel with a reasonable opportunity to review and comment on such amendment or supplement, file with the Commission such amendment or supplement. The Company agrees to provide you with any other information relating to the Rights Offering, the Offering Materials or this Agreement that you may from time to time reasonably request.

(b)    The Company will cause copies of the Prospectus and any applicable Offering Materials (other than any press releases or newspaper advertisements relating to the Rights Offering) as in effect at such time to be mailed or otherwise delivered or made available to each Holder as soon as practicable on or after the Representation Date through the Subscription Agent in accordance with the Subscription Agreement. The Company will, without charge, furnish to the Dealer Managers, from time to time during the period when the Prospectus is required to be delivered under the Securities Act (without taking into account Rule 172 under the Securities Act), such number of printed copies of the Prospectus (as amended or supplemented) as the Dealer Managers may reasonably request for the purposes contemplated by the Securities Act. The Company authorizes you to use copies of the Offering Materials in connection with the performance of your duties hereunder.

(c)    The Company will take all necessary actions to cause the Shares to be approved for listing on the NYSE, subject to official notice of issuance.

(d)    The Company agrees that, unless it has or shall have obtained the prior written consent of the Dealer Managers, the Company will not make any offer relating to the Rights or Shares that would constitute an Issuer Free Writing Prospectus or that would otherwise constitute a "free writing prospectus" (as defined in Rule 405 under the Securities Act) such as those required to be filed by the Company with the Commission or retained by the Company under Rule 433 under the Securities Act; Any such free writing prospectus consented to by the Dealer Managers is hereinafter referred to as a "**Permitted Free Writing Prospectus**." The Company agrees that (x) it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus and (y) it has complied and will comply, as the case may be, with the requirements of Rules 164 and 433 under the Securities Act applicable to any Permitted Free Writing Prospectus, including in respect of timely filing with the Commission, legending and record keeping.

(e)    The Company will use the net proceeds from the issuance of Shares upon exercise of the Rights in the manner as described under the caption "Use of Proceeds" in the Prospectus.

(f)    To the extent known, and to the extent permitted by applicable law, the Company will advise or cause the Agents to advise the Dealer Managers as to the names of all Holders exercising Rights (and, upon reasonable request by the Dealer Managers, additional contact information for such holders) and the total number of Rights exercised by each Holder during the immediately preceding day, indicating the total number of Rights verified to be in proper form for exercise and being processed; and will notify the Dealer Managers, as soon as practicable following the Expiration Date, but in no event later than the required time for the Company or Subscription Agent to notify the Supporting Shareholders of their obligation to provide the agreed to funding pursuant to the Backstop Agreement, of the total number of Rights exercised and Shares related thereto, the total number of Rights verified to be in proper form for exercise and being processed.

(g)    The Company or any of its affiliates will not take, directly or indirectly, any action designed to or that would constitute or that might reasonably be expected to cause or result in the stabilization or manipulation of the price of any security of the Company to facilitate the issuance of the Rights or the issuance and sale of the Shares pursuant to the terms of the Rights Offering.

(h)     The Company will endeavor, if necessary, in cooperation with the Dealer Managers, to qualify the Rights and the Shares for offering and sale under the applicable securities laws of such states and other jurisdictions (domestic or foreign) as the Dealer Managers may designate and to maintain such qualifications in effect so long as required to consummate the Rights Offering; provided, however, that the Company shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or as a dealer in securities in any jurisdiction in which it is not so qualified or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

(i)     The Company will timely file such reports pursuant to the Exchange Act as are necessary in order to make generally available to its securityholders as soon as practicable an earnings statement for the purposes of, and to provide to the Dealer Managers the benefits contemplated by, the last paragraph of Section 11(a) of the Securities Act.

(j)     So long as the Rights are outstanding, the Company will furnish to you copies of all reports or other communications (financial or other) furnished to holders of the Rights, and copies of any reports and financial statements furnished to or filed with the Commission (collectively, the "**Filings**"), except for all such Filings filed by the Company with the Commission in electronic format on EDGAR.

(k)     The Company will comply in all material respects with the Securities Act and the Exchange Act, as applicable, and the rules of the NYSE, in conducting the Rights Offering and the issuance of Shares pursuant thereto as contemplated in the Registration Statement, the Prospectus and the Offering, each as amended or supplemented.

(l)     Subsequent to the date of the Prospectus and for so long as the delivery of a prospectus is required in connection with the offering or sale of the Rights, the Company will file all reports and documents required to be filed by the Company with the Commission pursuant to the Exchange Act within the time periods required by the Securities Act or the Exchange Act, as applicable.

**4**     **Conditions to Obligations of the Dealer Managers.** The obligations of each Dealer Manager hereunder are subject to the performance by the Company of its covenants and other obligations hereunder and to the following additional conditions:

(a)     The representations and warranties of the Company contained herein shall be true and correct on the date hereof and on and as of the Closing Date; and the statements of the Company and its officers made in any certificates delivered pursuant to this Agreement shall be true and correct on and as of the Closing Date.

(b)     The Dealer Managers shall have received on and as of the Representation Date and on the Settlement Date, a certificate of the Chief Executive Officer, the President, any Senior Vice President, any Vice President or any Assistant Vice President of the Company and of the principal financial or chief accounting officer of the Company, satisfactory to you, in which such officer, to the best of his or her knowledge after reasonable investigation, shall state: that the representations and warranties of the Company set forth in Section 2 of this Agreement are true and correct at and as of such dates; that the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to such dates; that subsequent to the respective dates as of which information is given in the Registration Statement, there has not been any event or development with respect to the Company and its subsidiaries taken as a whole that would reasonably be expected to result in a Material Adverse Effect, other than as set forth or contemplated in the Registration Statement. The officers signing the certificate may state that in making the statements set forth therein they have relied, to the extent they deem proper, upon one or more certificates of officers of subsidiaries of the Company.

(c) On the Representation Date and on the Settlement Date, Linklaters LLP, counsel to the Dealer Managers, shall have furnished to the Dealer Managers their written opinion and negative assurance letter, dated the respective date of delivery thereof, with respect to such matters as you may reasonably request and such counsel shall have received such papers and information as they may reasonably request to enable them to pass on such matters.

(d) On the Representation Date and on the Settlement Date, Dentons US LLP, counsel to the Company, shall have furnished to the Dealer Managers their written opinion and negative assurance letter, dated the respective date of delivery thereof, in form and substance reasonably satisfactory to you, to the effect set forth in Exhibit A.

(e) On the Representation Date and on the Settlement Date, Appleby, counsel to the Company, shall have furnished to the Dealer Managers their written opinion, dated the date thereof, in form and substance reasonably satisfactory to you, to the effect set forth in Exhibit B.

(f) On the Representation Date and on the Settlement Date, L&L Partners, counsel to the Dealer Managers shall have furnished to the Dealer Managers their written opinion and negative assurance letter, dated the date thereof, in form and substance reasonably satisfactory to you, to the effect set forth in Exhibit C.

(g) On the Representation Date, on the Expiration Date and on the Settlement Date, S.R. Batliboi & Co. LLP and Ernst & Young Associates LLP shall have furnished to the Dealer Managers, letters, dated the respective dates of delivery thereof and addressed to the Dealer Managers, in form and substance reasonably satisfactory to the Dealer Managers, containing statements and information of the type customarily included in accountants' "comfort letters" with respect to the financial statements and certain financial information contained in each of the Registration Statement, the applicable Offering Materials and the Prospectus; provided that the letter delivered on the Settlement Date shall use a "cut-off" date no more than three business days prior to the Settlement Date (or such other date as may be agreed among S.R. Batliboi & Co. LLP , Ernst & Young Associates LLP and the Dealer Managers).

(h) No order suspending the effectiveness of the Registration Statement shall be in effect, and no proceeding for such purpose or pursuant to Section 8A under the Securities Act shall be pending before or threatened by the Commission; the Prospectus and each Issuer Free Writing Prospectus shall have been timely filed with the Commission under the Securities Act (in the case of an Issuer Free Writing Prospectus, to the extent required by Rule 433 under the Securities Act) and in accordance with Section 3(a) hereof; and all requests by the Commission for additional information with regard to the Rights Offering shall have been complied with to the reasonable satisfaction of the Dealer Managers.

(i) No event or condition of a type described in Section 2(g) hereof shall have occurred or shall exist, which event or condition is not described in the Offering Materials (excluding any amendment or supplement thereto) and the Prospectus (excluding any amendment or supplement thereto) and the effect of which in the judgment of the Dealer Managers makes it impracticable or inadvisable to proceed with the Rights Offering or the delivery of the Shares on the terms and manner described in the Registration Statement and the Prospectus.

(j) No action shall have been taken, and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority that would prevent the making or consummation of the Rights Offering or the issuance of the Shares upon exercise of the Rights or prevent the Dealer Managers from rendering services pursuant to this Agreement or continuing so to act, as the case may be; and no injunction or order of any federal, state or foreign court shall have been issued that would prevent the making or consummation of the Rights Offering or the issuance of the Shares upon exercise of the Rights or prevent the Dealer Managers from rendering services pursuant to this Agreement or continuing so to act.

(k) On or prior to the Representation Date, the Expiration Date and the Settlement Date, the Company shall have furnished to the Dealer Managers such further information, certificates and documents as the Dealer Managers may reasonably request.

