**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SERAP LOKMAN, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:22-cv-7432 |
| Plaintiff, | |
| v. | Hon. Gregory H. Woods |
| AZURE POWER GLOBAL LIMITED, RANJIT GUPTA, MURALI SUBRAMANIAN, and PAWAN KUMAR AGRAWAL, | |
| Defendants. | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

Dated: May 6, 2024

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
David C. Jaynes (admitted *pro hac vice*)
Morgan M. Embleton (admitted *pro hac vice*)
Amanda D. Foley (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
djaynes@zlk.com
membleton@zlk.com
afoley@zlk.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL BACKGROUND ................................................................................... 4

    A.   Azure Purports to Be at the Forefront of India's Renewable Energy Focus ..................... 4

    B.   Defendants Monitor Azure's Key Performance Metrics in Real Time ............................ 5

    C.   Azure is Subject to Various Corruption, Anti-Bribery, and Safety Laws ........................ 5

    D.   The First Whistleblower Complaints .................................................................. 6

    E.   Azure's Successive Executive Departures and Delays Filing the 2022 Form 20-F ............. 7

    F.   Azure Receives the Second Whistleblower Complaint ....................................... 8

    G.   Azure Receives the Third Whistleblower Complaint ........................................ 9

    H.   January 25, 2023 Press Release Disclosing Further Delays in Filing the 2022 Form 20-F and New Details Regarding Azure's Investigation into the Whistleblower Complaints.... 9

    I.    Azure Belatedly Files its 2022 Form 20-F and is Delisted from the NYSE..................... 12

    J.   The Truth is Revealed .............................................................................. 13

III.    ARGUMENT ...................................................................................... 13

    A.   Legal Standards ...................................................................................... 13

    B.   The SAC Adequately Pleads Materially False and Misleading Statements ..................... 14

       1.   False Statements Regarding Compliance With Anti-Corruption Laws ......................... 14

       2.   The Internal Controls Statements Were False and Misleading.................................... 25

       3.   Defendants Overstated Azure's Megawatts Operating.................................................. 27

       4.   False Statements About Wind Projects..................................................................... 33

       5.   False Statements About Commissioned Projects......................................................... 36

       6.   False Statements Touting Safety................................................................................ 38

    C.   The SAC Pleads a Strong Inference of Scienter ............................................................ 42

       1.   Azure *Admitted* Its CEO and COO Engaged in a Fraudulent Scheme During the Class Period ......................................................................................................... 43

       2.   Defendants Received Multiple Whistleblower Reports Identifying   Fraudulent Practices and Serious Internal Control Deficiencies .................................................................. 46

       3.   Defendants Knew of, or Recklessly Disregarded, Safety Violations and that Project Data Was Being Manipulated From Their Admitted "Real-Time" Monitoring of All Project Data Through Their "Centralized Monitoring Station At [The] Head Office" and Site Visits ................................................................................................................ 49

       4.   The Onslaught of Highly Unusual And Suspicious Senior Management And Auditor Resignations or Terminations Strongly Supports Scienter .......................................... 51

       5.   Defendants Knew Azure's Internal Controls Were Inadequate.................................... 59

6.    That the Data Manipulation Was Widespread and Occurred Over Multiple of Its Largest Projects Spanning Several Years Supports Scienter ....................................................... 61

7.    Defendants' Involvement in Issuing, Implementing, and Monitoring Safety Policies Support Scienter .......................................................................................................... 63

8.    Azure's Violations of its Own Internal Ethics and Internal Control Policies and Procedures Supports Scienter ........................................................................................ 64

9.    With Azure's Long-Term Viability in Jeopardy, Defendants Were Motivated to Engage in the Alleged Data Manipulation and Bribery to Secure New Projects ...................... 66

10.    Plaintiff's Allegations Demonstrate Corporate Scienter............................................... 68

11.    Plaintiff's Allegations Considered Holistically Overwhelmingly Support A Strong Inference of Scienter ..................................................................................................... 69

D.    Defendants' Factual Truth on the Market Argument Lacks Merit ................................... 71

E.    Plaintiff's Section 20(a) Control Person Claims Should Be Sustained ........................... 72

IV.    CONCLUSION................................................................................................................... 73

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Baker Hughes, Inc.*,
292 F.3d 424 (5th Cir. 2002) .................................................................... 55, 56

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)......................................................................... 24, 41

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 373 (E.D.N.Y. March 30, 2009)......................................... 43

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014)...................................................... 42, 69

*Arora v. HDFC Bank Ltd.*,
671 F. Supp. 3d 305 (E.D.N.Y. 2023) ........................................................ 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................... 13

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100  (D. Conn. 2021) ................................................... 55, 72

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012).......................................................... 40

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .............................................. 56

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ......................................................... 37

*Chapman v. Mueller Water Prods.*,
466 F. Supp., 3d 382 (S.D.N.Y, 2020)......................................................... 22

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010).......................................................... 50

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................... 14

*City of Brockton Ret. Sys. v. Shaw Group, Inc.,*
540 F. Supp. 2d 464 (S.D.N.Y. Mar. 18, 2008)............................................ 58

*City of Brockton Retirement Sys. v. Avon Products, Inc.*,
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)....................................................................... 47

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)............................................................................................... 23

*City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ....................................................................... 19

*Condra v. PXRE Grp. Ltd.*,
  357 F. App'x 393 (2d Cir. 2009)........................................................................................ 51

*Cresci v. Mohawk Valley Cmty. College*,
  693 Fed. Appx. 21 (2nd Cir. 2017)..................................................................................... 73

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)................................................................................. 54

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)........................................................................... 51, 64

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
  413 F. Supp. 3d 187 (S.D.N.Y. 2019)................................................................................. 72

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................................................... 14

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)............................................................................................... 68

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) .............................................................................................. 71

*Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................... 22, 31

*Feasby v. Industri-Matematik Int'l Corp.*,
  2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) .................................................................. 57

*Foley v. Transocean Ltd.*,
  10 Civ. 5233 (NRB), (S.D.N.Y. Mar. 18, 2011)................................................................. 41

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012)................................................................................. 41

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020)................................................................................. 56

v

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
  268 F.Supp.3d 526 (S.D.N.Y. 2017).................................................................... passim

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................... 66

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................... 56

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................... 54

*Glickman v. Alexander & Alexander Servs., Inc.*,
  1996 WL 88570 (S.D.N.Y. Feb. 29, 1996)................................................................ 51

*Greco v. Quidian Inc.*,
  2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022)........................................................... 32

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................... 56, 57, 59, 70

*Handal v. Tenet Fintech Grp. Inc.*,
  2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023) .......................................................... 70

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ..................................................... 46, 48

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)................................................................. 55, 59

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020).............................................................. 54

*In re Aegean Marine Petroleum Network, Inc. Secs. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021)....................................................................... 55

*In re Akorn, Inc. Secs. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ....................................................................... 57

*In re Allergan PLC Sec. Litig.*,
  2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019)........................................................... 24

*In re American Bank Note Holographics, Inc. Secs. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000)......................................................................... 62

*In re AppHarvest Sec. Litig.*,
  2023 WL 4866233 (S.D.N.Y. July 31, 2023) ........................................................... 54

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................. 57

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) ........................................................... passim

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018) .................................................................. 51

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) ................................................................ 46

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig*.,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................................. 14

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) .............................................................. 40, 69

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017) ................................................................................ 48

*In re BioScrip, Inc., Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................... 42

*In re BP P.L.C. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ................................................................ 64

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................................. 20

*In re CannaVest Corp. Secs. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018) .............................................................. 59, 60

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................... 37

*In re Citigroup Inc. Sec. Litig*.,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ............................................................. 49, 71

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ................................................................ 54

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ............................................................. 40, 44

*In re Didi Glob. Inc. Sec. Litig.*,
2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ................................................... 17, 67

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007)...................................................................66

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)............................................. 17, 31, 54, 60

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................................................66

*In re FirstEnergy Corp.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022)..........................................................23

*In re Gen. Elec. Sec. Litig.*,
    2020 WL 2306434 (S.D.N.Y. May 7, 2020) .........................................................54

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2014 WL 2815571 (S.D.N.Y. June 23, 2014) .......................................................16

*In re Grab Holdings Ltd. Sec. Litig.*,
    2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024) .......................................................31

*In re Grupo Televisa Sec. Litig.*,
    368 F. Supp. 3d 711 (S.D.N.Y. 2019)........................................................ 26, 31, 34

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ..................................................................................66

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018)............................................................................ 52, 62

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)...................................................................58

*In re Hudson Techs., Inc. Sec. Litig.*,
    1999 WL 767418 (S.D.N.Y. Sept. 28, 1999).........................................................65

*In re Immucor, Inc. Sec. Litig.*,
    2011 WL 2619092 (N.D. Ga. June 30, 2011) ........................................................19

*In re Insys Therapeutics, Inc. Sec. Litig.*,
    2018 WL 2943746 (S.D.N.Y. June 12, 2018) ..................................................passim

*In re ITT Educ. Servs.*,
    34 F. Supp. 3d 298 (S.D.N.Y. 2014)......................................................................71

*In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*,
    2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .................................................... 38, 51

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
2004 WL 376442 (S.D.N.Y. Feb. 27, 2004)...............................................................50

*In re Lottery.com, Inc.*,
2024 WL 454298 (S.D.N.Y. Feb. 6, 2024)................................................................54

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
536 F. Supp. 2d 313 (S.D.N.Y. 2007).......................................................................23

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .....................................................22, 55

*In re N. Dynasty Mins. Ltd. Sec. Litig.*,
2023 WL 9509337 (E.D.N.Y. Jan. 25, 2023) ...........................................................67

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006).......................................................................32

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014).................................................... 52, 55, 60, 70

*In re Pall Corp.*,
2009 WL 3111777 (E.D.N.Y. Sep. 21, 2009)...........................................................62

*In re Par Pharm., Inc. Sec. Litig.*,
733 F. Supp. 668 (S.D.N.Y. 1990) ...........................................................................34

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)...........................................................54

*In re Pegasus Wireless Corp. Sec. Litig.*,
2009 WL 3055205 (S.D. Fla. Sept. 21, 2009) ..........................................................65

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................31

*In re Philip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004)........................................................................62

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)........................................................................51

*In re Quantumscape Secs. Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ......................................................................38

*In re Rockwell Medical, Inc. Secs. Litig.*,
2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018).............................................................56

*In re Sadia, S.A. Sec. Litig.*,
643 F. Supp. 2d 521 (S.D.N.Y. 2009)................................................................. 65, 70

*In re Salix Pharms., Ltd.,*
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)....................................................... passim

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................. 48

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)................................................................. 58, 65

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................. 53

*In re Security Capital Assurance*,
729 F.Supp.2d 569 (S.D.N.Y 2010)................................................................. 46

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021)................................................................. 20, 37

*In re Tenaris S.A. Sec. Litig.*,
493 F. Supp. 3d 143 (E.D.N.Y. 2020) ................................................................. 22

*In re Teva Sec. Litig.*,
671 F. Supp. 3d 147 (D. Conn. 2023)................................................................. 24, 72

*In re Top Tankers, Inc. Sec. Litig.*,
528 F. Supp. 2d 408 (S.D.N.Y. 2007)................................................................. 57, 58

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ................................................................. 66

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) ................................................................. passim

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y Dec. 13, 2005) ................................................................. 23, 46, 48

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................. 31, 60, 61, 65

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)................................................................. 22, 34, 36

*Ind. Pub. Ret. Sys. v. Pluralsight,*
45 F.4th 1236 (10th Cir. 2022) ................................................................. 36

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ................................................................................................. 31

*Inter-Local Pension Fund v. General Electric*,
  445 F. App'x 368 (2d Cir. 2011) ...................................................................................... 50

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2nd Cir. 2010) ........................................................................................... 58

*Jackson Cty. Emples. Ret. Sys. v. Ghosn*,
  510 F. Supp. 3d 583 (M.D. Tenn. 2020) ..................................................................... 17, 45

*Janbay v. Canadian Solar, Inc.*,
  2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ................................................................. 61

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001) .............................................................................................. 68

*Karimi v. Deutsche Bank Aktiengesellschaft,*
  607 F. Supp. 3d 381 (S.D.N.Y. June 13, 2022) ........................................... 22, 46, 47, 55

*Khoja v. Orexigen Therapeutics, Inc.,*
  899 F.3d 988 (9th Cir. 2018) ............................................................................................ 58

*Kumar v. Kulicke & Soffa Indus., Inc.*,
  2019 WL 5081896 (E.D. Pa. Oct. 9, 2019) ..................................................................... 55

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  639 F. Supp. 3d 350 (E.D.N.Y. 2022) .............................................................................. 40

*Lopez v. CT Partners Exec. Search, Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016) ................................................................................. 38

*Lozada v. Taskus, Inc.*,
  2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ........................................................................ 57

*Marcu v. Cheetah Mobile Inc.*,
  2020 WL 4016645 (S.D.N.Y. July 16, 2020) .................................................................. 22

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...................................................................................................... 21, 24

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) .................................................................... 68, 69, 71

*Menkes v. Stolt-Nielsen S.A.*,
  2005 WL 3050970 (D. Conn. Nov. 10, 2005) .................................................................. 34

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
54 F.4th 82 (2d Cir. 2022) ........................................................................................ 35

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ..................................................... 35, 37

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)................................................................................. passim

*Noah Educ. Holdings, Ltd. Sec. Litig.*,
2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ......................................................... 22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)........................................................................... 48, 57, 64

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. July 31, 2020)................................................................ 67

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)....................................................................... 41

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010)................................................................................. 21, 41

*Owl Creek I, L.P. v. Ocwen Fin. Corp.*,
2018 WL 4844019 (S.D. Fla. Oct. 4, 2018)............................................................. 19

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019)...................................................................................... 14

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)......................................................... 22

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).................................................... 26, 57

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................... 53

*RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*,
878 F. Supp. 16 (S.D.N.Y. 1995) ............................................................................. 67

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4. 2017) ................................................................ 65

*Roth v. Avon Corp.*,
2008 WL 656069 (N.D. Ill. Mar. 7. 2008)............................................................... 65

*Rotunno v. Wood*,
2022 WL 14997930 (2d Cir. Oct. 27, 2022)..................................................................... 54

*S.E.C. v. Egan*,
994 F. Supp. 2d 558 (S.D.N.Y. 2014).............................................................................. 59

*S.S. Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
2023 WL 4744197 (S.D.N.Y. July 25, 2023) ............................................................. 49, 50

*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512 (S.D.N.Y. May 1, 2024) ............................................................. 51, 53, 56

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)............................................................................................. 68

*Saraf v. Ebix, In*c.,
632 F. Supp. 3d 389 (S.D.N.Y. Sept. 30, 2022) ........................................................... 58

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)............................................................................. 56

*SEC v. MiMedx Grp., Inc.*,
2022 WL 902784 (S.D.N.Y. Mar. 28. 2022) ................................................................. 48

*Sjunde Ap-Fonden v. Goldman Sachs Grp., Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021)............................................................................. 47

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................... 48, 66, 67

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)........................................................... 22, 35, 50

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008)...................................................................................... 14, 53

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999).......................................................................................... 32, 66

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)................................................................... 46, 50, 61

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)........................................................................................... 51

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................. passim

*Thorpe v. Walter Inv. Mgmt., Corp.*,
 2014 WL 11961964 (S.D. Fla. Dec. 23, 2014) ........................................................................ 19

*TSC Indus., Inc. v. Northway, Inc.*,
 426 U.S. 438 (1976) .................................................................................................................. 40

*U.S. SEC v. Dunn*,
 587 F. Supp. 2d 486 (S.D.N.Y. 2008) ...................................................................................... 64

*Valentini v. Citigroup, Inc.*,
 837 F. Supp. 2d 304 (S.D.N.Y. 2011) ........................................................................... 43, 45, 69

*Van Dongen v. CNinsure Inc.*,
 951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................................. 45, 52

*Vanderhoef v. China Auto Logistics, Inc.*,
 2021 WL 3260849 (D.N.J. July 30, 2021) ............................................................................... 57

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
 672 F. Supp. 2d 596, 606-607 .................................................................................................. 53

*Villella v. Chem. & Mining Co. of Chile Inc.*,
 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .................................................................... 31, 44

*Wang v. Cloopen Grp. Holding Ltd.*,
 661 F. Supp. 3d 208 (S.D.N.Y. 2023) ................................................................................. 22, 50

*Wilbush v. Ambac Fin. Grp., Inc.*,
 271 F. Supp. 3d 473 (S.D.N.Y. 2017) ................................................................................. 52, 55

*Woodley v. Wood*,
 2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) ............................................................................ 61

*Yannes v. SCWorx Corp.*,
 2021 WL 2555437 (S.D.N.Y. June 21, 2021) ..................................................... 50, 52, 56, 61

## Rules

Fed. R. Civ. P. 15(a)(2) .................................................................................................................. 73

I.      **PRELIMINARY STATEMENT**[1]

In the span of four years, Azure Power Global Limited ("Azure" or the "Company") was driven from a successful, publicly-traded renewable energy company to one that was delisted from the New York Stock Exchange ("NYSE") and whose continued operations became a going concern. In 2019, when Defendants Ranjit Gupta and Murali Subramanian took over as CEO and COO, respectively, Azure was poised to capitalize on over $8.6 billion (USD) of investment opportunity, primarily relating to acquiring renewable energy projects in India. However, under the leadership of Gupta and Subramanian, the Company's financial results quickly took a turn for the worse, with Azure going from a profit of INR 138 million in Fiscal 2019, to losses of INR 2.3 million in Fiscal 2020, and INR 4.2 million in Fiscal 2021, as debt loads mounted to cover cash flow shortages.

With Azure's future viability in jeopardy, Gupta and Subramanian initiated a scheme of bribes, kickbacks and data manipulation to acquire new projects and save the Company from its demise. Yet, throughout the Class Period, Defendants falsely told investors Azure: (i) had "developed and implemented formal controls and procedures to ensure that we are in compliance with the FCPA, as well as anti-corruption, anti-bribery and anti-facilitation payment laws;" (ii) had fully and successfully commissioned projects when, in reality, it had not; (iii) was winning Letters of Award ("LOA") and entering into Power Purchase Agreements ("PPA") with the Solar Energy Corporation of India ("SECI"), particularly with wind projects; and (iv) was experiencing significant increases in its key operating metrics, such as Megawatts Operating ("MWO") and

---

[1] "¶" refers to paragraphs in Plaintiff's Second Amended Class Action Complaint ("SAC") (ECF 80). "Motion" and "DB" refer to Azure, Gupta, and Subramanian's motion to dismiss and supporting brief, respectively (ECF 103). "AB" refers to Agrawal's motion to dismiss and supporting brief, respectively (ECF 106). "Ex." refers to Defendants' exhibits filed with their motions. (ECF Nos. 104-1-10, 107-1-5). Emphasis is added and citations and internal quotations are omitted unless noted. Capitalized terms used herein have the same meaning as in the SAC unless noted. Plaintiff has also filed herewith an Appendix to this memorandum of law that contains each alleged false statement and the reasons why such statements are false or misleading or made with scienter as alleged in the Complaint for the Court's convenience.

1

electricity generation, that was far outpacing prior period growth from new projects they had won through this corruption.

Beginning in June 2021, Gupta and Subramanian's scheme began to unravel when Azure received the First Whistleblower Complaints revealing that "Key Managerial Staff" at Azure orchestrated and participated in corrupt schemes with land aggregators to obtain land for new projects. While Azure does not identify the "Key Managerial Staff," Azure's own public documents define them as the "Chief Executive Officer, the Chief Financial Officer, Chief Operating Officer[]," confirming the Key Managerial Staff are Gupta and Subramanian. It was further revealed that, in July 2021 that "former executives" (*e.g.*, Gupta and Subramanian) made potential misrepresentations to the Board regarding an asset purchase transaction for a wind project's development and possibly circumventing internal policies in connection with the approval of another wind project. Though Azure's then-auditor flagged similar concerns, the Individual Defendants publicly claimed the whistleblower complaint was not credible and dismissed it (and the auditor).

On April 26, 2022, Gupta and Subramanian abruptly "relinquished … their roles" at the same time a second whistleblower came forward alleging safety violations and data manipulation to fraudulently secure government contracts with Azure's most important customer, SECI. The conduct raised in the Second Whistleblower Complaint was so egregious that the Company finally had to confront its ineffective internal controls. As a result, on August 16, 2022, Azure filed an amended notice of delayed filing of its 2022 Form 20-F by the extended due date as a result of an ongoing internal controls review.

