# Exhibit B

ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal Shah
Alison Conn
Christopher M. Colorado
Nicholas Karasimas
Stewart Gilson
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9143 (Colorado)
ColoradoCh@sec.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-against-<br><br>GAUTAM ADANI and SAGAR ADANI,<br><br>Defendants. | **COMPLAINT**<br><br>1:24 Civ. 8080<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendants Gautam Adani and Sagar Adani, alleges as follows:

**SUMMARY**

1.      In 2021, two senior executives of Adani Green Energy Ltd. ("Adani Green")—

Gautam Adani, Adani Green's founder and controlling shareholder, and Sagar Adani, Adani

Green's Executive Director (collectively, "Defendants")—engaged in a bribery scheme

involving the equivalent of hundreds of millions of dollars to obtain contracts that benefitted

Adani Green, while, at the same time, falsely touting the company's compliance with anti-bribery principles and laws in connection with a $750 million bond offering (the "Offering").

2.      Gautam Adani founded Adani Green and Defendants are part of a four-person management team that controls it.  For years, Defendants positioned Adani Green to investors and the public as a leader among its peers and within India in principles of good corporate governance, highlighting Adani Green's purportedly rigorous anti-bribery and anti-corruption principles and policies, and seeking to appeal to investors who valued governance factors.

3.      In September 2021, Defendants leveraged that narrative in the Offering to sell $750 million of Adani Green corporate bonds ("Notes"), including more than $175 million in Notes to investors in the United States.

4.      In connection with the Offering, Adani Green told purchasers of the Notes that none of Adani Green's directors or officers, including Defendants themselves, had paid or promised to pay bribes to government officials or attempted to unduly influence those officials. Adani Green and Defendants also emphasized to underwriters and potential investors that Adani Green had implemented robust anti-bribery and anti-corruption processes and that Adani Green was a leader in India in good corporate governance.

5.       None of this was true.  In the months and weeks before making these representations in connection with the Offering, Defendants were personally involved in paying or promising the equivalent of hundreds of millions of dollars in bribes to Indian state government officials to induce Indian state governments to enter into contracts necessary for Adani Green to develop India's largest solar power plant project, from which Adani Green stood to earn billions of dollars.

6.    A second company involved in that power plant project, Azure Global Power Limited ("Azure"), agreed to pay a portion of those bribes and Defendants were also personally involved in collecting payment from Azure.

7.    Gautam Adani and Sagar Adani lied to purchasers of Adani Green's Notes about Adani Green's and their own involvement in a complex and high value bribery scheme.  Those lies, made in connection with the offer and sale of Notes to investors in the United States, violated the antifraud provisions of the federal securities laws.

## VIOLATIONS

8.    By virtue of the foregoing conduct and as alleged herein, Gautam Adani and Sagar Adani each violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  They each also aided and abetted Adani Green's violations of Securities Act Section 17(a)(2), and Exchange Act Section 10(b), and Rule 10b-5(b) thereunder.

9.    Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.    The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and (d)], and Exchange Act Section 21(d) [15 U.S.C. §§ 78u(d)].

11.    The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C.

3

§ 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (c) permanently prohibiting Defendants from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(2)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this Complaint occurred within this District, including that the Notes purchased by United States investors were settled and cleared, and ownership of the Notes was transferred, in this District.

## DEFENDANTS

15.     **Gautam Adani**, age 62, is a citizen of India, and the founder of both Adani Group and Adani Green.  Since 2015, Gautam Adani has served on Adani Green's Board of Directors and as a member of its four-person Management Committee.  He is also one of Adani Green's two "Promoters," as defined by the Securities Board of India ("SEBI"), including

because he founded Adani Green, and because he and his family members own a majority of Adani Green's shares and he controls the company, directly and through a family trust.

16.     **Sagar Adani**, age 30, is a citizen of India, and the Executive Director of Adani Green's Board of Directors and the Chairman of Adani Green's four-person Management Committee, positions in which he has served since October 2018.  He is also Gautam Adani's nephew.

### ADDITIONAL RELEVANT ENTITIES AND PERSONS

17.     **Adani Group** (or the "Group") is a privately held multinational conglomerate headquartered in Ahmedabad, India, with numerous entities throughout India and in, among other places, Australia, Indonesia, Mauritius, Panama, Singapore, and the United Arab Emirates. Gautam Adani formed Adani Group in 1988 as a commodity trading firm and subsequently expanded it to own and operate airports, shipping ports, and railways; to produce and distribute power and energy through mining and thermal and renewable energy production; and to be India's largest trader of coal.  Adani Group's holdings currently have a market capitalization of more than $200 billion.

18.     **Adani Green** (or the "Issuer") is a public limited company formed by Gautam Adani and Rajesh Adani in 2015 under the laws of India, with a principal place of business in Ahmedabad, to be the renewable energy arm of Adani Group.  Adani Green, including through its subsidiaries, develops, builds, owns, operates, and maintains a portfolio of large solar power projects and wind farm projects.

19.     **Rajesh Adani** has worked for both Adani Group and Adani Green since their formation.  Since at least 2015, he has led Adani Group's operations with responsibility for its business development efforts, and he has served on Adani Green's Board of Directors and been a member of its four-person Management Committee.  He is Gautam Adani's brother, Sagar

5

Adani's father, and one of Adani Green's two "Promoters," as defined by the SEBI, including because he founded Adani Green, and because he and his family own a majority of Adani Green's shares and control the company, directly and through a family trust.  He also serves or has served on the Board of Directors of at least twelve other Adani Group companies including Adani Group's flagship company, Adani Enterprises Limited.

20.     **Vneet Jaain** ("Jaain") has worked for Adani Group for more than 18 years, served as Adani Green's Chief Executive Officer between July 2020 and May 2023, and is one of the four members of Adani Green's Management Committee.

21.      **Azure** is a limited company formed under the laws of Mauritius, majority-owned by two Canadian pension funds, that produces and sells solar power in India.  Azure's common stock previously publicly traded on the New York Stock Exchange until it was delisted in November 2023.  Azure has since suspended its reporting as a public company.

22.     **Solar Energy Corporation of India** ("SECI") is a public sector entity and is the arm of Indian central government responsible for implementing Indian central government programs related to renewable energy, including funding large solar projects like those Adani Green and Azure build and operate.

FACTS

**I.      GAUTAM ADANI FORMED BOTH ADANI GROUP AND ADANI GREEN.**

23.     Gautam Adani formed Adani Group in 1988 as a commodity trading firm. Subsequently, he expanded Adani Group into other sectors, including owning and operating airports, shipping ports, railways, building and operating means of power production, including from mining and thermal and renewable sources, and energy transmission.  During that time, Adani Group also became India's largest trader of coal.

6

24.     In 2014, the Indian central government announced a goal of achieving 175 gigawatts ("GW") of renewable energy production capacity in India, including at least 100 GW of solar energy production capacity by 2022.  At the time, renewable energy accounted for approximately 17 percent of India's energy production capacity.  The Indian central government has publicly announced that it is seeking to more than double that number.

