**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SERAP LOKMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>AZURE POWER GLOBAL LIMITED, RANJIT GUPTA, MURALI SUBRAMANIAN, and PAWAN KUMAR AGRAWAL,<br><br>    Defendants. | Case No. 1:22-cv-7432<br><br>Hon. Gregory H. Woods |

**DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF (I) LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND AWARD TO LEAD PLAINTIFF**

I, SHANNON L. HOPKINS, declare as follows:

1.      I am an attorney licensed to practice law in the State of New York and before this Court.  I am a partner with the law firm of Levi & Korsinsky, LLP ("Levi & Korsinsky"), counsel for Lead Plaintiff Serap Lokman and proposed class counsel for the proposed Settlement Class in the above-captioned action (the "Action").[1]  I have personal knowledge of the facts stated herein and, if called upon as a witness, I could and would testify competently thereto.

2.      I respectfully submit this declaration, together with the exhibits thereto, in support of (i) Lead Plaintiff's unopposed motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed $23,000,000 Settlement for the benefit of the Settlement Class and the proposed plan of allocation of Settlement proceeds (the "Plan of Allocation"); and (ii) Lead Counsel's motion for attorneys' fees in the amount of one-third of the Settlement Fund (plus applicable interest thereon), reimbursement of litigation expenses in the total amount of $107,069.18, and an award of $10,000 to the Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") to reimburse her reasonable time, costs and expenses in representing the Settlement Class (the "Fee and Expense Application").  In support of these motions, Lead Plaintiff and Lead Counsel also submit: (i) the exhibits attached hereto; (ii) Lead Plaintiff's Memorandum of Law in Support of Unopposed Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"); and (iii) the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Award to Plaintiff (the "Fee Memorandum").

3.      The Court preliminarily approved the proposed Settlement by Order dated April

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated April 11, 2025 (the "Stipulation").  ECF No. 119-1.

1

30, 2025 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class. ECF No. 123. Pursuant to the Preliminary Approval Order, Angeion Group, LLC ("Angeion"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by email, mail and by publication. The details of the notice program are set forth in the Declaration of Dawn M. Cody Regarding: (A) Mailing and Emailing of Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Angeion Decl."), a true and correct copy of which is attached hereto as Exhibit 1.

4.      In total, Postcard Notice of the Settlement has been disseminated to 22,467 potential Settlement Class Members, and thus far, no requests for exclusion have been received, and no objections have been filed with the Court. *See* Angeion Decl., ¶¶11, 16-18.

I.      **INTRODUCTION**

5.      This is a securities class action asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rules 10b-5. On December 8, 2022, the Court appointed Serap Lokman as Lead Plaintiff and approved her selection of Levi & Korsinsky to serve as Lead Counsel. ECF No. 38.

6.      Lead Plaintiff's claims were brought on behalf of all persons and entities that purchased or otherwise acquired Azure Power Global Limited ("Azure") equity securities between June 15, 2021 and August 29, 2022, inclusive. After subsequent pleading amendments, the proposed class period was modified, and the Settlement Class Period is January 1, 2020, through November 20, 2024, inclusive.  Named as Defendants were Azure and certain former and/or then-current officers and directors of Azure.

7.      The Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $23,000,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, the proposed Settlement represents a fair and adequate result for the Settlement Class considering the case's procedural posture as well as the significant risks remaining in the Action.

8.      As explained in greater detail herein, this Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class. Lead Counsel's investigation and prosecution of the Action included, among other things:

- Conducting an extensive investigation of the claims asserted in the Action by, *inter alia*: (a) consulting with an expert in market efficiency, loss causation and damages; (b) working with a private investigator to interview former Azure employees; (c) conducting an in-depth investigation of Azure's business in India; and (d) reviewing and analyzing (i) Azure's filings with the SEC; (ii) public reports, news articles, and research reports prepared by securities and financial analysts concerning Azure; (iii) transcripts of investor calls conducted by Azure's management; and (iv) press releases issued by and about Azure;

- Drafting and filing the detailed First Amended Complaint (ECF No. 46), Second Amended Class Action Complaint ("SAC" or "Complaint") (ECF No. 80) (based on, among other things, new revelations in Azure's SEC filings allowing Lead Plaintiff to extend the class period an additional eleven months), and drafting a third amended complaint based on new information obtained from the Department of Justice ("DOJ") Indictment and two parallel complaints filed by the SEC, which implicated an Azure outside director and controlling shareholder, and extended the class period back an additional 18 months, that was being finalized as the parties reached agreement to settle this Action;

- Researching, drafting, and filing oppositions to Defendants' separate motions to dismiss the Complaint (ECF Nos. 102-111), exchanging pre-motion conference letters and participating in discussions at pre-motion conferences concerning the parties' respective positions and arguments pursuant to the Court's Individual Rules of Practice (*see, e.g.*, ECF Nos. 58-61, 88-94, 96, 99), and submitting supplemental authority on such motions (ECF Nos. 112-13);

- Reviewing (and submitting to the Court) two SEC complaints and a U.S. government indictment relevant to the allegations in this Action;

3

- Engaging in discovery, which included reviewing documents produced by Defendants prior to mediation and serving a Freedom of Information Act ("FOIA") request;

- Engaging in a full-day mediation session overseen by Michelle Yoshida of Phillips ADR Enterprises, a mediator highly experienced in complex class actions, which involved the exchange of detailed submissions concerning the facts of the case, liability, and damages, and consultation with damages experts, but which did not result in a settlement agreement at that time; and

- Engaging in weeks of follow-up negotiations with Ms. Yoshida, Defendants' Counsel and counsel for the controlling shareholder, CDPQ, who was to be named as a defendant in the third amended complaint if filed, which ultimately resulted in an agreement to settle the Action for $23.0 million. *See* Stipulation (ECF No. 119-1), Section I, pp. 1-5.

9.      Based on the foregoing efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe that the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

10.     In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiff's consulting damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Loss divided by the total Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

11.     Finally, Lead Counsel seek approval of the request for attorneys' fees and reimbursement of litigation expenses as set forth in the accompanying motion and Fee Memorandum in support of Lead Counsel's fee application (collectively with the motion, "Attorneys' Fee Motion").  As discussed in detail in the Fee Memorandum, the requested 33⅓% fee is squarely within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check and warranted in light of the extent and quality of the work performed, the fully contingent nature of the representation, and the substantial result achieved. Likewise, the requested reimbursement of Lead Counsel's out-of-pocket litigation costs of $107,069.18, and of costs pursuant to the PSLRA (including lost wages and time) in the amount of $10,000 to the Lead Plaintiff, is also fair and reasonable.  Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully request that the request for attorneys' fees and reimbursement of litigation expenses be approved.