All opinions, letters, certificates and evidence mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof only if they are in form and substance reasonably satisfactory to counsel for the Dealer Managers.

## 5 Compensation and Expenses

(a) The Company has entered into side letters or engagement letters, as applicable, with each of the Dealer Managers, pursuant to which, the Company has agreed to pay a fee to each of the Dealer Managers as compensation for their services as Dealer Managers in connection with the Rights Offering.

(b) The Company further agrees to pay directly or reimburse the Dealer Managers for (i) all fees and expenses incurred in relation to the preparation, printing, filing, mailing or other distribution of the Prospectus and any Offering Materials, (ii) all fees and expenses of the Agents (including counsel therefor), (iii) all advertising charges in connection with the Rights Offering, including those of any public relations firm or other person or entity rendering services in connection therewith, (iv) all fees, if any, payable to Dealers (including the Dealer Managers) and banks and trust companies as reimbursement for their customary mailing and handling fees and expenses incurred in forwarding the Offering Materials to their customers, (v) the preparation, printing, authentication, issuance and delivery of the Rights or the Shares issuable on exercise of the Rights, including any stamp, transfer or similar taxes in connection with the Rights Offering, (vi) the preparation, printing (or reproduction) and delivery of this Agreement and all other agreements or documents prepared, printed (or reproduced) and delivered in connection with the Rights Offering; (vii) any fees and expenses relating to the registration or qualification of the Rights and Shares under the securities or blue sky laws of the several states of the United States, (viii) any filings required to be made with FINRA; (ix) the transportation and other expenses incurred by or on behalf of representatives of the Company and the Dealer Managers in connection with investor presentations; (x) the fees and expenses of the accountants of the Company and the fees and expenses of counsel (including local and special counsel) for the Company; (xi) the fees and expenses of the transfer agent (and any counsel therefor); (xii) all expenses and application fees related to the Rights being made eligible for clearance and settlement through the Depositary Trust Company and for the listing on the NYSE; and (xiii) the fees and expenses of counsel (including local and special counsel) for the Dealer Managers.

**6      Indemnification and Contribution**

(a)     *Indemnification of the Dealer Managers.* The Company agrees to indemnify and hold harmless each Dealer Manager, its affiliates, directors, officers, employees and agents and each person, if any, who controls such Dealer Manager within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act or any such other persons (each a "**Dealer Manager Indemnified Person**"), from and against any and all losses, claims, damages and liabilities (including, without limitation, legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred), joint or several, that arise out of, or are based upon, (i) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement, the Offering Materials, the Prospectus or any Issuer Written Communication (or any amendment or supplement thereto); (ii) any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Dealer Manager furnished to the Company in writing by such Dealer Manager expressly for use therein; (iii) any withdrawal, termination, rescission or modification by the Company of, or failure by the Company to make or consummate the Rights Offering; or (iv) any breach by the Company of any representation or warranty or failure to comply with any of the agreements contained herein, or otherwise in any way, arising out of, relating to or in connection with or alleged to, in any way, in connection with the Rights Offering, this Agreement or the Dealer Managers' role in connection therewith.

(b)     *Indemnification of the Company*. Each Dealer Manager agrees, severally and not jointly, to indemnify and hold harmless the Company, each of its affiliates, directors, officers, employees and agents and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the indemnity set forth in paragraph (a) above, but only with respect to any losses, claims, damages or liabilities that arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to such Dealer Manager furnished to the Company in writing by such Dealer Manager expressly for use in the Registration Statement, the Offering Materials, the Prospectus or any Issuer Written Communication (or any amendment or supplement thereto), it being understood and agreed that such information consists of the Dealer Managers Information.

(c)      *Notice and Procedures.* If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any person in respect of which indemnification may be sought pursuant to either paragraph (a) or (b) above, such person (the "**Indemnified Person**") shall promptly notify the person against whom such indemnification may be sought (the "**Indemnifying Person**") in writing; provided that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have under paragraph (a) or (b) above except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and provided, further, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have to an Indemnified Person otherwise than under paragraph (a) or (b) above. If any such proceeding shall be brought or asserted against an Indemnified Person and it shall have notified the Indemnifying Person thereof, the Indemnifying Person shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section 6 that the Indemnifying Person may designate in such proceeding and shall pay the fees and expenses of such proceeding and shall pay the reasonable fees and expenses of such counsel related to such proceeding, as incurred. In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary; (ii) the Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to the Indemnified Person; (iii) the Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the Indemnifying Person; or (iv) the named parties in any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood and agreed that the Indemnifying Person shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Indemnified Persons, and that all such fees and expenses shall be paid or reimbursed as they are incurred. Any such separate firm for any Dealer Manager, its affiliates, directors and officers and any control persons of such Dealer Manager shall be designated in writing by the Dealer Managers and any such separate firm for the Company, its directors and officers and any control persons of the Company shall be designated in writing by the Company. The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an Indemnified Person shall have requested that an Indemnifying Person reimburse the Indemnified Person for reasonable fees and expenses of counsel as contemplated by this paragraph, the Indemnifying Person shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the Indemnifying Person of such request and (ii) the Indemnifying Person shall not have reimbursed the Indemnified Person in accordance with such request prior to the date of such settlement. No Indemnifying Person shall, without the written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could have been a party and indemnification could have been sought hereunder by such Indemnified Person, unless such settlement (x) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, from all liability on claims that are the subject matter of such proceeding and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     *Contribution*. If the indemnification provided for in paragraph (a) or (b) above is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Dealer Managers on the other from Rights Offering or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company on the one hand and the Dealer Managers on the other in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the Dealer Managers on the other shall be deemed to be in the same respective proportions as the net proceeds (before deducting expenses) received by the Company from the sale of the Shares bear to the total fees received by the Dealer Managers, as provided in this Agreement. The relative fault of the Company on the one hand and the Dealer Managers on the other shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Dealer Managers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(e)     *Limitation on Liability*. The Company and the Dealer Managers agree that it would not be just and equitable if contribution pursuant to this Section 6 were determined by pro rata allocation (even if the Dealer Managers were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in paragraph (d) above. The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in paragraph (d) above shall be deemed to include, subject to the limitations set forth above, any legal or other expenses incurred by such Indemnified Person in connection with any such action or claim. Notwithstanding the provisions of this Section 6, in no event shall any Dealer Managers be required to contribute any amount in excess of the amount by which the total fees received by such Dealer Managers hereunder exceed the amount of any damages that such Dealer Manager has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Dealer Managers' obligations to contribute pursuant to this Section 6 are several in proportion to their respective fees received hereunder and not joint.

(f) *Non-Exclusive Remedies.* The remedies provided for in this Section 6 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any Indemnified Person at law or in equity.

**7** **Termination.** This Agreement shall terminate upon the earlier to occur of (i) the issuance of Shares pursuant to the exercise of Rights and (ii) the earlier withdrawal or termination of the Rights Offering. This Agreement may be terminated by either the Company or you at any time, with or without cause, effective upon receipt by the other party of written notice to that effect.

**8** **Survival.** The provisions of Sections 1(d), 2, 5, 6, 9, 10, 11, 12 and 14 hereof shall remain operative and in full force and effect regardless of (i) any failure by the Company to commence, or the withdrawal, termination or consummation of, the Rights Offering or issuance of Shares upon exercise of the Rights, (ii) any investigation made by or on behalf of any party hereto, (iii) any withdrawal by you as a Dealer Managers and (iv) any termination of this Agreement.

**9** **Certain Defined Terms.** For purposes of this Agreement, (a) except where otherwise expressly provided, the term "affiliate" has the meaning set forth in Rule 405 under the Securities Act; (b) the term "business day" means any day other than a day on which banks are permitted or required to be closed in New York City; (c) the term "subsidiary" has the meaning set forth in Rule 405 under the Securities Act; and (d) the term "significant subsidiary" has the meaning set forth in Rule 1-02 of Regulation S-X under the Exchange Act.

**10** **Notices.** All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be given (and shall be deemed to have been given upon receipt) by delivery in person, by telecopy, by e-mail or by registered or certified mail (postage prepaid, return receipt requested) to the applicable party at the addresses indicated below:

(a) if to HSBC Securities (USA) Inc.

HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018

24

Attention: Transaction Management Group
Email: tmg.americas@us.hsbc.com
Fax: (646) 366-3229

with a copy (which shall not constitute notice) to:

Linklaters LLP
1290 Avenue of the Americas
New York, New York 10104

Attention: Jeffrey Cohen
E-mail: Jeffrey.cohen@linklaters.com

(b)   if to Roth Capital Partners, LLC:

Roth Capital Partners, LLC,
888 San Clemente Drive
Newport Beach, CA 92660

Attention: Equity Capital Markets
E-mail: rothecm@roth.com

with a copy (which shall not constitute notice) to:

Linklaters LLP
1290 Avenue of the Americas
New York, New York 10104

Attention: Jeffrey Cohen
E-mail: Jeffrey.cohen@linklaters.com

(c)   if to the Company:

Azure Power Global Limited

Azure Power Global Limited
c/o AAA Global Services Ltd,
1st Floor, The Exchange
18 Cybercity, Ebene
Mauritius Attention: Muhammad Khalid Peyrye
E-mail: khalid.peyrye@aaa.com.mu

with a copy (which shall not constitute notice) to:

Dentons US LLP

2000 McKinney Avenue, Suite 1900
Dallas, TX 75201
Attention: John Chrisman
E-mail: john.chrisman@dentons.com

**11**   **Governing Law.** This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**12**     **Submission to Jurisdiction.** The Company hereby submits to the non-exclusive jurisdiction of the U.S. federal and New York state courts in the Borough of Manhattan in The City of New York in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. The Company waives any objection which it may now or hereafter have to the laying of venue of any such suit or proceeding in such courts. The Company agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon the Company, and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment. The Company irrevocably appoints C T Corporation System, located at 28 Liberty Street, New York, NY 10005, as its authorized agent in the Borough of Manhattan in The City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process in any manner permitted by applicable law upon such authorized agent, and written notice of such service to the Company, by the person serving the same to the address provided in this Section 12, shall be deemed in every respect effective service of process upon the Company in any such suit or proceeding. The Company hereby represents and warrants that such authorized agent has accepted such appointment and has agreed to act as such authorized agent for service of process. The Company further agrees that they shall take any and all action as may be necessary to maintain such designation and appointment of such authorized agent in full force and effect for a period of six years from the date of this Agreement.

**13**     **Waiver of Jury Trial.** The parties hereto hereby waive any right to trial by jury in any suit or proceeding arising out of or relating to this Agreement.

**14**     **Judgment Currency.** The Company agrees to indemnify each Dealer Manager, its directors, officers, affiliates and each person, if any, who controls such Dealer Manager within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, against any loss incurred by such Dealer Manager as a result of any judgment or order being given or made for any amount due hereunder and such judgment or order being expressed and paid in a currency (the "**Judgment Currency**") other than U.S. dollars and as a result of any variation as between (i) the rate of exchange at which the U.S. dollar amount is converted into the Judgment Currency for the purpose of such judgment or order, and (ii) the rate of exchange at which such indemnified person is able to purchase U.S. dollars with the amount of the Judgment Currency actually received by the indemnified person. The foregoing indemnity shall constitute a separate and independent obligation of the Company and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

**15**     **Waiver of Immunity.** To the extent that the Company has or hereafter may acquire any immunity (sovereign or otherwise) from jurisdiction of any court of (i) Mauritius, or any political subdivision thereof, (ii) the United States or the State of New York, or (iii) any jurisdiction in which it owns or leases property or assets or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, set-off or otherwise) with respect to themselves or their respective property and assets or this Agreement, the Company hereby irrevocably waives such immunity in respect of its obligations under this Agreement to the fullest extent permitted by applicable law.

**16   Persons Entitled to Benefit of Agreement.** This Agreement shall inure to the benefit of and be binding upon the Company and you and each parties' respective successors and the officers and directors and any controlling persons referred to herein, and the affiliates of each Dealer Manager referred to in Section 6 hereof. Nothing in this Agreement is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

**17   Recognition of the U.S. Special Resolution Regimes.**

(a)   If any Dealer Manager that is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Dealer Manager of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Agreement, and any such interest and obligation, were governed by the laws of the United States or a state of the United States.

(b)   If any Dealer Manager that is a Covered Entity or a BHC Act Affiliate of such Dealer Manager becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against the Dealer Managers are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if this Agreement were governed by the laws of the United States or a state of the United States.

As used in this Section 17:

"**BHC Act Affiliate**" has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k).

"**Covered Entity**" means any of the following:

(i)   a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)   a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)   a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1 as applicable.

"**U.S. Special Resolution Regime**" means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

**18   Counterparts; Electronic Signatures.** This Agreement may be signed in counterparts (which may include counterparts delivered by any standard form of telecommunication), each of which shall be an original and all of which together shall constitute one and the same instrument. The parties hereto agree and consent to the use of electronic signatures solely for the purposes of executing this Agreement or any related transactional document (including any amendments thereto). Such electronic signature shall be deemed to have the same full and binding effect as a handwritten signature.

**19**    **Amendments or Waivers.** No amendment or waiver of any provision of this Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the Company and you.

**20**    **Headings.** The headings herein are included for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

**21**    **Compliance with USA PATRIOT Act.** In accordance with the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Dealer Managers are required to obtain, verify and record information that identifies their respective clients, including the Issuer, which information may include the name and address of their respective clients, as well as other information that will allow the Dealer Managers to properly identify their respective clients.

Please indicate your willingness to act as Dealer Managers and your acceptance of the foregoing provisions by signing in the space provided below for that purpose and returning to us a copy of this Agreement so signed, whereupon this Agreement and your acceptance shall constitute a binding agreement among the Company and you.

Very truly yours

AZURE POWER GLOBAL LIMITED

By: /s/ Sandeep Arora
    Name: Sandeep Arora
    Title: Sr. Vice President, Capital

Accepted as of the date first above written:

HSBC SECURITIES (USA) INC.

By: /s/ Jeffrey Nicklas
    Name: Jeffrey Nicklas
    Title: Managing Director

Accepted as of the date first above written:

ROTH CAPITAL PARTNERS, LLC

By: /s/ Aaron M. Gurewitz
    Name: Aaron M. Gurewitz
    Title: Head of Equity Capital Markets



Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
United States

dentons.com

*Dentons US draft of 12/20/21 -- subject to opinion committee review*

December [ ● ], 2021

HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018

Roth Capital Partners, LLC
888 San Clemente Drive
Newport Beach, CA 92660

Ladies and Gentlemen:

We have acted as special U.S. counsel to Azure Power Global Limited, a Mauritius global business company (the "Company"), in connection with distributing at no charge to the record holders of its equity shares, par value $0.000625 per share (the "Shares"), as of 5:00 p.m., U.S. Eastern Time, on December 30, 2021, transferable subscription rights (the "Rights") to purchase up to an aggregate of [_____] Shares pursuant to the Dealer Manager Agreement, dated as of December [ ● ], 2021 (the "Agreement") by and among the Company and HSBC Securities (USA) Inc. and Roth Capital Partners, LLC, as dealer managers thereunder (the "Dealer Managers"). All capitalized terms used herein and not expressly defined herein have the definitions specified in the Agreement.

This opinion is being delivered pursuant to Section 4(d) of the Agreement at the request of the Company.

In connection with rendering this opinion, we have examined originals, certified copies or copies otherwise identified as being true copies of the following:

(a)    the Agreement;

(b)    the Backstop Commitment Agreement (the "Backstop Agreement") by and among the Company, CDPQ Infrastructures Asia Pte Ltd. and OMERS Infrastructure Asia Holdings Pte. Ltd., dated as of December [ ● ], 2021 ;

(c)    the Subscription Agent Agreement (the "Subscription Agent Agreement") by and among the Company, Computershare Inc. and Computershare Trust Company, N.A., dated as of December [ ● ], 2021;

(d)    the Information Agent Agreement (the "Information Agent Agreement") between the Company and Georgeson LLC, dated as of December [ ● ], 2021; and

Sirote ► Adepetun Caxton-Martins Agbor & Segun ► Davis Brown ► East African Law Chambers ► Eric Silwamba, Jalasi and Linyama ► Durham Jones & Pinegar ► LEAD Advogados ► Rattagan Macchiavello Arocena ► Jiménez de Aréchaga, Viana & Brause ► Lee International ► Kensington Swan ► Bingham Greenebaum ► Cohen & Grigsby ► Sayarh & Menjra ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms



    (e)       the registration statement on Form F-3 (File No. 333-249479) (the "<u>Registration Statement</u>"), which Registration Statement the Company initially filed with the Securities and Exchange Commission (the "<u>Commission</u>") on October 14, 2020, along with the base prospectus contained therein (the "<u>Base Prospectus</u>"), as supplemented by the prospectus supplement which the Company filed with the Commission on December [ ● ], 2021 (together with the Base Prospectus, the "<u>Prospectus</u>"), and which Registration Statement, as amended by Post-Effective Amendment No. 1, filed on November 10, 2021, by Post-Effective Amendment No. 2, filed on December 10, 2021, and as further amended by Post-Effective Amendment No. 3, filed on December 15, 2021, took effect on December 17, 2021 (the "<u>Effective Date</u>").

The Agreement, the Backstop Agreement, the Subscription Agent Agreement and the Information Agent Agreement are sometimes referred to herein collectively as the "<u>Transaction Documents</u>".

In addition, we have examined originals or copies authenticated to our satisfaction of such corporate records, certificates of officers of the Company and public officials, and other documents as we have deemed relevant or necessary in connection with our opinions set forth herein. We have relied, without independent verification, on certificates of public officials and, as to questions of fact material to such opinions, upon the representations of the Company set forth in the Transaction Documents, certificates of officers and other representatives of the Company and factual information we have obtained from such other sources as we have deemed reasonable. We have assumed without investigation that there has been no relevant change or development between the dates as of which the information cited in the preceding sentence was given and the date of this opinion letter. We have not independently verified the accuracy of the matters set forth in the written statements or certificates upon which we have relied, nor have we undertaken any lien, suit or judgment searches or searches of court dockets in any jurisdiction.