Two weeks later, on August 29, 2022, before the market opened, Azure disclosed its Audit Committee "identified evidence of manipulation of project data and information by certain

employees" and that the Company would further delay filing of its 2022 Form 20-F. Then, in September 2022, a third whistleblower came forward alleging nearly identical claims as those in the First Whistleblower Complaint. With Gupta and Subramanian now removed, Azure undertook another investigation, this time which found evidence of bribery necessitating disclosure to the US SEC and DOJ. Thereafter, executives and auditors continued to leave Azure in droves.

Though Defendants claim they cannot be held liable for investor losses because they did the responsible thing by investigating the whistleblower complaints and then timely reporting the results to investors, one only needs to look to Azure's analysts and auditors to unfurl this ruse. For instance, J.P. Morgan and RBC Capital Market analysts both felt that Azure's Special Call discussing the whistleblower complaints "didn't bring out many details…". Indeed, Defendant Agrawal was later removed as Azure's CFO in May 2023, two months before Azure revealed on July 13, 2023 that it would have to further delay filing its 2022 Form 20-F after being stonewalled when Agrawal and Azure management withheld information necessary to complete the 2022 audit. Defendants' continued delay in filing the 2022 Form 20-F caused Azure to breach its debt covenants and be delisted from the NYSE. When Azure finally found an auditor who would sign off on its Fiscal 2022 financial statements, the auditor did so with a devasting qualified opinion and "a substantial doubt about the Company's ability to continue as a going concern."

The fraud came to light over the course of four corrective disclosures that caused the price of Azure's equity shares to decline by $14.32 per share, or nearly 100%.

Defendants' claim that they did not learn about the widespread corruption at Azure that they, themselves, admittedly orchestrated, until after the internal investigation was completed, is simply not believable. Because the SAC sufficiently states a claim for relief, Defendants' Motions should be denied.

3

II.     **FACTUAL BACKGROUND**[2]

A.      **Azure Purports to Be at the Forefront of India's Renewable Energy Focus**

Azure is a power producer and sustainable energy solutions provider in India that was founded in 2008 by Inderpreet Wadhwa. ¶17. Azure claims to be at the forefront of the solar sector and derives its revenue from the sale of power to independent industrial and commercial customers, as well as central and state government utilities, primarily SECI. ¶¶32, 34, 36. Since its founding, the Company has developed utility scale solar projects in the Indian states of Punjab, Gujarat, Rajasthan, Uttar Pradesh, and Chhattisgarh. ¶33.

To obtain new projects, Azure first submits a bid for the project and, if selected, is issued a Letter of Award. ¶35. Next, Azure acquires land through land aggregators. ¶40. Once the land is acquired, Azure constructs the plant. ¶35. After the plant is constructed, Azure enters into a Purchase-Power Agreement with customers, like SECI, typically for 25-years, who then pay a fixed rate for electricity generated. *Id.*

On May 3, 2019, Mr. Wadhwa stepped down and Azure ushered in a new leadership team. Defendants Gupta and Subramanian joined Azure in July 2019 as the Company's CEO and COO, respectively. ¶¶18-19. Defendant Agrawal, newly promoted to CFO as of March 15, 2019, worked alongside them. Around this time, renewable and clean energy began to attract massive investments from around the world. India's renewable energy sector was estimated to attract investment worth US$80 billion from 2022-2026. ¶25. Alongside this global craze for renewables came corrupt opportunists. *Id.* SECI, Azure's primary customer, is responsible for developing the entire renewable energy sector in India and had allocated 10 billion rupees (US$132 million) of India's 2022-2023 annual budget to renewable energy growth and expansion. ¶26.

---

[2] Defendants' suggestion that Plaintiff has not identified the dates of her purchases is patently false. *See* ECF 16-1, 16-2, and 16-4.

With the old leadership out, and the new leadership at the helm, Defendants Agrawal, Gupta and Subramanian steered the successful Company to its demise, ultimately resulting in its delisting from the NYSE. The Company's net losses steadily increased from a profit of INR 138 million in Fiscal 2019, to losses of INR 4.2 million in Fiscal 2021. ¶58. Short on cash, Defendants incurred additional debt to fund operations and finance new projects. ¶59. Indeed, according to the Company's 2021 Form 20-F and 2022 Form 20-F, Azure's total debt balance increased 79% over the course of only three years under the management of Gupta, Subramanian, and Agrawal. *Id.*

### B. Defendants Monitor Azure's Key Performance Metrics in Real Time

Azure uses a "centralized monitoring station" to aggregate and monitor its key operating metrics, including revenue, electricity generation and MWO, in real time. ¶¶52, 53, 55. For instance, on August 10, 2022, Azure's then CEO Harsh Shah highlighted that Azure "digitally manages its power plants by using real-time monitoring platforms for day-to-day analysis and testing various tools to augment in-house predictive analytical capabilities to accurately analyse energy generation…" ¶54. Defendants also frequently emphasized that Azure's centralized system allowed the Company to "monitor and analyze plant performance at the project site." ¶52. Through this centralized system, Defendants claimed that they could remotely monitor project performance in *real-time* and respond rapidly to potential generation anomalies. ¶53.

### C. Azure is Subject to Various Corruption, Anti-Bribery, and Safety Laws

As a power producer and former publicly traded company, Azure must comply with a multitude of laws and policies aimed at preventing corruption and ensuring compliance with safety and environmental laws, regulations, and policies. ¶¶42-50. For instance, Azure's Anti-Bribery and Corruption policy prohibits "any form of bribery[,]" directly or indirectly, "to any government official, private party or any third party." ¶50.

Azure must also comply with a host of safety and environmental laws, and failure to do so subjects the Company to liability, fines, seizure of property, and imprisonment. ¶¶42-44. As such, throughout the Class Period, Azure frequently reiterated its purported steadfast commitment to safety and frequently touted its ISO-45001 certification and safety "awards" to assure investors of "*Azure's focus on occupational health and safety*." ¶¶44-49. While Defendants publicly touted such commitments, behind the scenes, whistleblowers reported health and safety lapses and violations that, ultimately, revealed the Company's widespread "deviations from safety and quality norms." ¶¶78, 89. These safety violations were so significant that it required "immediate remedial action at that site" and "multiple initiatives aimed at enhancing safety[.]" ¶¶78, 175.

### D.    The First Whistleblower Complaints

On July 28, 2021, in the 2021 Form 20-F signed by Gupta and Agrawal, Azure disclosed that it had received multiple whistleblower reports raising concerns against "*Key Managerial Personnel*" related to acquisition and use of land in Rajasthan, Assam, and Uttar Pradesh, and other undisclosed "corporate actions." ¶61. Azure represented that it purportedly investigated the complaints, and determined they "were not substantiated." ¶68.

Shortly thereafter, on September 30, 2021, Azure's Audit Committee approved a change to remove its independent public accounting firm, Ernst & Young Associates LLP ("E&Y"). ¶64. This change, according to confidential local sources, occurred because E&Y raised concerns of corrupt payments to vendors and project cost allocation that would require additional qualifications in its audit report. ¶66. Azure announced to investors on November 26, 2021 that it dismissed E&Y and replaced them with S.R. Batliboi & Co. LLP ("S.R. Batliboi"). ¶64. Then, on December 27, 2021, investors learned that Agrawal was named and charged with offences under India's Prevention of Money Laundering Act in relation to Agrawal's prior employment. ¶69.

6

On October 12, 2023, Azure would reveal that, contrary to its prior assurances, the First Whistleblower Complaints raised valid claims against former executives regarding "improper use of political connections, special treatment of certain employees, payment of kickbacks," in addition to the "corrupt conduct in acquisition of land[.]" ¶63. Azure also revealed that, in July 2021, "former executives" made potential misrepresentations to the Board regarding an asset purchase transaction for a wind project's development and may have circumvented internal policies in connection with the approval of another wind project. ¶195. In other words, the First Whistleblower Complaint's claims that "Key Managerial Personnel" were corruptly acquiring land were well founded. ¶¶61-62. Worse yet, Azure received a Third Whistleblower Complaint, in September 2022 after Gupta and Subramanian inexplicably "relinquished" their positions, reporting nearly identical irregularities in commissioning procedures and in land acquisition process. *See* §II.G, *infra*. These complaints revealed significant corruption involving "certain [Azure] former executives." ¶93.[3]

**E.    Azure's Successive Executive Departures and Delays Filing the 2022 Form 20-F**

On April 26, 2022, Azure abruptly announced that Gupta and Subramanian were "relinquish[ing] their roles … with immediate effect." ¶71. With no succession plan in place, Board Chairman Alan Rosling became interim CEO until a replacement could be found. *Id.* On May 6, 2022, Azure announced Harsh Shah would assume the role as CEO effective July 1, 2022. ¶72. On June 1, 2022, Audit Committee Chairman Arno Harris, who led the investigations in the whistleblower complaints, suspiciously resigned from the Board. ¶73. Then, on August 16, 2022,

---

[3] Defendants' lament that the SAC omits Defendants' reference to improper conduct by the "sales team" (DB12 n.6) is disingenuous because, as Defendants point out in the very same sentence, "the allegation relating to the sales team was later determined to be hoax." DB12. Defendants also misleadingly imply that all the allegations from the First Whistleblower Complaints, therefore, must relate to the sales team and the entire complaints were a hoax. But Defendants well know their assertion is contradicted by the very fact that Azure ultimately found control issues in the process of acquiring land and land use rights, as well as evidence that former "executives" were involved in a scheme to make improper payments, which directly corroborates the First Whistleblower's allegations. ¶¶194, 197.

Azure filed an amended notice of inability to timely file its 2022 Form 20-F, signed by Defendant Agrawal. The notice revealed for the first time that the delay stemmed from an "ongoing review of its internal control and compliance framework[.]" ¶74. The delayed filing also coincided with Azure's first year without an emerging growth exemption, meaning it needed to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act. ¶68 n. 16. Without the latitude afforded by the exemption, Defendants were struggling to find an auditor willing to sign off on Azure's 2022 Form 20-F. ¶104. On August 29, 2022, after less than two months, Azure unexpectedly announced that Shah resigned as CEO, effective immediately. ¶76. Thereafter, Rupesh Agarwal became acting CEO. *Id*. He lasted less than a year, resigning on July 10, 2023 "to pursue other opportunities." *Id.*

## F.    Azure Receives the Second Whistleblower Complaint

Also on August 29, 2022, Azure disclosed that it received the Second Whistleblower Complaint months earlier in May 2022, alleging "procedural irregularities and misconduct by certain employees at a plant belonging to one of its subsidiaries." ¶77. During its investigation, Azure "discovered deviations from safety and quality norms," and "evidence of manipulation of project data and information by certain employees[,]" which necessitated disclosing the findings "to the appropriate authorities." ¶78. The complaint's severity prompted a *purported* renewed investigation of Azure's internal controls over financial reporting and immediate "action to influence mechanisms to remediate these health and safety issues." *Id*.

On August 31, 2022, Azure held a "Special Call" with investors, where Rosling refused to provide any further details relating to the whistleblower complaints. ¶¶169-72. In response, analysts felt left in the dark but surmised the issues were more significant than Azure let on. *See e.g.*, ¶¶179, 181 (J.P. Morgan: Azure "is clearly giving a [signal] to the market that the issue is

significantly bigger than what hopefully it actually is[;]" "Azure's investor call yesterday didn't bring out many details[.]").

### G.    Azure Receives the Third Whistleblower Complaint

On December 30, 2022, Defendants filed a Form 6-K containing unaudited financial statements for their Restricted Group-II including those for an Azure private subsidiary, which disclosed the "Parent entity" had received whistleblower complaints after fiscal year-end. ¶¶81-83. Those complaints flagged "improper conduct including mismanagement of funds for the project and inaccurate record keeping" by a "project manager[,]" and resulted in "termination of the employee and blacklisting of the manpower vendor." ¶85. Defendants dropped another bomb in the December 30, 2022 Form 6-K, disclosing Azure's receipt of the *Third* Whistleblower Complaint months earlier in September 2022. ¶83. The Third Whistleblower Complaint, like the first, raised, *inter alia*, "irregularities in commissioning procedures" and in the "land acquisition process[.]" Azure supposedly investigated the Third Whistleblower Complaint and, again, determined it was "unsubstantiated[.]" ¶83.

In an about face, not one month later, Azure disclosed that it formed a Special Committee to investigate material projects and contracts over a three-year period (during which Gupta and Subramanian led the Company) for anti-corruption and related compliance issues, and corruption allegations against certain former executives. ¶93. Azure disclosed the findings to the SEC and DOJ. ¶93. Investors, however, would not learn the extent of the misconduct raised in the complaints until October 12, 2023 when Azure filed its 2022 Form 20-F.

### H.    January 25, 2023 Press Release Disclosing Further Delays in Filing the 2022 Form 20-F and New Details Regarding Azure's Investigation into the Whistleblower Complaints

On January 25, 2023, Azure informed investors that it was still unable to file its 2022 Form 20-F and as such, the Company was facing the risk of delisting from the NYSE and debt covenant

defaults. ¶88. Defendants also admitted that, as a result of investigations into the misconduct raised in the whistleblower complaints, Azure had "identified *several material weaknesses* in its internal control over financial reporting[.]" ¶98. In the same update, Azure revealed that investigations into the Second Whistleblower Complaint resulted in "evidence of manipulation and misrepresentation of project data by some employees at that project site[,] [w]eak controls over payments to a vendor of the subsidiary and failures to provide accurate information both internally and externally were found[,]" which were reported to the SEC and DOJ. ¶¶89-90.

Azure also disclosed that one of its large SECI projects had "shortfalls in generation" and had not been "timely complete[d]" or "commission[ed] [to] the requisite contractually required capacity," subjecting Azure to penalties and damages under the PPA. ¶91. Azure disclosed a contingent liability for these failures, amounting to "INR 390 million (US$ 5.2 million), including INR 16 million (US$ 0.2 million)" that was the sum "impact of inconsistencies in project data . . . identified during the whistle-blower investigations." ¶97. An *Economic Times* article published two months later, on March 30, 2023, revealed that a "source in the know of the development" said "[t]he whistle blower has alleged that the company got a commercial operation data certificate (COD) without the project being fully commercially operational." ¶130.

Accordingly, Defendants revealed that Azure expanded its investigation into "all projects commissioned in Fiscal 2022 and Fiscal 2023[,]" which uncovered "inconsistencies in project data in three other projects." [4] ¶92. Azure also had formed a Special Committee in August 2022 "to review material projects and contracts over a three-year period for anti-corruption and related compliance issues" and to "investigat[e] corruption allegation against certain former executives."

---

[4] Azure's 2022 fiscal year is from April 1, 2021 through March 31, 2022, and its 2023 fiscal year is from April 1, 2022 through March 31, 2023. *See* ¶8 n.1.

10

¶93.[5] Thus, Defendants admitted that Azure's data manipulation and internal control problems dated back at least three years and expanded far beyond the purported one project previously disclosed on August 29, 2022. ¶94. Though purportedly unable to quantify the financial impact, Azure confirmed it was exposed to contractual, civil, administrative, and regulatory liabilities, including potential findings of corruption and fraud. *Id*.

In the January 25, 2023 update, Azure also revealed that the 2,666 MWO reported for March 31, 2022 had to be *"[a]djusted for inconsistencies in MWs* reported as identified by the Group through its review of 2022 whistle-blower allegations," or 6% to 10%, less than Azure's Fiscal 2022 guidance of 2,855 to 2,955 MWO issued just one month before. ¶95. Similarly, MWO for the six months-ended September 30, 2022 of 2,907 was also "[a]djusted for inconsistencies in MWs reported" as a result of the of 2022 whistleblower allegations. ¶96.

In the wake of these disclosures, Azure continued to lose executives, board members, and auditors with Defendant Agrawal being replaced as CFO on May 1, 2023 and demoted to CFO of an Azure subsidiary (¶224) and Rupesh Agarwal resigning on July 10, 2023. ¶223. Just three days later, Azure revealed that its 2022 Form 20-F would be delayed by another fourteen weeks because the Company was yet again changing auditors. ¶¶101, 272-73. On September 5, 2023, S.R. Batliboi and E&Y Mauritius also resigned as Azure's subsidiaries' auditors. ¶217. On October 11, 2023, one day before the 2022 Form 20-F was filed, Rosling resigned as Board Chairman with absolutely no explanation. ¶225. On November 1, 2023, Azure announced two more directors, Deepak Malhotra and Cyril Cabanes, inexplicably resigned. *Id*.

---

[5] Agrawal became Azure's CFO on March 15, 2019, and Gupta and Subramanian both joined Azure in July 2019. ¶¶18-19, 22. Thus the timeframe under investigation is the period during which the Individual Defendants were running Azure. Reviewing material projects and contracts "over a three-year period" from August 2022 maps directly over the reign of those defendants who took control in 2019, providing a strong inference to support Plaintiff's claims.

### I.    Azure Belatedly Files its 2022 Form 20-F and is Delisted from the NYSE

On October 12, 2023, *fourteen months* after its initial deadline, Azure filed its belated 2022 Form 20-F, which confirmed widespread corruption perpetrated by Azure's former executives. ¶192. Despite claims the First and Third Whistleblower Complaints were "unsubstantiated[,]" Azure disclosed that those complaints resulted in findings of egregious misconduct, violations of internal policies, and woefully inadequate internal controls related to land acquisition and use processes, and that third-party land aggregators were likely involved in making improper payments. ¶194. Azure de-capitalized its book of accounts by "INR 135 million (US$ 1.8 million)" for one project and by another "INR 118 million (US$ 1.6 million)" after a review of the "entire amount paid to land aggregators in other projects[,]" despite claiming there was "no improper transfer of money by the Group." ¶194.

Azure also reiterated findings related to the Second Whistleblower Complaint disclosed on January 25, 2023, confirming "manipulation and misrepresentation of project data[,]" "[w]eak controls over payments to a vendor[,]" "failures to provide accurate information both internally and externally[,]" and shortfalls in generation at, and failure to timely complete and commission, the SECI project. ¶193. The potential liabilities for the above misconduct included PPA cancellations, being barred from future SECI contracts, penalties, and fines from the SEC and DOJ. ¶198. Azure further disclosed that its "former executives[:]" (i) were part of a "scheme" "to make improper payments" to a third-party for one project; (ii) made "potential misrepresentations" to the Azure Board in July 2021 about "an asset purchase transaction for the development of a wind project[;]" and (iii) "may have circumvented internal policies in connection with the approval of another transaction related to another wind project." ¶195.

Finally, the 2022 Form 20-F included an adverse opinion from Azure's auditor, which made the following findings: (1) a substantial doubt for Azure's ability to continue as a going

concern, (2) improper payments by land aggregators for acquisition of land, resulting de-capitalisation of INR 253 million (equivalent to USD 3.4 million) and risk of potential penalties and liability from the SEC and DOJ; (3) "certain employees … obtained a premature plant commissioning certificate after submitting inaccurate data[;]" (4) "[p]otential overpayments" to an entity for "a development fee including obtaining government orders for development of a wind power project[;]" (4) Azure has not maintained effective internal control over financial reporting as of March 31, 2022, including over "land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process[;]" and (5) "significant discrepancies or inconsistencies between the expert opinions and management's estimates" for property, plant and equipment.

On November 13, 2023, the NYSE determined that Azure's equity shares were no longer suitable for continued listing and trading, and Azure was officially delisted from the NYSE.

### J.    The Truth is Revealed

As discussed above, the truth was revealed through a series of partial disclosures from April 26, 2022 through July 15, 2023, which caused Azure's ADS price to decline by $14.32 per ADS (or nearly 100%) from a closing price of $14.66 per ADS on April 25, 2022 to $0.34 per ADS on July 14, 2023, two days before Azure was due to file its 2022 Form 20-F. ¶¶9-10.