25.     The Indian central government also previously instituted Renewable Energy Purchase Obligations that require Indian state-owned energy distribution companies (generally referred to as "DISCOMs"), which are responsible for buying power and transmitting it to consumers within their respective regions, to buy and distribute to consumers certain minimum amounts of energy from renewable sources.

26.     In January 2015, Gautam Adani and Rajesh Adani formed Adani Green to be a part of the Adani Group and to spearhead Adani Group's renewable energy business, and each has since served on Adani Green's Board of Directors.  That year, Sagar Adani, Gautam Adani's nephew and Rajesh Adani's son, also began working for Adani Green.

27.     Adani Green develops, builds, owns, operates, and maintains utility scale grid connected solar and wind farms.  It earns revenue by selling electricity to Indian central government agencies and also to DISCOMs, typically under long-term fixed-price Power Purchase Agreements (or "PPAs") that set the price (or "tariff") that the purchaser (or "off-taker") will pay for power for the duration of the contract.

28.     In 2018, at the age of 24, Sagar Adani was appointed as Executive Director of Adani Green's Board of Directors and Chairman of Adani Green's Management Committee.

29.     As Executive Director, Sagar Adani has been responsible for "leading the Adani Group's foray into renewable energy" and "achieving the Group's vision," "backed by his sound

understanding of new processes, systems, and macroeconomic issues." According to Adani Green, he is also responsible for reviewing and implementing Adani Green's ethics policies, including its anti-bribery policy.

30. Adani Green's strategic and fundraising decisions are made by its four-person Management Committee which includes, in addition to Sagar Adani as its Chairman, Gautam Adani, Rajesh Adani, and Vneet Jaain. Those decisions are then implemented by Adani Green's other management and business divisions.

31. Adani Green has repeatedly and publicly acknowledged that all aspects of its business and operations heavily rely on its "Promoter Group," *i.e.*, Gautam Adani and Rajesh Adani, including with respect to, among other things, identifying strategic opportunities, obtaining government or statutory permissions necessary to acquire and build on land, building and developing business relationships, and attracting and retaining talent.

32. Between its formation in January 2015 and December 2017, Adani Green was privately held, primarily by Gautam Adani and Rajesh Adani through their family trust.

33. In December 2017, Gautam Adani and Rajesh Adani caused Adani Green to become a publicly traded company and, in June 2018, its shares began trading on the BSE (f/k/a Bombay Stock Exchange) and the National Stock Exchange of India.

34. Gautam Adani and Rajesh Adani, together with their family, have continued to be Adani Green's majority owners. To that end, as part of its initial public offering, Adani Green disclosed that Adani Group's flagship company, Adani Enterprises Limited, was Adani Green's parent company, and that the S.B. Adani Family Trust, a trust controlled by Gautam Adani and Rajesh Adani, was Adani Green's "Ultimate Controlling Entity."

35.     Likewise, in the offering documents that underlie Adani Green's Offering and Notes at issue in this action, dated in late August and early September 2021, and which are described in greater detail in paragraphs 101 to 126 *infra*, Adani Green disclosed that,

> Our Promoters [*i.e.*, Gautam Adani and Rajesh Adani] and the members of our Promoter Group own approximately 57.47% of our Equity Share capital as at June 30, 2021, and therefore exercise significant influence over our business policies, affairs and all matters requiring shareholders' approval, including the composition of our Board of Directors, change in the Company's name, the approval of mergers, strategic acquisitions, joint ventures or the sales of substantially all of our assets and the policies for dividends, lending, investments and capital expenditures.

36.     Currently, Adani Green has a market capitalization of more than $30 billion.

## II.     ADANI GREEN PORTRAYED ITSELF AS AN ESG LEADER AND AIMED TO BE THE WORLD'S LARGEST SOLAR POWER PRODUCER.

37.     In its annual reports, news releases, and other self-published documents, Adani Green has positioned itself as a leader in environmentally conscious, socially responsible, and good corporate governance principles, often referred to as environmental, social, and governance or "ESG" principles.  In this way, Adani Green has sought to differentiate itself from its peers and other potential investments or issuers in developing countries that might be susceptible to corruption and bribery issues and to specifically appeal to investors who prioritize ESG principles or ESG-related investments.

38.     Adani Green has also touted its plan to become the world's largest private producer of solar power by 2025 and of renewable power by 2030.  This effort relies significantly on programs and economic incentives implemented by SECI (or the Solar Energy Company of India), an arm of the Indian central government responsible for renewable energy development.  It also depends on Adani Green's successful implementation of the so-called Manufacturing Linked Projects, described in paragraphs 47 to 61 *infra*, which comprise a substantial part of Adani Green's intended power generation capacity.

9

39.	In early 2016, Adani Green had a single power project with power generating capacity of only 20 megawatts ("MW").  Over the next three years, Adani Green grew its business and, by the end of 2018, had entered into long-duration contracts pursuant to which it intended to expand its renewable power generating capacity to 1,998 MW, or 1.998 GW.[1]

40.	Adani Green had much larger aspirations.  In mid-2019, Adani Green issued an annual report stating that by 2022 it intended to develop a portfolio of projects that produced a total of 10 GW of renewable power generating capacity—or five times the size of its portfolio at the end of 2018—and that it was the "best positioned" company "to tap [the] Indian large renewable energy opportunity."

41.	At the same time, Adani Green highlighted in investor presentations, news publications, annual reports, and other self-published documents that it stood out among its peers as a company committed to good corporate governance and preventing corruption and bribery by its directors, executives, and employees.

42.	For example, in mid-2019, Adani Green publicly announced that it had formed a Corporate Social Responsibility Committee and implemented a Code of Business Conduct and Ethics Policy for all Board members and senior management, and that it had adopted an Anti-Bribery Policy consistent with the principles of the World Bank Group and the International Labour Organisation.

43.	On October 7, 2019, Adani Green publicly announced that it was joining the United Nations Global Compact, supporting the Ten Principles of that Global Compact—which include detailed guidelines for businesses to support and protect Human Rights, Labor, and

---

[1] Based on recent industry estimates of power consumption by Indian citizens, 1 GW of power producing capacity is sufficient to meet the annual power consumption of approximately nine million Indian citizens.

Environmental Concerns, and to work against Corruption—and making those "principles part of the strategy, culture and day-to-day operations of our company."

44.     In or around June 2020, Adani Green issued its "first Integrated Annual Report," which highlighted Adani Green's "[r]obust governance and disclosures," its anti-bribery and anti-corruption efforts including its "policy of zero tolerance" for bribery by its employees, and that its Board members and senior management were trained annually on that policy.