## II.     PROCEDURAL HISTORY

### A.  Initial Complaint and Appointment of Lead Plaintiff and Lead Counsel

12.     On August 30, 2022, a putative securities class action was filed in the United States District Court for the Southern District of New York, captioned *Gilbert v. Azure Power Global Limited, et al.*, Case No. 1:22-cv-07432 (S.D.N.Y) (the "*Gilbert* Action"), on behalf of persons and entities who purchased or otherwise acquired Azure securities between June 15, 2021 and August 26, 2022, inclusive.

13.     On October 31, 2022, four movants filed motions for appointment of lead plaintiff and lead counsel, including Serap Lokman, who moved for appointment of lead plaintiff and her choice of Levi & Korsinsky to serve as lead counsel.  ECF Nos. 11-24.

14. On December 8, 2022, the Court entered an Order, *inter alia*, appointing Serap Lokman as Lead Plaintiff, and appointing Levi & Korsinsky as Lead Counsel. ECF No. 38.

**B. Amended Consolidated Pleadings and Defendants' Motions to Dismiss**

15. On February 21, 2023, Lead Plaintiff filed her detailed First Amended Class Action Complaint (the "First Amended Complaint"). ECF No. 46. The First Amended Complaint was filed after Lead Counsel conducted an extensive investigation of the claims asserted in the Action, including, *inter alia*, review of Azure's SEC and other available regulatory filings, consulting with an expert in market efficiency, loss causation and damages, and working with a private investigator to interview former Azure employees and other witnesses, including in India, and conducted an in-depth investigation of Azure's business in India, where it operated.

16. As a result of Lead Counsel's investigation, the First Amended Complaint included (a) extensive new evidence based on information obtained from witness interviews and an in-depth investigation of Azure and its operations; (b) allegations against an additional defendant; (c) an extended class period that allows more aggrieved investors to participate in the class action; (d) additional false statements; (e) new theories concerning the falsity behind Defendants' statements; (f) allegations based upon a review of pertinent laws, including Indian laws, applicable to Azure, and Azure internal policies, that Defendants allegedly violated; and (g) allegations based on additional SEC filings. ECF No. 46.

17. On April 7, 2023, Defendants' counsel filed a letter requesting a pre-motion conference in contemplation of Defendants' motion to dismiss the First Amended Complaint, in which Defendants set forth the bases of their anticipated motion to dismiss. ECF No. 58. On April 12, 2023, Lead Plaintiff submitted her response thereto and set forth the bases for her opposition to Defendants' proposed motion to dismiss. ECF No. 60. The pre-motion conference

was held April 17, 2023.  *See* ECF No. 61.

18.     At the April 17, 2023 pre-motion conference, in light of recent developments at Azure, including the delayed filing of Azure's 2022 annual report on Form 20-F which Lead Plaintiff asserted was relevant to her allegations, the Court directed that the parties report by July 31, 2023, after the anticipated filing of Azure's 2022 Form 20-F on July 15, 2023 (the NYSE's filing deadline), regarding the parties' proposed schedule for the filing of a contemplated second amended complaint. ECF No. 61.

19.     In a Status Report filed on July 31, 2023, Lead Plaintiff notified the Court that (i) Azure had been unable to file its annual report Form 20-F on July 15, 2023, (ii) Azure's external auditor had resigned on July 10, 2023, and (iii) Azure would be unable to file its Form 20-F for at least an additional 14 weeks. ECF No. 63. On August 1, 2023, the Court directed that Lead Plaintiff file her SAC within 28 days after Azure filed its 2022 Form 20-F. ECF No. 64.

20.     On October 27, 2023, Lead Plaintiff notified the Court that Azure had filed its 2022 Form 20-F on October 12, 2023. The next day, the Court ordered that Lead Plaintiff file her SAC on November 9, 2023, and set a schedule for Defendants' renewed pre-motion conference letter in anticipation of their motion to dismiss, and Lead Plaintiff's opposition thereto. ECF Nos. 76-77.  Azure shares were delisted from the NYSE on November 13, 2023 for failure to meet filing deadlines. *See* Azure press release filed on Form 6-K filed with the SEC on November 1, 2023.[2]

21.     In October 2023, Lead Plaintiff submitted requests under the Freedom of Information Act to the DOJ and the SEC related to the allegations in this Action.

22.     On November 9, 2023, Lead Plaintiff filed her SAC, alleging claims against

---

[2] Available at https://www.sec.gov/Archives/edgar/data/1633438/000095017023057097/azre-ex99_1.htm.

7

defendants Azure, Gupta, Subramanian and Agrawal. ECF No. 80.  The SAC added significant further allegations based on Lead Counsel's continued investigation, including the results of Lead Plaintiff's private investigator's further investigation in India, Lead Counsel's review of additional anti-corruption statutes, as well as Lead Counsel's review of Azure's 2022 Form 20-F and matters raised therein.  The allegations of the SAC also extended the class period covered by the Action by approximately eleven (11) months, to July 13, 2023, based on additional statements made by Defendants and additional facts that had come to light.

23.    On January 5, 2024, Defendants filed their pre-motion conference letters in anticipation of their motions to dismiss the SAC, and Lead Plaintiff filed her opposition thereto on January 18, 2024.  On February 6, 2024, the Court held its pre-motion conference at which it permitted Defendants to file their motions to dismiss the SAC and on February 7, 2024, set a briefing schedule thereon. ECF Nos. 88-91, 96, 99.

24.    On March 22, 2024, Defendants filed two separate motions to dismiss the SAC, totaling 75 pages, plus extensive supporting papers. ECF Nos. 102-07. In their motions, Defendants argued, *inter alia*, that (i) Defendants' statements about general compliance with pertinent laws and regulations, and commitment to safety, were not actionably material under precedent; (ii) Defendants adequately disclosed the risk that they may be found non-compliant with applicable laws and regulations, or that their plants may be found to have safety issues; (iii) Defendants disclosed that they investigated internal whistleblower complaints, and a "fulsome investigation" by Azure's Ethics Committee, "with the support of independent external counsel and forensic accounting professionals[,]" had found the complaints to be "not substantiated" and in some cases, "a 'hoax'"; (iv) Lead Plaintiff's allegations were therefore based on unsupported "speculation"; (v) certain of the SAC's allegations were based on data about Megawatt ("MW")

8

operating or kilowatt hours ("kWh") generated, "none of which has been shown to be incorrect[]", and did not result in any restatement during the proposed class period; (vi) the SAC's allegations were merely allegations of "fraud-by-hindsight"; and (vii) the SAC failed to plead the scienter of any defendant, did not allege evidence of contemporaneous knowledge by any Individual Defendant, and did not allege stock sales by and Individual Defendant "or any other indicia of motive beyond generic motives held by every corporate executive." *See* ECF No. 103. Defendant Agrawal's motion additionally argued, *inter alia*, that (i) Lead Plaintiff failed to plead a single actionable false or misleading statement attributable to Agrawal, or that the MW figures discussed by Agrawal were false or misleading; (ii) there is no duty to disclose uncharged, unadjudicated allegations of wrongdoing; and (iii) Lead Plaintiff failed to plead Agrawal's scienter.