We have assumed (i) the genuineness and authenticity of all documents examined by us and all signatures thereon, and the conformity to originals of all copies of all documents examined by us; (ii) that the execution, delivery and/or acceptance of the Transaction Documents have been duly authorized by all action, corporate or otherwise, necessary by each of the parties to the Transaction Documents; (iii) the legal capacity of all natural persons executing the Transaction Documents; (iv) that each of the parties to the Transaction Documents has satisfied those legal requirements that are applicable to it to the extent necessary to make the Transaction Documents enforceable against it; (v) that each of the Transaction Documents constitutes a valid and binding obligation of each of the parties to the Transaction Documents other than the Company (those parties other than the Company and are hereinafter collectively referred to as the "<u>Other Parties</u>") and is enforceable against the Other Parties in accordance with its terms; (vi) that each of the parties to the Transaction Documents has complied with all legal requirements pertaining to its status as such status relates to its rights to enforce the Transaction Documents; (vii) that the Transaction Documents accurately describe and contain the mutual understandings of the parties, and that there are no oral or written statements or agreements or usages of trade or courses of prior dealings among the parties that would modify, amend or vary any of the terms of the Transaction Documents; (viii) that each of the parties to the Transaction Documents will act in accordance with, and will refrain from taking any action that is forbidden by, the terms and conditions of the Transaction Documents; (ix) the constitutionality or validity of a relevant statute, rule, regulation or agency action is not in issue; (x) all agreements other than the Transaction Documents with respect to which we have provided advice in our opinion letter or reviewed in connection with our opinion letter would be enforced as written; (xi) that there has not been any mutual mistake of fact or misunderstanding, fraud, duress or undue influence; and (xiii) that each of the parties to the Transaction Documents and any agent acting for it in connection with the Transaction Documents have acted without notice of any defense against the enforcement of any rights created by, or adverse claim to any property transferred pursuant to, the Transaction Documents.

 
As used in this opinion letter with respect to any matter, the qualifying phrase "to our knowledge" or "our actual knowledge" or such similar phrase limits the statements it qualifies to the conscious awareness of facts or other information by: (i) the lawyer signing this opinion letter; and (ii) any lawyer who has had active involvement in negotiating or preparing the Transaction Documents or preparing this opinion letter. In this regard, it is noted that we have not made any special review or investigation in connection with rendering any opinion so qualified.

Based on the foregoing, and in reliance thereon, and subject to the qualifications, limitations and exceptions stated herein, we are of the opinion, having due regard for such legal considerations as we deem relevant, that:

1.      The execution and delivery by the Company of each of the Transaction Documents to which it is a party and the performance by it of its respective obligations thereunder, did not, and does not (i) violate any U.S. federal law or law of the State of New York applicable to it or (ii) require it to obtain any approval, consent or waiver of, or make any filing with, any U.S. federal or State of New York governmental agency or body (other than (a) approvals, consents or waivers already obtained or filings already made or (b) consents, waivers, authorizations or orders under state securities or blue sky laws as to which we express no opinion).

2.      Each Transaction Document is a valid and binding obligation of the Company and is enforceable against the Company in accordance with its terms.

3.      [Under the laws of the State of New York relating to personal jurisdiction, the Company has, pursuant to Section 12 of the Dealer Manager Agreement, Section 5.6 of the Backstop Agreement, Section 19.7 of the Subscription Agent Agreement and paragraph (g) of the Information Agent Agreement, validly and irrevocably submitted to the non-exclusive personal jurisdiction of any state or U.S. federal court located in the [Borough of Manhattan], the City of New York, New York (each a "New York Court") in any action arising out of or relating to the Dealer Manager Agreement, the Backstop Agreement, the Subscription Agent Agreement, the Information Agent Agreement or the transactions contemplated thereby, has validly and irrevocably waived to the fullest extent it may effectively do so any objection to the venue of a proceeding in any such New York Court and has validly and irrevocably appointed the [Authorized Agent] as its authorized agent for the purpose described in Section 12 of the Dealer Manager Agreement, [Section [XX] of the Backstop Agreement, Section [XX] of the Subscription Agent Agreement and Section [XX] of the Information Agent Agreement]; and service of process effected on such agent in the manner set forth in Section 12 of the Dealer Manager Agreement, [Section [XX] of the Backstop Agreement, Section [XX] of the Subscription Agent Agreement and Section [XX] of the Information Agent Agreement] will be effective to confer valid personal jurisdiction on the Company][1]

4.      The Company is not and, after giving effect to the distribution of the Rights and delivery of the Shares upon exercise of the Rights as described in the Prospectus, will not be an "investment company" as such term is defined in the Investment Company Act of 1940.

---

[1] NTD: Scope of this opinion para still to be discussed. Each such agreement does not likely cover each of these points or not in this precise manner….

 
5.     The statements under the captions "Description of Equity Shares", "Description of Warrant or Rights" and "Material U.S. Federal Income Tax Considerations" in the Prospectus, together with the Company free writing prospectuses listed in Exhibit A to the Dealer Manager Agreement, in each case to the extent that those statements constitute matters of U.S. federal tax law or State of New York laws or legal conclusions with respect thereto, while not purporting to discuss all possible consequences of the transactions to which they relate, are correct in all material respects with respect to those consequences or matters that are discussed therein.

6.     The Registration Statement and the Prospectus, as of the Effective Date, complied as to form in all material respects with the requirements the Securities Act of 1933 and the applicable rules and regulations of the Commission thereunder.

Our opinions as herein expressed are subject to the following qualifications and limitations:

1.     Our opinions are subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws. This exception includes:

a.     the federal Bankruptcy Code and thus comprehends, among others, matters of turn-over, automatic stay, avoiding powers, fraudulent transfer, preference, discharge, conversion of a non-recourse obligation into a recourse claim, limitations on *ipso facto* and anti-assignment clauses and the coverage of pre-petition security agreements applicable to property acquired after a petition is filed;

b.     all other federal and state bankruptcy, insolvency, reorganization, receivership, moratorium, arrangement and assignment for the benefit of creditors laws that affect the rights of creditors generally or that have reference to or affect only creditors of specific types of debtors;

c.     state fraudulent transfer and conveyance laws; and

d.     judicially developed doctrines in this area, such as substantive consolidation of entities and equitable subordination.

2.     Our opinions are subject to the effect of general principles of equity, whether applied by a court of law or equity. This limitation includes principles:

a.     governing the availability of specific performance, injunctive relief or other equitable remedies, which generally place the award of such remedies, subject to certain guidelines, in the discretion of the court to which application for such relief is made;

b.     affording equitable defense (e.g., waiver, laches and estoppel) against a party seeking enforcement;

c.     requiring good faith and fair dealing in the performance and enforcement of a contract by the party seeking its enforcement;

d.     requiring reasonableness in the performance and enforcement of an agreement by the party seeking enforcement of the contract;



e.      requiring consideration of the materiality of (i) a breach and (ii) the consequences of the breach to the party seeking enforcement;

f.      requiring consideration of the impracticability or impossibility of performance at the time of attempted enforcement; and

g.      affording defenses based upon the unconscionability of the enforcing party's conduct after the parties have entered into the contract.

3.      The opinion regarding enforceability set forth above is subject to the qualification that certain provisions of the contracts covered by this opinion letter may be unenforceable, but such unenforceability will not, subject to the other exceptions, qualifications and limitations in this opinion letter, render the contract invalid as a whole or substantially interfere with realization of the principal benefits provided by the contract.

4.      Our opinions are subject to the effect of the rules of law that:

a.      limit or affect the enforcement of provisions of a contract that purport to waive, or to require waiver of, (i) the obligations of good faith, fair dealing, diligence and reasonableness, (ii) broadly or vaguely stated rights, (iii) statutory, regulatory or constitutional rights, except to the extent that the statute, regulation or constitution explicitly allows waivers; (iv) unknown future defenses; and (v) rights to damages.

b.      provide that choice of law, forum selection, consent to jurisdiction, and jury waiver clauses in contracts are not necessarily binding;

c.      limit the availability of a remedy under certain circumstances where another remedy has been elected;

d.      provide a time limitation after which a remedy may not be enforced;

e.      limit the enforceability of provisions releasing, exculpating or exempting a party from, or requiring indemnification of a party for, liability for its own action or inaction, to the extent the action or inaction involves gross negligence, recklessness, willful misconduct, unlawful conduct, or violations of federal or state securities laws or regulations or public policy;

f.      may, where less than all of a contract may be unenforceable, limit the enforceability of the balance of the contract to circumstances in which the unenforceable portion is not an essential part of the agreed exchange;

g.      govern and afford judicial discretion regarding the determination of damages and entitlement to attorneys' fees and other costs;

h.      may permit a party that has materially failed to render or offer performance required by the contract to cure that failure unless (i) permitting a cure would unreasonably hinder the aggrieved party from making substitute arrangements for performance, or (ii) it was important in the circumstances to the aggrieved party that performance occur by the date stated in the contract;


   i.  limit enforcement of time is of-the-essence clauses; and

   j  provide that covenants requiring party to use "best efforts" or variants thereof may not be enforceable if lacking objective guidelines for performance.

5. We express no opinion as to the laws of any jurisdiction other than the laws of the State of New York (excluding local laws) and the federal laws of the United States of America.