## III.    ARGUMENT

### A.    Legal Standards

To defeat a Rule 12(b)(6) motion, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept[] all factual allegations in the complaint as true," "draw[] all reasonable inferences in the plaintiff's favor," and consider whether "*all* of the facts alleged, taken

13

collectively…not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

To state a §10(b) claim requires: (1) a material misrepresentation or omission (i.e., falsity); (2) scienter; (3) a connected purchase or sale of a security; (4) reliance; and (5) causation and injury. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Here, Defendants only challenge falsity, scienter, and loss causation for one corrective disclosure.[6]

**B.    The SAC Adequately Pleads Materially False and Misleading Statements**

**1.    False Statements Regarding Compliance With Anti-Corruption Laws**

**a.    Defendants' Compliance Statement Was False When Made**

In its 2021 20-F filed July 28, 2021, signed by Gupta and Agrawal, Azure asserted that:

> ***We have developed and implemented formal controls and procedures to ensure that we are in compliance with the FCPA as well as anti-corruption, anti-bribery and anti-facilitation payment laws***. ¶111.

This statement was materially false and misleading when made because, at the time of this misstatement, Gupta and Subramanian had simultaneously engaged in a scheme to, *inter alia*, provide illegal payments to win new projects. *See* ¶¶63, 68, 78, 83, 93, 112, 194-95, 197, 201-02.

---

[6] Defendants submitted 31 documents, totaling over 1,800 pages, with their motions purportedly "for the Court's convenience[.]" DB7 n.4. In reality, Defendants strive to (improperly) create their own factual narrative. But Defendants could not be bothered to inform the court whether they were seeking judicial notice or to incorporate by reference, let alone provide any substantive argument as to why the Court should consider any particular exhibit at the pleading stage. "Outside of" incorporation-by-reference and judicial notice, "it is generally not appropriate for a court, on a motion to dismiss, to consider information or documents extrinsic to the complaint." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 287 (S.D.N.Y. 2013). Defendants cannot circumvent Plaintiff's well-pled complaint by insisting the Court take these documents for their truth. *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (declining to accept documents "for the truth of the matters asserted in them."); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 410 (2d Cir. 2008) (emphasizing that documents not considered for the truth of the matters asserted). Plaintiff disputes Defendants' improper use of a chart and Exhibits B, X, C, D, F, G, H, I, L, and M to support their inappropriate counter narrative that Azure was "candid with its investors about its operational capacity" and "timely disclos[ed] its actual generation of energy as well as when new projects became fully commissioned or suffered delays." DB7-10. In a not-so-subtle attempt to rewrite the SAC, Defendants suggest that the Court should rely on their alternative facts and interpretations to dispute Plaintiff's well-pled allegations, but courts must "accept all factual allegations . . . as true" and construe all reasonable inferences in plaintiffs' favor at the motion to dismiss stage. *Tellabs*, 551 U.S. at 322-23.

Indeed, Azure admitted that it received whistleblower complaints in June and July 2021 against "Key Managerial Personnel" concerning "corrupt conduct in acquisition of land, improper use of political connections, … and payment of kickbacks" in relation to the acquisition and use of land. ¶112. The Third Whistleblower Complaint confirmed the allegations of the First Whistleblower Complaints as Azure admitted that for Fiscal Year 2022, it had "identified significant control issues in the process of acquiring land and land use rights" and that "third party land aggregators may have been involved in improper payments[.]"[7] ¶¶63, 68, 83, 112, 194. Further, a Special Committee convened in August 2022 to review "certain material projects and contracts over a three-year period"— the same three-year period that Gupta and Subramanian served as CEO and COO —"for anti-corruption and related compliance issues[,]" which "identified evidence that *former executives* were involved in an apparent scheme with persons outside the Company to make improper payments." ¶197. The Special Committee also found "potential misrepresentations made by *former executives* to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project," and that these "former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project." ¶195. Although Azure chose not to identify the executives by name, the only reasonable conclusion is that the "Key Managerial Personnel" and "former executives" were the recently terminated Gupta and Subramanian.[8] Indeed, Defendants' own documents define "Key

---

[7] Thus, contrary to Defendants' suggestion that the allegations of the First Whistleblower Complaints were not substantiated (DB26), they were. Moreover, contrary to Defendants' suggestion (DB41), Plaintiff does not allege that the partial disclosures in ¶194 about the acquisition and use of land and involvement of third-party land aggregators in improper payments are themselves affirmatively false and misleading, but that the facts acknowledged there show why Defendants' other statements were false and misleading when made. *See, e.g.*, ¶112(a).

[8] Defendants' repeated attempts to withhold, then question, the identity of the "former executives" are not credible. DB41, 50 n.17. Indeed, the Special Committee investigated the three-year time period where Gupta and Subramanian were CEO and COO, respectively. Gupta and Subramanian are the only "former executives" who were in a position to enter into such a scheme on behalf of Azure and to (mis)represent to the Board. Defendants offer no alternative "former executives" who fit the bill. *See also* Ex. W at F-48, F-60 (discussing departure of "CEO and COO of the Company" and noting "both of the KMP's were relinquished from their roles."); *see also* §III.C.1. *infr*a.

15

Managerial Personnel" as the "Chief Executive Officer, the Chief Financial Officer, Chief Operating Officer[.]" *See* Ex. A at 13.

Accordingly, it was misleading for Defendants to reassure investors that they had implemented formal controls and procedures to ensure compliance with anti-corruption laws, when Gupta and Subramanian were *simultaneously* engaging in, *inter alia*, a "scheme with persons outside the Company to make improper payments" to win new projects. *See In re Banco Bradesco S.A. Sec. Litig.,* 277 F. Supp. 3d 600, 660-61 (S.D.N.Y. 2017) (liability where compliance statements could reasonably be interpreted as suggesting the Company's senior-most executives were not at the same time engaging in corrupt activities when they were); *see also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (while investors may know statements that a company had implemented procedures to ensure compliance did not guarantee 100% compliance, they would be misled by said statement "if in fact [they] were then failing to prevent" violations of such regulations); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "[w]e have extensive procedures and controls that are designed to … address conflicts of interest" actionable where defendant was "alleged to have sold financial products to clients despite … conflicts of interest").

Defendants' arguments to the contrary lack merit. *First*, Defendants contend (repeatedly) that their statements are not false because these "findings were made after the challenged statements were made." DB26. However, (1) the date Azure decided to publicize a "finding" does not equate to when the corruption occurred[9]; (2) Gupta and Subramanian were already engaging in the misconduct by June 2021 (if not earlier); and (3) Azure admittedly received the First Whistleblower Complaints describing the corruption in "June and July 2021," *before* the July 28,

---

[9] Such a contention (including what Defendants deem a "finding") should not be accepted at the motion to dismiss stage and impermissibly asks the Court to weigh evidence in Defendants' favor. *See Tellabs,* 551 U.S. at 323.

2021 Form 20-F (and although initially described as "unsubstantiated[,]" the Special Committee confirmed those accounts *were* substantiated); and (4) Azure admitted it "identified potential misrepresentations made by former executives to the Board *in July 2021* regarding an asset purchase transaction …[and that] our former executive officers may have circumvented internal policies in connection with the approval of another transaction related to another wind project." ¶¶61-63, 83, 194-97. Gupta was then on Azure's Board, and even assuming, arguendo, that some other (*non-defendant*) Board members were unaware of the ongoing corruption, this is irrelevant where Defendants (and CEO Gupta in particular), themselves, made such misleading representations while personally engaging in a corrupt scheme at the same time. *See, e.g., Banco Bradesco*, 277 F. Supp. 3d at 660 (reassuring statements misleading given that top executives themselves engaged in the alleged misconduct).[10]

*Second*, Defendants' argument that Plaintiff "does not point to any violation" of anti-corruption laws, and Azure found "no evidence of improper payments" is false. DB26. Azure admittedly "identified evidence" that its executives were involved in a "scheme" "to make improper payments" (predating the 2021 20-F), clearly indicating violations of anti-corruption and anti-bribery laws. ¶197. Moreover, Defendants' suggestion that there was no evidence of improper payments – to the extent it is not flatly contradicted by the above admission – improperly relies on the distorted parsing of their own statement. DB26. Defendants' disclosures do not claim that improper payments did not occur, but that their Special Committee did not find *direct* evidence of

---

[10] *See also Jackson Cty. Emples. Ret. Sys. v. Ghosn,* 510 F. Supp. 3d 583, 611 (M.D. Tenn. 2020) (finding liability for general statements about compliance with applicable laws where special committee found facts sufficient to suspect CEO and Senior VP engaged in alleged scheme); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 465 (S.D.N.Y. 2017) ("Plainly, the fact that some of Eletrobras's officers have been engaged in [corrupt] conduct" for years that resulted in, *inter alia*, replacement of management "is not 'so obviously unimportant to a reasonable investor' to be immaterial"); *see also Meyer*, 761 F.3d at 251 (company acknowledgment in a June 8, 2010 report of "existing" problems provided sufficient inference that problems were present at time of May 13, 2010 offering ); *In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *14 (S.D.N.Y. Mar. 14, 2024) (representations company was "in material compliance" with all applicable laws and regulations actionable where regulatory review implied otherwise).

improper payments by the Company *to the government* or improper transfers of money by *the Group*.[11] ¶¶80, 194. That Azure did not identify payments by "the Company" or "the Group[,]"[12] does not mean there were no improper payments made by the Individual Defendants or entities acting on their behalf, nor does the purported lack of direct evidence of payment to the government mean that were no improper payments to vendors or to the government through other entities. Defendants cannot evade liability by construing bribery so narrowly (DB25-26), particularly given improper payments *did* occur. *See e.g.*, ¶202 ("potential overpayments" used to "obtain[] government orders" were routed indirectly through another entity); ¶85 (identifying "improper conduct" including "mismanagement of funds").[13]

Moreover, contrary to Defendants' suggestion (DB26), the aforementioned improper payments *did* require adjustments to be made in Azure's books for multiple projects. ¶¶194, 201 (adjustments totaling $3.4 million for *multiple* projects due to alleged "improper payments by land aggregators for acquisition of land").[14] Defendants also admitted to the data manipulation scheme to win new projects through "inaccurate record keeping," "manipulation" and "misrepresentation of project data," "failures to provide accurate information both internally and externally," "corrupt

---

[11] *See, e.g.*, ¶197 (acknowledging "evidence that former executives were involved in an apparent scheme with persons outside the Company to make improper payments in relation to a project but no related improper payments or transfers *by the Group* have been identified."); ¶193 ("Weak controls over payments to a vendor and failures to provide accurate information both internally and externally were found, but no direct evidence that any improper payment was made to any *government official* was identified."); ¶194 ("third party land aggregators may have been involved in improper payments but no improper transfer of money *by the Group* was identified.... [Adjustments in the books of account were made], "though *no improper payments by the Group* could be identified").

[12] According to Azure 2022 20-F, "the Group" refers to "Azure Power Global Limited, a company organized under the laws of Mauritius, together with its subsidiaries (including Azure Power Rooftop Private Limited ("AZR"), and Azure Power India Private Limited, or APIPL, its predecessor and current subsidiaries)." *See* Def. Ex. W at 5.

[13] *See Banco Bradesco*, 277 F. Supp. 3d at 663 (rejecting defendants' "attempt to split hairs" by arguing that Bradesco never paid anything to a government official where it was possible defendants "had only negotiated and offered, but had not actually paid, bribes").

[14] Contrary to Defendants' suggestion that the adjustment related to one project (DB42), Azure made an adjustment of $1.8 million, then "reviewed the entire amount paid to land aggregators in other projects to identify any similar issue" and then made another adjustment of $1.6 million, totaling $3.4 million *for multiple projects*. ¶194. While Defendants argue the amount is "immaterial" (DB42), Azure deemed it significant enough to require an adjustment. Moreover, it was due to corrupt conduct, which investors find material. *See* §III.B.1.b., n.19, *infra*.

18

payments," and "inconsistencies in MWs reported" (¶¶85, 89, 94, 95-96, 162, 170, 193), over the three-year period beginning after Gupta, Subramanian, and Agrawal took over. ¶¶18-19, 22, 58-60, 78, 88, 92-94, 197. Such widespread manipulation, in furtherance of Gupta and Subramanian's scheme to win new projects renders Defendants' compliance statements misleading.

Defendants' statement is not inactionable "puffery" or forward-looking. It is past tense ("have developed," "have implemented"), and describes specific actions purportedly taken "to ensure" compliance with a specific set of laws, which were of great importance to investors, particularly given that Azure operated under heavy regulations. ¶¶43, 50-51, 111; *see Meyer*, 761 F.3d at 247, 251  (statements that company had implemented procedures to "ensure that [its] waste emissions comply with … environmental standards" actionable because they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations," notwithstanding risk warnings); *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, 2018 WL 4844019, at *8 (S.D. Fla. Oct. 4, 2018) (statement that company had been "careful to assure ... strong compliance" is a "verifiable and specific factual statement" and more than mere puffery given defendants' industry was heavily regulated); *City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) ("working ... to make sure that we meet the highest level of compliance and quality" not puffery).[15] Such reassurances about actions taken to ensure compliance with anti-corruption laws were material as evidenced by the very "risk disclosures" Defendants cite in Azure's 2021 Form 20-F, which recognized that

---

[15] *See also Thorpe v. Walter Inv. Mgmt., Corp.*, 2014 WL 11961964, at *12 (S.D. Fla. Dec. 23, 2014) ("Defendants are involved in a heavily regulated industry and their statements relating to compliance with various state and federal laws and the internal controls for ensuring compliance were more than mere puffery"); *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *3 (N.D. Ga. June 30, 2011) (defendant's reassurance about its manufacturing and quality control procedures constituted material misrepresentation because it was "designed to reassure investors in light of the highly-regulated nature of the blood reagent industry").

misconduct contrary to such laws could harm the Company. DB21-22; *see Meyer*, 761 F.3d at 252 (statements were material as non-compliance could cause harm to company).[16]

Moreover, "whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Banco Bradesco*, 277 F. Supp. 3d at 647. In *Banco Bradesco,* this Court found that defendants' statements *in* their "Code of Ethical Conduct" were inactionable because such documents are "inherently aspirational." *Id.* at 650-52, 658.[17] However, statements in Bradesco's Forms 20-F "*about* the Code of Ethical Conduct or about the Company's anti-corruption policies and efforts" to ensure compliance *were actionable. Id.* at 659 (emphasis in original). For example, statements that Bradesco had "adopt[ed] an 'effective' anti-corruption policy" did not "express mere aspiration," but were actionable, as they "sought to reinforce and reassure its investors" that bribery and corruption was unacceptable and prohibited, while at the same time senior executives were involved in corrupt schemes (*id.* at 660) – as alleged here.[18] "[B]y choosing to speak to its investors on the topic of bribery and other corruption" and "in a manner that could be reasonably interpreted as suggesting at least that the Company's senior-most executives were not at the same

---

[16] The two cases Defendants rely on (DB25) are factually inapposite. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (statement that speaker was "pretty confident" and "pretty positive" about renewing partnerships in the future deemed "puffery;" statements here are not such hazy bromides about the future); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 745, 755-56 (S.D.N.Y. 2017) (statements about ethics generally and in ethics code and code of conduct found to be "puffery" because codes of ethics and conduct are "inherently aspirational"; the statements here were not about ethics, or made in codes of ethics or conduct).

[17] The Court also found that the risk factors in *Banco Bradesco* did not create a stand-alone duty to disclose uncharged conduct, and that the company's disclosure that its subsidiary was party to legal proceedings relating to corruption investigations, which may broaden and could adversely affect the company, did not create a duty to go further and accuse itself of wrongdoing. *Id.* at 651. Here, Plaintiff alleges that Defendants made an affirmatively misleading statement, and (unlike Bradesco, which had already disclosed its involvement in corruption investigations and legal proceedings), failed to disclose that the Defendant CEO and COO were then involved in a corruption-related fraudulent scheme. *Compare also id.* (disclosing subsidiary was "a party to certain legal and administrative proceedings filed against Petrobras and other defendants" and that "[w]e or our subsidiaries may become a party to other legal and/or administrative proceedings against Petrobras or other companies which have not yet been filed") *with* ¶108 ("In the past five fiscal years we have not experienced any fraud or misconduct by employees...").

[18] Reasonable investors could have also relied on the notion that the Company held such aspirations as reflecting that Azure's senior most officers were not simultaneously engaged in corruption. *See Banco Bradesco,* 277 F. Supp. 3d at 660 ("'It is well-settled that, when defendants knowingly or recklessly fail to follow policies announced in their public filings, they may cause[] those filings to be materially misleading in that the disclosed policy no longer reflect[s] actual practice.'").

time engaging in such activities, [Azure] was under a duty to speak the whole truth. Because the [complaint] asserts that it did not," such statements were false and misleading. *Id.* at 661; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (same); *Meyer*, 761 F.3d at 250-52 & n.3 ("once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (statement or omission's "veracity … is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers").

### b.  Defendants' Risk Warnings Were Insufficient and Themselves Misleading

In the 2021 Form 20-F, Defendants issued several risk disclosures purporting to warn investors of the potential risk that Azure may not be in compliance with regulatory laws, including:

- Our international corporate structure and operations require us to comply with anti-corruption laws and regulations of the United States government and various non-U.S. jurisdictions. ***If we are not in compliance with applicable legal requirements, we may be subject to civil or criminal penalties and other remedial measures***. ¶111.

- ***Any historic or future violations of these laws, regulations and procedures by our employees***, independent contractors, subcontractors and agents could be costly and time-consuming to investigate and expose us to administrative, civil or criminal penalties or fines…. *Id.*

- ***Any damages caused by fraud or other misconduct by our employees could adversely affect our business***, results of operations and financial condition. ¶108.

- In the past five fiscal years we have not experienced any fraud or misconduct by employees which has materially affected our business, results of operations or financial condition. However, ***we may not be safeguarded against all fraud or misconduct by employees or outsiders***, unauthorized transactions by employees and operational errors. *Id.*

- ***Employee or executive misconduct could also involve*** the improper use or disclosure of confidential information, data breach or ***other illegal acts***, which could result in regulatory sanctions and reputational or financial harm. *Id.*

The above purported risk warnings were false and misleading when made because the risks had already materialized as Defendants had already violated numerous anti-corruption laws and

21

regulations and committed fraudulent acts in obtaining and commissioning projects. *See Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (risk warnings misleading if it "has already happened or is then happening"); *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 228 (S.D.N.Y. 2023) (cautionary disclosures about factors that might affect customer retention actionable as they could be read to suggest decline in retention rate was only hypothetical); *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 161 (E.D.N.Y. 2020) (warning employee could fail to comply with a law misleading where employee already violated it); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *16 (S.D.N.Y. Sept. 27, 2020) (same); *Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (same).[19]

Moreover, Azure's "boilerplate" warnings, which allude to vague and general regulatory violations, fraud, and misconduct, are precisely the type that courts in this district routinely reject for failing to convey substantive information about the then-occurring corruption related to, *inter alia*, land aggregators, plant commissioning, and project approvals. *See Karimi v. Deutsche Bank Aktiengesellschaft,* 607 F. Supp. 3d 381, 396 (S.D.N.Y. June 13, 2022) ("vague disclaimers" insufficient); *In re Salix Pharms., Ltd.,* 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (boilerplate risk disclosures insufficient); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) (warnings "listing garden-variety business concerns that could affect *any* company's financial well-being" are "not meaningful cautionary language").

---

[19] Defendants' own cases (DB22) acknowledge that "risk disclosures" may themselves be actionable when they present as risk an event that has already transpired. *See Chapman v. Mueller Water Prods.*, 466 F. Supp., 3d 382, 405 (S.D.N.Y. 2020) (collecting cases holding "a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired"); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) (risk disclosures that "a governmental authority may take a ... contrary" position and that it "could [be] subject[ed] ... to investigation" misleading because a reasonable investor could have concluded such unfavorable events had not yet occurred, when they had); *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *6 (S.D.N.Y. July 16, 2020) (risk factors actionable where risk "'has already occurred,'" as here). Also inapt is *Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6-8 (S.D.N.Y. Mar. 31, 2010) (risk factors warning cost of raw materials could impact results not misleading as this could not reasonably be interpreted to imply such costs had not increased given their constant fluctuation, and plaintiffs acknowledged the increase was temporary).