45.     Then, in August 2021, the Corporate Social Responsibility Committee of Adani Green's Board of Directors approved and adopted, and Adani Green subsequently made public, its initial Report on Environmental, Social and Governance Policies, or "ESG Report," which touted Adani Green's anti-corruption *bona fides* and its purported strong and effective corporate governance framework.  This included representations that:

> a.     Adani Green has "best-in-class corporate governance practices" and maintains a "Strong Anti-Corruption Stance," including due to its "[z]ero tolerance to bribery and corruption" and an anti-bribery policy that is regularly reviewed by its Board of Directors and that classifies "[p]ayments or gifts for committing actual or suspected fraudulent activities" "as an act of bribery or corruption";
>
> b.     Adani Green's "Board of Directors is briefed on expected corporate behavior and the need to maintain a strong anti-corruption mindset in all company dealings upon appointment";
>
> c.     Gautam Adani and Sagar Adani are "skilled" and "expert" in, and have "core competencies" that include, "Corporate Governance & ESG," including their "[e]xperience in implementing good corporate governance

11

practices, reviewing compliance and governance practices for sustainable

growth of the company and protecting stakeholder's interest"; and

d.    Adani Green's adherence to "Anti-Corruption & Transparency" principles

is "significant" and "material" to both Adani Green and its stakeholders.

46.    Throughout this time, Adani Green also acknowledged repeatedly in its annual reports, the ESG Report, and other public documents that participation by it or its Board members or senior management in corrupt activities could result in both financial and non-financial penalties with adverse impacts on its business and reputation.

## III.    SECI AWARDED THE MANUFACTURING LINKED PROJECTS TO ADANI GREEN AND AZURE.

47.    In June 2019, SECI announced a Request for Selection ("RfS") seeking bids from solar power developers for the construction of a solar cell and module manufacturing plant which would be linked to SECI's agreement to purchase power from the developer(s) with the winning bid(s).

48.    Broadly described, SECI sought one or more solar power developers to construct a plant or plants in India capable of producing domestically solar power component parts (such as cells, modules, or wafers) and, in exchange for that construction and manufacturing, SECI would contract to purchase power generating capacity from the solar power developer(s) in an amount equal to a multiple of the power generating capacity of the solar components manufactured.

49.    For example, if a solar power developer agreed to construct a plant within India that manufactured solar power component parts capable of generating 500 MW of solar power, then SECI would agree to buy solar power capacity from that developer equal to a multiple of

500 MW (*e.g.*, 1,500 MW or 2,000 MW) at a fixed price pursuant to a long-duration Power Purchase Agreement.

50.     The two projects, consisting of building one or more domestic solar component manufacturing plants and also generating and selling solar power to SECI, are known as the Manufacturing Linked Projects.

51.     Under an amended RfS, SECI ultimately sought developers to construct a plant or plants in India capable of domestically manufacturing solar power components generating 3 GW of power capacity and, in exchange, SECI would buy up to 12 GW of solar power capacity from the developers (which also might include or necessitate the construction of new solar power plants)—for a total project capacity for the Manufacturing Linked Projects of 15 GW.

52.     Multiple companies, including Adani Green and Azure, made submissions in response to the RfS.  Ultimately, SECI awarded the Manufacturing Linked Projects jointly to Adani Green and Azure.

53.     Azure was the first to announce that it had won a portion of the RfS.  In an investor presentation on January 16, 2020, Azure disclosed that SECI had selected it to be awarded a portion of the projects associated with the RfS, and that Azure would cause the construction of a manufacturing plant or plants to produce solar power components with 1 GW capacity and, in turn, SECI would contract to buy 4 GWs of solar power capacity from Azure.

54.     On June 9, 2020, Adani Green issued a press release titled, "Adani Green Energy Wins The World's Largest Solar Award; Leapfrogs Towards Goal Of 25 GW Of Installed Capacity By 2025" that announced that SECI had selected Adani Green to be awarded a portion of the projects associated with the RfS, and that Adani Green would build a manufacturing plant

13

or plants to produce solar components with 2 GW capacity and, in turn, SECI would contract to buy 8 GWs of solar power capacity from Adani Green.

55. Specifically, in its June 9, 2020, press release, Adani Green said,

> Adani Green Energy Limited (AGEL, NSE: ADANIGREEN) has won the first of its kind manufacturing linked solar agreement from the Solar Energy Corporation of India (SECI). As a part of the award, AGEL will develop 8 GW of solar projects along with a commitment that will see Adani Solar establish 2 GW of additional solar cell and module manufacturing capacity. With this win, AGEL will now have 15 GW capacity under operation, construction or under contract thereby accelerating its journey towards becoming the world's largest renewables company by 2025.

The only person quoted in the press release on behalf of Adani Green was Gautam Adani.

56. Accordingly, pursuant to the Letters of Award issued by SECI to Adani Green and Azure documenting their selections as the winners of the RfS bidding process ("Letters of Award"), Adani Green would be responsible for and stood to benefit from two-thirds of the Manufacturing Linked Projects, and Azure would be responsible for and stood to benefit from one-third of the Manufacturing Linked Projects.

57. The Manufacturing Linked Projects immediately became the largest component of Adani Green's portfolio, more than doubling the amount of solar power capacity that Adani Green expected to have under contract to generate and sell.

58. According to industry analysts, Adani Green was projected to earn billions of dollars of revenue and more than a billion dollars in profit by selling power capacity to SECI related to its Letter of Award and Manufacturing Linked Projects. To that point in its corporate history, Adani Green had earned only approximately $50 million in revenue and had not recorded a profit.

14

59. SECI's Letters of Award to Adani Green and Azure did not, however, guarantee that SECI would purchase any power capacity from them or that they would earn any revenue or profits.

60. At minimum, two additional steps were required. First, SECI needed to enter into Power Supply Agreements with the DISCOMs (the Indian state energy companies) under which the DISCOMs would agree to buy energy from SECI at solar power prices consistent with those SECI had tentatively agreed to pay Adani Green and Azure in the Letters of Award. Second, after SECI contracted with the DISCOMs, it needed to enter into Power Purchase Agreements with Adani Green and with Azure pursuant to which SECI would buy power generating capacity from each of them (which SECI would then resell to the DISCOMs under the Power Supply Agreements).

61. Under the terms of the RfS, SECI said it expected to enter into Power Purchase Agreements with the winning bidders, *i.e.*, Adani Green and Azure, within 90 days of issuing the Letters of Award. That did not happen. Instead, the Power Purchase Agreements took more than 18 months and were executed by SECI only after Adani Green's senior executives, Gautam Adani and Sagar Adani, undertook a massive bribery scheme to incentivize Indian state government officials to enter into contracts with SECI to buy energy at above market rates.

## IV. GAUTAM ADANI AND SAGAR ADANI PROMISED AND PAID MASSIVE BRIBES TO INDIAN STATE OFFICIALS.

62. Although SECI had tentatively accepted the price at which Adani Green and Azure bid to sell power to SECI related to the Manufacturing Linked Projects, when SECI attempted to contract with Indian state governments to sell energy obtained via that capacity at prices consistent with the amounts to be paid to Adani Green and Azure, the Indian state governments refused.