25.    On May 6, 2024, Lead Plaintiff filed her 73-page omnibus opposition to both motions to dismiss, responding to Defendants' arguments. ECF No. 108. On May 28, 2024, Defendants filed their separate replies. ECF Nos. 109-110.

26.    On August 12, 2024, Lead Plaintiff filed a letter submitting supplemental authority on Defendants' pending motions to dismiss, and on August 19, 2024, Defendants filed a response thereto. ECF Nos. 112-13.

27.    On November 20, 2024, the U.S. Department of Justice ("DOJ") announced proceedings implicating Defendants Azure, Gupta and Subramanian, as well as certain related parties, in connection with alleged corruption and bribery, and unsealed an indictment. The indictment, *inter alia*, charged Defendant Gupta, among others, with conspiracy to violate the Foreign Corrupt Practices Act (the "Indictment"). Simultaneously, the SEC filed two parallel actions based on conduct similar to that asserted in the Indictment, one of which alleged bribery-related misconduct against an outside Azure director, Cyril Cabanes, who had served on Azure's

9

board as a representative of the Company's largest stockholder, Caisse de dépôt et placement du Québec ("CDPQ"). Lead Plaintiff informed the Court of these developments in a November 25, 2024 letter, asserting that the conduct and circumstances alleged in the DOJ Indictment and SEC complaints were related to, and further supported, the claims asserted in the Complaint. *See* ECF No. 114 and Exs. A-C thereto. Lead Plaintiff's letter also requested, in light of these developments, that the Court defer ruling on the pending motions to dismiss and indicated that Lead Plaintiff may seek leave to amend or supplement the SAC. ECF No. 114.

### C. Settlement Negotiations

28.     During September 2024, the parties began discussing the possibility of mediation to resolve this Action, over the course of several phone calls and other communications spanning several weeks. In connection therewith, Defendants produced to Lead Plaintiff certain limited documents, including financial and insurance documents, which Lead Counsel reviewed carefully. Lead Plaintiff also consulted with experts on damages and causation. After multiple communications, it was apparent the parties were far apart and would need the assistance of a skilled mediator to resolve this Action. The parties therefore agreed to hold a mediation before highly experienced mediator Michelle Yoshida, Esq. of Phillips ADR Enterprises (the "Mediator"), on December 4, 2024.

29.     In Lead Plaintiff's November 25, 2024 letter informing the Court of the DOJ and SEC actions, Lead Plaintiff also informed the Court that the parties were scheduled to participate in a mediation on December 4, 2024 to try and resolve the claims in the Action, noting that if the mediation was unsuccessful, Lead Plaintiff intended to seek leave of Court to amend or supplement the SAC with facts from the DOJ and SEC pleadings.

30.     Both parties submitted extensive materials to the Mediator in advance of the

mediation, including the Indictment and SEC complaints (ECF No. 114 and Exs. A-C thereto). In the meantime, Lead Plaintiff began preparing a third amended complaint, supplemented with facts from the DOJ and SEC pleadings, and additional facts unearthed from her continued investigation.

31.    The December 4, 2024 full-day mediation session was unsuccessful in resolving the Action, but the parties continued discussions with the assistance of the Mediator over the following weeks.  Negotiations were made particularly difficult due to Azure's insurance carriers' disclaimers of insurance coverage, Azure's weak financial position, and Azure's delisting from the New York Stock Exchange which adversely affected its access to international capital markets.  However, on January 6, 2025, the parties finally agreed in principle to settle the Action, and on January 10, 2025, executed a confidential Term Sheet ("Term Sheet") memorializing the Settlement Amount and other key terms, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers. That same day, Lead Plaintiff notified the Court that the parties agreed in principle to resolve all issues and claims involved in this Action.  ECF No. 117.

32.    The parties spent the next several weeks negotiating the detailed terms of the Stipulation which (together with the exhibits thereto) reflects the final and binding agreement between the parties, subject to the Court's approval. The Stipulation was executed on April 11, 2025. ECF No. 119-1.

33.    As part of the proposed Settlement, the Settlement Class Period was extended to begin on January 1, 2020, to reflect that new information came to light as a result of the Indictment and parallel SEC actions indicating that Azure's statements predating the class period contained in the SAC may have been false and misleading when made. It was also extended to end on

November 20, 2024, to reflect that Defendants' statements continued to omit material information that came to light only with the revelations of November 20, 2024. *See* Stipulation, ECF No. 119-1, ¶1.40. Additionally, the proposed Settlement Class excludes major Azure shareholders CDPQ and Ontario Municipal Employees Retirement System ("OMERS"), whose nominees served on Azure's Board of Directors and certain of their affiliates during the relevant time period. *See id.*, ¶1.39.

### D. Preliminary Approval of the Settlement

34.     On April 14, 2025, Lead Plaintiff filed her Unopposed Motion for Preliminary Approval of Class Action Settlement and papers in support thereof, including the Stipulation, exhibits thereto, and memorandum and supporting declaration. ECF Nos. 119-21.  On April 29, 2025, Lead Plaintiff filed a Notice of Non-Opposition to Motion for Preliminary Approval of Class Action Settlement, informing the Court that the April 28, 2025 deadline to oppose said Motion had passed and no opposition had been filed., ECF. No. 122. On April 30, 2025, this Court issued the Preliminary Approval Order, *inter alia*, approving the notice program, setting the briefing schedule for Lead Plaintiff's motion for final approval of the Settlement and the Fee and Expense Application, and setting September 5, 2025 as the date for the Final Approval Hearing. ECF No. 123.

### III.     THE RISKS OF CONTINUED LITIGATION

35.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $23,000,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A. Risks in Surviving Defendants' Motions to Dismiss

36. At the time Settlement was reached, Defendants' motions to dismiss were pending. At set forth above, Defendants made strong arguments, *inter alia*, that, notwithstanding the facts alleged, (i) none of their statements were actionably false or misleading when made, or materially so, including their statements regarding compliance and safety; (ii) Defendants adequately disclosed the risks concerning possible non-compliance with applicable laws, or safety issues; (iii) Defendants conducted a fulsome investigation of alleged whistleblower complaints with the support of outside counsel and forensic accountants which had found the complaints to be "not substantiated" or a "hoax"; (iv) Lead Plaintiff's allegations were thus based on unsupported "speculation"; (v) allegations about MW or kWh generated were not shown to be incorrect and did not result in a restatement; (vi) Lead Plaintiff was merely alleging "fraud-by-hindsight"; and (vii) the SAC failed to plead any defendant's scienter, whether through allegations of contemporaneous knowledge or motive, especially in the absence of any stock sales by any Individual Defendant. Moreover, while the DOJ Indictment and SEC complaints appeared to provide some support for Lead Plaintiff's claims about the nature of the undisclosed facts, these were not findings, referenced only two of the Individual Defendants, and Defendants would have argued that the allegations there did not relate to the allegations in this Action, and that their affirmative statements were still not actionably false or misleading *when made* (*e.g.*, there still was no duty to disclose uncharged alleged criminal conduct at the time).