This opinion is rendered on the date hereof, and we have no continuing obligation hereunder to inform you of changes of law or fact subsequent to the date hereof or facts of which we have become aware after the date hereof.

This opinion is solely for your benefit and may not be furnished to, or relied upon by, any other person or entity without the express prior written consent of the undersigned. This opinion is limited to the matters set forth herein; no opinion may be inferred or implied beyond the matters expressly stated in this letter. This opinion may, however, be disclosed by you (i) to the extent required by law, regulation or any governmental or competent regulatory authority, (ii) in connection with legal proceedings in relation to the distribution of the Rights or (iii) to your affiliates in relation to the distribution of the Rights.

Very truly yours,



Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
United States

dentons.com

*Dentons US draft of 12/20/21 -- subject to opinion committee review*

December [ ● ] , 2021

HSBC Securities (USA) Inc.
452 Fifth Avenue
New York, New York 10018

Roth Capital Partners, LLC
888 San Clemente Drive
Newport Beach, CA 92660

Ladies and Gentlemen:

We have acted as special U.S. counsel, to Azure Power Global Limited, a Mauritius global business company (the "Company"), in connection with distributing, at no charge, to the record holders of its equity shares, par value $0.000625 per share (the "Shares"), as of 5:00 p.m., U.S. Eastern Time, on December 30, 2021, transferable subscription rights (the "Rights") to purchase up to an aggregate of [_____] Shares pursuant to the Dealer Manager Agreement, dated as of December [ ● ], 2021 (the "Agreement") by and among the Company and HSBC Securities (USA) Inc. and Roth Capital Partners, LLC, as dealer managers thereunder (the "Dealer Managers"). The Company registered the Shares to be issued and sold upon the exercise of the Rights by means of a registration statement on Form F-3 (File No. 333-249479), as amended (the "Registration Statement"), which Registration Statement the Company initially filed with the Securities and Exchange Commission (the "Commission") on October 14, 2020, along with the base prospectus contained therein (the "Base Prospectus"), as supplemented by the prospectus supplement which the Company filed with the Commission on December [21], 2021 (together with the Base Prospectus, the "Prospectus"), and which Registration Statement, as amended by Post-Effective Amendment No. 1, filed on November 10, 2021, by Post-Effective Amendment No. 2, filed on December 10, 2021, and as further amended by Post-Effective Amendment No. 3, filed on December 15, 2021, took effect on December 17, 2021 (the "Effective Date"). All capitalized terms used herein and not expressly defined herein have the definitions specified in the Agreement.

We have assumed, for purposes of this letter, the conformity of each document filed with the Commission through the EDGAR system to the printed document which we have reviewed.

The primary purpose of our engagement was not to establish or confirm factual matters or financial or accounting matters, and we have not independently verified the accuracy, completeness or fairness of the statements made or included in the Registration Statement or in the Prospectus or in any amendments or supplements thereto (including any documents incorporated by reference or deemed to be incorporated by reference therein), and we take no responsibility therefor. In connection with our engagement, we have participated in conferences with officers and other representatives of the Company, representatives of the registered public accounting firm of the Company, and you at which the contents of the Registration Statement and the Prospectus and any amendments or supplements thereto (including any documents incorporated by reference or deemed to be incorporated by reference therein) and related matters were discussed.

**Rattagan Macchiavello Arocena ► Jiménez de Aréchaga, Viana & Brause ► Lee International ► Kensington Swan ► Bingham Greenebaum ► Cohen & Grigsby ► Sayarh & Menjra ► Larraín Rencoret ► Hamilton Harrison & Mathews ► Mardemootoo Balgobin ► HPRP ► Zain & Co. ► Delany Law ► Dinner Martin ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms**



Based upon such participation and discussions and subject to the foregoing, no facts have come to our attention that have caused us to believe that (i) the Registration Statement, including the documents incorporated by reference therein, as of the Effective Date, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the [Disclosure Package], at the [Time of Sale], contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or (iii) the Prospectus, as of the date hereof, contained or contains an untrue statement of a material fact or omitted or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (except that, in each case, we express no belief, and make no statement, with respect to the accuracy, completeness or fairness of the financial statements, including the notes and schedules thereto, and any other financial, accounting or statistical information or data derived therefrom, included or incorporated by reference therein or omitted therefrom).

This letter is rendered on the date hereof, and we have no continuing obligation hereunder to inform you of changes of law or fact subsequent to the date hereof or facts of which we have become aware after the date hereof.

This letter is solely for your benefit and may not be furnished to, or relied upon by, any other person or entity without the express prior written consent of the undersigned. This letter is limited to the matters set forth herein; no opinion may be inferred or implied beyond the matters expressly stated in this letter.

Very truly yours,

**APPLEBY**

HSBC Securities (USA) Inc.
Roth Capital Partners, LLC
(as "Dealer Managers")

Email  mmoller@applebyglobal.com
mkoomar@applebyglobal.com

Direct Dial  +230 203 4301

Tel  +230 203 4300
Fax  +230 210 8792

Your Ref
Appleby Ref

429640.0027

[  ] 2021

Mauritius Office 7th Floor Happy World House 37, Sir William Newton Street Port Louis Republic of Mauritius   Tel +230 203 4300   applebyglobal.com

Dear Sirs and Madams:

**INTRODUCTION**

This opinion as to Mauritius law is addressed to you in connection with the sale by Azure Power Global Limited, a public company limited by shares incorporated under the laws of Mauritius (the "**Company**"), of [ ] equity shares (the "**Shares**") of par value $0.000625 per equity share upon the exercise of rights (the "**Rights**") distributed by the Company in a rights offering pursuant to the Company's prospectus supplement (the "**Prospectus Supplement**") as amended or supplemented which is part of a registration statement on Form F-3, on 14 October 2020 (File No. 333-249479), as amended from time to time (the "**Prospectus**") filed with the U.S. Securities and Exchange Commission under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and a dealer manager agreement dated [ ] among the Dealer Managers and the Company (the "**Dealer Manager Agreement").**

**OUR REVIEW**

For the purposes of giving this opinion we have examined and relied upon the documents listed in Part 1 of Schedule 1 (the "**Documents**") and the documents listed in Part 2 of Schedule 1.

For the purposes of giving this opinion we also have carried out the Company Search described in Part 3 of Schedule 1.

We have not made any other enquiries concerning the Company and in particular we have not investigated or verified any matter of fact or opinion (whether set out in any of the Documents or elsewhere) other than as expressly stated in this opinion.

Unless otherwise defined herein, capitalised terms have the meanings assigned to them in Schedule 1.

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich



**LIMITATIONS**

Our opinion is limited to, and should be construed in accordance with, the laws of Mauritius at the date of this opinion. We express no opinion on the laws of any other jurisdiction.

This opinion is strictly limited to the matters stated in it and does not extend to, and is not to be extended by implication, to any other matters. We express no opinion as to the accuracy or correctness of the number of shares issued by the Company or any financial data or figures provided in the Prospectus or the Prospectus Supplement. We express no opinion on the commercial implications of the Documents or whether they give effect to the commercial intentions of the parties.

This opinion is addressed to you as Dealer Manager in connection with the registration of the Shares with the United States Securities and Exchange Commission and is not to be made available to, or relied on by any other person or entity, or for any other purpose nor quoted or referred to in any public document nor filed with any governmental agency or person, without our prior written consent, except (i) to the extent required by law, regulation or any governmental or competent regulatory authority, (ii) in connection with legal proceedings in relation to the distribution of the Rights or (iii) to your affiliates in relation to the distribution of the Rights.. Further, this opinion speaks as of its date and is strictly limited to the matters stated herein and we assume no obligation to review or update this opinion if applicable laws or the existing facts or circumstances should change.

**ASSUMPTIONS AND RESERVATIONS**

We give the following opinions on the basis of the assumptions set out in Schedule 2 (**Assumptions**), which we have not verified, and subject to the reservations set out in Schedule 3 (**Reservations**).

**OPINIONS**

1.  The Company is a global licence company incorporated with limited liability and existing under the laws of Mauritius and is a separate legal entity. The Company is in good standing with the Registrar of Companies.

2.  The Company is a holder of a global business licence issued by the Financial Services Commission of Mauritius.

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ London □ Mauritius □ Seychelles □ Shanghai □ Zurich



3. The Company has the requisite capacity and power to enter into, execute and deliver the Transaction Agreements to which it is a party and to perform its obligations thereunder.

4. The Company has taken all necessary corporate action to authorise the execution and delivery of the Transaction Agreements and the sale of the Shares pursuant to Dealer Manager Agreement.

5. The due execution and delivery by the Company of the Transaction Agreements and the sale of the Shares pursuant to the Dealer Manager Agreement will not

   (i)     contravene any provisions of the Constitutional Documents or

   (ii)    violate or contravene any law or regulation of Mauritius.

6. No consent, approval, licence or authorisation is required from any governmental, judicial or public body or authority in Mauritius in connection with the execution and delivery by the Company of the Transaction Agreements or the sale of the Shares pursuant to the Dealer Manager Agreement.

7. The chosen law (if any) in the Transaction Agreements will be upheld as a valid choice of law by the courts of Mauritius and applied by them in proceedings in relation to the Underwriting Agreement provided that the point is specifically pleaded, the choice of those laws is bona fide and legal and not contrary to Mauritius public policy.