Defendants argue they are not required to disclose "uncharged, unadjudicated wrongdoing." DB23, AB14. However, Defendants triggered a duty to disclose by assuring investors that they had "developed and implemented formal controls and procedures to ensure that we are in compliance" with anti-corruption laws and by portraying as *possible* "risks," non-compliance with anti-corruption laws, fraud, or executive or employee misconduct (*e.g.*, "*If* we are not in compliance," "*Any* historic or future violations"). *See In re FirstEnergy Corp.*, 2022 WL 681320, at *11 (S.D. Ohio Mar. 7, 2022) ("Even absent a per se rule requiring disclosure of unproven criminal conduct, 'corporations are [nevertheless] obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of [uncharged, unadjudicated conduct] to the same extent it applies to the disclosure of any other material information.'"; accepting plaintiffs' corruption claims as true even "Defendants' '[a]spirational statements' and '[g]eneric statements of legal compliance' … would be less than a full and fair disclosure of the facts actually known to the Company") (quoting, *inter alia*, *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007)); *In re Van Der Moolen Holding N.V. Sec. Litig*., 405 F. Supp. 2d 388, 400-01 (S.D.N.Y Dec. 13, 2005) (rejecting argument that "securities laws do not require a company to accuse itself of wrongdoing" because a company that puts a topic at issue, creates an obligation to disclose information that significantly alters the mix of information available).[20]

---

[20] The SAC does not allege a free-standing duty to disclose uncharged wrongdoing nor one based on "aspirational" statements. Thus, Defendants' cases (DB23, AB14) are distinguishable. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183-84 (2d Cir. 2014) (defendant did not have independent duty to disclose wrongdoing where it disclosed its involvement in multiple legal proceedings and government investigations; nor was such duty triggered by statements – unlike those here – merely about compliance with "ethical norms" that were "explicitly aspirational" "with qualifiers such as 'aims to'"); *Banco Bradesco*, 277 F. Supp. 3d at 651, 660 (risk factors did not "affirmatively require disclosure of uncharged illegal conduct" where company acknowledged it was party to legal proceedings and may become party to others; but sustaining statements that it had "adopt[ed] an 'effective' anti-corruption policy" which did not "express mere aspiration," but sought to "reassure" investors that corruption was unacceptable and prohibited, while at the same time senior executives were involved in corrupt schemes, as alleged here).

23

Defendants' argument that the First Whistleblower Complaints were disclosed, investigated, and found "groundless," is unavailing. DB23. Defendants omitted any mention of corruption, called the reports "unsubstantiated" (¶83), and said Azure had "completed its investigation" and "[t]he issues raised, including those raised against Key Management Personnel, have been closed." ¶68.[21] But Azure ultimately acknowledged that the complaints did allege *corruption*, and *were* substantiated, which Gupta and Subramanian knew at the time of the July 28, 2021 statements. *See Matrixx*, 563 U.S. at 47 (misleading to disparage report as "unfounded" where company had access to contrary facts).

Defendants further seek to capitalize on their belated admission that the First Whistleblower Complaints were accurate and supported by "evidence," to argue that their July 2021 statements were not false and misleading when made, and their risk warnings simply turned out to be true after the fact. DB24. But again, *when* Azure self-servingly chose to disclose a "finding" does not obviate that such corruption had occurred by June 2021 before the statement was made in, particularly where Gupta and Subramanian committed the corruption, themselves. *See* §III.B.1.a., *supra*; *Matrixx*, 563 U.S. at 47; *Banco Bradesco*, 277 F. Supp. 3d at 660.[22]

---

[21] As in *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 213 (D. Conn. 2023), "[o]ne cannot plausibly read those statements as anything other than denials of illegal conduct," thus statements "den[ying] liability" triggered the duty to disclose.

[22] Defendants' own authority (DB24) supports that understating risk is misleading where, as here, defendants are aware of information, which when left undisclosed, leaves investors with a false impression (¶¶206-09). *See In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *24-25 (S.D.N.Y. Sept. 20, 2019) (generic warnings that gave "false impression" about recall risk were actionable because of facts suggesting a safety issue). *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) is also distinguishable. There, the defendants' failure to disclose two inspections that showed an improving number of minor plant deficiencies was not actionable even where a third inspection ultimately led to a plant being shut down, because there was nothing about the first two inspections to indicate the third inspection would lead to any adverse consequences. Here, by contrast, the issue raised by the very First Whistleblower Complaints was a corrupt scheme by the CEO and COO, which could not reasonably be disregarded by Defendants (including Gupta and Subramanian themselves) as immaterial, particularly given the misrepresentations "executives" made to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project.

## 2.    The Internal Controls Statements Were False and Misleading

In the 2021 Form 20-F, Defendants falsely portrayed the hypothetical "risk" that "[o]ur existing operations, personnel, systems, and internal controls *may* not be adequate to support our growth and expansion," and that "certain internal control processes are carried out manually, which *may* increase the risk that human error, tampering or manipulation will result in losses that may be difficult to detect." ¶¶108, 110. These statements were false and misleading when made because Azure admitted that its internal controls over financial reporting were not effective for Fiscal Year 2022 due to "several material weaknesses[.]" ¶¶98, 202-03. Indeed, Defendants admitted that, throughout the Class Period, Azure had "material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls inter-alia including those related to significant estimates and financial statement closing process." ¶203. The statements were false for the additional reason that Azure was unable to file its annual report due to "ongoing review of its internal control and compliance framework," whistleblower complaints identifying corruption and data manipulation and improper payments by executives, and Azure's internal controls were in such shambles that its auditor resigned because it could not get information it had long requested from Azure for its audit. ¶¶61, 63, 74, 78, 83-85, 88-94, 193-97.

Defendants' arguments in response lack merit. *First*, Defendants dispute how many projects were affected by the data manipulation scheme and for how long. DB33. But there is no question that Azure "identified evidence of manipulation and misrepresentation of project data" (¶89), then "widened its review to include a review of all projects commissioned in Fiscal 2022

25

and Fiscal 2023"[23] and "identified inconsistencies in project data in three other projects" for a total of at least four projects for which data was manipulated. ¶92. Defendants' argument that they identified "inconsistencies," not "manipulation or misrepresentation" is semantics. DB34. They admit these so-called "inconsistencies" caused Azure to restate MWO, threatened "liabilities under the relevant contractual and tender documents," and resulted in suspensions and terminations of employees, "remedial measures in both project control and monitoring," and required disclosure to the SEC and DOJ. ¶92. These are drastic measures for purported mere "inconsistencies."

While Azure's third auditor in two years reported a material weakness in internal controls over financial reporting "as of March 31, 2022" (despite supposed remediation efforts) (¶203), it is clear from the compounding whistleblower complaints beginning as early as June 2021 that the corruption and other internal control deficiencies were material and existed Companywide throughout the Class Period. *See In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *5 (S.D.N.Y. June 12, 2018) (statements misleadingly suggesting effective internal controls would be "viewed by the reasonable investor as having significantly altered the total mix of information"); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *2, 12 (S.D.N.Y. Apr. 14, 2020) (Woods, J.) (statement regarding internal controls materially misleading where they failed to dissuade improper practices, and auditor "expressed concern" about certain practices); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720-21 (S.D.N.Y. 2019) (same).

*Second*, Defendants state that "there is no support in the Company's filings" that corrupt payments existed at four projects, or had anything to do with the data issues, and repeat their semantic argument that Azure reported no evidence of corrupt payments "by the Company."

---

[23] Fiscal 2022 began April 1, 2021, pre-Class Period. Azure elsewhere stated the Special Committee's investigation was convened in August 2022 (during Fiscal 2023) "to review material projects and contracts over a three-year period" (coinciding with Gupta and Subramanian's tenure). ¶93.

DB34. However, even the First Whistleblower Complaints (later substantiated) focused on Gupta and Subramanian's corrupt payments for the acquisition and use of land in at least three projects, in Rajasthan, Assam, and Uttar Pradesh given the complaints concerned "Key Managerial Personnel[.]" ¶61. Azure and its auditor also acknowledged "overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project" and "misrepresentations" and "circumvention of internal policies" in connection with a wind-solar project "by former executives[.]" ¶¶195, 202.a.  That alone indicates corrupt payments in connection with five projects.[24]

Further, as Azure's auditor noted, Azure entered into agreements with multiple land aggregators for land use permissions which likely involved making corrupt payments as a "development fee" to obtain government orders for a wind project, and obtaining a premature plant commissioning certificate after submitting false data. Azure also admitted that a "project manager engaged in improper conduct including mismanagement of funds for the project and inaccurate record keeping[,]" which led to, *inter alia*, blacklisting a vendor. ¶85. Finally, Azure recorded a US$5.2M contingent liability to specifically address commissioning delays related to its nefariously obtained premature COD *and* inconsistencies in project data. ¶¶91, 97. Thus, Defendants' data manipulation was both inextricably tied to and supported their corrupt payments.

### 3.    Defendants Overstated Azure's Megawatts Operating

Throughout Fiscal 2022, Azure touted MWO as its key metric demonstrating substantial growth at Azure. However, despite *multiple* whistleblower complaints alleging "Key Managerial

---

[24] Defendants' argument that "there were no findings" that "failures to provide accurate information internally or externally" that extended beyond one project (DB34), is belied by their own statements referring to multiple different projects where data manipulation occurred. *See* ¶¶89, 193 (failures to provide accurate information both internally and externally were found," by "*some employees*" at one project site); ¶195 (misrepresentations made *by former executives* to the Board in July 2021 regarding an asset purchase transaction for the development of *a wind project*," and policy circumventions regarding *another* project).

Personnel" were involved in "corrupt conduct in acquisition of land" and "payment of kickbacks" to win projects, and that "former executives to the Board" admittedly "circumvented internal policies" and made "misrepresentations" to the Board regarding projects and project data, Defendants falsely reported MWO as growing and at an increased rate. For example:

- 8/30/21 Press Release: "Megawatts ("MW") Operating* were 2,052 MWs, as of June 30, 2021, an increase of 23% over June 30, 2020…." ¶113.

- 2/25/22 Press Release: Reporting "Megawatts ("MWs") Operating were 2,523 MWs, as of December 31, 2021, an increase of 37% over December 31, 2020," and falsely claiming Azure "commissioned 313 MWs AC during the three months ended December 31, 2021." ¶¶143, 146.

- 2/28/22 Earnings Call: Defendant Gupta stated "…We had 37% more megawatts operating in quarter 2 – quarter 3 this year than we did at the same time last year" and Defendant Agrawal falsely reported "[a]s of December 31, 2021, we were operating 2,523 megawatts on a PPA or AC basis, which is 37% higher than what we were operating a year before." ¶¶148-49.

- 3/14/22 Press Release: Reporting "[f]ollowing this, Azure Power has now operationalized 2,683 MWs of high-performing renewable energy assets in India." ¶155.

Defendants admit that the above, and other similar misstatements (e.g., ¶¶ 129, 134-35, 137, 141, 151), were false when made because Azure overstated MWO for Fiscal 2022. As Defendants disclosed in a January 25, 2023 press release and Azure's 2022 Form 20-F, Azure restated MWO for Fiscal 2022 downward to 2,666 MWs to "adjust[] for inconsistencies" identified by the "2022 whistleblower allegations." ¶¶95-96; *Insys*, 2018 WL 2943746, at *5 (subsequent admissions of falsity through restated financial results, sufficient).[25] The "adjustments" decreased MWO by 6% to 10% as compared to Azure's 2022 annual guidance of 2,855 to 2,955 issued just one month before the end of the Fiscal year, which would have ***included the prior 11 months of***

---

[25] Defendants' disingenuously claim that Azure's 2022 Form 20-F ultimately reported an increase in MWO for Fiscal 2022. DB 31 n.12. Not so. In the January 2023 release, Defendants explicitly stated that the restated MWO of 2,666 ***excluded*** the Rooftop sale. The 2022 Form 20-F, however, ***included*** 86.5 MWO from the Rooftop sale after the transaction was subsequently terminated. Excluding the 86.5 MWO from the 2,752 MWO reported in the 2022 Form 20-F results in 2,666—the exact same figure reported in the January 25, 2023 Press Release.

*actual results*. Defendants admit falsity by arguing that Azure previously disclosed a higher MWO figure for Fiscal 2022 of 2,683 in a March 14, 2022 press release (which they then argue is an immaterial difference of .63% as compared to the restated 2,666 MWO) then reported in the January 2023 release. DB31. Moreover, Defendants' own admission that the restatement was necessitated by the misconduct in the whistleblower complaints, and that such conduct related to "manipulation and misrepresentation of project data," "corrupt payments" and "failures to provide accurate information both internally and externally" for at least four large projects, resulting in "shortfalls in generation"[26] (¶¶89-91, 202), effectively admits MWOs were falsity inflated due to corruption at Azure. *Id.* As with the commissioning false statements (*see* §III.B.5, *infra*), falsity is adequately pled where, as here, Defendants admit falsity through a subsequent restatement. *See Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F.Supp.3d 526, 544-45, 549, 551 (S.D.N.Y. 2017) (restated financials "sufficient basis for pleading that those statements were false").

Each of Defendants' arguments lack merit. First, Defendants contend that it is inappropriate for Plaintiff to use Azure's annual guidance as the basis for a restatement because the forecasts are only estimates and not actual results. DB29-30. But Azure's annual Fiscal 2022 guidance was made only one month prior to the end of the Fiscal year, after Defendants already had *eleven months* of *actual* financial results, which they presumably incorporated into their annual forecasts. Thus, a reasonable investor would have understood from Defendants' February 25, 2022 disclosure *increasing* Azure's annual guidance to 2,855 to 2,955 that annual MWO was certain to

---

[26] Defendants' arguments that their statements are not actionable because Plaintiff failed to allege a breach of contract (DB35-36) or that Defendant had a duty to disclose the plant commissioning certificate was prematurely obtained (DB40) are red herrings. Plaintiff does not challenge any false statements regarding compliance with contracts or the timeliness of Azure obtaining plant commissioning certificates. Rather, Plaintiff adequately alleges the MWO metric was falsely overstated, requiring a downward adjustment for the "aggregate impact of inconsistencies in project data that were identified during the whistleblower investigations."

be within that range. As such, Plaintiff's quantification of the restatement—a 6% to 10% decrease in MWO—is the most reasonable inference.

Defendants next claim that Plaintiff does not identify any restated MWO figures. DB29. Not so. As discussed above, the SAC alleges each of Azure's quarterly reported MWO was false and that, given MWO is a *cumulative* number, Azure restated MWO downward for Fiscal 2022 *in one aggregate adjustment* applicable to all prior quarters. Plaintiff also alleges Defendants restated the Fiscal 2022 MWO guidance which was comprised of 11 months of actual financial results. ¶95. Moreover, Defendants' own Motion concedes such where they point to the March 14, 2022 disclosure of 2,683 MWO, a statement Plaintiff alleges was falsely inflated, as essentially being the annual MWO figure that they subsequently restated down. DB31. Defendants then take the contradictory position to argue that, because Azure never reported year-end MWO, there can be no restatement. DB29. Defendants cannot have it both ways—arguing that the March 14, 2022 MWO disclosure was essentially Azure's annual MWO, but it was an immaterial difference, while simultaneously claiming no full year results were disclosed for purposes of claiming there was no restatement. Using Defendants' logic, Azure would not have needed to "adjust for inconsistencies" if no prior figure was reported. But Defendants made such an adjustment.

Defendants' materiality argument is equally flawed. "[T]o properly assess the materiality of errors in financial statements, 'a court must consider both quantitative and qualitative factors ... and that consideration should be undertaken in an integrative manner.'" *Insys,* 2018 WL 2943746, at *4 (rejecting argument that a restatement of less than 5% was immaterial in denying motion to dismiss). "Quantifying, in percentage terms, the magnitude of a misstatement ... cannot appropriately be used as a substitute for a full analysis of all relevant considerations." *Id.* Here, not only is Azure's MWO restatement material in terms of percentage decline (6-10%), but it is also

material because it was the result of admitted corruption that occurred at the highest executive levels and spanned across multiple projects. A reasonable investor would have found these facts important in making their investment decisions. *Id.* Indeed, courts have repeatedly held that regardless of the financial impact, allegation of internal fraud are material. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme involving a "single contract out of [] more than 10,000" that "was worth a fraction of SAIC's yearly revenues" was material given "exposure to significant civil and even criminal liability").[27] Further, that Azure deemed it necessary to make adjustments to MWO supports materiality. *Insys,* 2018 WL 2943746, at *13 ("that [Defendants] restated their financial information ... reinforces the conclusion that defendants had made ... material misstatements.") (quoting *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 234 (S.D.N.Y. 2006)). In any event, whether the restatement is material is an issue of fact not appropriate for a decision on a motion to dismiss. *See In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *18 (S.D.N.Y. Mar. 12, 2024) (materiality "can be decided on a motion to dismiss only if reasonable minds cannot differ[.]").

Moreover, Azure's purported risk warnings (DB30) are insufficient as they do not specifically warn that MWO could be overstated due to corruption and kickback payments, or that those risks had already materialized. *See Facebook*, 986 F. Supp. 2d at 516 ("risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has

---

[27]*See also, e.g.*, *Grupo Televisa*, 368 F. Supp. 3d at 720-21 (rejecting argument that bribe paid was relatively small and thus immaterial, as "participation in the years-long bribery scheme is material because it exposed" company to potential liability and imperiled its revenue); *Insys*, 2018 WL 2943746, at *4-5 (rejecting argument that restatement of less than 5% was immaterial); *In re Eletrobras Secs. Litig.*, 245 F. Supp. 3d 450, 464-65 (S.D.N.Y. 2017) (rejecting argument that illicit payments were only 0.20% of assets and .01% of assets where had engaged in bribery); *Villella v. Chem. & Mining Co. of Chile Inc*., 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing "0.5%" of "average annual income" material); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (materiality where errors in financial statements were due to bribery scheme).

already materialized.").[28] Finally, contrary to Defendants' contention (DB31, 40-41), Azure specifically identified where its internal controls were deficient in the 2022 Form 20-F, including, the very issues raised in the whistleblower complaints that Defendants admit necessitated the restatement. ¶203 ("[m]anagement has identified material weaknesses in the design and operating effectiveness of internal control over financial reporting in relation to land acquisition process…and…including those related to significant estimates and financial statement closing process.").[29]

Alongside their falsely represented MWOs metrics, Defendants regularly reported the amount of electricity generated in kilowatts hours ("kWhs"). *See, e.g.* ¶114 ("Electricity generation…was 1,112 million kWh"), ¶127 (Electricity generation…was 1,001 million kWh and 2,113 million kWh…"). Electricity generation represents the actual amount of power generated by Azure's solar power plants over the reporting period and is the product of plant load factor and the average MWO. ¶55 n.13. Azure admitted that it incurred "shortfalls in *generation*" from not "timely commissioning [] *the full capacity required* under the PPA," overstating reported MW, which subjected Azure to damages under the customer PPA estimated at US$5.2 million. ¶91. Because electricity generation is determined by the average MWO and Defendants restated their MWO metrics, but did not update plant load factor, the electricity generation metrics were also misstated. Thus, despite Defendants' incorrect argument that Plaintiff does not explain why the electricity generation numbers were false (DB33), those statements are false for the same reasons as the MWOs statements, which is adequately detailed in the SAC. ¶¶114-115, 127-28, 144-45.

---

[28] Whether the projects were "operational" (DB39) is another red herring. Plaintiff does not challenge the operability of projects. Rather, Plaintiff allege the reported MWO from the projects was overstated.

[29] Defendants' cases (DB30) are distinguishable. *See Greco v. Quidian Inc.*, 2022 WL 4226022, at *18 (S.D.N.Y. Sept. 13, 2022) (that some funding partners may be violating regulation, alone, insufficient to demonstrate financial outlook unreasonable); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 402 (S.D.N.Y. 2006) (risk warnings sufficiently specific to warn of competitive risks); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (prospective accounting change not indicative of scienter).

### 4.    False Statements About Wind Projects

Defendants also issued material misrepresentations touting that they won LOAs for wind projects, "secur[ing] our first step" and an "important milestone" in entering this growing market in India. On October 22, 2021, Defendants reported that Azure had received an LOA for its first wind project, a 120 MW ISTS project with SECI to supply power for 25 years. ¶121. On November 11, 2021, Defendants announced that Azure had "received the [LOA] for its first 150 MW ISTS connected wind–solar hybrid power project with [SECI]" and "[f]ollowing up on our first wind project win, we have secured yet another important milestone with our first solar-wind hybrid project[.]" ¶¶123-24. In Azure's December 13, 2021 earnings call, Gupta and Subramanian again each touted, as "[o]ur recent wins," that Azure had "received Letter of Awards for [the] 120-[MW] wind project and 150-[MW] wind-solar hybrid project with SECI," in its "first steps" into the growing "dispatchable renewable energy" markets, and which reflected that Azure had "significant organizational capabilities for these [projects] in house." ¶¶131-32.