63. The problem was economics. The price for energy capacity that SECI had tentatively agreed to pay under the Letters of Award turned out to be too high. So, when SECI attempted to contract with the Indian state governments and DISCOMs to offload power at prices consistent with the Letters of Award, the Indian states refused.

64. That refusal was only overcome when Gautam Adani, assisted by Sagar Adani, personally intervened and, in the aggregate, paid or promised to pay hundreds of millions of dollars of bribes.

65. In India, each state has a "chief minister" who is the elected head of the state government and has executive authority over the state.

66. Within each Indian state, electricity is typically procured and distributed by one or more state-owned power distribution companies, or DISCOMs. The chief minister of a state generally appoints one or more directors to oversee the DISCOM.

67. As the head executive of a state, a chief minister can influence the decisions of publicly owned DISCOMs.

68. After SECI issued Letters of Award to Adani Green and Azure for the Manufacturing Linked Projects, and accepted their proposed tariffs as amounts at which SECI would buy solar power generating capacity from them for the next twenty-five years, SECI attempted to enter into Power Supply Agreements (or PSAs) to sell solar electricity to Indian state governments and state DISCOMs at prices consistent with the Letters of Award.

69. The Indian states and DISCOMs, however, initially refused to contract with SECI, including because aspects of the Indian renewable energy market had shifted and caused downward pressure on solar energy prices. They were unwilling to buy solar energy from SECI

16

at prices consistent with those set forth in the Letters of Award, which were above then-market rates.

70.     This unwillingness of the Indian states and DISCOMs to enter into Power Supply Agreements prevented SECI from entering into Power Purchase Agreements with Adani Green and Azure.  Without those Power Purchase Agreements, Adani Green and Azure could not develop and operate the Manufacturing Linked Projects and earn the billions of dollars of revenue associated with them.

71.     Executives of both Adani Green and Azure, including Sagar Adani, began to pressure and to propose to pay "incentives" (*i.e.*, bribes) directly to Indian state government officials to persuade them to cause the Indian state governments or the state-owned DISCOMs to agree to Power Supply Agreements with SECI at prices favorable to Adani and Azure.

72.     For example, in late 2020 and early 2021, Sagar Adani regularly communicated with others, including Azure executives, about the need to pressure and "incentivize" (*i.e.*, bribe) Indian states and his efforts to do so.  Among many other communications, in writings to an Azure executive, he detailed how he had been proposing "incentives" (*i.e.*, bribes) to "motivate[]" Indian state officials and persuade them to agree to contracts with SECI, and, subsequently, he told Azure executives that he was substantially increasing those "incentives" (*i.e.*, bribes).

73.     By March 2021, however, it was publicly reported that "[a] major bottleneck that has been impeding the development of new solar and wind projects is the delay by distribution companies (discoms) in signing power sale agreements (PSAs) with the Solar Energy Company of India (SECI)" because SECI "has been struggling to find end buyers (discoms)" as the

17

"discoms, anticipating a decline in solar module prices and hence a reduction in future solar auction tariffs, have been reluctant to sign PPAs/PSAs."

74. By June 2021—a year after SECI issued a Letter of Award to Adani Green and fifteen months after Azure had announced that it had been selected for the Manufacturing Linked Projects—SECI had still not entered into Power Supply Agreements with Indian state governments related to the Letters of Award and Manufacturing Linked Projects.

75. That month, Azure stated publicly that its potential profits related to the Manufacturing Linked Projects were at risk, saying,

> [SECI] has informed us that so far there has not been adequate response from the state electricity distribution companies ('DISCOMs') for SECI to be able to sign the Power Sale Agreement ('PSA') at this stage even though we have a [Letter of Award]. SECI has mentioned that they will be unable to sign PPAs until PSAs have been signed, and they have committed to inform Azure Power of developments in their efforts with the DISCOMS. Capital costs, interest rates and foreign exchange rates have improved since Azure Power won the 4 GW auction in December 2019 which have resulted in lower tariffs in other recent SECI auctions. . . . We expect a tariff markdown from the price achieved in the auction, which will facilitate signing of PSAs. We will continue our discussions with SECI towards signing PPAs in respect of the 4 GW tender and believe the PPAs to be signed in tranches over a period of time.

76. Soon thereafter, Gautam Adani and Sagar Adani increased the pressure on Indian state government officials. Through their personal involvement and promises to pay or payment of a total of hundreds of millions of dollars of bribes to them, the Defendants finally obtained agreements from some DISCOMs to enter into Power Supply Agreements with SECI.

77. Adani Green executives kept track of the bribes, creating and maintaining multiple internal records of bribes that had been paid or promised to numerous Indian states and Indian state officials to induce them to cause the Indian states to buy renewable energy from SECI.

18

78.     By way of example, according to Adani Green's internal records, a payment equal to hundreds of thousands of dollars was paid or promised to government officials in the Indian state of Odisha to cause Odisha to enter into a Power Supply Agreement with SECI for the purchase of 500 MW of power.

79.     Consistent with Adani Green's internal records, SECI announced its first Power Supply Agreement related to the Manufacturing Linked Projects in July 2021, pursuant to which the Grid Corporation of Odisha agreed to buy 500 MW of power capacity from SECI.

80.     In August 2021, Gautam Adani met personally with the Chief Minister of Andhra Pradesh about the fact that Andhra Pradesh had not entered into a Power Supply Agreement with SECI and the "incentives" needed to cause Andhra Pradesh to do so.

81.     At or in connection with that meeting, Gautam Adani paid or promised a bribe to Andhra Pradesh government officials to cause the relevant Andhra Pradesh government entities to enter into Power Supply Agreements with SECI for the purchase of 7,000 MW of power capacity.

82.     The bribe to Andhra Pradesh for this Power Supply Agreement—which was significantly larger than the Odisha Power Supply Agreement—was greater than that paid to the Odisha government officials by orders of magnitude.  Later statements by Adani Green executives to executives of Azure, *infra* paragraphs 131 to 135, indicated that the Andhra Pradesh bribe payment was approximately $200 million.  This was also consistent with Adani Green's internal records.

83.     Shortly after Gautam Adani's meeting with Andhra Pradesh's Chief Minister, and the payment or promise to pay bribes, communications internal to Adani Green and Azure reflected that Andhra Pradesh had agreed to buy power from SECI.

19

84. Around the same time, Andhra Pradesh agreed in principle to execute a Power Supply Agreement with SECI that would directly benefit Adani Green and Azure. And, within weeks, the Andhra Pradesh government was publicly quoted as saying, "In the Cabinet meeting held last month, it was decided to accept SECI's offer. After deliberation, the State decided to tap 7,000 MW in the first phase." In other words, the bribes paid or promised worked.

85. Gautam Adani, with Sagar Adani's assistance, ultimately paid or promised bribes to government officials in numerous Indian states worth hundreds of millions of dollars to cause those state governments and their officials to enter into Power Supply Agreements with SECI. Adani Green's internal records documented these payments or promises.