37. Accordingly, while Lead Plaintiff believes her claims were meritorious, she recognized that the Court has not ruled on Defendants' motions to dismiss the SAC, which could have resulted in a dismissal of the Action, in whole or in part, in the immediate future.

13

### B. Risks in Obtaining and Maintaining Class Action Status

38. Had the Action not settled, Lead Plaintiff also would have had to move to certify the class. While Lead Plaintiff believed class certification was appropriate here, plaintiffs bear the burden of proof on class certification, and there was no assurance a class would be certified; or if certified, whether the proposed class period, or size of the class, would be narrowed, which would reduce the overall recoverable damages in the Action. It was also not assured that Defendants would not challenge the viability of Lead Plaintiff as a class representative, as defendants often do.

39. Even if Lead Plaintiff successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery, or reducing damages if the Second Circuit's ruling reduced the size of the class and thereby reduced associated damages. Further, there was no assurance Defendants' arguments related to class certification could have not have ultimately been credited, in whole or in part, on a motion for decertification, at summary judgment or at trial.

### C. Risks to Proving Liability

40. In addition to the hurdles of overcoming Defendants' motions to dismiss and obtaining and maintaining class action status, Lead Plaintiff and Lead Counsel faced numerous additional risks at summary judgment and trial, including in establishing Defendants' liability.

41. As noted above, Defendants forcefully argued in their motions to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Lead Plaintiff could not establish the required elements of her Exchange Act claims.

42. For example, Defendants would continue to maintain that Lead Plaintiff could not

14

establish the element of material misrepresentations and omissions, required under Section 10(b). For instance, Defendants would continue to argue that (i) reasonable investors would not be misled by Defendants' statements regarding compliance and safety because no reasonable investors would understand such statements as guarantees (especially in Azure's industry) that no violations at all may have been occurring, even if unbeknownst to Defendants; (ii) reasonable investors would not be misled by Defendants' statements given Defendants' risk disclosures; (iii) Defendants authorized full investigations of alleged whistleblower complaints with the support of independent expert third parties and were entitled to rely on their findings that the complaints were "not substantiated"; (iv) the whistleblower complaints themselves did not establish wrongdoing, at least wrongdoing that was pertinent to Lead Plaintiff's claims; and (v) allegations about MW or kWh generated were not shown to be incorrect.

43.    Moreover, Defendants would strongly argue that Lead Plaintiff failed to establish any Defendant's scienter, in the absence of evidence demonstrating Defendants' contemporaneous knowledge of the alleged undisclosed facts, or any cognizable motive, especially where no Individual Defendant directly profited from the alleged "fraud" by suspicious stock sales or otherwise. For example, Defendants have argued they became aware of the possible wrongdoing *after* the alleged misstatements were made.

44.    Likewise, Defendants would argue that Lead Plaintiff could not carry her burden under Section 10(b) of establishing loss causation, including that any declines following the August 16, 2022, August 26, 2022, and August 29, 2022 disclosures of executive resignations or a delayed late annual report filing were not due to any Azure statement that misled investors, but to market, industry, or other unrelated factors; and that any event, assuming the August 2022 disclosures were corrective of Defendants' alleged wrongdoing, any subsequent disclosures did

15

not disclose any "new" news, such that, at most, the class period should end in August 2022.

45.     Additionally, as discussed below, discovery in this Action would be a complicated, lengthy, and challenging process (including likely having to pursue several Letters Rogatory under the Hague Convention on Taking Evidence Abroad), especially since the documents, Defendants and witnesses are mostly located in India, some of the relevant events had taken place over six years ago, and there were indications of partial spoliation of evidence,[3] all of which increased the risk that Lead Plaintiff may not have been able to obtain sufficient documents and/or testimony necessary to prove her case.

46.     Even if Lead Plaintiff's claims survived a motion for summary judgment, which was not guaranteed, there is a significant risk that—if she were able to obtain all necessary discovery—she would not be able to prove her case before a jury. In this complex securities litigation relating to matters such as: (i) the propriety of Defendants' actions under foreign (Indian) law and custom; (ii) adequate safety measures in an industry (renewable energy) where maintaining complete plant safety is a complicated concept; (iii) measuring MW and kWh output, and interpreting complicated contracts regarding the delivery of same; (iv) alleged manipulation of complex internal data; (v) tracking of alleged sophistically concealed payments; and (vi) internal accounting control issues, there is a risk that a jury would not understand Lead Plaintiff's theories of the case, and the theories' intersection with economic and statistical analyses that underpin causation and damages issues. This is compounded by the fact that Lead Plaintiff would be forced to tell her story to the jury through Defendants' documents and adverse witnesses, most of which would have to be interpreted from multiple foreign languages (mostly Hindu, but

---

[3] *See* ECF No. 114-1 (Indictment), ¶¶38, 77.

possibly also Punjabi, Urdu or Bengali), if they were able to be obtained at all.  Conversely, Defendants would be able to obtain testimony from the Individual Defendants themselves, as well as many other witnesses who are supportive of the Defendants.

47.    Finally, Defendants would likely argue to a jury that the fact that they had two large and well-known major North American pension funds (CDPQ and OMERS) as major investors indicates these sophisticated investors believed in the bona fides of the Company.

### D.  Risks to Proving Damages

48.    Even if Lead Plaintiff was successful in establishing liability, she would still face substantial risks in establishing damages on a class wide basis.  For example, Defendants certainly would have, and already had, disputed damages by claiming that there was no causal connection between Defendants' allegedly misleading statements and later declines in the Company's stock price, and that even if there were such a connection, the damages suffered by the putative class were a mere fraction of the amount sought by Lead Plaintiff.

49.    As noted above, Defendants contended that Lead Plaintiff could not carry her burden under Section 10(b) of establishing loss causation, since (i) Azure's August 2022 disclosures regarding executive departures and a delayed SEC filing did not correct any prior misstatement, moreover, the price of any Azure securities had already significantly declined prior thereto for unrelated reasons; and (ii) there were no disclosures after the August 2022 disclosures that disclosed any "new" news related to the allegations herein.  Thus, Defendants would continue to argue (supported by expert reports and testimony) that any declines following the August 2022 disclosures, or any later disclosures, were due to industry and market factors, and not to any Azure statements that actually misled investors.