8. The Company's voluntary submission to the jurisdiction specified within the Transaction Agreements would generally be recognised by the courts of Mauritius if such submission is legal, valid and binding under the laws of the relevant jurisdiction.

9. The Shares to be issued and sold by the Company under the Dealer Manager Agreement have been duly authorized and, upon payment and delivery in accordance with the Dealer Manager Agreement, will be validly issued, fully paid and non-assessable.

10. The Transaction Agreements have been duly and validly authorized, executed and delivered by the Company.

11. The statements made in the Prospectus Supplement under the caption "Rights Offering", insofar as they purport to constitute summaries of the terms of the Shares, constitute accurate summaries of the terms of the Shares.

12. The statements made in the Prospectus under the caption "Enforcement of Civil Liabilities" insofar as they purport to constitute summaries of the terms of statutes, rules or regulations, legal and governmental proceedings or contracts and other documents, constitute accurate summaries of the terms of such statutes, rules and regulations, legal and governmental proceedings and contracts and other documents.

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich



13. The statements made in the Prospectus under the caption "Taxation", insofar as they purport to constitute summaries of matters of Mauritius law and regulations or legal conclusions with respect thereto, constitute accurate summaries of the matters described therein.

Yours faithfully

**Appleby**

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich



**SCHEDULE 1**

**Part 1**

The Documents

1.  A scanned copy of the Dealer Manager Agreement.

2.  A scanned copy of the backstop agreement dated [ ] among the Company, CDPQ Infrastructures Asia Pte Ltd. And OMERS Infrastructure Asia Holdings Pte. Ltd.

3.  A scanned copy of the subscription agent agreement dated [ ] among the Company, Computershare Inc. and Computershare Trust Company, N.A.

4.  A scanned copy of the information agent agreement dated [ ] between the Company and Georgeson LLC.

(Items 1 to 4 above are collectively referred to as the "**Transaction Agreements**")

5.  A scanned copy of the Prospectus and the Prospectus Supplement.

**Part 2**

**Documents Examined**

1.  A copy of the certificate of incorporation of the Company dated 2 February 2015.

2.  A copy of the constitution of the Company dated 17 October 2016.

3.  A copy of the Global Business Licence bearing the name of the Company dated 2 February 2015 and a copy of the receipt issued by the Financial Services Commission of Mauritius to confirm that the Company has paid its annual fees for the renewal of the Global Business Licence for the period July 2021 to June 2022.

    Items 3 -5 inclusive collectively referred to as the **Constitutional Documents**.

4.  A copy of the Certificate of Current Standing issued by the Registrar of Companies in respect of the Company (the **Certificate of Good Standing**).

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich



5. A copy of the written resolutions of the board of directors dated [ ] (the **Resolutions**).

6. A copy of Register of Members of the Company.

7. A copy of the Register of Directors.

8. A copy of the Certificate of Incumbency dated 1 December 2021 issued by the company secretary of the Company in respect of the Company.

9. A copy of the results of the Company Search.

10. A copy of the certificates issued by a director of the Company dated [ ] respectively (the **Director Certificate**).

**Part 3**

**Searches**

1. A search of the entries and filings shown in respect of the Company on the file of the Company maintained in the Register of Companies at the office of the Registrar of Companies in Port Louis, Mauritius as revealed by a search conducted on [2] December 2021 (**Company Search**).

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich

6



**SCHEDULE 2**

**Assumptions**

We have assumed:

1.      that

(i)      the originals of all documents examined in connection with this opinion are authentic and complete;

(ii)     the authenticity, completeness and conformity to original documents of all documents submitted to us as copies; and

(iii)    that each of the documents received by electronic means is complete, intact and in conformity with the transmission as sent;

2.      that there has been no change to the information contained in the Constitutional Documents;

3.      that the signatures and seals on all documents and certificates submitted to us as originals or copies of executed originals are genuine and authentic, and the signatures on all documents executed by the Company are the signatures of the persons authorised to execute the documents by the Company;

4.      that where incomplete documents, drafts or signature pages only have been supplied to us for the purposes of issuing this opinion, that the original documents have been completed and correspond in all material respects with the last version of the relevant documents examined by us prior to giving our opinion;

5.      that the Documents do not differ in any material respects from any drafts of the same which we have examined and upon which this opinion is based;

6.      that each of the parties (other than the Company under Mauritius law) is incorporated and in good standing (where such concept is legally relevant) under the laws which govern its capacity and has the capacity, power and authority, has fulfilled all internal authorisation procedures and completed all applicable filings and formalities, and has obtained all authorisations, approvals, consents, licences and exemptions required under the laws of any relevant jurisdiction to execute, deliver and perform its respective obligations under the Documents and the transactions contemplated thereby and has taken all necessary corporate and other action required and completed all applicable formalities required to authorise the execution of the Documents and the performance of its obligations under them;

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ London □ Mauritius □ Seychelles □ Shanghai □ Zurich

7



7.  the due execution and delivery of the Documents by each of the parties thereto (other than the Company under Mauritius law);

8.  that each of the Documents is in the proper legal form to be admissible in evidence and enforced in the courts of the foreign jurisdiction by which they are governed;

9.  the Documents constitute, or when executed will constitute, legal, valid, binding and enforceable obligations of all parties thereto (other than for the Company under Mauritius law) in accordance with their governing law;

10. that each party to which the Company purportedly delivered the Documents has actually received and accepted delivery of such Documents;

11. that the obligations of all parties to the Documents are or will be recognised as legal, valid, binding and enforceable obligations of all parties to the Documents under all relevant laws (other than Mauritius) to which they are subject and that the choice of laws as the governing law of the Documents has been made in good faith and is valid and binding under the laws of all relevant jurisdictions (other than Mauritius);

12. that, insofar as any obligation under the Documents is to be performed in any jurisdiction outside of Mauritius, its performance will be legal and effective in accordance with the law of any jurisdiction to which they are subject or in which they are respectively constituted and established;

13. that no party to the Documents by having entered into and performing the transactions contemplated by the Documents will be in breach of any other agreement, deed, trust deed or licence to which it is a party or by which it is bound;

14. the truth, accuracy and completeness of all representations and warranties or statements of fact or law (other than as to the laws of Mauritius and those matters upon which we have expressly opined) made in the Documents and any correspondence submitted to us;

15. the accuracy, completeness and currency of the records and filing systems maintained at the public offices where we have searched or enquired or have caused searches or enquiries to be conducted, that such search and enquiry did not fail to disclose any information which had been filed with or delivered to the relevant body but had not been processed at the time when the search was conducted and the enquiries were made, and that the information disclosed by the Company Search is accurate and complete in all respect and such information has not been materially altered since the date and time thereof;

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich

16. that each transaction to be entered into pursuant to the Documents is entered into in good faith and for full value and will not have the effect of fraudulently preferring one creditor over another;

17. that

(i) the Documents are in the form of the documents approved in the Resolutions,

(ii) any meetings at which Resolutions were passed were duly convened and had a constituted quorum present and voting throughout and any unanimous resolutions passed in writing were adopted in accordance with the law and the Constitutional Documents,

(iii) all interests of the directors on the subject matter of the Resolutions, if any, were declared and disclosed in accordance with the law and Constitutional Documents,

(iv) the Resolutions and any Power of Attorney have not been revoked, amended or superseded, in whole or in part, and remain in full force and effect at the date of this opinion, and

(v) the Directors of the Company have concluded that the entry by the Company into the Documents and such other documents approved by the Resolutions and the transactions contemplated thereby are bone fide in the best interests of the Company;

18. that the Certificate of Incumbency accurately reflects the names of all Directors and Officers of the Company as at the date the Resolutions were passed or adopted, the date the Documents were executed and as at the date hereof;

19. that there is no matter affecting the authority of the Directors to effect entry by the Company into the Documents including breach of duty, lack of good faith, not disclosed by the Constitutional Documents or the Resolutions, which would have any adverse implications in relation to the opinions expressed in this opinion;

20. that the Company has entered into its obligations under the Documents in good faith for the purpose of carrying on its business and that, at the time it did so, there were reasonable grounds for believing that the transactions contemplated by the Documents would benefit the Company;

21. that the entry into the Documents and carrying out each of the transactions referred to therein will not conflict with or breach any applicable economic, anti-money laundering, anti-terrorist financing or other sanctions;

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ London □ Mauritius □ Seychelles □ Shanghai □ Zurich



22.    that no resolution to voluntarily wind up the Company has been adopted by the members and no event of a type which is specified in the Constitutional Documents as giving rise to the winding up of the Company (if any) has in fact occurred; and

23.    that there are no matters of fact or law (excluding matters of Mauritius law) affecting the enforceability of the Documents that have arisen since the execution of the Documents which would affect the opinions expressed herein.