The above statements were materially false and misleading when made because, by discussing the Wind Projects, Defendants created a duty to disclose that the two Wind projects were obtained through illegal and corrupt means, and not because of Azure's "significant organizational capabilities" (¶¶122, 125, 131-33) or "in-house engineering, procurement and construction expertise" (¶¶28-30), and that Defendants' illegal means of obtaining the projects exposed Azure to damages and penalties.

Indeed, Azure acknowledged that it had "identified potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a *wind* project," and that those former executive officers also "may have circumvented internal policies in connection with the approval of another transaction related to

33

another wind project." ¶195.[30] The only inference is that this misconduct referred to the two announced Wind projects because those were Azure's *first and only two wind projects* at the time. Azure's auditors corroborated that Azure secured the wind projects through illegal means, stating as one of Azure's "critical audit matters"[31] that there were "[p]otential overpayments made to an entity towards a development fee including obtaining government orders for development of a wind power project." ¶202. Gupta and Subramanian made the statements touting that Azure had won these key projects, while knowing they were procured by their own corrupt actions.

Courts have repeatedly found that where, as here, Defendants make statements touting the award of major business, including substantial revenues and benefits therefrom, there is a duty to disclose the awards were obtained by corrupt means. [32] *See, e.g., Grupo Televisa*, 368 F. Supp. 3d at 721 (statement that "we hold the rights to the next three soccer World Cup's" actionable where defendants failed to disclose the rights were obtained by bribing FIFA officials); *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *8 (D. Conn. Nov. 10, 2005) ("touting the renewal of a major contract that could have been the result of an illegal agreement conveys the false impression that this particular contract was procured through sound business practices."); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (liability found where FDA approvals announced by company were due to bribery of FDA employees rather than any expertise implied by its announcements); *Meyer*, 761 F.3d at 250; *see also Vivendi,* 838 F.3d at 258 (citing "well-established precedent" that "once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic").

---

[30] The "former executives" were Gupta and Subramanian, *See* §III.B.1.a n.8, *supra.*
[31] "Critical audit matters" are matters that "relate to accounts or disclosures *that are material to the consolidated financial statements*…." ¶202.
[32] Thus, Defendants' contention that these projects were awarded and are under construction adds nothing here. DB38.

Defendants' arguments lack merit. *First*, Defendants contend that Plaintiff has failed to allege anything more than mere conclusory allegations of misconduct. DB37. But the SAC has sufficiently alleged, through Defendants' own admissions and other corroborating facts that, taken as true as they must be at this stage, demonstrate the Wind projects were obtained through corrupt and illegal means. *See, e.g.*, ¶195 (admitting former executives "may have circumvented internal policies" related to approval of wind project**)**; *id.* (Azure's acknowledgement of Gupta and Subramanian's misrepresentations to the Board about, and circumvention of policies in procuring approval of, the wind projects); ¶202 (auditors' findings of how the corrupt scheme to obtain the government orders for such wind projects worked). Indeed, Azure has incrementally been admitting the allegations that whistleblowers laid out back in June and July 2021 against the "former executives" involved in this scheme (i.e., Gupta and Subramanian).[33] ¶220. The SAC also alleges not only misconduct, but that Defendants' affirmative statements were rendered misleading by their omissions of that misconduct. *See Stadium Cap.*, 2024 WL 456745, at *2.[34]

*Second*, Defendants' continued denials that neither they nor their auditors made any "findings" of "evidence" of "improper payments" or "transfers by the [Company]" or required "adjustments" (DB37-38) is semantics and contradicted by the facts. Indeed, as explained by Azure's latest auditor, Defendants' scheme worked covertly by making overpayments to third parties for "development fees" some of which included obtaining government orders for the wind

---

[33] Moreover, even if Gupta and Subramanian "were relinquished" in April 2022 due to their misconduct, that misconduct had occurred by Azure's July 28, 2021 20-F. Thus, Defendants' statements were misleading "when made."
[34] Defendants' lone authority (DB37) is inapposite. *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at **1-2, 10, 22 (S.D.N.Y. Mar. 30, 2021) (improper payments in two countries (where one company operated in 162 countries and merger partner in 150) "several years" before class period was not sufficient to show that improper payments continued into the class period, moreover, plaintiffs had no standing), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) (affirming on standing grounds only).

projects in lieu of direct "payments" "by the Company" "to the government[,]"[35] ¶202. *Third,* even if Azure did not itself explicitly tie the finding of certain "material weaknesses" to the wind projects, allowing the former executives to "circumvent internal policies" to orchestrate overpayments to outside entities towards "development fees" to secure government orders for wind projects, and make misrepresentations to the Board about it, is one of the "the control deficiencies" that led to "material weaknesses." ¶203.[36]

### 5. False Statements About Commissioned Projects

Throughout the Class Period, Defendants announced Azure's projects had been fully and successfully commissioned. For instance, Defendants stated, "[o]ur largest project, 7,600-megawatt Rajasthan 6, is now fully commissioned," (¶151), "Azure … announced the successful commissioning of its largest project – 600 MWs Interstate Transmission System (ISTS) connected solar project" (¶141), and "Azure … announced full commissioning of its 300 MWs Interstate Transmission System (ISTS) connected solar project[.]" ¶155.[37] These statements were false when made because Azure admitted that a project with SECI failed to timely complete and commission to the requisite contractually required capacity and therefore, had shortfalls in generation. ¶¶91, 193; *Ind. Pub. Ret. Sys. v. Pluralsight,* 45 F.4th 1236, 1262 (10th Cir. 2022) (later statement supported inference of prior falsity). Moreover, Azure's auditor confirmed the Company obtained a premature plant commissioning certificate after submitting inaccurate data. ¶202. News media

---

[35] Regardless, Defendants' claim that the auditors only noted allegations of overpayment (DB37) does not demand a different result here. *See Banco Bradesco*, 277 F. Supp. 3d at 663 (rejecting defendants' "attempt to split hairs" by arguing that Bradesco never paid anything to a government official where it was possible defendants "had only negotiated and offered, but had not actually paid, bribes").

[36] Defendants' own exhibits concede remediation was needed "to address the control deficiencies that led to material weaknesses" including "creation of a Management Assurance Service function as an additional layer of review" and "additional accounting personnel for assistance on critical accounting matters" which included the "overpayments" to outside entities to obtain government orders for wind projects. Def. Ex. S at 10, 16, ¶202a.

[37] Such statements refer to then-present factual conditions, describing past or present conditions, and are thus, not forward-looking or protected by safe harbor. *Vivendi*, 838 F.3d at 246.

further corroborated that a commercial certificate was prematurely obtained. *See* ¶130 ("The whistle-blower has alleged the company got a commercial operation date certificate (COD) without the project being fully commercially operational."); *Synchrony*, 988 F.3d at 164-5 (media corroboration enhanced Plaintiff's allegations).

Azure further admitted that, in Fiscal 2022, it "experienced delays in execution of its ***projects*** beyond the extended commissioning timelines[,]" which necessitated a contingent liability of US$5.2 million directed related to "delayed commissioning[.]" ¶97; *see In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at \*8 (S.D.N.Y. May 24, 2018) (statement that project was meeting milestones was false and misleading when work was delayed). Consequently, Defendants' announcements that "we commissioned," "we have completed," "successful commissioning," and "fully commissioned" these projects, were false when made because the projects were not fully commissioned. ¶¶129, 137, 141, 146, 151, 155; *Carlton v. Cannon*, 184 F. Supp. 3d 428, 472 (S.D. Tex. 2016) (finding statements that plant operated successfully on a commercial scale were false and misleading).

Defendants have no credible answer for these well-pled statements. Rather than challenge their falsity, Defendants attack irrelevant strawmen without support. *First*, Defendants posit that the statements cannot be false because the SAC does not point to any public statements regarding plant certificates or Azure's communications with SECI. DB40. There is no authority for the assertion that Azure must have publicly announced plant certificates for Plaintiff to challenge statements that certain projects were fully commissioned, when they were not.[38] *See Meyer*, 761 F.3d at 250 ("once a company speaks on an issue or topic, there is a duty to tell the whole truth").

---

[38] Unlike here where Plaintiff has alleged a direct connection between the commissioning statements and Azure's admitted failure to timely complete and commission to the contractually required capacity due to misconduct (¶¶91, 97, 202)), in *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at \*15, plaintiffs alleged only general statements

*Second*, Defendants argue that certain other projects became *operational* in fiscal 2022 (DB39), yet both the auditor and the *Economic Times* article corroborate that Azure obtained a premature plant commissioning certificate after submitting inaccurate data and without the project being fully commercially operational. ¶¶202, 130. Defendants criticize reliance on the *Economic Times* article reporting that Azure improperly obtained a COD without the project being fully operational, as being impermissibly vague and conclusory. DB40-41. But Azure's own statements and auditors confirmed these allegations. ¶¶91, 193, 202. Regardless, such anonymous sources may be credited at the pleading stage particularly where, as here, the facts they provide are corroborated by other facts and accounts (*e.g.*, whistleblower complaints and auditor findings). *See In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *1-3 (S.D.N.Y. Jan. 27, 2014) (news sources credited where investigators independently corroborated them); *In re Quantumscape Secs. Litig.*, 580 F. Supp. 3d 714, 731-32 (N.D. Cal. 2022) ("plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.")[39]

### 6.      False Statements Touting Safety

During the Class Period, Defendants repeatedly misrepresented worker and plant safety, falsely assuring investors that safety was their priority and touting safety awards as verification that Azure provided a safe workplace environment across its sites. ¶¶44, 48, 116, 139, 153. For instance, on August 31, 2021, Subramanian claimed that "our ISO-45001 certification…

---

about organic financial growth globally that were too attenuated to create a duty to disclose misconduct in two of the numerous countries in which they operated.

[39] *Lopez v. CT Partners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 31-2 (S.D.N.Y. 2016) (DB40-41), is distinguishable because there, the confidential witnesses' allegations were "too sparse" to demonstrate that the departure of a number of female employees was related to discriminatory termination. Here, by contrast, the confidential source reported that Azure received a COD before the project was fully commercially operational and failed to timely commission other projects, which is directly linked to the commissioning statements and corroborated by Azure and its auditors. ¶91, 141, 151, 193, 202.

demonstrates Azure's focus on occupational health and safety," and Azure "also recently won the Greentech Effective Safety Culture Award for 2021 … which signifies the efforts we have put in to ensure safety culture is embedded across our project locations and sites." ¶116. On December 13, 2021, Subramanian stated that Azure had won an award purportedly evidencing "the efforts we have put in to ensure safety culture, which is now embedded across the project locations and sites." ¶139; *see also* ¶48 (certification "validates additional efforts we put in to make our workplaces safe;" "Azure Power provides a safe and healthy workplace."). Subramanian again claimed on February 28, 2022 that "safety … is paramount to us" and reiterated that "[t]he awards that we won for our safety culture…demonstrate our efforts in this area;" and, even in Facebook posts, Azure emphasized, "Safety is of paramount importance at Azure Power…. [I]t is imperative to ensure that safety is not just about rules and preventative measures—it's also a foundational value that is deeply embedded in our organization." ¶¶44, 153.[40]

These statements were false and misleading when made because, as Defendants acknowledged, the Second Whistleblower Complaint identified "health and safety lapses" at Azure, and Defendants "determined [] immediately" that "there was substance" to the complaint, and "deviations from safety and quality norms" had occurred, requiring Azure to "immediately [take] action to … remediate these health and safety issues, and [] strengthen our safety and quality protocols at this plant, but also across our other operations." ¶¶78, 89, 154, 162, 170, 175.

Defendants' argument that their reassurances about safety at Azure's plants were mere "aspirational puffery" is without merit. Such statements did not invoke mere future aspirations, but asserted that Azure's affirmative efforts and various factors "demonstrated" that "Azure Power provides a safe and healthy workplace." *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *15

---

[40] *See also* ¶141 (touting MW commission "while prioritising the health and safety of all our employees and communities.").

(E.D.N.Y. May 20, 2020) (touting commitment to safety misleading despite red flags about dam stability where defendants' statements "lull[ed]" investors into a "false sense of security"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79-80 (S.D.N.Y. 2017) (same for statements touting "relentless focus" and "overriding commitment" to safety); *see also Meyer*, 761 F.3d at 251 (describing safety measures gave investors false "comfort").

Moreover, whether a statement qualifies as puffery turns on the "context" in which it is made. *Banco Bradesco*, 277 F. Supp. 3d at 659 ("[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made"); *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023) (same). Thus, a statement inactionable "in some contexts," may be "a material misrepresentation in others." *Vale*, 2020 WL 2610979, at *10.[41] Here, Defendants' repeated reassurances were particularly misleading given the critical importance of plant safety to Azure (and thus its investors), since the Company is subject to strict safety and environmental laws where lack of compliance can result in liability, fines, seizure of property, and imprisonment, as it recognized. *See* ¶¶5, 42, 44-49; *see also Vale*, 2020 WL 2610979, at *12 *citing BHP*, 276 F. Supp. 3d at 79 (reassurances about "matters particularly important to the company and investors" may be material and actionable); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 375 (E.D.N.Y. 2022) ("repeated emphasis on safety" shows it is material noting "the line of cases finding statements relating to safety are not puffery where repeated emphasis on safety as a priority 'put[s] the topic at issue'"); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (where

---

[41] The issue of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Representations are immaterial if they are "so obviously unimportant to a reasonable investor" that reasonable minds could not disagree, and whether a fact would have "'assumed actual significance' in a reasonable investor's deliberations is a question that will be best determined on a more developed factual record." *Dentsply*, 665 F. Supp. 3d at 293.

40

"it is to be expected that investors will be greatly concerned about [a company's] safety and training efforts," repeated assertions about safety are not "obviously unimportant" puffery).

Further, by touting safety, Defendants triggered a duty to tell the "whole truth," including that Azure was experiencing safety violations and deficient safety and quality protocols across its operations, which could reasonably be found to "render[] misleading the comforting statements" by Defendants about their safety measures. *Meyer*, 761 F.3d at 250-51; *see also Operating Local 649 Annuity Tr. Fund*, 595 F.3d at 92 (the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers").[42]

Defendants' argument that the fact Azure "later disclosed" (again, at a time of its choosing) safety problems only "at one" project, does not undermine Defendants' earlier assurances (DB26-27), is likewise incorrect.  In fact, Defendants acknowledged that there were "deviations from safety and quality norms" across Azure's entire operations, requiring Azure to "strengthen our safety and quality protocols at this plant, *but **also across our other operations***." ¶170.[43] Lastly, Defendants' argument that, because their statements were not framed as "guarantees," they are not

---

[42] The statements this Court found inactionable in *Vale*, 2017 WL 1102666, at *21-2, are distinguishable as they concerned what Vale was "seeking" and "aiming" to do and thus were future-oriented and "explicitly aspirational," whereas here, Defendants flatly asserted that "Azure Power *provides* a safe and healthy workplace," and repeatedly sought to tie the winning of recent awards to verification of maintaining the highest safety standards, *e.g.*, claiming it "demonstrates," "validates" and "signifies" Azure's past efforts to "make our workplaces safe," and that Azure had already embedded such a safety culture across all its workplaces. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements such as "'commit[ment]' to food safety" were "couched … in aspirational terms"). Defendants also cite *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 204 n.7 (S.D.N.Y. 2012), but that citation is at best *dicta*, as the court there stated it "need not engage in a formal analysis" of "statements concerning Transocean's commitment to safety and training" but that they "would *likely* be considered expressions of 'puffery.'" Nevertheless, unlike here where safety statements aimed to assure investors that Azure was then complying with safety policies, the statements at issue in Foley were purely aspirational. *See e.g.*, Consolidated Class Action Complaint at 22, *Foley v. Transocean Ltd.*, 10 Civ. 5233 (NRB) (S.D.N.Y. Mar. 18, 2011) Dkt. Entry No. 53 (¶61: "Our *goal* is to have an incident-free work environment[;]" ¶62: "*strong focus* on preventative maintenance[;]" and *id*. ("The *training* Transocean offers is *top quality*").

[43] Defendants' citation to *Acito*, 47 F.3d at 52-53 (DB28) is inapposite. There, the court determined the conduct was not material because the FDA took no materially adverse action, the defendant committed to and continued improve conditions, and the plant at issue only manufactured 10 of over 1,000 products. *Id*. Here, by contrast, Azure's safety issues were material because their discovery at one project necessitated changes to safety protocols across all the projects. ¶162.

41

actionable misses the point.  Even if investors understand that a defendants' statement may not guarantee 100% perfection in the future, reasonable investors may be misled by statements such as those made by Defendants if in fact there had been deviations from safety and quality norms and protocols across the Company's operations.  *See Meyer*, 761 F.3d at 251 (while investors may understand defendants' statements did not guarantee 100% compliance 100% of the time, they may be misled by significant then-existing violations).[44]

### C.       The SAC Pleads a Strong Inference of Scienter

Scienter is adequately pled where "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323. Scienter is pled by allegations of conscious misbehavior or recklessness, or motive and opportunity to defraud. *In re BioScrip, Inc., Sec. Litig.*, 95 F. Supp. 3d 711, 732 (S.D.N.Y. 2015). Recklessness "requires action that 'is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Ark. Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485-86 (S.D.N.Y. 2014). An inference of scienter need not be of the "'smoking-gun'" variety or "even the 'most plausible of the competing inferences[.]'" *Tellabs*, 551 U.S. at 324. A tie goes to the plaintiff. *Id.*

Here, the SAC pleads facts supporting scienter *for each Defendant* that "a reasonable person would deem … cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[45] *Id*. Moreover, because "[c]ourts routinely impute to the corporation the

---

[44] *Arora v. HDFC Bank Ltd.*, 671 F. Supp. 3d 305 (E.D.N.Y. 2023) (DB28), involved a bank defendant and did not contain statements regarding safety, but statements that the bank simply *had* a code of ethics and whistleblower policy, and statements regarding financial internal controls which were made to comply with SOX certifications. *Id.* at 310, 312-313. As to the financial internal controls statements, unlike here, the complaint failed to plausibly allege that the corruption was rampant and involved the entire bank. *Compare id*. *with* ¶194 ("significant control issues"); ¶¶92, 202-03 (severe material weaknesses in numerous facets of Azure's business related to corruption and multiple projects).

[45] Defendants' contention that Plaintiff only alleges scienter through group pleading is undermined by Agrawal's own argument pointing to select allegations demonstrating his scienter. *See* AB9; *see also Vale,* 2017 WL 1102666, at *31.

intent of officers and directors acting within the scope of their authority," the SAC adequately pleads corporate scienter. *Vale*, 2017 WL 1102666, at *34.

### 1. Azure *Admitted* Its CEO and COO Engaged in a Fraudulent Scheme During the Class Period

Azure admitted that, as early as June 2021, "former executives[,]" alleged to be Gupta and Subramanian, perpetrated corrupt and fraudulent schemes to secure land and win project bids for Azure while misleading the Board and investors. *See* ¶¶41, 89-94, 195-97, 202, 208-09; *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 373, 386 (E.D.N.Y. March 30, 2009) ("'Intentional misconduct . . . 'is easily identified' because it involves 'deliberate illegal behavior[.]'"). Indeed, Azure admitted in its 2022 Form 20-F, that "former executives" were involved in a scheme to secure land for a project in exchange for improper payments. ¶¶41, 197, 202, 208.

Defendants also admitted that Azure "identified potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project" while noting that those former executive officers "may have circumvented internal policies in connection with the approval of another transaction related to another wind project." ¶¶195, 209; *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 316 (S.D.N.Y. 2011) (scienter alleged where "Defendants' active efforts to circumvent" policies "suggests, at the very least, that they knew, or should have known, of the dangers" of doing so and not informing investors). Moreover, Defendants' misstatements regarding Azure's wind projects began in October 2021— only a few months after Azure received the First Whistleblower Complaints in June and July 2021, which asserted "Key Managerial Personnel" had engaged in misconduct

---

Moreover, as set forth below, Plaintiff alleges numerous scienter allegations specific to Gupta, Subramanian, and Agrawal (scienter adequately alleged where, because of defendant's position, he "had access to information contradicting" certain statements and dealt with issues concerning the subject matter of the fraud, like the Individual Defendants here (*see e.g.*, §III.C.2-8, *infra*)).

relating to the acquisition and use of land and resulted in a perfunctory finding that Azure's ethics policies needed to be enhanced. ¶¶61, 68, 121, 212. Ultimately, the 2022 Form 20-F auditor opinion corroborated the complaint. *See* ¶¶195, 202, 209 (describing "[p]otential overpayments …for development of a wind power project[.]").