86. As Gautam Adani would later make clear to senior Azure personnel, *infra* paragraphs 131 to 135, their bribery scheme worked. Between July 22 and December 1, 2021, SECI entered into Power Supply Agreements with DISCOMs in at least four Indian states. These Power Supply Agreements allowed SECI to enter into Power Purchase Agreements with Adani Green and Azure implementing the Letters of Award under which those two companies were expected to earn billions of dollars from the Manufacturing Linked Projects.

87. On December 14, 2021, Adani Green issued a press release titled, "Adani Signs World's Largest Green PPA With SECI," announcing that SECI had finally contracted to buy nearly 5 GW of power capacity from Adani Green related to the Manufacturing Linked Projects. The only person quoted in the press release was, again, Gautam Adani, who said, "We are pleased to have signed the world's largest PPA with SECI. . . . This agreement keeps us well on track to our commitment to become the world's largest renewable player by 2030."

20

88.     Under Adani Green's Power Purchase Agreement, SECI agreed to purchase solar power capacity at prices that were well above the market prices set in contemporaneous solar power auctions in India.

## V.     DEFENDANTS MISLED INVESTORS ABOUT THEIR BRIBERY SCHEME.

89.     At the same time that Gautam Adani and Sagar Adani were implementing a massive bribery scheme to persuade Indian state governments to enter into Power Supply Agreements with SECI—and, by so doing, giving Adani Green the ability to proceed with the largest projects in its portfolio, the Manufacturing Linked Projects—Gautam Adani and Sagar Adani, through the Offering, were raising hundreds of millions of dollars from investors to support Adani Green's business.

90.     Adani Green offered and sold securities based on materially false and misleading statements that neither the company nor Defendants themselves had been involved in any bribery of or attempt to bribe government officials and by falsely suggesting that Adani Green was a leader in anti-corruption and anti-bribery principles with an effective anti-bribery program.

91.     The opposite was true.  Defendants had been personally and intimately involved in paying or promising bribes worth hundreds of millions of dollars to secure undue influence with Indian state government officials and procure contracts between Indian state governments and SECI that benefitted Adani Green.

A.      **Defendants Authorized Adani Green to Offer**
        **and Sell the Notes and Approved the Offering Documents.**

92.      On August 4, 2021, Adani Green's Board of Directors passed a resolution authorizing the Offering and the Notes.

93.      On August 26, 2021, the Management Committee, ultimately responsible for making Adani Green's strategic and capital markets decisions, also considered whether Adani Green should issue debt securities to raise or borrow money.

94.      That day, the Management Committee passed a resolution authorizing Adani Green to raise or borrow up to USD $750,000,000 through the issuance of debt securities, *i.e.*, the Notes, pursuant to Rule 144A and/or Regulation S of the Securities Act, among other laws, including "to fund the development of utility scale projects."[2]

95.      Also on August 26, 2021, the Management Committee authorized Sagar Adani, among others, "to negotiate, modify, sign, execute, register and deliver any disclosure documents, information memorandum or offering circular" necessary to issue the Notes.

96.      On August 27, 2021, the Management Committee reviewed and approved the Preliminary Offering Circular for the Notes.

97.      Between August 27 and August 31, 2021, Adani Green conducted a road show during which the Notes were marketed to potential investors, including to investors in the United States, as "Green Bonds" that would be used to fund "Eligible Green Projects," including "solar electricity generation facilities." During that marketing, Adani Green also highlighted that it had

---

[2] Rule 144A [17 C.F.R. § 230.144A] and Regulation S [17 C.F.R. § 230.901] concern exemptions for the requirement that the offer and sale of securities must be registered with the SEC. Rule 144A creates a safe harbor exemption from registration for private resales of restricted securities to institutions that are qualified institutional buyers. Regulation S exempts from registration offers and sales of securities that occur solely outside of the United States.

"adopted Anti-Bribery and Anti-Corruption Policies" and provided links to the policies for the potential investors to review.

98.     On September 2, 2021, Adani Green sent a letter to the BSE and the National Stock Exchange of India stating that the Management Committee had approved Adani Green's "issuance of USD denominated senior secured notes ('Notes') aggregating to US$ 750 million and has approved the pricing, tenure and other terms of the Notes."  The letter further confirmed that the Management Committee had "reviewed and approved the offering circular ('OC')" including the final pricing term sheets in relation to the issuance of the Notes by the Company," *i.e.*, the Final Offering Circular (referred to together with the Preliminary Offering Circular, *supra* paragraph 96, as the "Offering Circulars").

99.     Adani Green's September 2, 2021, letter to the BSE and the National Stock Exchange of India also stated expressly that the Notes "are being offered and sold . . . within the United States to persons reasonably believed to be 'qualified institutional buyers' (as defined in Rule 144A under the Securities Act)."

100.     At the time the Management Committee authorized the issuance of the Notes and approved the Offering Circulars, the four members of the Management Committee had participated in prior securities offerings, including by Adani Green, were familiar with the disclosures necessary to effect such an offering, and knew or recklessly disregarded that none of Adani Green, Gautam Adani, or Sagar Adani had disclosed or would disclose to potential investors in the Notes that a substantial part of Adani Green's portfolio of solar power projects and planned sale of energy generated by Adani Green was dependent on and had been obtained through payments or promises to pay bribes.  That is, both Gautam Adani and Sagar Adani

23

intended, or recklessly disregarded, that Adani Green would offer and sell the Notes based on a deceptive portrayal of Adani Green's core business.

**B.      Adani Green's Offering Circulars for the Notes Contained Materially False and Misleading Statements.**

101.    In connection with its offer and sale of the Notes and before it sold any Notes, Adani Green provided the Offering Circulars to potential investors.  The two Offering Circulars are substantially similar.

102.    In general, an offering circular for notes, like the Offering Circulars here, is intended to give potential investors important information about the entity issuing the notes and the notes offering, to enable those investors to make informed decisions about whether to invest in the notes.  This includes information about the notes issuer's business operations, financial statements, management team, and policies and strategic plans.  This also includes the specific terms of the notes, such as rates of interest, maturity date, and repayment schedule.

103.    The Offering Circulars informed potential investors that they could rely on the information therein to make their investment decision regarding the Notes, including that,

> [Adani Green] accepts responsibility for the information contained in this Offering Circular. . . .  [Adani Green], having made all reasonable inquiries, confirms that this Offering Circular contains or incorporates all information which is material in the context of the Notes, that the information contained or incorporated in this Offering Circular is true and accurate in all material respects and is not misleading, that the opinions and intentions expressed in this Offering Circular are honestly held and that there are no other facts the omission of which would make this Offering Circular or any of such information or the expression of any such opinions or intentions misleading.