50.    If Defendants were to prevail on any of these arguments, in whole or in part, the

17

amount of potentially recoverable damages would have been diminished significantly.

51.     Further, Lead Plaintiff's claims and damages theories would both be subject to complex expert testimony, offered by Defendants' experts, that would likely conflict with Lead Plaintiff's experts' analyses. The opinions of each side's experts can vary substantially, and continued litigation poses the risk that Defendants would prevail in a "battle of experts."

### E.  Other Risks, Including Trial, Appeals, and Potential Recovery

52.     Lead Plaintiff would have had to prevail at several stages of litigation, each of which would have presented significant risks. Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this Action is never assured.  For example, in 2023, Lead Counsel, Levi & Korsinsky, was lead trial counsel in a three-week securities class action jury trial in the Northern District of California. After five years of litigation, and despite the fact that the Court ruled for *plaintiffs* at summary judgment on the elements of falsity and scienter, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs, the jury returned a verdict for the defendants.  *See In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023), *aff'd*, 2024 WL 4688894 (9th Cir. Nov. 6, 2024).  This is yet another example demonstrating that complex securities class action litigation is highly uncertain, and success in cases like this one is never assured.  *See infra*, ¶88.

53.     Moreover, even if Lead Plaintiff succeeded in proving all elements of her case at trial and obtained a jury verdict, Defendants would almost certainly have appealed.  An appeal not only would have renewed the risks faced by Lead Plaintiff—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and increased litigation costs. Given these significant litigation risks, Lead

Plaintiff and Lead Counsel believe the Settlement represents a fair result for the Settlement Class.

54.    In addition to the risks of continued litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  If Lead Plaintiff had fully prevailed in their claims at the trial stage, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best-case scenario—estimated total maximum aggregated damages would be $141.2 million.  *See* Declaration of Kenneth N. Kotz (ECF No. 121-2), ¶¶17-18. Thus, the $23.0 million Settlement represents a recovery of approximately 16.3% of the maximum likely recoverable damages assuming Lead Plaintiff's claims were sustained in full and proven for the entire Settlement Class Period, which falls well above the 1.2% median settlement value for all securities class actions settled in 2024. *See* Ex. 2 (Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation, 2024 Full-Year Review, at 27 (Fig. 24) (NERA Jan. 22, 2025) ("NERA Report") (median recovery in securities class actions in 2024 was approximately 1.2% of estimated damages). NERA data from 2015-2024, broken down by percentage of recovery relative to size of damages, further confirms that this Settlement is favorable. *See id.* at 26, Fig. 23.

55.    Finally, even if Lead Plaintiff prevailed at trial and appeal, continued litigation presented risks of collectability as Defendants, including Azure, are all located in India,[4] and Azure's future ability to pay is not assured, particularly given Azure's delisting (*inter alia*, impacting its access to international capital markets), and its insurers' denials of coverage.  If the litigation continued for several more years through trial and appeals, there is a possibility that

---

[4] *See, e.g.,* https://www.jdsupra.com/legalnews/out-of-the-frying-pan-the-complexity-of-79646/ ("Victory in a U.S. court against an Indian entity can quickly become bittersweet if the judgment needs to be enforced in India[]"; noting that difficulties in enforcing non-arbitration awards stem partly from the U.S. being a "non-reciprocating territory[]").

Azure would be in a more difficult financial situation and have less of an ability to fund the Settlement.

### F.  The Complexity, Expense and Duration of Continued Litigation

56.    As noted, securities class actions are notoriously complex, lengthy, and expensive to litigate.  However, this Action presented particular complexities, costs and likely delays, even more than the usual securities class action. First, the subject matter of the Action was complicated, including complex power contracts, alleged bribery schemes, and accounting restatement issues. Second, it focuses on complex emerging solar technology-based operations in India.  Most of the discovery would be foreign discovery, with most of the key witnesses residing overseas, and a significant part thereof would require the issuance of Letters Rogatory or similar methods that could take years to result in document production—much less schedule, compel and take depositions.  Besides taking an inordinate amount of time, foreign discovery concerning both the Defendants and third parties would be unusually expensive and require translation from and into the various Indian dialects implicated in this case, for, *e.g.*, document analysis and deposition testimony, trial or appeal, further adding to costs and delays.

57.    Even under the best of circumstances, assuming Lead Plaintiff prevailed on the motions to dismiss, the claims were certified under Rule 23 (and not reversed on a Rule 23(f) interlocutory appeal or a subsequent motion for class certification), and survived summary judgment, litigating the Action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor. Were the litigation to continue, a potential recovery—if any— would occur years from now, substantially delaying payment to the Settlement Class. Further, enforcing any judgment in India could prove difficult and expensive.  By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class, without exposing the

Settlement Class to the risk, expense, and delay of continued litigation.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM

58.    The Preliminary Approval Order directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class, in addition to the online posting of the Notice and Claim Form, and the publication of the Summary Notice.[5]  ECF No. 123.  The Preliminary Approval Order also set a deadline of August 15, 2025 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Attorneys' Fee Motion or to request exclusion from the Settlement Class, and set a final fairness hearing date of September 5, 2025 (the "Settlement Hearing").

59.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Angeion, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the dissemination of the Postcard Notice, Lead Counsel instructed Angeion to post downloadable copies of the Notice of Pendency of Class Action and Proposed Settlement, Settlement Hearing and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release (the "Claim Form") online at www.AzureSecuritiesSettlement.com (the "Settlement Website").[6] Upon request, Angeion mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

60.    The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access

---

[5] A copy of the Postcard Notice is attached as Exhibit A to the Angeion Decl., which is Ex. 1 hereto.
[6] Copies of the Notice and Claim Form are attached, respectively, as Exhibits B and C to the Angeion Decl.

downloadable versions of the Notice and Claim Form.  The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Attorneys' Fee Motion, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of litigation expenses in an amount not to exceed $150,000, and to apply for an award of up to $10,000 for the Lead Plaintiff for her time and expenses related to their representation of the Settlement Class. *See* Ex. 1-B at pp. 2, 8.

61. On April 10, 2025, Angeion received the names and addresses of potential Settlement Class Members from Defendants, pursuant to paragraph 8 of the Preliminary Approval Order (the "Record Holder List").  Angeion Decl. ¶5.

62. In addition, Angeion maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees ("Broker Database").  *Id.* at ¶6. On May 21, 2025, Angeion caused the Postcard Notice to be sent by email or first class mail to the combined email and/or physical mailing addresses whose mailing records were contained in the Record Holder List and the Broker Database (*id.*).