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich

10



**Reservations**

Our opinion is subject to the following:

1.  **Enforcement:** Notwithstanding that the obligations established by the Documents are obligations which courts of Mauritius would generally enforce, they may not necessarily be capable of enforcement in all circumstances in accordance with their terms. In particular, but without limitation:

    (i)     enforcement and priority may be limited by laws relating to bankruptcy, insolvency, reorganisation, liquidation, court schemes, schemes of arrangements, moratoriums or other laws of general application relating to, or affecting the rights of, creditors generally;

    (ii)    enforcement may be limited by the principles of unjust enrichment or by general principles of equity (for example equitable remedies such as the grant of an injunction or an order for specific performance may not be available where liquidated damages are considered an adequate remedy);

    (iii)   claims may become barred by prescription or may be or become subject to defences of set-off, counterclaim, estoppel and similar defences;

    (iv)    obligations to be performed outside Mauritius may not be enforceable in Mauritius to the extent that performance would be illegal or contrary to public policy under the laws of that foreign jurisdiction;

    (v)     enforcement may be limited to the extent that matters which we have expressly assumed in this opinion will be done, have not been done;

    (vi)    the enforcement of the obligations of the parties to the Documents may be limited by the law applicable to obligations held to have been frustrated by events happening after their execution;

    (vii)   enforcement of obligations may be invalidated by reason of fraud, duress, misrepresentation or undue influence;

    (viii)  where the performance of payment obligations is contrary to the exchange control regulations of any country in whose currency such amounts are payable, such obligations may not be enforceable in Mauritius;

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ London □ Mauritius □ Seychelles □ Shanghai □ Zurich

11



(ix)    any agreement that the Company will not exercise the powers reserved for exercise by the shareholders of the Company may constitute an unlawful fetter on those reserved powers;

(x)    matters of procedure on enforcement of the Documents and forum conveniens will be governed by and determined in accordance with the *lex fori*.

2.    **Waiver of provisions of law:** We express no opinion as the enforceability of any present or future waiver of any provision of law (whether substantive or procedural) or of any right or remedy which might otherwise be available presently or in the future under the Documents.

3.    **Penalties:** Any provision as to the payment of additional money consequent on the breach of any provision of a Document by any person expressed to be a party to it, whether expressed by way of penalty, additional or default interest, liquidated damages or otherwise, may be unenforceable if it could be established that such additional payment constitutes a penalty rather than a compensatory amount.

4.    **Severability:** Severability provisions contained in the Documents may not be binding and the question of whether or not provisions may be severed would be determined by the Mauritius courts at their discretion, having regard to such matters as whether a particular severance would accord with public policy or involve the courts in making a new contract for the parties.

5.    **Determination:** Notwithstanding the provisions of the Documents, a determination, designation, calculation or certificate of any party to the Documents, as to any matter provided for in such Documents might, in certain circumstances, be held in the Mauritius courts not to be final, conclusive or binding (for example, if it could be shown to have been fraudulent or erroneous on its face, manifestly inaccurate, made on an unreasonable or arbitrary basis or not to have been reached in good faith) and the Documents will not necessarily escape judicial enquiry into the merit of any claim by any party in that respect.

6.    **Discretion:** Where a party to the Documents is vested with a discretion or may determine a matter in its opinion or is given the right to determine a conclusive calculation or determination, the Mauritius courts, if called upon to consider the question, may require that such discretion be exercised reasonably or that such opinion be based upon reasonable grounds or may determine that such right is not finally binding.

7.    **Modification of documents:** We express no view on any provision in any of the Documents requiring written amendments and waivers of any of the provisions of such Documents insofar as it suggests that oral or other modification, amendments or waivers could not be effectively agreed upon or granted by or between the parties or implied by the course of conduct of the parties.

8.    **Limitations on liability:** The effectiveness of any terms releasing or limiting a party from a liability or duty owed is limited by law.

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich



9. **Jurisdiction:** Where a Document provides for the submission to the exclusive or non-exclusive jurisdiction of the Mauritius courts, the court may decline to accept jurisdiction in any matter where:

   (i)     it determines that some other jurisdiction is a more appropriate or convenient forum;

   (ii)    another court of competent jurisdiction has made a determination in respect of the same matter; or

   (iii)   litigation is pending in respect of the same matter in another jurisdiction.

10. **Concurrent proceedings:** Proceedings may be stayed in Mauritius if concurrent proceedings in respect of the same matter are or have been commenced in another jurisdiction. Notwithstanding any provision in the Documents that all disputes arising under or in connection with the Documents should be brought before the competent court in the jurisdiction specified in the Documents, the Mauritius courts have discretion to refuse to stay proceedings in Mauritius if it is satisfied that it is just and equitable to do so and may grant leave to serve Mauritius proceedings outside of Mauritius.

11. **Foreign law:** Relevant foreign law will not be applied by the Mauritius courts if it is not pleaded and proved, is not a bona fide and lawful choice of law, or it would be contrary to public policy for that law to be applied.

12. **Costs:** A Mauritius court may refuse to give effect to any provisions of a Document in respect of costs of litigation brought before the Mauritius court.

13. **Preferences:** A transaction by a debtor, including the grant of a charge over any property or undertaking of the debtor, may be set aside by the Supreme Court of Mauritius on the application of the Official Receiver or a liquidator where it is a voidable preference and was made within 2 years immediately before adjudication or commencement of the winding up. A charge may not be set aside where it secures money actually advanced or paid, or the actual price or value of property sold or supplied, or any other valuable consideration given in good faith, by the charge holder to the debtor at the time when, or at any time after, the charge was given. A charge or security may not be set aside where it is a substitute for an existing charge that was given by the debtor more than 2 years before the date of adjudication or the commencement of the winding up, except to the extent that (a) the amount secured by the substituted charge is greater than the amount that was secured by the existing charge; or (b) the value of the property subject to the substituted charge at the date of substitution was greater than the value of the property subject to the existing charge at that date.

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich

13



14. **Presumption of insolvency:** A transaction by a debtor, including the grant of a charge over any property or undertaking of the debtor, that is made within 6 months immediately before the debtor's adjudication or the commencement of the winding up is presumed, unless the contrary is proved, to be made at a time when the debtor is unable to pay his due debts.

15. **Good standing:** the Company has received a Certificate of Current Standing issued by the Registrar of Companies.

16. **Major transactions:** Where the board of directors deems a transaction a major transaction within the meaning of section 130 of the Companies Act, shareholder approval by way of special resolution is required. Section 130 of the Companies Act defines a major transaction as

    (a)    the acquisition of, or an agreement to acquire, whether contingent or not, assets the value of which is more than 75 per cent of the value of the company's assets before the acquisition;

    (b)    the disposition of, or an agreement to dispose of, whether contingent or not, assets of the company the value of which is more than 75 per cent of the value of the company's assets before the disposition; or

    (c)    a transaction that has or is likely to have the effect of the company acquiring rights or interests or incurring obligations or liabilities the value of which is more than 75 per cent of the value of the company's assets before the transaction.

17. **Director Certificate:** With respect to this opinion, we have relied upon the statements and representations made to us in the Director Certificate provided to us and issued by a Director of the Company for the purposes of this opinion. We have made no independent verification of the matters referred to in the Director Certificates, and we qualify our opinion to the extent that the statements or representations made in the Director Certificate is not accurate in any respect.

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ London ☐ Mauritius ☐ Seychelles ☐ Shanghai ☐ Zurich

14

**Exhibit C-1**

**FORM OF OPINION OF INDIA DEALER MANAGERS' COUNSEL**

January [•], 2022

Ref: [•]

**HSBC Securities (USA) Inc**.
452 Fifth Avenue
New York, NY 10018

**Roth Capital Partners, LLC**
888 San Clemente Drive
Newport Beach, CA 92660

(*As dealer managers in connection with the offering*)

Re:     Offer of up to an aggregate of [•] new equity shares at par value US$0.000625 per equity share on a rights basis entitling the holders to purchase equity shares for an aggregate purchase price of up to $ 250 million (the "Shares", and such offer, the "Offer") by Azure Power Global Limited, a company limited by shares, organized under the laws of Mauritius (the "Issuer")

Ladies and Gentlemen:

This opinion is being delivered to you, in our capacity as counsel to the dealer managers as to matters of Indian law in connection with the Offer, pursuant to Section 4(f) of the Dealer Manager Agreement dated December [•], 2021 (the "**Dealer Manager Agreement**") among the Issuer and you (the "**Dealer Managers**").

For purposes of this letter, Azure Power India Private Limited is referred to as "**Azure India**". Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Dealer Manager Agreement.

1.     In rendering this opinion, we have examined and relied on originals or copies of the following:

(a)     the Registration Statement, the Prospectus, Prospectus Supplement (the Prospectus, Prospectus Supplement together being the "**Disclosure Package**") and the Dealer Manager Agreement.

(b)     such other corporate documents, records, information, declarations and representations furnished to us by Azure India and oral and written statements of officers and other representatives of Azure India as to the existence of certain factual matters.