Azure also admitted the Second Whistleblower Complaint investigation revealed "evidence of manipulation and misrepresentation of project data by some employees at that project site" and "[w]eak controls over payments to a vendor and failures[.]" ¶¶89, 193. *Dentsply Sirona*, 665 F. Supp. 3d at 291 ("affirmative steps" to further fraud combined with executive resignations support scienter). These findings are buttressed by Azure's admission that it identified inconsistencies in project data for a number of projects in Fiscal 2022 and 2023, which were restated. ¶208, §III.C.6, *infra*; *see Fresno*, 268 F. Supp. 3d at 551 (scienter pled for defendants who were aware of and made statements regarding revenue that was later restated due to admitted misconduct). In sum, Azure admitted Gupta and Subramanian's misconduct, which supports an overwhelming inference that Defendants' statements were false when made. *Villella*, 2017 WL 1169629, at *14 (post-class period admission supports scienter).

Despite Defendants' arguments to the contrary (DB50 n.17), here, the only plausible inference is that the "former executives" were Gupta and Subramanian because, Gupta (who sat on the board) and Subramanian were the only executives who had access to the Board and who relinquished their roles as additional complaints were coming to light. *See* §§III.B.1.a., III.B.1.a. n.8 *supra*; *see also* §§III.C.2, III.C.4.a, *infra*. Indeed, in responding to a question about whether executive departures were tied to the whistleblower complaints, Chairman Rosling distinguished Gupta and Subramanian' departures, implying they were untoward when compared against the following successive executive resignations. *See* ¶178 ("The 2 CEOs that have left us in the last 2

months are entirely different cases"). Moreover, Defendants' own definitions of executives and key managerial personnel (i.e., "KMP") support the conclusion that Azure was referring to Gupta and Subramanian in its disclosures. *See* §§I, III.B.1.a., and III.B.1.a. n.8, *supra*.

In response, Defendants ask the Court to either completely disregard the SAC allegations or alternatively, accept their improper counter-narrative that the findings related to the former executives are immaterial because the investigation purportedly "did not 'identify any evidence of improper payments[.]'" *Ghosn*, 510 F. Supp. 3d at 617 (rejecting argument court can disregard allegations as untrue, noting "must accept the well-plead allegations … as true"). Defendants are wrong and misstate the record. Azure disclosed only that it found no evidence of improper payments **to the government,** and otherwise found "third party land aggregators may have been involved in improper payments" and blacklisted certain vendors. ¶¶85, 193-94; *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013) ("factual disputes … cannot be resolved on a motion to dismiss"); *Valentini,* 837 F. Supp. 2d at 316-17 ("[T]hat, on multiple occasions, employees [] are alleged to have performed their professional duties in a consciously wrongful or reckless manner [by bribing third-parties] establishes a strong inference of corporate scienter.").

Defendants also argue that the admissions of misconduct here are mere fraud by hindsight. DB45. But Azure's admissions demonstrate that Defendants knew their statements were misleading at the time they were made. *See e.g.*, ¶¶62-68 (misconduct by key managerial personnel identified in June and July 2021); ¶195 (misrepresentations to the Board by former executives in July 2021); *see also Fresno*, 268 F. Supp. 3d at 545 (scienter pled where defendants "admitted to wrongdoing[,]" by later disclosing the "investigation concluded that, as a result of certain instances of misconduct and errors" remedial actions were taken); *see id*. (finding "the SAC plausibly

45

connects each 10(b) defendant to the misconduct" though "the disclosure does not single out any individual[.]"").

### 2. Defendants Received Multiple Whistleblower Reports Identifying Fraudulent Practices and Serious Internal Control Deficiencies

Azure received whistleblower reports in at least June and July 2021, May 2022, and September 2022, asserting misconduct spanning from "executives" and "key management personnel" engaging in "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, and payment of kickbacks" to severe safety lapses and systemic internal control failures. *See* §II.D, §II.F-G, *supra*; *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (whistleblower complaint to government that implicated defendant, who made misstatements and held himself out as knowledgeable, supported strong inference "that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."); *Van Der Moolen Holding*, 405 F. Supp. 2d at 406 ("the *sine quanon* of red flags are 'facts which come to a defendant's attention that would place a reasonable party in defendant's position 'on notice that the … company was engaged in wrongdoing[.]'""); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) (scienter pled where it was implausible that defendants were unaware given red flags raised in whistleblower complaints). Defendants initially publicly claimed those reports were unsubstantiated (though those reports *would later be* substantiated).[46] *See e.g.*, ¶¶61-62, 68, 70, 83; *Karimi*, 607 F. Supp. 3d at 398

---

[46] Defendants' spuriously claim that scienter is negated here because defendants "were unaware of potential misstatements in the company's filings and immediately conducted an investigation." DB49 citing *In re Security Capital Assurance*, 729 F.Supp.2d 569, 596 (S.D.N.Y 2010). Such an argument ignores that Defendants denied the legitimacy of misconduct in the first complaint allowing Gupta and Subramanian to continue perpetuating their scheme, precipitating a third complaint alleging the same misconduct by former executives. *See* ¶¶61-62, 68, 83. Moreover, because Gupta and Subramanian were simultaneously making false statements while engaged in the misconduct, Defendants' reliance on *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 329, 342-3 (W.D.N.Y. 2008) (DB49), where plaintiffs did not allege anyone at the corporations' US headquarters knew about the irregularities in another country prior to the whistleblower complaint, is misplaced.

("Public denials" coinciding with undisclosed red flags suggesting the opposite "support an inference of scienter"); *Fresno*, 268 F. Supp. 3d at 552 (efforts to placate market support scienter); *Sjunde Ap-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 143-44 (S.D.N.Y. 2021) (conscious disregard of "red flags" supports scienter).

However, once corrupt leadership was removed (i.e., Gupta, Subramanian, and Harris) and could no longer conceal the misconduct, (*see* §III.C.4.a, *infra*), Azure disclosed scathing findings directly implicating the former executives and substantiating the complaints to the market. ¶¶63, 78, 85, 89-98, 162, 193-203. Those findings included, *inter alia*, former executives who: (i) misrepresented asset purchase transactions related to a wind development project to the Board; (ii) circumvented internal policies to obtain approval for another wind project; (iii) were involved in a scheme to make improper payments; and (iv) failed to be transparent with the market and advisors. ¶¶193-97. The reports also revealed data manipulation at multiple projects (*see* §III.C.6, *infra*), significant material internal control issues, including those related to acquiring land and land use rights which required a $3.4 million (US) adjustment (*see* §III.C.5, §III.C.8, *infra*), and evidence of "[s]ignificant discrepancies or inconsistencies between the expert opinions and management's estimates [for property, plant & equipment]." ¶¶201-02.

Faced with such damning allegations, Defendants invoke fraud by hindsight (DB45). But the SAC, and Azure's own admissions, more than plausibly support that Gupta and Subramanian personally orchestrated and participated in the scheme from the outset of the Class Period in July 2021 (*see* §III.C.1, *supra*) while Gupta and Agrawal disseminated the information to investors (¶¶61, 67).[47] It follows, then, that Gupta and Subramanian knew of their own transgressions raised

_____

[47] Here, unlike in *City of Brockton Retirement Sys. v. Avon Products, Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) where plaintiffs alleged a former CEO must have known whistleblower allegations were true from receiving the report, the SAC alleges and Azure admitted that its former executives were the ones who perpetrated the

in the whistleblower reports and tried to obscure the truth to accomplish their scheme. *Compare* ¶195 ("potential misrepresentations made by former executives to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project") *with* ¶121 (Gupta, Oct. 22, 2021): announcing LOA for Azure's first wind project); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (Woods, J.) (S.D.N.Y. June 16, 2020) ("reckless gamble" supports scienter).[48] For the reasons discussed in §III.C.4.a., *infra*, Agrawal who, himself, has engaged in illegal misconduct shortly before joining Azure, either knew of or recklessly disregarded information that rendered his Class Period misstatements false and misleading at the time they were made.

Thus, contrary to Defendants' suggestion (DB46), the SAC's allegations are unlike those in *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 406 (S.D.N.Y. 2016), where the court found allegations that defendant must have had access to a whistleblower report and investigation findings insufficient where plaintiff failed to allege any "statements from the Board or any corporate committee[,]" "internal investigation" or "reports of the alleged internal investigation's findings" substantiating such claims. *Id*. at 407; *see Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("egregious refusal to see the obvious, or to investigate the doubtful," may in some cases give rise to an inference of recklessness); *Van Der Moolen Holding*, 405 F. Supp. 2d at 406 (defining red flags); *Hefler*, 2018 WL 1070116, at *10 (whistleblower complaints constitute red flags). The successive, substantiated whistleblower complaints and Azure's admissions (following initial denials) regarding those reports, and the resulting findings (particularly those against former

---

misconduct in the complaints. ¶¶41, 89-94, 195-97, 202, 208-09. Moreover, Defendants publicly disclosed the complaints were unsubstantiated once Gupta and Subramanian had relinquished their roles. *See SEC v. MiMedx Grp., Inc.*, 2022 WL 902784, at *8 n.7 (S.D.N.Y. Mar. 28, 2022) (distinguishing *Avon* and noting that "deliberate effort . . . to thwart the disclosure of the facts" supports scienter).

[48] In *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017), unlike here, post-class period statements were fraud by hindsight because they provided no insight into defendants' knowledge at the time of the misstatements.

executives) are more than sufficient for corporate and the Individual Defendants' scienter. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010).

### 3. Defendants Knew of, or Recklessly Disregarded, Safety Violations and that Project Data Was Being Manipulated From Their Admitted "Real-Time" Monitoring of All Project Data Through Their "Centralized Monitoring Station At [The] Head Office" and Site Visits

Defendants consistently touted their ability to remotely monitor and analyze project data for all of Azure's projects in "real-time" through a "centralized monitoring station at [the] head office" that allowed Azure to perform "day-to-day analysis[,]" and "accurately analyse energy generation[.]" ¶¶52, 54, 232, 235. Indeed, through the platform, Defendants "regularly review[ed] a number of specific metrics, including [] key operating and financial metrics," such as revenue, electricity generation, MWO, MW contracted and awarded, and total MWO, contracted and awarded. ¶55. Moreover, according to Subramanian, Defendants' real-time visibility into project data was so comprehensive that it allowed Azure to identify "minor plant failures[,]" monitor "parts of the plant where performance is lower than expected[,]" "predictive[ly] monitor[]" plants so that they could respond quickly to plant problems. ¶¶52, 233-34. Defendants maintained this "granular level" of visibility into every plant "on a real-time basis" through a "mobile application" that "always connected with the Head Office staff" to "site engineers[.]"[49] ¶¶52, 232, 234.

The data from Azure's centralized monitoring system would have showed Defendants that MWO and electricity generation were overstated due to data manipulation at least four large projects, particularly given that Defendants decreased MWO by 6% to 10% as compared to

---

[49] Defendants concede Plaintiff never claimed that Azure's monitoring "system entirely eliminated the risk of undetected anomalies or other issues" but nevertheless, argue that this somehow negates scienter. DB55. This is a distraction. Here, Defendants, complicit in the fraud, had real-time access to the MWO and electricity data that they were admittedly manipulating and publicly misrepresenting. *See e.g.*, ¶¶114, 118-19, 148-49, 151, 155. This is sufficient for scienter. *See S.S. Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 2023 WL 4744197, at *6 (S.D.N.Y. July 25, 2023). Moreover, their receipt of the whistleblower complaints starting in June/July 2021 through the end of 2022 should have alerted them to pay particular close attention to such data.

Azure's 2022 annual guidance of 2,855 to 2,955 to "[a]djust[] for inconsistencies". *See* ¶¶95-96, 229. Similarly, Azure's centralized monitoring system would have alerted Defendants to the shortfalls in generation from the "various preset alarms" that allowed them to monitor "parts of the plant where performance is lower than expected[,]" ¶¶193, 233-34.

Defendants' real-time visibility and monitoring the very data that was admittedly being manipulated creates a strong inference of scienter. *See, e.g., Wang*, 661 F. Supp. 3d at 236 (close monitoring of real-time key performance metrics is "strong circumstantial support for an inference" that changes were known to management); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021) (scienter pled where defendants held themselves out as knowledgeable); *Strougo*, 105 F. Supp. 3d at 351 (same); *Stadium Cap. LLC*, 2024 WL 456745, at *5 (scienter satisfied where defendants had access to information and kept "a close eye on [it] every day'"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter pled where the defendants "told the investing public that they monitored the value of their portfolio on a nearly real-time basis"); *Olo Inc.*, 2023 WL 4744197, at *6 (where defendant "had access to and used a specific software to obtain data[,]" it "gives rise to the strong inference that [defendant] knew or should have known about the … inaccurate reporting").

Because the SAC alleges the very information the Defendants had access to, how they monitored it in real-time, and by how much it was falsely overstated through former executives' intentional manipulation (¶¶52, 54-55, 95-96, 235), Defendants' reliance on *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) (DB46), is misplaced.[50] In *Loral Space*, plaintiffs only generally alleged that defendants had access to reports,

---

[50] For the same reasons, Defendants' authorities cited to support their contention that the SAC only alleged general access to information are distinguishable. *See* DB54-55 citing *Inter-Local Pension Fund v. General Electric*, 445 F. App'x 368, 370 (2d Cir. 2011) (unlike MWO here, the *General Electric* plaintiffs failed to allege *any* contradictory

which only became available part-way through the class period and which Defendants stated was "too sketchy" to rely on. *Id.*; *see also San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *8-9 (S.D.N.Y. May 1, 2024) (rejecting argument plaintiffs need to identify specific document where "[d]efendants' own statements suggest that they had access to—and reviewed—such information.").

Defendants' knowledge or reckless disregard for the Company's data manipulation, safety issues, and corrupt payments occurring at multiple plants is further established by their plant site visits, showcased on Facebook. *See e.g.,* ¶237 (Aug. 17, 2022 post: "Senior Management" took a "keen interest" in "connect[ing] directly with the site employees and workers" so they could "understand the workings on ground."); ¶238 ("senior management, [and] the Board" were "visit[ing] [Azure's] plants, unexpectedly or expectedly" to assess health and safety); *Longwei Petroleum*, 2014 WL 285103, at *4 (scienter alleged by real time monitoring and visits to region with the facility).

### 4. The Onslaught of Highly Unusual And Suspicious Senior Management And Auditor Resignations or Terminations Strongly Supports Scienter

#### a. Executives Departures Amid Delays, Investigations, and Restatements are Highly Unusual and Suspicious

The sheer number of suspicious executive departures over a short period and in close proximity to the disclosure of the fraud supports a strong inference of scienter. *Salix*, 2016 WL

---

data to which defendants had access), *Glickman v. Alexander & Alexander Servs., Inc.*, 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996) (plaintiff merely alleged defendant had "unfettered access" to subsidiary's data), *and In re PXRE Grp., Ltd., Sec. Litig*., 600 F. Supp. 2d 510, 538 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (relying on "intimate corporate culture" to assert defendant must have known of concerns); *see also* AB13 citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (allegation that defendants had access to information that "would reveal" true performance failed where complaint did not even allege that "raw data … had been collected into reports"); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 249 (S.D.N.Y. 2012) (lacking allegations that defendants actively manipulated data or allegations that raw data demonstrated accounting was in error); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) (allegation of access to expense and capital cost data insufficient to show defendants knew "'remedial works' had [not] been completed").

1629341, at *15 (a resignation on the same day of disclosure of true state of affairs and another during investigation supported scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622 (S.D.N.Y. 2014) (resignations on the same day and within few months of scope of fraud suggests defendants were terminated because of those previously undisclosed issues) (collecting cases). Azure experienced droves of suspiciously timed executive departures throughout the Class Period, starting with Gupta and Subramanian, who relinquished their roles on April 26, 2022, at the same time a second whistleblower came forward and shortly after Azure received the First Whistleblower Complaints. ¶¶193, 197, 220.  Moreover, that Gupta and Subramanian were "[m]anning the wheel" while "engaging in allegedly fraudulent conduct," departing "during investigations by [the Company's] Audit Committee," followed by financial restatements, are the exactly the type of resignations that courts find "highly unusual and suspicious." *Salix*, 2016 WL 1629341, at *15; *Van Dongen,* 951 F. Supp. 2d at 474. (resignation of insiders alleged to have been involved in the scheme contributes to an inference of scienter).[51]

Then, on June 1, 2022, Audit Committee Chairman Harris, who led the initial whistleblower investigations, resigned, just over one month after Gupta and Subramanian were terminated, after Azure received the First and Second Whistleblower Complaint, and just weeks before Azure announced its inability to timely file its 2022 Form 20-F due to ongoing review of its internal control and compliance framework on August 16, 2022. ¶¶73, ¶221. Courts have found similar circumstances surrounding the suspicious timing of executive resignations supports scienter. *See, e.g., Yannes,* 2021 WL 2555437, at *6 (board member's resignation and COO's

---

[51] Defendants' reliance on *Wilbush v. Ambac Fin. Grp., Inc*., 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017) is misplaced because, unlike here where the resignations "occurred at or about the time that Defendants' alleged fraud was disclosed" and defendants were subsequently implicated in the misconduct, there the resignations occurred months before and after an impairment charge and did not implicate the departed defendants. *In re Hertz Glob. Holdings Inc*., 905 F.3d 106, 119 (3d Cir. 2018) is also distinguishable because unlike here where Gupta and Subramanian perpetrated the fraud, the Hertz allegations did "not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud."

termination within weeks of report contributed to scienter); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606-607 (S.D.N.Y. 2009) (CEO's abrupt removal, and resignation of board and audit committee member support scienter); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) (resignations preceding a delayed annual report filing and restatement "lend[s] further weight to an inference of scienter.").

Then, after not even two months, Shah resigned as CEO on August 29, 2022—the same day Azure announced the Second Whistleblower Complaint, and its 2022 Form 20-F would be delayed. ¶¶74-76, 161, 222; *Salix*, 2016 WL 1629341, at *13-15 (same day resignations alleged with disclosures of true operating conditions, restated financials, and audit and regulatory investigations supports scienter). On October 11, 2023, the day before Azure published the long overdue 2022 Form 20-F, which detailed the extent of Defendants' misconduct, Rosling resigned as Board Chairman without explanation. ¶225; *Fresno*, 268 F. Supp. 3d at 553 (suspicious circumstances where defendants "left the Company toward the conclusion of the Audit Committee investigation" or within a month of the disclosure). Likewise, Rupesh Agarwal, the CEO who replaced Shah, resigned on July 10, 2023, three days before Azure announced another auditor resignation and the further delay of its 2022 Form 20-F.[52] ¶223; *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (multiple resignations "add to the overall pleading of circumstantial evidence of fraud."); *Dentsply Sirona Inc.*, 2024 WL 1898512, at *11 (rejecting argument that multiple departures was "coincidental" because "[s]uch house-cleaning and reforms

---

[52] Defendants use Exs. K, N, and U to improperly assert alternative factual narratives for why these executives departed. DB16-17, 52 n.18. (Ex. K is not even cited in the complaint). But the Court may not credit alternative facts asserted solely to undermine the Plaintiff's well-pled complaint nor consider them for their truth. *Staehr*, 547 F.3d at 410; *see* §III.B.1.a n.6 *supra* and §III.C.4.b n.61 *infra.* Moreover, Defendants' use of Ex. K erroneously claims that no whistleblower complaints were received before February 2022 as a means to purportedly undermine Harris's "resignation." *Compare* DB52 n.18 with ¶¶61-63 (complaints received in June and July 2021 according to Azure's 2022 Form 20-F, which Harris purportedly investigated as head of the audit committee and found "unsubstantiated" though corruption by Gupta and Subramanian was then-ongoing).

do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.").