104.    The Offering Circulars then informed investors of several "Risk Factors" associated with the Notes, which Adani Green urged investors to "carefully consider . . . before making an investment in the Notes."  Among those Risk Factors, the Offering Circular highlights

that one potential risk in investing in the 2021 Notes is the possibility that employees "***might***

take actions that ***could*** expose" Adani Green "to liability under anti-bribery laws," saying,

> Lack of transparency, threat of fraud, public sector corruption and other forms of criminal activity involving government officials increase the risk for potential liability under anti-bribery laws.
>
> We are subject to anti-corruption and anti-bribery laws that prohibit improper payments or offers of improper payments to governments and their officials and political parties for the purpose of obtaining or retaining business or securing an improper advantage and require the maintenance of internal controls to prevent such payments.  Although we maintain an anti-bribery compliance program and train our employees in respect of such matters, ***our employees might take actions that could expose us to liability under anti-bribery laws***. . . .  Any violation of anti-corruption laws could result in penalties, both financial and non-financial, that could have a material adverse effect on our business and reputation.

105.    This purported warning to potential investors of a risk to Adani Green that, in the future, its "employees might take actions that could expose us to liability under anti-bribery laws" was materially misleading because it falsely suggested that no bribery scheme was then ongoing and failed to disclose the existing bribery scheme led by Adani Green's most prominent leaders, Gautam Adani and Sagar Adani.

106.    The Offering Circulars made additional false and misleading statements to potential investors.  For example, they described Adani Green's portfolio of renewable energy contracts and projects, the largest component of which was the Manufacturing Linked Projects, and then described how Adani Green obtains such contracts and projects saying, "***We win our PPAs through transparent and competitive tender processes conducted by the central and state governments of India***."

107.    This statement was also materially false and misleading.  As detailed above, *e.g.*, *supra* paragraphs 62 to 87, Adani Green did not "win" the largest Power Purchase Agreement in its portfolio, with SECI related to the Manufacturing Linked Projects, "through transparent and

competitive tender processes."  Rather, that PPA was obtained only after bribes worth hundreds of millions of dollars were paid or promised.

108.     The Offering Circulars also repeatedly disclosed to investors that an "integral" part of Adani Green's "philosophy" is its "environmental, social, governance ('ESG') policy" and that Adani Green operates pursuant to an "ESG Framework."  The Offering Circulars informed potential investors that Adani Green's major objectives in this respect included "to align the ESG organization in business with [its] top governance body (Board of the Directors) of [Adani Green]" and "to integrate Sustainability and ESG (Environmental, Social and Governance) aspects into the business of [Adani Green] by considering ESG aspects in all stages" of its business.

109.     The Offering Circulars highlighted to potential investors that, as part of Adani Green's commitment to ESG principles, it is a "participant of the United Nations Global Compact, committing [Adani Green] to supporting the ten principles of the United Nations Global Compact in human rights, labor, environment and anti-corruption."  Principle 10 of the United Nations Global Compact, signed by Adani Green and highlighted in connection with the Offering and the Notes, says that "Businesses should work against corruption in all its forms, including extortion and bribery."[3]

110.     The Offering Circulars then disclosed to potential investors that a "core" part of the success of Adani Group—of which Adani Green is a part—is its philosophy of "Growth with Goodness" and its commitment to ESG principles.  To that end, the Offering Circulars say that

---

[3] As explained by the United Nations, "[t]he tenth principle against corruption was adopted in 2004 and commits UN Global Compact participants not only to avoid bribery, extortion and other forms of corruption, but also to proactively develop policies and concrete programmes to address corruption internally and within their supply chains."

Adani Group, like Adani Green, has also adopted an "ESG Framework" incorporating the United Nations Global Compact, described above, as one of its guiding principles.

111. The Offering Circulars did not merely claim that Adani Green aspired to meet anti-bribery and anti-corruption principles. Rather, they detailed that Adani Green had implemented those principles through specific policies and procedures, identified the committees of its Board of Directors responsible for those policies and procedures, and acknowledged the harm that Adani Green would suffer if it engaged in bribery or corruption—all of which would have led a reasonable investor to believe that effective steps were being taken to prevent bribery and corruption and that no corrupt bribery scheme was then being perpetrated by Adani Green's executives or directors.

112. Among other things, the Offering Circulars assured potential investors that Adani Green had established "committees and internal systems" "to *ensure* the integrity of our ESG performance including . . . creation of the Audit Committee, Nomination and Remuneration Committee, [and] Risk Management Committee," "which oversee our . . . *anti-corruption and bribery related matters.*" Notably, Sagar Adani is the Chairman of the Risk Management Committee.

113. The Offering Circulars then conveyed that Adani Green's efforts related to environmental, social responsibility, and good corporate governance principles—which included Adani Green's purported efforts with respect to anti-bribery and anti-corruption—should be meaningful to investors' investment decisions. Specifically, Adani Green represented that those efforts had led MSCI, Inc., the U.S.-based investment research firm, to assign Adani Green an "A" rating in respect of those ESG principles, and also led the Dow Jones Sustainability Index, a prominent benchmark for investors assessing and measuring companies' ESG performance, to

place Adani Green above its peers in India in respect of good corporate governance principles, ranking it "second-best in ESG benchmarking of Indian Electric Utilities."

114.    The Offering Circulars' many statements representing to potential investors that a core tenet of Adani Green and its Board was preventing bribery and corruption gave any reasonable investor comfort that none of Adani Green's executives or directors were then involved in a corrupt bribery scheme.  This was misleading.  In fact, months and weeks earlier, Adani Green's leadership, Gautam Adani and Sagar Adani, had been personally involved in such a corrupt bribery scheme, a fact that was not disclosed in the Offering Circulars.

115.    Finally, the Offering Circulars emphasized Gautam Adani's prominent role at Adani Green, highlighting that one of Adani Green's "competitive strengths" is the involvement of its "Promoter Group," *i.e.*, Gautam Adani and Rajesh Adani, "who founded one of the leading integrated energy and infrastructure conglomerates in India and has established a long track record of successfully executing large-scale projects."  The Offering Circulars then further described how the Promoter Group, and Adani Group, provided Adani Green with a competitive advantage, saying,

> We benefit from the support, vision, resources and experience of Adani Group, who leads one of India's largest private sector energy and infrastructure conglomerates and is committed to the long-term success of the Group. . . .  With over three decades of experience in the energy sector in India, Adani Group has built long-standing relationships with key stakeholders, including SECI and DISCOMs, as well as suppliers. Drawing upon this depth of experience, Adani Group has established a strong track record of executing large-scale projects, which will benefit us across all stages of our project development within India's complex regulatory framework . . . .
>
> Adani Group also brings to bear financial, as well as operational expertise, leveraging long-term relationships with financial institutions to provide us with access to financing in both the domestic and international debt and capital markets.  Capital management is an important pillar of Adani Group's development philosophy.  The capital management program is aimed at reducing risk, establishing robust ESG practices and executing

28

> sound financial policies at each of the portfolio companies. . . . We believe that the support of our Promoter Group will allow us to hedge on the reputation and experience of the Adani Group to grow our portfolio.