63. Additionally, Angeion provided a copy of the Notice and Claim Form to Depository Trust Company ("DTC"), for posting on its Legal Notice System ("LENS"), which may be accessed by any nominee that participates in the DTC's security system, and provides DTC participants the ability to search and download legal notices and receive email alerts based on particular notices, or security identifiers (CUSIPs).  The Notice and Claim Form were posted on

22

DTC's LENS on May 22, 2025. *Id.* at ¶7.

64.    Through July 30, 2025, Angeion received a total of 1,530 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees. *Id.* at ¶9. Angeion also received requests from brokers and other nominee holders for 11,289 total additional Postcard Notices or Notice and Claims Forms to be forwarded by the nominees to their customers. *Id.* at ¶10.

65.    In sum, as of July 30, 2025, a total of 22,467 Postcard Notices have been disseminated to potential Settlement Class Members and their nominees, including 11,498 sent via email and 10,969 sent via First-Class Mail. *Id.* at ¶11.

66.    On Thursday, May 22, 2025, and Monday, June 2, 2025, in accordance with the Preliminary Approval Order, Angeion caused the Summary Notice to be published once over *PR Newswire*, and once over the *Business Wire* newswire service, respectively. *Id.* at ¶12; Exs. 1-D and 1-E (copies of publication confirmations).

67.    Lead Counsel also caused Angeion to establish the Settlement Website, which became operational on May 21, 2025, and maintain a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement, including how to submit a claim form online and download copies of the Notice and Claim Form, as well as where to obtain copies of the Stipulation, Preliminary Approval Order, and the Complaint. *Id.* at ¶¶13-14.

68.    The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Attorneys' Fee Motion or to request exclusion from the Settlement Class is August 15, 2025. To date, not one request for exclusion has been received. *Id.* at ¶17. Angeion will file a supplemental declaration after the August 15, 2025, opt-out deadline addressing whether any requests for exclusion have been received. *Id.* In addition, to date, no objections to

23

the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Lead Counsel. *Id.* at ¶18. Lead Counsel will file reply papers by August 29, 2025, that will address any objections that may be received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

69.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (*i.e.*, the $23 million Settlement Amount, plus interest earned thereon less (i) Court-awarded attorneys' fees and expenses (any Court-awarded Lead Plaintiff Award); (ii) Notice and Administration Expenses; (iii) Taxes and Tax Expenses; and (iv) any other fees or expenses approved by the Court), must submit a valid Claim Form with all required information postmarked or received no later than August 29, 2025. *See id.*, Ex. 1-B (Notice), p.3 & p.6 Q.7. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation approved by the Court. *Id.*, p.11.

70.    The proposed Plan of Allocation is detailed in the Notice. *Id.*, pp.11-15. The Notice is posted online on the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses due to the alleged violations of the Exchange Act, and takes into consideration when each Authorized Claimant purchased or otherwise acquired and/or sold Azure shares. *Id.*, p.10.

71.    As stated in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial, or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to

weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See id.*, p.11.

72.     The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. In developing the Plan of Allocation, Lead Plaintiff's expert calculated the amount of estimated artificial inflation in the price of Azure equity shares related to Defendants' alleged false and misleading statements in this Action by considering the price changes in such shares in reaction to the alleged corrective disclosures, adjusting for price changes attributable to market and industry factors and litigation risk. *Id.* at 12-14.[7]  Under the Plan of Allocation, claimants who have an overall market gain are not eligible for a recovery. *Id*.

73.     Authorized Claimants with Recognized Losses will receive distributions based on their *pro rata* share of the Net Settlement Fund, in proportion to their total Recognized Losses. *Id.* at 11, 14. Lead Counsel believe that the Plan of Allocation, which is similar to numerous other plans in similar securities fraud class action cases, provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action and who submit valid claims.  *Id.* p.11-12.

74.     If the prorated payment to be distributed to any Authorized Claimant is less than

---

[7] As an example of the adjustments made for litigation risk, the Notice (p.12, n.3) states that the Plan of Allocation calculates the Recognized Loss for all shares purchased between January 1, 2020 and January 16, 2020, by discounting the difference calculated in Sections II.a. or II.b. of the Plan of Allocation by 90% (*i.e.*, multiplying by one-tenth). As set forth in Section VIII., the Plan of Allocation applies a similar 90% discount when calculating the Recognized Loss for each share purchased on or after July 14, 2023, and still held as of November 20, 2024. These discounts are made in recognition of the fact that, under the federal securities laws, establishing Defendants' liability with respect to the time periods referred to in Sections II. and VIII. of this Plan of Allocation would be difficult.

$10.00, no distribution will be made to that Authorized Claimant. *Id.* p. 11. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater.  In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.[8]

75.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on their purchases or acquisitions of Azure equity shares that were attributable to the violations of the Exchange Act alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

76.     As noted above, as of July 30, 2025, a total of 22,467 Postcard Notices have been disseminated to potential Settlement Class Members and their nominees. *See* Angeion Decl. at ¶11.  To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.  LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES AND LEAD PLAINTIFF'S AWARD

77.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a total fee award of 33⅓% of the Settlement Fund (or $7,666,666.67, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also request reimbursement of their out-of-pocket litigation expenses incurred in connection with the

---

[8] Pursuant to the terms of the Stipulation, ¶7.5, if funds remain after an initial distribution to Authorized Claimants due to uncashed or returned checks or other reasons after at least six (6) months from the date of initial distribution of the Net Settlement Fund, the Claims Administrator will conduct subsequent distributions, as long as they are cost-effective. At such time as it is reasonably determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, Lead Counsel shall propose a non-sectarian, non-profit for a *cy pres* distribution to the Court for approval.

prosecution of the Action in the amount of $107,069.18, and request an award of $10,000 to the Lead Plaintiff for her costs, including time incurred in connection with her representation of the Settlement Class. Each of these amounts was described in the Notice. The legal authorities supporting a 33⅓% fee award and the requested expenses are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith, and the requested litigation expense amount is well below the maximum expense amount of $150,000 set forth in the Notice. The primary factual bases for the requested fee and reimbursement of litigation expenses and Lead Plaintiff's award are summarized below.

### A. The Fee Application

78.    Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate Lead Counsel for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm also minimizes unnecessary drain on the Court's resources. Notably the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.

79.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Attorneys' Fee Motion, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable

27

settlements in this Circuit.