2.     In rendering this opinion, we have assumed:

(a)     in relation to the documents that we have examined (a) that all such documents are within the capacity and powers of and have been validly authorized, executed and delivered by and are enforceable and binding on the parties thereto, in accordance with applicable laws;

and (b) that there are no facts or circumstances in existence and no events have occurred which render the documents void or voidable, or repudiated or frustrated, or capable of rescission for any reason, and in particular but without limitation by reason of the lack of consideration, default, fraud or misrepresentation;

(b)     the genuineness of all signatures, the authenticity and completeness of all documents submitted to us as originals and the conformity with the originals of all documents submitted to us as copies thereof and that each of the copies of the documents supplied are true, complete and accurate;

(c)     as to any other matters of fact material to the opinions expressed herein, we have relied upon oral or written statements of officers and other representatives of Azure India;

1

(d) there are no agreements, letters or other arrangements having contractual effect modifying the terms or effect of the documents examined by us;

(e) that any meeting of the shareholders or the board of directors of Azure India or a duly constituted committee thereof was duly constituted and a quorum was present throughout and the minutes of any such meeting are a correct and accurate record of the proceedings thereof and that such resolutions have not been amended or restricted and are in full force and effect and in passing such resolutions all provisions of the Companies Act (as defined below), and the memorandum and articles of association of Azure India were duly observed;

(f) the due execution, validity and enforceability under the laws of the State of New York or other applicable foreign law of the Dealer Manager Agreement;

(g) the Offer is being conducted as described, and in compliance with the conditions and terms set forth in the Registration Statement and the Disclosure Package, and the Shares have not been, and will not be, offered or sold to the public or any member of the public in India.

Nothing has come to our attention that would indicate or that would cause us to believe that our assumptions or reliance set out above are not fully justified.

3. In rendering this opinion, we have reviewed such laws of the Republic of India as we deemed relevant and necessary and as have been published and made publicly available ("**Applicable Laws**"), all of which are subject to change either prospectively or retroactively. Any such change may affect the conclusions stated herein. We have not made any investigation of, and do not express any opinion on, the laws of any jurisdiction, other than the laws of the Republic of India as applicable on the date of this opinion. Further, we have assumed that the Issuer has complied with all of provisions of applicable laws of all jurisdictions (other than India) in connection with the transactions contemplated by the Dealer Manager Agreement. For the avoidance of doubt, the term "**Companies Act**" in this opinion refers to the Companies Act, 2013, as amended.

4. We express no opinion or belief as to the financial statements or other financial or accounting data derived therefrom, or any statistical data, industry data, or any expert reports and opinion or data derived therefrom, included in, or incorporated by reference, into the Registration Statement and the Disclosure Package.

5. We have not conducted any searches in any official registry or with any public authorities in relation to any matter, including without limitation, any legal, governmental or regulatory proceedings pending in relation to Azure India and any licenses, consents, approvals and permits issued to Azure India. We do not express any opinion on or confirmation of, the title or saleable area or marketability of any immovable property for Azure India, its projects or offices, which are either owned or leased by Azure India included in the Registration Statement and the Disclosure Package.

6. On the basis of, and subject to the foregoing, and having regard to such considerations of Indian law in force at the date of this opinion as we consider relevant and the qualifications set forth in paragraph 6 below, we are of the opinion that:

(a) Azure India has been duly incorporated and is validly existing as a private limited company under the Companies Act, 2013.

(b) The execution and delivery by the Issuer of, and the performance by the Issuer of its obligations under the Dealer Manager Agreement do not and will not contravene, result in any breach or violation of or constitute a default under any provision of (i) Applicable Laws or judgement of any court in India applicable to Azure India; or (ii) the memorandum of association and articles of association of Azure India; or (iii) any decree, judgement or order of any court or other agency of the Government of India that has been identified to us by Azure India as being applicable to and binding on Azure India, except for any such conflict, breach or violation under (i), (ii) or (iii) that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Issuer;

(c) No consent or approval of any governmental or regulatory authority in India is required by the Issuer and no filing with any governmental or regulatory authority is required to be made by the Issuer for the performance of its obligations under the Dealer Manager Agreement.

(d)  The statements in the Registration Statement and the Disclosure Package under the headings "*Business – Government Regulations*", "*Enforcement of Civil Liabilities*" and "*Taxation – Indian Taxation*" insofar as such statements constitute summaries of documents on Indian legal matters, documents or proceedings referred to therein, fairly present and summarize the information called for with respect to such legal matters, documents and proceedings, in all material respects.

(e)  Except as set forth in the Registration Statement and the Disclosure Package, subject to applicable provisions of the Foreign Exchange Management Act, 1999 and the rules and regulations issued thereunder, as amended, all dividends and other distributions that are legally declared and payable in respect of the equity shares of Azure India may be paid by Azure India to the holders thereof in Indian Rupees and, in the case of a holder thereof that is resident outside India, may be converted into foreign currency that may be freely transferred out of India without the necessity of obtaining any

governmental or regulatory authorization in India and such dividend payments shall be subject to tax withholding in India under the provisions of the Income-tax Act, 1961 as disclosed under the heading "*Taxation – Indian Taxation*" in the Registration Statement.

(f)  No stamp duty or other duties, capital gains tax, income, withholding or other taxes, are payable to the Government of India or any political subdivision or taxing authority thereof by or on behalf of the Dealer Managers in connection with the issuance, sale and delivery of the Shares by the Issuer to or for the respective accounts of the Dealer Managers as set forth in the Disclosure Package and pursuant to the terms of the Dealer Manager Agreement.

This opinion is given as of the date hereof, and we express no opinion as to the effect of any change in the facts or law on which such opinions are based subsequent to the date hereof. We disclaim any obligation to advise you of any change in the facts or law occurring after the date of this opinion, which might affect this opinion.

This letter is addressed to you solely for the Dealer Managers' benefit in connection with the transactions contemplated by the Dealer Manager Agreement, and may not be relied upon by any other person without our consent (including any person or other entity that acquires the Shares from you other than an Underwriter's successor in interest by means of merger, consolidation, transfer of business or a similar transaction), or used, circulated, quoted or referred to for any other purpose, without our specific prior written consent. This opinion may, however, be disclosed by you (i) to the extent required by law, regulation or any governmental or competent regulatory authority, (ii) in connection with legal proceedings in relation to the distribution of the Rights or (iii) to your affiliates in relation to the distribution of the Rights.

Sincerely,

**L&L Partners Law Offices**
(*Formerly Luthra & Luthra Law Offices*)

**Exhibit C-2**

Ref: [•]

January [•], 2022

**HSBC Securities (USA) Inc.**
452 Fifth Avenue
New York, NY 10018

**Roth Capital Partners, LLC**
888 San Clemente Drive
Newport Beach, CA 92660

(*As dealer managers in connection with the offering*)

**Re:** **Offer of up to an aggregate of [•] new equity shares at par value US$0.000625 per equity share on a rights basis entitling the holders to purchase equity shares for an aggregate purchase price of up to $ 250 million (the "Shares", and such offer, the "Offer") of Azure Power Global Limited, a company limited by shares, organized under the laws of Mauritius (the "Issuer")**

Ladies and Gentlemen:

This letter is being delivered to you, in our capacity as the counsel to the dealer managers as to matters of Indian law in connection with the Offer, pursuant to the Dealer Manager Agreement dated December [•], 2021 (the "**Dealer Manager Agreement**") among the Issuer and you. (the "**Dealer Managers**").

For purposes of this letter, Azure Power India Private Limited is referred to as "**Azure India**". Capitalized terms used herein and not otherwise defined have the meanings assigned to such terms in the Dealer Manager Agreement.]

In rendering this letter, we have examined and relied on originals or copies of the following:

a.  the Registration Statement, the Prospectus, the Prospectus Supplement (the Prospectus, the Prospectus Supplement together being the "**Disclosure Package**") and the Dealer Manager Agreement.

b.  such other corporate documents, records, information, declarations and representations furnished to us by Azure India and oral and written statements of officers and other representatives of and Azure India and others, as to the existence of certain factual matters.

Such identification and review is for the limited purpose of making the statements set forth in this letter and is not an expression of a view by us as to whether any such information has been conveyed to the investors generally or to any particular investor at any particular time or in any particular manner.

In connection with the Offer, we have participated in discussions with the representatives of Azure India, your representatives, United States counsel to you and to the Issuer, during which discussions the contents of the Registration Statement and the Disclosure Package and related matters were discussed. On the basis of the work referred to above, nothing has come to our attention that has caused us to believe that:

---

(i)  the Registration Statement, at the time it became effective, contained any untrue statement of a material fact or omitted (except information permitted to be omitted from the Registration Statement at such time pursuant to Rule 430B under the Securities Act of 1933) to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; or

(ii)  the Prospectus Supplement, as of its date and as of the date hererof contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading;

The limitations inherent in the independent verification of factual matters and the character of determinations involved in the preparation of the Registration Statement and the Disclosure Package are such that we do not assume responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement and the Disclosure Package, except as provided in paragraph 6(d) of our opinion to you dated the date hereof, and we have not made an independent check or verification thereof (except as aforesaid).

In addition, we express no view or belief in clauses (i) and (ii) above, with respect to the financial statements or other financial or accounting data derived therefrom, or any statistical data, industry data, or any expert reports and opinion or data derived therefrom, included in, or incorporated by reference, into the Registration Statement and the =Disclosure Package.

This letter is addressed to you solely in your capacity as representatives of the Dealer Managers, for the Dealer Managers' benefit in connection with the transactions contemplated by the Underwriting Agreement, and may not be relied upon by any other person without our consent (including any person or other entity that acquires the Shares from you other than an Underwriter's successor in interest by means of merger, consolidation, transfer of business or a similar transaction), or used, circulated, quoted or referred to for any other purpose, without our specific prior written consent.
Sincerely,

**L&L Partners Law Offices**
(*Formerly Luthra & Luthra Law Offices*)

2