Defendant Agrawal was removed as Azure's CFO on May 1, 2023, two months before the July 13, 2023 corrective disclosure. ¶224; *Eletrobras*, 245 F. Supp. 3d at 469 (executive replacement supports scienter). Moreover, Agrawal's tenure and subsequent demotion coincides with the auditor's report which found "significant discrepancies or inconsistencies between the expert opinions and management's estimates [for Property, Plant & Equipment]" while Agrawal was CFO. ¶202; *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (timing of personnel change may pose strong inference of scienter in relation to the magnitude of corrections); *Salix*, 2016 WL 1629341, at *15 (reducing executive compensation supports scienter even absent explicit admissions to wrongdoing).[53] Agrawal's scienter is also bolstered by allegations that he was formally charged with corruption, money laundering and obstruction of justice. ¶69; *see Eletrobras*, 245 F. Supp. 3d at 469.[54] Thus, contrary to Defendants' arguments

---

[53] Defendants' authorities acknowledge that an employment change or resignation "may add to … circumstantial evidence of fraud," but there, unlike here, plaintiffs failed to allege additional facts rendering the timing of such resignations suspicious. *See* AB10-11 *citing In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *22 (S.D.N.Y. July 31, 2023); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *29 (S.D.N.Y. Apr. 2, 2020); *In re Lottery.com, Inc.*, 2024 WL 454298, at *34 (S.D.N.Y. Feb. 6, 2024). By contrast, here, three CEOs, two directors, the COO and several auditors resigned, and Defendant Agrawal was replaced as CFO amid the fallout from the whistleblower complaints. ¶¶214-227, 197. Azure also admitted to several material weaknesses in its internal control over financial reporting (¶98); replaced Agrawal as CFO two months prior to revealing that the auditors resigned (¶197); was unable to find an auditor willing sign off on its financial statements, and once it did, received a harsh adverse opinion (¶202). Finally, Defendant Agrawal "consciously disregarded" the whistleblower complaints when they arose, and once the complaints were substantiated, he was removed from his position, rendering *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018) (AB10) inapt.

[54] Defendants' authorities do not hold otherwise. AB10. Instead, they simply state that "unrelated accounting misconduct" was insufficient to demonstrate scienter with scant analysis. *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *15 (S.D.N.Y. May 7, 2020); *Rotunno v. Wood*, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) (a personal-expense investigation had no nexus to company accounting fraud); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 905 (W.D. Tex. 2008) (out of circuit and PwC's audits of Dell had "no connection" to other companies PwC audited).

(DB49), the SAC alleges each resignation was accompanied by unusual and suspicious activity, and was connected to the fraud.[55]

Defendants' claim that Gupta's and Subramanian's resignations were purportedly to "pursue other opportunities" (DB51) are not credible where, as here, the SAC alleges they "relinquished" their positions (as opposed to resigned) and it occurred amidst internal investigations.[56] *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (abrupt departure to purportedly "pursue another professional opportunity" adds to scienter when coinciding with accounting difficulties and negative report); *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 114, 136 (D. Conn. 2021) (more compelling inference is resignations "were tied to the unethical and illegal sales practices" rather than "personal reasons" and "other opportunities[,]" given they occurred "shortly after" an internal investigation began). Indeed, courts have interpreted pretextual departures as actual terminations. *OSG*, 12 F. Supp. 3d at 632-33 ("circumstances and timing of the *resignations* suggest that both defendants were *terminated*" and "suggests a higher level of wrongdoing[.]"). Gupta and Subramanian's misconduct also necessitated SEC and DOJ involvement. ¶¶92-94, 197-198; *see Mylan*, 2018 WL 1595985, at *13 (scienter bolstered by investigation into same subject at time of misstatements); *Karimi*, 607 F. Supp. 3d at 397-98 (same).

---

[55] Plaintiff repeatedly alleged that Gupta and Subramanian were engaged in the fraudulent scheme, rendering Defendants cited authority for failure to connect resignations to the fraud inapplicable. DB49-52 citing *Wilbush*, 271 F. Supp. 3d at 499; *In re Aegean Marine Petroleum Network, Inc. Secs. Litig.*, 529 F. Supp. 3d 111, 170 (S.D.N.Y. 2021); *Kumar v. Kulicke & Soffa Indus., Inc.*, 2019 WL 5081896, at *9 (E.D. Pa. Oct. 9, 2019) (timing of alleged fraud did not match up).

[56] Thus, Defendants' reliance on *Abrams* to suggest resignations for "personal reasons" do not support scienter, is inapposite. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 n.28 (5th Cir. 2002). Indeed, even the press release announcing Jeffrey Skilling's resignation from Enron infamously stated it was for "personal reasons." *See* Bloomberg, Jeffrey Skilling's Surprising Split from Enron, https://www.bloomberg.com/news/articles/2001-08-14/jeffrey-skillings-surprising-split-from-enron (last accessed May 3, 2024).

Defendant Agrawal contends the SAC asserts only two individualized scienter allegations against him. AB9. Not so. The SAC pleads several facts which "taken collectively" with Agrawal's criminal offense and demotion raise an inference of scienter. *Tellabs*, 551 U.S. at 323. While Agrawal was CFO, Azure: (i) had significant material weaknesses in its internal control over financial reporting (¶¶98, 203); (ii) received numerous whistleblower complaints, alerting him fraud was afoot (¶¶68, 78, 83); (iii) had significant discrepancies between management's and consultants' estimates on valuations (¶202); and (iv) had a central monitoring system through which he either monitored Azure's MWO in real time and was alerted to shortfalls in generation, or which he was reckless in not using. ¶¶95-96, 193, 233-34; *Yannes*, 2021 WL 2555437, at *4 (recklessness alleged "'where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud[.]'"); *Dentsply Sirona Inc.*, 2024 WL 1898512, at *8 (defendants may have been reckless if they "didn't monitor these topics but made definitive statements as if they did").[57,58]

### b.  Multiple Auditor Resignations Raise Red Flags Supporting Scienter

Azure experienced multiple rounds of suspicious auditor replacements amid executive turnover, which further supports scienter. *Hall v. The Children's Place Retail Stores, Inc.*, 580 F.

---

[57] Given these facts, the SAC demonstrates Agrawal's scienter with more than his position (as he contends), and thus, his reliance on *In re Rockwell Medical, Inc. Secs. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) is inapt. AB12. Indeed, *Rockwell* is a factually dissimilar case about a company that applied for FDA approval for both the liquid and powder form of its drug, but only informed investors of the liquid version. The FDA was separate, intervening factor which determined which product would receive approval, thus the argument that defendants would have known by virtue of their position that only the powder would get approved, failed. *Id*. Here, the SAC alleges that several facts demonstrating the information that Agrawal both had access to, and a duty monitor related to the bribery and corruption, which directly impacted Azure's financial statements.

[58] Several of the cases Defendants cite are distinguishable because they addressed only one or two resignations whereas here, at least three CEOs resigned, the COO, two board members, auditors, and the CFO was demoted. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605–06 (S.D.N.Y. 2016) (one CEO resignation); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 214 (S.D.N.Y. 2020); (one CEO resignation); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (one CEO resignation); *Abrams*, 292 F.3d at 434 n.28 (out of circuit and two resignations, the CFO and the controller); *C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013) (two resignations).

56

Supp. 2d 212, 233 (S.D.N.Y. 2008) (resignations of CEO and auditor supported inference of scienter); *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 415-16 (S.D.N.Y. 2007) (auditor's resignation contributed to an inference of scienter); *Vanderhoef v. China Auto Logistics, Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) (executive and auditor resignations in tandem support such an inference of scienter). For instance, on November 9, 2021, shortly after receipt of the First Whistleblower Complaints, Azure dismissed its first auditor, E&Y, after the auditor raised concerns around corrupt payments to vendors and project cost allocation that would have required additional qualifications in its audit report.[59] ¶¶64, 66, 214; *Salix*, 2016 WL 1629341, at *15 (suspicious auditor resignations support scienter); *Vale*, 2020 WL 2610979 at *16 (warnings from auditors supportive of scienter); *Plumbers*, 2020 WL 1877821, at *13 (red flags about defendants' conduct supports scienter). Azure then "dismissed" the auditor after learning of the qualified opinion. ¶¶66, 214; *In re Akorn, Inc. Secs. Litig.*, 240 F. Supp. 3d 802, 819 (N.D. Ill. 2017) (scienter where the company fired two independent audit firms that identified "deficiencies" instead of "remediating the weaknesses").

Defendants argue, without any support, that E&Y's warning is negated because E&Y's replacement, S.R. Batliboi, was an affiliate of E&Y. This is unavailing given that S.R. Batliboi

---

[59] Contrary to Defendants' assertion (DB52-53), courts in this district credit confidential source allegations where, as here, other "independent factual allegations []corroborate the source's statement[s]." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 n.10 (S.D.N.Y. 2004) (citing *Novak*, 216 F.3d at 314). Indeed, "the requirement of a description of the source's job is loosened," where "independent adequately plead factual allegations corroborate a confidential source's statements." *Lozada v. Taskus, Inc.*, 2024 WL 68571, at *24 (S.D.N.Y. Jan. 5, 2024). Defendants' own authority, *Feasby v. Industri-Matematik Int'l Corp.* (DB53), agrees that "plaintiffs need not name their confidential sources as long as they rely on other facts that 'provide an adequate basis for believing that the defendants' statements were false.'" 2003 WL 22976327, at *5 (S.D.N.Y. Dec. 19, 2003). The SAC does so here given E&Y never said there were no disagreements, contrary to what Azure posited (DB53-54), only that the relationship ceased. ¶¶64, 214. Moreover, subsequent auditors also resigned amid multiple whistleblower complaints and executive resignations. ¶¶101, 217. That the auditor was dismissed because the corrupt payments to vendors and project cost allocation would require additional qualifications be included in its audit report (which was later borne out by ASA's own qualified opinion) is "at least as compelling" as any alternative. ¶¶64; *Tellabs*, 551 U.S. at 324.

resigned presumably for similar reasons as E&Y. Ernst & Young Mauritius, another E&Y affiliate, also resigned as the auditors of Azure's subsidiaries on September 5, 2023. ¶¶101, 217.[60]

Defendants next argue that scienter cannot be inferred here because Azure stated there were no disagreements with the auditor. *See* DB54 citing *City of Brockton Ret. Sys. v. Shaw Group, Inc.,* 540 F. Supp. 2d 464, 475 (S.D.N.Y. Mar. 18, 2008). Defendants are wrong. Unlike in *City of Brockton* where the auditor's letter explicitly affirmed "there were no disagreements between the Company and E&Y on any matter of accounting principles or practices," here, E&Y's letter makes no such disclaimer, stating only, "the client-auditor relationship … has ceased." *Id.* at 474-75.[61] Worse yet, Azure did not even attach S.R. Batliboi's July 13, 2023 resignation letter but instead merely recounted the auditor's reasons for resigning in its own words. *See* Def. Ex. V; Def. Ex. W at 96-97, ¶101 (citing S.R. Batliboi's letter and attributing the resignation to "the fact that they are yet to receive the information that they have requested to complete their audit work…"). Thus, the Court should not credit Defendants' assertion disclaiming disagreements because the auditor "never publicly disclosed the reasons for its resignation." *Top Tankers*, 528 F. Supp. 2d at 416. [62] Moreover, it is difficult to fathom that there were no disagreements with the auditors given Azure

---

[60] The Second Circuit has held that allegations in one period can support an inference of similar circumstances in a subsequent period where they demonstrate what defendants knew at the time of their misstatements. *See Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 143 n.13 (2nd Cir. 2010); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72, 74 (2d Cir. 2001).

[61] Plaintiff disputes Defendants' use of Ex. E which **clearly shows the auditor said nothing about whether they had disagreements with Azure.** *See* Ex. E at 6 (merely confirming the client-auditor relationship has ceased). The Ninth Circuit has warned of this situation in *Khoja v. Orexigen Therapeutics, Inc.:* Defendants "unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." 899 F.3d 988, 998 (9th Cir. 2018). Here, Defendants have piled on exhibits, which they use to undermine the well-pled complaint, creating their own factual narrative, which is replete with inaccuracies as discussed herein. *See* §III.B.1.a n.6, *supra.*

[62] Defendants' cases highlight the sufficiency of Plaintiff's allegations. Unlike in *Saraf v. Ebix, In*c., AB12, Plaintiff has alleged "that [the company] has either admitted to weakness in its internal controls or restated its 2020 financials," which "resulted in inaccurate financial reporting," 632 F. Supp. 3d 389, 401 (S.D.N.Y. Sept. 30, 2022). The Court in *In re HEXO Corp. Sec. Litig.,* agrees that, as here, pretextual resignations in the wake of investigations, and admissions of material weaknesses in internal controls are "catalyst[s]" for scienter. 524 F. Supp. 3d 283, 315 n.32 (S.D.N.Y. 2021).

withheld documents needed to complete the audit. *See* ¶101; *Ho*, 887 F. Supp. 2d at 572 (§10(b) claim pled where management prevented firm from accessing documents necessary for the audit).

Defendant Agrawal was also removed as CFO on May 1, 2023, (¶224) two months before Azure announced that its auditors, S.R. Batliboi, resigned. ¶101. *Hall*, 580 F. Supp. 2d at 233 (auditor's resignation adds to the overall pleading of circumstantial evidence of fraud). S.R. Batliboi resigned because Azure, *and thereby CFO Agrawal,* would not provide them with the information they needed. ¶101. This intentional withholding of information necessary for the auditors to complete their work, including financial documents and the whistleblower complaint findings, raises numerous red flags. *Vale*, 2020 WL 2610979 at *16 (red flags support scienter); *S.E.C. v. Egan*, 994 F. Supp. 2d 558, 567 (S.D.N.Y. 2014) (that defendant consciously misbehaved in withholding information from an auditor is sufficient circumstantial evidence of knowledge).

Moreover, Azure speciously attributed its delayed 2022 Form 20-F to an "ongoing review of its internal control and compliance framework[.]" ¶74. However, Azure's announcement coincided with the Company's "first year" without an "emerging growth exemption[,]" meaning the Company was no longer exempt from complying with the auditor attestation requirements of Section 404 of SOX, and in reality, was struggling to find an auditor willing to sign off its 2022 Form 20-F. ¶¶65 n. 16, 74, 104, 159. When Azure finally found an auditor to sign off on its financial statements, the auditors wrote an adverse opinion that found, *inter alia*, significant discrepancies between experts' and management's fair value assessment estimates, internal controls over financial reporting were ineffective as of March 31, 2022, and raised substantial doubt that Company could continue as a going concern. ¶202.

### 5.      Defendants Knew Azure's Internal Controls Were Inadequate

"Courts in this District have repeatedly held that weak internal controls will support an inference of scienter." *In re CannaVest Corp. Secs. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y.

2018) (collecting cases). Here, Defendants Gupta and Subramanian knew that Azure's internal controls were inadequate because they were actively violating those policies (*compare* ¶¶193-197 *with* ¶¶202-03), while Agrawal, as CFO was responsible for financial reporting, either knew that Azure had "significant control issues" given the extent of the material weaknesses impacting nearly every facet of Azure's business (¶¶194, 203) or was severely reckless given his duty to monitor such reporting. The Individual Defendants knew of the material weaknesses in Azure's financial controls or acted with deliberate recklessness for the additional reason that Azure's auditor, E&Y, internally warned that the Company's external consultant policies were grossly deficient and needed enhancement before Defendants dismissed them. ¶212; *Eletrobras*, 245 F. Supp. 3d at 468 (scienter pled where defendants represented internal controls did not uncover misconduct while reports sent to the board concluded company lacked controls).

Indeed, Defendants later admitted in the 2022 Form 20-F that Azure had "material weaknesses" in its internal controls over financial reporting related to "land acquisition process, assets capitalisation, vendor selection criteria and monitoring of management review controls" for "significant estimates and financial statement closing process." ¶¶202-03; *see OSG*, 12 F. Supp. 3d at 633 (scienter alleged where company admitted processes were "insufficient" to "identify and evaluate adequately"); *Insys,* 2018 WL 2943746, at *6 (failing "'to maintain sufficient internal controls to avoid fraud…is sufficiently indicative of scienter'"); *Veeco*, 235 F.R.D. at 232 (same). It is "illogical" that Defendant Agrawal, who signed Azure's 2021 Form 20-F disclosing both the First Whistleblower Complaints and the recommendation to review the controls to ensure continued compliance, served as Azure's CFO while its financial reporting internal controls were so inept that financial corruption was rampant, did not know that Azure's controls were inadequate or had been violated at the time of his misstatement, as he claims. AB13-14; *see Vale*, 2017 WL 1102666,

60

at *33 (finding it illogical that a defendant was unaware of key underlying liabilities when speaking to investors).[63] It is similarly illogical that Gupta and Subramanian did not know of the internal control failings given their roles in the misconduct. *See* §III.C.8., *infra*.

### 6. That the Data Manipulation Was Widespread and Occurred Over Multiple of Its Largest Projects Spanning Several Years Supports Scienter

Scienter is sufficiently pled here because Azure admitted that its former executives and employees manipulated data to give the Company an appearance of superior performance, allowing it to improperly secure additional projects and prematurely obtain commissioning certificates. ¶¶60, 77-78, 83, 85, 89. Indeed, Defendants publicly touted Azure's operating and financial results, including MWO and electricity generation, and their monitoring of such data at every opportunity (*see* §III.B.2, *supra*), when behind the scenes, as admitted, Azure's projects were awash with "inaccurate record keeping," "failures to provide accurate information both internally and externally," "misconduct" concerning and "evidence of" "manipulation of project data" and "data inconsistencies[,]" and "corrupt payments" to vendors, and mismanagement of funds. ¶¶85, 89, 92, 94, 229, 231; *Veeco*, 235 F.R.D. at 232 ("manipulations … are especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently,' but instead 'suggest a conscious decision[.]'"); *Yannes,* 2021 WL 2555437, at *5 (scienter pled where defendants held themselves out as knowledgeable); *Strougo,* 105 F. Supp. 3d at 351 (same).

Azure confirmed that data manipulation had occurred at multiple projects and was so extensive that it warranted investigation into *all* of the Company's material projects for the three

---

[63] Because Plaintiff alleges "red flags[,]" including whistleblower complaints that implicate "Key Managerial Personnel" and corroborating auditor reports demonstrating the Individual Defendants' knowledge or reckless disregard, Agrawal's reliance on *Woodley v. Wood*, 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022), where there were no allegation that the weakness was brought to the defendants' attention, is inapt. For the same reason, *Janbay v. Canadian Solar, Inc*., 2013 WL 1287326, at *13 (S.D.N.Y. Mar. 28, 2013), where no facts were alleged "demonstrating that Defendants knew or had reason to know that the Company's internal controls were not operating effectively[,]" is inapposite.

years prior to August 2022 (i.e., when the Individual Defendants led Azure). *See e.g.*, ¶89, 92 (data inconsistencies at four projects)[64]; ¶¶58, 60, 93, 228; *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("multiple allegations of 'red flags,' considered in the aggregate, support an inference of fraudulent intent"); *In re Pall Corp.*, 2009 WL 3111777, at*8 (E.D.N.Y. Sep. 21, 2009) (length of time of the alleged fraud and magnitude support compelling inference); *In re American Bank Note Holographics, Inc. Secs. Litig.*, 93 F. Supp. 2d 424, 447 (S.D.N.Y. 2000) (admitted falsity and length of time of the statements (spanning years) strongly supports scienter). Defendants' data manipulation allowed Azure to overstate its commission activities at a SECI project, resulting in shortfalls in generation, failure to timely commission to required capacity, and potential penalties. ¶¶91, 193, 230. As a result, Azure restated its MWO and recorded a US$ 5.2 million contingent liability, some of which was related to data inconsistencies. ¶¶95-97.

The data manipulation underlying the fraud here also emanated from former executives, Gupta and Subramanian, and went far beyond a mere corporate mismanagement style that allowed "improper accounting practices [to] flourish[]" as Defendants contend. *Compare* DB48 citing *Hertz*, 905 F.3d at 117 (finding more plausible inference referred to an inappropriate management style, not misconduct) *with* ¶¶93-94 (Azure disclosed "misconduct related to manipulation of project data and data inconsistencies[,]" and "corruption" **by "former executives"**); ¶¶195, 197 (former executives were: involved in scheme to make improper payments, mispresented asset

---

[64] Defendants improperly insert their own factual narrative and parse words in attempt to downplay the severity of the data manipulation. DB47. That Azure described the manipulation in myriad ways does not obviate that such misconduct occurred and had considerable operational and financial ramifications. *See e.g.*, ¶85 ("inaccurate record keeping"), ¶89 ("manipulation and misrepresentation of project data"), ¶92 ("inconsistencies in project data in three other projects"); ¶193 ("failures to provide accurate information"); ¶200 (breached loan covenants leading to a going concern); ¶202 ("premature plant commissioning certificate after submitting inaccurate data"); ¶204 (Azure delisted).

purchase transaction, and circumvented internal policies to secure projects) *and* ¶202 (premature certificate after submitting inaccurate data).