**C.     Adani Green's Subscription Agreement for the Notes
Contained Materially False and Misleading Statements.**

116.   Also in connection with its offer and sale of the Notes, Adani Green executed a Subscription Agreement pursuant to which ten financial institutions agreed to act as underwriters for the Offering.  Under the Subscription Agreement, the underwriters agreed to purchase certain minimum amounts of Notes with a view to offering and selling the Notes to others in connection with Adani Green's distribution of its Notes to public investors.  The Subscription Agreements were a necessary part of and enabled Adani Green's offer and sale of the Notes to investors.

117.   Before the Subscription Agreement was finalized and signed by Adani Green and the underwriters, multiple drafts were provided to Sagar Adani who, as alleged above *supra* paragraph 95, had been authorized by Adani Green's Management Committee to negotiate, modify, and finalize documents necessary to effect the Offering, and those drafts included the false and misleading statements described below.

118.   In general, with respect to an offering of notes, a subscription agreement, among other things, formalizes an investment commitment, details the terms of the offer and sale of the notes, sets forth the notes issuer's representations and warranties, and highlights potential risks associated with an investment in the notes.

119.   Here, the Subscription Agreement for the Notes included several materially false and misleading statements, including concerning the accuracy of the Offering Circulars, the absence of material transactions not reflected on Adani Group's balance sheet, that all material facts concerning Adani Green and the Adani Group had been disclosed, that neither Adani Green nor the Adani Group (nor any of their directors, officers, or employees) were engaged or would

engage in bribery, and suggesting to investors the false and misleading impression that both Adani Green and Adani Group had effective anti-bribery programs. None of this was true.

120. The Subscription Agreement, in Section 7.1.12, said that the Offering Circulars were accurate in all respects and that Adani Green had made full and accurate disclosures of all material facts about its businesses, specifically saying that the Offering Circulars are, "in every material respect true and accurate and not misleading and all reasonable enquiries have been made by the Issuer to ascertain such facts and to verify the accuracy of all such information and statements" and that "there are no other facts in relation to the Issuer, the Group, or the Notes the omission of which would, in the context of the issue and offering of the Notes make any material statement in" the Offering Circulars "misleading."

121. The Subscription Agreement, in Section 7.1.33, also said that Adani Green had disclosed to the underwriters "all information regarding the financial or business condition or prospects of the Issuer and the Group which is relevant and material in relationship to the Issuer and the Group, in the context of the issue, offering and sale of the Notes."

122. Nowhere did the Subscription Agreement disclose that Gautam Adani and Sagar Adani had paid or promised to pay bribes to Indian state officials to secure contracts necessary for Adani Green's most important development project.

123. To the contrary, the Subscription Agreement, in Section 7.1.19, stated that Adani Group—including Adani Green, Gautam Adani, and Sagar Adani—had not engaged in any undisclosed transactions or arrangements (*e.g.*, bribes or promises to bribe Indian state government officials) that do not appear on the balance sheets of the Adani Group entities, saying that "[e]ach of the Disclosure Documents accurately and fully describes, including

without limitation the section headed 'Risk Factors': . . . all off-balance sheet transactions, arrangements, [and] obligations that are material to the Group."

124. Also to the contrary, the Subscription Agreement, in Section 7.1.39, made three materially false and misleading statements about Adani Group's and Adani Green's efforts to prevent bribery and that their executives had not engaged in paying or promising to pay bribes. That Section said that:

a. None of Adani Group, Adani Green, or any of their directors or officers "has taken or will take any action in furtherance of an offer, payment, promise to pay, or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any 'government official' (including any officer or employee of a government or government-owned or controlled entity) . . . to influence official action or secure an improper advantage."

b. None of Adani Group, Adani Green, or any of their directors or officers "has taken or will take any action that has resulted or will result in a violation by the Issuer or any other member of the Group of any applicable Anti-Bribery and Corruption Laws; and the Issuer, each other member of the Group and their respective directors, officers and, to the best of the Issuer's knowledge (after due and careful enquiry), each of the affiliates . . . of the Issuer has conducted its businesses in compliance with

31

applicable Anti-Bribery and Corruption Laws, including the Prevention of Corruption Act, 1988."[4]

c.     "The Issuer and each other member of the Group has instituted and maintains and will continue to maintain policies and procedures designed to promote and achieve compliance with, and prevent violation of, such laws, and with the representations and warranties contained herein."

125.     The Subscription Agreement thus falsely informed the underwriters that Adani Green and those serving as its Directors, including Gautam Adani and Sagar Adani, had not paid bribes or promised to pay bribes to Indian state officials.  It also falsely portrayed Adani Green as having a rigorous anti-bribery and anti-corruption compliance program that had prevented payment or promises of such bribes.  Neither was true.

126.     As underwriters obtained orders for the Notes from potential investors, they communicated the status of those orders to Sagar Adani, among other Adani Green personnel, including the fact that investors in the United States intended to purchase Notes as part of the Offering.

**VI.     U.S.-BASED INVESTORS INVESTED IN THE OFFERING AND OWNERSHIP OF THE NOTES CHANGED HANDS IN THE UNITED STATES.**

127.     On September 8, 2021, pursuant to the Offering Circulars and Subscription Agreement, Adani Green issued $750,000,000 in Notes.  Adani Green sold at least $175 million of those Notes to investors in the United States.

---

[4] In the Subscription Agreement, "Anti-Bribery and Corruption Laws" was defined to mean "the United Kingdom Bribery Act 2010, the FCPA and the rules and regulations promulgated under each such law, and any other applicable anti-bribery or anti-corruption laws and regulations imposed in other relevant jurisdictions."

128.     Adani Green did not register its offer or sale of the Notes under the Securities Act or with the SEC.  Rather, Adani Green's offer and sale was under exemptions from such registration, offering and selling Notes within the United States to qualified institutional buyers in reliance on Rule 144A under the Securities Act and outside the United States in reliance on Regulation S under the Securities Act, *see* paragraph 94 and footnote 2 above.

129.     Under the terms of the Notes, Offering Circulars, and Subscription Agreement, with respect to Notes offered and sold to investors in the United States, Adani Green caused the Notes (or certificates representing all rights reflected in the Notes) to be deposited with the Depository Trust Company ("DTC") and title to the Notes to be registered in the name of Cede & Co. ("Cede"), as nominee for DTC.  Cede and DTC are each located in New York.

130.     As part of this process, and occurring within this District, ownership of and rights to the Notes was transferred to the investors in the Notes.

## VII.   AFTER THE OFFERING, DEFENDANTS MET WITH AZURE EXECUTIVES TO COLLECT ONE-THIRD OF THE BRIBES FROM AZURE.

131.     In 2022, after SECI and many Indian state governments publicly announced they had entered into Power Supply Agreements related to the Manufacturing Linked Projects— benefiting both Adani Green and Azure, which were to develop two-thirds and one-third of those projects, respectively—Gautam Adani and Sagar Adani sought to collect from Azure one-third of the bribes that had been paid or promised to Indian state government officials to secure those Power Supply Agreements.