**1. The Outcome Achieved is the Result of the Significant Time and Labor That Lead Counsel Devoted to the Action**

80.    As described in greater detail above, Lead Counsel devoted substantial time to the prosecution of the Action. Among other things, the work Lead Counsel performed in this Action included: (a) review and analysis of (i) Azure's filings with the SEC; (ii) public reports, news articles, and research reports prepared by market analysts concerning Azure; (iii) transcripts of investor calls conducted by Azure's management; (iv) press releases issued by and about Azure, and conducting a further, extensive international investigation into the claims asserted in the Action, consulting with an expert in market efficiency, loss causation and damages, and working with private investigators in the United States and overseas, including India, to interview former Azure employees, industry sources, research legal records, and conduct in-depth investigation of Azure's business in India; (b) drafting and filing a detailed First Amended Complaint based on that investigation, which included: (i) new evidence based on information obtained through the use of private investigators, including through witness interviews and in-depth investigation of Azure's operations in India; (ii) additional false statements; (iii) new theories concerning the falsity behind Defendants' statements; and (iv) allegations based on additional SEC filings; (c) conducting further investigation and drafting the SAC (ECF No. 80), based on, *inter alia*, new revelations in Azure's SEC filings, and extending the class period an additional eleven months from that in the initial complaint; (d) drafting a third amended complaint based on new information obtained from the Indictment and the two parallel SEC complaints, and which extended the class period back an additional 18 months from the class period in the initial complaint, and was being finalized as the parties reached agreement to settle this Action; (e) preparing multiple submissions for pre-motion conferences in connection with Defendants'

28

anticipated motions to dismiss, and participating in court conferences; (f) briefing and opposing Defendants' joint motion to dismiss; (g) engaging in discovery, which included reviewing documents produced by Defendants and serving a FOIA request; (h) consulting extensively throughout the litigation with experts and consultants in loss causation, damages, and market efficiency; (i) preparing for and engaging in a full-day mediation session overseen by Ms. Yoshida, which involved the exchange of detailed pre-mediation submissions concerning the facts of the case, liability, and damages, and consultation with damages experts; (j) analyzing Azure's financial status in connection with evaluating a potential settlement; and (k) engaging in weeks of follow-up negotiations with Ms. Yoshida, Defendants' Counsel and counsel for the controlling shareholder, CDPQ, which ultimately resulted in the Settlement.

81. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As lead attorney on the case, I personally monitored and maintained control of the work performed by other lawyers at Levi & Korsinsky throughout the litigation. Other experienced attorneys at my firm were also involved in the drafting, reviewing and/or editing of pleadings, motion papers and other significant court filings, court appearances, the mediation process, the settlement negotiations and in negotiating the terms of the Stipulation, and other matters. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

82. Attached hereto as Exhibit 3 is my declaration in support of Lead Counsel's motion for attorneys' fees and reimbursement of expenses (the "Fee Declaration"). The Fee Declaration includes a schedule summarizing the lodestar of the firm, which is sole Lead Counsel. The Fee Declaration includes the amount of time spent on the Action by the attorneys and professional support staff of Lead Counsel and the lodestar calculations based on their current hourly rates.

The Fee Declaration was prepared from contemporaneous daily time records regularly maintained and prepared by the firm.

83. As set forth in Exhibit 3, Lead Counsel expended a total of 4,843.15 hours in the investigation and prosecution of the Action. The resulting lodestar is $3,118,646.25. The requested fee of 33⅓% of the Settlement Fund thus represents a multiplier of approximately 2.45 to Lead Counsel's lodestar.

84. The above amounts do not include the additional time that Lead Counsel will devote overseeing and assisting in the administration of the Settlement, for which Lead Counsel will not be paid. This work will include answering questions posed by Settlement Class Members about the Settlement and the distribution of the Settlement proceeds, overseeing the work performed by the Claims Administrator, addressing any questions or disputes raised by Settlement Class Members about the allocation of the Settlement proceeds, and drafting and filing motions for distribution of the Net Settlement Fund.

85. As discussed in further detail in the Fee Memorandum, the requested multiplier is at the low end of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere, and is particularly appropriate under the circumstances of this case.

### 2. The Significant Risks Borne by Lead Counsel

86. This prosecution was undertaken by Lead Counsel on an entirely contingent-fee basis. As discussed above in connection with the litigation risks supporting approval of this Settlement, from the outset, this Action was an especially difficult, complex and highly uncertain securities case. There was no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and money the case would require, especially as the named

Defendants and the focus of discovery were located overseas, primarily in India. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the investigation and prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a complex, internationally-focused case like this one, which presented formidable discovery challenges including in seeking, obtaining, and facilitating translation of foreign discovery, were covered. Moreover, with an average lag time of many years for complex cases like this to conclude— putting aside the additional lag time and complexities of foreign discovery—the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly basis. Indeed, Lead Counsel have received no compensation since the initiation of this Action some three years ago, and Lead Counsel have incurred $107,069.18 in hard out-of-pocket litigation-related expenses in prosecuting the Action.

87.    Additionally, Lead Plaintiff and Lead Counsel developed and alleged their claims in the Complaint without information gained through government or regulatory actions, and were hindered by the PSLRA's automatic discovery stay and the fact that much of their investigation for the Complaint was required to be conducted abroad.

88.    Finally, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured and the risks are high. As noted above in the discussion of litigation risks in this case favoring Settlement approval, Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement, whether on a motion to dismiss, at summary judgment, at trial, or even on post-trial appeals. *See In re Tesla*, 2023 WL 4032010 (defendants prevailed at trial despite summary judgment for plaintiffs on falsity and scienter, and SEC settlement based on same alleged conduct); *see also In re Mylan N.V. Sec.*

*Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (defendants prevailed on summary judgment despite DOJ and state Attorney General prosecutions); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict reversed on appeal and judgment entered for defendant).

89.    Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

### 3.  The Experience and Standing of Lead Plaintiff's Counsel and the Standing and Caliber of Defendants' Counsel

90.    Lead Counsel's firm resume is attached as Exhibit 3-A. As reflected therein, Levi & Korsinsky is among the most experienced and successful securities class action law firms in the country.  Over the last few years, Levi & Korsinsky has been lead or co-lead counsel in more than 50 securities class actions that have resulted in over $300 million in recoveries for investors. Since 2020, Levi & Korsinsky has consistently ranked in the Top 10 in terms of number of settlements achieved for shareholders each year, according to reports published by *ISS*. Levi & Korsinsky was also ranked as one of the Top 5 Securities Firms for the period from 2018 to 2020 in *Lex Machina's* Securities Litigation Report. Recent class recoveries include a $80 million recovery in *In re Grab Holdings Ltd. Securities Litigation*, No. 1:22-cv-02189-JLR (S.D.N.Y.); a $47.5 million recovery in *In re QuantumScape Securities Class Action*, No. 3:21-cv-00058-WHO (N.D. Cal.); a $40 million recovery in *In re U.S. Steel Consolidated Cases*, No. 2:17-579-CB (W.D. Pa.); and $24.6 million recovery in *Kohl v. Loma Negra Industrial Argentina Sociedad Argentina*, Index, No. 653114/2018 (Sup. Ct., N.Y. Cty.). Other notable recoveries include a $79 million recovery in *E-Trade Financial Corp. Sec. Litig.*, No. 07-cv-8538 (S.D.N.Y); and a $522 million recovery for shareholders in *In re Google Inc. Class C Shareholder Litigation*, C.A. No.