### 7.    Defendants' Involvement in Issuing, Implementing, and Monitoring Safety Policies Support Scienter

Defendants' scienter is further supported by their direct involvement in creating and issuing safety policies, and regularly monitoring and discussing safety. *See Vale*, 2020 WL 2610979, at *17 (that "executives were directly and intimately involved with [plant] safety" demonstrate scienter). For instance, prior to the Class Period, Azure stated that Gupta authorized and implemented Azure's Occupational Health and Safety Policy, through which Defendants committed to "[c]ontinuously assess[ing] risks & opportunities throughout [its] operations" and "[m]aintain[ing] risk and incident management system[s]" that "incorporat[e] effective reporting, investigation, analysis and sharing this information across all levels[.]" ¶241. To facilitate this and maintain a safe work environment, the Company stated it also conducted "regular/periodic inspections and audits to assess compliance to the SHES guidelines at all sites[,]" "continually work[ed] with consultants and with advisers to improve [its] safety performance[,]" and "continually ke[pt]. . . eyes" on safety performance. ¶¶47, 241. Azure's central monitoring system also allowed Defendants to monitor the plants' safety compliance. ¶¶52-53, 232-33.

Indeed, safety was purportedly of such "paramount importance" to Azure that, according to Board Chairman Rosling, "***health and safety" was "the first thing" discussed during board meetings***. ¶¶44, 49, 238; *Vale*, 2020 WL 2610979, at *17 (executive safety reports support scienter). Gupta and Subramanian also consistently emphasized Azure's ISO 45001 certification and safety awards as evidence of the "efforts" Defendants had "put in to make [the Company's] workplaces safe for [its] team members and contractors[,]" to "provide[] a safe and healthy workplace[,]" and "ensure safety culture" was "embedded across the project locations and sites."

¶240; *Salix*, 2016 WL 1629341, at *14 ("defendants repeated statements about safety weighed 'strongly in favor of the inference that [the CEO] paid special attention to . . . safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements'"); *Dobina*, 909 F. Supp. 2d at 246 (similar). Despite these repeated assurances, Defendants admitted Azure had "deviat[ed] from safety and quality norms" and those "health and safety lapses" existed Companywide, across all of its operations. ¶¶162, 170, 175, 193, 243; *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 784 (S.D. Tex. 2012) (defendant's admissions company's safety processes broke down support scienter). Accordingly, Defendants either knew of Azure's safety violations or were severely reckless in touting safety without first apprising themselves of the true conditions.

### 8. Azure's Violations of its Own Internal Ethics and Internal Control Policies and Procedures Supports Scienter

Defendants regularly violated Azure's internal policies by engaging in corrupt practices, failing to comply with applicable laws, rules and regulations, and failing to maintain effective internal controls. *U.S. SEC v. Dunn*, 587 F. Supp. 2d 486, 506 (S.D.N.Y. 2008) (proceeding with conduct that violates policies "constitute[s] direct evidence of conscious misconduct sufficient to support [a] strong inference of scienter[.]"). Indeed, by engaging in corrupt schemes, Gupta and Subramanian "knowingly sanctioned [conduct] that violated the Company's own [Anti-Bribery and Corruption] policy." *Novak,* 216 F.3d at 311 (scienter alleged where defendants violated internal policies to prevent damage to Company's financial prospects); ¶¶208, 246. Defendants contend Azure's representation that it did not identify improper payments related to the former executives' scheme weakens these scienter allegations. DB57. Not so. The SAC alleges the defendants engaged in a scheme to make improper payments to, *inter alia*, secure land and project approval, which are well founded given Azure disclosed such payments occurred and otherwise took action to adjust for them. *See e.g.*, ¶¶201-02 (land aggregators agreements "may have

64

involved improper payments[,]" necessitating US$3.4 million adjustment); *id*. (finding "[p]otential overpayments"); ¶85 ("mismanagement of funds" resulting in blacklisting a vendor).

Defendants also admit that Azure's former executive officers violated Azure's Code of Business Conduct, which requires compliance with SOX as well as applicable laws and regulations, by circumventing internal policies in connection with the wind projects and by engaging in improper payments. ¶248; *Veeco*, 235 F.R.D. at 231 citing *Scholastic Corp.*, 252 F.3d at 77 ("[T]he Second Circuit has recognized … actions, which are contrary to expressed policy and prior practice, 'form the basis for proof of recklessness.'"). Not only did Defendants violate Azure's policies, but they admitted that their conduct violated its policies. ¶¶245-49; *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) ("acknowledgment" that "transactions…unaligned with [its] policy" supported scienter). Furthermore, Azure repeatedly failed to file its financial statements on time, in direct contravention of the SEC's reporting requirements, and was delisted as a result. *See* ¶¶74, 101-104, 184-186, 204-05. Thus, Azure's violations of these internal policies and its own admissions to these violations supports a strong inference of scienter.[65] ¶249; *Roth v. Avon Corp.*, 2008 WL 656069, at *9 (N.D. Ill. Mar. 7, 2008) (post-class period admission that defendants violated code of ethics supports scienter).

Far from fraud by hindsight, as Defendants claim (*see* DB46), the SAC alleges that, after receiving the first whistleblower reports in June and July of 2021, Azure's then-external auditor, E&Y, raised concerns regarding corrupt payments to vendors and project cost allocation, which

---

[65] Taken together, Defendants admitted serious violations of its internal policies, which directly implicated former executives in the fraud and resulted in significant monetary and operational consequences (*see e.g.*, ¶¶194, 202, 210), certainly constitutes more than boilerplate averments of violated accounting policies that Defendants suggest here. *See* DB57-58 *citing In re Pegasus Wireless Corp. Sec. Litig.*, 2009 WL 3055205, at *7 (S.D. Fla. Sept. 21, 2009) (notable absence of "red flags . . . or other suspicious circumstances or events") *and In re Hudson Techs., Inc. Sec. Litig.*, 1999 WL 767418, at *5 (S.D.N.Y. Sept. 28, 1999) (plaintiffs merely alleged "failure to comply with standard accounting practices, coupled with later revisions of financial statements") *and Rok v. Identiv, Inc.*, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4. 2017) (unlike here where Azure admitted its policies were violated, the *Rok* plaintiff merely alleged ethics violation in conclusory fashion).

would require additional qualifications be included in its audit report.[66] ¶¶63, 66. *Vale*, 2020 WL 2610979 at \*16 (warnings from auditors supportive of scienter). In response, Defendants initiated steps to replace E&Y. ¶64. Indeed, Azure's audit committee approved the change in auditors on September 30, 2021 – only a few months after the Company's received the First Whistleblower Complaints. *Id*. But, as discussed in §III.C.2, *supra*, the very conduct raised remained ongoing, as did Defendants' misleading statements, resulting in additional whistleblower reports that were disclosed only after the bad actors (i.e., Gupta and Subramanian) had been removed from the equation in May 2022.[67]

> **9.     With Azure's Long-Term Viability in Jeopardy, Defendants Were Motivated to Engage in the Alleged Data Manipulation and Bribery to Secure New Projects**

Contrary to Defendants' position that Plaintiff must plead stock sales (DB43-44), "[p]ersonal pecuniary motive is not required to plead scienter." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (citing *Tellabs*, 551 U.S. at 325); *Skiadas*, 2020 WL 3268495, at \*9. But a proper motive can bolster scienter when considered with other facts. *See Tellabs*, 551 U.S. at 325; *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131 (2d Cir. 2021) (recklessness and motive weighed "*together*" to support scienter).[68]

---

[66] As discussed in §III.C.4.b n.59, *supra*, the Court may rely on Plaintiff's CW allegations because they are corroborated by numerous other facts alleged in the complaint.

[67] Moreover, because the SAC alleges that Gupta and Subramanian were involved in facilitating the bribery scheme as it was occurring and Azure took steps to obscure its discovery by replacing E&Y (¶¶63-64, 66, 208-09, 246), Defendants' reliance on *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at \*8 (S.D.N.Y. Dec. 16, 2014), where weak accounting controls were not flagged by the auditors and only brought to Defendants attention "after the allegedly false and misleading statements were issued[,]" is inapposite. For the same reasons, *Stevelman*, 174 F.3d at 84-5 (DB46), where the Court found the company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings" amounted "to allegations of 'fraud by hindsight,'" is distinguishable.

[68] Defendants' cases do not hold otherwise. *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 281–82 (S.D.N.Y. 2006) ("possible to plead scienter by identifying circumstances indicating conscious behavior [or recklessness] by defendant" without motive); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (plaintiff can fulfill this scienter requirement by motive or strong circumstantial evidence of conscious misbehavior or recklessness.).

After Defendants Gupta, Subramanian and Agrawal took the reins, cash flow steadily declined due to project cost increases, as evidenced by consecutive years of losses. ¶¶58-60. Azure's debt balance skyrocketed 79%, growing from 71,772 INR in 2019 to 128,787 INR in 2022. ¶59. Thus, Azure's long-term viability was in jeopardy unless Defendants could secure new projects. *Skiadas,* 2020 WL 3268495, at *11 (inference of scienter bolstered by the fact that Defendants needed to raise funds for company to remain viable).

Defendants claim that the motive "[t]o make Azure's financial position appear more favorable," is too "generic" to support scienter. DB44. But courts routinely find a company's need to generate cash to survive supports scienter. *Skiadas*, 2020 WL 3268495, at *11 ("allegations of motive adequate where the company's needed to fundraise to survive"); *Didi*, 2024 WL 1119483, at *17 (corporate financial motive supports scienter); *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, 878 F. Supp. 16, 19 (S.D.N.Y. 1995) (motive to maintain appearance of financial health); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *8 (D.N.J. July 31, 2020) (long history of operating losses created motive).

Here, Defendants engaged in a concerted effort to manipulate data to secure projects, schemed to make improper payments to secure land and approvals, and misled the Board and investors. ¶¶194-95. Defendants also misled government officials to obtain commissioning certificates after submitting inaccurate data on the hope they could fully commission to their contractually required capacity before anyone noticed. ¶¶202, 130; *Skiadas*, 2020 WL 3268495, at *11 (motive where defendants had incentive to gamble); *In re N. Dynasty Mins. Ltd. Sec. Litig.*, 2023 WL 9509337, at *4 (E.D.N.Y. Jan. 25, 2023) (motive alleged where executive defendants withheld information to get project approval); *Fresno*, 268 F. Supp. 3d at 554 (motive alleged where defendants inflated results to secure a deal).

But the Defendants' scheme faltered when concerned employees blew the whistle. ¶60. Defendants publicly claimed those legitimate complaints were unsubstantiated in response, further evidencing their motive to obscure their involvement and to stymie investigations into such reports. *Insys*, 2018 WL 2943746, at *6 (motive to cover up the economic impact of officer's involvement in a kickback scheme). "These allegations support more than mere generic 'motives that are common to most corporate officers.'" *Insys*, 2018 WL 2943746, at *6.[69]

### 10.    Plaintiff's Allegations Demonstrate Corporate Scienter

Corporate scienter is sufficiently alleged where "the pleaded facts … create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *McIntire v. China MediaExpress Holdings, Inc*., 927 F. Supp. 2d 105, 126 (S.D.N.Y. 2013). "While the 'most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant'" as the SAC does here with the Individual Defendants, "it is [also] possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id*.; *see* §III.C.1-9 *supra*, §III.C.11 *infra*.

Here, Azure admitted that its "former executives": (i) "were involved in an apparent scheme with persons outside the Company to make improper payments" in a widespread data manipulation scheme (¶¶196-97); (ii) made "potential misrepresentations" "to the Board in July 2021 regarding an asset purchase transaction for the development of a wind project" (¶195);  (iii) "may have circumvented internal policies in connection with the approval of another transaction

---

[69] Because Plaintiff alleged a unique motive, Defendants authorities providing only generic motive are inapposite. *See* DB43-44 citing *ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 201 (2d Cir. 2009) (generalized desires); *Kalnit v. Eichler,* 264 F.3d 131, 139-40 (2d Cir. 2001) (generalized desires which can be imputed to all corporate officers); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801 (2d Cir. 1996) (motive common to every company in the United States).

related to another wind project" (*id*.); and (iv) were the subject of "an investigation into a corruption allegation" by a Special Committee convened explicitly to "review material projects and contracts … for anti-corruption and related compliance issues" during "a three-year period" during which those former executives led the Company. ¶93. These allegations on their own are more than sufficient to demonstrate corporate scienter. *See Valentini,* 837 F. Supp. 2d at 316-17 ("[T]hat, on multiple occasions, employees [] are alleged to have performed their professional duties in a consciously wrongful or reckless manner [by bribing third-parties] establishes a strong inference of corporate scienter."); *BHP*, 276 F. Supp. 3d at 90-91 (corporate scienter alleged where allegations allege executives had access to information that rendered their statements misleading).

But the SAC goes further, with additional allegations that create "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter[,]" including that "Key Managerial Personnel" were involved in "corrupt conduct in acquisition of land, improper use of political connections, special treatment of certain employees, [and] payment of kickbacks." ¶¶61-63, 70; *McIntire*, 927 F. Supp. 2d at 126; *see Ark. Teacher Ret. Sys.*, 18 F. Supp. 3d at 486 (corporate scienter alleged where it is implausible that senior management was "somehow oblivious to … severe problems").

Thus, the SAC more than sufficiently alleges facts to support Azure's corporate scienter.

### 11.    Plaintiff's Allegations Considered Holistically Overwhelmingly Support A Strong Inference of Scienter

The totality of allegations here—admissions of fraud, numerous substantiated whistleblower complaints, numerous executive and auditor resignations at suspicious times under suspicious circumstances, material weaknesses in internal controls, admitted widespread data manipulation and violations of safety and internal policies, access to and monitoring of critical KPIs, and motive — overwhelmingly support a strong inference of scienter. Indeed, courts in this

district have found similar allegations to be more than sufficient. *See Hall*, 580 F. Supp. 2d at 233 (regulatory investigations, admitted material weaknesses in internal controls, executive and auditor resignations sufficient for scienter); *OSG*, 12 F. Supp. 3d at 631-33 (allegations of issues being raised with management, suspiciously timed resignations, inadequate internal controls, and the magnitude and duration of violations sufficient for scienter).

Based on these facts, the more compelling scienter inference here is that Defendants publicly downplayed the whistleblower complaints to investors and terminated their relationship with E&Y in hopes that they could continue securing projects and complete commissioning without the fraud being uncovered. *See Handal v. Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at *17 (E.D.N.Y. Sept. 25, 2023) (inference "that [defendant] was trying to deceive the public about, or distract the public from looking further into, the supposed transactions" is "'cogent and at least as compelling as [the] opposing inference of nonfraudulent intent'"). Moreover, because Azure admitted that former executives and key managerial personnel are among those who committed the misconduct alleged herein, Plaintiff's inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324*; Sadia*, 643 F. Supp. 2d at 534 (recklessly if not knowingly false statements made, multiple employee departures, admitted policy deviations, a senior officer committed intentional misconduct, and investigation supported scienter).

Defendants contend the more plausible inference is Azure conducted timely, thorough, and good faith investigations, adequately disclosed to regulators, and informed investors of the continued efforts to resolve them, and then lost its public listing due to mere corporate mismanagement. DB48. This inference is belied by the numerous initial claims that the complaints were "unsubstantiated" though the conduct persisted. *See e.g.*, ¶61-62, 68, 83. Far from fulsome,

70

as Defendants' claim (DB48), Azure disclosed the bare minimum to investors publicly and internally withheld requested information from its auditors rendering their ability to audit financial statements (that were overdue by almost a year) impossible. *See e.g.,* ¶181 (J.P. Morgan: "Azure's investor call yesterday didn't bring out many details…"); ¶182 (RBC Capital Markets: "AZRE did not provide any details ..."); ¶103 ("Nomura said it was not fully convinced with this explanation"); ¶101 (S.R. Batliboi had "yet to receive the information that they have requested").

Where "it is clear that the culpable inference eventually won out," "the Court does not need to identify the precise moment at which the culpable inference" overtook the innocent one. *In re ITT Educ. Servs.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014). Considering the SAC's allegations holistically, "'a reasonable person would deem the [SAC's] inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). Moreover, given the widespread misconduct alleged here, "'it is at least as likely as not' that someone whose intent could be imputed to [Azure] acted with scienter" when "'accepting the whole factual picture painted by the complaint.'" *Citigroup,* 753 F. Supp. 2d at 237; *McIntire*, 927 F. Supp. 2d at 126-27 (multiple resignations, accounting manipulations, and numerous red flags support corporate scienter); *see* §III.C.10, *supra*.

### D.    Defendants' Factual Truth on the Market Argument Lacks Merit

Defendants erroneously argue that the Class Period should end in August 2022 because the subsequent alleged corrective disclosure does not contain new information not already known to the market. DB58. Not so. Plaintiff alleges one additional corrective disclosure on July 13, 2023[70] wherein Azure announced, for the first time, that its auditors resigned because "they are yet to

---

[70] Defendants incorrectly cite the corrective disclosure as occurring in May 2023. DB58. Plaintiff does not allege a corrective disclosure in May. Rather the alleged disclosure was on July 13, 2023.

receive the information that they have requested to complete their audit work inclusive of our March 31, 2022 draft financial statements, US annual filing, associated books and records, and our conclusions and representations on the impact of the whistle blower complaints" and, thus, "it is not possible for them to complete the audit of the financial statements within the timeline expected by the company." ¶101. This disclosure revealed for the first time that Azure's auditors resigned due to Azure's non-cooperation and apparent attempt to conceal information from the auditors. It also revealed that Azure would take another 14 weeks to file the 2022 Form 20-F. *Id.*

That same day, it was also revealed for the first time that the NYSE had officially suspended trading of Azure's shares and that the Company may default on its debt. ¶106. This material information was not disclosed before July 13, 2023 and Defendants cannot (and do not) point to a single example where it was. Accordingly, Plaintiff has adequately alleged loss causation with regard to the July 13, 2023 disclosure and the Class Period is properly alleged. *Teva Sec. Litig.,* 671 F. Supp. 3d at 197 (rejecting "truth-on-the-market" defense where "the market had no conception of its breadth.").

Moreover, Defendants ignore the SAC's allegations that the July 13, 2023 disclosure was a materialization of the risk relating to Azure's lack of internal controls and lack of compliance with safety, ethics and regulatory policies and laws that prevented it from filing its 2022 Form 20-F. *See DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 213 (S.D.N.Y. 2019) (Woods, J.) (loss causation adequately alleged through materialization of the risk). In any event, such factual arguments are wholly inappropriate at this stage.

### E.     Plaintiff's Section 20(a) Control Person Claims Should Be Sustained

Because the SAC adequately states claims under §10(b), its §20(a) claims should be sustained. *See Fresno*, 268 F. Supp. 3d at 556; *Bos. Ret. Sys.,* 556 F. Supp. 3d at 144-45 (complaint

adequately alleged defendant, who was generally aware of report and signed documents, was a culpable participant, though his scienter was not sufficiently pled).

## IV.    CONCLUSION

For these reasons, Defendants' motions to dismiss should be denied in their entireties. However, if the Court grants any part of either motion, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Cresci v. Mohawk Valley Cmty. College*, 693 Fed. Appx. 21, 25 (2nd Cir. 2017).

DATED: May 6, 2024                          Respectfully submitted,

                                            **LEVI & KORSINSKY, LLP**
                                            By: */s/ Shannon L. Hopkins*
                                            Shannon L. Hopkins (SH-1887)
                                            Gregory M. Potrepka (GP-1275)
                                            David C. Jaynes (admitted *pro hac vice*)
                                            Morgan M. Embleton (admitted *pro hac vice*)
                                            Amanda D. Foley (admitted *pro hac vice*)
                                            1111 Summer Street, Suite 403
                                            Stamford, CT 06905
                                            Telephone: (203) 992-4523
                                            Facsimile: (212) 363-7171
                                            shopkins@zlk.com
                                            gpotrepka@zlk.com
                                            djaynes@zlk.com
                                            membleton@zlk.com
                                            afoley@zlk.com

                                            *Lead Counsel for Plaintiff and the Class*