132.     Specifically, between April and June 2022, Gautam Adani and Sagar Adani, together with Vneet Jaain, met in person in India multiple times with multiple senior Azure personnel to discuss how—consistent with a prior agreement with Azure—Gautam Adani, with Sagar Adani's assistance, had paid or promised bribes to Indian state government officials to

procure contracts between the Indian states and SECI necessary for the Manufacturing Linked Projects to move forward.

133. In those meetings, Gautam Adani recounted, among other things, how, in mid-to-late 2021, Indian state governments had been reluctant to enter into Power Supply Agreements with SECI, and how he personally intervened and paid or promised to pay bribes to Indian state government officials to persuade them to enter into Power Supply Agreements.

134. Gautam Adani made clear how his efforts had succeeded and discussed with the Azure executives how, as previously agreed, Azure would pay its one-third share of those bribes. This included discussion of how Azure could pay its share through corporate transactions between Azure and Adani Green, which would have the effect of concealing the payment.

135. Among other things, Gautam Adani suggested that Azure could pay some of its share of the bribes by the Azure senior personnel causing Azure to cede Azure's rights to its most valuable aspect of the Manufacturing Linked Projects—Azure's right to sell 2.3 GW of power capacity to SECI related to Andhra Pradesh—to Adani Green.

## VIII.   AZURE CEDED CONTROL OF ITS INTEREST IN A KEY ASPECT OF THE PROJECT BACK TO SECI FOR ADANI GREEN'S BENEFIT.

136. Following each of the meetings with Gautam Adani, Sagar Adani, and Vneet Jaain, Azure senior executives met frequently and strategized about various transaction structures to pay Azure's one-third share of the bribes that Gautam Adani, with Sagar Adani's assistance, had paid or promised to Indian state government officials.

137. Azure ultimately decided to repay at least a portion of its share of the bribes through multiple transactions, including by, as Gautam Adani had discussed, ceding to Adani Green all of Azure's rights to sell 2.3 GW of power to SECI related to Andhra Pradesh.

34

138.    To that end, in December 2022 and February 2023, Azure sent letters to SECI seeking to withdraw from the Andhra Pradesh portion of the Manufacturing Linked Projects, which were the largest—and potentially most profitable—part of the projects.  The letters suggested that Azure could not proceed with that part of the projects due to economic reasons— namely, because Azure believed that a portion of the projects was "unbankable and unviable" and "untenable," such that Azure was "unable to proceed."

139.    This was a pretext.  The real reason that Azure returned a portion of the Power Purchase Agreements was so that it could later be awarded to Adani Green as payment for Azure's portion of the bribes paid or promised on Azure's behalf.

140.    The pretext worked.  In December 2023, Adani Green publicly announced that it had signed a Power Purchase Agreement with SECI for the majority of the 2.3 GW portion of the Azure award that Azure had returned to SECI.

141.    The end result of these maneuvers—Azure's withdrawal from and forfeiture of a substantial portion of the Manufacturing Linked Projects and Adani Green's takeover of nearly all of that portion of the projects—was that Azure transferred significant value to Adani Green, Gautam Adani, and Sagar Adani in partial satisfaction of Azure's share of the bribes that Gautam Adani and Sagar Adani had paid or promised.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Both Defendants)**

142.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 141.

143.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more

35

devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

144. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

145. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 141.

146. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

147. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

36

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Both Defendants)

148.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 141.

149.    As alleged above, Adani Green violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

150.    Defendants knowingly or recklessly provided substantial assistance to Adani Green with respect to its violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

151.    By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Adani Green's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Defendants will again aid and abet these violations.

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Both Defendants)

152.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 141.

153.    As alleged above, Adani Green violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

154.    Defendants knowingly or recklessly provided substantial assistance to Adani Green with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

155.    By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Adani Green's violations of Exchange

37

Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Defendants will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) and Exchange Act Section 10(b) [15 U.S.C. §§ 77q(a) and 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### III.

Permanently prohibiting each Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

### IV.

Granting any other and further relief this Court may deem just and proper.

38

# JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
November 20, 2024

/s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal Shah
Alison Conn
Christopher M. Colorado
Nicholas Karasimas
Stewart Gilson
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-9143 (Colorado)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Securities and Exchange Commission

## DEFENDANTS

Gautam Adani and Sagar Adani

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Antonia M. Apps, Tejal Shah, Alison Conn, Christopher M. Colorado, Nicholas Karasimas, Stewart Gilson; Securities and Exchange Commission, 100 Pearl St., 20-100, New York, NY; (212) 336-9143 (Colorado)

Attorneys *(If Known)*

Unknown.

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 365 Personal Injury - Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / **PERSONAL PROPERTY** / [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [x] 850 Securities/Commodities/ Exchange |
| | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** / **CIVIL RIGHTS** / **PRISONER PETITIONS** | | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation / [ ] 440 Other Civil Rights / **Habeas Corpus:** | | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure / [ ] 441 Voting / [ ] 463 Alien Detainee | | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment / [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land / [ ] 443 Housing/ Accommodations / [ ] 530 General | | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability / [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property / [ ] 446 Amer. w/Disabilities - Other / **Other:** / [ ] 540 Mandamus & Other | | [ ] 462 Naturalization Application | | |
| [ ] 448 Education / [ ] 550 Civil Rights | | [ ] 465 Other Immigration Actions | | |
| [ ] 555 Prison Condition | | | | |
| [ ] 560 Civil Detainee - Conditions of Confinement | | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5

Brief description of cause:
Securities fraud - false and misleading statements, a scheme to defaud, and aiding and abetting in connection with a securities offering

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE: 11/20/2024

SIGNATURE OF ATTORNEY OF RECORD: /s/ Antonia M. Apps

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**CERTIFICATION OF ARBITRATION ELIGIBILITY**

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration [ ]

I, _Antonia M. Apps_____, counsel for _Securities and Exchange Comm'n_, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

[ ]     monetary damages sought are in excess of $150,000, exclusive of interest and costs,

[✓]     the complaint seeks injunctive relief,

[ ]     the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

N/A

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 3 in Section VIII on the front of this form. Rule 3(a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 3(a) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case involves identical legal issues, or the same parties." Rule 3 further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (b), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

# NY-E DIVISION OF BUSINESS RULE 1(d)

1.)     Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County?     [ ] Yes     [✓] No

2.)     If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?     [ ] Yes     [✓] No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?     [✓] Yes     [ ] No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received: _____ .

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? _____ [ ] Yes     [✓] No _____
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

           [✓]     Yes               [ ]     No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

           [ ]     Yes    (If yes, please explain       [✓]     No

I certify the accuracy of all information provided above.

**Signature**: __/s/ Antonia M. Apps_____