7469-CS (Del. Ch.).

91.    Further, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Dentons US LLP, Willkie Farr & Gallagher LLP and Covington & Burling LLP, all among the most prestigious and well-respected defense firms in the country, who vigorously and ably defended the Action at every turn. In the face of this experienced and formidable opposition, Lead Counsel were able to develop strong claims, litigate and prosecute them successfully, and negotiate with Defendants to settle the case on terms favorable to the Settlement Class.

### 4.    Public Policy Interests, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Case

92.    Courts consistently recognize that it is in the public interest to have experienced and able counsel available to enforce the securities laws and regulations governing the duties of officers and directors of public companies. For this important public policy to be realized in practice, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks such counsel undertake in prosecuting a securities class action on a contingent-fee basis. Relatedly, it is long-recognized public policy that settlements are to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements on behalf of litigants who—absent the class action mechanism—would be economically unable to prosecute such actions.

### 5.    The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

93.    As noted above, notice has been provided to at least 22,467 potential Settlement Class Members or their nominees informing them that Lead Counsel would apply for an award

33

of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund plus a proportionate amount of interest accrued while the Settlement Fund has been held in Escrow. Angeion Decl. ¶11, Exs. A (Postcard Notice), B (Notice) thereto. To date, no objections to the attorneys' fees request specified in the Postcard Notice and Notice have been received or entered on this Court's docket.  Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by August 29, 2025. Moreover, the Lead Plaintiff supports the requested fee award.  *See* Lokman Decl. ¶¶10-11 (Ex. 4).

### B.  Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

94.    Lead Counsel seek a total of $107,069.18 in reimbursement of out-of-pocket litigation expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action, to be paid from the Settlement Fund. *See* Ex. 3, ¶5 (expense chart, listed by category).

95.    The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of litigation expenses in an amount not to exceed $150,000. The total amount requested by Lead Counsel thus falls well below the $150,000 that Settlement Class Members were advised could be sought. To date, no objections have been raised as to the expenses set forth in the Postcard Notice and Notice.  If any objection to the request for reimbursement of litigation (or any other) expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

96.    From the outset of the Action, Lead Counsel were aware that they might not recover any of their out-of-pocket expenses and, even in the event of a recovery, would not recover any such expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award

of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action. Accordingly, Lead Counsel were motivated to, and did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

97.    The largest component of expenses, $39,341.25, or approximately 36.7% of the total out-of-pocket expenses, was incurred for the retention of experts in the fields of market efficiency, loss causation and damages. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, the opposition to Defendants' motion to dismiss, reports on damages, on matters relating to the preparation of the mediation submissions and responses thereto, negotiation of the Settlement, and on the preparation of the proposed Plan of Allocation and review of the Claim Form.

98.    The next-highest expenditure, $34,059.38, was paid to Kroll Associates, Inc., a private investigator firm, for international investigation services that were critical to the development of the facts alleged in the Complaint (including the First Amended Complaint and the SAC). This expense constituted approximately 31.8% of the total out-of-pocket expenses.

99.    The next-highest expenditure, $14,225.00, was incurred in mediation service fees paid to Phillips ADR Enterprises for the services Ms. Yoshida provided in connection with the full-day mediation and subsequent weeks of negotiations of the Settlement. This expense constituted approximately 13.2% of the total out-of-pocket expenses.

100.    Lead Counsel also paid a total of $6,234.23 for process service fees, which in this case were more extensive than usual since some of the service of process was effected internationally.

101.    The other litigation expenses for which Lead Counsel seek reimbursement are the

35

types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things, court fees, court reporting fees, travel costs, postage and delivery expenses, and the costs of online research, including Westlaw, LEXIS, and/or Capital IQ.

102.    All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by the Lead Plaintiff. *See* Lokman Decl. ¶12 (Ex. 4). Moreover, as noted, all potential Settlement Class Members were told in the Postcard Notice and Notice that Lead Counsel would seek up to $150,000 in reimbursement of out-of-pocket litigation expenses, and to date there have been no objections.

**C.  The Lead Plaintiff Award is Fair and Reasonable and Should Be Approved**

103.    Finally, Lead Plaintiff seeks reimbursement of the reasonable costs she incurred directly in connection with her representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum. Specifically, Lead Plaintiff seeks an award of $10,000, which is modest in comparison to her efforts and the size of the Settlement she was able to obtain for the Settlement Class. *See, e.g., Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *11 (S.D.N.Y. Sept. 29, 2022) ("Plaintiffs' requested awards are commensurate with the level of their involvement in the Action, and, further, the awards only represent approximately 0.3% of the total settlement amount.").

104.    As detailed in her declaration (*see* Ex. 4), Lead Plaintiff was highly involved in the litigation and communicated regularly with Lead Counsel. She made herself freely available to perform her representative functions, including often speaking and emailing with Lead Counsel. The tasks performed by Ms. Lokman in executing her duties and responsibilities as Lead Plaintiff

36

in this Action included, among others: (a) reviewing the relevant court papers in the case; (b) communicating with Lead Counsel via email and videoconference about case developments and litigation strategy; (c) gathering documents for preservation and production in response to Defendants' anticipated discovery requests; (d) preparing for the mediation, including discussing with Lead Counsel the Parties' mediation submissions, as well as mediation strategy; (e) participating in the full-day mediation session; (f) considering the mediator's recommendation, conferring with counsel in the weeks during which the Settlement was being negotiated, and ultimately approving the Settlement; and (g) communicating with counsel regarding the process of finalizing the Settlement.

105.    A true and correct copy of Lead Plaintiff's Declaration attesting to these facts is attached hereto as Exhibit 4.  To date, no objections to the Lead Plaintiff Award, which was also specifically disclosed in the Notice, have been received.

## VII.    CONCLUSION

106.    For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 33⅓% of the Settlement Fund plus interest accrued thereon while said amount was in escrow should be approved as fair and reasonable, and the request for reimbursement of Lead Counsel's out-of-pocket litigation expenses in the amount of $107,069.18 plus interest, and the Lead Plaintiff Award, in the amount of $10,000, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated:  August 1, 2025

/s/ Shannon L. Hopkins
Shannon L. Hopkins

37